1     UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
2              AT TACOMA

3

4  UNITED STATES OF AMERICA,      )   Docket No. CR05-5828FDB
                                  )
5         Plaintiff,              )   Tacoma, Washington
                                  )   February 12, 2008
6  vs.                            )
                                  )
7  BRIANA WATERS,                 )   VOLUME 2
                                  )
8         Defendant.              )
   _____)
9

10

11                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE FRANKLIN D. BURGESS
      SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12

   APPEARANCES:
13

   For the Plaintiff:       MARK N. BARTLETT
14                          ANDREW C. FRIEDMAN
                            Assistant United States Attorney
15                          700 Stewart Street, Suite 5220
                            Seattle, Washington 98101-1271
16

   For the Defendant:       ROBERT BLOOM
17                          Attorney at Law
                            3355 Richmond Boulevard
18                          Oakland, California 94611

19                          NEIL M. FOX
                            Cohen & Iaria
20                          1008 Western Ave., Suite 302
                            Seattle, Washington 98104
21

22  Court Reporter:         Teri Hendrix
                            Union Station Courthouse, Rm 3130
23                          1717 Pacific Avenue
                            Tacoma, Washington  98402
24                          (253) 882-3831

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

1                          I N D E X

2   OPENING STATEMENTS:                                    Page

3         By Mr. Friedman...................................  71
          By Mr. Bloom.....................................  107
4
                        INDEX OF WITNESSES
5                       ==================

6   WITNESS ON BEHALF OF PLAINTIFF:                        Page

7   JOHN COMERY
          Direct by Mr. Friedman.........................  150
8         Voir Dire by Mr. Fox...........................  202
          Direct Continued by Mr. Friedman...............  202
9
                        INDEX - EXHIBITS
10  EXHIBITS                                               Page

11  No. 211                                                165
    No. 212-A                                              166
12  No. 212-B                                              167
    No. 212-C                                              169
13  No. 212-D                                              169
    No. 212-E                                              170
14  No. 212-F                                              172
    No. 212-G                                              173
15  No. 212-H                                              173
    No. 212-I                                              175
16  No. 212-L                                              177
    No. 212-M                                              178
17  No. 212-N                                              178
    No. 212-O                                              180
18  No. 213                                                183
    No. 221                                                188
19  No. 222-A                                              190
    No. 222-D                                              190
20  No. 222-E                                              190
    No. 222-F                                              191
21  No. 222-G                                              191
    No. 222-H                                              193
22  No. 222-I                                              193
    No. 222-J                                              194
23  No. 222-K                                              195
    No. 222-L                                              196
24  No. 222-N                                              196
    No. 222-Q                                              197
25  No. 222-O                                              199
    No. 222-P                                              199

1              INDEX - EXHIBITS

2    EXHIBITS                                          Page
     No.   222-S                                       200
3    No.   223                                         202
     No.   231                                         207
4    No.   232-A                                       209
     No.   232-B                                       210
5    No.   232-C                                       210
     No.   232-D                                       211
6    No.   232-E                                       212
     No.   232-F                                       213
7    No.   242-B                                       215
     No.   242-C                                       216
8    No.   242-D                                       216
     No.   242-E                                       217
9    No.   242-F                                       218
     No.   242-G                                       218
10   No.   242-I                                       219
     No.   233                                         222
11   No.   251                                         225
     No.   252-A                                       226
12   No.   252-B                                       226
     No.   252-E                                       227
13   No.   252-H                                       227
     No.   252-K                                       228
14   No.   252-M                                       229
     No.   252-N                                       230
15   No.   252-P                                       231
     No.   253                                         232
16   No.   261                                         235
     No.   262-C                                       236
17   No.   262-E                                       236
     No.   262-G                                       237
18   No.   262-H                                       238
     No.   262-M                                       239
19   No.   262-O                                       240
     No.   263                                         241
20   No.   262-Q                                       242
     No.   281                                         244
21   No.   282-B                                       245
     No.   282-C                                       246
22   No.   282-D                                       246
     No.   282-E                                       247
23   No.   282-F                                       247
     No.   282-H                                       248
24   No.   282-K                                       249
     No.   282-L                                       250
25   No.   282-N                                       253
     No.   283                                         254

1                TUESDAY, FEBRUARY 12, 2008 - 9:00 A.M.

2                         * * *

3    (Jury not present.)

4        THE CLERK:  This is in the matter of United States of

5  America versus Briana Waters, cause CR05-5828FDB.

6    Counsel, please make an appearance for the record.

7        MR. FRIEDMAN:  Good morning, Your Honor, Andrew

8  Friedman and Mark Bartlett for the United States.

9        MR. BARTLETT:  Good morning, Your Honor.

10       THE COURT:  Good morning.

11       MR. FOX:  Neil Fox on behalf of Ms. Waters, who's

12  present.  Mr. Bloom stepped out for a second.

13       THE COURT:  All right.  I guess we are ready to

14  proceed.

15    Let me mention one thing about the hours.  As I mentioned,

16  8:30, if there's anything the Court should take up, I will

17  take it up at that time.  Ms. Waters, that means the appointed

18  time I give the attorneys, I need you here also so you can

19  hear what is taking place.  If I tell them 8:30, that means

20  8:30 for you, too, so you can hear everything that is going on

21  and taking place.

22    Mr. Fox, I will leave it up to you and Mr. Bloom to take

23  care of that end of it.  All right.

24       MR. FOX:  Your Honor, we had something briefly that I

25  talked to Ms. Miner about yesterday afternoon, and she

1  informed me that the Court's ruling actually took care of that
2  issue, so I am not -- the reason I had originally to come
3  early is now moot.
4      THE COURT:  All right.  I believe they pointed the
5  order out.
6      MR. BARTLETT:  There is one minor matter that won't
7  take over a minute.
8      THE COURT:  All right.
9      MR. BARTLETT:  If I could note it to the Court.
10  Yesterday for the first time we heard from Mr. Fox that during
11  their trial they anticipated perhaps going into two areas;
12  that agents of the Federal Bureau of Investigation might have
13  changed their testimony or tailored their testimony because
14  they were worried about first an OPR, Office of Professional
15  Responsibility investigation and/or a civil lawsuit based on
16  their actions.  I want Mr. Fox and Mr. Bloom to be aware if
17  that issue were to be raised, which of course is totally
18  within their realm and choices to be made, it is the
19  government's strong position that that would open up the door
20  to subjectively what our agents knew.  For example, Special
21  Agent Halla knows a huge amount of information that
22  overwhelmingly leads to Ms. Waters' guilt, some of which -- a
23  fair amount of which is not admissible during this trial.
24      For example, Chelsea Gerlach, before she was sentenced in
25  Oregon, told us that she and Ms. Waters wrote the communiqué

1   in relation to one of the GE actions involving Oregon state.
2   In fact, in relation to that Oregon state action, she obtained
3   the rental car, the car used in the action, just as she did
4   for the University of Washington.

5       There are a number of other issues -- Ms. Gerlach, after
6   she was sentenced in Oregon and got her deal, suddenly got
7   cold feet and doesn't want to testify.  But if the issue is
8   what is in Mr. Halla's mind, is he worried about a civil
9   lawsuit, is he worried about an OPR investigation, he of
10  course would have to explain to the jury that, "No, I am not
11  worried about it, because I know all of these other things
12  that lead me to conclude beyond any doubt that Ms. Waters is
13  guilty."

14      That is an area, obviously, that we would love to get
15  into, but I want them to be aware of, they might want to tread
16  lightly, Your Honor.  If it's brought up in the opening
17  statement, we would plan to introduce it in our case-in-chief.

18          THE COURT:  I mentioned about the complaint, and the
19  Court's position on it.  They assured me that that would not
20  be an issue, that it would not be raised.  So I would hold
21  them to that.  Mr. Bloom is not here, and I am sure Mr. Fox,
22  being his cohort, will explain all of this to him.  If it
23  comes up, then the Court has got to rule on it.

24      So I will deal with that when there's an issue.  Right now
25  it is premature for this court to deal with anything like

1 that. So I will wait and see what happens. If it becomes an

2 issue, so be it. I can't control that. It sounds like the

3 ball is in the defendant's court, so we will see what happens.

4     All right. Are we ready for the jury now to opening?

5         MR. FOX: Your Honor, I guess I am concerned because

6 Mr. Bloom left briefly because he forget something at his

7 hotel, and he's not here. I don't know what to say at this

8 point.

9         THE COURT: You can repeat what I said.

10         MR. FOX: Can we wait 15 minutes?

11         THE COURT: Mr. Bloom -- I can't go on his schedule.

12 It seems like he's got a schedule I am not approving of.

13     We are going to start. I will give you a couple minutes,

14 because I am sure we will have a break once the government has

15 given their opening. Then you and Mr. Bloom can have your

16 tete-a-tete as to this whole thing.

17         MR. BARTLETT: Could I grovel a little bit, Your

18 Honor. This is going to be a long trial. On appeal, if there

19 is an appeal in this case, I don't want to have to deal with

20 an issue involving Mr. Bloom not being here during the

21 opening.

22     I know the Court is very concerned about wasting the

23 jurors' time, as is the government. We want to get this case

24 over as soon as possible, but if we could indulge just perhaps

25 10 minutes, maybe we could make it up later in the day.

1          THE COURT:   Mr. Bloom -- I don't have a rope to tie

2     him to things.

3          MR. FOX:   Neither do I.

4          THE COURT:   He seems like he's got his own marching

5     orders.   The intent as I see, he moving in a way I don't buy.

6          MR. BARTLETT:   He indicated that he forgot his

7     opening.

8          THE COURT:   He said, I believe the word that got to

9     me, was seven minutes away.   Well, by whose count?

10         MR. FOX:   Your Honor, I don't normally like to

11    apologize for things I haven't done, but I will apologize on

12    behalf of Mr. Bloom.   And I would ask the Court --

13         THE COURT:   Are you also asking me to repeat what I

14    just said to him so he can be here to hear this?

15         MR. FOX:   I will tell him that.   But I think it would

16    probably be ineffective assistance of counsel under the Sixth

17    Amendment for the person giving the opening statement not to

18    be present during opposing counsel's opening statement.

19         THE COURT:   When I tell you folks to be here at 8:30

20    and be prepared and you can't remember to either put your

21    clothes on or bring --

22         MR. FOX:   Your Honor, you are asking me --

23         THE COURT:   Well, you are evidently speaking for him.

24         MR. FOX:   I am at this moment, and I apologize.

25         THE COURT:   Let's take a recess.   See if you can find

1   him.

2          THE CLERK:   All rise, Court is in recess.

3      (Brief recess.)

4      (Jury not present.)

5          THE COURT:   All right, you may be seated.

6          MR. BLOOM:   First, apologies; I forgot my notes.

7          THE COURT:   He's apologized for you but we will talk

8   about that.   Are we then ready to proceed?

9          MR. FRIEDMAN:   We have one issue concerning exhibits

10  Mr. Bloom intended to use in his opening.   We had raised

11  yesterday, and the Court ruled on our motion to prevent the

12  defense from using notes taken by agents during interviews and

13  reports written by agents during those interviews, because

14  they are not likely to come in.   They would only come in if

15  they were prior inconsistent statements.   We don't expect

16  that.   My understanding is Mr. Bloom intends to hand write the

17  same exact thing and do that.   I think it's a clear invasion

18  of the Court's order.   We wanted to give a notice that we

19  object to that, and we ask the Court to instruct him that he

20  not be permitted to do that.

21         THE COURT:   I mentioned to all of you in the pretrial

22  conference what was permissible.   I also cautioned you about

23  what you may refer to in opening that may be problematic down

24  the line.   I am not going to ask you to build into the record

25  doing something I told you not to.   If that's a consequence

1    you have to offer, you will suffer it down the line.

2        Let me say one thing too -- obviously it's 9:30.  I wanted

3    to have the jury in the box at 9:00.  You said you forgot your

4    notes.  From here on, I want you here at 8:30.  You and your

5    client.  And we will take up anything that needs to be taken

6    up.  If you are not here, Mr. Bloom, the Court is going to

7    proceed.  I am giving you notice that I expect you to be here

8    unless I get a call that you got hit by a truck out there or

9    something, then I am going to proceed.

10       Mr. Fox was here and he was ready to go.  He pleaded your

11   case very well but that's not the issue, because he's raising

12   questions about whether it's an issue of right to counsel and

13   all of that.  Those issues are being raised.

14       I assume, and is it fair to say he's talked to you about

15   what I said about all of that?

16           MR. BLOOM:  Not yet.  I just got here.

17           THE COURT:  Do you understand what I am saying?  I

18   want to start on time, and I want you and your client here to

19   do that.

20           MR. BLOOM:  Sure.

21           THE COURT:  She's here.  I don't want to have to run

22   around and try to find you or have the Marshals try to track

23   you down or do anything like that.  Okay?

24       All right, let's bring the jury in.

25       (Jury present.)

1          THE COURT:   You may be seated.

2      Okay.   Good morning to you.   I trust my admonitions to

3  you, that you went home and didn't talk about the case, that

4  you complied with those requests.

5      I just want to say a couple things to you before the

6  parties get a chance to argue, and give you their opening

7  statement as to what they intend to present to you in the

8  course of this trial.

9      The way the case will be run is after they have done that,

10  will be the presentation of witnesses, where the government

11  will get a chance to call their witnesses first and examine

12  those witnesses, and the defense will get a chance to

13  cross-examine those witnesses as to their testimony.   The

14  evidence that you are to consider here would be the witnesses,

15  their testimony as to what took place here, any documents or

16  exhibits that are admitted by the Court for your

17  consideration, and any stipulations between the parties as to

18  any fact.

19      The evidence can be circumstantial or direct.   They all

20  carry the same weight and it is up to you to determine what

21  weight to give that.   What is not evidence is the argument of

22  counsel, the objections they may make to questions that may be

23  asked, and how the Court rules on those -- that's not

24  evidence.   The evidence will come by the way I mentioned:   The

25  witnesses, the exhibits and the stipulations.   You are to

determine the credibility of the witnesses, that is who to believe, and who not to believe based on what that person knows about what they are talking about, able to see and hear, and how they obtain that knowledge; able to describe and recall all of those matters, and how reasonable the testimony would be. You are to make all those assessments as the witnesses are called to testify, as you are the finders of fact here as to what took place.

As to the sentence, the matter is to for the Court to decide what that matter should be.

Keep in mind at all times, the defendant is presumed innocent. The burden of proof is on the government. They have to prove beyond a reasonable doubt that this person, this defendant, is guilty of anything.

With that, now, you will hear the opening statement. The law as to the specific instructions as to what you are to apply to the facts you find, will be given to you at the close of the case.

We will start with the government first, in terms of opening statement, and then you will hear from defense counsel.

MR. FRIEDMAN: Thank you, Your Honor.

May it please the Court: Between 1997 and 2001, a group of extremists blazed a trail of destruction across the states of Washington and Oregon.

1    They acted under the banners of the Earth Liberation Front

2  and the Animal Liberation Front, and they claimed that they

3  were protecting the environment.  They were acting to protect

4  animal rights.  But what they did was they selected buildings,

5  facilities that they thought hurt the environment and animals,

6  and they attacked them and they burned them and destroyed

7  them.

8    They didn't worry about the danger that their action

9  caused for firefighters, for people who might have been inside

10  the building.  They ignored the devastation that their actions

11  caused for the lives of all the people associated with the

12  building, people that worked there, people in the community.

13  And they paid no attention to the fact that the large fires

14  they set actually hurt the environment.

15    Instead, they just took it upon themselves to assume that

16  they were right and they were entitled to burn what they

17  wanted to.  And they left a trail of destruction; there is no

18  doubt about that.

19    In 1997, they burned a facility named Cavel West in

20  Redmond, Oregon.  You should have a picture on your monitors

21  that shows what they did to Cavel West.  They totally

22  destroyed it.

23    A few months later, that same year, they burned a Wild

24  Horse corral in Burns, Oregon, a facility operated by the

25  Bureau of Land Management, and they destroyed that.

The next year, 1998, they burned two facilities here in Washington, both in Olympia, both facilities operated by the Department of Agriculture -- something called the National Wildlife Research Center, and another building, the Animal Damage Control Center.  They burned those both the same night.

A year later, 1999, they burned Childers Meat Company, again in Oregon -- a meat packing company that they opposed, and they totally destroyed that.

Later that year, they burned a building belonging to Boise Cascade, a timber company, also in Oregon.

In 2001, they burned the headquarters of Superior Lumber Company, another timber company in Oregon.

In the spring of 2001, they conceived their biggest attack yet.  They planned to commit two arsons the same night, one in Oregon, one in Washington, hundreds of miles apart, but coordinated.

They thought by burning two things the same night in different states they would show the movement was growing; they would show they were gaining ground.  They would show they were making progress towards their goals.  They called it the double whammy.  And they assembled two teams to commit these fires, five people for each one.

The team that was to burn the University of Washington was headed by someone named William Rodgers, who was really the leader of this group, and you'll hear a great deal about him.

He went by the name Avalon. That's what others in the group knew him as.

There were five people in that group: William Rodgers; the defendant, Briana Waters -- there were five people: Avalon; the defendant; her boyfriend at the time, who's named Justin Solondz; and two other women, one Jennifer Kolar, and one named Lacey Phillabaum.

They plotted their action for weeks. They built complicated fire bombs in a building at the house that the defendant rented.

The defendant had her cousin rent a car so that they could drive from Olympia, where she lived, to Seattle to attack the Center for Urban Horticulture.

The evening before the arson, they drove that car up to Seattle. After dinner, they drove to the Center for Urban Horticulture. It's right near Husky Stadium, near the University of Washington, near a residential neighborhood. They parked in that residential neighborhood. There's a small hill, and they parked basically a block into the neighborhood on a hill looking down at the University.

The defendant stayed in some bushes at the end of the street, with a radio, to act as the lookout. The others circled around behind the building, broke into the office of Toby Bradshaw, a professor at the center and a target of their actions. At one point a policeman came by, and the defendant

radioed the others to warn them, but he left without noticing anything.

They set their fire bombs. They radioed the defendant to come pick them up. She did, and the group left.

At about 3:15 that morning, the fire broke out. The fire bombs that they had left went off and set the building on fire. It caused a huge fire.

You'll hear from two of the firemen who responded who were there fighting the fire that night. They will tell you it was something called a 311, a three-alarm fire, the biggest fire that they had fought that year. Flames were 75 feet in the air above the building. It took hours to control the fire, and by the time the firemen finally put it out, the building was totally destroyed.

What the defendant and her accomplices did that night was wrong in every way. Their target was a professor named Toby Bradshaw. They attacked him because they believed he was conducting genetic engineering of poplar trees, and they opposed that.

And you will hear from Professor Bradshaw during this case. He wasn't conducting genetic engineering of poplar trees; he was cross-breeding trees the way farmers have done for hundreds of thousands of years.

And the defendant and her accomplices didn't just destroy Professor Bradshaw's office, they destroyed the whole

building. They destroyed the offices and the labs of all of the other professors who worked there.

And you will hear from a couple of those professors. You will hear from a woman named Sarah Reichard. Her research was dedicated to conducting risk assessments that foreign species, foreign plant species, might invade and displace native plant species. She was trying to protect native plant species. And her office and her laboratory were destroyed.

You will hear there were populations in the building of endangered native plants destroyed. A library of rare botany books dating back hundreds of years -- books were damaged.

If there was one building in Seattle that helped the environment, it was probably the Center for Urban Horticulture, and yet the defendant and her accomplices decided they had the right to burn it, and they burned and destroyed it.

Ladies and gentlemen, as you probably remember from yesterday, my name is Andrew Friedman. Seated next to me at counsel table is Mark Bartlett. We are both federal prosecutors.

Also with us is Special Agent Ted Halla from the FBI. He's the case agent for this case. That's the person who is responsible for investigating, gathering evidence, and you will hear from him during the course of the trial about a number of subjects.

During the course of the trial over the next two or three weeks, we will prove to you that the defendant was one of the five people who participated in the plan to burn the Center for Urban Horticulture; that she was one of the five people present on the night of the fire, one of the five people who did this.

We will prove it through the testimony of Lacey Phillabaum and Jennifer Kolar, two of the people who were there that night. Each of them will come in and they will tell you they were one of the five arsonists; they were one of the people that did this. And each of them will tell you that the defendant was with them. She was one of the people with whom they committed this crime.

We will prove it to you through other evidence, documentary evidence and physical evidence that links the defendant to the other members of this group, to the other four people, and it links them to this crime.

Among that evidence was the rental record for the car. The defendant was the person responsible for coming up with the car for this action, and she convinced her cousin to rent that car.

You will see the record for that rental, and you will hear the testimony of her cousin who say that she suggested it; that they rented it. That on the evening before the arson, she showed up and took that car. She told them something

about where she was going that wasn't true.   And she didn't
reappear until after daylight the next day.

     She took that car to Seattle with Avalon, with Jennifer
Kolar, with Lacey Phillabaum, and with her boyfriend, Justin
Solondz, and burned the University of Washington.

     I want to begin by giving you some background about the
Earth Liberation Front, which I will sometimes call ELF, and
the Animal Liberation Front, ALF.   Some of you may have heard
of these groups, some of you may not have heard of them.

     These are groups that claim that they are trying to
protect the environment and animals, that that's their goal.
But they are not like the Sierra Club or the Audubon Society.
They don't lobby.   They don't participate in the political
process.   They don't hold demonstrations or protests.   They
claim all of those actions are ineffective.   But if you really
want to change, you have to do more than that.   There's only
one way to do that, and that's to cause damage and harm to
people with whom you don't agree.   And the best way to do that
is to burn their buildings.   So what these groups do is they
advocate, they encourage, they commit arson.

     Because they are committing crimes, they are not like
traditional organizations.   There's no membership role,
there's no public list of who belongs, there's no president
and secretary.   They are organized in cells, groups of five to
perhaps a couple dozen people.   And the members of a cell know

each other, but they don't know the members of any other cell.

The point of that is that if one cell is discovered, if one cell is exposed, those are the only people who are caught, and the rest of the group goes on committing their crimes. It's a classic structure for a terrorist or a guerilla organization.

Now, I said a moment ago that there's no central hierarchy, there's no president. There's one exception to that rule. These groups are trying to further an ideology, a position, and so they need publicity; they need people to know about what they are doing, and so they actually do have -- each one has a press office. And you are going to hear about an individual named Craig Rosebraugh in this case. During much of the relevant period he was the press officer for ELF.

When the members of a cell commit an action, when they commit a crime, they write a communiqué that says what they did, and it has some information in there that proves they are the people that did it. There will be references to the type of fuel or to the specific method by which they burned a building. And there's an explanation of why they did what they did -- a criticism of the thing that they are attacking and a threat to do it again if the victim doesn't change his behavior.

Once they write this communiqué, the communiqué is usually delivered anonymously to the press officer. It's sent to him,

and he then posts it on the web or disseminates it to
reporters, spreads it around, so that people will know what
the Earth Liberation Front -- what ELF has done or what ALF
has done, and so they will change their conduct.

The fires that I told you about when I started are all the
products of one cell. It was a prolific cell. It was headed
by Avalon, by William Rodgers. There were as many as
approximately 20 members in this cell. The defendant was one
of those members.

You are going to hear a lot about Rodgers during this
case. He wasn't formally the head, but he was the leader; he
was the person who set direction for the cell, and you are
going to hear a lot about that.

He was also an important figure in ELF overall. He wrote
a variety of manuals and books on fire, on arson. He wrote a
document called "Setting Fires with Electrical Timers." A
how-to guide, basically, to teach others how to commit arsons.
And that document, you will see, was recovered both from him
and ultimately posted on ELF's website. It was posted on the
ELF website so other cells and other people could follow
Rodger's example and commit crimes.

The way in which the members of this cell committed their
crimes made it extremely difficult to solve these arsons.
They went to tremendous lengths in preparing the crimes, in
committing the crimes; tremendous lengths to conceal their

identities, and to prevent themselves from being caught.

Initially, they conducted research to select targets, to figure out what they wanted to attack, targets that would be the type of target they could attack without being caught -- in many cases, isolated targets in rural areas.

After they had selected a target or during the process, they performed reconnaissance.  They would go and scout the target, drive by, figure out the lay of the land, figure out how they were going to do it, when was a good time to attack the target when people wouldn't be there.  Then they built complicated fire bombs -- incendiary bombs to use in their attacks.

You are going to hear a great deal about those, and you are going to hear about the evolution of those over time, but essentially they all followed a simple model.  They started with a timer; sometimes a mechanical timer, sometimes a digital timer, so that there would be a time delay.  People could set the bomb and leave before the fire broke out.

The timer would run for whatever time it was set, and when it finished that time, it would complete a circuit.  That circuit typically had a battery in it, and so as soon as it's complete, current flows from the battery.  It would flow to either a light bulb from which the glass had been removed or a model rocket igniter.

The current would heat those up, and those were placed

right next to books of match heads in most cases.  They would

light the matches, and so you would get a strong, sudden, hot

fire.

The matches would then go to the next step, be connected

to the next step; sometimes a sponge soaked in gasoline,

sometimes a road flare.

Ultimately, that next step was placed next to a gallon jug

of fuel or buckets, open buckets with fuel; gallons and

gallons of gasoline and diesel mixed together.

In many cases, the defendant and her coconspirators used

multiple devices, each one with as much as ten gallons of

fuel.

Even in building these devices, they took tremendous care

not to get caught.  They didn't just build these in the

backyard or their living room.  They would set up clean rooms,

rooms designed to avoid leaving any physical evidence linked

to the fire bombs.  They would spread plastic on the floor.

They worked using gloves and shower caps, everything they

could do to prevent leaving hair, fingerprints, DNA on the

fire bombs.

Once everything was ready, the members of this cell would

get dark clothes, dark top, dark pants, dark shoes, gloves,

usually hats.  They'd often perform a dry run, go to the

target maybe the night before, maybe the week before; go

through what was going to happen, because these actions

1    weren't committed by one person.  Each one was a team, done by
2    a team, often four to five people, and every member of that
3    team had a specific role.

4         There would be a lookout with a radio.  The other members
5    would have radios.  If the lookout saw something, they could
6    warn the others.  The team usually had a scanner or scanners
7    so they could monitor law enforcement, see if anyone was
8    coming by, monitor the response.

9         There were people whose role was to help carry the
10   devices, to get them to the scene, people whose role was to
11   set the devices.  These were carefully planned and coordinated
12   actions.

13        Finally, on the night of the action, they would head to
14   wherever it was supposed to be; typically arrive there in the
15   early morning hours, maybe 2:00 or 3:00; set their fire bombs
16   and leave.  And the fire would go off.  By the time the fire
17   went off, they were safely away.

18        Finally, because they were so successful in using fire
19   bombs and designing fire bombs that worked in setting fires,
20   they typically destroyed the target; they destroyed most of
21   the evidence they left behind.  You are going to see pictures
22   of burned fire bombs, burned devices.  Even if the clean room
23   wasn't successful, the fire destroyed fingerprints, other
24   forensic evidence that might have been there.

25        Because of all these steps, it took law enforcement years

to solve these crimes.  Agents worked -- the task force from
different agencies worked for years trying to figure out who
had committed this series of crimes.  For years, they didn't
make any progress.

In 2004, three years after the last fire I talked about,
seven years after the first fire, agents finally got a break.
They developed enough evidence to convince one of the members
of the cell to cooperate with them, and he began to provide
information.  As he did, they began to figure out who other
members of the cell were, and the whole thing started to come
apart like a chain of dominoes.  They started to figure out
who had committed the different crimes, to solve the different
crimes, to figure out who was involved.

The arson at the University of Washington was a hard one
to solve.  The first break in that case didn't come until
2005.  In 2005, investigators learned that a woman named
Jennifer Kolar had participated in Cavel West, the very first
arson they talked about that took place back in 1997.  They
approached her and suggested that they had evidence that she
had committed that crime, and Ms. Kolar decided to cooperate.
She came in for an interview.  She got a lawyer and came in
for an interview.

And investigators didn't promise her anything.  She was in
a serious situation.  They told her that she was looking at
potentially a very long sentence.  The penalty for committing

the University of Washington arson with a destructive device
could be a 35-year mandatory minimum.

