1                     UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
2                          AT TACOMA

3

4 UNITED STATES OF AMERICA,   )   Docket No. CR05-5828FDB
                      )
5       Plaintiff,       )   Tacoma, Washington
                      )   February 13, 2008
6 vs.                   )
                      )
7 BRIANA WATERS,         )   VOLUME 3
                      )
8       Defendant.       )
  _____)
9

10                    TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE FRANKLIN D. BURGESS
      SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
  APPEARANCES:
13

14 For the Plaintiff:      MARK N. BARTLETT
                     ANDREW C. FRIEDMAN
                     Assistant United States Attorney
15                  700 Stewart Street, Suite 5220
                     Seattle, Washington 98101-1271
16
For the Defendant:     ROBERT BLOOM
17                  Attorney at Law
                     3355 Richmond Boulevard
18                  Oakland, California 94611

19                  NEIL M. FOX
                     Cohen & Iaria
20                  1008 Western Ave., Suite 302
                     Seattle, Washington 98104
21

22 Court Reporter:        Teri Hendrix
                     Union Station Courthouse, Rm 3130
23                  1717 Pacific Avenue
                     Tacoma, Washington  98402
24                  (253) 882-3831

25 Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.

1                          I N D E X

2                      INDEX OF WITNESSES
                       ==================
3
   WITNESS ON BEHALF OF PLAINTIFF:                          Page
4
   JOHN COMERY - Continued
5
           Direct by Mr. Friedman......................... 266
6          Cross by Mr. Fox.............................. 266

7  DONALD RICE

8          Direct by Mr. Friedman......................... 306
           Cross by Mr. Fox.............................. 326
9
   JOHN COMERY - Recalled
10
           Direct by Mr. Friedman......................... 327
11         Cross by Mr. Fox.............................. 332

12 CHERYL GLENN

13         Direct by Mr. Bartlett......................... 337
           Cross by Mr. Fox.............................. 366
14
   BRADLEY COOPER
15
           Direct by Mr. Bartlett......................... 372
16         Cross by Mr. Fox.............................. 391

17 BRENNAN PHILLIPS

18         Direct by Mr. Bartlett......................... 398
           Cross by Mr. Fox.............................. 429
19         Redirect by Mr. Bartlett....................... 448
           Recross by Mr. Fox............................ 449
20
   RON TREZISE
21
           Direct by Mr. Friedman......................... 451
22         Cross by Mr. Bloom............................ 463

23 DAN PRIEST

24         Direct by Mr. Bartlett......................... 464
           Cross by Mr. Bloom............................ 480
25         Redirect by Mr. Bartlett....................... 484

INDEX - EXHIBITS

| EXHIBITS | Page |
|---|---|
| No. 562 | 265 |
| No. 242-J | 266 |
| No. 282-I | 266 |
| No. A-177 (Illustrative) | 288 |
| No. 381 | 310 |
| No. 382-B | 314 |
| No. 382-JJ | 315 |
| No. 382-KK | 316 |
| No. 382-C | 317 |
| No. 382-D | 318 |
| No. 382-J | 319 |
| No. 382-L | 320 |
| No. 382-O | 320 |
| No. 382-Q | 321 |
| No. 382-U | 321 |
| No. 382-V | 322 |
| No. 382-Z | 322 |
| No. 382-AA | 323 |
| No. 382-BB | 323 |
| No. 382-II | 324 |
| No. 1012-A | 332 |
| No. 201 | 341 |
| No. 382-E | 348 |
| No. 382-F | 348 |
| No. 382-G | 349 |
| No. 382-H | 351 |
| No. 382-I | 351 |
| No. 382-N | 354 |
| No. 382-R | 355 |
| No. 382-S | 355 |
| No. 382-W | 358 |
| No. 382-Y | 359 |
| No. 382-X | 360 |
| No. 382-CC | 363 |
| No. 382-DD | 363 |
| No. 382-EE | 364 |
| No. 382-M | 370 |
| No. 382-T | 370 |
| No. 515-B | 408 |
| No. 501 | 424 |
| No. 502 | 425 |
| No. 504 | 426 |
| No. 302 | 454 |
| No. 303 | 457 |
| No. 305 | 458 |

1

INDEX - EXHIBITS

EXHIBITS                                                    Page

2

No. 312-B                                                   473
3       No. 312-I                                           474
No. 312-J                                                   475
4       No. 312-K                                           475
No. 312-L                                                   476
5       No. 314                                             477
No. 315                                                     478
6       No. 316                                             478
No. 318                                                     479
7       No. 325-A                                           480
No. A-178 (Marked)                                          482
8       No. 504                                             487
No. 514-B                                                   487
9       No. A-97                                            488

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    TUESDAY, FEBRUARY 12, 2008 - 9:00 A.M.

2                            * * *

3    (Jury not present.)

4            THE COURT:   You may be seated.

5            THE CLERK:   This is in the United States of America

6    versus Briana Waters, cause CR05-5828FDB.

7        Counsel, please make an appearance for the record.

8            MR. FRIEDMAN:   Good morning, Your Honor, Andrew

9    Friedman and Mark Bartlett for the United States.

10           MR. FOX:   Good morning, Your Honor, Neil Fox and

11   Mr. Bloom for Ms. Waters, who's present.

12           THE COURT:   All right.  I guess we left off at a

13   point when Mr. Comery -- let me have him come back and take

14   the witness stand.  I guess we are ready for

15   cross-examination?

16           MR. FOX:   I think Mr. Friedman has to offer and admit

17   an amended exhibit that we discussed.  There's one issue with

18   Agent Comery that I would like to address for about two

19   seconds before the jury comes in.

20       I had talked to Mr. Friedman and Mr. Bartlett about having

21   Agent Comery remain under the subpoena so if we needed to

22   recall him in our case, instead of bringing Agent Caldwell

23   back, then we could do that.  The government didn't have a

24   problem because we left off with Agent Comery was checking

25   with the ATF.  I guess I am asking that Agent Comery remain so

1   that we -- not remain here physically, but if we needed to

2   recall him, we could.

3           THE COURT:  I don't know how to answer that.

4   Mr. Comery, I'm not sure where he's from.

5           MR. FOX:  He's from Oregon.  And I have given him a

6   subpoena.

7           MR. BARTLETT:  We will get him back, Your Honor.

8           THE COURT:  You are not saying that he should remain

9   in attendance, but just remain somewhere that you can have him

10  contacted; is that what you're saying?

11          MR. FOX:  Yes, so if we needed to recall him, we

12  didn't need to have to then --

13          THE COURT:  I hate to have all these witnesses remain

14  in attendance if it's not necessary.  It seems to be in an

15  area that I don't understand.

16      Are we ready for the jury?

17          MR. FOX:  Yes.

18          THE COURT:  Now, the document that we are talking

19  about was Exhibit 562.

20          MR. FRIEDMAN:  Right.  And we basically removed the

21  pages that the Defendant wanted out, and so I think there will

22  be no objection.

23      I have two other housekeeping matters.

24          MR. FOX:  No objection.

25          THE COURT:  Then as you two have agreed, that will be

admitted.

(Exhibit No. 562 admitted.)

MR. FRIEDMAN: I have two housekeeping matters, so I would have one minute of direct with Agent Comery, if that's okay?

THE COURT: All right. Are we ready for the jury? We could take these things up ahead of the 9:00 hour.

MR. FRIEDMAN: I am sorry, we are ready for the jury.

THE COURT: What I'm saying, we can take these matters up we just took up before the 9:00 hour. I have invited you to do that. I am at your disposal; meet you at 6:00 in the morning. I keep saying these things, but no one seems to pay attention.

MR. FOX: I am sorry, Your Honor. I told the clerk that we had to take care of things for a few minutes. So.

(Jury present.)

THE COURT: You may be seated.

Good morning to you. We are here to start, I guess, day three.

Mr. Comery is testifying, and of course, as always, remember you are still under oath. There are a couple of questions before we get to cross-examination.

MR. FRIEDMAN: Thank you, Your Honor.

First just a housekeeping matter for the record.

Your Honor, I understand that yesterday I forgot to offer

1   Exhibits 242-J, 261, and 282-J. Those were some of the

2   photographs Agent Comery looked at, so the government would

3   offer those three exhibits.

4            MR. FOX:  No objection.

5            THE COURT:  Admitted.

6            (Exhibit Nos. 242-J and 282-I admitted.)

7                    DIRECT EXAMINATION- Continued

8   BY MR. FRIEDMAN:

9   Q.  Agent Comery, yesterday do you recall discussing a

10  communiqué relating to the arson at the BLM Wild Horse Corral

11  at Burns, Oregon?

12  A.  Yes, I do.

13  Q.  Did you conduct some additional investigation concerning

14  that communiqué last night?

15  A.  Yes, I did.

16  Q.  What did you learn?

17  A.  I learned that I possessed the communiqué during my

18  interview, but it is unclear when I acquired the communiqué.

19  Q.  But you discussed it with Craig Rosebraugh?

20  A.  Yes.

21           MR. FRIEDMAN:  No further questions, Your Honor.

22  Thank you.

23           THE COURT:  All right.

24                    CROSS-EXAMINATION

25  BY MR. FOX:

1  **Q.** Good morning, Agent Comery.

2  **A.** Good morning.

3  **Q.** Agent Comery, you've been with the ATF for almost 20

4  years?

5  **A.** Yes.

6  **Q.** Now, the Bureau of Alcohol, Tobacco and Explosives, that's

7  what the ATF stands for?  You added the E at some point?

8  **A.** Yes.

9  **Q.** The explosives?

10  **A.** Yes.

11  **Q.** The ATF is not under the administrative rubric of the

12  Department of Justice, right?  It's under the Department of

13  Treasury, isn't that correct?

14  **A.** That is incorrect.  We are under the Department of

15  Justice.

16  **Q.** It's not the Treasury Department?

17  **A.** No.

18  **Q.** Has it ever been?

19  **A.** Yes.

20  **Q.** When did it change?

21  **A.** When the government reorganized the law enforcement after

22  2001.

23  **Q.** So back during the late '90s, it was under the rubric of

24  the Department of Treasury?

25  **A.** Correct.

**Q.** But you are a separate investigative agency than the Federal Bureau of Investigation, correct?

**A.** That's correct.

**Q.** You have your own rules and regulations, do things the way you do it, right?

**A.** Yes.

**Q.** Sometimes you work with the FBI, right?

**A.** Yes.

**Q.** But you are a different agency?

**A.** That is correct.

**Q.** Now, you primarily had little to do with the investigation of the University of Washington arson; is that correct?

**A.** That's correct.

**Q.** You were primarily dealing with the fires down in Oregon, correct?

**A.** Yes.

**Q.** With the exception of the two ones in Olympia?

**A.** Correct.

**Q.** Then also you have had some involvement in the Vail, Colorado fire, right?

**A.** That's correct.

**Q.** But you are not the primary investigator for the Center for Urban Horticulture fire, right?

**A.** No, I am not.

**Q.** Now, when you became an agent with the ATF, I think

1  Mr. Friedman asked you about your training yesterday.  You

2  said that you have had hundreds of hours of training; is that

3  right?

4  **A.**  That's correct.

5  **Q.**  In fact, as a new agent, you went through 400 hours of

6  training, right?

7  **A.**  Correct.

8  **Q.**  You had been a firefighter actually beforehand for a

9  number of years, right?

10  **A.**  A wildlife firefighter.

11  **Q.**  A wildlife firefighter.  But you were fighting fires,

12  right?

13  **A.**  Yes.

14  **Q.**  You have on-the-ground experience with fighting fires,

15  right?

16  **A.**  Yes.

17  **Q.**  Since you became an agent, you've had -- I've looked at

18  your CV -- probably a thousand of hours of training at least?

19  **A.**  That's correct.

20  **Q.**  You've also taught other fire investigators how to

21  investigate fires right?

22  **A.**  Correct.

23  **Q.**  You were a trainer, right?

24  **A.**  I do teach occasionally.

25  **Q.**  Well, on your CV you have a whole list of classes that

1    you've taught over the years.

2    **A.** Correct, over 20 years.

3    **Q.** Right. And you've taught other law enforcement officers,

4    right?

5    **A.** Yes.

6    **Q.** You've taught the prosecutors about how to do an arson

7    case?

8    **A.** Correct.

9    **Q.** And you've received many awards for your work?

10   **A.** Correct.

11   **Q.** You've been repeatedly named fire investigator of the year

12   down in Oregon by the Oregon Fire Investigation Society?

13   **A.** The International Association of Arson Investigators, yes.

14   **Q.** Down at the Oregon branch?

15   **A.** Yes.

16   **Q.** And you've been awarded by your own agency, by the ATF?

17   **A.** That is correct.

18   **Q.** You've investigated how many fires, would you say?

19   **A.** Over 400.

20   **Q.** Not all these end up as arsons; you investigate fires that

21   just got set for whatever reason, right? Or not set, but

22   broke out for whatever reason?

23   **A.** Correct. I investigate fires, sir.

24   **Q.** Your primary work is in the field, right?

25   **A.** I am field oriented, yes.

1    **Q.**  You are not a lab guy?

2    **A.**  Oh, no.

3    **Q.**  You basically -- when you investigate a fire, you go out

4    to the scene, right?

5    **A.**  Correct.

6    **Q.**  You sift through the evidence?

7    **A.**  Correct.

8    **Q.**  You document things?

9    **A.**  Yes.

10   **Q.**  You take pictures of things?

11   **A.**  Yes.

12   **Q.**  You record with as much detail as possible where various

13   items of evidence are located, right?

14   **A.**  Yes.

15   **Q.**  And you record these in your notes?

16   **A.**  Yes.

17   **Q.**  You turn your notes into reports?

18   **A.**  Yes.

19   **Q.**  You work for the federal government, so I assume you write

20   a lot of reports.

21   **A.**  Yes.

22   **Q.**  But there's a reason to write reports; isn't that true?

23   **A.**  Yes.

24   **Q.**  And the reason is so that years down the road, you can go

25   back and refresh your memory about what happened in a

1   particular case?

2   **A.**   Correct.

3   **Q.**   You can give your report to other law enforcement officers

4   who may be investigating similar cases?

5   **A.**   Correct.

6   **Q.**   You might transfer a case to another agent, and that agent

7   then can go through your reports and figure out what you had

8   done up to that point?

9   **A.**   That hasn't happened yet, but --

10  **Q.**   You've never transferred a case?

11  **A.**   I don't think so; not a fire case.

12  **Q.**   So you keep the cases from the beginning all the way to

13  the end?

14  **A.**   I have been in the same office for 20 years.

15  **Q.**   Now, when you find evidence at the scene, you don't

16  analyze it yourself; I mean, you don't do scientific testing

17  yourself, right?

18  **A.**   I don't do scientific testing.

19  **Q.**   Because your academic and work training is not in the same

20  genre as someone that works in a lab, right?

21  **A.**   Correct.

22  **Q.**   You don't have a chemistry background?

23  **A.**   No.

24  **Q.**   So if you find something that you think is significant,

25  you send it off to the ATF lab for examination?

1  **A.**  Or the state laboratory.

2  **Q.**  Or the state crime lab?

3  **A.**  Yes.

4  **Q.**  At the state crime lab or the ATF lab they have people

5  with science backgrounds, right?

6  **A.**  I assume they have science background, yes.

7  **Q.**  And they have a lot of equipment to analyze chemicals in

8  the soils that you -- the soil samples that you've located?

9  **A.**  Yes.

10  **Q.**  Do metallurgy testing, if need be?

11  **A.**  Yes.  Not in this case.

12  **Q.**  Basically, anything that you find at the scene that you

13  think should be analyzed, you send to someone else, right?

14  **A.**  Correct.

15  **Q.**  Now, apart from documenting the scene, you also interview

16  witnesses; is that correct?

17  **A.**  That's correct.

18  **Q.**  Some of these witnesses might be firefighters, the first

19  responders at the scene?

20  **A.**  Yes.

21  **Q.**  Just lay witnesses who saw the fire?

22  **A.**  Yes.

23  **Q.**  You also go out and investigate to try to find the people

24  that set the fire, if it's an arson, right?

25  **A.**  Depending on the case, yes.

1   **Q.**   You interview people, correct?

2   **A.**   Correct.

3   **Q.**   You interview possible suspects, right?

4   **A.**   Correct.

5   **Q.**   And in fact, with regards to all these cases down in

6   Oregon, you've actually traveled across the country to

7   interview people?

8   **A.**   Yes.

9   **Q.**   I believe in 1996 -- well, while you were investigating a

10  1996 arson at the Detroit ranger station, you even flew to New

11  Hampshire to track someone down; is that right?

12  **A.**   I can't remember if I flew in 1996, but I did associate

13  with that investigation.   I did go to New Hampshire.

14  **Q.**   You may have driven?

15  **A.**   No, I don't remember the interviewing occurring.

16  **Q.**   The ATF would pay for you to drive across the country?

17  **A.**   No, I did not know that it occurred in 1996.

18  **Q.**   Well the Detroit Ranger Station arson was one of the ones

19  you were involved in, right?

20  **A.**   Correct.

21  **Q.**   And that would have been in October of 1996?

22  **A.**   Correct.

23  **Q.**   And then there was another one at Oakridge Ranger Station

24  like two days later?

25  **A.**   Correct.

1 **Q.** So, when you interview suspects or witnesses, I imagine

2 that you take notes?

3 **A.** Yes.

4 **Q.** Actually, in terms of the trainings that you've given,

5 it's true that you've given trainings to other investigators

6 on how to do investigations, how to do interviews?

7 Have you not given trainings on how to write reports?

8 **A.** I have given training on report writing.

9 **Q.** So when you do an interview, you take your notes, and then

10 you transfer that, you type up a report afterwards, right?

11 **A.** The training I was given is specific to fire investigation

12 reports related to origin and cause.

13 **Q.** Some of the skills that you have in that area, writing

14 reports about origins and causes of fires, those skills are

15 kind of the same skills that you use when you write up a

16 report about the interview of a suspect?

17 **A.** Yes.

18 **Q.** You try to get down all the important details?

19 **A.** The pertinent details.

20 **Q.** The details you think are pertinent, right?

21 **A.** Correct. The amount of data you have from a fire scene is

22 overwhelming. So you can't detail every single burn pattern

23 and the consumption of every single piece of wood, things like

24 that.

25 **Q.** Sure, but when you interview a witness, you put down the

1    key salient points that the witness told you, right?

2    **A.**   Yes, I do.

3    **Q.**   Then you put that into your typed report.  I guess we

4    don't type reports any more, but --

5    **A.**   I do.

6    **Q.**   You have a typewriter?

7    **A.**   Well, computer.

8    **Q.**   Okay.

9    **A.**   Nobody types it for me.

10   **Q.**   I'm sorry?

11   **A.**   I type my own.

12   **Q.**   You try to put down in that typed report, all the salient

13   details you put down in your handwritten notes, right?

14   **A.**   Yes.

15   **Q.**   And again, the reason is that that report is sent to other

16   people in the law enforcement community?

17   **A.**   Yes.

18   **Q.**   Sent to the prosecutors?

19   **A.**   Yes.

20   **Q.**   Sent to defense counsel?

21   **A.**   Yes.

22   **Q.**   May even be sent to private insurance carriers, right?

23   **A.**   That's correct.

24   **Q.**   Now, I assume that the ATF has tape recorders if you need

25   to use them, right?

1    **A.**   Yes.

2    **Q.**   Or I guess we use digital recording now, right?

3    **A.**   Yes.

4    **Q.**   And you have access to those?

5    **A.**   Yes.

6    **Q.**   So if you wanted to tape-record an interview with a

7    witness, you could?

8    **A.**   Typically we don't.

9    **Q.**   Typically you don't, but if you wanted to, you could?

10   **A.**   We are encouraged not no.

11   **Q.**   You are encouraged not to?

12   **A.**   Uh-huh.

13   **Q.**   By your department?

14   **A.**   Yes.

15   **Q.**   But if you wanted to, you could; if you really needed to

16   interview a particular witness, you could ask your supervisor

17   for approval?

18   **A.**   Yes.

19   **Q.**   But if you are encouraged not to tape record interviews,

20   then will you agree with me that your notes become very

21   important?

22   **A.**   Yes.

23   **Q.**   And the report that you write becomes very important?

24   **A.**   Yes.

25   **Q.**   Now, the FBI uses something called a 302 to document an

1  interview with a witness.  The ATF had a different number for
2  it?
3  **A.**  We have a report of investigation.
4  **Q.**  And is there a number for that?
5  **A.**  Yes.
6  **Q.**  What's the number?
7  **A.**  I don't know.
8  **Q.**  So hypothetically, let's say you are interviewing a
9  witness, and the witness gives you the identities of the
10  people that the witness believes committed the arson.  Would
11  you agree with me that you would record those names in your
12  handwritten notes?
13          MR. FRIEDMAN:  Objection, Your Honor, it calls for
14  speculation.
15          MR. FOX:  He's an expert, Your Honor.  The government
16  offered him as an expert.
17          THE COURT:  You may ask him what does he do.
18          MR. FOX:  Okay.
19          THE COURT:  Not what somebody else should do, is
20  another thing.
21  BY MR. FOX:
22  **Q.**  If you are interviewing a suspect, or a witness, and the
23  person tells you the names or the identities of the people
24  that committed the crime you are investigating, would you put
25  that into your report?

1 **A.** Yes, I would.

2 **Q.** Let's say you were interviewing someone who was suspected

3 of committing an arson, and the suspect gave you four other

4 identities of people that he or she said committed the arson

5 with her. First off, you would record those names, right, in

6 your handwritten notes?

7 **A.** Yes, I would.

8 **Q.** And you would put them into your typed report of

9 investigation; correct?

10 **A.** Yes, I would.

11 **Q.** Let's say the witness or the suspect was not sure about

12 the names. They gave you some names and said it's hazy for

13 me. You would still put those names down in your handwritten

14 notes, wouldn't you?

15 **A.** Yes, I probably would put quotes or indicate that the

16 person was unsure.

17 **Q.** And then when you typed up your report of investigation,

18 you would put that language into your report?

19 **A.** I would put it within context, yes.

20 **Q.** Now, let's say the witness said possibly four other people

21 were involved with committing the particular crime, and you

22 were going to write up your report, your typed report. You

23 wouldn't say the witness and others committed the crime, would

24 you?

25 **A.** It depends on the situation.

**Q.** Well, if the witness had just said I did this, probably I did this with Joe, Mary, Tom, and Curtis. When you wrote up your report, would you put "I did this with others"?

**A.** This is hypothetical --

**Q.** Sure, hypothetically.

**A.** It depends on the degree of certainty which the witness is providing the information.

**Q.** Well, let's say the witness said I think I did it with these people, I am not certain. Would you put in your report exactly what the witness said, I think I did it but I am not certain?

**A.** Sometimes I would put quotes, sometimes I would not.

**Q.** But you would relay the essence of what a person said, the names; you'd give some indication as to whether or not the witness was certain or not, right?

**A.** Yes.

**Q.** So, these arsons, these cases that you were investigating down in Oregon, you investigated them for years, right?

**A.** That's correct.

**Q.** The first ELF arson was in 1996, wasn't it?

**A.** Correct.

**Q.** And it was very frustrating to you as an investigator that you hadn't arrested anyone for that, right?

**A.** No.

**Q.** It wasn't frustrating?

1  **A.** I am sorry --

2  **Q.** Did you -- you really wanted to find the people that

3  committed these crimes, right?

4  **A.** As with all my cases. I keep my cases open for the

5  statute of limitations. I pursue it as we have evidence

6  discovered.

7  **Q.** For some of these cases, isn't it true that for some of

8  the crimes that could be charged, the statute of limitations

9  was running out by 2005; isn't that true? It was coming up to

10 the statute of limitations?

11 **A.** Well, for the arsons, the statute is ten years.

12 **Q.** Right. So for the '96 arsons, you are getting into 2006,

13 you are kind of coming up against it, right?

14 **A.** Yes.

15 **Q.** And then some of the other -- the general statute of

16 limitations is five years, right, for non-arson related

17 crimes?

18 **A.** For most crimes.

19 **Q.** So, by 2005, 2006, you are coming up against that statute,

20 right?

21 **A.** Yes.

22 **Q.** Very briefly, let's talk about the Detroit and the

23 Oakridge Ranger Station cases. The Oakridge Ranger Station

24 arson took place on October 30, 1996? Or October '96?

25 **A.** It was either the 30th or 31st, I can't remember.

1  **Q.**  There was a fire that destroyed the building, right?

2  **A.**  That's correct.

3  **Q.**  Caused a couple, what, two, three, four million dollars in

4  damage in '85?

5  **A.**  Yes.

6  **Q.**  This ranger station had earlier been the subject of a

7  series of vandalism attacks against it, right?

8  **A.**  Correct.

9  **Q.**  Locks had been glued?

10  **A.**  Yes.

11  **Q.**  Compost had been spread around the ranger station?

12  **A.**  Yes.

13  **Q.**  And culminated in the arson.  And actually, neither -- in

14  neither of the two ranger station cases was there any type of

15  sophisticated timer, right?

16  **A.**  No, there was no sophisticated timer.

17  **Q.**  In one of the cases there actually was a jug of some sort

18  of petroleum product with a sponge and a stick of incense

19  stuck into it; is that correct?

20  **A.**  Yes.

21  **Q.**  And that remained at the scene.  It didn't burn, right?

22  **A.**  The device did not fully function.

23  **Q.**  So the incense stick was the timing device?

24  **A.**  That is correct.

25  **Q.**  It's different than an electrical timer, but it serves the

1  same function, right?

2  **A.** Yes, it creates a time delay.

3  **Q.** And then you also -- you talked yesterday about the two

4  arsons in Olympia, the Animal Damage Control facility and the

5  National Wildlife Research Facility, right?

6  **A.** Yes.

7  **Q.** And those took place on June 21, 1998?

8  **A.** Correct.

9  **Q.** At one point I asked you to distinguish between Blomberg

10  and O'Leary, right?

11  **A.** Correct.

12  **Q.** And those are the streets that the two facilities were on,

13  right?

14  **A.** Correct.

15  **Q.** So the Blomberg facility -- well, I'm sorry, the O'Leary

16  facility, that was the one that had the sophisticated delay

17  system, right?

18  **A.** Correct.

19  **Q.** With the light bulb filaments?

20  **A.** Correct.

21  **Q.** That fire, I think you said, caused $500,000 of damage?

22  **A.** Estimated.

23  **Q.** Estimated?

24  **A.** Correct.

25  **Q.** Let's talk for a second about the Blomberg -- and that's

1  B-l-o-m-b-e-r-g, for the record -- the Blomberg facility,

2  there was no time delay device at that arson, right?

3  **A.**  Correct.

4  **Q.**  The arson -- the fire started with buckets of some sort of

5  petroleum product, right?

6  **A.**  Correct.

7  **Q.**  It was ignited by hand?

8  **A.**  By an open --

9  **Q.**  By an open flame?

10 **A.**  By an open flame.

11 **Q.**  With someone standing there with something setting it on

12 fire?

13 **A.**  I wasn't present.

14 **Q.**  Okay, I understand.  But from your reconstruction, there

15 didn't appear to be any road flares or sponges or anything

16 like that?

17 **A.**  Well, actually there were two items of interest in the

18 remains of the bucket that was in the recessed -- where the

19 valve was.  In that area, that came back positive for wax.

20 And then the east entrance, there was debris that was

21 consistent with what we thought might have been a sponge, but

22 the laboratory was unable to verify that.

23 **Q.**  So the wax would be some sort of like candle or something,

24 possibly, used to --

25 **A.**  There are many things that would contain -- like the super

matches contain wax and wood fiber, fire starters.

**Q.** What's a super match?

**A.** If you remember from the BLM incident, we had super matches, they were about six inches by one inch. They have an ignition, striking like a regular match, and then the rest of the match is wood fiber and wax. It's designed to have a prolonged burning period.

**Q.** So that conceivably could be -- someone could still be standing there with it, right?

**A.** Yes, or they could throw it.

**Q.** They could throw it?

**A.** Uh-huh.

**Q.** Now, let's talk about another arson investigation that Mr. Friedman didn't ask you about yesterday. That's the Vail case. You were one of the agents, not the primary agent, investigating the arson of the Vail Ski facility in, was it October 1998?

**A.** Correct. I was one of the agents on the two national response teams that responded.

**Q.** This was a ski lodge that was being built up in the mountains that, I think there was, what, $15 million worth of damage; is that right?

**A.** The buildings were not under construction. They were constructed mainly.

**Q.** They were; okay.

1   A.   Yes.

2   Q.   But it had recently been constructed in an area that,

3   according to the communiqué, was endangering the lynx, right?

4   A.   No, the communiqué, they were concerned about the

5   expansion that was proposed for the area.

6   Q.   Okay.   That allegedly was going to hurt the lynx, right?

7   A.   Correct.

8   Q.   And there was actually, what, eight separate fires that

9   took place up there at the ski facility?

10  A.   I believe about eight.

11  Q.   This is in Colorado, right?

12  A.   Correct.

13  Q.   Jennifer Kolar was living in Colorado at the time; is that

14  correct?

15  A.   Yes.

16  Q.   And there was another arson at a gun club called the Wray

17  Gun Club that had taken place -- or an attempted arson a few

18  weeks earlier, right?

19  A.   Correct.

20  Q.   Also in Colorado?

21  A.   Correct.

22  Q.   Now, from your knowledge of the Vail Ski Lodge arson,

23  there were no timing devices, right?

24  A.   We did not find any timing devices.

25  Q.   You didn't find any evidence of ignition devices, other

1  than maybe a match or something like that?

2  **A.**  The other thing, I think again there was some debris that

3  we thought was a sponge.

4  **Q.**  Okay.

5  **A.**  But that was it.  No, we didn't find anything related --

6  **Q.**  No light bulb filaments?

7  **A.**  No.

8  **Q.**  No road flares or anything like that?

9  **A.**  No.

10  **Q.**  No electronic timers?

11  **A.**  Correct.

12  **Q.**  No manual timers?

13  **A.**  No.

14  **Q.**  Yet, just having gasoline or some petroleum product lit on

15  fire, that caused $15 million worth of damage, right?

16  **A.**  Correct.

17  **Q.**  So really, would you agree with me that the amount of

18  damage is not really driven by the presence or absence of a

19  time delay system?

20  **A.**  Not in that instance.

21  **Q.**  It's actually not driven by the sophistication or lack

22  thereof of the ignition sequence, right?

23  **A.**  Correct.

24  **Q.**  So, generally, would you agree that each of the fires that

25  you've testified about, if you break down the devices, they

1  are broken down into three categories?  I think you should

2  have, marked for identification, A-177 in front of you?

3  **A.**  Yes.

4  **Q.**  Would you agree that the first component is a time delay

5  system?  It's optional; sometimes it's present, sometimes it's

6  not?

7  **A.**  Correct.

8  **Q.**  The second component is the ignition method, right?

9  **A.**  Yes.

10  **Q.**  And the third component is the type of accelerant?

11  **A.**  The liquid fuel.

12  **Q.**  The liquid fuel.

13  **A.**  Yes.

14  **Q.**  Or sometimes it's solid?

15  **A.**  Yes.

16  **Q.**  But it's the accelerant, right?

17  **A.**  Correct.

18  **Q.**  Is that a fair characterization of how these things work?

19  **A.**  Correct.

20       MR. FOX:  Your Honor, I would offer for illustrative

21  purposes only Exhibit A-177.

