1                 UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
2                       AT TACOMA

3

4 UNITED STATES OF AMERICA,   )  Docket No. CR05-5828FDB
                       )
5        Plaintiff,     )  Tacoma, Washington
                       )  February 14, 2008
6 vs.                  )
                       )
7 BRIANA WATERS,          )  VOLUME 4
                       )
8        Defendant.     )

9

10                 TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE FRANKLIN D. BURGESS
     SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
   APPEARANCES:
13

14 For the Plaintiff:     MARK N. BARTLETT
                      ANDREW C. FRIEDMAN
                      Assistant United States Attorney
15                   700 Stewart Street, Suite 5220
                      Seattle, Washington 98101-1271
16
   For the Defendant:     ROBERT BLOOM
17                   Attorney at Law
                      3355 Richmond Boulevard
18                   Oakland, California 94611

19                   NEIL M. FOX
                      Cohen & Iaria
20                   1008 Western Ave., Suite 302
                      Seattle, Washington 98104
21

22 Court Reporter:        Teri Hendrix
                      Union Station Courthouse, Rm 3130
23                   1717 Pacific Avenue
                      Tacoma, Washington  98402
24                   (253) 882-3831

25 Proceedings recorded by mechanical stenography, transcript
   produced by Reporter on computer.

1            I N D E X

2          INDEX OF WITNESSES
           ==================

3
WITNESS ON BEHALF OF PLAINTIFF:                    Page

4
ERIC LINDAHL

5
        Direct by Mr. Bartlett......................... 494
6       Cross by Mr. Bloom............................. 512

7   JANE STEPHAN

8       Direct by Mr. Bartlett......................... 517
        Cross by Mr. Fox.............................. 546
9
RONALD KELLY

10
        Direct by Mr. Bartlett......................... 552
11      Cross by Mr. Fox.............................. 563

12  DONALD SACHTLEBEN

13      Direct by Mr. Bartlett......................... 569
        Cross by Mr. Fox.............................. 606
14      Redirect by Mr. Bartlett...................... 633
        Recross by Mr. Fox............................ 633
15
LACEY PHILLABAUM

16
        Direct by Mr. Friedman........................ 634
17

18

19

20

21

22

23

24

25

1

INDEX - EXHIBITS

EXHIBITS                                    Page

2

No. 311-A                                   504
No. 312-A                                   504
No. 312-B                                   505
No. 321                                     508
No. 315                                     509
No. 319                                     511
No. A-178                                   513
No. 327                                     527
No. 320                                     528
No. 322                                     529
No. 323                                     530
No. 330-A                                   532
No. 328                                     533
No. 339                                     534
No. 336                                     534
No. 333                                     535
No. 331                                     535
No. 337                                     536
No. 308 (Illustrative)                      537
No. 324                                     539
No. 342                                     541
No. 345                                     542
No. 343                                     542
No. 348                                     543
No. 346                                     544
No. 329-A                                   583
No. 329-B                                   583
No. 329-C                                   583
No. 330-B (Illustrative)                    584
No. 332-A                                   586
No. 332-B                                   586
No. 335                                     590
No. 338                                     592
No. 982                                     597
No. 344-A                                   602
No. 344-B                                   602
No. 344-C                                   602
No. 347                                     604
No. 792-B                                   640
No. 111                                     646
No. 117                                     649
No. 120                                     650
No. 119                                     650
No. 124                                     653
No. 112                                     654
No. 116                                     655

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

INDEX - EXHIBITS

EXHIBITS                                                    Page

No.  118                                                    655
No.  115                                                    662
No.  273                                                    667
No.  292-C                                                  670
No.  293                                                    673
No.  733                                                    682
No.  304-A                                                  696
No.  304-C                                                  698
No.  304-D                                                  700
No.  304-E                                                  700
No.  304-F                                                  701
No.  304-G                                                  702
No.  304-K                                                  704
No.  304-M                                                  705
No.  304-N                                                  705
No.  775                                                    711

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, FEBRUARY 14, 2008 - 9:00 A.M.

* * *

(Jury not present.)

THE COURT:   You may be seated.  Good morning.

THE CLERK:   This is in the matter of United States versus Briana Waters, Cause No. CR05-5828FDB.

Counsel, please make an appearance for the record.

MR. BARTLETT:   Mark Bartlett and Andrew Friedman and Special Agent Halla for the United States.

MR. FOX:   Neil Fox and Robert Bloom for Ms. Waters, who's present.

THE COURT:   All right.  Are we ready for the jury and the next witness?

Bring them in.

(Jury present.)

THE COURT:   All right.  You may be seated. Good morning.  Happy Valentine's Day and all of that. You look like you are rested and ready to go. All right.  Next witness.

MR. BARTLETT:   Your Honor, at this time, the United States calls Eric Lindahl to the stand.

THE COURT:   All right.  Come forward, Sir. I will have you step up and raise your right hand and be sworn.

ERIC LINDAHL, called as a witness, duly sworn.

1    THE COURT:   Take the witness chair, please.

2                 DIRECT EXAMINATION

3  BY MR. BARTLETT:

4  **Q.**  Would you tell the members of the jury your first and last

5  name and spell your last name for the Court Reporter?

6  **A.**  Eric, E-R-I-C, Lindahl, L-I-N-D-A-H-L.

7  **Q.**  Where do you work?

8  **A.**  Seattle Fire Department.

9  **Q.**  Can you kind of walk us through your history with the

10 Seattle Fire Department, bringing us up to what your current

11 position is?

12 **A.**  Sure.  I was hired in 1987 as a firefighter for the

13 Seattle Fire Department.  In 1992, I was promoted to

14 Lieutenant.  In 1996, I was promoted to Captain.  Currently, I

15 hold the rank of Battalion Chief, and I was promoted to that

16 rank in 2001.

17 **Q.**  Can you explain, kind of walking us through as you went

18 through the Seattle Fire Department, what the different

19 responsibilities you had as you reached each stage of your

20 career?

21 **A.**  Well, as a firefighter, of course, I would ride on the

22 back end of a fire engine, and I would respond to fire

23 emergencies, medical emergencies, rescues such as car

24 accidents where people are trapped, industrial accidents.

25     As a Lieutenant, I became a supervisor of a fire engine.

 1   Typically, the crew was two or three firefighters on the fire

 2   engine, plus a Lieutenant.

 3       As a Captain, pretty much the same role.  You are the

 4   supervisor of a crew on a fire engine and that's, again, two

 5   or three firefighters, plus yourself.  In addition as a

 6   Captain, you are responsible for all operations of a fire

 7   station.

 8       So, because we provide 24-7 service, you have to have more

 9   than one shift operating out of a fire station so that we can

10   relieve each other as the shift's terminated at the end of the

11   day or, in our case, in the morning.

12       So, a fire station will actually have four different sets

13   of crews working to provide that 24-7 service.  The Captain

14   makes sure that everything is coordinated within those four

15   sets of people working in that fire station.

16       As a Battalion Chief, I currently am now in charge of

17   eight fire stations, and in that position, as well as

18   responding to emergency scenes as a senior supervisor, I

19   coordinate staffing at the fire station, make sure that

20   there's enough people on duty that day when I come to work,

21   and as people take time off, get sick, provide for placement

22   there.  I also provide for training.

23       So, just a general supervisory role in one region of the

24   city and, in my case, that's seven fire stations.

25   Q.  With regard to the seven fire stations, are they

1  geographically kind of grooved together?

2  **A.**  Yes.  In my case, it's northeast Seattle.  That's my area.

3  They are called battalions.  So I am in Battalion 6, and that

4  is all the fire stations in northeast Seattle.

5  **Q.**  Can I direct your attention to May 21, 2001?  What was

6  your position at that point in time with the Seattle Fire

7  Department?

8  **A.**  My rank was Captain.  I had not been promoted yet.  I was

9  acting in one position up as a Battalion Chief.

10 **Q.**  You hadn't gotten the promotion, but you were doing the

11 work?

12 **A.**  Yes, I was, and that's common.

13       MR. BARTLETT:  If the witness could be handed what's

14 been previously marked as Government's Exhibit 310-A, which I

15 think is right in front of you.

16       THE WITNESS:  I am seeing 311-A.

17       MR. BARTLETT:  It's a new document that we just

18 handed up this morning.

19       THE WITNESS:  I don't see a folder labeled 310-A.

20       MR. BARTLETT:  I am not offering this into evidence,

21 Your Honor.

22 BY MR. BARTLETT:

23 **Q.**  Is that a document you prepared?

24 **A.**  Yes, it is.

25 **Q.**  Can you explain to the members of the jury what it is you

1   did and how you prepared it?

2   **A.** This is a personal overview written a day or so, at least,

3   after the fire, of kind of what I did. Part of it was

4   generated from our dispatch log, which is a record of what our

5   dispatch says over the radio and the actions that they do.

6   **Q.** Taking it one step at a time, when you are checking a

7   dispatch log, does that provide you fairly specific times?

8   **A.** Yes, it does.

9   **Q.** So you are looking at the dispatch log as you are trying

10   to recreate for yourself what happened on May 21st?

11   **A.** Correct.

12   **Q.** Go ahead.

13   **A.** So these times are fairly accurate, and in some cases

14   extremely accurate because they are taken off of radio

15   transmissions which can be coupled to time of day.

16   So, this is just kind of a general overview of how I saw

17   the incident, some of the highlights that I wanted to recall

18   and record.

19   MR. BARTLETT: With the Court's permission, I would

20   like to ask that he be allowed to keep that there. If you

21   need to, you can refresh your memory as to specific times by

22   looking at that.

23   THE WITNESS: Sure.

24   MR. BLOOM: We have no objection to that.

25   THE COURT: All right.

BY MR. BARTLETT:

**Q.** Did there come a time in the early morning hours of May 21st that you received notification of a possible fire at the Center for Urban Horticulture?

**A.** That is true.

**Q.** How did that happen? You are acting Batallion Chief. Where are you physically, and how did you get that notification?

**A.** I am in a fire station with a fire crew that has a fire engine and a ladder truck as well. As a supervisor, as a Battalion Chief or acting Battalion Chief in that case, I drive a Suburban and respond with the fire crews that are dispatched.

So the bell hits just like you see in the movies. We get up, race to the vehicles that we are assigned to and respond with lights and sirens to the incident that we are directed to.

**Q.** Specifically with regard to May 21st, Dan Priest testified yesterday about what his crew did. Were you notified at the same time that Dan Priest was?

**A.** No. This alarm came in as what we call a 1 and 1, an automatic fire alarm. In other words, some device in the building went off, it went to a central dispatcher contracted by the UW, and then that dispatcher contacts the 911 system in Seattle.

1    At that point in time, because of the type of alarm,

2  there's no other calls indicating there's a fire, just an

3  alarm device going off in a building, our protocol is to send

4  one fire engine and one ladder truck to go check it out.

5  That's what Dan Priest responded on, that smaller response

6  size.

7  **Q.** With regard to the smaller response, did you eventually

8  have a second notification with regard to the fire?

9  **A.** Yes.  On arrival -- actually, before arrival, they saw a

10 glow in the sky, and I believe that is the time that

11 Lieutenant Priest noted that and asked for a full response

12 knowing that there was a significant fire involved in that

13 area.

14 **Q.** When you say he asked for a response, physically what

15 would he have done and how would you have been notified about

16 this?

17 **A.** We have a radio system that is always monitored by the

18 dispatcher of Seattle Fire Department.  He would get on the

19 radio and say:  "This is Engine 38," which is his fire engine;

20 "we have a large amount of fire visible as we're responding, I

21 am requesting a full response," which gives more fire

22 apparatus, more manpower.

23 **Q.** When he asked for a full response, does that impact you?

24 **A.** Yes.  A full response involves usually four fire engines,

25 two ladder trucks, two Battalion Chiefs, an aid unit, an aid

1  car, an ambulance and a medic unit and a few other

2  ancillary -- safety chief.  I think that's about it.

3  **Q.**  Is that what happened on May 21st?

4  **A.**  That is what happened.

5  **Q.**  When did you actually start to respond yourself?

6  **A.**  It looks like I probably began to respond about 3:27,

7  3:30.  I don't have that specific time.  It was not important

8  to me when I wrote up this log.

9  **Q.**  Does it indicate when the first call came in with regard

10  to this fire?

11  **A.**  This log indicates that the first call came in at 3:22.

12  That's when Lieutenant Priest's fire engine and ladder 9 were

13  dispatched, the initial 1 and 1.  So the call may have come in

14  a minute or two earlier than that.

15  **Q.**  How long does it take -- where are you physically?  Mr.

16  Priest explained where his fire station was.  Where are you?

17  **A.**  I am in the University District Fire Station, which is, I

18  am guessing, a mile-and-a-half away, and I am in the fire

19  station with the crews that are assigned there.  Like I say,

20  there was fire engine 17, ladder 9 and myself.

21  **Q.**  Can you describe what you see when you get to the scene?

22  **A.**  I see a glow in the sky as I am coming down the Viaduct --

23  it's quite a view from the Viaduct; it's a typical response

24  route that we would take to that location -- and knew that I

25  had some work to do.

        As I approached the building, several hundred yards out, I
note that there's no fire on the particular side of the
building that I can see, but there's a glow from the back
side, which would be the south side.

**Q.** Where do you go?

**A.** Where do I go?

**Q.** Yes.

**A.** Ideally, I like to do a 360, drive around the building
because as -- I end up -- in my position, I am the commander
of the scene, so I like to kind of get a size-up to see what's
going on.

        That building, I knew I couldn't drive around so I drove
up and approached such that I could see three sides of the
building.  I ended up stopping, I guess it would be the
southeast corner where I could see some flame from the
building, in the parking lot of the southeast corner.

**Q.** As you are at the scene, you are kind of running it, I
assume?

**A.** Yes.

**Q.** Did there come points in time where you determined, based
on your training and experience, that you need more
assistance?

**A.** Oh, yeah.  Uh-huh.

**Q.** Can you explain how that comes about and when it occurs
and what you actually do?

**A.** Well, you know, on that full alarm assignment, which was the secondary request from Lieutenant Priest, I know I have a certain number of resources. If the fire is not terribly large, I can generally suppress the fire with those resources. As the intensity of this fire grew, I knew -- I could project that I would need more, and then I asked for further resources.

Typically, in our fire department, we ask for a second alarm. We call it a 211, 2-1-1. A 211 means basically you are getting nearly twice the amount of resources as the first alarm assignment.

**Q.** Did there come a point in time when you indicated to dispatch that you wanted a 211, you wanted further resources?

**A.** Yes, I did.

**Q.** When did that happen?

**A.** Just after the 4:00 hour. I believe it's written here. Yeah, it's 4:01:00 in the morning.

**Q.** Did there come a point in time when you actually increased that request?

**A.** Yes, I did. At 4:14, I requested a three-alarm assignment, and that again adds about the same number of people. It doesn't double the 211, but it adds another basically one chief, three or four fire engines. It really depends on the type of building and another two ladder trucks and another chief officer.

1  **Q.**  Did, in fact, those engines respond?

2  **A.**  Yes.

3  **Q.**  How long did it take you to suppress the fire?

4  **A.**  We have a term called a "tapped fire" and that occurred

5  and was announced over the radio at 5:58 in the morning.

6  However, at 5:20 in the morning, we said "fire under control."

7  "Fire under control" means that we've got a good handle on the

8  fire, no further damage is going to be caused by the fire

9  itself, and we will shortly be able to say that we have this

10  completely extinguished, and then "tapped fire" means it's

11  essentially completely extinguished.  There's always going to

12  be hot spots, little flare-ups, but we have got it

13  extinguished.

14  **Q.**  Prior to testifying today, did I ask you to take a look at

15  a short video that one of the local news stations made of the

16  fire that night?

17  **A.**  Yes, you did.

18  **Q.**  Did that video that you looked at fairly and accurately

19  depict at least a short scene, short pictures from that fire?

20  **A.**  Yes, it did.

21  **Q.**  Take a look at Government's Exhibit 311-A and tell me if

22  you recognize that video.

23  **A.**  I recognize the disc.

24  **Q.**  You have your initials on it?

25  **A.**  Yes.  It has my initials on it.

1          MR. BARTLETT:  Offer 311-A.

2          MR. BLOOM:  We have no objection.

3          THE COURT:  Admitted.

4               (Exhibit No. 311-A admitted.)

5          MR. BARTLETT:  If I could play that for the jury,

6   Your Honor.

7               (Video 311-A played in open court.)

8   BY MR. BARTLETT:

9   Q.  You can take a look at the photos marked as 312-A, B and

10  C, and tell me if those photographs also fairly and accurately

11  depict scenes from the fire that you were fighting that night

12  on May 21, 2001.

13  A.  312-A does.  312-B does.  312-C, I can't identify the

14  building, but the intensity is accurate as to the type of fire

15  that was there.

16  Q.  We will just go with A and B then.

17  A.  Okay.

18          MR. BARTLETT:  If I could offer those, Your Honor.

19          MR. BLOOM:  No objection.

20          THE COURT:  Admitted.

21             (Exhibit Nos. 312-A and 312-B admitted.)

22          MR. BARTLETT:  Publish them to the jury.

23  BY MR. BARTLETT:

24  Q.  Were there any circumstances relating to this fire in this

25  building that presented difficulties for your job as the

1  Battalion Chief in fighting the fire?

2  **A.**  Well, yes.  One of them was that there were reported

3  hazardous materials involved or processes in laboratories in

4  the building, and I received this from a reliable source, and

5  I gave great credence to it.

6      Because of this, I initiated a defensive operation, which

7  means that we don't take hose lines into the building.  My

8  concern was exposing my fire crews to hazardous materials.

9  Because of that, it's difficult to extinguish all areas of the

10  fire when you are not going into the building.  You stand

11  outside and put water on the fire from outside.

12  **Q.**  Anything else about the structure that presented

13  difficulties for you?

14  **A.**  The structure was -- there were several features of the

15  structure.  One of them was there was lattice work along the

16  outside of most of the building.  The lattice work was 2-by-2

17  cedar strips, two inches by two inches.  I think they were

18  about two inches square all around the building.  This acted

19  as if it were kindling.

20      The fire that I saw was on the south side of the building.

21  I believe that was a stretch of warm weather.  It was cedar

22  siding, which burns very quickly, the actual sheeting of the

23  building.  The soffits of the building which are underneath

24  the eaves were open to provide ventilation to remove moisture

25  from the attic space.

1    However, they were so open that it allowed fire to go up

2    this lattice work on the outside of the building and the cedar

3    siding on the outside of the building up into the soffits and

4    travel into the attic area, which was wood construction

5    without sprinklers, and the fire would travel unimpeded

6    throughout the entire attic area.

7    So that aided in the spread of the fire immensely, the

8    open soffits and the cedar construction details outside.  Very

9    unique.

10   **Q.**  At some point, did individuals associated with the

11   building from the University of Washington arrive at the

12   scene?

13   **A.**  Yes, they did.

14   **Q.**  Were you able to talk with them?

15   **A.**  Yes, I was.

16   **Q.**  After speaking with them, were you able to make a more

17   accurate determination about the degree of risk of the

18   hazardous material inside?

19   **A.**  When you first mentioned that -- the personnel that first

20   showed up were the building engineers, which they typically --

21   sometimes they even beat us to the location.  I wouldn't be

22   surprised if they had because they had received the alarm

23   actually earlier than us because they are monitoring their own

24   alarm system.

25   Those building engineers, they are the people that are

1  familiar with the physical plan, the heating systems, the

2  alarm systems; they have keys to all the areas of the

3  building, more or less, and provide us access.

4      Those people wouldn't have information regarding the

5  specific contents of all of the labs, all of the buildings at

6  the University.  They may have knowledge just from general

7  experience of being around all the time, but they are not

8  people that work out of those particular buildings or this

9  particular building.

10     Eventually, people who are responsible for this building,

11  who worked in the building, did respond, but that was much

12  later.

13  **Q.**  Were you eventually able to bring it under control?

14  **A.**  The fire, yes.

15  **Q.**  Could you take a look at Exhibit 321, a photograph?

16  **A.**  Sure.

17  **Q.**  Do you recognize that?

18  **A.**  That looks an awful lot like looking through the window of

19  one of the labs on the lower level of the building on the

20  south side.

21  **Q.**  Was there a library related to this?

22  **A.**  There was a library in this cluster of buildings.  It was

23  not in this specific location, I believe.

24          MR. BARTLETT:  Offer Exhibit 321.

25          MR. BLOOM:  No objection.

1        THE COURT:  Admitted.

2              (Exhibit No. 321 admitted.)

3    BY MR. BARTLETT:

4    **Q.**  This is obviously after the fire was out?

5    **A.**  Yes.

6    **Q.**  How long did you remain on the scene?

7    **A.**  Well, I arrived at approximately 3:33 hours, and I

8    indicated in my log here that I probably left around 8:30 or

9    9:00.

10   **Q.**  The following morning?

11   **A.**  Yes, that morning.

12   **Q.**  That morning, I should say?

13   **A.**  Yes.

14   **Q.**  Could you take a look at Government's Exhibit 314?

15   **A.**  Sure.

16   **Q.**  Do you recognize that?

17   **A.**  Yes, I do.  That is the horticulture center, what's left

18   of it.

19         MR. BARTLETT:  Offer 314.

20         MR. BLOOM:  No objection.

21         THE COURT:  I believe it's already been admitted.

22   BY MR. BARTLETT:

23   **Q.**  When you were at the scene, did you have a command center

24   that you maintained, or were you moving around the entire

25   time?

1  **A.**  No. We like to have the incident commander remain at a

2  central spot, in one spot. We call that the command post.

3  That typically is at my vehicle, which I responded in. It was

4  placed on the southeast aspect of the building in the parking

5  lot.

6  **Q.**  It obviously isn't shown in this picture. Where would it

7  be in relation to this picture? The nearest end to us on the

8  right, or the far end on the left?

9  **A.**  If you were to back up from the photographer and side step

10  to the right, back up maybe 100 feet and side step to the

11  right 100 feet, you would be in about that location.

12  **Q.**  Take a look at photo 315. Do you recognize that?

13  **A.**  That's definitely the urban horticultural building.

14          MR. BARTLETT: Offer 315.

15          MR. BLOOM: No objection.

16          THE COURT: Admitted.

17                 (Exhibit No. 315 admitted.)

18  BY MR. BARTLETT:

19  **Q.**  You talked before that one of the problems you had with

20  this fire was the lattice work. Do you recognize that?

21  **A.**  Yes. That is it right there.

22  **Q.**  If you could maybe touch the screen and explain to the

23  people what we are talking about.

24  **A.**  I will try and draw a circle there. That lattice work is

25  made out of cedar. It's just an architectural feature.

1    However, if a fire were to involve that, cedar being very

2    easily ignited and burning hot, it would, from the lower end,

3    burn up very rapidly and involve the attic area and soffits

4    that I was speaking of.

5    **Q.**  Photo 316.  Do you recognize that?

6    **A.**  Yes, I do.

7           MR. BARTLETT:  Offer 316.

8           THE COURT:  Previously admitted.  Some of these have

9    been already admitted.  Just go ahead and put them up.

10   BY MR. BARTLETT:

11   **Q.**  If you hit the lower left screen, you can get rid of that

12   circle.

13        When you first got to the fire scene, was there anything

14   about the fire that raised suspicion in your mind about where

15   the origin was?

16   **A.**  Well, obviously it was on the south side.  That's where,

17   really, the only fire was that I could see and detect.  I

18   couldn't tell if it ignited inside or from the outside, upon

19   my arrival.

20   **Q.**  It had already spread?

21   **A.**  It had spread considerably, yes.  There was a large volume

22   of fire that you could see from over the roof.

23   **Q.**  Finally, Exhibit 319, which I don't think has been

24   admitted.  I don't believe this has been admitted.

25        Do you recognize that?

1    **A.**  It certainly looks like the urban horticultural fire, the

2    construction and features and so forth.

3            MR. BARTLETT:  Offer 319.

4            MR. BLOOM:  No objection.

5            THE COURT:  Admitted.

6                    (Exhibit No. 319 admitted.)

7    BY MR. BARTLETT:

8    **Q.**  Looking through the very center lowest window, do you see

9    a library section back there, what appears to be books?

10   **A.**  I do see books.

11   **Q.**  Were you involved in -- did you have any discussions

12   during the time that you were fighting the fire about the

13   library, with individuals from the University of Washington,

14   and did you take any steps to try to protect the books there?

15   **A.**  Yes.  Like I said, eventually members who were responsible

16   and worked in the building responded, and I spoke to them at

17   the command post.  They indicated that there was a library in

18   that building cluster and that it contained valuable books

19   and, of anything, they would really like to try and save that.

20   This library was not initially involved in the area that I

21   noticed on fire upon my arrival.

22   **Q.**  What did you do?  I assume clearly water was a concern for

23   you?

24   **A.**  Well, yes.  We set up what we call a defensive operation

25   to try and protect that section of the building after we

1  decided that the hazardous materials issue was not as great a

2  concern as we had initially thought, and therefore I allowed

3  people into the part of the building that was uninvolved in

4  order to isolate the uninvolved part of the building from the

5  part of the building that was involved in the fire.   The

6  purpose was to just draw a line in the sand so it wouldn't get

7  past us and into the library area.

8  **Q.**   And you did that?

9  **A.**   We did that with various strategy and techniques that we

10  use.

11          MR. BARTLETT:   No further questions, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. BLOOM:

14  **Q.**   Good morning --

15  **A.**   Good morning.

16  **Q.**   -- Chief Lindahl, is it?

17  **A.**   That's correct.

18  **Q.**   I am Robert Bloom.   I am one of the lawyers for Briana

19  Waters in this case.

20  **A.**   All right.

21  **Q.**   I just have a few questions for you.

22          This report that you have in front of you, 310-A, is it

23  fair to say that you do your best, based on your notes and

24  your recollection, to make it as accurate as possible?

25  **A.**   Yes.

1    **Q.**  You do that, it's fair to say, so that in the future, such

2    as now, if you need to refer to it to refresh your

3    recollection, you'll have accurate information?

4    **A.**  Yes.   That's part of the purpose of it.

5    **Q.**  Now, yesterday when Lieutenant Priest testified, there was

6    an issue that came up --

7            MR. BLOOM:  Can I now offer -- there's a consent

8    apparently --

9            MR. BARTLETT:  I have no objection to the report --

10   the police report that Mr. Bloom was referencing yesterday in

11   his cross-examination.

12           THE COURT:  All right.  What was the number on it,

13   Mr. Bloom?

14           MR. BLOOM:  I think it's A-178.

15           THE COURT:  All right.

16           MR. BLOOM:  May I have a copy so I can put it up?

17   Thank you.

18           THE COURT:  Admitted.

19                (Exhibit No. A-178 admitted.)

20   BY MR. BLOOM:

21   **Q.**  Do you know if there came a time -- and maybe it's

22   routine -- when the University of Washington Police Department

23   would interview one or more of the firefighters to just get

24   the facts to complete their package, their report?

25   **A.**  Well, in the locale that I work in, we do often interact

1  with the UW Police.  I suppose they could come to us

2  informally, at least, and ask us questions about an incident

3  that we are responding to.

4  Q.  I would like you to take a look, if you would, at the

5  document that's in front of you.  If you'll notice, on the

6  second line, it says that, "At approximately 0415 hours,

7  Station 38 responded to an alarm."

8  A.  Yes.

9  Q.  Based on your information, that's probably just a typo, a

10  typographical error, because that's not what happened, right?

11  A.  At 0415 hours, that corresponds very closely to the -- my

12  request for a 311 response.  That's that third level alarm

13  bringing a lot more manpower to the fire scene.

14  Q.  If you go back to the very first page of your report --

15  A.  Uh-huh.

16  Q.  -- and you look at item No. 3 --

17  A.  Yes.

18  Q.  -- it indicates that at 3:27 in the morning, E-38

19  responded.

20  A.  Yes.

21  Q.  Engine 38?

22  A.  Yes, it does say that.

23  Q.  So that was a quick response?

24  A.  Yes.

25  Q.  A five-minute or so response?

1  **A.** Yes.

2  **Q.** So that if somebody looked at this, what I am pointing

3  to --

4  **A.** Yes.

5  **Q.** -- that's not what happened with E-38.  E-38 did respond,

6  but looking at this report, it would be reasonable to think

7  that they didn't respond until 4:15 in the morning.

8  **A.** You could interpret it that way.  They were certainly on

9  scene at that time of the morning, but yes, I would assume

10 that's a typo or some sort of error.

11 **Q.** All right.  That's all I really wanted to establish.

12 Thank you.

13    Let me just ask you a couple other questions.

14    The building, would you describe it as a brick building or

15 a wood building, or how would you describe it?

16 **A.** Wooden construction.

17 **Q.** It would be inaccurate to describe it as largely brick; is

18 that correct?

19 **A.** Yes.  I don't recall any brick on the building.  I would

20 have to review and look at the pictures.  There may have been

21 brick facade on parts of it.

22 **Q.** Just a few more questions.  Needless to say, this is

23 almost a silly question, but fires are dangerous?

24 **A.** That is true.

25 **Q.** And dangerous for what's inside the building, possibly

1   people inside the building and for firefighters as well?

2   **A.**   That is true.

3   **Q.**   Do you know the name Lacey Phillabaum?

4   **A.**   I saw it written on a sheet of paper this morning with an

5   itinerary of today's activities.  The last name, not the first

6   name.

7   **Q.**   Phillabaum?

8   **A.**   Yes.

9   **Q.**   Do you know the name Jennifer Kolar?

10  **A.**   I believe I saw that name on that sheet.

11  **Q.**   In your discussions with any of the prosecutors or the FBI

12  agents, have you been informed that those are two people who

13  have admitted to planning and setting this fire?

14  **A.**   I have not been specifically informed of that information,

15  but my general thought is that --

16  **Q.**   I am sorry?

17  **A.**   I have a feeling that that is a true statement.

18  **Q.**   Thank you.

19          MR. BLOOM:   I have no further questions.

20          MR. BARTLETT:   Nothing further, Your Honor.

21          THE COURT:   All right.  You may be excused.

22          MR. BARTLETT:   At this time, the United States calls

23  Special Agent Jane Stephan to the stand.

24          THE COURT:   Let me have you come forward, if you

25  would, and be sworn.

1      JANE STEPHAN, called as a witness, duly sworn.

2      THE COURT:  Take the witness chair.

3      MR. BARTLETT:  May I inquire, Your Honor?

4  Yes.

5                    DIRECT EXAMINATION

6  BY MR. BARTLETT:

7  **Q.**  Can you tell the members of the jury your first and last

8  name and spell your last name for the Court Reporter?

9  **A.**  Jane A. Stephan, S-T-E-P-H-A-N.

10 **Q.**  Where do you work, Ms. Stephan?

11 **A.**  I am a Special Agent with the FBI.

12 **Q.**  How long have you worked for the FBI?

13 **A.**  I have worked for the FBI for approximately 16 years.

14 **Q.**  Can you kind of walk us through your career with the FBI?

15 **A.**  I graduated from college from Colorado State University,

16 and I joined the FBI in April of 1992.  Upon graduation from

17 the FBI Academy, I was stationed in Olympia, Washington, in

18 July of 1992.

19      In approximately January of 1995, I was then transferred

20 to the Seattle FBI headquarters.  In January of 2000, I was

21 then assigned to the Joint Terrorism Task Force where I was

22 the Domestic Terrorism Coordinator and the Evidence Response

23 Team Leader.

24 **Q.**  What kind of training did you receive during the time you

25 were with the FBI up to when you became part of the JTTF, the

1  Joint Terrorism Task Force?

2  **A.** During my evidence response team, I have done multiple

3  trainings in crime scene investigations, fire investigations

4  and also in particular I received some training from Special

5  Agent John Comery about fires in the Northwest that have been

6  attributed to the Animal Liberation Front and Earth Liberation

7  Front.

8  **Q.** So you knew Mr. Comery who testified earlier this week?

