UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. CR05-5828FDB |
| | ) | |
| Plaintiff, | ) | Tacoma, Washington |
| | ) | February 15, 2008 |
| vs. | ) | |
| | ) | |
| BRIANA WATERS, | ) | VOLUME 5 |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANKLIN D. BURGESS
SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:        MARK N. BARTLETT
                          ANDREW C. FRIEDMAN
                          Assistant United States Attorney
                          700 Stewart Street, Suite 5220
                          Seattle, Washington 98101-1271

For the Defendant:        ROBERT BLOOM
                          Attorney at Law
                          3355 Richmond Boulevard
                          Oakland, California 94611

                          NEIL M. FOX
                          Cohen & Iaria
                          1008 Western Ave., Suite 302
                          Seattle, Washington 98104

Court Reporter:           Teri Hendrix
                          Union Station Courthouse, Rm 3130
                          1717 Pacific Avenue
                          Tacoma, Washington  98402
                          (253) 882-3831

Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.

1

<u>I N D E X</u>

2 INDEX OF WITNESSES
==================

3

<u>WITNESS ON BEHALF OF PLAINTIFF</u>:                      <u>Page</u>

4 LACEY PHILLABAUM

5
    Direct by Mr. Friedman........................ 721
6    Cross by Mr. Bloom........................... 737
    Redirect by Mr. Friedman...................... 918

7
MEGAN ROOP

8
    Direct by Mr. Friedman........................ 920
9    Cross by Mr. Fox............................. 928

10

11
                    INDEX - EXHIBITS

12 <u>EXHIBITS</u>                                            <u>Page</u>

13 No. 349                                            723
   No. 115-A                                          737
14 No. A-192 (Marked)                                 897
   No. 771                                            923
15

16

17

18

19

20

21

22

23

24

25

1          FRIDAY, FEBRUARY 15, 2008 - 9:00 A.M.

2                          * * *

3          THE COURT:  All right, you may be seated.

4          THE CLERK:  This is in the matter of United States of

5   America versus Briana Waters, Cause No. CR05-5828FDB.

6      Counsel, please make an appearance for the record.

7          MR. FRIEDMAN:  Good morning, Your Honor, Andrew

8   Friedman and Mark Bartlett for the United States.

9          MR. BLOOM:  Robert Bloom and Neil Fox for Ms. Waters.

10         THE COURT:  Let the record reflect Ms. Waters is

11  present.

12     We are dealing with Ms. Phillabaum, so we will bring in

13  the jury and continue that examination.

14     (Jury present.)

15     LACEY PHILLABAUM, called as a witness, resumed stand.

16         THE COURT:  All right, you may be seated.  Good

17  morning to you.

18     I believe we are ready for day five.

19     Mr. Friedman.

20         MR. FRIEDMAN:  Thank you, Your Honor.

21              DIRECT EXAMINATION- CONTINUED

22  BY MR. FRIEDMAN:

23  Q.  Good morning, Ms. Phillabaum.

24  A.  Good morning.

25  Q.  I think when we stopped yesterday we were talking about

1  the afternoon, after you had broken up following the arson.

2  **A.** Uh-huh.

3  **Q.** Do you recall having any discussions about any damage to

4  the car that day?

5  **A.** The day of the arson?

6  **Q.** I'm sorry, do you recall having discussions that afternoon

7  about damage to the car?

8  **A.** That may have been when I talked with Avalon about Bill

9  Rodgers, about how much damage had been done to the car, and

10  he reassured me that the damage was minimal.

11  **Q.** Did you have any sense as to whether anyone had tried to

12  repair it?

13  **A.** Yes. I knew that the plan was, and I think he confirmed

14  to me, to get some of like paint retouching, car retouching;

15  and to fix the minor scrape that had happened.

16  **Q.** I believe we were also talking about a communiqué. You

17  said you subsequently saw a communiqué relating to the action?

18  **A.** I did.

19  **Q.** Would you look again at Exhibit 349.

20  **A.** There's this page outside of it. There's nothing in the

21  folder, but this says 349 at the bottom.

22  **Q.** I think this may have been in the mixup right at the end

23  of the day yesterday, because I think you were looking at it

24  at the end of the day yesterday. Do you recall that?

25  **A.** Okay. I'm sorry.

1    Q.  Do you recall looking at it at the end of the day

2    yesterday, and it being Exhibit 349?

3    A.  No, I don't, I'm sorry.  I don't have a particular memory

4    of that.

5            MR. FRIEDMAN:  May I approach the witness and hand

6    her another copy, if necessary, Your Honor?

7            THE COURT:  You may.

8    BY MR. FRIEDMAN:

9    Q.  I'm sorry.  You're saying you have something that's marked

10   349?

11   A.  It has a sticker on the bottom that says 349.  It just was

12   inside the folder.

13   Q.  I'm sorry, I thought you said you were looking at a piece

14   of paper that had nothing on it.

15   A.  No, I'm sorry.

16   Q.  Do you recognize that document?

17   A.  It's a communiqué written after the arson.

18           MR. FRIEDMAN:  Government offers Exhibit 349.

19           MR. BLOOM:  No objection.

20           THE COURT:  Admitted.

21               (Exhibit No. 349 admitted.)

22           MR. FRIEDMAN:  If you could blow that up.

23   BY MR. FRIEDMAN:

24   Q.  Could I ask you to read that to the jury?

25           MR. BLOOM:  Could we perhaps get that "not published"

1 off the screen, do you think, Pat?

2       THE CLERK:  I'm sorry.

3       MR. BLOOM:  Thank you.

4 **A.**  It says:

5    "Communiqué sent by the Earth Liberation Front.

6    "Part 1.

7    "At 3:15 a.m. on Monday, May 21, the research of Toby

8 Bradshaw was reduced to smoke and ashes.  We attacked his

9 office at the University of Washington while at the same time

10 another group set fire to a related target in Clatskanie,

11 Oregon, 150 miles away.

12    "Bradshaw, the driving force in GE tree research,

13 continues to unleash mutant genes into the environment that is

14 certain to cause irreversible harm to forest ecosystems.

15    "After breaking into Bradshaw's office at the Center for

16 Urban Horticulture, we inspected the building for occupants

17 and set up incendiary devices with a modest amount of

18 accelerant.  Although we placed these devices specifically to

19 target his office, a large portion of the building was

20 damaged.  This extensive damage was due to a surprisingly slow

21 and poorly coordinated response from the fire department,

22 which was evident by their radio transmissions,

23    "As long as universities continue to pursue this reckless

24 'science,' they run the risk of suffering severe losses.  Our

25 message remains clear, we are determined to stop genetic

engineering.

"From the torching of Catherine Ive's office at Michigan State University to the total incineration of GE seeds at the D & PL warehouses in Visalia, CA, the Earth Liberation Front is growing and spreading. As the culture of domination forces itself into our very genes, wild fires of outrage will continue to blaze.

"ELF.

"Part 2.

"Early Monday morning, May 21, we dealt a blow to one of the many institutions responsible for massive hybrid tree farming in the Northwest. Incendiary devices at Jefferson Poplar in Clatskanie, Oregon, burned an office and a fleet of 13 trucks. Unfortunately, due to a design flaw, one targeted structure was left standing. We torched Jefferson Poplar because hybrid poplars are an ecological nightmare threatening native biodiversity in the ecosystem. Our forests are being liquidated and replaced with monocultured tree farms so greedy, earth raping corporations can make more money.

"Pending legislation in Oregon and Washington further criminalizing direct action in defense of the wild will not stop us and only highlights the fragility of the ecocidal empire.

"As we wrote in Clatskanie 'You cannot control what is wild.'

"ELF.

"Earth Liberation Front."

**Q.** Over time, Ms. Phillabaum, did you learn more about the Center for Urban Horticulture?

**A.** Yes.

**Q.** What did you learn?

**A.** Well, I'm not sure if I knew exactly what was in the building at that time, but I started to understand what the offices in that building were really about.

**Q.** Did you learn about what damage had been done to the center?

**A.** Yeah. I looked at it only in a very preliminary way, because I didn't really want to know or have to look back at what we had done. But working with Oregon Tilth, I came to understand what a master gardener is, and I came to know what a community of people invested in sustainable agriculture is. It was, you know, a blessing to me to work in that community in Oregon. I did great damage to that community in Washington.

**Q.** How did that cause you to feel about what you had done?

**A.** I still mostly tried not to look back at it. But, you know, one thing that really impacted me as well was knowing that books were burned. I have a lot of remorse about what we did.

**Q.** Did you ever consider committing another arson after that?

1  **A.** No.

2  **Q.** Did you ever commit any other arsons?

3  **A.** No. I made efforts to start distancing myself from the

4  Earth Liberation Front and radical environmentalism generally

5  at that point.

6     It took a while, and really, when this case happened was,

7  you know, an important point in me being forced to look back

8  at what had happened. It took me from 1995 to 2001 to be

9  willing to do this as well. So it took a while to change my

10  perspective on things as well.

11  **Q.** You told us yesterday you -- well, I guess you weren't

12  then -- you were growing involved with Mr. Meyerhoff?

13  **A.** Uh-huh. We got to know each other there, and then sort of

14  our relationship grew from that point. It was very much about

15  integrating ourselves back into the mainstream instead of

16  being counter to it. It was a lot of work and it was very

17  difficult to do.

18  **Q.** Do you know whether he may have committed any arsons after

19  these two arsons?

20  **A.** I don't know anything for sure except what was in the

21  documents in Oregon, the legal briefs, which I think says he

22  did.

23  **Q.** Did you try and do anything to prevent -- was part of

24  distancing yourself, did any of that have to do with

25  Mr. Meyerhoff or what he did?

1  **A.**  Well -- I'm sorry, ask me that again.

2  **Q.**  You said you tried to distance yourself.  What about the

3  fact that Mr. Meyerhoff may or may not have remained involved,

4  did you do anything about that?

5  **A.**  Well, the first part of getting uninvolved was admitting

6  to one another that we didn't want to be involved.  And that

7  was difficult to do at the very beginning of our relationship,

8  having met each other in this circumstance.

9     So eventually, you know, I -- I was pretty clear with him

10  after 9/11 that I thought it was just absolutely intolerable

11  to be involved in anything like this.  It was a mutually

12  reinforcing system of changing our values.

13  **Q.**  Do you have any information that he may, even after 9/11,

14  he might have been involved in another arson?

15  **A.**  I can't remember the dates of things that I wasn't

16  involved in right now.

17  **Q.**  Did you have discussions with him about him also becoming

18  uninvolved or distancing himself?

19  **A.**  Yes.  I think I told him that opinion after 9/11.  I think

20  I read in the paper about this thing in California that

21  happened after 9/11.  I was not sure that he had been

22  involved, but I made it pretty clear to him that I thought

23  that that was completely unacceptable.

24  **Q.**  Whether or not he was?  That he may have been, but that

25  you --

1    MR. BLOOM:  Excuse me.  Leading, please.

2 BY MR. FRIEDMAN:

3 **Q.**  Could you try and explain what you made clear to him or

4 what you were trying to make clear to him?

5 **A.**  That arson as a political tactic was completely

6 illegitimate given the political context after 9/11.  The

7 idea -- we were so focused on the fact that it was, we called

8 it nonviolent.  We didn't appreciate how incredibly

9 destructive what we were doing was.  We were just so focused

10 on it's not violent, it won't hurt anyone.  After 9/11, that

11 rationale seemed as thin as it was.

12 **Q.**  Did you ever see the defendant again after the weekend of

13 the arson?

14 **A.**  Briana Waters?

15 **Q.**  Yes.

16 **A.**  No.

17 **Q.**  Do you recall whether you ever saw Justin Solondz after

18 the weekend of the arson?

19 **A.**  I don't think so, no.

20 **Q.**  Did you ever see William Rodgers again?

21 **A.**  I am pretty sure that I never saw him again.

22 **Q.**  And what about Jennifer Kolar?

23 **A.**  I never saw -- oh, no, I saw her one other time, at a

24 meeting of that book club group that took place shortly after

25 the arson.

1   **Q.** Do you recall, what year was that?

2   **A.** That would have been 2001, shortly after the arson.

3   **Q.** Do you recall ever seeing her since 2001?

4   **A.** I have never seen Jen Kolar since 2001.

5   **Q.** Have you had any other direct contact with Ms. Kolar?

6   Have you telephoned or spoken to her by telephone?

7   **A.** I have had absolutely no contact with Jen Kolar.

8   **Q.** Have you received any e-mails from her, of which you are

9   aware of, since 2001?

10  **A.** No e-mail, no phone contact, no friend of a friend.

11  Absolutely no contact.

12  **Q.** Ms. Phillabaum, during 2000 and 2001, did you ever use

13  marijuana?

14  **A.** During 2000 and 2001, yes.

15  **Q.** Did you ever use it -- can you give us an idea of how

16  often you used it?

17  **A.** I used it -- I would say that I had a problem with smoking

18  marijuana.  I used it frequently.

19  **Q.** Did you use it before or around the time of any of the

20  planning meetings you've discussed?

21  **A.** No.  Avalon was very -- had a very strong ethic of not

22  using drugs generally, and very, very, particularly, we all --

23  I, mean this was serious.  None of us was going to be drunk or

24  stoned when we were doing this.  So, no, absolutely not.

25  **Q.** Did you also use ecstasy during that time period?

1   **A.**   No.

2   **Q.**   Have you used it since?

3   **A.**   I did afterwards, yes.

4   **Q.**   How often do you think you've used ecstasy?

5   **A.**   I haven't used it since, I think the latest would be 2002.

6   And how often?  I don't know.   A handful of times in that --

7   four times, maybe, between -- the first time I think was in

8   December of 2001.

9   **Q.**   Do you think that the marijuana that you used or the

10  ecstasy, either of those has affected your memory of these

11  events?

12  **A.**   Of these events, no.

13  **Q.**   Why is that?

14  **A.**   Well, I didn't ever -- it didn't ever make me hallucinate.

15  I was absent minded when I did smoke marijuana, but I don't

16  have problems with my memory.   The things I remember, I

17  remember clearly; and what I don't remember, I don't remember.

18  **Q.**   When we started out you told us a little bit about where

19  you had lived over time.   I think you told us at some point

20  you moved to Charlottesville.

21  **A.**   Uh-huh.

22  **Q.**   After you moved to Charlottesville, did Mr. Meyerhoff also

23  move to the east coast?

24  **A.**   He did at some point afterwards, yes.

25  **Q.**   Where were you living when this case became public and

1  Mr. Meyerhoff was arrested?

2  **A.** I was living in Washington, D.C.

3  **Q.** Do you recall the day on which he was arrested?

4  **A.** December 7, 2005.

5  **Q.** How did you learn he had been arrested?

6  **A.** He was living in a house that I had previously rented, and

7  I spoke with my housemate, my former housemate. I had been

8  calling him because I hadn't heard from him all day and she

9  told me he had been arrested.

10  **Q.** Did you have any contact with the government that day?

11  **A.** No, I didn't have any contact with the government. Very

12  late that night I received a voice mail from an FBI agent on

13  my phone. He told me that Stan had been indicted on two

14  counts of arson.

15  **Q.** Did you have any conversation with Stan Meyerhoff in the

16  days that followed that?

17  **A.** The next day I went to Charlottesville to move Stan's car,

18  which had been left on campus -- oh, my car was actually there

19  as well, was in Charlottesville, so my friend drove me to

20  Charlottesville. I moved his car so it wouldn't get towed. I

21  got a copy of the search warrant that they had left at my

22  former house where he was living, and he -- I'm sorry, I

23  forgot the question. Did I have contact with him?

24  **Q.** Right.

25  **A.** He called me. He was on an agent's phone, and we had a

1  very brief conversation in which I was yelling at him, and in
2  increasing hysterics, that he needed to get an attorney.
3  **Q.**  Did you speak with the agent at all during that
4  conversation?
5  **A.**  No.
6  **Q.**  Did you have a conversation with him the day or two after
7  that with the agent?
8  **A.**  During that conversation, Stan gave me the phone number
9  that he said was the agent's cell phone.
10     The next day, I called that number -- I think it was the
11  next day; it could have been a day or two later.  It was --
12  let me see.  I think the arrest happened on Thursday.  That
13  was maybe Friday when I talked to Stan.  It could have been as
14  long as Monday.  But I talked to him that day and wanted to
15  know if Stan had retained counsel and where Stan was, And he
16  would not answer those questions.
17  **Q.**  During any of those conversations, did you have any
18  substantive discussion about any arsons or any of the crimes
19  at issue?
20  **A.**  Definitely not.
21  **Q.**  After those conversations, when is the next time you had
22  any contact with the government?
23  **A.**  Presidents' Day weekend, 2006.  My father got a phone call
24  from the FBI, and he related the substance of that
25  conversation to me.

1  **Q.** Just to be clear, do you recall when Presidents' Day
2  weekend was?
3  **A.** The dates? I think that the phone call -- I think
4  February 21st was the Tuesday, February 20 was Monday,
5  February 19th was Sunday. I think the phone call happened on
6  Saturday, February 18.
7  **Q.** What did he relay to you as the substance of that contact?
8  **A.** That I was likely to be indicted on one, if not two counts
9  of arson.
10 **Q.** Did he provide any details about the arson or people who
11 might have been involved?
12 **A.** No.
13 **Q.** What happened after that?
14 **A.** I spoke with an attorney, who I'd had some preliminary
15 conversations with, in Seattle. On Monday my father and I met
16 with that attorney. On Tuesday, the attorney and I met with
17 yourself and FBI.
18 **Q.** Were you promised anything or told anything before the
19 start of that meeting? Were you promised anything before the
20 start of that meeting?
21 **A.** No, I was not promised anything.
22 **Q.** What were you told?
23 **A.** I was told it would be better for me if I was forthcoming
24 about what had happened.
25 **Q.** After that, what happened during the course of that

1  meeting?

2  **A.** I came in -- oh, I signed a piece of paper that said I

3  wasn't promised anything, and then -- and some other more

4  technical legal language. And someone, one of the FBI agents,

5  asked me where I was born, and the whole story came tumbling

6  out of my mouth.

7  **Q.** During the course of that meeting, who was providing the

8  information to him?

9  **A.** I was providing all of the information.

10  **Q.** Between the first phone call that took place on February

11  18 and that meeting on February 21st, were you involved in any

12  conversation or meeting in which anyone from the government

13  gave you any details about what they believed had happened in

14  any arson?

15  **A.** I'm sorry, from which point to which point?

16  **Q.** When your family received the phone call on February 18,

17  until three days later when you met with the government, were

18  you provided any information?

19  **A.** No. I would say to this day I haven't been provided any

20  significant information about anything that happened. I

21  haven't read any of the discovery that's not been in the court

22  case. I am relying on my memory alone.

23  **Q.** Mr. Bloom referred to something in the opening as a

24  reverse proffer. He said the government provides information

25  to you and then you give it back.

1    Did you receive any information from the government about

2  what happened at the University of Washington arson?

3  **A.**  No.

4  **Q.**  Do you have any reason to believe that your attorney

5  received any information from the government about what

6  happened during the University of Washington arson?

7  **A.**  No.

8  **Q.**  I am going to ask you about one other thing.  You've been

9  shown a number of pictures during the course of this

10  investigation; is that correct?

11  **A.**  Yes.

12  **Q.**  Would you take a look at Exhibit 115.  I think you've

13  already looked at this yesterday.  It's been admitted.

14         MR. FRIEDMAN:  Can you publish that, please?

15  BY MR. FRIEDMAN:

16  **Q.**  Was that one of the pictures you were shown?

17  **A.**  I believe it is, yes.

18  **Q.**  Do you recall what you said when you were shown that

19  picture?

20  **A.**  I said it was Justin Solondz.

21  **Q.**  Would you take a look at Exhibit 115-A and tell me if you

22  recognize that?

23  **A.**  I don't have that exhibit.

24  **Q.**  Do you recall being shown that picture?

25  **A.**  This picture is larger than the version I was shown.

1  Q.  Were you shown the same picture, just a little smaller?

2  A.  I was shown this picture and, I believe, another picture

3  that were smaller.

4         MR. FRIEDMAN:  The government offers Exhibit 115-A.

5         MR. BLOOM:  No objection.

6         THE COURT:  Admitted.

7                (Exhibit No. 115-A admitted.)

8  BY MR. FRIEDMAN:

9  Q.  Do you recall whether you recognized the person shown in

10  that picture when you were shown that?

11  A.  When I was shown this picture, I did not know who this

12  was.

13  Q.  Do you recognize it today, the person?

14  A.  Blown up it looks quite a bit more like Justin, but not

15  especially, no.

16         Thank you.  No more questions.

17                CROSS-EXAMINATION

18  BY MR. BLOOM:

19  Q.  Good morning.

20  A.  Good morning.

21  Q.  Have we ever met?

22  A.  Have you and I ever met?  I don't think so.

23  Q.  My name is Robert Bloom.

24  A.  Hello, Mr. Bloom.

25  Q.  Attorney for Briana Waters.

1    Have you met this man over here?

2  **A.**  No, I haven't.  I believe that must be Mr. Fox, but I have

3  never met him.

4  **Q.**  Where would you have gotten that information?

5  **A.**  I know that Briana's two attorneys are Mr. Bloom and

6  Mr. Fox.

7  **Q.**  How do you know that?

8  **A.**  I have read the pleadings in this case.

9  **Q.**  How have you come to read the pleadings in this case?

10  **A.**  My attorney sent them to me.  When I was out, I read them

11  on my own.

12  **Q.**  Did there come a time -- you say your attorney.  Is that

13  Mr. Levy?

14  **A.**  I have a number of people whom I seek legal advice from.

15  **Q.**  Who are they?

16  **A.**  Mr. Levy.  I originally had a different attorney named

17  Mr. Offenbecher.  I have spoken with a partner in my parent's

18  law firm named Mr. Matthew's.  And both of my parents are

19  attorneys, Steve and Cheryl Phillabaum.  And at different

20  points I have spoken with other lawyers.

21  **Q.**  Did there come a time when Mr. Levy asked you if you would

22  speak to me or Mr. Fox?

23  **A.**  No.

24  **Q.**  He never did ask you that?

25  **A.**  It was never clear to me that you had asked to speak with

1    me.  I know that you had some contact with my attorney,

2    Mr. Levy.  My understanding is that you were requesting to

3    speak with him.

4    **Q.**  It was not your understanding that we were also requesting

5    to speak to you; that was not your understanding?

6    **A.**  No, I did not understand that, no.

7    **Q.**  Do you have any reason, know any reason why Mr. Levy would

8    have written to us and said that "After further consultation

9    with my client, I do not see any point in a meeting.  She will

10   not agree to an interview, nor will she release Peter

11   Offenbecher to discuss this case with you."

12   Do you remember having those kind of discussions with Mr.

13   Levy?

14   **A.**  Yes.

15   **Q.**  Did Mr. Levy suggest to you or say to you that we would

16   like to speak with you?

17   **A.**  The main point of the conversation that I had with Mr.

18   Levy was you discussing with him.  It may have been -- it's

19   possible that he told me that you wanted to meet with me.  I

20   think if that had been relayed to me, it would have been

21   important to me that I be able to speak with Briana, and he

22   may have related to me that that was not a possibility.  That

23   was -- to me -- I authorized him to evaluate with you, to make

24   a decision whether or not he should meet with you.

25   **Q.**  Is there any reason that he would -- if that's so, can you

1   think of any reason, or did he tell you any reason why he

2   would say to us that she -- you, Lacey Phillabaum -- will not

3   agree to an interview, nor will she release Peter Offenbecher

4   to discuss the case with you?

5       Do you have any reason to know why he would say such a

6   thing?

7   **A.**   I authorized Mr. Levy to deal with the situation.   My

8   understanding is it was primarily about him meeting with you.

9   I think if he talked about me meeting with you, I was clear I

10  was not willing to do that unless Briana was there.

11  **Q.**   You did say that you were not willing to meet with us

12  unless Briana was there.   You told that to Mr. Levy?

13  **A.**   I believe I did.

14  **Q.**   Let me get back to that in a little while.   I wanted to

15  ask you about something you said yesterday.   Mr. Friedman

16  asked you a question, early on in your examination yesterday,

17  and the question was:   Do you bear any ill will toward Briana

18  Waters?

19      Do you remember that question?

20  **A.**   Yes, sir.

21  **Q.**   Do you remember that your answer was that you have

22  sympathy for everyone in this case?

23  **A.**   Yes, sir.

24  **Q.**   Is there a reason you didn't answer the question as to

25  whether or not you bore any ill will toward Briana Waters?

1  A.  I bear no ill will toward Briana Waters.

2  Q.  That's not my question.  Is there a reason you didn't

3  answer the question?

4  A.  I was speaking generally instead of specifically.  I have

5  really, really cultivated compassion for everyone involved in

6  this case.  It's something I work on.

7  Q.  And that would be a good thing for you.  The gentleman

8  sitting over there, Judge Burgess, he's going to be the person

9  who's going to be sentencing you; is that correct?

10  A.  That's correct.

11  Q.  And it's a nice thing for him to hear that you have

12  compassion for everyone.  You know that, don't you?

13  A.  I don't think being sympathetic to my coconspirators

14  necessarily helps me.  I don't know.  I am being honest.  I am

15  not trying to say what only benefits me.

16  Q.  Now back to the question of ill will toward Ms. Waters.

17  There came a time when you met Justin Solondz; is that

18  correct?

19  A.  That's correct.

20  Q.  You didn't call him Justin Solondz; you called him

21  something else, didn't you?

22  A.  I don't know what I first knew him as, but I knew him as

23  Connor during the course of the arson.

24  Q.  Did you meet Connor -- what year did you meet Connor?

25  A.  I believe I met him in 2001, or during the action in

1  Dusty, Washington.

2  **Q.**  Who else was involved in the action in Dusty, Washington?

3  **A.**  The people I remember for sure are Connor, myself, Chelsea

4  Gerlach, Suzanne Savoie.  I think, I am sure that Nathan Block

5  and Joyanna Zacher were there.  I think Daniel McGowan was

6  there, and I remember either Stan or Avalon being there, but I

7  am not sure which one.

8  **Q.**  When was that activity?

9  **A.**  That was, the Dusty action, I am not sure.  I think we

10  established yesterday it was in 2000.

11  **Q.**  Maybe August 1 or so of 2000, does that ring a bell?

12  **A.**  The action rings a bell.  The date is not particularly

13  significant in my mind.

14  **Q.**  Would it have been in the summertime of the year 2000?

15  **A.**  I couldn't place it during the season.

16  **Q.**  So you met this person you knew as Connor sometime in the

17  year 2000; is that correct?

18  **A.**  Yes.  If that's when the action was, that's when I met

19  him.

20  **Q.**  Where is Dusty, Washington?  How far, with direction from,

21  let's say, Seattle?

22  **A.**  I think it's in eastern Washington.

23  **Q.**  It would go beyond the Cascade's, the central part of the

24  state?

25  **A.**  I think it's near Pullman.

1  **Q.** You named about seven or eight people who were involved,

2  or maybe more. Do you remember how you got to Dusty,

3  Washington?

4  **A.** No. I think I might have driven with Chelsea. One time I

5  -- no, both times I drove with Chelsea.

6  **Q.** In her car or your car?

7  **A.** Her car; yeah, her car.

8  **Q.** What kind of car was that?

9  **A.** A small car, compact car.

10  **Q.** Now, I think you said yesterday -- you made quite a big

11  point of it -- that going to these actions, you couldn't get a

12  car that was not associated with the activists. That

13  sometimes was a deal breaker.

14     She took her car to Dusty, Washington. That's what you

15  just told us.

16  **A.** No, she didn't take her car to the site. She drove us to

17  the area. We parked the vehicles in a parking lot away from

18  the area.

19  **Q.** Well, you didn't drive right to the site. Of course you

20  didn't put the car right at the site. But you drove to the

21  site, and one of the cars was her car, registered in her name,

22  right?

23  **A.** I don't believe that's correct.

24  **Q.** Well, tell us what you said. How did you get there? You

25  said you got there in her car.

1  **A.** I drove to that area, that region, in Chelsea Gerlach's

2  car.  We parked the car in a parking lot, and then we took

3  different cars to the site of the action.

4  **Q.** What cars did you take to the site of the action?

5  **A.** I don't know.

6  **Q.** Who drove?

7  **A.** I think that I might have been in Justin's car at that

8  point.

9  **Q.** Justin Solondz, the same person as Connor; is that

10 correct?

11 **A.** That's correct.

12 **Q.** Registered in his name, right?

13 **A.** I don't know anything about the registration of that car.

14 I associated the car with him for some reason.

15 **Q.** Did it have a New Jersey license plate?

16 **A.** I don't think I would have been looking at that.

17 **Q.** Do you have any idea what kind of car it was?

18 **A.** I believe it was an SUV.  I thought it was maybe a 4

19 Runner.

20 **Q.** Whatever it was, it was his car that you took to an

21 action; is that correct?

22 **A.** As you pointed out, Dusty, Washington, is in far -- very

23 rural Washington.  And this was pulling plants out of the

24 ground.  It wasn't really high level -- it was sort of an

25 introductory thing, frankly.

1  **Q.** So it didn't matter if you got caught and his car was

2  identified?

3  **A.** I think because the area was so rural, people were

4  comfortable. But I don't know, because I didn't particularly

5  play a role in planning that aspect.

6  **Q.** That would be different from taking a car to an arson; is

7  that correct?

8  **A.** It would be significantly different, yes.

9  **Q.** You know, don't you, from reading the pleadings, that the

10  allegation is that Justin's car was used at the Jefferson

11  Poplar Farm on May 21 of the year 2001. Justin's car, in his

12  name. You know that, don't you?

13  **A.** No, I don't remember that particular detail in the

14  pleadings.

15  **Q.** If that was true, that would indeed put a lie to what you

16  just said, wouldn't it?

17  **A.** I don't think that demonstrates a lie. I think that

18  demonstrates that things didn't always work to ideal

19  circumstances.

20  **Q.** Does it demonstrate that to go to the arson, the car,

21  belonging to Justin Solondz, was used in perpetrating the

22  arson at Jefferson Poplar Farm, a car in his name?

23  **A.** Okay, I will tell you this. Like I said, cars were often

24  the linchpin. Coming by a number of completely anonymous cars

25  was very difficult. I cannot speak to what happened at

1 Jefferson Poplar Farm because I was not there and I do not

2 know what happened there.

3 **Q.** You were involved in planning the so-called double whammy,

4 were you not?

5 **A.** No.

6 **Q.** Is there any reason that your fiancee would say that you

7 are -- that you were, rather?  Can you think of any reason why

8 he would tell law enforcement that you in fact were involved

9 in the planning of the double whammy, if that were not true?