Ms. Kolar had actually committed other arsons.  She was
potentially looking at even more.  The investigators didn't
promise her anything.  They said, all we can tell you is your
situation will be better if you cooperate, and we would like
you to cooperate.

And Ms. Kolar came in and she gave an interview, and she
talked about several of the arsons in which she'd been
involved.

She said that the one that she had the least clear memory,
though, was the Center for Urban Horticulture arson at the
University of Washington.  She recalled that she had committed
that arson with William Rodgers and several other people, and
she talked about other names in connection with the arson.
She talked about someone who went by the name Capitol Hill
Girl.  She speculated about Capitol Hill Girl's boyfriend and
someone by the name of Crazy Dan.

And there's no dispute in this case, on the first day --
this is December 16 of 2005 -- on the first date that she was
interviewed, Ms. Kolar never mentioned the name Briana Waters.
There's not going to be any dispute about that.  Everyone
agrees.

Three weeks later, her lawyer called the government and
said that Ms. Kolar recalled the name of the lookout.  That in

addition to herself and William Rodgers, she recalled that
Briana Waters, the defendant here, was the lookout for the
arson at the University of Washington.

This was the first time investigators had ever heard
Ms. Waters' name. She wasn't a target of this investigation;
she wasn't even on the radar screen. It was the first time
her name came up in any significant way. And investigators
began to investigate her.

You will see that within days of that conversation, Agent
Halla was requesting record checks, he was pulling her
driver's license from California, from Washington. He was
beginning to try to figure out who was Briana Waters.

He was also continuing to investigate the case. I told
you that the whole cell was coming apart, like a chain of
dominoes falling down. Agent Halla continued to interview
other people.

By mid February, he had concluded that Lacey Phillabaum
was one of the other arsonists. At that point Jennifer Kolar
still hadn't identified her, but Agent Halla concluded that
she was probably one of the other five arsonists.

So over the weekend of February 18 to the 19th, Agent
Halla contacted her family. Investigators told her, told her
father, that we had evidence that she had committed this crime
and asked her to come in and cooperate.

It was the same situation as Ms. Kolar. She wasn't given

any specific promise. She was told that her situation would
be better if she cooperated, and asked if she would do that.

On February 21, Ms. Phillabaum and her lawyer came in and
gave an interview. Ms. Phillabaum talked about the University
of Washington arson, and she confirmed that she had committed
that, and that she was one of the arsonists. She had done it
with William Rodgers, Jennifer Kolar, the defendant, and she
provided the fifth name. She had done it with the defendant's
boyfriend, Justin Solondz.

During the course of this trial you are going to hear from
both Ms. Kolar and Ms. Phillabaum. Since those initial
interviews, they have entered into plea bargains. They will
tell you about those. Ms. Kolar is going to receive a
sentence of five to seven years under her plea bargain.
Ms. Phillabaum is going to receive a sentence of three to five
years. They will come in on the stand and they will tell you
about what happened back in 2001 and their role and the
defendant's role.

And you are going to see a lot of other corroborating
evidence. I am going to talk about some of that for a minute
and give you some more detail, a summary of what Ms. Kolar and
Ms. Phillabaum will tell you.

You are going to learn that the defendant originally was
from Pennsylvania. She came to the State of Washington in
1997 to attend classes at the Evergreen State College in

1   Olympia.  While she was there, she became involved in
2   environmental and animal causes.
3       In 1998, she was the coordinate of a group called the
4   Evergreen Animal Rights Network, EARN.  While she was
5   coordinator, that group actually hosted Craig Rosebraugh, a
6   spokesman who came up and gave a speech there at Evergreen.
7       You are going to hear that the defendant also became very
8   close to Mr. Rodgers.  The way we know that is from
9   Mr. Rodgers' cell phone.  In addition to his true name,
10  William Rodgers, and Avalon, the name he used within the
11  movement, William Rodgers used a third name.  He was living
12  under the name Todd Hager.  The reason he had that identity
13  was to further distance himself from his true name, because he
14  was involved in this criminal activity.  He was trying to
15  hide.
16      He rented his house in the name Todd Hager, and his
17  landlord will come in and tell you that's how he knew him, and
18  show you the checks, the money orders that he used to pay his
19  rent in the name of Todd Hager.
20      Mr. Rodgers apparently hadn't established that identity
21  fully enough to get a cell phone, and he wanted a cell phone.
22  Presumably he thought he needed a bank account or credit card,
23  or something like that.  In any case, he couldn't get a cell
24  phone himself, and so he turned to the defendant.
25      She was a poor student at the time.  She didn't have a

car.  She didn't have the money to get a cell phone for
herself.  But she got a cell phone in her name, and over time,
she paid the bills for that cell phone.  And you will see
checks from her for that cell phone.  But it wasn't her cell
phone, it was William Rodgers'.  She gave it to him.

You will see various evidence that proves that it was
William Rodgers' cell phone.  It shows up in address books as
Avalon's phone number.  Jennifer Kolar will tell you that
William Rodgers said that's my phone number; that she called
that number and spoke to him.

So when Avalon needed help getting a cell phone, when he
needed help hiding, when he needed help concealing his
identity, the person to whom he turned was the defendant.  The
cell phone is important in another way because if you look at
the calls, they also show you just how close the defendant and
Avalon were.

If you look at who was called on that cell phone, there
were regular calls to locations in which the defendant was
living.  She's one of the people he called the very most,
perhaps the person he called the very most.

By 2000 Avalon had big plans for his cell.  He was trying
to grow it.  He wanted to grow the movement.  He wanted to
commit bigger arsons.  He wanted basically to scale things up.

One thing he needed to do that, is he organized a series
of movements.  You will hear them called book club meetings or

study group meetings.  These were meetings that typically had
10 to 15 people.  There were a series of them, about five of
them held in different locations.  Most of the people, the
same from meeting to meeting.

MR. BLOOM:  Could you repeat that?  I didn't hear
that.

MR. FRIEDMAN:  Most of the participants, the same
between meetings.

MR. BLOOM:  Thank you.  I didn't hear it.  I'm sorry.

MR. FRIEDMAN:  The meetings were held in Eugene, in
Arizona, in California, in Olympia, and in a location,
Sisters, Oregon.

These meetings started out fairly general.  People talked
about what was a worthwhile thing to work on, a worthwhile
campaign.  Should we be working on environmental issues?
Should we be focused on genetic engineering?  What's something
bad that we should focus on?  And over time, they selected the
target of genetic engineering.

They also got much more tangible as things went on.  They
went from philosophical discussions to practical, hands-on
discussions.  People talked about how to do reconnaissance,
how to pick locks, how to get into buildings, how to
communicate by encrypted email, how to build fire bombs.

They even had a workshop, a demonstration during which
some of the people who knew how to do it built fire bombs, and

the others practiced soldering and trying to build fire bombs. And these meetings served as a ground -- a group from which to recruit people into the cell, people to participate in these actions.

I want to be clear about something.  The defendant didn't actually attend any of those meetings.  Avalon didn't need her to go to those meetings because he already knew her well.  He could recruit her directly.

In addition to these meetings that were designed to grow the movement, the group started to focus on genetic engineering.  Of all of what they perceived the evils out there, they decided genetic engineering was the thing they needed to work on.  For some reason, they focused on genetically engineered poplar trees.  They thought that was a threat that they needed to deal with.

And because they were focused on that, they focused on three professors -- three entities.  They focused on someone named Steve Strauss, who was a professor at Oregon State University.  They focused on a company, Jefferson Poplar Farm, in Oregon.  And they focused on a professor, Toby Bradshaw, at the University of Washington.  Professor Bradshaw's office, of course, is in the Center for Urban Horticulture.  These became the targets, the people that they were starting to focus on.

In March of 2007, members of the group attacked several plots of poplar trees in Oregon.  These are trees being grown

by Professor Strauss as part of his research.  They did
something called girdling or ring barking them, basically cut
rings around the bark to kill the trees, and they killed
hundreds of trees.

By May things had gotten more serious.  That's when they
were planning the coordinated attack on Jefferson Poplar Farm
and the University of Washington.

You are going to hear during this case from both Jennifer
Kolar and from Lacey Phillabaum.  They will each tell you that
they were approached in early May.  At the time, Lacey
Phillabaum lived in Eugene; Jennifer Kolar lived in Seattle.
Each of them was invited to come to Eugene for some meetings
related to an action.  And they both came on the weekend of
May 12th to the 13th.  That's about ten days before -- eight
days before the arson was actually committed.

They will tell you about their trips there and the
meetings they held.  There were two sets of meetings that went
on that weekend, one for the people who were going to commit
the University of Washington arson, the other for the five
people who were going to commit the Jefferson Poplar arson.
Both Ms. Kolar and Ms. Phillabaum went to the University of
Washington meeting, and they recall the defendant being there.

Lacey Phillabaum will tell you that the first meeting she
recalls was basically an introduction that took place at a
Denny's restaurant where she was dropped.  She thinks that's

the first place she ever saw the defendant, because she
remembers feeling like she was meeting her there.

There were meetings after that in a field or park, in a
library or building connected to the library at Evergreen, and
Lacey Phillabaum recalls the defendant being at those. She
remembers her being in the field because they had a discussion
about whether this action would be claimed in the name of the
ELF, that is, whether they would say it was an ELF action or
whether they wouldn't use that name.

Lacey Phillabaum thought the defendant would back up her
position in that, and she was surprised when the defendant
didn't.

They made plans that weekend for how they were going to
commit the action. They talked about how much fuel they were
going to use. There was some debate over how much fuel would
be necessary.

They talked about how they were going to get in the
building. The plan was that Jennifer Kolar was taking a class
having to do with stained glass, and so she knew how to cut
glass and had glass cutting tools. The plan was to have her
cut the glass in Professor Bradshaw's windows so that they
could get in through there.

They assigned roles for that. Everyone was responsible
for getting their own clothes, their own dark clothes for the
action. Justin Solondz was responsible for building the fire

bombs.   The defendant was responsible for coming up with a car
to use for the action, a rental car that wouldn't be traceable
to any of them in case they were spotted.

Lacey Phillabaum recalls that the defendant said she was
going to have an aunt rent the car, although Lacey Phillabaum
didn't necessarily understand that that meant a true
biological aunt.   She understood it to mean a female to whom
she felt close; perhaps a relative, perhaps not.

At the end of the weekend, everyone went home to make
their own preparations.   Jennifer Kolar practiced cutting the
glass.   Justin Solondz worked on building the fire bombs.   The
defendant worked on getting a rental car.

The next weekend, Lacey Phillabaum will tell you she came
back to Eugene -- back to Olympia.   And she went to the
defendant's house.   This is a house where the defendant was
living.   It was a separate building out back.

Justin Solondz took Lacey Phillabaum and the defendant
into that building, and set up a clean room in there where he
was building the fire bombs, and he showed them the fire
bombs.   Lacey Phillabaum thought he was trying to make it so
that everyone was responsible, everyone was part of it, and
they had ownership of them just as much as he did.

On Sunday evening, sometime in early evening, the group
drove up from Olympia to Seattle and they went to a
restaurant, the Greenlake Bar and Grill, and had dinner there.

Jennifer Kolar, who lived in Seattle, met them at the
Greenlake Bar and Grill.  At some point after dinner, they
drove over to the University of Washington neighborhood.  They
parked in a residential area, a block from the Center for
Urban Horticulture -- it's a small hill that looks down across
a busy street to the center, and they got out of the car and
walked to the end of the street.

There's a bush at the end of the street, and you will see
pictures of this.  There's a bush that is kind of at the end
of the cul-de-sac and has a clear view down the field and to
the center, and the defendant stayed there with a radio.  Her
job was to be a lookout from that spot.

The others walked down the hill.  They walked around sort
of in a large circular group.  They were all wearing dark
clothes.  Because this was in the city, because it wasn't out
in the country, they didn't wear hoods for this.  They were
trying to look like students but wear dark clothes.  And they
had backpacks and they were carrying -- instead of open
buckets, they had built devices using Tupperware containers
and Rubbermaid containers.  They walked in a big loop and came
around the area behind the Center for Urban Horticulture.
It's a wide open area basically just north of Lake Washington
and Ship Canal.

They came to the building probably sometime after 2:00.
At one point a patrolling policeman who worked at the

University of Washington came by and went into the area and patrolled the Center for Urban Horticulture, and the defendant radioed to the others to warn them that there was a policeman there. But he didn't see anything and he left.

You will hear how Jennifer Kolar went up to the window and cut the glass with her glass cutting tools. That was supposed to be quiet and allow them to get into the building without being noticed.

It didn't quite work that way because one of the panes crashed to the ground. Lacey Phillabaum remembers how loud that was when it happened. They all hunkered down and waited and hoped no one would notice, and no one did.

So after a time they went back up to the building, and Avalon climbed in the window. They scouted it so they knew exactly which window was Professor Bradshaw's. The others handed in the fire bombs that they had built, and Avalon set those fire bombs. He must have set the timer for a little bit after 3:00.

When they were set, he came back out of the building and they radioed to the defendant, told her they were done and asked her to come pick them up, and they walked back in roughly the direction from which they had come.

The defendant picked them up and they drove back towards Greenlake. They dropped off Ms. Kolar, and they stopped at the Greenlake park -- I don't know if any of you know that

1    it's a lake in the middle of Seattle with a park around it --

2    And they waited there. They waited until morning because they

3    didn't want to drive back to Olympia in the middle of the

4    night. They thought they might be seen, thought there might

5    be cameras on the road. And they waited for morning rush hour

6    traffic before they drove back to Olympia.

7        At some point they used their scanner and they listened to

8    the firemen and policemen responding. Lacey Phillabaum will

9    tell you she could hear fear in the voices of the firemen as

10   they fought the fire. She will tell you about how Avalon was

11   excited at what he was hearing. He was like a little boy

12   playing with fire. The defendant's good friend Avalon,

13   excited at the destruction that he caused and the fear in the

14   people responding.

15        The fact that you are going to hear from both Lacey

16   Phillabaum and Jennifer Kolar is obviously significant in this

17   case. I told you a few moments ago that arson is an unusual

18   crime. These people had taken tremendous steps to avoid

19   getting caught, and they set a fire that totally destroyed the

20   building, the scene of the crime. So they didn't leave behind

21   physical evidence that would help locate them, but they left

22   behind other evidence.

23        After the interviews with Jennifer Kolar and Lacey

24   Phillabaum, Agent Halla continued his investigation. He'd

25   been investigating this case for years, and he continued to

dog the investigation.  And that investigation resulted in a
bunch of other evidence about which you are going to hear, and
I am going to focus on several of those pieces.

Fist, he asked Jennifer Kolar and Lacey Phillabaum if they
had anything left from those days, anything they used for the
arson.

Jennifer Kolar had a blue tub.  It didn't have things that
she had used in the arson, but it had papers that she had
saved from her days in the cell.  It had red lights, which
were lights you could use at night without being seen easily
that people would use; walkie-talkies, things like that.

Agent Halla looked through and found a manila folder in
there with a collection of articles in it.  And there was a
note on the inside of the folder that said, "Hey, woman, take
a look at this.  We will talk later," and there was a heart
and the letter B.

Agent Halla thought that might be significant, and he
asked Jennifer Kolar about it.  She said she thought she had
gotten that from Briana.  And inside those articles -- there
were a variety of articles, but there were a number of
articles about the Earth Liberation Front and the Animal
Liberation Front.  And there were even articles about the
fires at Jefferson Poplar Farm and the University of
Washington.

Agent Halla took that folder and those articles and he

sent them to the FBI laboratory to look at. And they looked at them. They checked them for fingerprints. And on the folder, they found the fingerprint of Briana Waters.

So she didn't leave her fingerprint at the scene of the crime, but she did leave her fingerprint on evidence of the crime, an article about the very crime she had committed with Jennifer Kolar that she had given to Jennifer Kolar.

Also, Agent Halla developed evidence that Justin Solondz, after finishing -- he was also a student at Evergreen. After finishing, he moved to a small town called Brinnon on the Olympic Peninsula, and he lived in a small cabin there. He had apparently taken a lot of papers there from his days as a student and left them there.

Agent Halla got a search warrant and searched that cabin, and he found some evidence in there that was quite interesting. He found a bag with black hats and shower caps, exactly the sort of hat that you would use in building devices in the safe room, in committing this type of action.

And he found a map of Seattle. It's a 24-panel map, and it was folded open to the one panel that shows the Center for Urban Horticulture. Justin Solondz had no connection with the University of Washington, and yet he had a map in his cabin folded open to the scene of the crime, the spot where he and the defendant burned the Center for Urban Horticulture.

Agent Halla also followed up on the piece of information

about the rental car.  If you remember, Ms. Phillabaum said
that the defendant had come up with the rental car and had
talked about having an aunt rent the car.  Agent Halla tried
to figure out everyone who might be that aunt, everyone who
was close to the defendant, everyone whom she might have asked
to rent a car for her.  And he went to every rental car
company that he could find to see if any one of the people on
his list had rented a car from any company.  He found a record
that showed that a woman named Kara Larson rented a car.

The arson in this case happened in the early morning hours
of May 21, 2001.  That's early on a Monday morning.
Ms. Larson rented the car on Saturday morning, May 19, two
days before the arson, in Olympia, from Budget.  And it had
been returned -- it was registered as being returned at 6:33
a.m. on Tuesday morning, the day after the arson.  It showed
approximately 200 miles, enough miles to drive from Olympia to
Seattle and back.

You will hear that that 6:33 time is probably not actually
the time it was returned.  It was an after-hour drop.  If the
car is dropped off after hours on Monday, it would be
registered in at 6:33 on Tuesday.  So the car was likely
returned in the evening hours on Monday, the evening after the
arson.

After he found these records, Agent Halla interviewed Kara
Larson and her husband, Robert Corrina.  He'd already spoken

to them before.  He learned that Robert Corrina is the
defendant's first cousin.  So Kara Larson, I guess, is the
cousin by marriage.  I am not sure what we call that exactly.

When he'd interviewed them previously, he'd asked whether
they had rented a car for the defendant, whether the defendant
had ever asked them to rent a car, and they hadn't recalled
ever doing that.  But when he presented them the records that
showed the car rental for that weekend, they did recall that
they had rented a car for her.  Mr. Corrina will come in here,
in court, and he will tell you what he remembers about that.

The defendant had lived with him for a number of months
during 2000, the year before the arson -- not sure exactly
which months, but stayed with him for a number of months.
When she moved out she left a bunch of boxes and other stuff
in his basement.

Mr. Corrina recalls that the week before the arson, or the
week before the car rental, which is what he really recalls,
the defendant telephoned him, suggesting that he rent a car.
And they discussed the fact that if he rented a car, it could
be used to move her boxes out of his basement, which was
something he wanted.  Mr. Corrina also didn't have a driver's
license, and so he went to his wife, who had a driver's
license, and had her rent a car.  They rented that car in the
morning, Saturday morning, May 19.

Mr. Corrina recalls that on Sunday, May 20, the evening

before the arson, the defendant showed up at his house.  She
said she felt sick.  She had a serious stomach pain and she
needed to go to the emergency room.  And she said that her
boyfriend, Justin, was nearby but didn't have his car.  You'll
learn during this trial why he didn't have his car, because
Susan Savoie, who is one of the people who committed the
Jefferson Poplar arson, will tell you that she was driving his
car that evening to commit that arson.

So the defendant showed up at her cousin's house and said
she felt sick; he needed to go to the hospital, and wanted to
take the car to go there.

Mr. Corrina thought that was a little odd because she
didn't look sick, didn't see any sign that she was actually in
pain.  When Justin Solondz showed up, they didn't seem to
actually be in any great hurry to go to hospital.  After a
while they left.

Mr. Corrina couldn't check to make sure his cousin was
okay.  He has one phone in his house, a cordless phone.  He
looked around for the headset, and he couldn't find the
headset for the phone.  He couldn't make any phone calls.  He
stayed up for a while, and the defendant never showed up back
at his house.  Eventually he gave up and went to bed.

When he woke up the next morning, the defendant still
wasn't back.  He recalls that sometime during daylight the
next day, the defendant showed up back at the car -- back at

his house with the car.  When she came in, she said she hadn't been able to get into an emergency room in Olympia, so she had to drive up to Seattle.

You will hear in this case from people who work at the emergency rooms in Olympia that there's no record that the defendant tried to get into the emergency room; that if she had actually tried to get into an emergency room, there would be a record.  They don't turn people away because of insurance problems.  They don't turn people away because they are too busy if they have a serious problem that needs to be treated.

So what the defendant told her cousin was a lie, and the reason she told him that is because she was driving that car to Seattle.  She rented that car, or she had him rent that car, just as Lacey Phillabaum and Jennifer Kolar said, to commit this arson, and she rode in that car with them to Seattle to participate in that arson.

Mr. Corrina will also tell you that when the defendant showed up, she reached into the front of her sweatshirt, pulled out the headset for his phone, and said, "Look at that. What do you know, I took that by mistake."  And the reason she did that, of course, was so that he couldn't contact her and check where she was while she was in Seattle committing that arson.

For her conduct, Ms. Waters is charged with five crimes in this case.  She's charged with conspiracy.  Conspiracy is just

a fancy legal word for an agreement.  She's basically charged
with agreeing with the other members of her cell, or
conspiring with them to commit three crimes:  First, arson;
second, making destructive devices, fire bombs; and third,
using those devices to commit arson.

She's also charged with two counts of arson.  The reason
she's charged with two counts of that is for arson to be a
federal crime there has to be basically a jurisdictional hook.
So the arson of a building that receives -- belongs to
something that receives federal money is a federal crime.  The
arson of a building involved in interstate commerce is a
federal crime.  And so she's charged with two counts of arson,
one each way.

You will hear evidence from the professors and from an
official at the University of Washington that show that this
was a building that was receiving federal funding, that was
involved in interstate commerce.

She's charged with aiding and abetting the possession of a
firearm, destructive device.  And she's charged with aiding
and abetting the use of that device to commit the crime of
arson.

I should be clear; I didn't use the phrase "aiding and
abetting" when I talked about arson.  She was charged with
aiding and abetting the arson because she wasn't the person
who actually set the bomb, but she was the person who provided

the place to do it, who came up with the car and who served as
the lookout, who served as the get-away driver, who was part
of the team.

When I started talking about what you are going to learn
about Ms. Waters during the case, I talked about when she came
to Evergreen and the speech that EARN, the Evergreen Animal
Rights Network had, the speech by Craig Rosebraugh that they
sponsored, and in a way that brings us full circle.  Because
if you remember the folder filled with articles that Jennifer
Kolar -- the folder of articles that had been selected by the
defendant -- given to Jennifer Kolar by the defendant, there
were articles in there about ELF and ALF, and there was an
article by Craig Rosebraugh.  And that article talked about
the success that ELF and ALF had, the fires they had done
already.  But it said they needed to do more, and I want to
read you a bit from it.

It says, "While the Earth Liberation Front has been shown
to have had quite an impact in the United States since 1997,
its targets have arguably been limited in nature...Using
economic sabotage, the group has inflicted well over $34
million in damages on entities profiting off the destruction
of the environment.  But is this enough....If an individual
desires to engage in economic sabotage, she or he should pick
the best target possible....Then the best tactic should be
chosen to ensure that the most damage will be done....Think

1  big.  Wall Street, the stock market, the Statue of Liberty,

2  the U.S. Capitol.  Mt. Rushmore, Disneyland, media

3  conglomerates, military installations, government agencies."

4       The evidence you will hear in this case shows beyond any

5  doubt that the defendant did exactly what Craig Rosebraugh was

6  advocating, exactly what her close friend Avalon wanted.  By

7  escalating, by moving from a rural target to a large

8  university building, in a big city, she was thinking big.  She

9  was trying to escalate.

10      And at the end of this case, we will ask you to return the

11  only verdict consistent with the evidence, a verdict that

12  Briana Waters is guilty of each of the crimes with which she's

13  charged.

14      Thank you.

15          THE COURT:  All right.  Let's take the morning recess

16  now before you hear the opening from the defense counsel.  So

17  leave your books on the chair, and don't discuss anything

18  about the case.  Take a break, and I will have you back in

19  here in about 15 minutes.

20          THE CLERK:  All rise, Court is in recess.

21      (Morning recess.)

22      (Jury not present.)

23          THE COURT:  Mr. Bloom, are you ready for your

24  opening?

25          MR. BLOOM:  Yes.

1          THE COURT:  All right.  Bring in the jury.

2      (Jury present.)

3          THE COURT:  All right.  You may be seated.

4      Now you will hear the opening statement from the

5  defendant.

6      Mr. Bloom.

7          MR. BLOOM:  Thank you, Judge Burgess.  I am pleased

8  to be able to speak to you and tell you what we have to say.

9      First, I want to genuinely thank you for taking however

10 long this takes, two or three weeks -- even more if it turns

11 out -- of your lives.  I think it is an experience that you

12 will actually cherish for the rest of your lives.  It's a very

13 powerful experience and one of the most important things that

14 American citizens can do.  Understand, consider the evidence,

15 follow the law, listen to what the judge's instructions are

16 and listen to the evidence, not just the direct examination,

17 but the cross-examination -- everything.  It's really

18 critical.  Please reserve your judgment until you've heard it

19 all.

20     Not only has Ms. Waters pleaded not guilty, but she is not

21 guilty.

22     Let me introduce myself.  I am Robert Bloom.  My cocounsel

23 is Neil Fox.  That's our client, Briana Waters.  Completely

24 innocent.  Completely not involved in this or any other arson.

25     We believe the evidence will show that there is a very

serious reasonable doubt, a doubt for which you can give a
reason, or more than one reason, as to the government's proof.
That's what's on trial here, the government's proof.  In every
criminal case in this country, it's about the government
having the burden of proving, with credible evidence, beyond a
reasonable doubt the facts that they allege.

As Judge Burgess has already indicated, we do not have the
burden of proving anything.  We will offer evidence; we will
offer cross-examination, at the very least, for your
consideration.

Every week, every week, every couple weeks, we read that
somewhere in this country, some innocent person is getting out
of prison because, for one reason or another, he or she was
falsely accused.  This is the case, right here in Tacoma,
where a person is falsely accused, and we believe the evidence
will show just what we are talking about.

In the end, of course, Judge Burgess presides over the
courtroom, but again, in every criminal case in this country,
it is the jury that is the final judge about what happened,
what didn't happen, if there's a doubt as to what happened, if
there's a reasonable doubt as to what happened.

Of course, you are asked to bring your every day lives,
your common sense, your life experience.  Please don't leave
them at the door.  That's why we don't have machines instead
of computers making judgments.  It's about you; it's about

what you bring here, everything.  Each of us has a different
experience.  Please bring it.  Please don't be influenced by,
particularly, the last few words Mr. Friedman spoke.  He
talked about Disneyland and the Statue of Liberty.  Why would
he say such a thing?  This has nothing to do with Disneyland
or the Statue of Liberty or any other public targets like
that.  That's not what this is about.

This is about a bunch of fools, not including Ms. Waters,
who decided that it was a good thing to do, to burn down
buildings.  Two of those fools -- one is Lacey Phillabaum, and
another is Jennifer Kolar, and there are others.  Stan
Meyerhoff is another one.  That's a name you will hear in this
case.  They did these things.  They planned these things.
They decided they would target certain buildings, certain
facilities.  They planned it; they talked about it at these
meetings that Mr. Friedman has mentioned.  They built devices;
they recruited people.  They did everything they could to
accomplish this criminal activity.

You heard Mr. Friedman say Briana Waters was not at any of
these meetings.  Of course she wasn't.  She wasn't part of
this.  Even though Mr. Friedman told you, no less than 26
times -- he talked about Briana Waters and her coconspirators
or her coactors, and used different words.  He used the word
"they" -- I am not exaggerating -- at least 150 times in the
short time that he spoke to you.  He talked about what "they"

did.  This is about what, if anything, Ms. Waters did.  That's

what this case is about.  There's no dispute that there were

these arsons.  There's no dispute that the University of

Washington Center for Urban Horticulture was burned down, and

of course was destroyed.  A foolish act, a wrong act, a

criminal act in every conceivable way.  No question about it.