22       MR. FRIEDMAN:  No objection.

23       THE COURT:  Admitted.

24       (Exhibit A-177 admitted for illustrative purposes.)

25  BY MR. FOX:

1  **Q.** So in terms of the time delay sequence, this could be a

2  stick of incense, as you said?

3  **A.** Correct.

4  **Q.** It could be a digital timer?

5  **A.** Correct.

6  **Q.** I suppose it could be a really, really long match, right,

7  that goes for a block or something like that, if it doesn't

8  get blown out?

9  **A.** With that qualifier, yes.

10  **Q.** Because the function is to give time so that the person

11  setting the fire can leave the scene, right?

12  **A.** You have to ask the person that set it.

13  **Q.** Well, it allows for unattended ignition of the accelerant,

14  right, the time delay device?

15      It allows for unattended ignition, so the person doesn't

16  have to be there when it starts combusting, right?

17  **A.** Correct.

18  **Q.** And the time delay sequence -- actually it minimizes the

19  danger to the perpetrator, right?

20  **A.** Not always.  If you look at Cavel West, when they were

21  trying to put it together, by their own admission, it ignited

22  in their presence.

23  **Q.** But generally, if you can get away before the fire starts,

24  there's probably less chance that you'd be hurt?

25  **A.** Correct.

1   **Q.** On the other hand, without a timer, there's the certainty

2   of ignition, right? So if you are standing there holding a

3   flame to the bucket you are going to know whether it goes up

4   or not, right?

5   **A.** Yes.

6   **Q.** And Mr. Friedman yesterday talked about fail-safe devices,

7   two batteries, two timers, to try to make up in case something

8   goes wrong, right? And when you are standing there, you can

9   see if it goes up, right?

10   **A.** Correct.

11   **Q.** So you don't need a fail-safe device if you are standing

12   there with the flame over the bucket of the gasoline, right?

13   **A.** No.

14   **Q.** Now, the method of ignition could be a match?

15   **A.** Yes.

16   **Q.** It could be a road flare, right?

17   **A.** You are just saying in general --

18   **Q.** Right.

19   **A.** -- a match could be used to set a fire?

20   **Q.** Yes.

21   **A.** Yes, a road flare could be used to set a fire.

22   **Q.** The filament of a light bulb, right?

23   **A.** In and of itself.

24   **Q.** It's part of the sequence, it would light something on --

25   it would light the matches on fire that would then light the

1  sponge and then the jug, right?

2  **A.**  Yes.  It's a source of heat.  It needs a receptive fuel.

3  **Q.**  So in and of itself, the method of ignition can go from

4  very, very low-tech to very high-tech, right?

5  **A.**  Correct.

6  **Q.**  And then the accelerant, that's what's set on fire, right?

7  **A.**  The ignitable liquids, yes.

8  **Q.**  Mostly in the cases that you've been talking about, these

9  have been combustible liquids, right?

10  **A.**  Well, there's gasoline and then there's the heavy

11  petroleum distillate.

12  **Q.**  But it operates through the process of combustion, right?

13  **A.**  Yes, there is a distinction between a combustible liquid

14  and a flammable liquid.

15  **Q.**  But these are combustion fires, right?

16  **A.**  Yes.

17  **Q.**  And they don't all -- in these cases you've investigated,

18  the liquid doesn't go up all at one time, right; it doesn't

19  burn all at one time?

20  **A.**  Well, the liquid doesn't burn.  It's the vapors from the

21  liquid that's burning, and it depends on the amount of the

22  evaporation of the gasoline.  There's instances where gasoline

23  is not vaporizing as much, or there's instances where fuel has

24  been spread over a surface area and more of it is evaporating,

25  and then there would be a bigger initial flaming.

**Q.** With these devices, it would generally take some amount of time for all of the gasoline to be consumed, right?

**A.** Well, if you remember in the shop at Cavel West, we saw the ignitable liquid mixture had been spread about the area, which that would have ignited very readily before even the one-gallon jug was to fail and spread that liquid.

**Q.** Right. Because somebody poured it on the ground?

**A.** Correct.

**Q.** But in terms of having a plastic bucket with gasoline in it, if that gets set on fire, it takes some time before it burns down, right?

**A.** That's not always true.

**Q.** Well, are you familiar with the Earth Liberation Front manual setting fires with electrical timers?

**A.** Yes.

**Q.** That actually was published on the Internet; is that right?

**A.** Correct.

**Q.** It was authored by Stan Meyerhoff and William Rodgers?

**A.** Yes, I have knowledge -- well, I have no admission from Mr. Rodgers. I have knowledge that there were many authors contributed.

**Q.** You are familiar with that document, right?

**A.** Yes, I am.

**Q.** It's true, is it not, that the design that the Earth

1  Liberation Front manual talks about is designed for these
2  devices -- is designed to have sustained heat, and not to have
3  instantaneous fire?

4  **A.** Well, the combination of gasoline and diesel, the gasoline
5  is going to ignite fairly readily because it's vaporizing.  I
6  should say heavy petroleum distillate that's in the mixture is
7  a heavier fuel, so that will be sustaining fire.

8  So you are getting two things: a quick rapid developing
9  fire from the gasoline, and then the sustained burning from
10 the heavy petroleum distillate.

11 **Q.** But the design in the ELF fuel manual is basically to have
12 sustained fire in one location; not spreading the gasoline all
13 over the place, but to have -- the purpose of putting it in a
14 bucket is to have that be the localized source of heat, right?

15 **A.** I'd have to refer to the document you are talking about to
16 answer that.  If there's a specific area.

17 **Q.** Sure.  Well, maybe after the break we can do this.  What's
18 been marked for identification as A-99, if we could pull that
19 out.  I will go on to something else.

20 Basically, though, what I am trying to get at, you don't
21 need a fuse or road flare to set a fire to a bucket of
22 gasoline, right?

23 **A.** No.

24 **Q.** You don't need a timer to set the fire, right?

25 **A.** No.

1 **Q.** Ignition by whatever means is the same; it causes the same

2 result, right?

3 **A.** Well, direct ignition of a bucket of gasoline and a small

4 match puts you in great jeopardy.

5 **Q.** But basically, the effect is the same, right?

6 **A.** Correct.

7 **Q.** Now, another area that I'd like to talk about is the

8 nontechnical side of your investigation.  Mr. Friedman asked

9 you about the search of the Zacher/Block residence, is that

10 correct?

11 **A.** Correct.

12 **Q.** He referred to Exhibit 562; is that correct?

13 **A.** Yes, now I am recalling it.

14 **Q.** It's a notebook, right?

15 **A.** Yes.

16 **Q.** And this is a notebook found at the residence of Mr. Block

17 and Ms. Zacher in Olympia?

18 **A.** I don't know if that was her residence.  She was present

19 that day.

20 **Q.** I'm sorry?

21 **A.** She was present at the residence.

22 **Q.** Basically, this notebook had a lot of different things

23 written in it?

24 **A.** Correct.

25 **Q.** At some point the name Justin appeared on the page?

1   A.  Correct.

2   Q.  There were other notations about housing rentals and

3   things like that?

4   A.  Correct.

5   Q.  I would assume that Mr. Block knew a lot of people in the

6   Olympia area, right?

7   A.  You'd have to ask Mr. Block.

8       MR. FRIEDMAN:  Objection, Your Honor.  This witness

9   wouldn't have any knowledge.

10      THE COURT:  I think he just answered that; he said he

11  didn't know.

12  BY MR. FOX:

13  Q.  You don't -- just because someone's name is written down

14  in a notebook, it doesn't mean that they are perpetrators

15  together in any type of criminal activity; is that correct?

16  A.  Yeah.

17  Q.  It could be hypothetically somebody you play darts with at

18  the local tavern, right?

19  A.  Hypothetically.  Yes.

20      MR. FOX:  Did we find A-99?

21      THE COURT:  Any other questions; can we go to

22  something else and come back to that?

23      MR. FOX:  Okay.

24  BY MR. FOX:

25  Q.  Now, Agent Comery, you were present also during interviews

1   of Lacey Phillabaum; is that not correct?

2   **A.**  That is correct.

3   **Q.**  And you were present during the interviews of Jennifer

4   Kolar?

5   **A.**  Correct.

6   **Q.**  You were present for at least three of those interviews;

7   is that correct?

8   **A.**  I believe so, yes.

9   **Q.**  January 6, 2006?

10  **A.**  I don't have recall.

11  **Q.**  You don't have the dates, but January 2006, you saw her

12  once or twice?

13  **A.**  Yes.

14  **Q.**  And then another time in March?

15  **A.**  Yes.

16  **Q.**  Now, the first time that you met Ms. Kolar, she was with

17  her lawyer, right?

18  **A.**  Correct.

19  **Q.**  Does the name Michael Martin ring a bell?

20  **A.**  No.

21  **Q.**  Lawyers all kind of merge into each other?

22  **A.**  Names are not my strong point.

23  **Q.**  Okay.  Special Agent Halla was present?

24  **A.**  Yes.

25  **Q.**  Mr. Friedman was present?

1  **A.**  Without reviewing my report, I can't --

2  **Q.**  There were prosecutors present?

3  **A.**  Correct.

4  **Q.**  And you questioned her about various arsons; is that

5  correct?

6  **A.**  Yes, I did.

7  **Q.**  You actually questioned her about the Wray Gun Club case?

8  **A.**  Yes, I did.

9  **Q.**  And now, before you went into this interview, were there

10  discussions about new information that Ms. Kolar had come up

11  with?

12  **A.**  I don't know.

13  **Q.**  You don't remember anything like that?

14  **A.**  No, I don't know whether it did or didn't happen.

15  **Q.**  Do you recall whether there were discussions about

16  Ms. Kolar coming up with a new name for the University of

17  Washington arson?

18  **A.**  First, I don't know who you are saying discussions with.

19  **Q.**  Well, discussions with the prosecutors or Special Agent

20  Halla.

21  **A.**  I don't recall.  My focus on going to those interviews was

22  to find out information regarding specific fire instance and

23  primarily how they were started.  That's what I focused on.

24  **Q.**  Right.  But there were no off-the-record conversations

25  that you were aware of where someone said don't take notes

1  about something; is that right?

2  **A.**  No.

3  **Q.**  And it's true that during the course of the interview with

4  Jennifer Kolar, neither you nor anyone else accused her of

5  lying in a previous interview?

6  **A.**  Correct.

7  **Q.**  No one confronted her with any information that she

8  supposedly had withheld from the first interview, or prior

9  interviews?

10  **A.**  Correct.

11  **Q.**  No one questioned her about whether she had told the

12  complete truth earlier?

13  **A.**  Correct.

14  **Q.**  And it's true that there was no questioning of Jennifer

15  Kolar about Briana Waters?

16  **A.**  I would have to look at the reports of interview.

17  **Q.**  Why don't we pull out A-32, and I will go back to the ELF

18  manual.  You have in front of yourself what's been marked for

19  identification as A-99?

20          THE COURT:  Mr. Fox, let me ask you to give the clerk

21  the complete set of exhibits you are going to use and she can

22  find these things.

23          MR. FOX:  Sure.  I am sorry for Pat to have to go up

24  and back.

25  BY MR. FOX:

1  **Q.**  Can you identify what's been marked for identification as
2  A-99?
3  **A.**  Yes.  It's a document that says "Setting Fires With
4  Electrical Timers" and "Earth Liberation Front Guide."
5  **Q.**  Are you familiar with this?
6  **A.**  Yes, I am.
7  **Q.**  This is the document we were referring to before?
8  **A.**  Yes.
9  **Q.**  Why don't you take a look at page 4.  Take a look at that
10  for a second and see if that refreshes your recollection.
11  **A.**  That number, again, was A what?
12  **Q.**  A-99.
13      And referring you to the middle of the page.
14  **A.**  Yes.
15  **Q.**  You've read through it?
16  **A.**  The four rules of arson?
17  **Q.**  Right.
18  **A.**  Okay.
19  **Q.**  Does that refresh your memory as to the ELF's goals for
20  concentration of heat?
21  **A.**  As related to this document, yes.
22  **Q.**  And what is your -- can you tell us what the rule is?
23  **A.**  The four rules?
24  **Q.**  Well, it says the heat needs to be concentrated in one
25  place, right?

1  **A.**  Yes.   That's rule number two.

2  **Q.**  It's counterproductive to disperse the accelerants?

3  **A.**  Correct.

4  **Q.**  And then 3 is the heat needs to be sustained over a period

5  of time?

6  **A.**  Correct.

7  **Q.**  And that's what I was trying to get to before, about the

8  reason why you have it in the bucket; you just don't spread it

9  all over the floor, right?

10  **A.**  Well, I would argue that it's not counterproductive to

11  disperse the accelerant.  I have seen many very successful

12  arsons where they have dispersed the accelerant.

13  **Q.**  If you disperse the accelerant, it actually creates more

14  intense heat initially, right?

15  **A.**  No, the heat from the flame is the same from a candle

16  versus the flame from the gasoline or diesel.  What you are

17  talking about is the heat release rate; the energy that's

18  released.

19  **Q.**  Okay.

20  **A.**  With gasoline, the gasoline is consumed quicker, so there

21  would be more energy released in a shorter duration.

22  **Q.**  When it's spread out?

23  **A.**  Even when it's contained because it burns quicker than

24  diesel.  The heat of combustion is relatively the same for

25  both products.

1   **Q.** When you say you've seen many a fire with gasoline spread

2   about, the damage really is equivalent, isn't it, between when

3   you spread out the gasoline and when you burn it in the

4   bucket, for the petroleum product?

5   **A.** It can be, yes.

6   **Q.** Referring you to A-32.

7      Can you take a moment to look at that?

8   **A.** Yes.

9   **Q.** Can you identify that?

10  **A.** These are my handwritten notes dated January 6 of '06.

11  It's regarding the interview of Jennifer Kolar.

12  **Q.** Do you want to take a minute to review those?

13  **A.** Do you want me to read every single aspect of this?

14  **Q.** I just want you to refresh your memory about what

15  happened.

16       THE COURT:  Let's do it this way.  Why don't you ask

17  him a question and see if you can get an answer.

18       MR. FOX:  Okay.

19  BY MR. FOX:

20  **Q.** Agent Comery, it's true that during the interview with

21  Jennifer Kolar, the word Briana is mentioned only one time;

22  isn't that correct?

23  **A.** I would have to see the report.

24  **Q.** The 302?

25  **A.** Sure.

1  **Q.**  Okay, I thought by giving you your notes, I would speed
2  things up.
3  **A.**  Well, notes are just a tool for use in producing a report.
4  **Q.**  I am very sorry, it's A-30.
5      You don't have any -- there's no record that any pictures
6  of Briana Waters were shown to Jennifer Kolar that day, were
7  there?
8  **A.**  Sir, which document do you wish me to refer to?
9  **Q.**  Why don't you take a look at A-30.  Why don't you take a
10 look at that and identify it?
11 **A.**  This is a 302 reflecting the interview of Jennifer Kolar
12 on January 6, 2006.  It is produced by Ted Halla and myself.
13 **Q.**  Okay.  Do you want to take a moment to review that and
14 refresh your memory?
15      THE COURT:  Is there a question that you want him to
16 look at something in particular in there?
17 BY MR. FOX:
18 **Q.**  Well, my question was, it's true, is it not, that at no
19 time in that interview was Jennifer Kolar presented a picture
20 of Briana Waters to identify?
21 **A.**  Correct.
22 **Q.**  She was shown a lot of pictures that day, right?
23 **A.**  Correct.
24 **Q.**  Now, this 302, that's the FBI form for report of
25 interview, right?

1  **A.** Correct.

2  **Q.** You worked on this document with Agent Halla?

3  **A.** Yes. I provided information.

4  **Q.** And did you talk about it over the phone, or you -- how do

5  you send drafts up and back?

6  **A.** I don't know the specifics of how we did this one. We had

7  meetings, investigator meetings, so I don't know if I was

8  provided a draft at that time.

9  **Q.** But you went through -- before it was finalized you made

10 sure that it was accurate, right?

11 **A.** Correct.

12 **Q.** And the word "Briana" appears one time in that document,

13 right?

14 **A.** Could you point out the area you are referring to?

15 **Q.** I am referring to the middle of the first page.

16     I am sorry, down towards the bottom, maybe five, six lines

17 up.

18 **A.** Correct, it is mentioned there.

19 **Q.** But apart from the fact that there's a mention of the name

20 in the context with some sort of writing on the back of the

21 newsletter -- right?

22 **A.** Correct.

23 **Q.** -- there was no other questioning of Jennifer Kolar at

24 that meeting about Briana Waters; isn't that true?

25 **A.** As far as I am aware, yes.

1  **Q.** Now, you were also present during an interview with
2  Stanislas Meyerhoff, is that not correct -- a number of
3  interviews with him?
4  **A.** Very many.
5  **Q.** And you interviewed him on March 17, 2006; isn't that
6  true?
7  **A.** I don't recall the exact date.  Many interviews occurred.
8  **Q.** Okay.  There were times when you showed him pictures;
9  isn't that true?
10 **A.** That is correct.
11 **Q.** Were you not present on March 17, 2006, when you showed
12 him a picture of Briana Waters and he said, "Familiar; not
13 involved"?
14         MR. FRIEDMAN:  Objection, Your Honor.  They can call
15 Mr. Meyerhoff if they want.  They can't elicit hearsay from
16 Agent Comery.
17         MR. FOX:  Your Honor, it's present sense impression
18 under 803(1).
19         THE COURT:  It may be, and it may be we're getting
20 into an area the Court has ruled on.  I am sure you are aware
21 of that in terms of all these interviews and the extent this
22 witness can testify to.
23         MR. FOX:  I am offering it, Your Honor, under
24 Evidence Rule 803(1).
25         THE COURT:  I understand what you are saying.  I am

1  going to let you go ahead.  I am just telling you.

2          MR. FOX:  Are you sustaining or overruling?

3          THE COURT:  Ask your questions.

4  BY MR. FOX:

5  **Q.** Is it not true that when you showed the picture of Briana

6  Waters to Stan Meyerhoff, he said, "Familiar; not involved."

7          MR. FRIEDMAN:  Objection, Your Honor.  This calls for

8  hearsay.

9          THE COURT:  If he heard that, he can speak to it, and

10  then you can go into the rest of it.

11  BY MR. FOX:

12  **Q.** Is that true?

13  **A.** I would need to see the report.

14  **Q.** I would ask you then to take a look at A-86.

15      Have you taken a look at that?

16  **A.** I have looked at the first page.

17  **Q.** Can you identify that for the record, please?

18  **A.** Yes.  This is an FBI 302 report reflecting an interview of

19  Mr. Meyerhoff.

20  **Q.** On which date?

21  **A.** 3-17.

22  **Q.** 2006?

23  **A.** Correct.

24  **Q.** And your name appears at the bottom of that report?

25  **A.** Along with Detective Harvey and FBI Special Agent

Caldwell.

Q. Does that document refresh your memory of what took place during that interview?

A. Yes.

Q. It's true that Mr. Meyerhoff was shown a picture of Briana Waters, right?

A. Correct.

Q. And his response was "Familiar, not involved"?

A. Correct.

Q. I have no further questions.

THE COURT: All right. Any redirect?

MR. FRIEDMAN: May I have one moment, Your Honor? No questions, Your Honor.

THE COURT: Then you may step down. Your next witness. Let me have you step forward, sir, and raise your right hand to be sworn.

DONALD RICE, called as a witness, duly sworn.

THE COURT: Just come around and take the witness chair.

DIRECT EXAMINATION

BY MR. FRIEDMAN:

Q. Good morning, Mr. Rice. Can you tell us your whole name and spell your last name for the record.

A. Donald Eugene Rice, R-I-C-E.

Q. Are you originally from Washington?

1   **A.**   I grew up in Mount Vernon, Washington.

2   **Q.**   At some point, you moved to Oregon?

3   **A.**   Clatskanie, Oregon.

4   **Q.**   When did you move there?

5   **A.**   Right after college, 1979.

6   **Q.**   Why did you move there?

7   **A.**   Worked there for employment.  I was hired to work, manage

8   a farm there.

9   **Q.**   What was that farm called?

10  **A.**   Western Farms of Oregon.

11  **Q.**   When you moved down in 1979, what kind of a farm was that?

12  **A.**   The people that bought it at that time were converting it

13  from a cattle ranch to a crop farm.

14  **Q.**   To what type of crop farm?

15  **A.**   A variety of crops, wheat, barley, green beans, sweet

16  corn, vegetable seed crops.  Looking for other market

17  alternatives as well.

18  **Q.**   Was one of the crops that you investigated and started

19  growing, poplar trees?

20  **A.**   It was a couple years later that we got into the poplar

21  business.  We did some custom work for Crown Zellerbach at

22  that time.

23  **Q.**   And for what -- why did you go -- you started growing

24  poplar trees?

25  **A.**   We were working with Crown Zellerbach, a custom farming

1   rental agreement, and eventually, Crown Zellerbach bought the

2   farm from Western Farms of Oregon, and we were growing the

3   poplar trees for pulp wood to create a new source of fiber for

4   the pulp and paper mill in the Clatskanie area.

5   **Q.** Are there actually a number of poplar farms in the states

6   of Washington and Oregon?

7   **A.** Yes. There's been four or five farms over the years. Not

8   as many now as there were 10 years ago.

9   **Q.** Over time, were there a number of changes in ownership of

10  Jefferson Poplar?

11  **A.** Yes, a number of changes through corporate name changes,

12  mergers, those types of thing. And then Georgia Pacific sold

13  the farm to a private investor and operated as Jefferson

14  Poplar Farms.

15  **Q.** When did that sale take place?

16  **A.** It would have been about the 1998, 1999 timeframe.

17  **Q.** Who was the investor that purchased the farm?

18  **A.** Duncan Campbell out of the Portland area.

19  **Q.** Were you still working at the farm at that point in time?

20  **A.** Yes, I was. As that ownership change took place, I went

21  to work for Greenwood Resources, which is a resource

22  management company, managing the property for Jefferson Poplar

23  Farms.

24  **Q.** Was everyone working at the farm a Greenwood Resources

25  employee as opposed to a Jefferson Poplar employee?

**A.**   Yes, there were no Jefferson Poplar employees.   They were all Greenwood Resource employees.

**Q.**   What was your job from 1999 on?

**A.**   Farm manager.

**Q.**   How many employees were there working at the farm?

**A.**   It varied seasonally, but on a year-round basis, 12, 15.

**Q.**   How big a farm was this?

**A.**   It varied a little bit.   We leased ground and so forth, but I believe we had about 7,000 acres planted, a total of about 10,000 acres.

**Q.**   Did you live on the farm itself?

**A.**   I did for a number of years, but in the latter years I lived on the hill, about five minutes away.

**Q.**   Could you see the farm from where you lived?

**A.**   Yes.

**Q.**   Would you take a look at a document that's Exhibit 381 and tell me if you recognize that.

**A.**   Yes.   That's an aerial view just after the fire.   The buildings on kind of the lower left were our maintenance shop and equipment storage barns.

**Q.**   That's an aerial view of what?

**A.**   Jefferson Poplar Farms.

      MR. FRIEDMAN:   The Government offers Exhibit 381.

      MR. FOX:   No objection, Your honor.

      THE COURT:   It's admitted.

1    (Exhibit No. 381 admitted.)

2    BY MR. FRIEDMAN:

3    **Q.** It should be on your screen now. Could you describe for

4    the jury what this shows.

5    **A.** The buildings on kind of the center far left was our

6    equipment maintenance shop, and then just below that was the

7    equipment storage barn.

8    **Q.** I am sorry. If you touch the screen, you should be able

9    to put an arrow -- if you touch the lower bottom where it says

10   "exit" and then touch the screen, you should be able to do

11   that.

12   **A.** Okay. But that would be the equipment storage facility,

13   that would be our maintenance shop, and this was our office

14   facility.

15   **Q.** Okay. This is just -- this is where the buildings are,

16   this is a small portion of the farm itself?

17   **A.** Yes, it's kind of in the center of that area.

18   **Q.** Now, in 2001, did you know Toby Bradshaw?

19   **A.** Yes.

20   **Q.** Who is Toby Bradshaw?

21   **A.** Toby Bradshaw worked at the University of Washington. We

22   had known each other for several years. I knew his

23   predecessor for many years at the University. We had crossed

24   paths. The poplar community was kind of a small group, and we

25   did a lot of sharing of ideas and worked together on a variety

1  of aspects.

2  **Q.** In 2001, was Jefferson Poplar engaged in genetic

3  engineering?

4  **A.** No, we were not.

5  **Q.** Was the farm growing any genetically-engineered poplar

6  trees?

7  **A.** No.

8  **Q.** How did the farm grow poplar trees or breed poplar trees?

9  **A.** Most of the trees that we grew were hybrid poplars that

10  were produced through age-old mendelian breeding practices,

11  female flowers, male pollen, crossed the two.

12  The hybridization effort really focused on selecting

13  hopefully superior parent trees to make those hybrid crosses

14  and then screened the offspring for disease, insect

15  resistance, growth rate, a variety of characteristics.

16  **Q.** Is that a technique that farmers have used for some length

17  of time?

18  **A.** Yes, centuries.

19  **Q.** Can you tell us what the farm -- did the farm have any

20  goals related to sustainability?

21  **A.** It was managed on a sustained yield basis.  The harvesting

22  -- we'd plant a relatively balanced number of acres per year,

23  but the whole goal was to provide a stable source of fiber to

24  the pulp mill.

25  So it was designed to be sustainable not only in yield,

but financially and kind of environmentally, socially. We

worked with a number of different organizations to try and

enhance the sustainable aspects of production.

**Q.** With what organizations did you work?

**A.** A lot of universities and state, federal agencies,

environmental organizations. Audubon, Sierra Club, et cetera.

**Q.** Was the farm -- are there any publications, government

publications related to the farm of which you are aware?

**A.** We did work for a two, three-year time period with a group

call the National Biofuels Round Table.

That was a group of similar people like I just mentioned,

and we looked at crop production across the United States and

what were various aspects of production and sustainability

aspects, how it fit into the landscape and other farm factors;

and yes, as a result of that, our farm was kind of used as a

model in describing and publishing, I think it was the joint

USDA, U.S. Forest Service publication, the American Farm.

**Q.** That listed the Poplar Farm as the model farm for

sustainability?

**A.** I don't know if Jefferson Poplar was cited in the

publication, but it was the interaction of this team looking

at our management practices that they incorporate the

principles in the publication.

**Q.** Do you recall a fire that took place in 2001 at the farm?

**A.** Yes, I do.

1  **Q.** When did that fire take place?

2  **A.** I guess in the middle of the night.

3  **Q.** Do you recall the day of the week for us?

4  **A.** It would have been Sunday night, Monday morning.

5  **Q.** May 21 of 2001?

6  **A.** Okay.

7  **Q.** Had you been at the farm the previous day?

8  **A.** Yes.  You can't see on here, but parked right behind that

9  shed was a truck with a flatbed trail.  We had borrowed the

10 truck for a concert in the city park on Sunday afternoon,

11 evening, to use as the stage and platform for the band, so I

12 returned that to the farm late in the evening, probably 11:30

13 or something Sunday night.

14 **Q.** Did you go home after that?

15 **A.** Yes, I did.

16 **Q.** What happened?  Can you tell us what happened next?

17 **A.** Early in the morning, 2:00 something in the morning, I got

18 a couple calls from our security service.  We had Protection

19 One as our security service.  I got a call that there was a

20 motion alarm going off, and then just a few minutes later they

21 called and said there was also a smoke alarm going off, at

22 which point I looked out the window and I could see the flames

23 from our living room, and then drove down to the farm.

24 **Q.** How long do you think it took from the time you got the

25 phone call to the time you reached the farm?

1  **A.** 10, 15 minutes probably.

2  **Q.** Do you recall roughly what time early morning this was?

3  **A.** 2:30ish.

4  **Q.** What did you see when you got to the farm?

5  **A.** The fire department was already present. They had cut the

6  lock at the gate on the driveway out here and had come in and

7  had set up in this area with their fire trucks and equipment

8  and had their hoses laid and were starting to spray water.

9  **Q.** How many building were on fire when you got there?

10 **A.** Two; both of these big buildings were on fire.

11 **Q.** Would you look at Exhibit 382-B and tell me if you

12 recognize that.

13 **A.** Yes, that's the maintenance shop on fire viewed from the

14 back side. The reflectors you see in the foreground --

15 **Q.** Can I stop you for a moment.

16        MR. FRIEDMAN:  Government offers Exhibit 382-B.

17        MR. FOX:  No objection.

18        THE COURT:  It's admitted.

19                (Exhibit No. 382-B admitted.)

20 BY MR. FRIEDMAN:

21 **Q.** You've got a red button to clear all the red marks --

22 lower left.

23     Can you tell us what this picture shows?

24 **A.** Okay. Obviously, the flames are in the middle of the

25 maintenance shop, kind of viewed from the back side of the

1  shop on fire.  The line of red and white reflectors is the

2  truck that I parked there a few hours previously.

3  **Q.**  Is that how the fire looked when you were there?

4  **A.**  Yes.  When I look at the picture, it doesn't do justice to

5  seeing it in person.

6  **Q.**  Why is that?

7  **A.**  The heat and the sound and the smell.  Seeing the fire

8  brings back a lot of memories that don't just come out in the

9  picture.

10  **Q.**  In addition to the two buildings on fire, did you also see

11  some graffiti on the building?

12  **A.**  Yes.  There's another little shed just to the right of

13  this picture that had graffiti written on it.

14  **Q.**  Would you take a look at Exhibit 382-JJ and tell me if you

15  recognize that.

16  **A.**  Yes.

17  **Q.**  What is that?

18  **A.**  Pardon?

19  **Q.**  Can you tell us what that is?

20  **A.**  That was the graffiti on one side of the shed there, just

21  next to the maintenance shop.

22          MR. FRIEDMAN:  The Government offers 382-JJ.

23          MR. FOX:  No objection.

24          THE COURT:  It's admitted.

25              (Exhibit No. 382-JJ admitted.)

BY MR. FRIEDMAN:

**Q.** That's the graffiti you saw --

**A.** Yes.

**Q.** -- when you arrived?

**A.** Yes. This picture was taken at daylight, and at night -- it wasn't obvious when you first drove in, but when they backed the fire trucks away from the fire and light shone on it better, it became apparent.

**Q.** Was there also graffiti on the other side of the shed?

**A.** Just around the corner to the left, it was painted "ELF".

**Q.** Would you take a look at Exhibit 382-KK and tell me if you recognize that.

**A.** Yes, that's the other side of the shed.

MR. FRIEDMAN: Government offers 382-KK.

MR. FOX: No objection.

THE COURT: It's admitted.

(Exhibit No. 382-KK admitted.)

**A.** Also on the left side of that is the truck that we saw earlier.

BY MR. FRIEDMAN:

**Q.** Peeking out from around the shed?

**A.** Yes.

**Q.** That's the "ELF" to which you were referring?

**A.** Yes, that's correct.

**Q.** After you saw -- after you learned there were two

1  buildings on fire and saw this graffiti, did you go anywhere?

2  **A.**  Yes.  In talking with the assistant fire chief there, it

3  became apparent that it wasn't just a natural cause fire, and

4  the graffiti and so forth.  We decided we better see if there

5  was other buildings at risk.  So they went across the road to

6  the office.

7  **Q.**  Let me ask you to take a look at 382-C and tell me if you

8  recognize that.

9  **A.**  Yes.  That was my home for many years and our office for

10  the last several years.