9  **A.** Yes, I know John Comery.

10 **Q.** In addition to the -- what is an Evidence Response Team?

11 **A.** The Evidence Response Team was created similar to that of

12 the SWAT teams that most police departments and the FBI has to

13 specialize a group of people trained in collecting forensic

14 evidence.

15     Instead of just the initial search that we do for like a

16 white collar case where we just go to get documents, these

17 folks are actually trained to collect smaller items, to sift

18 through debris or collect hair and fibers, things that are not

19 obvious to the naked eye.

20 **Q.** You were part of that team?

21 **A.** Yes, I was.

22 **Q.** If we can kind of go ahead.  Are you still with the

23 Seattle FBI?

24 **A.** No, I am not.  I am currently assigned to FBI headquarters

25 in Washington, D.C., and I work in counter-intelligence.

1   Q.   What's your position there?

2   A.   I'm a Supervisory Special Agent.

3   Q.   Are you about to get a promotion?

4   A.   Yes, as a matter of fact, I am.   Thank you.

5   Q.   Well, what's your position going to be in March?

6   A.   I will be the Unit Chief of the Arabian Peninsula Unit in

7   the global section.

8   Q.   Can I direct your attention to Monday, May 21, 2001?

9   A.   Yes.

10  Q.   Were you working that day?

11  A.   Yes.

12  Q.   Did there come a point in time when you heard about a fire

13  that occurred at the Center for Urban Horticulture at the

14  University of Washington?

15  A.   Yes.   I was driving on my way to work, and I was listening

16  to the news when I heard over the news that there had been a

17  fire earlier in the morning at the University of Washington.

18      The news further went on to describe that the fire had

19  been at the Center for Urban Horticulture where, at that

20  point, I knew for sure that my day had changed because I

21  was -- I could pretty much assume that --

22          MR. FOX:   I would object, Your Honor, to assumptions.

23          THE COURT:   Just what she did.

24  BY MR. BARTLETT:

25  Q.   You heard it was the Center for Urban Horticulture?

1   **A.**  Yes, I did.

2   **Q.**  What did you do after you heard that?

3   **A.**  I went to the office to talk with other folks in the

4   office about the fire and that it was at the Center for Urban

5   Horticulture.  My partner, Lee Yates, had received a phone

6   call from S.P.D. Sergeant Crowe who gave us an update on the

7   fire, and at that point Special Agent Yates and myself went to

8   the fire, about 10 a.m.

9   **Q.**  Does the FBI normally investigate fires?

10  **A.**  Typically -- well, we investigate things that are of --

11          MR. FOX:  Your Honor, I am going to object on

12  relevancy.

13          THE COURT:  I think she can answer that yes or no.

14  **A.**  Yes, we do.

15  BY MR. BARTLETT:

16  **Q.**  What did you do when you got to the fire scene at the

17  Center for Urban Horticulture?

18  **A.**  Upon arriving at the scene, the first thing I saw was the

19  firefighters were still there finishing their work.  The

20  building was clearly -- had a fire.  Parts of it were still

21  smoldering.

22      As I walked around to the south side of the building, you

23  could clearly see that there was one office that sustained a

24  significant amount of fire damage.

25  **Q.**  Did you find out what office that was?

1   **A.**   Yes, that office belonged to Professor Toby Bradshaw.

2   **Q.**   Did you talk to Professor Bradshaw?

3   **A.**   Yes, I did.

4   **Q.**   What did he tell you?

5          MR. FOX:   Objection, hearsay.

6          THE COURT:   What was the question?

7          MR. BARTLETT:   What did he tell you?  I will

8   withdraw, Your Honor.

9          THE COURT:   Well, let me ask you this:   This

10  professor will be testifying?

11         MR. BARTLETT:   He will.

12         THE COURT:   Then I think she can go ahead and answer

13  it.  Just let him do his own answering.

14  BY MR. BARTLETT:

15  **Q.**   Did you also talk with Tom Hinckley?

16  **A.**   Yes, I did.  We spoke to Tom Hinckley earlier in the day.

17  When I was speaking with Seattle Fire Captain Cringele and

18  Seattle Police Department Sergeant Crowe, Mr. Hinckley

19  introduced himself to us and explained he had some very

20  valuable and rare books in the library --

21         MR. FOX:   I object to the hearsay.

22         THE COURT:   Just a minute.   I am going to have her

23  adjust the mike, so we can make sure we hear you.

24      What was the issue here?

25         MR. FOX:   Again, Your Honor, it's our position that

1  limited background is fine, but I am objecting to extensive
2  narrative about what other people have said.
3      MR. BARTLETT:  I am not going to have an extensive
4  narrative.
5      THE COURT:  All right.
6  BY MR. BARTLETT:
7  Q.  What did Mr. Hinckley tell you?
8  A.  Mr. Hinckley advised that there was some very rare and
9  valuable books in the library that he would like to rescue
10 from the fire damage.
11 Q.  Why was he talking to you about it?  Do you normally let
12 people take things out of the scene?
13 A.  No, clearly we do not.  At that point, we considered it a
14 crime scene and we did not want anybody going into the fire
15 scene.  The portion that he was talking about had only
16 suffered some soot and water damage, therefore we let him go
17 in and rescue those books.
18 Q.  What about the rest of the scene?
19 A.  The rest of the scene was contained and sealed and only
20 investigators were allowed in.
21 Q.  Was there anyone from the Bureau of Alcohol, Tobacco &
22 Firearms there?
23 A.  Yes.  Later in the day, at about 1:00 p.m. we all met back
24 at the scene, and I met with ATF Agent Doug Krogh.  At that
25 time, also we talked with Captain Pringle again from Seattle

1  Fire Department and Sergeant Crowe -- I am sorry, University

2  of Washington Police Detective Rich Lewis -- Gand we discussed

3  at that time our procedure for investigating the scene.

4  **Q.** What was the plan that you came up with?

5  **A.** At that point, since it was apparent that the fire had

6  been an arson, Special Agent Doug Krogh was able to secure a

7  dog from -- an accelerant dog to come down from British

8  Columbia to assist in the fire investigation.  Although, at

9  that time we did not need a dog to smell the gasoline that was

10 apparently used in the fire.

11 **Q.** You could smell it?

12 **A.** I could smell it.

13 **Q.** Did you eventually get the dog down from British Columbia?

14 **A.** Yes.  The dog arrived about three hours later.  During the

15 time when we were waiting for the dog, I had another

16 conversation with Professor Toby Bradshaw.  He had mentioned

17 that he and a friend of his had seen some snake cages that he

18 knew that were to be in his office the night before.

19     So during those three hours we were waiting for the dog,

20 we went over and looked at the snake cages that were under the

21 tree and we collected those as evidence as well.

22 **Q.** What happens after the dog comes down?  Are you actually

23 there?

24 **A.** Yes.  The dog arrived on the scene, and we decided that we

25 will start systematically from the outside and work our way

1  in.  The dog was led around the outside of the building and

2  hit positively indicating that there was an accelerant present

3  in three areas outside office A17, which was Toby Bradshaw's

4  office.  At that time, we collected samples of the area where

5  the dog hit and proceeded to move inside the building.

6  **Q.**  What happened when you moved inside the building?

7  **A.**  Inside the building, as we walked down the corridor, the

8  dog immediately hit as it got to office A17.  As we turned the

9  corner to collect a sample from where the dog hit, myself,

10  Seattle Fire Department Hunton and Carruthers, we saw what

11  appeared to be a flare with wires attached to it.

12  **Q.**  Where was this?

13  **A.**  Right as you walk in the doorway, there's a lateral filing

14  cabinet to the left up against the hallway wall, and there

15  was -- the wire with the flare -- the wires were going up into

16  the drawers, the drawers had been pulled open and the wires

17  were on top of that, and then the wires went down from the

18  flare into what was a melted plastic container-like thing that

19  was melted.

20  **Q.**  When you say you walked in the door, what door were you

21  walking into?

22  **A.**  We were walking through the door that entered into A17,

23  Toby Bradshaw's office.

24  **Q.**  If you could take a look at Exhibit 303, which has already

25  been admitted.  Do you recognize this?

1  **A.** Yes, I do.

2  **Q.** With regard to your investigation, can you just point out

3  where the Center for Urban Horticulture is?

4  **A.** The Center for Urban Horticulture is right here.  It's

5  actually this whole group of buildings.  The actual main part

6  of the fire was right there -- sorry.

7      That's not right either.

8      Right there, in this part.  Oops.  It's touchy.

9      But anyway, this whole section of buildings right there is

10  the actual Center for Urban Horticulture, and the majority of

11  the fire damage was right there.

12  **Q.** If you could take a look at Exhibit 314, which has also

13  already been admitted.

14  **A.** That would be the south side of the building where the

15  main part of the damage was done.

16  **Q.** You can see what appears to be yellow tape going around

17  it.  Do you see that in the picture?

18  **A.** Yes.

19  **Q.** What is that?

20  **A.** That's crime scene tape.

21  **Q.** Did you have any part in putting up that crime scene tape?

22  **A.** No, I believe that tape was actually already put up by the

23  fire department when we arrived.

24  **Q.** If you could look at 316.  Do you recognize that?

25  **A.** Definitely.  That's a head-on shot of the south side of

the Center for Urban Horticulture.

**Q.** What are we looking at right in the center?

**A.** The very center office without windows in it is office A17, Toby Bradshaw's office.

**Q.** You can look at what has not been introduced but is in front of you, it's Government Exhibit 325-A.

Do you recognize that?

**A.** Yes, this is a photograph of where the snake cages were found.

MR. BARTLETT: Offer 325-A.

THE COURT: I think it's previously been admitted.

THE CLERK: Yes.

MR. BARTLETT: I'm sorry.

**A.** The snake cages are right there.

BY MR. BARTLETT:

**Q.** This is what you and Mr. Bradshaw talked about?

**A.** Yes, exactly.

**Q.** If you look behind you on the floor, do you see those snake cages or snake boxes, I should say?

**A.** Yes, I do.

MR. BARTLETT: This has been marked as Government's Exhibit 327, Your Honor.

BY MR. BARTLETT:

**Q.** Do you recognize those?

**A.** Yes, I do.

1   **Q.** Did you collect them?

2   **A.** Yes, I did.

3   **Q.** Is that how they looked?

4   **A.** I don't recall them having all the soot on them. I am

5   assuming that must have come from the other evidence, because

6   they were clearly put out there to avoid the fire.

7        MR. BLOOM: I didn't hear you.

8   **A.** They were clearly put outside to avoid the fire because

9   they were in the fire -- in the office before.

10       MR. BARTLETT: Offer 327.

11       MR. BLOOM: No objection.

12       THE COURT: Admitted.

13            (Exhibit No. 327 admitted.)

14  BY MR. BARTLETT:

15  **Q.** During this first day, May 21st, do you and part of your

16  team actually collect items at the scene?

17  **A.** Yes, we did. During the initial part of the search, we

18  collected 12 items that evening.

19  **Q.** And those two snake boxes were items 1 and 2?

20  **A.** Yes, they were.

21  **Q.** If you'll look at Exhibit 318.

22  **A.** I don't have that up here.

23  **Q.** I believe that's already been admitted.

24       Do you recognize that?

25  **A.** Yes, I do. That's the hallway where we entered into the

1  building.

2  **Q.**  Going down toward Toby Bradshaw's office?

3  **A.**  Yes.  The door entering into Toby Bradshaw's office would

4  be on the left side, on this side.

5  **Q.**  Exhibit 320, which I believe is in front of you --

6  **A.**  I don't have 320.

7  **Q.**  -- do you recognize that?

8  **A.**  Yes, I do.

9  **Q.**  What is that?

10  **A.**  A picture taken from outside looking in.  As you look in,

11  you can see the door frame and then the interior window that

12  was leading out to the hallway.

13           MR. BARTLETT:  Offer 320.

14           MR. BLOOM:  No objection.

15           THE COURT:  Admitted.

16                (Exhibit No. 320 admitted.)

17  BY MR. BARTLETT:

18  **Q.**  Can you explain what we are looking at?

19  **A.**  I am taking the picture from the outside looking in, and

20  this right here is the door frame.  These are the windows that

21  look out into the hallway that we previously saw.

22  **Q.**  Exhibit 321?

23  **A.**  I don't have that.

24           THE CLERK:  It's been admitted.

25  BY MR. BARTLETT:

1  **Q.** What are we looking at here?

2  **A.** Another picture taken from outside looking in. It would

3  be the west wall of his office.

4  **Q.** Also outside looking in?

5  **A.** Also from outside looking in.

6  **Q.** And Exhibit 322?

7         MR. BARTLETT: I think it's already been admitted,

8  Your Honor.

9         THE COURT: No, it has not.

10 **A.** 322 is also a picture looking at the rubble from inside

11 looking out.

12        MR. BARTLETT: Offer 322.

13        MR. FOX: No objection.

14        THE COURT: Admitted.

15                (Exhibit No. 322 admitted.)

16 **A.** You can see the sunlight from outside up here, and this is

17 from -- looking inside from the hallway.

18 BY MR. BARTLETT:

19 **Q.** Is that how it looked when you got there on May 21st?

20 **A.** Yes, it did.

21 **Q.** Was there a lot of water?

22 **A.** There was a lot of water, yes.

23 **Q.** Exhibit 323, do you recognize that?

24 **A.** Yes. 323 is a photograph of the dog that -- the dog and

25 the dog handler that came down from British Columbia, that

1  came to assist us in the fire investigation.

2          MR. BARTLETT:  Offer 323.

3          MR. FOX:  No objection.

4          THE COURT:  Admitted.

5              (Exhibit No. 323 admitted.)

6  BY MR. BARTLETT:

7  **Q.**  Where are we looking?

8  **A.**  The south side of the building right outside Toby

9  Bradshaw's office.  This right here would be Toby's office.

10  **Q.**  Is that an area where you recovered items on May 21st?

11  **A.**  Yes, it is.

12  **Q.**  Is that because of what the dog is doing?

13  **A.**  That's correct.  We had the dog work from the outside in,

14  so we wanted to make sure that we systematically started the

15  dog in a place that was neutral from outside and working in.

16  **Q.**  During the time that you are there on May 21st, obviously

17  you or someone else is taking pictures of what's going on?

18  **A.**  Yes, that's correct.

19  **Q.**  How is it that you go about collecting evidence?

20  **A.**  First, what we do is we observe -- we first take pictures

21  of everything that we see before we've entered the scene to

22  look further in detail, and then as we come upon the evidence,

23  for example, the flare that we saw with the wires hanging out,

24  clearly that was something that did not fit in an office.  So

25  that was what clued us in that that was something we wanted to

1   collect.

2       We try to take a picture so you can see how it looked as

3   we saw it at the scene, and then we take a picture of it on

4   like a white sheet of paper if we can, or we remove it from

5   where it was to take a better picture of it.

6   **Q.**   Did you take steps to try and prevent you and other

7   investigators from contaminating the scene?

8   **A.**   Yes.   Anybody entering or exiting the scene had to wash

9   their boots with soapy water.   We also -- every time we

10  collected evidence, like the samples outside, we washed those

11  tools off with soapy water as well.

12  **Q.**   When you collected evidence, were you using your bare

13  hands or did you have gloves on?

14  **A.**   No, I used gloves.

15  **Q.**   If you could step down and take a look at what's been

16  marked as Government's Exhibit 330-A and tell me if you can

17  recognize that.

18  **A.**   330-A?

19  **Q.**   Is it the plastic bag in front of you?

20  **A.**   Is it item 7?   Yes, the 330-A.

21  **Q.**   Can you take that up to the witness stand and tell me if

22  you recognize that and how you recognize it, if you do.

23  **A.**   I do recognize this.   This was the melted plastic.   It

24  looked like maybe the rectangular pail that we found that the

25  wires were attached to.   It was actually kind of in the water.

1   The melted plastic thing is actually still even now attached
2   to carpet and we had to cut around the carpet to get it out.
3   Q.  When did you first see that?
4   A.  We saw that after we saw the flare and the wires and went
5   further down to see where the wires were leading to, and
6   that's where I found the plastic.
7   Q.  This is on May 21st?
8   A.  Yes, it is.
9   Q.  What did you do?
10  A.  At that time, we took the best photographs we could in
11  place, and then we collected it and we put this particular
12  piece in a large over-packed container.
13          MR. BARTLETT:  I would like to offer Government's
14  Exhibit 330-A.
15          MR. FOX:  No objection.
16          THE COURT:  Admitted.
17              (Exhibit No. 330-A admitted.)
18  BY MR. BARTLETT:
19  Q.  I believe in front of you there is a photograph, 328.
20  Tell me if you can recognize that.
21  A.  Yes.  This is a photograph of when we took a photo of that
22  particular item in place where we found it.
23          MR. BARTLETT:  Offer 328.
24          MR. FOX:  No objection.
25          THE COURT:  Admitted.

1          (Exhibit No. 328 admitted.)

2    BY MR. BARTLETT:

3    **A.** The item that was in the plastic bag is right here.

4    **Q.** You said it was actually -- you had to cut the carpet out?

5    **A.** Yes, that's correct.  It was melted to the carpet.

6    **Q.** What is it that we are looking to -- it would be the left

7    of the photograph, the opposite side of your hand?

8    **A.** Right there?

9    **Q.** Yes.

10   **A.** That's the open filing cabinet drawer that the other wires

11   went up into.

12   **Q.** If you could step down and take a look at what's been

13   previously marked as Government's Exhibits 333, 336 and 339,

14   which I think were your items 9, 10 and 12.

15   **A.** Yes.  This is item 9, 10 and 12 on my log sheet.

16   **Q.** Taking them one at a time, you said 331 -- excuse me --

17   Exhibit 339.

18   **A.** Yes.

19   **Q.** Do you have that?  Now, was there a metal pail when you

20   recovered this?

21   **A.** Was there what?

22   **Q.** Was there a metal pail?  Was that part of your recovery?

23   **A.** No.  This is a can that we actually used to preserve the

24   evidence in.  It's an unlined paint can.

25   **Q.** So as you recovered things, you put it in there?

1  **A.** Correct. The best way to handle evidence from a fire,

2  especially with the fuel that we could smell, would be to put

3  it in a paint can.

4  **Q.** You could smell fuel at this point?

5  **A.** Yes, heavily.

6          MR. BARTLETT:  Offer 339.

7          MR. FOX:  Can the witness explain what is inside the

8  can?

9          THE COURT:  What are you saying?  I don't understand

10  you.

11          MR. FOX:  No objection.

12  **A.** Inside this particular can is a digital clock battery, a

13  clock face and other small electrical components that we found

14  on the top of that filing cabinet.

15          MR. FOX:  Thank you.

16              (Exhibit No. 339 admitted.)

17  BY MR. BARTLETT:

18  **Q.** And Exhibit 336.

19  **A.** 336 was -- again, we put the evidence in a paint can, and

20  it was more wires and a 9-volt battery that were found on top

21  of the filing cabinet.

22          MR. BARTLETT:  Offer 336.

23          THE COURT:  No objection.  Admitted.

24              (Exhibit No. 336 admitted.)

25  BY MR. BARTLETT:

1  Q.  Finally, 333.

2  A.  333 was more wires and unidentified electrical components

3  that were found in the drawer.

4          MR. BARTLETT:  Offer 333.

5          MR. FOX:  No objection.

6          THE COURT:  Admitted.

7              (Exhibit No. 333 admitted.)

8  BY MR. BARTLETT:

9  Q.  Could you take a look at a photo that I believe is in

10  front of you, Exhibit 331?

11      Do you recognize that?

12  A.  Yes.  That's the open filing cabinet drawer where we found

13  all those wires and electrical components.

14  Q.  The three items you just talked about?

15  A.  Yes.

16          MR. BARTLETT:  Offer 331.

17          MR. FOX:  No objection.

18          THE COURT:  Admitted.

19              (Exhibit No. 331 admitted.)

20  BY MR. BARTLETT:

21  Q.  Can you point out -- I realize we are looking at a fairly

22  tough photograph.  Can you point out any of the items you

23  recovered?

24  A.  Well, it is difficult to see the items.  That's why we

25  take them out and put them out on a piece of white paper, but

1  right here you can see some of the wires that were going down.
2  It's hard to see within the ashes and whatnot, but right on
3  top of here is where we found the clock face and batteries.
4  Q.  As we look at this photograph, at least it appears in the
5  bottom right-hand corner that we have a date that does not
6  match up with May 21st?
7  A.  That is correct.  I apologize.  I am pretty good at taking
8  photographs, but the data back on the back of those cameras I
9  have yet to be able to get the date changed on those, so my
10 apologies.  That's my mistake.
11 Q.  Can you take a look at Exhibit 337?  It's also a
12 photograph?
13 A.  Yes.
14 Q.  Do you recognize that?
15 A.  Yes.  Those are the pieces that we found in the top of the
16 drawer.  We put them on a piece of white paper so you could
17 see them better.
18         MR. BARTLETT:  Offer 337.
19         MR. FOX:  No objection.
20         THE COURT:  Admitted.
21             (Exhibit No. 337 admitted.)
22 A.  Right here is the digital clock face and then the smaller
23 pieces were electrical components.
24 BY MR. BARTLETT:
25 Q.  Could you look at Exhibit 308, which I believe is a

1  diagram?

2  **A.**  Yes.

3  **Q.**  Do you recognize that?

4  **A.**  Yes.  This is a drawing of where the furniture items were

5  placed inside Toby Bradshaw's office.

6          MR. BARTLETT:  Offer 308 for illustrative purposes.

7          MR. FOX:  No objection.

8          THE COURT:  Admitted.

9              (Exhibit No. 308 admitted.)

10  BY MR. BARTLETT:

11  **Q.**  Can you give us a perspective; where's the interior door

12  that you walked through?

13  **A.**  The interior door that we walked into the office is right

14  there, and we walked in and right here is where we found the

15  plastic melted pail, and in the upper filing cabinet drawer is

16  where we found the electrical components and the wires.

17  **Q.**  How many total items did you recover on that first day?

18  **A.**  On the first day, we recovered a total of 12 items.

19  **Q.**  What time did you end your work that night?

20  **A.**  Approximately 8 p.m., Seattle Fire Department Captain

21  Pringle called the search and said we would resume the next

22  day in the morning.

23  **Q.**  Did you take any steps to secure the scene overnight?

24  **A.**  Yes, we did.  University of Washington Police had already

25  put up a barricade fence around the whole scene, and they

1  stayed with the scene all night to make sure that there were

2  no intruders.

3  **Q.**  Did you come back the next day?

4  **A.**  Yes, I did.

5  **Q.**  By yourself?

6  **A.**  No.  The second day the entire FBI Evidence Response Team

7  arrived with me, along with ATF Mark Stites, Art Ahern and I

8  believe also University Police Department Rich Lewis was there

9  and Ed Butler.

10  **Q.**  What did you do the second day?

11  **A.**  The second day, as we've seen the evidence from the first

12  day, the second day we are going to do an even more thorough

13  search, pretty much empty the entire room to basically leave

14  no stone unturned.

15      We want to make sure that we have the actual cause of the

16  fire and that we've found every item possible that we could to

17  put the devices back together.

18  **Q.**  Did you write a report relating to your search of May

19  22nd?

20  **A.**  Yes, I did.

21  **Q.**  Make a mistake on it?

22  **A.**  Yes, I did make a mistake on my report.

23  **Q.**  Can you explain that?

24  **A.**  On my report, within the body of the report, I

25  inadvertently used June instead of May.  However, on the

bottom of my report where it says investigation on, I have May

22, 2001 and the date that the report was dictated was May 30,

2001.

**Q.** When did you begin the search on May 22nd?

**A.** We began at roughly 9:00 in the morning.

**Q.** How many items did you collect that second day?

**A.** The second day, we collected 76 items.

**Q.** With regard to all of those items, the 12 you had the

first day, the 76 you get the next day, all 88, what happens

to them?

**A.** All 88 items were then -- at the conclusion of each day,

they were all secured in the FBI space. Once we had all 88

items together, I sent everything back to the FBI laboratory

for their analysis.

**Q.** Where is that?

**A.** Washington, D.C.

**Q.** Can you take a look at what's been marked as Government's

324, a photograph that's in front of you?

**A.** Yes.

**Q.** Do you recognize that?

**A.** Yes, that's the search on the second day, May 22nd.

      MR. BARTLETT: Offer 324.

      MR. FOX: No objection.

      THE COURT: Admitted.

            (Exhibit No. 324 admitted.)

BY MR. BARTLETT:

**Q.** Can you kind of explain what we are looking at?

**A.** Again, here is Toby Bradshaw's office, right there. These buckets here and here -- I was inside the building and I was passing them outside through the window to the other members of my team so as to not contaminate and cross-contaminate.

Once outside, they take these buckets of debris and they would sift them with these sifters over here, and that way we can find some of the smaller electrical components that we found.

Eventually throughout the day, everything that was in the office was outside. We had another tarp that we laid everything out, diagramming somewhat kind of respectively where all of the items were found in Toby's office.

**Q.** And the white -- I guess it looks like a tarp that's in the center of the photograph -- what is that?

**A.** Correct. That's the tarp actually where we laid everything out in the office. We were collecting pieces of interest and we were separating them on the tarp. Once we bagged them and put an FBI seal on them, then we would number them and walk them out to the evidence log.

**Q.** Could you step down and pick up what's been previously marked as Government's Exhibit 342? I think it's item 47.

Do you recognize that?

**A.** Yes, I do.

Q.  What is it?

A.  It was some more sifted debris that we recovered on the
second day of the fire investigation.

Q.  Where did you recover it?

A.  We recovered this specifically in the northeast corner of
the office A17.

Q.  Toby Bradshaw's office?

A.  Yes, correct.

          MR. BARTLETT:  Offer 342.

          MR. FOX:  No objection.

          THE COURT:  Admitted.

               (Exhibit No. 342 admitted.)

BY MR. BARTLETT:

Q.  Do you also have Exhibit 345, which would be item 58?  Did
I say 348?

          THE COURT:  I thought you said 345.

BY MR. BARTLETT:

Q.  That is exactly what I want you to look at.

     Do you recognize that?

A.  Yes, I do.  This is another melted container that we found
more towards the southwest corner of the room.

Q.  The room being Mr. Bradshaw's office?

A.  Yes, in office A17, Toby Bradshaw's office.

          MR. FOX:  Which corner?

          THE WITNESS:  The southwest corner.

1          MR. FOX:   Thank you.

2     BY MR. BARTLETT:

3     **Q.** What did you do and how did you actually recover it?  You

4     talked about the first time that you had to actually cut

5     carpet around.

6          Did you have to do that again this time?

7     **A.** Yes.  This one still has some carpet attached to it as

8     well.

9          MR. BARTLETT:   Offer Government's Exhibit 345.

10          MR. FOX:   No objection.

11          THE COURT:   Admitted.

12               (Exhibit No. 345 admitted.)

13    BY MR. BARTLETT:

14    **Q.** Can you take a look at a photograph in front of you,

15    Exhibit 343?  Do you recognize that?

16    **A.** Yes.

17    **Q.** What is it?

18    **A.** This is a photograph of where we found the second melted

19    rubber container.

20    **Q.** The one we were just looking at?

21    **A.** Yes.

22          MR. BARTLETT:   Offer 343.

23          MR. FOX:   No objection.

24          THE COURT:   Admitted.

25               (Exhibit No. 343 admitted.)

BY MR. BARTLETT:

**Q.** Is that how it first looked when you saw it?

**A.** Yes, it did.

**Q.** If you could look at what's already been entered into -- Special Agent Halla can pull up 308 -- the diagram of Toby Bradshaw's office.

What is it that we are looking at?  Where was that item found?

**A.** This item was found in this corner of the office where the circle is.

**Q.** Thank you.  Finally, if you could step down and grab Exhibit 348, which I believe is item 63.

Do you recognize that?

**A.** Yes, I do.

**Q.** What is it?

**A.** This is more debris that was found, metal components that were found in the southwest corner.

**Q.** Near where you recovered the --

**A.** Right, near where I found the second melted container.

MR. BARTLETT:  Offer Government's Exhibit 348.

MR. FOX:  No objection.

THE COURT:  Admitted.

(Exhibit No. 348 admitted.)

BY MR. BARTLETT:

**Q.** Once again, if you can look at a photo that's not been

1 admitted into evidence, Exhibit 346, do you recognize that?

2 **A.** Yes, I do.

3 **Q.** What is it?

4 **A.** I don't know exactly what it is.  I am not an expert in

5 metal components, but it appeared to be something that looked

6 out of place.  Right next to it is also what appears to be a

7 book of matches.

8       MR. BARTLETT:  Offer 346.

9       MR. FOX:  Agent, you found this at the scene?

10       THE WITNESS:  Yes, I did.

11       MR. FOX:  No objection.

12       THE COURT:  Admitted.

13          (Exhibit No. 346 admitted.)

14 **A.** Right here in my hand is the small electrical components,

15 and right here is what appears to be a matchbook.

16 BY MR. BARTLETT:

17 **Q.** In addition to the items that we are actually introducing,

18 do you have a list of other items that were sent back to the

19 lab?

20 **A.** Yes, I do.

21 **Q.** If we could just go through taking -- did you send item 8

22 back?

23 **A.** Yes.

24 **Q.** What was that and where was it found?

25 **A.** It was a circular or metal plastic piece on the floor that

1  was near the metal cabinet.

2  **Q.**  Item 22?

3  **A.**  Item 22 was more sifted debris found in the southeast

4  corner of the floor.

5  **Q.**  Of Toby Bradshaw's office?

6  **A.**  Correct, of Toby Bradshaw's office.

7  **Q.**  Item 26?

8  **A.**  26 were more debris that were found from the southeast

9  corner of office A17, Toby Bradshaw's office.

10  **Q.**  Item 48?

11  **A.**  Item 48 was more sifted debris that was recovered from the

12  southwest corner of Toby Bradshaw's office.

13  **Q.**  Item 56?

14  **A.**  No. 56 was a sample of the accelerant or the gasoline that

15  was used in the firefighter's chainsaw.

16  **Q.**  Why did you do that?

17  **A.**  We took that as a controlled sample to prove or disprove

18  that that was the fuel that might have been -- that we smelled

19  in the office.

20  **Q.**  Item 65?

21  **A.**  Item 65 were ashes that we found in the northeast corner

22  of the office, Toby Bradshaw's office.

23  **Q.**  Item 67?

24  **A.**  67 was fuel -- I am sorry, carpet with fuel on it.  It was

25  also recovered from the northwest corner of the office.

**Q.** Why do you say it was carpet with fuel on it?  Could you smell it?

**A.** Oh yes, absolutely.

**Q.** And finally, item 72?

**A.** 72 was more sifting debris from the southwest corner of Toby Bradshaw's office.

**Q.** You would collect all the items on the second day.  Where do you take them after you collect them?

**A.** As soon as we were done with the search -- we took all the items that were sealed from the scene, we took them to the FBI office in Seattle and locked them in the evidence room.

**Q.** And then sent them back to D.C.?

**A.** Then we sent them along with the first 12 items to Washington, D.C.

    MR. BARTLETT:  One moment, Your Honor.

No further questions.

    THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. FOX:

**Q.** Good morning.

**A.** Good morning.

**Q.** I am Neil Fox.  I am one of the lawyers helping Briana Waters.

**A.** Great.  Nice to meet you.

**Q.** Agent Stephan --

1  **A.**  Stephan.

2  **Q.**  Is there a difference between an accelerant dog and an

3  explosive dog?

4  **A.**  I am not aware.  I am not a professional that deals with

5  dogs in particular.  I do know that there are some dogs that

6  are trained to smell perhaps just drugs and some that are

7  trained to smell perhaps just gasoline.

8  So in this particular case, ATF Doug Krogh had requested a

9  dog that was skilled in smelling accelerants.

10 **Q.**  Accelerants -- but do you know of any explosives dogs that

11 the FBI has?