10 **A.** He may remember differently.  As far as I am concerned, I

11 was involved at the last minute.  And there was a plan that

12 was revealed to me.  I would prefer to say I was not involved

13 in the planning, but I have to acknowledge that certain

14 planning details were worked out while I was there.  The

15 question of how much fuel to use.  I questioned a decision

16 which had already been made about how to approach the

17 building.

18    So, someone could have -- Stan, I imagine, has a different

19 memory of what happened than I do.

20 **Q.** Well, you have just told us how you in fact were involved

21 in the planning of the event, the double event.  Did you just

22 not tell us that about how much fuel was used and other

23 issues?  You just told us that just now.  Isn't that part of

24 planning?

25 **A.** Yes.  That could fairly be called planning.  I think a

1  significant portion of the plan had been established before I

2  was involved and was revealed to me afterwards.

3  **Q.** And yet you have told us that you had input into refining

4  the planning, is that fair to say?

5  **A.** That would be fair to say. It's not how I would phrase

6  it, but you could say that.

7  **Q.** So, is it fair to say you were aware of the fact that

8  Justin's car, in his name, was going to be used for that event

9  at Clatskanie?

10 **A.** No, sir. I had no idea what was happening at Jefferson

11 Poplar Farm until after it happened.

12 **Q.** You just work here, right? You have no idea.

13 **A.** Sorry --

14 **Q.** Withdrawn.

15 Let's get back to Justin Solondz, or Connor, as you knew

16 him. You knew him sometime at first -- did you meet him at

17 the event at Dusty, Washington?

18 **A.** I believe that was the first time I ever took note of him.

19 **Q.** Was there any flirting going on between the two of you?

20 **A.** No.

21 **Q.** None?

22 **A.** No.

23 **Q.** Did there ever come a time when you were at the place

24 where he lived?

25 **A.** During one of the two weekends, when I spent time in

1  Olympia, I went briefly to a bus that I believed that he lived
2  in.
3  **Q.** And who else went to the bus that you believed he lived
4  in?
5  **A.** Just Justin.
6  **Q.** So just you and Justin were at his place of residence; is
7  that correct?
8  **A.** That's correct, sir.
9  **Q.** Could you describe that bus?
10 **A.** It was a short bus, I think.  I'm not sure.
11 **Q.** Well, think about it.
12 **A.** Okay.  It was renovated to be a living space, and it was a
13 short bus.
14 **Q.** A small space; is that correct?
15 **A.** That's correct.  It usually is when you live in a bus.
16 **Q.** How did you come to go to that place with him?
17 **A.** I think Justin took me there.
18 **Q.** For what reason did he take you there?
19 **A.** I am not sure.  I think he needed to get something.
20 **Q.** He what?
21 **A.** I think he needed to get something.
22 **Q.** What was it that he needed to get?
23 **A.** I am sorry, I don't have any idea.
24 **Q.** How long did you and he stay there?
25 **A.** A short period of time.

1  **Q.** How short?

2  **A.** Well, it's hard to be exact about something like that, but

3  I would say an hour or less.

4  **Q.** I am sorry, an hour or less?

5  **A.** Yes, probably less.

6  **Q.** Give us your best estimate of how much time you and he

7  spent at his place of residence?

8  **A.** Probably less than an hour.

9  **Q.** What did he get? What was it that he went to get?

10 **A.** I am sorry, I don't know.

11 **Q.** Was there a reason that he asked you to come along? Is

12 there something that was heavy and he needed another person to

13 help him carry it?

14 **A.** No. I think we were together for some other reason

15 already.

16 **Q.** So he said, "Let's go to my place. There's something I

17 have to get"?

18 **A.** I don't have a particular memory of that, but that sounds

19 approximately correct.

20 **Q.** While the two of you were there, what did he do in that

21 less than one hour?

22 **A.** I am sorry, I don't have any particular memory of what he

23 did. At some point there was this idea that we might take a

24 nap there.

25 **Q.** "That we might take a nap," did you say?

**A.**  Well, neither of us had slept very much.  So I remember being on his bed, and we didn't end up falling asleep.  We ended up deciding to leave, and we left.

**Q.**  You had some interaction with him?

**A.**  Um --

**Q.**  You laugh?

**A.**  Yeah, I think it's funny.  I am sorry.  I think the implication is that I had some sort of sexual interaction with him, and that's not correct.

**Q.**  But you were at his cabin, where -- is there even any room to sit anywhere other than the bed?

**A.**  I am sorry, I don't have a particular memory of the layout of his bus.

**Q.**  But you remember the bed?

**A.**  I remember being on a bed.  It was at the end of the bus, I remember that.

**Q.**  And you remember that you and he were discussing taking a nap; is that correct?

**A.**  I don't think it was a long discussion.

**Q.**  And in fact, did he take a nap?

**A.**  I am not sure he ever laid down on the bed.

**Q.**  Do you remember the first day that you spoke with -- I am sorry, the second day that you spoke with law enforcement officials here, including Agent Halla?  That's Agent Halla at the end there; is that correct?

1  **A.**  That's correct.

2  **Q.**  Do you remember telling him that in fact Justin took a

3  nap -- I am sorry, Connor took a nap while you were there with

4  him?

5  **A.**  No, I don't remember telling him that.  I am not trying to

6  say I didn't tell him that, but I may have discussed the fact

7  that I went to the bus with Justin.  But I am unclear whether

8  or not Justin was on the bed.

9  **Q.**  When you say you were together, you may have been together

10  for other reasons before that, or just before that, and that's

11  why you went with him.  What were you doing just before that?

12  **A.**  Errands.

13  **Q.**  What kind of errands?

14  **A.**  I don't have a particular memory.

15  **Q.**  And it was just the two of you?

16  **A.**  Yes.

17  **Q.**  And how long were you together before you went to his bus?

18  **A.**  I am sorry, I can't say.

19  **Q.**  Do you remember what day of the week it was?

20  **A.**  It would have been Saturday or Sunday, I believe.

21  **Q.**  And that would be the weekend of the arson, or the weekend

22  before the arson?

23  **A.**  I think that would be the weekend before the arson.

24  **Q.**  Do you know where his bus -- I am sorry, it's called a

25  bus.  Do you know where it was in relation to, let's say, the

1  center of Olympia?

2  **A.**  No.  I don't know Olympia at all.

3  **Q.**  Well, was it in a rural area or urban area?

4  **A.**  I think it was a more rural area.

5  **Q.**  Did you drive there?

6  **A.**  I believe we drove there in his car.

7  **Q.**  That would be his SUV; is that correct?

8  **A.**  I think so, yes.

9  **Q.**  That would be the weekend of the arson?

10  **A.**  No, I think it was the weekend before.

11  **Q.**  I am sorry, you did say that.  I am sorry.

12      And you are unable to tell us how long you were with him

13  on that day?

14  **A.**  That's correct.

15  **Q.**  Now, by that time -- we are talking about May of 2001 --

16  is it fair to say that you had known him for several months?

17  **A.**  A more accurate thing to say would be that I had met him

18  once prior.

19  **Q.**  And you had not seen him in between?

20  **A.**  Let's see.  Oh, I think I saw him once in between.

21  **Q.**  And when was that?

22  **A.**  Maybe twice.

23  **Q.**  Maybe twice?

24  **A.**  Uh-huh.

25  **Q.**  When was that?

1   **A.** I saw him once at a meeting, prior to the University of
2   Washington arson; and I saw him one other time in Eugene, very
3   briefly.
4   **Q.** How did that come to be? What was that event about?
5   **A.** Which?
6   **Q.** Eugene.
7   **A.** He was with some other people. I saw him and I waved, and
8   he went on.
9   **Q.** So you are telling the jury, between the time you pulled
10   up some crops in Dusty, Washington, until the time of the
11   arson, you maybe saw him casually twice in between?
12   **A.** That's correct.
13   **Q.** And you had no intimate relations with him?
14   **A.** I never had intimate relations with him.
15   **Q.** Well, isn't it a fact there came a point in time that
16   Briana Waters said to you, how dare you, how dare you have an
17   affair with my boyfriend?
18   **A.** No.
19   **Q.** Isn't it a fact that there came a time when she was told
20   by her boyfriend, Justin, who you call Connor, that in fact
21   there had been intimate relations between you and her
22   boyfriend? Did you come to learn that from Ms. Waters, that
23   he, Justin, had so informed Ms. Waters?
24   **A.** I don't think so. I was under the impression that they
25   had broken up.

1  **Q.** That's basically your story when it comes to your getting

2  involved with other womens' men. That's just what you told

3  the law enforcement people. The very first day that you spoke

4  to them, you said Chelsea Gerlach, who was Meyerhoff's

5  girlfriend, that they were just breaking up. You told them

6  that, didn't you?

7  **A.** I am sorry, could you repeat that question?

8  **Q.** Yes. Your MO is that you make a decision that this man is

9  breaking up with this woman, so this man, it's okay for me to

10  go after this man. That's the way you operate, isn't it?

11 **A.** No.

12 **Q.** In fact, is there bad blood between you and Chelsea

13 Gerlach because of the way you dealt with the relationship,

14 you interfered with the relationship between her and Stan

15 Meyerhoff?

16 **A.** I don't think -- they were broken up when Stan and I

17 started dating. Chelsea and I have an uneasy relationship

18 because it's a strong relationship. The fact that I have

19 spent a number of years with her ex-boyfriend is a factor in

20 that, but it's not an important factor.

21    When you say my MO, I feel like my sexual history is on

22 trial. But it's obviously irrelevant to the question of

23 whether or not Briana Waters was at the University of

24 Washington arson.

25 **Q.** Well, I think that's something the jury is going to have

1 to determine, whether or not you have ill will toward

2 Ms. Waters. That was the question that you were asked

3 yesterday, a question that you did not answer. Do you

4 understand that?

5 **A.** Again, I don't bear Briana Waters any ill will.

6 **Q.** You didn't say again; you didn't say that yesterday. Now

7 is the first time you say that you don't bear her any ill

8 will.

9 **A.** No. At the beginning of this cross-examination you asked

10 me that question at least twice. I tried to answer it with

11 the same meaning each time. I don't bear her any ill will.

12 **Q.** Isn't it a fact that she called you all kinds of names

13 when she found out that you had cheated with Justin? She

14 called you irresponsible. She called you unprincipled. She

15 called you disrespectful of women and a person who is not

16 worthy of being an activist in the cause of the betterment of

17 humanity. Things like that. She told you that, did she not?

18 **A.** Actually, I am starting to remember a conversation along

19 those lines. My general memory of that, over the course of

20 the weekend, was that I went to Avalon and said: What is

21 going on? Can I really be involved in this action? This

22 person seems to be upset. You are asking me to put a lot of

23 trust in this person. I told him that Justin had told me that

24 they were broken up, and I kind of remember that raised his

25 eyebrow.

1  **Q.** What do you mean, raised his eyebrow?

2  **A.** That maybe it wasn't his understanding that they were

3  broken up. And -- I am sorry, what was the question?

4  **Q.** I actually don't remember. It was whether or not -- let

5  me just ask you another question.

6  **A.** I have to say that's really vague; and the whole idea of

7  being grilled by Briana, that's reaching for me to remember

8  that. It's a very hazy thing.

9  **Q.** Was it hazy because that was during the period you were

10 using marijuana?

11 **A.** No.

12 **Q.** Was it hazy because it's something you don't really like

13 to hear, that people call you unprincipled?

14 **A.** No, that's not why it's hazy. It's hazy because it was a

15 confusing interaction with me to start with, because I

16 understood they were broken up and I hadn't had sex with him.

17 I don't think, if she was accusing me of that, she was clear

18 about that. I never had sexual interactions with Justin.

19 **Q.** You just watched him take a nap -- I am sorry, you

20 discussed with him taking a nap at his bus when you were alone

21 with him in that bus?

22 **A.** That's correct.

23 **Q.** No sexual interaction?

24 **A.** That's correct.

25 **Q.** I would ask you to look at the record of an interview --

1  withdrawn.

2      Now, you say that your recollection of these events was

3  that it happened on the weekend that you committed the arson;

4  is that correct?  The conversation with Avalon.

5  **A.**  No, I am not sure which weekend that happened.

6  **Q.**  Well, when was it?  Try to think about it, and tell us

7  when was the conversation with Avalon?

8  **A.**  I am sorry, sir, it's difficult for me to distinguish

9  between the two times when I was in Olympia.  I don't know.

10  **Q.**  You were able to do that pretty well yesterday, isn't that

11  correct, distinguish between the two times?

12  **A.**  I am not sure.  I don't know, did I do it well yesterday?

13  **Q.**  Well, you did.  And you told us, you told the jury certain

14  dates, certain times, certain locations, certain people

15  regarding the weekend before the arson and the weekend of the

16  arson.  Do you remember testifying to that; is that correct?

17  **A.**  I testified about the arson yesterday, yes.

18  **Q.**  And those other details as well; is that correct?

19  **A.**  I have tried to be as detailed as I can, yes.

20  **Q.**  How many times have you gone over your testimony with Mr.

21  Friedman or Mr. Bartlett, or both?

22  **A.**  Over the course of the events that happened?  Over the two

23  weekends?

24  **Q.**  Let me make it clear.  Have you discussed with

25  Mr. Friedman before yesterday, have you gone over what he was

1  going to ask you as a witness in this courtroom?

2  **A.**  Yes.

3  **Q.**  And when did you do that?  How many times did you do that?

4  **A.**  I would say one time completely through, and abbreviated

5  versions at other times.

6  **Q.**  How many abbreviated versions at other times?

7  **A.**  I think two other times he's asked me.

8  **Q.**  When was the date, approximately, that you went over it

9  beginning to end?

10  **A.**  Let's see.  The 9th of this month -- of last month, the

11  9th of January.

12  **Q.**  About five weeks ago, would you say?

13  **A.**  Yeah.

14  **Q.**  What location was that?

15  **A.**  At the Sea-Tac Bureau of Prisons, F.D.C.

16  **Q.**  How much time did you spend with him on that day?

17  **A.**  Let's see.  We did it quickly, maybe two-and-a-half, three

18  hours.

19  **Q.**  And the abbreviated times, when were they?

20  **A.**  Let's see.  Sometime last week he asked me in more detail

21  some of the questions.

22  **Q.**  In more detail, you say?  Is that what you just said?

23  **A.**  We went through it more slowly.

24  **Q.**  More slowly?

25  **A.**  Uh-huh.

1 **Q.** Where was that location?

2 **A.** Last week, that was at Sea-Tac F.D.C.

3 **Q.** How much time did you spend with him on that day?

4 **A.** We didn't spend very long on that, but I spent a number of

5 hours with him that day.

6 **Q.** I am missing you. You didn't spend much time --

7 **A.** We didn't spend much time on that, the abbreviated going

8 over the questions again, but I spent a significant amount of

9 time with him that day.

10 **Q.** Talking about the case?

11 **A.** Talking about my concerns, talking about all sorts of

12 issues, yeah.

13 **Q.** I want to go back to what you remember about Briana

14 Waters, if anything, Briana Waters saying things to you that

15 were unpleasant to hear, accusing you of being an unprincipled

16 person. I want to go back to that.

17 Do you regard yourself as a feminist?

18 **A.** Yeah, I would call myself a feminist.

19 **Q.** Do you remember Briana Waters excoriating you for your

20 conduct with regard to her boyfriend as being very much

21 anti-woman and anti-feminist?

22 **A.** I didn't remember that until you -- you know, basically

23 that language you are using is familiar to me, and that

24 reminds me that happened. I didn't have an independent memory

25 of that until you mentioned it.

1    Again, I will just reiterate that if she excoriated me, I
2 did not realize that Justin Solondz was her boyfriend.  In
3 fact, Justin told me otherwise.
4 **Q.** I am sorry?
5 **A.** Justin told me otherwise.  Not in the course of, you
6 know, in the course of building a friendship.  He told me that
7 he was going through problems with his ex-girlfriend, who was
8 unhappy because they broke up.
9 **Q.** This was the same time that you were planning and
10 committing an arson, isn't that correct, in the same time
11 period?
12 **A.** Over the course of weekends that I spent there, I came to
13 understand that he was having tension with this close friend
14 who he had been in a relationship with, and they were
15 transitioning out of that relationship.
16 **Q.** That's what you say he told you?
17 **A.** That is what I say he told me, yes.
18 **Q.** Am I correct that you are now seeming to recall that there
19 was some unkind things said to you by Briana Waters relating
20 to what she regarded as your having a sexual affair with her
21 boyfriend?  Are you recalling that now?
22 **A.** Just to make it clear, you've triggered a very hazy memory
23 of something that could have happened.  Generally, I wouldn't
24 put such a hazy memory out there without being much more sure
25 of it.  But that sounds somewhat familiar to me, yes.

**Q.** When you were asked the question yesterday, and again today, about bearing any ill will toward Briana Waters, is it fair to say that it would be a normal human reaction to bear some ill will toward a person who was calling you really unpleasant names, names that -- not dirty words, but pinpointing or describing your unprincipled behavior, and somebody as to whom you might want to -- think you might be feeling some ill will? If I were to call you those names, you wouldn't like that, would you?

**A.** There was a number of questions there.

**Q.** You are right, and I am going to withdraw them all and try to make it clearer.

**A.** Okay.

**Q.** It seems to me your memory of being excoriated by Briana Waters is now being somewhat revived or being refreshed; is that fair to say?

**A.** I don't have any independent memory of that. You have reminded me of something hazy in the back of my mind. So hazy, I wouldn't normally acknowledge it, put it out there without being much more sure of it.

**Q.** And is it your testimony that however hazy that memory might be, that that would not, in any way, have triggered, in your mind, some ill will from you to Briana Waters?

**A.** I think if I felt that there was a genuine misunderstanding happening, I wouldn't bear ill will. I also,

1  you know, because I have conflict with people, doesn't mean

2  that I hate them.

3  **Q.**  If somebody called you an unprincipled slut, or words to

4  that effect, do you think you might bear ill will toward such

5  a person?

6  **A.**  If such a person had information that was inaccurate, I

7  would not bear ill will towards that person.

8  **Q.**  What if a person had information that was accurate, based

9  on the fact that you had spent time in the bus, in his bed,

10  would that make a difference?

11  **A.**  If I was an unprincipled slut, would it bother me to be

12  called that?

13  **Q.**  Yes.

14  **A.**  I don't know, because I am not an unprincipled slut.

15  **Q.**  And that's not what happened, you weren't called that in

16  so many words by Briana Waters?

17  **A.**  I don't have a particular -- unprincipled sounds familiar.

18  Slut, I don't know.

19  **Q.**  And who is Jeff Hogg?

20  **A.**  Jeff Hogg is my ex-boyfriend.

21  **Q.**  Another ex-boyfriend -- I am sorry.  How many

22  ex-boyfriends have you had since 1996?

23            MR. FRIEDMAN:  Objection, Your Honor.

24            THE COURT:  Is this thing relevant about this case?

25            MR. BLOOM:  Of course, Judge, this is a woman who

1   cheated.
2          THE COURT:  I don't need you to editorialize
3   anything.  I want you to -- if we are talking about a point in
4   time over the timeframe, let's keep it to that.  Let's not do
5   a life history here.
6   BY MR. BLOOM:
7   **Q.**  Your relationship, you have no respect of the boundaries
8   that women have with their men.  If a man interests you,
9   that's fair game, is that fair to say?
10  **A.**  No.
11  **Q.**  Jeff Hogg, ex-boyfriend, right?
12  **A.**  That's correct.
13  **Q.**  And he's now with somebody named Cecilia; is that correct?
14  **A.**  That's correct.
15  **Q.**  And they have a baby; is that correct?
16  **A.**  That's correct.
17  **Q.**  And you, while you are in jail, are able to make telephone
18  calls; is that correct?
19  **A.**  That's correct.
20  **Q.**  You are able to send e-mails; is that correct?
21  **A.**  That's correct.
22  **Q.**  And have you made telephone calls to their home?
23  **A.**  No.
24  **Q.**  Have you sent e-mails to their home?
25  **A.**  I don't know what computer Jeff uses to read my e-mails.

1  **Q.** Have you sent e-mails to him?

2  **A.** Yes.

3  **Q.** How many?

4  **A.** I don't know.

5  **Q.** What month was it, or date, that you -- I think you

6  described it as self surrendered.  Is that the correct phrase?

7  **A.** I don't know what the correct phrase is.

8  **Q.** How would you describe the day that you decided to start

9  doing your time?

10 **A.** How would I describe it?  Self-surrender is what I call

11 it.

12 **Q.** Self what?

13 **A.** I think there's a slightly different term the BOP uses.

14 **Q.** So when I just said self-surrender and you didn't

15 recognize the term, it's a term that you used, right?

16 **A.** I didn't know if you were trying to get to the technical

17 BOP term.

18 **Q.** You turned yourself in so you could start doing your time

19 for which you are getting credit now; is that correct?

20 **A.** I hop so.

21 **Q.** You've not been sentenced yet; is that correct?

22 **A.** That's correct.

23 **Q.** In fact, your sentence keeps getting put off, doesn't it?

24 **A.** Yes.

25 **Q.** And the reason it gets put off is until after Briana

1    Waters' trial is over?

2    **A.**  That's correct, yeah.

3    **Q.**  And that's happened maybe twice?

4    **A.**  I think so, yes.

5    **Q.**  And you've been ready for sentence, and then you come to

6    learn that Briana's trial is going to be put over to another

7    date, to a later date, right?  And then your sentence will be

8    put over until after that; is that correct?

9    **A.**  That's correct.

10   **Q.**  So they have that, is it correct, in your mind, they have

11   that hanging over your head; that you won't get sentenced

12   until you come in here and you testify against Briana Waters?

13   **A.**  That's correct.

14   **Q.**  We will get back to that in a little while.  But for now,

15   you have, what's called self surrendered -- what month was

16   that?

17   **A.**  I self-surrendered in January 2007.

18   **Q.**  A little over a year ago?

19   **A.**  A little over a year ago.

20   **Q.**  In that period of time, how many e-mails have you sent to

21   Jeff Hogg, your former boyfriend?

22   **A.**  Let's see, maybe 30; I am not sure.

23   **Q.**  And is it correct to say, has he sent e-mails back to you?

24   **A.**  We communicate.

25   **Q.**  And it's legitimate, you don't have to do it in a

1  clandestine way. The jail knows, they have such a program

2  where they -- where they permit e-mail communication with a

3  prisoner and somebody on the outside?

4  **A.** That's correct.

5  **Q.** And I presume that they censor it, they clear both

6  incoming and outgoing, correct?

7  **A.** That's what I think. But they don't tell me how they do

8  things at the BOP.

9  **Q.** But you assume that's true?

10 **A.** I assume that's accurate.

11 **Q.** These approximately 30 e-mails that you've sent to Jeff,

12 has he responded and told you that Cecilia is not at all happy

13 with your contacts with him?

14 **A.** I don't know if he did that in those e-mails. I know that

15 Cecilia doesn't like our interaction, that's true.

16 **Q.** But she being a woman and he being your ex-boyfriend, it

17 doesn't matter to you what she thinks, does it?

18 **A.** Jeff Hogg has been a dear friend for 14, 15 years.

19 **Q.** Has he made it clear that his partner, his life partner, a

20 woman who has born his child, does not want you to be in touch

21 with him? Has he made that clear to you?

22 **A.** I know that Cecilia doesn't like me. Yeah, I know that

23 she doesn't want me to be in touch with him, and I also know

24 that Jeff wants to be in touch with me.

25 **Q.** So it pleases you, you get support from him, is that

1  correct, emotional support?

2  **A.**  I get friendship from him.

3  **Q.**  Do you have any kind of arrangement with him where he will

4  give you support of one kind or another and you do something

5  in return?

6  **A.**  No, other than friendship.  That's what friendship is.

7  **Q.**  Are you aware whether or not he has been involved in

8  activities that might be questionable?

9  **A.**  Jeff went to the book club meetings.

10 **Q.**  Have you told that to anyone before just now?

11 **A.**  Yes.

12 **Q.**  You told it to the authorities?

13 **A.**  Yes.

14 **Q.**  There's no arrangement between you two, that you will go

15 no further than that, than saying he went to the book club

16 meetings, if he remains in support of you?

17 **A.**  No, there's no arrangement between us.

18 **Q.**  So as of now, we've so far talked about Chelsea Gerlach

19 and Stan Meyerhoff, your present fiancee, they were breaking

20 up so it was okay for you to take up with him.  We have that,

21 right?

22 **A.**  I am sorry --

23 **Q.**  Was that your position, that Chelsea Gerlach and Stan

24 Meyerhoff had been a couple for quite some time -- is that

25 correct, were a couple for quite some time?

1 **A.** They were a couple for quite some time.

2 **Q.** And there came a time when he became your boyfriend and

3 then your fiance; is that correct?

4 **A.** Eventually, yes.

5 **Q.** Are you married to him?

6 **A.** No.

7 **Q.** Do you wear a wedding ring?

8 **A.** I have a band on my finger that signifies our engagement.

9 **Q.** Does he have one too?

10 **A.** No.

11 **Q.** Is it an engagement ring or does it look like a wedding

12 ring?

13 **A.** Um, the band on my finger?

14 **Q.** Yes.

15 **A.** It's like a dime store thing that I bought.

16 **Q.** And you wear it on your -- this finger?

17 **A.** I wear it on my ring finger, yes.

18 **Q.** So you are very closely and intimately involved with him;

19 is that correct?

20 **A.** Stan and I have been partners for seven years.

21 **Q.** I am sorry?

22 **A.** Stan and I have been together for seven years.

23 **Q.** And did it come as a shock to you when you learned that he

24 was telling the authorities about your criminal activity?

25 **A.** I don't know what Stan told the authorities about my

1  criminal activities to this day.  That Stan cooperated was

2  probably less shocking than the arrest happening altogether.

3  But it was, you know, upsetting, definitely.

4  **Q.**  From the time he was arrested, December 7, to the time you

5  first spoke to law enforcement, February 21 of '06,

6  approximately two plus months, did you visit him in jail at

7  any time?

8  **A.**  Before I spoke to the FBI?

9  **Q.**  Yes.

10  **A.**  I think I had seen him once.

11  **Q.**  And did he inform you at that time that he had been giving

12  information to the FBI about you?

13  **A.**  When I saw him?

14  **Q.**  Yes.

15  **A.**  No.

16  **Q.**  Did there come a time when he told you he was giving

17  information to the FBI?

18  **A.**  He said something during that very brief phone

19  conversation I had with him, the day after, something very,

20  like fatalistic, that was concerning to me, and I remember

21  clearly having a conversation with him where he told me I

22  betrayed everyone.

23  **Q.**  And by betrayed, you took that to mean what?

24  **A.**  That he was cooperating with the authorities.

25  **Q.**  And did there come a time when you came to believe or

1   understand or know that he had betrayed you?

2   **A.**  I don't know what Stan has told them about me.  Initially

3   I didn't want to say to him, do you remember the time you

4   drove me to Olympia and dropped me off so I would go to an

5   arson, because I didn't really want to trigger that memory.

6       Since then we haven't talked in particular about whether

7   or not he testified against me or cooperated against me.  At

8   times I thought he did and at times I thought he didn't, and I

9   truly don't know.

10  **Q.**  Did there come a time when he told you that he was talking

11  to the FBI and naming names, and you went, like pointing to

12  yourself, and he nodded his head?  Did something like that

13  happen?

14  **A.**  That might be true, yes.

15  **Q.**  When did that happen?

16  **A.**  That might have happened in that visit.

17  **Q.**  At that visit in jail?

18  **A.**  I think I pointed to myself.  I was trying to get from him

19  whether or not definitely.

20  **Q.**  Whether or not he was telling the police, law enforcement

21  officials, about his fiancee's involvement in criminal

22  activity.  That's what you were trying to find out from him;

23  is that correct?

24  **A.**  We weren't engaged at that point, but yes.

25  **Q.**  He was your boyfriend at that time?

1   **A.**  Yes, I wanted to know -- yes.

2   **Q.**  It was difficult to communicate, and it still is when you

3   do communicate, because the authorities -- you believe that

4   the authorities listen to and/or read the interactions between

5   you and other people?

6   **A.**  Yes, I have that.  I don't have any communication with

7   Stan right now, and I haven't had unmonitored communication

8   with Stan since he was arrested.

9   **Q.**  You haven't had unmonitored?

10  **A.**  Since he was arrested.

11  **Q.**  You would always be concerned that you would have to be

12  very cautious about how you said things and what you said, is

13  that fair to say?

14  **A.**  No.  Most of my conversations aren't something where it

15  would be a concern whether or not it was monitored.

16  **Q.**  You keep it general and personal as opposed to talking

17  about criminal defense; is that correct?

18  **A.**  We have -- yeah.

19  **Q.**  Have you belonged to an organization that would be

20  described as a zero population organization?

21  **A.**  I don't think so.  I don't know.

22  **Q.**  I am sorry, you don't think so?

23  **A.**  Do you mean like -- no, I don't think so.

24  **Q.**  Meaning no children; that there are enough people on the

25  earth that people shouldn't have children.

1    MR. FRIEDMAN:  Objection, Your Honor, this is

2 irrelevant.

3    MR. BLOOM:  It is not irrelevant.

4    THE COURT:  I don't know if it is or not because I

5 don't know where you are headed with this, and I don't want

6 you to explain it at this point in time.

7    Can we go on with something else and I will take it up at

8 the break?

9 BY MR. BLOOM:

10 **Q.**  You know, do you not, from looking at her website that

11 Ms. Waters has a child, a three-year-old child?  You know

12 that, do you not?

13 **A.**  I know she has a child.

14 **Q.**  Am I correct that there have been times when you have

15 expressed disdain for people who have children and called them

16 breeders, in a derogatory manner?

17 **A.**  I don't think I have called people breeders.

18 **Q.**  Have you thought, in those terms, that people should not

19 have children?

20 **A.**  There were always people involved in Earth First who felt

21 that because overpopulation is a significant environmental

22 issue, that the key was to not have children.  That was never

23 a particular belief of mind.  Just generally, I don't think

24 that -- it seems like kind of bizarre to think that if you had

25 a vasectomy, therefore you would solve the environmental

1  problems of the environment.  I never really supported that

2  idea.

3  **Q.**  And you are not a person who has referred to people with

4  children as breeders?

5  **A.**  I am not saying the word never came out of my mouth, but I

6  don't think -- it's not what I think of people who have

7  children.

8  **Q.**  Now, you are a person who grew up in a fairly well-to-do

9  home; is that correct?

10 **A.**  No.

11 **Q.**  Your parents are both partners a law firm, a successful

12 law firm in Spokane?

13 **A.**  They are now.

14 **Q.**  They have been lawyers for quite some time?