We know two people who did that.  One is Lacey Phillabaum

and another is Jennifer Kolar.  They are going to testify

before you, and you have a right to consider what kind of

people are these.  What are they doing and why are they here

testifying?

Well, as Mr. Friedman pointed out, each of them was facing

at least 35 years in prison.  I mean at least.  That's a

mandatory minimum.  You will find out that they knew that if

they didn't cooperate, they had a serious risk of going to

prison for at least the mandatory minimum.  No matter how nice

the judge might be, had to be sentenced to 35 years in prison.

That's what the crime of arson and the use of a destructive

device carries if a person is convicted, and these women knew

that.  Definitely I will get back to them in a while.

Ms. Waters is innocent, not because of some technicality;

she's innocent because she was not involved with this group of

people in any arson or any attempts to commit arson or any

discussions of arson.  That's not what happened.  You will

hear about who she is, what she has done with her life, and

what she does do with her life.

Let's talk about the burden of proof always being on the government. That was not always true on this continent. You may recall, I guess in grade school and high school, the Salem witch hunts; people were accused of being witches, and they had to prove that they weren't witches.

Well, the founders of the Constitution had a different idea. They made it clear, eventually as the Supreme Court decided cases, that it was always the prosecution who had the burden of proving the accusations. I think that's a good change.

Mr. Friedman talked about a number of times, what do these groups do? What did this group do? The question is, what, if anything -- if anything -- did Ms. Waters do?

Ms. Waters, you will find, the evidence will show, that she was not involved in the Earth Liberation Front. That she was involved, as Mr. Friedman pointed out, in a campus organization, Evergreen Animal Rights Network. She was also involved in something called Earth First.

What you will find from the evidence is when she was at Evergreen, she chose as a project -- she was in communications -- she chose as a project, a particular project documenting a wonderful, wonderful event.

There's a small town in the cascades called Randle -- about 300 people. The timber company that owned the property

above Randle wanted to clear-cut it, wanted to cut down the trees. Everybody knows, scientifically, you cut down the trees; floods. Randle was slated to die.

And people from Earth First, at the Earth Liberation Front, people from Earth First, the hippies, the tree huggers, the people who want to save the earth, got together with these 300 absolutely stray Americans from this tiny town of Randle. And at first they were, you know, they were a little different from each other, but within weeks, not only were the people from Randle in support of the assistance they were getting from these Earth First people, the tree huggers, but before long, these people from Randle, middle aged men and women, were up in the trees with them, trying to prevent the cutting down of these trees.

Ms. Waters, while she was at Evergreen, she chose as her project to document that struggle. What did that mean? She wrote and produced and directed and scripted a one-hour documentary, that I hope the judge lets you see. It's called "Watch," W-a-t-c-h, and it's called Watch because the mountain is Watch Mountain.

You will hopefully see the film, but at least you will hear about it. That's how she was spending her time, from about 1999 -- the editing was finished in around April of 2001, about a month before Lacey Phillabaum, Jennifer Kolar, and their associates burned down the building at the

1   University of Washington.

2       Ms. Waters was working day and night filming, editing,

3   scripting, getting the music, doing everything you do to put

4   together a magnificent one-hour documentary.  That's what she

5   was doing.  And from that moment on, after it was finally, as

6   they say, in the can, or halfway in the can, it was a matter

7   of getting it distributed.  She was spending her time, that's

8   what she was doing with her time.  She wasn't burning

9   buildings, she wasn't going to what they call incubator

10  meetings or what they cutely called book club meetings.  She

11  wasn't at any of those meetings.  She wasn't a planner.  She

12  wasn't involved with the Earth Liberation Front.  She was busy

13  with her film and with her life.

14      She's a musician.  She plays the violin.  She's played the

15  violin since childhood.  She's in occasional bands, which she

16  does now.  First it was Irish fiddle she was interested in and

17  bluegrass, and mostly now Balkan music.  That is her love.

18  That has always been her love, and that's what else she was

19  doing.  Plus she was spending her time with her friends and

20  family -- her boyfriend, I should say, at Evergreen.

21      Today she does that.  She's with her partner, John, who is

22  the father of their three-year-old child, Calliope, who just

23  turned three.  Calliope is a musical name, obviously.

24      That is what she was doing with her time when Lacey

25  Phillabaum, Jennifer Kolar, Stan Meyerhoff, Avalon, Chelsea

1  Gerlach, and a whole bunch of other people were out there
2  planning and burning down buildings, not Briana Waters.
3      Briana Waters, during the time she was involved in the
4  events at Randle, the filming and production of Watch, they
5  were also doing other things, her group of people on campus.
6  They were working with longshoremen in Tacoma to create a bond
7  so that there would be no class differences.  She's a working
8  class person.  She grew up in Pennsylvania in a working
9  family.  Her mom; she has brothers.  She very much understands
10  the needs of working people.  That's who she is.  That's where
11  she comes from.  That's what she is.
12      They also work, she did in her group at Evergreen, worked
13  with unions, in solidarity with them so that they could
14  accomplish what they had to accomplish.  This is not warfare
15  between loggers and tree huggers.  This is her efforts to
16  achieve unity in the struggle against the forces that are not
17  so good when it comes to environmental work.
18      That's her work, that's her life, and that was her
19  mission.  She is not an arsonist.  She has pleaded not guilty.
20  She has denied any guilt.  She has pleaded not guilty to this
21  unlike, literally, every other person involved in these
22  events.
23      I will explain that most of the people who were accused
24  were accused in an indictment that was handed down in Eugene,
25  Oregon.  It was handed down December 7 of 2005, a little over

1  two years ago.

2      Everybody in that case, about a dozen people, not counting

3  a couple people who are fugitives -- and here, Lacey

4  Phillabaum and Jennifer Kolar -- everybody else, everybody has

5  pleaded guilty.  And they pleaded guilty because they are

6  guilty.

7      Ms. Waters has pleaded not guilty because she is not

8  guilty and she wants a trial.  She doesn't want a trial; she

9  wants this case to get dismissed.  I will talk in a while

10 about why this case should have been dismissed two years ago.

11 But she's not pleaded guilty.

12     Some of the evidence besides Kolar and Phillabaum that

13 Mr. Friedman has talked about is the worst kind of innuendo.

14 Consider, if they searched my house today, and I am not really

15 a scholar, but I can read, I do read, and you will find books

16 about capitalism.  You will find books about free enterprise.

17 You will find books about Communism.  Does that mean if I have

18 a book about Communism, I am a Communist?  Does that mean if I

19 refer a book or an article to someone, or 15 articles to

20 someone, that means I am promoting what's in those articles?

21     We will get back to that, on the evidence.  We will talk

22 about that as the evidence comes in.

23     So please, I ask you to be very cautious and very

24 circumspect and don't be pushed.  Don't be pushed.  Don't let

25 them treat you as if you don't understand what innuendo is.

1   Don't let them treat you, don't let them denigrate you.  Don't
2   let them tell you terrorism.
3       Disneyland.  Disneyland.  Come on, it's not about
4   Disneyland.  It's to scare you.  Don't be scared.  Be brave.
5   That's what the jury experience is about, is courage and using
6   your own independent judgment and not being pushed by anything
7   except the evidence and your common sense and your life
8   experience.  That's what it's about.
9       I urge you, I pray to you that that is what you do.
10      Let's talk about the events from around 1996 to 2001.
11  There were in fact about, something like 17 different arsons,
12  or approximately -- maybe 15, maybe 18 -- for which the Earth
13  Liberation Front took credit, if credit is the word.  Every
14  one of those arsons was dangerous.  It was dangerous to the
15  people surrounding those buildings.  It was dangerous to the
16  people who occupied those buildings.  It was dangerous to the
17  firefighters who came to fight it.  There's always a risk, and
18  terrible things happen, as we know, when firefighters come in,
19  unpredictable things.  It was wrong for every reason.  There's
20  no dispute about that.
21      Again, we know that Jennifer Kolar sat in meetings, went
22  to these five so-called book club meetings, or incubator
23  meetings.  She went, she planned, she taught people how to
24  encrypt their messages.  She was involved in building these
25  incendiary devices.  She was involved in picking targets, and

1  so was Lacey Phillabaum.   That's who they are.

2       They were involved -- and Mr. Friedman described it as

3  reconnaissance of targets, selecting targets, reconnaissance

4  of targets -- Lacey Phillabaum, Jennifer Kolar, Stan

5  Meyerhoff.

6       By the way, Stan Meyerhoff is a name we have now

7  mentioned.   One thing you want to know about Stan Meyerhoff,

8  he's the fiancé of Lacey Phillabaum.

9       Another thing you want to know about Stan Meyerhoff is

10  that in the Oregon case that he was arrested, as were many

11  others, on December 7, two years ago, that he became a

12  cooperating witness within two hours.   He was arrested

13  actually in the state of Virginia.   He started naming names

14  within two hours.   One of the names he named was his own

15  fiancée -- not that day, but at some point later; they talked

16  to him many times -- he named Lacey Phillabaum, and he named

17  many others.   His fiancée.

18       He was not at all reluctant to name names, because he,

19  too, was facing essentially the rest of his life in prison.

20       Now, the mandatory 35 years in prison, that's if you do

21  one arson.   If you do two or more, you are facing life in

22  prison, and that's what he was facing.   In fact, that's what

23  Jennifer Kolar is facing, life in prison.

24       Phillabaum, who's admitted to only one arson, she's only

25  facing the next 35 years in prison, essentially her whole

1   life.  But she made a deal, so she's not facing that.

2       Mr. Friedman suggested what each of those two women is

3   facing.  But in fact -- it's important to know this -- Lacey

4   Phillabaum is facing a sentence where the maximum range

5   between the best she can do is three years, the worst she will

6   do is five years; and it will be up to, in fact, Judge

7   Burgess, before whom both women pleaded guilty, where in that

8   range the sentence will be.

9       It is very much in their interest to please the people

10  sitting at this prosecution table so that they will say to

11  Judge Burgess, when sentence comes, we think she deserves the

12  lower end of that sentence.

13      The same issue -- the numbers are different -- Kolar, she

14  is facing a minimum sentence of five years, a maximum sentence

15  of seven years; exactly the same consideration.  Both women

16  hope, of course, that the sentence will be at the lower end of

17  that range, and they have a very high incentive to make sure

18  that they please Mr. Bartlett and Mr. Friedman -- that's when

19  they testify.

20      I want to talk about Mr. Meyerhoff.  Mr. Meyerhoff, in the

21  Oregon case where he pleaded guilty, he got the highest

22  sentence of all the people involved.  The reason he got the

23  highest sentence is because he was involved in virtually

24  everything.  He was a planner, he was a theoretician, he built

25  bombs --

1        MR. FRIEDMAN:  Objection, Your Honor.  This is
2   irrelevant.  Mr. Meyerhoff isn't on our witness list or on the
3   defense witness list.  He's not going to be a witness in this
4   case.
5        MR. BLOOM:  If he needs to be, we will put him on our
6   witness list.
7     But when Mr. Meyerhoff --
8        THE COURT:  Confine the argument if you will --
9        MR. BLOOM:  I'm sorry?
10       THE COURT:  Confine the argument to what the jury is
11  going to see.
12       MR. BLOOM:  I will.  I didn't object at all --
13       THE COURT:  I understand.  Go ahead.
14       MR. BLOOM:  The evidence will show that Mr. Meyerhoff
15  was involved in everything.  He was involved in this double
16  whammy.  He was involved in planning.  He was involved in
17  reconning it, doing reconnaissance.  He was involved in
18  constructing the incendiary devices.  He was involved in every
19  aspect of the so-called double whammy.  That's the May 21st
20  arson at the University of Washington that took place at the
21  same time as an arson that took place at what's called the
22  Jefferson Poplar Farm in Oregon.  They happened at about the
23  same time, and Mr. Friedman correctly stated that that was
24  done with the intent of showing strength from the people who
25  in fact were involved with the Earth Liberation Front.

1    He was arrested, as I mentioned, in Virginia on December 7

2  of '05, and he started naming names.  It was to his benefit to

3  give names, because then he could show he was cooperating.  It

4  was not to his benefit if he was shown a picture and said, no,

5  that person was not involved.  That didn't help him.  It

6  didn't necessarily hurt him, but it didn't help him.

7    He's a person who was not in any way reluctant to give

8  names.  And I remind you, one of the names he gave was his own

9  fiancée.

10    A very important date in this investigation was St.

11  Patrick's day --

12    MR. FRIEDMAN:  Objection.  First, he's not on the

13  witness list.  If they do call him --

14    THE COURT:  Counsel, I understand.  Let's see if we

15  can get through this without a lot of interruption, because if

16  it opens the door to something, then I will discuss it.

17    MR. FRIEDMAN:  Thank you, Your Honor.

18    MR. BLOOM:  On March 17 of '06, Mr. Meyerhoff was

19  questioned by FBI agents and others as part of his

20  cooperation.  On that day, he was shown pictures.  One of the

21  pictures they showed him -- that's one of the pictures they

22  showed him.

23    Mr. Meyerhoff looked at that picture, and he said to the

24  questioners, when they asked him, "Does this person look

25  familiar?" and what he said is, "This person in this picture

looks familiar, and she was not involved," meaning not
involved in any arson.  This is not just some guy.  This is
Meyerhoff, who was involved in everything, said that she was
not involved.

Could you stand up a moment, please?

I ask you to look at Ms. Waters and look at that picture.
And if you are looking at that picture and you say that woman
in that picture was not involved, you are meaning that woman
was not involved.  Mr. Meyerhoff, the heavyweight, Mr. Big,
Mr. Planner, Mr. Doer, Mr. Know It Everything said she's not
involved.

This case should have ended as to Briana Waters on March
17, in the year 2006, two years ago, because they knew from a
person who is giving names, cooperating, doing everything he
could to give all the names he could, including his fiancée,
he said no, this woman is not involved.

This case couldn't end against Briana Waters because --
and this is where your common sense and your life experience
should be brought to bear -- this administration, Attorney
General Gonzalez, President Bush, they couldn't give up
because this was their centerpiece, domestic terrorism.  They
are not dismissing any cases.

They should have dismissed it as to Briana Waters.  That
should have been the end of the investigation as to Briana
Waters.  Meyerhoff said no.

1     How did they get her name in the picture?  Mr. Friedman is

2    correct, her name came up.  And how did it first come up?

3    Well, it came up first with Jennifer Kolar.  I will get back

4    to that in a little while.

5     If I may suggest to you, what Mr. Meyerhoff said to the

6    investigators, a man to whom it was important to give names

7    and say yes, this person was involved; yes, this person was

8    involved.  He looked at her picture.  The picture looks more

9    like her than she looks like her.  That's a person who wasn't

10   involved, and he said so.

11     Now, he said a number of other things during his

12   interviews.  He described a blond woman from Olympia.  But as

13   to that woman, he said that's a woman, and I am referring to,

14   not in connection with the University of Washington arson,

15   there was another arson that Mr. Friedman didn't mention.

16   There was an arson after this, at a rural place in California

17   where Mr. Meyerhoff was involved.  And he said there was a

18   blond woman from Olympia who was involved; that that woman was

19   a person who was originally from California.  That was a woman

20   who had no connection to another person involved in that, a

21   guy named Joe Dibee, a member of the ELF, who is a fugitive

22   now.  He was clearly describing a different person.

23     So you may hear:  Well, if Meyerhoff said this, not

24   involved, he said other things that you should hear about.

25   You should hear it all.  No question.  Use your judgment.

And you will find that the people who have admitted in
this group, who have pleaded guilty to involvement in these
events, they will make clear that no matter what Meyerhoff
suggests or hints about Susanville, those people who
participated in the Susanville event, they don't recognize
Briana Waters.

In fact, the Susanville event was an event where the
people who were involved camped out for two-and-a-half days.
It wasn't like 40 people; it was eight or ten people.  And
these two people, Tubbs and Thurston, they don't recognize
Briana Waters because she wasn't there.

So no matter what more innuendo you may hear, and I don't
know how they are going to put it in -- they are going to
try -- she's not accused of being involved in the Susanville
event.  She's not indicted for it; she never has been.

In fact, in the conspiracy count in this indictment, they
list 25 overt acts committed by various members of the alleged
conspiracy.  The one -- one -- in which Briana Waters is named
is the University of Washington arson.  That other arson,
Susanville, is mentioned.  She is not mentioned in that.

So please be wary as you hear the evidence of more
innuendo that she was involved in another arson.  She was not
involved in any arson.

Let's talk about her connection to Mr. Rodgers, Avalon.

Mr. Friedman told you a number of times how they went to

1    great lengths and took great pain not to leave trails.  Here's

2    a woman who, in her own name, has been asked by Mr. Rodgers to

3    rent them a telephone -- not rent; to buy them a telephone, I

4    should say, a cell phone -- and she does that and she pays the

5    bill.

6         Now, how is that going to great lengths if she was

7    involved?  Of course not.  Of course it had nothing to do

8    with -- anything to do with arson or Earth Liberation Front.

9    The evidence will show he asked her, because he was having

10   credit problems, if she would get a phone for him.

11        Now, he may have misled her.  It may have been indeed on

12   his mind that he wanted to hide his identity, but he asked

13   her, the relationship he had with her, a woman who was in the

14   environmental, above ground, totally legitimate, totally

15   honest, totally lawful, activities at Evergreen:  Briana, do

16   me a favor.  I can't get a cell phone, I need one.  Would

17   you -- I'll pay you for it.  Would you rent me, buy me a cell

18   phone?  And she did.  And to suggest that that group that's

19   protecting itself and going to great lengths to not make

20   connections, that's just ridiculous, that she would do that

21   knowing -- he would do that, knowing the potential downside of

22   that.

23        That's not what happened.  That's not why it happened.  So

24   don't let that innuendo, don't let them throw that at you.

25   Don't let them, again, treat you as though you don't

understand and can't reason through it. It's really simple.
She would never have, and he would never have asked her to buy
a phone in her name if she were in any way connected to these
ELF activities. It just wouldn't happen.

There will be a bunch of testimony about the nature of the
devices that were used, whether or not they were incendiary
devices, incendiary bombs. Technical matters like that,
Mr. Fox will be dealing with that. I would just ask you, we
do have to deal with that because, as you have already heard,
the accusation regarding the use of a destructive device is
the one that Lacey Phillabaum and Jennifer Kolar had to deal
with, where they were facing that gigantic mandatory minimum
sentence, and that's what they were concerned about. So we do
have to deal with that. But that's not what this is about.
Whatever the device was, whether it was an atomic bomb or a
match, or anywhere in between, Ms. Waters had nothing to do
with it. She wasn't there.

So we will talk about it, but that's not our focus. Our
focus is that she didn't do it; she wasn't there.

Mr. Friedman is correct that these arsons, after they took
place between 1996 and 2001, it was very frustrating for law
enforcement. They really did not make headway until they got
hold of this guy Jake Ferguson and he agreed to become an
informant and he admitted his role. He's been sentenced, I
believe, or at least he's been promised a sentence of

probation. Despite his involvement in a number of arsons, he
is the first cooperating witness, got himself quite a break.
He will not have to do any time in jail or prison.

And what did he do? Well, when he agreed to become a
cooperating witness, one of the things he did was he wore a
wire, a transmitting device, so that he could have
conversation with other of his coconspirators.

By the way, he didn't know of Briana Waters or hear of
Briana Waters. He had no idea of who she is. No role
whatsoever.

But why did he wear a wire? Why did they want -- why does
law enforcement want there to be a record of what was said?
Well, because it's very important to be able to prove to a
jury who said what. There will be witnesses: I said this, he
said that, she said that. That is of some importance;
particularly if there are contemporaneous notes, that's
important. But the best evidence of what was said would be a
tape recording.

Now, when the FBI spoke to Jennifer Kolar and they spoke
to Lacey Phillabaum, you will find that they had the option of
asking a supervisor and the FBI if they could tape-record the
interview. They chose not to exercise that option.

If they had that option, if we had a tape recording of
what Jennifer Kolar said and the way she said it -- the first
interview, for example, December 16 of '05, about a week after

1   everybody else got arrested, you would hear for yourself just

2   what she said.  You wouldn't have to rely upon her memory.

3   You wouldn't have to rely upon the memory of Mr. Halla,

4   Mr. Friedman, or Agent Torres -- I am sorry, Agent Halla.  You

5   would hear the tape recording.  But we don't have a tape

6   recording because Mr. Friedman and the FBI decided they were

7   not going to tape-record what Jennifer Kolar said.

8       Remember, the burden of proof is on the government.  It

9   would go a long way to prove what was said and whether she was

10  vague or specific about naming people who did not include

11  Briana Waters.

12      In fact, I will get back to it, she named herself, Avalon,

13  Capitol Hill Girl, Capitol Hill Girl's punk boyfriend, as she

14  described him, and a guy named Crazy Dan.  That's who she said

15  on December 16, the first interview as a cooperating witness,

16  facing life in prison unless her deal were accepted, that's

17  who she named as the perpetrators of this crime at the

18  University of Washington.  That's who she named, not Briana

19  Waters.  Briana Waters, as Meyerhoff has said, is not involved

20  in these arsons.

21      Excuse me for raising my voice, but what is happening here

22  is wrong.  It is an outrage.  She should not be here.

23      I have spoken a little bit about who Briana Waters is.

24  When she was in high school in Pennsylvania, even earlier

25  actually, she began to play the violin, got interested in

1  Irish fiddle and then expanded it.  She teaches violin.
2  That's how she makes a very meager living where she lives now,
3  in Oakland, California, with her partner and her child.

4      She plays in small bands.  I am not talking about rock
5  bands.  She plays in what are called Balkan bands, and they
6  play in very small venues for just a few dollars, and she
7  doesn't do it very often.  That's how she makes a living, and
8  John works as a carpenter.

9      You will learn from the evidence in this case what kind of
10  family they are and who they are, what kind of people they
11  are.

12      She went to college in Ohio, a small school, and then she
13  visited out this way and she wound up in Olympia, looking at
14  Evergreen; and as many people do, she fell in love with
15  Evergreen and she decided to transfer there.  She could do her
16  music; she could be in the environment.  And that's what she
17  did, she went to Evergreen.  And when she was there, she got
18  involved in environmental activities, a person who is wanting
19  to save the water and the air and the trees and our
20  environment which we live and breathe and drink the water.
21  That's who she is.  She is not an arsonist.  She is not a
22  violent person.  Quite the opposite.  She's simply not that
23  person.

24      She got involved in the project to film and document the
25  struggle at Watch Mountain.  And that, as you heard -- I won't

repeat it -- that's how she spent her time.  I hope you will
hear from somebody, from one of the people who is one of the
residents of Randle about how she spent her time and what
those events were about.

As I say, we will try to offer that documentary into
evidence.  It's up to Judge Burgess as to whether or not you
will see it.  I surely hope you see it.  I think it will be
very enlightening and will tell you not only how she was
spending her time but what kind of person she was then and is
now.

While she was doing that, the Earth Liberation Front
people, they, as Mr. Friedman said -- I am not exaggerating;
you heard it, maybe about 150 times, he said "they" did this,
"they" did that.  "They," "they," "they," "they."  We're
talking about "she."  We're talking about her.  What did she
do?

It's appropriate for Mr. Friedman to talk about "they,"
because these events were bad events.  They were wrong.  They
were dangerous.  They were criminal.  But again, the focus is
what, if anything, did she do?

One of the things I haven't mentioned yet is that the
people in the Earth Liberation Front movement, they all had
nicknames.  For example, really kind of aliases.  Jennifer
Kolar was known as Diver, D-I-V-E-R.  Lacey Phillabaum was
known as Reba.  Stan Meyerhoff was known as Country Boy.

Ms. Waters was known as Briana or Bri.  She had no code
name.  She had no alias.  She's not part of the ELF.

They had meetings.  At one of the meetings, where of
course she was not present, they had what they called an
ailment list; that each person took -- more like a joke -- an
ailment name.  Like one was known as, as cholera -- I'm making
these up.  But they all had like kind of joke names, as code
names.  Ms. Waters didn't have any such name.  She lived by
her name openly.  She rented her house.  She had a boyfriend.

You know, you'll find in the end that when they got
Ms. Waters' name, they investigated her, as Mr. Friedman has
indicated.  They investigated her right and left.  Here's what
they got about Ms. Waters -- no incriminating evidence:

They got her phone records.  They got her bank records.
They got her mother's phone records and bank records.  They
got her grandparents' information.  They got her credit card
information.  They got Justin Solondz's information.
Everything.

They got their information from Evergreen college.  They
seized all this material from Justin Solondz's house.  Nothing
incriminating her.  Nothing.

They got -- when they arrested Mr. Rodgers, Avalon,
December 7 in Arizona -- they got thousands and thousands and
thousands of pages of documents.  There's one mention of
Briana Waters, and it's a mention in some list of resources

for environmental activities.  Her film was mentioned, Watch. It doesn't talk about Briana Waters in the ELF.  It only mentioned in, like hard drive after hard drive, in everybody's hard drive, what did they find?  Nothing incriminating about her.

They went to CitiBank, which she had an account.  Nothing. They went to Experian.  Thank God -- without having to do anything but make a phone call or send a letter to Evergreen -- they got all her records, her exams, her test scores, everything.  What she had written, her reports, what the professors had to say about her -- everything.

They went to Morgan Chase, which she had a bank account or a credit card.  They went to Bank One where she had a credit card, or it was the same credit card.  And they went to Wachovia where she had the same credit card.

They got her spending records.  They got her shopping records.  They got her father's records.  They got her brother's records.  They went to her recently, they went to her own website, and what do they have?  They have what they have told you so far.  They have innuendo, and a couple things -- and we will deal with each of these things as they come up.  Please, before you accept -- this thing about the car and the cousin is extraordinary.

For starters, after they got Ms. Waters' name, at the end of '05 or the beginning of '06, they wound up, after they

spoke to both Kolar and Phillabaum, they wound up on February
24 of '06, about eight weeks after this original interview
with Kolar -- and Agent Halla was one of the people who went
where Briana Waters was living in Berkeley at the time.  He
was very polite to her; he wasn't abusive at all.  He wanted
her to get a lawyer and cooperate.  And she got a lawyer, but
she had nothing to cooperate about.  You will learn I was that
lawyer.

     Let me hold the rest of that, I want to get back into that
in a moment.  Let me regress.

     When they asked her to cooperate, to get a lawyer -- and
that's what they do.  That's the way they do it.  It's not
inappropriate; it's the way the FBI operates.  They get names,
they follow those names, they follow those leads.  In that
regard, Agent Halla, the case agent, was doing what he was
supposed to do.

     There came a time soon after I was retained that I was in
touch with Mr. Friedman.  Something happened that I will talk
about in a little while with regard to conversations that were
had between the prosecution and Ms. Waters through me.  I want
to put that -- I want to keep that in context.  I just want to
alert you to that, and I will get back to that.

     What happened after that was Ms. Waters spoke to me.  I
suggested -- and she did -- that she get in touch with her
friends and her relatives.

1          MR. FRIEDMAN:  Objection, Your Honor, unless she
2   wishes to waive all of her attorney/client privilege.
3          MR. BLOOM:  You are right, I will withdraw it.  I
4   will say it another way.
5       Soon after I was retained, Ms. Waters contacted a number
6   of people, her friends and her family, and said to them:  I am
7   innocent, I haven't done anything.  If the FBI comes around to
8   interview you, just tell them the truth.  I am innocent, and
9   tell them the truth.
10      And one of the people to whom she said that was her cousin
11  who lived up in Olympia, Rob Corrina, and Rob's wife, Kara,
12  Kara Larson.  That's what Ms. Waters said to Rob Corrina, "I
13  am innocent.  Don't worry about it.  Tell the truth."
14      Well, when the FBI first came around and heard this,
15  Mr. Friedman, when they first came around to Rob Corrina and
16  they said in effect, we want to talk to you about Briana
17  Waters, he said, "Who?  I don't even know any Briana Waters."
18  He lied to them.  For whatever his reasons, this guy decided
19  he was going to lie to them.
20      After he'd been told by or suggested by Ms. Waters, tell
21  them the truth, I have nothing to hide, tell them the truth,
22  he lied.  And he put himself in a pickle, because the pickle
23  is -- and the name Martha Stewart may ring a bell.  Martha
24  Stewart got convicted for the crime of making a false
25  statement to a federal law enforcement official.