11  **Q.**  Including at the time of the fire?

12  **A.**  Yes, that's correct.

13          MR. FRIEDMAN:  Government offers 382-C.

14          MR. FOX:  No objection.

15          THE COURT:  Admitted.

16                  (Exhibit No. 382-C admitted.)

17  BY MR. FRIEDMAN:

18  **Q.**  It's still nighttime when you walked over, I assume, so

19  things were a lot darker?

20  **A.**  Yes.

21  **Q.**  Did you notice anything significant at the office?

22  **A.**  I went in the office first and walked around, and

23  everything seemed okay on the inside.  I began to walk around

24  to the outside, and then there at the corner was a couple of

25  buckets that didn't belong there.

1　**Q.**　Would you take a look at 382-D and tell me if you

2　recognize that.

3　**A.**　Yes, that's the corner of the building and the buckets and

4　device that was there.

5　　　　　MR. FRIEDMAN:　Government offers 382-D.

6　　　　　MR. FOX:　No objection.

7　　　　　THE COURT:　Admitted.

8　　　　　　　　(Exhibit No. 382-D admitted.)

9　BY MR. FRIEDMAN:

10　**Q.**　Do they basically look the same as when you initially saw

11　them?

12　**A.**　Yes.　Once again, it was night and dark and the

13　flashlight, but yes.

14　**Q.**　What did you do once you saw these?

15　**A.**　When I first saw it, we didn't -- we had reports of

16　explosions and so forth associated with the fires, and we

17　later became aware it was flares, but at the time we didn't

18　know what it was.　We assumed it could be dynamite, so I went

19　back to talk to the assistant fire chief and let him know what

20　I found.

21　**Q.**　Did you ask him to do anything?

22　**A.**　Yes.　I asked him to do something to save the office

23　building.　He said he didn't have enough resources to address

24　it at that time and, in particular, with the device here, not

25　knowing what it was, he elected not to put any of their people

1   at risk and wait until police arrived.

2   **Q.** Did the police arrive later?

3   **A.** Yes, they did.

4   **Q.** What happened when they arrived?

5   **A.** I went back over with -- I think it was Officer Downing --

6   and we did a further walk around. We parked where our

7   headlights could see this, and we did a further walk around

8   the building and found two more devices and a lawn mower gas

9   can that had been dumped out.

10   **Q.** Had you reached -- had you stopped being so concerned that

11   it was dynamite at that stage?

12   **A.** It took a while, but eventually Officer Downing decided it

13   was not dynamite.

14   **Q.** You said you found two more devices. Would you take a

15   look at 382-J and tell me if you recognize that.

16   **A.** Yes. This is the opposite side of the building that we

17   were just looking at.

18         MR. FRIEDMAN: The Government offers 382-J.

19         MR. FOX: No objection.

20         THE COURT: Admitted.

21           (Exhibit No. 382-J admitted.)

22   **A.** Right in there is two more buckets, and I think the dark

23   spot there is where the lawn mower was parked. I can't tell

24   if it was tipped on its side or what, but that's where we

25   stored the lawn mower, and there was a gas can along with it.

**Q.** Would you take a look at 382-L and tell me if that's a close-up photo of the area.

**A.** Yes, that's correct.

      MR. FRIEDMAN: Government offers 382-L.

      MR. FOX: No objection.

      THE COURT: Admitted.

          (Exhibit No. 382-L admitted.)

BY MR. FRIEDMAN:

**Q.** So that's the set of buckets you saw on that porch?

**A.** Yes.

**Q.** Would you take a look at 382-O and tell me if you recognize that.

**A.** Yes, that's the other side of the building, the office.

      MR. FRIEDMAN: Government offers 382-O.

      MR. FOX: No objection.

      THE COURT: Admitted.

          (Exhibit No. 382-O admitted.)

BY MR. FRIEDMAN:

**Q.** Which -- tell us what's significant on the house there.

**A.** There's an enclosed porch here and there was another couple buckets in there.

**Q.** Would you look at 382-Q and tell me if you recognize that.

**A.** Yes, that's correct.

**Q.** What is that?

**A.** The buckets that were inside, there's a little porch bench

1   there they are sitting on.

2         MR. FRIEDMAN: Government offers 382-Q.

3         MR. FOX: No objection.

4         THE COURT: Admitted.

5              (Exhibit No. 382-Q admitted.)

6   BY MR. FRIEDMAN:

7   **Q.** So those were inside the porch?

8   **A.** Yes.

9   **Q.** How badly damaged were the vehicle shed and the

10   maintenance shed that you talked about earlier?

11   **A.** Both were a total loss.

12   **Q.** Would you look at 382-U and tell me if you recognize that.

13   **A.** I don't have a 382-U. 382-U?

14   **Q.** Yes.

15   **A.** It's on the back. Okay. That would be the equipment

16   storage shed.

17         MR. FRIEDMAN: Government offers 382-U.

18         MR. FOX: No objection.

19         THE COURT: Admitted.

20              (Exhibit No. 382-U admitted.)

21   BY MR. FRIEDMAN:

22   **Q.** What kind of equipment was stored in that shed?

23   **A.** Primarily pickups and in kind of the center part there,

24   that was our primary maintenance truck.

25   **Q.** Would you look at 382-V and tell me if you recognize that.

1    A.  Yes, that's the same building from a different angle.

2           MR. FRIEDMAN:  Government offers 382-V.

3           MR. FOX:  No objection.

4           THE COURT:  Admitted.

5                (Exhibit No. 382-V admitted.)

6    BY MR. FRIEDMAN:

7    Q.  How many vehicles did you have parked in that shed,

8    roughly?

9    A.  Probably 12 or 15.

10   Q.  Did any of them survive the fire?

11   A.  No.

12   Q.  Would you look at 382-Z and tell me what that is.

13   A.  Yes, that's the other maintenance shop.

14          MR. FRIEDMAN:  Government offers 382-Z.

15          MR. FOX:  No objection.

16          THE COURT:  Admitted.

17                (Exhibit No. 382-Z admitted.)

18   BY MR. FRIEDMAN:

19   Q.  That was also totally destroyed?

20   A.  Yes, that's correct.

21   Q.  Would you look at 382-AA?

22   A.  That's the maintenance shop from the back side.

23          MR. FRIEDMAN:  Government offers 382-AA.

24          MR. FOX:  No objection.

25          THE COURT:  Admitted.

1                    (Exhibit No. 382-AA admitted.)

2    BY MR. FRIEDMAN:

3    Q.  Then would you look at 382-BB and tell me what that is.

4    A.  Same thing, a little different angle.  The part that's

5    still standing there on the right was our shop office where we

6    had service manuals and that type of thing.

7                    MR. FRIEDMAN:  Government offers 382-BB.

8                    MR. FOX:  No objection.

9                    THE COURT:  Admitted.

10                   (Exhibit No. 382-BB admitted.)

11   BY MR. FRIEDMAN:

12   Q.  There's a large -- sort of a large tank in the front of

13   that picture.  Can you tell us what that is.

14   A.  Propane tank for shop heat.

15   Q.  Then behind it, what's the black area?

16   A.  That black area right below that is where one of the fire

17   devices was set, and there was also the point where the line

18   from the propane tank went in.  It had a regulator that was

19   either broken or burned and came apart.

20   Q.  How close was that device to that propane tank?

21   A.  Eight or 10 feet.

22   Q.  What about the line from the tank which you just

23   discussed?

24   A.  Well, the line, I believe, went underground over to that

25   corner and then came up from the tank.  I don't understand

1   your question.

2   Q. So how close was the line to the location of where the

3   device was?

4   A. The device was right at the line where it came out of the

5   ground and went into the building.

6   Q. Would you look at 382-II.

7   A. Yes. That's the inside, that end of the shed where the

8   burned service manual is on the floor.

9           MR. FRIEDMAN: Government offers 382-II.

10          MR. FOX: No objection.

11          THE COURT: Admitted.

12                  (Exhibit No. 382-II admitted.)

13  BY MR. FRIEDMAN:

14  Q. That's inside of the maintenance shop?

15  A. Yes, the end of it there.

16  Q. What was that shop used to maintain?

17  A. All the farm equipment, vehicles, tractors, implements.

18  Q. What impact did this fire have on the farm's operations?

19  A. Well, immediately the next day we were pretty well able to

20  go to work because people drove their own vehicles to the

21  tractors. Most of our tractors were out in the field at that

22  time of the year, or left in the field overnight.

23      So the first day, a few days, went pretty good. We had a

24  little trouble getting fuel to the tractors because the tanks

25  were in the pickups that had been burned, and then as time

1    went on, it got increasingly difficult because our spare

2    parts, our tools, service vehicles, everything was destroyed.

3    **Q.**  Did the farm get insurance money to replace those to keep

4    going?

5    **A.**  There was a long, drawn out process on the insurance, and

6    I believe there was eventually some insurance settlement, but

7    it took months to work through that process.

8    **Q.**  Was the farm still in operation by then?

9    **A.**  No.

10   **Q.**  How long did the farm continue to operate after the fire?

11   **A.**  I don't remember exactly.  A few months, maybe, two, three

12   months.

13   **Q.**  Did it close down because of the fire?

14   **A.**  Largely.

15   **Q.**  What happened to the employees after the fire?

16   **A.**  Everybody was laid off.

17   **Q.**  What happened?  Were you also laid off?

18   **A.**  Yes, I was.

19        MR. FRIEDMAN:  Thank you.  I have no further

20   questions.

21        THE COURT:  All right.  Before you do any

22   cross-examination, let's take the morning recess.

23        MR. FOX:  I have two questions.

24        THE COURT:  No sub parts to them?  All right.  Two

25   questions, go ahead.

CROSS-EXAMINATION

BY MR. FOX:

**Q.** Sir, I imagine looking at these pictures is very painful for you?

**A.** It does bring back a lot of painful memories.

**Q.** The people that committed this arson caused you and others a lot of serious problems?

**A.** That's correct.

**Q.** I am very sorry.  Thank you.

THE COURT:  All right.  This witness can be excused.  Mr. Fox, this witness can be excused?

MR. FOX:  Yes, Your Honor.

THE COURT:  All right.  Then you are excused.

All right.  Then we will take the morning recess.  Like always, I ask you not to talk about the case, discuss anything, take your break.  Leave your books on the chair and we will have you back in 15 minutes.

THE CLERK:  All rise.  Court is in recess.

(Morning recess.)

THE COURT:  All right, you may be seated.

I believe that we finished with the witness, so we are down to --

MR. FRIEDMAN:  We'd like to recall Mr. Comery at this point.

THE COURT:  Is he here?  All right.  Bring in the

1  jury.

2     (Jury present.)

3       THE COURT:  All right.  You may be seated.

4    Mr. Comery, you are retaking the stand.  Of course,

5  Mr. Comery, remember you are still under oath.

6       THE WITNESS:  Yes, Your Honor.

7           DIRECT EXAMINATION - RECALLED

8  BY MR. FRIEDMAN:

9  **Q.** Right before the end of your cross-examination you were

10  asked some questions about Stan Meyerhoff and a photo at which

11  he looked.  Did you have a number of interviews with

12  Mr. Meyerhoff?

13  **A.** Yes, I did.

14  **Q.** Did you show him -- did you or other agents show him a

15  number of pictures at interviews?

16  **A.** Yes, we did.

17  **Q.** And you were showing those -- were those being shown in

18  connection with this series of arsons or a particular arson in

19  this series?

20  **A.** Yes.

21  **Q.** Any arson in particular?

22  **A.** In relation to the Susanville or Litchfield BLM fire.

23  **Q.** I don't think you testified about that one yesterday, did

24  you?

25  **A.** I did not.

1  **Q.** When did that arson take place?  Roughly.

2  **A.** I did not investigate that.

3  **Q.** Are you aware of the month even?

4  **A.** October 2001 or --

5  **Q.** And Mr. Meyerhoff was a participant in that arson?

6  **A.** That is correct.

7  **Q.** Did you interview him about other people who had

8  participated in that arson?

9  **A.** Yes.

10  **Q.** Did he identify or generally describe a number of the

11  other people there?

12  **A.** Yes.

13  **Q.** Did you show pictures of people to try and determine who

14  it was that he was describing?

15  **A.** Yes, we did.

16  **Q.** I would like to ask you to turn to, or to think of an

17  interview you conducted with Mr. Meyerhoff on December 7 of

18  2005.  Was that the first time you interviewed Mr. Meyerhoff?

19  **A.** Yes, it is.

20  **Q.** How did that relate in time to his being contacted by law

21  enforcement and arrested in this investigation?

22  **A.** We had arrested him earlier that day.

23  **Q.** So this was the first day, basically, that he was being

24  questioned?

25  **A.** Correct.

1  **Q.** Did you interview him concerning the arson at Susanville?

2  **A.** Yes.

3  **Q.** Did he identify anyone in particular of interest to you?

4       MR. FOX: Objection. Calls for hearsay and

5  confrontation.

6       THE COURT: You opened this up in terms of

7  Mr. Meyerhoff.

8    You may answer.

9       MR. FRIEDMAN: Thank you, Your Honor.

10 BY MR. FRIEDMAN:

11 **Q.** Did he identify anyone of particular interest to you that

12 day? Or tell me in general whom he identified, and we will go

13 from there.

14 **A.** He identified that, on the trip down there, they picked up

15 another woman, an unidentified woman at that point.

16 **Q.** Did he say from where that woman was or where they picked

17 her up?

18 **A.** It was on the trip down from Washington.

19 **Q.** Did he refer to a specific city in Washington in relation

20 to this woman?

21 **A.** I'd have to refer to my notes.

22 **Q.** Would looking at your notes or report of that interview

23 help you remember?

24 **A.** Yes, it would.

25      MR. FRIEDMAN: Your Honor, may the witness be given

 1   the opportunity to look at his report of that interview?  And

 2   I will pass a copy up, and I will share it with defense

 3   counsel.

 4            THE COURT:  What's the number?

 5            MR. FRIEDMAN:  We had not intended this as an

 6   exhibit, Your Honor, so I don't have it as an exhibit.

 7            THE COURT:  Share it with counsel.

 8            MR. FRIEDMAN:  I will, Your Honor.

 9   BY MR. FRIEDMAN:

10   Q.  Have you had an opportunity to look at that, Mr. Comery?

11   A.  Yes.

12   Q.  Do you recall, did he give any more specific description

13   of this woman?

14   A.  No.  He just said that there were two other individuals he

15   referred to from Olympia, and he just said it was not her.

16   Q.  But he was discussing Olympia?

17   A.  He was discussing the drive down from Seattle.

18   Q.  Did you interview him again about this arson on January

19   25, 2006, so six weeks later?

20   A.  Yes.

21   Q.  Did he provide more detail about the person whom he was

22   discussing?

23   A.  Yes, he did.

24   Q.  Do you recall what he said about her on that day?

25   A.  Yes.

**Q.** What did he say?

**A.** He said she -- he referred to her as the blond woman. That she had blond curly hair. That she played the violin and was from the Bay area.

**Q.** Did you interview him again six days later, on January 31?

**A.** Yes.

**Q.** Did you have pictures that you showed him on that day?

**A.** Yes.

**Q.** Did you show him any pictures of the Defendant in this case?

**A.** Yes.

MR. FRIEDMAN: May this witness be shown Exhibit 212a?

THE CLERK: 212 or 1012?

MR. FRIEDMAN: 1012, I am sorry.

BY MR. FRIEDMAN:

**Q.** Do you see that?

**A.** Yes.

**Q.** Can you tell us what that is?

**A.** That is a picture of Briana Waters.

MR. FRIEDMAN: The government offers Exhibit 1012-A.

MR. FOX: No objection.

THE COURT: I didn't hear you.

MR. FOX: No objection.

THE COURT: Admitted.

(Exhibit No. 1012-A admitted.)

BY MR. FRIEDMAN:

**Q.** Was that picture used in this interview?

**A.** Yes.

**Q.** It was shown to Mr. Meyerhoff?

**A.** Yes.

**Q.** What did Mr. Meyerhoff say when he saw this picture?

**A.** Can I refer to my report so I get it exact?

**Q.** That's fine with me.

**A.** He said no, and then he explained that it looks like the blond woman at Susanville if her hair was blonder.

     MR. FRIEDMAN: Thank you very much, Agent Comery.

     THE COURT: All right.

CROSS-EXAMINATION

BY MR. FOX:

**Q.** Agent Comery, did you have an opportunity to review the 302 from the interview of Stan Meyerhoff on December 7?

**A.** I reviewed portions.

**Q.** The portions that Mr. Friedman referred you to?

**A.** Yes.

**Q.** And it's correct that Mr. Meyerhoff said that at some point on the trip from Seattle to Susanville they met a different woman, not the kids, from Olympia, Washington, who participated in the action, correct?

**A.** Correct.

1  Q. He didn't say that he picked her up in Olympia?

2  A. Correct.

3  Q. And then at a later point, at another interview, he said

4  that the woman was from the Bay area.  Is that what you just

5  testified to?

6  A. Correct.

7  Q. Then when you showed him pictures --

8       MR. FOX:  Can we put back on the screen the picture

9  that was just admitted, 1012-A?

10 BY MR. FOX:

11 Q. So when Mr. Meyerhoff looked at this picture, 1012-A, he

12 said "No."  That was the first words out of his mouth, right?

13 A. Correct.

14 Q. That was on January 31, 2006; is that right?

15 A. If that's the report that I have in my hand, yes.

16 Q. Okay.

17 A. I am not good with days.

18 Q. He said no, she looked like the woman?

19 A. Correct.

20 Q. But he said no?

21 A. Yes.

22 Q. Then referring you to what's been marked for

23 identification as Exhibit A-97, can you please identify that

24 picture?

25      I am trying to turn the screen on.  Somehow it's not

1  coming up.

2      Can you please identify that?

3  **A.**  It appears to be a picture of Briana, I guess.

4  **Q.**  Isn't it true that that's the picture that was shown to

5  Mr. Meyerhoff on March 17, 2006, in your presence?

6  **A.**  I don't know.

7  **Q.**  You don't know?  You don't have any record of the picture?

8  **A.**  Sir, I conducted numerous interviews in the course of 11

9  years.  I do not have a total recall of every single interview

10  without looking at reports.

11  **Q.**  Do you have a report that would identify the particular

12  picture shown to him?

13  **A.**  If you are saying I was there, there's a report, I assume.

14  **Q.**  It's the report I had you look at before, from the 302,

15  and I also had your notes.

16  **A.**  Okay.

17  **Q.**  Not your notes, but I had the 302 from March 17.  It

18  doesn't refresh your recollection as to what the picture was?

19  **A.**  There were numerous pictures that have been shown to

20  people during interviews.

21  **Q.**  Okay.

22  **A.**  They were in discovery with the reports, so I had to have

23  looked at them.

24  **Q.**  Does that picture, A-97, look familiar to you?

25  **A.**  Familiar, yes.  I am not a person that I remember physical

1  details of arsons.

2  **Q.** Familiar in the context of this investigation?

3  **A.** Yes.

4  MR. FOX: Your Honor, I would offer Exhibit A-97.

5  MR. FRIEDMAN: Objection, Your Honor. I don't think

6  there's a basis for it. It's a generally familiar picture.

7  MR. FOX: Well, it's a picture of the Defendant that

8  is familiar to the agent in the context of this investigation.

9  THE COURT: Is that your answer, sir?

10  THE WITNESS: Well, unfortunately, it depends on what

11  he says "familiar." Does it look like the Defendant at some

12  stage of her life? Yes.

13  MR. FOX: I will offer this.

14  THE COURT: Well, let me take that up. I will take

15  that up at the break. I am not so sure that answer really

16  qualifies.

17  Next question. Any other questions for the witness?

18  MR. FOX: If I could have one minute.

19  BY MR. FOX:

20  **Q.** Agent Comery, you said that Mr. Meyerhoff said that this

21  woman from the bay area played the violin; is that correct?

22  **A.** Yes.

23  **Q.** Didn't he say that she played a stringed instrument,

24  perhaps a cello?

25  **A.** No, she was a violinist.

**Q.** Let's take a look at your report. The report that you just looked at from December 7. Is it not correct that it makes no reference to any string instruments?

**A.** December 7?

**Q.** Right. It never says anything about stringed instruments at all.

**A.** It doesn't even mention -- the December 7th one is the report where all we say is a different woman.

**Q.** I am sorry?

**A.** December 7 he talked about picking up a different woman on the way down to the --

**Q.** Right, not at Olympia.

**A.** Correct.

**Q.** There's no mention in that report of any violins or anything like that?

**A.** That's correct.

**Q.** Then on January 31, the picture where he says it almost looked like the blond woman in Susanville, but no, it's not Briana Waters' picture, he also doesn't make any reference to stringed instruments or violins; is that correct?

**A.** Not that we showed --

**Q.** Correct.

**A.** -- as far as the photos.

     MR. FOX: If I could have one minute, Your Honor?

BY MR. FOX:

Q. When is the first time that a stringed instrument came up, either a violin or whatever?

A. I don't know the first time.

MR. FOX: I have no further questions, Your Honor.

THE COURT: All right. Are we through with this witness?

MR. FRIEDMAN: No further questions, Your Honor. Thank you.

THE COURT: All right. You may step down.

Your next witness.

MR. BARTLETT: Your Honor, at this time the United States calls Cheryl Glenn to the stand.

THE COURT: Ms. Glenn, let me have you come forward and raise your right hand and be sworn.

CHERYL GLENN, called as a witness, duly sworn.

THE COURT: All right. Just take the witness chair.

DIRECT EXAMINATION

BY MR. BARTLETT:

Q. Would you tell the members of the jury your first and last name and spell your last name for the Court Reporter, please.

A. Cheryl Glenn, G-L-E-N-N.

Q. Ms. Glenn, where do you work?

A. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Q. Currently, where do you work?

1  **A.**  Helena, Montana.

2  **Q.**  What is your position over in Helena?

3  **A.**  Resident agent in charge of that office.

4  **Q.**  For those of us that are not that familiar with federal

5  law enforcement, what does that mean?

6  **A.**  I am the boss for the western half of the state of

7  Montana.

8  **Q.**  Have you always worked in Montana?

9  **A.**  No.  Prior to that, I worked in Oregon.

10  **Q.**  Can you tell the members of jury your educational

11  background and how you came to work at the ATF?

12  **A.**  I have a bachelor's degree from Gonzaga University.  I

13  graduated from Gonzaga in 1984.  Then law enforcement-wise, I

14  began my career in federal law enforcement as a deputy U.S.

15  Marshal in Spokane, Washington, and I worked as a marshal from

16  1985 to 1987.  In July of 1987, I started work with ATF in

17  Portland, Oregon.

18  **Q.**  At the time that you had hired to be a Special Agent with

19  the Bureau of Alcohol, Tobacco, Firearms and Explosives, did

20  you undergo any training?

21  **A.**  Yes.  When you get hired on as a new agent for ATF, you

22  attend the ATF academy at the Federal Law Enforcement Training

23  Center at Glenco, Georgia, and there's two halves to the

24  training for federal agents for most agencies.

25      The first half is the Basic Criminal Investigations

1   School, and that's common to most of the agencies that you go

2   through it.  So I had gone through that eight-week class when

3   I was a Deputy U.S. Marshal, so when I came to ATF, I didn't

4   have to redo that eight weeks of training.  I just had to go

5   through another nine weeks of training that's specific to ATF,

6   and it's training in the federal firearms laws, the federal

7   arson laws and the federal explosives laws.

8   **Q.**  When is it that you actually get out to Oregon and start

9   working as an agent?

10  **A.**  Well, I actually started working as an agent in Oregon

11  before I got to attend the academy, but basically, in about

12  January of 1988, I started working as an agent in Oregon.

13  **Q.**  How is the Oregon office set up?  Approximately how many

14  agents are there?  Are they divided into different teams, and

15  what is your position?

16  **A.**  Okay.  When I started with ATF, there was only one group

17  of ATF agents in Portland that covered the entire state of

18  Oregon.  At that point in time, we had seven agents.  By the

19  time I left Oregon about three years ago, now there's two

20  different separate groups of agents in Oregon, and now they

21  are up to about 18 agents in Oregon.

22  **Q.**  What are the two groups?

23  **A.**  Well, now there's the firearms investigation group and

24  arson explosives group, and we also have a satellite office

25  with two agents down in Eugene.

1  **Q.** Can I direct your attention to May 21st of 2001? You were

2  a Special Agent with ATF assigned to the Portland office at

3  that time?

4  **A.** Yes. I was in the arson explosives group in the Portland

5  office there.

6  **Q.** And specifically, what was that group assigned to do?

7  **A.** Investigate federal arson crimes and federal explosives

8  violations.

9  **Q.** On that morning of May 21st, did you receive a call?

10  **A.** Yes, I did.

11  **Q.** What was that in reference to?

12  **A.** It was a call from Mickey Webber who's an analyst with the

13  Eugene Police Department, and she had called me at the request

14  of Ray Downey, who's a detective with the Oregon State Police

15  Arson and Explosives Unit, and they were requesting that I

16  respond to Clatskanie, Oregon to a fire scene to assist the

17  Oregon State Police.

18  **Q.** Did you go to Clatskanie?

19  **A.** Yes, I did.

20  **Q.** What did you find there? What was the location you went

21  to?

22  **A.** The Jefferson Poplar Farm, which is located at 79114

23  Collins Road in Clatskanie. It's essentially a rural area.

24  **Q.** If you could take a look at Exhibit 201 and tell me if

25  that is a map of the Oregon/Washington area.

1  **A.** Yes, it is.

2  MR. BARTLETT: I would like to offer 201.

3  MR. FOX: No objection.

4  THE COURT: Admitted.

5  (Exhibit No. 201 admitted.)

6  BY MR. BARTLETT:

7  **Q.** Looking at the map you have in front of you, can you just

8  point to where you went on that day?

9  **A.** Right here is Clatskanie.

10  **Q.** Basically right on the Washington/Oregon border?

11  **A.** Yes, right on the Washington/Oregon border.

12  **Q.** What time do you get to the Jefferson Poplar Farm, and

13  what do you do when you get there?

14  **A.** It was about between 9:15 and 9:30 in the morning when I

15  got out to Clatskanie. It's in a rural area, and I had

16  general directions to the right road, and then I could see the

17  emergency equipment. There was still the fire department on

18  scene and police cars at that point in time.

19  **Q.** Just in general terms, did you drive -- were you by

20  yourself?

21  **A.** Yes, I was.

22  **Q.** When you drive up to the scene, what do you notice?

23  **A.** Well, once I get to the actual scene, there were two of

24  the buildings that had sustained the most fire damage, that

25  sat a short distance off the road. So once I got to the

1  driveway of the actual farm properties, and then I could see

2  the fire damage to the buildings involved.

3      At that point, I met with the Oregon State Police

4  detective that had telephoned for me, and we decided -- we

5  kind of started dividing up responsibilities for the

6  investigation.

7  **Q.** At the time that you got there, were you informed that

8  people had found what they thought were incendiary devices

9  that hadn't gone off?

10  **A.** Yes, I was.

11  **Q.** What's the first thing you do?

12  **A.** The first thing I did was actually get together with Ray

13  Downey who was the case agent for the Oregon State Police

14  Arson Unit, and he walked me over to the farmhouse building,

15  which was the office for the business that's across the road

16  from the two buildings that were destroyed by fire.

17  **Q.** We have already had Exhibit 381 admitted.  Why don't we

18  pull that up.  Rather than just talk in general terms, maybe

19  you can show people on this particular exhibit that's in front

20  of you what we are talking about.

21  **A.** Okay.  The driveway -- this is the -- the county road is

22  here, so I came driving up that way.  There's a gate

23  approximately here that goes into the two buildings to the

24  left that were destroyed by fire.  So that's where I met

25  everyone, was at that dot.

1    Then I walked with Ray Downey over to the office building,

2  which is right there, and that's the building where the three

3  devices were still in place that had not functioned.

4  **Q.**  What do you do at the scene?

5  **A.**  Basically at that point in time, there were already three

6  fire investigators that are trained in cause and origin that

7  were already at the scene, and there was at least one more

8  coming at that point in time.

9    So there were enough people to dig the scene and

10  investigate the cause of the fire itself, but because the

11  three unfunctioned devices represented a lot of physical

12  evidence, essentially I agreed to team up with the Oregon

13  State Police criminalist, Brenda Havelin, to collect the

14  physical evidence and process that.

15  **Q.**  As an arson investigator with ATF, what do you view your

16  duty with regard to evidence at a crime scene like this?

17  **A.**  You try and preserve the evidence as best as possible, to

18  preserve the evidence.

19  **Q.**  What do you do with evidence that you seize at a scene

20  like this?  Where do you send it?

21  **A.**  Well, for forensic examination, if it's solely an ATF

22  case, we package it up for transmittal to the ATF laboratory.

23  We have forensic examiners that are chemists and explosives

24  experts.  They do latent fingerprint examination and hair and

25  fiber and toolmarks and all of that stuff.

1     Then if it's explosives evidence or related to a
2 destructive device, after it's examined by the laboratory and
3 the suspected -- either accelerant/flammable liquid is tested
4 by a chemist or the explosive is identified, then our
5 laboratory sends it to our explosives enforcement officers,
6 and they are the ones that actually do examination of devices
7 to classify them under federal law as to whether or not they
8 are destructive devices.

9 **Q.** How many total exhibits did you collect at the Jefferson
10 Poplar Farm?

11 **A.** Fifty-five.

12 **Q.** Did you send all 55 of those exhibits to the crime lab?

13 **A.** No, I did not.

14 **Q.** How does that work?

15 **A.** Well, the evidence from the scene was kind of voluminous,
16 especially the buckets involved.  As far as preserving the
17 evidence, for example, the latent fingerprints, if there were
18 any on the buckets, there was a pretty high likelihood that in
19 the process of handling and shipping it to our laboratory in
20 California, that we might in fact destroy those fingerprints.

21     The criminalist from the Oregon State Police was trained
22 in latent fingerprint collection, so essentially what we chose
23 to do was process all of the buckets at the scene for latent
24 fingerprints and lift those prints, if any existed, to best
25 preserve them because not only does the jostling and packaging

on the way to the lab rub off a fingerprint, but because the buckets contained gasoline or something where there were a lot of vapors, those vapors could dissolve any oil of fingerprints on those items.

So in order to best preserve them, we did the fingerprinting there. Since I'd already collected the fingerprinting from them, there was no point in sending every single one of the buckets to the lab for classification as part of the device. I could just send a representative sample of those buckets saying there were two of these, but here's one of the two.

**Q.** What about with regard to liquid samples from the various devices that hadn't gone off?

**A.** Okay. We had a large quantity of flammable liquid. Each one of the devices contained two five-gallon buckets, and all of them were approximately two-thirds full of flammable liquid. There wasn't an evidentiary purpose to keep the entire quantity of flammable liquid there.

Once we could measure it and say how much had been in that bucket, what we did was we collected two samples from each individual bucket, one for analysis by ATF and one to maintain in case the defense ever wanted to do their own independent testing to double-check our laboratory.

**Q.** So part of the exhibit you didn't send were things you were keeping in case the defense wanted to do their own

1  independent exam?

2  **A.**  Correct.  So out of the samples collected from each bucket

3  -- there were two from each bucket I sampled, and one went to

4  the lab and one did not.

5  **Q.**  If you could take a look at what's already been admitted

6  as photo 382-C. We'll just pull it up, you don't have to go

7  through the exhibit pile.

8     For ease, when you were processing this scene, did you

9  refer to the buildings as Building A, B, C, D?