12 **A.**  I know that the FBI has some, but I don't know them

13 personally.

14 **Q.**  Now, you are trained to gather evidence; is that correct?

15 **A.**  Yes.

16 **Q.**  And you don't analyze it, right?

17 **A.**  No, I do not.

18 **Q.**  You are not a scientist?

19 **A.**  No.

20 **Q.**  That's why you send stuff off to the lab?

21 **A.**  I was a finance major in college.

22 **Q.**  A finance major?

23 **A.**  Correct.

24 **Q.**  When you gather evidence, it's important to document what

25 you are doing, right?

1  **A.**  Correct.

2  **Q.**  You take notes as you go around, take notes about what you

3  are gathering, right?

4  **A.**  Yes, we keep an evidence log depicting what items we found

5  and where we found them.

6  **Q.**  Do you actually take down those notes, or do you have

7  somebody walking with you?

8  **A.**  There's usually somebody walking with me.

9  **Q.**  Then you also have cameras to document things as well?

10  **A.**  That's correct.

11  **Q.**  If you just get the dates right?

12  **A.**  That's correct.  It's hard to change those.

13  **Q.**  But the reason why you have cameras is kind of like a fail

14  safe from your memory of things, right?

15  **A.**  I suppose.  I mean, I remember the scene like they are

16  depicted in the photographs, but we do the photographs to

17  memorialize actually what happened.

18  **Q.**  Then you also have video cameras too, if you need them?

19  **A.**  We don't use video cameras in our crime scenes.

20  **Q.**  You don't?

21  **A.**  I have not.

22  **Q.**  Then you write up reports as well, right?

23  **A.**  Correct.

24  **Q.**  You take your notes and you transfer them to some sort of

25  typed report?

1 **A.** That's correct.

2 **Q.** When you do that, but for a few typographical mistakes,

3 you try the best you can to transfer that accurately, right?

4 **A.** That is correct.

5 **Q.** Because if you get transferred to some other posting,

6 someone else may have to review your reports and see what

7 happens?

8 **A.** That's correct. That's exactly what happened.

9 **Q.** In fact, in this case you sent your report off to the FBI

10 lab so they would have your report when they are looking at

11 all those evidence items?

12 **A.** That's correct.

13 **Q.** Along with all those photographs, right?

14 **A.** We sent them the photographs and our evidence recovery

15 log. I don't know that at that time I sent them my 302s

16 specifically detailing what we did on those days.

17 **Q.** But you sent off, so that they would know, based upon your

18 logs, what they were looking at when they got the materials?

19 **A.** Correct. However, most -- a lot of the items that I found

20 were sifted debris, and I didn't know exactly what they were.

21 I just knew that they didn't fit in the office type setting.

22 **Q.** Sure. And the reason why you send sifted debris is that

23 there might be evidence contained in that debris that may

24 become apparent down the road?

25 **A.** That's correct.

1  **Q.** Since we are talking about evidence, we are looking at

2  perhaps electrical components?

3  **A.** Correct. Again, I am not an expert in incendiary devices.

4  Therefore, I collect things that don't seem to fit. So if I

5  don't know about them, then I collect them and let the lab

6  determine if they were important or not.

7  **Q.** There might be other types of trace evidence as well,

8  right?

9  **A.** Correct, fingerprints and whatnot.

10  **Q.** Hairs? Fibers?

11  **A.** Correct.

12  **Q.** When you make up your 302 -- what is a 302?

13  **A.** A 302 is a report depicting what we did during the

14  investigation on a particular day.

15  **Q.** What's the purpose of a 302?

16  **A.** The 302 also memorializes what actions we took during that

17  day.

18  **Q.** Does the FBI have regulations about the production of

19  302s?

20  **A.** We have guidelines.

21  **Q.** Do you know what those guidelines say? Have you read

22  them?

23  **A.** I have read them, yes.

24  **Q.** Do they give you instructions about what types of details

25  to include in the 302s?

1    **A.** Not specific detail. The 302s were designed to depict the

2    details that happened. You simply -- you take the notes and

3    go from what your recollection is and you put that into your

4    report on the account of the activities that happened during

5    that day.

6    **Q.** The important activities?

7    **A.** Everything that was important to the crime scene, yes.

8    **Q.** Thank you.

9            MR. FOX: I have no further questions.

10           MR. BARTLETT: Nothing, Your Honor.

11           THE COURT: All right. This witness can be excused?

12   All right. You may step down.

13       Let's take the morning recess at this time and give you a

14   break. Of course, don't discuss the case. Leave your books

15   on the chairs. I will have you back in here in about 15

16   minutes.

17           THE CLERK: All rise. Court will be in recess.

18       (Morning recess.)

19           THE COURT: Ready for the next witness?

20           MR. BARTLETT: We are.

21       (Jury present.)

22           THE COURT: All right. You may be seated.

23       Ready for the next witness?

24           MR. BARTLETT: Your Honor, at this time, the United

25   States calls Ron Kelly to the stand.

1    THE COURT:  All right.  Just come forward and raise

2 your right hand and be sworn.

3    RONALD KELLY, called as a witness, duly sworn.

4    MR. BARTLETT:  May I proceed, Your Honor?

5    THE COURT:  Yes.

6                    DIRECT EXAMINATION

7 BY MR. BARTLETT:

8 Q.  Mr. Kelly, could you tell the members of the jury your

9 first and last name and spell your name for the Court

10 Reporter?

11 A.  Ronald Kelly, K-E-L-L-Y.

12 Q.  Where do you work, Mr. Kelly?

13 A.  I am employed by the Federal Bureau of Investigation, and

14 I am assigned to the FBI laboratory in Quantico, Virginia.

15 Q.  What do you do there?

16 A.  At the FBI laboratory, I am assigned in the explosives

17 unit as an explosives and arson chemist.  My duties there

18 involve the analysis of evidence received from state, local

19 and federal law enforcement agencies, mainly dealing with the

20 investigations of fires and explosions.

21 Q.  Can you briefly explain to the members of the jury your

22 educational background?

23 A.  Certainly.  I was born and raised in the Washington, D.C.

24 area.  I went to the University of Maryland.  I graduated in

25 1977 with a Bachelor of Science degree in chemistry.  I

continued an additional year. I decided to go into law
enforcement, and I was taking criminology courses for an
additional year at the University of Maryland before being
hired by the FBI in September of 1978.

**Q.** When you were first hired by the FBI, where were you
assigned?

**A.** My first assignment was with the FBI laboratory that was
currently in Washington, D.C. I was assigned to the chemistry
toxicology unit as a chemist.

**Q.** Since the time that you joined the FBI, have you received
any training in addition to the formal education that you've
just described?

**A.** Yes. While at the FBI, I have attended many training
courses that involve the analyses and investigations that we
conduct in the FBI laboratory, and a lot of that training I
received at our training facility, the FBI academy at
Quantico, Virginia.

I also attended numerous courses that are offered by
outside law enforcement agencies, private companies,
instrument companies, that deal with the analysis that I
perform in the laboratory as well as other related-type
courses to my subject matter.

Also while at the FBI, I trained under the supervision of
experienced chemists in the various units and received a lot
of on-the-job training as well.

**Q.** Could you estimate how many different courses you've gone
through over the years?

**A.** Oh, my gosh. I have probably attended well over 100
different types of courses, seminars, educational conferences
in the almost 30 years that I have been employed with the FBI
now.

**Q.** Are you a member of any professional organizations?

**A.** Yes. I am a member of several organizations, to include
the International Association of Arson Investigators, American
Academy of Forensic Science, the American Society for Testing
and Materials, to name a few.

**Q.** You talked about going to courses and taking courses
yourself to improve your education. Have you ever taught
courses?

**A.** Yes. More in the last 10, 15 years or so now, I have been
involved with the instructional aspect of forensics. We teach
several courses at the FBI academy related to arson
investigation, explosion investigations, chemical analysis of
evidence from those type of cases, as well as we teach state,
local and other federal law enforcement officers, as well as
do international training now in those subject matters.

**Q.** Can you estimate just in very broad terms, how many
different cases you've worked on as a forensic chemist for the
FBI?

**A.** I probably, on the average, worked on at least 100 cases a

year, so if you want to extrapolate that over about 30 years,

I have probably done well in excess of about 300 cases.

**Q.** Have you ever testified as an expert in the field of

forensic chemistry?

**A.** Yes, I have. I've testified at state and local as well as

federal and international trials, and I believe my number

right now is about 36 testimonies.

**Q.** Were you asked as part of your duties at the FBI lab to

analyze various items that Special Agent Stephan and other

individuals collected at the arson scene of the Center for

Urban Horticulture on May 21st and May 22nd?

**A.** Yes, I did. I received evidence on several occasions

related to the investigation involved here.

**Q.** Can you explain to the members of the jury -- you are back

at the lab, what happens? How do you get evidence and what do

you do?

**A.** Typically with the FBI, the laboratory is the central

location and we receive most of our evidence through certified

mail at the FBI. We have an evidence receiving facility,

which receives the initial mailing of the evidence, and then

from that point, the evidence is subsequently delivered to the

various units that are involved with the analysis of that

evidence.

At that point, we have many individuals that may be

involved in a large case such as this, so we would have

1  several examiners that are assigned to the case that would

2  receive evidence from a primary examiner.  Thus, I would

3  receive evidence from the primary examiner in this case,

4  because I was not the lead forensic individual in the lab.

5  **Q.**  Who was the lead in this case?

6  **A.**  The lead examiner on this particular case was Don

7  Sachtleben.

8  **Q.**  What did you get and approximately when did you start

9  working on the case?

10  **A.**  The evidence arrived at the FBI lab on May 25th, 2001, and

11  the first contact I had was the following day, Saturday, May

12  26, 2001.

13  **Q.**  What did you do?

14  **A.**  On that particular day, with Mr. Sachtleben, I reviewed an

15  initial set of evidence, began processing that evidence for

16  the detection and presence of ignitable liquids and performed

17  a variety of examinations that day.

18  **Q.**  How do you do that?

19  **A.**  The particular examinations that I performed, again, was

20  to detect the presence of ignitable liquids.  Ignitable

21  liquids is another common term that refers to flammable or

22  combustible liquids.  The analysis is fairly straightforward.

23     I take our evidence, which usually comes in in bags or

24  cans, and we suspend a small piece of carbon strip.  Carbon is

25  a very absorptive material and we spin that in the container.

The purpose of that is to absorb any vapors that may be within that container, a process very similar to you putting a box of baking soda in your refrigerator to remove the odors from your refrigerator. That's the purpose of the charcoal strip in the can.

That charcoal strip is sealed within the container, the bag or the can. It's heated to approximately 85 degrees Centigrade for several hours, allowed to cool, and then that charcoal strip after a while is removed. I take a small amount of a solvent material that removes those absorbed vapors from that charcoal strip, and then I take a very, very small portion of that solvent and perform an instrument analysis on it that we refer to as gas chromatography mass spectrometry.

**Q.** What does that tell you?

**A.** Gas chromatography mass spectrometry is a very common and often-used technique in the laboratory for the analysis of organic materials. Ignitable liquids are organic materials.

Keep in mind, most ignitable liquids -- take, for example, gasoline -- is not just a single compound. It's a very complex mixture of well over 400 compounds.

So the reason why we use gas chromatography as our analytical technique is that's a separation technique in which a complex mixture, such as gasoline, can be separated into the individual components so that the analyst, such as myself, can

more easily recognize the material.

Gas chromatography is nothing more than a long tube, sort of like a garden hose that's about 30 meters long, but it's the size of a needle, and you would inject that small amount of solvent from that carbon strip wash at the beginning of that column, and the compounds go racing through.

It's very similar to sort of a marathon race, where you get all the runners at the beginning of the race and you fire the gun, and the gun goes off and those 500 runners start running. Well, the fastest and swiftest are going to cross the finish line first. The slowest and the more out of shape ones are going to finish slower and last.

That's the same way gas chromatography works, the faster, swifter molecule compounds come off the column first; the heavier, slower compounds come off last. So we get a separation of the many compounds that are in gasoline. That is the separation part of the technique, the gas chromatography.

The mass spectrometry is an identification of the technique, so as those runners cross the finish line, in this case the compounds come out of the chromatograph, they are analyzed for various mass characteristics. So we can get molecular weights and certain structural information about the compounds, which actually allows us to identify the various compounds that are coming off the gas chromatograph. So it's

1  a very powerful technique that we use for the identification

2  of ignitable liquids.

3  **Q.** You did that in this case?

4  **A.** Yes, that was performed in this case.

5  **Q.** Taking a look first at Exhibit 330-A which I think is

6  right beside you in your seat.

7     Do you recognize that?

8  **A.** Yes, I do.

9  **Q.** How do you recognize it?

10 **A.** On each of the items of evidence, there's a laboratory

11 number.  In this case, the laboratory number is 01-0525005.

12 Also, several days ago, I had the opportunity to review this

13 evidence, and within the bags itself there are my initials on

14 some of the subsequent bags.

15    This is a bag that's been used after the analysis to

16 contain the evidence, which I did not have access to at the

17 time, or I used myself.  The bags that I had encountered are

18 within the bag as you can possibly see by looking through it.

19 My initials appeared on those bags.

20 **Q.** So what did you do with this?

21 **A.** Again, as I mentioned, this evidence was analyzed for the

22 presence of ignitable liquids, so a C-strip was suspended

23 inside the bag, heated, removed and analyzed by gas

24 chromatography and mass spectrometry.

25 **Q.** What did you find?

1   **A.**   Within the bag, I identified gasoline or residues of

2   gasoline.

3   **Q.**   In addition to identified gasoline, were there any other

4   items within that bag that you performed a chemical analysis

5   on?

6   **A.**   Yes, there was.  Within the bag, there was a noticeable

7   object that looked very similar to a road flare.  A road flare

8   is a pyrotechnic instrument that we are all familiar with, and

9   I did an analysis on that particular object just to confirm

10   that the contents of that were consistent with a road flare,

11   and they were.

12   **Q.**   What is in a road flare?

13   **A.**   The main pyrotechnic, the red glow that you see that comes

14   from a road flare, is from a chemical called strontium

15   nitrate, and that is the chemical that was present within that

16   flare, within the bag.

17   **Q.**   If you could take a look at what's also been entered into

18   evidence -- and I think it's beside you -- as Exhibit 345.

19        Once again, do you recognize that?

20   **A.**   Yes, I do.

21   **Q.**   How do you recognize it?

22   **A.**   Again, in a similar way, there is a laboratory number,

23   01-0525005, and again you can actually see my initials on the

24   inside of -- on the bag which I actually encountered when I

25   received the evidence.

**Q.** Once again, what did you do with 345?

**A.** 345 was analyzed in an identical manner as the previous one using the carbon strip techniques and gas chromatography mass spectrometry.

**Q.** What did you find?

**A.** Again, gasoline or residues of gasoline were identified.

**Q.** This time you are going to have to step off. If you look at the boxes down below, I believe you'll see that there is one marked 342. If you could pull the paper bag out that is marked as 342.

Do you recognize that, Mr. Kelly?

**A.** Yes, I do. Again, the laboratory number is on the bag, as well as on the container. In this case, another set of initials that I use, called our laboratory symbols. GG, up there on the can.

**Q.** What did you do with this?

**A.** Again, the same type of analysis for the presence of ignitable liquid. The carbon strip and gas chromatography was used on the analysis of this item.

**Q.** What, if anything, did you determine?

**A.** Again, gasoline or residues of gasoline were identified.

**Q.** Without going into other items that we have not physically entered into evidence, did you perform analysis on other exhibits that Special Agent Stephan sent back to you?

**A.** Yes. I performed an analysis on approximately 24 items,

1  specifically for the presence of ignitable liquids.

2  **Q.** I am looking at exhibit -- your exhibit would be Q8.

3  **A.** Yes.

4  **Q.** Can you summarize what you found with regard to those

5  various analyses.  Perhaps you can explain -- we are getting

6  so many numbers here.  We have got our exhibit number and then

7  we have the FBI exhibit number.

8      Do you guys have another type of exhibit number when it

9  gets to the lab?

10  **A.** Yes, it does.  When the evidence comes into our

11  laboratory, we assign it an item number with either a "Q"

12  designation or a "K" designation.  In this particular

13  submission, all the items received a "Q" designation.  So I

14  have items Q1 through approximately Q90-something in this

15  particular submission.

16      So when I refer to a result in my report, I will mention

17  something along the line of specimen Q8 was analyzed, and

18  gasoline or something was identified in that sample.

19      So that's going to be different from the exhibit number

20  like this one, which is 342.

21  **Q.** What did your analysis find with regard to the various

22  exhibits that you analyzed?

23  **A.** Of the 24 items that I analyzed for the presence of

24  ignitable liquids, 13 of them were found to be positive for

25  the presence of gasoline or residues of gasoline.

1   **Q.** Do you have those Q numbers?

2   **A.** Yes, I do. They are in a report that I have in front of

3 me. If I could read that or refer to that.

4         MR. FOX: No objection.

5         THE COURT: All right.

6 BY MR. BARTLETT:

7   **Q.** In addition to the Q number, does it have the original FBI

8 number?

9   **A.** The case file number, is that what you are referring to?

10   **Q.** Yes.

11   **A.** Yes, it does. This particular report that I issued was on

12 June 11, 2001, for the case ID of 266 A-SE-85962, and the FBI

13 laboratory number of 010525005.

14     Within that report, the 13 items that I found gasoline or

15 residues of gasoline, those items were Q7, Q8, Q22, Q26, Q49,

16 Q50, Q56, Q58, Q60, Q67, Q69, Q73 and Q74.

17   **Q.** Did you also find -- analyze various items where there was

18 no ignitable liquid?

19   **A.** That is correct. There were also 11 items which were

20 found to not contain identifiable ignitable liquids. Those

21 items were Q4 through Q6, Q29, Q39 through Q44, and Q.

22         MR. BARTLETT: Nothing further, Your Honor.

23                 CROSS-EXAMINATION

24 BY MR. FOX:

25   **Q.** Good morning.

1  **A.**  Good morning.

2  **Q.**  We met outside, didn't we?  So it is Agent Kelly?

3  **A.**  No, it's Mr. Kelly.

4  **Q.**  Mr. Kelly.  Mr. Kelly, you have a chemistry degree?

5  **A.**  That is correct.

6  **Q.**  But you are not just a chemist, you are also a fire

7  investigator, right?

8  **A.**  That is one of my skills that I bring to the FBI, that's

9  correct.

10  **Q.**  As part of being a fire investigator, you also deal with

11  explosions too, right?

12  **A.**  That's correct.

13  **Q.**  Now, you've published, actually, materials in the field of

14  fire investigation?

15  **A.**  I have.

16  **Q.**  Now, what is the Technical Working Group for Fire and

17  Explosives?

18  **A.**  Again, that is a scientific working group that involves

19  the participation of both fire investigators, explosion

20  investigators and forensic scientists throughout the country.

21  **Q.**  You are a member of that organization?

22  **A.**  It's a working group, so yes.

23  **Q.**  You are actually an officer, aren't you?

24  **A.**  No, I am not.

25  **Q.**  You are not an officer of one of the subcommittees, a

1   co-chair of one of the committees?

2   **A.** Not unless I have been recently assigned.

3   **Q.** Okay. I saw something on the Internet last night. The

4   Scene Education and Training Committee?

5   **A.** Okay. Many of these committees have been defunct for a

6   while. Again, to be quite honest with you, I was not aware

7   that I was a co-chair of that committee.

8   **Q.** Ronald Kelly from the FBI?

9   **A.** Yeah, yes.

10   **Q.** Is there more than one Ronald Kelly?

11   **A.** No, that would be my name. I am not sure if that is a

12   typo on that list. But I am a member of that committee, so

13   that much is absolutely correct.

14   **Q.** I see. You are a member of that committee, and Tom

15   Thurman is the chair?

16   **A.** Yes.

17   **Q.** But you are a member?

18   **A.** Yes, I am.

19   **Q.** I didn't want to give you more work than you've taken on.

20   So the Technical Working Group for Fire and Explosives, it

21   has members from the FBI in it, right?

22   **A.** That's correct.

23   **Q.** And from the ATF, there are members on that organization?

24   **A.** That's correct.

25   **Q.** There are private scientists in private practice that are

1  members?

2  **A.**  Yes, there are.

3  **Q.**  It's actually called TWGFEX, is the acronym?

4  **A.**  That it is.

5  **Q.**  One of the goals of TWGFEX is to develop professional

6  development in fire and explosion investigation?

7  **A.**  That's true.

8  **Q.**  And to provide guidelines for such investigations?

9  **A.**  That's correct also.

10  **Q.**  To gain national acceptance for its guidelines, right?

11  **A.**  This is true.

12  **Q.**  Towards that end, is it not true that TWGFEX puts out a

13  glossary of terms?

14  **A.**  There is a glossary of terms that is posted on the TWGFEX,

15  one of the TWGFEX sites, correct.

16  **Q.**  As a scientist, you rely upon this glossary in the course

17  of your business, right?

18  **A.**  Well, I rely on many sources of reference materials.  No

19  single reference material.

20  **Q.**  That's one source, right?

21  **A.**  That could be a source of reference material I would go

22  to, yes.

23  **Q.**  You have in front of you -- you should have -- what's been

24  marked for identification as Exhibit A-180.  You will have.

25      Take a look at that, skim through it briefly.

1    Can you identify that?

2    **A.**  Yes, this is the -- appears to be the posting of the

3    glossary of terms that appears on the TWGFEX website, yes.

4    BY MR. FOX:

5    **Q.**  And I would refer you, on the second page of that

6    glossary, halfway down that page -- it's true that there's a

7    definition of the term "bomb" in this glossary; is that not

8    correct?

9    **A.**  That's correct.

10   **Q.**  Do you want to read that?

11            MR. BARTLETT:  Objection, Your Honor.

12            THE COURT:  Where is this headed, Counsel?

13            MR. FOX:  Well, I would offer Exhibit A-180 in

14   evidence.

15            MR. BARTLETT:  Objection, Your Honor.  I think he

16   needs to testify whether this glossary is in fact something he

17   relies on.

18            MR. FOX:  He just testified to that.

19            THE COURT:  Well, he testified it's one source of

20   information.

21            MR. FOX:  Right.  Well, I would offer A-180.

22            THE COURT:  I will deal with that at the break, but

23   it will not be admitted at this time.

24   BY MR. FOX:

25   **Q.**  Mr. Kelly, do you have a working definition of the word

1  "bomb" in your professional development?

2  **A.**  I have no single working definition, but there are some

3  general definitions that we use for the term "bomb" itself,

4  yes.

5  **Q.**  Is it true that one of those working definitions is a

6  device containing an explosive, incendiary or chemical

7  material designed to explode?

8  **A.**  That would be one of the definitions that would describe

9  the word "bomb," yes.

10  **Q.**  That is, in fact, is it not, the definition by the

11  organization of which you are a member, TWGFEX?

12  **A.**  That is a definition used by TWGFEX.

13  **Q.**  Again, TWGFEX has law enforcement from many different

14  agencies participating in it, right?

15  **A.**  The participants on TWGFEX come from a very vast variety

16  of individuals within law enforcement, yes.

17  **Q.**  Including individuals such as yourself?

18  **A.**  Yes.

19          MR. FOX:  Thank you.  I have no further questions.

20          THE COURT:  All right.  Anything further?

21          MR. BARTLETT:  Nothing further.

22          THE COURT:  All right.  This witness can be excused

23  then?

24          MR. BARTLETT:  Yes.

25      Your Honor, at this time, the United States calls Don

1    Sachtleben to the stand.

2            THE COURT:   All right.

3        Step forward and be sworn.

4        DONALD SACHTLEBEN, called as a witness, duly sworn.

5            THE COURT:   Take the witness chair, please.

6                        DIRECT EXAMINATION

7    BY MR. BARTLETT:

8    **Q.**   Would you tell the members of the jury your first and last

9    name and spell your last name for the Court Reporter?

10   **A.**   Yes, Donald Sachtleben.   The last name is spelled

11   S-A-C-H-T-L-E-B-E-N.

12   **Q.**   Where do you work, Mr. Sachtleben?

13   **A.**   I am a Special Agent with the FBI.

14   **Q.**   How long have you worked with the FBI?

15   **A.**   Just over 24 years.

16   **Q.**   Can you explain your educational background prior to

17   joining the FBI?

18   **A.**   Yes, sir.   I have a bachelor's degree from Northwestern

19   University and a law degree from DePaul University in Chicago.

20   **Q.**   When did you graduate from the law school at DePaul?

21   **A.**   1983.

22   **Q.**   What did you do after you graduated?

23   **A.**   Took the bar exam, and then I made application and was

24   accepted as a Special Agent later that year.

25   **Q.**   Where were you first assigned?

1    **A.**    First assignment was in Pittsburgh, Pennsylvania.

2    **Q.**    How long did you work in Pittsburgh?

3    **A.**    I was there just under two years, about a little over a

4    year-and-a-half.

5    **Q.**    What were your general duties?

6    **A.**    I was a brand new agent so I had a lot of general

7    investigative duties.  Eventually, I did work some

8    counter-terrorism and counter-intelligence cases.

9    **Q.**    Were you eventually re-assigned from Pittsburgh?

10   **A.**    Yes.  In August of 1985, I was transferred to the San

11   Francisco division of the FBI.

12   **Q.**    What happened when you got to San Francisco?  Can you

13   explain your work history to these jurors?

14   **A.**    Sure.  I was assigned to a counter-terrorism squad in San

15   Francisco.  My job duties included investigating acts of

16   terrorism, bombing cases, anything in that line.

17   **Q.**    How long were you assigned to that group?

18   **A.**    I was there for just short of 11 years.  I left in 1996.

19   **Q.**    During that time, did you become interested in bomb

20   investigation?

21   **A.**    There were several bombing incidents that took place in

22   the San Francisco Bay area while I was there, and I was

23   assigned to do some general investigative work in those cases,

24   and I guess it kind of spurred my interest a little bit, and I

25   sought out some further training in the subject.

**Q.** Have you, in fact, received training as to how to conduct and how to analyze bombs and bomb investigations?

**A.** Yes, sir. Probably the first course I took was in September of '86. The FBI conducts a one-week basic post-bombing investigation course. I took that class at our training academy in Quantico, Virginia.

**Q.** Did you eventually take other courses?

**A.** Yes. In 1990, I sought application and was accepted to be trained as a bomb technician. That's a four-week class that's held in Redstone Arsenal in Huntsville, Alabama. That class covers every aspect of explosives, the rendering safe of explosive devices or bombs, and so that was my most technical training in the subject that I initially took.

**Q.** What's a bomb technician?

**A.** In the United States, there are civilian and military bomb technicians. Obviously, the military bomb technicians largely deal with military devices, things like that. Civilian bomb technicians -- there are roughly 3,000 of us, about 140 within the FBI, we deal with the rendering safe -- that is, I suppose in the movies they would say the diffusing of bombs. So a typical thing might be a call for a suspicious item, go try to evaluate that item and make sure it doesn't cause anybody any harm.

**Q.** What else are bomb technicians asked to do?

**A.** Quite a bit of training, both receiving training to

1 further our skills and then to provide training.  One of my

2 most common assignments while I was a bomb technician in San

3 Francisco was to do training classes for local police

4 departments, for private security sector people, just to give

5 them a little better understanding of how bombs and explosives

6 work and how best to protect themselves and their businesses

7 from them.

8 **Q.**  What's your current title?

9 **A.**  My current title is Special Agent Bomb Technician, and I

10 am assigned to the Indianapolis field office of the FBI.

11 **Q.**  Have you always been in Indianapolis?

12 **A.**  No, I have only been there a little over a year now.

13 **Q.**  Where did you go after you left San Francisco?

14 **A.**  In 1996, I sought and received a promotion to Supervisory

15 Special Agent, and I was assigned to the FBI laboratory, to

16 the explosives unit.

17 **Q.**  What did that involve?

18 **A.**  The explosives unit in the laboratory does the examination

19 of bomb components.  We look at debris after an explosion or a

20 fire and try to render some forensic opinion as to the items

21 that were received, whether they constituted a bomb and how

22 they might have functioned or, in some cases, how they didn't

23 function.

24 **Q.**  What training did you have before becoming a Supervisory

25 Special Agent back at the FBI lab in the explosives unit?

**A.** Within the explosives unit, you go through a period of apprenticeship. Regardless of how long you've been in the field, you work directly under other senior qualified examiners. You look at cases that they are working on and receive instruction in them.

You do quite a bit of reading, going through all the literature -- the scientific literature on the subject. I took quite a few training courses to sort of expand the scope of my knowledge of explosives and bomb components and how they work.

This lasted a little over a year-and-a-half, just a little less than two years, that I went through that process. I was tested while I was in the unit. The other examiners would give me formal tests on the subject. I had to go through moot court proceedings where we were put in a situation like this and asked to explain our findings on test cases.

Ultimately, the FBI laboratory gave me a certification saying that I was qualified to conduct my own investigations.

**Q.** Could you describe some of the major investigations that you've been involved in over the years?

**A.** Probably the first one would have been in 1993. I was assigned to the World Trade Center in New York City after the bombing there. I was one of the crime scene team leaders. That is, I directed a group of other investigators getting evidence there.

In 1995, I went to Oklahoma City. I was one of the team leaders at that bombing incident and collected quite a bit of the evidence there.

In 1996, there was an incident in Saudi Arabia known as the Khobar Towers incident. I was one of the crime scene team leaders there.

In 1998, I was the principal advisor at the bombing -- I should say principal forensic advisor -- at the bombing of the United States Embassy at Nairobi, Kenya, and then later I had the responsibility in the laboratory for all the examination of the evidence that came from that bombing.

I skipped one. In 1996, I was the team leader for the search at Theodore Kozinski's cabin. He's perhaps better known as the "Unabomber." I led the entry into his cabin and the recovery of the evidence from his cabin.

In 2000, I was the forensic advisor at the bombing of the United States Cole, USS Cole, which was a Navy ship that was bombed in Yemin.

Well, on 9/11 -- after 9/11, I was the forensic advisor for the crash of United Flight 93 in Somerset County, Pennsylvania. Subsequently, I became the coordinating forensic examiner for all of the 9/11 evidence that was collected and submitted to the laboratory for examination.

I am probably missing some, but those are the ones that kind of come to mind.

Q.  Are you a member of any organizations -- professional
organizations?  Have you provided any training?  Have you
published anything yourself?

A.  I am currently a member of the International Association
of Bomb Technicians and Investigators.  I have published a
couple of articles, one of them on disaster management, in a
United Kingdom publication, and I wrote an article on forensic
examination of bombing cases for the United States Attorneys
Bulletin.

    Training -- in my 17 years or so of doing this, I have
probably done maybe 100 training classes where I have taught
all the aspects of bombing scene collection, explosives
effects, construction of improvised explosive devices, or
IED's as we kind of call them in our business, so that would
be somewhat related to that.

Q.  Have you ever testified as an expert in court?

A.  Yes, sir, I have.  I have testified in this courthouse
here, and others.

        MR. BARTLETT:  I would like to offer Mr. Sachtleben
as an expert, as a bomb technician expert.

        MR. FOX:  Your Honor, we would object.  The
Government hasn't established his background sufficiently.

        THE COURT:  In what particular way are you talking
about?

        MR. FOX:  We don't believe the Government set the

1    proper foundation to offer him as an expert.

2         THE COURT:  It is noted.  He may testify.

3    BY MR. BARTLETT:

4    **Q.**  Mr. Sachtleben, before getting to your analysis of the

5    various items that were recovered from the University of

6    Washington, I want to talk about an incident that you were

7    involved in at FBI headquarters in March of 2001 involving a

8    parking pass.

9    **A.**  Yes.

10   **Q.**  Were you disciplined by the Federal Bureau of

11   Investigation?

12   **A.**  I was, yes.

13   **Q.**  Why don't you explain the circumstances to the jury.