15 **A.**  My father has been a lawyer for a long time, and my mother

16 finished law school when I was in junior high.  There was four

17 of us, and my father's sole practitioner business was not

18 immediately successful.  So I don't consider that I grew up

19 rich and spoiled.

20 **Q.**  Well, did I say rich and spoiled?

21 **A.**  No, you didn't say that.

22 **Q.**  Did you grow up in an upper middle class home?

23 **A.**  No, I would say we were middle class during my youth.

24 **Q.**  Do you remember when you were an editor for the Earth

25 First Journal?  Do you remember that period?

1  **A.**  Of course, yes.

2  **Q.**  Do you remember writing some pieces for the Earth First

3  Journal?

4  **A.**  Yes.

5  **Q.**  Do you remember writing:  As much as I rage against it, my

6  family is upper middle class, white and typical?

7  **A.**  By the time I wrote that, my family probably would be

8  considered upper middle class.

9  **Q.**  That would be March of 1997?

10  **A.**  Yes.

11  **Q.**  You didn't say that they were upper middle class now.

12  **A.**  They are upper -- I mean, I don't know how much my parents

13  earn.  I think they are upper middle class.  That would be

14  fair probably in most people's terms.

15  **Q.**  You said a few moments ago you are not spoiled and rich;

16  is that correct?

17  **A.**  I said I didn't grow up spoiled and rich, but neither am I

18  spoiled and rich.

19  **Q.**  And you grew up in Spokane; is that correct?

20  **A.**  That's correct.

21  **Q.**  You were a good student; you are a smart person?

22  **A.**  I was a good student, yes.

23  **Q.**  You were on the debating team?

24  **A.**  Yes.

25  **Q.**  And you spent some of your time as a racing skier; is that

1  correct?

2  **A.**  I ski raced as a child, yes.

3  **Q.**  When you went to -- is it University of Oregon?

4  **A.**  I am sorry, what?

5  **Q.**  The college was where?

6  **A.**  I went to the University of Oregon.

7  **Q.**  Were you on the debating team there?

8  **A.**  Well, between working part-time to pay for my tuition, the

9  student loans I was taking out, my parents' support and the

10  academic scholarships that I had, I was pretty focused on my

11  studies and was not able to continue to be at the University

12  of Oregon.

13  **Q.**  Were you a debater in high school?

14  **A.**  Yes.  And I did debate, I think, my first quarter at the

15  University of Oregon.

16  **Q.**  So you have debating skills; is that correct?

17  **A.**  Yes.

18  **Q.**  And you are a writer, that's correct?

19  **A.**  That's correct.

20  **Q.**  A journalist?

21  **A.**  That's correct.

22  **Q.**  And you have a way with words, do you not?

23  **A.**  Yeah.  That didn't sound like I did, but yes.

24  **Q.**  I am sorry?

25  **A.**  That didn't sound very eloquent, but yes.

**Q.** You have a way with the written word and spoken word; is that correct?

**A.** I feel like I have kind of lost my public speaking abilities, but, yes, I was practiced at public speaking when I was in high school and I was quite good at it, yes.

**Q.** Well, you have an audience of 14 people here, before whom you are speaking. Now, you know that, don't you? You are very conscious of that.

**A.** Yes.

**Q.** As you say, you haven't been sentenced yet. Correct me if I am wrong. The deal you have is that the best sentence you can get is three years in prison, and the worst sentence you can get is five years in prison, if the deal -- if you stay with the deal. Is that your understanding?

**A.** My understanding is that it's a closed deal, and the best sentence I can get is three years, and the longest I could do is five.

**Q.** Is it correct to say it's Judge Burgess that will be sentencing you?

**A.** Yes.

**Q.** It was before him that you pleaded guilty?

**A.** That's correct.

**Q.** Is it correct that one of the things, one of the inputs in your sentence is what these men, sitting at this table, tell the man sitting up there on the bench about what they

1  recommend?

2  **A.** That's my understanding how it usually works, yes.

3  **Q.** So, is it fair to say that you have a high degree of

4  incentive to please the people sitting at this table with your

5  testimony?

6  **A.** I am not particularly motivated by my plea agreement.  My

7  plea agreement, I am committed to fulfilling.  I feel my

8  emotional and moral commitment is due to my responsibility to

9  the researchers.

10  **Q.** You know what, could I just ask you to repeat the last

11  part and pull the microphone a little closer?

12  **A.** Yeah.

13  **Q.** Thank you.

14  **A.** I am committed to the plea agreement and my emotional and

15  moral commitment, which really has really driven me to be

16  fully honest to the researchers who I victimized.

17  **Q.** And it's not relevant to you whether you get three years

18  or five years?

19  **A.** It's of course relevant to me.  I'd rather do three years

20  in prison than five, but I can do no more than five years,

21  even if I were to come in here and testify unconvincingly.

22  **Q.** What if you were to testify that I made it up about Briana

23  Waters, I wasn't telling the truth, and I am not telling the

24  truth?  Would it be three years or five years, or the deal is

25  over and 35 years?

1   **A.**   The deal would be over if I said that I lied.

2   **Q.**   So, your story that you told, beginning in February of

3   2006, that Briana Waters was involved in the arson that you

4   committed, that's "the truth," that's what you have to testify

5   to to keep your deal, is that correct?

6   **A.**   Yes.

7   **Q.**   And it's also true, if I ask you or Mr. Friedman asks you,

8   are you telling the truth, of course you are going to say,

9   yes, I am telling the truth?  That's part of your

10   understanding, right, not only tell the truth, but say you are

11   telling the truth?

12   **A.**   They are one and the same to me.

13   **Q.**   Now, I notice that yesterday and today you are wearing, I

14   guess, what would be called prison attire?

15   **A.**   That's correct.

16   **Q.**   Where are you, at Sea-Tac?

17   **A.**   Uh-huh.

18   **Q.**   Is that a federal facility?

19   **A.**   That's a Federal Detention Center.

20   **Q.**   Is it your understanding that you had to wear prison

21   clothes to come and testify?

22   **A.**   I don't know.

23   **Q.**   Did you discuss with Mr. Friedman whether or not you could

24   wear street clothes, civilian clothes?

25   **A.**   I wanted to wear street clothes, yes.

**Q.** And how was it -- who said you can't?

**A.** I don't know why I could not. Mr. Friedman told me it would be important for me not to be wearing street clothes, as though I were trying to deceive about where I am.

**Q.** Trying to deceive. Did Mr. Friedman tell you anything, like you would look more sympathetic and tragic if you wore prison clothes?

**A.** I didn't want to look sympathetic and tragic. I wanted to look normal.

**Q.** That's what you wanted. My question is, did he say to you, no, I want you to look pathetic, because that way the jury will relate to you better?

**A.** No, he definitely never said anything about sympathy.

**Q.** But in someway or another, the authorities were responsible for how you come to court, how you are dressed when you come to court, no civilian clothes; is that correct?

**A.** Yes, I am not wearing civilian clothes. It was conveyed to me I shouldn't wear civilian clothes. I think an effort would have had to have been made to put me in civilian clothes.

**Q.** A little louder?

**A.** I think an effort would have had to be made for me to be able to wear civilian clothes also.

**Q.** And the other would be your family or your friends --

**A.** I think the BOP would have had to approve of it, but I

1  don't know.

2  **Q.** I'm sorry?

3  **A.** I think the BOP or the judge or someone would have had to

4  approve it.  A request would have to be made to someone, I

5  don't know, and that would have to be approved.  And I don't

6  know what the criteria was, and it wasn't that important to

7  me.

8  **Q.** And is it, in your mind, that that wouldn't have been

9  easily dealt with by a request in to the judge or to the

10  Bureau of Prisons or whomever?

11  **A.** I don't deal with the BOP very much.  Nothing is easily

12  dealt with by the BOP.

13  **Q.** What I'm saying, if you wanted to wear civilian clothes --

14  and you told that to Mr. Friedman; is that correct?

15  **A.** Yes.

16  **Q.** And for reasons you don't know, that got nixed.  They said

17  it's not going to happen, you are going to wear jail clothes?

18  **A.** The reason that I was told was that because I did not want

19  to be up here, to be hiding that I was in prison or hiding

20  anything.

21  **Q.** It didn't occur to you that somebody, like me, or Mr. Fox,

22  would ask if you are in jail?  The question wouldn't have come

23  up.  You thought you would have just stood there -- or sat

24  there, rather, in civilian clothes, and it wouldn't have come

25  up about where you are living?

1 **A.** I don't know.

2 **Q.** Was that in your mind?

3 **A.** I thought it would be -- I don't know what the standard

4 protocol is. I thought it would be out there that I was in

5 prison, yes.

6 **Q.** And you in fact put it on your website, that you were self

7 surrendering, a little over a year ago and that you were going

8 to be in jail?

9 **A.** My friends put it on that website. I didn't put it there,

10 but they did.

11 **Q.** You are aware, it's public information that you have been

12 in jail for a little over a year?

13 **A.** Yes.

14 **Q.** Now you say you haven't been in touch with Jennifer Kolar

15 since the arson?

16 **A.** No. One time after the arson I saw her.

17 **Q.** I am sorry, you did say that. When was that?

18 **A.** At a meeting in Sisters, Oregon, shortly after the arson.

19 **Q.** That was a book club meeting?

20 **A.** Yeah.

21 **Q.** About how long after the book club meeting was that?

22 **A.** I am not sure. I think it was shortly thereafter, a

23 number of days.

24 **Q.** A week, two weeks, three weeks, four weeks, in that range?

25 **A.** Closer to a week than four weeks, but I don't know.

1   **Q.** That was in a small town in Oregon called Sisters?

2   **A.** That's correct.

3   **Q.** Was it near where you were living?

4   **A.** No, I wasn't living there at the time.

5   **Q.** Where were you living?

6   **A.** I lived in Eugene through December 2001.

7   **Q.** So you were there about a week after, a week or so after

8 the arson; is that correct?

9   **A.** At a meeting, yes.

10   **Q.** So you were still into book clubs -- what's also called

11 incubator meetings; isn't that correct?

12   **A.** I never heard that term before the pleadings. I think I

13 saw it in the pleadings.

14   **Q.** Let's call it book club meetings. The reason it was

15 called book club, they didn't want to call it arson club,

16 right?

17   **A.** No, it wasn't arson club.

18   **Q.** It was about actions and how radical environmentalists,

19 such as yourself, were going to bring down the

20 anti-environment establishment, is that what those meetings

21 were about?

22   **A.** It was also about philosophy and, yes, I was a radical

23 environmentalist.

24   **Q.** So a week after that -- let me withdraw that.

25      The day after the arson, you saw newspaper articles,

1   television reports about the arson; is that correct?

2   **A.**  Yes, I think so.

3   **Q.**  Was it then that you started to feel bad about the arson

4   and the results of it and the books that were lost?

5   **A.**  No.  I kind of freaked out when I heard the firefighters,

6   and I at first didn't read about the books that were lost and

7   the other facilities that were involved.

8   **Q.**  Please keep your voice up.

9   **A.**  Oh, okay.

10   **Q.**  Whatever it was you felt, you weren't feeling remorse at

11   the time you went to the book club meeting in Sisters, were

12   you?

13   **A.**  I don't know what I felt at that time.

14   **Q.**  You were still into it; is that correct?

15   **A.**  Into arson, no.

16   **Q.**  No, into the book club meeting and theorizing how to

17   undermine the corporate establishment.

18   **A.**  I was still radical at that point, yes.

19   **Q.**  Who else was at that meeting?

20   **A.**  Also at that meeting was Nathan Block, Joy Zacher, Chelsea

21   Gerlach, myself, Jeff Hogg.  A woman named Diana Robin.  Jen

22   Kolar came at some point.

23   **Q.**  I am sorry?

24   **A.**  Jen Kolar came at some point.

25      Did I say Stan Meyerhoff?

1   **Q.** You didn't say that.

2   **A.** Daniel McGowan.

3          THE COURT:  Let's stop at this point.

4          MR. BLOOM:  Can I just ask one question?

5   BY MR. BLOOM:

6   **Q.** Briana Waters, was she there?

7   **A.** No.

8          THE COURT:  Let's take the morning recess.  Of course

9   you don't discuss the case.  Leave your books on the chair,

10  and I will have you back in here.

11         THE CLERK:  All rise.  Court is in recess.

12     (Morning recess.)

13     (Jury not present.)

14         THE COURT:  You may be seated.  Ready to continue,

15  Mr. Bloom?

16         MR. BLOOM:  Yes, I am.

17     (Jury present.)

18         THE COURT:  You may be seated.

19     Mr. Bloom.

20  BY MR. BLOOM:

21  **Q.** We left off with the meeting at Sisters, Oregon, and it

22  was a week or so after the arson that you had committed.

23     Prior to that, there were four other book club meetings;

24  is that correct?

25  **A.** Yes.

1   **Q.** The first one was where and when?

2   **A.** Eugene, Oregon, March 2000.

3   **Q.** Who was there?

4   **A.** At the first meeting was me, Jeff, Vernell Lundberg, Al

5   Decker, Ron Coronado, Avalon, a man whose name I don't know

6   but we called Tumbleweed, Suzanne Savoie. I am not sure if

7   Nathan and Joy were there. A man from Tucson, Arizona, who I

8   knew as Rubin, and two men from Santa Cruz, California. Did I

9   say Diana Robin? She was there, and I think I said Jeff Hogg.

10   **Q.** You did. When was that?

11   **A.** March 2000.

12   **Q.** Briana Waters, was she there?

13   **A.** No, she was not there.

14   **Q.** In what kind of location was this meeting?

15   **A.** There was a conference going on at the same time, which is

16   why people were in town.

17   **Q.** Could you speak a little louder.

18   **A.** There was a conference going on at the same time, which is

19   why people were in town. It was at the hotel. I think it

20   might have been Vernell Lundberg and Al Decker's hotel room,

21   but I am not sure.

22   **Q.** So this group of people you named, about 13 to 15 people,

23   met in a room?

24   **A.** Yes.

25   **Q.** And you didn't meet in a room like a public room, you met

1 in a private room; is that correct?

2 **A.** Yes, it was a hotel room.

3 **Q.** Now, there came a time when you say that there was -- the

4 first time you say that you met Briana was at a Denny's in

5 Olympia; is that correct?

6 **A.** Yes.

7 **Q.** And there was a meeting, you say, involving five people;

8 is that correct? Or was it four people?

9 **A.** There were -- I think there were five people there. I

10 believe Jen Kolar was there, but I am not sure, and I would

11 not necessarily characterize it as a meeting, as in where

12 business was discussed but a meeting as in people met up

13 there.

14 **Q.** Could I ask you, don't drop your voice, please.

15 So you met there. How long did you stay? You said it was

16 a Denny's?

17 **A.** A Denny's, yes.

18 **Q.** Is there a chain of restaurants also called Perkins?

19 **A.** Yes.

20 **Q.** Was it a Perkins or was it a Denny's?

21 **A.** I believe it was a Denny's.

22 **Q.** How long did you stay at Denny's on that occasion?

23 **A.** Maybe an hour, I am not sure.

24 **Q.** Did you have breakfast, lunch, whatever?

25 **A.** It was evening. I think someone ordered -- I think

1  someone ordered some food because it was weird if we sat there

2  without ordering food.

3  **Q.** You didn't want to look weird, right?

4  **A.** No, I didn't.

5  **Q.** Didn't want to draw attention to yourselves; is that

6  correct?

7  **A.** That's correct.

8  **Q.** Somehow Avalon -- who organized this meeting? Was it

9  Avalon?

10 **A.** I don't know, I was dropped off by Stan. I don't know who

11 organized the meeting.

12 **Q.** Was Avalon one of the people that was there?

13 **A.** Avalon was there.

14 **Q.** He was involved in the planning of this arson; is that

15 correct?

16 **A.** I believe he was. He was involved completely from the

17 time that I was involved.

18 **Q.** You know that he has written a manual on how to do arsons;

19 is that correct?

20 **A.** I believe that's true, yes.

21 **Q.** And did anyone else write such a manual that you know of,

22 Stan Meyerhoff?

23 **A.** I think Stan and Avalon worked together on the manual,

24 although Stan's not a very talented writer. He is now, but he

25 was not at that point, and I think Avalon did the writing and

1    Stan had the knowledge.

2    **Q.** Now, one of the things that I think you said is that at

3    all the meetings, the book club meetings, security was a big

4    time event; is that correct?

5    **A.** No. At the later meetings, it became increasingly

6    important.

7    **Q.** And it wasn't just security at the book club meetings, it

8    was security in general about how you contacted people or

9    declined to contact people and how you would do that and how

10   you would do encryptions and things of that nature; is that

11   correct?

12   **A.** Yes. Security was important.

13   **Q.** So by May of 2001, there was a lot of encrypting and

14   secrecy going on amongst this group of people; is that

15   correct?

16   **A.** No. I only ever received one encrypted e-mail message

17   that I remember.

18   **Q.** I'm sorry, could you say that louder?

19   **A.** No, I only ever received one encrypted e-mail message that

20   I remember.

21   **Q.** Were there concerns about security, people who said don't

22   make phone calls, don't do e-mails?

23   **A.** Yes, that was a big concern.

24   **Q.** Right. Did it strike you as odd that people who were

25   going to do some kind of criminal action were meeting in a

1 public place like Denny's?

2 **A.** No, that was consistent with our security culture. Not

3 talking about criminal activity at that place was important,

4 but meeting in public, not associated with outdoor places,

5 careful where we had conversations.

6 **Q.** So when you left Denny's, did you go off to the woods

7 somewhere and talk about it?

8 **A.** I don't remember for sure where we went.

9 **Q.** Well, think about it. You've been able to give -- just a

10 few minutes ago, I asked you who was at the first book club

11 meeting, and you were able to remember those details pretty

12 well; is that correct?

13 **A.** I remember that clearly, yes.

14 **Q.** Now, the first meeting where you claim that's the first

15 time you met Briana Waters, did you talk about any kind of

16 arsons while you were at Denny's?

17 **A.** I don't think we talked about arson explicitly or

18 criminality very much at all while we were at Denny's.

19 **Q.** So my question is, when you left Denny's, did you go

20 somewhere else so that you could talk in a place where the

21 waiters weren't listening?

22 **A.** Probably. That would make sense. I had no idea what the

23 plan was, so I had to be told at some point.

24 **Q.** Well, whatever you were told or not told, I am asking you

25 to search your memory. Did you leave Denny's and go to a

1  place where you could discuss the arson that you say was being
2  planned?  Did you do that?
3  **A.**  The next clear memory I have is running on the track the
4  next morning near Briana's house.
5  **Q.**  Now, that was a person who turned out to be the girlfriend
6  of Connor or Justin; is that correct?
7  **A.**  I am sorry, I don't know what the status of their
8  relationship was at that point.
9  **Q.**  Now, you don't remember -- let me withdraw that.
10      Are you saying you don't remember what happened from the
11  time you left Denny's to the time you were running on the
12  track?  Is that what you are saying?
13  **A.**  I have a clear memory of being at Denny's, and I have a
14  clear memory of running on the track, yes, that's what I am
15  saying.
16  **Q.**  Now, prior to the events of May of 2001, had you ever
17  committed an arson?
18  **A.**  No.
19  **Q.**  So this is -- the events surrounding your involvement in
20  the arson would be something that you would have a clear
21  memory, a distinct memory about; is that correct?
22  **A.**  The memories that I have are distinct, yes.
23  **Q.**  But you are saying the events between leaving Denny's and
24  running on the track, you have no clear memory of that?
25  **A.**  My memory tends to work in not movie length feature.  It's

1  shots of things I remember.

2  **Q.** Now, there came a time starting December 7, 2005, when

3  Stan got arrested, and other people got arrested as well, that

4  you must have thought, uh-oh, I could be next?

5  **A.** Yes.

6  **Q.** Did you start thinking about what had you done?

7  **A.** Yes.

8  **Q.** Did you discuss that with your parents?

9  **A.** I discussed at one point the arson with my parents, as my

10  attorneys. I asked them for legal advice.

11  **Q.** I am sorry, could you say that again?

12  **A.** We were very explicit that I was having a privileged

13  attorney-client conversation with them.

14  **Q.** With your parents?

15  **A.** My parents acted as my attorneys, yes.

16  **Q.** So you said to them -- these are your parents, your mother

17  and father -- I want to make sure I can trust you to not give

18  out this information, so you said let's be attorney/client?

19  Is that more or less what you are saying?

20  **A.** No. I was saying that I needed legal advice, and I turned

21  to my parents. Obviously, there's a blending of roles there

22  but --

23  **Q.** When was this in relation to December 7th? When did this

24  conversation take place?

25  **A.** I am not sure. It was after I returned to Spokane.

1   **Q.** When was that?

2   **A.** I think the date was like December 11th or 10th. I am not

3   sure.

4   **Q.** Three, four or five days after Mr. Meyerhoff had been

5   arrested?

6   **A.** Yeah, both Mr. Meyerhoff and I had cleared our schedules

7   because we both intended to do a bit of traveling over that

8   holiday. I was not expected back to work in Washington, D.C.

9   until January.

10  **Q.** You were going to go to a wedding in Mexico; is that

11  correct?

12  **A.** We were going to go to a wedding, and then we were going

13  to go to his mother's house, and then we were going to go to

14  my parents' house.

15  **Q.** And the wedding in Mexico, was it Jeff or Josh?

16  **A.** No, it was in Costa Rica. It was a friend, Josh Laughlin.

17  **Q.** And Katie Higgins?

18  **A.** That's correct.

19  **Q.** And they live in Eugene?

20  **A.** They live in Eugene, yes.

21  **Q.** Did you ever speak to FBI agents in Eugene, after February

22  21st of 2006?

23  **A.** Did I ever speak to FBI agents in Eugene?

24  **Q.** Yes.

25  **A.** No. I believe that there may have been agents at the

1  Portland office at, at least one of the interviews that I did.

2  **Q.**  When was that?

3  **A.**  The interview?

4  **Q.**  Yes.

5  **A.**  I am sorry, I don't have the dates of the interviews

6  readily available.

7  **Q.**  Was that at a time when you were staying with Josh and

8  Katie?

9  **A.**  No.  The only interviews I ever did were in Seattle, one

10  time I went to Olympia, but I did not speak with the FBI while

11  I was staying with Josh and Katie.

12  **Q.**  Now, you saw Jennifer Kolar in May of 2001 at Sisters,

13  Oregon; is that correct?

14  **A.**  Yes.

15  **Q.**  And did you and she have any private conversations about

16  the arson that you had done the week before?

17  **A.**  A group of us spoke at one point.  It wasn't just Jen and

18  I.

19  **Q.**  Was this in a room in a hotel, or where was it?

20  **A.**  We were camping, and we walked up the road a little bit

21  away from the people who were in the book club but not

22  involved in the arson.

23  **Q.**  Who was in this group of people?

24  **A.**  That walked away together?

25  **Q.**  Yes.

**A.** Myself, Jen Kolar. Avalon, Briana and Justin were not there.

**Q.** I am sorry. Could you start over. You said Jen Kolar, and then you said Avalon, Justin and Briana, thinking that you were going to say that they were there, but they were not there?

**A.** They were not there.

**Q.** Avalon, Justin, Briana were not -- were they at the -- any of them at the general meeting?

**A.** My co-conspirators were not there.

**Q.** Your co-conspirators, the people you were saying that you committed the crime with; is that correct?

**A.** Right. When I am thinking about who was there, I am thinking about the people involved in the two individual crimes. The two people from the University of Washington who were there were me and Jen Kolar, and then Nathan Block, Suzanne Savoie, Stan Meyerhoff, Daniel McGowan and I believe Joy were all there as well. All of the people involved in the other half of the two arsons.

**Q.** Now, are those the people who walked away and had a meeting somewhere?

**A.** Yes.

**Q.** Yourself and Kolar who had burned down the University of Washington building, right?

**A.** Yes, we were responsible for that in part, yes.

**Q.** Then five people, as you understood it, who had been involved in the other incident?

**A.** That's what I understood, yes.

**Q.** Was there any discussion at that walk-away meeting that Justin's car was used at that incident?

**A.** I don't know.

**Q.** Was there any discussion about who had driven to that location, Jefferson Poplar Farm?

**A.** I don't know.

**Q.** Did you express remorse for what had happened a week or two earlier at the Center for Urban Horticulture?

**A.** I don't believe I did.

**Q.** Did Kolar do so?

**A.** I don't have a memory of that.

**Q.** Did anyone express remorse in that walk-away group?

**A.** I don't have a particular memory of very much that was said there.

**Q.** In fact, you were kind of thrilled that you had accomplished something, weren't you?

**A.** There was definitely a feeling of we accomplished something, yes. We did something big, yes.

**Q.** And you were proud of yourself, weren't you?

**A.** I would say yeah, at that point I was probably proud of what I had done.

**Q.** Now, since that day or that meeting -- how long did that

1 meeting go?  One day?  Two days?  Three?

2 **A.**  Let's see, we spent at least one night there, maybe two,

3 in Sisters camping.

4 **Q.**  After that meeting, it's your position that you have not

5 seen Jennifer Kolar since then; is that correct?

6 **A.**  That's correct.

7 **Q.**  It is your position that there has been no communications

8 between the two of you?

9 **A.**  That's correct.

10 **Q.**  Have you come to learn from Mr. Friedman or Agent Halla or

11 anyone else that, to this day, Jennifer Kolar has not

12 identified you as being at the UW fire?

13 **A.**  I learned that first, I believe, from your pleadings.

14 **Q.**  Did you and Jennifer Kolar have some agreement that you

15 would not name each other if you were ever apprehended?

16 **A.**  We all had that agreement.

17 **Q.**  You understand that Jennifer Kolar is cooperating with the

18 United States Government in this arson; is that correct?

19 **A.**  In the investigation, yes.

20 **Q.**  You understand that she has pled guilty, as you have, to

21 burning down the Center for Urban Horticulture?

22 **A.**  That's correct.

23 **Q.**  Can you think of any reason, other than an agreement

24 between you two, that she has failed to name you as being

25 involved?

1  **A.**  Maybe she doesn't remember.

2  **Q.**  Jennifer Kolar, not unlike yourself, is a very intelligent

3  woman; is that correct?

4  **A.**  In my interactions with her, I thought she was smart, yes.

5  **Q.**  She was a Ph.D. candidate at some point; is that correct?

6  **A.**  I know that from your pleadings.

7  **Q.**  You know that she was a -- has a master's degree in some

8  astrophysics type of study; is that correct?

9  **A.**  I didn't know that except -- no, I didn't really know

10  that.

11  **Q.**  You know that she has a substantial employment as a

12  computer person, programmer, expert, you know that, right?

13  **A.**  No, I don't know what she does.

14  **Q.**  You never knew that about her?

15  **A.**  When I was interacting with her and we were friends, I

16  guess, I think she might have been between jobs, but I am not

17  sure.  I knew that she did computer science type stuff, yes.

18  **Q.**  So, is it your -- I think you said a few minutes ago that

19  the reason you might ascribe to her failing to identify you is

20  that she forgot?

21  **A.**  I have no idea.  I don't know, I am sorry.  I am Lacey,

22  and not Jen.

23  **Q.**  Did you, Lacey, have a discussion with Jen saying, let's

24  not name each other?

25  **A.**  No, I never had -- well, I mean, I did the weekend before

1  the arson.  I believe we all had that discussion, yes.  And

2  since then, no, never.

3  **Q.**  And you, as a principled person, have abrogated that

4  understanding, have violated that understanding; is that

5  correct?

6  **A.**  I broke a promise that I made, yes, in order to tell the

7  truth here today.

8  **Q.**  And in breaking that promise, you are naming Jennifer

9  Kolar and she's not naming you?  Does that strike you as odd?

10  **A.**  It strikes me as odd that Jen doesn't remember me, yeah.

11  Although, since she was never in Olympia, she might not

12  remember me.

13  **Q.**  I am sorry?

14  **A.**  Since she was not -- I'm sorry, she wasn't in Olympia.

15  She wasn't at Briana's that I remember.  I was involved at the

16  last minute, I believe.

17  **Q.**  You were involved at the last minute, but the week before

18  you say you were at three meetings?

19  **A.**  A lot of groundwork would have had to go into the arson,

20  as I understand it, and I was not involved in that sort of

21  groundwork.

22  **Q.**  Part of the groundwork, is it correct, according to you

23  was getting a car; is that correct?

24  **A.**  Yeah.

25  **Q.**  Is it correct that in the writings of your

1  boyfriend/fiancee Meyerhoff and Avalon, one of the critical

2  things they say is you have to have the car arranged, if you

3  are going to get a car, at least 36 hours beforehand.

4  Do you remember reading that in any manual?

5  **A.**  No.  I don't read that type of manual.

6  **Q.**  You were involved in an arson; is that correct?

7  **A.**  If you are talking about that manual they wrote --

8  **Q.**  I am talking about that, yes.

9  **A.**  I have never read it.  It doesn't make sense to me.  I

10  can't do that, what is described in there.

11  **Q.**  The manual wasn't just about how to put the device

12  together to start a fire.  It was about preparing to do so; is

13  that correct?

14  **A.**  I don't know.  I have never read it.  You've clearly read

15  it more thoroughly than I have.

16  **Q.**  And you were comfortable going on this action without

17  having read that; is that correct?

18  **A.**  I never read the manual, that's true.

19  **Q.**  Now, we talked about the first time you spoke to law

20  enforcement about your involvement in this crime, and that

21  was, am I correct, about two-and-a-half months after Meyerhoff

22  and the other people were arrested, February 21?

23  **A.**  Yeah, almost three months, yes.

24  **Q.**  And am I correct that you are saying you've testified

25  here, that sometime after the arson, May of '05 -- I am sorry,

1    May of '01 -- you began to feel remorse; is that correct?

2    **A.**   Yes.

3    **Q.**   When was that?

4    **A.**   Well, of really significant note in my mind, an odd note,

5    a jarring note, that has always stuck out in my head --

6    **Q.**   A little louder.

7    **A.**   One thing that always stuck out in my head was hearing

8    those radio transmissions of the firefighters, and it's been a

9    very long process and really -- and also a very important

10   point was being held to account by the Government.  That made

11   me, you know, look at something that I didn't want to

12   re-evaluate, unlike Stan who did force himself to re-evaluate

13   it.

14   **Q.**   Well, I think you are saying that that very morning,

15   hearing the firefighters and hearing that they might be in

16   danger, began to trouble you; is that correct?

17   **A.**   That always stuck out in my head as a very jarring note,

18   yes.

19   **Q.**   And a week later in Sisters, Oregon, you were proud of

20   what you had done?

21   **A.**   Are you asking me a question?