1    Now, there came a time when Mr. Corrina got himself a

2    lawyer, and there can be no doubt that that lawyer said to him

3    and Kara Larson, his wife, you are already in trouble.  You've

4    lied to federal officers.  So if you want to save yourself,

5    you should listen to what they have to say and use your

6    judgment.

7        I don't know what was said between them, but certainly he

8    was aware of the fact that he was already in trouble for

9    lying.  Why?  He said he didn't even know Briana Waters, his

10   cousin.

11       So what happened from him, I am not going to go into any

12   detail now, but what he had to say and what he has to say when

13   Mr. Friedman presents it to you -- let me put it this way, you

14   did not get a complete picture from what Mr. Friedman told you

15   about Mr. Corrina and Kara Larson.  When they testify, I hope

16   you'll get a more complete picture of what happened between

17   them and who this car was for and what this car was about.

18       Let's talk about the car for a minute.

19       It appears from what Mr. Friedman tells you that this

20   incident, the arson, took place at, say, 2:00 or 3:00 in the

21   morning, on a Monday morning/a late Sunday night.  It appears

22   to be Mr. Larson is saying -- I am sorry, Mr. Corrina is

23   saying that that Sunday, at some point, Briana Waters came to

24   him and said, can I use the car you've rented?  Now, isn't

25   that a little bit shaky and risky?  What if they were out

taking a drive?  What if they were out eating?  What if they weren't around all day?  Then the arsonist, if she was involved in it, wouldn't have a car, if that's really what happened.

That's not what happened.  It's ridiculous.  In fact, some of the writings of Mr. Rodgers, of Avalon, made clear that when you are planning something like this, you have the car set, all established for at least 36 hours.  You don't want to take a chance that the car that somebody is supposed to arrange isn't going to be available.  It's ridiculous.

I don't want to go into too much detail about the Corrina and the Larson testimony, but you will hear it.  Please keep an open mind, listen beyond the direct examination, listen to the cross-examination, and I think you will understand what he has to say is not truthful, not reliable, doesn't meet the burden and the standard as required for proof beyond a reasonable doubt.

Let's talk about -- Ms. Waters comes from a working class family.  You are going to find that Lacey Phillabaum and Jennifer Kolar did not come from working class families.  You are going to find that they are spoiled kids who are accustomed to a rather up-scale lifestyle, who didn't want to give up their up-scale life-styles.

Lacey Phillabaum's parents, you will find, in Spokane, are both lawyers, partners in a law firm.  She, herself,

1  Phillabaum, describes her family as upper middle class.

2      Kolar -- and by the way, more about Lacey Phillabaum, a

3  very smart person, and I think you will find her to be a

4  physically attractive person.  She's not only smart -- I think

5  she may have graduated from college with some honors -- but

6  she was a very skillful and skilled debater.

7      So this is not one of those situations where this bully

8  lawyer is going to be questioning her and she doesn't know

9  what's up.  She's very smart, and she will clearly -- she's

10 not a person at a disadvantage when she's being asked

11 questions.

12     Jennifer Kolar is also very smart.  She has a degree from

13 the University of Colorado, I believe, in very advanced

14 astrophysics type major, I can't be specific.  She also has a

15 master's degree.  And at the time of these events, she was a

16 Ph.D. candidate; a really smart person.

17     And if she comes in and takes the position that when she

18 spoke to them, law enforcement, that very first time, that

19 very important date, December 16 of '05, a critical date, that

20 she just forgot who was involved in the arson.  This Ph.D.

21 candidate forgot who was involved in the arson?  We are not

22 talking about who did she have dinner with.  We are talking

23 about with whom did she plan an arson, have meetings, go to an

24 arson, have dinner just before, go to the arson, do things.

25 We are talking about, according to them, five people -- four

people and herself -- and she just remembered two weeks, three weeks after she lied to them, or did she lie to them on December 16th? Jennifer Kolar is not a stupid person. She's a smart person, and she's a schemer.

Now, here's the other thing you are going to hear about Jennifer Kolar. This is quite astonishing. To this day, to this day she has never named Lacey Phillabaum as one of the people who committed the arson with her. You know, unless that changed yesterday, but to this day she has never named Lacey Phillabaum, who has pleaded guilty to being one of the people who committed the crime. Jennifer Kolar, for whatever her reasons, has not named her, Lacey Phillabaum. Both of them, you may recall, are people from Spokane. They went to the same high school.

Now, I ask you to consider when you are listening to Jennifer Kolar and evaluating whether or not she's a person upon whose word you can rely, the fact is she has never said that one of the other four people with her was Lacey Phillabaum. What are we talking about? We are talking about Alice In Wonderland here. This is a woman who they are relying upon, who says Lacey Phillabaum, she said, I don't remember a role for Lacey in that arson. She said that at one point to the investigators. Come on. Common sense, human experience.

So all I ask you, don't make a judgment now, but when you

are listening, when you first listen to the first words out of
her mouth, think about, this is a person who says Lacey
Phillabaum is not one of the perpetrators, or I don't remember
her being one of the perpetrators.

More about Jennifer Kolar. She's a woman who has done
very well for herself. She has personal property and
personal -- and a lifestyle, I should say, that she wants to
protect. She doesn't want to go to prison.

What is it she wants to protect? Well, she owns a yacht,
and she's a member of a yacht club in Seattle, the Corinthian
Yacht Club in Seattle. And she races the yacht, and it's a
valuable piece of property this yacht that she owns.

She's a person who has so much at stake that we know she's
lied. We know she's lying today about Lacey Phillabaum. We
know that. They are going to claim that she was lying or
mistaken when she first spoke to them on December 16; that she
was lying when she named herself and the four other people who
were involved: Capitol Hill Girl, Capitol Hill Girl's
boyfriend, William Rodgers, and Crazy Dan, and herself. Those
are the people she said. Is that true or is that not true?
Is that a person you want to rely upon, when she now says
Briana Waters? No, it isn't a person, I submit to you, that
you want to rely upon.

Jennifer Kolar, again, she was involved in the Cavel West
arson that Mr. Friedman mentioned. And she was involved in

the planning of it and the execution of it. And when she got

through with that, she did another one, something called the

Wray -- W-r-a-y -- Wray Gun, an attempted arson. I may have

them switched in order. But after she did one arson, she went

right back and she did another one. And then after she was

through with those two, she did another one, this one. And

she's going to come in and say, oh, I'm sorry, I was wrong.

What kind of person does that? What kind of person are

you listening to? What kind of person are they relying upon

to convict Briana Waters, who had nothing to do with it?

Stan Meyerhoff said not involved, and he knew, he knows.

He's a cooperating witness. If they want to call him, they

can call him. They have the burden of proof. If they want to

prove anything I have said here is not true, that he didn't

say not involved, put him on the witness stand. Put him on

the witness stand and let him say, I didn't say that. Let him

say, oh, I couldn't recognize that picture. That picture,

that's her picture. You see that. He saw that. He looked at

it, and said not involved.

Going back to the first cooperating witness, Jake

Ferguson, who wore the wire. His wearing a wire is what put a

couple of the other people involved in the Earth Liberation

Front, particularly Meyerhoff and a couple of others, his

wiring is what put them in the situation where they really had

no choice. They had to cooperate, otherwise go to prison

1  forever.  That's the way it works, if they have good evidence.
2  As to them, they have good evidence; they have the tape
3  evidence, they have tape recordings of Meyerhoff admitting to
4  these crimes.

5      They don't have that kind of evidence because there isn't
6  any such evidence because Briana Waters did not commit these
7  crimes.  They don't even have Kolar on tape telling them what
8  she told them at her various interviews, and there were a lot
9  of interviews.  They don't have Phillabaum on tape so you can
10 hear just what she's saying and how she said it.

11     Let me talk about the interview of Jennifer Kolar on
12 December 16.  One of the things that's important about that
13 interview is that it was about four-and-a-half years after the
14 incident, the University of Washington arson.  And you can
15 imagine when they, the prosecutors, heard from Jennifer
16 Kolar's lawyer -- his name is Michael Martin -- that she
17 wanted to come in and speak to them, how excited they must
18 have been.  This is the first person, after a four-and-a-half
19 year investigation, who's going to come in and who's going to
20 tell them what happened, how the crime happened and who did
21 it.

22     Sitting there in Mr. Friedman's office, and she comes in
23 with her lawyer, and they talk about a bunch of other things.
24 They lead up to it, and eventually they get to the University
25 of Washington.  And now Ted Halla, who's working himself to

1   the bone -- no question about it, conscientious, trying to get

2   this crime resolved and do his work -- he and Mr. Friedman and

3   the other agent, Torres, they hear her -- that is Jennifer

4   Kolar -- say what she has to say.  And one of the things they

5   did, this is one of the things they are required to do, is

6   they took notes as to what she said.

7       I don't want to talk any more about the notes, I don't

8   want to talk about the reports that were made from the notes.

9   But understand, they didn't tape-record it, but they took

10  notes.  It's likely you will hear more about the notes during

11  the trial.

12      You will hear that last August Ms. Kolar was interviewed

13  by Mr. Bartlett, Assistant U.S. Attorney, in August, August

14  15, about six months ago, eight months ago, and she affirmed

15  to him that on that fist interview, back in December of '05,

16  that she did in fact definitively name herself, Rodgers,

17  Capitol Hill Girl, Capitol Hill Girl's boyfriend, and Crazy

18  Dan.  She affirmed that that was her recollection.  She wasn't

19  vague about, oh, Capitol Hill Girl, I don't know.  Those are

20  the people she named in her first statement, which had been

21  waited four-and-a-half years.  That's what she said.  She said

22  that as recently as this August.

23      I have been asked to cut it short, I am going to trim some

24  of what I am going to say.

25      You will hear from her lawyer that on January 5 of 2006 --

that's about three weeks after her initial statement, this
December 16 statement -- she named those people.  On
January 5, Mr. Martin informed Mr. Friedman that Ms. Kolar had
remembered that Briana Waters was involved and that she was
involved as the lookout.

Well, on January 6, the very next day, the very next day,
Jennifer Kolar is interviewed by Agent Halla and other people.
And, of course, they are going to ask her about, well, your
lawyer has told us that you remembered Briana Waters being
involved.  Of course they are going to ask her that.  If they
believed her, of course they would ask her about it.

But in fact, they did not ask her about it that very next
day, January 6.  In fact, the next time they interview her,
about a week later, again they didn't ask her.  And again, a
couple of weeks later, they didn't ask her, was Briana Waters
a lookout?  Was Briana Waters involved in this arson?

In fact, Briana Waters' name came up in a totally innocent
context.  She didn't say at that time, yes, that's the Briana
Waters I mean who was the lookout.  Nobody said that.  Nobody
asked that.  Nobody said why?  Does that make any sense?

Now, we weren't there; Mr. Fox and Ms. Waters and I
weren't there during these interactions with Mr. Martin, the
lawyer, and Ms. Kolar.  But we do know that she wasn't asked
about it and she didn't mention Briana Waters at any interview
as being involved in this until March, weeks and weeks and

weeks later, after Lacey Phillabaum had spoken to law
enforcement.

What is that about?  Why do you think, if they had
information on January 5 of 2006 that Briana Waters was
involved, why wouldn't they ask her?

When you are hearing the evidence, ask yourself, and
demand, demand to hear an answer to that question.  You can't
speak up, but in your own hearts ask, how did this happen that
they didn't ask her about it in seven or eight interviews
after they supposedly learned that?  Not one question.

Let's talk about Lacey Phillabaum for a moment.  She, too,
was, as we said, facing 35 years.

How do they get a second witness, after they got Kolar
apparently to say, to remember that Briana Waters was
involved?  How do you get -- how does a second person get
involved?  How does Phillabaum get involved?

Well, I can tell you this much.  I mentioned to you that
on February 24 of '06, Agent Halla went and he spoke to, as I
say, in a respectful way, to Ms. Waters.  They wanted her to
cooperate, and she got a hold of me.  And eventually some
weeks later, they did something which tells you how they do
it.

They did something called a reverse proffer.  Now, usually
a lawyer, let's say in a drug case, goes to the prosecutor and
says, listen, my client will come and tell you who committed

this murder or who Mr. Big is in the drug business; makes a
proffer to the prosecutor.

A reverse proffer is where they tell you what they think
happened.  And by telling you that, they tell you that's what
we want to hear.  We want you to tell us that.

That's exactly what they did with Briana Waters on the
telephone.  She was in my office, they were in Seattle, and
they told us what their theory of the case was.  The
witnesses, they told us about Jennifer Kolar, they talked
about Lacey Phillabaum, they talked about they think she
rented a car.  They told us, they told her, a potential
witness, what it is they wanted to hear from her.  That's the
way they do it.

There's all kinds of subtle ways they do it.  And I
suggest to you that in some way that's how they got Lacey
Phillabaum, desperate Lacey Phillabaum, to tell them, to
repeat their theory, to regurgitate what they had indicated to
her.

She will tell you, Lacey Phillabaum will, that she has
told friends that she didn't, quote "betray" anyone.  What
does she mean by that?  She means she told them what she
thought they already knew.  And how does she know that?
Because in some way they made it clear to her what they,
quote, "already knew."  That's how you get a second person
involved in that.

1    Please, just listen to all the facts, everything, about

2    Lacey Phillabaum.  Not just cross-examination, but other

3    related matters.

4    There are many matters regarding the car.

5    By the way, when Jennifer Kolar was first interviewed on

6    that very first day, she said that the vehicle that was used,

7    it was either a car or a van.  We haven't heard that yet.

8    We've heard that it was a car.

9    Why would Jennifer Kolar say it may have been a van or it

10   was a van?

11   Well, if we had a tape recording of what she said, we

12   would know just what she said.  We wouldn't have to rely on

13   other people's testimony or her testimony.  We would hear a

14   tape recording.  If she said van, then we would hear her say

15   van.

16   You will hear about that car, and let me just say one

17   thing.  You will hear who used that car and what they used it

18   for.  You will hear about that.  You will hear about why that

19   car was rented.  Quite different from what Mr. Friedman has

20   told you.

21   Kolar said something else later on.  On February 4 -- I am

22   almost finished, Judge -- on February 4 of 2006, she told

23   Agent Halla, she said, I don't remember Briana and Lacey being

24   together.

25   Now, if that's true that they were not together, that's

the end.  It's the other end of the case.  If they weren't together, if Phillabaum is committing the crime and Kolar is there and Kolar doesn't see them together, that means Briana Waters could not have been there, was not there.  That's what she told them.

You will find -- let me leave that for proof.

One more thing I wanted to mention.  We have tried to speak to people in this case.  We have tried to speak to Jennifer Kolar.  Her lawyer says no; she says no.  We've tried to speak to Lacey Phillabaum.  She says no, she won't speak to us.  We've tried to talk to the cousin, Rob Corrina, and his wife, Kara Larson.  They won't speak to us.  We've tried to speak to Agent Halla.  He won't speak to us.  We've tried to speak to Agent Torres.  He won't speak to us.

This is what's called, in another context, the wall of silence.  That's what we have met here.  They can put all kinds of pressure on people, the government can, the prosecution can, to get people to talk to them.  They have hanging over their heads 35 years in prison, and of course people talk to them.

We don't have any.  We don't have that kind of power.  We don't have that kind of influence.  We can't make anybody talk to us.  They can, and they do.

I just want to ask you to bring this thought with you. When you hear this case and you hear the evidence and if you

have a reasonable doubt as to the credibility of the witnesses and the prosecution's case and if you say not guilty, everybody wins. Even they win because that's what this country is about. Before you can convict a person of a crime, especially a serious crime, you've got to be sure beyond a reasonable doubt that you are doing the right thing.

If you say no, the evidence is not here beyond a reasonable doubt, everybody wins.

I pray to you that you don't let an innocent person get convicted. You will find this is a wonderful human being, who is here because of the pressure that's been put on two people who are not people of principle. They have falsely named her in order to save themselves and to save their life-styles.

It's tragic. This whole thing is tragic, from the arsons on down to what these two women have sunk to.

If Ms. Waters looks tired and scared; it's because she is. It's been two years of this nightmare for something she didn't do. She's got a child to raise. She's got -- this isn't about sympathy. I am not saying vote not guilty because of sympathy. That's the way she looks. She is exhausted. Emotionally exhausted and physically exhausted. She's lucky to have Mr. Fox and myself to help her through this.

We ask you to please keep your minds open. This whole apparatus -- the courtroom, Judge, prosecutor, defense lawyers, jury selection, clerks -- it's overwhelming. One or

1　more of the jurors could say, well, if she's here she must

2　have done something.  That's not America.  If she did it and

3　they prove it beyond a reasonable doubt, you have a duty.  But

4　if they haven't proven it beyond a reasonable doubt, I pray

5　you will end this horrible, unreal nightmare for a person who

6　is innocent.

7　　　　Thank you.

8　　　　　　THE COURT:  All right.  Now, before we take any

9　testimony, I will give you your noon recess.  As we indicated

10　and talked about, an hour to do that.

11　　　　So I am going to give you ten minutes on the other side of

12　the hour, so I will have you back here ready to go about 1:15.

13　　　　As you go about your business, always remember you are not

14　to talk about the case or research or let anybody else talk to

15　you.  When you are back in the building, of course, report

16　directly into the jury room.  Leave your books on the chair as

17　always.  See you back here at 1:15.

18　　　　(Jury not present.)

19　　　　　　THE COURT:  All right, you may be seated.

20　　　　I assume at 1:15 we will be ready with the first witness?

21　　　　　　MR. BARTLETT:  We will, Your Honor.

22　　　　　　THE COURT:  How I have requested we handle the

23　witnesses, that's all been done and no issues to take up?

24　　　　　　MR. BARTLETT:  The only issue I would bring up, Your

25　Honor, is prior to trial the defense had asked that we not

1    bring up that Justin Solondz is a fugitive and that William

2    Rodgers killed himself.  I assume by the opening that you now

3    realize we are going to bring that up.  He indicated in his

4    opening that everybody else has pleaded guilty, and factually

5    that isn't correct, and we need to correct the record.

6         MR. BLOOM:  No problem.

7         THE COURT:  All right.

8         MR. BARTLETT:  Thank you.

9         THE COURT:  We are at recess.  1:15.

10        THE CLERK:  All rise.  Court is in recess.

11   (Luncheon recess.)

12   (Jury not present.)

13        THE COURT:  All right, you may be seated.

14   Ready for the first witness?

15        MR. FRIEDMAN:  We are, Your Honor.

16        THE COURT:  Bring in the jury.

17   (Jury present.)

18        THE COURT:  All right, you may be seated.

19   Call your first witness.

20        MR. FRIEDMAN:  The Government calls John Comery.

21        THE COURT:  All right.

22   Mr. Comery, let me have you come forward and raise your

23   right hand.

24   JOHN COMERY, called as a witness, duly sworn.

25        THE COURT:  Come around and take the witness chair,

1    please.

2                    DIRECT EXAMINATION

3    BY MR. FRIEDMAN:

4    **Q.**  Good afternoon, Agent Comery.

5    **A.**  Good afternoon.

6    **Q.**  Could you tell us your whole name and spell your last name

7    for the record?

8    **A.**  John Comery, C-O-M-E-R-Y.

9    **Q.**  Where do you work, Agent Comery?

10   **A.**  I work as a senior Special Agent for the Bureau of Alcohol

11   Firearms and Explosives in Portland, Oregon.

12   **Q.**  As a Special Agent, what do you do?

13   **A.**  I am a certified fire investigator for the agency, and I

14   investigate fires and explosions.

15   **Q.**  Let me take you back a little bit.  Where did you go to

16   college?

17   **A.**  I have a Bachelor of Science degree in natural resources

18   from the University of Rhode Island.

19   **Q.**  When did you finish there?

20   **A.**  1976.

21   **Q.**  Did you go to any graduate school after that?

22   **A.**  Yes, I did.  I attended the University of Washington.  I

23   have a Master's of Science Degree in forestry, with a

24   specialization in fire science, which I received in 1981.

25   **Q.**  Did you write a thesis on fire science?

1   **A.**   Yes, I did.

2   **Q.**   While in school, did you have any job; did you work

3   anywhere while you were still in school?

4   **A.**   Yes, I was a seasonal firefighter for the Forest Service.

5   I started as an initial attack firefighter, and then worked as

6   a hotshot firefighter for many seasons.

7   **Q.**   I have heard that term before. Can you tell us what a

8   hotshot firefighter is?

9   **A.**   It's a 24-hour crew that travels throughout the United

10   States for suppressing large fires.

11   **Q.**   For how long did you continue to work as a hotshot

12   firefighter?

13   **A.**   1983, I went to the National Parks Service and led a

14   hotshot crew until July of 1987.

15   **Q.**   In 1987, did you -- where did you go?

16   **A.**   That's when I started with ATF.

17   **Q.**   You've been a Special Agent since that time?

18   **A.**   Yes, that's correct.

19   **Q.**   Initially, did you start working as a fire investigator at

20   ATF?

21   **A.**   No, the first four years I did general investigations,

22   which included doing firearms investigations, fire

23   investigations, and also explosives investigations.

24   **Q.**   So when did you start working on arsons particularly?

25   **A.**   I entered the certified fire investigator program in

1   October 1991.

2   **Q.** Have you had any special training as a fire investigator?

3   **A.** Yes, I have. The ATF certification process is a two-year

4   training program.

5   **Q.** Can you tell us what you did over the course of that two

6   years?

7   **A.** During the two-year period, you investigate 100 fires

8   under the tutelage of an experienced fire investigator. You

9   attend seminars. You do self study. You also take -- we went

10  to the University of Maryland M.D. fire protection engineering

11  department and was taught fire dynamics.

12  **Q.** Is there any testing that occurs at the end of that

13  program?

14  **A.** Not with the ATF certification.

15  **Q.** Is there formal certification that occurs?

16  **A.** Yes, every year since my certification we have to

17  recertify, and that's based upon work experience, continuing

18  education, and other teaching and things like that.

19  **Q.** Have you been recertified every year since that year?

20  **A.** Yes, I have.

21  **Q.** Do you have any other certifications as a fire

22  investigator?

23  **A.** Yes, from the International Association of Arson

24  Investigators.

25  **Q.** What does it take to be certified by them?

**A.** They evaluate your work history, your training, your education, and then you take a test. If you pass the test you are certified.

**Q.** When were you first certified by that association?

**A.** 1991.

**Q.** Have you been recertified since that time?

**A.** That program requires a recertification every five years. My last recertification was August of 2007.

**Q.** You talked about a test a moment ago. Have you had any other involvement with that test apart from taking the test?

**A.** Yes, I was assigned -- after my certification, I was a member of the IWIA, International Association of Arson Investigators, Certified Fire Investigation Committee, and I participated in writing the test.

**Q.** You took a different version than the one you wrote, I trust?

**A.** Yes.

**Q.** Are you familiar with something called the National Fire Protection Association?

**A.** Yes.

**Q.** Can you tell us what that is?

**A.** That's an association of engineers and people within fire service that develop guides and codes that affect both building construction, standards for firefighting and things of that nature.

**Q.** You are on a technical committee of that association; is that correct?

**A.** That's correct. In 2001 I was appointed as a principal member of the technical committee on fire investigation. That committee is responsible for producing the document called NFPA-921, Guide for Fire and Explosion Investigation.

**Q.** Is that the leading guide on fire investigation?

**A.** Yes.

**Q.** Now, you are familiar with something called the National Response Team, ATF's National Response Team?

**A.** Yes.

**Q.** Can you tell us what that is?

**A.** They have four national response teams divided into regional areas. I was a member of the western National Response Team for 11 years. And we responded to fires throughout the United States, primarily west of the Mississippi, although I did do a couple in the east.

**Q.** What determines whether the National Response Team responds to a particular fire?

**A.** Typically, a local jurisdiction has had a large loss or a complex fire and they need assistance, so the team responds with a cadre of fire investigators, agents, fire protection engineers, chemists and explosive specialists.

**Q.** You said you were on that team for 11 years?

**A.** Yes.

1  Q.  From 1989 to 2000?

2  A.  Yes.

3        MR. FRIEDMAN:  The Government offers Agent Comery as

4  an expert in fire investigation.

5        MR. FOX:  No objection.

6        THE COURT:  You may ask questions.

7        MR. FRIEDMAN:  Thank you.

8  BY MR. FRIEDMAN:

9  Q.  Have you been involved in investigating a series of fires,

10  arsons that took place in Oregon and Washington between 1997

11  and 2001?

12  A.  Yes, I have.

13  Q.  Was there anything that caused you to link these fires in

14  your investigation?

15  A.  Yes.  There were several things that linked them.  The

16  nature of the targets, the nature of the devices that were

17  found or the ignition methodology at the fires, and also the

18  nature of how organizations claimed responsibility for setting

19  those fires.

20  Q.  Let me walk you through a few of those points.  First off,

21  anything about the geography of the fires that you found

22  significant?

23  A.  Many of them occurred in Oregon and Washington area.

24  Q.  You mentioned the nature of the targets chosen.  Can you

25  tell us what you mean by that?

**A.**   Yes, they were either industries or Government agency property that was of concern to animal liberation activists or environmental liberation activists.

**Q.**   You talked about the methodology of the fires; what did you mean by that?

**A.**   The majority of the fires involved multiple incendiary devices.   In many cases the devices were placed on the exterior of the buildings.   The fires occurred typically in the early morning hours, and many times associated with holidays.

**Q.**   Did you -- was there any pattern in terms of how many incendiary devices were used in each fire?

**A.**   There were multiple incendiary devices which was highly unusual, anywhere from two to five.

**Q.**   You also talked about something that happened after the fires?

**A.**   Yes.   There would be a communiqué, either from the Animal Liberation Front or from the Earth Liberation Front, or sometimes both would claim responsibility for setting the fire.

**Q.**   Agent Comery, I know you are not in the laboratory, but did you examine devices or remnants of devices at a number of these fires?

**A.**   Yes.

**Q.**   Did you notice anything significant to you?

**A.** The nature, the complexity of the design of the devices was unusual.

**Q.** Was there any consistency between the devices used at different arsons?

**A.** Yes. The devices typically had a large amount of accelerant and liquid that was in plastic containers or buckets. They had a timing component that would then go to power, which would power the igniter and cause the fire.

**Q.** Were the devices used at each of these arsons identical?

**A.** No, they were not.

**Q.** We are going to walk through each of those in a minute. Was there anything about the pattern of them that you noticed over time?

**A.** In general, the devices became more complex as the series of arsons continued.

**Q.** Agent Comery, before we dive into some of the fires that you investigated, can you explain to us in general terms how you would usually conduct a fire investigation in this type of case? How would you initially become involved?

**A.** Typically a local jurisdiction or fire department or police department would call for assistance. I would respond, and working with a local or state agents or investigators that were present, we would work the scene together.

This encompassed, when we arrived at the scene, gathering information. We would gather witness information. We would

1  talk to firefighters to determine what they discovered upon

2  their arrival and what actions they took to suppress the fire.

3      We would then try to understand the building construction,

4  talk to the owners or occupants, look for building plans,

5  things of the nature, or examine the remains.  We also wanted

6  to know the contents, what was in the building prior to the

7  fire, what natural fuel was present.  And then we would use

8  our knowledge to examine the fire effects; look at the

9  charring, the consumption of the timbers, things of that

10  nature, and see if there were fire patterns.  We'd look at the

11  fire patterns, and what we were trying to do was go to the end

12  of the fire back to origin.

13      So we would be retracing the fire spread from -- typically

14  it's the least damaged to the most, but there were exceptions

15  in that.

16  **Q.**  You mean the area where the fire starts is the most

17  damaged?

18  **A.**  That's a general rule.  What would happen once you got to

19  an area of origin, you would be looking for the mechanism that

20  caused the ignition, what item ignited what fuel.