10  **A.**  Yes.  The office building that's shown in this picture, we

11  identified as Building A, and that's where we started.

12  **Q.**  With regard to the devices, you are at Building A and you

13  also numbered the devices?

14  **A.**  Yes.  We numbered the devices at Building A, 1, 2 and 3.

15  **Q.**  So let's talk about Building A, the office building, and

16  device 1.

17  **A.**  Uh-huh.

18  **Q.**  Do you see that?

19  **A.**  Yes.  This is the west side of the building.  So as the

20  camera is facing, you are looking east from the building from

21  the direction of the road.

22  **Q.**  This is actually what you are seeing when you are there?

23  **A.**  Yes.

24  **Q.**  As you look at that photo, do you see the two buckets?

25  **A.**  Yes.  There was one device that was on this side of the

1  building, right there.  There's two buckets visible sitting

2  against the side of the building there.

3  **Q.**  If we could have 382-D that's already been admitted.

4     Is that a closer view?

5  **A.**  Yes, it is.

6  **Q.**  When you are at the scene that morning, had this device

7  already been rendered inoperable or still -- exactly what's

8  your job when you get there?

9  **A.**  At this point, my job is collecting evidence.  When Ray

10  Downey, the arson detective, arrived at the scene, nothing had

11  been done at that point in time to render the device safe.

12  Because it was obviously a timed device, they couldn't tell

13  just from examining it from a distance exactly when it would

14  function, and it constituted an ongoing hazard to both people

15  and that building if it should function.

16     So Detective Downey had gone up to all three of the

17  devices placed at this building and cut one wire coming out of

18  that to break the circuit so it would not function before we

19  had a chance to collect it.

20  **Q.**  If you could take a look at 382-E, which I don't think has

21  been admitted yet.  Do you recognize that photo?

22  **A.**  Yes, I do.  This is of a fanny pack that was immersed in

23  the pail in that device.  If you go back to the screen, right

24  there, that draped thing outside of the pail is in fact this

25  same fanny pack.

1          MR. BARTLETT:  Offer 382-E.

2                    (Exhibit No. 382-E admitted.)

3    BY MR. BARTLETT:

4    **Q.**  That's what was actually recovered from there?

5    **A.**  Yes, it was kind of a dark green color.

6    **Q.**  If you could take a look at 382-F and tell me if you

7    recognize that.

8    **A.**  Yes.

9    **Q.**  What is that?

10   **A.**  This is -- I guess you'd call it the initiating circuit or

11   how they intended to function the device from that side of the

12   building.

13   **Q.**  A close up of the device No. 1?

14   **A.**  Yes, just the pail part of it.

15             MR. BARTLETT:  Offer 382-F.

16             MR. KNOX:  No objection.

17             THE COURT:  Admitted.

18                    (Exhibit No. 382-F admitted.)

19   BY MR. BARTLETT:

20   **Q.**  Were you part of the team that took this photo?

21   **A.**  Yes.  I was not the photographer, but I was there when it

22   was being taken.

23   **Q.**  What is happening?  Obviously, this isn't on top of the

24   bucket.  What is happening here?

25   **A.**  It was probably me that picked it up off the two buckets.

1  That's actually just the top of a bankers box that we were

2  using to hold evidence that we put down on the ground as a

3  background for the photo.

4  Q.  Prior to court today, we got out a couple of the physical

5  items.  If you could step off the witness stand and go over to

6  the cardboard box and grab 382-G and tell me if you recognize

7  that.

8  A.  Okay.

9  Q.  Do you recognize that?

10 A.  Yes, I do.

11 Q.  What is it?

12 A.  This is in fact that same thing that was just

13 photographed.  This is the pail top and initiating components

14 for the device that was on that west side of the building.

15 Q.  The device you described as device No. 1?

16 A.  Yes.

17            MR. BARTLETT:  Offer 382-G.

18            MR. FOX:  No objection.

19            THE COURT:  Admitted.

20                 (Exhibit No. 382-G admitted.)

21 BY MR. BARTLETT:

22 Q.  You talked about the photographs.  What do you do with

23 this after you collect it?

24 A.  Well, I tried to not handle it any more than I had to, to

25 package it up and transmit it.  For instance, it has a Ziploc

1   brand plastic container that had actually parts of the timing

2   components in it, and I did not open that container because if

3   there was any trace evidence like hair or fiber or DNA or

4   whatever, I didn't want to potentially contaminate that.

5      So I just packaged it up as it was, and I already knew

6   that the circuit itself had been inactivated by cutting the

7   wire, so it was safe to package it and send it just as one

8   piece to the laboratory.

9   **Q.**  And eventually send it on to the laboratory?

10   **A.**  Yes.  I sent it to the ATF lab, and after they process it

11   they send it to our explosives technology branch for the

12   device determination.

13   **Q.**  Where is the ATF lab that Oregon uses?

14   **A.**  Walnut Creek, California.

15   **Q.**  In addition to having this bucket lid that you've already

16   shown us, were there also buckets you sent down?

17   **A.**  Yes.  There were six buckets.  There's five in that stack

18   and one separately, but there were six buckets from the three

19   devices at Building A, and I believe I sent three or four of

20   those buckets down to the ATF laboratory.

21   **Q.**  Could you go over and take a look at -- looking at those

22   buckets, the five buckets of 382-H and the single bucket of

23   382-I, tell me if you recognize those and how it is you

24   recognize those.

25   **A.**  Yes, I recognize both of them.  In addition to the

1  evidence tags, which I am the person that prepared the

2  original evidence tags on these, on the buckets themselves, we

3  have the Oregon State Police evidence number, which are BH, in

4  this case, 7C.

5      BH stands for Brenda Havelin which is the OSP criminalist

6  that was processing the scene with me.  Then 2-A -- we labeled

7  each of them for whether they were device 1, 2 or 3, and then

8  the two buckets were labeled A and B so we knew which specific

9  bucket came from which device.

10  **Q.**  That's bucket 2-A?

11  **A.**  Yes.

12  **Q.**  If you look at the other five, what are we referring to?

13  **A.**  The top bucket on the stack is 2-B, so that's the second

14  bucket from device B. The second one in the stack is bucket

15  1-A. The third bucket is 1-B. So those are the two buckets

16  from device 1.  The fourth bucket is 3-B, and the fifth bucket

17  is 3-A.

18      MR. BARTLETT:  I would like to offer the six buckets,

19  Your Honor.

20      MR. FOX:  No objection, Your honor.

21      THE COURT:  Admitted.

22      (Exhibit Nos. 382-H and 382-I admitted.)

23  BY MR. BARTLETT:

24  **Q.**  I assume it's these buckets that you took two samples from

25  1-A, two samples from 1-B?

1   **A.**   Yes.

2   **Q.**   And half of them were sent on to the lab?

3   **A.**   Correct.

4   **Q.**   The black material that we see, what is that?

5   **A.**   That's actually the fingerprint powder from when we were

6   latent printing the outside of the bucket; they were dusted

7   with fingerprint powder.

8   **Q.**   We talked about device 1.  You also found a second device

9   at the house?

10  **A.**   Yes.

11  **Q.**   What I refer to as the house, the house office?

12  **A.**   At the building that was the office on the east side of

13  the building, there was a covered porch that covered half of

14  the east side of that, that was just enclosed with like screen

15  material.

16      Then there was a porch area that was just like a concrete

17  slab that had a lawn mower on it.  There was one device that

18  was placed on that concrete slab area near a corner underneath

19  windows.  Then the third device was inside that screened-in

20  porch area.  There was a bench next to the back door, and it

21  was placed on the bench underneath the window, next to a

22  couple of garbage bags that had been taken out by the janitor.

23  **Q.**   If we could take them one at a time.  If you could take a

24  look at what's already been admitted as 382-J which will show

25  up on your screen here.

1    You've talked about a second device being found.  Do you

2  recognize that picture?

3  **A.**  Yes.  This is the east side of the house that I was

4  referring to.  Underneath this porch area, right here, you can

5  see the two buckets underneath that window right there.  Then

6  the third device would be through this door and the

7  screened-in porch, through that doorway right there.

8  **Q.**  There are two people that are -- at least I think I see

9  over here on the far left side of that picture.

10    Do you recognize those people?

11  **A.**  Yes.  That one right there is me, the one on the right.

12  **Q.**  Could you look at what's already been admitted as 382-L?

13  Do you recognize that?

14  **A.**  Yes.  That's the one that was on the concrete slab.

15  That's device No. 2.

16  **Q.**  If you could go over to the cardboard box that you've just

17  been to and tell me if you see 382-N, as in "Nancy"?

18  **A.**  Yes, this is 382-N.

19  **Q.**  What is that?

20  **A.**  This is the lid that's pictured in that photograph.  It's

21  different from the other two lids in that this container that

22  the timing mechanism was in is a taller freezer-type

23  container.  The others were kind of the disposal Ziploc kind.

24  So it's a little bit distinct from the other two devices.  It

25  also has a white lid and the other two had orange lids.

1  **Q.** Once again, two buckets were there and you took samples

2  from those two buckets and submitted them to the lab?

3  **A.** Yes.

4  **Q.** You've also described device No. 3?

5  **A.** Yes.

6  **Q.** If you can look at what's already been admitted as 382-O.

7      MR. BARTLETT: Your Honor, I may have forgotten to

8  admit the device that we just talked about.

9      MR. FOX: No objection.

10     THE COURT: Admitted.

11        (Exhibit No. 382-N admitted.)

12  BY MR. BARTLETT:

13  **Q.** Do you recognize that angle?

14  **A.** Yes, that's facing north.

15  **Q.** Do you see where the third device was?

16  **A.** You can't see it in this picture. Once again, it's

17  through that doorway right there into the interior of that

18  screened-in porch.

19  **Q.** If we could look at 382-Q.

20  **A.** Yes. That's device No. 3 that was inside that porch.

21  **Q.** This is how it looked when you first saw it?

22  **A.** Yes.

23  **Q.** What is it that we see? We see the white buckets. What's

24  underneath that?

25  **A.** That's kind of like a flat bench area. There may have

1 been storage underneath it.

2 Q. If you can look at what has not been admitted -- if you

3 could look at the photo that appears at 382-R and tell me if

4 you recognize that photo.  You will have to pull it out of the

5 stack.

6 A. This is a picture of the lid of that device, a close up of

7 it.

8       MR. BARTLETT:  Offer, Your Honor.

9       MR. FOX:  No objection.

10       THE COURT:  Admitted.

11          (Exhibit No. 382-R admitted.)

12 BY MR. BARTLETT:

13 Q. If you could take a look at -- also it's not been

14 admitted, but it's in front of you -- 382-S.

15 A. Yes.  This is a side view of the same device where you can

16 see the clock timer inside the Ziploc container.

17       MR. BARTLETT:  Offer 382-S.

18       MR. FOX:  No objection.

19       THE COURT:  Admitted.

20          (Exhibit No. 382-S admitted.)

21 BY MR. BARTLETT:

22 Q. If you could just point to the various items you recognize

23 within this photo.  For example, you were talking about the

24 clock.  Where is that?

25 A. The clock is right here, inside that Ziploc container.

1  **Q.**  What is it that we see immediately to the right of that

2  clock?

3  **A.**  Immediately to the right -- well, you see the igniter end

4  of the road flare, which is right here.  They have taken a

5  paper matchbook and opened it up and peeled the cover off of

6  it and put one layer of matches all the way around the igniter

7  in the road flare to ignite it better, and then there's a

8  couple of paper matchbooks that are peeled off their backing

9  and placed side to side, and right inside it you can just see

10  the tip right there of a model rocket igniter.

11  **Q.**  What is a model rocket igniter?

12  **A.**  It's made for model rockets, but essentially it's a piece

13  of wire that when you pass current through it, it heats up and

14  can start a fire.  In this case, passing current through that

15  would ignite the matchbooks which would in turn ignite the

16  road flare.

17  **Q.**  In discussing the various items that you recovered at the

18  office/house, the building you referred to as Building A, did

19  you also process the crime scene at Building B?

20  **A.**  The fire investigators did the primary search on that

21  building, and it took us a full day to process the evidence

22  from Building A, the office building.  So on the second day,

23  we came back, and after the fire scene investigators had

24  already identified the evidence, then we collected the

25  evidence from scene B, Building B.

1  **Q.** What is Building B?

2  **A.** Building B is kind of a vehicle storage, kind of pole barn

3  structure.

4  **Q.** We've heard the term pole barn referred to a couple times.

5  For those of us not from farms, what is a pole barn?

6  **A.** It's one that has timbers providing the primary framework,

7  and then it probably had some kind of aluminum roof over it,

8  and it may or may not have sides.  In this case, it didn't

9  have sides because the vehicles were parked by pulling it in

10  the side with the covering on it.

11  **Q.** Could you take a look at 382-U, an item that's already

12  been admitted?  This one has already been admitted so we can

13  just look at the screen.

14  **A.** Yes.  This is an aerial view of that Building B.

15  **Q.** If you could take a look at what's already been admitted

16  as 382-V, which will show up on your screen, what is that?

17  **A.** This is facing west, the view of the end of that building.

18  It shows how the vehicles are pulled in from each side.

19  **Q.** When you first got to that building, were the vehicles

20  still inside it?

21  **A.** Yes, it was in this condition.

22  **Q.** How many vehicles were inside the building?

23  **A.** There were approximately 10 pickup trucks.

24  **Q.** What had happened to them?

25  **A.** All of them were destroyed by fire.

1  **Q.**  If you could take a look at what's not been admitted into
2  evidence yet, so it's a photo in front of you, 382-W.
3     Do you recognize that?
4  **A.**  Yes.  This is a portion of that building.  It's on the
5  north side of that building, and it's after the vehicles have
6  been towed out so the investigators can get to the ground area
7  underneath the vehicles.
8            MR. BARTLETT:  I would like to offer 382-W.
9            MR. FOX:  No objection.
10           THE COURT:  Admitted.
11                (Exhibit No. 382-W admitted.)
12  BY MR. BARTLETT:
13  **Q.**  So if you could explain, now that we are seeing the photo,
14  what had happened before you could process the scene?
15  **A.**  What had happened was, first of all, those timbers that
16  were still standing after the fire, those were a hazard to the
17  investigators.  They could come down at any moment and whack
18  somebody on the head.
19     So the first thing that had to happen before they could
20  investigate the scene was they had to bring in some equipment
21  and knock those down so they weren't hazardous anymore.  So
22  those had been knocked down.  Then the fire investigators had
23  gone through the entire building by the time I'd gotten there.
24     This photograph here shows an orange tape right there, and
25  that was circling an area where they identified an area where

1  evidence was to be collected.

2  **Q.** So they had seen it there, but they hadn't done anything

3  yet?

4  **A.** Correct.

5  **Q.** Did you go in that area and collect any evidence?

6  **A.** Yes, I did.

7  **Q.** If you could take a look at what's been marked as 382-Y,

8  which I believe is -- once again, do you recognize that?

9  **A.** Yes, I do.

10  **Q.** How is it that you recognize it and what is it?

11  **A.** It's got a bunch of my handwriting on the box.  It's

12  components from two devices from under VHQ 661 and the Do Not

13  Tilt box is my handwriting.

14  **Q.** What is this?

15  **A.** This is the melted remains that were collected from inside

16  that circle of the components of two devices.

17        MR. BARTLETT:  I would like to offer 382-Y.

18        MR. FOX:  No objection.

19        THE COURT:  Admitted.

20            (Exhibit No. 382-Y admitted.)

21  BY MR. BARTLETT:

22  **Q.** How is it you collected this?  Physically, what did you

23  do?

24  **A.** Physically, I was wearing gloves, and I went to that area

25  and got down on my hands and knees and picked out the pieces,

1  piece by piece.  I might have shoveled up some of the burnt

2  remains.

3  **Q.**  Set it up into this and then sent it in to the lab?

4  **A.**  Yes.  It was all -- when I collected it, it was more one

5  piece than now.  Now it's been separated out by our

6  laboratory, examining the different components.

7  **Q.**  Could you take a look at a photo that's not been admitted

8  yet that's in front of you, 382-X, and tell me if you

9  recognize that?

10  **A.**  This is a view of Building B facing east, and on the left

11  side of the photo there's a blue plastic streamer running

12  across the ground marking the location of evidence that we'd

13  collected.

14          MR. BARTLETT:  If I could offer 382-X.

15          MR. FOX:  No objection.

16          THE COURT:  Admitted.

17               (Exhibit No. 382-X admitted.)

18  BY MR. BARTLETT:

19  **Q.**  What is it that you are talking about?

20  **A.**  Right here, this blue line, indicated where we collected

21  trailer material that had been placed between the vehicles to

22  essentially transmit the fire from vehicle to vehicle.

23  **Q.**  Could you determine when you were out at the scene in May

24  2001 what the trail of material was, exactly how it worked?

25  **A.**  Well, we knew how it worked.  We could see evidence where

1  the trailer material had been like run underneath the

2  vehicles, and then when it got to the area of the fill spout

3  of the gas tank where you actually pump in, the trailer

4  material had been run up and draped over the filler nozzle of

5  the gas tank, which is plastic so it would melt through that

6  on multiple vehicles.

7  **Q.**  In addition to processing Building A, the office, and

8  Building B where all these cars were, did you also go over to

9  Building C?

10  **A.**  Yes.

11  **Q.**  What is Building C?

12  **A.**  Building C was kind of a combined-use building.  It had a

13  small office area.  It had a machine shop in it, and then it

14  was also used for vehicle storage.

15  **Q.**  If you could look on the screen, we are going to show you

16  what's already been admitted as Government's Exhibit 382-Z.

17      Do you recognize that?

18  **A.**  Yes, it's the aerial view of Building C.

19  **Q.**  When you said it was multiple-use, when you were there

20  looking at it, what did you see inside that building?

21  **A.**  Well, in the destroyed section, here and here are

22  vehicles.  I think there were three pickup trucks and two ATVs

23  that had been in the building that were destroyed by fire.

24  **Q.**  ATV's?

25  **A.**  All terrain vehicles, like four wheelers.  Then in the

1  uncollapsed area over here was the office section of the

2  building.

3  **Q.**  If you could take a look at what's already been admitted

4  as 382-AA.

5      Do you recognize that?

6  **A.**  Yes, that's the side view of Building C looking north.

7  **Q.**  Finally, 382-BB.  It's already been admitted.  Do you

8  recognize that?

9  **A.**  Yes.  That's another view of the same building, kind of

10  looking northwest.

11  **Q.**  In addition to a view of the building, does it show a

12  location of any devices that you recovered?

13  **A.**  Yes.  Behind the propane tank in the corner of the

14  building right there, where the two walls came together on the

15  ground, was the remains of another device that had functioned,

16  and that explains the scorching pattern that's kind of

17  isolated in the corner there going up the side of the

18  building.  That's where the device had been burning.

19  **Q.**  If you could look at a photo that has not been admitted,

20  Exhibit 382-CC, and tell me if you recognize that.

21  **A.**  Yes.  That's looking at the ground in that corner of the

22  building, at the remains of the device.

23          MR. BARTLETT:  Offer 382-CC.

24          MR. FOX:  No objection.

25          THE COURT:  Admitted.

1     (Exhibit No. 382-CC admitted.)

2  BY MR. BARTLETT:

3  **Q.** If you could clear the screen and perhaps give us some

4  perspective of what you are looking at, and what we are

5  seeing.

6  **A.** Some of this is just debris that had fallen down from the

7  wood on the side of the building, but an identifiable piece of

8  the device -- you can see right here is a round metal piece,

9  and that's like where the pail handle bail is.

10  **Q.** Did you process this scene?

11  **A.** Yes, I did.

12  **Q.** If you could take a look at that final picture at 382-DD,

13  which also has not been admitted into evidence, but is next to

14  you. Can you tell us if you recognize that?

15  **A.** This is a closer view of that same area, and it has some

16  of the wood debris moved off so you can see it a little more

17  clearly, the pail handle.

18          MR. BARTLETT: Offer 382-DD.

19          MR. FOX: No objection.

20          THE COURT: Admitted.

21              (Exhibit No. 382-DD admitted.)

22  BY MR. BARTLETT:

23  **Q.** If you could perhaps point out --

24  **A.** Right below where this line is where the pail handle is,

25  and then there's the round piece that I pointed out in the

1  previous photo.

2  Q. If you could once again get out of your seat and go over

3  and take a look at an exhibit marked as 382-EE, and tell me if

4  you recognize that and how you recognize it.

5  A. Once again, it's got my writing on the outside of the box

6  that says "device melted pail from northwest corner of

7  office." And then here you can see the pail handle that was

8  in the photograph. This is the melted plastic and debris from

9  the ground, and then these are components of the device. This

10 is slag or remains of the road flare, that white, crumbly

11 stuff.

12         MR. BARTLETT:  Offer 382-EE.

13         MR. FOX:  No objection.

14         THE COURT:  Admitted.

15             (Exhibit No. 382-EE admitted.)

16 BY MR. BARTLETT:

17 Q. Looking back at 382-BB, when you first looked at this

18 photo and before we had a chance to look at the items you

19 explained to us, you looked at the burn pattern and you were

20 going to explain some things to us.

21     Can you talk to us about that?

22 A. Yes.  Briefly, one of the things that is an important

23 piece that we look at in fire investigation to determine how a

24 fire started is where it started burning first, and because

25 fire, when it burns, goes up and out as it spreads, any place

1  where we've got an area of low burning may indicate either

2  where the fire started to begin with, or it may be something

3  that was burning and fell down to the ground and started the

4  fire burning up from that point again.

5      But here on the outside of this building we've got low

6  burn all the way to the ground, so that's a spot we want to

7  look at to see if there's something in that location that

8  started the fire there.

9  Q.  If you were a person wanting to destroy a building, is

10  there a reason you would choose the location that's depicted

11  in this picture?

12  A.  Yes.  From a fire dynamics or fire behavior standpoint, if

13  you set a fire at an area that's the join of two walls, the

14  fire is going to grow faster there because it has reflected

15  heat from two sides.  So it multiplies the fire growth by

16  putting it in that place.

17  Q.  What about roof overhangs, does that have any impact with

18  regard to fires and fire dispersion?

19  A.  Yes.  Although, I am not a highly qualified fire expert,

20  but from my training as an ATF agent, I know that when it

21  burns up, if it burns up under the overhang of a roof, that

22  will tend to kind of funnel it into the building.

23  Q.  Speaking of that, we can pull up what's already been

24  admitted at 382-II.  Is this in fact what the interior of this

25  building looks like?

1  **A.**  Yes, that's the interior of the office area.

2  **Q.**  Did you go in there during your investigation?

3  **A.**  Yes, just briefly.

4  **Q.**  You are talking about Building A, Building B, Building C.

5  Was there a fourth building, Building D?

6  **A.**  Yes, there was a Building D that was an outbuilding that

7  was kind of a storage shed.

8  **Q.**  What, if anything, did you do relative to Building D?

9  **A.**  Building D was of significance because it had graffiti

10 spray painted on two sides of the building.

11 **Q.**  If you could look at what's already been admitted as

12 382-JJ.  Do you recognize that?

13 **A.**  Yes, that's the north side of Building D.

14 **Q.**  And KK?

15 **A.**  That would be the east side of the building on the left

16 where it says "ELF."

17 **Q.**  Were you familiar with ELF at the time you went out to

18 this crime scene?

19 **A.**  Yes.  It stands for Earth Liberation Front.

20        MR. BARTLETT:  One moment, Your Honor.

21     No further questions, Your Honor.

22        THE COURT:  All right.

23                    CROSS-EXAMINATION

24 BY MR. FOX:

25 **Q.**  Good morning, Agent Glenn.

1   A.   Good morning.

2   Q.   Your primary focus was the Jefferson Poplar Farm arson,

3   right?

4   A.   I was the case agent for that.

5   Q.   So you weren't investigating the University of Washington

6   Center for Urban Horticulture fire?

7   A.   Correct.

8   Q.   I will refer you to what's been admitted as, I believe

9   it's Exhibit 201.   Now, this is the map, right?

10  A.   Yes.

11  Q.   There are a lot of things marked on this map, correct?

12  A.   Yes.

13  Q.   A lot of different incidents?

14  A.   Yes.

15  Q.   I take it there are a lot of other criminal activities

16  that have taken place between 1999 and 2001 that are not on

17  this map, right?

18  A.   Yes.

19  Q.   In fact, there were a number of arsons in the state of

20  Oregon that aren't on this map, right?

21  A.   Yes.

22  Q.   There was an arson at the Romania Chevrolet dealership in

23  Eugene --

24  A.   Yes.

25  Q.   -- on March 30, 2001?

1   **A.**  I couldn't tell you the date independently.

2   **Q.**  It was in 2001?

3   **A.**  I don't know.  I wasn't the case agent for that.

4   **Q.**  Were you the case agent for all these incidents?

5   **A.**  No.

6   **Q.**  So which ones were you the case agent for?

7   **A.**  I was only the case agent for the Jefferson Poplar Farm,

8   although I was aware of some of these other fires.

9   **Q.**  Well, there are some things that aren't fires that are

10  marked on this exhibit, right?  The vandalism at Monsanto, do

11  you know anything about that?

12  **A.**  No, I don't.

13  **Q.**  The Vail arson in Colorado isn't on this map, is that

14  true?

15  **A.**  Colorado is not shown on this map.

16  **Q.**  There was a fire at the Eugene Police Department in

17  September of 2000.  Were you aware of that one?

18  **A.**  I believe that's correct.  I am not certain of the date,

19  but I was aware of the fire.

20  **Q.**  That's not marked on this map?

21  **A.**  No.

22  **Q.**  Then generally, if you are -- looking at this map, if you

23  are going to drive from Eugene to the Jefferson Poplar Farms

24  at Clatskanie --

25  **A.**  Clatskanie.

1  **Q.** I am sorry, Clatskanie -- I am from Chicago, so some of

2  these names escape me.

3      If you are going to drive that way, you wouldn't

4  necessarily have to go through Olympia, would you?

5  **A.** No.

6  **Q.** There's a more direct route, right?

7  **A.** Correct.

8  **Q.** Then finally, referring to some of those bulky exhibits,

9  Exhibits 382-N and 382-G, can you find those, please?

10     If you could just pick up one of them.

11     Which one is that?

12  **A.** This one is 382-N.

13  **Q.** That's the ignition sequence; is that right?

14  **A.** Yes, I believe so.

15  **Q.** Is there a timer in there as well?

16  **A.** You know, I can't see the timer without opening the

17  container that's sealed in here.

18  **Q.** Okay.

19  **A.** I can do that.

20  **Q.** Sure.

21  **A.** Yes, there's a timer in here.

22  **Q.** This is how you found it, without the gasoline underneath

23  it, right?

24  **A.** Right, without the gasoline underneath it, and this is not

25  the condition that I found it in.  The clock's been

1  disassembled now.

2  **Q.**  Disassembled to analyze it, right?

3  **A.**  I believe so, yes.

4  **Q.**  If the clock was assembled -- well, let me back up.  As

5  you hold that right now, that's safe, right?

6  **A.**  Yes.

7  **Q.**  So if the jurors take that back in the jury room they can

8  look at it?

9  **A.**  Yes.

10  **Q.**  They don't have to worry about any fires starting?

11  **A.**  Correct.

12          MR. FOX:  I have no further questions.

13          THE COURT:  Anything further for the witness?

14          MR. BARTLETT:  I just have a question for the clerk.

15  There's a disagreement as to whether or not I admitted all the

16  devices.

17          THE CLERK:  I am questioning M, N and T.

18          MR. FOX:  We don't have an objection, Your Honor.

19          MR. BARTLETT:  I am offering them all.

20          THE COURT:  All right.  Admitted.

21          (Exhibit Nos. 382-M and 382-T admitted.)

22          THE COURT:  This witness may step down?

23          MR. BARTLETT:  Yes.

24          THE COURT:  As we start the new witness, how long a

25  witness is that?

1    MR. BARTLETT:  It's not long, but we will never get

2  done before noon.

3    THE COURT:  All right.  Then let's recess for the

4  noon hour at this time.  I will have you get a bite and have

5  you back here at 1:00.

6    Don't discuss the case and all that.  Leave your books on

7  your chair and I will see you after lunch.

8    (Jury not present.)

9    THE COURT:  All right.  You may be seated.

10    Anything we need to take up before, with the next witness?

11    MR. FOX:  The next witness is who?

12    MR. BARTLETT:  Brad Cooper.

13    MR. BLOOM:  Very brief question of the Court.

14  Ms. Waters has a back problem.  If you were to explain to the

15  jury, if it's okay with the Court, that she won't disrupt any

16  testimony, but at kind of a break, like when the witness is

17  looking for -- if she could just stand over there for about 20

18  seconds and stretch.

19    THE COURT:  I see no problem with that.

20    MR. BLOOM:  If you could explain to the jury, because

21  she doesn't want to seem rude.  If you could explain that she

22  is having a little back problem and occasionally she will get

23  up and stretch.

24    THE COURT:  I understand what you are asking.

25    MR. BLOOM:  Thank you.

1        THE COURT:  Anything else?

2        MR. BARTLETT:  Nothing else.

3        MR. FOX:  Maybe the jurors need a stretch every now

4   and then again.

5        THE COURT:  I am going to try to worry about the

6   courtroom myself.  I appreciate your help, but I am okay.

7        THE CLERK:  All rise.  Court is in recess.

8      (Luncheon recess.)

9        THE COURT:  All right.  You may be seated.

10     We are ready for the jury and the next witness?

11       MR. BARTLETT:  Yes, Your Honor.

12     (Jury present.)

13       THE COURT:  You may be seated.

14     I have been told that Ms. Waters has a problem with her

15  back, and from time to time she needs to relax it and may

16  stand up from time to time, and I have permitted her to stand

17  up and get that relief.

18     Next witness.

19       MR. BARTLETT:  At this time, the United States calls

20  Brad Cooper to the stand.

21       BRADLEY COOPER, called as a witness, duly sworn.

22                    DIRECT EXAMINATION

23  BY MR. BARTLETT:

24  **Q.**  Mr. Cooper, could you tell the members of the jury your

25  first and last name?

1  **A.** Bradley D. Cooper, C-O-O-P-E-R.

2  **Q.** Where do you work?

3  **A.** I work for the United States Bureau of Alcohol, Tobacco,

4  Firearms and Explosives. Presently, I am assigned to the

5  Terrorist Explosives Device Analytical Center, or TEDAC for

6  short, in Quantico, Virginia.

7      At this point in time, I am serving as the ATF liaison

8  officer for TEDAC and ATF up at another organization called

9  the Joint Improvised Explosive Device Defeat Organization or

10  JIEDDO. Sorry about the acronyms, but that's my life these

11  days. That's a part of the Department of Defense.

12  **Q.** Prior to moving back to the Washington, D.C. area and

13  working for the terrorist-related organizations, what was your

14  assignment?

15  **A.** I worked for approximately 19 years as a forensic chemist

16  at the forensic science laboratory for ATF in Walnut Creek,

17  California.

18  **Q.** Before we get to what you did at ATF, can you provide the

19  members of the jury a little bit about your background,

20  educational background, training, those types of things?

21  **A.** Certainly. I received my Bachelor of Science degree in

22  1985 in chemistry from Randolph-Macon College in Ashland,

23  Virginia.

24      I then attended a number of graduate level courses in

25  forensic science or criminalistics at the California State

1  University, Los Angeles campus in Los Angeles, California.

2      Following that, I joined ATF as a forensic chemist.

3  **Q.**  If I could stop you for just two seconds.