14   **A.**  Sure.  To get into FBI headquarters as an employee, you

15   need to have a parking pass.  Myself and two other colleagues

16   had a pass but unfortunately we found that our travel -- we

17   kept -- whoever had the pass always seemed to be somewhere

18   else in the world, and we were having trouble getting in, so

19   we made a decision, which was in contravention to policy, to

20   photocopy the pass.  So we were caught and we were each given

21   a disciplinary action.  I was given three days off without pay

22   for having made that copy of the pass, as well as not being

23   completely honest with the employee who found that I had made

24   this copy of the pass.

25   **Q.**  Let's talk about your role in analyzing evidence recovered

1  from the May 21, 2001 arson at the Center for Urban

2  Horticulture here at the University of Washington.

3      Were you involved in that?

4  **A.**  Yes, I was.  On May 25, 2001, I was assigned to be the

5  coordinating examiner for all the forensic evidence in this

6  case.  Within the laboratory, the coordinating examiner is

7  basically the examiner who is going to shepherd that evidence

8  through the laboratory, make sure it gets to all the right

9  other disciplines within the laboratory and ultimately get it

10 back out to the agency that submitted it to us.

11 **Q.**  How is the lab set up?  Physically, what really happens?

12 How does this all come to you?  What do you do?

13 **A.**  At that time, in 2001, the FBI laboratory was still housed

14 within FBI headquarters in downtown Washington, which is just

15 an office building.  So within that building, we had separated

16 out certain rooms where we could receive evidence.

17     So in this case, we had a large bay down in the lower

18 level of the building, brought the boxes of evidence into that

19 bay, set up folding tables, spread out paper so we could cover

20 those tables, took an inventory of everything that we had

21 received, made some notations about those items and generated

22 a list of those items.

23 **Q.**  After you do this, as part of your duties, do you actually

24 assign other people to do the work?  For example, Ron Kelly?

25 **A.**  Yes.  Well, I suppose it's a fine point here.  I don't

1 actually assign Mr. Kelly; my boss does that, but I certainly

2 work very closely with all the other examiners.

3     So on this occasion, Mr. Kelly was assigned as the

4 forensic chemist. We got together that first weekend and sat

5 down with it and made sure that he got the rights things; in

6 other words, the items that would be the most useful to him in

7 his chemical analysis.

8     Similarly, I worked with the latent fingerprint examiner,

9 hairs and fibers, DNA, whoever else was involved in this case.

10 I would sit down with that examiner, make sure they got the

11 right things in their hands.

12 **Q.** Did you eventually conduct an examination yourself?

13 **A.** I did. Typically, my examination comes at the end. I

14 obviously have to wait to see what the results are of the

15 chemical analysis. My exams would be -- I have to wait to

16 make sure that the latent fingerprint people handle things

17 because I tend to take things apart.

18     One of my duties is to sort of cut through the layers, if

19 you will, go down to the very core of the material and make

20 sure we get an appreciation for everything that's there. If I

21 were to do that at the beginning, I could mess something up

22 for the latent people or the hair and fiber people.

23 **Q.** Did you do that in this case?

24 **A.** I did.

25 **Q.** Could you take a look at what's been already entered into

1    evidence -- and I hope it is right there beside you -- as

2    330-A, the plastic bag?

3    **A.**  Yes.

4    **Q.**  First of all, do you recognize that?

5    **A.**  I do.  I see my initials on here from my examination, and

6    I recognize this item.

7    **Q.**  Can you explain to the jury -- it looks like there's a

8    thousand plastic bags in there.  What happened with regard to

9    the evidence at the FBI, and why do we keep seeing all those

10   bags?

11   **A.**  Sure.  Well, the first bag that it would reside in would

12   be at the crime scene itself.  So the investigators at the

13   crime scene collect evidence, they package it up in some

14   material, and they put various labels and markings and

15   initials on it so that we can preserve what we call chain of

16   custody, the legal term for just making sure we keep track of

17   everything.

18       That's very important packaging, but at the laboratory it

19   doesn't help us.  Very often it's a metal can or something we

20   can't see.  So the first thing I do is go through and open all

21   that packaging and get the material out to where now I can see

22   it.  But of course, I still have to preserve the integrity of

23   the evidence; I have to keep the chain of custody.

24       So I am going to use my own packaging and put various

25   notations, labels, my initials on here and, of course, we have

our own numbering system.  Just to make things more confusing,

perhaps, but when the evidence is collected at the crime

scene, they number it in a certain way based on the order that

they have collected it.

Well, when I get it in the laboratory, I have to put my

own numbers on it because it's going to be put through all of

our own processes, and often those two don't always line up.

Then when it comes here in court, this courtroom has its

own numbering system, and so that's why we have yet another

series of numbers and labels on it.

Q.  Taking a look at what's inside Exhibit 330-A, can you

explain what, if anything, you found that was relevant to your

analysis as an FBI bomb technician?

A.  Yes.  If I can open this, I will do so.

THE WITNESS:  May I stand up, sir?

THE COURT:  You may.

A.  Thank you.  The largest item I found in here is kind of

fused together and it's melted plastic.  There's even some

carpet that's all melted together.

When I examined this in the laboratory, I found on the

underside of this piece where the material had not melted but

was stuck to this carpet -- I saw some lettering and some

notation, which I believe indicates this is a Rubbermaid

plastic storage container.

Then kind of almost melted into this container is this

1  other plastic bag.  I think in my notes I may have called it a
2  bladder or something, but it's some sort of plastic bag.  It's
3  a little bit heavier than the plastic bags you might use in
4  your trash container, and that's kind of melted right into
5  this.  So it would appear as if these two were once together.
6      Then in addition to that --
7  **Q.**  Special Agent Sachtleben, as you are handling that, is
8  there any odor relating to that?
9  **A.**  Yeah.  There's a pretty good smell of some kind of
10  gasoline or some other kind of petroleum type product.
11      MR. BARTLETT:  Your Honor, with the Court's
12  permission, perhaps if he could briefly walk by the jury so
13  they could see for themselves.
14      THE JURORS:  We can smell it.
15      MR. BARTLETT:  Nevermind.
16      THE COURT:  I guess we don't need it.
17  BY MR. BARTLETT:
18  **Q.**  What else did you find in that bag?
19      THE WITNESS:  Sorry about the mess, Your Honor.  I
20  will keep it to a minimum here.
21  **A.**  Kind of all fused together within this same object is a
22  couple of items.
23      This is what appears to me to be a partially consumed road
24  flare.  You can see the kind of characteristic red color in
25  here.  It too has a little bit of that same odor.  There's

1   some wire and some tape; quite a bit of scorching on the wire.

2   The remaining items are more or less the same.  We've got a

3   lot of things that are just kind of fused together -- plastic

4   cardboard and all those kind of things -- very indicative to

5   me to things that have been subjected to a fairly intense

6   heat.

7   BY MR. BARTLETT:

8   **Q.**  If you could repackage those things and take a seat.

9       Did you take any photographs during the time -- when I say

10  you, did you and your team take any photographs at the time

11  you were analyzing them?

12  **A.**  Yes.  One of our standard procedures within the laboratory

13  is that, to the extent we are able to, everything we receive,

14  we photograph in the condition that we receive it.  So in this

15  case, I did photograph, or direct to be photographed, all

16  these items.

17  **Q.**  Would you take a look at Government's Exhibit 329-A, 329-B

18  and 329-C and tell me if you can recognize them and what, if

19  anything, they depict?

20  **A.**  I do recognize these.  These are photographs that were

21  taken in the laboratory of this exhibit here, which has been

22  marked as Government's Exhibit 330-A.

23          MR. BARTLETT:  Offer Government Exhibits 329-A, B and

24  C.

25          MR. FOX:  No objection, Your Honor.

1          THE COURT:   Admitted.

2          (Exhibit Nos.  329-A,  329-B and 329-C admitted.)

3    BY MR. BARTLETT:

4    **Q.**  Taking a look first at Government's Exhibit 329-A, what is

5    it we are looking at?

6    **A.**  The image just clicked.  I don't know if --

7    **Q.**  Exhibit 329-A.

8    **A.**  Okay, very good.  329-A is looking from the top down, so

9    what you are seeing there in the center of the photograph is

10   that plastic bag or bladder that I described, and then around

11   the edges of the photograph are the -- and I will just point

12   here -- that's the carpeting that was stuck to the bottom of

13   the Rubbermaid container.

14   **Q.**  329-B?

15   **A.**  329-B is just flipped over.  We've got the bottom of the

16   Rubbermaid container there.  It's a little hard to see in this

17   photograph, but there are some raised letters that read

18   Rubbermaid.  Unfortunately in that photograph they are just

19   not readily apparent.

20   **Q.**  And 329-C?

21   **A.**  329-C is a photograph that shows some of the smaller items

22   they held up.  For example, that item there is the road flare.

23   That's the road flare which was kind of folded a bit in there.

24   That item that I have just indicated is the electrical wire

25   that was wrapped throughout, and there's some tape that's just

1 at the end of that, black electrical tape.

2 Q. Were you able to actually see what type of Rubbermaid item

3 it was?

4 A. Yes. I was able to read some lettering on the bottom that

5 said Servin' Saver, and I believe it was also 33 cups.

6 Q. If you could look at what's been marked for illustrative

7 purposes as Government's Exhibit 330-B, does the numbering on

8 the bottom of that plastic container appear to match?

9 A. Yes. This is a very similar to the lettering and

10 numbering that I saw on the exhibit that I examined.

11 MR. BARTLETT: I would like to offer 330-B just for

12 illustrative purposes.

13 MR. FOX: For illustrative purposes, no objection.

14 THE COURT: Admitted.

15 (Exhibit No. 330-B admitted for illustrative purposes.)

16 BY MR. BARTLETT:

17 Q. In addition to the melted plastic material you just talked

18 about, did you also examine Exhibit 333 which was your Item

19 Q9, by your own numbers?

20 A. Yes. Once again, I recognize my initials.

21 Q. Can you take it apart and find what else you found?

22 A. In this instance, as I alluded to previously, it

23 originally came to us in this metal can. Once I opened the

24 metal can and went through the items inside there, I found

25 several things of interest. Here we have got the charred

1    remains of one or possibly two matchbooks.

2        So these are the common, what we call the kitchen-type

3    matches, cardboard matches; and so we have got a couple

4    matchbooks here.

5        This item here which was taped to the matchbooks when we

6    first received them in the laboratory, there's a couple pieces

7    of -- they are tan-colored paper with some lighter-colored

8    white like masking tape applied to them.  I recognize these as

9    an item that's known and is called a model rocket igniter.

10   Now, if you as a hobbyist were interested in using model

11   rocket, these are a little electrical device that you can use

12   to remotely set the rocket off so you don't have to be

13   standing right next to it when you ignite it and send it up in

14   the air.

15       They come packaged, usually two together with this tape

16   holding them together.  So I recognize this as being

17   consistent with the tape that's on a model rocket igniter.

18       Within this same exhibit, again, we've got some more

19   pieces of black electrical tape.  In fact, these were wrapped

20   around the matchbooks to sort of hold this model rocket

21   igniter paper within there.

22   **Q.**  Did you take photographs with relation to your examination

23   of Exhibit 333, Item Q9?

24   **A.**  Yes.

25   **Q.**  Do those photographs appear at 332-A and 332-B?

1   **A.** Yes, those are the photographs I had taken.

2       MR. BARTLETT: Offer.

3       MR. FOX: No objection.

4       THE COURT: Admitted.

5           (Exhibit Nos. 332-A and 332-B admitted.)

6   BY MR. BARTLETT:

7   **Q.** 332-A. What is it we are looking at?

8   **A.** If I could clear the screen.

9   **Q.** Lower left-hand corner.

10  **A.** There we go.

11      This photograph is a little dark, and the contrast isn't

12  very good, but I will indicate with that arrow -- that object

13  there is the matchbooks that I previously displayed. There,

14  the matchbooks are still kind of taped or fused together with

15  that partially-melted black electrical tape.

16  **Q.** And 332-B?

17  **A.** 332-B is a photograph that I had taken that shows on the

18  left-hand side -- there you can see those two pieces of paper

19  that have the lighter-colored masking tape on them.

20      There on the right-hand side is a single model rocket

21  igniter. What you are looking at there is two pieces of very

22  thin wire and at the tip, where those two pieces of wire come

23  together, there's a very small amount of flammable material.

24  It's the same thing you'd find on the head of a match.

25      Now, the white tape and tan-colored paper that is in the

1   center here holds those two pieces of wire together so that

2   they don't cross over with one another and create a short

3   circuit.

4        If you were to apply power, say with a battery -- say with

5   like a 9-volt battery -- to that, those two very thin wires

6   would heat up; heat up almost like you'd look inside your

7   toaster and you see the elements inside your toaster heat up;

8   so those wires would heat up and could cause that little tip,

9   that little match tip, to flash out and throw out a flame.

10       Now, if you were a model rocket hobbyist, you would use

11  that in the rocket itself, and that little bit of flame would

12  be enough to ignite the engine and shoot the rocket up in the

13  air.

14       Now, in this case, we found these two items on the left

15  had been taped together inside those matchbooks, which led me

16  to conclude that they were there to help ignite the matchbooks

17  themselves.

18  **Q.**  Just to clarify for the members of the jury, although I

19  don't think there's any confusion, the item we are looking at

20  on the right is something that you had there for illustrative

21  purposes; that isn't something that you actually found?

22  **A.**  Right.  Thank you.  You may notice on the photograph, we

23  have labels on all of our photographs.  On the left-hand side,

24  you will see a label that has a bunch of letters and numbers

25  and so forth which indicates that we applied those in the

1  laboratory, and on the right-hand side it simply says "known

2  standard."

3      One of the things we do in the laboratory is just to keep

4  cupboards full of batteries and clocks and timers and model

5  rocket igniters so we can compare them side by side like this.

6  **Q.** Thank you.  You can repackage that, and then if you could

7  pick up what's already been entered into evidence as

8  Government Exhibit 336, which I believe is Item Q10, your lab

9  number.

10  **A.** Once again, I recognize 336.  I see my initials on the

11  imaging here.  You can see the metal can that it initially

12  came to us in.

13      A couple of items that got our attention during our

14  examination -- first off, we found a 9-volt battery.  Now, a

15  9-volt battery -- typically we'd see it and in fact we saw it

16  in the laboratory; it was intact.  It was a rectangular

17  object.  You could see the outer casing.  Like I mentioned

18  earlier, one of the things that I do is I take things apart

19  because I like to see anything, any notations, any markings on

20  them.

21      So in this case, I have taken this 9-volt battery apart,

22  and people may or may not realize it, but inside a 9-volt

23  battery are these six cylinders or cells, as they are called,

24  and each one of these cylinders or cells has one-and-a-half

25  volts of power.  When we add six times one-and-a-half

1  together, you get 9 volts.  So that's what we had in this

2  case.

3       Unfortunately, though, the reason I took it apart is

4  sometimes we will find markings or lettering inside the casing

5  that would tell us what brand it was.  This object was so

6  charred that we never really found anything in there that

7  helped us identify it.

8       There's several pieces of wire that were inside here, the

9  fragment of what I believe is a circuit board.  So we can see

10  the little electrical components that are connected to this

11  board.  It's the right size and the right shape for the type

12  of circuit board that I have seen previously used in small

13  digital clocks or timers; kind of like a digital kitchen timer

14  that you may have in your kitchen.  It's about the right size

15  for that.

16       One other thing that I found that certainly got my

17  attention was -- it was actually found in two pieces -- and

18  this object right here, when I hold it together like this,

19  this is consistent with an electrical component that's called

20  a silicone controlled rectifier, or SCR for short.

21       An SCR is really just a switch.  It's got -- normally, it

22  would have three prongs coming out the bottom, and we could

23  use this within an electrical circuit to take power from a

24  smaller object, like a timer, and run it through this switch

25  and trigger a larger source of power like a 9-volt battery.

1    So the presence of these three things here were very

2 interesting to me in trying to reconstruct what happened here,

3 what might have caused this gasoline and this road flare and

4 all these other matchbooks that were in here -- how did they

5 actually come to function.

6 **Q.** Did you take a photo of these items also, and does that

7 photo appear in Exhibit 335?

8 **A.** Yes.

9        MR. BARTLETT:  Offer 335.

10       MR. FOX:  No objection.

11       THE COURT:  Admitted.

12              (Exhibit No. 335 admitted.)

13 **A.** Exhibit 335 is the photograph that I had taken in the lab.

14 A couple things here.  In the lower right-hand corner is this

15 circuit board.  Immediately above that is the 9-volt battery.

16 You can see that that's the condition that we received it in.

17    I will start over again.  In the lower right-hand corner

18 is the fragment here, the circuit board.  Above that is the

19 9-volt battery, but you can see that's the condition it was in

20 prior to our disassembling it in the laboratory.  Then just

21 over to the left of that -- it's a little bit hard to see, but

22 this is the SCR that I talked about earlier.

23    One of the things that you might be able to notice in that

24 photograph, if you look up from the arrow that I have

25 indicated on the photo, you will see almost like a little bit

of a curly line. That's this piece of wire. Someone has soldered a piece of wire onto one of the legs of this component. That got my attention because that's not how these are normally used.

Normally, these items are mounted in a circuit board, but to take one out like that and to actually solder a wire, which is not an easy thing to do, once again, it drew my attention in trying to sort out how this whole circuit might have worked.

BY MR. BARTLETT:

Q. Thank you. If you could repackage that and then grab, finally, Exhibit 339 that's already been entered into evidence, which I believe is Item Q12 of your evidence.

Do you recognize that?

A. Yes, I do.

Q. Once again, how do you recognize it?

A. I recognize it by the markings and my initials that I placed on this bag.

Q. Could you open that up and explain what's in it that you found?

A. Here's the original can that this was received in. A couple things with Exhibit 339.

First off, once again, we had another casing -- it was intact at the time we received it -- for a 9-volt battery, and we've got the cells here, again.

1       Then this is a little button battery.  This is the type of
2  battery that you'd see typically in, let's say, your watch or,
3  in this case, it's the type and size battery that I have seen
4  before used in a small digital timer or clock.

5       Speaking of which, we've got a couple pieces of glass or
6  plastic here, and these are what I recognize to be consistent
7  with the faceplate of a timer.  When you look at it -- if you
8  are familiar with a kitchen timer and you look at the
9  faceplate, it's got readouts for numbers.  I think the
10 photograph may show this better, but I can see on this -- I
11 can see the imprint that is typically seen for the readout of
12 those numbers.

13 **Q.**  Did you take a photograph of this also that appears in
14 Exhibit 338?

15 **A.**  Yes, I did.

16       BY MR. BARTLETT:  Offer 338.

17       MR. FOX:  No objection.

18       THE COURT:  Admitted.

19            (Exhibit No. 338 admitted.)

20 **A.**  Starting in the lower right again, there's three objects
21 there clustered together.  That's these three pieces here.  If
22 you look right there where I have just put that arrow, that's
23 the outline or imprint.  It's kind of like if you have a clock
24 or a timer and you look at it and the power is out, you might
25 still actually see the outline; it looks like a bunch of 8s on

1  it; that's just simply the digital readout, so there you can

2  just make out one or two of the digits.

3      Above that is the intact item that I looked at in the lab,

4  which turned out to be this 9-volt battery, and that I have

5  just indicated with an arrow is this small, what I would call

6  a button battery.

7  Q.  Go ahead.  You can go ahead and repackage that.

8      Special Agent Sachtleben, after analyzing the exhibits

9  that we've gone through, Exhibits 333, 336, 339, the items

10  that Special Agent Jane Stephan described as recovering from

11  just inside the door at Toby Bradshaw's office, did you reach

12  a conclusion as to what these items, put together, comprised?

13      MR. FOX:  I would object again.  It's a question for

14  the jury.

15      THE COURT:  It is noted.  You may answer, sir.

16  A.  Yes, I did reach a conclusion.

17  BY MR. BARTLETT:

18  Q.  What was that conclusion?

19  A.  The conclusion was that these items, taken together,

20  constituted the components of an improvised incendiary device,

21  which would be also known as a fire bomb.

22  Q.  Why did you reach that conclusion?

23  A.  Well, several things.  First off, in my experience, in

24  having looked at items like this before, both in my field

25  experience and my forensic training at the lab, in order to

have a fire bomb, you've got to have an accelerant; something
that will catch fire.

In this case, I had the report from Mr. Kelly that said he
found gasoline -- of course, I could smell it as well, but it
was good to know what it was that he had found.  Then you have
to have something to make that gasoline catch on fire.
Obviously, it doesn't just burn all on its own.

So in this case, I found a road flare.  I found
matchbooks.  I found a model rocket igniter.  So once again,
all those items, when you put those together, you've got the
ability there to start a fire.  But to have an improvised
incendiary device, to have a fire bomb, typically in my
experience, you don't want to be standing right there when it
ignites.  You want to be somewhere else when it starts
burning.

So in this case, what I found was all the components to
put together a timed delay circuit so that you could set some
period of time, walk away from that scene, and when the time
expired, if everything was connected properly, you could start
the fire.

**Q.**  Prior to coming to testify today, did I ask you to create
your own mock-up that would explain how this timing device
worked?

**A.**  Yes, you did.

**Q.**  Did you?

1 **A.** Yes, I did.

2 **Q.** Is that Exhibit 982?

3 **A.** Yes, sir, it is.

4 　　　MR. BARTLETT:  Your Honor, if we could use this just

5 for illustrative purposes and have Special Agent Sachtleben

6 explain how this is set up.

7 　　　THE COURT:  What exhibit is that?

8 　　　MR. BARTLETT:  982.  It's over by the chair.  It's an

9 actual physical item.

10 　　　THE COURT:  All right.

11 　　　MR. FOX:  Your Honor, I have not had the opportunity

12 to look at that.

13 　　　THE COURT:  Why don't we do this.  Let's take the

14 noon recess and give you a chance to look at it, and we will

15 take this up after the break.  Of course, you will have your

16 noon hour, have your lunch.  As you go about your business,

17 don't discuss the case or anything else.

18 　　When you are back in the building, I would like to have

19 you in the jury room.  Keep your books on the chair, and see

20 you around the 1:00 hour.

21 　　(Jury not present.)

22 　　　THE COURT:  All right.  You may be seated.  We will

23 be in recess, and I will have you take care of that.

24 　　　THE CLERK:  All rise.  Court is in recess.

25 　　(Luncheon recess. )

1    (Jury not present.)

2         THE COURT:  Let me say one thing before I bring out

3    the jury.

4    It has come to my attention that some witnesses may be

5    called on to testify, and I made the ruling as to excluding

6    the witnesses.  It's up to you to keep your witnesses out;

7    advise them not to come in until they are called to testify.

8    The same for the defense.

9    If that should happen, I will rule on it.  You know who

10   your witnesses are going to be, okay.

11        MR. BLOOM:  I would like to tell you what the

12   situation is.

13        THE COURT:  I don't need to know anything more about

14   that now.  If you have a potential witness in the room, they

15   have to leave, and then I will take it up at a different time,

16   but right now we are going to the jury.

17        MR. BLOOM:  This is a person that I had no idea was

18   going to be in the courtroom.

19        THE COURT:  That may be, but if you intend to call

20   somebody, and they are in the room now, tell them to leave.

21        MR. BLOOM:  I will.  I also want to subpoena her at

22   this time.

23        THE COURT:  Well, do what you have to do on that.

24   Bring in the jury, and I will take up the issue as to whether

25   these folks testify, and to what extent, at some other time.

1    MR. FRIEDMAN:  Your Honor, we do have the motion in

2  limine, and it can be dealt with at the break.

3    THE COURT:  I will take those matters up at the

4  appropriate time, as I have indicated.

5    Bring in the jury.  I believe we had Mr. Sachtleben on the

6  stand.

7    (Jury present.)

8    THE COURT:  All right.  You may be seated.

9    MR. BARTLETT:  May I continue, Your Honor?

10    THE COURT:  Yes.

11  BY MR. BARTLETT:

12  Q.  Special Agent Sachtleben, just prior to the break for

13  lunch, we were talking about Government's Exhibit 982.  I

14  believe that was a mock-up that you built pursuant to a

15  request I made for you?

16  A.  Yes, sir.

17    MR. BARTLETT:  I would like to offer Government's

18  Exhibit 982 for illustrative purposes.

19    MR. FOX:  For illustrative purposes, no objection.

20    THE COURT:  All right.  Admitted.

21    (Exhibit No. 982 admitted.)

22  BY MR. BARTLETT:

23  Q.  Could you perhaps hold that up and explain to the members

24  of the jury what you built?

25  A.  What I put together here was a combination of the various

1    objects and components, both what I saw in the evidence that I

2    reviewed, as well as in my training and background in this

3    type of device that I have seen before.

4        Now, obviously, I have built this in such a manner as to

5    make it more display friendly so I put it on a clear piece of

6    plastic and put everything out.  Ordinarily, in my experience,

7    you wouldn't see anything laid out quite as neatly as this;

8    they tend to be clustered together.

9        The items that you see -- I will begin with this up here.

10   This is a road flare.  I have taped to it several matchbooks

11   and several of these model rocket igniters that I spoke about

12   previously, but I have not connected them to the circuit for

13   the obvious reason that I did not want to start a fire today

14   in the courtroom.

15       In their place, I put a red light.  Leading off from that

16   light, we have got several lengths of wire.  Here I have glued

17   to the board that silicone controlled rectifier, or SCR, that

18   I talked about earlier.  This item is connected in several

19   ways.  On the one side of the circuit, we have got a digital

20   countdown timer.  On the other side of the circuit is a 9-volt

21   battery and an on/off switch.

22       The way that this will function is that I have already set

23   a short period of time on the timer, and when I press the

24   start button, I will throw this safety switch over.  The

25   reason I put the safety switch in is to allow everything to

happen right up to the point where you start the time running.

Once I throw the safety switch, then time will count down on the timer, and when it reaches it -- and I disconnected the beeper or buzzer that's in there, and instead connected it to this SCR. The time counts down and current will flow through the SCR and trip that electronic switch in there and allow the current to flow from the battery.

So at this time, I have got it set for four seconds. I will press the start button. I will move the switch into the on position, and at the conclusion of the four seconds, the red light has come on indicating that current is now flowing from the 9-volt battery into this red LED here.

**Q.** Thank you, Special Agent Sachtleben.

I want to turn your attention to a second group of items that have been physically introduced into evidence that Special Agent Stephan described as recovering from a different area of Toby Bradshaw's office on May 22nd.

First, if you could look at Exhibit No. 342, which I believe is a paper sack behind you, and it was your Q49.

**A.** Yes, sir.

**Q.** Do you recognize that?

**A.** Yes. Once again, I see my markings and initials on this.

**Q.** Could you take it out and explain to the jury what it is you found in there?

**A.** Here we have the original packaging container, and in this

instance, I have not separated it into a separate bag, so I am going to use a tool that I often use in the laboratory, which is a quarter, to open the can and take out some of the contents that are in here.

Several items in here came to my attention when I was examining this in the laboratory. For example, here's a circuit board. This circuit board is in a little better condition than the one that was in the previous exhibit. Once again, this circuit board is consistent with the boards that I have seen inside digital timers, such as the one that was just displayed.

The second item here, we've got several lengths of wire. Most of it has had the outer plastic insulation melted off of it. Here we've got a cardboard object, which I believe is consistent with the outer paper from a road flare.

I believe that's it for this.

**Q.** Go ahead and repackage it.

**A.** (Complying.)

**Q.** If you could also pull up and take a look at the large plastic bag behind you, which is Exhibit 345; I believe your Item Q60.

**A.** Yes.

**Q.** Do you recognize that?

**A.** Yes, I see my initials on it and the other laboratory markings.

**Q.** If you can take that out and explain what, if anything of relevance, you found when you examined that at the lab.

**A.** This item has several parts. First off is a plastic container here, and it bears some imprinted writing on the bottom: Rubbermaid, Servin' Saver, 33 cups. So this is consistent with the Rubbermaid container that was in the previous exhibit. We, again, have a plastic bag or bladder inner liner that would appear to have been fitted inside this container here.

Then I separated several items out from this in the laboratory. In this case, there are at least one, perhaps more -- well, let's say at least two matchbooks. This item -- these items I am holding in my hand were originally taped together with some black plastic electrical tape.

Sandwiched in the midst of these matchbooks, once again, we've got one of those pieces of tan paper with the masking tape on it which, I believe, is consistent with the model rocket igniter holder. Here's another portion of that same model rocket paper.

Here -- this is perhaps a little easier to see than the last item that I was looking at here. We've got the red paper that's characteristic of the outer wrapping for a common road flare. That's about it for that item.

**Q.** If you can take a second and repackage that.

Looking at the bladder, before you put that back, the top

1  plastic, do you notice anything on that?

2  A.  There's quite a bit of charring, melting.  I am not sure

3  if there's something you wanted particular attention to.

4  Q.  Thank you.  If you can -- go ahead, I am sorry.  I keep

5  interrupting you.

6      If you can look at the three photos marked 344-A, B, C and

7  D, four photos, and tell me if you recognize those.

8  A.  Yes, I recognize these as photos taken in the laboratory.

9          MR. BARTLETT:  Offer.

10          MR. FOX:  No objection.

11          THE COURT:  Admitted.

12          (Exhibit Nos. 344-A, 344-B and 344-C admitted.)

13  BY MR. BARTLETT:

14  Q.  Taking them one at a time, looking first at Government's

15  Exhibit 344-A, what is that?

16  A.  344-A is a photograph of the plastic container and the

17  plastic bag or bladder.  It looks to me like we are looking at

18  it from the top down, which would be the bladder side of it.

19  Q.  344-B?

20  A.  344-B is the reverse of that, the bottom of the plastic

21  Rubbermaid container.

22  Q.  The loose material that you see in the upper right portion

23  of that photo that seems to be attached -- what is it that we

24  are looking at?

25  A.  Where I have indicated with an arrow, is that the

1    location?

2    **Q.** Yes.

3    **A.** That looks like it's some of the carpeting that was fused

4    to the container, and it appears to have been cut out when it

5    was collected at the crime scene.

6    **Q.** And 344-C?

7    **A.** 344-C shows the matchbooks that I held up a few minutes

8    ago.  In the upper left corner is the matchbook that had the

9    model rocket igniter paper still affixed to it.

10        Then below that is -- as we peeled the tape away in the

11   laboratory and started to unwrap the layers, that piece came

12   off and we could see it looked like another piece of that

13   model rocket igniter paper.

14        Once again, on the right-hand side, I selected from our

15   library, if you will, the known standard of a model rocket

16   igniter to display those side by side.

17   **Q.** Finally, if you could turn around and take a look at

18   what's been marked and admitted into evidence as Government's

19   Exhibit 348, which I believe is your Q65.

20   **A.** Once again, I recognize my laboratory markings on this.

21   **Q.** If you could open it up and explain what, if anything, of

22   relevance you found inside of that.

23   **A.** Here we have the original metal can that it was collected

24   in.  There are a couple of items that were contained in this

25   exhibit.  One is, we've, again, got a fragment of one of the

1  common matchbooks, cardboard matchbook.

2      Here we've got a piece of -- it's a little hard to see,

3  but it's a red-colored paper which is consistent with the

4  outer wrapping on a road flare.

5      Finally, this item right here.  And here again, we have an

6  example of the silicone controlled rectifier, the SCR, that

7  electronic switch.  In this case, unlike the previous exhibit

8  that we discussed, here it is intact, as opposed to being in

9  several parts.

10 **Q.**  Looking at what has not been admitted, Exhibit 347, a

11 photo that you have in front of you; do you recognize that?

12 **A.**  Sir, I am not sure I am seeing -- 347?

13 **Q.**  Correct.

14 **A.**  That is not up here.

15      MR. BARTLETT:  Sorry, Your Honor.

16 **A.**  Yes, I recognize this photograph.

17 BY MR. BARTLETT:

18 **Q.**  What is that?