22   **Q.**   Yes, I am.  I should say:  Were you, a week later at

23   Sisters, Oregon, at the book club meeting, one that was not

24   attended by Briana Waters -- in fact, none of them were

25   attended by Briana Waters, zero, none, right?

1  **A.** That's correct; she was at none of the book club meetings.

2  **Q.** You said a few minutes ago that you began to feel troubled

3  when you heard the firefighters' interchanges on their

4  scanner; is that correct?

5  **A.** Yes.

6  **Q.** Yet, am I correct that a week later, you were proud of

7  what you had done at the -- burning down the Center for Urban

8  Horticulture?

9  **A.** Yes.  I am ashamed to admit that I was proud to have

10  gotten away with a major federal crime.

11  **Q.** So your act here is shame.  Ladies and gentlemen of the

12  jury, I am ashamed of what I have done and I am here, and I am

13  just going to tell you the truth.  That's your story, right?

14       MR. FRIEDMAN:  Objection, Your Honor, this is

15  argumentative.

16       THE COURT:  Question?

17  BY MR. BLOOM:

18  **Q.** When you get caught in something and you rely on, you

19  know, I'm ashamed --

20       MR. FRIEDMAN:  Objection, Your Honor, he's arguing.

21       THE COURT:  Ask the question.  You can answer it if

22  you can.

23  **A.** I avoided re-evaluating what had happened until I was

24  arrested -- or until Stan was arrested.  When that happened, I

25  still, for a long time, didn't know how I felt.  I mean, I

1    didn't think it was good that we burned down the building, but

2    I also did not want to cooperate, and I didn't know how to

3    reconcile these old beliefs that I had moved on from with my

4    feeling that what we had done was wrong and the loyalty I felt

5    to the people who I believed were idealistic and

6    well-intentioned.

7    **Q.** So basically, you became a truth teller; is that correct?

8    **A.** I told the truth, yes.  I am telling the truth, yes.

9    **Q.** Well, yesterday you testified, for example, that when you

10   had the job at the C-Ville Daily in Charlottesville, Virginia,

11   the reason that you left is because there was a personality

12   problem between you and the editor; is that correct?

13   **A.** I think the phrase is I was terminated without cause or

14   something, yes.

15   **Q.** That was a woman named Ms. Harding; is that correct?

16   **A.** Kathy Harding, yes.

17   **Q.** In fact, didn't you get fired because you showed up drunk

18   at a town meeting, to cover a town meeting?

19   **A.** She -- that's what she said.  What the unemployment

20   decision determined was that I was terminated without cause.

21   **Q.** Were you drunk at the town meeting?

22   **A.** No, I wasn't drunk at the town meeting.

23   **Q.** Were you a little intoxicated?  Had you been at a Cinco de

24   Mayo party?

25   **A.** No.  Kathy Harding assigned me a story for the Spring

1  issues, sort of out and about in the springtime, and we were

2  to write these short blurbs.  One of the blurbs I was assigned

3  to write was a review of the best margarita in town, and then

4  she fired me for drinking a margarita.  I think she didn't

5  like me very much and kind of set me up, but I don't know.

6  **Q.**  Poor you.

7  **A.**  You are the one who raised the subject, sir.  I learned a

8  lot from that experience.

9  **Q.**  And she said -- this woman said that you got fired because

10  you showed up drunk to cover a public event.  That's what she

11  said, right?

12  **A.**  She terminated me without cause.  She may have said that

13  to Unemployment.  I think they contested my unemployment.

14  Unemployment determined that I was terminated without cause.

15  **Q.**  You testified yesterday under oath that it was about a

16  personality conflict.  That's the truth, right?  You think it

17  was just about a personality conflict?

18  **A.**  Yeah, I do.

19  **Q.**  Now, in the time between December 7th, the arrest of your

20  boyfriend, December 7th of '05 -- when did you become engaged,

21  by the way?

22  **A.**  Late 2006.

23  **Q.**  And that was after he was cooperating and after you were

24  cooperating; is that correct?

25  **A.**  That's correct.

1 **Q.** And he was cooperating within two hours of being arrested;
2 is that correct?
3 **A.** I don't know, sir. I have never spoken with him about
4 that. I have never read anything about his cooperation.
5 **Q.** You do know --
6 **A.** Let me clarify. I have never read anything that's not in
7 the public records, the court documents, about his
8 cooperation.
9 **Q.** Can you say that again. It's hard to hear you sometimes.
10 **A.** I have never read anything that's not in the unsealed
11 pleadings.
12 **Q.** How did you get to read the unsealed pleadings?
13 **A.** How did I get to read them?
14 **Q.** Yes. Who gave them to you?
15 **A.** I have access to them myself.
16 **Q.** How is that?
17 **A.** There's an electronic service to access pleadings.
18 **Q.** It's called PACER?
19 **A.** Yes.
20 **Q.** And you have -- whenever you want to, by computer you can
21 access that via the Internet?
22 **A.** No, I am in prison.
23 **Q.** So whenever you get use?
24 **A.** No. We are not allowed to access the Internet; we only
25 have e-mail.

1  **Q.**  I see.  So the access via PACER was before you

2  self-surrendered a little over a year ago?

3  **A.**  Yes.  I believe I have read all the pleadings in this

4  case, almost, except for anything filed in the last few days.

5  **Q.**  So from the time you self-surrendered in January a year

6  ago, you have not or you have seen the pleadings that have

7  been filed since then?

8  **A.**  I have seen those.

9  **Q.**  How did you get those?

10  **A.**  My attorney sent them to me.

11  **Q.**  In hard copy, on paper?

12  **A.**  Yes.

13  **Q.**  And you requested those?

14  **A.**  Yes.

15  **Q.**  Because you wanted to know what was happening?

16  **A.**  I have tried to stay up-to-date on every single one of the

17  cases of all of the people who were indicted.

18  **Q.**  In particular this case because you expected that you were

19  going to be testifying; is that correct?

20  **A.**  No, I hoped and prayed that I would not have to testify.

21  **Q.**  Nevertheless, hoped and prayed, you thought that you might

22  be testifying; is that correct?

23  **A.**  No, it didn't seem like a reasonable position to take so I

24  kind of thought I would not have to testify.

25  **Q.**  I am sorry --

1  **A.**  I thought I would not have to testify.  I think it's rare

2  for cases to go to trial.

3  **Q.**  In fact, tell us who Brian Baker is.

4  **A.**  Brian Baker is a man I know through working in sustainable

5  agriculture in Oregon.

6  **Q.**  Have you been in touch with him?

7  **A.**  I am in touch with Mr. Baker.

8  **Q.**  Did you ask him to write a letter to Judge Burgess on your

9  behalf?

10  **A.**  I believe he did, yes.  Yes, I asked him.

11  **Q.**  Did you do that by e-mail, get in touch with Brian Baker?

12  **A.**  I have seen Brian Baker face to face.  I could have asked

13  him then or by e-mail.

14  **Q.**  Do you remember telling him, with regard to what you

15  answered a moment ago, about why you thought this case, Briana

16  Waters' case wouldn't go to trial, did you write to Brian

17  Baker and tell him that the feds overcharge?

18  **A.**  I believe that's true, yes.

19  **Q.**  Did you tell him that they force plea deals?

20  **A.**  I don't know the feds.  I would say there's three

21  combinations that lead to people having very long sentences in

22  federal prison.  Those would be mandatory minimum, severe drug

23  penalties and, I guess, the charging ability of the U.S.

24  Attorney's Office.

25  **Q.**  My question is:  Did you write to Brian Baker and tell him

1  that it was your opinion that the feds force plea deals?

2  **A.** It sounds like you are reading from something to me. I

3  don't have access to that that you are reading from.

4  **Q.** I am just asking, whether I am reading or not, did you say

5  that? Did you write that to Brian Baker?

6  **A.** I may have written that to Brian Baker. I'm sorry, unless

7  I can see what you are reading from, I can't verify that it's

8  my words.

9  **Q.** Well, I am not asking you to say word for word. I am

10  asking you if you remember writing that to him. That's all I

11  am asking, whether I am reading or not.

12  **A.** I don't have a particular memory of writing that to him.

13  I am sorry, I am not trying to be difficult.

14  **Q.** Do you remember writing to him that, in your opinion, that

15  with regard to the feds taking a case to trial is not a right,

16  but a very risky proposition?

17  **A.** I believe that's true, yes.

18  **Q.** And you believe that you wrote that?

19  **A.** I think it is very risky to take a case to trial, yes. I

20  believe I probably wrote that to Brian.

21  **Q.** So when it came to your thought that you not just hope,

22  but your thought that you would not have to testify in this

23  case against Briana Waters, it was your hope that she would

24  plead guilty and the case would be over for you, you wouldn't

25  have to testify; is that correct?

1  A.  Yes, sir.

2  Q.  Do you know that everybody else who's not a fugitive in

3  these cases, this case and the Eugene, Oregon case, including

4  you, everybody has pleaded guilty except for Briana Waters?

5  A.  That's right.

6  Q.  Is that, in your mind, because they, the feds, force plea

7  deals?

8  A.  I think they pled guilty because they were guilty and --

9  you can take it to trial, you have a right to take it to trial

10  technically, but there is a penalty built into the system if

11  you take it to trial.

12  Q.  And the penalty is a gigantic sentence, right?

13  A.  Well, the clearest penalty to me is that you don't get a

14  downward departure for acceptance of responsibility.

15  Q.  You were told -- I think Mr. Friedman asked you

16  yesterday -- when you first spoke to the law enforcement

17  people on the 21st of February of 2006, you understood that

18  you were facing a mandatory minimum sentence of 35 years if

19  you went to trial and lost.

20      You understood that; is that correct?

21  A.  Yeah, I think I knew that at that point.

22  Q.  I am sorry?

23  A.  Yes, I knew that at that point.

24  Q.  And was that what you had in mind when you said to Brian

25  Baker that they force plea deals?

1  **A.** No, I was making a general analysis of the prosecution,

2  the way the justice system works in this country.

3  **Q.** Is that what you had in mind when you said that taking --

4  if you said something like, taking a case to trial is not a

5  right, but a very risky proposition --

6  **A.** Yeah.

7  **Q.** -- words to that effect?

8  **A.** Technically, you have the right, of course, to take a case

9  to trial, so I was wrong if I said that it's not a right. It

10  is a right. But it is a very risky proposition because you do

11  not get credit for accepting responsibility.

12  **Q.** But in your mind, and what you were thinking, is that even

13  though it's a right, the federal authorities with whom you

14  were dealing don't think of it as a right, they think of it as

15  a luxury, that nobody goes to trial, guilty or not?

16  **A.** I can't speak to how they think.

17  **Q.** No, what you think about how they operate. That's what I

18  am talking about. Your belief about how they operate.

19  **A.** If you wanted me to characterize my belief, I do it pretty

20  carefully and in my own words.

21  **Q.** Of course you do it carefully because it's these people

22  right here who are going to say to Judge Burgess, give her

23  three years or give her five years or the deal is off?

24  **A.** I do it carefully because my perspective has changed since

25  I have been in prison.

1  **Q.** You are remorseful now, right?

2  **A.** Yes, I feel a lot of remorse.

3  **Q.** And you were -- were you remorseful between December 7, of

4  '05 when everybody was arrested and the 21st of February,

5  two-and-a-half months later? Were you remorseful at that

6  time?

7  **A.** I was panicked and remorseful and scared senseless, yes.

8  **Q.** It took you two-and-a-half months to come in and express

9  your remorse, correct?

10  **A.** Confessing to a crime that could put you in prison for 35

11  years is very scary.

12  **Q.** Yes, it is, but it took you two-and-a-half months to come

13  in and tell Mr. Friedman, Mr. Bartlett and Agent Halla and

14  everyone else, that you are remorseful. It took you

15  two-and-a-half months after the arrest of your boyfriend?

16  **A.** Yes, it did. And one thing that was a big factor in my

17  mind is that I did not want to bear the responsibility of

18  sending anyone else to prison.

19  **Q.** Now, in that period or after that period, did you travel

20  to Arizona?

21  **A.** I did travel to Arizona during 2006, yes.

22  **Q.** When was it?

23  **A.** I am not sure of the months.

24  **Q.** Was it before you began to cooperate or after?

25  **A.** After, and I think in like May, June and then maybe

1    November, October, November.

2    **Q.**  When you were in Arizona, did you look up a long-time

3    activist named Millett?

4    **A.**  Peg Millett, yes.

5    **Q.**  Did you tell her you were cooperating?

6    **A.**  I didn't have a specific conversation with her about what

7    I was doing, no.

8    **Q.**  You concealed the fact from her that you were a

9    cooperating individual; is that correct?

10   **A.**  Generally, I had been asked not to tell people that I was

11   cooperating.  I did not -- I didn't tell her that I was

12   cooperating, that's true.

13   **Q.**  You had been asked by whom to do that?

14   **A.**  After I cooperated, I felt like -- I felt like -- the day

15   I was going to cooperate, I felt like I was on the way to my

16   funeral.  Afterwards, I felt like I had been to confession and

17   was given new life, and I wanted to sing it from the mountain

18   tops.  I wanted to tell everyone in the world what I had done

19   and why I had done it.

20        My attorney told me that I should not do that.  I believe

21   that the U.S. Attorney's Office did not want me to tell people

22   I was cooperating, but I don't know for sure.  They didn't

23   tell me that, I don't think.

24   **Q.**  Now, whatever you were told and whatever you wanted to do,

25   how much time did you spend with Peg Millett in Arizona?

1   **A.**   A number of hours.

2   **Q.**   During that time, you had already been, at least once, to

3   the prosecution and made statements; is that correct?

4   **A.**   Yeah.

5   **Q.**   You were already a cooperating witness; is that correct?

6   **A.**   I guess so.

7   **Q.**   Did you have a bite to eat with Peg Millett?

8   **A.**   I remember her making some juice and maybe there was some

9   food.

10  **Q.**   You went to her home?

11  **A.**   I went to her home.

12  **Q.**   As you sat across from her or stood across from her, you

13  did not want her to know that you were a Government witness;

14  is that correct?

15  **A.**   No, I think I kind of hinted to her that I was.

16  **Q.**   In what way did you do that?

17  **A.**   I talked with her about the woman in her case who had

18  folded, and I talked with her generally about why a person

19  would do that, what a person would do.

20  **Q.**   So that was your hinting at it; is that correct?

21  **A.**   I don't remember exactly how I hinted or -- I think she

22  knew.

23  **Q.**   Basically, you sat with her for two or three hours and you

24  deceived her; is that correct?

25  **A.**   I think she knew that I was cooperating.

1 **Q.** What makes you think that she knew that you were
2 cooperating?

3 **A.** It seemed like something I had conveyed and that she had
4 understood.

5 **Q.** Did you tell her you were cooperating?

6 **A.** No, not explicitly.

7 **Q.** You kept that from her. You expressly decided, I am not
8 going to tell this woman that I am cooperating?

9 **A.** I did not tell that woman I was cooperating.

10 **Q.** You made a decision, you said to yourself before you saw
11 her and while you were with her, I am not going to tell this
12 woman that I am a cooperating witness.

13 You made that decision; is that correct?

14 **A.** No, I don't think I decided that. I think after I felt
15 like I hinted at it and she had understood, then it seemed
16 unnecessary.

17 **Q.** Did you also look up a fellow named Ron Coronado?

18 **A.** No.

19 **Q.** Did you bump into him?

20 **A.** Yes.

21 **Q.** And how much time did you spend with him in Arizona in
22 2006, on this trip that you made to Arizona?

23 **A.** Maybe three minutes.

24 **Q.** And he walked away from you, right?

25 **A.** Yeah.

1  **Q.** And were you at the same time looking for Spring and
2  Peaches, who had last been in Arizona?
3  **A.** No, I was not looking for them.
4  **Q.** Were you doing any kind of investigative work for the
5  United States Government as a cooperating witness?
6  **A.** No.
7  **Q.** In fact, on your website, either your writing or your
8  associates' or your friends' writing, it's indicated that
9  there's a lot of misunderstandings about what you are doing;
10 is that correct?
11 **A.** I haven't read the website recently.
12 **Q.** Well, when it first went up, were there writings to that
13 effect?  There's a lot of misunderstandings?
14 **A.** I think that's true.
15 **Q.** In fact, it's not a misunderstanding that you are a
16 Government witness, right?
17 **A.** When my plea changed, people spread the fact that my plea
18 changed and it was said that I wore a wire.  That was a great
19 misunderstanding.  I never wore a wire.
20 **Q.** But you were and are a Government witness, and you've been
21 such since February 21 of 2006; is that correct?
22 **A.** That's correct.
23 **Q.** Was that a misunderstanding that people were saying that?
24 **A.** No.  People said that before that as well, when it wasn't
25 true.

1  Q. But you made it true.  You went in and you saved yourself;
2  isn't that right?  You saved yourself from essentially the
3  rest of your life in prison, only 35 years, not a life
4  sentence, only 35 years, the mandatory minimum.  No parole
5  before 35 years.  You understood that, right?
6  A. Yes.
7  Q. And at the time, in February of '06, how old were you?
8  A. In February '06, I was 31.
9  Q. So you would have been 66 years old if you hadn't cut a
10 deal, by the time you got out of prison if you got convicted,
11 right?
12 A. Yes.
13 Q. And you knew you were going to get convicted because your
14 boyfriend had informed on you?
15 A. No, I didn't think -- no, I didn't know that.  I didn't
16 think Stan's word alone would be sufficient, if he had.
17 Q. So you were considering going to trial; is that right?
18 A. I wanted to take a straight plea deal.
19 Q. I am sorry?
20 A. I wanted to take a non-cooperating plea deal originally.
21 Q. And that didn't work out, they said no, right?
22 A. No, it was never -- let's see.  It didn't work out.  I was
23 never offered a non-cooperation deal, but they didn't say no
24 to it.
25 Q. Well, what you really wanted was for it to just go away,

1  right?  That would have been the best solution, right?

2  **A.**  Yeah, I wish I could have woken up and it had gone away.

3  **Q.**  But you knew that wasn't going to happen, right?

4  **A.**  No, because I was guilty.

5  **Q.**  Well, it's not just that you were guilty, it's that your

6  boyfriend was saying that you were involved in the double

7  whammy?

8  **A.**  I didn't know that.  I thought that might be true.

9  **Q.**  Sometime this morning, we talked about you did have a

10  recollection of going to visit Stan Meyerhoff in lockup and he

11  said he was giving names and you pointed to yourself and he

12  nodded yes.

13      Do you remember that?

14  **A.**  I don't think he said -- he said something, and I

15  said (indicating) and he said yes, but it was --

16  **Q.**  Pointing to yourself?

17  **A.**  Yes.

18  **Q.**  The record should indicate that because -- I have to use

19  the words because -- I have to describe it for the record.

20      You pointed to your own chest with your index figure, is

21  that correct, which is the gesture that you made essentially

22  questioning him, did you name names?

23      That is what you were asking; is that correct?

24  **A.**  I was trying to ask that.  I was unsure what the

25  significance to him was.

1  **Q.**  Did you get a response from him when you pointed to your

2  chest?  What was his response, if any?

3  **A.**  I think he was responsive in the affirmative.

4  **Q.**  He said, yeah, I named you.  I told them about you.

5  **A.**  No, he didn't say that.

6  **Q.**  That's what he said in effect, right?

7  **A.**  No.  He was in prison.  I was unsure what he remembered

8  about me, and our interaction was videotaped, recorded, and

9  there was probably an officer watching as well.  So it was

10  unclear.

11  **Q.**  Right.  You were trying to be secretive; is that correct?

12  You didn't say, did you name me, and he said yes, I named you,

13  you thug.  He didn't say that, right?

14  **A.**  Right, he didn't say that.

15  **Q.**  In fact, you know he wrote a letter to a judge the day or

16  the night he was arrested calling you and everybody else who

17  was involved in these arson "thugs"?

18  **A.**  No, I didn't know that he'd written such a letter.

19  **Q.**  That's what happens when you decide to cooperate, isn't

20  it?  You say what you think they want to hear, and you put

21  your fate in their hands?

22  **A.**  That's what I thought might happen from watching TV, and

23  the process has actually been nothing like that.

24  **Q.**  In fact, didn't you and your boyfriend/fiancee, didn't

25  there come a time when he told you in a phone conversation

1    that things didn't go well -- sometime in January of '06 --

2    didn't go well, and he's going to go back to the plan of

3    making the prosecutor his advocate?

4        Remember that conversation?

5    **A.**  I remember him telling me at one point things didn't go

6    well.

7    **Q.**  Do you remember his saying he was going to go back to his

8    original plan to make the prosecutor his advocate?

9    **A.**  I don't remember that, and if he had said that, I wouldn't

10   have known what it meant.

11   **Q.**  Now you know what it means, don't you, because that's what

12   you are doing?

13   **A.**  The prosecutor prosecutes me; they are not my advocates.

14   **Q.**  Well, they are going to speak up on sentencing day and

15   they are going to tell Judge Burgess one thing or another; is

16   that correct?

17   **A.**  They are going to prosecute me on the day I am sentenced,

18   yes.

19   **Q.**  They are going to -- you hope they are going to say to

20   you -- I am sorry, to Judge Burgess about you, she's done what

21   we wanted her to do, she should get the lower end of the three

22   to five range.

23       That's what you hope that they would say; is that correct?

24   **A.**  I would like a recommendation for a low sentence, but my

25   main hope is that Judge Burgess gives me a low sentence.  I am

1   not really overly concerned about the recommendation. They

2   have two years over me, but they don't have 35 years over me.

3   **Q.** Whatever it is they have, you would prefer that they come

4   in before Judge Burgess and advocate for you, rather than

5   against you?

6   **A.** They will not ever advocate for me. They are the

7   prosecutors. My lawyer advocates for me.

8   **Q.** And he will come and argue for you on sentencing day; is

9   that correct?

10   **A.** I fully expect that the U.S. Government will use every

11   speck of dirt they have on me on the day that I am sentenced.

12   That's what they do, they are prosecutors.

13   **Q.** And that's why you have agreed to be in league with them?

14   **A.** Because they will use every speck of dirt on me? No.

15   **Q.** No. These are people you have just described with some

16   disdain who they are and what you expect them to do.

17   **A.** I am sorry if that was disdainful. I didn't mean to be

18   disdainful. I don't feel disdainful for their job title. I

19   think it's important.

20   **Q.** I think you said that's who they are, or something like

21   that, right?

22   **A.** Yeah, maybe.

23   **Q.** Are you saying to this jury that you don't care whether

24   they come in and say give her three years or, on the other

25   hand, they say give her five years?

1  **A.** I care greatly about doing the minimum amount of time in

2  prison as possible, but I will tell you that if there was any

3  risk, it was that I would have convenient memory lapses and

4  not remember Briana there. There have been days when I

5  thought I would kill myself before I would testify against

6  her.

7  I am not telling the truth because I owe it to the

8  prosecution. I am telling the truth because I owe it to the

9  victims of the crime.

10  **Q.** When you say the truth, to you the truth is: "I said

11  Briana Waters did it, for whatever my reasons, and I have to

12  keep saying that. That is my position. If I don't say that,

13  the deal is over, 35 years in prison. You understand that.

14  They can come in here -- let me withdraw that. That's a

15  complex question.

16  You understand that if you don't please them, they have

17  the option of coming in here and saying: Judge Burgess, she

18  has not fulfilled her obligation, and we believe the deal

19  should be abrogated, called off?

20  **A.** If I told a lie, they could do that.

21  **Q.** To them, a lie would be anything other than Briana Waters

22  did it, in your mind?

23  **A.** Because Briana Waters did it.

24  **Q.** That's what you are saying, and that's what you are going

25  to say from here to the end of time, because it helps you to

1 say that?

2 **A.** Yes, to the end of time until after the prosecutors have

3 nothing on me, forever. My recollection is Briana Waters did

4 it.

5 **Q.** Can you explain why four weeks after you said Briana

6 Waters did it, they showed her picture to your boyfriend,

7 Meyerhoff, who looked at the picture and said: She, the woman

8 in this picture, is not involved in any arsons?

9     Can you explain how possibly that could happen?

10 **A.** I could speculate.

11 **Q.** Let's hear it. Let's hear you speculate.

12 **A.** Just like I didn't recognize the picture of Justin. I

13 don't know what picture was shown to him. He was involved in

14 a number of arsons. I am sure it's difficult for him to

15 remember. So I don't know. I can't explain it, but that's my

16 speculation.

17 **Q.** Let me show you A-97. Who is that?

18 **A.** That's Briana Waters.

19 **Q.** Any mistake that that's Briana Waters?

20 **A.** Not to me.

21 **Q.** That picture looks more like her than she looks like her.

22 That's Briana Waters, right?

23 **A.** That's Briana Waters.

24 **Q.** If you looked at that picture, would you say not involved?

25 You wouldn't say that at all. You would say involved in the

1  CUH arson; is that correct?

2  **A.**  I was only involved in one arson, so my memory is very

3  clear.

4  **Q.**  Well, he was asked -- or did you come to learn that he was

5  asked:  Was she involved?  Do you recognize this picture?  And

6  he said, looks familiar, not involved?

7       MR. FRIEDMAN:  Objection, calls for speculation and

8  it's been asked and answered.

9       THE COURT:  I thought she had answered that,

10 Mr. Bloom.

11      MR. BLOOM:  All right.  I will move on.

12      THE COURT:  All right.

13 BY MR. BLOOM:

14 **A.**  Another bit of speculation is that those photo lineups go

15 really quickly.

16 **Q.**  Well, did you come to learn that he did pick out a number

17 of people in that photo lineup --

18 **A.**  No.

19 **Q.**  -- on March 17th of 2006?

20 **A.**  No, only just now when you said that.  I don't know what

21 the conversation was about, what arson it was about, if he was

22 talking about University of Washington at that point or not.

23 I don't know anything about that conversation, other than your

24 characterization of it.

25 **Q.**  You weren't present; is that correct?

1  **A.** Of course not.

2  **Q.** Did you have a discussion, either by telephone or by

3  e-mail or in person, with Mr. Meyerhoff any time after St.

4  Patrick's day of '06, March 17th?

5  **A.** Did I converse with him after March 17th of '06? Yes.

6  **Q.** Did he indicate to you -- first of all, did you ever tell

7  him that you were going to be naming or you had already named

8  Briana Waters as a participant in the University of Washington

9  arson?

10     Did you ever tell him that?

11  **A.** Sometime very long after I did do that, I did tell him

12  that. I believe it was after she was indicted and after I

13  was -- my plea change happened.

14  **Q.** Your plea change happened, meaning you were pleading

15  guilty?

16  **A.** Right.

17  **Q.** And when you were pleading guilty, it was in front of

18  Judge Burgess; is that correct?

19  **A.** Yes.

20  **Q.** In this very room; is that correct?

21  **A.** Yeah.

22  **Q.** Let's talk about the first day you spoke to Mr. Friedman

23  and Agent Halla. Your father was with you?

24  **A.** He accompanied me to the federal building, yes.

25  **Q.** And that would be in Seattle?

1    **A.**   Yes.

2    **Q.**   What time of day was that?

3    **A.**   I don't remember.  I think it was 10:00, 11:00 or

4    something.

5    **Q.**   Late morning?

6    **A.**   Yeah.

7    **Q.**   He was not in the room with you when you were talking

8    about the events; is that correct?

9    **A.**   No.

10   **Q.**   He was asked to wait outside?

11   **A.**   Yes.

12   **Q.**   And in the room with you, did you have a lawyer?

13   **A.**   Peter Offenbecher.

14   **Q.**   And when did you retain Peter Offenbecher?

15   **A.**   I am not sure what day I signed a contract or whatever you

16   would call it with him.

17   **Q.**   Retainer agreement?

18   **A.**   Retainer agreement, uh-huh.

19   **Q.**   Would that have been in the month of December of '05?

20   **A.**   In December of 2005, I consulted with a number of

21   attorneys, including Peter Offenbecher.

22   **Q.**   And there came a time when you decided he was going to be

23   your lawyer?

24   **A.**   Yes.

25   **Q.**   And did you pay him or did your parents pay him?

1  **A.**  I -- the money was mine.

2  **Q.**  You had gotten money from your parents?

3  **A.**  No, I got the money from hard work.

4  **Q.**  Okay.  There came a time when you and Peter Offenbecher --

5  February 21 -- went to speak to the authorities; is that

6  correct?

7  **A.**  Yes.

8  **Q.**  And you had already decided that you were going to save

9  yourself; is that correct?

10  **A.**  No, I had no idea what I was going to do when I walked

11  through the door.

12  **Q.**  You didn't know?

13  **A.**  I didn't know.

14  **Q.**  Had you discussed it with Mr. Offenbecher?

15  **A.**  I had discussed it -- yeah.

16  **Q.**  It was not your understanding that you were going there to

17  become a cooperating witness?

18  **A.**  I knew I was going there to meet with the U.S. Attorney's

19  Office.  I thought that they would hope that I would

20  cooperate.  I thought they would tell me something about it

21  beforehand, but they didn't.  This meeting went differently

22  than I expected.  I was -- immediately prior to going to the

23  U.S. Attorney's Office, I was told by Lauren Regan that

24  Chelsea Gerlach and Suzanne Savoie were cooperating, and in my

25  mind, the truth was coming out, it was time to be truthful.

1  **Q.** You looked over here when you said Lauren Regan.  Is she
2  in the courtroom?
3  **A.** Yes, she is.
4  **Q.** Is she an attorney?
5  **A.** Yes, she is.
6  **Q.** Is she from Eugene, Oregon?
7  **A.** Yes, she is.
8  **Q.** How long had you known her before February 21st of '06?
9  **A.** The year that I met her, let's see, maybe 19 -- no, 1996
10 or '97 I met her for the first time.
11 **Q.** Was she the attorney with whom you worked in Eugene, or
12 was it someone else?
13 **A.** I worked for a law firm while I was in college, Arnold,
14 Gallagher, Saydack, Percell and Roberts, and I worked at a
15 different firm after I came back from Europe, with an attorney
16 named Jeff Rosas.
17 **Q.** Did you -- after December 7th, did you call Lauren Regan?
18 **A.** I tried to, but she was in Costa Rica.
19 **Q.** She had gone to the wedding; is that correct?
20 **A.** Yes.
21 **Q.** Is it fair to say that she got back right after Christmas?
22 **A.** I think so.
23 **Q.** And you spoke to her more than once right after Christmas?
24 **A.** Probably, yes, I spoke with her.
25 **Q.** Did there come a time -- let me withdraw that.