21  **Q.**  You talked about burn patterns.  Is this what you mean by

22  burn patterns, how heavily different areas are burned, or is

23  there more to it?

24  **A.**  Sometimes when there's a fire, depending on where it

25  starts, there can be distinct patterns.  If a fire starts on

the exterior of the building at the base, you can see the char

coming right from the base of the building extending up the

edge of the building.

A lot of times it will reach a soffit or overhang, and

then the fire spreads out.  Sometimes this would form a "V"

pattern or a "U" pattern and would be an indicator to us that

we should go to that area and look to see what was burning in

that area.

**Q.**  Once you conducted your initial investigation and initial

observations, what's the next thing you typically do in a fire

investigation?

**A.**  Depending on the scene, we have walked around, typically

if we can get an aerial view we try to get that, we try to

understand the scene as best as possible.

During those initial walk around and photography, we would

be taking photos.  If we see any obvious evidence, we would

stop and try to determine if we should collect that

immediately to preserve that evidence.  And then we would go

ahead, and after coming up with our initial scenario, go ahead

and examine the debris.  We would layer through the debris.

That means many times when a building burns there will be

collapse.  So you want to see is this roof material, what

layer -- you take that off.  Then you see if you are on a

second floor or first floor, and you keep going to see if you

find any evidence.

1   **Q.**   Kind of like archaeology, but a shorter timeframe?

2   **A.**   That's correct.

3   **Q.**   You talked about readily observable evidence that you

4   might collect initially.  What type of evidence are you

5   talking about there?

6   **A.**   Well, in these scenes, there was instances where devices

7   had not functioned.  So when we found containers of gasoline

8   with timing components and ignition components, we realized we

9   should collect that very immediately.

10  **Q.**   Did you ever use -- you are obviously familiar with

11  something called accelerant.  Can you tell us what that is?

12  **A.**   ATF has a program which they train dogs to alert to the

13  smell, primarily ignitable liquids that are petroleum based,

14  like gasoline, diesel, fuel oil, lighter fluid; things of that

15  nature.  These dogs are just a tool for us, because many times

16  fire scenes are very, very large.  And the dog will come with

17  a handler, and they will examine the scene, and the dog will

18  alert and that just gives us an idea of the place we need to

19  examine in depth to see what the nature of that fuel was as to

20  the origin or the cause of the fire.

21  **Q.**   As you are examining areas of depth and layering, are you

22  collecting evidence as you go?

23  **A.**   If we discover evidence, yes, we are collecting it.

24  **Q.**   What would you typically collect as evidence, what types

25  of evidence?

1  A.  In this case we were going for items that related to

2  ignition.  Clearly if you find componentry, timing mechanisms,

3  you find containers, buckets that had ignitable liquids, or

4  red plastic gas containers, or one-gallon jugs, we would

5  collect those.  We would find things like batteries that

6  powered the ignition source; those items.

7  Q.  Did you also collect samples of general debris or soil

8  from areas?

9  A.  Many times when the dog alerted, or in these particular

10  fires, the amount of ignitable liquid was so overwhelming that

11  much of the liquid was absorbed in the substrate soil or the

12  rocks in the area that, No. 1, the odor was overwhelming to

13  us, so we would -- we didn't even need the dog -- we would

14  take samples and send those samples to the laboratory.

15  Q.  Did you send the other evidence you collected to the

16  laboratory also?

17  A.  The majority of it, yes.

18  Q.  After you had done all this, would you typically reach an

19  opinion in one of these cases?

20  A.  Yes, I would.

21  Q.  What -- as to what are you reaching an opinion?

22  A.  I would reach an opinion as to the origin of the fire and

23  the cause of the fire.

24  Q.  So basically where it started and what caused it to start?

25  A.  And how it started, yes.

1    **Q.**  I would like to take you through a number of the different

2    fires you investigated.  Are you familiar with the plant,

3    Cavel West, in Redmond, Oregon?

4    **A.**  Yes.

5    **Q.**  Are you familiar -- and that plant caught fire at a

6    certain point?

7    **A.**  Yes, July 21, 1997.

8    **Q.**  When did you learn about that fire?

9    **A.**  Early that morning.

10   **Q.**  Did you go to the Cavel West plant?

11   **A.**  Yes, I did.  I responded and arrived late in the

12   afternoon.

13   **Q.**  What did you learn about the fire when you arrived?

14   **A.**  I spoke to the investigators already on the scene:  Randy

15   Davis, the fire investigator, who ran the fire department,

16   Ryan Fields from Oregon State Police Department, and Dave

17   Fields from the Oregon State Fire Marshals office.

18       They informed me that the fire had been called in by a

19   witness who was an employee of a bakery just down the highway;

20   saw smoke and called 911.  A police officer from the Redmond

21   Police Department responded, arriving before the fire

22   department.  He circled the facility.  It's a fairly large

23   collection of buildings, about 16,500 square feet.  As he came

24   around the back side, west side, he saw an area that was

25   burning.  He had a video camera, and he did record this.

1      MR. FOX:  I am going to object to the complete

2 narrative of this testimony.

3      THE COURT:  Well.

4      MR. FOX:  I would ask there be more questions.

5      THE COURT:  I didn't think this was an area of great

6 concern from the opening statement.  You rather have question

7 and answer, let's do that.  I thought the issue was something

8 else.  Go ahead.

9 BY MR. FRIEDMAN:

10 **Q.**  You may have said this, and I may have missed this, did

11 you learn at what time roughly the fire was initially noticed?

12 **A.**  About 4:00 in the morning.

13 **Q.**  After the fire was reported, who arrived at the scene?

14 **A.**  A Redmond police officer.

15 **Q.**  Did the fire department come?

16 **A.**  Yes, and the fire department arrived.

17 **Q.**  Did you learn how long it took to contain the fire?

18 **A.**  It took until approximately 6:45 a.m. for containment.

19 **Q.**  Did you learn why it took so long to contain it?

20 **A.**  It had developed into a massive fire, and it had burned --

21 like I said, the building was about 16,500 square feet.

22 **Q.**  Does the fact that the fire was contained at about 6:45 --

23 does that mean it was out?

24 **A.**  No, the fire continued to burn throughout the afternoon.

25 **Q.**  How much water did it take to put that fire out?

1   **A.**  They estimated it took over 2 million gallons of water.

2   **Q.**  Did that have any effect on the local water supply?

3         MR. FOX:  Objection, relevance.

4         THE COURT:  You may answer.

5   **A.**  Yes, it did.

6         THE COURT:  Do I need to take this matter up, because

7   I thought -- you have a standing objection it to.  Go ahead.

8   BY MR. FRIEDMAN:

9   **Q.**  Did you answer it?

10   **A.**  Yes, it did have an impact upon the water supply for the

11   city.

12   **Q.**  What time roughly did you start processing and

13   investigating the fire?

14   **A.**  In the late afternoon of that day.

15   **Q.**  Did it take you more than one day to do that?

16   **A.**  Yes, it did.

17   **Q.**  As part of your investigation, did you prepare a diagram

18   of the scene?

19   **A.**  Yes, I did.

20   **Q.**  Would you take a look at Exhibit 211 and tell me if you

21   recognize that?

22       You should have a physical copy and --

23   **A.**  Yes, I do.

24   **Q.**  Is that the diagram you prepared?

25   **A.**  Yes, it is.

1   **Q.**  It says approximation.  Is it generally an accurate

2   diagram of what you saw there that day?

3   **A.**  Yes.

4          MR. FRIEDMAN:  The Government offers Exhibit 211.

5          THE COURT:  Objection to these?

6          MR. FOX:  No objection.

7          THE COURT:  Admitted.

8               (Exhibit No. 211 admitted.)

9          THE COURT:  You should have a list of the exhibits

10  they are going to offer with this witness?

11         MR. FOX:  I don't believe I do.

12         THE COURT:  Was it shared the exhibits that were

13  going to be used with this witness.

14         MR. FRIEDMAN:  We gave it to the Court clerk and

15  didn't realize --

16         MR. FOX:  I have no objection.

17         THE COURT:  All right.

18  BY MR. FRIEDMAN:

19  **Q.**  Agent Comery, could you tell us -- could you give us a

20  general description of what's shown in the diagram?

21  **A.**  Yes, at the north end where it says offices, that is a

22  single story building wood frame, continues into the

23  warehouse.  As I mentioned, this is a series of building that

24  had been cojoined and built over a period of time.

25      From the area of the offices to the storage, that's the

1   portion that burned and that was about 16,500 square feet.

2       Then to the east of that is a building called the shed,

3   and then there was a new building under construction just to

4   the south of that.

5   Q.  So everything but the shed and the new building burned?

6   A.  Yes, was damaged, yes.

7   Q.  Were aerial photographs taken at the scene?

8   A.  Yes, they were.

9   Q.  Could you take a look at Exhibit 212-A and 212-B?

10  212-A first.

11  A.  Yes.

12  Q.  Do you recognize that?

13  A.  Yes, I do.

14  Q.  That's an aerial photograph taken that day or shortly

15  thereafter?

16  A.  Yes.

17          MR. FRIEDMAN:  Government offers Exhibit 212-A.

18          MR. FOX:  No objection.

19          THE COURT:  Admitted.

20          (Exhibit 212-A received in evidence.)

21  BY MR. FRIEDMAN:

22  Q.  Could you describe for the jury what's shown in this

23  picture?

24  A.  Yes, first the main highway in the lower right-hand corner

25  is Route 97.  And then as you cross, there's railroad tracks,

1    and then you come onto the facility.  You can see almost in

2    the dead center of the photograph is the area of fire damage

3    where the roofs have burned off, and down at the south end the

4    building has completely burned.

5         The other point of interest is there is a residence in

6    that area, just to the left of the main facility.

7    **Q.** Would you take a look at Exhibit 212-B?  Do you recognize

8    that?

9    **A.** Yes, it's an aerial photograph of the scene.

10   **Q.** Is it a closer-up photograph?

11   **A.** Yes.

12            MR. FRIEDMAN:  The Government offers Exhibit 212-B.

13            MR. FOX:  No objection.

14            THE COURT:  Admitted.

15            (Exhibit No. 212-B admitted.)

16   BY MR. FRIEDMAN:

17   **Q.** Is it fair to say this is basically the plant but without

18   the surroundings?

19   **A.** That's correct.

20   **Q.** Now, did you find or learn of any destructive devices

21   during the course of this investigation?

22            MR. FOX:  Objection, Your Honor, to the conclusion

23   and the leading phrasing of that question.  There's no

24   foundation.

25            THE COURT:  It is noted, you may answer.

1   **A.**  Yes, I did.

2   BY MR. FRIEDMAN:

3   **Q.**  Do you recall how many?

4   **A.**  The remains of three devices.

5   **Q.**  Let me ask you to turn back to Exhibit 211, which has been

6   admitted.  Can you tell us what are the Nos. 1, 2, and 3?

7   **A.**  Yes, those relate to the areas where evidence of

8   incendiary devices were located.  The numbering is just the

9   order in which the devices were collected as evidence.

10  **Q.**  In what condition were these devices when they were found

11  and collected?

12  **A.**  The device in the shed, No. 1, was found; it had not

13  functioned.

14  **Q.**  What about device No. 2 next to the office?

15  **A.**  No. 2, at the time of collection -- when I arrived, the

16  device had partially burned or almost completely burned.

17  **Q.**  Did you learn anything about the condition when the first

18  firefighters arrived?

19  **A.**  Yes, firefighters discovered that device intact, and I

20  viewed a photograph that was taken of it when it was intact,

21  subsequently during the fire suppression effort that ignited.

22  **Q.**  What about device 3?

23  **A.**  Device 3 was just the componentry and burnt evidence, the

24  remains of an incendiary device.

25  **Q.**  Let me ask you to take a look at 212-C and tell me if you

1  recognize that?

2  **A.** Yes, I do.

3  **Q.** Can you tell what that is?

4  **A.** That is the shed.

5          MR. FRIEDMAN:  Government offers 212-C.

6          MR. FOX:  No objection.

7          THE COURT:  Admitted.

8          (Exhibit 212-C admitted.)

9  BY MR. FRIEDMAN:

10 **Q.** Can you tell us in general terms, from what perspective we

11 are looking at the shed?

12 **A.** You are looking from the open west side of the shed.

13 **Q.** So the burned buildings would be to your back as you look

14 in?

15 **A.** Yes, that's correct.

16 **Q.** Can you take a look at 212-D and tell me if you recognize

17 that?

18 **A.** Yes, I do.

19 **Q.** Is that a picture taken inside the shed?

20 **A.** Yes, that's correct.

21         MR. FRIEDMAN:  The Government offers 212-D.

22         MR. FOX:  No objection.

23         THE COURT:  Admitted.

24         (Exhibit 212-D admitted.)

25 BY MR. FRIEDMAN:

1  **Q.** Agent Comery, can you tell us what is shown in this

2  picture?

3  **A.** In this picture we see an incendiary device and

4  accelerant, ignitable liquid that has been spread about the

5  combustibles in the shed.

6  **Q.** Is Exhibit 212-E a closer up of what's shown in 212-D?

7          MR. FOX:  Your question was what?

8  **A.** To 212-E?  Yes, it is.

9          MR. FRIEDMAN:  Government offers 212-E.

10         MR. FOX:  No objection.

11         THE COURT:  Admitted.

12         (Exhibit 212-E admitted.)

13 BY MR. FRIEDMAN:

14 **Q.** Agent Comery, did you study this device and how it was

15 designed to work?

16 **A.** Yes.

17 **Q.** Did you look at it to determine that?

18 **A.** Yes, I did.

19 **Q.** Can you walk us through that?  Let me ask you first,

20 there's a white square, kind of bottom center of this picture?

21 **A.** Correct.

22 **Q.** Can you tell us what that is?

23 **A.** That's a 60-minute wind-up timer, typical kitchen timer.

24 **Q.** And there's a red line shown across that?

25 **A.** Yes, that is a red plastic straw that had been adhered to

1 the handle of the timer.

2 **Q.** Did you determine what that straw was designed to do or

3 appeared to be designed to do?

4 **A.** On top of the timer at the zero point, there were two

5 wires attached.  The ends of the wires had been stripped clear

6 of insulation.  It appeared when the timer came around to the

7 zero point, the straw was designed to push the two wires

8 together to make complete contact.

9 **Q.** Maybe if you touch the screen and circle, you are maybe

10 able to indicate particular areas.  Give that a shot.

11 **A.** Okay.

12 **Q.** You rather go with just words?

13 **A.** Yeah.

14 **Q.** The two wires you talked about, those are the two black

15 wires coming out of the top of the white box?

16 **A.** Correct.

17 **Q.** When they were joined, what would that do to this

18 apparatus?

19 **A.** It would make a complete circuit between the 9-volt

20 battery and the bayonet-based light bulb that is over by the

21 match books.

22 **Q.** So current would flow through that light bulb?

23 **A.** That's correct.

24 **Q.** Would you look at 212-F and tell me what that is?

25 **A.** That is a close-up photograph of the jug, the matches and

1  the light bulb.

2        MR. FRIEDMAN:  Government offers 212-F.

3        MR. FOX:  No objection.

4        THE COURT:  Admitted.

5        (Exhibit 212-F admitted.)

6  BY MR. FRIEDMAN:

7  **Q.**  Once the current flowed through the light bulb, could you

8  tell what was designed to happen next?

9  **A.**  Yes, one of the things you will notice on the light bulb

10  is that the glass bulb is missing.  You can see the filament

11  has been placed between two matches in the matchbook.  So it's

12  designed as the current from the 9-volt battery passes through

13  the filament, there will be resistant heating that would heat

14  up and it would ignite the matches.

15  **Q.**  I understand if you press the "X" in the lower left-hand

16  corner of the screen that will give you the ability to draw on

17  the screen -- exit, I mean.  Do you want to try a practice

18  somewhere?

19  **A.**  There.

20  **Q.**  Okay.  Once the match head is lighted, what would happen

21  next?

22  **A.**  Then the flame would spread to the other match heads, and

23  then above the matchbook is a sponge that has ignitable liquid

24  in it, and the fire would spread to that.  Plus there is

25  ignitable liquid spread on the floor in the area, and that

1  would ignite.  And then the container of gasoline, the
2  one-gallon jug -- the flaming sponge would cause it to melt
3  and then gas would pour out and that too would ignite.
4  **Q.**  At that point you would have a fire with at least a gallon
5  of gas plus whatever else was spread?
6  **A.**  That's correct.
7  **Q.**  Take a look at 212-G and tell me if you recognize that?
8  **A.**  This is a five-gallon plastic bucket that was discovered
9  in the sheet.
10       MR. FRIEDMAN:  Government offers 212-G.
11       MR. FOX:  No objection.
12       THE COURT:  Admitted.
13       (Exhibit No. 212-G admitted.)
14  BY MR. FRIEDMAN:
15  **Q.**  Did you notice anything significant about this bucket?
16  **A.**  It was a white bucket that had been painted black.  Also
17  inside the container was a liquid that smelled strongly of
18  gasoline.
19  **Q.**  Would you take a look at 212-H?
20  **A.**  Is that a photograph of the interior of the bucket?
21       MR. FRIEDMAN:  The Government offers 212-H.
22       MR. FOX:  No objection.
23       THE COURT:  Admitted.
24       (Exhibit No. 212-H admitted.)
25  BY MR. FRIEDMAN:

**Q.** Agent Comery, was there anything in this bucket when you saw this?

**A.** There was liquid at the bottom of the bucket, yes.

**Q.** Can you estimate how much liquid?

**A.** Enough for us to take two samples.

**Q.** Did you notice, did the liquid have any smell?

**A.** It smelled strongly of petroleum and gasoline-based products.

**Q.** Did you see any similar liquid anywhere else in the shed?

**A.** Yes.  The remnants of material was spread around the floor, and the material had the addition of a soap to it.

**Q.** Before examining this device, did you or other investigators take any steps related to it?

**A.** Yes, when this device was discovered it was prior to my arrival on the scene.  Randy Davis called the Oregon State bomb tech and got advice on how to render it safe, and he did cut the wires between the power supply and the light bulb.

**Q.** So it certainly wouldn't work as designed, as you are looking at it?

**A.** That's correct.

**Q.** Would you take a look at 212-L and tell me if you recognize that?  Oh, I am sorry, 212-I.

**A.** Yes.  This is a photograph of the west side of the warehouse, and the southwest of the office portion of the complex.

1    MR. FRIEDMAN:  Government offers 212-I.

2    MR. FOX:  No objection.

3    THE COURT:  Admitted.

4         (Exhibit No. 212-I admitted.)

5  BY MR. FRIEDMAN:

6  **Q.**  You said this was the southwest side of the office?

7  **A.**  Yes.

8  **Q.**  Was -- can you point out where in this picture device 2

9  was located?

10  **A.**  In the southwest exterior of the office, which is on the

11  left center portion of the photograph, that's where device 2

12  was discovered.

13  **Q.**  That's the device that was intact when the firefighters

14  arrived but had gone off by the time you were there?

15    MR. FOX:  Objection, leading.  And asked and

16  answered.

17    THE COURT:  Let's see if we can get it without -- let

18  me do this.  Let me have you step out for a moment.  Leave

19  your books on the chair.  Don't discuss the matter.

20    (Jury not present.)

21    THE COURT:  You may be seated.

22    My concern, Mr. Fox, is this.  From your opening

23  statement, and what you've been telling me all the time,

24  there's no issue with the damage, what has happened here.  So

25  it's a matter of how quickly can you get through this without

1  them having to question and answer until we get through.

2  Because you are not contesting this, am I correct?  Or can't

3  you look at these matters and stipulate to a lot of these

4  matters if you have no concern about them?

5         MR. FOX:  Generally, you are correct, although we are

6  in trial and I am trained to make objections when I hear --

7         THE COURT:  Can I untrain you a little bit and make

8  objections when they count?  You don't have to make noise like

9  a lawyer.  Protect your client's interest as you go through.

10 This is in an area that the concern wasn't there, so what's

11 wrong with them getting to the issue and saying what you've

12 got to say about it as quickly as possible?

13        MR. FOX:  I will keep that in mind, Your Honor.

14 Thank you.

15        THE COURT:  All right.  Let's see if we can get the

16 jury back in here so we can get through this.

17    (Jury present.)

18        THE COURT:  All right.  Question.

19        MR. FRIEDMAN:  Thank you, Your Honor.

20 BY MR. FRIEDMAN:

21 **Q.**  Agent Comery, would you look at Exhibit 212-L?

22 **A.**  Yes.

23 **Q.**  Can you tell me a little more about it?

24 **A.**  The damage that's on the screen?

25 **Q.**  No, 212-L.

1  **A.** Sorry. This photograph was taken at the area that I

2  showed on the diagram that is to the southwest exterior of the

3  office. And what we can see here is several items in the

4  center of the photograph is the --

5  **Q.** Can I stop you for a moment? The Government offers 212-L.

6        MR. FOX: No objection.

7        THE COURT: Admitted.

8            (Exhibit No. 212-L admitted.)

9  BY MR. FRIEDMAN:

10 **Q.** Now, can you tell us what this photograph shows?

11 **A.** There are several items of interest in this photograph.

12 No. 1, there is the remains of a tube of fire paste. No. 2,

13 there is the remains of a red plastic container. There is

14 also -- No. 3 is the remains of a green sponge. And then

15 there is also the remains of a one-gallon plastic container.

16 Within that debris is also the remains of a 9-volt battery and

17 a timer -- 60-minute timer.

18 **Q.** Did you draw any conclusion as to the similarity of these

19 items to the similarity of the items you found in the shed,

20 device 1?

21 **A.** This appeared to be the same design as in the device in

22 shed 1.

23 **Q.** Would you take a look at 212-M and tell me in general

24 terms if you recognize that?

25 **A.** That is an aerial view of the main processing portion of

1   the building.

2         MR. FRIEDMAN: Government offers Exhibit 212-M.

3         MR. FOX: No objection.

4         THE COURT: Admitted.

5             (Exhibit No. 212-M admitted.)

6   BY MR. FRIEDMAN:

7   **Q.** Then would you take a look at 212-N and tell me what that

8   is?

9   **A.** That's a close up of the area where the components of

10   device 3 were located on the west side of the building.

11   **Q.** Closer up view of what was shown in the previous photo?

12   **A.** Yes.

13         MR. FRIEDMAN: Government offers 212 N.

14         MR. FOX: No objection.

15             (Exhibit No. 212-N admitted.)

16   BY MR. FRIEDMAN:

17   **Q.** Agent Comery, I see a number of red spots on the bottom

18   center. Can you tell us what those are?

19   **A.** Yes. During the processing of this area, we were looking

20   for componentry consistent with the other devices and any

21   other evidence we could find.

22     As we went through the debris, we would just place a flag

23   in it because we were going to try to collect it in its

24   entirety.

25   **Q.** So those flags are the locations of items you found

1  significant?

2  **A.**  Yes.

3  **Q.**  The wall behind them has black streaks; can you tell us

4  what that is?

5  **A.**  A fairly unusual fire pattern in comparison to the rest of

6  that wall.  We see that there has been sooting and staining of

7  the wall.  And then right above that concrete foundation, you

8  see an area of wood wall.  This is one of those fire patterns

9  where you can see a general pattern where the fire damage gets

10  wider as it goes up to the top of the wall, almost to the end.

11  **Q.**  What does that tell a fire investigator?

12  **A.**  In looking at the debris below the stain on the wall, we

13  knew from conversations with employees of the facility, that

14  nothing was stacked up there.  Any time we see burning on the

15  exterior of the building we would look for naturally occurring

16  fuel; in this instance wood pallets or something of that

17  nature.  There was not evidence of that, and no report of

18  pallets stored in the area.  When we started to process the

19  debris, we did find the componentry from a device and then the

20  characteristic odor of gasoline.

21  **Q.**  Could you take a look at 212-O and tell me if you

22  recognize that?

23  **A.**  Yes, I do.

24  **Q.**  In general terms what is that?

25  **A.**  That is just a close up of the area where red flags had

1  been when we were processing.

2         MR. FRIEDMAN:  The Government offers 212-O.

3         MR. FOX:  No objection.

4         THE COURT:  Admitted.

5              (Exhibit No. 212-O admitted.)

6  BY MR. FRIEDMAN:

7  **Q.** Agent Comery, could you describe for the jury what you see

8  in the picture?

9  **A.** This is some of the evidence collected from that site.

10 You can see right there is the remains of a 9-volt battery.

11 You can see wiring in the center of the picture, and then at

12 the upper left-hand, you see the remains of melted plastic.

13 **Q.** Were you able to tell what type of plastic item that was

14 that is melted there?

15 **A.** It was a type of white plastic consistent with what you

16 would see from the remains of a five-gallon container.

17 **Q.** How do these items compare to the items you found in the

18 shed, device 1?

19 **A.** It would appear it was of the same design.  The difference

20 was we found two timers in this location.  We found one 9-volt

21 battery, but also found an undamaged battery, or rather, Agent

22 Davis found that just several feet away on the railroad

23 tracks, a 9-volt that was not damaged.

24 **Q.** Was any testing done of the items that you've labeled as

25 items 1, 2 and 3?

1  A.  Yes.

2  Q.  What did the result of the testing show?

3  A.  The test came back positive for the presence of gasoline

4  and a heavy petroleum distillate.

5  Q.  What do you mean by that?

6  A.  That's typically a diesel or fuel oil No. 2.

7  Q.  Were both of those found in the same sample?

8  A.  Yes.

9  Q.  What inference did you draw from that?

10  A.  It appeared the ignitable liquid was a mixture of a

11  gasoline and heavy petroleum distillate.

12  Q.  Possibly diesel?

13  A.  Correct.

14  Q.  On July 30, 1997 did you interview someone named Craig

15  Rosebraugh?

16  A.  Yes, I did.

17  Q.  Did you know who Craig Rosebraugh was when you went to

18  interview him?

19  A.  Yes, I did.

20  Q.  Was he affiliated with any organizations?

21        MR. FOX:  Objection, irrelevant, Your Honor.

22        THE COURT:  Where is this going, counsel?

23        MR. FRIEDMAN:  Your Honor, Mr. Rosebraugh is the

24  spokesperson for the Earth Liberation Front.

25        THE COURT:  Will he be testifying in the matter.

1     MR. FRIEDMAN:  He will not be testifying?

2     THE COURT:  Then I sustain the objection; move on.

3  BY MR. FRIEDMAN:

4  **Q.**  When you interviewed Mr. Rosebraugh, what did you

5  interview him concerning?

6  **A.**  A communiqué --

7     MR. FOX:  Objection, Your Honor, again he's calling

8  for a hearsay answer; and irrelevance.

9     MR. FRIEDMAN:  Your Honor, Mr. Rosebraugh provided

10  the communiqué for this action --

11     THE COURT:  Well, it might have been, but let's move

12  on to the next question.

13     MR. FRIEDMAN:  Your Honor, could I ask a related

14  question?

15     THE COURT:  Well, I don't know what the question is.

16  BY MR. FRIEDMAN:

17  **Q.**  Did you speak with Mr. Rosebraugh on July 30, 1997?

18  **A.**  Yes.

19  **Q.**  Did Mr. Rosebraugh provide you any document?

20  **A.**  Yes, he did.

21  **Q.**  Would you take a look at Exhibit 213 and tell me if you

22  recognize that?

23  **A.**  Yes, I do.

24  **Q.**  Is that the document Mr. Rosebraugh provided you?

25  **A.**  It is a copy of the document, yes.

1      MR. FRIEDMAN:  Government offers Exhibit 213.

2      MR. FOX:  No objection.

3      THE COURT:  Admitted.

4           (Exhibit No. 213 admitted.)

5  BY MR. FRIEDMAN:

6  **Q.**  Mr. Comery, you've read this document?

7  **A.**  Yes, I have.

8  **Q.**  What does it purport to be?

9  **A.**  It claims to be a communiqué from the Animal Liberation

10  Front in which they claim credit for starting the fire at

11  Cavel West.

12  **Q.**  If you look at the sentence beginning on -- the first

13  sentence.  Is what you told me, basically the first sentence?

14  **A.**  Correct.

15  **Q.**  What does the second sentence tell us?