4      You are the first person they have heard from that's been

5  a forensic chemist.  What is a forensic chemist?  What do you

6  do?

7  **A.**  Certainly.  My job as a forensic chemist specifically for

8  ATF was to examine physical evidence that came from fire and

9  explosion scenes to identify explosives, explosive residues,

10  ignitable liquids, as well as identify components that could

11  be used in suspected devices in order to give the

12  investigators leads or links to possible suspects.

13  **Q.**  Have you received specialized training in addition to the

14  formal schooling?  Did you actually receive specialized

15  training to help you with your work?

16  **A.**  Yes, I did.  While with ATF, I have taken a number of

17  courses that were offered by ATF in explosion investigation,

18  fire scene investigation, as well as courses offered by

19  different manufacturers of the instruments that we use on how

20  to utilize their instrumentation in the course of my duties,

21  as well as there have been other courses I have taken from

22  other colleges, one-week courses on such things as the

23  chemistry of pyrotechnics and explosives, for example.

24  **Q.**  You have gone to these courses.  Have you taught courses?

25  **A.**  Yes, I have.

1  Q.  How many?  How often?

2  A.  I have taught actually quite a few, probably 30, 40 times.

3  This has ranged from instructing state and local police

4  agents, officials like that, all the way up to instructing

5  overseas at the International Law Enforcement Academy in

6  Bangkok, Thailand; instructing national police forces from the

7  various Southeast Asia countries, China, Taiwan -- not Taiwan,

8  sorry -- China, Vietnam, Laos, Thailand, Cambodia, on

9  post-blast explosion investigation.

10  Q.  Have you ever testified as an expert?

11  A.  Yes, approximately 42 times before.

12        MR. BARTLETT:  Offer Mr. Cooper as an expert.

13        MR. FOX:  No objection.

14        THE COURT:  All right.

15  BY MR. BARTLETT:

16  Q.  I am going to direct your attention specifically to the

17  May-June period of 2001.  During that time period, where were

18  you assigned?

19  A.  I was assigned to the forensic science laboratory in

20  Walnut Creek.

21  Q.  You were working as a forensic chemist down there?

22  A.  That's correct.

23  Q.  Did you eventually become -- as part of your assignment,

24  were you eventually asked to work on evidence that had been

25  acquired by Cheryl Glenn at the Jefferson Poplar arson in

1  Clatskanie, Oregon?

2  **A.**  Yes, I was.

3  **Q.**  Explain how that came about.

4  **A.**  The evidence was flown down from the area and was received

5  by my former partner in the fire debris laboratory.  Richard

6  Lute is his name.  The evidence was flown down by a U.S.

7  Customs pilot, and we received the evidence into the

8  laboratory for analysis by myself for this particular case.

9  **Q.**  Special Agent Glenn just identified that she was at the

10  fire scene on May 21st and 22nd.  Do you know approximately

11  when it was that your partner went out and met the Customs

12  plane and got the evidence from him?

13  **A.**  That would have been, I believe, May 25th.

14  **Q.**  Is that normal?  Is that how you got all the evidence at

15  the Walnut Creek lab, that some Customs or other plane flew it

16  down from the crime scene?

17  **A.**  No.  Actually, the vast majority of our evidence actually

18  is received via Federal Express, UPS or a commercial shipper

19  like that.  Some of the ATF agents that are present in the San

20  Francisco Bay area would have the luxury of driving or

21  bringing their evidence into us in person.

22       To have evidence flown down by a plane like that was

23  fairly unusual, but it had occurred a couple other times, too.

24  **Q.**  You probably can't do this from memory, but can you

25  explain to the members of the jury from looking at your notes

1 exactly what exhibits did you receive from that Customs plane

2 that was sent down?

3 **A.** If I may refer to my laboratory report?

4 **Q.** Yes.

5 **A.** Would you like me to go down each one of my exhibits?

6 **Q.** Please.

7 **A.** Exhibit 1 was a box containing a suspected incendiary

8 device.

9     Exhibits 2 and Exhibit 4 were glass vials containing

10 suspected ignitable liquids.

11     Exhibit 6 was a plastic -- excuse me, a paper bag

12 containing a plastic bag.

13     Exhibit 7 was an envelope containing a red twist tie.

14     Exhibit 9 was a glass vial containing a stained swab.

15     Exhibit No. 11 was a paper bag containing a plastic bag.

16     Exhibit 13 was a plastic bag containing a suspected

17 incendiary device.

18     Exhibit 14 was a glass vial containing a suspected

19 ignitable liquid.

20     Exhibit No. 16 was a paper bag containing a plastic bag.

21     Exhibit No. 17 was a paper bag containing a bucket lid.

22     Exhibit No. 19 was a glass vial containing suspected

23 ignitable liquid.

24     Exhibit No. 21 was a paper bag containing a plastic bag.

25     Exhibit 23 was a plastic bag containing a suspected

incendiary device.

Exhibit 24 was a glass vial containing suspected ignitable liquid.

Exhibit No. 26 was a paper bag containing a plastic bag.

Am I going too fast? I just wanted to make sure.

Exhibit No. 27 was a plastic bag containing a plastic bucket.

Exhibit No. 28 was a glass vial containing suspected ignitable liquid.

Exhibit No. 30 was a paper bag containing a plastic bag.

Exhibit No. 33 was a glass vial containing a suspected ignitable liquid.

Exhibit No. 35 was a gallon can containing melted plastic fragments.

Exhibit 36 was a gallon can containing a partially charred wood fragment.

Exhibit 37 was a gallon can containing partially charred wood fragment, but this was a comparison sample that was taken by the investigators.

Exhibit No. 38 was a quart can containing a soil sample.

Exhibit 39 was a box containing the charred remains of a suspected incendiary device.

Exhibit 40 was a quart can containing a soil sample.

Exhibit 41 was a plastic bag containing melted metal debris.

1    Exhibit 42 was a quart can containing charred fabric.

2    Exhibit 43 was a quart can containing melted plastic which

3    also had some charred fabric.

4    Exhibit No. 44 was a plastic bag containing a crushed

5    metal can.

6    Exhibit 45 was a plastic bag containing melted glass

7    fragments.

8    Exhibit 46 was a paper bag containing metal fasteners.

9    Exhibit 47 was a quart can containing charred fabric.

10   Exhibit 48 was a box containing the charred remains of a

11   suspected incendiary device.

12   Exhibit 49 was a quart can containing charred fabric.

13   Exhibit 50 was a quart can containing charred fabric.

14   Exhibit 52 was a quart can containing charred fabric.

15   Exhibit 53 was a quart can containing charred fabric, and

16   lastly, Exhibit No. 55 was another quart can containing

17   charred fabric.

18   **Q.**  What do you do when your department brings in these items

19   from the Customs plane?

20   **A.**  As you recall, part of my duties is -- there's several

21   facets to what I do -- what I did, I should say, as a forensic

22   chemist.  The first is to identify any potentially ignitable

23   liquids, explosive residue and that type of material.

24   So the first thing I did was to prepare the appropriate

25   samples that needed to be tested for ignitable liquid or

1  ignitable liquid residues.

2      Following that analysis --

3  **Q.**  If I could stop you just a second.  So you've got some

4  vials of liquids?

5  **A.**  Yes, sir.

6  **Q.**  As I understand it, Exhibits 2 and 4 were liquid samples

7  from buckets A and B for device three?

8  **A.**  Yes.

9  **Q.**  So Exhibits 14 and 19 were liquid samples from buckets A

10  and B for device 1?

11  **A.**  That's correct.

12  **Q.**  And Exhibits 24 and 28 were liquid samples for buckets A

13  and B from device 2?

14  **A.**  Yes.

15  **Q.**  Did you test those?

16  **A.**  Yes, I did.

17  **Q.**  How does that happen?  What do you do for the test?

18  **A.**  The testing protocol for a suspected ignitable liquid

19  sample is a little bit different than residues that might be

20  found on fire debris itself.

21      For the liquid samples, what I would do is take a very

22  small portion of that liquid and, first of all, go ahead and

23  place it on a cotton swab and hold the flame to it just to see

24  would it burn, and each one of these samples did burn the way

25  I would expect an ignitable liquid to burn.

1    In addition, I also mixed -- or attempted to mix, I should
2    say -- a little bit of water with those drops, additional
3    drops, from the suspected ignitable liquids to see whether or
4    not they would mix or not.

5    Ignitable liquids, petroleum-based ignitable liquids, are
6    not mixable or will not mix with water, and that particular
7    result was also obtained on these samples.

8    Lastly, we take another small portion of the liquid and
9    individually mix them with a solvent.  That particular mixture
10    then is injected into one of the instruments that we use in
11    the laboratory called a gas chromatograph mass spectrometer.

12    This particular instrument has the ability to separate
13    out -- if we take gasoline as an example -- separate out
14    gasoline into the hundreds of different compounds that
15    gasoline is actually made of.  Gasoline is not just one
16    chemical compound; it's a mixture of chemical compounds.

17    So the gas chromatograph has the ability to separate out
18    these compounds from each other to make the identification of
19    the gasoline a little bit easier.

20    In addition, the detector for the gas chromatograph is
21    called a mass spectrometer.  This particular detector is
22    specific enough that you can identify the type of organic
23    compounds found, such as in gasoline, and that will enable us
24    to help identify gasoline as well.

25    So using this particular instrument, we would be able to

take a look at what is called a chromatogram, and a chromatogram is basically a graph that has a variety of peaks and valleys, and each type of petroleum product that's out there will have, depending on what class it falls in, will have a different profile of peaks and valleys.

Gasoline looks very distinctly different than the other classes of petroleum product. So in this particular case, these different samples were all identified as gasoline based on that particular technique.

Q. So all of these samples, the two samples from device 1, the two samples from 2, the two samples from device 3, all came out as gasoline?

A. That's correct.

Q. If you could take a look down at the floor next to you, I believe there's an exhibit already admitted, Government's 382-E which I think is ATF Exhibit 39.

A. Yes.

Q. If you could grab that.

A. Should I put this one back?

Q. Yes. First of all, do you recognize that?

A. Yes.

Q. Is that part of the group of items you received from Special Agent Glenn?

A. Yes, it is.

Q. What did you do when you got this?

1  **A.** If I may open up the exhibit.

2  **Q.** Absolutely. Why don't you explain to the members of the

3  jury -- we talked about what you did when you had liquid

4  samples. Now you don't have the liquid sample. What do you

5  do?

6  **A.** In this particular case, this particular sample was

7  handled a little bit differently than the liquid samples.

8  Because we are dealing with residues of ignitable liquid,

9  residues I cannot see with my eye, unlike obviously liquid

10 gasoline, for example, we have to use what's termed an

11 activated charcoal strip method.

12     The way this is performed is a very small strip of -- it's

13 Teflon that's been impregnated with activated charcoal, and

14 what the activated charcoal will do is absorb any ignitable

15 liquid vapors; gasoline, if you recall, has vapors. If you go

16 to the gasoline station you can see the vapors flowing down,

17 depending on how good the pump is, but you can see those

18 vapors of gasoline, for example.

19     So the activated charcoal strip has the ability to absorb

20 those vapors that might be present as residues on the fire

21 debris, and what will happen is -- in this particular case, I

22 left an activated charcoal strip within this package for about

23 three days at room temperature to give it a chance to absorb

24 any potential ignitable liquid vapors that might be there.

25     Following that, I removed the charcoal strip and went

1    ahead -- and there were two of them.  One got saved for

2    purposes of analysis by the defense, if they so desire.  The

3    other one I took and extracted with a little bit of solvent.

4         That solvent then would contain any ignitable liquid

5    vapors that might be present.  That gets injected into the gas

6    chromatograph, and basically we look at the chromatogram with

7    the peaks and valleys to determine if there's an ignitable

8    liquid present or not.

9    **Q.**  Were you able to make a determination with regard to this

10   Exhibit, 382-E?

11   **A.**  Yes, I was.

12   **Q.**  What did you determine?

13   **A.**  Gasoline was identified in this particular exhibit.

14   **Q.**  Did you also do examinations with debris that had been

15   recovered from various locations, for example, ATF Exhibits

16   38, 40 and 41?

17   **A.**  Yes, I did.

18   **Q.**  What did you determine?

19   **A.**  Gasoline was also identified in those particular exhibits

20   as well.

21   **Q.**  Did you also -- you described at various times when you

22   were going through the 50-some odd exhibits that there was

23   cloth trailer material?

24   **A.**  Charred fabric, actually.

25   **Q.**  Did you do an analysis of those?

1  **A.** Yes, I did.

2  **Q.** What did you determine?

3  **A.** On some of the fabric samples, specifically Exhibit Nos.

4  49, 52 and 55, that actually contained a mixture of gasoline

5  and another class of petroleum product called heavy petroleum

6  distillate.  An example of heavy petroleum distillate would be

7  diesel fuel and fuel oil number two.

8  On others of the charred fabric, specifically Exhibit No.

9  53, Exhibit No. 50 and Exhibit No. 47 and Exhibit Nos. 42 and

10  43, only gasoline was identified.

11  **Q.** After you've done this analysis, did you prepare a report?

12  **A.** Yes, I did.

13  **Q.** Do you do the ultimate analysis with regard to -- we

14  talked about the chemistry and the various solvents that

15  you've identified by some of the pieces of evidence.

16  Do you also go to the next step and do an analysis with

17  regard to whether this is an incendiary device or whether it's

18  an incendiary bomb, that type of analysis?

19  MR. FOX:  Your Honor, that final analysis is for the

20  jury to decide.

21  THE COURT:  The question is whether he does that.

22  You may answer.

23  BY MR. BARTLETT:

24  **Q.** Did you, Mr. Cooper?

25  **A.** No, I did not.  That was not part of my responsibilities.

1 **Q.** Who does that for the Bureau of Alcohol, Tobacco, Firearms

2 and Explosives?

3 **A.** Those responsibilities are carried out by --

4     MR. FOX:  Your Honor, I would object again.  That

5 response is the jury's decision.

6     THE COURT:  Your objection is noted.  You may answer,

7 Sir.

8 **A.** That responsibility is carried out by ATF's explosive

9 enforcement officers, and we have a number of them around the

10 country that we work with fairly closely.

11 BY MR. BARTLETT:

12 **Q.** Your reports are forwarded on to them?

13 **A.** Yes, sir.

14     MR. BARTLETT:  Your Honor, with the Court's

15 permission, I have already spoken with Mr. Fox.  Mr. Cooper

16 also was the forensic chemist for another arson that we

17 haven't talked about yet.  It's the arson that occurred at the

18 Susanville in October of 2001.

19     But with the defense's concurrence, I would like to go

20 through the various analyses that he did with that, subject to

21 a connection later since obviously none of those items have

22 been introduced into evidence, but since he's flying back from

23 the east coast, I would just as soon get him done now.

24     MR. FOX:  That's fine.

25     THE COURT:  All right.  Go ahead.

BY MR. BARTLETT:

Q. You can put that down if you want.

Can I ask you to change gears for a second. Were you also involved as the forensic chemist for the Bureau of Alcohol, Tobacco, Firearms and Explosives for an arson committed in northern California in Susanville?

A. Yes, I was.

Q. Can you explain to the members of the jury, when did you work on that arson?

A. I started working on that particular evidence from that particular fire scene soon after the evidence was received on October 17, 2001. The evidence was delivered to the laboratory by the California Department of Forestry Fire Investigator Greg Smith.

Q. Did you complete your investigation then, or was your work on that delayed for a while?

A. I worked on that particular case off and on over a period of about a year-and-a-half.

Q. I assume that you had a request to speed up the Jefferson Poplar, but no such request with regard to Susanville?

A. Nothing specifically came to mind on that. Unfortunately, I had other responsibilities at that time, other cases I was working on. This was a situation where we're keeping as many balls up in the air as we can, but on occasion things don't necessarily get done as quickly as we would like.

1 **Q.** When did you finally complete that examination?

2 **A.** My final report was issued on March 18, 2003. My draft

3 report, when I was completed with my draft before the report

4 went for peer review -- we have a peer review, technical

5 review process in the ATF laboratory for quality assurance

6 purposes -- that particular report was done March 13, 2003.

7 **Q.** When you did the preliminary report, did you provide that

8 to Mike Morgan?

9 **A.** I don't recall specifically, but I could very well have.

10 **Q.** Where was Mike Morgan located with regard to you?

11 **A.** Mr. Morgan's office was probably about 30 feet away, down

12 one corridor, through one hall door and, like I said,

13 Mr. Morgan is an explosives enforcement officer that is

14 stationed at the laboratory in Walnut Creek. As I mentioned

15 before, we work very, very closely with our explosives

16 enforcement officer. So I had, at times, daily contact with

17 them on a variety of cases.

18 **Q.** With regard to the exhibits that you received from the

19 Susanville arson, how many did you receive?

20 **A.** If I can refer to my report.

21 **Q.** Yes.

22 **A.** We received 21 different exhibits.

23 **Q.** If you can briefly go through those 21 exhibits.

24 **A.** Okay. Do you want me to read the same list like I did

25 before?

1    **Q.**    Yes.

2    **A.**    Exhibit No. 1 was a plastic bag containing a bucket

3    handle.

4         Exhibit No. 2 was a quart can containing the remains of a

5    suspected incendiary device.

6         Exhibit 3 was a gallon can containing a soil sample.

7         Exhibit No. 4 was a glass vial containing a suspected

8    ignitable liquid.

9         Exhibit No. 5 was a glass vial containing a suspected

10   ignitable liquid.  This was a duplicate sample of Exhibit No.

11   4.

12        Exhibit 6 was a glass vial containing a suspected

13   ignitable liquid.  This was also a duplicate sample of Exhibit

14   No. 4.

15        Exhibit No. 7 was a plastic bag containing a suspected --

16   excuse me, Exhibit No. 7 was a plastic bag containing

17   suspected timing mechanisms.

18        Exhibit 8 was a plastic bag containing a plastic bucket

19   and lid.

20        Exhibit No. 9 was a plastic bag containing a lid, road

21   flare and suspected igniter assembly.

22        Exhibit No. 10 was a glass vial containing a suspected

23   ignitable liquid.

24        Exhibit No. 11 was another glass vial containing a

25   suspected ignitable liquid, and this was a duplicate sample of

Exhibit No. 10.

Exhibit No. 12 was a glass vial containing a suspected ignitable liquid, and this was also another duplicate sample of Exhibit No. 10.

Exhibit No. 13 was a plastic bag containing suspected timing mechanisms.

Exhibit No. 14 was a plastic bag containing plastic bucket and lid.

Exhibit No. 15 was a plastic bag containing a lid, road flare and suspected igniter assembly.

Exhibit No. 16 was a glass vial containing a suspected ignitable liquid.

Exhibit No. 17 was another glass vial containing a suspected ignitable liquid, and was a duplicate sample of Exhibit No. 16.

Exhibit No. 18 was a glass vial containing a suspected ignitable liquid, another duplicate sample of Exhibit No. 16.

Exhibit No. 19 was a plastic bag containing suspected timing mechanisms.

Exhibit No. 20 was a plastic bag containing a plastic bucket and lid.

Lastly, Exhibit No. 21 was a plastic bag containing a lid, a road flare and a suspected igniter assembly.

Q.  Once again, what type of analysis -- did you analyze all 21 of these exhibits?

1  **A.**  I analyzed all except for the duplicate samples that I had

2  mentioned specifically in my description here.

3  **Q.**  Looking specifically at the glass vials that contained

4  suspected petroleum distillates, what did you find?

5  **A.**  The vials all contained a mixture of gasoline and a heavy

6  petroleum distillate and, once again, examples of a heavy

7  petroleum distillate would be, for example, diesel fuel, fuel

8  number two, kerosene.

9  **Q.**  What exhibit numbers were those?

10  **A.**  Those would have been Exhibit No. 4, No. 10 and Exhibit

11  No. 16.

12  **Q.**  Did you have any other determinations with regard to the

13  existence of petroleum or gasoline?

14  **A.**  Exhibit Nos. 2 and 3 -- No. 2 was the remains of the

15  suspected incendiary device, and No. 3 was a quart can

16  containing a soil sample.  Those also contained a mixture of

17  gasoline and a heavy petroleum distillate.

18        MR. BARTLETT:  Nothing further, Your Honor.

19        THE COURT:  All right.

20                    CROSS-EXAMINATION

21  BY MR. FOX:

22  **Q.**  Good afternoon, Mr. Cooper.

23  **A.**  Good afternoon.

24  **Q.**  Mr. Cooper, you investigated or you did the chemical

25  analysis of evidence from the Jefferson Poplar Farm arson,

1  right?

2  **A.**  That's correct.

3  **Q.**  And the Susanville BLM horse facility arson, correct?

4  **A.**  Yes.

5  **Q.**  You weren't involved in any chemical analysis of the

6  University of Washington Center for Urban Horticulture fire?

7  **A.**  That's correct, I was not involved with that.

8  **Q.**  Now, you are a chemist, right?

9  **A.**  Well, I was a chemist by training and education, but I

10  have since moved on to a new career as an intelligence

11  research specialist.

12  **Q.**  That's just since -- in the last year, right?

13  **A.**  Started -- my new job duties commenced on August 6th of

14  last year.

15  **Q.**  But up until last year, you worked as a chemist?

16  **A.**  That's correct.

17  **Q.**  I understand that you have a bachelor's degree in

18  chemistry?

19  **A.**  That's correct.

20  **Q.**  Then you studied in graduate school, criminalistics?

21  **A.**  That's correct.

22  **Q.**  How much training did you have to take to become -- to

23  work for the ATF?

24  **A.**  The ATF decided to hire me, considering my educational

25  background with the chemistry degree background, having

attended the graduate school at California State University at
Los Angeles, as well as some of my work experience.  At that
time as well, I had been a laboratory technician working for a
private forensic science laboratory in Signal Hill,
California.

This particular laboratory specialized in the field of
serology, which is looking at blood, and this day and age,
DNA, but this was the time period before DNA became obviously
as well-known as it is now.  The firm did mostly defense work
for homicide and rape cases, did do a little bit of
prosecution work.

**Q.** When you went to the ATF, what type of training did you go
through?  How many hours of training did you do?

**A.** It was hundreds of hours.  A great deal of different
courses that ATF sent me to, lasting for a week or two for
each one of them.  So I would be saying it literally would be
hundreds of hours with all the courses that I took and
instruction that I took.

**Q.** I notice you've done trainings as well; is that correct?

**A.** That's correct.

**Q.** I was just looking through your resume.  You identify an
organization by the acronym TWGFEX?

**A.** That's correct.

**Q.** What does TWGFEX stand for?

**A.** That stands for the Technical Working Group for Fire and

1  Explosions.

2  **Q.** What is that?

3  **A.** That is an organization that is made up of forensic

4  scientists as well as investigators that are involved with the

5  investigation of fires and explosions, and that's basically

6  it.

7  **Q.** Are you a member?

8  **A.** I have been; however, because I am no longer with the

9  laboratory, I think my membership has since lapsed.

10  **Q.** How do you pronounce it TWGFEX?

11  **A.** Yes.

12  **Q.** Another acronym?

13  **A.** Yes.

14  **Q.** Does TWGFEX publish anything?

15  **A.** They have published some.

16  **Q.** What types of material?

17  **A.** There's been some training guides that I am familiar that

18  they have published.  TWGFEX, so you know, is made up of

19  different subcommittees, and there is, for example, the

20  training subcommittee that is dealing with training issues and

21  putting together maybe potential documents related to training

22  issues.

23      The particular subcommittees that I belonged to for TWGFEX

24  was the Ignitable Liquid Library.  This is a subcommittee that

25  was responsible for maintaining an extremely large database of

1   all the various ignitable liquids that were present out there

2   in the marketplace that an arsonist could potentially use to

3   start a fire.

4       So there was a computer database associated with that, and

5   we were responsible for collecting samples, making sure that

6   they were run under proper instrumental conditions, including

7   all the data in the database and making it available to law

8   enforcement agencies around the United States.  I believe it

9   was also available to law enforcement agencies overseas as

10   well.

11       My other subcommittee I was involved with was the TWGFEX

12   symposium committee, and that one was not nearly as onerous of

13   a duty.  It was primarily just organizing, determining when we

14   were going to have our annual symposium and making

15   arrangements to have the symposium and the meeting every year

16   that we were supposed to have.  So that was my involvement

17   with TWGFEX.

18   **Q.**  Do they ever publish glossaries of technical terms?

19   **A.**  They probably have --

20       MR. BARTLETT:  Objection, relevance, Your Honor.

21       MR. FOX:  Your Honor, he's their expert.

22       THE COURT:  We will see what the question is about.

23   BY MR. FOX:

24   **Q.**  Do they ever publish glossaries?

25   **A.**  They might very well have, yes.

**Q.** Have you ever seen any of the glossaries?

**A.** I don't recall specifically seeing any.

**Q.** Would you recognize their glossary as being authoritative in your field?

**A.** Without having read it, I just don't know. Like I said, my area was different as far as what I worked with TWGFEX than what the investigators and other people worked on, so I can't really render a judgment there.

**Q.** Moving on, you said you dealt with the ignitable liquid section of TWGFEX?

**A.** Yes.

**Q.** Other than just telling me it's gasoline, what's an ignitable liquid?

**A.** An ignitable liquid is basically a liquid that will burn. There are various technical issues that determine if it's a combustible liquid, a flammable liquid, but the overall family of these liquids, of these petroleum products are termed ignitable liquids within the forensic science discipline that analyzes arson evidence.

**Q.** Gasoline, that's an ignitable?

**A.** Yes.

**Q.** Is that combustible or flammable?

**A.** That would be termed a flammable liquid; however, the preferred definition that we use in the forensic science community would actually be ignitable liquid.

**Q.** Okay. When a flammable liquid is set on fire, chemically what happens?

**A.** Basically, it's what's termed an oxidation reaction. The fuel would be the gasoline, and you need an oxygen source, that would be the outside air, and it would burn.

**Q.** What's the difference between flammable liquid burning and an explosion?

**A.** You are getting into an area that actually would be better answered by one of our explosives enforcement officers.

**Q.** I thought you were -- had experience with explosives.

**A.** That is true, but you are also getting into an area that actually falls outside my area of expertise.

**Q.** Okay. Thank you very much.

**A.** Thank you.

THE COURT: Any other questions?

MR. BARTLETT: No. Thank you, Mr. Cooper.

THE COURT: All right. You may step down.

MR. BARTLETT: At this time, the United States calls Brennan Phillips to the stand.

THE COURT: Mr. Phillips.

MR. BARTLETT: Your Honor, just so the record is clear, Mr. Cooper is going to be returning to Washington, D.C.

MR. FOX: That's fine.

THE COURT: All right. You are excused.

Let me have you raise your right hand to be sworn.

BRENNAN PHILLIPS, called as a witness, duly sworn.

DIRECT EXAMINATION

BY MR. BARTLETT:

Q. Would you tell the members of the jury your first and last name and explain where you work.

A. Brennan Phillips. I am with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Q. What is your current assignment, Mr. Phillips?

A. I am an explosives enforcement officer with the Explosive Technology Branch which is a branch within ATF.

Q. As an explosive enforcement officer, what does that mean? What do you do?

A. I am basically a bomb technician for ATF and a subject matter expert on explosives and destructive devices.

Q. Before we get into your various training, can you just generally walk the members of the jury through your educational background?

First of all, just normal education, and then we will get to specialized training.

A. Certainly. I went to high school in Medford, Oregon. Graduated from Western Oregon State College down in Monmouth, Oregon.

Q. When did you graduate?

A. 1990, and I have a degree in geography.

Q. After you graduated from Western Oregon in 1990, what did

1  you do?

2  **A.**  Well, I was commissioned in the U.S. Army as a Second

3  Lieutenant through Oregon State as an ordnance officer, and I

4  went through ordnance officer training.

5  **Q.**  Let me stop you.  Ordnance officer?

6  **A.**  Ordnance officer, basically the people responsible for

7  weapon systems, the maintenance and procurements and

8  specialists on weapon systems within the Army.

9  **Q.**  How long were you an ordnance officer in the Army?

10 **A.**  Ten years on active duty doing that, and I still do that

11 in the reserve status.  I have done that for another seven or

12 so years.

13 **Q.**  During the time you were an ordnance officer, what kind of

14 training, if any, did you receive from the Army?

15 **A.**  Well, initially I received training on munitions, weapon

16 systems, that sort of thing.  Then in addition to that, I went

17 on to be an explosive ordnance disposal officer which is kind

18 of an additional skill set on top of that.

19 **Q.**  When did that happen?

20 **A.**  That happened in -- I graduated from that school in 1991.

21 That's a nine-month course run by the U.S. Navy at the Naval

22 Explosive Ordnance Disposal School, at that time in Indian

23 Head, Maryland.

24 **Q.**  What kind of training did you receive in the nine months?

25 **A.**  That is the military's sole source for qualifying and

training all bomb disposal personnel within the Armed Forces.
That training teaches everything from explosive physics to
hazards and safeties, identifying all sorts of military and
improvised munitions and how to render those safe and then
subsequently dispose of the residual hazards.

**Q.** After you finished that training, what do you do?

**A.** Well, then you are normally assigned to an active
assignment as a bomb disposal officer.

**Q.** Is that what happened with you?

**A.** Right.  I was given command of an explosive ordnance
disposal company or a bomb disposal company.

**Q.** What did that mean?

**A.** Basically, I had about a dozen soldiers and was the
commander of this team and happened to be located in
Pennsylvania -- Indiantown, Pennsylvania -- and I commanded
the unit, and we responded to calls for assistance, basically
bomb calls.

The Army has a responsibility within the land mass of the
continental United States to respond to calls, be they from
military installations or even from civil authorities.

In my particular case in Pennsylvania there, we responded
to bomb calls throughout the state of Pennsylvania.  At that
time, the state of Pennsylvania didn't have a bomb team at the
state level.  So if the community -- other than like
Pittsburgh or Philly that had their own capability -- called,

we would respond to everything from pipe bombs to old
explosives to incendiary devices or whatever the threat was.

**Q.** How long did you do that?

**A.** I was stationed there for about four years.

**Q.** During the four years you were there, how many bomb
activities were you called to respond to, military and
civilian?

**A.** In excess of 100 that I personally ruled on myself.

**Q.** In addition to the 100 you personally did, did you
supervise other people on other instances?

**A.** Certainly, yes.

**Q.** When is it you decided to leave the Army?

**A.** In 2000, I was offered a job with ATF and I accepted that.

**Q.** What was the job that you were offered?

**A.** To be an explosive -- to be an explosives enforcement
officer, which is basically an ATF subject matter expert in a
bomb technician cadre of bomb disposal people.

**Q.** You talked about the training you received in the military
for nine months at the ordnance school. What other training
have you received?

**A.** I've received numerous trainings over the years in
addition to that, more advanced level bomb disposal training.
I attended the Irish Army bomb disposal course in Dublin,
Ireland. I had additional training in Northern Ireland with
the British Army which was based around an assignment that I

1   had.

2     I attend the police -- the Law Enforcement Bomb Disposal

3   School called the Hazardous Device School, which is at

4   Redstone Arsenal, taught by the Army.

5     Since coming on with ATF, I have received advanced crime

6   scene, bomb crime scene investigation training, received

7   additional courses in chemistry and electronics to bolster my

8   skills so that I can provide the kind of expertise when we are

9   conducting investigations into violations of the explosive

10  laws, arson laws and destructive device laws.