19 **A.**  This is a photograph I had taken in the laboratory.

20      MR. BARTLETT:  Offer 347.

21      MR. FOX:  No objection.

22      THE COURT:  Admitted.

23          (Exhibit No. 347 admitted.)

24 BY MR. BARTLETT:

25 **Q.**  Taking a look at that, explain what it is we are looking

1  at.

2  **A.**  Yes, sir.  In this corner, where I have indicated with an

3  arrow, that is the SCR.  To the left of that object is the

4  matchbook.  Up here in the upper left-hand corner is the

5  fragment of the road flare outer wrapping.

6  **Q.**  Thank you.  I will give you a second to reload all that

7  stuff.

8      Special Agent Sachtleben, based on your training and

9  experience, after analyzing the items that you've looked at,

10  Exhibit 342, Exhibit 345, Exhibit 348, did you reach a

11  conclusion as to what, if anything, those various items

12  comprised?

13         MR. FOX:  I would object on the basis that this is

14  the ultimate conclusion testimony for the jury to decide.

15         THE COURT:  It is noted.  He may answer.

16  **A.**  Yes, I did.

17  BY MR. BARTLETT:

18  **Q.**  What was that conclusion?

19  **A.**  It was my conclusion that these items constituted a second

20  improvised incendiary device or fire bomb that was collected

21  from the office on the evening of the fire.

22  **Q.**  Once again, what is your reason behind that conclusion?

23  **A.**  Well, several.  First of all, in concluding that it

24  constitutes an IID and provides an incendiary device, a fire

25  bomb, is that I found all the components that I discussed

earlier.  Mr. Kelly found the presence of gasoline on those items.  I saw the Rubbermaid container.  There was a road flare present, matchbooks, the model rocket igniter, the silicone controlled rectifier, the SCR switch.  We've got the fragment of the timer as well.

Now, in these specimens, there was not a 9-volt battery contained in these, but you may recall in the previous specimens that we looked at, there were two 9-volt batteries. It is my experience that in crime scenes like this, objects are often moved around and can wind up a few feet away from their original location.

So I found that the total of these specimens and the previous specimens would be consistent with at least two fire bombs.

MR. BARTLETT:  Thank you.  No further questions.

CROSS-EXAMINATION

BY MR. FOX:

Q.  Good afternoon, Agent Sachtleben.

A.  Hello.

Q.  Earlier this morning, Mr. Bartlett asked you -- do you want to wipe your hands off --

A.  I am fine, sir.

Q.  Mr. Bartlett asked you about the parking permit issue?

A.  Yes, sir.

Q.  It's correct that you were disciplined by your own agency

1  over that incident?

2  **A.**  Yes, sir.

3  **Q.**  You actually appealed that decision, didn't you?

4  **A.**  I did.

5  **Q.**  And you lost?

6  **A.**  Yes.

7  **Q.**  But earlier, when you were describing that incident, you

8  said that you tried -- you had a duplicate parking pass or

9  something like that?

10  **A.**  Yes.

11  **Q.**  And that you were not completely honest with one of the

12  employees of the Federal Bureau of Investigation, right?

13  **A.**  That's right.

14  **Q.**  It's true, Agent Sachtleben, that you lied to that

15  employee of the Federal Bureau of Investigation?

16  **A.**  I wouldn't characterize it in that way; no, sir.

17  **Q.**  Well, you wouldn't characterize it as a lie, but you told

18  her something that wasn't true; you told her this parking

19  permit had been lost?

20  **A.**  That was my -- at the time I made that statement, that was

21  my honest belief, sir.

22  **Q.**  It was your honest belief, and you told that to your

23  supervisors at the Federal Bureau of Investigation who were

24  investigating this?

25  **A.**  Yes.

**Q.** But they didn't believe you had made an honest mistake,
did they? But you were disciplined, right?

**A.** Yes, sir -- well, the discipline was -- I violated the
rules.

**Q.** Well, it was also for not being -- for misrepresenting
what happened, to the employee of the Federal Bureau of
Investigation; isn't that true?

**A.** That's right.

**Q.** By trying to cover for your wrongful duplication of the
parking pass, you discredited yourself in front of two FMU
employees; isn't that true?

**A.** That's what the report says; yes, sir.

**Q.** So it wasn't that you weren't being completely honest, you
tried to cover up for your own misdeed; isn't that right?

**A.** I obviously didn't provide as much information as I could
have.

**Q.** Obviously not.

Let's talk about your qualifications, and I will refer you
to what's been marked for identification as A-143, which you
should have in front of you.

**A.** Yes.

**Q.** Now, when you testified earlier, Mr. Bartlett asked you
what your educational background was; isn't that true?

**A.** That's right.

**Q.** You told him that you had a Bachelor's degree from

1   Northwestern University, right?

2   **A.**   Yes, sir.

3   **Q.**   You didn't say that your degree was in history, did you?

4   **A.**   No, but it was.

5   **Q.**   It was in history?

6   **A.**   Yes.

7   **Q.**   You don't have a scientific background at all?

8   **A.**   I do not.

9   **Q.**   Then you have a law degree from DePaul University?

10  **A.**   Yes.

11  **Q.**   You've never practiced law, right?

12  **A.**   No, sir.

13  **Q.**   You went directly into the FBI?

14  **A.**   Yes.

15  **Q.**   You spent your entire professional career with the FBI,

16  right?

17  **A.**   Yes.

18  **Q.**   You've never worked outside that agency?

19  **A.**   Well, I certainly have worked outside the agency, sir.

20  **Q.**   Well, you've never been employed by anyone other than the

21  Federal Bureau of Investigation since you left law school in

22  1983?

23  **A.**   That's right.

24  **Q.**   Since you left law school, you've never received any

25  formal academic training in any of the sciences; isn't that

1   true?

2   **A.**  No, that's not correct, sir.  If you look at my CV, I

3   think you'll see several of the courses that I took.

4   **Q.**  Well, let's take a look at those courses.

5       In September 1986, you went to the post-blast

6   investigators course put on by the FBI?

7   **A.**  Yes, sir.

8   **Q.**  That was a one-week course?

9   **A.**  Yes, sir.

10  **Q.**  In November 1990, you took a four-week course in

11  Huntsville, Alabama -- hazardous devices school, right?

12  **A.**  That's right.

13  **Q.**  In 1997, you took a two-week course at a Naval school on

14  explosive ordnance disposal, right?

15  **A.**  It's actually a demolitions course which is -- we covered

16  all military explosives, their uses and applications.

17  **Q.**  Then you also took a course -- a one-week course in the

18  chemistry of pyrotechnics and explosives, right?

19  **A.**  Yes, sir, and that was a scientific course on the

20  chemistry of both the construction of explosives and

21  pyrotechnics, which is fireworks, as well as incendiary

22  material.

23  **Q.**  That was a one-week course, right?

24  **A.**  Yes.

25  **Q.**  Then 1998, you went to England for two weeks for a course

1  on bombing crime scene management, right?

2  **A.** That's right.

3  **Q.** And then in 1999, you went to Australia for two weeks for

4  a bomb scene analysis and management course?

5  **A.** That's right, sir.

6  **Q.** So am I not correct that you have a total of 12 weeks of

7  training for bomb investigations?

8  **A.** Well, I don't know if I'd characterize it in that way,

9  sir.  In the course of my 24 years as a Special Agent and 17

10  years as a bomb technician --

11  **Q.** I am asking about your training.

12       MR. BARTLETT:  Objection, Your Honor.

13       THE COURT:  Let him answer the question.

14  **A.** I will say I have both.  As I stated earlier, I have taken

15  formal courses; that's where I have sat in the classroom and

16  studied material.  I have read dozens of scholarly treatises,

17  textbooks and so forth on the subject of explosives and bomb

18  construction.  I have worked under other senior bomb and

19  explosives examiners during the course of my 10 years in the

20  laboratory.  So you are absolutely right, though, in saying

21  that that would be 12 weeks of formal classroom-type

22  education.

23  BY MR. FOX:

24  **Q.** Now, when you've had some of your training, some of the

25  people that have trained you over time have included Tom

1  Thurman?

2  **A.**  He was at one time my boss, yes.

3  **Q.**  Richard Hahn?

4  **A.**  Yeah, I have worked with Mr. Hahn.

5  **Q.**  David Williams?

6  **A.**  David Williams -- yes, I worked with him.

7  **Q.**  Roger Marks?

8  **A.**  Roger Marks was the head of our chemistry unit, so he was

9  not my direct supervisor, but I certainly know him.

10  **Q.**  When you talked about being an apprentice to more senior

11  figures in the FBI lab, those were the type of people that

12  were your mentors, right?

13  **A.**  Some of them.  I entered into the explosives unit in June

14  of 1996, and the people you've just listed -- at that time

15  Mr. Williams and Mr. Thurman were in the unit, and they left

16  the unit in early 1997.

17  **Q.**  Okay.  Michael Malone; you worked with him?

18  **A.**  I don't know Mr. Malone.

19  **Q.**  Wallace Higgins?

20  **A.**  I do know Mr. Higgins.

21  **Q.**  One of your colleagues?

22  **A.**  Yes.

23  **Q.**  Now, you testified also about some of the rather high

24  profile cases that you've worked on, right?

25  **A.**  Yes.

1  **Q.**  The Oklahoma City bombing case at the Federal Building?

2  **A.**  Yes.

3  **Q.**  The African Embassy bombing case?

4  **A.**  Yes.

5  **Q.**  The American Embassy in --

6  **A.**  I was in Nairobi, Kenya.

7  **Q.**  The Unabomber case?

8  **A.**  Yes.

9  **Q.**  That's Ted Kozinski?

10  **A.**  Yes.

11  **Q.**  And the first World Trade Center case in 1993, right?

12  **A.**  Yes, sir.

13  **Q.**  But you didn't work as a forensic scientist in any of

14  those cases; isn't that true?

15  **A.**  I was the coordinating forensic examiner for the bombing

16  of the United States Embassy in Nairobi, Kenya, and I later

17  testified as an expert witness on the forensics in that case.

18  **Q.**  Actually, your primary job was to gather evidence in those

19  cases; isn't that true?

20  **A.**  No, sir --

21        MR. BARTLETT:  Objection, Your Honor.  Let him answer

22  the question.

23        THE COURT:  Let me handle this, okay.  Let's not get

24  excited.  Question.

25  BY MR. FOX:

1   **Q.**  Let's talk about the Unabomber case.

2   **A.**  Yes.

3   **Q.**  Your job was to search Ted Kozinski's hut?

4   **A.**  Yes, sir.

5   **Q.**  And you prepared the search warrant -- after you went into

6  the hut you prepared the search warrant?

7   **A.**  No, sir; that's incorrect.  I was affiant; that is the

8  person who signed the arrest warrant affidavit.

9   **Q.**  Okay.  But you searched his hut?

10   **A.**  I did.

11   **Q.**  You weren't a forensic scientist in that case?

12   **A.**  No, sir.

13   **Q.**  And the Oklahoma City bombing case, you were assigned to

14  search a parking lot and collect evidence; isn't that true?

15   **A.**  That's right.

16   **Q.**  You weren't the forensic examiner of that evidence; is

17  that true?

18   **A.**  That's correct.

19   **Q.**  At the World Trade Center case in 1993, you were a team

20  leader and you supervised other agents who swept the debris

21  from the ground, right?

22   **A.**  That's correct.

23   **Q.**  In all of those cases, the World Trade Center case, the

24  Oklahoma bombing case -- those two cases, that's where you

25  worked with David Williams, for instance, right?

1  **A.**  Yes, sir.

2  **Q.**  Richard Thomas Thurman?

3  **A.**  Yes.

4  **Q.**  I believe you said Michael Malone -- you didn't know

5  Mr. Malone?

6  **A.**  To be honest, I have never met Mr. Malone.

7  **Q.**  Wallace Higgins?

8  **A.**  Yes.

9  **Q.**  Now, isn't it correct that your agency -- your unit and

10  your unit's performance in those two cases, the Oklahoma City

11  bombing and the first World Trade Center bombing case, was

12  criticized by the Office of Inspector General, Department of

13  Justice, for its performance in those cases?

14  **A.**  That's right.

15  **Q.**  In fact -- well, tell the jury what the Office of

16  Inspector General is.

17  **A.**  Within the Department of Justice, the Inspector General

18  would look into any allegations of misconduct with all the

19  various agencies that are part of the Department of Justice,

20  which the FBI is one of them.

21  **Q.**  Then they would issue an independent report, like an audit

22  of the unit's performance?

23  **A.**  That's fair to say, yes.

24  **Q.**  And actually, when you mentioned that some of these

25  individuals left your unit in 1996 -- was it?

1  **A.** '97.

2  **Q.** They left because the Office of Inspector General

3  criticized their performance in those very cases?

4  **A.** That's right.

5  **Q.** And they criticized the fact that that unit had people

6  testifying outside their areas of expertise?

7  **A.** That was one of the allegations, yes.

8  **Q.** And that's what the Office of Inspector General concluded

9  was the case?

10  **A.** Yes.

11  **Q.** That the people that trained you were misrepresenting

12  their credentials in courts of law?

13  **A.** Again, I don't know if I would characterize it -- they

14  trained me in the fact that we were only in the unit together

15  for a short time.

16  **Q.** Well, you took your first courses in the 1980s, right?

17  **A.** Yes.

18  **Q.** And those were the people that were training people back

19  in 1980?

20  **A.** They may not have all been in the unit at that time, but

21  there was certainly some overlap, yes.

22  **Q.** The Office of Inspector General suggested that the FBI

23  bomb lab not have unqualified people running the lab?

24  **A.** I don't know that that was the exact language of the

25  report.

1   **Q.**  Well, have you read the report?

2   **A.**  I have.

3   **Q.**  So the exact language of the report -- do you want to see

4   the report?

5   **A.**  I have read it. I don't need to see it.

6   **Q.**  Didn't the Office of Inspector General conclude that

7   examiners should not draw conclusions that overstate the

8   significance of the technical or scientific examinations in a

9   particular case?

10   **A.**  That sounds -- yes.

11   **Q.**  As a result of this Office of Inspector General report,

12   notices were placed in the personnel files of various

13   laboratory examiners who performed examinations that might be

14   tainted, right?

15   **A.**  I cannot speak to what, if anything, was placed in other

16   people's personnel file.

17   **Q.**  But there's something in your file from the Office of

18   Inspector General warning people that you worked on cases -- I

19   am not saying that you were criticized by the Office of

20   Inspector General -- but warning people that might look at the

21   cases you worked on and say, look, some of these people were

22   subject to criticism by the OIG?

23   **A.**  Yes.

24   **Q.**  Now, you also testified you were in the San Francisco

25   office for a number of years?

**A.** I was, from 1985 to 1996.

**Q.** You were at times the acting supervisor, right?

**A.** Yes, I was.

**Q.** Isn't it true that you were the acting supervisor when the environmental activist Judy Barry was the victim of a car bombing?

**A.** For about 30 minutes, yes.

**Q.** But it was that particular time that you sent the people out to investigate that?

**A.** That's right.

**Q.** And it turned out that the people you sent out tried to frame Ms. Barry to be the suspect when in fact she was the victim of the car bombing?

**A.** I wouldn't agree with that, no.

**Q.** Well, but a jury agreed with that and entered an award of $4.4 million against the FBI; isn't that true?

**A.** You know, sir, I would have to look at that verdict. That doesn't sound like the verdict that I remember, but --

**Q.** There was a verdict against the FBI; isn't that true?

**A.** There was a civil case held and there were sanctions against both the FBI and the Oakland Police Department in that case, yes.

**Q.** The very day that these agents were sent out to frame Judy Barry, you were the acting supervisor?

**A.** My boss was at lunch, so yes, I was the acting supervisor.

1  **Q.** So you've just testified that the devices in this

2  particular case were incendiary fire bombs, right?

3  **A.** Yes.

4  **Q.** That was your testimony?

5  **A.** Yes.

6  **Q.** Are you aware of the Technical Working Group on Fires and

7  Explosives?

8  **A.** I have heard of them.

9  **Q.** TWGFEX?

10  **A.** Yes.

11  **Q.** Is this a reputable organization?

12  **A.** I know some of the members of it. I have never

13  participated in any of their meetings or proceedings, but I do

14  know some of the members.

15  **Q.** There are FBI agents that participate in the meetings?

16  **A.** I don't know that they are agents, but they are FBI

17  employees.

18  **Q.** Scientists?

19  **A.** That may be.

20  **Q.** Are you familiar with TWGFEX's definitions?

21  **A.** I have read some of them, yes.

22  **Q.** It's true, is it not, that TWGFEX defines a bomb as a

23  device containing an explosive incendiary or chemical material

24  designed to explode?

25  **A.** I have read that definition, yes.

1  **Q.**  So explosions are different than combustion fires; isn't
2  that true?
3  **A.**  Well, not really.  An explosion is a rapid burning.  Any
4  material that ignites gives off heat; gives off gas.  Even
5  when you light a match, you've created a very, very small
6  explosion, not one that you'd be able to register really in
7  any way other than seeing that match burn.
8  You can go right up the scale then in terms of burning.
9  When we get to an explosion which some people refer to as a
10  detonation, there the burning is so fast that it's almost
11  instantaneous.
12  **Q.**  Well, don't explosions have a build up of pressure?
13  **A.**  Not necessarily, no.  That's a very narrow definition of
14  an explosion.  An explosion releases gases.  It's like I said,
15  lighting a match.  If we were to light a match here in the
16  courtroom, we would have a very, very small explosion.
17  **Q.**  So by your definition, a match is a bomb, an incendiary
18  bomb?
19  **A.**  No, that's not the definition that I would use.
20  **Q.**  So every time you strike a match, there's an explosion,
21  and if you have an explosion, then it's a bomb, right?
22  MR. BARTLETT:  Objection, Your Honor.  He just said
23  he didn't agree with it.
24  THE COURT:  Next question.
25  BY MR. FOX:

1  Q. Well, you've published -- you've been interviewed by the
2  media about your work, right?
3  A. I have.
4  Q. You were interviewed by USA Today back on April 5, 2001?
5  A. Yes, I recall that.
6  Q. Just a couple weeks after you lied at the FBI
7  headquarters?
8  A. No, sir; a couple weeks after the incident that took
9  place, yes.
10  Q. Where you lied?
11  A. Where I was less than completely honest.
12  Q. And this was an article about bombs and explosives, right?
13  A. The interview touched on that, yes. It was actually not
14  an interview. It was an online chat. I don't know the term.
15  A series of questions were posed online and I answered them.
16  Q. It's true that every time in that online chat that you
17  talked about bombs, you talked about explosions, right?
18  A. Yes, in that case I was talking about detonations, for the
19  most part.
20  Q. Every time you talked about bombs, you talked about
21  explosions, right?
22  A. Again, sir, I'd have to review that. It's been a long
23  time since I have looked at that, but I talked about the
24  bombing cases that I had worked on.
25  Q. Well, let's move back to this case. You wrote a report in

1  this case, right, in June of 2001?

2  **A.** I did.

3  **Q.** And that's in front of you marked for identification as

4  A-144.

5  **A.** This is a copy of my report, yes.

6  **Q.** Now, at no point in that report did you ever describe the

7  devices at the Center for Urban Horticulture as bombs; isn't

8  that true?

9  **A.** Yes, I used the term improvised incendiary device.

10  **Q.** So there's no mention of bombs in that report, right?

11  **A.** Well, in my experience --

12  **Q.** No, I am asking you what's in your report.

13  **A.** In my report, I did not use the word "bomb." Yes, sir,

14  that's correct.

15  **Q.** You don't mention destructive devices?

16  **A.** I do not.

17  **Q.** In fact, the first time that you ever described anything

18  in writing that these devices were bombs of some sort was just

19  a few weeks ago, right?

20  **A.** Yes. I was asked to give a written statement of what's

21  called a basis of my conclusion, and in that statement I did

22  use those terms.

23  **Q.** You provided that to Mr. Bartlett in preparation for this

24  trial?

25  **A.** That's right.

1  **Q.** But in the six years between 2001 and 2008 --

2  six-and-a-half years -- you never issued any reports using the

3  word "bomb?"

4  **A.** You mean in this case?

5  **Q.** In this case.

6  **A.** That's right.  The only report I have issued in this case

7  is the one we are looking at.

8  **Q.** Before you sent that letter to Mr. Bartlett using the word

9  "bomb" in preparation for this trial, I sent you a letter,

10 right?

11 **A.** Yes, you did.

12 **Q.** Asking you for the basis of your opinion, right?

13 **A.** Yes, sir.

14 **Q.** And I sent it to you as an e-mail attachment, right?

15 **A.** Yes.

16 **Q.** I asked you a whole series of questions, did I not?

17 **A.** You did.

18 **Q.** I asked you if you could provide me with a basis and

19 reasons for your conclusion that the devices at issue met the

20 definition of incendiary bombs, right?

21 **A.** Yes.

22 **Q.** I asked you if you could provide me with any protocol

23 supported by scientific literature cites that support your

24 conclusion, right?

25 **A.** That's right.

1  **Q.**  I asked you what your definition of a bomb was, right?

2  **A.**  Yes, sir.

3  **Q.**  I asked you when you first reached the conclusion that the

4  devices meet the definition of bombs?

5  **A.**  Yes.

6  **Q.**  I asked you to list any other cases that you worked on

7  where you examined and analyzed devices similar to the ones

8  used in the Center for Urban Horticulture case, right?

9  **A.**  Yes, sir.

10  **Q.**  I asked you if the FBI had any databases of bombs analyzed

11  by its laboratories and, if so, are there any references in

12  those databases to devices similar to the ones used in this

13  case; is that right?

14  **A.**  Yes.

15  **Q.**  I asked you if you could give me a copy of those

16  databases, right?

17  **A.**  Yes.

18  **Q.**  I asked you to give me a list of all the cases that you've

19  been involved in as a bomb technician?

20  **A.**  Yes.

21  **Q.**  I asked you if the professional affiliations and

22  publications on your resume were accurate, right?

23  **A.**  Yes, sir.

24  **Q.**  Or complete?

25  **A.**  Yes.

1　Q.　I also asked to set up a telephone conference with you so

2　I could talk to you before you testified about your

3　conclusions?

4　A.　Yes, sir.

5　Q.　You sent me back an e-mail, right?

6　A.　I did.

7　Q.　You said, "I decline your request for a telephone

8　conference in this matter?"

9　A.　That's right.

10　Q.　"You will shortly receive the document I prepared at the

11　request of Mark Bartlett which addresses many of your

12　questions," right?

13　A.　Yes, sir.

14　Q.　So I would like to direct you to A-147.  It's been marked

15　for identification as A-147.

16　A.　Yes, sir.

17　Q.　That is, in fact, the letter you prepared addressing many

18　of my concerns, right?

19　A.　Yes, sir.

20　Q.　Now, is it not true that you didn't answer most of the

21　questions I asked?

22　A.　To the best of my ability in this letter here, I was

23　hoping to give you the bases and reasons for my conclusion,

24　which included, I think, most of the questions.

25　Q.　Well, you didn't give me one cite to any definition in the

1   scientific literature to support your conclusion; isn't that

2   true?

3   **A.**   That's right.

4   **Q.**   You didn't mention any other investigations where you

5   worked with similar devices?

6   **A.**   I mentioned the fact that in my experience, I have seen

7   this type of device on other occasions.

8   **Q.**   You didn't tell me which occasions those were, did you?

9   **A.**   That's right.

10   **Q.**   You didn't talk about any databases that the FBI has about

11   bombs, did you?

12   **A.**   No.

13   **Q.**   You didn't answer that question, right?

14   **A.**   No.

15   **Q.**   So basically, your letter just said, well, I have

16   concluded, based on my training and experience, that it's a

17   bomb, so therefore I have answered your questions, right?

18   **A.**   No, sir. Again, we are here today in this courtroom, and

19   it's been my experience as an expert witness in a number of

20   other cases, that this is certainly an appropriate forum to

21   discuss these matters before the jury.

22   **Q.**   But you didn't feel like you wanted to share any of your

23   bases or opinions or the basis of your opinions with anyone

24   before you came to court; isn't that true?

25   **A.**   No, sir, I have given you here the basis for my opinion

1  right in this letter.

2  **Q.** Which includes no reference to any scientific literature,

3  no specific cites.

4  **A.** Again, I am happy to discuss that with you now.

5  **Q.** I understand. I understand.

6     You don't believe that by you discussing this with me now

7  you are not repeating the very same problem that the Office of

8  Inspector General criticized your lab for, having

9  non-scientists testifying outside their area of expertise?

10  **A.** Sir, I am in no way suggesting that I am presenting myself

11  to you today as a scientist in the question of explosives. I

12  was, and continue to be, a forensic scientist in the sense

13  that I have examined material in a laboratory and issued a

14  report. But I have given you also the background and the

15  bases on which I reached my conclusions, which is technical in

16  nature and not scientific.

17  **Q.** But you just said you were a forensic scientist.

18  **A.** That's right.

19  **Q.** But you have no training to be a scientist.

20  **A.** Sir, you are parsing a term out rather finally there. A

21  forensic scientist is one who uses scientific methods to study

22  problems of a legal nature. So I used -- and I give you here

23  the scientific methods that I used in this letter.

24  **Q.** Without any reference to any literature. But I will move

25  on. Let's talk about your conclusions that this device is a

1  bomb.

2  **A.**  Yes.

3  **Q.**  When you reviewed Jane Stephan's report, you relied on her

4  to give you information about the scene at the Center for

5  Urban Horticulture, right?

6  **A.**  I don't recall if she was the author of it, but I did read

7  some description of the scene, and I also reviewed a number of

8  photographs that were taken at the scene by the agents there.

9  **Q.**  There actually was no evidence in any of those photographs

10  or reports of any explosion taking place?

11  **A.**  Well, I saw quite a fire.

12  **Q.**  You saw quite a fire, but there were no craters, right?

13  **A.**  No.

14  **Q.**  A crater is usually the result of -- can be a result of an

15  explosion, right?

16  **A.**  It can be.

17  **Q.**  When you are looking at bomb scene investigations, you

18  look for things like craters, right?

19  **A.**  Not always.  Craters are generally only present when you

20  have a large quantity of explosive material.  I have worked

21  bombing cases throughout my career where there was no crater

22  at all.  Sometimes it has to do with the surface of the road.

23  I have seen large bombs where they were on a hard road

24  surface, and you could barely tell that it had dented that

25  material.  So a crater is only one very small part.

1    MR. BARTLETT:  Objection, Your Honor.  Mr. Fox is
2  going into an erroneous definition --
3    THE COURT:  Well, I will take that up.  I want you to
4  ask him, Mr. Fox, and stay into the charge as it is laid out
5  by the statute which the jury will be given in terms of
6  instructions to them as to how to view this evidence.
7    MR. FOX:  All right.
8  BY MR. FOX:
9  Q.  So your conclusion that this is an incendiary bomb rests
10  upon the fact that there's a timing device?
11  A.  That's certainly one important portion of it, yes.
12  Q.  So if someone hand-lit gasoline and didn't have a timing
13  device, would that be a bomb?
14  A.  My understanding of the statute in this case --
15  Q.  I am not asking your opinion as a lawyer.  I am asking
16  your opinion as a forensic technician.
17  A.  As a forensic scientist, understanding the law is an
18  important part of what we do because often definitions are
19  significant.
20    For example, in this case, an incendiary bomb -- my
21  understanding of it is -- is a device that causes a fire.  I
22  saw evidence of a timing system, and to my training and to my
23  experience, a timing system is often found in an incendiary
24  bomb.
25  Q.  Well, your conclusion that an incendiary bomb is a device

1  that causes a fire -- that's your conclusion?

2  **A.**  One of the results of an incendiary bomb can be a fire;

3  not every incendiary bomb works.  I have seen a number of

4  incendiary bombs that were built for that purpose that never

5  ignited.  That doesn't mean that they weren't incendiary

6  bombs, just because they didn't cause a fire.

7  **Q.**  But isn't the time delay mechanism just a way that someone

8  could leave the scene before it goes off?

9  **A.**  In my experience, a time delay is a very important part of

10  this.  To light a match and to throw it into a pile of rags

11  certainly can cause a fire.  That is not what I would call an

12  incendiary bomb.  It certainly caused a fire, and that's not a

13  good thing, but I am not going to characterize that as an

14  incendiary bomb.

15  **Q.**  The fact that you are using -- didn't you just say that an

16  incendiary bomb is a device that causes a fire?

17  **A.**  It can cause a fire.

18  **Q.**  So let's say you have someone that sets cans of gasoline

19  at a ski lodge in Vail, Colorado -- there's no timing device,

20  there's no fuses, no ignition sequence; all there is is a

21  match or a fire starter or something like that.  Would that be

22  an incendiary bomb?

23  **A.**  It could be.  The scenario as you've laid it out there

24  doesn't sound like an incendiary bomb, but it could be.

25  **Q.**  Is the fact that there's a road flare -- is that part of

1  your conclusion?

2  **A.**  A road flare is certainly important in this case.  If you

3  are going to reliably start a fire, if you take a match and

4  you just were to toss a match into a puddle of gasoline, most

5  of the time the gasoline is not going to ignite.  You need

6  something a little bit more robust; you need a lot more flame,

7  generally, to ignite gasoline, especially gasoline where it's

8  in a container where the fumes may be contained within the

9  plastic container or the bladder.

10  **Q.**  How about if you had an incense stick that led to a

11  kerosene soaked sponge?

12  **A.**  Yes, I have seen that used in a number of incendiary

13  bombs; yes.

14  **Q.**  So the fact that you have a kerosene-soaked sponge, that

15  turns something from a non-bomb into a bomb?

16  **A.**  Well, you mentioned an incense stick.  The incense stick

17  is a time delay.  When you light the incense, it burns down at

18  a certain rate until it reaches whatever its destination is.

19  In this case, you described the soaked sponge.

20  **Q.**  So in your conclusion, the time delay is what separates an

21  incendiary bomb from just a fire?

22  **A.**  I wouldn't draw a line quite that finally.  A time delay

23  is often an important part of the construction of the

24  incendiary bomb to get away.  It doesn't make any sense to

25  build a bomb and be standing right next to it when it goes

1  off.  That doesn't mean you can't do that.  I mean, we

2  certainly have suicide bombs in this world that don't have

3  time delays.

4  **Q.**  Can't people start fires by just spreading gasoline around

5  and throwing something in to light it?

6  **A.**  Yes, absolutely.

7  **Q.**  It has the same destructive effect?

8  **A.**  It absolutely does.

9  **Q.**  How about the fact that there's a road flare.  Is the road

10  flare the key factor?

11  **A.**  You are asking me to pick out one thing in a large number

12  of items.  No, the road flare is not the key.  It's certainly

13  an important item among others.

14  **Q.**  In fact, if you just had the road flare -- the road flare

15  is capable of burning for, what, 15 minutes or so?

16  **A.**  Depends on the model, yes.

17  **Q.**  That certainly can set something on fire, right?

18  **A.**  Absolutely.

19  **Q.**  But the road flare wouldn't be a bomb, would it?

20  **A.**  A road flare, all on its own, no; I wouldn't say that's an

21  incendiary bomb.

22  **Q.**  In fact, you've dealt with hoax bomb cases where there

23  have been nothing more than road flares that looked like

24  bombs, right?

25  **A.**  Yes.

**Q.** Your conclusion is that no explosives or detonating devices were observed on the hoax bomb because it's just a road flare?

**A.** That's right.

**Q.** If I could have one more minute.

      MR. FOX: I have nothing further.

      MR. BARTLETT: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. BARTLETT:

**Q.** During his cross-examination, Mr. Fox was asking you about a case in San Francisco involving a woman named Judy Barry and a civil lawsuit.

    Did you have anything to do with that case?

**A.** I did not.

**Q.** During his cross-examination, Mr. Fox was also asking you about an investigation done at the lab and people being fired. Were you fired from the lab?