1      Did you come to learn that she's an attorney for
2  environmental activists; is that correct?
3  **A.**  And environmental causes, yes.
4  **Q.**  Did you come to learn that she was in some way involved in
5  the Oregon case where Stan Meyerhoff was one of the people
6  indicted?
7  **A.**  I was never clear on what her involvement was.
8  **Q.**  Did you come to learn that she was in some way involved?
9  **A.**  She seemed to have information related to the case, yes.
10  **Q.**  And it was important to you to get information related to
11  the case; is that correct?
12  **A.**  Yes.
13  **Q.**  In fact, you and Lauren had been roommates for a while; is
14  that correct?
15  **A.**  Yes.
16  **Q.**  When was that?
17  **A.**  I am not sure of the dates, but I lived with her at the
18  time I committed the arson.
19  **Q.**  Did you tell her at that time that you had committed an
20  arson?
21  **A.**  No, I never told anyone.
22  **Q.**  I am sorry?
23  **A.**  I never told anyone.
24  **Q.**  Right.  It's understandable that you don't want to admit
25  to a crime, unless you are put in a position where some reason

you feel you have to?

   THE COURT:  Let's do this.  Let's break at this point and take the noon recess, have you go about your way and get a sandwich.  When you are back in the building, of course always enter into the jury room.  Leave your books on the chair and don't discuss the case.

  (Jury not present.)

   THE COURT:  All right.  You may be seated.

  We'll take the noon recess.

   MR. FRIEDMAN:  Before we adjourn, we are concerned that a lot of the questions are getting very close to attorney/client privilege, conversations that Ms. Phillabaum had with various lawyers so --

   THE COURT:  I think if she feels it's in that category, she will disclose that and handle that.

   THE WITNESS:  Does that mean I can say if I think it's a privileged conversation?

   THE COURT:  I can't advise you, but you may step down.  I believe you have a lawyer, don't you?

   THE WITNESS:  Uh-huh.

   THE COURT:  Okay.  That will take care of that.

   MR. BARTLETT:  Can we get a feel -- we totally misunderstood how long this is going to go on.  We have a lot of witnesses sitting outside.

   MR. BLOOM:  I think I intend to take the day.

1       THE COURT:  I can't tell how long he's going to go

2  on.  Sometimes I am here to listen, and hopefully it won't be

3  a broken record like it tends to seem sometime.

4       MR. FOX:  If I in any way -- I apologize if I in any

5  way suggested it would be less.

6       MR. BARTLETT:  No problem.  Let's take the noon

7  recess.

8       THE CLERK:  All rise.  Court is in recess.

9  (Luncheon recess.)

10  (Jury not present.)

11       THE COURT:  All right.  You may be seated.

12  Mr. Bloom, we are ready.  Bring in the jury.

13  (Jury present.)

14       THE COURT:  You may be seated.

15  You may continue, Mr. Bloom.

16       MR. BLOOM:  Thank you.

17  BY MR. BLOOM:

18  **Q.**  I think we were talking about the Sisters meeting.  Now,

19  the four other meetings, the book club meetings that had

20  preceded that, I think you've already testified that Briana

21  was at none of those meetings; is that correct?

22  **A.**  That's correct.

23  **Q.**  Now, did you have a nickname in this group of people?

24  **A.**  I think I might have had one or two nicknames during that

25  period of time.

1  **Q.**  Well, might have?

2  **A.**  The only nickname or alias I ever remember is Reba.

3  **Q.**  You say the only one.  That is your nickname, that was

4  your alias; is that right?

5  **A.**  For a period of time, I believe that I had, like maybe at

6  different meetings, we had different names.  I'm not sure.

7  **Q.**  Was there such a thing -- there was one meeting where you

8  all chose what might be called an ailment name; is that

9  correct?

10  **A.**  No.  There was one meeting at which Jen Kolar handed out

11  PGP disks that she had assigned ailment names, and I had been

12  assigned an ailment name.

13  **Q.**  What was that?

14  **A.**  I don't know.

15  **Q.**  It was kind of a semi joke, right, that "bronchitis" would

16  be somebody's name or something like that?

17  **A.**  I never got the joke, if it was a joke.

18  **Q.**  Well, then it was a serious effort using some medical

19  ailment to conceal people's names; is that correct?

20  **A.**  It was an effort to conceal people's names, yes.

21  **Q.**  Because people were really security conscious; is that

22  right?

23  **A.**  PGP was at the point which we were very security

24  conscious, yes.

25  **Q.**  When was this meeting, the meeting at which PGP was

1   discussed?

2   **A.**   That was the third meeting in Santa Cruz, I think,

3   California.

4   **Q.**   Santa Cruz, California?

5   **A.**   Yes.

6   **Q.**   What month and what year?

7   **A.**   I believe it would have been the year 2000.   I am unsure

8   of the month.

9   **Q.**   Who was present?

10  **A.**   Myself, Stan Meyerhoff, Jen Kolar, Chelsea Gerlach, Diane

11  Robin, Jeff Hogg, Nathan and Joy.   I believe a man from Santa

12  Cruz who we called Leroy was there.   Rod Coronado was there.

13  Avalon was there.

14  **Q.**   Those are the ones you remember right now?

15  **A.**   Those are the ones I can rattle off without being sure

16  which ones I have said already.

17  **Q.**   Now, was there any discussion with regard to security,

18  that one thing that should never happen in a secure situation

19  is one person should buy a cell phone for another person in

20  the group?   Was that kind of thing discussed?

21  **A.**   I don't know that particular rule.

22  **Q.**   That really would have been, in your mind, based on the

23  instructions that you were hearing, a ridiculous breach of

24  security for that to happen; is that correct?

25  **A.**   It would depend on the circumstances.

**Q.** Well, if I were to buy a cell phone for you, put the cell phone in my name and give it to you to use in my name, that would be a security breach, wouldn't it?

**A.** If I intended to recruit you to commit arsons at that point of time, if I originally intended to use you as a support person to support my arsonist activities, it might not be a security breach, it might be something I did with the intention of having you support me.

**Q.** What about if I was your friend and you were having credit problems and you asked me to buy a phone for you that you couldn't get one in your name, would that be another option?

**A.** I wouldn't buy a phone for someone. I am not sure why we are talking about this.

**Q.** Because maybe you are not such a good friend, you wouldn't buy a phone for someone?

**A.** (Laughing.) No, I generally try to neither lender nor a borrower be.

**Q.** Nor a favor doer?

**A.** That's a little piece of advice that Stan gave me. It works well in prison, as well, where you don't want to be lending and borrowing a lot.

**Q.** Stan is a good person from whom to seek advice; is that right?

**A.** I am engaged to him. I find him to be a very good person, right, yes.

1    **Q.**  Am I correct that you testified this morning that after

2    September 11th, in your mind, all this arson stuff, this crazy

3    stuff, was completely out, completely ridiculous; is that

4    correct?

5    **A.**  After September 11th -- well, after the crime, I didn't

6    want anything to do with arson.  During that whole period of

7    time, I was re-thinking my involvement with radical

8    environment groups, and September 11th made on me, like

9    everyone, a very big impression, yes.

10   **Q.**  And this man whom a moment ago you said is a person whose

11   advice you would heed, Stan Meyerhoff, a month after September

12   11th, October 15th of the year 2001, he committed another

13   arson, did he not?

14   **A.**  I have no direct knowledge of that, sir.

15   **Q.**  Did he tell you he did?

16   **A.**  No.

17   **Q.**  Has he since then told you that he did?

18   **A.**  No, we've never talked explicitly about his crimes.  I

19   have read it in court papers.

20   **Q.**  You have come to learn now, or do you believe now, that

21   he, Stan Meyerhoff, committed an arson in Susanville,

22   California, a rural part of California?

23       Do you believe that now?

24   **A.**  He's been convicted of that, yes.  Yeah, I believe that he

25   did that.  He admitted it.

1  Q.  You believe that that crime occurred approximately one

2  month, five weeks after September 11, 2001?

3      Do you believe that?

4  A.  I don't have any independent basis to verify any of this.

5  If that's when it occurred, that's when it occurred, and I

6  would believe it if I read it somewhere, yes.

7  Q.  Well, did you read about it when it happened in the

8  newspaper or in any Earth First journal or a Portland media or

9  anywhere where you would get information about environmental

10 activities?

11 A.  I am not sure how I came to know about that, sir.

12 Q.  Well, didn't you read that the Earth Liberation Front had

13 taken credit for the arson at the Litchfield or Susanville

14 facility?

15 A.  Yeah, I believe I read about it somewhere at some point,

16 yes.

17 Q.  Did you ever discuss that -- is it your testimony you've

18 never discussed that with your fiancee, Stan Meyerhoff?  You

19 have never discussed that with him?

20 A.  Like I said, I made it be known to him that I thought

21 after September 11th, it was incredibly stupid to involve

22 ourselves in activities like that.

23 Q.  Have you ever discussed that incident with him?

24 A.  No.  Sir, my -- my general relationship with Stan, I would

25 compare to like recovery from, or deprogramming from a very

1 severe ideological event. Reliving the mistakes that we made

2 was not big on our agenda. Moving on in our life was.

3 **Q.** I don't pretend to be an expert on recovery, but isn't

4 part of recovery acknowledging, talking about and resolving

5 and experiencing what you may or may not have done wrong?

6 **A.** Yes, and the opportunity to tell the truth about this has

7 been very cathartic and penitential to me for that reason.

8 **Q.** This incident happened more than six years ago; is that

9 correct?

10 **A.** Yes, sir.

11 **Q.** And you've been with him for how long?

12 **A.** Stan and I have been together for almost seven years.

13 **Q.** And in all this time, you have never spoken with him about

14 that incident to which he has pleaded guilty?

15 **A.** No, sir. He was involved in a number of arsons, I

16 believe, and we had only very few, very failed conversations

17 about any of those because we were trying to move on in our

18 lives. And since he was arrested again, because we are not

19 free to talk about the case, the conversation has been

20 minimal.

21 **Q.** He was arrested in December of '05; is that correct?

22 **A.** Yes, sir.

23 **Q.** And the incident happened four years plus before that; is

24 that correct? We are talking about Litchfield, Susanville,

25 more than four years before that, right?

1  **A.** I guess so, yes.

2  **Q.** October of '01, December '05. That's four years and two

3  months, right?

4  　　　MR. FRIEDMAN: Objection, Your Honor, these have all

5  been asked and answered.

6  　　　MR. BLOOM: It has not been asked and answered.

7  　　　THE COURT: Well, ask it again. She keeps answering,

8  but you are not satisfied, I guess.

9  BY MR. BLOOM:

10  **Q.** Is it your position that in four years and two months,

11  that you never once discussed that incident with the man who

12  is to become your fiancee?

13  **A.** I had one conversation with him where I told him that I

14  thought after 9/11, it was unacceptable to be involved in such

15  activities.

16  **Q.** Would that have been soon after 9/11 that you had that

17  conversation?

18  **A.** Yes.

19  **Q.** And was it before October 15th of that same year?

20  **A.** No, I don't think so.

21  **Q.** So it was after that?

22  **A.** Well, I didn't think it was necessary to say really. I

23  was surprised that this arson, which was potentially related

24  to the people I knew, happened because I thought everyone

25  would have the same misgivings that I did.

1   **Q.** When you were at Sisters at the fifth book club meeting

2   one week after the University of Washington arson, you

3   basically did high-fives for the wonderful work that you had

4   done the week before; is that correct?

5   **A.** No. It was a tense meeting. We were angry with each

6   other about the communiqué.

7   **Q.** So it was an intense meeting because of the communiqué?

8   Did you not tell us this morning that you were feeling proud

9   of yourself for what you had done?

10   **A.** That was the word of choice. That was your choice of

11   words. I agreed to it, yes.

12   **Q.** Were you pleased with yourself? How about your word. You

13   give the jury your word.

14      How did you did you feel about what you had accomplished

15   by burning down the building?

16   **A.** I hadn't had time -- it took a long time to completely

17   re-evaluate what I did and renounce it, and I do want to

18   renounce it. I am renouncing it.

19   **Q.** I want you to use your word. In fact, that's what you do.

20   You are a really good debater, aren't you?

21   **A.** Sir, I am trying to be thoughtful about the answers

22   because it's an important matter.

23   **Q.** Your choice of what words and how to present them and what

24   kinds of supporting facts to throw into your argument, that's

25   among your highest skills, isn't it?

1  **A.** No, I haven't been a debater since I was 18 years old. I
2  am 32, about to turn 33.
3  **Q.** It's like riding a bike, though, isn't it?
4  **A.** No, I wouldn't say so. I was a very competitive person
5  when I was a debater. I was a very different person. I often
6  find that I am not interested in argumentation anymore.
7  **Q.** Well, I am sorry to put you in this situation, but am I
8  correct that two-and-a-half months went by after the arrest of
9  Meyerhoff and the others before you decided to show your
10 remorse by speaking to the U.S. Attorney on February 21st of
11 06?
12 **A.** Yes, sir.
13 **Q.** Two-and-a-half months went by?
14 **A.** Yes, sir.
15 **Q.** And it wasn't about remorse, it was about saving yourself,
16 wasn't it?
17 **A.** My motivations for cooperating were very complex. One
18 thing I didn't want to do is put my family through a trial
19 based on a lie. That was an important consideration for me.
20 **Q.** That's because you were guilty?
21 **A.** I am guilty.
22 **Q.** You were then and you are now?
23 **A.** Yes, I am.
24 **Q.** And you became guilty on May 21st in the early morning
25 hours of 2001; is that correct?

1   **A.** Yes, sir.

2   **Q.** Even before that, you were a conspirator with a number of

3   the people you have mentioned; is that correct?

4   **A.** Yes, sir.

5   **Q.** Before you met -- as you claim -- met Briana Waters at

6   Denny's a week before the fire, was she involved in any

7   conspiracy that you know of?

8   **A.** From direct knowledge, no. The only way I knew her and

9   the only reason I ever had a conversation with her, including

10   the conversation in which she was angry with me, was because

11   she participated in this arson.

12   **Q.** The conversation in which she was angry with you is

13   because she had participated in the arson?

14   **A.** The only reason I knew her to have that conversation was

15   because she was -- that happened that weekend. One of those

16   two weekends before the arson.

17   **Q.** You had met Justin way back, sometime in the middle of the

18   previous year, 2000; is that correct?

19   **A.** I knew him for a matter of hours on the night of the

20   Dusty, Washington crime, yes.

21   **Q.** And there came a time when you wound up in his cabin just

22   the two of you, right?

23   **A.** Is that unusual for a man and a woman to be in a residence

24   together? I don't think it is.

25   **Q.** I didn't say it was unusual, I am just asking the

1  questions.

2      Was it unusual in your mind to be in his bed with him?

3          MR. FRIEDMAN:  Your Honor --

4          THE COURT:  Why are we covering this again?

5          MR. BLOOM:  Because she just brought it up.

6          THE WITNESS:  I just want to mention, though -- what

7  do you call it when it's not --

8  BY MR. BLOOM:

9  **Q.**  Platonic?

10  **A.**  Platonic interactions between men and women in the Earth

11  First Movement to the point of sleeping together were common

12  because we often camped together, sleeping together in the

13  same space, camped together, spent time together.  We were

14  working on things intensely.  It might be less usual in

15  different communities, but in that community it was -- I never

16  had sex with the man.  I never thought about having sex with

17  the man.

18  **Q.**  Do you remember a guy by the name of Bill Clinton, right?

19  **A.**  I never gave him a blow-job either, if that's what you are

20  asking.

21  **Q.**  I did not ask that at all.

22      Do you remember him saying, "I did not have sex with that

23  woman"?

24          MR. FRIEDMAN:  Objection, Your Honor.

25          THE COURT:  Mr. Bloom, move on to a question that

1  helps here.

2  BY MR. BLOOM:

3  **Q.**  Now, Tilth, what is that again?

4  **A.**  Oregon Tilth is a certifier of organic farms.

5  **Q.**  When did you work there?

6  **A.**  I worked there from February 2001 until February of 2005.

7  **Q.**  So am I correct that you testified earlier that it was

8  working at Tilth that was one of the things that basically got

9  you straightened out with regard to this radicalism?

10  **A.**  It was one of three main influences, I would say.

11  **Q.**  Am I correct that the dates you just gave, you were

12  working at Tilth at the time you burned down the building?

13  **A.**  Yes, to my great shame, I was -- you know, dishonored my

14  employer.

15  **Q.**  You've come here and you've indicated and you've thrown it

16  in from time to time how bad you feel about being here, right?

17  **A.**  Yes, sir.

18  **Q.**  In fact, you don't like Briana Waters because she told you

19  who you are and she put it right in your face and you don't

20  like her, you didn't like her and you don't like her today?

21  **A.**  I bear no hostility to Briana.  I feel a lot of sympathy

22  that she's in this situation.  I feel sympathy for Justin

23  who's fled.  The decision of how to deal with a crime like

24  this is heart breaking and painful no matter how you choose to

25  deal with it.

1 **Q.** Have you seen her movie, Watch?

2 **A.** No, I have never seen it.

3 **Q.** You know of it, right?

4 **A.** I remember her talking about it and referencing it that

5 weekend.

6 **Q.** Do you remember -- you say that weekend. You keep talking

7 about that's when you saw her.

8 Did you see her any other times?

9 **A.** Not that I remember.

10 **Q.** When did she have this conversation with you when she told

11 you off?

12 **A.** One of those two weekends when we were working on the

13 University of Washington arson. That's the only way that I

14 know her.

15 **Q.** She had it wrong because you had not had sex with her

16 boyfriend; is that correct?

17 **A.** I did not ever have sex with Justin Solondz.

18 **Q.** So she had it wrong, whenever it was?

19 **A.** If she believed that. It wasn't entirely clear to me that

20 she believed that.

21 **Q.** She didn't say to you words to the effect that, you slept

22 with my boyfriend and you are a so-and-so?

23 **A.** The conversation is not clear in my mind. I don't

24 remember it very well at all. I didn't remember it at all

25 until you mentioned it today.

1  **Q.** It came up before today, didn't it? Weren't you asked

2  about it, whether or not you had an affair with Justin

3  Solondz, by the prosecution?

4  **A.** An argument with Briana was never mentioned to me before.

5  **Q.** Was whether or not you had --

6  **A.** I have been asked that, yes.

7  **Q.** And you denied it then, as well as now; correct?

8  **A.** Yes, sir.

9  **Q.** I see you sighing about that, right?

10  **A.** Yes, sir.  Again, I am just not sure why one way or the

11  other it has anything to do with whether or not Briana

12  committed an arson.  It's kind of crazy to be raked over the

13  coals about being an unprincipled slut for something that's

14  unrelated.

15  **Q.** Well, it has to do -- and this is my last question on

16  this -- you were asked early on yesterday by Mr. Friedman:  Do

17  you bear any ill will toward Briana Waters, and your answer

18  is:  I have sympathy for everyone involved in this case.  You

19  did not answer the question.

20  So I asked you the question:  Do you have ill will.  It's

21  about ill will and how you feel about her, no matter what you

22  say.

23  How do you feel about her?

24  **A.** I don't -- you've mentioned the term unprincipled slut,

25  and I don't bear you ill will either.  I don't bear ill will

1    to the prosecutors, to Briana, to the people who are my former

2    friends and have turned their back on me; I do not bear them

3    ill will.

4    **Q.**  People turn their back on other people sometimes when they

5    become informants, and especially so when they lie about what

6    happened.

7         You know that, don't you?

8    **A.**  No, not from firsthand experience.

9    **Q.**  Now, did there come a time when you went to the Oregon

10   State University girdling action?

11        Do you remember going to that?

12   **A.**  Yes.

13   **Q.**  Do you remember Mr. Meyerhoff was there?

14   **A.**  He drove the car.

15   **Q.**  He drove what car?

16   **A.**  He drove a van.

17   **Q.**  And was that Justin Solondz' van?

18   **A.**  No.

19   **Q.**  It was not?

20   **A.**  If Justin had a van, I don't know about it.

21   **Q.**  Was it Justin Solondz' vehicle?

22   **A.**  I don't think so.

23   **Q.**  Now, did you come to know that in the Susanville arson,

24   one of the participants was Joe Dibee?

25        Did you come to know that?

1 **A.** I've read that in court papers.

2 **Q.** Did you come to learn that --

3 **A.** I think.

4 **Q.** Did you come to learn that one of the vehicles that was

5 brought to that arson was Mr. Dibee's own, registered in his

6 name, four wheel Toyota?

7    Did you come to learn that?

8       MR. FRIEDMAN:  Objection, Your Honor.  She has no

9 knowledge of any of these things.

10       THE COURT:  Well, she can answer yes or no, and then

11 we will move on.

12 **A.** I haven't taken particular note of that detail from the

13 pleadings.

14 BY MR. BLOOM:

15 **Q.** Did you come to know that your own boyfriend/fiancee drove

16 his own silver Acura to that arson?

17 **A.** No, sir, I didn't know that.

18 **Q.** Have you come to learn that the Vail -- the Vail, Colorado

19 arson, that Avalon took his own truck?

20    Did you come to learn that?

21       MR. FRIEDMAN:  Your Honor, she has no personal

22 knowledge of these facts.

23       THE COURT:  I understand, and she can respond to

24 that.  I don't know what Mr. Bloom is after here.  She can

25 answer yes or no.  If she didn't hear about it or know about

1  it --
2  BY MR. BLOOM:
3  **Q.**  You have indicated, am I correct, that getting a car that
4  was not in anybody's name, any of the participants' name was
5  really important, sometimes the deal breaker, right?
6  **A.**  And the examples you just gave would tend to illustrate
7  how difficult that was to come by a car.
8  **Q.**  I am sorry?
9  **A.**  It's difficult to come by a truly anonymous car.
10  **Q.**  So if you don't, then you use somebody's car, one of the
11  participants' car?  That's what happened time after time after
12  time in these activities?  They used their own cars; isn't
13  that correct?
14  **A.**  Sir, I was only involved in one arson.
15  **Q.**  With regard to the accident that you say happened when the
16  car was leaving, or the van or whatever the vehicle, was
17  leaving the scene of the University of Washington arson, I
18  think you testified that it felt like the impact was huge?
19  **A.**  In my innervated state, yes, it felt huge.
20  **Q.**  In what?
21  **A.**  In my highly anxious, innervated state, it felt huge.
22  **Q.**  Was it loud?
23  **A.**  No, I don't remember a noise.
24  **Q.**  What do you mean by huge?
25  **A.**  Leaving the site, scene of the crime, any accident at all

1  felt like a big deal.

2  **Q.** How fast would you estimate the car was going?

3  **A.** We were going around a Connor, so it was pretty slow.

4  **Q.** How slow?

5  **A.** Five miles an hour.

6  **Q.** Five miles an hour. That's how the vehicle was going,

7  five miles an hour? You were getting away from the scene, and

8  your estimate is five miles an hour?

9  **A.** We were driving on crowded residential streets late at

10  night.

11  **Q.** Did you have the lights on in your car, headlights?

12  **A.** I assume so, yeah.

13  **Q.** What part of the vehicle was hit?

14  **A.** It was the rear driver's side or door panel, I am not sure

15  which.

16  **Q.** Did you ever get yourself to see the damage?

17  **A.** No, I didn't get out of the car to look at it at that

18  point, and I didn't see it later either.

19  **Q.** When you say you didn't see it later, there did come a

20  time obviously when you got out of the car, right?

21  **A.** Yeah.

22  **Q.** Where was the car when you got out of the car?

23  **A.** I don't have a distinct memory of that.

24  **Q.** Well, was it in a park?

25  **A.** Sir, I don't have a distinct memory of that.

1   **Q.** Who was in the car at the time?

2   **A.** When I got out?

3   **Q.** Uh-huh.

4   **A.** I don't have a distinct memory of that. I can tell you

5 who was in it when I got in.

6   **Q.** Who was in it when you got in?

7   **A.** The people in the car when I got into the car were Justin,

8 Avalon, Briana, Jen and myself.

9   **Q.** Five people in the car?

10   **A.** Five people.

11   **Q.** How many in the front? How many in the back?

12   **A.** There were two seats in the front and three in the back.

13 You mentioned a van a minute ago; it wasn't a van.

14   **Q.** Do you have any reason to know why Kolar would have said

15 at her first interview that it might have been a van?

16   **A.** Perhaps she was involved in multiple arsons.

17   **Q.** You don't have any independent knowledge of why she might

18 have said that; correct?

19   **A.** No, I have no independent knowledge of her.

20   **Q.** Now, did there come a time -- can you tell the jury what

21 ELAW is?

22   **A.** It's that conference in Eugene, Oregon. It's sponsored by

23 the University of Oregon Law School.

24   **Q.** Is it a public conference?

25   **A.** Yes, I think so.

1  **Q.**  Have there been ELAW conferences that you have attended?

2  **A.**  Yes.

3  **Q.**  Did you attend the one in the year 2000?

4  **A.**  Yes, I did.

5  **Q.**  Was there a panel where you were one of the speakers?

6  **A.**  There were multiple panels where I was a speaker one year.

7  It might have been that year.

8  **Q.**  Do you remember telling the people assembled at that panel

9  that nonviolence is being used to limit your movement?

10  **A.**  No.

11  **Q.**  Do you remember telling the panel and the people who were

12  listening that nonviolence is not the way change happens?

13  **A.**  No.

14  **Q.**  Do you remember talking about what you called the cult of

15  nonviolence?

16  **A.**  There's an article by a professor by that title that I

17  referenced, yes.

18  **Q.**  Did you believe at that time that there was such a thing

19  as the cult of nonviolence?

20  **A.**  I am sorry, what?

21  **Q.**  Did you believe at that time that there was such a thing

22  as a cult of nonviolence?

23  **A.**  No.

24  **Q.**  Did you tell the panel or one of those panels that

25  property destruction must be an available tactic?

1  **A.**  Yes, I probably advocated property destruction.

2  **Q.**  Did you tell the people that you shouldn't let the fear of

3  jail deter you?

4  **A.**  I don't know if I said that.

5  **Q.**  Do you remember saying that it was not important to reach

6  out to middle class white people?

7  **A.**  I don't believe I would have said that.

8  **Q.**  You did come to know that -- well, one more thing.

9      Do you remember saying that we, the movement, must combine

10  night sabotage and daytime actions?

11  **A.**  I think that might have been the tenor of my remarks, yes.

12  **Q.**  I am sorry?

13  **A.**  I think what was the tenor of my remarks.

14  **Q.**  What did you mean by nighttime sabotage?

15  **A.**  Property destruction, road blockades, field trials, the

16  type of actions we were doing there.

17  **Q.**  Not arsons, right?

18  **A.**  No, I never wanted to be involved in an arson before it

19  happened.  I distinctly did not want to be involved.

20  **Q.**  You just got pulled into it, right, with no free will of

21  your own?

22  **A.**  I had free will.  Do you want me to tell you why I think I

23  went along with it?

24  **Q.**  Was it because Meyerhoff wanted you to?

25  **A.**  No.

1    **Q.**  Do you know who a guy by the name of David Carr is?

2    **A.**  Yes.

3    **Q.**  Tell the jury who David Carr is.

4    **A.**  David Carr is a journalist that I know.

5    **Q.**  Would you describe him as one of your mentors?

6    **A.**  He has mentored me.

7    **Q.**  Is he a journalist for the New York Times?

8    **A.**  He's a columnist for the New York Times.

9    **Q.**  Is it fair to say that you met him at a conference, a

10   convention at San Antonio, the Association of Alternative

11   Newspapers?

12   **A.**  Yes, that's where I met him.

13   **Q.**  Do you remember seeing him perhaps twice in New York?

14   **A.**  I saw him once in New York, I believe.

15   **Q.**  Do you remember telling him, after you had agreed to

16   cooperate, telling him what your problem was?

17   **A.**  I did tell David that I was in legal trouble, yeah.

18   **Q.**  Do you remember telling him in a telephone conversation

19   that you had not cooperated with the feds?

20   **A.**  No, I don't think I ever told him that.

21   **Q.**  Do you remember telling this man -- he was a friend,

22   right?

23   **A.**  It's a formal relationship because he's a much more

24   accomplished journalist than I ever was, but I felt friendly

25   towards him, yes.

1  **Q.**  Do you remember telling him that you didn't tell the feds

2  anything that they didn't already know?

3  **A.**  I don't remember telling him that.

4  **Q.**  Do you remember telling him that the fact that you were

5  romantically involved with one of the people is what caused

6  you to transgress your own values?

7  **A.**  I don't remember -- I had a conversation with David where

8  I told him I was in legal trouble.  That's what I remember.

9  If you have some notes or something to improve my memory, I

10  would be happy to look at them.

11  **Q.**  Sure, let me show them to you.  I have marked them as

12  A-190.  I do have an extra copy for the Court.

13              (Exhibit A-190 marked for identification.)

14              MR. BLOOM:  Let the record reflect that it's a

15  two-page document being shown to the witness to refresh her

16  recollection.

17  BY MR. BLOOM:

18  **Q.**  Have you been able to read that?

19  **A.**  Yes, I scanned it.

20  **Q.**  Take as much time as you want to read it and understand

21  it.  Is there anything in there that refreshes your

22  recollection about the questions I asked you?

23  **A.**  It refreshes my recollection of the conversation -- well,

24  it's clearly David's perspective on the conversation that I

25  had with him.

1  **Q.** Well, did you tell David Carr, in a telephone conversation

2  sometime after February 21 of 2006, did you tell him that you

3  had not cooperated with the feds?

4  **A.** I don't know what date I talked to David.

5  **Q.** I am sorry?

6  **A.** I don't know if I talked to him before or after. This

7  says that I told him I didn't. I didn't have any reason to

8  lie to him. I probably hadn't talked to the feds at that

9  point.

10  I also would just like to note, this says there's somebody

11  who knows Stacy, but it's not me, the best of luck in

12  defending your client.

13  **Q.** That's correct.

14  **A.** David believed that he was talking to my attorneys when he

15  had this conversation, and my perception is that your

16  investigator misrepresented themselves to my friend.

17  **Q.** Excuse me, but it says here, "You now remember that David

18  said what?" Could you repeat what you said? That when David

19  had this conversation?

20  **A.** He understood that he was talking to someone who worked

21  for my attorney.

22  **Q.** How do you know that?

23  **A.** David wrote me a letter saying that my attorney had

24  threatened to subpoena him and he was very upset about it.

25  **Q.** So the situation here -- it says here, the best of luck in

1  defending your client.  That's the last comment in this report

2  of an interview by our investigator; is that correct?  Best of

3  luck in defending your client?

4  **A.**  David thought he was talking to someone who worked for my

5  attorney.

6  **Q.**  And that he was defending -- that he or she was defending

7  you?

8  **A.**  Yes, that my attorney defends me.

9  **Q.**  Do you have a copy of that letter?

10  **A.**  Yes, I do.

11  **Q.**  I don't assume you have it with you; is that correct?