16  **A.**  It states, "About 35 gallons of vegan jello was brought in

17  with the team."

18  **Q.**  If we move down to about seven or eight lines up from the

19  bottom, do you see a sentence that starts with the word

20  "finally"?

21  **A.**  The first word on that line is "may"?

22  **Q.**  Yes.

23  **A.**  "Finally, the incendiary devices were set to ignite at

24  exactly the same time."

25  **Q.**  "What is the next sentence?

1   **A.** "Unfortunately, as the battery was being connected to the

2   device at the refrigeration unit, a spark started that entire

3   area on fire."

4   **Q.** Three lines up from the bottom, do you see a claim as to

5   how much damage was done?

6   **A.** Yes, I do.

7   **Q.** Can you tell us what that says?

8   **A.** It says "At least $1 million of damage has been done, and

9   the entire plant is currently closed and out of operation."

10   **Q.** And let me take you back up a little higher.  If you go to

11   the fifth line, can you read a sentence that starts with the

12   word "next"?

13   **A.** Yes, the line reads "Next, a number of large holes were

14   drilled into the rear wall of the slaughterhouse office to

15   bypass potential alarms on the doors or windows.  Next, the

16   area that housed the refrigeration units was located, and

17   again large holes were drilled through the wall at that part

18   of the slaughterhouse."

19   **Q.** Then the following sentence.

20   **A.** Then it says, "Two teams then poured the jello into the

21   numerous holes and quickly began to assemble the three

22   electrically-timed incendiary devices that would bring to a

23   screeching halt what countless protests and letter writing

24   campaigns could never stop."

25   **Q.** After receiving this, did investigators do any follow-up

1  investigation?

2  **A.**  Yes, we did.

3  **Q.**  Can you tell us what that was?

4  **A.**  Yes.  Based upon the information about drilling holes, we

5  remembered that when we were processing the scene by device to

6  the southwest of the office, we had seen a hole drilled in the

7  side of the wall.

8  **Q.**  Let me ask you to turn back to 212-J which is already in

9  evidence.

10     Do you see anything related to what you just said there?

11  **A.**  Yes.  In the upper right-hand corner, you can see a hole

12  in the siding of the building.

13  **Q.**  What did investigators do after they returned and saw

14  that?

15  **A.**  They collected it as evidence.

16  **Q.**  Did they collect anything else?

17  **A.**  Yes, when they cut that piece out, they then -- Randy

18  Davis, then noticed that there was ignitable liquid, kind of a

19  gel with a soap that was in the crawl space near that hole.

20  So we collected a sample of that.

21  **Q.**  Was that sample sent to the laboratory for testing?

22  **A.**  Yes.

23  **Q.**  What were the results of that testing?

24  **A.**  Came back presence for gasoline and HPD.

25  **Q.**  During the course of your investigation, did you learn

1   what the damage to Cavel West was?

2   **A.**   Yes.

3   **Q.**   What did you learn?

4   **A.**   That it was approximately $1,200,000.

5   **Q.**   Did you reach any opinion as to the cause and origin of

6   this fire?

7   **A.**   Yes.

8   **Q.**   Would you tell us what that opinion is?

9   **A.**   Yes.   The area of origin was the west side of the

10  processing plant, the area on the diagram where device No. 3

11  was collected.   The fire was caused by the initiation of the

12  device which ignited the flammable liquids, the ignitable

13  liquids that had been spread in that area.

14  **Q.**   Agent Comery, did you also investigate a fire that took

15  place on November 30 of 1997 at the BLM horse corrals at

16  Burns, Oregon?

17  **A.**   Yes, I did.

18  **Q.**   Can you tell us, what is BLM?

19  **A.**   Bureau of Land Management.

20  **Q.**   What was the purpose of this horse corral; what did it do?

21  **A.**   The Bureau of Land Management maintains the corral to

22  house wild horses that exceed the carrying capacity of the

23  range in that area.   They bring the horses in and keep them

24  there.

25  **Q.**   When did you first learn of the fire that took place at

1   the horse corral?

2   **A.**   That day at the fire.

3   **Q.**   When did you go to the scene?

4   **A.**   The next day we traveled to the scene.

5   **Q.**   What did you learn about the fire when you arrived on the

6   scene?

7   **A.**   I was informed that the fire had been discovered at 8:00

8   in the morning on the 30th.   This is the Sunday after

9   Thanksgiving.   Two Bureau of Land Management employees had

10  come to the facility to take care of the horses.   When they

11  came to the front gate, the lock on the gate would not open

12  with their key.   They then looked and realized the lock had

13  been replaced, and on the ground was the cut lock that they

14  usually opened.

15      They then noticed there was smoke in the area coming from

16  where the barn was.

17  **Q.**   Did you go observe the barn?

18  **A.**   Yes, I did.

19  **Q.**   What did you see when you went to see the barn?

20  **A.**   The barn was totally destroyed and the roof -- the metal

21  roof had collapsed down to the ground.

22  **Q.**   Did you learn anything about anything else that had

23  happened at the site, any --

24  **A.**   Yes.

25  **Q.**   What did you learn?

**A.** There was a John Deere diesel tractor with a trailer full of hay that was parked near the barn, and there were two incendiary devices, one under the engine and one within the cab of the tractor.

**Q.** Had those devices gone off?

**A.** They had not.

**Q.** What about the horses that were at the corral?

**A.** Most of the horses were still in the facility, but some of the fence had been removed and some of the horses had escaped.

**Q.** Did you process that scene over several days?

**A.** Yes, I did.

**Q.** Did you prepare any diagram of the scene?

**A.** Yes, I did.

**Q.** Would you take a look at Exhibit 221 and tell me if you recognize that -- it should be a two-page document?

**A.** That's correct, it's the diagram I produced of the whole barn.

**Q.** Is that an accurate diagram?

**A.** Yes, it is.

          MR. FRIEDMAN:  Government offers 221.

          MR. FOX:  No objection.

          THE COURT:  Admitted.

                    (Exhibit No. 221 admitted.)

BY MR. FRIEDMAN:

**Q.** Agent Comery, looking at the first page of that, could you

1  describe what that shows?

2  **A.** This building is approximately 96 feet long and about 50

3  feet wide. It had a metal roof. The sides were wood fencing.

4  What was unusual is there were two single-story wood frame

5  structures within the barn itself. In the upper left-hand

6  corner you can see there's a small 10 by 14-foot building

7  called the tack room. And then in the center of the top of

8  the diagram, you can see something labeled the office, and it

9  has a bathroom as part of that building. That's about 325

10 square feet.

11 **Q.** Turning to the second page of that exhibit, can you tell

12 us what that shows?

13 **A.** This is just a blow up of the area of interest around the

14 office.

15 **Q.** There are three letters, C, D, and E; what do they mean?

16 **A.** They correspond to evidence collected related to

17 incendiary devices. The first incendiary devices were -- A

18 was under the tractor, and B was in the cab. And when we

19 started to process the barn, we just continued to label them

20 as such.

21 **Q.** Would you take a look at Exhibit 222-A and tell me what

22 that is?

23 **A.** That is a photograph of the entrance to the facility and

24 the gate.

25         MR. FRIEDMAN: Government offers Exhibit 222-A.

1          MR. FOX:  No objection.

2          THE COURT:  Admitted.

3                (Exhibit No. 222-A admitted.)

4 BY MR. FRIEDMAN:

5 **Q.** Then can you turn to Exhibit 222-D, and tell me what that

6 is?

7 **A.** This is a photograph of the tractor with the trailer, and

8 on the far left-hand side you can see the remains of the whole

9 barn.

10         MR. FRIEDMAN:  Government offers Exhibit 222-D.

11         MR. FOX:  No objection.

12         THE COURT:  Admitted.

13             (Exhibit No. 222-D admitted.)

14 BY MR. FRIEDMAN:

15 **Q.** Could you just point out when you are referring to the

16 remains of the whole barn, to what are you referring?

17 **A.** That area right there.  (Indicating.)

18 **Q.** Would you take a look at Exhibit 222-E and tell me what

19 that is a picture of?

20 **A.** That is a picture of the area underneath the engine of the

21 tractor where a device was found.

22         MR. FRIEDMAN:  The Government offers 222-E.

23         MR. FOX:  No objection.

24         THE COURT:  Admitted.

25             (Exhibit No. 222-E admitted.)

BY MR. FRIEDMAN:

**Q.** Is 222-F a closer-up shot of the same device?

**A.** That's correct.

      MR. FRIEDMAN:  Government offers 222-F.

      MR. FOX:  No objection.

      THE COURT:  Admitted.

          (Exhibit No. 222-F admitted.)

BY MR. FRIEDMAN:

**Q.** Were the two devices found on the tractor, the one in and the one under -- were they generally similar or were there significant differences between them?

**A.** The only difference was the presence of what's called a super-match in the componentry of the one in the cab.

**Q.** Why don't we go to that one and work through that.  Would you look at Exhibit 222-G, tell me what that is?

**A.** Yes, this is the interior of a cab of the tractor.

      MR. FRIEDMAN:  Government offers 222-G.

      MR. FOX:  No objection.

      THE COURT:  Admitted.

          (Exhibit No. 222-G admitted.)

BY MR. FRIEDMAN:

**Q.** Can you tell us what's significant to you in that picture?

**A.** Several things.  You can see the residues of ignitable liquid that had been mixed with the soap that had been spread and splattered around the area of the seat, the console and

window.  On the floor three super-matches.  Those are just
matches that are very large matches that have wood fiber base.
They should sustain burning for a period of time.  You also
see an ignition component down there, which is a pack of
matches that has a rocket igniter in the center of it.  Then
up on the console, you see the timing mechanism.  And that is
a 60-minute timer with an attached 9-volt battery and wires.
The wires have been cut by Detective Coleman, and then the
wires went to alligator clips that went over to a pack of
matches -- several books of matches that have the rocket
igniter inside it.  And they are placed on top a super-match,
which is placed on top a sponge with ignitable liquids.  And
then the one-gallon container contained ignitable liquid.

**Q.**  So, how do, if you look at the device?  You talked a
moment ago about rocket igniter and super-match.  How do those
compare to the device we saw earlier at Cavel West?

**A.**  This is just a little more sophisticated.  The rocket
igniter is not as fragile as the element of the light bulb.

**Q.**  It's still a wire through which current flows and which
heats up?

**A.**  That's correct, and would create a flame.

**Q.**  Would you take a look at 222-I and tell me what that is?
I am sorry, I have moved you too fast.  222-H.

**A.**  That is a photograph, a closer-up photograph of the timer
and the one-gallon jug.

|     |                                                                        |
| --- | ---------------------------------------------------------------------- |
| 1   | MR. FRIEDMAN:  Government offers 222-H.                                 |
| 2   | MR. FOX:  No objection.                                                 |
| 3   | THE COURT:  Admitted.                                                   |
| 4   | (Exhibit No. 222-H admitted.)                                           |
| 5   | BY MR. FRIEDMAN:                                                        |
| 6   | **Q.**  Can you show us where you are referring to some wires that      |
| 7   | had been cut a moment ago?                                              |
| 8   | **A.**  Yes, the red dot right in the center of the photograph;         |
| 9   | you can see the wire is cut.                                            |
| 10  | **Q.**  That originally connected to the  timer?                        |
| 11  | **A.**  Yes.                                                            |
| 12  | **Q.**  Would you look at 222-I?                                        |
| 13  | **A.**  This is a close-up photograph of the timer on the console.      |
| 14  | **Q.**  What identifications had been made; what's been done to         |
| 15  | this timer?                                                             |
| 16  | **A.**  The timer has a 9-volt battery --                               |
| 17  | **Q.**  I am sorry, Government offers 222-I.                            |
| 18  | MR. FOX:  No objection.                                                 |
| 19  | THE COURT:  Admitted.                                                   |
| 20  | (Exhibit No. 222-I admitted.)                                           |
| 21  | BY MR. FRIEDMAN:                                                        |
| 22  | **Q.**  Let me ask you to start again.                                  |
| 23  | **A.**  The timer has a 9-volt battery attached to the right-hand       |
| 24  | side.  A snap connector is on top of the battery, the wire              |
| 25  | goes to the very top of the timer and you can see the ends;             |

1    the installation has been peeled off that.  Adjacent to that

2    is another wire that also has the insulation removed.  On the

3    timer itself you can see a toothpick has been taped to the

4    handle.

5    **Q.**  When you discovered this timer, at what time was it or

6    what time was it set?

7    **A.**  This timer had run to zero.

8    **Q.**  Were you able to determine why this device didn't go off?

9    **A.**  What we saw was when the toothpick reached that area, it

10   had not pushed the two wires to connect.

11   **Q.**  Would you take a look at Exhibit 222-J and tell me what

12   that is?

13   **A.**  It is a close-up photograph of the matchbook, sponge,

14   super-match and jug.

15              MR. FRIEDMAN:  Government offers 222-J.

16              MR. FOX:  No objection.

17              THE COURT:  Admitted.

18                   (Exhibit No. 222-J admitted.)

19   BY MR. FRIEDMAN:

20   **Q.**  Could you point out for the jury each of the items you

21   just referred?

22   **A.**  You can see on this -- the first thing you see is the

23   alligator clips at the end of the wires coming from the 9-volt

24   battery and from the timer.  Then you see bare wire that

25   that's attached to.  What you don't see is the bare wire is

1  attached to one end of the rocket igniter.  You see several

2  books of matches that the cover has been bent back and been

3  taped together with the super-match, and then you see the

4  yellow sponge and the one-gallon jug.

5  **Q.**  So when the timer closed the circuit and current flowed

6  through these wires, what would happen with this device?

7  **A.**  It was designed so that the rocket igniter would cause the

8  matches to ignite.  The fire would spread to the super-match

9  and spread to the ignitable liquid-soaked sponge.  And then of

10  course it would cause the destruction of the plastic

11  one-gallon jug, which would then spill its contents and that

12  would ignite, plus the ignitable liquid mixture had been

13  spread around the cab.  That too would ignite.

14  **Q.**  Would you take a look at 222-K and tell me what that is?

15  **A.**  That is a close-up photograph of one of the books of

16  matches.

17          MR. FRIEDMAN:  Government offers 222-K.

18          MR. FOX:  No objection.

19          THE COURT:  Admitted.

20              (Exhibit No. 222-K admitted.)

21  BY MR. FRIEDMAN:

22  **Q.**  Agent Comery, is this matchbook in the condition it was

23  originally in when it was found?

24  **A.**  No, I have peeled back the matches to expose the rocket

25  igniter.

1   **Q.** Could you point that out for the jury?

2   **A.** Right above the red dot is the rocket igniter.

3   **Q.** Agent Comery, would you turn to 222-L and tell us what

4   that is?

5   **A.** It is a photograph of the fire damaged barn.

6         MR. FRIEDMAN: Government offers 222 L.

7         MR. FOX: No objection.

8         THE COURT: Admitted.

9            (Exhibit No. 222-L admitted.)

10  BY MR. FRIEDMAN:

11  **Q.** Then would you look at Exhibit 222-N?

12  **A.** Yes. That is another photograph just showing the

13  destruction of the pole barn.

14         MR. FRIEDMAN: Government offers 222-N.

15         MR. FOX: No objection.

16         THE COURT: Admitted.

17            (Exhibit No. 222-N admitted.)

18  BY MR. FRIEDMAN:

19  **Q.** This is obviously taken from a different perspective than

20  the previous one?

21  **A.** Yes.

22  **Q.** Can you see what used to be the roof of the pole barn in

23  this picture?

24  **A.** Yes, the metal is the roofing material.

25  **Q.** The left of the center of the picture?

1  A.  Yes.

2  Q.  Would you look at 222-Q, and tell us what that is?

3  A.  This is a photograph taken after the metal roofing had

4  been removed from the area, exposing the damage to the side of

5  the office.

6          MR. FRIEDMAN:  Government offers 222-Q.

7          MR. FOX:  No objection.

8          THE COURT:  Admitted.

9              (Exhibit No. 222-Q admitted.)

10  BY MR. FRIEDMAN:

11  Q.  Agent Comery, do you see any items here that were in the

12  diagram that you originally drew of the scene?

13  A.  Yes.

14  Q.  Can you tell us what those are?

15  A.  I indicated on the diagram, the file cabinets, the garbage

16  can, and the table and the front door to the office.

17  Q.  Are these in the position they were when you found them?

18  A.  Yes.

19  Q.  Let's turn back to Exhibit 221, the first page of that on

20  your diagram.

21      Do you have that up on your screen?

22  A.  Yes, I do.

23  Q.  Do you see those same items in that diagram?

24  A.  Yes, right above C are the three file cabinets.  Right

25  above D is labeled "table."  And then right above E is the

1  indicator that that's a door.

2  Q.  So turning back again to 222-Q, these are basically the

3  same items, from the same perspective, roughly?

4  A.  Correct.

5  Q.  Did you use an accelerant dog in the investigation of this

6  fire?

7  A.  Yes.  Oregon Police Detective Mark Merrill had his dog

8  Deacon, and we used him when we processed the scene at the

9  barn.

10  Q.  What happened when you used Deacon?

11  A.  Deacon alerted to the area along that side of the office.

12  Q.  When you say Deacon alerted, what do you mean by that?

13  A.  The dog is trained to catch a cone of the scent and follow

14  it to its source.  The richest portion of the scent in the dog

15  came to the area by the front door.  And there was a little

16  confusion, because the dog was overwhelmed by the scent.  So

17  there was a wide area which the dog was alerting to.

18  Q.  How does that area relate to what you had marked down as

19  C, D and E on your chart?

20  A.  We then processed that area and we found the remains of

21  componentry relating to an incendiary device.

22  Q.  Was Deacon alerting to the area that you have indicated as

23  C, D and E?

24  A.  All along that area.

25  Q.  Would you take a look at 222-O and tell us what that is?

1  **A.**  Yes, that's part of some items found in the debris by the

2  area marked C.

3          MR. FRIEDMAN:  Government offers 222-O.

4          MR. FOX:  No objection.

5          THE COURT:  Admitted.

6              (Exhibit No. 222-O admitted.)

7  BY MR. FRIEDMAN:

8  **Q.**  Can you tell us what you see of significance in that

9  picture?

10  **A.**  Two items of significance:  One is the remains of a 9-volt

11  battery, and the other is the main spring, metal spring from a

12  60-minute timer.

13  **Q.**  Is that consistent with the timers you found in the truck

14  cab -- in the tractor cab and under the tractor?

15  **A.**  Yes, they also had large metal springs.

16  **Q.**  Would you look at 222-P and tell us what that is?

17  **A.**  This is debris in the area that was marked D on the

18  diagram.

19          MR. FRIEDMAN:  Government offers 222-P.

20          MR. FOX:  No objection.

21          THE COURT:  Admitted.

22              (Exhibit No. 222-P admitted.)

23  BY MR. FRIEDMAN:

24  **Q.**  Agent Comery, could you outline what you see that is

25  significant?

**A.** In the center of the photograph there's two points of interest, one is at the bottom; you can see the remains of a 9-volt battery. Then where the flagging material is, just to the right of that arrow, are some wires.

**Q.** Would you look at Exhibit 222-S, and tell me what that is?

**A.** This is debris that was located in the area by the door to the office, the door on the diagram marked E.

MR. FRIEDMAN: Government offers 222-S.

MR. FOX: No objection.

THE COURT: Admitted.

(Exhibit No. 222-S admitted.)

BY MR. FRIEDMAN:

**Q.** What items of significance are in this photograph?

**A.** In the upper left-hand area, you can see a metal spring, and then in the center of the photograph, you can see the remains of paper matches, the faint remains.

**Q.** Now, were fluids from the two intact devices, devices A and B, and samples found from C, D and E tested in this case?

**A.** The debris samples were found. We didn't find fluids per se. We collected debris and put it in a can, and it was tested and it came back for the presence of gasoline, HPD -- gasoline and heavy petroleum distillate.

**Q.** On December 6, 1997, did you again interview Craig Rosebraugh?

MR. FOX: Objection, irrelevance, calls for hearsay.

1    We don't have any objection if he gave them something --

2              MR. FRIEDMAN:  That's going to be where we are going.

3    BY MR. FRIEDMAN:

4    **Q.**  Did you meet with Mr. Rosebraugh on December 6 of 1997?

5    **A.**  Yes.

6    **Q.**  During the course of that interview, did you receive or

7    show him the communiqué relating to this action?

8    **A.**  I received.

9    **Q.**  Did you discuss a communiqué?

10             MR. FOX:  Objection, Your Honor.  Mr. Rosebraugh is

11   giving him something --

12             THE COURT:  I think we are going to get to that.  You

13   have no objection to admitting what was given to him.  Can we

14   get there?

15             MR. FOX:  I thought he was testifying he was giving

16   Mr. Rosebraugh something.

17             THE COURT:  Let's see if we can get it straight.

18   Question?

19   BY MR. FRIEDMAN:

20   **Q.**  Was there a communiqué that was part of your meeting with

21   Mr. Rosebraugh?

22   **A.**  Yes.  I did discuss that.

23   **Q.**  Would you take a look at Exhibit 223?

24   **A.**  Yes, that is a copy of a communiqué.

25             MR. FRIEDMAN:  Government offers 223.

1    MR. FOX:   Your Honor, May I voir dire the agent on

2  this point for one minute?

3    THE COURT:   About whether he gave it to him or not?

4    MR. FOX:   I guess my question --

5    THE COURT:   Ask him, counsel.

6                   VOIR DIRE EXAMINATION

7  BY MR. FOX:

8  Q.  Did you show Mr. Rosebraugh this communiqué or did

9  Mr. Rosebraugh give it to you?

10 A.  Mr. Rosebraugh gave this to me, a copy.

11   THE COURT:   All right.   Continue.

12   MR. FOX:   No objection, Your honor.

13   MR. FRIEDMAN:   Government offers 223.

14   THE COURT:   Is there any objection?

15   MR. FOX:   No objection.

16   THE COURT:   Admitted.

17           (Exhibit No. 223 admitted.)

18           DIRECT EXAMINATION - CONTINUED

19 BY MR. FRIEDMAN:

20 Q.  Agent Comery, did this communiqué relate to the arson at

21 Burns, Oregon we just discussed?

22 A.  Yes, it is.

23 Q.  Can you read the first paragraph for the jury?

24 A.   "In the spirit of Crazy Horse and Geronimo, members of

25 the Animal Liberation Front and Earth Liberation Front

1  combined efforts to help halt the BLM's illegal and immoral

2  business of rounding up wild horses from public land and

3  funneling them to slaughter, as the Associated Press uncovered

4  in January of 1997 after an intensive investigation."

5  Q.  If we turn to the second paragraph, about eight or nine

6  lines down, there's a sentence "after many gates"?

7  A.  "Starting with the horses and ponies kept nearest the

8  barn, the teams opened gates and barked like dogs to frighten

9  the horses into the chutes that would lead them to the open

10 range."

11 Q.  Moving down to the bottom of that paragraph, five lines

12 before the end, there's a sentence that begins "the signal"?

13 A.  "The signal was given and the demolition crew set to work

14 spreading hay and fuel in a large tractor and around the

15 office and refrigerator units where the pharmaceuticals

16 intended for these wild horses were kept.  A number of

17 incendiary devices were constructed and placed and all the

18 team members quickly exited in the crisp night wind."

19 Q.  Were those last two sentences consistent with the evidence

20 you had seen when you were at the scene?

21 A.  They are, except we did not find the hay around the

22 refrigerator because that whole area was burned up.

23 Q.  But the portion about where the devices were set was

24 consistent with what you saw?

25 A.  Yes.

1   **Q.** During the course of your investigation, did you determine

2   how much damage had been done to this Wild Horse corral?

3   **A.** Yes, it was estimated $193,000.

4   **Q.** Did you reach a conclusion as to the cause and origin of

5   this fire?

6   **A.** Yes, I did.

7   **Q.** What was that conclusion?

8   **A.** The fire origin was underneath -- inside the pole barn,

9   but the entrance to the office, where device or devices --

10   incendiary devices had functioned, causing the ignition of the

11   introduced fuel and the subsequent burning of the building.

12   **Q.** I am about to start another fire. I would be happy to do

13   that, but I thought the Court might want to take a recess.

14         THE COURT: Let's take a quick recess and then come

15   back and get the rest of it.

16     Take about 10 or 15 minutes, and I will have you back here

17   and we will finish up the day.

18     Leave your books on the chair and don't discuss the case.

19     (Jury not present.)

20         THE COURT: All right, you may be seated. We will

21   take the afternoon recess.

22     (Afternoon recess.)

23         THE COURT: Ready to bring them in.

24     (Jury present.)

25         THE COURT: All right. You may be seated.

1      Mr. Friedman.

2          MR. FRIEDMAN:  May I continue Your Honor?

3          THE COURT:  Yes.

4   BY MR. FRIEDMAN:

5   **Q.**  Good afternoon again, Agent Comery.  Let me move you along

6   to another fire.

7      Did you participate in investigating a fire of the

8   National Wildlife Research center in Olympia?

9   **A.**  Yes.

10  **Q.**  Do you recall when that fire took place?

11  **A.**  June 21, 1998.

12  **Q.**  Was there actually more than one fire that night?

13  **A.**  Yes, there was.

14  **Q.**  What else was burned that night?

15  **A.**  An Animal Damage Control office and shop in Olympia,

16  Washington.

17  **Q.**  Were those both Department of Agriculture facilities?

18  **A.**  Yes, they were.

19  **Q.**  When did you arrive -- let's start with the National

20  Wildlife Research Center.  When did you arrive to begin

21  research there?

22  **A.**  The next morning, the 22nd.

23  **Q.**  Were you the lead investigator for that fire?

24  **A.**  No.

25  **Q.**  Had you been the lead investigator for the two previous

1  fires we talked about?

2  **A.**   Yes.

3  **Q.**   Who was the lead investigator this time around?

4  **A.**   Dean Wetzel from ATF in Seattle.

5  **Q.**   When you arrived at the National Wildlife Research Center,

6  what did you learn about the fire?

7  **A.**   I learned that the fire had occurred in the early morning

8  hours after 2:00 when an alarm functioned in the building.

9  The Thurston County District No. 11 responded and discovered

10  fire burning in several locations in the building.

11  **Q.**   Did one of the investigators prepare a diagram of the

12  National Wildlife Research Center?

13  **A.**   No, I did not, excuse me.

14  **Q.**   Would you take a look at Exhibit 231?

15      You told us firefighters arrived and there was a fire

16  involving the whole building.  What happened after that?  Did

17  you learn what had happened after the firefighters arrived?

18  **A.**   Yes, there was damage to the building, and they suppressed

19  the fire.

20  **Q.**   Exhibit 231, do you recognize that?

21  **A.**   Yes.

22  **Q.**   Could you tell us what that is?

23  **A.**   That is a rough diagram prepared by an individual, Bryan

24  Christensen -- a rough diagram of the facility.

25  **Q.**   Was Bryan Christensen one of the people investigating that

1  fire?

2  **A.**  I believe he was with the fire department.

3  **Q.**  Although rough, is it generally accurate?

4  **A.**  Yes.

5          MR. FRIEDMAN:  The Government offers Exhibit 231.

6          MR. FOX:  No objection.

7          THE COURT:  Admitted.

8                  (Exhibit No. 231 admitted.)

9  BY MR. FRIEDMAN:

10  **Q.**  Looking at the diagram, can you explain for the jury what

11  it shows?

12  **A.**  Yes.  This was an L-shape or T-shape building.  It was a

13  single story wood frame building.  And the significant areas

14  are the entrance area, the foyer, the east and west; and then

15  there is on the east entrance of the building, right here, and

16  then there's an area of interest where there was fire damage

17  on the west side.  The arrow is pointing in the wrong

18  direction.

19  **Q.**  Jump ahead to your conclusion, just so we can use this

20  diagram.  Did you ultimately determine how many points of

21  origin there were for this fire?

22  **A.**  Yes, three distinct areas of origin.

23  **Q.**  Could you indicate on the diagram where those were?

24  **A.**  Yes, again, on the -- the first one was on the west foyer

25  region.  The second one was on the west wall, and the third

was by the east entrance.