11  **Q.**  In addition to going to training, have you actually

12  provided training yourself; you've been an actual trainer?

13  **A.**  Certainly.  Because of my experience, and specifically in

14  Ireland and there in Pennsylvania, I was sent to be the

15  officer in charge of the Improvised Explosive Device Disposal

16  Division, training division, within the Naval Explosive

17  Ordinance Disposal School, which is our training facility.

18    So I actually ran that course and was charged with

19  revamping it and increasing our counter IED or improvised

20  explosive device capability within the military.

21  **Q.**  How long did you do that?

22  **A.**  For a year before coming on with ATF.

23  **Q.**  After coming on with ATF, have you provided any training

24  to either local, federal or international folks?

25  **A.**  Certainly.  We routinely, probably on average once every

1  other month, give training to local authorities on crime scene

2  investigation as it pertains to explosives, incendiary

3  devices, training on how to dispose of these sorts of things,

4  advance disposal training.

5          MR. BARTLETT:  I would like to offer Brennan Phillips

6  as an expert.

7          MR. FOX:  I have no objection.

8          THE COURT:  All right.

9  BY MR. BARTLETT:

10  Q.  During your discussion, you talked about Northern Ireland.

11  Can you explain to the members of the jury what your

12  involvement was there?

13          MR. FOX:  Your Honor, I am going to object to

14  discussions about things that happened in other countries,

15  subject to other laws.

16          THE COURT:  The necessity for that?

17          MR. BARTLETT:  Withdrawn, Your Honor.

18  BY MR. BARTLETT:

19  Q.  You indicated that you joined the Bureau of Alcohol,

20  Tobacco, Firearms in June of 2000?

21  A.  June of 2000, yes.

22  Q.  What was your -- can you kind of walk us through where you

23  were first assigned and where you were eventually assigned?

24  A.  When I first came on with ATF, I was assigned to our

25  headquarters in Washington, D.C. where I did field type of

1    work and I also did work within the headquarters, as far as
2    policy type of issues.
3        Then after about a year, I was asked to come to Seattle.
4    There was a feeling that because of the amount of explosives
5    and incendiary device type of crime in Seattle, the Special
6    Agent in charge of the Seattle field division successfully
7    convinced headquarters to have a bomb technician assigned
8    permanently to the Northwest.
9        So I came here specifically to work in Oregon, Idaho,
10   Washington, Montana and Alaska.
11   Q.   Have you ever provided your expert opinion?
12   A.   I have.
13   Q.   How many times?
14   A.   On nine other occasions, I have testified in a court with
15   regards to destructive devices or explosives.
16   Q.   Going beyond when testifying, approximately how many cases
17   have you been involved in since joining ATF in June of 2000
18   where you've provided your opinion to agents about devices
19   that they provided to you?
20   A.   About 250 or a little in excess of 250.
21   Q.   Were you asked at some point to examine evidence that
22   Cheryl Glenn had collected at the Jefferson Poplar arson on
23   May 21, 2001?
24   A.   Yes.
25   Q.   Why don't you explain to the members of the jury where you

1  were working and how did you get this evidence?

2  **A.**  Well, I work in the Federal Building in Seattle.  After

3  the evidence has gone through our laboratory system, it is

4  then sent to me or sometimes I go to it.  In this case, it was

5  sent to me and I examined it in Seattle.

6  **Q.**  So first of all, it was sent to where?

7  **A.**  The evidence was sent to our West Coast lab, forensics

8  lab, which is located in Walnut Creek, California.

9  **Q.**  After they got done with that analysis, you got it?

10  **A.**  That's correct.

11  **Q.**  When you got that evidence, in addition did you have a

12  report from Forensic Chemist Brad Cooper, the individual that

13  just testified?

14  **A.**  Yes, I had his report.

15  **Q.**  Why do you need that?

16  **A.**  Well, for me to make my determination, I need to see all

17  the evidence, to include the chemical analysis.  I am not a

18  chemist, I don't do the chemistry, but in order to consider

19  whether or not the device is a destructive device, there has

20  to be the presence of your explosives or incendiary or poison

21  gas materials.  So I need a scientist to make that

22  determination first.

23  **Q.**  As you can see, there's a bunch of items outside where you

24  are seated.

25      If you could step down and grab what's been previously

1    entered into evidence as Exhibit 382-G --

2  **A.**  Okay.

3  **Q.**  -- which I think is ATF Exhibit 13.

4  **A.**  Okay.

5  **Q.**  Do you recognize that?

6  **A.**  I do.

7  **Q.**  How do you recognize it?

8  **A.**  This is some of the evidence that was sent to me.  On the

9    evidence tags, I have made my mark.

10  **Q.**  Perhaps, Pat, if you could provide Mr. Phillips a pair of

11   scissors, it might make his life a little easier.

12        What did you do when you first got this?

13  **A.**  When I first got this, it came in a bunch of boxes, so the

14   first thing was to read through all the reports, look at the

15   photos, talk to Cheryl, and then we take this out -- I get a

16   big piece of butcher paper out and lay this out and take a

17   look at the components and kind of go through the mental

18   process of reconstructing the device.

19  **Q.**  So you look at all the photos first?

20  **A.**  Yes.

21  **Q.**  Pull up Exhibit 382-D, as in "dog."

22        Is that one of the photos you looked at?

23  **A.**  It is.

24  **Q.**  Does that appear to be the photo of the device at the

25   crime scene?

**A.** Yes.

**Q.** Taking a look, first of all, at the photo. What is it that as a bomb expert you look at, that you find relevant?

**A.** Well, there is an electronics package there. In my vernacular, I would call that a time and power unit or TPU. I have a road flare, which is a pyrotechnic device. I have what appears to be liquid fuel.

So my assumption there, just looking at those photos, is that it's some type of incendiary device.

**Q.** Then you had a chance to actually look at the top portion of it?

**A.** Yes.

**Q.** If you could open that up and explain what it is you found relevant.

**A.** Okay. So what we have here is a Glad type of -- almost like what you would put leftovers in; you can buy it at the store. It's kind of a container that contains the electronics package with the time and power unit.

In this particular time and power unit, it incorporates a digital timer, like a digital kitchen timer. There is a solid state switch. This one happens to be a silicone controlled rectifier, which is kind of a solid state switch. It's almost like a light switch, only instead of having any moving parts, it just takes an electronic impulse, and that changes the state of the switch, so there's no moving parts, in other

1   words.

2       There was a battery, a 9-volt battery with this, and you

3   have the 9-volt battery connector here, so an additional power

4   source in addition to the timer itself.

5   **Q.** Have you seen devices like this prior?

6   **A.** I have.

7   **Q.** Specifically Exhibit 515-B, could we pull that up?

8       Do you see a book with this title?

9   **A.** I have.

10              MR. BARTLETT:  Offer 515-B.

11              MR. FOX:   No objection.

12              THE COURT:   Admitted.

13                   (Exhibit No. 515-B admitted.)

14  BY MR. BARTLETT:

15  **Q.** When had you seen that, and how is it used in your work?

16  **A.** I have certainly seen it in conjunction with examining

17  this type of case.  I have also seen the book in training.

18  It's fairly common to have -- somebody in my line of work

19  would typically keep a copy of this book as part of their

20  library.

21  **Q.** Have you had a chance to look at -- in addition to seeing

22  the timing device, what else did you see in this exhibit?

23  **A.** In addition to the timing device and the power source,

24  which is this 9-volt battery, we had a pyrotechnic initiation

25  source, which is the road flare.

A road flare is basically a pyrotechnic flare. This is
the ignition end of it. We also had books of matches. These
books of matches were gathered around the end, and then they
were -- these are the model rocket motor igniters, so what you
would use to ignite a model rocket. You can buy them at the
hobby shop or at the store.

These model rocket motor igniters -- now, at the time I
had it, it was disassembled -- but in the photos were
sandwiched in between the books of matches. So when the timer
ran out, it would send an electronic impulse to our silicone
controlled rectifier, our solid state switch, and then go
ahead and close the gates of that switch, or flip the switch
essentially, which allowed power to flow from the 9-volt
battery, which would have been hooked up to this 9-volt
battery adapter, and allowed that power to flow out to the
model rocket motor igniters, which are basically just a bridge
wire, very much like you would have in a light bulb that heats
up. And there's a little bit of pyrotechnic mixture on the
bridge wires that ignites the books of matches, and that
ignites -- there's actually a little ignition mixture on the
end of this road flare, that ignites the ignition mixture and
starts the flare to burn.

Q. What happens when the flare starts burning?

A. The flare is going to burn and, of course, in this
particular case, the flare is positioned over the bucket of

1 liquid fuel, and the vapors from those fuels are going to be
2 ignited by the burning road flare.
3 **Q.** Did you reach a conclusion as to what all of these things
4 were, the devices on top of the bucket, the two buckets, all
5 of those things? In your opinion, what did those comprise?
6      MR. FOX: Your Honor, I object. That's a question
7 for the jury to decide ultimately, not for this witness to
8 decide.
9      THE COURT: It is noted. You may answer.
10 **A.** In combination, and as they were arrayed, this device was
11 an incendiary bomb.
12 BY MR. BARTLETT:
13 **Q.** Why do you say that?
14 **A.** Well, an incendiary bomb is essentially a weapon designed
15 to deliver a destructive payload to a target and have some
16 kind of means to initiate it. In this particular case, we
17 have our destructive payload, which is the liquid fuel
18 contained within the buckets; we have our initiation system,
19 which is the digital timer; the switch, in combination with
20 the igniters or model rocket motor igniters; and then we have
21 our pyrotechnic initiation source.
22     So you have all of the components there that delay the
23 initiation of the fuel, liquid fuel, and that was placed
24 against a target. In this case, a building.
25 **Q.** Just as a layman, I thought bombs exploded.

1  **A.**  A bomb is a very broad word. You know, as a military

2 ordnance person like myself, I understand that there's all

3 kind of bombs. In the law, in particular --

4      MR. FOX: Your Honor, I am going to object to this

5 witness telling the jury what --

6 BY MR. BARTLETT:

7  **Q.**  Without going into the law, there's an explosive bomb?

8  **A.**  Yes, there is an explosive bomb.

9  **Q.**  How does that work?

10  **A.**  An explosive bomb would have some kind of explosive

11 payload in it, that when initiated would explode and either

12 use the shock wave from that explosion or may have

13 fragmentation in addition to that.

14  **Q.**  You just described an incendiary bomb?

15  **A.**  Right.

16  **Q.**  How does that work?

17  **A.**  The incendiary bomb, as opposed to explosives, has some

18 kind of incendiary material in it. That incendiary material

19 is ignited and spreads onto the target and catches the target

20 on fire.

21  **Q.**  Does the military use any types of incendiary bombs?

22  **A.**  It does.

23  **Q.**  Could you describe what those are?

24  **A.**  Well, probably one of the most common ones we have at this

25 point is the Mark 77 incendiary bomb. It's kind of

generically known as the napalm bomb.  It's a large airdrop
munition.  It's actually a thin aluminum-cased bomb that is
filled up by the air crews, filled up with a liquid fuel,
kerosene, with a thickener in it.  There is some igniters,
pyrotechnic-type igniters, and that's dropped from the
aircraft; and when it hits the ground, it just bursts open,
kind of similar to a big aluminum water balloon.  These
igniters ignite the mixture of the air, the air out in the
atmosphere and the fuel, and that burns and of course the
action of it hitting the target spreads it out over the
target.

**Q.**  One of the things that some people have heard about is a
Molotov cocktail.  Are you familiar with that?

**A.**  Sure.  Molotov cocktails are, of course, both military
weapons and, of course, have been improvised weapons and are
commonly used.  We deal with them and respond to them
routinely here in the Northwest.  They were used -- where they
get the name "Molotov" is really by the use of the Finnish
Army against Russian tanks in World War II.

They are simply some type of bottle, normally a breakable
bottle, with a wick, a burning wick, or it could also be maybe
two dissimilar type of chemicals that create a hypergolic
reaction.  In other words, when the two chemicals touch, they
burst into flames.  And then some type of burning fuel, so
that's once again thrown against a target, it breaks, and the

1  fuel spread outs and the burning wick ignites it, or the

2  chemical reaction ignites the fuel.

3  **Q.** With regard to the napalm and the Molotov cocktail that

4  you just described -- withdrawn, Your Honor.

5      If you could take a look at Exhibit 382-N, as in

6  "Nancy" --

7  **A.** Okay.

8  **Q.** -- which I think is outside there.  It might be in the

9  box.

10 **A.** Do you have the other exhibit number?

11 **Q.** It would be ATF Exhibit No. 23.

12 **A.** It's right here.

13 **Q.** Let's clear off your desk.  Mr. Phillips, do you recognize

14 that?

15 **A.** I do.

16 **Q.** What is it?

17 **A.** This is another time and power unit, a lid with a road

18 flare and initiated system.

19 **Q.** Was this also part of the evidence that you analyzed from

20 Jefferson Poplar that Cheryl Glenn and eventually Brad Cooper

21 sent to you?

22 **A.** Yes.

23 **Q.** Without going through everything else, do you recognize

24 some things that are relevant?  Can you just briefly explain

25 to the jury what you see?

1  **A.** It's really all the same type of componentry as described.

2  We have the digital timer. We have the silicone controlled

3  rectifier, which is our solid state switch. A 9-volt battery

4  and 9-volt battery connectors. We have the road flare, the

5  books of matches and the model rocket motor igniters that

6  would have been attached to the timing unit.

7  **Q.** Exhibit 382-K, please. That's already been admitted.

8        THE CLERK: Mr. Bartlett, I don't have it.

9  BY MR. BARTLETT:

10  **Q.** Do you recognize it? It's a little hard to see because of

11  the white box lid. Do you recognize that?

12  **A.** Yes.

13  **Q.** Is that one of the photos that you looked at in addition

14  to analyzing this?

15  **A.** Yes.

16  **Q.** Did you also look at the photos that had the buckets

17  underneath this device?

18  **A.** Yes.

19  **Q.** When you put all these items together and Mr. Cooper's

20  analysis, the photos you received, the reports, did you come

21  to a conclusion as to what this device was?

22  **A.** I concluded that it was an incendiary bomb and a

23  destructive device.

24        MR. FOX: I would object again, Your Honor.

25        THE COURT: It is noted. The answer will stand. It

1  is noted.

2  BY MR. BARTLETT:

3  **Q.**  Finally, could you look at device No. 3, which I believe

4  is also down there, Exhibit 382-T as in "Tom."

5      Did you also analyze that?

6  **A.**  I did.

7  **Q.**  Briefly, is it similar to the other devices you described?

8  **A.**  It is similar to the other devices, yes.

9  **Q.**  Any differences?

10  **A.**  No significant differences, other than colors and types of

11  tubs that were used.

12  **Q.**  If you would bring up 382-S.

13      Did you have a chance to look at this and other

14  photographs when analyzing this?

15  **A.**  Yes.

16  **Q.**  Can you briefly describe what you are looking at?

17  **A.**  We have the digital timer, wiring, silicone controlled

18  rectifier -- digital timer, silicone controlled rectifier,

19  power source, 9-volt battery, books and matches, model rocket,

20  motor igniters and our road flare.

21  **Q.**  What was your conclusion?

22          MR. FOX:  I object.  This is for the jury to decide.

23          THE COURT:  It is noted.  You may answer.

24  **A.**  I concluded this also was an incendiary bomb and,

25  therefore, a destructive device.

BY MR. BARTLETT:

**Q.** I will give you a minute to put that stuff back. When you get through, if you could put that down and pick up Exhibit 382-Y.

Mr. Phillips, do you recognize that?

**A.** Yes.

**Q.** What is it?

**A.** This is one of the exhibits that was sent for me to examine.

**Q.** What did you do when you got it?

**A.** Once again, I reviewed all the paperwork and photos and opened it up and laid it out.

**Q.** What, if anything, of relevance did you find within that?

**A.** In this particular device -- of course, this one actually functioned, and so these are the remains after the fire. We found wires, connectors, which are similar to the unburned devices, the bullet style connectors.

**Q.** You call it a bullet style connector. What else might you see?

**A.** As far as another name for the connectors?

**Q.** Or just different types of connectors.

**A.** In the vernacular, sometimes they are called bullet-type connectors or quick snap type connectors. Basically, they have kind of a bulbous end and then a hollow end or a female end, and you just place the two together. It makes it easier

1  to quickly connect things.

2  **Q.**  Thank you.  What else did you find?

3  **A.**  We found the remains of silicone controlled rectifiers,

4  two of them.

5  **Q.**  Once again, what's an SCR?

6  **A.**  Silicone controlled rectifiers, a solid state switch,

7  which is used to switch power from your power source,

8  basically from the timer -- when the timer runs down and sends

9  that impulse actually from the speaker, the Piezoelectric

10  speaker that's contained within the timer -- which doesn't

11  have enough power into it.

12      There's not enough power coming off that speaker to

13  initiate the model rocket motor igniter which actually

14  requires a fair amount of power.  So instead, the switch is

15  used.  That takes the impulse from the speaker and then

16  allows -- closes the switch and allows power to flow from a

17  larger power source.  In this case, a 9-volt battery is what

18  we found.

19  **Q.**  You find the silicone switch.  What else did you find?

20  **A.**  I'll just review here.  We found some remains of timers.

21  These are kind of the boards or the remains of the fiberglass

22  from the boards of the timers.  The chemist in this case had

23  gone through these and separated them out.  There's the two

24  timing boards.

25  **Q.**  Anything else?

1    A.   Yes.   There's the actual rocket motor igniters, or

2    remnants of the model rocket motor igniters packaged here and

3    here.   Let's see if I can get these opened up without damaging

4    them.

5        What tends to happen in these fires --

6            MR. FOX:   I object, Your Honor, it's beyond the scope

7    of the question.

8            THE COURT:   Wait on the question.   I don't know what

9    he's going to say.   Question and answer.

10   BY MR. BARTLETT:

11   Q.   What were you going to explain about how fire can affect

12   this type of evidence and your handling of it?

13   A.   The reason we are able to capture -- the reason most of

14   this evidence was left residually is after the ignition, the

15   bucket tends to melt from the fire and tends to capture all

16   these components in the bottom of the bucket, and you get this

17   melted bucket bottom that tends to capture all these bits and

18   pieces.   These are kind of delicate here.   These are the

19   actual model rocket motor igniters, the remnants of them, the

20   bridge wires.

21   Q.   When you have that effect -- when you have a bucket that

22   actually melts down and collapses upon itself, how do you try

23   to figure out what's inside there?

24   A.   Right.   We would typically -- to a trained investigator,

25   when you see that melted bucket, we have a word for it.   We

call it "pancakes" because it kind of looks like a pancake.

When we see that, that's normally taken. Oftentimes, it's x-rayed -- and you can see a lot of this componentry in the x-ray -- and then we would go through and actually kind of break that apart to extract the pieces out of the pancake.

**Q.** In this instance, did you in fact do x-rays on this pancake?

**A.** I did not, but the lab did.

**Q.** Anything else?

**A.** Yeah. We have the two 9-volt batteries here. There's one 9-volt battery and a second one.

**Q.** Anything else?

**A.** The watch battery from one of the timers, and road flare remains.

**Q.** Anything else?

**A.** No.

**Q.** Based on your professional opinion, looking at all these components together and looking at the photographs, what did you determine?

MR. FOX: Again, this is a matter for the jury to decide. I would object to this testimony.

THE COURT: It is noted again. You may answer, Sir.

**A.** I determined that this was two additional incendiary bombs and, therefore, destructive devices.

BY MR. BARTLETT:

1  **Q.** Finally, if you could, I will give you a second to pack

2  that up.

3  **A.** Okay.

4  **Q.** Go ahead.  You can put that away.

5  If you could grab 382-EE before you return, that will be

6  helpful.

7  Do you recognize that, Mr. Phillips?

8  **A.** This is also one of the boxes that was sent to me, yes.

9  **Q.** Did you analyze it?

10  **A.** I did.

11  **Q.** Can you briefly go through what you found?

12  **A.** Okay.  The first item here was a number of wires and

13  similar type of connectors.  We had road flare remnants,

14  plastic debris, model rocket motor igniter.  This also has a

15  piece of wire with a connector that goes with it, which you

16  can see here.  These are the two model rocket motor igniters

17  still twisted together with their wire connector; 9-volt

18  battery with the 9-volt battery connector still on the 9-volt

19  battery.

20  We have the remains of a silicone controlled rectifier.

21  You can see the three legs here.  You can kind of see -- there

22  it is.

23  **Q.** In normal practice, would you find a silicone controlled

24  rectifier like that, or is it normally connected with

25  something else?

**A.** Silicone controlled rectifiers are normally connected through some other kind of electronic componentry. They are not normally off by themselves.

**Q.** Go ahead.

**A.** Wire. This is the fiberglass backing from a timer similar to the other two we just looked at. Then the rest of this is debris from the bucket and such.

**Q.** When you first examined these items, was there any odor that you could detect? Was there any odor that you could smell?

**A.** Strong, kind of gasoline odor.

**Q.** If you could pull up 382-DD.

In addition to examining these items, looking at Mr. Cooper's report, looking at the photos such as the one that's depicted in front of you, were you able to make a determination and reach an opinion as to what was in this exhibit, which is 382-EE?

MR. FOX: Again, Your Honor, I would object on the basis of improper conclusion testimony, that the jury should make this decision.

THE COURT: It is noted. You may answer.

**A.** I determined that it was an incendiary bomb as well and a destructive device.

BY MR. BARTLETT:

**Q.** You can go ahead and put that away.

1  **A.** Sure.

2  **Q.** Mr. Phillips, in addition to analyzing this evidence, have

3  you ever built any of these?

4  **A.** I have.

5  **Q.** Do they work?

6  **A.** They work quite well, yes.

7  **Q.** I want to shift gears and direct your attention to

8  December 7th of 2005.

9      Were you working for ATF then?

10 **A.** Yes.

11 **Q.** Where were you?

12 **A.** Prescott, Arizona on a search warrant.

13 **Q.** What location were you and other agents searching on

14 December 7, 2005?

15 **A.** We were searching kind of a business residence in

16 Prescott, Arizona that belonged to Bill Rodgers.

17 **Q.** Did you participate in that search?

18 **A.** I did.

19 **Q.** Did you recover a number of items?

20 **A.** I did.

21     MR. BARTLETT:  If the witness could be handed up

22 Exhibits 502, 504, 505 and 514.  I think they are over behind

23 you.

24     Your Honor, maybe we can take our afternoon break right

25 now, and I can get this organized over here.  In the long run,

1  it may save us time.

2        THE COURT:  Just as well.  Let's take the afternoon

3  recess.  Don't discuss the case.  Leave your books on the

4  chair and take your break, and I will have you back here

5  shortly.

6     (Jury not present.)

7        THE COURT:  All right.  You may be seated.  We will

8  be at recess.

9        MR. BARTLETT:  Thank you, Your Honor.

10        THE CLERK:  All rise.  Court is in recess.

11     (Afternoon recess.)

12        THE COURT:  You may be seated.

13     All right.  Ready to continue?

14        MR. BARTLETT:  Yes.

15        THE COURT:  All right.  Bring in the jury.

16     (Jury present.)

17        THE COURT:  All right.  You may be seated.

18        MR. BARTLETT:  May I continue, Your Honor?

19        THE COURT:  Yes.

20  BY MR. BARTLETT:

21  Q.  Mr. Phillips, just prior to the break, I had asked you

22  about where you were on December 7, 2005.

23     Do you recall that question?

24  A.  Yes.

25  Q.  Where were you?

1    **A.**  Prescott, Arizona.

2    **Q.**  What were you doing there?

3    **A.**  Conducting a search warrant at the residence of Bill

4    Rodgers.

5    **Q.**  There's a photo in front of you marked Exhibit 501.  Can

6    you take a look at that?

7    **A.**  Yes.

8    **Q.**  Does that depict the area that you searched on that day?

9    **A.**  It does.

10                 MR. BARTLETT:  Offer Exhibit 501.

11                 MR. FOX:  No objection.

12                 THE COURT:  Admitted.

13                      (Exhibit No. 501 admitted.)

14   BY MR. BARTLETT:

15   **Q.**  What is it?

16   **A.**  This is -- it was kind of a business and residence, the

17   Catalyst Info or book shop, and it was also the residence of

18   Mr. Rodgers.

19   **Q.**  What specifically did you do during the search?  Looking

20   at this photo, where did you go?

21   **A.**  Well, the reason I was there was kind of as the bomb

22   technician and device kind of expert, so I was there mainly,

23   one, for the safety of the team; two, to look for device type

24   of items, and then as a law enforcement officer to help with

25   the search.

1    I initially did a walk through of the residence and shop

2 to look for kind of safety type of stuff.  Once that was done

3 and it was clear, then I started searching.

4 **Q.**  Could you take a look at the exhibits in front of you,

5 Exhibits 502, 504, 505 and 514-B?

6 **A.**  Yes.

7 **Q.**  Do you recognize all of those items?

8 **A.**  505, 514-B, 504 and 502, yes.

9 **Q.**  Are these all items that you recovered from Mr. Rodgers'

10 residence on December 7th?

11 **A.**  They are, yes.

12 **Q.**  Let's take them one at a time.  First of all, looking at

13 Exhibit 502, what is that?

14 **A.**  It's a reel of wire.  There's some gloves in here, kind of

15 knit gloves, and then also some surgical-type gloves or

16 plastic gloves in a sealed container.

17 **Q.**  Where did you find those?

18 **A.**  These were found up in kind of the attic area of the

19 house.  It was kind of being used as living quarters and a

20 storage area as well.

21        MR. BARTLETT:  Offer Exhibit 502.

22        MR. FOX:  No objection.

23        THE COURT:  Admitted.

24           (Exhibit No. 502 admitted.)

25 BY MR. BARTLETT:

1  **Q.** Why did you grab those?

2  **A.** Mainly because the wire could have been, you know, similar

3  to the wires found in devices, and then the gloves might have

4  been used to -- at scenes for planting devices to prevent

5  fingerprints from being left.

6  **Q.** Exhibit 504?

7  **A.** Uh-huh.  504 is a flashlight, kind of the standard -- kind

8  of the older-style camping flashlight that you might use for

9  backpacking and camping, that sort thing.  It had some red

10  sort of film taped onto the end of it to kind of make it into

11  a red light flashlight.

12  **Q.** Where did you find it?

13  **A.** I found it up in kind of the same general area upstairs as

14  this.

15        MR. BARTLETT:  Offer Exhibit 504.

16        MR. FOX:  No objection.

17        THE COURT:  Admitted.

18             (Exhibit No. 504 admitted.)

19  BY MR. BARTLETT:

20  **Q.** Why would you have a red-type filter item on the top of

21  the flashlight?  What does that do?

22  **A.** It would cut down on the amount of light emitted, so at

23  night if you don't want to be seen but need a little bit of

24  light to do something, you might use a red flashlight or

25  filtered flashlight.  Certainly in the military we do that so

the enemy can't see us, that sort of thing.

**Q.** Exhibit 505?

**A.** Yes.

**Q.** What's that, and where did you find it?

**A.** These are pamphlets or different types of literature, and I found this in Room F on the west side, which was kind of one of the main sort of rooms, living sort of area within the house.

     MR. BARTLETT: Offer Exhibit 505.

     MR. FOX: Your Honor, I wonder if we could deal with this outside the presence of the jury later on, not right now.

     THE COURT: Do you need that now?

     MR. BARTLETT: We can offer it and --

     THE COURT: I will reserve until the end of the day.

BY MR. BARTLETT:

**Q.** Looking at -- what is it in general do we have there?

**A.** In 505? These are literatures or publications which talk about building and using devices, incendiary devices.

**Q.** Is the top one a pink document?

**A.** It is.

**Q.** What does it say?

**A.** "Factories don't burn themselves down. They need help from you" is the title. "Learn to Burn."

**Q.** Thank you. Finally, if we could look at Exhibit 514-B, as in "boy."

**A.** Yes. 514-B is some -- a floppy disk and two zip disks.

MR. BARTLETT: Offer 514-B.

MR. FOX: I would make the same objection, if we could take it up briefly outside the jury.

THE COURT: All right.

BY MR. BARTLETT:

**Q.** Nothing further related to the search. Going over my notes during the break, though, I think I failed to ask you a question I want to go back to.

During direct examination, we were talking about the military's use of a napalm bomb. I can't remember the title of it.

**A.** Mark 77 was an example I gave. There is others.

**Q.** The Mark 77. How does the Mark 77 cause destruction?

**A.** Well, the destructive elements fire --

MR. FOX: Objection, relevancy. We are not dealing with napalm bombs in this case.

THE COURT: Why is that necessary in this?

MR. BARTLETT: Your Honor, I think it is necessary for the jury to kind of have a grasp. There are different kinds of bombs --

THE COURT: I understand that, and we could go into a whole bunch of them, if that's the case.

MR. BARTLETT: Nothing further, Your Honor.

THE COURT: Okay. Cross-exam?

CROSS-EXAMINATION

BY MR. FOX:

Q. Good afternoon, Mr. Cooper. I am sorry, Cooper was the last witness. Mr. Phillips.

A. Yes.

Q. So when you searched Mr. Rodgers' home, this was on December 7, 2005?

A. Yes.

Q. I am referring you to what's been admitted into evidence as Exhibit 501. Can you pull that out, please?

A. Yes.

Q. This was -- it said the Catalyst Infoshop on the exterior?

A. Yes.

Q. Basically, this was a book store, right?

A. Yes.

Q. When you went through the book store, there were lots of books there?

A. There were.

Q. All sorts of books, right? Is that correct?

A. Yes.

Q. And then Mr. Rodgers also lived in the residence as well?

A. Yes.

Q. Thank you.

Looking at your background, Officer Phillips, you testified that you have a bachelor's degree in geography?

1   **A.**   That's correct.

2   **Q.**   Then you were in the military for how many years?

3   **A.**   Ten years on active duty and then another seven years in

4   the reserve status.

5   **Q.**   You have a lot of experience in the military with bombs;

6   is that correct?

7   **A.**   Yes.

8   **Q.**   In fact, that's the primary focus of your activity is

9   bombs?

10   **A.**   It is.

11   **Q.**   You don't have a chemistry background; is that right?

12   **A.**   I do not.

13   **Q.**   You don't have an academic training in science?

14   **A.**   That's correct.

15   **Q.**   You are not a lab guy?

16   **A.**   I am not a lab person.  I am much more of a field person.

17   **Q.**   You are the bomb guy?

18   **A.**   I am the bomb guy.

19   **Q.**   Don't you think, Agent Phillips, that you have an

20   institutional bias to finding bombs where there weren't any?

21   **A.**   No.

22   **Q.**   Not at all?

23   **A.**   Not at all.

24   **Q.**   Just because your whole life is in the field of bombs, you

25   don't think that that kind of narrows your focus to look at

1  something?

2  **A.**  We are presented with stuff all the time on a routine

3  basis, and we simply inform them that those are not bombs.  I

4  get phone calls on a daily basis asking is this a bomb or is

5  this not a bomb, from federal agents, local law enforcement

6  officers.  And a good portion of them, we tell them those

7  aren't bombs, according to the law, and send them on their

8  way.

9  **Q.**  You don't think at all that your judgment is in any way

10 filtered by your institutional experience?

11 **A.**  No.

12 **Q.**  So in terms of this particular case, the Jefferson Poplar

13 Farm case that you worked on --

14 **A.**  Yes.

15 **Q.**  -- you reviewed other people's reports; is that correct?