**A.** No.

**Q.** Were you one of the people they retained?

**A.** Yes.

      MR. BARTLETT: No further questions.

RECROSS-EXAMINATION

BY MR. FOX:

**Q.** Well, you are not being completely forthright here. You were involved in the Judy Barry case, weren't you?

**A.** I took a phone call about an incident and I directed various agents to go to a crime scene.

**Q.** Well, didn't you testify in that case?

**A.** I testified to the statement I just gave you.

**Q.** So you did have some involvement in the case?

**A.** I was not involved in the investigation. I was involved in the civil litigation.

**Q.** And you were a witness in the case?

**A.** I was a witness in the civil lawsuit, yes, sir; I was.

**Q.** Thank you very much.

     MR. BARTLETT: Nothing further, Your Honor.

     THE COURT: May this witness be excused? Mr. Fox, may this witness be excused?

     MR. FOX: Yes.

     THE COURT: You are excused.

     MR. BARTLETT: With the Court's permission, could I retrieve some of the items over here.

     THE COURT: Yes.

  Mr. Bartlett, this is your witness?

     MR. FRIEDMAN: She's my witness, Your Honor.

  LACEY PHILLABAUM, called as a witness, duly sworn.

     THE COURT: All right. Take the witness chair.

               DIRECT EXAMINATION

BY MR. FRIEDMAN:

**Q.** Good afternoon, Ms. Phillabaum.

1          Where are you from?

2     **A.**   I am from Spokane, Washington, actually.

3     **Q.**   Were you born there?

4     **A.**   No, I was born in Yakima and I lived in Olympia until I

5     was five.

6     **Q.**   And then you moved to Spokane?

7     **A.**   Yes.

8     **Q.**   For how long did you live in Spokane?

9     **A.**   Until I was 18.

10    **Q.**   You went to high school there?

11    **A.**   I went to Shadle Park High School.

12    **Q.**   Did you graduate from that high school?

13    **A.**   In 1993.

14    **Q.**   What did you do after you graduated from high school?

15    **A.**   I went to the University of Oregon in Eugene.

16    **Q.**   What did you study there?

17    **A.**   I studied art history.  I graduated in 1996 with a

18    Bachelor of Arts in art history.

19    **Q.**   So you were there three years?

20    **A.**   Uh-huh.

21    **Q.**   Where did you work after you finished college?

22    **A.**   I worked at the Earth First Journal for an environmental

23    organization.

24    **Q.**   The Earth First Journal is a journal of which

25    organization?

1  **A.**  An environmental group.

2  **Q.**  What's that group called?

3  **A.**  Earth First.

4  **Q.**  On the spectrum of environmental organizations, can you

5  tell us where Earth First falls or what it is?

6  **A.**  It's probably the most radical group.

7  **Q.**  Does it have a motto or --

8  **A.**  No compromise in defense of Mother Earth, is the motto.

9  **Q.**  Does Earth First take a position on civil disobedience?

10  **A.**  Generally Earth First advocates direct action on behalf of

11  the environment.

12  **Q.**  You said you work for the Earth First Journal?

13  **A.**  That's correct.

14  **Q.**  What is that?

15  **A.**  It's the newspaper of the group.

16  **Q.**  What was your job at the Earth First Journal?

17  **A.**  I was an editor there.

18  **Q.**  For how long did you work there?

19  **A.**  Let's see, I worked there, I think, starting in the winter

20  of 1996, early 1997, through spring 1999.

21  **Q.**  Why did you leave the journal?

22  **A.**  It was a lot of work and I was worn-out.

23  **Q.**  After you left the Earth First Journal, what did you do?

24  **A.**  I traveled in Europe for six months.

25  **Q.**  Then you came back to the United States?

1    **A.**   Uh-huh.

2    **Q.**   When you came back, where did you work?

3    **A.**   Let's see, I did sort of odd jobs for a couple months, and

4    then I got a job in a law office, and I worked there for just

5    a few months.  Then I started working for Oregon Tilth in

6    February of 2001, I believe.

7    **Q.**   I probably should have asked.  When you worked for the

8    Earth First Journal, was that also in Eugene?

9    **A.**   Yes, that's also in Eugene.

10   **Q.**   And when you worked for Oregon Tilth, where were you

11   living and working?

12   **A.**   The organization is based in Salem, but I started -- when

13   I first started working there I lived in Eugene, and then I

14   moved to Bend later.

15   **Q.**   When did you move from Eugene to Bend?

16   **A.**   December 2001.

17   **Q.**   Can you tell us, what is Oregon Tilth?

18   **A.**   It's a trade paper for an organic certifier.  They certify

19   that a farm that calls itself organic meets the national

20   organic standards.

21   **Q.**   Is it fair to say that's a more mainstream environmental

22   group than Earth First?

23   **A.**   Yes, it's a trade paper for the other group, so yes, it

24   is.

25   **Q.**   What did you to for Oregon Tilth?

1   **A.**  I edited their paper.

2   **Q.**  Were you the editor-in-chief or top editor?

3   **A.**  It's kind of a one-person show.  I did all the desktop

4  publishing, editing, soliciting articles, everything.

5   **Q.**  For how long did you keep working for Oregon Tilth?

6   **A.**  I worked there through February 2005.

7   **Q.**  And what did you do?  What happened in February of 2005?

8   **A.**  I wanted to be writing full-time, so I was looking for a

9  job, and I moved to Charlottesville, Virginia, and took a job

10  there.

11   **Q.**  Where were you working there?

12   **A.**  At an alternative newsweekly called C-Ville Weekly.

13   **Q.**  Is that something like the Seattle Weekly?

14   **A.**  Well -- yeah, yeah.

15   **Q.**  There's probably a Tacoma version of that; I am not sure.

16   **A.**  Yeah, like Seattle Weekly or the Stranger or something

17  like that.

18   **Q.**  For how long did you stay at the Charlottesville's Daily?

19   **A.**  The C-Ville Weekly, I was there for -- not very long, like

20  three months, four months.

21   **Q.**  Why did you leave there?

22   **A.**  It didn't work out.  The editor didn't like me, we had a

23  conflict of personalities.

24   **Q.**  After you left there, where did you go work?

25   **A.**  I worked in Washington, D.C., doing freelance journalism,

1  and I worked also part-time for a media organization in
2  Washington.
3  **Q.**  Did you live in Washington, D.C.?
4  **A.**  Uh-huh.
5  **Q.**  Now, at a certain point, the investigation in this case
6  lead to a number of people being arrested; is that correct?
7  **A.**  Uh-huh.
8  **Q.**  When was that?
9  **A.**  December 7, 2005.
10  **Q.**  After that happened, did you move home to Spokane?
11  **A.**  No.  First I thought I might live in D.C.  I didn't know
12  what was going to happen, but in -- just after the new year,
13  so within a month, I was pretty sure I needed to be on the
14  West Coast, and I came back to the West Coast.
15  **Q.**  You subsequently have been charged and pled guilty; is
16  that correct?
17  **A.**  That's correct.
18  **Q.**  And I am sure the jury has noticed you are wearing khakis.
19  Why is that?
20  **A.**  I'm in prison.
21  **Q.**  Did you fail to make bail, or how did you end up there?
22  **A.**  I self-surrendered.  The case has gone on so long and I
23  wanted to start doing my time, so I self-surrendered so I
24  could start putting this behind me.
25  **Q.**  You are testifying today pursuant to a plea bargain; is

1  that correct?

2  **A.**  That's correct.

3  **Q.**  You are familiar with the terms of that, I assume?

4  **A.**  I think so.

5  **Q.**  I would like to ask you to look at Exhibit 792-B.  There

6  should be a stack of folders there with numbers on top.  Can

7  you look at 792-B and tell me if you recognize that?

8  **A.**  This is my plea agreement.

9          MR. FRIEDMAN:  The government offers Exhibit No.

10  792-B.

11          MR. BLOOM:  No objection.

12          THE COURT:  Admitted.

13                (Exhibit No. 792-B admitted.)

14  BY MR. FRIEDMAN:

15  **Q.**  Ms. Phillabaum, under the terms of your plea agreement,

16  how many crimes did you plead guilty to?

17  **A.**  I think there's three counts in the plea agreement.

18  **Q.**  Do you recall what those crimes are?

19  **A.**  Well, I pled guilty to the University of Washington arson.

20  Are you asking me about the counts or every crime that's

21  mentioned?

22  **Q.**  The counts to which you pled guilty.

23  **A.**  Okay.  I pled guilty to conspiracy, arson, and use or

24  possession of an incendiary device.

25          MR. FRIEDMAN:  Your Honor, may we publish Exhibit

1   792-B for the jury?

2           THE COURT:  It is admitted.

3   BY MR. FRIEDMAN:

4   **Q.**  Ms. Phillabaum, if you look at the first page, at the

5   bottom, do you see a section labeled "The Charges?"

6   **A.**  Yes.

7   **Q.**  And that lists the three crimes to which you pled guilty?

8   **A.**  Yes.

9   **Q.**  There's only one on this page; that's the conspiracy

10  count?

11  **A.**  Right.

12  **Q.**  Can you describe to us the conspiracy to which you pled

13  guilty?

14  **A.**  I pled guilty to a larger conspiracy which included the

15  University of Washington arson.

16  **Q.**  Who were the other people named in the conspiracy to which

17  you pled guilty?

18  **A.**  Briana Waters, Justin Solondz, Avalon, Bill Rodgers,

19  and -- I am sorry, I am nervous -- myself and Jen Kolar.

20  **Q.**  And others known and unknown?

21  **A.**  And others, yeah.

22          MR. BLOOM:  I am going to ask that there be no

23  further leading, please.

24  BY MR. FRIEDMAN:

25  **Q.**  If you turn the page, do you see a description of the

1  second crime to which you pled guilty?

2  **A.**  Uh-huh.

3  **Q.**  Can you tell us what that is?

4  **A.**  Arson.

5  **Q.**  Was that a specific arson?

6  **A.**  The University of Washington arson.

7  **Q.**  And then the third crime?

8  **A.**  Use of destructive device during a crime of violence.

9  **Q.**  Under the terms of your plea agreement, what did you agree

10  to do?

11  **A.**  Tell the truth.

12  **Q.**  Can I get you to be a little broader?  Did you agree to

13  cooperate with the government?

14        MR. BLOOM:  Excuse me.  I object to leading.

15        THE COURT:  Counsel, this is not so leading that we

16  are losing grip here, so let's make an objection when it

17  really would do something other than slow the case down.

18        MR. BLOOM:  I don't want to slow the case down,

19  Judge; I am asking the witness be permitted to answer the

20  question.

21        THE COURT:  I understand.  I have an answer.  Be

22  seated, please.

23     Question.

24  BY MR. FRIEDMAN:

25  **Q.**  Ms. Phillabaum, have you agreed to cooperate with the

1  government?

2  **A.**  Yes.

3  **Q.**  What do you understand that to require?

4  **A.**  To tell the truth, regardless of the impact.

5  **Q.**  In return, what has the government agreed to do?

6  **A.**  I have a plea deal that means that I will serve between

7  three and five years in prison.

8  **Q.**  Ultimately, who will decide what sentence you receive

9  within that range?

10  **A.**  Judge Burgess does.

11  **Q.**  The government gets to make a recommendation?

12          MR. BLOOM:  Objection.  Leading.

13          THE COURT:  Question.

14  BY MR. FRIEDMAN:

15  **Q.**  Does the government get to make a recommendation?

16  **A.**  I think so.

17  **Q.**  Now, if you had not entered into this plea agreement, what

18  understanding do you have of what penalties you might have

19  been facing?

20  **A.**  For the first count, conspiracy, is zero to five years.

21  Arson is five to twenty years.  And 924(c), using or

22  possessing an incendiary device in furtherance of a crime of

23  violence, is a mandatory minimum of 30 years, to run

24  consecutive with the other charges.

25  **Q.**  I would ask you to turn to the third page of your plea

1   agreement, if you would.

2      Do you see a section labeled "The Penalties?"

3   **A.**   Yes.

4   **Q.**   Would you take a look at that and tell me if that's

5   consistent with what you just said?

6   **A.**   It looks the same. I didn't realize it was mandatory

7   minimum of five years for arson, but --

8   **Q.**   And the 30-year penalty, to which count does that apply?

9   **A.**   The 30 years, that's for 924(c), using or possessing an

10   incendiary device.

11   **Q.**   Does it apply to any of the others?

12   **A.**   No.

13   **Q.**   Why did you decide to cooperate?

14   **A.**   Well, I felt like the truth was coming out, and having

15   worked as a journalist, I kind of believed that that was

16   likely to happen. And I had regrets about what had happened,

17   and I did not want to spend 35 years in prison.

18   **Q.**   Was it an easy decision for you to decide to cooperate?

19   **A.**   No. It's been excruciating, every day beforehand and

20   every day since.

21   **Q.**   Do you bear any ill will towards Ms. Waters?

22   **A.**   I have a lot of sympathy for everyone involved in this

23   case.

24   **Q.**   Now, when did you first become involved in environmental

25   activism?

1   **A.**  In 1995 when I was attending the University of Oregon.

2   **Q.**  What was the first thing you did that was --

3   **A.**  I was involved in a campaign to protect an area called

4   Warner Creek, to stop a timber sale from happening there.

5   **Q.**  Where is Warner Creek?

6   **A.**  It's in Oregon, near Eugene, outside of Oakland --

7   Oakridge.

8   **Q.**  Were there a number of people involved in this?

9   **A.**  It was a large campaign and started out walks in the

10  forest, protests at the federal building, and eventually we

11  had a road blockade that blocked the road and blocked access

12  to the timber sale.

13  **Q.**  Do you recall any of the other individuals who were there,

14  also involved in this protest?

15  **A.**  I met Bill Rodgers there.

16  **Q.**  Was he involved in the protest?

17  **A.**  Oh, yeah.

18  **Q.**  Why do you say, "Oh, yeah," in that way?

19  **A.**  I don't know.  I'm nervous.

20  **Q.**  Did he have a particular role?  Was he a leader or just

21  another member of the protest?

22  **A.**  He was there.  I would say he was experienced at that sort

23  of thing so people looked at him for advice.

24  **Q.**  Would you take a look at Exhibit 111 and tell me if you

25  recognize that?

1   A.  Yes, I recognize it.

2   Q.  Can you tell us what it is?

3   A.  It's a picture of Bill Rodgers.

4           MR. FRIEDMAN:  Government offers Exhibit 111.

5           MR. BLOOM:  No objection.

6           THE COURT:  Admitted.

7               (Exhibit No. 111 admitted.)

8   BY MR. FRIEDMAN:

9   Q.  Now, by what name did you know Mr. Rodgers?

10  A.  I knew him as Avalon.

11  Q.  Is that how you knew him from even the time of Warner

12  Creek?

13  A.  I knew him as Avalon there.

14  Q.  How well did you get to know Mr. Rodgers, Avalon, at

15  Warner Creek?

16  A.  The campaign went on for about a year and a half, so by

17  the end I had a fairly high trust level with him.

18  Q.  After the Warner Creek campaign, were you involved in

19  other environmental issues or campaigns?

20  A.  Uh-huh.  I went to protests at other timber sales.  I went

21  to protests in California regarding the Red Woods and Idaho,

22  other places.

23  Q.  Were you arrested at any of those protests?

24  A.  Yes.  I have been arrested for protesting, I am not sure

25  what the charge was, I think three times for trespass, for

1    protest-related things.

2    **Q.** Did you see Avalon at any of these later protests that

3    you've just described to us?

4    **A.** Over the years, yes.

5    **Q.** Can you tell us how your relationship with Avalon

6    developed over time?

7    **A.** Well, I put a lot of -- I had a lot of trust in him. In

8    the sort of uncomfortable consensus group meetings that we

9    often had, Avalon was someone who was frequently the

10   facilitator, which is a difficult job because you have to keep

11   everyone on task and from fighting. And he was always very

12   reasonable and moderate in those meetings, and I tended to

13   identify with that.

14   **Q.** Did he play a leadership role in those meetings?

15   **A.** I would say it would be more accurate to call it a

16   facilitator.

17   **Q.** In 1999, do you recall the WTO protests in Seattle?

18   **A.** Yes.

19   **Q.** Were you involved with anything before those protests

20   happened, relating to the protests?

21   **A.** I helped do some of the organizing, like look for places

22   for people to stay. I did outreach, you know, to get more

23   people there. Posturing. I was looking at the companies who

24   might have an agenda who were also sponsoring, meeting, that

25   sort of thing.

1 **Q.** Did you see a link between World Trade, WTO, and the
2 environment?

3 **A.** Yes.

4 **Q.** Can you explain that to us?

5 **A.** Well, I guess we'd been doing these sort of place-by-place
6 campaigns, and we felt like global trade was an overarching
7 structure that was pushing resource exploitation in a number
8 of areas.

9 **Q.** So was your participation in WTO the result of your
10 environmental activism?

11 **A.** Yes.

12 **Q.** Were you present during the WTO protests themselves?

13 **A.** Yes.

14 **Q.** Were you alone or were you with other people during that?

15 **A.** No.  I started working with a group of people that
16 intended to go to the Cargill grain elevator and have a
17 protest there.

18 **Q.** What's the Cargill grain elevator?

19 **A.** I am not sure how to explain it more than that.  It's a
20 grain elevator owned by Cargill.

21 **Q.** In Seattle?

22 **A.** Yes.

23 **Q.** Why were you going to have a protest there?

24 **A.** Trade policies that we disagreed with.

25 **Q.** What kind of a protest were you planning?

1    A. We were going to do like an office occupation and shut

2    down the office for the day.

3    Q. And who were the other individuals in this group?

4    A. Avalon was there. Suzanne Savoie was there. Daniel

5    McGowan was there. Joy Zacher I met there.

6    Q. Would you take a look at a folder labeled as Exhibit 117.

7    Tell me if you recognize that.

8            THE COURT: What was that number again?

9            MR. FRIEDMAN: 117, Your Honor.

10   A. Yes, I recognize it.

11   BY MR. FRIEDMAN:

12   Q. Who is that?

13   A. That's Daniel McGowan.

14   Q. One of the individuals who went there?

15   A. Uh-huh.

16           MR. FRIEDMAN: Government offers Exhibit 117.

17           MR. BLOOM: No objection.

18           THE COURT: Admitted.

19               (Exhibit No. 117 admitted.)

20   BY MR. FRIEDMAN:

21   Q. And would you take a look at a folder, Exhibit 120.

22   A. Okay.

23   Q. Do you recognize that?

24   A. That's Suzanne Savoie.

25           MR. FRIEDMAN: Government offers Exhibit 120.

1          MR. BLOOM:   No objection.

2          THE COURT:   Admitted.

3                    (Exhibit No. 120 admitted.)

4     BY MR. FRIEDMAN:

5     Q.   And would you take a look at Exhibit 119?

6     A.   Okay.   That's Joy Zacher.

7          MR. FRIEDMAN:   Government offers Exhibit 119.

8          MR. BLOOM:   No objection.

9          THE COURT:   Admitted.

10                   (Exhibit No. 119 admitted.)

11    BY MR. FRIEDMAN:

12    Q.   So all of these individuals were in this group?

13    A.   Amongst others, yes.

14    Q.   Did the group ultimately end up taking over Cargill's

15    grain elevator?

16    A.   No.   That protest didn't end up happening.   We just went

17    downtown and ended up being part of a larger protest.

18    Q.   You were present during --

19    A.   Also, you know, the people blockading the roads.   And then

20    later when people started breaking windows and stuff, some of

21    those people I was with did that.   I spray painted a building

22    at one point.

23    Q.   Did you break any windows?

24    A.   No.

25    Q.   Did you cause any other property damage?

1    **A.**   No.

2    **Q.**   Did you perceive the WTO protest as being a success?

3    **A.**   We thought it was a success because the trade minister,

4    the meeting did not lead to a new round of negotiations.

5    **Q.**   Did that lead to any other action or activity by this

6    group?

7    **A.**   The people who had worked together in that group of people

8    sort of developed an affinity with each other, and Avalon came

9    to get us back together and continue working together, if

10   not -- obviously not on that protest, but on other things.

11   **Q.**   So what did Avalon do as a result?

12   **A.**   We started having meetings in Eugene in March 2001.

13   **Q.**   Is there a name that you -- how many of these meetings did

14   you have?

15   **A.**   Ultimately there were five meetings.

16   **Q.**   Were they all in Eugene?

17   **A.**   No, they happened in different places.  The first was in

18   Eugene; the second was in Arizona; the third was in

19   California; the fourth, I think, was in Washington; and the

20   fifth was in -- outside of Bend, in Sisters, Oregon.

21   **Q.**   I think you said the first was March of 2001.  Is that

22   what you meant to say?

23   **A.**   No, I meant March 2000.

24   **Q.**   Over what time span did these five meetings take place?

25   **A.**   Until May 2001.

1    **Q.** So roughly 15 months?

2    **A.** Uh-huh.

3    **Q.** How many people went to these meetings?

4    **A.** Between 10 and 12.

5    **Q.** Was it generally the same people, or totally different

6    people?

7    **A.** It got bigger as time went on.

8    **Q.** But was there repetition in who was present?

9    **A.** Mostly it was the same people, yes.

10   **Q.** In general, who was at these meetings?

11   **A.** Do you want me to name everyone?  Avalon, myself.  Suzanne

12   was at the first one.  Nathan, Joy, Daniel.

13          MR. BLOOM:  If you could, just a little slower,

14   please.

15          THE COURT:  All right.  Do you want her to go over

16   them again?

17          MR. BLOOM:  Yes, please.  I just want to note the

18   names.

19          THE COURT:  Name them again.

20          THE WITNESS:  I was there.  Suzanne, Nathan -- no,

21   I'm sorry.

22      Myself, Suzanne, Nathan, Joy, Daniel.  Those are the

23   people relevant, I think.

24   BY MR. FRIEDMAN:

25   **Q.** So of the group that we talked about a moment ago that

1  were at the WTO protest with you, was Avalon present at these

2  meetings?

3  **A.** Oh, yes.

4  **Q.** And we talked about Suzanne Savoie. Was she present at

5  these meetings?

6  **A.** Yes.

7  **Q.** We had talked about Daniel McGowan. Was he present?

8  **A.** Yes.

9  **Q.** Were there additional people present?

10 **A.** At the second meeting, Avalon started introducing new

11 people to the group.

12 **Q.** Did he introduce other people who ended up being involved

13 later with you in an arson or arsons?

14 **A.** At the second meeting, Chelsea was there. At the third

15 meeting, I believe Jen Kolar and Stan Meyerhoff came for the

16 first time.

17 **Q.** Would you look at Exhibit 124, which should be in front of

18 you?

19 **A.** Okay.

20 **Q.** Do you recognize that?

21 **A.** That's Chelsea Gerlach.

22         MR. FRIEDMAN:  Government offers 124.

23         MR. BLOOM:  No objection.

24         THE COURT:  Admitted.

25               (Exhibit No. 124 admitted.)

BY MR. FRIEDMAN:

**Q.** You said she started attending at which meeting?

**A.** The second meeting.

**Q.** And would you look at Exhibit 112 and tell me if you recognize that?

**A.** That's Jennifer Kolar.

        MR. FRIEDMAN: Government offers 112.

        MR. BLOOM: No objection.

        THE COURT: Admitted.

            (Exhibit No. 112 admitted.)

BY MR. FRIEDMAN:

**Q.** At what meeting did she first appear?

**A.** The third meeting, I believe.

        MR. BARTLETT: Your Honor, we are having some technical difficulties. Although the pictures are showing up here, they are not showing up at the jury.

        THE COURT: Now are they all showing up?

        MR. BARTLETT: Yes. Sorry about that.

BY MR. FRIEDMAN:

**Q.** Would you look at Exhibit 116 and tell me if you recognize that person?

**A.** That's Stan Meyerhoff.

        MR. FRIEDMAN: Government offers Exhibit 116.

        MR. BLOOM: No objection.

        THE COURT: Admitted.

1                    (Exhibit No. 116 admitted.)

2  BY MR. FRIEDMAN:

3  **Q.** At what meeting did Mr. Meyerhoff first show up?

4  **A.** I believe it was at the third meeting.

5  **Q.** I think you had mentioned someone named Nathan.  To whom

6  were you referring?

7  **A.** Nathan Block.

8  **Q.** Would you look at Exhibit 118 and tell me if you recognize

9  that?

10 **A.** That's Nathan.

11            MR. FRIEDMAN:  Government offers Exhibit 118.

12            MR. BLOOM:  No objection.

13            THE COURT:  Admitted.

14                    (Exhibit No. 118 admitted.)

15 BY MR. FRIEDMAN:

16 **Q.** Now, do you know someone named Briana Waters?

17 **A.** Yes.

18 **Q.** Did she show up at any of these meetings?

19 **A.** No.

20 **Q.** Was she present in any way at any of them?

21 **A.** Not that I know of.

22 **Q.** Over time, did the subject of the meetings change?

23 **A.** When we first started, it was sort of, what are we going

24 to do to inspire the movement?  What's the next direction we

25 are going to go in?  How do we stop doing the same thing over

1  and over?  And we also talked about particulars of people who

2  had experience doing direct action, what they were familiar

3  with.  And then as time went on, we became more and more

4  focused on direct action and sabotage, and eventually, at the

5  third meeting, we were trained on how to build incendiary

6  devices.

7  **Q.** Was there an actual demonstration of how to build

8  incendiary devices?

9  **A.** Yes.

10 **Q.** Who did that?

11 **A.** Stan and Chelsea.

12 **Q.** You said you were trained.  Did other people try and do

13 it, or what do you mean by trained?

14 **A.** The main thing I remember is soldering.

15 **Q.** What do you remember about that?

16 **A.** That we tried to solder things together.

17 **Q.** Things, was it just practice soldering, or things that

18 would be components of fire bombs?

19 **A.** Right.  I wouldn't call it a fire bomb, but.

20 **Q.** Devices to burn down buildings?

21 **A.** Incendiary devices is what I understood it to be.

22 **Q.** Now, did you do any -- was there any training or

23 information about how to communicate with each other?

24 **A.** At the -- well, the first meeting we agreed would be

25 secret.  The second meeting, I think we started setting up

1  ways to communicate anonymously, and those got increasingly

2  sophisticated over time.

3  **Q.** So at the beginning, how was that done?

4  **A.** The first level of secrecy I remember us having was a

5  generic e-mail address.  Then we were supposed to access that

6  e-mail address through a proxy server which disguised what

7  computer we were using.  Then over time we were using a book

8  as a method of encryption.  Like if you wanted to write

9  something, you'd write it in code using a book.

10      Then at the third meeting, Jen Kolar taught us how to use

11  PGP, which we had totally talked about before, but she gave us

12  each a disk with PGP on it, which was a type of encryption.

13  **Q.** So these layers were added one after the other, basically?

14  **A.** Over time they got more sophisticated.

15  **Q.** What other practical things were taught or discussed at

16  these meetings?

17  **A.** Well, how to do reconnaissance at a site.  Look at what

18  was there, take notes of what was there, see when security

19  passed by.  Lock picking.  Breaking windows, breaking and

20  entering.

21  **Q.** You said that when it started out there was sort of some

22  discussion of issues on which to focus.  Were any decisions

23  made or reached over time?

24  **A.** Well, we didn't have a focus, other than just we were all

25  very passionate about the environment when we started.  And we

1    spent a lot of time discussing the philosophy behind that, as

2    well as doing these other more hands-on things.

3        And we kind of wanted to focus on something together, but

4    we never made a hard and fast agreement of anything to work on

5    together, because we decided that the meetings shouldn't

6    be the group of people who went out and did actions together.

7    That seemed risky.  So we were explicit that those meetings

8    were not people who were going to go do actions together

9    exclusively.

10       People could -- subgroups could break off, but we weren't

11   all going to do the same thing.  We decided that in Arizona,

12   at the second meeting.

13   Q.  You said the subgroups.  The whole meeting wouldn't, but

14   subgroups might?

15   A.  That's correct.

16   Q.  Was the subject -- you said people talked about the

17   environment and were interested in the environment.  Was

18   genetic engineering something that was discussed?

19   A.  Oh, yeah.  Daniel and Suzanne were very, very interested

20   in genetic engineering.  They really pushed that as an agenda,

21   and eventually sort of by default that became our agenda.  I

22   wouldn't say it was really the whole group's agenda, but it

23   was something they were always drawing us back to.

24   Q.  You referred a moment ago to -- we've talked about William

25   Rodgers and his nickname Avalon.  A moment ago you talked

1    about Suzanne.  Can you tell us the last name?

2  **A.**   Savoie.

3  **Q.**   Did she have a nickname by which she went?

4  **A.**   India.

5  **Q.**   And you said Daniel a moment ago?

6  **A.**   McGowan.

7  **Q.**   Did he have a nickname?

8  **A.**   He had a number of different names over the time that I

9    knew him.  Zorro, I think, would have been a common name I

10   used for him at that point.

11 **Q.**   Did most of the other people who were attending these

12   meetings have nicknames that they used or went by?

13 **A.**   Well, going back to our days in the protest movement to

14   when we were doing that, people generally had some sort of a

15   nickname that they would go by.  And then at these meetings

16   people adopted different pseudonyms to go by.

17 **Q.**   Did you have a name by which you went?

18 **A.**   At the meetings?  I think everybody pretty much knew I was

19   Lacey.

20 **Q.**   Was that what you were generally called?

21 **A.**   I think at times people would call me something else, but

22   I don't really remember.  I think Reba was a name I was called

23   at one point.

24 **Q.**   Now, you've told us about the genetic engineering becoming

25   a focus and the e-mails.  Did you receive a, I guess, an

1  e-mail communication at some point after these meetings, or

2  after one of these meetings?

3  **A.** At some point, Suzanne invited me to be involved with an

4  action in Eastern Washington, and she sent me an e-mail about

5  that.

6  **Q.** Just so it's clear, could I ask you to either use first

7  and last name or code name, if that's one that's well-known.

8  When you say Suzanne, you mean --

9  **A.** I mean India.

10  **Q.** How did she get in touch with you?

11  **A.** She sent me an e-mail.

12  **Q.** To your -- do you have a personal e-mail account?

13  **A.** I think it was probably to a generic group account.

14  **Q.** What did she ask you to do in that e-mail?

15  **A.** It was encrypted using all those layers that I talked

16  about with the book, with the PGP encryption, so I decoded it.

17  Really, the only encrypted part was the really significant

18  information, which was a time and a place to meet, or a place

19  to meet, and that was Starbucks in Pullman, Washington.

20  **Q.** Did you go to that Starbucks?

21  **A.** I drove there with Chelsea Gerlach.

22  **Q.** What did you find when you got there?

23  **A.** We met Suzanne and -- Suzanne or India.  And we eventually

24  ended up doing an action in that area.

25  **Q.** You said you discussed an action in that area?

1  **A.** Yes. We eventually ended up pulling some canola out of

2  the field, I think.

3  **Q.** Was that the initial plan?

4  **A.** No. Initially there was a different plan, and I had a

5  disagreement with Suzanne about the target of that action.

6  She wanted to do something against this barley field and I

7  didn't believe it was genetically engineered, so we didn't do

8  that first action. Then we went back at some point later and

9  did this other action against the canola.

10  **Q.** When you say genetically engineered, what do you

11  understand that to mean?

12  **A.** A gene from a foreign body has been introduced into the

13  gene of the plant in question.

14  **Q.** You thought that the barley was not genetically

15  engineered?

16  **A.** Right.

17  **Q.** How much time passed between your first trip, when you

18  were going to do that, and you said you went back and did

19  something different?

20  **A.** I'm not sure.

21  **Q.** When you say you did something different, can you tell us

22  what you did?

23  **A.** We took these genetically engineered canola plants out of

24  the ground. It was a small field.

25  **Q.** Roughly how many people were involved in doing that?