12  **A.**  That's correct.

13  **Q.**  It's in your belongings at Sea-Tac?

14  **A.**  Yes.

15  **Q.**  Do you think we could get a copy of that letter from David

16  Carr?

17  **A.**  Sir, I feel like you've harassed a prominent person who

18  knows me.  I don't really want to drag David's name into this.

19  **Q.**  Whoever he was talking to -- let's give you that --

20  whoever he thought he was talking to, is he correct when he

21  said that, in a phone conversation that Lacey had with me,

22  David Carr, she maintained that she had not cooperated with

23  the feds?

24      Did you say that to him in a telephone conversation?

25  **A.**  I don't know.

1   **Q.** Did you say to him in a telephone conversation that you

2   had been accused of cooperating with the feds, but that you

3   had never told the feds anything that they didn't already

4   know?

5      Did you say that to David Carr? No matter what this

6   letter is about, no matter who he spoke to, the question is:

7   Did you say that to the New York Times journalist, David Carr,

8   I didn't tell the feds anything they didn't already know?

9   **A.** I don't know.

10   **Q.** Try to remember.

11   **A.** I confessed to a prominent person who I knew that I had

12   been involved in a major federal crime. I wanted to apologize

13   to him and to kind of find out where we stood with each other.

14   That's what I remember of the conversation.

15   **Q.** So your testimony is you don't remember whether -- one way

16   or another -- whether you said that you didn't tell the feds

17   anything they didn't already know?

18      You don't remember one way or another if you said that to

19   David Carr?

20   **A.** Yes, sir, that is my testimony. Three times so far, I

21   believe.

22   **Q.** Did you send e-mails to Brian Baker?

23   **A.** Yes, sir, I have sent e-mails to Brian Baker.

24   **Q.** You were hoping that he would write a letter for you, for

25   Judge Burgess; is that correct?

1    **A.**  Mr. Baker did write such a letter.

2    **Q.**  One of the things that you told Mr. Baker, in writing, is

3    I didn't betray anyone; is that correct?

4    **A.**  I don't know, sir.

5    **Q.**  I am going to get it in order so I can give copies to

6    everyone, but I will show it to you in a little while.  I am

7    going to ask my co-counsel to try to put it together because

8    it's one of those series of e-mails where they come in reverse

9    order as they are printed out.  So we've got to find one.

10       Did you write to Jeff Hogg by e-mail?

11   **A.**  Yes.

12   **Q.**  Did you tell him, "I didn't betray anyone"?

13   **A.**  Mr. Bloom, I have been clear that I believed that the

14   story was coming out.  I thought the truth was coming out.  I

15   did not feel that confirming what the feds already knew was a

16   betrayal of anyone.

17   **Q.**  So you believe that what you were telling the feds is what

18   they already knew?

19   **A.**  Yes, and strangely enough, Jennifer Kolar didn't name me.

20   I fingered myself because of my guilty conscience.

21   **Q.**  So aside from what she said or didn't say about you, I

22   want to get back to the point here, that you believe what you

23   were telling them were things they already knew; is that

24   correct?

25   **A.**  Yes, I did have some feeling that they knew most of what I

1  knew, yeah.

2  **Q.** Right. Be specific, if you will. Please answer my
3  question specifically.

4  Did you tell them what you believed they already knew?

5  **A.** No.

6  **Q.** I thought you just said that a moment ago.

7  **A.** I told them what I knew. I thought they knew it already.
8  I was wrong.

9  **Q.** You told them -- here's my question. Please listen.

10  You told them what you thought they already knew; isn't
11  that correct?

12  **A.** Emphatically, no.

13  **Q.** Didn't you just say that a moment ago, that's what you
14  told, what you thought they knew?

15  **A.** Isn't it funny that you kind of restate it that way, and
16  it seems like you are saying one thing, but it really has a
17  dual meaning.

18  **Q.** Let's go back. Let's start over. None of those
19  questions. Let's start over, okay? I don't want to trick
20  you. I want you to answer the questions as best you can?

21  Did you tell them, the feds, the investigators, the people
22  at this table what you thought they already knew?

23  **A.** I thought they knew the general outline of what happened.
24  I told them what I knew.

25  **Q.** I don't think you are answering my question. Did you tell

1   them what you thought they already knew?

2   **A.**  I think that's a funny way to phrase the question because

3   it has multiple meanings.

4   **Q.**  Let me try to break it down.

5       You're sitting there in Mr. Friedman's office the very

6   first day; is that right?

7   **A.**  I was sitting in a conference at the federal building on

8   February 21st, yes.

9   **Q.**  You were there, Mr. Offenbecher, your attorney, was there?

10  Was there someone else from his office or just Mr.

11  Offenbecher?

12  **A.**  Someone else from his office.

13  **Q.**  No one else?

14  **A.**  His assistant was there.

15  **Q.**  A young woman?  A woman?  A man?

16  **A.**  Excuse me, a woman.

17  **Q.**  Mr. Friedman was there?

18  **A.**  Mr. Friedman was there.

19  **Q.**  Was Mr. Bartlett there?

20  **A.**  Mr. -- I don't know.  I think he was there -- yes, he was

21  there the first day.

22  **Q.**  Was Agent Halla, the fellow at the end, was he there?

23  **A.**  Yes, he was there.

24  **Q.**  Was there any other agent, maybe Agent Torres?

25  **A.**  Mr. Torres was there.

1   **Q.** Anyone else that you can remember?

2   **A.** In that first interview, I think that was everyone that

3   was there.

4   **Q.** There came a time when you decided, during that meeting,

5   that you were going to give them information; is that correct?

6   **A.** Yeah, kind of right before that meeting when Lauren told

7   me that Chelsea and Suzanne were cooperating, that kind of

8   sealed the deal for me in any mind.

9      I was unsure what would happen. You know, I didn't make

10   an affirmative decision to do it, but I walked in that door

11   and the story came out.

12   **Q.** Well, when you say Lauren told you. Before you actually

13   went into the FBI office, you and your father met Lauren

14   either at or in front of a cafe?

15   **A.** That's correct.

16   **Q.** And the cafe was the Seattle Anarchist Cafe, something

17   like that?

18   **A.** I think it has a different name. If it was an anarchist

19   cafe, I didn't know it. I am not really familiar with

20   Seattle.

21   **Q.** The woman here in the red outfit; is that correct?

22   **A.** That's correct.

23   **Q.** She gave you certain information on that morning; is that

24   correct?

25   **A.** She told me she thought Suzanne and Chelsea were

1  cooperating, and we also talked that day about 924(c) and if

2  there was any way around that.

3  **Q.** What is 924(c)?

4  **A.** Use or possession of an incendiary device in furtherance

5  of a crime of violence.  It carries a 30-year mandatory

6  minimum.

7  **Q.** So she as a lawyer and you -- did you discuss that right

8  there that morning?

9  **A.** Yes.

10 **Q.** Had you discussed that prior to that morning with her?

11 **A.** 924(c), I am not sure.

12 **Q.** Had you had discussions after she got back around

13 Christmastime, Christmas Day, or thereafter, about the case in

14 general?

15 **A.** Yes, sir.

16 **Q.** In fact, you wanted to get information from her as much as

17 you could; is that correct?

18 **A.** Yes, sir.

19 **Q.** She had access to the information because she was in some

20 way involved in the Oregon case; is that correct?

21 **A.** I think that she was involved, yes.

22 **Q.** As an attorney?

23 **A.** I am unsure what her capacity was.

24 **Q.** Did there come a time between December 26th and February

25 21st that you and Lauren Regan had a conversation where you

1    asked her: Did Briana Waters' name come up in this case?

2    **A.** I don't remember that. It might have happened. I don't

3    know.

4    **Q.** Well, you were trolling for some way out of your

5    predicament?

6    **A.** No, I was trolling to understand the parameters of my

7    predicament.

8    **Q.** Was it explained to you, either by Lauren or by any other

9    lawyer or by any friends, that it's of no value to the feds to

10   give them names they already know, you have to come up with a

11   new name in order to get any kind of play with them?

12   **A.** No, that was never explained.

13   **Q.** That was never explained?

14   **A.** It was never explained and, in my experience, it's not

15   accurate either. The prosecutors offered cooperation deals to

16   everyone involved with the case whether or not they named new

17   names or not. I don't really know but --

18   **Q.** Did they ask you if you knew where Justin Solondz was?

19   **A.** They probably -- yeah, I think they've asked that.

20   **Q.** He was a fugitive; is that correct? Or at least he hadn't

21   been arrested; is that correct?

22   **A.** He's not arrested.

23   **Q.** Still not arrested?

24   **A.** Yeah.

25   **Q.** At the time, he was not arrested? On December 7th or any

1  day since; is that correct?

2  **A.**  That's correct.

3  **Q.**  So is that something with which the feds wanted some help?

4  **A.**  They asked me if I knew where he was.

5  **Q.**  So they wanted your help on that; is that correct?

6  **A.**  If I had information, they wanted it, yes.

7  **Q.**  So they wanted you to take from that that they wanted new

8  information?

9  **A.**  They never asked me about Justin Solondz except -- until I

10  had named him.

11  **Q.**  Then they asked you, do you know where he is, right?

12  Words to that -- or questions to that effect?

13  **A.**  Uh-huh.

14  **Q.**  They wanted to know that new information; is that correct?

15  **A.**  Yes, they wanted to know where Justin Solondz was.

16  **Q.**  Was there a time, sometime in February of '06, before the

17  21st, that you went to Mr. Friedman's office, where you took a

18  walk along the river with Lauren Regan and you asked her, in

19  the documents that you've gotten, the discovery documents

20  you've gotten in the Oregon case, has Briana Waters' name come

21  up?

22    You don't remember that?

23  **A.**  I don't remember asking her that.  I think I probably

24  would have been reluctant to say Briana's name.  I might have

25  asked her that, though.

1  **Q.** Let's talk about the day you went to speak to the feds,
2  February 21st.
3      Did they ask you what happened at the University of
4  Washington arson?
5  **A.** No.
6  **Q.** They did not ask you?
7  **A.** They asked me my name, some background information and
8  some generalized questions, and I confessed my criminal
9  activity.
10 **Q.** You had not known until that day, at that meeting, that
11 you were going to confess; is that correct?
12 **A.** I wasn't sure what I was going to do.
13 **Q.** Were you scared you were going to go to prison for 35
14 years if you didn't tell them?
15 **A.** Yes.
16 **Q.** You made a decision right there in that office at that
17 time to save yourself; is that correct?
18 **A.** Uh-huh.
19 **Q.** Now, you've indicated a couple times that this was about
20 remorse.  There had been no remorse for two-and-a-half months
21 since Meyerhoff's remorse; is that correct?  You had not
22 expressed remorse?
23 **A.** No, I had expressed remorse.
24 **Q.** To the Federal authorities?
25 **A.** No.

1  **Q.** To your mother, your father and some friends?

2  **A.** Uh-huh.

3  **Q.** Did you express remorse to Stan Meyerhoff?

4  **A.** I don't know. Stan was in jail and we had very limited

5  communication.

6  **Q.** But you had some communications, right?

7  **A.** Yes.

8  **Q.** You saw him at least once?

9  **A.** I saw him only once.

10 **Q.** You saw him once where you pointed to your chest and asked

11 if he had named you, right?

12 **A.** Yes.

13 **Q.** Did you have telephone conversations with him?

14 **A.** Yes, I had telephone contact with him, starting on

15 Christmas.

16 **Q.** But it was very difficult because you knew everything was

17 probably being listened to and censored and monitored; is that

18 correct?

19 **A.** Uh-huh.

20 **Q.** So you had to be very careful about what you said; is that

21 correct?

22 **A.** Yes, sir.

23 **Q.** You didn't want to incriminate yourself or have him

24 incriminate himself?

25 **A.** Or incriminate me.

**Q.** Or incriminate you.  So you were concerned.  When did you
first learn that he had been cooperating since two hours after
he was arrested?

**A.** Well, I strongly suspected that the day after when I
talked with him and he said this very fatalistic thing -- I
don't remember what it was -- and I told him to get an
attorney.  And then there came a point where he said this
thing to me, which stuck in my mind, he said that I betrayed
everyone.

**Q.** When he said betrayed, what did you take that to mean?

**A.** That he was cooperating to the best of his ability.

**Q.** I can't remember, did you say you do or don't remember
that you used the word betrayed; that you wrote to Jeff Hogg
and others, saying "I did not betray anyone"?  Do you or do
you not remember that?  I am asking again because I don't
remember the answer.

**A.** I don't remember the answer either.  It's possible I used
those words.

**Q.** If you did, then what did you mean by your use of the word
betrayed?

**A.** No one is going to prison because of me, is what I would
have meant.

**Q.** That's what you meant, that nobody is going to prison
because of you?

**A.** I didn't think I had given any names that the federal

1  authorities did not already know.

2  **Q.** Isn't that the question I asked you 12 minutes ago, where

3  you denied that?  You just said now, I don't believe -- I

4  believe I didn't give them any names they didn't already know?

5  **A.** No.  The way you said it was, did you tell them what they

6  already knew?  You rephrased the question like that a number

7  of ways, a number of times.

8  **Q.** Now you've just answered it?

9  **A.** No, that's a different question.

10  **Q.** Whatever it is, however the question came up.  You just

11  said to us, and to this jury, I didn't give them any names

12  they didn't already know.

13  **A.** I believed that, and I was wrong.  I named myself.

14  **Q.** Other than yourself, is it true that you didn't give them

15  any names they didn't already know?

16  **A.** I don't know what they knew and what they didn't know.  I

17  think that I definitely fingered myself definitively.  They

18  may have had my name already.  I am not privy to what the

19  government knew.

20  **Q.** You knew, your family had been contacted and told that you

21  were facing serious problems, right?

22  **A.** Yes.

23  **Q.** So you knew somehow they had your name?

24  **A.** I assumed Jen Kolar had given it to them.

25  **Q.** You learned your boyfriend had also given them your name

1  -- I shouldn't say also -- that your boyfriend had given them

2  your name; he told you so?

3  **A.** Yeah, he did tell me that.

4  **Q.** So you knew, by the time you spoke to them, that they had

5  your name?

6  **A.** Well, yes, they had my name.  They called me.  My number

7  was up.

8        MR. BLOOM:  Judge Burgess, the prosecutor had asked

9  if it's okay to interrupt the witness's testimony so that they

10  can call one or two other witnesses.  We will do that.  We

11  hadn't actually given a definitive answer, but I would be

12  happy to do that.  If we could do that now, would that be all

13  right?

14        THE COURT:  Well, if you get to the witnesses after

15  the break, can you finish them today?

16        MR. FRIEDMAN:  Yes.

17        MR. BLOOM:  Because I do have a lot more questions.

18        THE COURT:  Keep going.

19  BY MR. BLOOM:

20  **Q.** I do want to talk about what you told the feds on that

21  very first day.  Did you tell them about the University of

22  Washington arson?

23  **A.** Yes, I volunteered that information.

24  **Q.** When you say you volunteered it.  Did they actually ask

25  about the Center for Urban Horticulture, or did you bring it

1 up first, say there's something I want to tell you?

2    How did that come up?

3 **A.** I am not sure. I think I brought it up without them ever

4 asking about it. I am not sure.

5 **Q.** Did you first tell them, before you talked about that

6 incident, did you first tell them about the five book club

7 meetings?

8 **A.** I am not sure what order the conversation happened in. I

9 did tell them about the five book club meetings.

10 **Q.** Did you tell them that there came a time when you were

11 dropped off at Denny's, sometime a week before the incident?

12 **A.** Yes.

13 **Q.** Did you tell them it was either Denny's or Perkins?

14 **A.** Yes.

15 **Q.** So you weren't quite clear on that at the time you first

16 told them; is that correct?

17 **A.** I have been back to the Denny's since then.

18 **Q.** So now you are clear?

19 **A.** Yes.

20 **Q.** Did you tell them, without being asked, that Briana and

21 Connor had recently broken up?

22 **A.** I would have told them that. That was my understanding.

23 **Q.** And that just came up, when the name Connor came up,

24 brought up by you, you volunteered, without being asked, that

25 Connor and Briana had just broken up; is that correct?

1  **A.** I am not sure whether I was asked or not asked. I think I

2  probably described Briana as his recent ex-girlfriend. That

3  was my understanding. It still is my understanding.

4  **Q.** Now, we've talked about the meeting that you now recall

5  was at Denny's. Was Jennifer Kolar there?

6  **A.** I am not sure. I don't think I remembered at first that

7  she was. I am really not sure. She might have been, she

8  might not.

9  **Q.** As I think you testified, the arson wasn't planned in any

10  part at that restaurant, what's called Denny's. There was no

11  arson planned in discussion at that restaurant; is that

12  correct?

13  **A.** The arson was not plotted there, no. Not while I was

14  there.

15  **Q.** I am sorry?

16  **A.** Not while I was there.

17  **Q.** Was there a time you left to go to the bathroom or take a

18  walk or make a phone call?

19  **A.** During the course of the interview?

20  **Q.** During the course of the meeting that took place at

21  Denny's.

22  **A.** I don't remember.

23  **Q.** Now, I think you said that after you all left Denny's --

24  somebody ordered food, and then you left Denny's and you went

25  somewhere together and had a discussion?

**A.** No.  You asked me where we went afterwards.  I said it would make sense that that would happen, but I don't have a memory of it.

**Q.** So the meeting at Denny's took place what date, what day of the week?

**A.** I believe it would have been Friday or Saturday, a week prior to the arson.

**Q.** Okay.  You don't recall Jennifer Kolar being at Denny's; is that correct?

**A.** No.  I am unsure if she was there.

**Q.** I am sorry?

**A.** I am unsure if she was there.  I think she might have been.

**Q.** You are also unsure whether right after Denny's, whoever was there, went to some open area and had a discussion?  You don't remember; is that correct?

**A.** I don't remember.

**Q.** Well, do you remember, did there come a time when you left the area of Denny's?

**A.** I don't remember.  I am sorry, I thought you meant while I was there.  I don't remember leaving for sure or going to the bathroom or anything while I was there.  Obviously we left Denny's at some point.

**Q.** Right.  And where did you go?  You don't remember anything about where you went?

**A.** No, sir, I don't remember where we went.  The next clear

memory I have is being on the track the next morning.

**Q.** So you don't remember whether or not there was a meeting,

after you left Denny's, until the time you were on the track

the next morning?

**A.** No, I don't remember.

**Q.** Okay.  So you don't remember one way or another.

When you say the next morning, what day of the week was

that?

**A.** The next morning, it was probably Saturday morning or

Sunday morning.

**Q.** Can you remember which it was?

**A.** Not with any absolute certainty.

**Q.** Was there a meeting any time after you were on the track?

**A.** Yeah.

**Q.** Where was that meeting?

**A.** We met in a park-like area in a field.

**Q.** And who was at that meeting?

**A.** Myself, Jennifer Kolar, Briana Waters, Justin Solondz, and

Avalon.

**Q.** How did you get from the track to that meeting?

**A.** I can't answer that question.

**Q.** How long did that meeting take?

**A.** I don't know.  The significant features of that meeting in

my mind were that Jen described breaking the window.  I asked

1  that we not use the term ELF, and we vowed, agreed not to

2  cooperate.

3  **Q.** Was there any meeting after that, that weekend.

4  **A.** I believe that all of these meetings happened -- the first

5  weekend we met at Evergreen one time, and in my memory it

6  would seem that meeting was after that park meeting.

7  **Q.** At the Evergreen meeting, was the arson discussed?

8  **A.** Yes.

9  **Q.** And Evergreen is the state college or state university?

10 **A.** Yes.

11 **Q.** Is it a place where -- were you in a room?

12 **A.** I remembered that we went -- and I couldn't describe the

13 building we went in -- and walking through this labyrinth.  I

14 read somewhere Jen had described it as a computer lab, and I

15 didn't remember it that way, but once I read it, it actually

16 kind of triggered that it was off a computer lab, is what I

17 remember.

18 **Q.** Computer lab.  Was it a locked room?

19 **A.** Sir, I don't know.

20 **Q.** Were there students, a lot of students at the University;

21 is that correct?

22 **A.** There are lots of students at Evergreen University, yes.

23 **Q.** And there was a meeting, you say, about an arson in a room

24 where there were possibly students who could walk in or

25 faculty who could walk in; is that correct?

1  **A.**  They could have walked in.

2  **Q.**  Was Kolar there?

3  **A.**  I believe she was, yes.  I think she was.

4  **Q.**  Did anybody say, why are you meeting here in a public

5  room, somebody could walk in?

6  **A.**  I don't remember that conversation happening.

7  **Q.**  You would have been aware of that, right?  You were

8  somewhat security conscious, right?

9  **A.**  That would have been fitting with security protocols that

10  were comfortable to me.

11  **Q.**  I am not sure what you mean by that?

12  **A.**  That was consistent with our security culture.

13  **Q.**  What was?  Meeting in a room where somebody could walk?

14  **A.**  Speaking in an empty room, unassociated, guaranteed to be

15  bug free.

16  **Q.**  Aside from bug free, was it a room that was open to the

17  students and public in general, and faculty?

18  **A.**  Briana and Justin seemed familiar with the room.

19  **Q.**  And they were both there?

20  **A.**  Yes.

21  **Q.**  And what happened after that meeting?

22  **A.**  Let's see.  I think in the timeline, the next thing I

23  remember would be driving back to Eugene.

24  **Q.**  In whose car?

25  **A.**  In Stan's car.  And we stopped at the pullout on the

1   opposite side of the highway than the one we had stopped at on

2   the way up.

3   **Q.**  How did you get to meet with Stan?

4   **A.**  I don't remember.

5   **Q.**  Did he pick you up at Evergreen?

6   **A.**  That's possible.

7   **Q.**  Do you remember?

8   **A.**  No, I don't remember.  I just said that.

9   **Q.**  So you and he took -- somewhere or another you wound up in

10  his car; is that correct?

11  **A.**  Yes.

12  **Q.**  And you drove to Eugene?

13  **A.**  Yes.

14  **Q.**  Was it just the two of you, or were there other people?

15  **A.**  I believe Suzanne Savoie and Daniel McGowan were there.

16  **Q.**  Did you talk about any plans for any arsons in the car?

17  **A.**  No.

18  **Q.**  Where did you go when you went back to Eugene?

19  **A.**  I don't remember where I was dropped off.

20  **Q.**  Did you live in Eugene?

21  **A.**  I lived in Eugene at that point.

22  **Q.**  Where were you living in Eugene?

23  **A.**  It would have been in the house with Lauren Regan.

24  **Q.**  The same Lauren Regan?

25  **A.**  The same.

1 **Q.** You didn't tell her you were planning an arson, right?

2 **A.** I didn't tell Lauren that I was planning an arson. I

3 believe Lauren knew that I was involved in underground

4 activities and was supportive of that.

5 **Q.** Did you tell her you were planning an arson?

6 **A.** I wasn't planning an arson. I didn't tell her I was about

7 to be involved in one.

8 **Q.** You were not planning an arson?

9 **A.** Like I said, I had minimal involvement in the planning.

10 What I did in that timeframe was buy some black clothes, some

11 black dark clothes.

12 **Q.** Did you conceal from Lauren Regan what you were about to

13 do?

14 **A.** I concealed from everyone what I was about to do, except

15 for the people directly involved.

16 **Q.** So you were able to deceive people about what was on your

17 mind; is that correct?

18 **A.** Deception is not a particular skill that I have. I had to

19 learn how to be evasive when I started being involved with

20 this group of people. It was difficult for me because I was,

21 especially at that point, a very, very open,

22 apt-to-put-what-I-thought-into-words person.

23 **Q.** In any event, you did not open up, of course, and tell

24 anyone you were about to be involved in burning down a

25 building; is that correct?

1  A.  Correct.

2  Q.  You were able to keep that a secret; is that correct?

3  A.  Yes.

4  Q.  Now, going back to that first weekend, was there a time,

5  was there a meeting at Evergreen where -- who was present at

6  that meeting?

7  A.  The same people.

8          MR. FRIEDMAN:  Objection, Your Honor.  This has all

9  been asked and answered.

10  BY MR. BLOOM:

11  Q.  Was Jennifer Kolar at that meeting?

12          MR. FRIEDMAN:  Objection, Your Honor.

13          THE COURT:  Mr. Bloom, any reason why we are going

14  back and forth over the same --

15          MR. BLOOM:  Yes, Your Honor.  I am about to ask her

16  what she told -- about to impeach her where she indicated that

17  Jennifer Kolar was not at that meeting, as she told them on

18  the 21st.

19  A.  Yes, sir, I do not remember the conversation about fuel,

20  how much --

21  BY MR. BLOOM:

22  Q.  About fuel?

23  A.  About how much fuel to use on the 21st.

24  Q.  No, that's not my question.  My question is, on the 21st

25  of February of 2006, did you tell Mr. Friedman, and everybody

1  else who was present, that Diver was not there at the

2  Evergreen meeting?

3  **A.**  I may have said that on February 21st.

4  **Q.**  Would that have been true or not true?

5  **A.**  That was accurate to my recollection at that point in

6  time.

7  **Q.**  So is there something that helped you refresh your

8  recollection?

9  **A.**  Yeah.  Actually, I think I did remember the conversation

10  about fuel at that first interview, but later I remembered it

11  was Jen who advocated for using less fuel.

12  **Q.**  My question is, on the first day you spoke to law

13  enforcement, did you in fact tell them that Diver, Jennifer

14  Kolar, was not present at the meeting you say took place at

15  Evergreen?  Did you tell them that on the 21st, February of

16  2006?

17  **A.**  I believe I could have told them that, yes.

18  **Q.**  You were essentially making it up as you went along in

19  February 2006; is that correct?

20  **A.**  I think that would be a gross mischaracterization of what

21  I just said.

22  **Q.**  You know you had committed the arson; is that correct?

23  **A.**  Yes, I know I had committed the arson.

24  **Q.**  You knew Jennifer Kolar was one of the people who

25  committed the arson with you; is that correct?

1   **A.**   Yes, sir.   That's why I named her.

2   **Q.**   But you didn't name her as being at that meeting that you

3   say took place at Evergreen; is that correct?

4   **A.**   I just answered that question.

5   **Q.**   Was she in fact at one of the meetings that weekend, or

6   more than one?

7   **A.**   I remember her very distinctly, or somewhat distinctly, at

8   the meeting in the grass and at the Evergreen meeting.

9   **Q.**   So you remember her being at two of the meetings; is that

10  correct?

11  **A.**   I have distinct recollections of conversations that she

12  was part of at two of the meetings, that's correct.

13  **Q.**   Did you tell Mr. Friedman and his associates on the 21st

14  that she, Diver, was at one of the meetings that weekend?

15  **A.**   I am not sure.   I haven't looked at the reports from those

16  interviews.

17  **Q.**   Do you have an independent recollection that you said that

18  Diver was at one of the meetings that weekend?

19  **A.**   That seems accurate.

20  **Q.**   Now, the next weekend you say you drove up from Eugene, is

21  it to Olympia?

22  **A.**   The next weekend I drove up from Eugene to Olympia, I

23  believe, yes.

24  **Q.**   With whom did you drive up?

25  **A.**   I believe it was with the same four people.

1  **Q.** Who would that be?

2  **A.** Stan Meyerhoff, Suzanne Savoie, Daniel McGowan, and

3  myself.

4  **Q.** Now, from Eugene to Olympia, what direction is that?

5  **A.** North.

6  **Q.** And about how long a drive is it between Eugene and

7  Olympia?

8  **A.** I don't know. It's been a long time since I drove it.

9  **Q.** What's your best estimate?

10 **A.** Four, five hours; I don't know.

11 **Q.** Okay. Do you know where Clatskanie, Oregon, is?

12 **A.** I do now. I didn't at that point. I think I know -- no,

13 I don't really know where it is now.

14 **Q.** Well, it is certainly south of Olympia, right?

15 **A.** It's in Oregon, yes.

16 **Q.** Am I correct that the people you say you drove up with --

17 Meyerhoff, Savoie, McGowan -- were they in some way involved

18 in the Clatskanie incident?

19 **A.** Meyerhoff, Savoie, McGowan, Block, and Zacher are the

20 people who I thought were involved in the incident and who

21 pled guilty to that.

22 **Q.** So you have them driving from Eugene up to Olympia; is

23 that correct?

24 **A.** I believe they probably went to Nathan and Joy's house,

25 but I don't have any way to verify that.

1  **Q.** You were with them on the ride, you say?

2  **A.** Are we talking about the weekend of the arson?

3  **Q.** The weekend you committed the arson.

4  **A.** I believe that is how I got there. I remember I was in a

5  car with the same people the next weekend, yes.

6  **Q.** And what day was that?

7  **A.** Let's see. I think it was -- the arson happened on early

8  Monday. It was either Saturday or Sunday of that weekend.

9  **Q.** Think back. Was it Saturday or Sunday or some other day?

10  **A.** Well, it would have only been one of those two days. I

11  think it was Sunday.

12  **Q.** So on Sunday you drove up. What time did you leave

13  Eugene?

14  **A.** I have no idea, sir.

15  **Q.** Was it in the morning?

16  **A.** I have no idea.

17  **Q.** Was it light out?

18  **A.** Sir, I don't know.

19  **Q.** You remember being in the car with the particular people,

20  but you can't tell us whether it was even light or dark?

21  **A.** I know I drove in the car with the same people the next

22  weekend. That's my best recollection.

23  **Q.** Where did you go on that Sunday when you drove from Eugene

24  to Olympia?

25  **A.** I don't know. To Olympia.

1  **Q.** What part of Olympia?

2  **A.** Sir, I can provide no additional detail on that question.

3  **Q.** Somebody's home, somebody's office, some restaurant?

4         MR. FRIEDMAN:  Objection.  Asked and answered.

5         THE COURT:  She said she has no recollection.

6         MR. BLOOM:  Okay, no recollection.

7  BY MR. BLOOM:

8  **Q.** Did there come a time when Stan Meyerhoff, you saw him

9  assisting in the construction of incendiary devices?

10 **A.** No, I didn't see him assisting in the construction.

11 **Q.** Did you see Connor doing so?

12 **A.** I didn't witness that firsthand, except at the point when

13 I was taken into the clean room.

14 **Q.** I didn't hear the last part?

15 **A.** I didn't witness anything happening with the incendiary

16 devices except at the point where I was taken into the clean

17 room.

18 **Q.** Was Meyerhoff there in that house or the area of that

19 house?

20 **A.** It's possible that I saw him there at one point, but it's

21 a hazy memory.

22 **Q.** Well, he was your boyfriend.

23 **A.** No, he wasn't my boyfriend at that point.

24 **Q.** Had you been flirting with him at that point?