**Q.** Now, was there an accelerant dog used as part of the investigation of this fire?

**A.** Yes.

**Q.** Do you recall what happened when that dog was used?

**A.** Yes, the dog alerted in the three areas that have been described.

**Q.** Were the burn patterns in those areas significant to you?

**A.** Yes, they were.

**Q.** In general terms, why or how is that?

**A.** Well, two areas specifically. The west side area, there is a distinct burn pattern that extends to the base of the wall, and there is burning in a water control box that is below grade. That was highly unusual.

And then the other area, the east entrance, there is another very discreet burn pattern on the exterior of the wall. And then the patterns in the west foyer area, there was so much damage in there that the patterns themselves were not distinctive to origin, but it was the samples recovered from that area that was important.

**Q.** Would you look at Exhibit 232-A and tell us what that is?

**A.** Yes. That is a photograph showing the east foyer.

**Q.** You referred a moment ago to one of the points of origin. One of the points of origin was the west foyer, is that correct?

1  **A.** That is correct.

2  **Q.** Where on this diagram is the east foyer?

3  **A.** It is here.

4  **Q.** Is that what 232-A is a photograph of?

5  **A.** Yes.

6      MR. FRIEDMAN: Government offers 232-A.

7      MR. FOX: Objection. Agent, is this on the Blomberg

8  or O'Leary location?

9  **A.** Blomberg.

10     MR. FOX: I have no objection.

11     THE COURT: Admitted.

12         (Exhibit No. 232-A admitted.)

13 BY MR. FRIEDMAN:

14 **Q.** Agent Comery, now that we are looking at this picture,

15 could you tell us what what this shows?

16 **A.** It shows an area of greater fire damage coming from the

17 foyer entrance. You can see the fire damage is all the way to

18 the base of the walls and extends up into the roof. A lot of

19 the roof assembly over the entrance foyer has been destroyed

20 and then less damage extending out to the sides of the foyer.

21 **Q.** Would you look at Exhibit 232-B and tell us what that

22 shows, or is?

23 **A.** This is a photograph of the west side, and in the center

24 of the photograph you can just see a little bit of the west

25 foyer area.

1          MR. FRIEDMAN:  Government offers 232-B.

2          MR. FOX:  No objection.

3          THE COURT:  Admitted.

4                (Exhibit No. 232-B admitted.)

5    BY MR. FRIEDMAN:

6    **Q.**  This is a photograph of the foyer from the opposite side

7    of the building?

8    **A.**  Yes.

9    **Q.**  Can you point out what you see as significant here?

10   **A.**  A burn damage of the west foyer and also the discreet burn

11   pattern on the west side of the wall.

12   **Q.**  So is this showing one or two points of origin?

13   **A.**  Showing two areas of origin.

14   **Q.**  Are the areas -- the arrows you've indicated are those

15   areas?

16   **A.**  Approximate.  The arrow for the foyer is off just a bit.

17   **Q.**  Would you look at 232-C, tell me what that is?

18   **A.**  This is a photograph of the west side of the building

19   showing the burn pattern.

20   **Q.**  The second of the two areas you indicated?

21   **A.**  That's correct.

22          MR. FRIEDMAN:  Government offers 232-C.

23          MR. FOX:  No objection.

24          THE COURT:  Admitted.

25                (Exhibit No. 232-C admitted.)

BY MR. FRIEDMAN:

**Q.** Can you explain what's significant about that photograph?

**A.** You can see the burning extends all the way down to the ground and there's burning underneath the wood along the foundation.  The pattern extends up to the soffit and then extends underneath the overhang and there's burning damage right in that area of the attic.  You can see this pattern is fairly isolated and discreet.

**Q.** Why is that significant?

**A.** It makes you want to investigate to see what caused this discreet burning.  Is it an area of origin or is there an explanation in the burning dynamics that would explain that?

**Q.** You investigated that, I assume?

**A.** Yes.

**Q.** Would you look at 232-D, tell us what that is?

**A.** This is a close up of the base of the wall that we just described.

            MR. FRIEDMAN:  Government offers 232-D.

            MR. FOX:  No objection.

            THE COURT:  Admitted.

                  (Exhibit No. 232-D admitted.)

BY MR. FRIEDMAN:

**Q.** What does this photograph show, Agent Comery?

**A.** It shows the base of the wall, and one of the things you can see is the recessed area where the water pipe shut-off

1  was.  And there's burning in that area, burning along the

2  ground, the grass.  You see burning, heavy burning right at

3  the base of the wall, that the burn damage, the consumption,

4  the char depth is greater in that area than above that area.

5  **Q.**  I point out a recessed area.  Can you show us where that

6  is?

7  **A.**  Right at the base of that line.

8  **Q.**  Is 232-E a photograph of that recessed area?

9  **A.**  Yes, it is.

10          MR. FRIEDMAN:  Government offers 232-E.

11          MR. FOX:  No objection.

12          THE COURT:  Admitted.

13              (Exhibit No. 232-E admitted.)

14  BY MR. FRIEDMAN:

15  **Q.**  So this is a photograph looking down into that area?

16  **A.**  Correct.

17  **Q.**  Can you tell us what you see of significance in that

18  photograph?

19  **A.**  Yes, on the left side of the recessed area, there is a

20  metal handle consistent with the remains of a five-gallon

21  bucket, and there's wood debris from the side of the box that

22  is burned.  There's also -- attached to that metal handle was

23  plastic, melted plastic and burned plastic.

24  **Q.**  Could I get you to indicate on the screen where you see

25  that bucket handle?

1  **A.**  The top of the red line.

2  **Q.**  Then you look at Exhibit 232-F and tell us what that is?

3  **A.**  This is a photograph of the east entrance on the north

4  section of the building.

5  **Q.**  What you described earlier as the third point of origin?

6  **A.**  Third area of origin yes.

7         MR. FRIEDMAN:  Government offers 232-F.

8         MR. FOX:  No objection.

9         THE COURT:  Admitted.

10                 (Exhibit No. 232-F admitted.)

11  BY MR. FRIEDMAN:

12  **Q.**  Can you describe for the jury what that picture shows?

13  **A.**  Again we can see isolated exterior fire damage extending

14  all the way to the ground.  There is no communication from the

15  other fire.  We see low burning underneath, on the area of the

16  wall below the overhang.

17  **Q.**  Were samples from each of these three points sent to the

18  laboratory for testing?

19  **A.**  Yes.

20  **Q.**  What did the testing show?

21  **A.**  They came back positive.  The ones on the west where the

22  recessed wall was, came back positive for gasoline and heavy

23  petroleum distillate.  The ones on the west foyer, one came

24  back positive for gasoline, and the other came back positive

25  for heavy petroleum distillate.  The two samples from the east

1  entrance, positive for gasoline and heavy petroleum

2  distillate.

3  **Q.** Did you determine what the total damage was to this

4  research center?

5  **A.** The estimate was approximately $1.2 million dollars.

6  **Q.** Did you reach an opinion as to the cause and origin of

7  this fire?

8  **A.** Yes, this fire was caused by ignition of introduced

9  ignitable liquids at three separate areas: The west side of

10 the building, the west foyer and the east entrance.

11 **Q.** Now you said there were two fires that same night in

12 Olympia?

13 **A.** Correct.

14 **Q.** Where did the other fire take place?

15 **A.** It took place at the Animal Damage Control buildings on, I

16 believe, 7200 O'Leary Road in Olympia, Washington.

17 **Q.** How great a distance was there between the two locations,

18 roughly?

19 **A.** Several miles.

20 **Q.** That's also a Department of Agriculture facility?

21 **A.** That is correct.

22 **Q.** Did you participate and investigate that fire?

23 **A.** Yes, I did.

24 **Q.** What did you learn about when that fire had broken out?

25 **A.** That fire had occurred after 4 a.m. in the morning. They

1  learned of it when an alarm system functioned.

2  **Q.**  How does that compare to the time when the Wildlife

3  Research Facility fire took place?

4  **A.**  Approximately two hours later.

5  **Q.**  Now, the Animal Damage Control center, what made that up;

6  was that one building or many buildings?

7  **A.**  Two buildings:  The shop garage, which was a one-story

8  building about 1,000 square feet, and then the office which

9  was one-story building wood frame construction, about 1780

10  square feet.

11  **Q.**  Would you take a look at 242-B and tell me if you

12  recognize that?

13  **A.**  Yes, I do.

14  **Q.**  Is that a photograph of the two buildings?

15  **A.**  Yes, it is.

16          MR. FRIEDMAN:  Government offers 242-B.

17          MR. FOX:  No objection.

18          THE COURT:  Admitted.

19              (Exhibit No. 242-B admitted.)

20  BY MR. FRIEDMAN:

21  **Q.**  Can you describe in general terms what this photograph

22  shows?

23  **A.**  Yes.  On the left side of the photograph you can see the

24  shop garage, and you can see burn pattern on the exterior of

25  the building between the main door and the garage.  You see

1  that the burn pattern extends all the way to the base of the
2  wall and you see the remains of two buckets in that area.
3      On the adjacent building, the office building, you see low
4  burn at the corner, originating from the base of the building.
5  Then you see an area of greater damage between the window and
6  the front door, underneath the overhang at the front entrance.
7  Q.  Is Exhibit 242-C a closer-up shot of the garage?
8  A.  Yes, it is.
9          MR. FRIEDMAN:  Government offers 242-C.
10         MR. FOX:  No objection.
11         THE COURT:  Admitted.
12             (Exhibit No. 242-C admitted.)
13  BY MR. FRIEDMAN:
14  Q.  You spoke a couple moments ago about buckets.  Do you see
15  those in this picture?
16  A.  Yes.
17  Q.  Can you point out where you see those?
18  A.  Right to the right of the garage door.
19  Q.  Then can you look at Exhibit 242-D and tell us what that
20  is?
21  A.  This is a close up of the remains of the two buckets.
22         MR. FRIEDMAN:  Government offers 242-D.
23         MR. FOX:  No objection.
24         THE COURT:  Admitted.
25             (Exhibit No. 242-D admitted.)

1  BY MR. FRIEDMAN:

2  **Q.** Agent Comery, could you describe in a little more detail

3  what that picture is showing?

4  **A.** Yes, it's showing the remains of two buckets.  What's

5  unusual is you see a mound of white material on either side of

6  a stack of burned debris.  That white material is a soap or

7  detergent that was wet.  It reeked of gasoline.  Between the

8  two containers, or the remains of the two containers, are two

9  egg cartons; and the egg cartons were filled with a mixture of

10  wood fiber and wax.

11  **Q.** Would you look at Exhibit 242-E and tell me what that is?

12  **A.** This is a close up of componentry that was removed from

13  the center of the device.

14          MR. FRIEDMAN:  Government offers 242-E.

15          MR. FOX:  No objection.

16          THE COURT:  Admitted.

17                  (Exhibit No. 242-E admitted.)

18  BY MR. FRIEDMAN:

19  **Q.** Agent Comery, could you tell us what components you see in

20  the picture?

21  **A.** We see the 9-volt battery on the left-hand side.  In the

22  center of the photograph we see the remains of a digital alarm

23  clock, and it also has a power cord that's bundles.  Then we

24  see just associated plastic.

25  **Q.** You referred a moment ago to a digital alarm clock.  How

1  does that compare to the timers we see in the earlier devices?

2  A.  In the previous devices we've talked about, there was a

3  60-minute wind-up mechanical timer.

4  Q.  Then would you look at 242-F and tell me what that is?

5  A.  This is a photograph of the entrance area of the office.

6        MR. FRIEDMAN:  Government offers 242-F.

7        MR. FOX:  No objection.

8        THE COURT:  Admitted.

9        (Exhibit No. 242-F admitted.)

10  BY MR. FRIEDMAN:

11  Q.  To the left do you see anything of significance?

12  A.  Yes a fairly discrete area of low burn damage.  And at the

13  base of that, in the center of the pattern, you can see the

14  remains of two buckets.

15  Q.  Can you tell us what Exhibit 242-G is?

16  A.  This is a close-up picture of the remains of the device by

17  the office there.

18        MR. FRIEDMAN:  Government offers Exhibit 242-G.

19        MR. FOX:  No objection.

20        THE COURT:  Admitted.

21              (Exhibit No. 242-G admitted.)

22  BY MR. FRIEDMAN:

23  Q.  Agent Comery, what do you see in the picture?

24  A.  Again, the unusual mound of soap detergent that had been

25  in the buckets.  On either side of that you can see the

1  remains of a handle from a five-gallon bucket.  In the center
2  you can see the remains of an egg carton.
3  Q.  Turning to 242-I, can you tell us what that is a picture
4  of?
5  A.  Yes, this is componentry that had been removed from
6  underneath the egg cartons.
7  Q.  You said underneath the egg cartons.  Is this right side
8  up, upside down?
9  A.  It is upside down.  We are looking at the base on the
10 pavement.
11         MR. FRIEDMAN:  Government offers 242-I.
12         MR. FOX:  No objection.
13         THE COURT:  Admitted.
14             (Exhibit No. 242-I admitted.)
15 BY MR. FRIEDMAN:
16 Q.  There are two semi-circles.  Can you tell us what they
17 are?
18 A.  Yes, we have cut the plastic from the remains of the
19 bucket so we can put this in a sealed container and preserve
20 it for the laboratory.
21 Q.  You referred to componentry.  Can you tell us what you see
22 in the picture?
23 A.  I placed a white arrow on the photograph there that's
24 pointing to -- and that was introduced obviously -- it's
25 pointing to the base of the 9-volt battery.  Next to it is the

1  remains of a box of kitchen matches.  The box has holes in it,

2  in the top, and inside were the heads of kitchen matches, plus

3  a light bulb.

4  **Q.**  Would you turn to Exhibit 242-J and tell us what that is?

5  **A.**  Yes, that is a picture of some rolled-up fabric that's

6  along the base of the wall in the office.

7  **Q.**  Did this run from -- between where and where did this run?

8  **A.**  Remnants of this were found from the first device along

9  the base of the wall, across the void between the wall of the

10  two buildings and then along the base of the office to the

11  second device.

12  **Q.**  You said it was rolled up cloth.  Anything else

13  significant about this cloth?

14  **A.**  Yes.  The cloth smelled strongly of petroleum products and

15  gasoline.

16  **Q.**  So were you able to determine what the function was of

17  this cloth?

18  **A.**  The function of this was to ensure that the fire spread

19  from one device to the other.

20  **Q.**  Sort of a fail-safe mechanism?

21  **A.**  Possibly, yes.

22  **Q.**  Now, when we talked about the devices a moment ago, you

23  said they had digital timers?

24  **A.**  Correct.

25  **Q.**  Can you explain how that -- how the circuitry was

1  different from the earlier devices, the ones the digital
2  timers were incorporated?
3  **A.**   There had been alterations made to the clock so that the
4  digital clock, even though it was a plug-in clock, is designed
5  with a backup battery so that the alarm will still function if
6  you lose power.
7      Alterations had been made so that wiring from the bulb
8  went to a read relay that then went to a power for the
9  speaker.  What would happen is on functioning of the alarm,
10 instead of the speaker sounding, power would pass to the
11 switch; the switch would close.  And then power from the
12 9-volt battery, just like the previous design, would pass from
13 the 9-volt battery to the back-up light bulb, the bayonet-base
14 light bulb that had the glass removed, heating up the
15 filament.
16 **Q.**   Is it fair to say when the clock counted down, it's
17 flipping an electronic switch, instead of pushing two wires
18 together, and once again completing a circuit?
19 **A.**   Yes.
20 **Q.**   And then functioning similarly to the devices we've seen
21 before?
22 **A.**   Correct.
23 **Q.**   Were you able to determine the total amount of damage to
24 this facility?
25 **A.**   The damage to this facility was estimated about $500,000.

1  **Q.**  Did you reach a conclusion as to the cause and origin of
2  this fire?
3  **A.**  Yes.
4  **Q.**  What was that conclusion?
5  **A.**  The fire was caused by the functioning of the incendiary
6  devices that were placed on the exterior of the buildings.
7  **Q.**  Did you subsequently download a communiqué related to
8  these two fires from the Internet?
9  **A.**  Yes, I did.
10  **Q.**  Would you look at Exhibit 233?  Do you recognize that
11  document?
12  **A.**  Yes, it's a copy of the same communiqué.
13          MR. FRIEDMAN:  The Government offers 233.
14          MR. FOX:  No objection.
15          THE COURT:  Admitted.
16                  (Exhibit No. 233 admitted.)
17  BY MR. FRIEDMAN:
18  **Q.**  Agent Comery, to what fires does this communiqué relate?
19  **A.**  It talks about the two fires, the one at the Western
20  Research Center, Wildlife Research Center, and the Animal
21  Damage Control.
22  **Q.**  Would you read just the first -- well, the first
23  paragraph?
24  **A.**  "This year for summer solstice, the Animal Liberation
25  Front and Earth Liberation Front decided to honor the wildlife

1   of the great Pacific Northwest and the forests they call home

2   by having a bonfire (or two) at facilities which make it a

3   daily routine to kill and destroy wildlife."

4   Q.  Would you turn to the last significant paragraph, the

5   fifth line at the bottom, and read that?

6   A.   "Between the 25 and 30 gallons of a 50 percent unleaded

7   fuel, 50 percent diesel fuel combination was brought to the

8   research facility on Blomberg Road.  Slightly less was

9   required for the smaller Animal Damage Control building on

10  O'Leary Road.  The buckets were placed at key points and left

11  open so the flames could climb up the walls and shoot

12  underneath the eaves and ventilation holes of the building

13  beginning its great cleansing process."

14  Q.  Is that description consistent with the evidence you saw

15  of these two incidents?

16  A.  Yes, it is.

17  Q.  Were you also involved investigating a fire at Childer's

18  Meat Company in Oregon?

19  A.  Yes.

20  Q.  When did that fire take place?

21  A.  May 9, 1999.

22  Q.  What was -- when did you arrive on the scene, do you

23  recall?

24  A.  I arrived on May 10.

25  Q.  Did you learn what Childer's Meat Company was?

1    **A.**  It was a meat packaging plant.

2    **Q.**  What did you learn about when the fire had broken out and

3    what had happened after that?

4    **A.**  The fire was discovered about 3:00 in the morning.  The

5    Lane County rural fire department responded and found the

6    building, the main portion, the entrance of the office,

7    burning.

8    **Q.**  What happened after they discovered that?

9    **A.**  During the suppression efforts, while they were inside the

10   building, another device functioned on the back side of the

11   building and a fire ensued.

12   **Q.**  Were they ultimately successful in controlling the fire?

13   **A.**  Yes.

14   **Q.**  How extensive was the damage before they could control it?

15   **A.**  The damage -- the two-story office building was destroyed,

16   and the fire spread along the roof assembly towards the main

17   portion of the building.

18   **Q.**  Now, you said you didn't get there until the day after the

19   fire.  Did you learn whether investigators had discovered

20   anything significant the first day?

21   **A.**  Yes.

22   **Q.**  What did they discover?

23   **A.**  The two detectives from the Eugene Police Department had

24   processed the area of the entrance alcove.  It was an area

25   just to the outside of the window and door.  During the

1   processing, they found the characteristic melted plastic
2   remains of two plastic buckets.
3   Q.  Did you prepare a diagram of the scene in this case?
4   A.  Yes, I did.
5   Q.  Would you look at Exhibit 251?  Do you recognize that?
6   A.  Yes, I do.
7   Q.  Is that what was prepared?
8   A.  Yes.
9           MR. FRIEDMAN:  Government offers 251.
10          MR. FOX:  No objection.
11          THE COURT:  Admitted.
12              (Exhibit No. 251 admitted.)
13  BY MR. FRIEDMAN:
14  Q.  What does this show?
15  A.  This is a very rough diagram of the office building
16  showing the entrance alcove.  And location No. 1 is where the
17  debris was recovered by the detectives from the Eugene police
18  department.  They had moved debris from that location to the
19  area where I call the debris pile, where there's a circle and
20  14.
21      On the back side of the building, you see location 2 next
22  to a gas meter, and you see items 7, 8, 9, 10 and 11 which
23  corresponds to evidence that was discovered when we processed
24  that area on the May 10th.
25  Q.  How does location 2 relate -- you said a second fire broke

1  out while firefighters were fighting the first fire?

2  **A.**  That is that location.

3  **Q.**  At location 2?

4  **A.**  Yes.

5  **Q.**  Take a look at 252-A and tell me if you recognize that.

6  **A.**  That is a photograph showing the front of the building.

7  In the center is the alcove entrance to the office.

8           MR. FRIEDMAN:  Government offers Exhibit 252A.

9           MR. FOX:  No objection.

10          THE COURT:  Admitted.

11               (Exhibit No. 252-A admitted.)

12  BY MR. FRIEDMAN:

13  **Q.**  Could you point -- you referred to an entrance alcove a

14  moment ago.  Could you point that out for us?

15  **A.**  Right above the red line in the center of the burn

16  pattern.

17  **Q.**  Would you take a look at 252-B and tell us what that is?

18  **A.**  That is a closer-up photograph of that area of the alcove.

19          MR. FRIEDMAN:  Government offers 252-B.

20          MR. FOX:  No objection.

21          THE COURT:  Admitted.

22               (Exhibit No. 252-B admitted.)

23  BY MR. FRIEDMAN:

24  **Q.**  So that's again the alcove where the first device was

25  found?

1  **A.**  The very dark area in the center of the photograph.

2  **Q.**  Would you look at 252-E?

3  **A.**  Yes.

4  **Q.**  Do you recognize that?

5  **A.**  Yes.

6  **Q.**  What is that?

7  **A.**  That is the plastic remains discovered in the area of the

8  alcove.

9            MR. FRIEDMAN:  Government offers 252-E.

10           MR. FOX:  No objection.

11           THE COURT:  Admitted.

12                 (Exhibit No. 252-E admitted.)

13 BY MR. FRIEDMAN:

14 **Q.**  When you say plastic remains, to which part of that

15 photograph are you referring?

16 **A.**  Right there, that area within the circle and center of the

17 picture.

18 **Q.**  Would you look at 252-H?  Tell us what that is a picture

19 of.

20 **A.**  This is a picture of those plastic remains removed from

21 that area of the alcove.

22           MR. FRIEDMAN:  Government offers 252-H.

23           MR. FOX:  No objection.

24           THE COURT:  Admitted.

25                 (Exhibit No. 252-H admitted.)

BY MR. FRIEDMAN:

**Q.**  Agent Comery, do you see any items you find significant in the remains shown in that picture?

**A.**  Yes.

**Q.**  Can you tell us what you see?

**A.**  Yes, on the right-hand side you see a handle for a five-gallon bucket.  In the center of the photograph, you see the metal remains of a bell housing for a 60-minute timer. Above that to the right you see the remains of a 9-volt battery, and over to the left upper portion you see another, called a bell housing, which is the interior of the 60-minute timer.

**Q.**  What does the fact you see two bell housings tell you?

**A.**  It indicates that two mechanical timers were used in this device.

**Q.**  Then would you look at Exhibit 252-K and tell me what that is?

**A.**  This is a photograph of the back side of the office building, showing the gas meter and right hidden from view is the area of location 2 where the second device was located.

MR. FRIEDMAN:  Government offers 252-K.

MR. FOX:  No objection.

THE COURT:  Admitted.

(Exhibit No. 252-K admitted.)

BY MR. FRIEDMAN:

1  **Q.** You said hidden from view is location 2.  Can you tell us

2  where that would be if it were not totally hidden?

3  **A.** It would be to the right of that red line.  There's a

4  corner there and another corner.

5  **Q.** Would you take a look at 252-M and tell us what that

6  shows?

7  **A.** It shows the corner where debris from an incendiary device

8  was found on the back side of the building.

9  **Q.** Location 2?

10 **A.** Yes.

11      MR. FRIEDMAN:  Government offers 252-M.

12      MR. FOX:  No objection.

13      THE COURT:  Admitted.

14          (Exhibit No. 252-M admitted.)

15 BY MR. FRIEDMAN:

16 **Q.** Agent Comery, do you see anything significant in the

17 photograph of location 2?

18 **A.** Yes, on left-hand side you can see a metal handle from a

19 five-gallon bucket and the right hand, right side, a metal

20 handle from a five-gallon bucket.  In the center, a bell

21 housing from a timer.  And the very center of the two, remains

22 of plastic.  I can't tell if it's -- I won't call it --

23 **Q.** We have a closer up.  I will ask you to look at 252-N.

24 Tell me if you recognize that.

25 **A.** Yes, I do.

1  **Q.**  Is this a closer-up photograph of the same remnants?

2  **A.**  Yes.

3  MR. FRIEDMAN:  Government offers 252-N.

4  MR. FOX:  No objection.

5  THE COURT:  Admitted.

6  (Exhibit No. 252-N admitted.)

7  BY MR. FRIEDMAN:

8  **Q.**  Agent Comery, can you point out the important components

9  seen in this photograph?

10  **A.**  The two bucket handles on the left and right.  The bell

11  housing on the upper left-hand side.  The bell housing from a

12  60-minute timer.  I have to clarify that is a 9-volt battery

13  in the center.  And then the remains of another 60-minute

14  timer is over to the right.

15  **Q.**  So again, two timers?

16  **A.**  Correct.

17  **Q.**  Did you infer anything from that?

18  **A.**  It appears that they w-e-r-e.  If you remember in other

19  instances, the timers have been the weak link in the devices

20  and hadn't functioned properly.  This time it appears they are

21  d-e-s-i-g-n-e-d, they have two timers; one is a backup,

22  obviously to ensure that the devices will function.

23  **Q.**  So different type of fail-safe mechanism from what we saw

24  in A, B, and C?

25  **A.**  Yes.

1   **Q.** Would you take a look at 252-P and tell me if you
2   recognize that?
3   **A.** Yes, I do.
4   **Q.** Can you tell me what that is?
5   **A.** That is showing damage to the first floor office of the
6   building.
7                   MR. FRIEDMAN:  Government offers 252-P.
8                   MR. FOX:  No objection.
9                   THE COURT:  Admitted.
10                  (Exhibit No. 252-P admitted.)
11  BY MR. FRIEDMAN:
12  **Q.** Agent Comery, did you determine the total damage to
13  Childer's caused by this fire?
14  **A.** I am aware of an estimate.
15  **Q.** Can you tell us what that is?
16  **A.** I believe it's over $1.2 million; just approaching $1.2
17  million.
18  **Q.** Was testing done of samples you recovered from locations 1
19  and locations 2?
20  **A.** Yes.
21  **Q.** What were the results of that testing?
22  **A.** Came back positive for the presence of gasoline and heavy
23  petroleum distillate.
24  **Q.** Once again, did you download a communiqué related to this
25  fire from the Internet?

1    **A.**  Yes.

2    **Q.**  Would you look at 253?  Do you recognize that?

3    **A.**  Yes, it's a copy of the same type of communiqué

4    downloaded.

5              MR. FRIEDMAN:   Government offers 253.

6              MR. FOX:   No objection.

7              THE COURT:   Admitted.

8                   (Exhibit No. 253 admitted.)

9    BY MR. FRIEDMAN:

10   **Q.**  This is a shorter communiqué.  Could I just ask you to

11   read the three paragraphs we have there?

12   **A.**  "ALF Celebrates Mother's Day, Eugene, Oregon, USA.

13   In honor of Mother Earth and all the cows who have their

14   babies stolen from them to help furnish the meat and dairy

15   industries, the Animal Liberation Front chose Mother's Day

16   1999 to pay a visit to Childer's Meat Company on Airport Road

17   in Eugene, Oregon.

18        "Using 20 gallons of a diesel fuel unleaded mixture, four

19   5-gallon buckets were strategically placed near the two-story

20   office building containing the company's business records and

21   along the main building near a natural gas line.  Using two

22   kitchen timer delays, with another two timers as back up,

23   there was plenty of time to leave town before the Mother's Day

24   celebration really ignited.

25        "As long as companies continue to operate and profit off

1  of Mother Earth and Her sentiment animal beings, the Animal

2  Liberation Front will continue to target these operations and

3  their insurance companies until they are all out of business.

4      "Happy Mother's Day."