16 **A.**  That's correct.

17 **Q.**  You reviewed the reports of Agent Glenn dated June 19,

18 2001?

19 **A.**  I did.

20 **Q.**  She actually did the on-scene fire investigation, right?

21 **A.**  She was part of that team that did it, yes.

22 **Q.**  You are not a fire investigator, are you?

23 **A.**  I am not a fire investigator.

24 **Q.**  You reviewed Bradley Cooper's record.  I am sorry, I

25 called you Mr. Cooper.

1   **A.**   Yes.   I did review the forensic science report prepared by

2   Mr. Cooper.

3   **Q.**   And he's a chemist?

4   **A.**   He is.

5   **Q.**   Now, the Jefferson Poplar arson is not the same arson as

6   the Center for Urban Horticulture at the University of

7   Washington; is that correct?

8   **A.**   That's correct.

9   **Q.**   So in terms of your opinions, they only deal with the case

10  that you were working on, is that correct, the Jefferson

11  Poplar Farm?

12  **A.**   The opinion on the stuff that we looked at here pertains

13  to that, yes.

14  **Q.**   Now, when you reviewed Agent Glenn's report, it's correct,

15  is it not, that she made no reference to incendiary bombs?

16  **A.**   That's correct.

17  **Q.**   When you reviewed Bradley Cooper's, the chemist's report,

18  he made no reference to incendiary bombs?

19  **A.**   That's correct because they reserve that for me to make --

20  **Q.**   Well --

21          MR. BARTLETT:   Objection, Your Honor, let him answer

22  the question.

23          THE COURT:   You will get a chance to follow up on

24  this.

25  BY MR. FOX:

1  **Q.** They referred to incendiary devices; isn't that true?

2  **A.** That's true.

3  **Q.** Now, let's talk about these devices. There's a time delay

4  sequence in them, right?

5  **A.** Yes.

6  **Q.** In this case, this was the Jefferson Poplar Farm, it was a

7  digital alarm clock; is that right?

8  **A.** Yes.

9  **Q.** Then there is some batteries and wires, and that connected

10  ultimately to the ignition device, right?

11  **A.** Yes.

12  **Q.** That was the model rocket igniters placed between two

13  books of paper matches that were taped to a road flare?

14  **A.** Yes.

15  **Q.** That was designed to light the gasoline and the tubs on

16  fire?

17  **A.** Yes.

18  **Q.** Then there was the accelerant?

19  **A.** The accelerant.

20  **Q.** Inside the tubs?

21  **A.** Yes, the liquid fuel.

22  **Q.** Yes, the liquid fuel.

23  **A.** Yes.

24  **Q.** Now, the ultimate goal of this sequence was to light the

25  buckets of fuel on fire, correct?

1   **A.**   Correct.

2   **Q.**   When the buckets of fuel were lit on fire, they combusted,

3   right?

4   **A.**   Yes.

5   **Q.**   They burned down the gasoline in the container?

6   **A.**   They burned the gasoline in the container.   The plastic

7   melts and then the gasoline spills out.

8   **Q.**   Okay.   It takes some time, does it not, for the gasoline

9   to spill out?

10   **A.**   It does, yes.

11   **Q.**   It actually could take a couple minutes?

12   **A.**   It does, yes.

13   **Q.**   These devices were designed to burn for a sustained period

14   of time; isn't that true?

15   **A.**   That's true.

16   **Q.**   If you look at the manual "Setting Fires with Electrical

17   Timers," that's exactly what the point was, right?

18   **A.**   Yes.

19   **Q.**   To build up intense heat in the localized location, right?

20   **A.**   Yes.

21   **Q.**   In fact, the manual says the heat needs to be concentrated

22   in one place, right?

23   **A.**   Yes.

24   **Q.**   It's counter-productive to disperse the accelerant?

25   **A.**   Yes.

1    **Q.** The heat needs to be sustained over a period of time,

2    right?

3    **A.** Right.

4    **Q.** A momentary flash of intense heat like a ball of fire is

5    not likely to transfer sufficient heat to the object as would

6    a steady flame?

7    **A.** That's what it says in the manual.

8    **Q.** That's how these things work, right?

9    **A.** Yes.

10   **Q.** So the goal is not to spread the fuel out and ignite it

11   all at one time; isn't that true?

12   **A.** Yeah, the goal is to concentrate the heat in a vulnerable

13   part of the building to ignite the building.

14   **Q.** That's the ultimate goal, but in terms of how the device

15   works, it's not designed to ignite all of the gasoline in an

16   instant?

17   **A.** That's correct.

18   **Q.** Now, these devices, these incendiary devices are not

19   designed for explosions, are they?

20   **A.** The incendiary devices are --

21   **Q.** No, the ones that we were dealing with in court.

22   **A.** Yes.

23   **Q.** I am pointing to what used to be over --

24   **A.** I understand.

25   **Q.** So the idea of what was over there?

1  **A.**  Yes.

2  **Q.**  Those weren't designed to explode, were they?

3  **A.**  They are designed to catch a target on fire.

4  **Q.**  But an explosion is very different than a combustion fire,

5  right?

6  **A.**  Correct.

7  **Q.**  An explosion, you have a rapid expansion of gases, right,

8  resulting from a chemical or physical action that reduces a

9  pressure wave?

10  **A.**  To get into the kind of technical difference between where

11  you cross the line from combustion to explosion, but

12  combustion is normally thought to be a slower process than an

13  explosion, and then there are different types of explosions.

14  **Q.**  Sure.  But the explosion is a violent incident, right, a

15  shock wave?

16  **A.**  That's correct.

17  **Q.**  And that type of event would create a crater, possibly?

18  **A.**  Yes.

19  **Q.**  It could shatter glass?

20  **A.**  Uh-huh.

21  **Q.**  Knock out supports of walls?

22  **A.**  Yes.

23  **Q.**  But these devices used at the Jefferson Poplar Farm

24  weren't designed to do that, right?

25  **A.**  No, they were designed to catch the target on fire.

1  **Q.**  Now, you would concede, would you not, that if someone

2  hand-lit a bucket of gasoline on fire, that it would have the

3  same effect as this device, right?

4  **A.**  Right.

5  **Q.**  You don't need to have a timer or a time delay device to

6  set a fire to a bucket of gasoline, do you?

7  **A.**  You could light it using other methods, yeah.

8  **Q.**  You could do it while standing there; you don't need to

9  have a timer, right?

10  **A.**  Right.

11  **Q.**  You don't need to have a fancy ignition sequence either to

12  light the gasoline in a bucket on fire, do you?

13  **A.**  You could use other means to light it, like a hand

14  lighter.

15  **Q.**  You could use a match?

16  **A.**  Yes.

17  **Q.**  You could use a really long match, right, standing away

18  from the gasoline, right?

19      So in terms of your conclusion that this sequence of

20  things, the time delay, the ignition sequence and the

21  gasoline, that this is an incendiary bomb or a destructive

22  device, it really has nothing to do with the timer, right?

23  **A.**  The timer is an aspect of it because that makes it much

24  more like a military weapon, in the sense that a military

25  weapon or improvised weapon normally has some kind of system

1 to ignite it, be it a delay system, be it a burning delay
2 system.
3     That is oftentimes characteristic of a weapon.  In other
4 words, to simply douse something with gasoline and light it by
5 hand is one thing, but to build a device consisting of a
6 container, a destructive payload and some kind of fusing and
7 firing system, in this case the Cat's Cradle device, to
8 ignite, that makes it weapon-like or comparable to military
9 weapons or improvised weapons used in combat.  Like we talked
10 about with the napalm bomb or the Molotov cocktail, it may be
11 used in political dissident type of activity or criminal
12 activity.
13 **Q.** When we talk about military weapons, I guess what I am
14 having troubles with is, aren't you merging together the
15 different functions?
16     I mean, isn't the timing delay really irrelevant to the
17 ultimate effect of what this device has to do?
18 **A.** The process of lighting the building on fire?
19 **Q.** No.  Well, yeah, the ultimate result is to light the
20 building on fire.  The time delay is really -- the time delay
21 mechanism is really irrelevant.  You could do it while
22 standing there?
23 **A.** It's not irrelevant to my determination because lighting
24 it on fire by hand is one aspect, but by putting a delay
25 system in there, that makes it much more tactically

advantageous, much more like a military weapon system.

In other words, a common aspect of a bomb being incendiary or explosive is that I can place it and then I can retreat to safety so that when it goes off, I am not there, present. I can't be -- it's much harder to associate myself with the device, and I am not there to be injured by the explosion or fire that ensues.

**Q.** Sure, but you are aware of the Vail fire, right?

**A.** I am.

**Q.** That caused, what, $15 million worth of damage?

**A.** Yeah.

**Q.** Destroyed the ski resort?

**A.** Yes.

**Q.** You are aware, aren't you, that there was no time delay system for that fire?

**A.** I didn't review the evidence from that fire, but I believe that's true.

**Q.** So really -- let's flip around the other way.

Let's say that you have this fancy time delay sequence with the ignition and road fuse or something like that, and you have a cup of gasoline, okay, just a cup of gasoline. Would you call that a destructive device?

**A.** Okay. If I have a cup --

**Q.** You have the same digital timer and the same 9-volt battery and the same fuse, the road flare, but instead of

1  having three to four gallons of gasoline, you have a cup of
2  gasoline.
3  **A.**  The volume of the destructive element or, in this case --
4  the flammable liquid really doesn't matter or doesn't bear --
5  depending on the circumstances, there are certainly things
6  that we've ruled to be destructive devices that are very
7  small.
8  **Q.**  But let's say you had that situation.  You had a timer and
9  you had a road flare and you had a thimble of gasoline, would
10 you classify that as a destructive device?
11 **A.**  Possibly, depending on the circumstances.  If that's
12 capable of lighting a target on fire, absolutely.
13 **Q.**  Would you categorize it as an incendiary bomb?
14 **A.**  Yes.
15 **Q.**  A thimble of gasoline would be an incendiary bomb?
16 **A.**  Well, if I have a small amount of gasoline and this road
17 flare, I can certainly light a target on fire and it would be
18 an incendiary bomb.
19 **Q.**  But, of course, you could light a target on fire with just
20 a bucket of gasoline?
21 **A.**  That's true, and I can kind of help you with this.  We
22 investigate fires all the time as a team.  We have a team of
23 fire investigators, agents, myself.  We investigate these
24 fires.  Some aren't -- they can be incendiary fires and some
25 are hand-lit with a match and there's no destructive device

1 involved.

2     Some have a destructive device involved where there's an

3 actual built device that normally would constitute some kind

4 of destructive element, maybe gasoline in a bucket or gasoline

5 in a small container with some kind of initiation system

6 attached.

7 **Q.** So is it the initiation system that makes it an incendiary

8 bomb?

9 **A.** It's the combination of all those parts together that make

10 it a weapon and, therefore, an incendiary bomb and destructive

11 device.

12 **Q.** How about -- how much energy is in, what, two or three

13 gallons of gasoline?

14 **A.** We would have to ask the chemist that. That's not my area

15 of expertise.

16 **Q.** Do you think the amount of energy is similar in two or

17 three gallons of gasoline as what's in a sofa?

18 **A.** A sofa?

19 **Q.** Yes.

20 **A.** It could be. I mean, sofas could have a lot of

21 combustible material in them.

22 **Q.** So let's say someone lit a sofa on fire with a match --

23 **A.** Right --

24 **Q.** -- do you think that would have the same potential for

25 damaging a building as gasoline?

1  **A.** It could, but it wouldn't be a destructive device.

2  **Q.** It's not a destructive device, even though it could

3  destroy -- set the whole room on fire within minutes, right?

4  I mean, there are people that die because they smoke in bed,

5  right?

6  **A.** Certainly fires are very dangerous and very destructive.

7  My role in this is to identify devices or destructive devices.

8  Fires are hand-lit all the time, and we don't rule that

9  there's a destructive device involved.  The destructive device

10  is the combination of an initiation system, be that delay,

11  command.  There's all different types of initiation systems

12  that function.  They could be boobie traps, whatever that

13  mechanism is for igniting it.

14  **Q.** How about a match, an ordinary match?

15      MR. BARTLETT:  Objection, Your Honor.  I think we

16  have had the match question three or four times.  Asked and

17  answered.

18      THE COURT:  I understand.  But at some point, you are

19  going to have to get an answer you will accept.

20      MR. FOX:  I guess that's the job of a lawyer.

21      THE COURT:  Well, don't keep asking the same thing

22  over and over if you are going to get the same answer.

23      MR. FOX:  I will ask it one more time, Your Honor.

24  BY MR. FOX:

25  **Q.** Could a match be the type of ignition device that makes

1  something an incendiary bomb?

2  **A.** It could, and it was in this case. The matches were

3  actually a part of the incendiary bomb in this particular

4  case.

5  **Q.** One match. Five gallons or four gallons of gasoline,

6  hand-held; would you classify that as an incendiary bomb?

7  **A.** It depends upon the circumstances, and I can give you

8  examples.

9  **Q.** How about if you spread the gasoline around on the floor

10  and light it on fire?

11  **A.** If I took gasoline and doused it and then lit it by hand

12  with a match, I would say that that is not a destructive

13  device.

14  **Q.** Even though the destructive effect could be the same?

15  **A.** Yes.

16  **Q.** So when you make your conclusions, it's true that you

17  have -- you make your conclusions without regard to any

18  scientific literature; isn't that true?

19  **A.** We make our determinations based on our training,

20  experience and technical background.

21  **Q.** But I asked you -- the question I asked you is, do you

22  reference any scientific literature when you make your

23  conclusion?

24  **A.** Depending on, I guess, what you would classify as

25  scientific literature. We would certainly reference those

1  technical sort of manuals and those technical documents about

2  similar types of incendiary devices or similar types of

3  weapons.

4      In this particular case, I went and looked at the

5  background of Molotov cocktails.  I looked at the example of

6  the Mark 77 air-dropped incendiary bomb and consulted those

7  types of manuals in making my comparison to determine if this

8  was a weapon or not a weapon.

9  **Q.**  Well, we are not talking about weapons.  We are talking

10 about destructive devices and incendiary bombs, but --

11 **A.**  Which are weapons.

12 **Q.**  But if you are talking about Molotov cocktails, you have a

13 container; isn't that correct?

14 **A.**  Yes.

15 **Q.**  It can be thrown, right?

16 **A.**  Typically the Molotov would be thrown.

17 **Q.**  And the MK 77 is dropped from a plane; isn't that correct?

18 **A.**  Yes.

19 **Q.**  So there's some motion, right?

20 **A.**  (Indicating affirmatively.)

21 **Q.**  Is that correct?  And it hits the target?

22 **A.**  Right.

23 **Q.**  And then instantaneously, the shell of the casing breaks

24 and the gasoline or the fuel or the napalm is set on fire

25 instantly, right?

1  **A.** Yes.

2  **Q.** That's different than the devices that were at the

3  Jefferson Poplar Farm; isn't that true?

4  **A.** They are quite similar in function and form.

5  **Q.** Well, the devices of the Jefferson Poplar Farm do not --

6  the containers do not break instantly and the fire doesn't

7  combust all at once, right?

8  **A.** We have a container that can be transported to a target,

9  that can be ignited through a delay ignition system and then

10  releases its destructive payload, the liquid fuel against the

11  target. That liquid fuel is designed -- actually, the manual

12  talks about mixing it so you get a more sustained fire, so the

13  concentration of heat to light that started out -- which is

14  very similar to a Molotov cocktail; you want to have that --

15  you throw the Molotov cocktail at your target, oftentimes at

16  buildings -- I investigate these all the time -- and yes, you

17  get this kind of breaking and the burning and that all happens

18  relatively fast. But you still -- what does the damage is the

19  sustained burning against the target and then ignites the

20  larger building or vehicle.

21  **Q.** What happens with the Molotov cocktail is that it's a

22  glass container, correct?

23  **A.** Right.

24  **Q.** The glass breaks instantly, as soon as it hits the target,

25  right?

**A.** Not necessarily, but sometimes it does. I mean, that's kind of the idea. Oftentimes, the gas just pours out depending on what type of bottle you used and how well you threw it. It still has the same effect, and we still classify it the same.

Basically, you are delivering that fuel to the target making it stick to the target. Getting it in proximity to the target, you get the sustained flame and the sustained flame then lights the target on fire.

**Q.** Well, the gasoline in the Molotov cocktail spreads out, right, and the surface burn rate is much higher than with these devices, because it burns all at once, right?

**A.** I mean, actually, it's a smaller concentration than the devices in question, which tend to spill out and you get a fairly large amount of gasoline, a big pool of it, if you will, which is normally concentrated in an area, and there's a lot of advice in the manuals as to how to place those in the corners.

**Q.** But it takes a number of minutes for that to happen?

**A.** For the gasoline to spill out --

**Q.** Yes.

**A.** -- it takes a little bit of time for the container to melt and then the gasoline pours out.

**Q.** Right. So it could take a couple minutes, right? Yes or no?

**A.** Yeah. It could take -- I have burned a number of them.
It usually takes something like 30 seconds for the gasoline to
spill out.

**Q.** You've burned -- you've done experiments with --

**A.** In training, yeah, we've certainly built those and
functioned them.

**Q.** It's different than instantaneously spreading it out,
right, with a Molotov cocktail?

**A.** The time that it takes to get the gasoline on the target
is slightly longer, and in this type of device and the Cat's
Cradle device and the Jefferson Poplar device that we are
talking about, as opposed to a Molotov cocktail when it's
thrown against a target.

**Q.** So there is a difference. I will move on.

Ultimately, your conclusion is just your opinion, right?

**A.** It is my opinion based on my expertise and background and
technical training and experience.

**Q.** But you have no scientific evidence to support your
conclusion that these devices are incendiary bombs; isn't that
true? You've only compared it to Molotov cocktails and Mark
77s, right?

**A.** I mean, the process that we use is a scientific process.
We examine the device. We basically make it a hypothesis:
How is this going to function? I think it is going to
function this way, and then we test that, whether that's doing

a full blown rebuild or penciling it out on paper or comparing

it to other similar devices.

So the process that we use is a scientific process. That

process is then peer-reviewed and supervisor-reviewed in

accordance with the same type of protocols that all

laboratories use.

So to say what we are doing is not scientific, I think is

a mischaracterization.

Q. You are not a lab guy; you are a bomb guy?

A. I am not a lab guy; I am a technical expert, a bomb

technician.

MR. FOX: Thank you very much.

THE COURT: Any questions?

MR. BARTLETT: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. BARTLETT:

Q. At the beginning of his cross-examination, Mr. Fox was

asking you about when you did the search on December 7th of

2005 at Mr. Rodgers' book store and living location, there was

a lot of books down below, correct?

A. Yes.

Q. With regard to the items that we introduced, though, the

exhibits that were in the packet, the various pamphlets and

things like that, where did you recover those?

A. Those were in the living quarters portion. I don't recall

1    that we searched any of the book store portion.

2          MR. FOX:  I am sorry, your answer?

3    **A.**  We found those items he was talking about in the living

4    quarters.  I was not involved in any of the search, and I

5    don't think we searched the book store portion of the

6    business.

7    **Q.**  Just one other issue.  At some point there was a

8    discussion during the cross-examination from Mr. Fox about --

9    asking you about Cheryl Glenn's report and Brad Cooper's

10   report, and there was no reference in there to an incendiary

11   bomb.

12         Can you explain -- they talked about incendiary devices.

13   Can you explain how ATF works?

14   **A.**  Well, ATF, and the system that -- we used to be part of

15   the Treasury, so it used to be the Secretary of the

16   Treasury -- now the Adjunct General gives the responsibility

17   to determine what's a destructive device and what is not a

18   destructive device to the explosive enforcement officers.

19         So the other agents and lab people will call it an

20   incendiary device which is not a term that's found in the law,

21   and they reserve that determination for the explosives

22   enforcement officer since that's our responsibility to make

23   that determination.

24         MR. BARTLETT:  No further questions.

25                    RECROSS-EXAMINATION

BY MR. FOX:

**Q.** Agent Phillips, the scientists call it "incendiary devices" and you call it an "incendiary bomb"; is that correct?

**A.** Because of the protocol that -- that ATF has determined that is our job, the explosive enforcement officers, to make that call.

In other words, we just don't randomly go around calling things weapons. We let the technologist, myself, make that determination.

**Q.** I understand that, but the scientists don't see it that way. They call it something --

**A.** I think you are misunderstanding. By protocol, they are not allowed to make that call. That's my job. It's not that they don't see it that way. The protocol says that they are not to make that determination.

I mean, we certainly speak about it, but in their written formal reports, they are going to reserve the responsibility of making the determination -- incendiary bomb, explosive bomb, poison gas bomb -- that is reserved for my office to make that call.

**Q.** Thank you.

THE COURT: All right. This witness can be excused?

MR. FOX: One final question.

BY MR. FOX:

1    **Q.** Will you agree that it's not up to the ATF to determine

2    the application of the law to the facts of a particular case?

3    **A.** I am sorry?

4    **Q.** It's not up to the ATF --

5            MR. BARTLETT:  Objection, Your Honor, that's

6    argumentative.

7            THE COURT:  It is.  The Court will instruct the jury

8    on the law.

9            MR. FOX:  Thank you.  I have no further questions,

10   Your Honor.

11           THE COURT:  He can be excused?

12           MR. BARTLETT:  Yes, Your Honor.

13           THE COURT:  You are excused.

14      Next witness.

15           MR. FRIEDMAN:  Government calls Ron Trezise.

16           THE COURT:  Come forward, sir, and raise your right

17   hand.

18            RON TREZISE, called as a witness, duly sworn.

19                      DIRECT EXAMINATION

20   BY MR. FRIEDMAN:

21   **Q.** Good afternoon, Officer Trezise.

22   **A.** Good afternoon.

23   **Q.** Could you tell us your whole name and spell your last name

24   for the Court Reporter?

25   **A.** Ronald E. Trezise, T-R-E-Z-I-S-E.

1  **Q.** I apologize for mispronouncing that.

2  **A.** No problem.

3  **Q.** You are retired?

4  **A.** That's correct.

5  **Q.** When did you retire?

6  **A.** November of 2002.

7  **Q.** Before you retired, where did you work?

8  **A.** University of Washington Police Department.

9  **Q.** What did you do for the University of Washington Police

10 Department?

11 **A.** I was a patrol officer.

12 **Q.** That's the University of Washington in Seattle and other

13 branches?

14 **A.** That's correct.

15 **Q.** As a patrol officer, what was your job?

16 **A.** Basic police patrol duties, serving the community, law

17 enforcement and protection of life and property.

18 **Q.** What area did you patrol?

19 **A.** All the state-owned lands belonging to the University of

20 Washington in and around the Union Sector in Seattle.

21 **Q.** Essentially, the campus?

22 **A.** Correct.

23 **Q.** In May of 2001, do you recall what shift you were working?

24 **A.** I was working a graveyard shift that night.

25 **Q.** What does graveyard shift mean?  What hours was that?

1  A.  I believe at the time it was 10-hour shifts, so from 8:00

2  at night to about 6:00 in the morning.

3  Q.  You were in a patrol car?

4  A.  That's correct.

5  Q.  Did you have a partner with whom you were working?

6  A.  No, I was driving alone.

7  Q.  Were you responsible for patrolling the whole of the

8  campus?

9  A.  Basically, yes.

10  Q.  Were there other patrol officers on duty at the same time?

11  A.  Yes, there were.

12  Q.  Over the course of the evening, were you out on patrol the

13  whole evening?

14  A.  Yes, I was.

15  Q.  Let me ask you to take a look at Exhibit 302.  Do you have

16  a stack of three folders in front of you?  Can you tell me if

17  you recognize that?

18  A.  Yes.

19  Q.  What is it, in general terms?

20  A.  The east side of the University of Washington

21  incorporating some ball field areas, Husky Stadium, wildlife

22  areas and numerous buildings.

23  Q.  Getting even more general, it's a map of that area you

24  just described?

25  A.  Yes, it is.

1    MR. FRIEDMAN:   The Government offers Exhibit 302.

2  **A.**  I am on 302, yes.

3    MR. FRIEDMAN:   I am sorry, the Government offers

4  that.

5    MR. FOX:   No objection.

6    THE COURT:   Admitted.

7    (Exhibit No. 302 admitted.)

8  BY MR. FRIEDMAN:

9  **Q.**  Do you have a copy on your screen?

10  **A.**  I have a copy, and it's on the screen now, yes.

11  **Q.**  If you touch the screen, you may have a red arrow.  If

12  not, depress the bottom left corner and you will be able to

13  get a red dot.

14    Can you tell us, starting from the left-hand side, some of

15  this area -- some of the areas shown on the map is green and

16  some is gray.

17    What's the significance of what's green and what's gray?

18  **A.**  Well, the green areas are unincorporated and undeveloped

19  wetlands and also ball fields.  Then the dark colored areas

20  are various buildings, and the gray colored areas are,

21  majority speaking, parking lots.

22  **Q.**  But the light gray at the very top of the map?

23  **A.**  That would be off of the University of Washington campus

24  in the City of Seattle.

25  **Q.**  So the green background is all part of the University of

1 Washington campus?

2 **A.** That's correct.

3 **Q.** You said this is just the east side of the campus?

4 **A.** Correct.

5 **Q.** Starting on the left, there's an area with a lot of dark

6 gray or black rectangles. In general terms, what's that?

7 **A.** If I am referring to the right place, it's a large parking

8 lot.

9 **Q.** All the way on the left of the picture, why don't you --

10 **A.** Oh, okay, all the buildings?

11 **Q.** Yes.

12 **A.** That portion of the map is showing a lot of the major

13 buildings on the main part of campus.

14 **Q.** And then down kind of in the bottom center on the left --

15 feel free to use an arrow -- there's a big horseshoe-shaped

16 object?

17 **A.** That's Husky Stadium.

18 **Q.** Kind of moving up from there, what part of the campus is

19 that?

20 **A.** It's an intramural activities area, and there is ball

21 fields, play areas and major parking lots.

22 **Q.** Then there's a fairly large, wide open green area?

23 **A.** A lot of that area -- the upper portion of that is a golf

24 driving range area, and then south of that to the lake area is

25 considered to be a wildlife area, an undeveloped area, with

1 pathways.

2 **Q.** Are you familiar with the building, the Center for Urban

3 Horticulture?

4 **A.** Yes, sir.

5 **Q.** This map, to be clear -- can you see the date on this map

6 in the bottom right-hand corner?

7 **A.** Say the question again?

8 **Q.** Do you see the date on the bottom right-hand corner of

9 this map?

10 **A.** Yes.

11 **Q.** What date is it?

12 **A.** I am sorry, date?

13 **Q.** Right. Do you see a year on the map there?

14 **A.** Excuse me, 2001.

15 **Q.** Can you tell us where on this map the Center for Urban

16 Horticulture was in 2001?

17 **A.** In the top right-hand quadrant of the map.

18 **Q.** Do you want to put an arrow pointing towards it?

19     MR. BLOOM: Could we get that clarified?

20     MR. FRIEDMAN: And we are going to go to a blow-up in

21 a moment.

22 BY MR. FRIEDMAN:

23 **Q.** Would it be to the right of there?

24 **A.** I am sorry. I don't have cheaters on here. It would be

25 right here.

1  Q. The building that your last arrow showed?

2  A. My right arrow, I think.

3  Q. The right-most of those four arrows?

4  A. Yes.

5  Q. Why don't we make this a little easier.  Would you look at

6  a document marked as Exhibit 303 and tell us in general terms

7  what that is?

8  A. Now I can see it.

9  Q. Is it fair to say this is a blown-up close-up of that

10  portion of the map?

11  A. Yes.

12        MR. FRIEDMAN:  The Government offers Exhibit 303.

13        MR. BLOOM:  No objection.

14        THE COURT:  Admitted.

15              (Exhibit No. 303 admitted.)

16  BY MR. FRIEDMAN:

17  Q. If you press the very bottom left-hand corner, all the red

18  arrows that you've drawn before will disappear and you will

19  have a fresh start.  I am sorry, of the screen.  All the way

20  down, the very corner of the screen.  There you go.

21        So this is a blown-up portion of the section you were just

22  looking at.  Can you show us where on this map the Center for

23  Urban Horticulture is?

24  A. I have circled it.

25  Q. Let me ask you to look at one more diagram, Exhibit 305.

1    Do you recognize what that is?

2    **A.** It's not on my screen, but it's in the folder here, an

3    enlargement of the Center for Urban Horticulture.

4    **Q.** So even closer up of it, essentially?

5    **A.** Yes, sir.

6         MR. FRIEDMAN:  Government offers Exhibit 305.

7         MR. BLOOM:  No objection.

8         THE COURT:  Admitted.

9              (Exhibit No. 305 admitted.)

10   BY MR. FRIEDMAN:

11   **Q.** Can I ask you to erase the circle once again.

12        So looking at this, there's two blocks labeled Miller

13   Library and Merrill Hall.  What are those?

14   **A.** They are two different wings of a connected building.

15   **Q.** Together they are the Center for Urban Horticulture?

16   **A.** That's correct.

17   **Q.** And then there's something labeled McVay Courtyard?

18   **A.** Yes.

19   **Q.** What's that?

20   **A.** That is an inner courtyard area serving the surrounding

21   buildings and conference center and offices, et cetera.

22   **Q.** What's the thing labeled NHS Hall right above McVay

23   Courtyard?

24   **A.** Again, please.

25   **Q.** What is the block labeled NHS Hall, which is right above

1 McVay Courtyard?

2 **A.** That is a -- I believe, if I recall, it's a conference

3 meeting area and it has a kitchen facility in it as well as a

4 restaurant.

5 **Q.** Then looking at Miller Library, if you go right to the

6 left of that, there's an area with a whole bunch of vertical

7 lines parallel to each other.

8     What is that?

9 **A.** It is a parking lot.

10 **Q.** For the Center for Urban Horticulture?

11 **A.** That's correct.

12 **Q.** Do you recall the night that there was a fire at the

13 Center for Urban Horticulture?

14 **A.** Yes, I do.

15 **Q.** Were you on duty that night?

16 **A.** Yes, I was.

17 **Q.** You were patrolling the campus?

18 **A.** Yes.

19 **Q.** Did you patrol this area?

20 **A.** Yes, I did. I believe it was about 2:45 in the morning or

21 so. I entered off Northeast 41st Street and drove along the

22 frontage road of that complex area observing the location.

23 **Q.** Could I get you to draw a line indicating roughly where

24 you drove?

25 **A.** (Indicating.) And then I proceeded along the north end of

1   the buildings, through the frontage road and observing into

2   the parking lots at both ends of the complex.

3   **Q.** For what were you looking?

4   **A.** Just for any unusual activity or persons or anything that

5   would draw my attention to anything unusual.

6   **Q.** Were you in a marked University of Washington patrol car?

7   **A.** Yes.

8   **Q.** Did you see anything unusual?

9   **A.** No.  I observed no vehicles parked in the lots nor any

10  unusual activity or persons.

11  **Q.** What did you do after you finished driving through the

12  lot?

13  **A.** I just continued on a random patrol and exited that area

14  and headed down Montlake Boulevard, and thereafter was down in

15  the other area -- portion of the map.

16  **Q.** At some point, did you hear anything broadcast over the

17  radio?

18  **A.** Yes, sir.  It was dispatched about 3:15 in the morning, I

19  believe -- an automated fire alarm coming from Merrill Hall,

20  and I responded to that location from Husky Stadium.

21  **Q.** You were near Husky Stadium when you heard the broadcast?