1   A.   Maybe eight to ten.

2   Q.   Whom do you recall being there?

3   A.   Myself, Chelsea.

4   Q.   Chelsea Gerlach?

5   A.   Chelsea Gerlach. Joyanna Zacher. Nathan Block. Justin

6   Solondz. Suzanne Savoie. And either Avalon or Stan, but I'm

7   not sure.

8   Q.   By Stan, do you mean Stan Meyerhoff?

9   A.   Stan Meyerhoff.

10  Q.   And you've added -- most of these are -- these are names

11  you talked about before, but you've added one name, Justin

12  Solondz?

13  A.   That's corrected.

14  Q.   Would you take a look at Exhibit 115 and tell me if you

15  recognize that?

16  A.   That's Justin Solondz.

17          MR. FRIEDMAN:   Government offers Exhibit 115.

18          MR. BLOOM:   No objection.

19          THE COURT:   Admitted.

20                  (Exhibit No. 115 admitted.)

21  BY MR. FRIEDMAN:

22  Q.   Had Mr. Solondz been at any of the -- this series of

23  meetings you described, was there a name that you all

24  sometimes referred to them by?

25  A.   They were sometimes called the book club meetings.

1  **Q.** Was Mr. Solondz at any of the book club meetings?

2  **A.** No.

3  **Q.** Had any of the other people we've discussed been at the

4  book club meetings?

5  **A.** Yes, most of them had.

6  **Q.** You said you took crops out of the field.  How did you do

7  that?

8  **A.** I don't remember in particular, but it was basically like

9  pulling weeds, except it was a small field of weeds.  We just

10  ripped them out of the ground.

11  **Q.** Was this done during the day or night?

12  **A.** No, we did it during the night.

13  **Q.** Do you recall whether you took any precaution to avoid

14  being noticed?

15  **A.** Uh-huh.  We wore black and I think we probably wore

16  gloves, and I think that there were lookouts.  And we were

17  dropped off and we walked into the site in a way that we

18  thought would be inconspicuous.

19  **Q.** Then after the action?

20  **A.** After the action we left.

21  **Q.** Okay.  Do you recall whether there was a communiqué issued

22  after that action?

23  **A.** I think there was a communiqué, yes.

24  **Q.** Can you tell us, what is a communiqué?

25  **A.** A claim of responsibility for the crime.

**Q.** Why would you issue a communiqué?

**A.** So it didn't seem like random destruction, but people understood that it was undertaken for a specific reason, which was environmental. We thought we were pursuing environmental ends.

**Q.** Over time did you have some involvement with issuing communiqué for different actions?

**A.** I helped write a couple but I never issued any. There was sort of a process to sending them out anonymously, and I was not involved in that process.

**Q.** Why would you send them out anonymously?

**A.** It was a claim of responsibility for an illegal action, so you didn't want to be associated directly with the action.

THE COURT: Mr. Friedman, let me ask this question: It looks like you have a ways to go?

MR. FRIEDMAN: I do.

THE COURT: Then let's take the afternoon recess at this time, take a break for about 15 minutes. Don't discuss the case; leave your books on the chair.

(Jury not present.)

THE COURT: You may be seated.

Any reason -- Mr. Bloom, are you going to say something?

Then we will take the recess.

MR. FRIEDMAN: Your Honor, we do have the motion that we had -- the matter we raised before, and I think we should

1  address it before the jury comes back because it's possible we

2  would get to cross this afternoon.

3        THE COURT:   This is on Exhibit 132?

4        MR. FRIEDMAN:   It is.   We believe that's irrelevant.

5  It has no relation to anything in the case, and the only

6  reason the defense is offering it is to try to taint and smear

7  Ms. Phillabaum.

8        THE COURT:   I don't know.   Let him speak for himself.

9     What reason are you offering this exhibit?

10        MR. BLOOM:   I am not sure yet.   It depends on what

11  the answers are to other questions.   If there are issues,

12  these are letters.

13     You are talking about the letters, right?

14        THE COURT:   Talking about A-132, that I understand

15  you are going to use in cross-examination.

16        MR. BLOOM:   May Mr. Fox address that?

17        THE COURT:   Well, somebody.

18        MR. FOX:   Your Honor, we put that into the packet of

19  possible impeachment information.   I really don't know.

20        THE COURT:   I can't answer the question if you don't

21  know what you are going to do.

22        MR. FOX:   We don't know how the direct is going to

23  go.

24        THE COURT:   Then that's premature.   I can't answer

25  that.   I don't know what you are trying to do.

1    MR. FRIEDMAN: Could the Court order it not be used

2 until and unless they raise it with the Court and give a

3 basis?

4    THE COURT: I don't expect them to do that before

5 that.

6    MR. BLOOM: That's fine.

7    THE CLERK: All rise, court is in recess.

8  (Afternoon recess.)

9    THE COURT: You may be seated.

10  Are we ready to continue?

11    MR. FRIEDMAN: Yes, Your Honor.

12    THE COURT: Bring in the jury.

13  (Jury present.)

14    THE COURT: You may be seated.

15  All right. Questions?

16    MR. FRIEDMAN: Thank you, Your Honor.

17 BY MR. FRIEDMAN:

18 **Q.** Ms. Phillabaum, when we broke we were talking about a

19 communiqué relating to the Monsanto action in Dusty,

20 Washington.

21  Do you recall that?

22 **A.** Yes.

23 **Q.** Would you take a look at Exhibit 273, which should be in a

24 folder in front of you.

25 **A.** Yes.

1   **Q.** Do you recognize that?

2   **A.** I think this is the communiqué for the field action in

3 Dusty, Washington.

4         MR. FRIEDMAN: The Government offers 273.

5         MR. BLOOM: No objection.

6         THE COURT: Admitted.

7             (Exhibit No. 273 admitted.)

8 BY MR. FRIEDMAN:

9   **Q.** I am not going to ask you to take us through it, but could

10 you read the headline.

11     Could you just read the headline and then the sub headline

12 for us.

13   **A.** "Dusty Desperadoes Raid Monsanto. Tuesday, August 1,

14 2000, Monsanto: Wanted dead, not alive."

15   **Q.** Ms. Phillabaum, after this action on the Monsanto fields,

16 were you involved in an action relating to some poplar trees

17 in Oregon?

18   **A.** That's correct, yes.

19   **Q.** When did that take place?

20   **A.** I think that was March of 2001.

21   **Q.** Nine months later, roughly?

22   **A.** Seven months, nine months, something like that.

23   **Q.** Now, had you been involved in discussions relating to

24 poplar trees before that action?

25   **A.** Yes.

1  **Q.** Can you tell us about that.

2  **A.** Well, Daniel McGowan had a big interest in the subject.  I

3  believe that he had talked about it during the WTO protest.

4  And then afterwards, when they were sort of talking about

5  genetic engineering at these meetings and other places, he was

6  very interested in this.  I don't know, it sort of became a

7  focus of research.

8  **Q.** Do you know why he was interested in poplar trees?

9  **A.** Well, it was the first non-crop plant that was being

10  genetically engineered that we knew of, fiber plant.

11  **Q.** Did you get involved in doing any research relating to

12  poplar trees?

13  **A.** I eventually did.  I did research on, I believe a man

14  named Steven Strauss at Oregon State University, who was doing

15  genetically-engineered popular research.

16  **Q.** Do you know whether Daniel McGowan was doing any research

17  relating to poplar trees?

18  **A.** I believe he did, yes.

19  **Q.** Do you know what he was researching?

20  **A.** I think he researched the issue overall, and Steven

21  Strauss and a professor at the University of Washington,

22  Dr. Bradshaw.

23          MR. BLOOM:  Excuse me, I don't object to that

24  question, but I would ask that the hearsay kinds of questions

25  be limited, please.

 1          THE COURT:  Well, identify them and I will rule on

 2    them.

 3          MR. BLOOM:  I don't want to get up and appear to

 4    obstruct.  I just would ask that Mr. Friedman be cautious.

 5    Thank you.

 6          THE COURT:  Questions.

 7    BY MR. FRIEDMAN:

 8    Q.   You said you were researching a man named Professor

 9    Strauss at Oregon State University.

10         Where is Oregon State University?

11    A.   Corvallis, Oregon.

12    Q.   At some point, did you learn about particular poplar trees

13    or crops of poplar trees?

14    A.   Yes, I found two different fields, trials where

15    genetically-engineered poplar trees were being grown.

16    Q.   Where were those?

17    A.   One was at an arboretum research forest associated with

18    the University, and another was some other University land by

19    the river, by the Willamette River outside of Corvallis.

20    Q.   To be clear, when you say "University" what are you

21    talking about?

22    A.   Oregon State University.

23    Q.   What happened once you -- and this is Professor Strauss'

24    research, not Professor Bradshaw's?

25    A.   That's correct.

1    **Q.** What happened once you learned about these two crops of

2    poplar trees?

3    **A.** Well, we were sort of working on an action at the site to

4    destroy the trees and the research; they were the same thing.

5    And we were moving very slowly on it, and some other people

6    got involved and pushed us to work on it more quickly and to

7    do the action. They wanted to do it in early March 2001, and

8    I said we weren't ready and we waited until later that month,

9    I believe. Then we went to the site and destroyed the trees,

10   or tried to destroy the trees.

11   **Q.** How did you destroy or try to destroy the trees?

12   **A.** By girdling them or making a break in the bark so that

13   nutrients couldn't flow through the tree.

14   **Q.** Would you take a look at Exhibit 292-C which should be in

15   a folder in front of you.

16   **A.** Yes.

17   **Q.** Do you recognize that?

18   **A.** I think it's a tree there at one of the sites.

19          MR. FRIEDMAN: The Government offers 292-C.

20          MR. BLOOM: No objection.

21          THE COURT: Admitted.

22              (Exhibit No. 292-C admitted.)

23   BY MR. FRIEDMAN:

24   **Q.** Can you explain what's been done to that tree.

25   **A.** Someone has taken a chisel and rubbed it up the side of

the tree to make a break in the cambium of the tree.

**Q.**  When you say cambium, what do you mean by cambium?

**A.**  I think that's the layer under the bark that transfers water.

**Q.**  What's the effect on a tree when you do that?

**A.**  The tree would die.

**Q.**  You used the word "girdling" a moment ago.  Was there another term by which you also referred to this?

**A.**  There was, but I don't remember what it is right now.  I am sorry.

**Q.**  Now, you said there were two plots of trees that were involved in this action.  Were you at both of those sites?

**A.**  No.  I went one night with a small group of people to one site, and we were not there very long, and I thought I saw headlights and I called off the action.

There was another group of people at the other site, but there was a radio relay in between the two.  When I called off the action, we both left both sites, is my understanding.

**Q.**  Let me stop you for a moment.  Who was with your team that night?

**A.**  Daniel McGowan, Nathan Block, another person, and Stan Meyerhoff drove.

**Q.**  Do you know who was on the other team that night?

**A.**  I don't know for sure who was there.

**Q.**  Do you know for sure any of the people who were there?

1   **A.**  I think the radio relay was Chelsea Gerlach, and I believe

2   that a woman named Vernell Lundberg or String was at the other

3   site.

4   **Q.**  How many trees do you think you destroyed at the site at

5   which you were before you called off the action the first

6   night?

7   **A.**  All of us or me individually?

8   **Q.**  All of you together.

9   **A.**  Not very many at all.  I didn't have a very good

10  temperament for this sort of thing.  I was sort of nervous.

11  **Q.**  When you say "not many," can you give us a ballpark?

12  **A.**  Thirty or less.

13  **Q.**  Do you know how many trees were there?

14  **A.**  Hundreds.

15  **Q.**  Did you subsequently learn what happened to those trees?

16  **A.**  People went back another night, and I didn't know it until

17  they came to me with the communiqué.  I believe it was

18  Vernell, Spring, that came to me with a communiqué.  And I

19  read the communiqué, and it indicated that the properties had

20  been destroyed or the trees had all been destroyed, and I

21  said, what's this about?  She said, we went back without you.

22  So I found out that they had gone back.

23  **Q.**  Would you take a look at a document in this folder,

24  Exhibit 293.

25      Do you recognize that?

1  **A.**  I believe this is the communiqué that was sent after that

2  second action, the complete action.

3            MR. FRIEDMAN:  Government offers 293.

4            MR. BLOOM:  No objection.

5            THE COURT:  Admitted.

6                 (Exhibit No. 293 admitted.)

7  BY MR. FRIEDMAN:

8  **Q.**  I am going to ask you to read this to the jury.

9  **A.**  The whole thing?

10  **Q.**  Yes, thank you.

11  **A.**  It says, "Open letter to Steve Strauss, Oregon State

12  University forestry professor and founder of the Tree Genetic

13  Engineering Research Cooperative:

14       Dear Steve, during mid-March, three of your genetically

15  engineered tree research sites were visited by night.  The

16  test plots of Populus genus trees (poplars and cottonwoods) at

17  these places were independently assessed and found to be a

18  dangerous experiment of unknown genetic consequences.

19       Therefore, we ringbarked or cut down 90 percent of your

20  trees at OSU's site at the Peavey Arboretum on Arboretum Road

21  (off Highway 99 north of Corvallis, Oregon).  At OSU's tract

22  near Half Moon Bend of the Wilamette River (just south of

23  Garden Avenue off Highway 20 between Corvallis and Albany), we

24  eliminated 60 percent of the trees.  Lastly, every tree was

25  cut down in one test plot at OSU's Agricultural Experiment

Station in Klamath Falls, Oregon (on Washburn Way, across from
the Kingsley Field).  In all, over 1200 of your GE research
trees were destroyed.

"Some of the trees we targeted may have been hybrids and
not technically GE.  However, your Tree Genetic Engineering
Research Cooperative (TGERC) focuses on hybrid poplars as its
method for delivering modified genes into its frankentrees.
All of the program's research on the Populus genus is used for
the goal of patenting and commercializing GE trees.

"Steve, your exploits with TGERC are socially and
environmentally unacceptable.  You claim to be undertaking
basic independent studies to address environmental concerns,
but that claim is belied by the millions of dollars your
program receives from huge timber corporations to develop fast
growing supertrees for them.

"The expansion of GE from agriculture to industrial
resource extraction, as with trees for timber production,
exhibits the slippery slope of biotechnology permeating every
part of human interaction with the rest of our natural world.

"In 1999, people used similar methods as we have to attack
an AstraZeneca GE tree research site in England.  AstraZeneca
said the incident seriously affected its eight-year research
program and the company decided to end it soon after the
incident.

"Our goal is to do to TGERC what other did to

1  AstraZeneca's program.  You may recall your thoughts about the
2  event:  'These environmental extremists are unfortunately
3  making us very paranoid,' said Steve Strauss, forestry
4  professor at Oregon State University (Reuters News Service
5  feature article, 'Eco-Warriors Stunt U.S. Biotech Tree
6  Research,' March 2, 2000).
7      "Well, Steve, as the saying goes, just because you're
8  paranoid, it doesn't mean that we're not out to get your
9  research.
10      Very truly yours, concerned OSU students and alumni."
11  Then it has some contact information associated with the
12  e-mail.
13  Q.  That's fine.  Thank you.
14      Now, this action took place in March 2001, you said?
15  A.  Yes.
16  Q.  Do you recall being approached at a bar in Oregon a couple
17  months later in May of 2001?
18  A.  Yeah.
19  Q.  If I said 2000, I meant 2001.  Do you recall being
20  approached in May of 2001?
21  A.  In May of 2001, I met Stan Meyerhoff and Chelsea Gerlach
22  at a bar, and it was clear that they wanted to ask me
23  something.  They conversed for a couple minutes in French,
24  which I don't understand, and seemingly agreed to ask me this
25  question, and they asked me if I would be involved in an

1  action.

2  **Q.**  What did you say when they asked you?

3  **A.**  I said yes.

4  **Q.**  Did they give you any details about the action?

5  **A.**  I don't believe I knew anything about it at that point.  I

6  think I was only told that I would need to go north with Stan

7  that weekend.

8  **Q.**  Do you recall when it was that they approached you?

9  **A.**  It was approximately 10 days before the arson.

10  **Q.**  Do you recall when during the week it was?

11  **A.**  It was Thursday night.

12  **Q.**  Do you remember when the action took place?

13  **A.**  Very late Sunday night, Monday morning of May 21, 2001.

14  **Q.**  So back 10 days before that on a Thursday, when would that

15  have been?

16  **A.**  May 10th, May 11th.

17  **Q.**  Now, we have talked a few times about Stan Meyerhoff.  Had

18  he and Chelsea Gerlach been involved in a relationship at any

19  point?

20  **A.**  I think they had been boyfriend and girlfriend since high

21  school.

22  **Q.**  Were they still dating or involved at this stage?

23  **A.**  It was back and forth.  I think they were at the end of

24  their relationship at that point.

25  **Q.**  Did you have any relationship with Stan Meyerhoff?

**A.** I knew them both as friends at that point, and Stan and I were starting to develop a flirtatious relationship.

**Q.** At roughly this point in time?

**A.** Yes.

**Q.** Are you still in a relationship with Stan Meyerhoff?

**A.** Yes.

**Q.** Are you engaged to him?

**A.** Yes, I am.

**Q.** So they told you that you would need to go north with Stan Meyerhoff. Did that happen?

**A.** Yes. That weekend, I drove north in Stan's car with Stan and Suzanne and Daniel McGowan. I have a clear memory of sitting in the car listening to --

MR. BLOOM: I am sorry, I am having trouble hearing you.

**A.** I have a clear memory of sitting in the car listening to an Elastica song, and Daniel making fun of the way Stan was dancing to the song.

BY MR. FRIEDMAN:

**Q.** If your voice drops -- these mikes are great, but if you could pull the mike in close to you.

You said you went north. Where did you go?

**A.** Olympia.

**Q.** Where specifically in Olympia did you go?

**A.** The vehicle of people dropped me off at a Denny's

1  restaurant, just off the highway in Olympia.

2  **Q.** Did any of them stay with you?

3  **A.** Stan was there for a minute. I think he got out of the

4  car and talked to the people who were there, and then he got

5  in the car and left, and I was the only one who stayed.

6  **Q.** You said the people who were there. Who were the people

7  who were there at the restaurant?

8  **A.** Briana Waters was there. Justin Solondz was there.

9  Avalon or Bill Rodgers, myself and I think that Jen Kolar

10  might have come once we were inside the restaurant.

11  **Q.** Let me ask you to look at Exhibit 101-A. That should be in

12  a folder in front of you.

13  **A.** Uh-huh.

14  MR. FRIEDMAN: We'd like to offer this or use it for

15  illustrative purposes at this stage.

16  MR. BLOOM: No objection -- excuse me, I am going to

17  withdraw that. I am going to objection to that. It's really

18  suggestive as presented.

19  MR. FRIEDMAN: This will help the witness a great

20  deal in explaining her testimony.

21  THE COURT: It might, but before you publish it, let

22  her look at it and see if there's a question.

23  BY MR. FRIEDMAN:

24  **Q.** Do you recognize the people pictured on that exhibit?

25  **A.** Yes.

1   **Q.** Are they all involved in the events -- are most of those

2   people involved in the events about which we are talking?

3   **A.** You mean the University of Washington arson?

4   **Q.** Well, this meeting and the car ride that we talked about

5   and that?

6   **A.** Yes.

7   **Q.** Would it help you in discussing and explaining who's where

8   to use that exhibit?

9   **A.** Yes.

10   **Q.** Thank you.

11       MR. BLOOM: My problem is that there are individual

12   pictures of all the people that are available. Grouping them

13   together like this is a suggestion.

14       THE COURT: It might be. Identify the ones that were

15   there and those are the ones you can display. Ones that you

16   can identify on this photograph as being there at that

17   restaurant in Olympia.

18       Ask her to identify them by name and then cover the rest

19   of them up.

20   BY MR. FRIEDMAN:

21   **Q.** We will need to use the document camera to do that, if

22   that's okay.

23       Could you tell us the name of the five people at the

24   restaurant.

25   **A.** Justin Solondz. Briana Waters. Myself. William Rodgers.

1 And I believe Jen Kolar came once we were there.

2        MR. BLOOM: May the record reflect that as I looked

3 at the witness, she was reading from something or looking at

4 something as she spoke.

5        THE COURT: You can ask her about that, if she's

6 looking at something.

7        MR. BLOOM: I want the record to reflect that,

8 because there was silence as she was doing that.

9        THE COURT: I think it's reflected that.

10        MR. BLOOM: Thank you.

11 BY MR. FRIEDMAN:

12 Q. Who were the other individuals whom you had driven up from

13 Eugene to Olympia?

14 A. Suzanne Savoie, Stan Meyerhoff and Daniel McGowan.

15 Q. So, who -- can you relate those to the individuals

16 pictured in the top and bottom row of this chart?

17 A. Suzanne Savoie, Daniel McGowan and Stan Meyerhoff who I

18 drove with are in the bottom row.

19     The people who were at the restaurant for a period of time

20 are in the top row.

21 Q. Now, had you known all of the people who were in the

22 restaurant before, or was this the first time you met any of

23 them?

24 A. I believe that was the fist time I had seen Briana Waters.

25 Q. Do you see Ms. Waters in the courtroom today?

1 **A.** Yes. She's wearing pink and wearing glasses.

2 **Q.** At the defense table?

3 **A.** Yes.

4   MR. FRIEDMAN: May the record reflect the witness has

5 identified the Defendant.

6   THE COURT: It will.

7 BY MR. FRIEDMAN:

8 **Q.** Do you recall what was discussed at the restaurant?

9 **A.** Well, it was clear that we were going to undertake an

10 action together. I don't think that an explicit plan was laid

11 out to me, but because I was unfamiliar with Briana, I think

12 that Mr. Rodgers, Avalon, sort of vouched for her and vouched

13 for me as being people that he had worked with and trusted.

14 **Q.** At any point, did you become uncomfortable with the

15 conversation that took place at the restaurant?

16 **A.** Well, the other things I remember that happened is we

17 first sat in the back of the restaurant. I think Briana and I

18 sort of headed there, and Avalon didn't want us to be off in

19 the corner by ourselves, so he pulled us to the front of the

20 restaurant. There was some explicit conversation, and I was

21 uncomfortable with the fact that they were having an explicit

22 conversation about an action, and I think I said something to

23 that effect.

24 **Q.** Over the course of the weekend, did you meet in other

25 places with the people in the top row here, these five people?

1   A.   Yes.

2   Q.   Where else did you have meetings over the course of that

3   weekend?

4   A.   Well, the next thing that I remember is the next morning,

5   I went for a run at a house that I remember being near

6   Briana's.  I went for a run at a track that I remember being

7   what I thought was Briana's house.  I came back to the house,

8   and I think she was playing violin in the kitchen maybe.  I

9   think she stopped when I got there.  I went in the house for a

10  minute, and then I also have a clear memory then of being in

11  an outbuilding behind the house.

12  Q.   Would you take a look at a document marked as Exhibit 733

13  in a folder in front of you.

14       Can you tell us in general terms what that is?

15  A.   I believe that's the house where we were.

16  Q.   Is it --

17  A.   It's a house.

18  Q.   Is the document one page or more pages than that?

19  A.   It's two pictures.  It's three pictures of that house.

20            MR. FRIEDMAN:   The Government offers Exhibit 733.

21            MR. BLOOM:   No objection.

22            THE COURT:   Admitted.

23                 (Exhibit No. 733 admitted.)

24            MR. FRIEDMAN:   May we publish the first page to the

25  jury?

BY MR. FRIEDMAN:

**Q.** This is the house you understood was the house in which the Defendant was living?

**A.** I think this is the house where we met that weekend, and I understood that she lived there, yes.

**Q.** Do you know why you were running or jogging on a track near that house?

**A.** Because I was getting exercise.

**Q.** Is there any reason you were near that house in particular? Do you know where you stayed the night before?

**A.** I think I may have stayed in that house, but I am not sure.

**Q.** When you came back, what happened? When you came back from the jog.

**A.** Well, what I just described of Briana being in the kitchen practicing, and eventually I believe we went out to the outbuilding.

**Q.** Would you look at the third page of that exhibit. Can you describe for us what that shows?

**A.** I believe this is the backyard of that house and the outbuilding.

**Q.** If you touch your screen, you should be able to indicate what it is you are referring to as the outbuilding.

**A.** This building here.

**Q.** The red building with the white roof?

1    **A.**  Yes.

2    **Q.**  Now, you said you went out to the outbuilding.  Who went

3    out to the outbuilding?

4    **A.**  I remember being in that building with Briana, Justin and

5    I believe Avalon was there.

6    **Q.**  Do you remember what was discussed when you went out to

7    the outbuilding?

8    **A.**  At this point, I must have known what was going to happen

9    because Justin was talking about the incendiary devices and

10   some improvement in the design that he had made which involved

11   using bags from water bladders, like you would use if you were

12   running or something, instead of what had been used before,

13   which I believe was buckets.

14        So we talked about that.  We talked about where he had

15   gotten them.  I believe he dumpster-dived them, which means he

16   took them out of a dumpster from a business in the area.  We

17   talked about the bags the devices would be in eventually while

18   we were in that space.

19   **Q.**  Was the defendant present for all of that conversation?

20   **A.**  I believe so.

21   **Q.**  Do you recall any other meetings that took place later

22   that day or later that weekend?

23   **A.**  I remember being in a field talking with those same

24   people, including Avalon and Jen Kolar, and we were having a

25   discussion --

**Q.** Can I slow you down for a moment.

So how many of you were there in this field?

**A.** Five.

**Q.** Can you tell us all five names, just to be clear.

**A.** Myself, Jen Kolar, Avalon, Briana Waters and Justin Solondz.

**Q.** How did that meeting begin?

**A.** I don't remember how it began. What I remember clearly happening at that meeting was Jen Kolar outlining to us how she intended to break the windows of this building. She had some special technique that she had developed using glass cutting tools or stained glass cutting tools or something. She gave us a very detailed explanation of that. I remember --

**Q.** Before you move on, do you remember anything about this special technique or what the goal was of the technique?

**A.** It was supposed to be quieter than just smashing a window. I had the impression it would be soundless.

Then I remember also while we were in that field that we talked about -- we had a conversation about the claim of responsibility or communiqué that would happen. One point of contention was that I did not want to use the name Earth Liberation Front in the communiqué because even to that point, I didn't really realize that these people I was working with, you know, self-identified as Earth Liberation Front.

1   **Q.**  Do you remember what position other people took on that

2   issue?

3   **A.**  Everyone else thought it was absurd, I think.  I remember

4   kind of hoping that Briana would back me in not using the name

5   ELF, and she didn't.

6   **Q.**  Do you remember any discussion that took place in the

7   field about what would happen if you were discovered or

8   caught?

9   **A.**  We all sort of made a commitment.  This was, I think,

10  standard, but I think I asked to do this, that we made a

11  commitment that if we were ever caught, we wouldn't roll on

12  each other or cooperate against each other.

13  **Q.**  Do you recall meeting with this group anywhere else that

14  same weekend?

15  **A.**  I believe it was also that weekend that we met in a

16  building at the Evergreen campus.

17  **Q.**  What was discussed at that meeting?

18  **A.**  At that meeting, it seems like it was closer to the actual

19  arson because finer details were being discussed, and I

20  remember that there was conversation about how much fuel to

21  use, and I think that Jen Kolar was advocating using less

22  fuel.  She seemed to have knowledge of what else was in the

23  building, and Avalon was wanting to use more fuel.

24  **Q.**  Did he say why he wanted to use more fuel?

25  **A.**  I think he wanted to use more fuel because he was

1  concerned that there were a number of fire stations in the

2  immediate area, and he wanted to make sure that more than the

3  fire going out would -- you know, the sprinklers coming on and

4  putting the fire out wouldn't not happen.

5  **Q.** Do you recall which of the two views prevailed? More fuel

6  or less fuel?

7  **A.** I think Avalon prevailed.

8  **Q.** You told us about several different meetings of this group

9  over this weekend, and you talked a moment ago about the

10  agreeing not to testify during one of those, or not to

11  cooperate against each other?

12  **A.** That's correct.

13  **Q.** Is that one of the things that makes it hard for you to

14  testify today?

15  **A.** It's hard for a lot of reasons.

16  **Q.** What happened at the end of the weekend?

17  **A.** At the very end?

18  **Q.** Where did you go after the weekend?

19  **A.** At the end of that weekend, we drove back -- I drove back

20  in the car with the same people I had driven up with, back to

21  Eugene.

22  **Q.** During the various meetings, had there been talk about

23  what each person's responsibilities would be during the coming

24  week to prepare for this action?

25  **A.** Yes.

**Q.** What responsibilities did you have?

**A.** My responsibility was to secure black clothes for myself and nothing else.

MR. BLOOM: I am sorry, a little louder.

**A.** My responsibility was to get black clothes, and I remember that Briana was kind of in charge of renting the car or securing the vehicle.

BY MR. FRIEDMAN:

**Q.** Before I get to that, you said dark clothing. Was there any difference in the clothing that you were supposed to get, or each person was supposed to get, for this arson as opposed to other actions in which you'd been involved?

**A.** Not in any technical way, except we all felt it was more important to have clothing unassociated with us.

**Q.** For instance, did you wear -- were you supposed to get a hat or stocking cap or anything like that?

**A.** I don't remember in particular if we had a stocking cap. I think there might have been discussion that it was better to get dark clothing. We didn't want to look like we were prowlers or something walking around. So maybe have a dark brown sweater or a blue sweater instead of something that could be unzipped and would be less than black.

**Q.** Did the fact that the Center for Urban Horticulture is in the middle of a city have any impact on the clothes that you were going to get?

1  **A.**  I think it did.

2  **Q.**  Can you tell us what that was.

3  **A.**  Well, I think we wanted to be able to pass as something

4  other than burglars walking around the city.

5  **Q.**  Now, you mentioned getting a car a moment ago.  Can you

6  tell us about that?

7  **A.**  Well, generally for all of these actions, it was

8  preferable to have a car that wasn't associated or didn't have

9  license plates that were registered to any of us.  So this was

10  kind of a big issue in any of these criminal activities, was

11  how we were going to secure a car that wasn't associated with

12  us.  It was often the linchpin on whether or not the action

13  happened.

14  **Q.**  What was the plan for this action?

15  **A.**  Briana was supposed to secure a car.  I remember I was a

16  little concerned when I found out she was renting it or that

17  people were talking about renting a car because generally it

18  was not seen as preferable to rent.

19  **Q.**  Did you understand whether she was going to rent the car

20  herself?

21  **A.**  Well, I asked about that.  I asked, why are we renting

22  this car?  Won't there be rental records?  Whose credit card

23  is being used?  It was explained to me that someone she

24  trusted was actually going to rent the car, and over the

25  course of this period of time, I came to understand that it

1   was someone who had a somewhat familial relationship with her,

2   like an older aunt type person is what I thought.

3   **Q.** Did you understand that it was definitely a family

4   relationship or someone whom she considered like an aunt?

5   **A.** Someone she considered like an aunt; a distant,

6   untraceable relative is what I was led to believe.

7   **Q.** Did you have any understanding as to whether the person

8   who rented the car was going to know for what it was going to

9   be used?

10  **A.** No.  I thought the person would not understand what the

11  car was going to be used for.

12  **Q.** Why did you think that?

13  **A.** Well, anyone who understood what the car was going to be

14  used for would be implicated in the crime, so they needed to

15  not know what it was going to be used for.

16  **Q.** Do you remember any explicit discussion of what the person

17  would be told?

18  **A.** It was my understanding that this person was going to be

19  told that Briana and her boyfriend were having problems and

20  she needed to get away from things.

21  **Q.** Why was that your understanding?  Where did you learn

22  that?

23  **A.** From conversations with that group of people.

24  **Q.** So we've talked about what you were doing, what the

25  Defendant was going to do that week.

1    Did Justin Solondz have any particular responsibilities?

2  **A.**  I understood that he was supposed to make the incendiary

3  devices.

4  **Q.**  Do you know if he was supposed to make those alone or if

5  anyone else was participating?

6  **A.**  Well, I imagine that Avalon helped him.