25 **A.** I was starting to have a flirtatious relationship with

1  him.

2  **Q.** So you are not aware -- you believe you saw him in what

3  you are calling the clean room?

4  **A.** Huh-huh.

5  **Q.** In the area of the clean room?

6  **A.** If I saw him, it was walking from the right access, the

7  fenced opening of the house, to the outbuilding, walking in

8  between.

9  **Q.** Was it light out?

10  **A.** Yes, if this memory is accurate, which I am not sure that

11  it is.

12  **Q.** So you are not sure; is that correct?

13  **A.** If I saw that, I knew I wasn't supposed to see it, so I

14  would have put it out of my mind.

15  **Q.** And you were not supposed to see it why?

16  **A.** The two actions were supposed to remain independent of one

17  another, as far as I was concerned.

18  **Q.** And that was the information that you had, is that

19  correct, that there were two actions?

20  **A.** I had an understanding that two crimes were going to be

21  committed. I didn't know they were both arsons.

22  **Q.** Okay. You mentioned a clean room. What is a clean room?

23  **A.** It's a room free of our genetic material and identifying

24  information and material associated with the site.

25  **Q.** And the idea behind a clean room is that a hair or some

1  skin or any kind of material that would identify a person, a

2  clean room should not involve that.  That's the whole idea, it

3  should be clean of those kind of things; is that correct?

4  **A.**  Yes, sir.

5  **Q.**  Is it also true, based on the manuals written by your

6  fiance and Avalon, that the clean room should be associated

7  only with a person who is not involved in the arson?

8  **A.**  I can't speak to anything in the manuals.

9  **Q.**  Well, were there discussions about what a clean room

10  should be that you participated in?

11  **A.**  I think at that Santa Cruz meeting, the book club meeting

12  there was a conversation about the clean rooms.

13  **Q.**  Am I correct that it was made clear that clean rooms are

14  supposed to be unassociated, unconnected with any of the

15  people who will be participating in the arson?

16  **A.**  The fact that there were deviations from the perfect crime

17  is completely consistent with the way the groups operated.

18  **Q.**  Could you answer my question?  Were there discussions that

19  indicated that a clean room should never be associated with a

20  person who is a participant in the arson?

21  **A.**  I don't remember that being part of the Santa Cruz

22  conversation.  It would have been your fibers and materials

23  shouldn't be in the space.

24  **Q.**  In fact, the place that you are claiming the clean room

25  was, was a garage at Conger Avenue in Olympia?

1  **A.** I don't know the street name. It was Briana's house, as
2  far as I am concerned.
3  **Q.** And Briana lived, her living space was in that garage?
4  **A.** It wasn't at that point.
5  **Q.** And how do you know that?
6  **A.** There wasn't a bed.
7  **Q.** In fact, the main house was owned by a man named Ocean; is
8  that correct?
9  **A.** I knew that someone named Ocean was associated with the
10 house.
11 **Q.** And in fact, at that time, the middle of May, he was not
12 living at that house. You came to learn that, didn't you?
13 **A.** I associated this person, Ocean, with the house. I don't
14 know whether I thought he lived there, was about to move in
15 there. Maybe they were waiting for a wheelchair ramp to be
16 built, I don't know.
17 **Q.** In fact, what was happening, Ocean had been in an
18 automobile accident where he was very severely injured and he
19 was a person who had to use a wheelchair. You know that,
20 right?
21 **A.** No, except that I have been told that.
22 **Q.** And in fact, that third week and beyond, the third week of
23 May and beyond, and before, there were workers working on the
24 main house, not just to build a wheelchair ramp, but to make
25 it accessible and liveable for a person with a wheelchair.

1  Did you see any of that happening?

2  **A.** I kind of have a memory that maybe a wheelchair ramp was

3  in progress or was about to be built there, but I was there on

4  the weekends.

5  **Q.** So, in fact, there was construction; do you remember there

6  was construction going on in the main house?

7  **A.** I only saw a very limited part of the main house. I don't

8  really remember a big construction project.

9  **Q.** In fact, did you come to know that nobody was living in

10  the main house at that time because of the construction?

11  **A.** Did I come to know that?

12  **Q.** Yes, ma'am.

13  **A.** No. It makes sense that there was construction going on

14  because there was maybe framing-in for a room in the house

15  that was the clean room that no one was living in.

16  **Q.** I am talking about construction in the main house; not in

17  the garage where Briana lived, but in the main house.

18  **A.** She did not live in the garage at that time.

19  **Q.** How do you know that?

20  **A.** There was no bed or furniture. If it was a bedroom, it

21  was living out of crates, sleeping on the floor.

22  **Q.** Did you see the whole garage?

23  **A.** I believe I saw the whole garage eventually. I don't

24  know.

25  **Q.** Did you or didn't you?

**A.** I saw a main area, and then eventually I was in the clean room, and I believe that was the whole area.

**Q.** So this was a clean room associated with a person you say was involved in this incident, this arson; is that correct, that's what your testimony is?

**A.** Yes.

**Q.** And contrary to the manual written by Avalon and your fiance, they decided it was okay to risk DNA material being on some of the devices, that's your testimony?

**A.** I am sorry, what's the question?

**Q.** That you are saying that what was chosen as a clean room, contrary to all the writings in the manual, was a place where a person you claim was a participant -- let's not say she was living there -- she was associated with that space, she spent time in that space?

**A.** I think there are three factual claims in your question. I refute them all.

**Q.** Well, you are an intelligent person. I ask you to help me parse them out. I am not so good with that.

**A.** To start with, I don't think Stan had a very big role writing the manual. To continue, I haven't read the manual and I can't speak to what's in it.

The idea that we worked perfectly in alignment with something Avalon wrote is wrong. We didn't. There were many small things that could not be done in the ideal manner.

1     And I think there was one other claim in there that I

2 didn't agree with.

3 **Q.** How about getting the car arranged at least 36 hours in

4 advance, do you know anything about that? Was that another

5 rule that was broken?

6 **A.** I have never heard the 36-hour-in-advance rule.

7 **Q.** Okay. Did you --

8     THE COURT: Why don't we stop you right there,

9 Mr. Bloom, so the jury can take the afternoon recess.

10     Leave your books on the chair, don't discuss the case. I

11 will have you back in here in about 15 minutes.

12     (Jury excused.)

13     THE COURT: You may be seated.

14     I guess we are talking about the other witness now, the

15 government's witness, taking them out of turn. Is that what

16 we are talking about?

17     MR. BLOOM: I think there may be two.

18     THE COURT: Will you line those up.

19     We will be at recess.

20     THE CLERK: All rise. Court is in recess.

21     (Afternoon recess.)

22     (Jury not present.)

23     THE COURT: Are we ready to continue with

24 Ms. Phillabaum?

25     (Jury present.)

1        THE COURT:  All right.  You may be seated.

2      We are going to continue the rest of the day with

3  Ms. Phillabaum.

4      Mr. Bloom.

5           MR. BLOOM:  Okay.

6  BY MR. BLOOM:

7  **Q.**  On the very first day that you spoke to law enforcement,

8  February 21, did you tell them that Connor and Briana Waters

9  were both lookouts?

10  **A.**  I don't think so.

11  **Q.**  I ask you to look at a page of a document and read it to

12  yourself, in particular the entry, the first highlighted

13  entry, and see if that refreshes your recollection as to what

14  you told them on the very first day.

15           MR. BLOOM:  May the record reflect that the clerk is

16  showing Exhibit A-191.  The whole document is A-113.

17           THE COURT:  Is what?

18           MR. BLOOM:  A-113.  It's one page from that document.

19  BY MR. BLOOM:

20  **Q.**  If you could look, there's a couple of highlighted

21  portions.  If you could look, I think it's the very first one,

22  toward the top.  Does that in any way refresh your

23  recollection as to whether or not you said, on the very first

24  day, that Connor and Briana were the lookouts?

25  **A.**  This says that I said that.

1 **Q.** Well, did you say that?  Does that refresh your

2 recollection?

3 **A.** I am very particular about my notes, and I would never

4 want someone else's notes of what I said to be taken as my

5 word.

6 **Q.** Did you -- can I get that back?  Thank you.

7 May I take it from you?  Thank you.

8 So you are saying that somebody must have gotten it wrong.

9 **A.** I am not sure if I said that or if they got it down wrong.

10 I don't think I said that.  I may have at one point used the

11 term "lookout."  My main memory is that he was the driver.

12 I think at later interviews they pushed me hard on the

13 point of whether he was in the building; whether he was also a

14 lookout.  I tried to be consistent with the fact that what I

15 remember is that he drove.

16 **Q.** After he drove, what did he do?

17 **A.** I am not sure.

18 **Q.** So you are not sure if he was a lookout, or what was it?

19 **A.** I am not sure if he stayed in the car or was a lookout.

20 **Q.** Or came with you?

21 **A.** I am pretty sure he was not at the building.

22 **Q.** Do you remember seeing him do anything in relation to the

23 building, from close up to the building?

24 **A.** No.

25 **Q.** So your position here is that there was one lookout, and

1  you're saying that that was Briana Waters; is that correct?

2  **A.**  Yeah.   If Justin filled the role as someone who was a

3  lookout at some other point during the action, I don't have a

4  clear memory of that.

5  **Q.**  Jennifer Kolar, on May 20 -- that would be Sunday -- when

6  did you first see her?  Did you have an appointment to meet

7  her at a particular time?

8  **A.**  I don't know.

9  **Q.**  Well, there did come a time when you met her, you say, at

10  a restaurant?

11  **A.**  We ended up at the Greenlake Pub together.

12  **Q.**  Could you say it a little louder?

13  **A.**  We ended up at that bar together that I was shown a photo

14  of.

15  **Q.**  That was by happenstance or a prearrangement to meet her

16  at that bar or restaurant?

17  **A.**  I am not sure.

18  **Q.**  Before you went to the restaurant -- well, let me go back.

19  You drove up from Olympia, and you are claiming that it was

20  you, Briana, Justin, and Avalon, is that what you're saying?

21  **A.**  No.   I think that might be in that report, but I don't

22  think that I said that.   I don't have a clear recollection of

23  how I got to Seattle.   I have a memory at some point, perhaps

24  during these two weekends, of being in a car with Jen Kolar.

25  It's possible that I drove there with her.

**Q.** So we are talking now about the evening, let's say afternoon and evening, 12 hours before the incident. The incident was about what time of day?

**A.** It was after dark; maybe 11:00, 12:00.

**Q.** And that was the arson. When I say the incident, the arson; is that correct?

**A.** Yes.

**Q.** Had you been in Olympia or had you been in Eugene before you went to Seattle?

**A.** I am not sure. I think I was probably in Olympia. I think I was probably dropped off somewhere in Olympia and somehow given a ride to Seattle, but I couldn't testify to that with any certainty.

**Q.** Well, did you drive -- let's go back.

What day of the week -- talking now about the weekend of the incident, the weekend of the arson. What day of the week did you go to Olympia?

**A.** I think that would have been Sunday.

**Q.** Did you travel from Eugene or from somewhere else?

**A.** From Eugene, I believe.

**Q.** How did you get from Eugene to Olympia on Sunday?

MR. FRIEDMAN: Objection, Your Honor. This has been asked and answered.

MR. BLOOM: This has not all been asked.

THE COURT: It's been asked a whole bunch of times.

1    Go ahead and answer.

2   **A.** I was in a car, Stan's car, I believe, with the same four

3   people I remember being in the car with both weekends;

4   Suzanne, Daniel, Stan, and myself.

5   **Q.** This was sometime on Sunday, which would have been May 20;

6   is that correct?

7   **A.** I believe so, yes.

8   **Q.** Do you remember where you went, where in Olympia you went?

9   Did you go to the place where the clean room was?

10       MR. FRIEDMAN:  Objection, Your Honor.  It's been

11  asked and answered.

12       THE COURT:  Let her answer it.

13    Can you answer it?

14  **A.** It may have been that I went to the clean room that

15  weekend.  I am not sure which weekend the clean room incident

16  occurred.

17  BY MR. BLOOM:

18  **Q.** When was this device built?

19  **A.** I didn't build it.  I don't know.

20  **Q.** When did you see it being built?

21  **A.** I saw it at one point in time.  It's hard for me to attach

22  each of those points in time together into a continuous reel.

23  **Q.** Can you tell us if it was the weekend of the arson or the

24  weekend before the arson?  Can you tell us that much?

25  **A.** When I was taken to the clean room?

1  **Q.** When you say you were taken to the clean room, yes.

2  **A.** I think that was the weekend of the arson.

3  **Q.** Was Meyerhoff in the vicinity of that house?

4  **A.** If he was, I didn't know it. I may have had an image of

5  him at one point, but I can't connect it to other points in

6  time. If I could talk to other people involved, I am sure I

7  would remember things I don't know now, but I have never had

8  that opportunity. This is entirely my own memory.

9  **Q.** I point out that I am talking about the arson, the weekend

10 of the arson that you are testifying about, that you are

11 giving the jury testimony about who did what. I am not

12 talking about the weekend before, the year before. I am

13 talking about the arson. If you could focus your mind on that

14 issue.

15 **A.** Okay.

16 **Q.** You came up, you said you came up on Sunday, you came up

17 from Eugene to Olympia, but you are not sure just where you

18 went to; is that correct?

19 **A.** That's correct.

20 **Q.** And you were with Suzanne Savoie. Did they just drop you

21 off, the people with whom you rode, or did they stay in the

22 location where they brought you to?

23 **A.** I have no recollection of Suzanne Savoie or Daniel McGowan

24 interacting with the people involved with the University of

25 Washington arson other than myself and Stan.

1  **Q.** Do you have any recollection that weekend, the weekend of

2  the arson, of Stan Meyerhoff interacting with anything to do

3  with what you are calling the clean room?

4  **A.** Only if that memory of him walking towards the building is

5  accurate.

6  **Q.** Did you tell the authorities on February 21 that it was

7  either Stan, that Stan may have been involved in building the

8  device or devices? Did you tell that to them?

9  **A.** Yes, I may have told him that, I am not sure. If I told

10  him that, it was for that reason. I also think I generally

11  sort of understood that Stan and Justin and Avalon were in

12  charge of the devices for both.

13  **Q.** My question was, on that Sunday, did you tell the

14  authorities, when you first spoke to them February 21, that

15  Stan and Connor were rushing to finish the devices?

16  **A.** That's accurate.

17  Just to point out. When I am speaking, I am really trying

18  very hard to be accurate, and the strength of my memory with

19  each particular question, and there's no way that the agents

20  could have written down my careful qualifications of each

21  statement that I have made.

22  **Q.** Well, having said that, my question is, did you tell the

23  agents and Mr. Friedman and whoever else was in the room on

24  February 21 that Stan and Connor were rushing to finish the

25  devices?

1  **A.** That's consistent with what I remember.  It would make

2  sense if I told the agents that.

3  **Q.** Okay.  Now, was that because Stan had to take one or more

4  devices from Olympia to Clatskanie, Oregon?

5  **A.** I am sorry, sir, I don't have any more detailed knowledge

6  about it than that.

7  **Q.** I am sorry?

8  **A.** I don't have any more detailed knowledge than what I have

9  already said.

10 **Q.** Do you now have a distinct recollection that Stan and

11 Connor were working on the devices?

12 **A.** I don't have a distinct recollection in my mind of seeing

13 that.  I remember having a distinct understanding that that's

14 what was happening.

15 **Q.** Did you know at the time -- that would be that Sunday, May

16 20 -- that there was going to be a joint action?

17 **A.** I believe I understood at that point that there was going

18 to be two simultaneous actions, yes.

19 **Q.** Did you tell Agent Halla and Mr. Friedman and the other

20 people present on the 21st of February that you did not know

21 it was going to be a joint action?

22 **A.** I did not know it was going to be a joint arson.

23 **Q.** No, my question was, did you tell them you did not know it

24 was going to be a joint action?

25 **A.** If they wrote that down, I would think they wrote it down

1  incorrectly, because I did know that other people were going

2  to Seattle and Olympia to be involved in another crime.  I

3  didn't know what that crime was.

4  **Q.**  To Seattle and Olympia to be involved in another crime?

5  **A.**  No, I guess it was to Olympia.  I don't know.  They were

6  in the car when I got out in Olympia.  They were on their way

7  to a crime.  That was my understanding.

8  **Q.**  That was going to be in Olympia, as you understood it?

9  **A.**  I had no knowledge of what or where it would be.

10  **Q.**  Were you surprised when it turned out to be Clatskanie,

11  the Jefferson Poplar Farm in Clatskanie, Oregon?

12  **A.**  Yes.

13  **Q.**  In fact, a week later, after that, at the book club

14  meeting in Sisters, they talked about it; is that correct?

15  **A.**  Yes.

16  **Q.**  So Stan Meyerhoff, who you came to know, was involved in

17  that particular incident in Clatskanie, right?  You know that,

18  right?

19  **A.**  Yes.

20  **Q.**  And you know that you saw him and Connor putting the

21  devices together in Olympia, right?

22  **A.**  No, you misstated what I said.  I never saw them putting

23  the devices together.

24  **Q.**  You didn't tell the authorities that Stan and Connor were

25  rushing to finish the devices?

**A.** We've been over this. Those are two different statements, whether I saw them or whether I understood something to be true. I am sorry to be really particular and qualified, but I feel like it's necessary.

**Q.** Give me a moment, please, and I will show you a document that may refresh your recollection.

I show you a page marked as Bates No. -- I am sorry. This is a page from a document marked A-115. It's got a Bates number 014093.

THE CLERK: A-192.

(Exhibit A-192 marked for identification.)

BY MR. BLOOM:

**Q.** I would ask you to take a look at that document. I think the clerk has pointed to a place that I would like you to look. You can look at the whole thing if you want.

Does that refresh your recollection as to whether or not you told the authorities on February 21 that Stan and Connor were rushing to finish the devices?

**A.** I am sorry, could you repeat the question?

**Q.** Yes. Does it refresh your recollection, looking at that document, which is some handwritten notes? Have you told the authorities on February 21, the first day that you were talking to them, that Stan and Connor were rushing to finish the devices?

**A.** I believe that could be accurate, that I told them that.

1    Just for larger reference, having been a journalist and a

2  debater, I am very particular about notes.  I take very good

3  notes.  I think note-taking is an appreciated skill that not

4  many people are really excellent at.

5    This other exhibit you showed me of the David Carr e-mail,

6  I notice in here his e-mail address is incorrect.  I wouldn't

7  take this as the truth about what David Carr said in that

8  interview, even though this woman understood it to be and

9  wrote it down that way.

10    I would expect there to be differences in what David

11  recollected and what I believed about what David recollected

12  about the conversations we had.

13    Likewise with the FBI agents, I don't think that I can

14  speak and be perfectly clear at all times.  So if they wrote

15  down something that was inconsistent with what I remember, it

16  would not be because I remember it inconsistently, but maybe

17  because they didn't understand me.

18  **Q.**  So Agent Halla got it wrong?

19  **A.**  No.  In this case I don't think he got it wrong.  I may

20  have said that.

21  **Q.**  What would have been the basis of your knowledge that Stan

22  and Connor were rushing to finish the devices?

23  **A.**  I am not sure what exactly I saw or heard that made me

24  think that.  It was an impression that I had.

25  **Q.**  Well, is it fair to say that Stan had a three- or four- or

1  five-hour drive from Olympia to get to place those devices at

2  the Poplar Farm?

3  **A.**  I don't know where Clatskanie, Oregon, is for sure.

4  **Q.**  So can you tell us about what time of day you made that

5  observation about Stan and Connor rushing to finish the

6  devices?

7  **A.**  During the interview or --

8  **Q.**  No, today.  Can you picture about what time of day it was

9  that you made that observation?

10  **A.**  I have been consistent that I don't remember seeing

11  something that led me to believe that.

12     I may have seen something.  I may have heard something, I

13  do not know.

14  **Q.**  Whatever it is you saw or heard, you cannot now identify

15  what time that would have been?

16  **A.**  No.

17  **Q.**  Okay.  Now, once the device or devices were finished, was

18  there any gasoline in the area of the clean room?

19  **A.**  I don't know.

20  **Q.**  Well, do you have any idea at what point gasoline was

21  either purchased or stolen or taken or siphoned from

22  somewhere?

23  **A.**  No.  I don't remember seeing gasoline in the clean room

24  ever.

25  **Q.**  So do you have any idea when the gasoline, or the

combustible material, was introduced into this device or
connected to the package or put in the car or anything?  Do
you remember anything about gasoline?  And I don't mean
gasoline to make the car run, I mean gasoline that was used as
the accelerant in these inflammatory devices.

**A.**  I remember a conversation about how much gas to use.  I
believe that Connor acquired the gas.  I don't know.

**Q.**  What makes you believe that?

**A.**  I don't know.

**Q.**  Just a guess?

**A.**  I think that was my understanding at the time.

**Q.**  From where did you get that understanding?

**A.**  I am sorry, sir, I can't say.

**Q.**  Do you know when he got the gas?

**A.**  No, sir.

**Q.**  Do you know from where he got the gas?

**A.**  No.

**Q.**  Did you drive in a vehicle from Olympia to Seattle?

**A.**  Yes.

**Q.**  Was there gas?  I don't mean in the gas tank.  Was there
gas accelerant in the vehicle when you drove up?

**A.**  I don't know.  I don't have a particular memory of the
vehicle or the drive.

**Q.**  Well, did it smell like gasoline?

**A.**  I don't have a particular memory at all, including the

1  smell of gas.

2  **Q.** Do you remember how long it took to get from Olympia to

3  Seattle?

4  **A.** I don't know.

5  **Q.** Was it ten minutes or half an hour or an hour?

6  **A.** I don't know. I have done the drive a large number of

7  times. I think it's like an hour or something.

8  **Q.** Do you actually remember that day -- it was apparently a

9  Sunday, maybe the end of the afternoon or something like that.

10 Do you remember whether there was a lot of traffic? Sometimes

11 there's a lot of traffic here in the Tacoma area.

12 **A.** The only particular memory I have of being in a car from

13 Seattle to Olympia is the time I drove with Jen Kolar. It may

14 have been to Seattle that night; it may not have been. I

15 don't know.

16    And it was evening and there was traffic, and we may have

17 talked about this issue of does Briana hate me because she

18 thinks I slept with her boyfriend. That's why I would

19 remember.

20 **Q.** So this is a conversation with Kolar; is that correct?

21 **A.** Yes, if I'm remembering correctly.

22 **Q.** Well, it wouldn't have been this particular date, the

23 20th, because you were on your way to meet Kolar, according to

24 your testimony.

25 **A.** No, I am not sure. I think I testified I might have been

1  with Jennifer Kolar when I drove to Seattle.

2  **Q.**  I understood that you met Kolar at a restaurant.

3  **A.**  It definitely was at a restaurant with Jennifer Kolar.

4  **Q.**  You don't remember that that's where you met her that

5  night?  I don't mean met her for the first time; I mean

6  that's where whoever came from Olympia met Kolar in Seattle.

7  **A.**  When you asked me that previously, I told you they did

8  come to be at a restaurant with Jennifer Kolar.

9  **Q.**  She could have been in the car with you from Olympia to

10 Seattle?

11 **A.**  That's possible.  I am not sure.

12 **Q.**  Or maybe you picked her up at Sea-Tac or somewhere?  I

13 don't mean the prison, the jail; I mean the airport.

14 **A.**  I am pretty sure that didn't happen, but I don't know.

15 **Q.**  Before you got to the restaurant, did you stop somewhere

16 else?

17 **A.**  I don't have any memory for sure of that drive.

18 **Q.**  Do you remember going to any dumpsters at any time that

19 night?

20 **A.**  No.

21    I'm sorry, I remember walking past the dumpsters on our

22 way to the site.

23 **Q.**  But before that, was there a time when you remembered

24 anybody dropping off the devices and gasoline at the

25 dumpsters?

1  **A.**  My recollection is that Justin placed the devices there
2  sometime earlier in the evening.
3  **Q.**  When you say earlier in the evening, how did he do that?
4  Was he with you?
5  **A.**  I wasn't with him when that happened.
6  **Q.**  So you are in the car, you say, from Olympia to Seattle,
7  in the car, and you get to Seattle, right?  Where do you go in
8  Seattle?
9  **A.**  I ended up at that bar.
10  **Q.**  Where did you first go in Seattle?
11  **A.**  I don't know.
12  **Q.**  That's where you ended up.  Was there something before the
13  bar?
14  **A.**  I don't know.
15  **Q.**  Specifically, was there a stop at anybody's home to pick
16  up anybody?
17  **A.**  It's possible.  But I want to add one little bit that I
18  remember, is that there was this role, this thing of dropping
19  off a car under an overpass, I think.  I am not sure where
20  that fits in my complete recollection of things.
21  **Q.**  Was that that night?
22  **A.**  I think so, yes.
23  **Q.**  Or was it in the afternoon?  When was it?
24  **A.**  Well, I don't remember it that night.  I remember getting
25  in the car really the next morning.  I am not sure.  I am

1  sorry.

2  **Q.** Did it have to do with this particular weekend?

3  **A.** I think it did.

4  **Q.** What kind of car?

5  **A.** I don't know.

6  **Q.** Whose car?

7  **A.** I don't know.  I just remember an overpass and the car

8  being dropped off.  Maybe it had to do with what time we drove

9  back the next morning.  I am not sure.

10  **Q.** Was it Jennifer Kolar's car?

11  **A.** Possibly; I don't know.

12  **Q.** So do you remember -- you are saying you don't remember

13  the very first stop that you made in Seattle?

14  **A.** The first place I remember being in Seattle is at that

15  bar.

16  **Q.** At that bar, and at that bar there were five of you?

17  **A.** Yes.

18  **Q.** What time did you get to that bar?

19  **A.** I don't know.  Early evening.

20  **Q.** You say early evening.  What do you mean, 6:30, 7:00?

21  **A.** I don't know what time I got to the bar.

22  **Q.** Just think.

23  **A.** I am sorry, sir, I can't say with any specificity.  It was

24  afternoon.

25  **Q.** What makes you think it was afternoon?

1   **A.**   Well, the bar was open and we ate dinnier-ish type food.

2   **Q.**   That could have been anywhere from 4:30 to 9:00, in that

3   range?

4   **A.**   That's correct.

5   **Q.**   This is a meeting, according to you, of the five people

6   who were going out to commit an arson, to burn down a building

7   at the University of Washington.  Am I correct about that?

8   **A.**   Yeah.  It was a meet-up, more than a meeting, to discuss

9   things that were -- from the site we were going first to burn

10   the building.

11   **Q.**   My question is, are you saying that you don't remember

12   whether or not -- or you don't remember dropping off the

13   devices at a dumpster area yourself -- you, yourself -- with

14   anyone prior to the restaurant?

15   **A.**   That's correct, I don't think I was part of that.

16   **Q.**   So did Justin jump out of the car and -- what happened?  I

17   don't quite get it.  There were five of you in the car, and

18   you're saying Justin dropped off the devices at the dumpster.

19   How did he do that if you were all together?

20   **A.**   The FBI or the U.S. Attorney's Office may have believed

21   that there were five of us in the car.  I have no clear

22   recollection of getting to Seattle and being in a particular

23   car with any number of people.

24   **Q.**   You just remember leaving Olympia and arriving; the next

25   you know, it was the restaurant?

1  **A.** Sir, I don't remember leaving Olympia.  I am very sorry.

2  The first time I ever gave an interview was a number of years

3  later.  The things I can remember, I don't remember in

4  continuous sequence.

5      I have done my best to remember what I can.  If I were to

6  have new memories, it would probably involve having to talk

7  with other people who were there.

8  **Q.** In other words, somebody could refresh your recollection,

9  you are saying, a conversation with someone might refresh your

10 recollection.

11     I am not sure, is that what you are saying?

12 **A.** If I could talk with someone, that would probably refresh

13 my recollection.

14 **Q.** Who would be that someone?

15 **A.** Well, Briana, Jen or Justin could add details to what

16 happened.

17 **Q.** Briana, who said she wasn't there at all, you think she

18 could refresh your recollection?

19 **A.** Sir, I believe that Briana was there.  I am certain Briana

20 was there.

21 **Q.** Because that's what you said on February 21st, and if you

22 don't say that, you go to prison for the rest of your life?

23 **A.** I think if I genuinely had misunderstood or misremembered,

24 I wouldn't go to prison for life.  I haven't misunderstood or

25 misremembered.  I am very clear that Briana Waters was at the

arson at the University of Washington Horticulture Center,
without a doubt.

**Q.** You can't even remember what time you left Olympia?

**A.** That's true, I do not have a continuous memory of the
sequence of events.

**Q.** Well, it's important, is it not, for your purposes to say
your own self -- you have to say -- you have to say -- that
Briana Waters was at that arson?

You have to say it; otherwise, it's 35 years in prison for
you, and you won't get to see your parents out on the street
until then?

**A.** I think if I had genuinely had a bad memory, that
Mr. Bartlett and Mr. Friedman have no interest in convicting
someone who was not there, and if I said to them that was not
the right person, I don't think that they would punish me for
that. But I don't know. I mean, they very well could punish
me for that, but I have no doubt about my memory on the point
of whether or not Briana was there.

**Q.** You say you don't think they have an interest in
convicting somebody who is innocent, is that what you are
saying?

**A.** That's right. I don't believe that they want to convict
an innocent person.

**Q.** Have you been reading our pleadings online?

**A.** I have read your pleadings.

1  **Q.** Without getting into the specifics, you know that we have

2  made certain claims, just yes or no?

3  **A.** Yes. I think there's this idea that this is a political

4  prosecution. I have never gotten the sense at all, which has

5  actually made it quite a bit easier for me to deal with the

6  United States Attorney's Office. They never questioned me

7  about people who were not involved in noncriminal activities

8  and other political activities.

9  **Q.** Have you read our pleadings with regard to factual issues

10  that have nothing to do with political considerations? Just

11  yes or no?

12  **A.** I have read your pleadings.

13  **Q.** And you know that we've made certain claims about certain

14  things that we believe took place; correct?

15  **A.** Yes.

16  **Q.** And you know that those things do not have to do with any

17  political anything, they have to do with particular facts that

18  we allege, period? Just yes or no, please.

19  **A.** I am sorry, I'm not sure of the question. You allege

20  things in your brief, of course.

21  **Q.** Yes. And addressing the fact that -- addressing the fact

22  that you say they wouldn't want to convict somebody who's

23  innocent, you know that our pleadings address certain factual

24  issues that relate to that kind of claim?

25      I am being very careful with my words here because I

1 really don't want you to -- there's been a ruling by the Court

2 that we can't go into certain things.  So I am trying to keep

3 it narrow in response to your statement that they wouldn't

4 convince a person who's innocent.