5  **Q.**  Agent Comery, the second matter has some details about the

6  devices used in this fire.  Is what's written there consistent

7  with the evidence you had seen?

8  **A.**  Yes, we found the remains of four five-gallon buckets and

9  the remains of four timers, mechanical kitchen timers.

10  **Q.**  Did you read an opinion as to the cause and origin of this

11  fire?

12  **A.**  Yes.

13  **Q.**  Can you tell us?

14  **A.**  Yes, two discreet areas of origin, one being in the alcove

15  entryway, and the other on the back side of the building near

16  the gas meter.  And the cause of the fire was the functioning

17  of introduced incendiary devices igniting the fuels of the

18  incendiary devices.

19  **Q.**  Did you also participate in investigating a fire that took

20  place at an office for Boise Cascade on December 25, 1999?

21  **A.**  Yes, I did.

22  **Q.**  The fire that day was not necessarily your investigation?

23  **A.**  That's correct.

24  **Q.**  When did you arrive on the scene?

25  **A.**  I arrived December 27.

1  **Q.** Can you tell us what Boise Cascade is?

2  **A.** Boise Cascade is a timber harvesting and timber milling

3  operation and they produce paper products also.

4  **Q.** What was this building?

5  **A.** This was just an office building for their operations.

6  **Q.** Did you learn when this fire had broken out?

7  **A.** Yes, I did.

8  **Q.** What did you learn?

9  **A.** The fire came in at approximately 4:00 in the morning when

10  an interior fire alarm, fire detection system functioned.

11  **Q.** What happened after the fire alarm went off?

12  **A.** Cook County Fire District No. 1 responded and discovered

13  the building with a fully involved roof fire.

14  **Q.** Do you have any idea how long it took to contain -- put

15  out the fire?

16  **A.** No, I don't.

17  **Q.** How extensive was the damage?

18  **A.** The whole roof assembly was destroyed and of course in

19  putting out the fire, all the first floor was destroyed by

20  water and heat.

21  **Q.** This was a one-floor building?

22  **A.** That's correct.

23  **Q.** Was an accelerant canine used in investigating this fire?

24  **A.** Yes, Oregon State Police Detective Moe Austin and his

25  Canine Kent responded to the scene on February 27.

**Q.** What were the results of that?

**A.** He ran the dog around the exterior of the building and the dog alerted at the northwest entrance and the southwest entrance.

**Q.** You prepared a diagram, I take it?

**A.** Yes, I did.

**Q.** Would you look at Exhibit 261? Do you recognize that?

**A.** Yes, that's a portion of the diagram I drew.

      MR. FRIEDMAN: Government offers 261.

      MR. FOX: No objection.

      THE COURT: Admitted.

            (Exhibit No. 261 admitted.)

BY MR. FRIEDMAN:

**Q.** Can you tell us what that diagram shows?

**A.** The key points are the areas designated northwest entrance, where there is an A, which corresponds to where evidence of an incendiary device was discovered; and then the southwest entrance B, where the evidence of an incendiary device was discovered.

**Q.** Are those the two areas to which -- and I forget the dog's name -- to which the canine alerted?

**A.** Yes, that's where Kent alerted.

**Q.** Would you look at 262-C and tell us whether you recognize that?

**A.** Yes, I do.

1  Q.  In general terms what is that?

2  A.  It depicts the area I just described, the northwest and

3  southwest entrance area.

4          MR. FRIEDMAN:  The Government offers 262-C.

5          MR. FOX:  No objection.

6          THE COURT:  Admitted.

7              (Exhibit No. 262-C admitted.)

8  BY MR. FRIEDMAN:

9  Q.  Can you show us where on this diagram --

10 A.  Over on the --

11 Q.  -- where the area is?

12 A.  On the left-hand side is the northwest entrance, and

13 that's where A is.  On the right-hand side behind that bush is

14 southwest entrance where B was.

15 Q.  Look at 262-E and tell me what that is.

16 A.  Is that a closer-up photograph of the northwest entrance?

17         MR. FRIEDMAN:  Government offers 262-E.

18         MR. FOX:  No objection.

19         THE COURT:  Admitted.

20             (Exhibit No. 262-E admitted.)

21 BY MR. FRIEDMAN:

22 Q.  So this is the corner to the entrance, basically?

23 A.  That is correct.

24 Q.  Is there anything significant about the burn pattern here?

25 A.  Yes, what we see is heavy damage to the lower portion of

1  the wall in the corner, inconsistent there is no drop down in

2  the area that would have ignited that, and there's burning up

3  to the soffit, and then the roof above the area is destroyed.

4  Of course the window has failed and the fire has entered in

5  that area, too.

6  **Q.** Would you look at 262-G and tell me what is that a picture

7  of?

8  **A.** I processed this area, and this is where I find the

9  remains of melted plastic.

10 **Q.** Is this area the corner we just looked at?

11 **A.** Yes.

12         MR. FRIEDMAN:  Government offers 262-G.

13         MR. FOX:  No objection.

14         THE COURT:  Admitted.

15              (Exhibit No. 262-G admitted.)

16 BY MR. FRIEDMAN:

17 **Q.** You said you found melted plastic in this area.  Can you

18 show us what it is you are referring?

19 **A.** Yes, this area in the center of the photograph is melted

20 plastic.  The substrate in that area was just bark chips.  The

21 plastic had melted and adhered to some of the bark chips.

22 **Q.** Do you see any other items of significance in that photo?

23 **A.** I believe another photo would be advantageous.

24 **Q.** Before we move to the next one, can you see any bucket

25 handles in here?

1   A.  Yes.   There's wiring and handles.

2   Q.  Turn to Exhibit 262-H, and what's that a photograph of?

3   A.  This is the material after it was removed from the area in

4   the corner.

5   Q.  Same material we just saw?

6   A.  Correct.

7           MR. FRIEDMAN:   Government offers 262-H.

8           MR. FOX:   No objection.

9           THE COURT:   Admitted.

10              (Exhibit No. 262-H admitted.)

11  BY MR. FRIEDMAN:

12  Q.  Can you tell us what you see in the photograph?

13  A.  Yes, again there is the plastic on the upper portion of

14  the photograph.   You can see the handle on the left-hand --

15  another metal handle for another five-gallon bucket on the

16  right.   There's the remains of two timers; one on the lower

17  left and one towards the center.   You can see the springs and

18  some of the housing, remains of two 9-volt batteries, one

19  between the two timers and one below the timer.   There's also

20  the remains of the plastic bag.

21  Q.  So again, two timer mechanisms at Childer's?

22  A.  That's correct, and two batteries.

23  Q.  So an extra level of fail-safe basically, redundancy in

24  the timing mechanism and in the batteries?

25  A.  And in the igniters, yes.

1  Q.  After you processed area A, did you turn to area B?

2  A.  That's correct.

3  Q.  Would you look at Exhibit 262-M and tell me what that is?

4  A.  Yes, this is -- I have removed the debris atop the ground

5  and found the melted plastic remains that's adhered to the

6  bark chips.

7  Q.  Can I take you back a moment; is this a photograph of area

8  as you are processing it?

9  A.  Yes.

10          MR. FRIEDMAN:  The Government offers 262-M.

11          MR. FOX:  No objection.

12          THE COURT:  Admitted.

13          (Exhibit No. 262-M admitted.)

14  BY MR. FRIEDMAN:

15  Q.  Can you tell what this is showing in area B?

16  A.  This is showing the melted remains of plastic.  You can

17  see a handle in the upper right-hand corner.  There's

18  associated wiring toward the center of the debris.

19  Q.  Can you look at 262-O and tell me what that is a

20  photograph of?

21  A.  This is a photograph of some of the debris and componentry

22  separated or discovered in or on top of that plastic.

23  Q.  In area B?

24  A.  Yes.

25          MR. FRIEDMAN:  Government offers 262-O.

1  　　　　MR. FOX:  No objection.

2  　　　　THE COURT:  Admitted.

3  　　　　　　　(Exhibit No. 262-O admitted.)

4  BY MR. FRIEDMAN:

5  Q.  Agent Comery, could you tell us what these items of

6  componentry are?

7  A.  Yes, we see the bell housing and spring of a mechanical

8  timer on the upper left, and another bell housing for a

9  60-minute timer in the right.  We see a casing for a 9-volt

10  battery, the upper center and another casing for a 9-volt

11  battery below that.

12  　　　To the left of that is actually the interior of a 9-volt

13  battery which is similar to a AAA battery.  You also see two

14  alligator clips.  Then the remains of a sponge in the upper

15  right-hand corner.

16  Q.  Are these components you found in area B consistent with

17  what you found in area A?

18  A.  Yes.

19  Q.  Was testing done of samples recovered from both areas A

20  and B?

21  A.  Yes, it was.

22  Q.  What did that show?

23  A.  Some of the samples came back positive for the presence of

24  gasoline and heavy petroleum distillate.

25  Q.  After this, did you obtain a copy of a communiqué issued

1   in connection with this fire?

2   **A.**   Yes.

3   **Q.**   Would you take a look at 263?  Do you recognize that?

4   **A.**   Yes, a communiqué claiming responsibility for this fire.

5           MR. FRIEDMAN:   Government offers 263.

6           MR. FOX:   No objection.

7           THE COURT:   Admitted.

8                   (Exhibit No. 263 admitted.)

9   BY MR. FRIEDMAN:

10  **Q.**   Agent Comery, would you just read this communiqué for the

11  jury also?

12  **A.**   "Animal Liberation Frontline Information Service.   ELF

13  fires up Boise Cascade's HQ Communique.

14       "Communiqué, December 25, 1999.   Boise Cascade has been

15  very naughty.   After ravaging the forests of the Pacific

16  Northwest, Boise Cascade now looks towards the virgin forests

17  of Chile.   Early Christmas morning, elves left coal in Boise

18  Cascade's stocking.   Four buckets of diesel and gas with

19  kitchen timer delay destroyed their regional headquarters in

20  Monmouth, Oregon.   Let this be a lesson to all greedy

21  multinational corporations who don't respect their ecosystems.

22  The elves are watching.   Earth Liberation Front."

23  **Q.**   Is the information in here about the diesel and gas and

24  the number of buckets and kitchen timers -- is that all

25  consistent with the physical evidence you found?

1   **A.**  Yes.

2   **Q.**  As part of your investigation, did you see an estimate of

3   the amount of damage to this Boise Cascade office?

4   **A.**  Yes.

5   **Q.**  What was the amount?

6   **A.**  Approximately $1.6 million.

7   **Q.**  Would you take a look at 262-Q and tell me what that is?

8   **A.**  That is a photograph of some of the damage to the

9   building.

10         MR. FRIEDMAN:  Government offers 262-Q.

11         MR. FOX:  No objection.

12         THE COURT:  Admitted.

13             (Exhibit No. 262-Q admitted.)

14   BY MR. FRIEDMAN:

15   **Q.**  Agent Comery, did you reach an opinion as to the cause of

16   this fire and the origin?

17   **A.**  Yes.

18   **Q.**  Would you tell us what that opinion is?

19   **A.**  There were two discreet areas of origin, one at the

20   northwest entrance and one at the southwest entrance.  The

21   fire was caused by the functioning of incendiary devices at

22   each area which ignited the introduced ignitable liquids.

23   **Q.**  One last fire, Agent Comery.  Did you participate in

24   investigating a fire at Superior Lumber?

25   **A.**  Yes, I did.

Q.   When did that fire take place?

A.   January 2, 2001.

Q.   What is Superior Lumber?

A.   Superior Lumber is a timber harvesting corporation, and it also has a mill in Glendale, Oregon.

Q.   This was the headquarters of Superior Lumber that was burned; is that correct?

A.   The building was the office.

Q.   The office.  When did you arrive on the scene?

A.   Late on the afternoon of the second.

Q.   Were you there for more than one day?

A.   Yes, I was.

Q.   What did you learn about when that fire broke out?

A.   The fire occurred shortly after 2:00 in the morning on the second.

Q.   In general terms, how extensive was the damage?

A.   There was two areas of damage, heavy damage; one was by the break room, patio area; and the other was by the computer room, an office area on the other side of the building.

Q.   Did the investigators have an accelerant at this fire?

A.   Yes, they did.

Q.   What happened when that canine was used?

A.   Moe Austin ran Kent, and Kent alerted to two areas; one over by the exterior of the computer room, and the other over by the patio.

1  **Q.** Were those the areas you had noted extensive fire damage?

2  **A.** Yes.

3  **Q.** Could you smell the accelerant or gas yourself?

4  **A.** The one outside the computer room was very strong odor of

5  gasoline.

6  **Q.** Did you prepare a diagram of Superior Lumber?

7  **A.** Yes, I did.

8  **Q.** Would you look at 281 and tell me if that's that diagram?

9  **A.** Yes, it is.

10      MR. FRIEDMAN: Government offers 281.

11      MR. FOX: No objection.

12      THE COURT: Admitted.

13          (Exhibit No. 281 admitted.)

14  BY MR. FRIEDMAN:

15  **Q.** Could you describe what this diagram shows, Agent Comery?

16  **A.** This is showing the perimeter of the office building.

17  There's two areas of interest. One is just to the upper right

18  of the east addition. You can see it says evidence No. 1,

19  evidence 2, evidence No. 3. That's where we recovered the

20  remains of an incendiary device. The other is on the back

21  side, right above the breakroom, on the concrete patio and you

22  can see an area where it's marked evidence 5, with arrows for

23  evidence 6 and 7.

24  **Q.** Would you look at 282-B and tell me what that's a

25  photograph of?

**A.** This is a photograph of the area of burning on the eastside, just outside the computer room.

MR. FRIEDMAN: Government offers 282-B.

MR. FOX: No objection.

THE COURT: Admitted.

(Exhibit No. 282-B admitted.)

BY MR. FRIEDMAN:

**Q.** This is the area outside the computer room?

**A.** That's correct. The computer room is right behind the corner there.

**Q.** Diagonally inside, basically?

**A.** Correct.

**Q.** What do you find significant about the damage shown in the picture?

**A.** This fire pattern is significant because, again, we see isolated low burning, and we don't see the associated drop down from above that would cause that low burning. The pattern goes up the walls. Again, the pattern is in the area where there's a corner, in an area where there's windows that would fail and also under an overhang.

**Q.** Would you look at 282-C and tell me what that is a picture of?

**A.** Is that a close-up picture of the corner of the ground, the corner of the ground there.

MR. FRIEDMAN: The Government offers 282-C.

1          MR. FOX:  No objection.

2          THE COURT:  Admitted.

3                  (Exhibit No. 282-C admitted.)

4   BY MR. FRIEDMAN:

5   **Q.**  Then 282-D.

6   **A.**  This is another close up of the corner.  We removed the

7   debris that was atop the ground and we discovered the remains

8   of an incendiary device.

9          MR. FRIEDMAN:  Government offers 282-D.

10         MR. FOX:  No objection.

11         THE COURT:  Admitted.

12                 (Exhibit No. 282-D admitted.)

13  BY MR. FRIEDMAN:

14  **Q.**  When you say the remains of an incendiary device, what are

15  you referring?

16  **A.**  The flagging is on the handle.  Also you can see the

17  lifted plastic.  Again right in the corner that I have circled

18  in the center of the photograph, you can see the unusual

19  degree of burning on the base of the wall where the siding

20  itself is burned off.

21  **Q.**  Can you look at 282-E; do you recognize that?

22  **A.**  Yes, this is when we removed that large piece of debris

23  and turned it over.

24         MR. FRIEDMAN:  Government offers 282-E.

25         MR. FOX:  No objection.

1          THE COURT:  Admitted.

2                  (Exhibit No. 282-E admitted.)

3    BY MR. FRIEDMAN:

4    **Q.**  Could you tell us what this picture shows?

5    **A.**  This shows the characteristic preserved bottoms of

6    five-gallon buckets; we have two of them.  The other thing of

7    interest is the remains of two plastic Ziploc containers, one

8    in the center of the photograph, and one at the bottom left of

9    the bucket remains.

10   **Q.**  At this point in your investigation, were you able to

11   determine why those Ziploc containers were here with these

12   remnants?

13   **A.**  Yes.

14   **Q.**  Would you look at Exhibit 282-F?

15        What is a photograph of?

16   **A.**  That is a photograph depicting -- it shows the remains of

17   a matchbook from the debris.

18   **Q.**  This is from the same debris which you were looking a

19   moment ago?

20   **A.**  Correct.

21          MR. FRIEDMAN:  The Government offers 282-F.

22          MR. FOX:  No objection.

23          THE COURT:  Admitted.

24                  (Exhibit No. 282-F admitted.)

25   BY MR. FRIEDMAN:

1   **Q.** You are going to have to help us, Agent Comery.

2   **A.** The two things you can see, the remains of the handle of

3   the five-gallon bucket in the upper right hand corner, and the

4   matches in the center of the photograph. The photograph is

5   upside down, and that's why the perspective is off.

6   **Q.** I am not sure that helps too much, but thank you.

7       Turning to Exhibit 282-H, can you tell us what is that a

8   photograph of?

9   **A.** This is the west side of the break room showing the patio

10   and the entrance to the break room.

11   **Q.** So this is the second area in which you found -- second

12   area to which the accelerant dog had alerted?

13   **A.** Correct.

14       MR. FRIEDMAN: Government offers 282 H.

15       MR. FOX: No objection.

16       THE COURT: Admitted.

17             (Exhibit No. 282-H admitted.)

18   BY MR. FRIEDMAN:

19   **Q.** Would you look at 282-I, and tell me what that is?

20   **A.** This is a close up of that, after the debris had been

21   removed, that had been placed on top of the patio.

22   **Q.** Is there anything significant here about the burn pattern?

23   **A.** Yes, again we see the uncharacteristic low burning of the

24   walls that is not associated with the normally occurring fuel

25   in the area. And then the fire entered the building through

1   the glass doors, and then there's been heavy burning within
2   the break room itself.
3   Q.  How are you able to tell the fire entered through the
4   glass doors?
5   A.  Because you read the fire patterns, and the initial fire
6   investigation team mistook the patterns and actually thought
7   the fire was originating within the break room.  That's why in
8   the first photograph you can see the debris is piled on the
9   patio.
10      When we came, we noticed the characteristic.  If the fire
11  had been in the break room, the patterns coming out that door
12  would have been different.
13  Q.  Would you turn to Exhibit 282-K and tell me what is that a
14  photograph of?
15  A.  This is a photograph of the debris that was discovered on
16  the concrete patio by that entrance to the break room.
17          MR. FRIEDMAN:  The Government offers 282-K.
18          MR. FOX:  No objection.
19          THE COURT:  Admitted.
20              (Exhibit No. 282-K admitted.)
21  BY MR. FRIEDMAN:
22  Q.  Can you tell us what that photograph shows?
23  A.  Yes, on the lower right-hand side there is the plastic
24  cover for a five-gallon bucket.  Then in the center of the
25  photograph are the metal handles for two five-gallon buckets.

And then in the center of the photograph you can see the
remains of a D-cell battery.

Q.  Would you look at 282-L and tell us what is that a
photograph of?

A.  This is a photograph of that plastic debris that has been
removed from the patio and flipped over.

          MR. FRIEDMAN:  Government offers 282-L.

          MR. FOX:  No objection.

          THE COURT:  Admitted.

               (Exhibit No. 282-L admitted.)

BY MR. FRIEDMAN:

Q.  Agent Comery, can you go through and tell us the items of
significance you see in that photograph?

A.  On the left-hand side is the plastic cover for the bucket.
In the center and right-hand side are the bottom remains of
five-gallon buckets.  The flag material is the handle.  And
then right between the two buckets, again we see the plastic
remains of a Ziploc container.

Q.  Is this the first fire of all the fires we've talked about
where you've seen Ziploc containers?

A.  That's correct.

Q.  Are there any additional components you found in this
device that are different from ones you found in earlier
devices?

A.  In examining the debris, we found the remains of a fabric.

In one of the examinations of that fabric area, I found a wire

that was like a resistor, a heating element.  That was very

unusual.  Plus we found the remains of D-cell batteries, which

we had not seen before.

**Q.**  Did you find -- are you familiar with components called

SCR, silicone controlled rectifiers?

**A.**  Yes.

**Q.**  Did you find any of those among the debris here?

**A.**  I did not.  The examination laboratory revealed remains of

one component that was identified as an SCR and one damaged

component that was very similar to an SCR.

**Q.**  Did you also find, or did laboratory testing show the

presence of items consistent with road flares?

**A.**  We did collect residue that the analysis in the lab

determined it was consistent with the post burn residue of a

road flare.

**Q.**  Based on the presence of those items, are you able, or

were you able, to determine if there had been an evolution in

the devices?

**A.**  Yes, that, and also the item's circuit boards were clearly

seen; and those circuit boards were identified to electronic

timers.  And also we had the presence of AAA batteries, and

then also a watch battery that would be consistent with

electronic timers.

**Q.**  If you compare this to one of the earliest devices, one of

1 the devices at Cavel West when you started, in terms of how
2 the devices -- how those components would allow the devices to
3 function, what changes had occurred over the span of these
4 fires?

5 **A.**  The primary difference is we've gone from a mechanical
6 kitchen timer with a fairly fragile igniter, which was the
7 backup base of a light bulb.  We have now gone into an
8 electronic timer.  It is not as prone to failure as the
9 mechanical timer we saw a failure in some of the devices
10 previously.

11      The other thing is we are seeing dual systems:  Dual
12 timers, dual igniters.  That's just to ensure there is
13 ignition.  The other thing is the presence of what the
14 laboratory determined was a Nordic brand electric socks had
15 been placed in amongst the componentry, which we speculate it
16 was placed to -- some people believe that when batteries get
17 cold they lose their power.  So we felt that might have been
18 the reason that was placed there.

19 **Q.**  I assume testing was done of the remnants of these two
20 devices?

21 **A.**  Yes.

22 **Q.**  What did that testing show?

23 **A.**  It came back positive for the presence of gasoline and a
24 heavy petroleum distillate.

25 **Q.**  Would you look at 282-N; could you tell me what is that a

1  picture of?

2  **A.**  Yes, this is a picture just of the window in the area

3  where the first device was located on the eastside.

4  　　　　MR. FRIEDMAN:  The Government offers 282N.

5  　　　　MR. FOX:  No objection.

6  　　　　THE COURT:  Admitted.

7  　　　　　　　(Exhibit No. 282-N admitted.)

8  BY MR. FRIEDMAN:

9  **Q.**  Is it fair to say this is a photograph of the internal

10 damage near one of the devices?

11 **A.**  Yes.

12 **Q.**  As part of your investigation, did you determine how much

13 total damage was done to the Superior Lumber office?

14 **A.**  Yes.

15 **Q.**  What did you learn or determine?

16 **A.**  The estimate was about $1.2 million.

17 **Q.**  Agent Comery, during the course of the investigation, did

18 law enforcement obtain a communiqué relating to this action?

19 **A.**  Yes, they did.

20 **Q.**  Would you look at Exhibit 283 and tell me if you recognize

21 that?

22 **A.**  Yes.

23 　　　　MR. FRIEDMAN:  Government offers 283.

24 　　　　MR. FOX:  No objection.

25 　　　　THE COURT:  Admitted.

1          (Exhibit No. 283 admitted.)

2     BY MR. FRIEDMAN:

3     **Q.** Can you read that?

4     **A.** It's a communiqué sent by the Earth Liberation Front.

5         "We torched Superior Lumber in Glendale, OR, on January 1,

6     2001.  Superior Lumber is a typical earth raper contributing

7     to the ecological destruction of the northwest.  What happened

8     to them should shock no one.  This year, 2001, we hope to see

9     an escalation in tactics against capitalism and industry.

10    While Superior Lumber says, 'make a few items, and do it

11    better than anyone else,' we say, 'choose an earth raper, and

12    destroy them'.  ELF, Earth Liberation Front."

13    **Q.** Did you reach a conclusion as to the cause of the fire in

14    Superior Lumber?

15    **A.** Yes.

16    **Q.** What was that conclusion?

17    **A.** The fire was caused by the functioning of incendiary

18    devices placed in two separate areas; one on the east

19    exterior, and one on the west exterior.

20    **Q.** Did you participate in searching a house of Nathan Block

21    and Joyanna Zacher in 2006?

22    **A.** Yes.

23    **Q.** Could you take a look at 562 and tell me if you recognize

24    that?

25              THE COURT:  Is that 562?

1     MR. FRIEDMAN:  It is, Your Honor.

2  BY MR. FRIEDMAN:

3  **Q.**  Do you have an item, Exhibit 562, in front of you?

4  **A.**  Yes.

5  **Q.**  Do you recognize that?

6  **A.**  Yes, I do.

7  **Q.**  Where have you seen that before?

8  **A.**  At the house that you just described that we did the

9  search warrant.

10  **Q.**  That's an item you found in the search of that house?

11  **A.**  Yes, in the bedroom.

12     MR. FRIEDMAN:  Government offers 562.

13     MR. FOX:  Your Honor, we had reached agreement with

14  the Government, and I would like to take this up outside the

15  presence of the jury.

16     THE COURT:  All right.  We will recess -- take that

17  up before we recess for the day.

18     MR. FRIEDMAN:  The Government has no further

19  questions.  Thank you, Your Honor.

20     THE COURT:  Well, this might be a good time to break

21  for the day.  It's about four minutes to 4:00.  I said I'd let

22  you go at 4:00 each day, and so I will do that and have you

23  back here ready to go again hopefully at 9:00, sitting right

24  there.

25     As you go about your day, you are going to hear me say,

1  until I sound like a broken record, don't discuss the case,

2  research anything, do anything about the case.  Come back;

3  have a good night's rest, and come back to receive the

4  evidence.

5      So I will see you in the morning.  Leave your books on the

6  chair.

7      (Jury departed.)

8          THE COURT:  All right.  You may be seated.  Let me

9  hear about this Exhibit 562.

10          MR. FOX:  I thought the Government was only going to

11  offer one page in this Exhibit.  There may have been some

12  confusion because I got a whole stack of papers.  I wasn't

13  aware at the time that there were currently two different

14  Exhibits.

15          THE COURT:  Let me ask it another way; is it

16  something the two of you should discuss?

17          MR. FRIEDMAN:  No, we didn't realize that's what the

18  defense was asking for, so we are happy to take out the one

19  page.

20          THE COURT:  Let's do this.  I will recess.  I will

21  have the two of you get together and decide on that page, and

22  then I will take it up if you can't agree on it.

23          MR. FOX:  I think we will.

24          THE COURT:  Let me have the witness step down.  You

25  can step down, sir.

1    Like I said, we will start at 9:00 in the morning.  I

2  don't know if there's something we can take up today; if

3  there's something there, we will deal with that.

4    Of course, I ask you, as to the witnesses, let the defense

5  know the witnesses you'll be calling tomorrow; the ones you

6  think you can get through in the same fashion.

7        MR. BARTLETT:  I will.  I should warn the Court I

8  anticipate, although I am not 100 percent certain, that there

9  will be an issue the United States wants to bring up at 8:30.

10        THE COURT:  As I said, I would like all of you here

11  at 8:30, including both attorneys and the Defendant, so we can

12  deal with that.  Hopefully, Mr. Bloom, you make a list of

13  whatever you might get so you don't do that.

14        MR. BLOOM:  I am really embarrassed.  I apologize.

15        THE COURT:  Give it some thought as you leave out the

16  door so we can take it up.  Is it something we can't get to

17  today?

18        MR. BARTLETT:  No, Your Honor.

19        THE COURT:  All right.  Then anything else we need to

20  take up tonight?

21        MR. BLOOM:  I don't believe so, Your Honor.

22        THE COURT:  I am good until about 9:00 tonight.

23    All right, then we will be at recess; we will see you

24  about 8:30.

25        THE CLERK:  All rise, Court is in recess.

1    (The Court recessed to Wednesday, February 13, 2008,

2  at the hour of 9:00 a.m.)

3              *    *    *    *    *

4              C E R T I F I C A T E

5

6      I certify that the foregoing is a correct transcript from

7  the record of proceedings in the above-entitled matter.

8

9  /S/  Teri Hendrix _____          May 2, 2008

10 Teri Hendrix, Court Reporter            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25