22  **A.** Yes, sir.

23  **Q.** How long did it take you to get to Merrill Hall?

24  **A.** At 3:00, 3:15 in the morning, probably 40, 45 seconds.

25  **Q.** Were you the first police officer to get there?

1   **A.**  Yes, I was.

2   **Q.**  Can you show us -- can you erase the line you've done and

3   show us the direction from which you came and how you

4   approached it?

5   **A.**  Yes.  I entered the same area the way I indicated before.

6   I came up Northeast 41st Street, entered onto the frontage

7   road, and as soon as I entered, I did observe large billowing

8   smoke in the background.

9      I continued past the frontage road and parked to the right

10   of the complex and exited my vehicle towards where I could see

11   smoke and flames coming from --

12   **Q.**  What did you do once you got out of your car?

13   **A.**  I immediately responded to the back of the building where

14   I observed fire burning through both stories of the building

15   and into the roof line.  I immediately, at that time, advised

16   my dispatch to advise the fire department of those conditions

17   and also the fact that it was a two-story wood building.

18   **Q.**  You said you were south of the building, so below Merrill

19   Hall on this map?

20   **A.**  Correct.

21   **Q.**  What did you do after you called the fire into dispatch?

22   **A.**  After I updated that information, I proceeded up to the

23   right stairwell of Merrill Hall into the courtyard area.

24   **Q.**  Can you show us the right stairwell on this diagram?  You

25   went up into that courtyard?

1  **A.** Yes.

2  **Q.** Why did you do that?

3  **A.** That hour of the morning, it's not unusual for those

4  premises to be occupied by janitor staff or students or

5  faculty, so my immediate concern was for any life safety

6  issues or any persons in the area.

7  **Q.** Did you look around for people when you got into McVay

8  Courtyard?

9  **A.** Yes. I ran into the courtyard area and circled the

10  complete interior of that courtyard, and I did not find or

11  locate anyone.

12  **Q.** What did you do after you looked around the courtyard?

13  **A.** Thereafter, the fire department began arriving and I stood

14  by in that location, and I also had keys to the facility in

15  the event access was needed by the fire department for

16  anything.

17  **Q.** How long do you think it was from the time you called the

18  fire in and the fire department got there?

19  **A.** Well, it's speculation, but I do have knowledge that in

20  that area, their response time is normally around three

21  minutes from one of their stations, but I can't exactly say.

22  **Q.** Even if you can't be exact, is that about how long it

23  seemed to you that night?

24  **A.** I don't recall. I was just paying attention to my

25  environment and realizing they were arriving and heard sirens,

1   so I wasn't checking my watch at all.

2   **Q.** Were they arriving by the time you were coming back out of

3   McVay Courtyard?

4   **A.** Yes.

5   **Q.** Did you stay on the scene through the end of your shift?

6   **A.** Yes, I did.

7   **Q.** Thank you.

8          MR. FRIEDMAN:  I have no further questions.

9                    CROSS-EXAMINATION

10  BY MR. BLOOM:

11  **Q.** Good afternoon.

12  **A.** Good afternoon.

13  **Q.** I just have a couple questions for you.  The building, the

14  Center for Urban Horticulture, I think you said it was a wood

15  building?

16  **A.** That's correct.  I believe I have been in the building

17  numerous times.  I believe it was a wood structure with a

18  stucco type of finish in portions of it.

19  **Q.** You wouldn't describe it as a brick building, would you?

20  **A.** No.

21  **Q.** When you made your run, I think in your report you said

22  maybe about a half hour before the smoke and the alarm and

23  this event -- it was about when you made your run in the area

24  that you described; is that correct?

25  **A.** Yes, sir.

1 **Q.** You didn't see anything or hear anything unusual?

2 **A.** No, I did not.

3 **Q.** See a car?

4 **A.** None.

5 **Q.** Did you hear a car?  Did you hear a car have an accident

6 of any kind?

7 **A.** No.

8 **Q.** Did you hear any voices of people?

9 **A.** No.

10 **Q.** Did you have your car window open?

11 **A.** Yes, sir.

12 **Q.** Thanks.

13       MR. BLOOM:  I don't have any further questions.

14       THE COURT:  Anything else?

15       MR. FRIEDMAN:  No, Your Honor.  Thank you.

16       THE COURT:  This witness may be excused?

17       MR. BLOOM:  Yes.

18       THE COURT:  You are excused.

19       MR. BARTLETT:  At this time the United States calls

20 Dan Priest to the stand.

21       THE COURT:  Come forward and be sworn.

22       DAN PRIEST, called as a witness, duly sworn.

23       MR. BARTLETT:  May I inquire, Your Honor?

24       THE COURT:  Yes.

25               DIRECT EXAMINATION

BY MR. BARTLETT:

**Q.** Would you tell the members of the jury your first and last name, and spell your last name for the Court Reporter?

**A.** Dan Priest, P-R-I-E-S-T.

**Q.** Where do you work?

**A.** Seattle Fire Department, Engine 38.

**Q.** I am sorry, Seattle Fire Department?

**A.** Yes.

**Q.** How long have you worked there?

**A.** For 23 years.

**Q.** Can you kind of walk us through how you started and what your position is currently?

**A.** I started out as a firefighter in '84. Worked a year at 31s up at Northgate. Nine years at 25s on Capitol Hill.

**Q.** You are saying 31, 25s; what are we talking?

**A.** Station 31 up at Northgate. Station 25 on Capitol Hill. Then I was promoted to Lieutenant with about 10 years in at Station 38; been there ever since.

**Q.** Where is station 38?

**A.** It's Ravenna/Bryant neighborhood.

**Q.** I am assuming each fire station has kind of a geographical area that they are responsible for in general?

**A.** Correct.

**Q.** Station 38, what is your area?

**A.** It's east of the UW campus and south of 75th Street.

1  **Q.** As Lieutenant at station 38, what are your duties?

2  **A.** I supervise a crew of a driver and two firefighters that

3  are on the fire engine for a 24-hour shift.

4  **Q.** How is this station set up? I assume every station is a

5  little different, or at least most of them are?

6  **A.** Yes, station 38 is a single house. There's just one fire

7  engine in there with a crew of four, 24-hours a day.

8  **Q.** Do you work with the same crew all the time?

9  **A.** There's certain variables, but I have a permanent crew

10 assigned with me.

11 **Q.** What are your duties on a normal day run-through?

12 **A.** Inspections, exercising, drilling, station maintenance,

13 rig maintenance.

14 **Q.** You talk about inspections, what does that involve?

15 **A.** It's doing fire safety inspections on all the buildings in

16 our district.

17 **Q.** Is that something you personally do?

18 **A.** Yeah, as a crew we do it.

19 **Q.** Why?

20 **A.** To identify fire code violations and protect life safety.

21 **Q.** Can I direct your attention to May 21 of 2001. Were you

22 working that day?

23 **A.** If that was the date of the fire in question, I was.

24 **Q.** It is.

25 **A.** Yes.

1  **Q.**  What was your shift and what were your duties?

2  **A.**  It was a B shift, just a normal 24-hour shift of the

3  aforementioned duties.

4  **Q.**  When had you started?

5  **A.**  What had I started?

6  **Q.**  When you say 24-hour shift, does that mean you start at

7  5:00 at night to 5:00 in the morning?

8  **A.**  We start at 7:30 in the morning and finish at 7:30 the

9  next morning.

10  **Q.**  Did you receive a call that night about a fire?

11  **A.**  Yes.

12  **Q.**  When did that call come?

13  **A.**  I guess it was around 2:00 in the morning.

14  **Q.**  Do you have any document that you could look at to refresh

15  your recollection as to exact times?

16  **A.**  Not on me.

17  **Q.**  Do you have them outside?

18  **A.**  Probably.

19  **Q.**  Do you want to go out and take a look at them?

20  **A.**  Okay.

21          MR. BARTLETT:  I apologize, Your Honor.

22  BY MR. BARTLETT:

23  **Q.**  What is it that you went out and got?

24  **A.**  We were initially dispatched at 0322 a.m.

25  **Q.**  How do you know that?

1 **A.** Apparently from dispatch records.

2 **Q.** So 3:22 a.m. you get a call. How does that work?

3 **A.** We were dispatched on automatic fire alarm, engine 38 and

4 ladder 9; so two units responding to UW Horticulture.

5 **Q.** One at a time. You were dispatched on an automatic fire.

6 What does that mean?

7 **A.** That means the fire alarm system in that building had been

8 activated.

9 **Q.** And your group sent out?

10 **A.** Yes.

11 **Q.** Who else?

12 **A.** Engine 38 and ladder 9 from station 17.

13 **Q.** What's the difference between engine 38 and ladder 9?

14 **A.** Engine 38 is a fire pumper. We have water on board. We

15 can hook up hose to hydrants and pump water. Ladder 9 is

16 strictly a ladder truck. They deal with rescue and

17 ventilation.

18 **Q.** A call comes in, what do you do?

19 **A.** We put on our bunking gear, jump on the rig, and go to the

20 place.

21 **Q.** Do you know when you arrived, approximately?

22 **A.** 0327.

23 **Q.** What do you remember seeing as you came up to the scene?

24 **A.** As we approach the front of the building, you could see a

25 light in the sky behind the building. As we worked our way

around the building and got around the south side, there was a
fully involved room on the ground floor, about three rooms
going upstairs, and heavy involvement in the soffits and
attic.

**Q.** Were you familiar with this building?

**A.** Yes.

**Q.** Why?

**A.** I'd done a fire safety inspection on it probably the
previous year.

**Q.** What did you remember about the building?

**A.** I knew it was a lightweight construction, had lightweight
attic construction, had lightweight unprotected steel trusses
on the ground floor, daylight basement. It had laboratories
with a limited number of hazardous materials in them.

**Q.** What impact did your knowledge have in regard to how you
were going to fight this fire as you pull up to the scene?

**A.** Just do to the extent of the involvement and type of
construction, I knew we initially had to go with a defensive
attack.

**Q.** What does that mean? What's the differences between a
defensive attack and an offensive attack when you are fighting
a fire?

**A.** A defensive attack means it will take a large bore
appliance that can apply a lot of water and attack the fire
from outside to the inside, as opposed to an offense attack,

1 you'd take a smaller caliber hand line inside the building.

2 **Q.** Why did you do that in this case?

3 **A.** Because the only way to knock it down with an initial

4 1-and-3 crew was attack it from the outside, otherwise it

5 would have gotten going and probably the whole top floor.

6 **Q.** What did you do initially?

7 **A.** We laid an inch and a half, 2 1/2 reverse manifold, which

8 means a large caliber hand line and a small caliber hand line,

9 and the manifold laid on the scene there.  And then the fire

10 engine drove out to the nearest hydrant and hooked up so we

11 had a constant ongoing source of water.

12 **Q.** How big a line that you were providing there was actually

13 pouring onto the fire?

14 **A.** It was a 2 1/2 inch diameter hand line and an inch and

15 three-quarter diameter hand line.

16 **Q.** How long did it take to get that set up and get water on

17 the fire?

18 **A.** We got water on the fire real quick.  As soon as the bill

19 was hooked up to the hydrant, probably just a couple minutes,

20 and the 2 1/2 knocked it down pretty good.

21 **Q.** Put it out?

22 **A.** No.

23 **Q.** Did there come a time when you felt that based on your

24 training and experience additional fire trucks would be

25 necessary?

1   **A.**  Yes, as soon as I saw the fire, I called for a full
2   response.
3   **Q.**  You say before you even get your lines hooked up?
4   **A.**  Yes.
5   **Q.**  What did you call for?
6   **A.**  A full response, which on that fire is probably a total of
7   five engines and two trucks, a medic unit, aid car, another
8   couple chiefs, safety unit, air unit.
9   **Q.**  Is it fairly common for you to be involved in a fire of
10   this size?
11   **A.**  No. It was surprising to have that well involved a
12   building on that quick of an arrival time.
13   **Q.**  In addition to being surprised at how big the fire was,
14   just in terms of your response, how many times a year, for
15   example in 2001, were you required to call up that many trucks
16   and that many people to help you fight a fire?
17   **A.**  That may have been the only time that year. I couldn't
18   tell you for sure.
19   **Q.**  When you first get to the scene, what are your
20   responsibilities?
21   **A.**  I have to ascertain if there's people in the building.
22   Get as quick of an attack on the fire as possible, and make a
23   full radio report to dispatch about conditions and needed
24   resources.
25   **Q.**  Are you in charge when you first get there?

1  **A.**  Yes.

2  **Q.**  Does that change at some point?

3  **A.**  Yes.  As soon as the Battalion Chief -- usually the

4  Battalion Chief arrives, then they take over command.

5  **Q.**  As you are outside fighting this fire from the back side,

6  do you notice anything on the ground?

7  **A.**  Yeah, there was something kind of weird.  There was a

8  couple of plastic containers sitting over by some trees in the

9  backyard there.

10  **Q.**  You noticed this as you were fighting the fire?

11  **A.**  Yeah, when I was probably walking around looking at the

12  rest of the building, seeing what was involved and what was

13  not involved while my guys were flowing water.

14  **Q.**  We've already admitted a schematic of the Center for Urban

15  Horticulture, Exhibit 305.  Can you point to how you arrived

16  at the scene and eventually where your fire truck was set up?

17  **A.**  We came down here.  Looked at the front side, couldn't see

18  anything.  Drove around here, parked here.  We had to cut open

19  a chain hold and a gate open there.  Then I looked and saw the

20  fire, called for a full response.  Got the rig turned around

21  and dropped the manifold and laid a hose here.  So the hose

22  was going to here.  Then the fire engine hooked up to a

23  hydrant up here.

24  **Q.**  How long were you there?

25  **A.**  Till -- we got relieved in the morning, probably 7:30,

1 8:00.

2 **Q.** Working the whole time?

3 **A.** Yeah.

4 **Q.** How long did it take you to actually put out the fire?

5 **A.** Hm, a long time. We called for fire under control at

6 05:20; so that was about two hours.

7 **Q.** Could you take a look at Exhibit 312-B in a folder that's

8 in front of you. Does that photo depict how that scene looked

9 when you got there?

10 **A.** This is by the time the news got there, so this is

11 obviously later on. By this time it was involving quite a bit

12 of the attic. But that was the general scene yes.

13          MR. BARTLETT: Offer 312-B.

14          MR. BLOOM: No objection.

15          THE COURT: Admitted.

16                (Exhibit No. 312-B admitted.)

17 BY MR. BARTLETT:

18 **Q.** If you hit the lower left-hand part of your screen, 312-B.

19 First, do you recognize where your group was?

20 **A.** We are right around in here.

21 **Q.** When you first got there, was the roof engulfed like that,

22 or was the fire looking different?

23 **A.** The fire was lower down, the main body of the fire was on

24 the ground floor and the initial room. And there was two or

25 three rooms up here that were -- that the glass was broken and

1  it was going along the soffits along here.  There was a lot of

2  fire going into there and smoke was issuing from the attic

3  area.

4  **Q.**  If you can look at a photo 312-I.  Do you recognize that?

5  **A.**  Yes.

6       MR. BARTLETT:  Offer 312-I.

7  **A.**  Yes, I do.

8       MR. BLOOM:  No objection.

9       THE COURT:  Admitted.

10            (Exhibit No. 312-I admitted.)

11  BY MR. BARTLETT:

12  **Q.**  Looking at the screen -- maybe you can eliminate your red

13  spots there.

14     Do you recognize that?

15  **A.**  Yes, the east end of the main fire building.

16       MR. BLOOM:  I am sorry, can you say that again?

17  **A.**  That's the east end of the main fire building.

18       MR. BLOOM:  Thank you.

19  BY MR. BARTLETT:

20  **Q.**  Is that your fire truck?

21  **A.**  No.  Like I say, we laid out to a hydrant.  So this is

22  another fire engine that's pulled up in approximately the

23  location where we dropped our manifold.

24  **Q.**  As we look at this picture, and see two ladders and some

25  firefighters up on the roof, what are they doing?

1    **A.**   They are involved with ventilation and preventing

2    extension of the fire from the main fire building to this

3    adjoining building.

4    **Q.**   Were you able to successfully do that?

5    **A.**   We did, yes.

6    **Q.**   Could you look at the photograph that appears at 312-J?

7    Do you recognize that?

8    **A.**   Not in particular, but that looks like probably the

9    adjoining building.

10                MR. BARTLETT:   Offer 312-J.

11                MR. BLOOM:   No objection.

12                THE COURT:   Admitted.

13                     (Exhibit No. 312-J admitted.)

14   BY MR. BARTLETT:

15   **Q.**   You say not particular, you don't remember specifically

16   seeing this scene?

17   **A.**   No, it's some kind of close-up of that that I wouldn't

18   have been privy to.

19   **Q.**   Exhibit 312-K, do you recognize that?

20   **A.**   Yes.

21                MR. BARTLETT:   Offer 312-K.

22                MR. BLOOM:   No objection.

23                THE COURT:   Admitted.

24                     (Exhibit No. 312-K admitted.)

25   BY MR. BARTLETT:

1   **Q.**  Can you explain what we are looking at here?

2   **A.**  312-K?

3   **Q.**  Yes.

4   **A.**  It's the late stage of the fire, looks like it's coming

5   towards dawn.  Just a bunch of guys with hoses.  We are trying

6   to control the attic fire at this point and limit the

7   extension to the library.

8   **Q.**  Is this basically where your crew had been the whole

9   night?

10  **A.**  Roughly the same area, yeah.

11  **Q.**  Finally, 312-L.  Do you recognize that?

12  **A.**  Yes.

13          MR. BARTLETT:  Offer 312-L.

14          MR. BLOOM:  No objection.

15          THE COURT:  Admitted.

16              (Exhibit No. 312-L admitted.)

17  BY MR. BARTLETT:

18  **Q.**  What is it we are looking at?  Obviously, this is the next

19  morning?

20  **A.**  Yes, the aftermath of the fire.  You can see on the ground

21  floor, the point of origin.  Upstairs, the extension to the

22  upper rooms and the extension to the attic.

23  **Q.**  When you first got there, was this where the fire was

24  centered?

25  **A.**  Yes.

1    **Q.**  I think you also have Exhibit 314 in front of you.

2    **A.**  Yes.

3            MR. BARTLETT:  Offer 314.

4    BY MR. BARTLETT:

5    **Q.**  Do you recognize that?

6    **A.**  Yes.

7            MR. BARTLETT:  Offer 314.

8            MR. BLOOM:  We have no objection.

9            THE COURT:  Admitted.

10                  (Exhibit No. 314 admitted.)

11   BY MR. BARTLETT:

12   **Q.**  Is this a similar view, except later in the morning?

13   **A.**  Appears so.

14   **Q.**  The fire hoses that are on the ground, are you already off

15   the scene at this point in time?

16   **A.**  That's correct.

17   **Q.**  What happened, how did the shift change come about?  Did

18   actually new crew come down and replace you at the University

19   of Washington?

20   **A.**  Yes, the A shift crew showed up on the scene and relieved

21   the B shift crew.

22   **Q.**  Finally, Exhibit 315.  Do you recognize that?

23   **A.**  Yes.

24           MR. BARTLETT:  Offer 315.

25           MR. BLOOM:  No objection.

1    THE COURT:  Admitted.

2              (Exhibit No. 315 admitted.)

3  BY MR. BARTLETT:

4  **Q.**  Is this part of the morning when your crew was working?

5  **A.**  Yes.

6  **Q.**  Kind of the side end of the building?

7  **A.**  Correct.

8  **Q.**  316, do recognize that?

9  **A.**  Yes.

10    MR. BARTLETT:  Offer 316.

11    MR. BLOOM:  No objection.

12    THE COURT:  Admitted.

13              (Exhibit No. 316 admitted.)

14  BY MR. BARTLETT:

15  **Q.**  This is more of a central look at the back of Merrill

16  Hall?

17  **A.**  Correct.

18  **Q.**  As you look at that, can you point to the area that you

19  first saw where the fire was burning hardest when you got

20  there?

21  **A.**  Yeah, it was burning real hot right down here in this

22  first floor office.  It also popped the windows up here on

23  these three rooms and extended into the soffits on the attic.

24  **Q.**  If you could look at 318.  Do you recognize that photo?

25  **A.**  I never went inside, but from inspections I recognize that

1  as the interior of Merrill Hall.

2          MR. BARTLETT:  Offer 318.

3          MR. BLOOM:  No objection.

4          THE COURT:  Admitted.

5                  (Exhibit No. 318 admitted.)

6  BY MR. BARTLETT:

7  **Q.**  You talked about you had done inspections at this

8  building.  Looking at that, can you recognize some of the

9  areas that provided problems for you as a firefighter?

10  **A.**  It's hard to tell from this photo, but it looks like a lot

11  of open area in the attic up there.

12  **Q.**  Finally, if you could look at 326-A.  Do you recognize

13  that photo?

14  **A.**  It looks kind of like the Tupperware containers I saw out

15  in the field.

16  **Q.**  I think I misspoke.  Do you have 326 or 325-A?

17  **A.**  That was 326-A.

18  **Q.**  My fault.  325-A.

19  **A.**  I do not have that.  I have 319, 326-A, 326-B.

20  **Q.**  We will get it to you.  Do you recognize that?

21  **A.**  Yes.

22  **Q.**  What is that?

23  **A.**  That's the back of Merrill Hall.

24  **Q.**  Do you notice any of the plastic boxes that you saw?

25  **A.**  Yes.

```
 1              MR. BARTLETT:  Offer 325-A.

 2              MR. BLOOM:  No objection.

 3              THE COURT:  Admitted.

 4                   (Exhibit No. 325-A admitted.)

 5  BY MR. BARTLETT:

 6  Q.  If you could just point out where you saw those boxes?

 7  Does that appear to be the same location when you first saw

 8  them?

 9  A.  I believe so.

10              MR. BARTLETT:  Nothing further of this witness, Your

11  Honor.

12              THE COURT:  All right.  Mr. Bloom, let me ask you how

13  long you think you will do in your cross-examination?

14              MR. BLOOM:  Five minutes.

15              THE COURT:  Let's finish up with the witness.

16                        CROSS-EXAMINATION

17  BY MR. BLOOM:

18  Q.  Good afternoon.

19  A.  Hi.

20  Q.  Lieutenant Priest?

21  A.  Yes.

22  Q.  Thanks.  I believe you testified that you had -- there was

23  an automated fire alarm.  Could you explain, there's a fire

24  detector, smoke detector; or how does that work?

25  A.  Any kind of device that could issue an alarm.  It could be
```

1  a pole station, a smoke detector, a heat detector, duct

2  detector; anything in the automatic fire alarm system that

3  triggers it.

4  Q. Your information is that that mechanism went off at 3:22

5  a.m.; is that correct?

6  A. That's when we were dispatched.

7  Q. You say dispatched. That was your unit was -- what was

8  your unit?

9  A. Engine 38.

10 Q. Do you know somebody named Butler, first initial E.?

11 A. That doesn't ring a bell.

12 Q. Do you remember the University of Washington Police

13 Department -- being interviewed yourself on the 26th of June

14 of 2001, by the University of Washington Police Department, by

15 somebody named E. Butler of the University of Washington

16 Police Department?

17 A. It doesn't stick in my brain, but it could have happened.

18 Q. If you don't remember the name, do you actually remember

19 the interview?

20 A. No.

21 Q. Do you remember telling anyone on June 26, 2001, any

22 official at the University of Washington, that at

23 approximately 4:15 in the morning, station 38 responded to an

24 automatic fire alarm at the University of Washington Center

25 for Urban Horticulture, 4:15 a.m.? Do you remember telling

1  anybody that?

2  **A.**  No, I don't.

3       MR. BLOOM:  May this be shown to the witness, please?

4       MR. BARTLETT:  Objection, Your Honor.  He's not

5  saying he doesn't remember -- he doesn't need his memory

6  refreshed.  He's saying he doesn't remember saying it.

7       MR. BLOOM:  I am going to ask him if this refreshes

8  his memory.

9       THE COURT:  Is there anything on that that he might

10  have signed or done anything with that?

11       MR. BLOOM:  It's a one-paragraph that says --

12       THE COURT:  He said he doesn't remember it.

13       MR. BARTLETT:  I withdraw my objection.

14       MR. BLOOM:  Thank you.  May it be marked for

15  identification?  We could start a different series, maybe D-1.

16       THE CLERK:  A-178.

17       (Exhibit A-178 marked for identification.)

18  BY MR. BLOOM:

19  **Q.**  Having read that, does that refresh your recollection as

20  to whether or not you were interviewed by somebody from the

21  University Police Department?

22  **A.**  No, I don't recall the interview.

23  **Q.**  Do you remember having any interviews, whether that date

24  or any other date, where somebody said "Tell us what happened,

25  give us your best memory of your response time"?

**A.** That makes sense that the University of Washington would conduct such an interview, but I don't recall it happening.

**Q.** Do you remember telling anyone from the University that you responded at 4:15 in the morning?

**A.** If I said 4:15, it was probably an approximation.

**Q.** We are talking about if the alarm was at 3:22. We are talking about almost an hour later that it appears you told somebody that you responded. Does any of that refresh your recollection as to what happened with regard to the response, or what you have said to the University Police with regard to the response time?

**A.** No. I think our dispatch records spell out our response times pretty clearly.

**Q.** So if the report indicates that you said 4:15, would that be an error by either yourself or the person who prepared that report?

**A.** Yes.

**Q.** Now, I think you testified, and Mr. Bartlett asked you, that the fire was under control about 5:20 in the morning?

**A.** Yeah, according to these records.

**Q.** Which records?

**A.** These are, I believe, a transcript of dispatch timelines.

**Q.** I just have one more question, if I may.
Do you know the name Lacey Phillabaum?

**A.** That doesn't strike me familiar.

1  **Q.** Do you know the name Jennifer Kolar?

2  **A.** No.

3  **Q.** Have you come to learn that either one or both of those

4  people have admitted to setting this fire and have pleaded

5  guilty to setting this fire?

6  **A.** No.

7       MR. BLOOM:  I don't have any further questions.

8  Thank you.

9                    REDIRECT EXAMINATION

10 BY MR. BARTLETT:

11 **Q.** We've talked about a number of documents, and obviously

12 you are referring to -- does the Seattle Fire Department keep

13 track of when calls go out to their dispatch?

14 **A.** Yes.

15 **Q.** Do they keep track of calls when calls come into their

16 dispatch?

17 **A.** Yes.

18 **Q.** When I asked you to go out and get something to refresh

19 your memory as to when things happened, what did you get?

20 **A.** I got a document that referred to those kind of records.

21 **Q.** So you were able to give us an exact time based on what

22 dispatch was telling you?

23 **A.** Correct.

24 **Q.** When the fire was first called in?

25 **A.** I don't have that, but I do have the initial dispatch

1  time.

2  **Q.**  And that means when you were first told to get out to it?

3  **A.**  Affirmative.

4        MR. BARTLETT:  Nothing further.

5        MR. BLOOM:  Just the last question, again.

6  BY MR. BLOOM:

7  **Q.**  The initial dispatch time was either 3:22 or 3:27; is that

8  right?  The alarm was 3:22, and it is your position you

9  arrived at 3:27?

10  **A.**  Yes.

11  **Q.**  And 4:15 a.m. does not in any way ring a bell with you?

12  **A.**  No, other than that's about the same time of the morning.

13  **Q.**  I am sorry, sir?

14  **A.**  Other than it's about the same time of the morning.

15  **Q.**  Would you agree that a response time of five minutes is --

16  **A.**  I am not talking about response time.  I am talking about

17  waking up out of a dead sleep at the odd hour of the morning;

18  whether it's 3:00 or 4:00 it feels about the same.

19  **Q.**  We are talking about -- my question was about did you,

20  about five or six weeks after the incident, about 11:30 in the

21  morning, have an interview with the department, with the

22  police department at the University of Washington, and did you

23  tell them at that time that the response was at 4:15 a.m.?

24  **A.**  I don't know.  I don't remember.

25  **Q.**  Thank you.

1      MR. BARTLETT:  Nothing further, Your Honor.

2      THE COURT:  All right.  This witness can be excused?

3      MR. BLOOM:  Yes.

4      THE COURT:  It's time for you to recess for the day.

5  So as I have said again, as you go about your business, don't

6  discuss the case.  Don't research anything.  Don't read the

7  newspaper.  Don't do any of those things.  Everything you need

8  to decide this case will be here in this courtroom.

9      Leave your books on your chair.  Have a good evening.  See

10  you back here hopefully ready to go at 9:00.

11  (Jury not present.)

12      THE COURT:  All right, you may be seated.

13  I guess before we end the day, whether you need a break

14  now I don't know.  But there were two Exhibits left out there

15  for some consideration.  I believe it was 505 and 514-B.

16      MR. FOX:  It's three exhibits.  I have my notes, that

17  504 --

18      THE COURT:  Why don't with deal with that?

19      MR. FOX:  I guess, I had two concerns about the bulky

20  exhibits.  For ease of the presentation, I wasn't asking to

21  inspect everything before it was admitted.  The paper exhibits

22  we have, but some of the larger packages, I haven't had a

23  chance to look at, and I believe 504 or 505 --

24      THE COURT:  Well, all of these, I can't remember

25  where they are, and whether they are all in this category or

1  not.

2      MR. FOX:  I think they were packages of things I

3  wanted to look at.

4      THE COURT:  Let's take a recess and you look at them

5  and see if there's an issue about them, and then I will come

6  back and we'll deal with them.

7      THE CLERK:  All rise.  Court is in recess.

8      (Brief recess.)

9      THE COURT:  You may be seated.

10    I guess we were trying to deal with the exhibits.

11      MR. FOX:  Having reviewed those two Exhibits, 504 and

12  514-B, those can be admitted, no objection.

13      THE COURT:  All right.  They are admitted.

14          (Exhibit No. 504 and 514-B admitted.)

15      MR. FOX:  The one remaining was A-97.

16      THE COURT:  A-97?

17      MR. FOX:  T was the picture of Ms. Waters from this

18  morning.

19      THE COURT:  What's the issue around that?

20      MR. FOX:  We offered it.  Agent Comery had seen the

21  picture in relation to this investigation and wasn't real

22  clear how it was -- we offered it on that basis.  It was the

23  first picture shown.

24      MR. FRIEDMAN:  We have no objection to that picture

25  being admitted.

1        THE COURT: A-97, is that all to the exhibit?

2        MR. FOX: Yes.

3        THE COURT: Okay, and there's no objection to the

4 picture being admitted?

5        MR. FRIEDMAN: Correct, Your Honor.

6        THE COURT: Then A-97 is admitted.

7        (Exhibit No. A-97 admitted.)

8        THE COURT: Is that it?

9        MR. BLOOM: Just one clarifying matter, just so

10 Ms. Waters understands. If we have business before the Court,

11 8:30 or even before, she will of course be here. If we don't

12 have business before the Court --

13        THE COURT: I want her here at 8:30, the same I want

14 you here. If something comes up, I want you all here. This

15 side may come up with something, or you may come up with

16 something, and she's entitled to hear. 8:30 is the time,

17 everybody.

18        MR. BLOOM: Just so we know.

19        THE COURT: Anything else? Then we will be at recess

20 and I will see you at 8:30.

21        THE CLERK: All rise, Court is in recess.

22

23        (The Court recessed to Thursday, February 14, 2008, at the hour of 9:00 a.m.)

C E R T I F I C A T E

24    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

25 /S/ Teri Hendrix          May 2, 2008

Teri Hendrix, Court Reporter       Date