7         MR. BLOOM:  Objection.

8         THE COURT:  Sustained.

9         MR. BLOOM:  That she imagined.

10        THE COURT:  Sustained.

11        MR. BLOOM:  I am sorry, I didn't hear you.

12  BY MR. FRIEDMAN:

13  **Q.**  You heard or understood that Justin Solondz was supposed

14  to make the incendiary bombs, incendiary devices?

15  **A.**  Yes.

16  **Q.**  At some point -- at the end of the week, what happened?

17  What did you do next?

18  **A.**  At the end of that week, I drove back to Olympia from

19  Eugene with the same group of people.

20  **Q.**  Which people is that?

21  **A.**  The people I had driven with the previous weekend, Suzanne

22  Savoie, Daniel McGowan, Stan Meyerhoff.  I have a pretty clear

23  memory of being at the rest station with them.

24  **Q.**  On the road somewhere between Eugene and Olympia?

25  **A.**  A particular one, yeah.

1  **Q.** Do you recall anything that happened while you were in

2  Olympia that second weekend? Let me ask you this: Do you

3  recall where you slept that weekend?

4  **A.** I think after the crime, that I might have stayed at

5  Nathan and Joy's house. I think that might be the only time I

6  stayed over -- that was for a matter of hours after the crime,

7  but I remember being in that outbuilding one other time that I

8  haven't talked about.

9  **Q.** Was that this second weekend?

10  **A.** I think that it was the second weekend.

11  **Q.** Let me ask you a couple more questions before we dive into

12  that. This is the outbuilding at the house at which Briana

13  Waters was living?

14  **A.** Yes.

15  **Q.** Did you connect anyone else in your mind with that house?

16  Was anyone else living there?

17  **A.** I understood that there was a person named Ocean who was

18  in a wheelchair that lived there as well.

19  **Q.** Was he around that weekend?

20  **A.** I am sorry, I am thinking -- I also understood that there

21  was his girlfriend with red hair who was maybe someone I knew

22  was in and out. I don't remember what her name is.

23  **Q.** Do you recall seeing any of them that weekend?

24  **A.** No.

25  **Q.** What do you recall about being at Briana Waters' house

1   that second weekend?

2   **A.**  I remember being in the outbuilding, and I don't know if

3   this was new that weekend or it had been there before, but

4   there was a bit sectioned off from the rest of the building,

5   and it was a clean room where the destructive devices were

6   being built.

7   **Q.**  You used the term "clean room."  What do you mean by clean

8   room?

9   **A.**  Well, it was free of genetic material and fingerprints

10  associated with the house or with the people who were working

11  on them.

12  **Q.**  How do you create a room free of genetic material?

13  **A.**  I think it was like painting plastic on the side of the

14  space.  I am not sure if it was -- the two-by-four structure

15  was actually there for it, but there was plastic over the

16  sides, and it was plastic on the inside as well.

17  **Q.**  When you say sectioned off, you mean sectioned off by the

18  plastic on all sides?

19  **A.**  Yes.

20  **Q.**  Did you ever go into the clean room?

21  **A.**  Uh- huh.  I was made to understand that we needed to help

22  with the destructive devices, and I believe that at one point

23  Briana and I went into that room, and we were supposed to help

24  build the devices.  My feeling was that it was a method of

25  getting our hands dirty so that we were as implicated as other

1 people were in the crime, and while they kind of built it up

2 that we were going to have to work on the devices, actually

3 what happened when we went in there was, we looked at them. I

4 don't remember interacting with them or touching them at all.

5 **Q.** Who took you in there?

6 **A.** I think that Justin did, but I am not sure. Justin or

7 Avalon.

8 **Q.** Now, going into a clean room, did you take any special

9 precautions? Did you do anything to keep it clean?

10 **A.** I think that we put on the sort of cloth -- I am not sure

11 if they were painters outfits or fiber sort of suits. I think

12 we would have had -- we would have had -- we did have gloves

13 on and probably something to cover our hair as well.

14 **Q.** Did you see -- what did you -- apart from the room itself,

15 what did you see while you were in there?

16 **A.** I saw the devices or a device that was being worked on.

17 **Q.** Do you recall the details of what the device looked like?

18 **A.** Uh-huh. It was sort of an alarm clock with wires sticking

19 out of it at strange places, and it was nestled in Tupperware

20 that was like a sandwich-sized Tupperware that was blue, I

21 think.

22 **Q.** Did you see any other components or parts to the device?

23 **A.** There might have been a second device there, but I don't

24 remember for sure.

25 **Q.** Did you see any larger containers that would hold fuel or

1  anything like that?

2  **A.**  Not in the clean room.  At some point, I was shown how the

3  bags that would have the components in were to be packed, and

4  there were these oversized Tupperwares to put the fuel in, and

5  then my understanding was that they were going to be put in a

6  garbage bag and then they were in these green Army bags.

7  **Q.**  Okay.  Would you take a look at Exhibit 330-B. It's

8  actually not a document.  It's probably to your left.

9  **A.**  In this stack?

10  **Q.**  No, it's not a document, it's a container of some sort.

11  We can come back to this.

12  Now, at some point did you leave Olympia?

13  **A.**  Yes.

14  **Q.**  When did that happen?

15  **A.**  The morning after we left, the morning after the crime,

16  Monday morning.

17  **Q.**  I am sorry.  Before the crime, did you leave Olympia?

18  **A.**  At some point, we went to Seattle.

19  **Q.**  Do you recall roughly when that was?

20  **A.**  In the evening.

21  **Q.**  The evening before the arson?

22  **A.**  Of the arson.

23  **Q.**  The evening that becomes the night or the morning of the

24  arson?

25  **A.**  Yes.

1  **Q.** You told us the arson was in the early morning hours of
2  Monday, May 21st so --
3  **A.** It would have been Sunday.
4  **Q.** The 20th?
5  **A.** Uh-huh.
6  **Q.** Let me ask you to take a look at Exhibit 330-B which has
7  already been introduced into evidence.
8  Does that look familiar to you?
9  **A.** Yes.
10  **Q.** Can you tell us why?
11  **A.** It looks just like the Tupperware that was used to hold
12  the fuel.
13  **Q.** Now, you said on Sunday night you drove up from Olympia to
14  Seattle. Where did you go when you got to Seattle?
15  **A.** We went to a bar.
16  **Q.** Would you take a look at Exhibit 304-A which should be in
17  a folder in front of you.
18  **A.** Okay.
19  **Q.** Do you recognize this?
20  **A.** I believe this is the bar.
21  MR. FRIEDMAN: The Government offers 304-A.
22  MR. BLOOM: No objection.
23  THE COURT: Admitted.
24  (Exhibit No. 304-A admitted.)
25  BY MR. FRIEDMAN:

1 **Q.** The Greenlake Bar & Grill?

2 **A.** Uh-huh. How do I clear this?

3 **Q.** At the very bottom left corner, there should be something

4 that says "exit."

5 Who was at that bar?

6 **A.** Jen Kolar, Avalon, myself, Justin Solondz and Briana

7 Waters.

8 **Q.** For how long do you think you all were at the bar?

9 **A.** An hour or two.

10 MR. BLOOM: Could you say that again?

11 **A.** An hour or two.

12 BY MR. FRIEDMAN:

13 **Q.** Did you eat or drink there?

14 **A.** I think I ate a salad.

15 **Q.** What do you recall after you left the bar?

16 **A.** The next thing I remember after we left the bar is getting

17 out of the car.

18 **Q.** Did you drive somewhere?

19 **A.** We drove to the University of Washington, very near the

20 Center for Urban Horticulture.

21 **Q.** Can I ask you to lean in a little?

22 **A.** I am really sorry. It's loud to me up here.

23 **Q.** You drove near the University of Washington. Would you

24 take a look at Exhibit 303. This has already been admitted

25 into evidence, so it should show up on your screen.

1    That's a map of an area near the Center for Urban
2 Horticulture.  Have you looked at that map before?
3 **A.**  Yes.
4 **Q.**  Using that map, can you tell us where you drove?
5 **A.**  I believe that we drove to Northeast 42nd Street.  Is that
6 what that says?  42nd Street?
7 **Q.**  Can you mark on the map where that is.
8 **A.**  Just by touching it?  I think we drove to about there.
9 **Q.**  What happened when you got there?
10 **A.**  We were dropped off and we got out of the car.
11 **Q.**  Whom do you recall getting out of the car?
12 **A.**  I don't really have a very clear memory of who got out of
13 the car.
14 **Q.**  What did you do after you got out of the car?
15 **A.**  I remember walking across I believe what's a field right
16 here.  Right there.
17 **Q.**  Let me slow you a little bit.  Would you take a look at
18 Exhibit 304-C which is in a folder in front of you.
19 **A.**  Yes.
20 **Q.**  Do you recognize that?
21 **A.**  I recognize the end of the street there.
22        MR. FRIEDMAN:  The Government offers Exhibit 304-C.
23        MR. BLOOM:  No objection.
24        THE COURT:  Admitted.
25             (Exhibit No. 304-C admitted.)

BY MR. FRIEDMAN:

**Q.** Can you tell us what that shows?

**A.** That shows the street where we were dropped off and a sort of little gate that we passed through to get down to the building. Can I back up?

**Q.** Sure.

**A.** I just want to say, I don't have a clear memory of how this happened, but one thing that I believe happened was at some point during that evening, I am not sure when, some people went -- and I believe it was Justin -- sort of pre-positioned the backpack, so we didn't have the backpack with us at the point we got out of the car.

**Q.** Do you recall whether you were carrying anything when you got out of the car?

MR. BLOOM: Excuse me, I would ask you to repeat that or have it read back.

THE COURT: Do you want her to repeat it or her to read it back?

MR. FRIEDMAN: I am happy to repeat it.

BY MR. FRIEDMAN:

**Q.** Do you recall whether you were carrying anything when you got out of the car?

**A.** I don't remember if we were carrying anything.

**Q.** You don't recall carrying anything?

**A.** Not at the point when we got out of the car.

**Q.** Would you take a look at Exhibit 304-D.

Do you recognize that?

**A.** That's the sort of gate we passed through.

**Q.** Let me ask you to look at Exhibit 304-E also.

**A.** That's the gate and a bush.

MR. FRIEDMAN: Government offers Exhibits 304-D and E.

MR. BLOOM: No objection.

THE COURT: Admitted.

(Exhibit Nos. 304-D and 304-E admitted.)

BY MR. FRIEDMAN:

**Q.** How does this picture relate to the picture we were looking at a moment ago, the view down 42nd Street?

**A.** That's the end of the street.

**Q.** Going to 304-E?

**A.** That's the gate -- that's the hole in the gate that we passed through.

**Q.** Can we go back to Exhibit 303 for a moment. So where on this map is the photograph of the gate we just looked at?

**A.** The gate is there.

**Q.** Then would you take a look at Exhibit 304-G for a moment. Tell us if you recognize that.

**A.** Yes, I recognize that.

**Q.** I am sorry, I led you out of order for a moment.

Exhibit 304-F, can you tell us if you recognize that?

1  **A.** Exhibit 304-F is a picture from the other direction of the

2  bush and the gate.

3      MR. FRIEDMAN: Government offers Exhibit 304-F.

4      MR. BLOOM: No objection.

5      THE COURT: Admitted.

6      (Exhibit No. 304-F admitted.)

7  BY MR. FRIEDMAN:

8  **Q.** So where in that picture is the gate that we just looked

9  at?

10  **A.** This is the gate here and this is the opening.

11  **Q.** Why is that bush significant?

12  **A.** I remember when we came back, after we had placed the

13  incendiary devices, that that's where Briana was the lookout

14  from.

15  **Q.** When you were going down, did she stay there or did she --

16  did she stay there as you were working down to the fire?

17  **A.** I don't have a clear memory of her going -- how she got

18  positioned there.

19  **Q.** But she was there when you came back?

20  **A.** She was there when we came back.

21  **Q.** Did she have any way of getting in touch with you?

22  **A.** I think she had a radio, and we had radios.

23  **Q.** Then 304-G, do you recognize that?

24  **A.** That's the field where the last photo was taken from that

25  we walked across.

1    MR. FRIEDMAN:  Government offers Exhibit 304-G.

2    MR. BLOOM:  No objection.

3    THE COURT:  Admitted.

4              (Exhibit No. 304-G admitted.)

5  BY MR. FRIEDMAN:

6  **Q.**  Looking at that picture, can you tell us what that shows?

7  **A.**  It shows this field, and one difference I notice from the

8  time is that I don't remember there being a little gate at the

9  far end of the field, of the little fence.

10 **Q.**  There's a bush at the very left of this picture, what is

11 that?

12 **A.**  I believe that would be just a bit of the bush.

13 **Q.**  The one we were just looking at?

14 **A.**  Uh-huh.

15 **Q.**  In the center of the picture, there's a large building

16 right beyond the field.  Do you know what that is?

17 **A.**  I believe that's the Center for Urban Horticulture.

18 **Q.**  Is it fair to say this is the view from that bush?

19 **A.**  Yes, I think so.

20 **Q.**  Did you have any understanding what Briana Waters'

21 responsibilities were after the rest of you left here?

22 **A.**  She was meant to notify us if there was security coming,

23 or police, or if some sort of ruckus was raised by our

24 presence.

25 **Q.**  Let's go back to Exhibit 303.  What happened after you

1   moved on from that bush?  Where did you go?

2   **A.**  We started here on the street where it drops off.  We

3   crossed the field.  Then I don't really remember walking down

4   all this way.  It looks like a long way, but we walked down

5   this strip here, down to sort of some industrial yard support

6   facilities for the building.

7   **Q.**  Let me stop you there for a second.

8           MR. BLOOM:  Excuse me.  Why stop there?  I would like

9   to hear the rest of the answer, please.

10          MR. FRIEDMAN:  I was trying to avoid a narrative.

11          THE COURT:  Go ahead, if you can finish in the

12  narrative.  I thought he wanted question and answer.

13  **A.**  I believe -- my understanding was this road here that I

14  just went down, that this is the road they had driven down

15  earlier when they dropped off the bags, and the bags were

16  hidden down here where the dumpsters were.

17      So there was some conversation at some point about we

18  couldn't drive down that road so late at night, but it was

19  okay for them to drive down that road earlier when they

20  positioned the bags.

21  **Q.**  Would you take a look at Exhibit 304-K and tell me if you

22  recognize that.

23  **A.**  Yes, it's the dumpsters in that sort of industrial field.

24          MR. FRIEDMAN:  The Government offers Exhibit 304-K.

25          MR. BLOOM:  No objection.

1          THE COURT:  Admitted.

2                  (Exhibit No. 304-K admitted.)

3     BY MR. FRIEDMAN:

4     **Q.** Do you recall what happened when you got to the dumpsters?

5     **A.** The bags were there.  I remember we got the bags.  Do you

6     want me to continue?

7     **Q.** Well, with whom do you recall being there?

8     **A.** I remember being there for sure with Avalon.

9     **Q.** Would going back to the map help you show us where you

10    went next?

11    **A.** Well, just looking at this photo, I would point out that

12    we walked down this sort of trail beyond the yellow gate

13    there.  I remember sort of walking over to the right and then

14    over on a footpath.

15    **Q.** So let's go back to Exhibit 303.  Can you show us the

16    trail beyond the yellow gate and where you walked?

17    **A.** I think this is the trail here, and then we came up here,

18    and then there's a little bit of a marsh area type here.  I am

19    not sure if we cut across it.  Then there's a lighted kiosk up

20    here where I have circled.

21         Then we went over here to some knolls outside of the

22    building.  I think there was also a footpath here, and the

23    knolls we are on were closer to the building than the

24    footpath.

25    **Q.** Would you take a look at Exhibit 304-M and 304-N and tell

1  me if you recognize those.

2  **A.**  304-M and N?

3  **Q.**  Yes.

4  **A.**  Yes, I recognize both of those.

5  **Q.**  What are they?

6  **A.**  It's a view of the Center for Urban Horticulture Center

7  from that wetland type area.

8         MR. FRIEDMAN:  The Government offers 304-M and 304-N.

9         MR. BLOOM:  No objection.

10        THE COURT:  Admitted.

11           (Exhibit Nos. 304-M and 304-N admitted.)

12  BY MR. FRIEDMAN:

13  **Q.**  So tell us what you see in 304-M.

14  **A.**  That's the wetland, and then I can see the roof of the

15  Urban Horticulture Center there off to the left.

16  **Q.**  Halfway up the picture to the left-hand side?

17  **A.**  Yes.

18  **Q.**  And then 304-N?

19  **A.**  That's the wetland, and I think you can see a little bit

20  of the roof, sort of here.

21  **Q.**  Is this the path by which you approached the Center for

22  Urban Horticulture?

23  **A.**  I don't remember if we walked through the wetland.  I

24  think we might have but --

25  **Q.**  The direction from which you approached?

1  **A.**  Oh, yeah.

2  **Q.**  You said a moment ago that you came to a knoll just before

3  the Center?

4  **A.**  Uh-huh.

5  **Q.**  Whom do you recall being at the knoll?

6  **A.**  I have a clear memory of being crouched down there with

7  Jennifer Kolar.  I remember being there and looking around.

8  It was the first time that I had been on the site, and I

9  looked around to my left and there was some bike racks, and

10  there was a bike in the bike rack, and I was worried about

11  people being in the building because I had a very strong

12  commitment not to hurt any people.

13     I remember turning to Jen and saying -- pointing to the

14  bike and asking her, is there someone in the building?  And

15  she said no -- she indicated no.  I think she just shook her

16  head.  My impression was that she had been there before and

17  was familiar with the fact that it was an abandoned bike or

18  something.

19  **Q.**  Do you recall where Avalon, William Rodgers, was at this

20  point?

21  **A.**  I think that he was at the building checking to make sure

22  there was no one inside.

23  **Q.**  Did you see him do that?

24  **A.**  I couldn't see the building.  I think I may actually

25  remember him, you know, sort of creeping up to the building.

1  **Q.** What did he do after he crept up to the building?

2  **A.** He came back to where I was, and he and I must have been

3  there for a minute, and then Jen Kolar went up to the building

4  and she used her technique to break the window.

5  **Q.** Did she know -- was she headed towards a particular

6  window? Did she know where to go?

7  **A.** She knew where the office of the professor was.

8  **Q.** What happened when she tried to cut the glass in the

9  window?

10 **A.** It was loud, like a window breaking.

11 **Q.** What did you do when that happened?

12 **A.** I just was sort of like, oh, gosh, that's loud. But I

13 don't remember for sure where she went from that point. She

14 might have come back to where Avalon and I were, and then

15 Avalon and I went to the building. He went inside the

16 building, and I handed him the bags I believe. He looked

17 around the office for anything that might have been useful in

18 our research on genetic engineering and checked, but there was

19 nothing in there. And he came to me with some Tupperware and

20 sort of indicated that I should take it out, and I said why,

21 what is this? But we weren't talking very much. I opened the

22 lid to the Tupperware, and I saw snake shapes, and I didn't

23 really want to stick my hand in there to determine if it was

24 snakes or snake skins. So I put the lid back on in a rush and

25 moved those Tupperwares away from the building.

1  **Q.** At any point during this process, do you recall getting
2  called on a radio?
3  **A.** I think that may have happened, but I kind of remember
4  that while Jen and I were back by the knoll, she got a call on
5  the radio and we held for a minute instead of proceeding.
6  **Q.** Did anything happen, or what happened next?
7  **A.** Whatever had caused the hold passed by without causing a
8  problem.
9  **Q.** And you proceeded?
10 **A.** Uh-huh.
11 **Q.** So you said you had been given these containers with the
12 snake skins and put them away from the building.
13      What did you do after that?
14 **A.** So Avalon was in the building.  He set the devices, took
15 the Tupperware out of the bags, set them around the room in
16 places he decided would be a good idea.
17      MR. BLOOM:  Excuse me, I object only because she was
18 told this.  I won't object on hearsay if that's the --
19      THE COURT:  Let's see if we can find out.
20 BY MR. FRIEDMAN:
21 **Q.** Ms. Phillabaum, are you telling us what you saw that
22 night?  Did you see this, or were you told this?
23 **A.** Which part are you asking about?
24 **Q.** What you've just told us about, what Avalon, William
25 Rodgers, was doing in the room.  Is this what you saw?

1  **A.**  I think he might have been sort of -- I couldn't really

2  see much other than a generic office, but I think he might

3  have been sort of narrating what was going on as it was going

4  on.

5  **Q.**  As it was going on at the time?

6  **A.**  Yeah.  So he was in the office.  He looked for places to

7  put the devices.  I remember that one of them I think was on

8  the window -- I think actually he was setting it there because

9  he had to set the time.  I remember seeing him inside the

10  window and then he placed them around the office, came out of

11  the building and we left.

12  **Q.**  Then which direction did you leave?

13  **A.**  We went back in a similar direction to the way we had

14  come.

15  **Q.**  Okay.  Do you recall any of you making a call on one of

16  your radios?

17  **A.**  Not at that point.  Could I look at the map again?

18  **Q.**  Sure.  That's Exhibit 303, please.

19  **A.**  So we were over here somewhere.  I think we went back this

20  way (indicating).

21      At some point, someone called on the radio for a pick up.

22  We crossed this field and --

23  **Q.**  When you say called for a pick up, what do you mean by

24  that?

25  **A.**  I believe Justin was driving the car, and he was not

1  parked where he had dropped us off, but he drove down I

2  believe to where we had been dropped off and picked us up, and

3  I remember Briana being there when we got back.

4          MR. BLOOM:  I'm sorry, could I get that repeated?

5  **A.**  I remember Briana being there with the bush.  I kind of

6  remember thinking, oh, she must have been so nervous and --

7          MR. BLOOM:  What I didn't understand is what Justin

8  supposedly did.

9          MR. FRIEDMAN:  He'll have the opportunity to ask all

10  these questions on cross-examination.

11          MR. BLOOM:  I just want to hear it and make a note on

12  it.

13          THE COURT:  Can you remember what you said about what

14  Justin did?

15  **A.**  I believe someone called him on the radio, and he drove

16  from a different location nearby to the place where he had

17  dropped us off and picked us up in the rental car.  I will

18  just say that I have a pretty clear memory of walking back

19  across this road and feeling relief.

20  BY MR. FRIEDMAN:

21  **Q.**  Would you take a look at Exhibit 775 and tell me whether

22  you recognize that.

23  **A.**  Yes, I recognize that.

24  **Q.**  What is that?

25  **A.**  I believe that's the rental car.

1    MR. FRIEDMAN:  Government offers Exhibit 775.

2    MR. BLOOM:  Did the witness answer the question?

3    THE WITNESS:  I'm sorry, was there a question

4  pending?

5    MR. BLOOM:  The question was:  Was that the car?

6  Could I get your answer repeated, please.

7  **A.**  Yes, I believe that that's the car.  It fits what I

8  remember about the car.

9    MR. BLOOM:  I have no objection.

10    THE COURT:  Admitted.

11    (Exhibit No. 775 admitted.)

12  BY MR. FRIEDMAN:

13  **Q.**  So you were picked up in this car?

14  **A.**  I believe we were, yes.

15  **Q.**  And all five of you were in this car?

16  **A.**  Yes.

17  **Q.**  What happened after everyone got into the car?

18  **A.**  Well, Justin was driving, and I remember being in the back

19  seat and we had a scanner to listen to the radio, emergency

20  responder, radio frequencies.  Someone -- I remember the

21  scanner being out.  I remember driving out of the area, the

22  residential area.  I remember that as we turned left onto a

23  residential street, there were cars double parked on both

24  sides of the street -- I think it was a one-way street -- and

25  Justin nicked, with the back of the car we were in, nicked one

1  of the cars as he was -- on the side here -- as he turned the

2  corner.

3  **Q.** When you say nicked, you mean slight contact?

4  **A.** Yes.  It felt huge to me, but it was not significant.

5         MR. BLOOM:  I'm sorry, you said "huge" and then your

6  voice dropped.

7  **A.** It felt huge, but it was not significant.

8  BY MR. FRIEDMAN:

9  **Q.** What happened after that?  Did you keep driving?

10 **A.** No, we switched drivers and Avalon started driving.

11 **Q.** Did you switch right at the scene at which --

12 **A.** No, I think we were sort of -- there was panic, keep

13 driving.  We pulled over a couple blocks away.  I think Avalon

14 and Justin got out and looked, and the rest of us stayed in

15 the car, and then Avalon drove after that point.

16 **Q.** To where did you drive?

17 **A.** Well, we were driving around and we pulled over on another

18 residential road, which I didn't want to do, and we were

19 listening to the scanner.

20 **Q.** Why were you listening to the scanner?

21 **A.** Avalon wanted to hear the fireman's response.

22 **Q.** Did you hear the fireman's response?

23 **A.** Yes.  We heard the call, and we heard firefighter jargon

24 about how many trucks were being sent.  There seemed to be

25 some hesitation to start fighting the fire because they

1   thought there might be -- because it was a science lab and
2   they thought there might be chemicals in the building.  I have
3   a pretty clear memory of hearing a firefighter trying to
4   decide whether or not to continue fighting the fire from the
5   roof of the building.
6   **Q.**  Why do you have a clear memory of that?
7   **A.**  Because it was terrifying to hear him in this dangerous
8   situation.
9   **Q.**  Do you recall Avalon's response as he was listening to the
10  scanner?
11  **A.**  Avalon seemed excited.
12  **Q.**  For how long do you think you stayed pulled over listening
13  to the scanner?
14  **A.**  Not too long.  I was really uncomfortable with it, and I
15  think that I pushed to leave.  I would say between five and
16  ten minutes.
17  **Q.**  Where did you go from there?
18  **A.**  After that, we went to a park nearby with a big manmade
19  lake in the middle.
20  **Q.**  Did all five of you go there?
21  **A.**  I am not sure if Jennifer Kolar was with us at that point.
22  I think we dropped her off at some point.  I remember thinking
23  she was so lucky to be out and done, but the rest of us went
24  to the park.  The idea was that we needed to wait until there
25  was more traffic on the highway before we hit the highway and

1  started driving south.

2  **Q.** Why did you want to wait for more traffic?

3  **A.** Because we didn't want to be a conspicuous car on the

4  traffic cams at an unusual hour of the morning.

5  **Q.** For how long did you wait in the park, do you think?

6  **A.** Until morning traffic time.

7  **Q.** What did you do once you got through morning traffic?

8  **A.** We got in the car and drove back towards Olympia.

9  **Q.** Where did you go once you arrived in Olympia?

10  **A.** I remember just a couple things about that period of time.

11  I remember having a conversation with Avalon -- I remember

12  that Avalon and Justin were supposed to fix the dent in the

13  car, and I ended up at Nathan Block and Joy Zacher's rented

14  cabin in the woods.

15  **Q.** Had you had any sleep during that day?

16  **A.** No, so we slept for a couple hours. I knew that those

17  people were involved in a simultaneous action and --

18  **Q.** When you say "those people," who did you mean by that?

19  **A.** The five people, Nathan Block, Joy Zacher, Suzanne Savoie,

20  Daniel McGowan and Stan Meyerhoff.

21  **Q.** How did you know they were involved in another action?

22  **A.** Well, when they dropped me off by myself in Olympia, I

23  think I had -- that first weekend, I had some forewarning that

24  they were going to do something else related but not the same.

25  **Q.** So did you learn more about that after you had slept a

1 couple hours on the morning of the 21st?

2 **A.** Well, they were all there, and they were all keyed up

3 about what they had done, and they made little comments about

4 driving and carrying heavy stuff and crawling through the

5 brush, but I was not clear on what in particular had happened.

6 **Q.** Did you do anything else relating to the arson that you

7 had just participated in?

8 **A.** Later that morning, four of us I believe sat down and

9 wrote a communiqué or a claim of responsibility for the arson.

10 **Q.** Which four people did that?

11 **A.** I believe it was myself, Suzanne Savoie, Daniel McGowan

12 and Nathan Block.

13 **Q.** When you say a communiqué for the arson --

14 **A.** For the two simultaneous actions.

15 **Q.** What happened to that communiqué after you wrote it?

16 **A.** My understanding was that Chelsea Gerlach was going to

17 take it and either send it out through an anonymous computer

18 herself, or give it to Jen Kolar who knew a coffee shop

19 without cameras where she could send it from.

20 **Q.** Did you subsequently learn whether the communiqué had

21 actually gotten out and gotten published?

22 **A.** No.  Days passed and there was no claim of responsibility.

23 **Q.** At some point, was there a claim of responsibility?

24 **A.** It seemed like a long time later, but I think it was just

25 a matter of days.

1    **Q.**  Did you eventually see the communiqué that came out?

2    **A.**  Yes.

3    **Q.**  Would you take a look at Exhibit 349 and tell me if you

4    recognize that.

5         THE COURT:  Before you get into the actual

6    communiqué, are you anywhere close?

7         MR. FRIEDMAN:  Probably 10 minutes.  We could finish

8    tomorrow.  Either way, Your Honor.

9         THE COURT:  Well, of course, we have to have her back

10   for cross.  Let's do this.  Let's recess, keep to my schedule.

11   I told you we will recess at 4:00, around there, so you will

12   get a chance to go home and get a good night's rest and

13   hopefully be back in the same position at 9:00.  You'll hear

14   the rest of the case.  Don't discuss the case or research

15   anything or get involved in any way.

16       As I keep saying, everything that you need to decide this

17   case you will receive right here in this courtroom.  Leave

18   your books on the chair.  I will see you back here in the

19   morning.

20       (Jury not present.)

21         THE COURT:  You may be seated.

22       Unless there's some issue that I need to take up, we will

23   be at recess for the day.

24         MR. BLOOM:  May the witness be excused?

25         THE COURT:  Yes.  Do you having something to take up?

1          MR. BLOOM:  Well, it relates to the witness.  I think

2     Mr. Friedman has something.

3          THE COURT:  That's what I am asking.

4          MR. FRIEDMAN:  We had our motion in limine --

5          THE COURT:  Well, I don't know if that's an issue.  I

6     don't know anything more about that than I did the last time.

7     Let's take the witness out.

8        (Witness left courtroom.)

9          THE COURT:  Is the answer this time any different

10    than the answer I got the last time as to if you are going to

11    use this exhibit?

12         MR. FOX:  Could I have one moment?

13       (Discussion held off the record.)

14         THE COURT:  I would like to know the purpose for

15    which it is going to be used, and we can have further

16    discussion on this at 8:30 in the morning.

17         MR. FOX:  I think the only issue would be -- and I

18    don't know if Mr. Friedman is going to deal with this -- but

19    the letters reflect the witness's very deep emotional

20    connection to Stan Meyerhoff, and the way she made it sound

21    is, we are fiancees.

22       I guess to the extent that in cross-examination she denied

23    that she's intricately and intimately connected to Stan in an

24    incredibly deep and significant manner, and that she wants to

25    have his children, and that she misses him, and all the things

1  that are in the love letters.  I think if she is in any way

2  reluctant to admit that on cross, then I think the letters

3  become relevant.

4      Her presentation was:  Well, we got together --

5          THE COURT:  Well, I understand what you are saying,

6  but let's see what her response to you may be.  Right now, you

7  are wanting me to answer something that hasn't even happened

8  yet.

9          MR. FOX:  We haven't made the motion.  If nothing

10  comes up -- but we will bring it up outside the presence of

11  the jury.

12          THE COURT:  What you are telling me is this would be

13  -- the reason you would want to use it is for the reason you

14  just stated?

15          MR. FOX:  Right.

16          THE COURT:  We will.

17      Be at recess.  We will see you at 8:30.

18          THE CLERK:  All rise.  Court is adjourned.

19          (The Court recessed to Friday, February 15, 2008 at

20  the hour of 9:00 a.m.)

              *   *   *   *   *

21              C E R T I F I C A T E

22      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

23

    /S/  Teri Hendrix_____        May 2, 2008
24  Teri Hendrix, Court Reporter              Date

25