5 **A.**  I don't think I have read in your pleadings that the

6 prosecutors want to convict an innocent person.

7 **Q.**  Have you read in our pleadings claims that we make about

8 what certain FBI agents have done?  Just yes or no.

9 **A.**  I have read your pleadings.

10 **Q.**  Have you read them with regard to claims that we make with

11 regard to what certain FBI agents have done?

12 **A.**  If there's been a ruling about introducing those, I would

13 rather not speak about them.

14 **Q.**  Well, if there's an objection and the Judge says you

15 can't, then you can't, but for now --

16        THE COURT:  Why don't we move on to another line of

17 questioning.

18        BY MR. BLOOM:  I am sorry?

19        THE COURT:  Another line of questioning.

20        MR. BLOOM:  If that's the answer, that's correct.  I

21 understand and I respect that.

22 BY MR. BLOOM:

23 **Q.**  Now, did there come a time when you were right there at

24 the Center for Urban Horticulture and Avalon was in Toby

25 Bradshaw's office, were you just a few feet away from him?

1  **A.**  Yes.

2  **Q.**  And the window had been broken?

3  **A.**  Yes.

4  **Q.**  Was it a large window?  Small window?  How did that work?

5  What do you remember about that?

6  **A.**  It was a big window.

7  **Q.**  And did Avalon hand out any documents to you?

8  **A.**  He did.

9  **Q.**  What kinds of documents were they?

10  **A.**  Excuse me, he handed me materials from Professor

11  Bradshaw's office.

12  **Q.**  Materials, documents of some kind; is that correct?

13  **A.**  Yes.

14  **Q.**  Am I correct that you testified on direct that there were

15  no documents?

16  **A.**  I don't know.

17  **Q.**  About renting a car, did you tell the authorities that

18  Briana Waters had an older woman, an aunt, rent a car?

19  **A.**  Yes.

20  **Q.**  You testified the other day that your involvement in the

21  WTO was in 1999, the Seattle events that took place in the WTO

22  conference?

23  **A.**  Yes, it was in 1999.

24  **Q.**  You testified that, in fact, what you were involved in was

25  essentially making sleeping arrangements for people; is that

1 correct?

2 **A.** No, I said quite a bit more than that.

3 **Q.** I am sorry?

4 **A.** I said quite a bit more than that.

5 **Q.** What else were you involved in?

6 **A.** I was involved in sleeping arrangements, outreach --

7 **Q.** I am sorry?

8 **A.** Sleeping arrangements, outreach, research on the companies

9 they were sponsoring, ministerial.  There was a lot.

10 **Q.** Were you involved in throwing bricks?

11 **A.** I never broke any windows.  I did spray paint.

12 **Q.** Do you know who Tim Lewis is?

13 **A.** I know who Tim Lewis is.

14 **Q.** He's does films; is that correct?

15 **A.** Yes, he does.

16 **Q.** Do you remember Tim Lewis -- you were asking Tim Lewis:

17 Do me a favor, Tim.  Keep an eye on my bricks.

18     Did you tell him that?

19 **A.** I don't remember -- no, I have no idea what you are

20 talking about.

21 **Q.** You had collected some bricks that were going to be thrown

22 through windows; is that not correct?

23 **A.** No, sir, I am not sure what you are talking about.

24 **Q.** You don't remember running through the streets with 200

25 people in black clothing?

1  **A.**  I do remember being in downtown Seattle with those people,
2  yes.
3  **Q.**  Do you remember the exhilaration that you felt having 200
4  people, everybody watching everybody's back and the police
5  couldn't do anything about it?
6  **A.**  It sounds to me like you are quoting from a video that Tim
7  Lewis made.
8  **Q.**  Am I quoting who?
9  **A.**  You would be quoting me.  Tim Lewis put those comments in
10  there.  I was only in his video very reluctantly.  I was
11  careful, obviously, to not implicate myself in the criminal
12  activity.  I at one point spoke very specifically about that
13  sort of thing, running with 200 people.  I was referring to
14  something that happened in England --
15  **Q.**  That what?
16  **A.**  -- happened in England, this protest that I went to that
17  was called off and nothing ever came of it, and I clarified
18  that on the unedited version of the video that he made, but he
19  did not put that clarification in the final version of his
20  video, and it's led to a falling out between him and I.
21  **Q.**  So that description that you were giving had nothing to do
22  with what you were doing in Seattle; it had to do with what
23  other people did in another country?
24  **A.**  That's accurate, but it's fair to say that I had the same
25  experience in Seattle.  I was just very careful not to

1   implicate myself on video.

2   **Q.** I see.  So that was exhilarating for you, as it was when

3   you expressed the week after this arson, the same kind of

4   exhilaration you expressed at the book club meeting in

5   Sisters, Oregon?

6   **A.** Yes, sir.

7   **Q.** I do have a couple other questions.

8   Was there an event that you participated in where --

9   excuse me one second -- did you participate in some events or

10  protests in either an Oakridge or Detroit station?

11  **A.** The ranger station?

12  **Q.** The ranger station, yes.

13  **A.** Yes.

14  **Q.** Is it correct that you participated in spreading manure

15  around a site where you had put glue into some locks?

16  **A.** Other people glued the locks, and I was involved in

17  dumping compost at the ranger station office.

18  **Q.** And that would be -- you knew very well that the people

19  who would be cleaning that up would be working people?

20  **A.** The thoughtless radical that I was, I never gave that

21  **Q.** I am sorry?

22  **A.** I never gave a thought to who would clean it up.

23  **Q.** It's about you.  The world is about you, right?

24  **A.** The feeling that your moral choices are more important

25  than the scientific process and administrative legal remedies

1  is extremely hubristic.

2  **Q.** I am sorry. Could you say that another way? I didn't

3  graduate cum laude.

4  Could you say that in some way that I can understand?

5  **A.** Sure. I am sorry if I wasn't clear.

6  When you are taking action like that where you have

7  decided that your judgment is more important than the judgment

8  of the law and the judgment of administrative regulatory

9  systems, that is a very arrant thing to do.

10  **Q.** What I am doing?

11  **A.** No. I am sorry, what I did.

12  **Q.** I see. So that was -- basically you did not consider the

13  consequences to the people who had to clean up after you?

14  **A.** That's correct, sir.

15  **Q.** One last thing. The events, the interaction between

16  yourself and other people in the environmental, people at all

17  levels -- let me go back a second.

18  Avalon was involved in all kinds of levels of

19  environmental work; is that correct?

20  **A.** Can I just say -- I just want to point out about that

21  question. In Oakridge, that was 1996 and I think you can kind

22  of see the progression of my increasingly-radical activities.

23  First, it was protests at the federal building, dumping

24  compost, digging blockades on a Forest Service road, to

25  eventually burning a building. It was a very long

1    progression.  I was a radical.  I admit it.

2    **Q.**  And now you are a Government informant?

3    **A.**  I am many things, and that would probably be one of the

4    last things on my list.

5    **Q.**  Avalon was a person who had an entire range of

6    environmental activities, from arsons to organizing and

7    facilitating meetings, above-board, legal meetings; is that

8    correct?

9    **A.**  I can't really speak to Avalon's involvement very much

10   because he was very secretive.  I think I could say that I saw

11   a development in his activism, too, from legal to focused

12   obsessively on the clandestine, towards the period of the

13   University of Washington arson.  But I believe he may have

14   been involved in clandestine activities at the same time that

15   he was also doing above-ground work earlier when I knew him

16   and I just didn't know that.

17   **Q.**  There was a range of people here in the Northwest who were

18   involved in a range of activities from totally legal to very

19   illegal; is that correct?

20   **A.**  Yes.

21   **Q.**  And there was an interchange amongst the people, people in

22   Olympia, people in Eugene, people in Seattle, and other places

23   as well; is that correct?

24   **A.**  Yes.

25   **Q.**  Including Tacoma?

1   **A.** I don't remember meeting any activists from Tacoma ever.

2   **Q.** Do you remember a big discussion at the ELAW conferences

3 about the documentary "Watch" that Briana produced and

4 directed and wrote, where she documented a coalition of people

5 working together, regular people, totally law-abiding people

6 and tree huggers.

7      Do you remember a lot of discussion and a lot of buzz, as

8 it is said, about that kind of activity?

9   **A.** No, I am sorry, I don't remember the documentary "Watch"

10 except for the way it was involved in the weekend of the

11 arson.

12   **Q.** It was involved in the weekend of arson?

13   **A.** My understanding is that Briana had made this documentary,

14 and we were going to do an arson.

15   **Q.** I am sorry. One had to do with the other? It was going

16 to be shown --

17   **A.** No, there's no connection. I am sorry if I implied that.

18 I meant, the only way that that really sticks out in my

19 memory, that video "Watch", is because it was associated in my

20 mind with that weekend when I came to meet Briana.

21   **Q.** Briana Waters, at the same ELAW conference where you

22 talked about not reaching out to white people, Kim Marks was

23 in that same panel, and she talked about the project at

24 "Watch" and the film that was made.

25      She was sitting in the same dais as you are, and she was

1  talking about working with people, and you are talking about

2  nonviolence has no place, we have to re-think nonviolence.

3  That shows the kind of range that happened at, for example,

4  the ELAW conference, right?

5  **A.** If -- I think you mischaracterized my remarks. I think I

6  testified that I didn't say we should avoid working with

7  working class people.

8  **Q.** White people, working class white people is what you said.

9  **A.** No, I told you earlier when you asked me that that I did

10  not say that. But again, being the arrogant person that I

11  was, I don't remember what other people said on that panel.

12  **Q.** One more thing -- and then one more request of the

13  Court -- you came to know -- you've now come to know that

14  Briana was involved at Evergreen in an organization known as

15  Evergreen Animal Rights Network.

16     What they were involved in is bringing speakers to campus

17  and having bake sales. Have you come to know that?

18  **A.** You just told me. That's the only way I know that.

19       MR. BLOOM: One other matter, Judge. Given the

20  witness's answers with regard to what she had to say at the

21  ELAW conference, we do have a tape that we would like to play.

22  It would be logistically difficult to play it now, but we

23  could. I think they --

24       THE COURT: Without going into it, let's wait. Share

25  it with everybody. I will look at it and decide what to do

1  about it.

2        MR. BLOOM:  That will be fine.  I have no further

3  questions.  If I could get back that document.

4        MR. FRIEDMAN:  I have some very brief redirect.

5    Your Honor, may the witness be handed Exhibit 612?

6    I am not going to offer this into evidence.

7                  REDIRECT EXAMINATION

8  BY MR. FRIEDMAN:

9  **Q.**  If you could just look at it, basically keep it on the

10  table in front of you, that would be great.

11    Can you just describe in general terms what Exhibit 612

12  is?

13  **A.**  It's some radical literature, I think.

14  **Q.**  Is it one brochure or pamphlet?

15  **A.**  It says it's the "Newsletter of the North American Earth

16  Liberation Prisoner" --

17        THE COURT:  Elevate your voice just a little bit.

18        THE WITNESS:  Speak up?

19        THE COURT:  Yes.

20  **A.**  It says it's the "Newsletter of the North American Earth

21  Liberation Prisoner Support Network," and there appears to be

22  two copies in here.

23  BY MR. FRIEDMAN:

24  **Q.**  That's just because it's an exhibit, it's really one

25  document, one item?

1   **A.** It looks to be two copies of one item.

2   **Q.** Is there a date on that item?

3   **A.** Spring 2002.

4   **Q.** Then would you look at the back of it for a moment.

5   Do you see the handwriting there?

6   **A.** Yes.

7   **Q.** Can you just tell us in general terms what you see?

8   **A.** It's contact information, some websites and some phone

9   numbers.

10   **Q.** Is any of that -- can you tell us for whom that contact

11   information is? Are you able to tell us that?

12   **A.** It has a number for Briana, a number and an e-mail, and a

13   phone number for me, and something that's indicated as a

14   voicemail for India.

15       MR. BLOOM: Excuse me, I am going to object to this

16   unless they can explain how somebody's handwriting on a

17   pamphlet got to be there and what significance it has.

18       MR. FRIEDMAN: I just want to ask her if it's her

19   handwriting and then we will be done.

20       THE COURT: All right.

21 BY MR. FRIEDMAN:

22   **Q.** Is any of the handwriting for that contact information --

23   is any of that your handwriting?

24   **A.** I don't think so.

25   **Q.** Were you together -- you are one of the people listed

1   there; is that correct?

2   **A.**   Yes.

3   **Q.**   Were you together with any of those other people in the

4   Spring of 2002 when that pamphlet was written -- is dated?

5   **A.**   No, I don't think so.

6           MR. FRIEDMAN:   I have no further questions.

7       The Government calls Megan Roop.

8           THE COURT:   Let me have you come forward and be

9   sworn.

10      Step forward and raise your right hand, please.

11          MEGAN ROOP, called as a witness, duly sworn.

12          THE COURT:   Just come around and take the witness

13  chair.

14                      DIRECT EXAMINATION

15  BY MR. FRIEDMAN:

16  **Q.**   Good afternoon, Ms. Roop.   Can you tell us your whole name

17  and spell your last name for the record.

18  **A.**   Megan Marie Roop, and my last name is spelled R-O-O-P.

19  **Q.**   Where do you work?

20  **A.**   Avis Budget.

21  **Q.**   Are you in a particular unit or group?

22  **A.**   Yes, the Special Investigations Group, which is located

23  inside the insurance department.

24  **Q.**   Where in the country?   Where are you located?

25  **A.**   Orlando, Florida.

1   **Q.**  What does the Special Investigations Unit do?

2   **A.**  We typically handle insurance fraud claims coming out of

3   rental car accidents.

4   **Q.**  What's your job in the Special Investigations Unit?

5   **A.**  I am the administrative assistant, assisting the special

6   investigator.

7   **Q.**  What does that mean that you do?

8   **A.**  I generally perform all the research on all our claims

9   that are referred to our department and handle general

10  clerical duties.

11  **Q.**  Do you know Special Agent Ted Halla of the FBI?

12  **A.**  Yes, from speaking on the phone with him.

13  **Q.**  In November of 2006, did he give you a request for certain

14  information?

15  **A.**  Yes, he did.

16  **Q.**  In general terms, what was he looking for?

17  **A.**  He was looking for rental agreements pertaining to a list

18  of names.

19  **Q.**  Do you recall roughly how many names?

20  **A.**  I would say about 20.

21  **Q.**  Was there a particular timeframe for which he was looking?

22  **A.**  May 21, 2001.

23  **Q.**  Now, was this the first request Agent Halla had made to

24  you?

25  **A.**  No.

1   **Q.**  Roughly, when is the first time he requested information

2   from Avis?

3   **A.**  Around March 21, 2006.

4   **Q.**  Roughly eight months before?

5   **A.**  Yes.

6   **Q.**  Over the course of that eight months, have you had

7   continuous contact with Agent Halla?

8   **A.**  Yes.

9   **Q.**  In general terms, what was nature of the contact?  What

10   was going on?

11   **A.**  Searching for any cars that may have been returned with

12   damage or rentals coming out of a specific location during

13   specific times.  It was very generalized information as to

14   what I was looking for.

15   **Q.**  When you had this request, the one that came in November

16   2006, did you perform a search?

17   **A.**  Yes, I did.

18   **Q.**  Did you find some records that you provided to Agent

19   Halla?

20   **A.**  Yes, I did.

21   **Q.**  Would you take a look at a document that's marked 771.

22      Tell us if you recognize that.

23   **A.**  Yes, it's a fax from me.

24   **Q.**  If we could use the document camera for a moment.

25      So what is Exhibit 771?

1  A.  This is a fax from me to Agent Halla.

2  Q.  Is it information about a rental that you found?

3  A.  Yes, it is.

4  Q.  Is that part of Avis Budget's records?

5  A.  Yes.

6  Q.  Are those records the company keeps in its normal course

7  of business?

8  A.  Yes.

9          MR. FRIEDMAN:  The Government offers 771.

10         MR. FOX:  No objection.

11         THE COURT:  Admitted.

12              (Exhibit No. 771 admitted.)

13  BY MR. FRIEDMAN:

14  Q.  I am going to put a document on the overhead projector,

15  and if you can answer questions based on this.

16      Can you tell us in general terms, what it is that we are

17  looking at?

18  A.  This is a printout from the system I use in order to

19  identify old rentals.

20  Q.  It says rental detail screen.  What is this?

21  A.  It's just the details of the rental agreement, like the

22  name, the address associated with the name, the credit card

23  number used, the mileage in and out of the car, the station

24  the car was rented out of, telephone, zip code, the amount

25  charged for the rental, any insurances taken out like

1  insurance coverages taken out, and then the total we charged

2  for it.

3  **Q.**  So this document -- entire document relates to one car

4  rental?

5  **A.**  Yes.

6  **Q.**  Would you walk me through it.  Up top is something --

7  **A.**  That's the name of our renter.

8  **Q.**  In this case, what's the name of the renter?

9  **A.**  Kara Denise Larson.

10  **Q.**  Below that, do you see an address where this person lived?

11  **A.**  Yes.

12  **Q.**  Can you read that for the record?

13  **A.**  2411 Capitol Way Southeast, Olympia, Washington 98501.

14  **Q.**  Then there's something that says "drive license".  What is

15  that?

16  **A.**  That's the driver's license of the individual who rented

17  the car.

18  **Q.**  When you say that's the driver's license, what do you mean

19  by that?

20  **A.**  The driver's license issued by the Department of Motor

21  Vehicles in the state they reside in.

22  **Q.**  So that's the number that identifies the driver's license?

23  **A.**  Yes.

24  **Q.**  Moving down to "credit card".

25  **A.**  Do you want me to read the credit card number?

1  **Q.**  No, but that's the credit card number to which the rental
2  was charged?

3  **A.**  Yes.  The "DS" in front of it generally means a Discover
4  card was used, and the number behind it is the number taken
5  off the credit card for renting at the time of rental.

6  **Q.**  Then moving further down we have an open date, open DT.

7  **A.**  That's the open date of the rental, the day they actually
8  walked in and took possession of the car.

9  **Q.**  In this case, what is that date?

10  **A.**  May 19, 2001.

11  **Q.**  Can you tell the time the car went out?

12  **A.**  Yes, 12:31 p.m.

13  **Q.**  On that date?

14  **A.**  Yes.

15  **Q.**  Can you tell the location from which it was rented?

16  **A.**  Yes, that's our Olympia, Washington office, OLMDT.

17  **Q.**  So that's the open station?

18  **A.**  Yes.

19  **Q.**  And where and when was the car returned?

20  **A.**  The car was returned to the same location on May 22nd,
21  2001 at 6:33 a.m.

22  **Q.**  What does that 6:33 a.m. mean?  How much does it tell you
23  and what does it not tell you?

24  **A.**  The only information that's not listed on this particular
25  RA screen would be the unit number, the VIN number of the car

1  that they rented.

2  **Q.**  Do you know this location yourself?

3  **A.**  I have never been to it.

4  **Q.**  So if it had an after hours night drop, does this tell you

5  the time the car is logged in or dropped there?

6  **A.**  That's the time the car is logged in.

7  **Q.**  So it's actually processed back in by the people?

8  **A.**  Yes.

9  **Q.**  Can you tell us, what was the total charge of the rental?

10  **A.**  $187.87.

11  **Q.**  I am going to page through for a moment.  The second page

12  is basically the same thing?

13  **A.**  Yes.

14  **Q.**  When we get to the third page, can you tell us what this

15  is?

16  **A.**  This is a different printout from the system showing a

17  little bit more detail on the rental agreement, unfortunately

18  omitting other details off of the rental agreement.

19  **Q.**  What's this number on the left?

20  **A.**  The one that's circled?

21  **Q.**  Yes.

22  **A.**  That's the rental agreement number.

23  **Q.**  Is that the same rental agreement -- the same one we just

24  looked --

25  **A.**  Yes.

1   **Q.** Still on page 3, do you see the name of the renter here

2 again?

3   **A.** Yes, Kara Denise Larson.

4   **Q.** Switching to the eighth and last page of this exhibit,

5 there is something that says VIN on here.

6     Can you tell us what that is?

7   **A.** A VIN is a vehicle identification number.

8   **Q.** Generally, in more general terms, what's a vehicle

9 identification number?

10   **A.** It's the number assigned to a vehicle in the United States

11 of America, identifying the maker of the car, the model of the

12 car, the color of the car, the plant the car was made out of,

13 the engine size of the car.

14   **Q.** Does every vehicle have a different VIN?

15   **A.** Yes.

16   **Q.** So this number here would uniquely identify --

17   **A.** It's unique to the vehicle.

18   **Q.** Could you read that, for the record.

19   **A.** 4T1BG22K21U816051.

20   **Q.** Turning back to the first page, we had talked already

21 about the time the car was taken out and returned.  There's

22 another line odometer out, QTY, what does that mean?

23   **A.** That's the mileage that was on the car when it left the

24 lot.

25   **Q.** In this case, what was that mileage?

1   **A.**   5,673.

2   **Q.**   Right under there, we have an odometer reading QTY?

3   **A.**   That was the mileage on the odometer when it was returned

4   to the location.

5   **Q.**   What was that mileage in this case?

6   **A.**   5,910.

7   **Q.**   I hate to make you do subtraction on the stand. Can you

8   tell, roughly how many miles did this car drive?

9   **A.**   About 227 miles.

10   **Q.**   237?

11   **A.**   Yes, I think.

12        MR. FRIEDMAN: Thank you very much, Ms. Roop.

13                  CROSS-EXAMINATION

14   BY MR. FOX:

15   **Q.**   I am Neil Fox, one of the attorneys for Briana Waters.

16   **A.**   Hi.

17   **Q.**   Very quickly, let me just put this back up on the screen.

18   Just very quickly, on this document that you just testified

19   about, there's a notation for additional driver; is that

20   correct?

21   **A.**   Yes.

22   **Q.**   The "N" underneath additional driver means what?

23   **A.**   I am not exactly sure, but I would assume it would stand

24   for "no additional driver".

25   **Q.**   At least no one that -- no one that signed up that they

1  were going to drive?

2  **A.**  Exactly.

3  **Q.**  Then there's a section that says "rental remarks text" at

4  the very bottom?

5  **A.**  Generally, we would use that column if the vehicle was

6  returned with damage.  It looks like there was nothing unusual

7  about the car.

8  **Q.**  So it says no remarks?

9  **A.**  Yes.

10  **Q.**  And for you, in the course of your business, that would

11  mean no damage?

12  **A.**  No damage or nothing unusual.

13  **Q.**  Then in terms of the odometer, there's no special

14  mechanism that Budget has to keep track of mileage of rental

15  cars, it really depends on the person checking in to record

16  the mileage accurately in both instances?

17  **A.**  Yes.

18  **Q.**  So it depends on the first person writing down the proper

19  mileage, right?

20  **A.**  Yes.

21  **Q.**  And then the second person writing down the mileage,

22  right?

23  **A.**  Yes.

24  **Q.**  And sometimes, is it not correct that sometimes people

25  make mistakes?

1    **A.**  I think so.

2         MR. FOX:  Thank you very much.  I have no further

3    questions.

4         MR. FRIEDMAN:  We have no further questions.

5         THE COURT:  You may step down.

6      All right, I think we are going to recess the matter for

7    today and have you go home.

8      Well, the good thing about it, it's a three-day weekend.

9    Monday is a federal holiday, so we won't have you back here

10   until Tuesday.

11        As always, you are not to discuss the case.  You are not

12   to research anything, watch TV about it, get on the Internet,

13   doing any of these things.  Stay away from all those kind of

14   things.  Everything you need to decide this case will be here

15   in this courtroom, and that's what I want to hold you to.

16        Have a good three-day weekend.  I will see you right there

17   9:00 on Tuesday.

18      (Jury not present.)

19        THE COURT:  All right, you may be seated.

20      I guess the only thing, there's some discussion about a

21   tape.  I will hear what you have to say about that.  Is it

22   something I should see?  I don't know how I can tell what's in

23   it without seeing it.

24        MR. FOX:  Your Honor, the DVD, I believe the disks

25   are inside the room.

1          THE COURT:   How long is this?

2          MR. FOX:   Well, Ms. Phillabaum's segment is probably

3     20 minutes -- 20, 30 minutes.   The prior section dealing with

4     the Watch Mountain campaign is probably about the equivalent

5     amount.

6          THE COURT:   What am I supposed to do with it?

7          MR. FOX:   Maybe Mr. Bloom and I can discuss this.

8          MR. BLOOM:   My recollection is that the part we want

9     to show is the Phillabaum part -- we could show the other as

10    well -- is less than 30 minutes; it's more like 15 to 18

11    minutes.

12         THE COURT:   It sounds like that will be your part of

13    the evidence; is that correct?

14         MR. BLOOM:   Yes.

15         THE COURT:   And you want me to look at that and see

16    if there's some editing that needs to be done in terms of what

17    the jury will hear?

18         MR. BLOOM:   Yes, we'd like to offer it.   And we'd

19    also like to offer -- there is another segment, it's a panel

20    of four people; two of whom are not relevant to this

21    discussion and two of whom are.   One is Ms. Phillabaum herself

22    giving a presentation, and she denies saying certain things

23    that are very clearly on the DVD that you will see.

24         The other segment is a woman named Kim Marks who gave a

25    presentation about the Watch Mountain project and was referred

1 to in the cross-examination.

2      THE COURT: Now, one you want to show that something

3 that she said on the tape, that she said she didn't say here,

4 that's one item you want me to look for?

5      MR. BLOOM: Right.

6      THE COURT: Then the Watch Mountain, you want to

7 present that in terms of what you want to present in your

8 case-in-chief; is that right?

9      MR. BLOOM: I guess that's right. That's a good way

10 to analyze it.

11      THE COURT: What else am I to look for? That's it?

12      MR. BLOOM: I think that's it, yes.

13      MR. FRIEDMAN: Your Honor, they are trying to impeach

14 Ms. Phillabaum on a collateral matter with extrinsic evidence.

15 There's nothing in there that's admissible to impeach here.

16    If they want to offer the Watch Mountain portion in their

17 case, that is a decision to be made at that time, but nothing

18 to do with Ms. Phillabaum.

19    The portion to do with Ms. Phillabaum, it doesn't matter

20 what it is she admits. It doesn't matter if it's directly

21 contradictory. It's a collateral matter, and it's not

22 admissible under Rule 609 of the Rules of Evidence, otherwise

23 we'd basically have a trial that spirals out of control on

24 everything..

25      THE COURT: I understand what you are saying.

1      MR. FRIEDMAN:   Thank you, Your Honor.

2      THE COURT:   I am trying to, again, get the exhibit

3  number.

4      MR. FOX:   Your Honor, it hasn't been marked.   I would

5  suggest, to save Your Honor having to watch this over the

6  weekend, what I would suggest is 8:30 on Tuesday we can deal

7  with this.

8      MR. BARTLETT:   Do we have a copy?

9      MR. FOX:   No.

10     MR. BARTLETT:   Could you get a copy so we can look at

11 it over the weekend?

12     THE COURT:   I think they should have it, and I should

13 have a copy.   I may find I have nothing to do on the weekend

14 and I want to look at something.

15     MR. FOX:   May I take two minutes before recess and

16 talk to Mr. Bloom?

17     THE COURT:   Let's share this information, then I

18 think we can get to the bottom of it as to what should or

19 should not be done.   Okay.

20    If you have some copies.

21     MR. FOX:   Sure.   May I speak to Mr. Bloom?

22     THE COURT:   Let's take a recess.   Right now I think

23 we are through with the night.   8:30 Tuesday morning, unless I

24 talk to you about something else.

25     THE CLERK:   All rise, Court is in recess.

1          (Recess taken.)

2          THE CLERK:  All rise, Court is again in session after

3    a recess.

4          THE COURT:  All right.  It is my understanding, now,

5    we are talking about the DVD or whatever it is.

6          MR. FOX:  What we would like to do is put this issue

7    off.  We can move on, on Tuesday, with other things.  If we

8    decided we want to bring this DVD into evidence or to play it

9    for Ms. Phillabaum and to have her confronted with what we

10   believe to be prior inconsistent statements, we will give

11   sufficient notice to the prosecutors that that is what we are

12   going to do; and we can deal with that piece of it at a later

13   time.  But first thing Tuesday morning I think --

14         THE COURT:  I will add one thing to that:  Do it in a

15   timely fashion.

16         MR. FOX:  Yes.

17         THE COURT:  As to what you are specifically looking

18   for, identify that and identify question and answer here, so I

19   can look at it from that standpoint and see just what it is.

20   Okay.

21         MR. BARTLETT:  And the United States would be given

22   an opportunity to respond?

23         THE COURT:  Yes.

24         MR. FOX:  Absolutely.

25         MR. BARTLETT:  And at some point we will actually be

1  given a copy of the video.

2          THE COURT:  All of those should be done before we get

3  into it.  I don't want to delay it with a lot of time where I

4  have got to take time out to go through all these things and

5  sift through them.  You know how to do that.  Let's make sure

6  it's done and done in a clean fashion.

7      What else?

8          MR. BARTLETT:  That is it.

9          MR. FOX:  Your Honor, I have asked the clerk once to

10  relay something to you.  There have been times when I have

11  encountered jurors at the security.  I have, of course, looked

12  down and not even at their eyes.

13     In other cases, I have had sometimes the judge has told

14  the jurors, that if the attorneys, in particular, if you come

15  across them and they don't smile at you, it's not because they

16  are stuck up and not friendly.  I don't know that these jurors

17  have been told that specifically.  I don't want the jurors to

18  think that I'm --

19          THE COURT:  I don't know how to be specific.  I

20  thought I mentioned something along that line.  I am not

21  trying to make them antisocial.  Didn't I say all that?

22          MR. FOX:  Yes, but if you could say in particular the

23  attorneys cannot really look in their direction.

24          THE CLERK:  I have talked to the jurors about it.

25          THE COURT:  I think they have been told that.  I told

1  them not to take anything out on you because you represent
2  your client.  I thought I said all that.
3          MR. FOX:  Thank you very much.
4          THE COURT:  We are through, are we?  I don't know of
5  anything else to bring up.  I am going to try to get out of
6  here and have a three-day weekend and take some work home to
7  read over the weekend and maybe watch a ball game.
8      We will be at recess.  See you back here on Tuesday.
9          (The Court recessed to Tuesday, February 19, 2008, at
10  the hour of 9:00 a.m.)
11              *   *   *   *   *
12              C E R T I F I C A T E
13
14      I certify that the foregoing is a correct transcript from
15  the record of proceedings in the above-entitled matter.
16
17  /S/  Teri Hendrix _____          May 2, 2008
18  Teri Hendrix, Court Reporter              Date
19
20
21
22
23
24
25