1      UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
2         AT TACOMA

3

4 UNITED STATES OF AMERICA,  ) Docket No. CR05-5828FDB
            )
5    Plaintiff,   ) Tacoma, Washington
            ) February 19, 2008
6 vs.         )
            )
7 BRIANA WATERS,    ) VOLUME 6
            )
8    Defendant.   )
 _____)

9

10      TRANSCRIPT OF PROCEEDINGS
11   BEFORE THE HONORABLE FRANKLIN D. BURGESS
  SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
 APPEARANCES:
13
 For the Plaintiff:   MARK N. BARTLETT
14         ANDREW C. FRIEDMAN
         Assistant United States Attorney
15         700 Stewart Street, Suite 5220
         Seattle, Washington 98101-1271
16
 For the Defendant:   ROBERT BLOOM
17         Attorney at Law
         3355 Richmond Boulevard
18         Oakland, California 94611

19         NEIL M. FOX
         Cohen & Iaria
20         1008 Western Ave., Suite 302
         Seattle, Washington 98104

21

22 Court Reporter:    Teri Hendrix
         Union Station Courthouse, Rm 3130
23         1717 Pacific Avenue
         Tacoma, Washington  98402
24         (253) 882-3831

25 Proceedings recorded by mechanical stenography, transcript
 produced by Reporter on computer.

1

<u>I N D E X</u>

2

INDEX OF WITNESSES
==================

3

<u>WITNESS ON BEHALF OF PLAINTIFF</u>:                    <u>Page</u>

4

SARAH REICHARD

5

     Direct by Mr. Bartlett......................... 950

6

     Cross by Mr. Fox.............................. 979

7

TIFFANY TUDDER

8

     Direct by Mr. Bartlett......................... 980
     Voir Dire by Mr. Bloom........................ 987

9

     Direct Continued by Mr. Bartlett.............. 989
     Cross by Mr. Bloom............................ 990

10

TOBY BRADSHAW

11

     Direct by Mr. Friedman........................ 993

12

     Cross by Mr. Bloom............................1022

13

THOMAS HINCKLEY

14

     Direct by Mr. Friedman........................1025

15

GARY QUARFOTH

16

     Direct by Mr. Friedman........................1045

17

DAVID GRATZER

18

     Direct by Mr. Friedman........................1067

19

ROBERT CORRINA

20

     Direct by Mr. Friedman........................1072
     Cross by Mr. Bloom............................1109

21

22

23

24

25

INDEX - EXHIBITS

EXHIBITS                                                                 Page

No.  354                                                                 957
No.  306                                                                 966
No.  352                                                                 1007
No.  301                                                                 1012
No.  353                                                                 1030
No.  350                                                                 1049
No.  351                                                                 1055
No.  355                                                                 1059
No.  775                                                                 1071
No.  776                                                                 1071
No.  772                                                                 1086
No.  777                                                                 1093
No.  773                                                                 1094
No.  774                                                                 1095

1    TUESDAY, FEBRUARY 19, 2008 - 8:40 A.M.

2                              * * *

3    (Jury not present.)

4         THE CLERK:  This is in the matter of the United

5    States versus Briana Waters, Cause CR05-5828FDB.

6    Counsel, please make an appearance for the record.

7         MR. FRIEDMAN:  Good morning, Your Honor.  Andrew

8    Friedman and Mark Bartlett for the United States.

9         MR. FOX:  Good morning, Your Honor.  Neil Fox and

10   Robert Bloom for Ms. Waters, who's present.

11        THE COURT:  All right.  One matter.  I am not sure it

12   needs to be done this morning, I mean before we get the jury

13   in, but the one that's closest to anything that needs to be

14   done would appear to be the Government's motion to exclude

15   what's been classified as self-serving hearsay and a

16   conviction, I guess, of Mr. Corrina, back in 1993 or so

17   talking about a malicious mischief conviction.

18   Let me start with it this way.  Mr. Fox, this conviction,

19   is that an issue?

20        MR. FOX:  Your Honor, I don't believe it would --

21   no.

22        THE COURT:  Okay.  Then the self-serving hearsay

23   thing, I don't know if I have a complete picture of what was

24   said.

25   Are you saying here that Ms. Waters called Corrina and

said this, that was it, or there's some other conversation
around that in terms of what the Court should be concerned
with?

       MR. FRIEDMAN:  No.  I think that's the conversation.
She called and says, I am innocent and tell the truth.

       THE COURT:  That, and hang up?  No response, no
nothing?

       MR. FRIEDMAN:  That's the entire material part of the
conversation, yes.

       THE COURT:  Explain that to me.  I don't understand
that kind of conversation.  I dial the phone, and the person I
am calling answers and I say this and hang up?

       MR. FOX:  Maybe Mr. Friedman can add more.

       MR. FRIEDMAN:  Your Honor, I think she's calling
because she understands that Mr. Corrina is going to be called
and --

       THE COURT:  What I am asking for is, is that as much
as you know about the conversation right there, and that's it?

       MR. FRIEDMAN:  No, Your Honor.  She called because
the Government has contacted her, and she knows that people
are going to be called and interviewed about her, that the
Government is going to contact Mr. Corrina, so she's giving
him a wake up call or a warning call, and during that call she
says you are going to hear from the Government --

       THE COURT:  Well, now you said during that call.

1  That's what I am asking about.   What's going on here?

2        MR. FRIEDMAN:   She makes a call to Mr. Corrina to

3  say:   You are going to hear from the Government, they are

4  going to be contacting people I know, and they will contact

5  you, I am innocent, and my lawyer has said that if you don't

6  tell the truth, you can get in trouble.   So it's basically a

7  warning to him and a statement to him knowing that he is going

8  to be interviewed shortly by the Government.

9        THE COURT:   That's what you are saying?

10        MR. FRIEDMAN:   Your Honor, because it's basically a

11  way for her to introduce the fact that she is saying she's

12  innocent without being cross-examined about that.   So she is

13  getting to say -- it's hearsay from her.

14        THE COURT:   She said that in her plea, too.

15        MR. FRIEDMAN:   Well, she said she hadn't said that to

16  the Court.   If she wants to actually say that to the jury, she

17  can say that by testifying.   But it's basically straight up

18  hearsay under Rule 801, Your Honor.

19        THE COURT:   It depends on why it's given, I suppose.

20  Let me get a response so I can hear the whole story and then I

21  can decide something, I guess.

22        MR. FOX:   Your Honor, there's two issues.   The first

23  is Mr. Corrina has to explain why he perjured himself in front

24  of the Grand Jury.   Mr. Corrina testified in front of the

25  Grand Jury -- well, first he testified -- he was contacted by

1     Agent Halla and said, "I don't know Briana Waters," his own

2     cousin.  Then he was called in front of the Grand Jury and

3     testified, "Car?  We never rented a car," under penalty of

4     perjury.

5         Then after he was threatened with a perjury prosecution,

6     he said a number of other things.  We don't want the jury to

7     believe that he perjured himself in front of the Grand Jury

8     because Ms. Waters told him to do so.  Ms. Waters told him,

9     tell the truth and you can get in big trouble if you don't

10    tell the truth.

11        So we are not necessarily offering it for the truth of the

12    matter asserted, but to explain that his decision to perjure

13    himself had nothing to do with Briana Waters.

14        So, I think otherwise, the jury is going to think, without

15    any foundation, that he was trying to protect Briana, that he

16    was doing something to help her when she told him to tell the

17    truth.

18        That's the key part.  So it's not really being offered for

19    the truth of the matter asserted.  It's being offered to show

20    that Briana Waters told him to tell the truth and he decided

21    not to tell the truth for his own reasons.

22           THE COURT:  All right.

23           MR. FRIEDMAN:  Your Honor, he'll testify that he

24    initially didn't tell the truth to protect her, but it was his

25    decision, there's no connection, there's no suggestion that

1  it's her.  So it doesn't need to be offered for that reason.

2      She can't get her statements to other people -- her

3  hearsay that "I am innocent" in.  It's incredibly damaging

4  evidence if it comes in.  It's complete hearsay.  She can

5  testify if she wants to say she's innocent.  She can testify

6  if she wants to say, I told people to tell the truth, but it's

7  not relevant for any other purpose.

8      Mr. Corrina isn't going to attribute anything -- any ill

9  motive to her, any suggestion that she asked him to lie.

10  There's not going to be any suggestion like that.  It's not

11  relevant for the purpose the defense says.  It's just pure

12  hearsay.

13      THE COURT:  That's both parties' position.  I guess I

14  am trying to determine -- this conversation sounds like it was

15  very short, so I don't know if that leads into anything else

16  which Mr. Corrina might have said, if I decide to allow that

17  evidence.

18      I am trying to, I guess, get the full picture of this.  I

19  can't get it in my mind, the conversation.  Like I said, if

20  you pick up the phone and you say this and hang up, and maybe

21  even no response from the other side or anything else.

22      MR. FRIEDMAN:  Your Honor, it is not tied to any

23  other evidence in this case.  It doesn't lead to anything.

24  It's not related to anything.  Mr. Corrina said what he said

25  for his own reasons, and he'll explain those.  He's not going

1 to link those to Ms. Waters. There's no connection to this

2 conversation and any of the other evidence that will come out

3 through Mr. Corrina.

4       THE COURT: Well, let me say this. I understand what

5 you both are saying. Maybe I am at a point where I need to

6 hear what Mr. Corrina is saying about what he knows about this

7 case. To the exclusion of what we are talking about now, when

8 I hear all that evidence, maybe I can come to a better

9 position as to what it's offered for.

10    Mr. Corrina -- it sounds like he went before the Grand

11 Jury and lied, so I don't know how that is going to develop.

12       MR. FRIEDMAN: He'll testify that he did not recall

13 the car rental when he was in front of the Grand Jury so he

14 said something factually wrong, but it wasn't a lie.

15       THE COURT: You want me to parse it out, and I don't

16 want to do that at this point. I want to hear more before I

17 do that. Right now, I don't see any sense that that is coming

18 up at the moment, and it should have come up in direct. It

19 would only come up in terms of in cross-examination.

20       MR. BARTLETT: And Mr. Corrina will not testify

21 before the morning break. I am virtually certain of that.

22       THE COURT: All right. Have I heard it all now how

23 this thing will come up? Of course, you are offering it for

24 something other than the hearsay.

25    Now, give me exactly why you are offering it, other than

1   to say -- to explain why he would lie before the Grand Jury.

2          MR. FOX:   The other thing would be, the Government, I

3   believe, through Mr. Corrina is going to offer other

4   conversations that Mr. Corrina now says he had with Briana

5   Waters about this Center for Urban Horticulture fire.   He's

6   going to say they had some conversation at some other point,

7   that he talked about some Crime Stopper thing he saw on the

8   news.   So I guess it's kind of like the rule of completeness.

9   If the Government is going to bring up some of Ms. Waters'

10  statements through Mr. Corrina, we think all of them ought to

11  come in.

12         THE COURT:   Well, I think there's a difference

13  between against interest and self-serving.   That's a little

14  bit different, so I have got to weigh this thing.

15         MR. FOX:   Your Honor, there's one more matter.   There

16  are a number of matters that need to be addressed.   We don't

17  have to address them now, except for one, and that relates to

18  Tiffany Tudder, who I believe the Government is going to lead

19  with.

20         MR. BARTLETT:   Second.

21         MR. FOX:   Second witness.   We had filed a motion

22  earlier to have an offer of proof as to what she would say.   I

23  believe we deferred ruling on that, and we would ask that

24  there be a voir dire outside the presence of the jury so that

25  we can find out exactly what she's going to say and see

1    whether it's admissible or not, because we believe she really

2    doesn't remember a whole lot about the conversations that took

3    place in 1998 at the -- this is the witness with the New York

4    Times reporter.

5            THE COURT:  This is the person that said she was at a

6    meeting, and this is what she heard the Defendant speak?

7            MR. FOX:  Right, but she doesn't have a very good

8    memory of what the question was, the question and answer, and

9    the Government, we believe, is going to try to lead her by

10   showing her the New York Times article, and basically lead her

11   down the path that it isn't accurate in terms of what her

12   actual memory is.  So we would ask that we have a short

13   hearing to find out what she actually remembers.

14           THE COURT:  I thought that the gist of the testimony

15   had been provided.

16           MR. FOX:  Right, and we had filed a motion that we

17   have this hearing beforehand.  We deferred ruling on that, and

18   we are renewing our motion in that regard right now.

19           THE COURT:  I thought I had ruled on that, had I not?

20   I have to go back and check some of my --

21           MR. FOX:  I think we decided that was the type of

22   thing we could wait until the day of the testimony.

23           MR. BARTLETT:  Your Honor, there's no need to have a

24   hearing outside and waste the Court's time.  She will

25   testify -- if they think she is not eligible, they can make

1   their motion and objection at that point in time.

2       Ms. Tudder will get on the stand, she will use the New

3   York Times article to refresh her memory, and we've gone over

4   it and there's no question that I believe that her testimony

5   will be admissible.

6       Excuse me.  Mr. Fox made the argument with regard to this.

7   I really don't want both of them making the argument on --

8           THE COURT:  We've been through that before.  Mr. Fox,

9   is there anything to add to that?

10          MR. FOX:  Well, Your Honor, she spoke to both

11  Mr. Bloom and my investigator and she didn't remember the

12  questions or the answers.  I am vaguely familiar --

13          THE COURT:  Mr. Bloom, would you let Mr. Fox -- I

14  can't hear you both.  I understand what you are saying.

15          MR. BLOOM:  Your Honor --

16          THE COURT:  Mr. Bloom, you are going to keep talking

17  regardless of what I say.

18          MR. FOX:  Well, it's very important what the question

19  is so that we understand what the answer supposedly was or

20  what it refers to.

21          THE COURT:  The question -- I will have a hearing

22  before we get to that point.  You have a right to

23  cross-examine and do a lot of things to test a person's

24  memory, but let me look at that.  I thought I had made a

25  ruling on that.  I want to look at that again.  But whether I

1  have a hearing on that, I am not going to have two trials

2  going on at the same time. I am not going to do that.

3        MR. FOX: Okay.

4        THE COURT: But I want to look at what you are saying

5  because I want to approach it in a way that I think is fair to

6  approach it. So all right. Then we will be back in recess,

7  and I will see what I have on Ms. Tudder.

8      Then like I said, as to Corrina, I will probably wait

9  until that time in there. But I think I understand the issue

10  as to what you are both contending and why you are contending

11  that, and I will handle it in that way.

12        MR. FOX: We also had proposed an instruction that we

13  would ask the Court read to the jury this morning about

14  cooperating witnesses. That's the pattern instruction -- and

15  I think I took it from the prosecutor's packet, which I gave

16  to Pat to send back --

17        THE COURT: Well, I haven't had a chance to look at

18  that, but I think that -- and I will read an instruction as to

19  how they are to view these, and at what point in time -- to do

20  it piecemeal as you indicated, I might not want to do it that

21  way, but I will look at it.

22        THE CLERK: All rise. Court is in recess.

23        (Brief recess.)

24        (Jury present.)

25        THE COURT: Ready for the next witness now.

```
 1            MR. BARTLETT:  Yes, Your Honor.

 2            MR. FOX:  Yes.

 3            THE COURT:  All right.  Bring them in.

 4       Who will this witness be?

 5            MR. BARTLETT:  Sarah Reichard.

 6       (Jury present.)

 7            THE COURT:  You may be seated.  Good morning to you.

 8   I hope you had a nice three-day weekend and back ready to go.

 9       All right, next witness.

10            MR. BARTLETT:  Thank you, Your Honor.  At this time,

11   the United States calls Sarah Reichard to the stand.

12            THE COURT:  Let me have you come forward and raise

13   your right hand, if you would, please.

14        SARAH REICHARD, called as a witness, duly sworn.

15            THE COURT:  Just come around and take the witness

16   chair.

17                       DIRECT EXAMINATION

18   BY MR. BARTLETT:

19   Q.  Would you tell the members of the jury your first and last

20   name and spell your last name for the Court Reporter.

21   A.  My name is Sarah Reichard, R-E-I-C-H-A-R-D.

22   Q.  Ms. Reichard, where were you born and raised?

23   A.  I was born in New Orleans, Louisiana, but I was mostly

24   raised in Winston-Salem, North Carolina.

25   Q.  Where did you do your college?
```

1  **A.** I came out here -- when I turned 18, I moved out to
2  Seattle.  We lived here for a couple years when I was in
3  junior high, and I liked it here.  I came out and worked for a
4  year and got residency so I could go to the University of
5  Washington.  So I got my bachelor's degree -- a bachelor of
6  science in botany in 1981.
7  **Q.** After you got your BS in botany in 1981, what did you do
8  career-wise?
9  **A.** I first worked managing a nursery and landscaping company
10 for about four-and-a-half years and then I decided I wanted to
11 go back to graduate school.  So I went back to the University
12 of Washington.  The Center for Urban Horticulture had been
13 started while I was gone, and I did a master's degree working
14 on a plant, trying to unravel the evolution of a group of
15 plants that are in Chile from Santiago down to Tierra Del
16 Fuego.
17    I completed that in 1989, and then I decided -- when I was
18 down in Chile, I had seen a lot of invasive plants, plants
19 that were introduced that caused environmental problems.
20 Things like we have here, Scotch Broom.  They have Scotch
21 Broom too, and I became interested in that and I decided I
22 wanted to do a Ph.D. to study why some species become invasive
23 and some don't, and I completed that in 1994.
24 **Q.** At the time that you were doing your doctoral work on
25 invasive plants, I guess a lot of us have heard about that

1  now.  Was this a new area?

2  **A.**  It was very new.  I started actually in 1988 when I came

3  back from doing my fieldwork in Chile.  I got really

4  interested in it there, and even before I finished my

5  master's, I started working on it, and there was really no

6  literature at all.

7      There was a little bit on agriculture weeds.  There was

8  that kind of literature, but as far as national area problems,

9  environmental problems, very little.  So I am actually one of

10  the first people who started working in that field.

11  **Q.**  During the time that you were picking up your master's and

12  eventually going on to complete your doctorate program, did

13  you ever work at the University of Washington?

14  **A.**  Yes.  From pretty much soon after I started my master's

15  right up to the time I finished my Ph.D., I worked for the

16  University of Washington, mostly as a research assistant.  I

17  did a number of different jobs.  Sometimes helping my major

18  professor with his research.  Mostly running a herbarium,

19  which is a collection of pressed and dried plant specimens,

20  kind of like a library of plant specimens, and then I also did

21  some teaching for the University as well.

22  **Q.**  How does that work?  When you are a research assistant for

23  the University of Washington, how are you paid?  What kind of

24  grants are you expected to get or not get?

25  **A.**  Well, as just a research assistant, as a graduate student,

1 we don't really have to bring in grants. So I worked -- some

2 of the money that I had came from the state. Running the

3 herbarium was paid for by the University of Washington and

4 some of it came from grants that we received.

5 **Q.** Are you still a research assistant?

6 **A.** No. So after I finished graduate school in 1994, I did a

7 postdoctoral project, and that was a joint project mostly at

8 the University of Washington but also at the University of

9 Hawaii, trying to do some of the same things that I'd done for

10 North American Invasive Species wi th Hawaiian invasive

11 species.

12  So I did that for two years, and then I came back to the

13 Center -- so I was based at the zoology department at the UW

14 and not at the Center for Urban Horticulture during that

15 period of time from '94 and '95. Then in early '96 -- no,

16 '97 -- I came back to become a research assistant professor at

17 the Center for Urban Horticulture.

18 **Q.** In 1997?

19 **A.** Yes, January 1997.

20 **Q.** What is a research assistant professor at the University

21 of Washington?

22 **A.** So, professors are divided into sort of two camps. So

23 what most people think of as a professor, which are the state

24 funded professors that, you know, they have teaching as an

25 important part of their responsibility. There are a small

group of professors that are considered to be research

professors, and so we -- generally, a research professor

doesn't teach, although they may teach in contract with the

university, but they are not expected to teach. They pretty

much just do research, and all of their research comes from

grants that they get for themselves.

**Q.** So you actually didn't get a salary from the state, you

were just depending on grants?

**A.** Not at that time. From 1997 until the Fall of 2001, I was

a research assistant professor, so all of my money came from

grants or from teaching, because I did also do some teaching

for the UW, but again that was a class by class basis not a

regular thing, and it was -- yeah, it was all from grants that

I got.

**Q.** When did that change? When did your title at the U

change?

**A.** In March of 2001, I was hired into a tenure track

position, a state funded position. But that appointment, even

though I was hired in March, the appointment didn't take place

until September 15, 2001. So I was kind of in a transition

period.

**Q.** What was the title? You went from a research assistant

professor to --

**A.** To an assistant professor. Basically, it just meant that

when you took the research away, you are still supposed to do

1  research, but it means that you are part now of the

2  state-funded tenure track faculty.

3  **Q.**  Is that your current title?

4  **A.**  I am now an associate professor, so I have been promoted.

5  **Q.**  During the time that you were working at the Center for

6  Urban Horticulture, what different positions and what

7  different jobs did you do down there?

8  **A.**  Well, at the time that the fire happened, I was just a

9  research assistant professor, so I was mostly doing research

10  and then some teaching.  Once I got the state-funded position,

11  I did have some additional responsibilities.  I curated the

12  herbarium, which is the herbarium that I worked at when I was

13  a graduate student.

14     I now was in charge of it, as a curator.  Then I also

15  started a conservation program for the University of

16  Washington Botanic Gardens which the Center for Urban

17  Horticulture is now a part of, and so I am the director of

18  this conservation program.

19  **Q.**  What is the program?

20  **A.**  We call it rare care or rare plant care and conservation,

21  and we work to conserve Washington's rare plants.  So we do

22  research on rare plants, but we also have a very large program

23  where we train volunteers, people that are interested in

24  education about plants all over the state, to monitor rare

25  plant populations because the state has a monitoring program

in the National Heritage Program, which is part of the
Department of Natural Resources, but they are understaffed so
they estimate that any given rare plant population only gets
monitored once every 10 years, and a lot of bad things can
happen to the populations over that period.

So what we do is we train volunteers in how you go out and
look at the population to assess the health of the population.
They give the data back to us, and then we give it to the land
managers so they can manage those populations better.  And
then we also have a seed vault which is a secure seed storage
facility.  It's 150 square feet.  It has four-hour fire walls,
and we can collect seeds of rare plants and store them there
for long-term protection.

Q. How many rare plant species does your group monitor in the
State of Washington?

A. So far we've monitored about 400 populations.  The program
has grown since we started it.  It started in 2001.  So it's
been growing, and I think we've done about 200 species and
about 400 populations total.

Q. You talked earlier about obtaining grants so you could get
paid and you could fund some of the research you've done.  I
want to direct your attention specifically to grants that you
had obtained and were being paid through during May of 2001.

Can we focus on that?

A. (Indicating affirmatively.)

1   **Q.** If you could take a look at Government's 354 and tell me

2   if you recognize that.

3   **A.** It's a list of the grants that I had at the time.

4        MR. BARTLETT:  Your Honor, I would like to offer

5   Exhibit 354k.

6        MR. FOX:  No objection.

7        THE COURT:  Admitted.

8               (Exhibit No. 354 admitted.)

9   BY MR. BARTLETT:

10   **Q.** It's pretty hard to read, perhaps you can take us through.

11   During May of 2001, what -- and if I could direct your

12   attention specifically to federal grants, money where you were

13   receiving money from the federal government -- were you

14   working under at that point in time?

15   **A.** I had three at that time.  The first was funding from the

16   Bureau of Land Management, which is a federal agency in the

17   Department of Interior.  The money came through the National

18   Fish and Wildlife Foundation, so they gave the money to the

19   National Fish and Wildlife Foundation who gave it to me, and

20   that was to start the rare plant monitoring program.  So we

21   were just beginning that project at that time.

22      So that was the money that was allowing us to develop what

23   we call quality assurance protocols, so when we train the

24   volunteers and we send them out, we know they are collecting

25   quality data.

1    **Q.**  For the record, when did you obtain that grant?  How long

2    did it last and how much was it?

3    **A.**  It was -- it started on February 1, 2001 and was completed

4    on April 30, 2002, and it was $20,000.

5    **Q.**  It's kind of hard, but if you reach over and touch the

6    screen, you can actually make a little arrow show up.

7        Do you actually see that grant there?

8    **A.**  I do.  I will see if I can do it.

9        Yes, that's it.

10   **Q.**  In addition to that grant, what other money were you

11   receiving from the federal government?

12   **A.**  I had two grants from the U.S. Department of Agriculture.

13   The U.S. Department of Agriculture is the federal agency

14   that's charged with monitoring what plants come into the

15   country, and what I work on is risk assessment.  A big part of

16   what I worked on is risk assessment, trying to determine which

17   species will become invasive and which weren't.

18       They were interested in having me do some work for them.

19   So I had one of them that was awarded on August 14, 2000, with

20   completion on August 13, 2001, and that was for $13,326.  That

21   was money that came directly from the office of the secretary

22   in the Department of Agriculture.

23       They had, I think it was, eight species that they were

24   considering adding to the federal noxious weed list, and they

25   wanted me to -- usually they have a staff botanist do it, but

because of my expertise and some other issues they had, they wanted me to do the evaluations for them and so that funding was to do the evaluation for those eight species.

**Q.** Do you see the Department of Agriculture grant, the $13,326 grant?

**A.** Yes, I do.

**Q.** Now, you've talked about -- most grants -- I assume a bunch of people put in requests for it and they ask for the money and they choose one.

Is that what happened in this grant?

**A.** No. They came to me and said, would you be willing to do this, and I said sure, I would be happy to do it. I was living off of grants at that time so if people were going to offer me money, I was going to take it.

When you are a research professor, when you are any kind of professor, but especially research and you are trying to fund your own salary, the reality is that you are not just funding your own salary because as you get going, you can't just -- if you are writing proposals for the next bit of funding, then you have to have somebody else doing the work from the last grant so you can be writing proposals for the next grant.

So you are constantly getting grants to fund your graduate students and your staff. So yeah, if somebody offers me money, especially something that's easy for me to do, I am

1  going to take it.

2  **Q.**  Did you have a third grant at that point in time from the

3  federal government?

4  **A.**  Yeah, I also had another grant from the Department of

5  Agriculture, and this one was a competitive grant.  So this is

6  one where lots and lots of people apply and just a few people

7  get it.  I think their funding rate was about 25 percent, or

8  at least it was at that time.

9      That one was a longer-term project.  It was awarded on

10  August 1, 1998, and then it was due for completion on July 31,

11  2002, but because of the fire, I had to get a couple other

12  extensions so it actually didn't get completed until 2004, and

13  that was for $88,693.

14  **Q.**  What was that involving?

15  **A.**  That was to develop -- most of my work has been done on

16  woody plant species, shrubs and trees and woody vines.

17      That was to develop methods for assessing the risk of

18  herbaceous plants, so non-woody plants so that they could use

19  those methods when they were considering bringing something

20  into the country.

21  **Q.**  If you could make a mark near where that grant is listed.

22  **A.**  Somewhere in there, right below the other one.

23  **Q.**  How many people -- how many assistant professors --

24  research assistants work at the Center for Urban Horticulture?

25  **A.**  At the time of the fire, there were five of us that had

1    our offices full time at the Center for Urban Horticulture,

2    and then four of us who had labs there.  One had their

3    office -- Tom Hinckley had his lab up on the main campus, and

4    then there were three faculty members who had part-time

5    offices there, so they had offices in other places, but they

6    also had an office with us.

7    **Q.**  I assume you know all the people there?

8    **A.**  Yes.

9    **Q.**  And talked with them?

10   **A.**  Yes.

11   **Q.**  Could you explain to the members of the jury, of the

12   people, the professors, the assistant professors that were

13   working down there, was everyone involved in getting grants?

14   **A.**  Yeah, yeah.  Even if you are a state-funded faculty, you

15   are expected to bring in grants.  So when you are state-funded

16   faculty, what that means is they pay our salary for nine

17   months out of the year.  But if you want Summer salary, if you

18   want to get paid during the Summer, you have to bring in your

19   own salary.

20        Your graduate students, and then as I said, pretty much as

21   you get going you have to have staff to manage things for you,

22   so you end up having to do all of that.  So yeah, I am sure

23   all of them -- well, actually all of them did have grants at

24   the time.

25   **Q.**  Can you explain to the members of the jury, when you get

1   -- like, for example you've talked about an $88,000 grant

2   from the Department of Agriculture -- do you get a check sent

3   to you personally?

4   **A.**  No, they don't do it that way.  They send it to the Office

5   of Sponsored Projects, which is the office that deals with

6   such things, and they set up the budgets for it, and there's

7   people who manage the budgets, help us manage the budgets.

8   It's ultimately our responsibility.

9       So it all goes to them.  I can't contract for the

10  University of Washington, only the Office of Sponsored

11  Projects can sign a contract for the UW.

12  **Q.**  Does the UW take a cut of your grants as they come through

13  the door?

14  **A.**  It depends on the grant.  So Department of Agriculture has

15  negotiated a special rate, and it varies per year.  I think

16  the year that I got the $88,000 one, it was 14 percent.  It

17  can be as high with some grants 53 percent, it just depends on

18  who the grantor is.

19      The National Fish and Wildlife Foundation doesn't pay

20  those kinds of indirect costs, so in that case there was

21  nothing coming out of that one at all, it went into my

22  project.  So it just kind of varies.

23  **Q.**  I want to change topics.  I want to focus your attention

24  to May 21 of 2001.  Can you explain to the members of the

25  jury, what were you doing at that point in time?

1  **A.**  So I was a research assistant professor, but I was

2  teaching a couple classes, and it was right at the end of the

3  academic year.  The academic year officially ends June 15th,

4  but classes usually end a week or so before that.

5      So that morning, my husband was out of town helping his

6  mom in California, and I woke up early -- I usually do.  I

7  probably woke up around 5:00.  It was a really pretty day that

8  day, and it was dawn and there was a robin singing in the

9  tree, and it was very nice and I was thinking about my classes

10  and what I needed to do to finish up things, and the phone

11  rang downstairs, and I heard it ring -- I thought it was

12  probably my sister on the East Coast who's never quite figured

13  out the time change, so I just let the machine pick it up and

14  then a little bit later I got up and went downstairs and

15  checked it.  It was probably getting close to 5:30 at that

16  point, and the message was from my colleague Linda

17  Chalker-Scott who has a lab in the building, too.

18  **Q.**  When you say in the building too?

19  **A.**  In Merrill Hall.  The message just said the lab is on fire

20  and I am going down there, and that's all it said.  And I had

21  been in working on Sunday afternoon, the day before, and I had

22  seen one of her graduate students there.  She was trying to

23  finish up her master's degree and was going into a Ph.D.

24  program on the East Coast, and we talked for a while and she

25  told me she was going to be working late trying to get a bunch

1  of work done in the lab.

2      So I thought oh, my gosh, she left something on, Linda's

3  lab is on fire, but it didn't really occur to me what Linda

4  meant.  I called up Linda's husband Jim at home and asked him,

5  and said how bad is it, I got the message, and he said turn on

6  the TV.  So I turned on the TV, Channel 5, and there was

7  Merrill Hall with flames -- the end of the building where my

8  office was, so I just said to Jim, oh, my God, I am going to

9  go down there and tell her if she calls, and I hung up.

10 **Q.**  Where did you go?

11 **A.**  So I got dressed and grabbed my keys and drove over.  We

12 live west of the University, and the Center for Urban

13 Horticulture is east of the University, and as soon as I got

14 to the U District, I could smell and see smoke, and we were

15 still a couple miles away so I knew it really wasn't very

16 good.

17     And then there were fire trucks coming back because the

18 rest of the fire had been put out so they were letting some of

19 the firemen go.  So I was passing some of the fire trucks.  I

20 got within a couple of blocks of the Center, and the streets

21 were marked off, and so I got out of the car and I just ran

22 until I found Linda and the others.

23 **Q.**  Where were they?

24 **A.**  They were in a parking lot east of the building.

25 **Q.**  Did you eventually walk around to the back of the

1 building?

2 **A.**  Yeah, yeah, we did.  At first, the firemen wouldn't let us

3 anywhere near it, and then we figured out that the fenced

4 nursery area behind, that we could go into that fenced area

5 behind and then we could see the back of the building.

6 **Q.**  If you could take a look at an exhibit already admitted in

7 front of you, Exhibit 305.

8      This is a schematic.  Does that in general terms represent

9 how the Center for Urban Horticulture was set up?

10 **A.**  Yes, it does.

11 **Q.**  Can you just kind of briefly walk us through the different

12 buildings and areas.

13 **A.**  Okay.  So the main building where all of the offices and

14 labs are is Merrill Hall, and the library adjoins it so it's

15 not really separate like it looks like in this diagram.  The

16 library is all part of it.

17      Merrill Hall is two stories.  It's built into a hill so

18 you enter from the McVay Courtyard, which is an open courtyard

19 area, into the lobby area, and then you could go downstairs to

20 where the academic floor was, the offices and labs, which is

21 also on the ground floor since it's built into a hill.

22      So then the Miller Library, you could also enter that off

23 the main lobby on the first floor, and below the Miller

24 Library was the Otis Douglas Hyde Herbarium, which is the

25 herbarium that I curate.  Then across the way is NHS Hall

1  which is a public meeting space for anybody who wants to meet

2  there.  We do a lot of weddings and funerals and that kind of

3  thing there too.

4  Q.  If you would look at another exhibit that's not been

5  admitted.  Exhibit 306, which I believe is in the folder in

6  front of you.

7      Do you recognize that?

8  A.  Yeah, this is a diagram of the lower level.

9  Q.  Of Merrill Hall?

10  A.  Of Merrill Hall.

11  Q.  Is that an accurate diagram?

12  A.  Yes.

13          MR. BARTLETT:  I would like to offer Exhibit 306.

14          MR. FOX:  No objection.

15          THE COURT:  Admitted.

16              (Exhibit No. 306 admitted.)

17  BY MR. BARTLETT:

18  Q.  Could you kind of walk us through what we are looking at

19  here, where Toby Bradshaw's office is, where your office is,

20  what the other areas are that existed in Merrill Hall in May

21  of 2001.

22  A.  Right.  So Toby's office is right there.  He was right in

23  the middle of the building there, and then his lab was

24  directly across from that.  My office was on the far end of

25  the building right there, and then my main laboratory was

1  directly across from my office.

2      I also managed the tissue culture laboratories for plant

3  propagation, which was here and then part of that -- part of

4  the second larger room is storage, and part of it is for

5  growing out the plants.

6  **Q.**  If I could stop you just a second.

7  **A.**  Okay.

8  **Q.**  You've talked about a laboratory.  You talked about tissue

9  propagation.  What are we talking about?

10 **A.**  Tissue culture is --  it's a lot like taking a cutting,

11 really, only it's a little bit fancier than that.  So when you

12 take a cutting of a plant, you take a strip of the stem and

13 you dip it in a growth hormone, and then you put it in soil or

14 sand or something.

15     When you are doing tissue culture, if you take a little

16 piece of tissue -- in this case, stem tissue -- of plants and

17 you put it on -- it's just a little chunk of stem, and you put

18 it on a medium, it's kind of like jello or jelly, that has

19 hormones and nutrients, and you get the piece of tissue to

20 form chutes.

21     Once it has chutes, you put it on a different kind of

22 auger, a different medium, that has hormones that induce

23 roots, and then you get little plants out of it.  I was

24 working on a plant called Hackelia venusta or showy stickseed,

25 which is Washington's rarest plant.  There's only one

1   population left in the state, and it's in a pretty precarious
2   situation up in the North Cascades.
3       So the U.S. Fish and Wildlife Service had asked me to look
4   at the propagation of it.  They are the agency that manages
5   rare plants in this country, and they had asked me to figure
6   out if I could tissue culture it because they thought it
7   couldn't be reproduced from seeds, and so we were working on
8   the methods for that and how you could tissue culture them and
9   had managed to get some success with it.
10  **Q.**  Where else -- if you just look around, what other labs
11  were you involved in?
12  **A.**  I already touched on the herbarium, but I will touch it
13  again.  That's the sort of library of dried plant specimens
14  that I curated.
15  **Q.**  In May of 2001, in addition to your own work and the work
16  of Toby Bradshaw, were you working with any research
17  assistants?
18  **A.**  Yeah.  I had a research assistant who helped me manage the
19  herbarium.  I had a research assistant working on the large
20  USDA grant.  I had a research assistant working on the smaller
21  USDA grant.  I am trying to think if I had any others.  I know
22  I had those three.
23  **Q.**  When you had research assistants, obviously they are not
24  making much money?
25  **A.**  (Indicating negatively.)

1  **Q.** I assume most of them were working on either a master or
2  doctoral program?

3  **A.** Yes.

4  **Q.** Are there points in time when, for example, you and
5  perhaps your research assistants had to work more than the
6  9:00 to 5:00 job?

7  **A.** Yeah. You know, people don't go into academia expecting
8  to work a 9:00 to 5:00 job. We do what we do because we
9  really love it and because we are excited about it. I don't
10 think any of us really work 9:00 to 5:00.

11     It's expected that graduate students in particular and
12 junior faculty like I was at the time are really -- you are
13 really supposed to show that you are working hard and worth
14 it. So yeah, it was very common. I am more of a morning
15 person in a lot of ways, so I don't really work very late at
16 night, but a lot of the graduate students would work all
17 night.

18 **Q.** When grad students would work all night, generally where
19 would they be involved? Would they be sitting in -- for
20 example, did they take over Toby Bradshaw's office or your
21 office? Or are they back in the labs or in both?

22 **A.** Both. I don't know about Toby. I don't think Toby, but
23 Linda Chalker-Scott and I both had sofas in our offices, full
24 length sofas, so that people could take a nap if they needed
25 to.

1    There was also sofas in the graduate room which was not in

2 Merrill Hall.  It was in the adjoining Isaacson Hall, which

3 wasn't on the diagram that you showed me, but on the other

4 side of the McVay Courtyard.  So they might be in the labs or

5 in the office taking a nap.  They might be anywhere in the

6 building.  They had full access.

7 **Q.** You've talked about arriving there in the early morning

8 hours of May 21st. Are you eventually let into your office and

9 into your labs?

10 **A.** It was a couple of days before we got in there.  I think

11 it was probably the 23rd. I am not completely sure, but I

12 think it was the 23rd before they let us in because it was a

13 crime scene, and they needed to investigate it, and then also

14 they were worried about the structural integrity of the

15 building.

16    So they finally did let us in -- I think it was Wednesday

17 -- and they originally said you have 15 minutes to get

18 everything you need because they were worried about the

19 building.  So they would let each of us go in, and it was like

20 what do I grab in 15 minutes.

21 **Q.** Can you describe your office when you got in there the

22 first time.

23 **A.** It was a mess.  The whole building was a mess.  I was

24 pretty far from Toby's office, so the damage in my office and

25 especially in the lab, my main lab directly across from my

1  office, was not really fire damaged.  It was a lot of water

2  because the fire had traveled -- it had got up into the roof

3  of the building and traveled along the spine of the roof to

4  over the library, which is -- the herbarium and my lab were

5  under where the laboratory was, so a lot of water got dumped

6  on it.  So there was tremendous water damage and then there

7  was also a lot of soot.  The soot was very acidic so there was

8  soot everywhere on things in my office.  There's still soot in

9  my file folders.

10  **Q.**  How about your labs?

11  **A.**  The labs were -- the main lab, again, lots and lots of

12  water.  Pretty much anything that was out was destroyed by all

13  the water damage to it.

14      The hardest thing for me was I had a slide sorting table

15  that my husband had built me in my laboratory, and this was a

16  few years ago, so we weren't all digital then, so I had all my

17  slides laying out on there because I didn't file them away

18  always right away after I finished teaching or lecturing.  I'd

19  just take them out of the care zone and put them on the thing

20  until I had time to do it, and they were all laying out there,

21  so they got a lot of water and this very acidic soot on them,

22  and the ash etched them.

23      So I lost a lot of slides, which is really hard because

24  that's documentation of your work that you collected over

25  years and years and years and when you lose something like

1   that, it's just not replaceable.

2       The other laboratory was more towards the center of the

3   building where there was a lot of heat.  So in that case,

4   there wasn't a lot of fire damage but the heat was quite

5   intense because the paint had actually slid down the walls,

6   kind of melted down the wall.  And then that's where my little

7   plants were, my tissue culture plants, so they were just

8   cooked.

9   **Q.**  Destroyed?

10  **A.**  Destroyed.

11  **Q.**  You've described your work in the week prior where you are

12  teaching classes, you've got things going on.  How does the

13  fire impact your work at the University of Washington?

14  **A.**  Well, the teaching -- I was teaching actually two classes

15  even though I was a research professor at this time, so I was

16  teaching a class, a graduate level class in biological

17  invasions.

18      That class -- I couldn't be teaching it because I didn't

19  have any of my lecture notes, my slides.  I didn't have any

20  way to teach it, plus I was pretty much not in the mental

21  state to be able to actually coherently lecture to students.

22      So with that class, I just canceled it and told the

23  students -- I only had a few more lectures anyway, and they

24  had a big project due, so I just told them to finish up your

25  project and turn it in.

1      The other class I was teaching was plant identification,

2   and I had a co-teacher, co-instructor, as well as a teaching

3   assistant for that class, so they very generously said don't

4   worry about it, we will take care of things.  So they

5   continued teaching for me.

6      Research, you know, again was very difficult to do for

7   some time.  I mean, for one thing, they took everything away

8   from me.  The University hired a company to come in and take

9   all the books and papers because everything was wet and

10  everything smelled like smoke.  So they took it somewhere; I

11  don't know where.  Everybody had everything taken.

12     They took them to have the books freeze dried to dry them,

13  and then ozoned to get the scent out.  Freeze drying didn't

14  really work very well for things that were really wet, they

15  were just pulp.  They weren't usable.  So I lost a lot of

16  books and papers.

17     And for an academic, this is -- you know, we -- everyone

18  of us has our unique research specialty, and we pull together

19  all the papers and the books that support our work, so a lot

20  of the things you amass -- like the slides, you amass them

21  over decades, so they are not easily replaceable.

22     But I did finally -- so they took all the papers away.  I

23  got them back sometime in the early Fall, about the time that

24  Fall quarter started up again, but some things were missing.

25  I never got them back.  Then the whole next year was just

1  chaotic.  We were in trailers --

2  **Q.**  Why is that?  You got your books and stuff, the little

3  things back in the Fall of 2001.  Don't you get your office

4  back?

5  **A.**  Well, no.  The building was destroyed so they had to pull

6  it down.  It wasn't salvageable.  So they brought in trailers

7  for each of us, so each faculty member had our own trailer

8  that was for us and for our staff and maybe a graduate

9  student, if we could fit them.

10  Most of the graduate students -- they brought in another

11  trailer for the graduate students that were out there.  And

12  then I didn't have a lab, so one of the botany professors was

13  very generous about letting my students use her lab during

14  that time.

15  **Q.**  Can you explain to the members of the jury -- you said

16  that you were kind of on tenure track at this point in time.

17  Is that automatic?  In other words, once you get on the track,

18  you are for sure going to get tenure?

19  **A.**  No, not at all.  So once I got hired as a state-funded

20  faculty member, that puts me on a tenure track, and that means

21  after five years -- it's usually five years; it sort of

22  depends on the person -- usually after five years, you are

23  evaluated, and it's not just the University that evaluates

24  you.  You prepare what's called a tenure package, and they

25  send it out to people all over the country to look at it to

1   see if you are of sufficient scholarship to be hired and

2   promoted.

3       So once you serve your sort of five-year apprenticeship,

4   and then you go up for tenure, if you get it, that means the

5   University cannot fire you without cause.  It's to protect our

6   academic freedom so that we can do research on things that may

7   be unpopular with administration.

8       It's not automatic that you get tenure.  In fact, the two

9   people who had come up in my college for tenure before me had

10  not gotten it, so I was a little bit freaked out about getting

11  tenure.  I thought I would work hard and be good, but you just

12  never know.  There's people evaluating it all over the

13  country.

14  **Q.**  Does this fire affect your ability to prepare a tenure

15  packet?

16  **A.**  Yes.  So the tenure packet divides into three things, your

17  teaching, your research and your service, service to the

18  University as well as service to your profession, serving on

19  committees, things like that.

20      So the research one in particular was of concern to me

21  because things were chaotic that year.  I mean, I didn't have

22  an office.  I didn't have a lab.  We were trying to figure out

23  are we going to rebuild, where was the money going to come

24  from.  First, it looked like there wasn't enough money to

25  rebuild so there was a lot of drama around that, a lot of

things going on.

So the ability to focus on my research didn't happen for at least a year. I can remember there was a day in June 2002 where I was sitting in my trailer working on a paper, and I suddenly felt this really kind of lightheaded feeling of wow, I am being productive, this is what it feels like, I haven't felt like this in over a year. So I pretty much lost a year in that tenure, five-year package.

I did have a very good faculty chair who went to the provost and got me an extension because of the circumstances, so I did end up with an extra year and was able to recover from that.

**Q.** You've talked about the professional impact the arsons had on you and your work at the University of Washington. Did it have any personal impact on you?

**A.** Yeah, it did. I am always amazed when people refer to what happened to us as a property crime because I can't conceive of the kind of mind that would think that the only way that you can cause pain and suffering is through physical distress. There are a lot of ways to hurt people, and I am just one of them.

So I am a pretty upbeat person. You have to be when you are a conservation biologist. You have to believe that you can make a difference and be upbeat. That Summer in 2001, I had times when I just didn't want to live anymore, where I

just felt like the effort to rebuild my career was too much, and I just couldn't do it.  So that was really hard.

I started having panic attacks which I have never had before.  The first one was that Wednesday, the 23rd, after the fire, and I had done an interview for KOMO TV.  It was the first time I had done something like that, and I was wearing a T-shirt that day.  It was kind of distinctive, it was an art piece, and my husband still wasn't home, and I thought -- I was there until after dark, and I thought I'd stop off at the Safeway in the U District and get something to eat.

So I went into the Safeway, and it was really brightly lit, and I was wearing this T-shirt, and I knew that the bit had aired on KOMO, and it was full of University students because it was the U District, and I felt like they were all looking at me and that they were all people from ELF, and that they all knew who I was and that I had pointed out the harm that they had done to my work and to the rare plants that I work with.

I got really freaked out, and I ran out of the building and got in my car and drove away.  I went home, ultimately, and Bryan still wasn't home.  I went over to my next-door neighbor's house because I didn't want to be alone, and I told her what had happened, and her daughter had had panic attacks when she was a teenager, and so she told me that's what it was.  I didn't even have the vocabulary to know what was going

1   on with me, and I had more after that.

2       The worst one was probably -- we were looking to move from

3   our house anyway, and we wanted a bigger house and bigger

4   yard, a bigger garden for me, so we put a bid on a house just

5   a couple weeks after the fire, and we moved in in early Fall,

6   and we'd been in there maybe five or six weeks.  We had barely

7   done the change of address stuff yet.  It was a Friday night

8   about 7:00, and this young man came to the door, and he was

9   neatly dressed and nice.  I didn't open the door, but there's

10  a glass pane, and we could see each other and hear each other,

11  and he says are you Sarah Reichard?

12      I said, "Who are you?"  He says, "Well, I am canvassing

13  for Green Peace, and you've given money to us before," and I

14  have never given money to Green Peace.  They are a little too

15  radical for me actually.  So I said no, and I was really

16  freaked out and he left.  I am sure he thought I was insane.

17  And I probably was.

18      So I called up my husband to see if he was coming home yet

19  and he had just left.  He worked about a half hour away, so he

20  was still a ways away, and I was convinced that this guy --

21  how did he know my name and why did he say I had given money

22  to Green Peace and that they were out there some place and

23  they were going to burn my house down.

24      So I got the phone and I just sat there on the floor in a

25  place where no one could see in the window, ready to call 911

in case something happened. We hadn't lived there very long and so I didn't really know all the sounds of the house, and so every little sound that I heard I thought somebody was out there.

I called my husband a couple more times saying are you here yet, where are you, and he got there and it was nothing, of course. And it was Friday, so I had to wait until Monday and I called Green Peace's office to ask about a canvasser and they said they had somebody in the area and it turns out that they shared lists with the Washington Public Interest Research Group which I have given money to before, so it was all really innocent.

But I went from a person who had no problem doing fieldwork and traveling alone in Chile during an era when it was ruled by a military dictator, to sitting on my floor clutching a phone. So yeah, I would say it had a pretty profound effect on me emotionally and personally, and I would say I was hurt by it.

**Q.** Nothing further.

Thank you, Ms. Reichard.

CROSS-EXAMINATION

BY MR. FOX:

**Q.** Good morning, Ms. Reichard. I am Neil Fox helping Ms. Briana Waters. This was a pretty traumatic event for you; is that true?

1   **A.** I would say so.

2   **Q.** We are very sorry for the trauma. Thank you very much.

3   **A.** Really.

4   **Q.** Yes.

5   **A.** I saw your video on you too where you said this was a

6   property crime.

7        MR. FOX: Your Honor, I would ask that that matter be

8   stricken from the record.

9        THE COURT: It will be. It's stricken.

10       MR. BARTLETT: At this time, the United States calls

11   Tiffany Tudder to the stand.

12       THE COURT: Mr. Fox, my record reflects that I

13   previously ruled on that so I will allow that to stay in.

14    Let me have you come forward and raise your right hand and

15   be sworn.

16       TIFFANY TUDDER, called as a witness, duly sworn.

17       THE COURT: Come around and take the witness chair.

18       MR. BARTLETT: May I inquire, Your Honor?

19       THE COURT: Yes.

20                DIRECT EXAMINATION

21   BY MR. BARTLETT:

22   **Q.** Could you tell the members of the jury your first and last

23   name and spell your last name for the Court Reporter.

24   **A.** Tiffany Tudder, T-U-D-D-E-R.

25   **Q.** Good morning, Ms. Tudder.

1   **A.**  Good morning.

2   **Q.**  Can you tell the members of the jury a little bit about

3   yourself, where you were born and raised, where you went to

4   high school.

5   **A.**  I was born in Silsbee, Texas, and I grew up in Bellevue,

6   Washington.  I went to high school at Interlake High School in

7   Bellevue.

8   **Q.**  When did you graduate from Interlake High School in

9   Bellevue?

10  **A.**  1987.

11  **Q.**  After graduating, did you go to college?

12  **A.**  Yes.

13  **Q.**  Where?

14  **A.**  Evergreen State College.

15  **Q.**  In Olympia?

16  **A.**  Yes.

17  **Q.**  During the time that you were at Evergreen, what was your

18  primary area of study?

19  **A.**  Mostly film.

20  **Q.**  Did you graduate?

21  **A.**  Yes.

22  **Q.**  When was that?

23  **A.**  2001.

24  **Q.**  What was your official degree when you graduated from

25  Evergreen in 2001?

1  **A.**  A Bachelor of Liberal Arts.

2  **Q.**  Where are you living currently?  Not your specific

3  address, the city.

4  **A.**  I live in Brooklyn, New York.

5  **Q.**  What do you do in New York?

6  **A.**  I work in nonprofit development.

7  **Q.**  During the time -- the four years that you spent at

8  Evergreen College in Olympia, in addition to your normal class

9  work and friends, were you involved in any organizations down

10  there?

11  **A.**  Yes.

12  **Q.**  Could you tell us --

13  **A.**  The Evergreen Animal Rights Network.

14  **Q.**  At the time that you were involved in the Evergreen Animal

15  Rights Network, did you know Briana Waters?

16  **A.**  Yes.

17  **Q.**  Do you see her in court?

18  **A.**  Yes.

19          MR. BARTLETT:  For the record, the witness has

20  identified the Defendant.

21          THE COURT:  It will.

22  BY MR. BARTLETT:

23  **Q.**  Can you explain your relationship with Briana?  Close

24  friends, barely knew her or something in between?

25  **A.**  We were friends, not close, but we did a lot of things

1   together with the group.

2   **Q.** In addition to knowing Ms. Waters, did you also know her

3   boyfriend?

4   **A.** Yes.

5   **Q.** What was his name?

6   **A.** Justin.

7   **Q.** Could you take a look at Exhibit 115. I think it is going

8   to show up on a screen in front of you. There's a lot of red

9   arrows. Could you point the little exit button on the left

10  lower part of that screen. There you go.

11      Do you recognize that photo?

12  **A.** Yes.

13  **Q.** Is that her boyfriend Justin Solondz?

14  **A.** Yes.

15  **Q.** Did you know him at Evergreen in other areas?

16  **A.** I knew him from being with Briana, and then I took a

17  couple classes and he was in my class.

18  **Q.** What kind of class?

19  **A.** It's a Brazilian dance, martial arts.

20  **Q.** In addition to Ms. Waters and Mr. Solondz, did you also

21  know a Chris Dickinson?

22  **A.** Yes.

23  **Q.** How did you know him?

24  **A.** He was my friend's boyfriend.

25  **Q.** Can I direct your attention to the Fall, November of 1998.

1  You were going to Evergreen at that point in time?

2  **A.**  Yes.

3  **Q.**  You were involved in the Evergreen Animal Rights Network?

4  **A.**  Yep.

5  **Q.**  Did there come a time when a person named Craig Rosebraugh

6  was invited to give a talk at Evergreen?

7  **A.**  Yes.

8  **Q.**  Did you invite him?

9  **A.**  Our group did.

10  **Q.**  The Evergreen Animal Rights Network?

11  **A.**  Yes.

12  **Q.**  Did you attend that lecture?

13  **A.**  Yes.

14  **Q.**  Could you describe him for the jury.

15  **A.**  He was set up in the main area of school, kind of in

16  between like the library and the computer area, and I remember

17  there was tables set up, and it was mostly over by those

18  tables.

19  **Q.**  How many people attended the lecture?

20  **A.**  I don't know, maybe 30.

21  **Q.**  Can you just generally remember how long it lasted?

22  **A.**  Maybe half an hour.

23  **Q.**  After Mr. Rosebraugh completed his lecture on that

24  morning, did a person come over and talk with you?

25  **A.**  Yes.

1  **Q.** At the time that this person was talking to you, where was
2  Ms. Waters?
3  **A.** She was near me.
4  **Q.** A reporter?
5  **A.** Yes.
6  **Q.** After this reporter talked to you, did there come a point
7  in time that not only a reporter was talking to you but an
8  article was written?
9  **A.** Yes.
10 **Q.** Tell the jury how you heard about that.
11 **A.** A friend of mine was actually at his parents' house in
12 Florida and called me and said:  You are in the New York
13 Times, and I was like really, because I kind of forgot about
14 it, and he told me about it.
15 **Q.** Did you eventually see that article in 1998?
16 **A.** Yes.
17 **Q.** Had you ever had your name in the New York Times before?
18 **A.** Not that I am aware of.
19 **Q.** When you read it, at the time you read it, was it an
20 accurate depiction of the conversation?
21 **A.** Yes.
22        BY MR. BARTLETT:  Could the witness be handed what's
23 been previously marked as Government's Exhibit 740-C.
24 BY MR. BARTLETT:
25 **Q.** If you turn to page 5 of that article, do you see a brief

1  section that depicts statements you made -- the question asked

2  and statements Ms. Waters made to this reporter on that day?

3  **A.** Yes.

4          MR. BLOOM:  Objection.

5          THE COURT:  It is noted.  You may answer

6  **Q.** I couldn't hear you.

7  **A.** Yes.

8  BY MR. BARTLETT:

9  **Q.** Do those statements, including your statements, the

10  reporter's statements and Ms. Waters' statements, they are

11  accurate?

12  **A.** Yes.

13          MR. BARTLETT:  Your Honor, I would like to offer just

14  this portion of the article pertaining to the conversation

15  between Ms. Tudder, Mr. Sullivan, the reporter, and

16  Ms. Waters.

17          MR. BLOOM:  May I have a voir dire on that question,

18  please?

19          THE COURT:  Give me the page number again.

20          MR. BARTLETT:  It's page 5.

21  BY MR. BARTLETT:

22  **Q.** Now, Ms. Tudder, I assume that as you sit here, you can't

23  independently remember exactly what was asked and answered?

24  **A.** No.

25  **Q.** But as you read this, it refreshes your recollection as to

1   the questions asked --
2          MR. BLOOM:  Excuse me, I am going to object --
3          THE COURT:  Just a second.  He wants to voir dire.
4   Show me exactly what we are talking about on page 5.
5          MR. BARTLETT:  There is a portion of the thing -- of
6   the article that begins, "The talk was sponsored by EARN, the
7   Evergreen Animal Rights Network," and then there is a quote
8   from Ms. Tudder --
9          THE COURT:  All right.  It's down to the end of that
10  quote?
11         MR. BARTLETT:  Going down to the quotations from
12  Ms. Waters, which are --
13         THE COURT:  To the end.  All right.  Mr. Bloom, now
14  you want to --
15         MR. BLOOM:  Just a few questions, yes.
16                    VOIR DIRE EXAMINATION
17  BY MR. BLOOM:
18  Q.  Good morning.  I am Robert Bloom, and I am one of the
19  attorneys for Briana Waters.  We met in the hallway very
20  briefly.  I just said hello, right?
21  A.  Yes.
22  Q.  Other than that, we talked on the phone once, maybe twice?
23  A.  Yes.
24  Q.  I am going to be very specific.  That was almost 10 years
25  ago --

1 **A.** Yes.

2 **Q.** -- that event?

3 Is it fair to say that, without any particular document in

4 front of you, you could not say what the exact question or

5 questions were, or the exact answer or answers were?

6 **A.** That's correct.

7 **Q.** And seeing in print, can you be sure that's exactly what

8 was said, or does it -- is it more like that's kind of what

9 was said?

10 **A.** It looks accurate. I do remember looking at it after it

11 happened and thinking that it was accurate.

12 **Q.** You remember the words that are printed there, were all

13 those words used or some of those words used or --

14 **A.** I don't remember the exact words.

15 **Q.** Right. That's really all I am getting at. You don't

16 remember the exact words of either the question or questions

17 or answer or answers?

18 **A.** No.

19 MR. BLOOM: Given that, I would object to this matter

20 coming in as an accurate reporting of actually what was said.

21 THE COURT: It is noted. You may question. It will

22 be admitted for the purpose, and you may cross-examine on that

23 point.

24 MR. BARTLETT: I would like to just have the

25 overhead.

<pre>
 1              DIRECT EXAMINATION - CONTINUED
 2    BY MR. BARTLETT:
 3    Q.  So after this meeting, Mr. Sullivan came over and asked
 4    you -- and you stated, if you could indicate --
 5              MR. BLOOM:  Excuse me, I am just going to object
 6    because there hasn't been any testimony that the person was
 7    Mr. Sullivan.
 8              THE COURT:  It is noted.
 9    BY MR. BARTLETT:
10    Q.  A reporter came over to talk to you?
11    A.  Yes.
12    Q.  What did you tell him?
13    A.  Would you like me to read --
14    Q.  Yes.
15    A.  "The talk was sponsored by EARN, the Evergreen Animal
16    Rights Network.  We all pretty much know Craig and the
17    liberation collective, said Tiffany Tudder, a junior."
18    Q.  I am assuming that's you.  There weren't two Tiffany
19    Tudders at Evergreen?
20    A.  I highly doubt it.
21    Q.  Then there's an indication of a question from the
22    reporter.  Can you tell us what that question was?
23    A.  "I asked the EARN members if they supported arsons and
24    mink farm releases."
25    Q.  And you heard that question?
</pre>

1    **A.**   Yes.

2    **Q.**   And what did Ms. Waters respond on that day in November?

3    **A.**   "As long as people don't get hurt, I totally support it,

4    said Briana Waters, a senior."

5    **Q.**   What was your response?

6    **A.**   "And animals don't get hurt -- don't be species-ist, said

7    Tiffany."

8    **Q.**   And what does Ms. Waters say?

9    **A.**   "And animals, said Briana."

10      MR. BARTLETT: I have no further questions, Your

11    Honor.

12                 CROSS-EXAMINATION

13    BY MR. BLOOM:

14    **Q.**   Hello again. With regard to what Briana supposedly said

15    and you supposedly said, the idea of arsons and mink releases,

16    do you know what was in Briana's mind when she said, I support

17    it?

18    **A.**   No.

19    **Q.**   Do you know what she meant by "it"?

20    **A.**   No.

21    **Q.**   Did she mean mink releases?

22    **A.**   From what the question looks like, it looks like it, but I

23    don't know what she was thinking exactly.

24    **Q.**   And about Briana, did she ever express to you that she was

25    a person who was in favor of burning down buildings?

1 **A.** No.

2 **Q.** Did she strike you as a person like that?

3 **A.** No, she was very laid back, very calm.

4 **Q.** Would you describe her as mellow?

5 **A.** Yes.

6 **Q.** Would you describe her as not extreme?

7 **A.** Yes.

8 **Q.** Would you describe her as violent?

9 **A.** No.

10 **Q.** Would you describe her as honest?

11 **A.** Yes.

12 **Q.** Would you describe her as rational?

13 **A.** Yes.

14 **Q.** Would you describe her as level headed?

15 **A.** Yes.

16 **Q.** Would you describe her as a nice person?

17 **A.** Yes.

18 **Q.** EARN, the Evergreen Animal Rights Network, one of the

19 things that your organization did was you brought speakers; is

20 that correct?

21 **A.** Yes.

22 **Q.** And Craig Rosebraugh was one of those people?

23 **A.** Yes.

24 **Q.** Did you also have bake sales?

25 **A.** Yes.

1  **Q.** That's kind of what the organization was at the time and

2  perhaps still is?

3  **A.** Yes.

4  **Q.** It's not a militant organization, you didn't burn down any

5  buildings, did you?

6  **A.** No.

7  **Q.** You had potlucks sometimes?

8  **A.** Yes.

9  **Q.** Was the idea in part to raise awareness on the campus and

10  beyond of environmental activities regarding animal rights --

11  I am sorry, animal rights activities, I should say?

12  **A.** Yes.

13  **Q.** Just a couple other questions about the University.  Was

14  it a campus where it was pretty much open, people came and

15  went on the campus, outside and within the buildings?

16  **A.** Yes.

17  **Q.** The buildings weren't kept locked for the most part?

18  **A.** No, I don't remember anything really being locked.

19  **Q.** If one were to have -- let me withdraw that for a moment.

20  It's a rather large campus, right?

21  **A.** The area was large.  The buildings weren't very large.

22  **Q.** If one wanted to have a clandestine secret meeting, there

23  were plenty of secluded areas, woodsy areas; is that correct?

24  **A.** Yes.

25  **Q.** All over the place?

1  **A.** Yes.

2  **Q.** So to have a meeting, a clandestine meeting, in a room in

3  a building would be a little risky that somebody might come?

4  **A.** Yes.

5          MR. BLOOM:  I have no further questions.  Thank you.

6          MR. BARTLETT:  Nothing further, Your Honor.

7          THE COURT:  This witness can be excused?

8          MR. BLOOM:  Yes.

9          MR. FRIEDMAN:  The Government calls Toby Bradshaw.

10         THE COURT:  Let me have you come forward and be

11  sworn.

12         TOBY BRADSHAW, called as a witness, duly sworn.

13                    DIRECT EXAMINATION

14  BY MR. FRIEDMAN:

15  **Q.** Good morning, Professor Bradshaw.

16  **A.** Good morning.

17  **Q.** Could you tell us your whole name and spell your last name

18  for the Court Reporter.

19  **A.** Sure.  My name is Toby Bradshaw, B-R-A-D-S-H-A-W.

20  **Q.** Where were you born and raised?

21  **A.** I was born in Havalot, North Carolina and my father was a

22  Marine so we moved around a bit.  I've lived in North

23  Carolina, Virginia, Tennessee, California, a lot of different

24  places.

25  **Q.** Where did you go to college?

**A.** North Carolina State for two years and East Carolina University where I graduated in 1979.

**Q.** In what did you get your degree?

**A.** In biology.

**Q.** After college, did you go on to graduate school?

**A.** Yes, I did. I went to graduate school in the Department of Biochemistry at the Louisiana State University Medical Center in New Orleans.

**Q.** You said Medical Center. Were you studying medicine?

**A.** No. A lot of times your basic science departments that support medical education are in medical school, so it was a biochemistry department, a basic research department, but our teaching responsibilities were for medical students.

**Q.** After getting your Ph.D. in biochemistry, what did you do?

**A.** I came to the University of Washington in 1984 as a postdoctoral fellow in the Department of Biochemistry, working with Milt Gordon.

**Q.** At some point, did you switch departments?

**A.** Yes. I moved around inside the University a bit. I had a -- after my postdoctoral position in biochemistry, I had a faculty appointment, a research assistant professor appointment, and then I moved my appointment to the College of Forest Resources where I became a research assistant professor in that department and was promoted to research associate professor, and that's the position I held in the College of

1  Forest Resources in 2001.

2  **Q.**  Can you tell us, what is the College of Forest Resources?

3  **A.**  The College of Forest Resources is -- was at the time

4  divided into two departments, and the two departments focused

5  on different aspects of forest biology.

6      The department I was in focused on sort of the biological

7  aspects of forestry, ecology, genetics, physiology, things

8  like that.  The other half of the department worked on pulp

9  and paper science, more chemical engineering kind of a group.

10  There's also economists and social scientists.  The college

11  encompasses a wide variety of disciplines of which biology is

12  just a part.

13  **Q.**  This is part of the University of Washington?

14  **A.**  Yes.  So it's one of the 17 or so colleges at the

15  University.

16  **Q.**  In 2001, what were you doing at the College of Forest

17  Resources?

18  **A.**  As a research associate professor, the major focus of my

19  daily activities is research.  Research faculty are supported

20  by external funds, by grants from outside organizations, so

21  they are not drawing a state salary.  But also as part of my

22  mission, besides research, it included some teaching, so I had

23  graduate students who were participating in the research, and

24  then I did teach undergraduate courses for the biology program

25  because I liked to teach, and I like to teach undergraduates.

1  So I did some undergraduate teaching even though it wasn't

2  really part of my official responsibilities.

3  **Q.**  What course or courses did you teach for undergraduates?

4  **A.**  Introductory biology, Biology 101.

5  **Q.**  Now, in 2001, did you have an office and laboratory at the

6  University?

7  **A.**  Yes.  My office and lab were at the Center for Urban

8  Horticulture.

9  **Q.**  Let me ask you to look at Exhibit 306.  It's already been

10  admitted so it should appear on your screen.

11  **A.**  Okay.

12  **Q.**  Do you recognize that?

13  **A.**  Yes, I do.  It's the floor plan for the first floor of

14  Merrill Hall, where my office was.

15  **Q.**  The first floor is the ground floor?

16  **A.**  The ground floor, yes.

17  **Q.**  Can you point out for us where your office was.

18  **A.**  Sure.  Right there.  (Indicating.)

19  **Q.**  Across the hall, I guess, there's a space labeled

20  "laboratory"?

21  **A.**  Yes.  So the space across the hall was my lab, and then I

22  also had experimental plants in the greenhouse as well which

23  isn't shown on this floor plan.  So my lab space is where I

24  carried out the genetic research, the wet lab part of it, and

25  then I used greenhouse space as well to do my cross-breeding

1 and what not.

2 **Q.** Was the greenhouse near this building?

3 **A.** Yeah, I would say about 75 meters away, something like

4 that.

5 **Q.** Would you describe being a professor and working there,

6 was it a 9:00 to 5:00 job for you?

7 **A.** Oh, definitely not. So research is one of those

8 professions that requires large investments of time at some

9 periods and then huge investments of time at other periods.

10 So it's a very busy activity.

11 Of course, since I was doing a lot of tree breeding, it's

12 seasonal work. So in the breeding season, things would be

13 very, very busy and we'd spend a lot of time in the lab, and

14 the graduate students are there at all hours trying to get

15 their thesis work done.

16 **Q.** Now, I think you touched on this briefly, but what were

17 you doing? What was your research focused on in 2001?

18 **A.** In general, my area of research is evolutionary genetics

19 so I am interested in how organisms adapt to their

20 environment, the genetic basis by which they do this. So this

21 is a question that's still open in evolutionary biology.

22 Darwin addressed many of the major issues of evolution,

23 but he didn't know anything about genetics so we are at a

24 place now where we can try to understand gene by gene how

25 organisms adapt to their environment. So I worked on a

1  variety of organisms.  I worked on trees, I've worked on

2  monkey flowers -- I still work on monkey flowers.  So my

3  day-to-day research involves things like making crosses

4  between different plants, so cross-pollination.  I'm

5  extracting DNA from those plants and then mapping the genes

6  that differ between two differently-adapted organisms.

7       So you could think of it as a classical genetics sort of

8  brought into the 21st century using modern methods that were

9  adapted for the human genome project, for example.

10 **Q.**  Let me get you to walk us through what you would do on a

11 research project in general terms.  You talked about crossing

12 a moment ago.  What do you mean by that?

13 **A.**  Sure.  So the two -- I will just refer to the work I have

14 done on trees since that's sort of what's at issue here.  The

15 work would usually start with crossing two different species

16 of trees.  So the two species I work most with are the black

17 cottonwood, which is native to Western Washington.  Everybody

18 here has seen them growing along I-5, for example.

19      Then there's the eastern cottonwood, which is found in

20 Eastern Washington and all the way through the Midwest and

21 Eastern North America.  So these species are adapted to two

22 really different environments.

23      One, the black cottonwood is adapted to cool, maritime

24 coastal climate, and the eastern cottonwood is adapted to this

25 drier, more arid, interior climate.  So we would make crosses

1    between those by collecting male and female branches -- these

2    are trees that have sexes on separate trees -- so we collect

3    male and female branches, force pollen from the male branches

4    and then dust the pollen on the female branches to produce the

5    seeds.

6         All this can be done in the greenhouse, we don't have to

7    do it on the tree, thank goodness.  You can collect the

8    branches and root the branches in the greenhouse and make your

9    process right there.  We plant the seeds out, and then we

10   would do tests of adaptations.  We would essentially plant

11   these seedlings in different environments, both west and east

12   of the mountains, and measure their performance.

13        And then we are able to analyze gene by gene which genes

14   that differ between these two species are important for

15   adaptations to their local environment.  So it's sort of a

16   classic approach to understanding the genetics of adaptation.

17        These kinds of hybrids, by the way, don't just occur in

18   the lab.  If you go down, for example, if you are crossing the

19   Umatilla Bridge into Oregon, you will see there's a big stand

20   of natural hybrids between these two species because where

21   their ranges overlap, they hybridize.

22   **Q.**   Are you familiar with what's called genetic engineering?

23   **A.**   Very familiar.

24   **Q.**   Would you tell us what you understand that to mean.

25   **A.**   So I won't tell you what I understand it to mean, I will

tell you what it is because this is -- this area of genetics

is my area of expertise.

Genetic engineering is introducing a gene from one

organism into another by means other than a sexual process.

So cross-pollination is a sexual process.  We have male sperm

from the male, an egg cell from the female.  They merge and

the genes from the male and the genes of the female are

combined into one zygote that grows into the organism of the

next generation.

In genetic engineering, you take a specific gene of

interest and insert it into the organism's genome that you are

targeting, and that gene, that extra gene, is incorporated

into the chromosomes of the organism and then it is passed

onto its offspring.

But it's an asexual process.  There's a variety of ways to

get the DNA into the nucleus of the cell.  You can shoot it in

literally with a gun.  You can put DNA on little gold

particles and shoot the gold particles into the nucleus of a

cell.

Most commonly, though, it's done by using a bacterium that

naturally, as part of its life cycle, introduces DNA into

plant cells, and we can engineer the bacterium, the bacterium

then engineers the plant cells.  So genetic engineering

involves manipulating one gene at a time in an asexual

process.

**Q.**   Were you conducting research to do that?

**A.**   I don't do genetic engineering of trees.  I had never done any genetic engineering.  It's not a technique that I think is objectionable.  It's used every day in basic research labs around the world.

If you want to understand how a gene functions, a single gene, the best way to find out is to put it into an organism and see what it does.  But I wasn't doing any genetic engineering.  My work involved sort of standard cross-breeding of trees.

**Q.**   Was there anything different in what you were doing than what farmers have done for hundreds or thousands of years?

**A.**   Yeah, more like tens of thousands.  No, it's not at all different.  As I explained it, it's not even different from what happens in nature when we see these hybrids form naturally everywhere the range of the two species overlap.

In fact, you can look into the fossil records, and there's 30 million years of evidence that these two species have been hybridizing for as long as they both have been around.

**Q.**   Professor Bradshaw, you said that in 2001 you were a research associate professor.  Where did the money to pay your salary come from?

**A.**   So research faculty are supported by their grants, and my grants came from the National Science Foundation, the Department of Energy.  I had grants from various pulp and

1  paper companies, forest product companies that supported my

2  research.

3  **Q.**  Did the University pay you any salary?

4  **A.**  No.

5  **Q.**  What about -- you had a laboratory.  Did you have people

6  working for you?

7  **A.**  Yes, graduate students and technicians.

8  **Q.**  Where did their money come from?

9  **A.**  Their salary also comes from grants.  So there's no state

10  salary support for the operation of research faculty.

11  Research faculty appointments are really common at the

12  University of Washington.  There are probably 1500 research

13  faculty in the medical school, for example, and their work is

14  supported entirely by extramural grant funding.  So it's a

15  normal kind of appointment at the UW, but it does require

16  external support.  There's no state support for it.

17  **Q.**  The grants you are talking about, do you yourself enter

18  into a contract with whoever is the granting agency?

19  **A.**  No, the University is the organization that actually

20  receives the grant.  So I would write the application, it

21  would be put through the Office of Sponsored Projects at the

22  University of Washington, and then the funds themselves would

23  come back to the grant and contract accounting at UW and then

24  be disbursed to me as needed.

25  **Q.**  Do you get all the money that comes into the grant?

**A.** That would be wonderful if it were true but no, the University has indirect costs that they recover on every grant.

So every grant that's submitted, if it's funded, the University takes some percentage of that. If it's on-campus research, that percentage is about 53 percent. They take 53 percent of the received funds and use it to support research activities around the campus. So not just my research activities, even though I wrote the grant. They are used to pay for the library, to pay the electrical bills, to pay people to clean the labs, to pay for compliance with accounting practices, all the things that are necessary to administer the billion dollars of federal research support that comes to the UW every year.

**Q.** I would like to take a minute to ask you some questions about some of the specific entities that were funding you in 2001.

Who was funding your research in 2001?

**A.** So I had a few sources of funding, the National Science Foundation, which did fund then and still continues to fund my work on the adaptation of these monkey flowers which I haven't talked about; it's similar but smaller organisms to the trees that I worked on.

The U.S. Department of Energy funded my work on the adaptation of trees to their environment because the

1  Department of Energy then, just as they are now, are

2  interested in high biomass, or plants to be used for

3  conversion to biofuels for sort of reducing carbon footprint

4  of fuel consumption in the U.S.

5      Then forest product companies were supporting my work,

6  companies like Alberta Pacific, Forest Industries and Westvaco

7  in 2001.

8  Q.  Was there some formal organization that does that?

9  A.  Yeah, I had formed a research cooperative called the

10 Poplar Molecular Genetics Cooperative, and these cooperatives

11 are sort of a common mechanism in the forest product industry

12 to support basic research, the kind of research that I was

13 doing.

14     So the kind of research I do doesn't have usually direct

15 application to the forest products industry.  So the industry

16 supports university-based cooperatives to do cutting edge

17 basic research that maybe the company would be able to put to

18 use 10 or 20 years down the road.

19     These involve, on the forest products industry scale,

20 pretty modest sums of money.  So this research cooperative is

21 the mechanism by which the different forest product companies

22 could aggregate their money with the funds from the Department

23 of Energy to support this basic work on tree genetics.

24 Q.  That was called the Poplar Genetic Cooperative?

25 A.  Yes.

**Q.** Do you recall who were the members of that cooperative, the Department of Energy?

**A.** Oh, yeah. So the Department of Energy -- I know I won't be able to remember them all here -- the Department of Energy, Alberta Pacific. At times, maybe not in 2001, but in other years, Boise Cascade, Champion, International Paper, Westvaco, Weyerhaeuser, James River Corporation, Potlatch, a lot of forest product companies.

**Q.** Are those companies based just in Washington or do they operate --

**A.** Oh no. Alberta Pacific is based in Boil, Alberta, for example, and Westvaco's research facility is in Sommerville, South Carolina. They are spread all over the country and all over the nation.

In fact, I had money from New Oji Paper Company in Japan. They were members for a while. And the University of Talca in Chile. So it was an International cooperative and lots of states within the United States supporting it as well.

**Q.** In return for funding your research, what benefits did these companies get?

**A.** So in the agreement, the cooperative agreement, it's clear that the major benefit that they get is intellectual in nature. In other words, we provide them with a first look at the fruits of the research that we are doing on how organisms adapt to their environment.

So you might think that that doesn't seem like a very tangible reward. It's maybe something that they can't keep exclusive because the nature of academic research is, even though these are private companies that are funding this work, they don't have privileged access to the information.

They hear about it before it comes out in publication form, but all of this work is going to be published in the public domain eventually. So it's not any kind of private or secret sort of research, but they do hear about it before it's written up for publication. So they get some access to the information ahead of time, which is useful to them.

Then of all the trees I bred, which I think was around 15,000 trees, I would provide the companies -- if they requested them, I would provide them with cuttings of that material or extra seeds, so that they could propagate them and use them in their own tests if they were interested in propagating them commercially, but that's not something I was involved in.

So they had access to information and what's, in the plant breeding world, called germ plasm, seeds and cuttings of potentially commercially useful things, but commercial evaluation isn't something I was involved in at all.

Q. Did the companies ask you for seeds, though?

A. Oh, yes. Oh, yes. So all the companies that propagated these trees for commercial use asked for material from me that

1 they could test on their own, yeah.

2 **Q.** Have you seen a list of the grants that you had?

3 **A.** Yes.

4 **Q.** Is that a document that's maintained and produced by the

5 University of Washington in the normal course of business?

6 **A.** Yes.

7     MR. FRIEDMAN: May the witness be shown Exhibit 352.

8 I am sorry, you will have to look at a folder in front of you.

9 **A.** Okay. I have got it.

10 BY MR. FRIEDMAN:

11 **Q.** Is that the spreadsheet you had looked at previously?

12 **A.** Yes.

13     MR. FRIEDMAN: Government offers 352.

14     MR. BLOOM: No objection.

15     THE COURT: Admitted.

16         (Exhibit No. 352 admitted.)

17 BY MR. FRIEDMAN:

18 **Q.** Can you tell us in general what this is, Professor

19 Bradshaw?

20 **A.** It's just a list of sources of grant support for my

21 research starting back in the mid-1990s through 2002, 2004, it

22 looks like.

23 **Q.** It's basically all the grants that you've had over time?

24 **A.** Yes.

25 **Q.** When was the Poplar Molecular Genetics Cooperative formed?

1  **A.**  In 1995.

2  **Q.**  For how long did the companies sign up initially?

3  **A.**  For five years.

4  **Q.**  What happened after that five-year period?

5  **A.**  After five years, there was a renewal agreement and some

6  companies renewed their affiliation.  This was a time -- I

7  don't know how many of you know much about the forest product

8  industry, but there was a time of great consolidation within

9  the forest products industry about the time the cooperative

10  was being renewed, and some people rejoined for another

11  five-year hitch and some didn't.

12  **Q.**  If you look at the sixth line of this spreadsheet, if you

13  touch your screen, you should be able to create a dot or red

14  arrow by it.

15    Do you see a line for Alberta-Pacific?

16  **A.**  Yes.

17  **Q.**  It's probably one line below that.  Can you see the start

18  date and end date for the grant?

19  **A.**  Yep.  I can't tell where the tip of the arrow is going to

20  end up.  Can I move it?

21  **Q.**  Can you tell us what that shows?

22  **A.**  Sure.  It just shows that Alberta-Pacific forest

23  industries had renewed its membership for the year ending in

24  February of 2002 and paid its annual dues of $12,500 U.S.

25  **Q.**  Was that funding that was in place at the time of the fire

1  in this case?

2  **A.**  Yes, it had been continuously there since 1995.

3  **Q.**  We are going to turn to the third page of that exhibit.

4  **A.**  Okay.

5  **Q.**  If you erase that red dot, there should be a number of

6  lines for Westvaco.  Can you highlight the bottom line?

7  **A.**  For Westvaco?

8  **Q.**  Was Westvaco another member of this cooperative?

9  **A.**  Yes.

10  **Q.**  What does that bottom line show?

11  **A.**  Just that they had also renewed their membership through

12  the end of February 2002 and paid their annual dues of

13  $12,500.

14  **Q.**  If you go up a little bit, there is four lines that say

15  UT-Batelle?

16  **A.**  Yes.

17  **Q.**  The first line seems to cover the period that we are

18  talking about.

19        What is UT-Batelle?  Why are they there?

20  **A.**  UT Batelle is the subcontract for the U.S. Department of

21  Energy responsible for the disbursement of funds through their

22  biofuels program.  So Batelle essentially is just the

23  accounting agent for the Department of Energy.  So those are

24  Department of Energy funds that you are looking at when it

25  says UT-Batelle.

1  MR. BLOOM:  Excuse me, I am not objecting, I just

2  want the record to reflect that we regard this all as hearsay.

3  We are not objecting.

4  BY MR. FRIEDMAN:

5  **Q.**  How much Department of Energy funding did you have

6  covering this period?

7  **A.**  Oh, gosh.  The Department of Energy paid essentially four

8  dues equivalents, so $50,000 a year.

9  **Q.**  In addition to funding from the Department of Energy and

10  the members of this cooperative, were you receiving other

11  federal funding for your research?

12  **A.**  Yeah, I had a grant from the National Science Foundation

13  to work on my monkey flower project.

14  **Q.**  What were you doing relating to monkey flowers?

15  **A.**  So there, the issue is how organisms adapt to different

16  pollinators.  I worked on two different species of monkey

17  flower, one is pollinated by bumble bees and one is pollinated

18  by hummingbirds.

19  They have very, very different flower shapes and colors,

20  and I was doing the genetic basis of the differences between

21  those two species that allow pollinators to recognize those

22  kinds of flowers.

23  **Q.**  Is this again cross-breeding?

24  **A.**  Yes, same kind of thing.

25  **Q.**  If you take a look at the second page, this should show up

1 on the second page -- the second page of that exhibit?

2     Can I get you to erase the red lines. The National

3 Science Foundation grant.

4 **A.** The National Science Foundation, here.

5 **Q.** How much money were you receiving from the National

6 Science Foundation?

7 **A.** $408,000.

8 **Q.** Did it cover a several-year period?

9 **A.** It was a four-year proposal.

10 **Q.** Now, in 1999, did something happen where some of your

11 research was attacked?

12 **A.** Yeah. In 1999, at the time when the World Trade

13 Organization meetings were in Seattle, I had a few -- maybe

14 two or three dozen of my hybrid cottonwood plants growing in

15 the fenced-in area behind my lab at the Center for Urban

16 Horticulture, and those were cut down, which is --

17 **Q.** Was there other damage done to plants in --

18 **A.** Yes. One of my colleagues, Al Wagar, had a couple of

19 hundred Red Alders, and those were cut down. He was using

20 those for wetland restoration projects.

21 **Q.** Did you subsequently receive a communiqué or an

22 announcement about what had happened?

23 **A.** Yeah, I did. I saw it on the web. I didn't receive it by

24 e-mail directly, but yeah, I was notified that it existed.

25 **Q.** Would you take a look at 301 and tell me if you recognize

1    that.

2    **A.**  Sure.  Yes, this is the communiqué that was put out after

3    the WTO meetings in 1999.

4              MR. FRIEDMAN:  The Government offers 301.

5              MR. BLOOM:  We have no objection.

6              THE COURT:  Admitted.

7                   (Exhibit 301 admitted.)

8    BY MR. FRIEDMAN:

9    **Q.**  Now, you said you had Cottonwoods that were destroyed?

10   **A.**  Right.  So I guess I should clarify, the cottonwoods,

11   poplars and Aspens are all trees in the genus populous and so

12   the terms sort of get used interchangeably, but yeah,

13   cottonwood, Aspen and poplar, all the same.

14   **Q.**  Were those genetically engineered?

15   **A.**  No.

16   **Q.**  What were you using them for?

17   **A.**  They were just part of my breeding program at the time.

18   **Q.**  You talked about some trees belonging to Al Wagar.  Were

19   those genetically-engineered trees?

20   **A.**  No, nobody's ever genetically engineered an alder.

21   **Q.**  For what was he growing them?

22   **A.**  For the wetland restoration work that he does.

23   **Q.**  Did that have an effect on his work?

24   **A.**  Sure.  But for those of you who aren't familiar with

25   cottonwoods or poplars, never cut one down in your yard and

1    had it resprout from the stump, when you cut down a poplar or

2    a cottonwood or aspen, they just resprout.

3        So for me, cutting down a few of my trees, it was no big

4    deal.  I cut them down every Winter myself anyway.  But these

5    red alder that Al was propagating, when they are cut down,

6    they don't resprout, so they essentially destroyed his

7    propagils that he was going to be using for his restoration

8    work.

9    **Q.**  Where was he restoring wetlands?

10   **A.**  I really don't know.

11   **Q.**  Had you reviewed the communiqué you saw after this action?

12   **A.**  Yes.

13   **Q.**  There's a reference in the second paragraph to

14   genetically-modified cottonwoods and poplars that were

15   destroyed at WSU?  Can you tell us about that.

16   **A.**  This is one of my favorite stories.  Sure.  So at the same

17   time, the WSU Research and Extension Facility in Puyallup --

18   it's an extension facility where work specific to Western

19   Washington plants is done, even though it's a WSU

20   installation, and the group that claimed that they went in and

21   destroyed all of the genetically-engineered poplars at WSU had

22   actually broken into a greenhouse and dumped out a few hundred

23   pots of raspberry plants that the raspberry breeder there was

24   using to breed against disease resistance.  So they claimed

25   they were genetically-engineered poplars, but they couldn't

1   tell them from raspberries.  If it hadn't happened to me, it

2   would have been a little funnier, but it's still fairly funny.

3   **Q.**  And then the fourth paragraph is the one that really

4   refers to your work.  I would ask you to read that to the

5   jury.

6   **A.**  Read the whole thing?

7   **Q.**  Just the fourth paragraph.

8   **A.**  The whole fourth paragraph?  Sure.

9       "At the University of Washington, Professor Toby Bradshaw

10  conducts research on poplars, genetically engineering them to

11  be resistant to leaf rust, a fungus that threatens the profit

12  margins of timber companies that grow poplars.  Founder of the

13  Poplar Molecular Genetics Cooperative, Bradshaw receives funds

14  from such timber giants as Alberta Pacific Forest Industries,

15  Scott Paper Ltd., Boise Cascade, Union Camp, Champion

16  International, Westvaco, Fort James, Weyerhaeuser, Inland

17  Empire Paper Company, U.S. Department of Energy Biofuels

18  Feedstock Development Program, Pacifica Papers Limited and

19  Potlatch Corporation.  His lab exists to serve industry and to

20  engineer the poplar (and other trees in the Populus family)

21  to have stronger industrial characteristics and be more

22  profitable.  In addition to this lab's activities, UW is

23  genetically engineering poplars for phytoremediation.  In

24  other words, to clean up toxic waste generated by

25  corporations.  In light of this, the Washington Tree

1  Improvement Association visited Bradshaw's facilities at the
2  UW College of Urban Horticulture."
3  **Q.**  After this, were you concerned that your research might be
4  the subject of future attacks?
5  **A.**  It crossed my mind, but to be honest, I am just not the
6  kind of person that worries about things like this.  They are
7  beyond my control.  We work at a public university where
8  there's free access by everyone.  I wouldn't change that about
9  the University.  So I didn't spend any real time worrying
10 about it, even though it crossed my mind.
11 **Q.**  Did you ever look on the Internet after this?
12 **A.**  Yes.
13 **Q.**  Where did you look and why?
14 **A.**  So I would browse around to -- I would Google, for
15 example, tree genetic engineering to look for groups that
16 specifically were targeting me, you know, where my name and my
17 affiliation and my location would be posted with some sort of
18 invective about genetic engineering.
19 **Q.**  When did you first -- let me turn your attention --
20         THE COURT:  Mr. Friedman, let me ask you this.  How
21 much longer do you have on your direct?
22         MR. FRIEDMAN:  Five to 10 minutes, Your Honor, but it
23 would be fine to take a break.
24         THE COURT:  Let's take a break, the morning recess at
25 this time.  All right.  Of course, don't discuss the case.

Leave your books on the chair, and I will have you back in here about 15 minutes.

(Jury not present.)

THE COURT: All right. You may be seated. We will take the morning recess.

THE CLERK: All rise. Court is at recess.

(Morning recess.)

MR. BARTLETT: Your Honor, Mr. Friedman pointed out to me that I forgot an administerial matter this morning. I believe I laid the foundation for admitting 740-E which is a section of the New York Times article, but I actually failed to move its admittance.

THE COURT: I don't think there was an objection, but I had ruled on it. But it hadn't been offered, I believe.

MR. BLOOM: I think I did object, and I think you did rule. We still object.

THE COURT: I understand it, but I will admit it.

MR. BARTLETT: In talking to Mr. Fox, and I wanted to give him a heads up, there is a front line that arguably is not admissible. "The talk was sponsored by EARN, the Animal Rights Network." Technically, that is not part of her conversation and --

MR. BLOOM: I was the person that talked about that.

MR. BARTLETT: I am sorry.

THE COURT: Are we clear now on the exhibit?

1          MR. BARTLETT: We are, Your Honor.

2          THE CLERK: It was page 5. I will have it redacted.

3          THE COURT: All right. Bring in the jury.

4    (Jury present.)

5          THE COURT: All right. You may be seated.

6    Continue.

7          MR. FRIEDMAN: Thank you, Your Honor.

8    BY MR. FRIEDMAN:

9    **Q.** Professor Bradshaw, how did you first learn of the fire at

10   the Center for Urban Horticulture?

11   **A.** I got a call about 6:20 or 6:30 in the morning from my

12   colleague Sarah Reichard.

13   **Q.** What did you learn during that call?

14   **A.** Sarah just told me that Merrill Hall was on fire and, of

15   course, I hopped in my truck and drove into the UW.

16   **Q.** Did you have any thoughts when you first heard it was on

17   fire about what might have happened?

18   **A.** Yes. I mean, it certainly occurred to me that I might

19   have been the target of a fire bombing. My colleague Steve

20   Strauss had trees that he was working on at Oregon State

21   University that had been damaged. I had my own tree work

22   damaged in 1999, so yeah, it crossed my mind.

23   **Q.** Defense counsel has asked that you lean a little closer to

24   the microphone so we get more volume.

25   **A.** Sure.

1   **Q.**   What time was it that you arrived at the Center?

2   **A.**   Around 7:00 or not long thereafter.

3   **Q.**   Was the building still on fire?

4   **A.**   There were still some hot spots and firefighters on the

5   roof trying to put out the last of the fire.

6   **Q.**   What did you do when you arrived at the scene?

7   **A.**   I walked around the building -- it was cordoned off --

8   just to see what might be going on.   Of course, I met with

9   Sarah and Tom and other of my colleagues who were at the

10  scene.

11  **Q.**   Would you take a look at Exhibit 325-A which should show

12  up on your screen.   It's already been admitted.

13       Do you see anything there that you saw there that morning?

14  **A.**   Yeah.   This was one of the things that caught my eye right

15  away.   These are two plastic Tupperware boxes, and they were

16  in my office the night before.   These are boxes that I kept

17  snakes in.   I have some color mutants of corn snakes that I

18  used to teach basic genetics.

19       Most students get taught genetics on fruit flies or

20  something fairly boring, but I think snakes are more

21  interesting.   So I kept these snakes for teaching genetics,

22  and I had used them back in November to teach my class, but

23  then I brought the snakes home.

24       The boxes that the snakes lived in were empty, they didn't

25  have any snakes in them, but they were still in my office in

1  May.  So these had been removed from my office and put

2  outside.

3  **Q.**  Did you have any concern based on the fact that they were

4  outside the office?

5  **A.**  Well, it's obviously unusual to have them put outside.  I

6  knew that the Earth Liberation Front in its other actions had

7  purported to try to spare animal life, although the bomb

8  swallows that were nesting in the building I am sure got fried

9  by the fire.

10  **Q.**  Would you take a look at Exhibit 320 which is also already

11  in evidence.

12  **A.**  Yes, this is my office.

13  **Q.**  I skipped over one exhibit.  Could we look at 316 first.

14  **A.**  Yes, this is the outside of Merrill Hall.  My office is

15  here, my office window.  (Indicating.)  So it was no mystery

16  to anybody there that morning where the fire had started.

17  **Q.**  Then turning to Exhibit 320.

18  **A.**  This is the inside of my office.  This is my server, file

19  server that contained all the experimental data for my lab.

20  Here's one of my desks.  My book shelves were here.  So no

21  more books.

22  **Q.**  Can you describe for us the -- was there damage also to

23  your laboratory?

24  **A.**  No, not directly from the fire, but there was extensive

25  smoke and water damage to the lab, yes.

1  **Q.**  As a result of the fire, what did you lose?

2  **A.**  The things that I lost that I miss the most are probably

3  things that don't mean much to anybody other than an academic

4  scientist.  I lost my books and papers that I'd collected over

5  the past 20 years.  Some of these books are out of print

6  books.

7      One of them, the one I miss the most, was signed by the

8  author, and the author has since died.  It was his last copy

9  of this seminal work on plant breeding by Bob Allard.  So they

10  are things that mean a lot to academics.  I mean, it's your

11  whole intellectual career essentially that was destroyed.

12  **Q.**  What about slides?  Is that something that's used in your

13  --

14  **A.**  Of course.  I had images from my research in the form of

15  slides, collected over the past 20 years of work in the lab

16  and in the field.  Those were all destroyed.  Lecture notes,

17  photographs, artwork, the kinds of things that anybody would

18  have, personal things that anybody would have in their office,

19  in addition to the academic papers.

20  **Q.**  Are things like the slides -- can you replace those?

21  **A.**  Oh, no, those were all one-of-a-kind, irreplaceable sorts

22  of things, yes.

23  **Q.**  What about the equipment in your laboratory and perhaps

24  office?

25  **A.**  Well, all the -- as you can see from my office, there was

1 nothing left, so all the pieces of equipment in my office were

2 completely destroyed, all of the lab equipment in my lab,

3 centrifuges and gel electrophoresis apparatus, all that was

4 destroyed by the smoke and water damage, the refrigerators,

5 freezers, everything.

6 **Q.** What impact did that have on your research?

7 **A.** Fortunately, the University of Washington really came

8 through in great style after the fire bombing and bought new

9 equipment for me.  I was housed in a new lab, the same lab I

10 am in today, within a matter of a few weeks.  So the effect on

11 my research wasn't as severe as it was for the other people in

12 my building.

13    My research operation, by the time we got everything

14 cleaned up and organized and the computers back up and

15 running, lab equipment purchased and back up and running was

16 probably about a six-week time period when my research was

17 shut down.  But I was up and going again in about six weeks

18 after the fire bombing.

19 **Q.** As a researcher and one supported by grants, how important

20 are delays in research to you?

21 **A.** Well, for someone who is research faculty, whose

22 livelihood depends on making sustained progress on the work

23 that you've been funded to do by the granting agencies, a

24 six-week time delay is potentially a very serious thing for my

25 career.  I mean, I was very concerned for my grad students.

1 They were able to get funding, again from the University, to

2 carry them through this period when they couldn't get any

3 research done.

4      So, it was a potential threat to my career.  I have to say

5 that wasn't the foremost thing in my mind at the time, though.

6           MR. FRIEDMAN:  Thank you very much, Professor

7 Bradshaw.

8                     CROSS-EXAMINATION

9 BY MR. BLOOM:

10 **Q.**  Good morning.  My name is Robert Bloom.  I am one of the

11 two attorneys for Briana Waters who's on trial here.  We've

12 never spoken or communicated until just now; is that correct?

13 **A.**  That's correct.

14 **Q.**  Now, it goes without saying that this event was beyond

15 horrible for you and your colleagues, and many people beyond

16 that; is that correct?

17 **A.**  Yes.

18 **Q.**  Your research has suffered, people have suffered

19 personally, including you, despite your being very amiable and

20 powerful, obviously you suffered a good deal?

21 **A.**  Yes.

22 **Q.**  Now, do you know the name Lacey Phillabaum?

23 **A.**  Yes.

24 **Q.**  Do you know the name Jennifer Kolar?

25 **A.**  Yes.

1  **Q.** You know that those two have admitted to planning and
2  burning down the Center for Urban Horticulture?
3  **A.** Yes.
4  **Q.** You know that this trial is about whether the Government
5  has reliable, credible evidence that Briana Waters was
6  involved in it?
7  **A.** Yes.
8  **Q.** You understand that she has pleaded not guilty?
9  **A.** Yes.
10  **Q.** She's denied her guilt?
11        MR. FRIEDMAN:  Objection, Your Honor, argumentative.
12  BY MR. BLOOM:
13  **Q.** And that she has demanded a trial?
14        THE COURT:  Mr. Bloom, what is this line of
15  questioning -- that's why we are here.  What is this line of
16  questioning leading to?
17        MR. BLOOM:  I just want to ask him if he was aware of
18  that for the next question.
19        THE COURT:  Next question.
20  BY MR. BLOOM:
21  **Q.** That question is, are you aware that we are all here
22  because she has demanded a trial having pleaded not guilty and
23  denied her guilt?
24        THE COURT:  Let him answer.
25  **A.** Yes.

BY MR. BLOOM:

**Q.** Now, with regard to Lacey Phillabaum and Jennifer Kolar, given the results of what happened to your work and the work of many others, do you have some question in your mind about the morality and the self-interest of those two people, Lacey Phillabaum and Jennifer Kolar?

MR. FRIEDMAN: Objection, Your Honor.

THE COURT: Sustained. He'd have no knowledge of that.

BY MR. BLOOM:

**Q.** Based upon the results of their work, do you have any doubts about their morality and their self-interest?

MR. FRIEDMAN: Objection, Your Honor, it's the same --

THE COURT: Sustained. Next question.

MR. BLOOM: I have no other questions. Thank you.

MR. FRIEDMAN: No further questions.

THE COURT: This witness can be excused?

MR. BLOOM: As far as I am concerned.

THE COURT: Mr. Friedman?

MR. FRIEDMAN: Yes, he may.

THE COURT: Is this witness to be excused?

MR. FRIEDMAN: Yes, he may.

The Government calls Professor Tom Hinckley.

1    THE COURT:   Come forward and raise your right hand to

2  be sworn.

3         THOMAS HINCKLEY, called as a witness, duly sworn.

4         THE COURT:   Step around and take the witness chair.

5                  DIRECT EXAMINATION

6  BY MR. FRIEDMAN:

7  **Q.**  Good morning, Professor Hinckley.  Can you tell us your

8  whole name and spell your last name for the Court Reporter.

9  **A.**  Thomas Metcalf Hinckley, H-I-N-C-K-L-E-Y.

10 **Q.**  Where were you born and raised?

11 **A.**  Born in Washington, D.C. and raised in Pennsylvania.

12 **Q.**  Where did you go to college?

13 **A.**  A small college in Minnesota.

14 **Q.**  What did you study in college?

15 **A.**  I was a biology major.

16 **Q.**  After college, what did you do?

17 **A.**  I went to -- immediately to graduate school at the

18 University of Washington.

19 **Q.**  When did you come to the University of Washington?

20 **A.**  That was the Fall of 1966, and I graduated in June of

21 1971.

22 **Q.**  From the University of Washington?

23 **A.**  From the University of Washington, yes.

24 **Q.**  What did you come here to study?

25 **A.**  The tree physiology and ecology.  I studied at the College

1  of Forest Resources.

2  **Q.**  When you say tree physiology and ecology, can you tell us

3  what that is?

4  **A.**  Interested in how trees function in the environment,

5  particularly interested in how they function -- because trees

6  can't move -- how they function from going from day to night,

7  going from warm Summers to cold Winters.

8  **Q.**  Once you had gotten your Ph.D. here, what did you do?

9  **A.**  I went to -- after finishing my Ph.D. I went to the

10 University of Missouri for almost nine years where I worked on

11 the faculty at the School of Forestry and Fisheries and

12 Wildlife.

13 **Q.**  After that, what did you do?

14 **A.**  Came back to the University of Washington as a faculty

15 member in early January 1980 and have been on the faculty of

16 the University of Washington since that time.

17 **Q.**  Roughly the last 27 years?

18 **A.**  Yes.

19 **Q.**  Did you come back to a particular school at the University

20 of Washington?

21 **A.**  I returned to the College of Forest Resources where I'd

22 done my graduate work some nine years earlier.

23 **Q.**  Over the next 20 years roughly, from then to 2001, what

24 did your research focus on?

25 **A.**  Actually, my arrival at the University of Washington was

fortuitous because Mount St. Helens was beginning to erupt, so my first research project was on the impact of the eruption of Mount St. Helens on trees that had been covered by ash as well as trees that had been severely damaged by the eruption itself, and I have continued to follow many of those same sites and locations even today.

**Q.** Are there particular trees you study?

**A.** At Mount St. Helens, there was a whole range of different species, species that range from the low elevation Douglas fir, western hemlock to high elevation Pacific silver fir and some Alpine fir.

**Q.** Now, were you at the University of Washington when the Center for Urban Horticulture was first built?

**A.** Yes.

**Q.** When was that?

**A.** The actual formation of the Center as a concept was in the late '70s before I arrived, but the hiring of the first faculty and the beginning of the research program was in the very early '80s.

The actual construction of the Center for Urban Horticulture and Merrill Hall was '83 or '84, I believe. The faculty then moved in shortly thereafter.

**Q.** This is the faculty from the College of Forest Resources?

**A.** Yes.

**Q.** Did you move in there?

1  **A.**  No, I did not.

2  **Q.**  At some point, did you move in there?

3  **A.**  Yes, I did.  In 1979, in the Fall, the director at the

4  time, Clint Hamilton took a new position.  I became the

5  interim director.  A year later, I became the director of the

6  Center for Urban Horticulture, so that would have been

7  September of 2000.  My office then formally moved from the

8  main campus to Merrill Hall, to the Center for Urban

9  Horticulture.

10  **Q.**  Would you take a look at Exhibit 306 which should appear

11  on the screen to your right.  Do you recognize that?

12  **A.**  Yes.

13  **Q.**  Can you tell us what that is.

14  **A.**  That's the lower floor of Merrill Hall.

15  **Q.**  I don't see your office on there.

16  **A.**  No, my office was one floor above that.

17  **Q.**  In general terms, what did the Center for Urban

18  Horticulture house?

19  **A.**  It housed faculty, graduate students.  It housed a

20  herbarium, a library.  It housed the Washington State

21  University/King County's extension program, the Master

22  Gardener Program, and then it housed associated staff that

23  assisted the faculty, the students.

24  **Q.**  Roughly, how many people worked in the building, would you

25  estimate?

1  A.  I would say at least 20.

2  Q.  As the director, what were your responsibilities?

3  A.  The responsibilities were for not only for the facility

4  itself, but also the property that the facility is on.  There

5  is what's now called Union Bay Gardens, about a 20-acre site.

6  Associated with it is Union Bay Natural Area, which is about

7  54 acres, and then there was the entire responsibility of all

8  the wetlands and shorelines that the University of Washington

9  campus has, which are quite extensive.

10      Then there was the co-management of the Washington Park

11  Arboretum, which is 230-acre site that co-manages with the

12  City of Seattle's Parks and Recreation Department.

13  Q.  In 2001, in addition to being director of the Center for

14  Urban Horticulture, what kind of professor were you at the

15  University of Washington?

16  A.  I continued being a faculty member.  I continued all my

17  teaching responsibility, advising both undergraduate and

18  graduate students, as well as doing research.

19  Q.  Did you draw a salary?

20  A.  Yes.

21  Q.  Who paid that?

22  A.  The State of Washington, University of Washington.

23  Q.  What about your research?  How was your research funded?

24  A.  The research was mostly funded from federal grants that I

25  had, or that my students had.

1  **Q.** Was the money paid directly to you or your students?

2  **A.** The money goes through the University of Washington and

3  then goes through the department and then it is allocated.

4  It's sort of a line of responsibility for how budgets are

5  maintained and allocated.

6  **Q.** Have you seen a spreadsheet that has a list of all the

7  research grants that you've had over the last few years at the

8  University of Washington?

9  **A.** Yes.

10 **Q.** Would you look at Exhibit 353. That should be in a

11 folder. Tell me if you recognize that.

12 **A.** Yes, I do recognize it as a list of the budgets that I

13 have had either been awarded or that are pending from -- it

14 looks like the first date is -- starts in the mid '90s and

15 goes through the present.

16 **Q.** That's a University of Washington record?

17 **A.** That's correct.

18          MR. FRIEDMAN:  The Government offers Exhibit 353.

19          MR. FOX:  No objection.

20          THE COURT:  Admitted.

21                  (Exhibit No. 353 admitted.)

22 BY MR. FRIEDMAN:

23 **Q.** Professor Hinckley, can you look at this and tell us what

24 federal funding you had in 2001?

25 **A.** I believe there was three grants.  There was a Department

1  of Energy grant that was involved in their global exchange

2  program.  Actually, the western part of their global exchange

3  program.  Two graduate students I had that had NASA

4  fellowships, that would have been another federal grant.

5  **Q.**  I think if you look at the second line listed for NASA,

6  could you highlight that.  If you touch your screen, you will

7  get a red arrow, but I believe that's the grant you were

8  talking about.

9  **A.**  First of all, going back to sort of the grants from the

10  Department of Energy are the ones I am about to touch, are

11  these that are listed as West GEC.

12  **Q.**  Why don't we go to the second page first, and then there's

13  a second West GEC.  Do you see any --

14  **A.**  On this page, there's no NASA grants.

15  **Q.**  Right, but if you look at the top line --

16  **A.**  Yes, the West GEC that goes through that period.

17  **Q.**  A Department of Energy grant?

18  **A.**  That's correct.

19  **Q.**  Can you tell us what period that ran and how much money we

20  are talking about?

21  **A.**  The grant began and was renewed several times, and it was

22  renewed on a two-year basis.  It began in the mid '90s. The

23  emphasis was examining for cottonwood stands in the Wallula

24  area, for Douglas fir located at Wind River Canopy Crane, and

25  for Pacific silver fir located in the City of Seattle's Cedar

River Watershed to examine changes that occur in carbon and water exchange as trees go from being very young to being very old.

**Q.** Can you see the period from which this two-year grant ran?

**A.** Yes, from July 1, 1999 to June 30, 2001.

**Q.** So was that in force on the date of the fire?

**A.** That's correct.

**Q.** How much was that grant for?

**A.** The grant was $57,000 I believe is the number listed there.

**Q.** Then turning back to the previous page, you referred to a NASA grant?

**A.** Yes.

**Q.** The second line for NASA, can you highlight that for us?

**A.** Sure. About 10 lines down, National Aeronautics and then it's cut off. Okay. So these go from here down to there.

There was two of them that were ongoing during the period of the fire. One was to a student who was studying actually in the rain forests of Brazil looking at the role that fires in the Savannah and in agriculture areas, when started by farmers, how far they would progress in the forest. So that was his grant.

Then the other student was studying in Panama, and her grants were looking at gradients going from the west to the east side of Panama and how forests -- whether you could

detect with land site satellite photographs changes in forest behavior over time.

Q. I believe there's a U.S. Forest Service grant. Can you tell us what that covered?

A. The U.S. Forest Service grants were -- well, there was also a National Science Foundation grant to analyze fire in Brazil, too.

Q. Why were you studying fire in Brazil?

A. Well, for a couple reasons. It's an interesting model system to look at because you are looking at a really large scale where you have -- to the south of the wet tropical forest, you have a dry tropical forest and to that south of that, you have Savannah, and this is the area where people are rapidly moving farms into.

They are using a slash and burn technique, and as a result the fires often get away and then move into the native dry tropical forest. As a result, more land is being cleared than is intended, and we are looking at the mechanisms for how one might either predict one fire behavior because of climate and El Nino and El Nina effects, predict when fire may be at a greater risk and then change regulations regarding local farm burning practices, or what mechanisms could be used in restoring dry tropical forests, what species one might select that would better use water to keep the system moist so when a fire did get away, it would stop as it hit moist material.

**Q.** There are three National Science Foundation grants listed here. This is the bottom of those. Can you indicate that for us?

**A.** Right here is the National Science Foundation. (Indicating.)

**Q.** The last is the National Science Foundation lines; is that correct?

**A.** Yes, that's correct, biomass combustion. So that's located there.

**Q.** For how much was that grant?

**A.** It was for almost $30,000.

**Q.** In addition to the specific grants about which you've talked, the ones funding your research, was there other federal funding that funded research at the Center for Urban Horticulture in the College of Forest Resources?

**A.** Certainly. Other researchers in the building had varying degrees, and I assume from either Professor Bradshaw or the like that you've already heard the particular grants that they might have had.

**Q.** Are you familiar with something called McIntyre-Stennis funding?

**A.** Yes.

**Q.** Can you tell us what that is?

**A.** It's an allotted funding that each public institution receives based upon the acreage of forest lands and the

1  magnitude of the industry production.  So if you have "X"

2  acres of forest land and you have "X" dollars of management

3  production from forest lands, then you are given an allotment,

4  and the University of Washington shares a federal allotment

5  with Washington State University, since we both have forest

6  industry programs.  And then that money is used to fund

7  faculty salaries, pay for research, pay for graduate students.

8  **Q.**  Roughly, during the time when you were director,

9  specifically in 2001, roughly how much McIntyre-Stennis

10  funding did the college have?

11  **A.**  The college probably had $385,000 of McIntyre-Stennis

12  money, of which a portion of my salary would have been

13  actually on that -- from that source.  Probably less than 8

14  percent.

15  **Q.**  The day before the fire, May 20, were you working in the

16  Center for Urban Horticulture?

17  **A.**  Yes.  It was a beautiful, sunny day.  It was one of those

18  days where my wife and daughter were at a horse show.  My

19  daughter rides horses.  And I decided to use the day to

20  actually work and catch up on work at the Center.

21      I remember going home at about 8:00 p.m. in the evening.

22  Another staff member, Ray Larson, was there.  I said good

23  night to him.  It was a real sense of accomplishment.  I felt

24  like I had actually caught up a whole bunch of things.  We had

25  just finished completing the master plan for the -- gotten it

1 approved through the council of the City of Seattle, got a

2 whole bunch of paperwork, thanks for gifts that people

3 provided, and went home.

4 **Q.** When did you first hear about the fire?

5 **A.** My wife received a phone call, which she was more alert

6 than I and was able to answer, and it was a little after 6:00,

7 and she said to me:  Tom, the Center is on fire.

8 **Q.** When you say 6:00, do you mean 6:00 a.m. the next morning?

9 **A.** 6:00 a.m. the next morning.

10 **Q.** What did you do when she told you that?

11 **A.** My first reaction was, maybe I left the coffee pot on the

12 night before or maybe one of the other people working in the

13 lab just didn't turn something off and we've got -- this is

14 going to be a problem.

15      So I got dressed and drove in, and as I drove towards the

16 Center, first I could see some smoke rising up and realized

17 well, this lab fire was still ongoing.  And then as I went

18 down the hill approaching from 45th towards the Center, I saw

19 this -- it looked like somebody had taken a colander of

20 spaghetti and dumped it on the street, there was so many fire

21 houses on the ground, and I realized a lab fire doesn't

22 deserve this level of hoses, and then there were seven

23 television -- or five or seven television trucks with antennae

24 up, and that's not another lab fire.  And then it began to

25 dawn on me this was something really big.

1 **Q.** Was the building still on fire when you got there?

2 **A.** Yes.

3 **Q.** Would you look at 312L. That should show up on your

4 computer screen.

5 **A.** Yes.

6 **Q.** Can I get you to press the lower left-hand corner on your

7 screen which will erase all the red.

8 **A.** Okay.

9 **Q.** Do you recognize that picture?

10 **A.** Yes.

11 **Q.** Why?

12 **A.** Because it's the south side of Merrill Hall, and you can

13 clearly see where the fire originated, and you can see exactly

14 the path the fire took and why there was such extensive

15 damage, particularly on the upper floor of this building.

16 **Q.** Can you tell us, maybe put a dot to show us where your

17 office is in this picture.

18 **A.** My office is right here.

19 **Q.** Were you able to see into your office?

20 **A.** Yeah.  We weren't allowed by the fire department to get

21 close to the building, but there was a nursery that's to the

22 south of this that I had a key for.  So I ran into the nursery

23 to look at the south side of the building, and I could thereby

24 see directly into my office.

25 **Q.** Did you see anything happen in your office?

**A.** I saw some of the mess that I'd left in there catch on fire, and there was sort of -- one part of the room just flamed up, and I started screaming at some firemen to please put a hose on it.

**Q.** Did they?

**A.** They did, yes.

**Q.** When were you first able to go into the building?

**A.** It was later that afternoon. One of the captains of the Seattle Fire Department said -- and I think this arose partly because -- obviously all the occupants of the building were really worried about the contents of the building, and particularly the contents of places like the herbarium and the various labs, and he felt that if one person -- I think because I was the director, he selected me -- if one person could actually come out and report what they had seen, that that would help people understand the sort of nature of the damage and the potential impact on their own property. So he took me in. It was a little after 3:00 in the afternoon, I believe.

**Q.** What did you see when you went inside?

**A.** It was a very, very different building than when I had left that Sunday, the previous Sunday evening. There were no lights on. You could smell this rancid, acrid smoke. You could see smoke sort of waving up from all sorts of places. When you walked in, you could look up and see the sky through

1  the roof which no longer was there.

2      As you went down the stairs, he had a big flashlight, he

3  was constantly warning about where you'd step, and there was

4  debris everywhere.  The carpets were -- your feet were wet

5  already.  I had shoes on, but the water was over the --

6  sufficiently over the shoes that my feet were now wet, so you

7  were just constantly reminded of a smell, heat, smoke and

8  dampness.

9  **Q.**  Did you get a look in your office?

10  **A.**  Uh-huh.

11  **Q.**  What did your office look like?

12  **A.**  It was partly encouraging because the books on the bottom

13  shelves, I had recognized there were still books on the bottom

14  shelf.

15      It was really discouraging because things on the desks and

16  the computer and the monitor and things like that, things that

17  I had from my kids that were on the wall, were gone.  So yeah.

18  **Q.**  Did you look in the library?

19  **A.**  Actually, we had been through -- the Seattle Fire

20  Department, they had made a superhuman effort to preserve the

21  library, recognizing its value.  There's about 12,000 volumes,

22  including 700 rare books that were in the library at the time.

23  They had tarped as many shelves as they could.

24      One of the collections managers from the main library came

25  out and said, if you don't get these books out in six hours,

1  you are going to lose every book in the library, and the fire

2  department then said, we will help you move the books out.

3      So we started, I would say at probably at 10:30 or 11:00

4  in the morning when the other part of the building you could

5  not safely even get near, we were moving books out of the

6  library and they were being triaged in the neighboring

7  building.  So I'd already seen the library, seen actually

8  where the fire had penetrated at several points in the

9  library, the water on the floor, the smoke smell, but it

10  wasn't nearly as bad as the rest of the building.

11      The efforts to get the books out resulted in an incredible

12  volunteer response, students, grad students, faculty, students

13  from the main campus, staff from the main campus, friends

14  poured in, what can I do.  They brought food.  They moved into

15  this NHS Hall, which is right next to the library, completely

16  occupied the entire buildings, tables were put up, books were

17  brought in.  A librarian then triaged every book that came in

18  and was assigned some task, and the task could be drying and

19  cleaning, the task then could be after drying and cleaning

20  where it was sent for subsequent recovery.

21      As a result of that really prompt action, about 12 percent

22  of the total book collection -- only 12 percent of the total

23  book collection was lost.

24  **Q.**  What about your research and your equipment?

25  **A.**  Well, my lab was actually back on the main campus so

except for my office and all the research and personal items in the office, I didn't suffer to the extent that the faculty who actually had both labs and offices at Merrill Hall.

**Q.** What did you lose as a result of the fire?

**A.** I lost -- well, one of the interesting things about being in science and research is you accumulate information, and sometimes that information you get to use right away in teaching or maybe you get to write it up in a paper for research, but it also becomes sort of your legacy, your history.

So, almost all of the research notes that I had from various projects, including looking at the effects of the Spruce Budworm on defoliation of Douglas fir and grand fir in Montana and Washington, that was all gone.

I had an incredible slide collection from the eruption of Mount St. Helens, lost about 30 percent of that. And then there was -- the one thing that -- there was a heroic effort made to recover things. Recovered the hard drive on the computer, for example, they got about 65 percent of the hard drive back. But I think anyone who knows and keeps a computer, you keep a certain organization on the computer, and when they recover lost files, that organization is totally gone.

So the same with all the notes and all the slides, whatever organization I weakly had, it was either gone because

1   I had to throw the material out or it was destroyed because it

2   went up in flames or it was now in a total state of

3   disorganization.

4   **Q.**   Did you have some equipment that was covered by the

5   federal funding they are talking about?

6   **A.**   Yes, there was actually some equipment that was in the

7   hallway outside Toby's office that was so severely damaged

8   that it was not salvageable.

9   **Q.**   What was that?

10  **A.**   There was two data loggers, I believe, Campbell Scientific

11  data loggers that had been used -- we'd been using at the

12  Cedar River Watershed site to collect information about

13  climate that the trees that are in the watershed see.

14  **Q.**   After the fire, were you able to continue immediately with

15  your research?

16  **A.**   No.  I mean, I made a major effort and the grad students

17  and students I had were really understanding about the fact

18  that I was now focused on something completely different.  The

19  focus -- because I was director of the Center, the focus was

20  not only on how faculty, staff and students in the Center were

21  affected, but it was on all right, we don't have space, so how

22  are we going to get space to function, how are we going to

23  reinstate our outreach program, how are we going to get the

24  library to be open again, how are we going to get students who

25  are working on their thesis as their graduate programs

1 finished in a timely way. Their funding was going to run out,
2 how were we going to get money for them, how were we going to
3 rebuild this building, where's the money going to come for
4 rebuilding this building.
5     I would say until November, December, I don't think I had
6 a free moment where I actually got to think about what
7 research responsibilities that I had. In fact, as a result of
8 not thinking about it, a renewal deadline for the Department
9 of Energy grant, I just let that go by. Four hours of my
10 time, I would have had another $60,000 from DOE to do
11 research. I didn't have that four hours.
12 **Q.** With the Center burned, what space did you find to
13 continue?
14 **A.** Unlike Sarah, who ended up in a trailer, I ended up in the
15 head house of the greenhouse, and this is a space where you
16 plant plants and things like that. They had an old tool room
17 that they took all the tools out of and they put partitions in
18 there, and three of us had shared offices there.
19 **Q.** When do you think is the first time you did anything
20 research related again after the fire?
21 **A.** Other than helping my students, when I actually did
22 hands-on, four years, maybe. Three, four years maybe.
23 **Q.** What were you doing for those three, four years?
24 **A.** Doing the job as director of the Center, which I don't
25 think at the time I could have expected a rebuilding project,

1 and all of the sort of ramifications of rebuilding, including

2 fund raising and holding auctions and doing all sorts of

3 things that were going to take that amount of time.

4     Plus you've got -- the principal responsibilities you have

5 as a faculty member is to teach your classes.  Not only did I

6 teach my classes, but the college was undergoing a complete

7 programatic change so I was teaching new classes.

8     So as a result, I didn't really have that direct hands-on

9 time.  In fact, last Summer is the first time I actually got

10 to spend -- the last two Summers, that's the first time I

11 actually got to spend days in the field which is really

12 important for grad students to give them a sense that you

13 really are interested in what they are doing and that you

14 spend days in the field.  One of my students is working on top

15 of Snowshoe Mountain and so I spent five days there with him.

16 **Q.**  For how long did you stay director for the Center of Urban

17 Horticulture?

18 **A.**  Through June 2004.

19 **Q.**  Had it been rebuilt by then?

20 **A.**  No, the new building wasn't completed and open until late

21 December 2004.

22 **Q.**  How many years of research do you think you lost or

23 weren't able to do because of this fire?

24 **A.**  It's really difficult to say because I think what I did is

25 I completely changed what I did.  I became much interested in

an exchange program with China involving undergraduate
students.  I became interested in a graduate program where
students got to study internationally, that didn't involve me
re-learning what I had known really well, and it's only been
the last couple years where I have had students working on
projects that I feel real competent in.

**Q.**  Since 2005 roughly or so?

**A.**  Yeah.

**Q.**  So is it fair to say four years basically before you
returned to research?

**A.**  Yeah, I would say that.

**Q.**  Thank you very much, Professor.

MR. FOX:  No questions.

THE COURT:  No questions.  All right.  Then you are
excused.

MR. FRIEDMAN:  The Government calls Gary Quarfoth.

GARY QUARFOTH, called as a witness, duly sworn

THE COURT:  Take the witness chair, please.

DIRECT EXAMINATION

BY MR. FRIEDMAN:

**Q.**  Good morning, Mr. Quarfoth.

**A.**  Good morning.

**Q.**  Can you tell us your whole name and spell your last name
for the Court Reporter.

**A.**  Gary Quarfoth, and the last name is Q-U-A-R-F-O-T-H.

**Q.** Where do you work?

**A.** I work at the University of Washington.

**Q.** What is your job there?

**A.** My title is Associate Vice Provost and Budget Director, and it's Associate Vice Provost of the Office of Budget and Planning at the University of Washington.

**Q.** You are the head of the Office of Planning and Budgeting?

**A.** Yes, I am currently the head of the Office of Planning and Budgeting.

**Q.** What does that office do?

**A.** It coordinates the University's operating budget, the University's capital budget, it assigns all of the space at the University of Washington and does various other institutional research for the University.

**Q.** It's the central financial office?

**A.** Yes, one of the central financial offices.

**Q.** Now, are you familiar with the -- I guess how the real estate at the University of Washington is held?

Who owns the land on which the University of Washington is located?

**A.** Well, the University does, so it's ultimately the State of Washington that owns the land on which the University facilities are located.

**Q.** Does the same apply to the buildings?

**A.** Yes.

1  **Q.** And specifically the Center for Urban Horticulture?

2  **A.** Yes.

3  **Q.** Now, we've heard about the College of Forest Resources.

4  How does the University decide to which schools particular

5  buildings are assigned?

6  **A.** Historically, space is assigned based on the type of space

7  that a particular college or department needs, the amount of

8  research space, amount of office space, and colleges and

9  departments are assigned to buildings based on their needs.

10  **Q.** But they don't own the buildings, they are just assigned

11  them?

12  **A.** That's correct, it is all centrally managed by the

13  University.

14  **Q.** In 2001, if you were -- from your perspective, if you were

15  to describe the University of Washington, how would you

16  describe it?

17  **A.** The way we describe the budget when we have the Board of

18  Regents approve it is to think of the University in sort of

19  three large pieces.  One piece is sort of the core education

20  part of the University's budget, that's probably the part that

21  most people are familiar with.

22      Another large part of the University's budget is the

23  research enterprise of the University of Washington, which as

24  a research University, the University does a great deal of

25  research.

        The University, because of the nature of its operations,
also runs a lot of auxiliary businesses.  So it runs a major
medical center, it runs a very extensive housing and foods
services operation, it has activities of that sort.

**Q.**  In 2001, roughly how big was the University, in financial
terms?

**A.**  If you looked at the operating budget, it was I believe a
little over $2 billion in 2001.

**Q.**  Have you ever used the phrase holding company ever?

**A.**  Yes.  For the public, we often say -- it can be useful to
think of the University as a holding company where the Board
of Regents oversees those three broad functions that I just
discussed.

**Q.**  How does the Center for Urban Horticulture fit into all of
this?

**A.**  The Center for Urban Horticulture is part of the College
of Forest Resources.  They teach courses and have students at
the University of Washington.  They conduct research.

**Q.**  As part of the overall enterprise?

**A.**  As part of the overall enterprise, yes.

**Q.**  You said $2 billion a moment ago.  What does that $2
billion represent?  What is that?

**A.**  That would be the amount of revenues or the amount of
expenditures of the University approximately in that
particular fiscal year.

1  **Q.** Does the University of Washington have financial

2  statements?

3  **A.** Yes, it does. It publishes an annual financial report.

4  **Q.** Like any public business?

5  **A.** Yes.

6  **Q.** Are those statements audited?

7  **A.** Yes. The University has an independent auditor. It's

8  been the firm KPMG for a number of years, and as a normal part

9  of preparation of the financial statements, KPMG certifies

10  that they think the numbers included in those statements are

11  accurate.

12  **Q.** Would you look at Exhibit 350, that should be in a folder

13  in front of you, and tell me if you recognize that.

14  **A.** Yes. This is a copy of the University of Washington's

15  annual report for fiscal year 2001, which is the July 1, 2000

16  through June 30, 2001 time period.

17        MR. FRIEDMAN: Government offers 350.

18        MR. FOX: No objection.

19        THE COURT: Admitted.

20           (Exhibit No. 350 admitted.)

21  BY MR. FRIEDMAN:

22  **Q.** This should show up now to the screen to your left. Let's

23  turn to something marked page 31 of that exhibit. Once that

24  appears on the screen, if you can tell us what that is.

25  **A.** That is a copy of the letter that is included in the

1  record, that is the official certification from the firm KPMG

2  that, as it states in the final paragraph there, "In our

3  opinion, based on our audit and report of other auditors, the

4  financial statements referred to above presented fairly, in

5  all material respects, the financial position of the

6  University of Washington."

7  **Q.**  Then five pages forward to page 36, if you could tell us

8  what that is.

9  **A.**  That is a summary statement of the total revenues and

10  total expenditures of the University in that fiscal year.

11  **Q.**  And income statement basically?

12  **A.**  Yes.

13  **Q.**  And then if we can highlight just the revenue section in

14  the fourth of the five columns, can you tell us what this

15  portion of the statement shows?

16  **A.**  This summarizes the revenues of the University of

17  Washington in that particular year.  There are a variety of

18  categories listed there.

19  **Q.**  The first category is tuition and fees?

20  **A.**  That's correct.

21  **Q.**  What is that?

22  **A.**  That is a combination of the tuition that students pay and

23  various student fees that are charged like services and

24  activity fees, a technology fee and a variety of other student

25  fees.

**Q.** What do the students receive in return for tuition?

**A.** They receive education from the University of Washington and hopefully a degree.

**Q.** Is the student body -- from where does the student body come?

**A.** The student body comes from both within the State of Washington and from outside of the State of Washington.

**Q.** Do you know in 2001 what portion of the student body came from outside the State of Washington? Let's start with undergraduates.

**A.** For undergraduates, for the 2000-2001 academic year from the Fall data quarter that the University uses to look at this, there were 3,051 nonresident undergraduate students at the University of Washington.

**Q.** What was the total student body?

**A.** There were approximately 26,000 undergraduate students, so that I believe is 11.7 percent of the undergraduate student population was nonresident students.

**Q.** What about the graduate student body?

**A.** The graduate student body, in that same academic year, there were 3,329 graduate students, which was 39-and-a-half percent of the approximately 8400 graduate students in that particular academic year.

**Q.** As far as you know, were those same percentages applied to the College of Forest Industry Services?

1    **A.**   I would imagine they would.

2    **Q.**   Does the University affirmatively seek out students from

3    out of state?

4    **A.**   Yes, it does.   At the undergraduate level, the University

5    recruits students from out of state by sending our recruiters

6    to college fairs and cities in other states, by doing direct

7    mailing to students in those states, by responding to

8    information requests that we receive from students from those

9    states who might be interested in attending the University of

10   Washington.

11        At the graduate level, it is generally the University's

12   policy to try to attract in the best students they can

13   possibly get, sort of irrespective of whether those students

14   are coming from the State of Washington or from other states.

15   **Q.**   For undergraduates, is there a reason the University tries

16   to get students from out of state?

17   **A.**   There are two reasons why the University tries to get

18   students from out of state.   I believe the faculty believe

19   that having a broader geographic mix of students sort of

20   improves the quality of discussion in many courses.   It has a

21   broader exposure of students from people from a bunch of

22   different places.   As nonresident students also pay

23   substantially more tuition than resident students pay, it's a

24   financial matter in part to have nonresidents.   They provide

25   additional resources that help improve the education for all

1  students at the University.

2  **Q.**  That's something you count on in the budgeting process?

3  **A.**  Yes, that's correct.

4  **Q.**  Can we go back to page 36 of the last exhibit.  In

5  addition to tuition, is federal funding another source of

6  revenue that's important for the University?

7  **A.**  Yes, it is.  At least most of the research that is funded

8  by outside entities at the University is funded by the federal

9  government.

10  **Q.**  Do you see that reflected in this income statement?

11  **A.**  Yes.  In the revenues category, the third row is

12  government grants and contracts, and in fiscal year 2001,

13  which would be the column that's labeled June 30, 2001, the

14  University received approximately $571 million in government

15  grants and contracts.

16  **Q.**  Do you have a general sense of how much of that is federal

17  versus possibly state grants and contracts?

18  **A.**  That is overwhelmingly federal.  I would say probably over

19  90 percent federal grants and contracts.

20  **Q.**  Approximately 25 percent of the University's revenue

21  roughly?

22  **A.**  Yes.

23  **Q.**  How does the University of Washington rate against other

24  colleges in terms of the amount of federal funding it

25  receives?

**A.**   The University of Washington is the -- sort of the second

largest recipient of federal research funds in the country,

and I believe among public universities, it is the first --

the highest -- receives more federal research funds than any

other public University in the country.

**Q.**   Which is the only one in the -- in a private university,

which university receives more?

**A.**   Johns Hopkins receives more federal research funding than

the University of Washington does.

**Q.**   Are you familiar with something called the Office of

Sponsored Programs at the University?

**A.**   Yes, I am.

**Q.**   What is that, in general?

**A.**   That is the office through which all of the grant

applications that the faculty at the UW send in to the

organizations that are offering funding.  It is the channel

through which those grants go to those organizations.

**Q.**   Do they put out an annual report?

**A.**   Yes, they publish an annual report that summarizes both

the awards of grants that the University received in a

particular year as well as the expenditures that were made on

grants and contracts in that particular year.

**Q.**   Would you take a look at Exhibit 351 and tell me if you

recognize that.

**A.**   Yes.  That is the report that the Office of Research

prepared for fiscal year 2001 that summarizes grant, awards

and expenditures in that fiscal year.

MR. FRIEDMAN: The Government offers 351.

MR. FOX: No objection.

THE COURT: Admitted.

(Exhibit No. 351 admitted.)

BY MR. FRIEDMAN:

**Q.** If we could turn to the 12th page of that. We have a

numbering problem. I am going to grab a hard copy, if it's

all right, to show it to you that way.

MR. FRIEDMAN: I apologize, Your Honor.

BY MR. FRIEDMAN:

**Q.** Do you recognize that chart?

**A.** Yes. That is a summary table that is included in the

report that lists the federal grant and contract awards

received in fiscal year 2001. The total federal grant and

contract awards received in that fiscal year was $552.4

million.

**Q.** That's sightly different than the number we looked at in

the annual report which was approximately $570 million?

**A.** That's correct.

**Q.** Do you have a general explanation for why they are

slightly different?

**A.** The numbers in the annual report include financial aid

dollars that the University receives from both the federal

1  government and from the State of Washington.  So they are part

2  of the total that's in the annual report, and they are not

3  included in the total in this offices sponsored programs

4  report.

5  **Q.**  Does this report also break out any figures by college

6  within the University?

7  **A.**  Yes.  I believe on the tables summarizing expenditures, it

8  summarizes expenditures for each of the colleges at the

9  University of Washington.

10  **Q.**  Do you recognize -- turning to page 72 of this exhibit,

11  can you tell us what that shows?  This is a two-page exhibit.

12  I will put page 73 up in just a moment.

13  **A.**  This lists various colleges at the University of

14  Washington, and in some instances has departmental summaries

15  underneath that college.

16      Toward the bottom of the page, there is a summary total

17  for the College of Forest Resources.  This page lists

18  funding -- well, expenditures on grants that were received

19  from the Department of Health and Human Services, Department

20  of Defense and Department of Energy in that particular fiscal

21  year.

22  **Q.**  Then turning to the next page, continuing the same line,

23  are you able to tell the total amount of federal money spent

24  by the College of Forest Resources in 2001?

25  **A.**  I am not sure I have rows lining up correctly here.

1   **Q.** I believe you do now.

2   **A.** Okay. It's a matter of subtraction. The total grants

3   which would include the federal and the nonfederal dollars

4   that are listed there in the second column from the right, if

5   you subtract the $2.37 million from the $7.5 million, it's

6   about $5.2 million in federal expenditures on federal grants

7   that year.

8   **Q.** So more than $5 million is going to the College for Forest

9   Resources?

10  **A.** Correct.

11  **Q.** Let's go back to page 50 which is the overall income

12  statement.

13      Exhibit 350, Agent Halla, page 36. If we could highlight

14  the revenue portion once again.

15      Three lines up that says --

16      There's a line three lines up from the sales and services

17  of Auxiliary Enterprises. What is an auxiliary enterprise?

18  **A.** That would be a combination of -- it's a whole variety of

19  auxiliary enterprises. The biggest would be housing and food

20  services, intercollegiate athletics, there are some stores,

21  athletic operations in there, items of that sort.

22  **Q.** Miscellaneous services operated by the University?

23  **A.** That's correct.

24  **Q.** In 2001, how much revenue did the University get from this

25  collection of businesses?

**A.**  In that column, there is $266,713,000 of revenue in that particular fiscal year.

**Q.**  Would members of the student body be contributing to or involved in generating that revenue?

**A.**  Yes.  A large portion of that revenue would be from housing and food services, and students are among the primary users of the services provided by that organization.

**Q.**  Now, are you familiar with an arson that took place -- or a fire that took place in 2001?

**A.**  Yes, I am.

**Q.**  Have you seen documents relating to that?

THE COURT:  Mr. Friedman, let me ask you before you get into that, how long would this take?

MR. FRIEDMAN:  Five minutes, then we would be done with this witness.

THE COURT:  All right.  Let's see if we can do it.

MR. FRIEDMAN:  Thank you, Your Honor.

BY MR. FRIEDMAN:

**Q.**  Would you look at 355 and tell me if you recognize that.

**A.**  Yes, I do.  This is a letter that was sent by Lee Huntsman who at the time was the provost of the University of Washington to representative Frank Chopp who at that point was cospeaker of the U.S. House of Representatives.

It was sent on May 30, 2001, which was a little more than a week after the fire at the Center for Urban Horticulture,

1  and it summarizes what the University's estimates were of how

2  much it was going to cost to recover from that fire.

3          MR. FRIEDMAN:  The Government offers 355.

4          MR. FOX:  Subject to earlier discussion, no

5  objection.

6          MR. FRIEDMAN:  If we could display this on the

7  overhead camera.

8          THE COURT:  Admitted.

9              (Exhibit No. 355 admitted.)

10 BY MR. FRIEDMAN:

11 **Q.**  I think you used the phrase of U.S. House of

12 Representatives?

13 **A.**  I meant the State of Washington House of Representatives.

14 **Q.**  This letter sets forth the costs the University expects to

15 incur?

16 **A.**  Yes.

17 **Q.**  Let's go through those.  Item 1, can you tell us what that

18 is?

19 **A.**  Obviously, there were a number of faculty and students and

20 staff whose offices and labs had been destroyed in the fire,

21 so we had to find ways of housing all of those folks, and we

22 had to clean up the site after the fire.

23          So the recovery number there includes both what were

24 estimates of the costs to clean up the site as well as costs

25 for renting trailers, which was the primary means we used for

1  housing the faculty and students who had been at that site.

2  **Q.**  What was the total estimate for recovery?

3  **A.**  Total estimate was $915,000.

4  **Q.**  Item 2 is interim security guard?

5  **A.**  Yes.  There were other facilities at the same location,

6  and the University thought it prudent to request funding for a

7  security guard for those facilities and asked for $75,000 for

8  that purpose.

9  **Q.**  Then turning to the next page, item 3.

10  **A.**  Item 3 was an estimate of what it would cost to

11  reconstruct the building, and the cost figure that was come up

12  with was $4,130,000.

13  **Q.**  And then finally, increased fire and personal safety?

14  **A.**  Correct.  It was assumed that when we rebuilt the

15  building, we would probably add additional fire and safety to

16  the building that was sort of beyond just replacing the

17  structure that had been there.

18  **Q.**  Turning back to the first page, the last paragraph before

19  you get to all these totals with all these items added up,

20  correct?

21  **A.**  Yes.

22  **Q.**  What was the total amount the University was requesting?

23  **A.**  It was $5,395,000.

24  **Q.**  Did the University receive that money?

25  **A.**  The University received part of that money.  The state

1 legislature provided $4,130,000 to reconstruct the building.

2 Q. So basically, item 3 got paid and the others didn't?

3 A. That's correct.

4 Q. Did it actually end up costing $4.13 million to construct

5 the building?

6 A. It cost slightly more than that for two reasons. One is

7 that after the design was completed the -- well, two things

8 happened. We did a detail design. The cost of simply

9 replacing the building was estimated to be $5.4 million. The

10 University then added some scope to the project because donors

11 came in and offered funding for the building, and the

12 University had some changes it wanted as well.

13     So it was approximately $8.2 million to build the building

14 that was reconstructed, but of that total we estimated that

15 $5.4 million was the cost to replace the building that had

16 been there.

17 Q. Did the University in fact incur recovery costs?

18 A. Yes, it did.

19 Q. Roughly, how much did the University incur for those?

20 A. I think it was on the order of $500,000 or $600,000.

21 Q. That's for trailer rental and clean up, demolition?

22 A. Yes.

23 Q. So adding that to the $5.4 million, do you have an

24 estimate for the total financial harm --

25 A. It would be approximately $6 million.

Q. Thank you very much, Mr. Quarfoth.

MR. FOX: We have no questions.

THE COURT: All right. This witness can be excused. Of course, we will take the noon recess at this time. As always, when you are through with your lunch and you report back to the building, return to the jury room. Leave your books on the chair and don't discuss the case.

(Jury not present.)

THE COURT: All right. We will be at recess and give you a chance to get a sandwich.

MR. FRIEDMAN: The issue we discussed concerning Mr. Corrina, he'll be on shortly after the lunch break. If we could discuss that before he testifies, that would be helpful.

THE COURT: I intend to do that.

THE CLERK: All rise. Court is in recess.

(Luncheon recess.)

(Jury not present.)

THE COURT: All right, you may be seated.

MR. FOX: Your Honor, we were just informed that Mr. Bartlett, that they plan to take a witness, Jennifer Kolar, out of order. We had not been notified that she was on the list for today.

Before lunch, we thought she'd be on towards the end of the day and they would start their direct, but I am not prepared for cross-examination for today.

1          THE COURT:   That hasn't been provided, as I have

2    indicated?

3          MR. BARTLETT:   We've just had some issues come up,

4    Your Honor, in the government's case-in-chief, and this works

5    better for our case-in-chief.

6          THE COURT:   I understand that, but as to supplying

7    them with the gist of the testimony --

8          MR. BARTLETT:   They have all of that, Your Honor.

9    They were aware there was a possibility she was going to

10   testify today, although not in this order.

11         MR. FOX:   We weren't yesterday.   In terms of direct,

12   I think that that's fine, but I have materials back in my

13   office that I actually did not bring with me today because I

14   didn't anticipated that she would even be on the witness

15   stand.

16         THE COURT:   So what are you talking about then, doing

17   direct examination and defer cross-examination?

18         MR. FOX:   I can do my cross-examination tomorrow.

19         THE COURT:   What's the necessity of the fashion we

20   are talking about now?

21         MR. BARTLETT:   Just the way the government wants to

22   put on our case-in-chief.

23         THE COURT:   I understand that, but we often call

24   people out of turn to accommodate everybody.   Is this not one

25   of those cases?

1    MR. BARTLETT:  It's the way we are going to proceed
2  this afternoon, Your Honor.
3    THE COURT:  The way you are going to proceed or you
4  wish to proceed?
5    MR. BARTLETT:  I am sorry, Your Honor; the manner
6  that we wish to proceed.  We have a very short witness, and
7  then we want to call Jennifer Kolar.
8    THE COURT:  You have that information now that you
9  can share?  Do you have that information?
10    MR. FOX:  Your Honor, my trial notebooks for
11  Ms. Kolar are actually back in my office.  All I am saying is,
12  if they want to put direct on for Ms. Kolar.
13    THE COURT:  Is that the witness you are talking about
14  calling right now?
15    MR. FOX:  Yes.
16    THE COURT:  Ms. Kolar.
17    MR. FOX:  Which is a complete change from everything
18  that they told us.
19    THE COURT:  Wasn't she on the list for the day?
20    MR. BARTLETT:  Your Honor, I did not realize there
21  was going to be such a major issue.  We will withdraw our
22  request and go back to the original order.
23    THE COURT:  Who do we have next then?
24    MR. FRIEDMAN:  David Gratzer, Your Honor.
25    THE COURT:  Who?

1    MR. FRIEDMAN:  David Gratzer.

2    THE COURT:  How long is this witness and how long

3  before we get to the next witness?

4    MR. FRIEDMAN:  He is approximately ten minutes.

5    THE COURT:  And who else do we have today?

6    MR. FRIEDMAN:  We have a one-paragraph stipulation in

7  place of Mr. Richard Wedderspoon, and then we would go to

8  Robert Corrina, which means we should probably address the

9  issues that we have with him.

10    THE COURT:  All right.  That's what I want to go to.

11   I have gone through what's been said here and thought

12  about it, and the Court's ruling on it is that is hearsay.  I

13  can't find any way to address it any other way.  If it comes

14  up in the fashion stated in the motion, then -- it shouldn't

15  come up in the fashion that's addressed in the motion.

16   The Court is granting the motion.  I see it no different

17  than if you go up to the mall and tell 100 people up there

18  what your position is.  I think Mr. Bloom stated, when he was

19  speaking in front of the jury about she is innocent and acquit

20  her, plea of not guilty, all these things have been said.  And

21  that says no more than that.

22   So the Court is granting the motion on cross-examination

23  as to the call going to Mr. Corrina saying that I am innocent,

24  and you should tell the truth as the lawyer said.  Don't go

25  there, period.

1    MR. BLOOM:  Either one of those, I can't say that she

2  told him to tell the truth?

3    THE COURT:  The motion has been granted, and you are

4  not to do that.

5    MR. BLOOM:  The motion was only about the first part.

6    THE COURT:  It was about the whole thing, if you read

7  the motion.

8    The Court has granted the motion.  Your exceptions are

9  made, and you can do what you will with it, but that's the

10  court's ruling on it.

11    MR. BLOOM:  I am not asking you to change your mind,

12  I just want to complete the record.

13    What happened here is Mr. Corrina, after he was told that

14  by Briana Waters, the first time they eventually did show up

15  to see him, he lied to them.  Now, I am going to point out

16  that he lied to them, and there's going to be some thought

17  that he lied because Briana Waters thought or suggested to him

18  that he should lie.  That's a real problem; that is misleading

19  to the jury.

20    THE COURT:  You can address that in any way you think

21  you should in cross-examination, except don't go into it the

22  way the motion is stated.  That's all I am saying to you.

23  That's my ruling.

24    Are we ready for the jury now?

25    MR. FRIEDMAN:  We are, Your Honor.

1    THE COURT:   Bring them in.

2    (Jury present.)

3    THE COURT:   All right.   You may be seated.

4    Call your next witness.

5    MR. FRIEDMAN:   The government calls David Gratzer.

6    Just come forward, sir and be sworn.

7    Raise your right hand, please.

8    DAVID GRATZER, called as a witness, duly sworn.

9    THE COURT:   Come around and take the witness chair,

10   please.

11                 DIRECT EXAMINATION

12   BY MR. FRIEDMAN:

13   **Q.**  Good afternoon, Mr. Gratzer.

14   **A.**  Good afternoon.

15   **Q.**  Can you tell us your whole name and spell your last name

16   for the record?

17   **A.**  David Gregory Gratzer, G-R-A-T-Z-E-R.

18   **Q.**  Where are you from?

19   **A.**  Spanaway, Washington.

20   **Q.**  Were you born and raised around here?

21   **A.**  Born in Puyallup.

22   **Q.**  In 2001, for whom were you working?

23   **A.**  Budget Rent A Car.

24   **Q.**  Were you working at a particular location?

25   **A.**  At the Olympia rental car location, at 1100 South Plum

1 Street.

2 **Q.** What was your job there?

3 **A.** I was the branch manager.

4 **Q.** Can you give us one or two sentences telling us what that

5 means you did?

6 **A.** I was in charge of the employees that worked there. Hired

7 them; in charge of, I guess, developing them for customer

8 service skills and sales.

9 **Q.** Managing the branch?

10 **A.** Managing the branch, yes.

11 **Q.** I am going to put on the overhead projector a document

12 that's marked as 771. It's already been introduced into

13 evidence.

14 Do you recognize this document?

15 **A.** Yes, it's a copy of the information on a rental agreement.

16 **Q.** Is that a rental that took place from the location which

17 you worked?

18 **A.** Yes, it was.

19 **Q.** If we look down a little in from where my pen is, do you

20 see a box that's labeled "open date"?

21 **A.** Yes, I do.

22 **Q.** What does that tell us?

23 **A.** It says the rental took place on May 19 of 2001, at 12:31

24 p.m.

25 **Q.** That's the time the rental began?

1    **A.** Began, yes.

2    **Q.** And this is a rental, just to be clear, by -- can you tell

3    us the name of the renter?

4    **A.** Kara Denise Larson.

5    **Q.** Then if we go down to close date, what time does this

6    record show for the close date on this rental?

7    **A.** May 22, 2001, at 6:33 a.m.

8    **Q.** Now, is the Plum Street office of Budget open at 6:30 in

9    the morning?

10   **A.** No, it's not.

11   **Q.** In 2001, what were the hours for that office?

12   **A.** From 7 a.m. to 6 p.m.

13   **Q.** If someone wanted to return a car after 6 p.m., was there

14   a procedure in place for that?

15   **A.** We have a night drop. It's a secured lockbox, basically,

16   where customers, if they return it after we close can drop the

17   keys off, and then we check it in the next morning.

18   **Q.** What time do employees typically arrive at that office and

19   start checking in cars?

20   **A.** 6:30 a.m. was the start time.

21   **Q.** I think you may have said. The office actually opened

22   formally at what time?

23   **A.** 7 a.m.

24   **Q.** So from this record, what can you tell about the time that

25   the car was actually returned?

**A.** Since it was closed at 6:33 a.m., which is before they opened, it looks like the car was dropped off after we had closed the previous day. So it was returned sometime between 6 p.m. and 6:33 a.m. the next day.

**Q.** Sometime after 6 p.m. on May 21st?

**A.** Yes.

**Q.** Before you opened the next morning?

**A.** Yes.

      MR. FRIEDMAN: One moment, Your Honor.

Thank you very much, Mr. Gratzer. No further questions.

      MR. FOX: We have no questions, Your Honor.

      THE COURT: All right. You may step down.

Next witness.

      MR. FRIEDMAN: Your Honor, at this point we have a very brief stipulation in place of a witness. If I could just read that to the jury and show them the two exhibits referred to in the stipulation.

      THE COURT: Which one are you talking about?

      MR. FRIEDMAN: The stipulation regarding photographs, and it would be basically stipulating to what two photos are, and then I would ask to show those to the jury.

I can bring a copy up, if the Court doesn't have it.

      THE COURT: I am looking at three stipulations here. Which one?

      MR. FRIEDMAN: This would be after those three.

1    There were three that preceded that.

2          THE COURT:  I don't have that.

3       Mr. Fox and Mr. Bloom, you agree with the stipulation.

4          MR. FOX:  Yes.

5          THE COURT:  Go ahead.

6          MR. FRIEDMAN:  The stipulation reads:

7       The United States of America and the defendant, Briana

8    Waters, agree and stipulate as follows:

9       Exhibits 775 and 776 are photographs of a Toyota Camry

10   with vehicle identification number (VIN) 4T1BG22K21U816051.

11   These photographs were taken in January 2007.  The exhibits

12   are authentic and are admissible at trial without calling a

13   witness to establish a foundation or the authenticity of the

14   photographs.

15      If I could, I would ask that the --

16         THE COURT:  The date on that?

17         MR. FRIEDMAN:  The date of the stipulation is today,

18   the 18th of February -- or 19th of February.

19         THE COURT:  All right.  You may publish.

20         MR. FRIEDMAN:  If we could publish 775 for a moment.

21   They are electronic.

22   The government offers both of those, Your Honor.

23         MR. FOX:  No objection.

24         THE COURT:  Admitted.

25             (Exhibits Nos. 775 and 776 admitted.)

1    MR. FREIDMAN:  Thank you, Your Honor.  The government
2  would call Robert Corrina.
3    THE COURT:  I will have you come forward and be
4  sworn.
5    ROBERT CORRINA, called as a witness, duly sworn.
6    THE COURT:  Come around and take the witness chair,
7  please.
8    Questions?
9    MR. FRIEDMAN:  Thank you, Your Honor.
10                  DIRECT EXAMINATION
11  BY MR. FRIEDMAN:
12  Q.  Good afternoon, Mr. Corrina.
13  A.  Good afternoon.
14  Q.  Could you tell us your whole name and spell your last
15  name?
16  A.  My full name is Robert Corrina, last name is
17  C-O-R-R-I-N-A.
18  Q.  Where were you born?
19  A.  I was born in the Philadelphia, area.
20  Q.  Did you grow up in that area?
21  A.  Yes, I did.
22  Q.  Did you attend high school there?
23  A.  Yes, I did.
24  Q.  When did you finish high school?
25  A.  '91.

**Q.** After high school, where did you go?

**A.** I moved around quite a bit, University of Massachusetts, worked in New Orleans, and eventually Colorado.

**Q.** Where did you go to the University at Massachusetts?

**A.** University of Massachusetts at Amherst.

**Q.** For how long were you there?

**A.** For about a year.

**Q.** What did you study there?

**A.** Philosophy, I was a philosophy major.

**Q.** Why did you leave school?

**A.** That's a good question. I felt like traveling, basically, so I did.

**Q.** What took you to New Orleans?

**A.** That's a good question, too. I wanted to travel and see a more interesting destination.

**Q.** You said you got to Colorado in about 1995?

**A.** Yes, I got to Colorado in about 1995.

**Q.** And to where did you move in Colorado?

**A.** Greeley, which is north of Denver, Denver area.

**Q.** What took you there?

**A.** That time I sort of just wound up there.

**Q.** Did you meet anyone there?

**A.** Yes, I met Kara Larson, and we went on to have a child and get married.

**Q.** She's currently your wife?

1  **A.**  Yes, that's correct.

2  **Q.**  Now, is your child a boy or girl?

3  **A.**  My son.

4  **Q.**  When was your son born?

5  **A.**  1998.

6  **Q.**  And did that have an impact on where you lived?

7  **A.**  That was -- that happened in Olympia, Washington.

8  **Q.**  What brought you to Olympia, Washington?

9  **A.**  Several reasons.  We heard they had home birth available

10  in Washington State, and that it was a good place -- Olympia

11  was a good place for families from various people and also my

12  cousin Briana lived there.

13  **Q.**  When you say home birth, you are talking about the birth

14  with a midwife?

15  **A.**  A midwife comes to your home on the day, and unless

16  there's a problem, the birth happens at home.

17  **Q.**  You said -- when you say your cousin Briana, to whom are

18  you referring?

19  **A.**  Briana Waters; she's here today.

20  **Q.**  Can you describe what she's wearing for the record?

21  **A.**  She has what looks like a white sweater and glasses.

22       MR. FRIEDMAN:  May the Court record reflect that the

23  witness has identified the defendant?

24       THE COURT:  It will.

25  BY MR. FRIEDMAN:

1  **Q.**  You said the fact that she lived in Olympia was a factor
2  in you coming to Olympia?
3  **A.**  Uh-huh.
4  **Q.**  Did you reach out to her?
5  **A.**  I did.  She was -- we were able to stay with her when we
6  came out.
7  **Q.**  But had you been in contact with her before you came out?
8  **A.**  Yes.
9  **Q.**  Tell us about that.
10  **A.**  We asked her about the area, about the possibility of
11  staying with her until we got situated and so forth.
12  **Q.**  And then you stayed with her when you first got to
13  Olympia?
14  **A.**  That is correct.
15  **Q.**  For how long have you -- you said you are cousins?
16  **A.**  Yes.
17  **Q.**  Where did the defendant grow up?
18  **A.**  Philadelphia area.
19  **Q.**  How close to you was that from where you grew up?
20  **A.**  It was in the same area, same town, about 20 or 25 blocks.
21  **Q.**  And what's -- if you are cousins, what's the actual
22  relationship or the connection between the two of you?
23  **A.**  Our mothers are sisters.
24  **Q.**  Were you close growing up?
25  **A.**  Yes.  We spent holidays together, various summertime

1 parties, things like that.

2 **Q.** Did you go to the same schools or different schools?

3 **A.** We went to the same high school.

4 **Q.** Were you there at the same time?

5 **A.** For one year. I am older, so we overlapped for one year.

6 **Q.** Would you describe -- how would you describe your

7 relationship growing up with her; were you close, distant?

8 **A.** We were close.

9 **Q.** When you lived in Colorado, did you ever receive a visit

10 from the defendant?

11 **A.** Yes, she stopped by for the afternoon one day. She was

12 traveling, and we had lunch.

13 **Q.** Than you moved to Olympia and moved in with her?

14 **A.** That's correct.

15 **Q.** And what time type of arrangement was she living?

16 **A.** It was a house, a rental house. Several roommates rented

17 it. They were all Evergreen students.

18 **Q.** Did both you and your wife move in with her?

19 **A.** Basically, yeah, we stayed -- we stayed in the living

20 room, basically.

21 **Q.** For how long do you think you lived there?

22 **A.** For two to three months.

23 **Q.** After that, where did you go?

24 **A.** I was able to rent a duplex, which is like half of a

25 house, sort of an apartment, basically; a rental.

1  Q. What was the address of the house you rented?

2  A. 2411 Capitol Way, which is in Olympia.

3  Q. Did you live there for a number of years?

4  A. Yes, many years.

5  Q. Until roughly when?

6  A. Recently, November of '06, I think.

7  Q. Were you living there in 2001?

8  A. Absolutely.

9  Q. Now, I assume you and your wife lived there and your son

10  once he was born?

11  A. That's correct.  My son was born in October of '98, and we

12  all lived in the house.

13  Q. Apart from the three of you, did anyone else live there?

14  A. Let's see, at one point Briana came to stay with us.

15  Q. Do you recall roughly when that was?

16  A. 2000, 2001.

17  Q. Do you recall for roughly how long she lived with you?

18  A. She lived with us on and off in 2000 and 2001.  I would

19  say six months consistently.

20  Q. Where did she live in the house?

21  A. In the basement.  It was a large basement, the size of the

22  whole floor plan of the house.

23  Q. Did you charge her rent to live with you?

24  A. No.

25  Q. Was there any arrangement that was in place of rent?

**A.** Well, the plan was she would help with child care and some of the kitchen chores and things like that.

**Q.** Did she help with that over time?

**A.** Sometimes.

**Q.** At the time that she was staying with you, was she dating or involved with anyone else?

**A.** Yes, her boyfriend Justin -- was Justin.

**Q.** Do you know his last name?

**A.** I have heard it recently, but I did not know it at the time.

MR. FRIEDMAN: May the witness be shown Exhibit 115, which is already in evidence.

**A.** That's a picture of Justin as he looked at the time I met him.

BY MR. FRIEDMAN:

**Q.** At the time the defendant was living with you?

**A.** Yes.

**Q.** Apart from your wife, your son, and the defendant, did anyone else live at the house during those years you rented it?

**A.** No.

**Q.** Did the defendant have -- did you have a car when you lived there?

**A.** I did not own a car.

**Q.** Did the defendant have a car?

1    **A.**  She did not own a car at the time.

2    **Q.**  What about phones, what did you have in the house by way

3    of phones?

4    **A.**  We had one landline.  The unit itself was a base unit with

5    a hand set that would detach so you could carry it within a

6    limit range.

7    **Q.**  A cordless phone?

8    **A.**  That's correct.

9    **Q.**  Did either you or your wife have a cell phone?

10   **A.**  No.

11   **Q.**  Did the defendant have a cell phone?

12   **A.**  No, she didn't.

13   **Q.**  As a result, did she ever make phone calls from your

14   house?

15   **A.**  Very often, yes.

16   **Q.**  And how did she do that?

17   **A.**  She used our phone.

18   **Q.**  I am going to ask you take a look at something marked 111,

19   which has also been admitted.

20   **A.**  Okay.

21   **Q.**  Do you recognize that person?

22   **A.**  Yes.

23   **Q.**  How do you recognize it?

24   **A.**  Let's see, we had -- Briana asked that we be gone from the

25   house one night, that we should go out to dinner and not come

1  back before a certain time.  When we came back, there was a

2  meeting was ending, and he was one of the participants in that

3  meeting.

4  **Q.**  Did you speak to him after that meeting?

5  **A.**  He might have said something on the way out, but I didn't

6  have a conversation with him.

7  **Q.**  Had you ever spoken to him at any other time?  Did you

8  know his name until you saw it on the screen?

9  **A.**  No.

10  **Q.**  Have you ever made a telephone call from your house to

11  him?

12  **A.**  No.

13  **Q.**  Let me ask you to take a look at a document marked Exhibit

14  122.  This has not been admitted, so it should be in the

15  folders to your left.

16  **A.**  Okay.  122?

17  **Q.**  Yes.  It should be a photograph with the name of a person?

18  **A.**  Yes.

19  **Q.**  Can you tell us what the name is?

20  **A.**  The name is Joseph Dibee.

21  **Q.**  Do you recognize the person in that photograph?

22  **A.**  I can't be sure.  He -- I don't think I know him.

23  **Q.**  Do you believe -- did you ever telephone him from your

24  house?

25  **A.**  No.  No.

**Q.** By May of 2001, was the defendant still living at your house?

**A.** Her belongings were still there, including her clothes and furniture; but I hadn't seen her in some time.

**Q.** Did you understand that she was living somewhere else?

**A.** Yes. Yes, I did.

**Q.** Do you know where she was living?

**A.** I remember there was times when she would stay with her boyfriend Justin. I remember at one time she was staying with someone named Ocean and his family, but I am not sure -- I can't remember what she was doing at the time.

**Q.** You said she still had her belongings or some of her belongings in your basement?

**A.** Oh, yes, her clothes and her bed and all that sort of thing.

**Q.** Would you take a look at a document marked 777? That should also be in a folder in front of you. Tell me if you recognize that.

**A.** 777?

**Q.** Yes.

**A.** Yes, I am looking at this, and this is my calendar from May of 2001.

MR. FRIEDMAN: Government offers 777.

MR. BLOOM: I am going to object at this time. I don't mind --

1       THE COURT:   Your objection is at this time --

2       MR. BLOOM:   Yes, I would like an offer of proof as to

3  why this is being offered at this time.

4       THE COURT:   I don't want you to discuss it, but I

5  will take it up at the break.   Can we go on without this?

6       MR. FRIEDMAN:   We will need it in a couple moments

7  Your Honor.   He can testify looking at it, but it basically

8  allows --

9       THE COURT:   Let him testify looking at it, but don't

10  put it on the screen.

11  BY MR. FRIEDMAN:

12  **Q.**   You said this is your calendar from 2001?

13  **A.**   Yes.

14  **Q.**   Is it fair to say it's one-page, with a block for each day

15  in which people write notes?

16  **A.**   Yes, that's right.

17  **Q.**   Whose writing -- there's handwriting on here; is that

18  correct?

19  **A.**   That's correct.

20  **Q.**   Who did most of the writing on here?

21  **A.**   Mostly my wife Kara, it's her handwriting.

22  **Q.**   Is some of the writing yours?

23  **A.**   Some of it is mine, yes.

24  **Q.**   And is there a phone number in the top left corner, a name

25  and a phone number?

1    A.  Yes.

2    Q.  Whose name and phone number have you written down there?

3    A.  Briana, it says Briana and then a phone number.

4    Q.  Can you tell us the phone number?

5    A.  Yes.  570-0226.

6    Q.  Now, do you recall at some point during this month, do you

7    recall receiving a telephone call from the defendant?

8    A.  Yes.  Yes, I did.  It was basically she told me some

9    current events if her life and that she was interested in

10   renting a car.

11   Q.  Do you recall when it was, roughly, that she called you?

12   A.  The week of Monday, May 14, that week.

13   Q.  Sometime during the week that began with Monday, May 14?

14   A.  That's correct.

15   Q.  You said there was discussion about a car?

16         MR. BLOOM:  Excuse me, for just one moment.  I want

17   to put on the record I am objecting that he's looking at the

18   document when he answers.  I am allowed to put that on the

19   record.

20         THE COURT:  I told him to look at the document.  I

21   told him not to publish it to the jury.  You will get a chance

22   to ask your question.

23         MR. BLOOM:  I am putting something on the record

24   that's not otherwise on the record.

25         THE COURT:  It's on the record.

1          MR. BLOOM:   Now that I said it's on the record.

2          THE COURT:   Mr. Bloom, should I send the jury out so

3    we can discuss it further, or are you through?

4          MR. BLOOM:   I think so.  All I was doing was -- I

5    have done it for 40 years, when something happens that's not

6    on the record.

7          THE COURT:   I don't care how long you've done it, but

8    you are not in charge here.  Are you through right now with

9    this?

10         MR. BLOOM:   The answer is yes.

11         THE COURT:   Then you may be seated.

12      Ask the question.

13         MR. FRIEDMAN:   Yes, Your Honor.

14   BY MR. FRIEDMAN:

15   Q.  You mentioned some discussion about a car during this

16   conversation.  Tell us about that.

17   A.  During that phone conversation, Briana mentioned several

18   reasons that a rental car would be convenient on the upcoming

19   weekend.

20   Q.  Do you recall what those reasons were at the moment?

21   A.  She gave me reasons at the time why it would be

22   convenient, but I am not remembering it right now.

23   Q.  Did any of those reasons relate to her belongings in the

24   basement?

25   A.  That came up during that same conversation..  I am not

1  remembering whether I brought it up like, hey, this would be

2  good to take care of this, too; or if she offered at some

3  point that might happen -- that she could move her belongings

4  with the car as well.

5  **Q.** Was there any discussion about who was going to pay for

6  this rental car?

7  **A.** Yes, there was.  We discussed that in that same

8  conversation.  Basically we decided she would pay for some or

9  all of the rental, depending on how things went.

10  **Q.** Now, you said you didn't have a car yourself?

11  **A.** That's correct.

12  **Q.** Did you have a driver's license at the time?

13  **A.** No.

14  **Q.** So who was going to rent this car?

15  **A.** Well, it would have to be my wife Kara using her credit

16  card and her license.

17  **Q.** Would you take a look at Exhibit 772 and tell me if you

18  recognize that?

19  **A.** Okay.  772?

20  **Q.** Yes.

21  **A.** Department of Licensing, I see my wife's name on the first

22  page, and then there's a photocopy of her driver's license.

23  MR. FRIEDMAN:  Government offers 772, if we could

24  turn to the second page.

25  MR. BLOOM:  What was the second thing you said?

1    MR. FRIEDMAN:   Second page.

2    MR. BLOOM:   No objection.

3    THE COURT:   Admitted.

4              (Exhibit No. 772 admitted.)

5  BY MR. FRIEDMAN:

6  **Q.**  That's your wife's driver's license and photograph?

7  **A.**  Yes, that's correct.

8  **Q.**  Do you recall discussing when this car rental was going to

9  take place, when you were going to rent the car?

10 **A.**  Let's see, our original plan was for Friday, but Briana

11 did not show up; so got moved to Saturday.

12 **Q.**  So the record is clear, Friday was what day in May?

13 **A.**  Friday, the 18th of May, 2001.

14 **Q.**  And you said it moved to the 19th, which would be what day

15 of the week?

16 **A.**  Saturday, the 19th.

17 **Q.**  What happened on the 19th?

18 **A.**  On the 19th, Kara did actually go ahead and rent the car.

19 **Q.**  Was she alone, or had the defendant come to your house?

20 **A.**  Let's see, I don't remember if Briana appeared at the

21 house that day or where she met up with Kara before they went.

22 **Q.**  Did they both return to your house with the car?

23 **A.**  Yes.

24 **Q.**  Would you look at Exhibit 775, which is admitted into

25 evidence, so it should appear on your screen?

1    **A.**   775?

2    **Q.**   Do you recognize that?

3    **A.**   Yes, that's a white rental car, and I believe it's the

4    same one.

5    **Q.**   For how long did you all or did your wife rent this car,

6    do you know?

7    **A.**   Let's see, Saturday, Sunday, Monday -- so three days.

8    **Q.**   Once your wife and the defendant came back with the car,

9    do you remember doing anything with the car?

10            MR. BLOOM:   Excuse me, I am going to object.   I am

11   not sure there was clear testimony that they came back

12   together.

13            THE COURT:   All right.   Ask the question again.

14            MR. BLOOM:   I would object to the phrasing.

15   BY MR. FRIEDMAN:

16   **Q.**   Did your wife and the defendant come back to your house

17   with the car?

18   **A.**   Yes, I was at home, and Briana and my wife pulled up into

19   the driveway in the white rental car.

20   **Q.**   Do you recall doing anything with the car that day?

21   **A.**   Let's see, I know we drove about a bit with the car, just

22   to go to a restaurant, things like that.

23   **Q.**   You had a young child.   Did you have to do anything?

24   **A.**   Oh, yes.   I had to -- he uses a car seat.   He was a baby

25   at the time, so I had a car seat I had to put in the car.

**Q.** Do you recall the defendant coming to your house the next day, that is May 20?

**A.** Yes, on Sunday.

**Q.** Tell us about that.

**A.** Briana was at our house. She was at the house, it was the afternoon, and before long she began to complain of abdominal pains. And eventually she said she thought she should go to the emergency room.

**Q.** Could you see any sign that she was actually in pain?

**A.** No, I could not. She told me just with words that she was having abdominal pains.

**Q.** Did you discuss how she would get to the emergency room?

**A.** She suggested that she wanted to be driven there, and that Justin could drive her, her boyfriend Justin.

**Q.** Was he there?

**A.** He was not there at the time.

**Q.** Did she say anything about that at the time?

**A.** She said he was nearby at a friend's house but without his car, and that he could come over and drive her in the rental car to the emergency room.

**Q.** Did he come to your house after that?

**A.** Yes, he appeared on foot. And after some preparation, they drove off in the rental car.

**Q.** Did they rush off to the emergency room, or were they at your house for some time?

**A.** They were at my house preparing for some time.

**Q.** Now, did you have an understanding as to which emergency room they were headed to?

**A.** Since she was in pain, it was my assumption that they would go to one of the Olympia hospitals and use the emergency room. That was my assumption.

**Q.** How many hospitals -- how many emergency rooms are there in Olympia?

**A.** There's two.

**Q.** Roughly what time of day did they leave your house?

**A.** Late afternoon, early evening.

**Q.** After they left, did you notice anything missing from your house?

**A.** Yes, the hand set for my phone was gone.

**Q.** Did you try to find it?

**A.** Yes, I did. I looked throughout the house and also used the pager function on the base unit, which causes it to beep if you can't locate it. But there was no beep. I searched the house, it wasn't there.

**Q.** Did you ever -- did the defendant come back that evening?

**A.** No. I stayed up late, but she never came back until the following day.

**Q.** Were you concerned about what was going on?

**A.** Yes, I was for several reasons.

**Q.** Why were you concerned?

1   **A.** Well, for one thing, she said she was in pain, going to

2   emergency room. Didn't return. They had the rental car. I

3   didn't know what the status of that was and so forth.

4   **Q.** Did you try and call the hospital or check?

5   **A.** I couldn't. I didn't have the phone.

6   **Q.** Eventually you went to bed?

7   **A.** That's correct.

8   **Q.** When you woke up, had the defendant come back to your

9   house?

10   **A.** No, she did not return in the morning.

11   **Q.** Was there any message telling you anything about what had

12   happened?

13   **A.** No.

14   **Q.** Did you continue to be concerned?

15   **A.** Yes, I was concerned.

16   **Q.** At some point, did she reappear at your house?

17   **A.** Yes, she reappeared in the late afternoon on Sunday.

18   **Q.** I thought you said she had taken the car --

19         MR. BLOOM: Objection, leading.

20         THE COURT: Ask the question.

21 BY MR. FRIEDMAN:

22   **Q.** On what day did she reappear?

23   **A.** I meant Monday.

24   **Q.** Was she with the car? Did she reappear with the car?

25   **A.** Yes, that's correct.

1  **Q.** Was anyone with her?

2  **A.** Justin may have been with her, but he didn't come in.  He

3  might have been there.

4  **Q.** If he was there, for how long was he there?

5  **A.** Just for a moment.

6  **Q.** Did she say anything about where she had been?

7  **A.** She said -- she gave reasons that she could not gain

8  access to the Olympia emergency rooms and that they had to go

9  all the way to Seattle for the emergency room.

10  **Q.** Do you recall why it was that she said she couldn't get

11  into an emergency room in Olympia?

12  **A.** She gave me reasons at the time, but I can't remember what

13  they were.

14  **Q.** Do you recall what she said actually happened in Seattle?

15  **A.** To the best of my memory, the basic story was she made it

16  to the emergency room in Seattle, was in pain.  There was a

17  wait, and eventually the pain subsided in the middle of the

18  night and she came back.

19  **Q.** Did she produce anything for which you had been looking?

20  **A.** And she had the phone.  She gave me the phone back and

21  said, "sorry".  She apologized and made a joke that I was

22  probably mad that the phone was gone.

23  **Q.** Had she ever taken the phone with her before when she left

24  the house?

25  **A.** No.  She would take it to other rooms of the house, but

1  not away.

2  **Q.** After returning the phone and telling you that she'd been

3  to Seattle, what did the defendant do?

4  **A.** She went downstairs and went to sleep.

5  **Q.** What happened to the car?

6  **A.** We took it back to the rental place and dropped it off.

7  **Q.** Was the rental place open when you got there?

8  **A.** I remember dropping it off. I don't remember seeing any

9  personnel. They must have had some sort of drop or something.

10 **Q.** Did you or the defendant ever use the car to move any of

11 her belongings that were still in your basement?

12 **A.** No.

13 **Q.** Do you recall any discussion about damage to the car?

14 **A.** Yes. When the car was returned on Monday afternoon,

15 Briana asked me to take a look at the side of the car and see

16 if I could see any damage.

17 **Q.** What did you see?

18 **A.** I couldn't see any damage.

19 **Q.** You have a note on your calendar --

20 **A.** Yes.

21 **Q.** -- approximately a week later; what does that note say?

22 **A.** It says --

23          MR. BLOOM: I object.

24          THE COURT: Whose note is it? Are you asking him did

25 he write the note; is that the question?

1          MR. FRIEDMAN:  It's either him or his wife.  I was

2    asking him what the note was on his calendar.

3          MR. BLOOM:  I can resolve this.  I withdraw my

4    objection to the offer of the calendar, so let it all.

5          THE COURT:  All right.  Then admit the document, put

6    it on the screen.

7                (Exhibit No. 777 admitted.)

8    BY MR. FRIEDMAN:

9    Q.  Mr. Corrina, do you see your calendar on the screen now?

10   A.  Yes.

11   Q.  There's a note on the 28th of May, so a week after the car

12   was returned?

13   A.  Yes.

14   Q.  What does that note say?

15   A.  It says "call budget," yes.

16   Q.  Do you know why that note is on the calendar?

17   A.  Because we knew how much the rental would cost, but I was

18   calling to find out if there was any additional cost for

19   damages.

20   Q.  Did you learn whether there was in fact any additional

21   charge for damages?

22   A.  There was no additional charge.

23   Q.  Would you take a look at document 773?  Tell me if you

24   recognize that.

25   A.  773?

1    Q.   Yes.

2    A.   The first page is a certification.   The second page, this

3    was our Discover Card.   This is a Discover Card statement.

4    Q.   For May of 2001?

5    A.   Correct.

6              MR. FRIEDMAN:   The government offers 773.

7              MR. BLOOM:   No objection.

8              THE COURT:   Admitted.

9                    (Exhibit No. 773 admitted.)

10   BY MR. FRIEDMAN:

11   Q.   If we could blow up the middle portion.   The name up at

12   the top, can you tell us whose name this account is held in?

13   A.   K.R. Collins, that was my name.   That's my name I was born

14   with until I changed it.

15   Q.   Why did you change your name from Collins to Corrina?

16   A.   We were going to have a new family, a new baby.   We

17   decided we should have a new family name.

18   Q.   And your son uses that name, I take it?

19   A.   That's correct.

20   Q.   Your wife didn't quite change?

21   A.   She actually retained her maiden name after all.

22   Q.   If we could blow up the transactions portion.   Do you see

23   a transaction there that starts with -- in the gas/automotive

24   section?

25   A.   Gas/automotive, yes.

1 **Q.** Tell us which company charged that and what the charge

2 was?

3 **A.** Budget, the charge s$187.87.

4 **Q.** What was that charge for?

5 **A.** That charge was for the rental car for three days.

6 **Q.** And then, did you ever receive payment for renting that

7 car?

8 **A.** Yes. Yes, I did.

9 **Q.** Who paid you?

10 **A.** Briana.

11 **Q.** How much did she pay you?

12 **A.** $200 in cash.

13 **Q.** Have you looked at your bank records for 2001?

14 **A.** Yes, I have.

15 **Q.** Would you look at Exhibit 774 and tell me if you recognize

16 those?

17 **A.** 774?

18 **Q.** Yes.

19 **A.** These are our financial records from Key Bank for 2001.

20         MR. FRIEDMAN:  The government offers 774.

21         MR. BLOOM:  No objection.

22         THE COURT:  Admitted.

23                 (Exhibit No. 774 admitted.)

24 BY MR. FRIEDMAN:

25 **Q.** If we turn to page 17 of those, this will show up on the

1    screen and probably make your life easier.

2        Do you see a section now blown up on the screen labeled

3    "Deposits"?

4    **A.** Yes.

5    **Q.** Do you see a transaction that took place on May 29?

6    **A.** 29th?  Yes.

7    **Q.** What is that transaction, what happened that day?

8    **A.** A $400 deposit.

9    **Q.** If we turn to page 49 of those records.  Do you recognize

10   the documents on that page?

11   **A.** Yes, I do.  There's a check from my mother-in-law and a

12   cash deposit with my handwriting on it.

13   **Q.** How much is the check from your mother-in-law?

14   **A.** That's for $200.

15   **Q.** And then how much cash was deposited that day?

16   **A.** $200 in cash.

17   **Q.** What was the source of that cash?

18   **A.** That was the cash that Briana gave me for the rental car.

19   **Q.** Have you looked through your bank records for the first 8

20   months of that year?

21   **A.** Yes, I have.

22   **Q.** Is there any other cash deposit that you make -- made to

23   that account any time during that eight-month period?

24   **A.** No.

25   **Q.** Sometime after that weekend, did the defendant move away

1  from Olympia?

2  **A.**  She told me that she did.

3  **Q.**  Roughly when was that?

4  **A.**  Boy, let's see, it's hard to remember for sure.

5  **Q.**  Still in 2001?

6  **A.**  Correct.

7  **Q.**  Do you recall an episode that took place while -- did she

8  come get her belongings from your house before she moved out?

9  **A.**  Eventually.

10  **Q.**  Was she alone or with someone?

11  **A.**  Justin was helping her pack.

12  **Q.**  Do you recall any conversation you had with him or

13  overheard him?

14  **A.**  I overheard them talking and --

15          MR. BLOOM:  I object to that, please, hearsay.

16          THE COURT:  Well, let's find out who said what.

17  **A.**  We were all loading her clothes and things into the car,

18  and they were talking while we were doing this, Justin and

19  Briana.

20  BY MR. FRIEDMAN:

21  **Q.**  And what did he say to her?

22  **A.**  He said that he --

23          MR. BLOOM:  Objection.

24          MR. FRIEDMAN:  It's a coconspirator statement.

25          THE COURT:  Overruled.

1    **A.**  He said he was going to change his appearance.

2    BY MR. FRIEDMAN:

3    **Q.**  Did he give any details about how he was going to change

4    his appearance?

5    **A.**  Yeah, he said he was going to change his hair.

6    **Q.**  Do you recall any more details than that?

7    **A.**  No, he was discussing -- he was bringing up various ways

8    he could change his appearance.  He said he was going to

9    change his hair.

10    **Q.**  Did you have an understanding of why he was going to

11    change his hair?

12            MR. BLOOM:  Objection.

13            THE COURT:  If he knows -- I don't know how he might

14    know this.  Make your question a little more direct.

15    BY MR. FRIEDMAN:

16    **Q.**  Did you understand from the context, and from his tone,

17    did you have an understanding of what he meant and why he was

18    going to do that?

19    **A.**  He didn't say specifically, but the context was a legal

20    problem.

21            MR. BLOOM:  Objection -- I withdraw the objection.

22            MR. FRIEDMAN:  May I have a moment?

23    BY MR. FRIEDMAN:

24    **Q.**  Would you look again at Exhibit 115?

25    **A.**  Yes.

1  **Q.** Is that how he looked this day when he was helping the
2  defendant move out of your house?
3  **A.** That's correct.
4  **Q.** Then would you look at 115-A, which I believe has been
5  admitted into evidence. Did you subsequently see -- sometime
6  after that day, did you see Justin Solondz in Olympia?
7  **A.** Sometime thereafter I did see him in Olympia and spoke
8  with him, and that was his appearance at that time. So he had
9  changed it.
10 **Q.** He basically looked as he does in 115-A?
11 **A.** Exactly as that, yes.
12 **Q.** Now, do you know where the defendant moved after she left
13 Olympia?
14 **A.** She told me that she was moving to California.
15 **Q.** Did you ever get a call from her after she moved to
16 California -- do you recall getting a call from her after she
17 moved to California?
18 **A.** Yes, I did.
19 **Q.** What had you been doing when she called you?
20 **A.** I had been working on my computer and listening to the
21 radio.
22 **Q.** Did you hear anything on the radio that you found
23 interesting?
24 **A.** Yeah, there was a strange Crime Stoppers segment, and I
25 mentioned it to her on the phone.

1   Q.  What was that Crime Stopper segment about?  Tell us first,
2   what's Crime Stoppers?
3           MR. BLOOM:  Objection, please.
4           THE COURT:  Are we getting into --
5           MR. FRIEDMAN:  This is an entirely different
6   conversation five years earlier.
7           THE COURT:  It may be, but the way it is coming about
8   is concerning here.
9           MR. FRIEDMAN:  The conversation they have --
10          THE COURT:  I don't want you to explain it here in
11  front of the jury.  I am having problems in terms of the
12  admissibility of this.  So if you have another line of
13  questioning, let's go to something; or if they need to be sent
14  back before we go any further, then I say move on to your next
15  line of questioning.
16          MR. FRIEDMAN:  Your Honor, if we end up taking the
17  break before coming back, is it okay to raise this in
18  redirect?
19          THE COURT:  I will hear whatever you have to say to
20  me at the break.  I just don't want to hear it now.
21  BY MR. FRIEDMAN:
22  Q.  Do you recall, over the course of the last year or so,
23  you've been interviewed a number of times; is that correct?
24  A.  Yes, that's correct.
25  Q.  Was the first time you had any contact with the government

1    once when Agent Halla came to your house?

2    **A.**   That's correct.

3    **Q.**   In May of 2006?

4    **A.**   Yes.

5            MR. BLOOM:   Excuse me, I am going to ask that the

6    leading stop, in terms of who came and when they came.   I ask

7    him please, what happened, who came.

8            THE COURT:   Question.

9    BY MR. FRIEDMAN:

10   **Q.**   What did Agent Halla say when he came to your house?

11   **A.**   He showed me a series of pictures, including Briana's

12   picture.   And asked if I knew any of these people.   I said,

13   "No, I didn't."

14   **Q.**   Did you in fact recognize her picture?

15   **A.**   Yes, I did.

16   **Q.**   Why did you say you didn't know her?

17   **A.**   I thought I could protect her, and I thought I could get

18   them to go away.

19   **Q.**   Did he in fact go away?

20   **A.**   That day, but I saw him again later.

21   **Q.**   Did he come back in October of 2006?

22   **A.**   Yes, that's correct.

23   **Q.**   Did he interview you again?

24   **A.**   That's correct.

25   **Q.**   What do you recall him asking you?   That time did you tell

1  him you knew the defendant?

2  **A.**  Yes, I did.  And I was asked a series of questions, which

3  I answered.

4  **Q.**  In particular, were you asked any questions about whether

5  you had rented a car for the defendant?

6  **A.**  Yes, I was.

7  **Q.**  What did you say?

8  **A.**  I said, "No, I hadn't."

9  **Q.**  Why did you say that?

10 **A.**  At the time I had forgotten about the whole thing with the

11 rental car.

12 **Q.**  You actually were subpoenaed to the Grand Jury and

13 testified about a month after that; is that correct?

14 **A.**  Yes.

15          MR. BLOOM:   Objection, leading.

16          THE COURT:   This is not so leading that you can't

17 take care of it in cross-examination.  If he appeared before

18 the Grand Jury, let him answer the question.

19          MR. BLOOM:   Why can't he say what happened, rather

20 than say -- he can't give him the answer.

21          THE COURT:   Your exception is noted.

22 BY MR. FRIEDMAN:

23 **Q.**  When you testified before the Grand Jury, were you asked

24 whether you rented a car for the defendant?

25 **A.**  Yes.

**Q.** What did you say?

**A.** Ultimately, I said no, I had not rented a car.  I had still not remembered the incident with the car.

**Q.** In January 2007, did you learn that Agent Halla --

MR. BLOOM:  Objection, leading.  He's about to give him the facts.

THE COURT:  See if you can ask the question so Mr. Bloom will be satisfied.  See if you can ask the question and he can fill in the times and dates.

BY MR. FRIEDMAN:

**Q.** Did you subsequently learn that Agent Halla had contacted your wife?

**A.** Yes, I got a phone call from my wife Kara.

THE COURT:  Then you can ask him when.

BY MR. FRIEDMAN:

**Q.** Roughly, when did that happen?

**A.** Beginning of, just prior to January 2007.

**Q.** What did you learn about that, why Agent Halla had contacted your wife?

**A.** She said there were documents about a rental car in May of 2001 that she had seen.  And they asked what these -- she was asked what these were.

MR. BLOOM:  Excuse me, this is the wife speaking.

THE COURT:  He's talking about the wife.  Will she be testifying?

```
 1              MR. FRIEDMAN:  She will not be testifying.
 2              MR. BLOOM:  She will not be testifying.
 3              MR. FRIEDMAN:  We can move on.
 4              MR. BLOOM:  I am sorry, did you say she will not be
 5    testifying?
 6              THE COURT:  I think that was the answer.
 7              MR. BLOOM:  All right.
 8    BY MR. FRIEDMAN:
 9    Q.  So you learned there had been a meeting?
10    A.  Yes.
11    Q.  What -- did you reach any decision after that
12    conversation?
13    A.  Yes.  I decided to hire a lawyer, and I also resolved to
14    look at my notes from this time period and see if I could
15    figure out why there was -- more about these documents.
16    Q.  Did you look at your notes and remember anything?
17    A.  Yes, I did.  I looked over my notes and thought about what
18    my wife told me about the documents, then I remembered the
19    rental car in May of 2001.
20    Q.  What did you do once you remembered that?
21    A.  Let's see, I spoke to my lawyer about it.  Later he
22    arranged a meeting so I could explain, so I could explain what
23    had happened.
24    Q.  With whom did you meet?
25    A.  The government.
```

1    **Q.** Did you explain what had happened?

2    **A.** Yes, I did.

3    **Q.** What did you explain?

4    **A.** I explained that --

5          MR. BLOOM:   Objection.

6          THE COURT:   He can say what he said.

7          MR. BLOOM:   I am sorry?

8          THE COURT:   Are you asking him what did he say to

9    them, was that the question, Mr. Friedman?

10         MR. BLOOM:   Withdraw the objection.

11         THE COURT:   You may answer, sir.

12   **A.** Basically what I said to the Grand Jury was before I had

13  remembered the rental car.  And now that I remembered it, I

14  was ready to explain these documents, that there was a rental

15  car in 2001.

16  BY MR. FRIEDMAN:

17   **Q.** At any time prior to that meeting, did anyone from the

18  government ever threaten to prosecute you for the statements

19  you'd made before?

20   **A.** No.

21   **Q.** Prior to or during that meeting, had you ever been

22  promised that you won't be prosecuted, given what you've said

23  now?

24   **A.** No.

25   **Q.** Is it difficult for you to be testifying here today?

1  **A.** Yes, it is.

2  **Q.** Why is that?

3  **A.** It's hard to explain.  It's very stressful.  It's very

4  stressful.  This is causing problems with my extended family.

5        MR. FRIEDMAN:  Thank you, Mr. Corrina.  I have no

6  further questions.

7        MR. BLOOM:  May we take a break because I really need

8  to bring something up to the Court based on some of the

9  testimony?  Maybe we can take five minutes so we can address

10  that.

11        THE COURT:  Can you go on at this point, to

12  cross-examination?

13        MR. BLOOM:  It's something I would want to bring up

14  at the beginning of my examination.

15        THE COURT:  Let me have you folks step out for a

16  moment.  Leave your notes on the chair.

17    (Jury not present.)

18        MR. BLOOM:  May I ask that the witness be excused,

19  too?

20        THE COURT:  I thought you had something to ask him?

21        MR. BLOOM:  No, I want to address the Court, but I

22  don't want to do it in the presence of the witness.

23        THE COURT:  Let me have you step down.  We have a

24  witness room.  I will have you step outside the courtroom.

25  Have them show you where that is.

1    (Robert Corrina left the courtroom.)

2    THE COURT:  All right.  Mr. Bloom?

3    MR. BLOOM:  Yes, the ruling the Court made a little

4 while ago, that we can't go into Ms. Waters' call, forget the

5 "I'm innocent" part, I do think that should be clear, the rule

6 of completeness should be there.  But the key is here, he was

7 told by Ms. Waters, "tell the truth."  Again, forget that "I'm

8 innocent, tell the truth, tell the truth."  What he's

9 testified to here now completely skews the circumstance.  He's

10 testified that he didn't identify her picture because he

11 wanted to protect her.  It created completely 180 degrees from

12 the reality here, that she has said to him, "I'm innocent."

13 In fact, there's nothing to protect me from, "Don't worry

14 about it, tell them the truth, tell them the truth."

15    Now he has said, "I didn't identify her.  I didn't tell

16 the truth because I was trying to protect her."  I hope the

17 Court sees that that's a real problem that has created.

18    So I am asking the Court to reconsider, given the

19 testimony, that we really should be able to bring out that she

20 said to him, it can be modified to "Don't worry about

21 anything, tell the truth."

22    But the fact that she said to him, "tell the truth," and

23 he has now told the jury he was trying to protect her is a

24 real problem, and I ask the Court to think about it.

25    MR. FRIEDMAN:  Your Honor, there is no suggestion

1   that he was trying to protect her because she asked. There's

2   no suggestion of that. It's just that he wanted to do that.

3      So she can testify on direct as to what she said. But

4   there is no suggestion. The door hasn't been opened to that.

5   There's no inference that will hurt them in front of the jury.

6   They can cross and say -- and basically make it clear it's

7   because he wanted to do it himself, not because he was asked

8   to protect her.

9      So there's no need for this statement. The statement is

10   hearsay and incredibly prejudicial for her -- as the Court

11   said -- for her to get to testify --

12        THE COURT: My ruling is the same because of the

13   reasons I stated before. I see no reason to do that. But you

14   are entitled to ask him, what made him -- as long as it

15   doesn't get into this issue that I ruled on -- as to why he

16   felt his responsibility to protect her.

17        MR. BLOOM: That's the opposite direction. He's

18   going to say -- suggesting she was guilty. In fact, she says:

19   I am not guilty. Tell them anything. Tell them the truth.

20   And the whole impression, if that cross-examination goes in

21   the direction you and the prosecution suggest, it's exactly

22   the opposite.

23        THE COURT: Let me say this --

24        MR. BLOOM: He reenforces he's trying to protect her.

25        THE COURT: You raised a question. You raised it

1 twice. I have ruled on it two or three times. My ruling is

2 the same. You've made your exception to my ruling.

3     You have a right, of course, to take it anywhere you take

4 it in terms of an appeal or whatever you think I have done

5 incorrectly here.

6     As I see it -- I don't see it the same way you see it. So

7 my ruling will stand. All I can ask of you is this: I am not

8 asking you to like my ruling, but I am asking you to accept it

9 and move on. That's what I am asking of you right now.

10        MR. BLOOM: I do. I am entitled to ask the Court to

11 reconsider it. I have done that. You've denied it. Let's

12 move on.

13        THE COURT: Bring in the jury.

14   (Jury present.)

15        THE COURT: You may be seated. Cross-examination?

16               CROSS-EXAMINATION

17 BY MR. BLOOM:

18 **Q.** Mr. Corrina, my name is Robert Bloom. I am one of the

19 lawyers for Briana Waters. Have you and I ever spoken?

20 **A.** No.

21 **Q.** Has it been communicated to you on several occasions that

22 I would like to speak to you?

23 **A.** Yes.

24 **Q.** And each case you said no; is that correct?

25 **A.** That's correct.

1  **Q.**  Is your lawyer here in this courtroom?

2  **A.**  No.

3  **Q.**  Is that Mr. Zulauf?

4  **A.**  Mr. Zulauf.

5  **Q.**  Did he communicate to you that I would like to speak to

6  you and to Kara?

7  **A.**  Yes.

8  **Q.**  Did he do that at least twice?

9  **A.**  Yes.

10  **Q.**  You chose not to speak to me; is that correct?

11  **A.**  That's correct.

12  **Q.**  There's nothing I can do for you, right?

13  **A.**  I don't understand your question.

14  **Q.**  These guys sitting here at this table, they hold you and

15  your freedom in their hands, do they not?

16  **A.**  That is not correct.

17  **Q.**  You lied to a federal agent, Agent Halla, when he showed

18  you Briana's picture and you said "I don't recognize her," did

19  you not?

20  **A.**  I already said that, yes.

21  **Q.**  That's what you said, and that's what you did; you lied to

22  the man right in his face, right?

23  **A.**  I answered that three times, yes.

24  **Q.**  Would you please answer my question?  You did that -- did

25  you come to learn that lying to a federal investigator is a

1   felony?

2   **A.** How would I come to learn that?

3   **Q.** Do you have a lawyer?

4   **A.** Yes.

5   **Q.** Did he tell you that?

6   **A.** We did not discuss that.

7   **Q.** Did your wife speak, that is Kara, did she speak at one

8   point in January of 2007, a little over a year ago, with

9   Mr. Friedman and Mr. Halla when you were not present?

10   **A.** That correct.

11   **Q.** Did she tell you that they had threatened you and her with

12   going to prison?

13   **A.** Would you please repeat the question?

14   **Q.** Did she tell you that they, Mr. Friedman and Mr. Halla,

15   had threatened her and you with going to prison?

16   **A.** No.

17   **Q.** Did you have a discussion with her as to what took

18   place -- let me withdraw that.

19      Did you come to learn there was a meeting between your

20   wife, Mr. Friedman and Mr. Halla, in January, a year ago,

21   2007?

22   **A.** The answer is yes.

23   **Q.** When she got through with that meeting, did she come and

24   talk to you about what had happened at that meeting?

25   **A.** Yes, she talked to me about that.

1   **Q.** Did she tell you that Mr. Friedman had told her that

2   because of her testimony and your testimony in the Grand Jury,

3   the Grand Jury might want to indict you for perjury?

4   **A.** Kara was upset, but I was not at that meeting. I don't

5   know exactly what was said.

6   **Q.** No, sir, my question is: Did she tell you that that's

7   what they told her at that meeting?

8   **A.** I don't understand the question. You are going to have to

9   repeat it.

10   **Q.** Let me ask it again. You knew she was going to a meeting

11   with Mr. Friedman and Mr. Halla; is that correct?

12   **A.** I heard about it later.

13   **Q.** Okay. You didn't know before that she was going to meet

14   with them?

15   **A.** She tried to call me, but I was not at home.

16   **Q.** By the way, did there come a time that she told you there

17   was one event where the FBI came to her place of work?

18   **A.** This is the same thing we've been talking about. That's

19   the meeting.

20   **Q.** Did she tell you that at the place of work, they yelled at

21   her?

22   **A.** Yes, she did.

23   **Q.** And who did she tell you had yelled at her?

24   **A.** Andrew Friedman.

25   **Q.** This man right here?

1  A. That's correct.

2  Q. Did she tell you what it was he yelled about?

3  A. About the discrepancy between the documents and the Grand

4  Jury testimony.

5  Q. Did she tell you in reporting that meeting that took place

6  in January of '07, that Mr. Friedman had threatened that the

7  Grand Jury might want to indict her and you for the crime of

8  perjury?

9  A. I believe she asked if she was going to be charged with

10 perjury.

11 Q. Did Mr. Friedman, according to what she told you, answer

12 that the Grand Jury may be considering that; words to that

13 effect?

14 A. I don't know.

15 Q. You got a lawyer soon after that, right?

16 A. That's correct.

17 Q. And you got a lawyer because you were scared, right?

18 A. I got a lawyer because I thought we were done with this

19 situation but new documents had come to light.

20 Q. Did you get a lawyer because you were scared?

21 A. I got a lawyer because you need a lawyer when dealing with

22 legal matters.

23 Q. Did you get a lawyer because you were scared?

24 A. No.

25 Q. Briana's brother, Eric, you know him, right?

1  A.  Correct.

2  Q.  Did he send you an e-mail where he said you should get a

3  lawyer, way back, way back before this all happened, after you

4  had -- or even before you had been shown a picture that you

5  have a right to a lawyer, if you can't afford a lawyer you

6  should ask the authorities to appoint a lawyer; did you get an

7  e-mail from Eric Waters telling you that?

8  A.  I don't remember.

9  Q.  The things you do remember are from now about seven years

10  ago, right; May of '01, close to seven years ago?

11  A.  That's correct.

12  Q.  But I was just asking you something that you remember may

13  have happened about two years ago, correct?

14  A.  I don't know.

15  Q.  Well, the first approach by Agent Halla, when he showed

16  you the photographs, when was that?

17  A.  Let's see, I first saw Agent Halla in 2006.

18  Q.  What month?

19  A.  It was fall of 2006.

20  Q.  And what month in the fall of 2006?

21  A.  I can't remember right now.

22  Q.  You have testified under the questioning of Mr. Friedman

23  that you remember Thursday, Friday, Saturday, Sunday on a

24  particular weekend.  You have particular memories of certain

25  things that happened on certain days of the week, seven years

1  ago.  Do you remember that testimony this afternoon?

2  **A.**  I pieced those dates together from the documents I was

3  shown, not because I remembered what day it was when certain

4  things happened.

5  **Q.**  Let me get back to that later.

6  May of 2001, did you have a job?

7  **A.**  May of 2001, yes, I had a job.

8  **Q.**  What was that job?

9  **A.**  Computer specialist.

10  **Q.**  For whom did you work?

11  **A.**  Patrick Townsend and Associates.

12  **Q.**  Patrick Townsend and Associates?

13  **A.**  That's in Olympia, Washington.

14  **Q.**  Where about in Olympia?

15  **A.**  An area of Olympia, to the north, called Boston Harbor.

16  **Q.**  Is that about nine miles from your home?

17  **A.**  That's correct.

18  **Q.**  Capitol Way?

19  **A.**  That's correct.

20  **Q.**  And when did you get that job?

21  **A.**  Summer, let's see, summer of 2000.

22  **Q.**  And how many days a week did you work?

23  **A.**  Five days a week.

24  **Q.**  What were your hours?

25  **A.**  Let's see, 8:00 to 5:00.

1   **Q.** 8:00 in the morning to 5:00 in the evening?

2   **A.** That's correct.

3   **Q.** Now, there came a time when after your child was born --

4   what is your child's name?

5   **A.** Xie Corrina.

6   **Q.** How would you would you spell that?

7   **A.** First name X-I-E, last name C-O-R-R-I-N-A.

8   **Q.** And he was born in 1998?

9   **A.** That's correct.

10  **Q.** And there came some times -- I assume you loved him very

11  much then and love him very much now?

12  **A.** Of course.

13  **Q.** He's your treasure?

14  **A.** Yes.

15  **Q.** This treasure, probably the most valuable wonderful thing

16  in your life, right -- you entrusted this woman, your cousin,

17  Briana Waters, to stay with your treasure, the treasure of

18  your life; you trusted her, is that right?

19  **A.** That's correct.

20  **Q.** That's what you thought of your cousin; is that correct?

21  **A.** That's correct.

22  **Q.** Now, was there a time when you had a driver's license?

23  **A.** Yes.

24  **Q.** When was the last time you had a driver's license?

25  **A.** '95, I would say 1995.

1 **Q.** How come -- what happened so that you did not any longer

2 have a license?

3 **A.** It was -- the license I had was about to expire.

4 **Q.** Yes.

5 **A.** I went to the Department of Motor Vehicles in Colorado to

6 get a new ID. At the time I did not own a car or have access

7 to a car. I got up to the counter, and I had about five

8 dollars, it was enough for an ID but not enough for a license,

9 which would have been a lot more.

10 So I needed an ID, right away for something, either a job

11 interview or something; so I got the ID.

12 **Q.** And that was in 1995?

13 **A.** Correct.

14 **Q.** And the day after that, or a week after that or three

15 weeks after that, did you go down to the Colorado Department

16 of Motor Vehicles and get a driver's license?

17 **A.** No, I did not.

18 **Q.** So for now 13 years you've decided that you don't need a

19 driver's license?

20 **A.** Basically.

21 **Q.** You didn't have any problem that led to the license being

22 revoked or suspended, did you?

23 **A.** Oh, no.

24 **Q.** Now, when was it that you changed your name?

25 **A.** Just before the birth of my son; so I would say '98.

1   **Q.**  You changed your name why?

2   **A.**  My son was about to be born.  We were going to change our

3   names to a new family name.

4   **Q.**  Was it in any way related to the relationship you had with

5   other members of your family when you decided to change your

6   name?

7   **A.**  No.

8   **Q.**  Now, let's go to the day you say was in the fall of 2006,

9   when Agent Halla came and showed you some photographs.  Did he

10   come alone or was he with someone else?

11   **A.**  There was another agent with Agent Halla.

12   **Q.**  Do you remember the name?

13   **A.**  I don't know his name.

14   **Q.**  Do you remember hearing his name?

15   **A.**  He may have introduced himself, but I don't remember his

16   name.

17   **Q.**  So he showed you a picture of your cousin; is that right?

18   **A.**  That's correct.

19   **Q.**  What location was this?

20   **A.**  In front of my house.

21   **Q.**  It was you and the two agents, correct?

22   **A.**  Correct.

23   **Q.**  They identified themselves?

24   **A.**  That's correct.

25   **Q.**  Were they polite to you?

1  **A.**  I think so, yes.

2  **Q.**  How long did they spend with you?

3  **A.**  A few minutes.

4  **Q.**  How many?

5  **A.**  Ten.

6  **Q.**  Okay.  How many pictures did they show you?

7  **A.**  Five or six.

8  **Q.**  Were they all Briana?

9  **A.**  No.

10  **Q.**  Do you know who any of the other people were?

11  **A.**  No.

12  **Q.**  Now, by the way, were you expecting to see the FBI, or was

13  this a surprise?

14  **A.**  I am not sure.  I knew Briana was in trouble.  I didn't

15  know if I would see agents or not.

16  **Q.**  How did you know she was in trouble?

17  **A.**  Let's see, I had heard from my parents that she was in

18  trouble.  And I also had a phone call from Briana herself

19  saying she was in trouble.

20  **Q.**  Did she say that you should lie for her?

21      MR. FRIEDMAN:  Objection, Your Honor, the Court has

22  already addressed this issue.

23      THE COURT:  Do not go into the area that I have ruled

24  on.

25      MR. BLOOM:  I won't.

1         THE COURT:   Okay.

2    BY MR. BLOOM:

3    **Q.**  Did she say that you should lie for her?

4    **A.**  No, she did not.

5    **Q.**  Whatever it was, she said some other things, but she

6    didn't say you should lie, right?

7    **A.**  No, she did not say that.

8    **Q.**  Now, you looked at the picture, and it's clearly Briana

9    Waters, correct?

10   **A.**  Correct.

11   **Q.**  No mistake in your mind, right?

12   **A.**  No.

13   **Q.**  You stood there in the face of two FBI agents and you made

14   a decision that you were going to lie to them; is that

15   correct?

16   **A.**  I thought I could protect Briana.

17   **Q.**  Sir, please answer my question.   You made a decision --

18   let me withdraw that.

19        Protect her from what?  You hadn't seen her do anything.

20   She hadn't told you she had done anything.   You came to know

21   that she was accused of something, right?

22   **A.**  Correct.

23        MR. BLOOM:   Judge, I ask you to reconsider your

24   decision --

25        THE COURT:   Denied.

1     MR. BLOOM:   -- at this point.

2     THE COURT:   There's no sense in keep bringing this

3 up, Mr. Bloom.   Just keep going.

4 BY MR. BLOOM:

5 **Q.** My question now is, you made a decision to protect her, to

6 root for the Yankees, to root for the Red Sox, whatever your

7 reason is, you made a decision to lie to Agent Halla; is that

8 correct?

9 **A.** You make it sound like it's logical.   But when you are

10 going to protect your family, you are not logical, you just do

11 it.

12 **Q.** My question, sir, is:   You made a decision that you were

13 going to lie to this guy, these two guys, these two FBI

14 agents?   You said to yourself, here's a picture of Briana, I

15 am going to deny that I know this person; is that what you

16 said to yourself?

17 **A.** No.

18 **Q.** It just came out of your mouth, right?

19 **A.** No, I said I could make them go away.   I thought I could

20 make them go away.

21 **Q.** That's not my question.   My question is:   Whatever your

22 reason was, you made the decision I am going to tell a lie?

23 **A.** I wouldn't describe it that way, no.

24 **Q.** It was a lie, was it not?

25 **A.** Yes, it was.

1  **Q.** Did you decide you were going to do it, or did it come

2  upon you like the devil made you do it?

3           MR. FRIEDMAN:  Objection, Your Honor.

4           THE COURT:  I think it's been answered.  You are

5  being argumentative now.  She's answered.

6  BY MR. BLOOM:

7  **Q.** Now, you indicated that you did or did not expect that law

8  enforcement people might be around to speak with you?

9  **A.** I thought they might.

10 **Q.** So when you saw them there, they showed their

11 identification, right?

12 **A.** Correct.

13 **Q.** You were not completely taken by surprise?

14 **A.** No, not completely.

15 **Q.** You had been cautioned that law enforcement people might

16 be around to speak to you; is that correct?

17 **A.** Briana said that in a phone call.

18 **Q.** Then she said certain things, but among those things she

19 did not say lie to them?

20           MR. FRIEDMAN:  Objection, asked and answered.

21           THE COURT:  I think it's been asked several times,

22 Mr. Bloom.

23 BY MR. BLOOM:

24 **Q.** Now, did you, in addition to saying I don't recognize that

25 person, did they ask you some questions about whether or not

1  she had lived with you, that person in the picture had lived

2  with you?

3  **A.**  Yes, that's correct.

4  **Q.**  And your answer was what?

5  **A.**  No.

6  **Q.**  That she had not?  That this person in the picture had not

7  lived with you; is that correct?

8  **A.**  Correct.

9  **Q.**  You said more than that, didn't you?

10  **A.**  I don't know.

11        MR. BLOOM:  Pat, could you please put before the

12  witness the Exhibits A-1 through 19.

13        THE CLERK:  He's got them there.

14        MR. BLOOM:  Thank you.

15  BY MR. BLOOM:

16  **Q.**  Could you look at A-2, please?

17  **A.**  A-2, I have it.

18  **Q.**  Do you have it?

19  **A.**  Yes, I do.

20  **Q.**  Did you tell Agent Halla -- and if you look at the bottom

21  it appears it's also Agent Anthony Torres, T-O-R-R-E-S, did

22  you tell them that you and your wife have had a variety of

23  people stay with them over the years?

24  **A.**  That was a miscommunication.  I was trying to explain it

25  was a rental property; and that over the years, many people

1  had stayed there.

2  **Q.** Excuse me, my question is:  Did you say that to them?

3  **A.** No.

4  **Q.** Uh-huh, so Agent Halla got it wrong in this report?

5  **A.** No, it was simple, one or two words is a miscommunication.

6  I was trying to explain it was a rental property, and that

7  many people had lived there.

8  **Q.** Mr. Friedman explained to you -- I am sorry, he asked you

9  this afternoon:  Did anyone else ever live with you?  And I

10  think you said no; is that correct?

11  **A.** That's correct.

12  **Q.** So, is it your testimony that you did not say to Agent

13  Halla and Agent Torres that you -- take a look at it, follow

14  it with me -- that they have had a variety of people stay with

15  them with them over the years; did you say that to Agent

16  Halla?

17  **A.** As I said, it was a miscommunication.

18  **Q.** What you really said was, this is a rental property, there

19  have been a lot of people before me, that's probably the

20  problem here; right?

21  **A.** That's correct.

22  **Q.** You were really trying to say -- this is before you moved

23  in there, right, that's what you are telling us, telling this

24  jury, this is about before you moved in, that was your intent;

25  right?

1  **A.**  I was implying that, yes.

2  **Q.**  But somehow, Agent Halla apparently heard that you were

3  saying to them that you and Kara had a variety of people who

4  stayed with them, with you, over the years, somehow that Halla

5  got it wrong?

6  **A.**  Simple miscommunication.

7  **Q.**  Halla got it wrong, is that what you are saying?

8  **A.**  You are putting words in my mouth.

9  **Q.**  You said -- this was about, what you told him was about

10  before you moved in, and he reports that you have had a

11  variety of people living with you while you were there?

12  **A.**  There was rush hour traffic going by, a few feet away.

13  **Q.**  So what time of day was it?

14  **A.**  Afternoon.

15  **Q.**  What time in the afternoon?

16  **A.**  Between 3:00 and 5:00.

17  **Q.**  What day of the week was it?

18  **A.**  Tuesday.

19  **Q.**  That's the day you worked till 5:00?

20  **A.**  This is 2006.

21  **Q.**  Well, were you working then?

22  **A.**  No.

23  **Q.**  I am sorry, my mistake.  So he came to your house.  Were

24  you actually in the house?

25  **A.**  I was in the house when they knocked on the door.

1    **Q.** Was anyone else home when they knocked on the door?

2    **A.** My son was home.

3    **Q.** How old was he at the time, about seven or eight?

4    **A.** Correct.

5    **Q.** Was Kara there?

6    **A.** No.

7    **Q.** Was she working?

8    **A.** Correct.

9    **Q.** Where does she work?

10   **A.** For the state, for the Washington State.

11   **Q.** Was it that office that Mr. Friedman yelled at her?

12   **A.** She works at the Office of Superintendent of Public

13   Instruction, and that's where the meeting took place.

14   **Q.** The meeting where Mr. Friedman yelled at her, that

15   meeting?

16   **A.** Yes, that meeting.

17   **Q.** Did you also go on to say -- back to the first day you

18   were with Agent Halla -- did you also go on to say that the

19   duplex next door has had a lot of college students living

20   there over the years, and that the current renters moved in a

21   week ago; did you tell them that, too?

22   **A.** I might have said that, I don't remember.

23   **Q.** In other words, you didn't just tell them the lie that I

24   don't recognize that picture, you made up a whole fabric of

25   lies to support your first lie?

1    MR. FRIEDMAN:  Objection, Your Honor, he's arguing
2  with the witness.
3    THE COURT:  If you can answer the question, but at
4  some point you are going to have to accept the answer and
5  maybe argue about where it lies in the whole thing.
6    MR. BLOOM:  This is the first time I have asked that
7  question.
8    THE COURT:  Let's do this.  Before you ask the next
9  question, let's take the afternoon recess.  Don't discuss the
10  case.  Leave your books on the chair.  I will have you back in
11  here about 15 minutes.
12    (Jury not present.)
13    THE COURT:  Okay, we will take the afternoon recess.
14  Would you keep in mind this is cross-examination, so give the
15  defendant a chance -- let's get a question and answer, but at
16  some point in time the answer has got to stand.  I want you to
17  have all you need to cross-examine this witness, because it's
18  important.
19    We will be in recess.
20    THE CLERK:  All rise.  Court is in recess.
21    MR. BARTLETT:  Thank you, Your Honor.
22    (Afternoon recess.)
23    THE COURT:  You may be seated.
24    All right.  Ready?
25    MR. BLOOM:  Yes.

 1          THE COURT:  Bring in the jury.

 2      Was A-2 offered?  It wasn't offered, was it?

 3          MR. BLOOM:  It was not offered.

 4      (Jury present.)

 5          THE COURT:  All right.  You may be seated.

 6          MR. BLOOM:  You just asked if A-2 was offered, and it

 7   was not, but I do offer it now in evidence.

 8          MR. FRIEDMAN:  Objection, Your Honor.  It's a prior

 9   report.  It is not his statement, and it isn't admissible for

10   any reason.

11          THE COURT:  I will take up the admissibility, but he

12   can question about it.

13   BY MR. BLOOM:

14   **Q.**  Now, this phone call that you referred to from Briana

15   Waters, when did that phone call happen?

16   **A.**  Early 2006.

17   **Q.**  Okay.  And in that phone call, did Briana Waters ask you

18   to protect her?

19   **A.**  No.

20          MR. FRIEDMAN:  Objection, Your Honor.  This has all

21   been asked and answered.

22          THE COURT:  He's answered that several times.

23          MR. BLOOM:  I don't think he answered that question,

24   sir.

25          THE COURT:  Answer that question.

1  **A.**  No.

2  BY MR. BLOOM:

3  **Q.**  Did she say anything about there would be a need to

4  protect her?

5          MR. FRIEDMAN:  Objection, Your Honor.

6          THE COURT:  Same question.  Let's see if we can get

7  through this and make objections where they really serve a

8  real purpose, I guess.

9          MR. BLOOM:  I'm sorry?

10          THE COURT:  Go ahead, ask the question.

11  BY MR. BLOOM:

12  **Q.**  Now, the first time Agent Halla came to you in the fall of

13  '06 with the pictures, in fact, that wasn't the fall at all;

14  it was May 16, was it not?

15  **A.**  Correct.

16  **Q.**  And you are looking at that Exhibit A-2 to refresh your

17  recollection; is that correct?

18  **A.**  Correct.

19  **Q.**  So your memory from about two years ago is not so clear;

20  you actually had it in the fall, and it was in the spring,

21  four or five, six months previous.  Is that correct?

22  **A.**  I was just remembering about the quality of the light.

23  That afternoon reminded me of the fall.  I am not real big on

24  the calendars.

25  **Q.**  You keep a calendar, right?

1   **A.**  That's correct.

2   **Q.**  But your memory was, remembering something two years ago

3   was the fall, correct, and it turns out to be incorrect?

4   **A.**  I was just remembering, the quality of the light reminded

5   me of the fall, so I said the fall.

6   **Q.**  That's actually how you identify the day that Agent Halla

7   came to see you is the quality of the light, is that what you

8   are testifying?

9   **A.**  That's what I said.

10  **Q.**  Is that what you are saying, that's how you remember when

11  it was, based on the quality of the light?

12  **A.**  You asked me about the fall and I answered you.

13  **Q.**  Now, as we've discussed, you didn't just make a false

14  statement about identifying the picture, you made up other

15  details to support the lie that you had told about the

16  photograph; is that correct?

17  **A.**  No, that's not true.  There was additional --

18  **Q.**  There was a miscommunication because there was traffic

19  going by and Agent Halla and Agent Torres must have misheard

20  you; is that correct?

21  **A.**  No, there was additional questions about the property and

22  the nature of the property which I answered.

23  **Q.**  And you didn't say to them that you and Kara have had a

24  variety of people staying with you over the years?  You didn't

25  say that to him?

1    **A.**   No.

2          MR. BLOOM:   I now offer Exhibit A-2.

3          THE COURT:   I thought I said I would take that up.

4          MR. BLOOM:   Okay.

5    BY MR. BLOOM:

6    **Q.**   Now, is it your -- you've heard the name Martha Stewart,

7    the homemaker and personality on television?

8    **A.**   Yes, I think I have.

9    **Q.**   Are you aware that she did time in prison for the crime of

10   making a false statement to a federal law enforcement agent?

11   **A.**   I did not know the reason that she was incarcerated.

12   **Q.**   There was a rap singer named Lil' Kim.  She also did time

13   in prison, are you aware, for making a false statement?

14   **A.**   I am not familiar with that story.

15   **Q.**   About Scooter Libby, you know who he is, right?

16   **A.**   Yes, I think so.

17   **Q.**   Do you remember reading that he was accused of making a

18   false statement to a federal official?

19   **A.**   Something -- he had something to do with the Valerie Plame

20   case.

21   **Q.**   That's right.  So you knew, of course, as of the date,

22   whatever that date was, that you had lied to Agent Halla; is

23   that correct, you knew that?

24   **A.**   Yes.

25   **Q.**   Is it your testimony that nobody, no friends, no lawyers,

1  no Mr. Friedmans, no Mr. Halla, your lawyer, nobody told you

2  that that is an independent federal felony, is that your

3  testimony?

4  **A.**  I am confused about the question.

5  **Q.**  The question is, as you sit there today --

6  **A.**  Uh-huh, do I know this --

7  **Q.**  -- do you believe that making a false statement to a

8  federal investigator, such as Mr. Halla, is a separate federal

9  felony, separate, perjury?

10  **A.**  Yes, I understand that.

11  **Q.**  When did you first come to understand that?

12  **A.**  I am not certain.

13  **Q.**  Was it soon after your wife told you that Mr. Friedman and

14  Mr. Halla had been to her place of work and told her that

15  there might be a prosecution, was it sometime after that?

16  **A.**  I don't know.

17  **Q.**  Well, if you would think back -- let me withdraw that.

18      You have testified here in some detail about events that

19  happened seven years ago.  I am asking you to think back, and

20  try to put together for the jury when it was that you came to

21  learn that lying to a federal officer is a federal felony.

22  Think back, when did that happen?

23  **A.**  Let's see, I am not sure.  I might have known at the time.

24  **Q.**  At the time of what?

25  **A.**  When Agent Halla came to the door.

1  **Q.** Had somebody informed you that it is a federal crime?

2  **A.** I don't know how I knew.

3  **Q.** Did Eric Waters, Briana's brother, tell you that it's a

4  separate crime?

5  **A.** I was not in communication with him.

6  **Q.** Did you get an e-mail from him?

7  **A.** I don't know.

8  **Q.** Did you get an e-mail from him that Briana's lawyer thinks

9  you should know that it's a separate crime?

10       MR. FRIEDMAN:  Objection, Your Honor, asked and

11  answered.

12       THE COURT:  You may answer.

13      But at some point you are going to have to accept his

14  answer, I don't know.

15  **A.** I don't know.

16  BY MR. BLOOM:

17  **Q.** So you say he was not in touch with you by e-mail, is that

18  your testimony?

19  **A.** I don't know.  He may have sent me something, I don't

20  know.

21  **Q.** So you don't remember that?

22  **A.** No, I don't.

23  **Q.** And that would have been in the year 2006, you have no

24  memory of that; is that correct?

25  **A.** I might have deleted it without reading it.

1  **Q.** Why would you have done that?

2  **A.** I might have deleted it along with other e-mails.  I might

3  have deleted it because I didn't want to speak with him.

4  **Q.** Reading his e-mail wouldn't mean speaking with him.

5  **A.** I might not have wanted to read his e-mail.

6  **Q.** Did there come a time, as a result of the FBI trying to

7  find you, that there was some trouble with your landlord?

8  **A.** Um, what do you mean?

9  **Q.** Did your landlord express some dismay that the FBI had

10  been in touch with him or them and wanted to find you?

11  **A.** No, he did not.

12  **Q.** Was there any trouble with the landlord as a result of

13  these events?

14  **A.** What do you mean?

15  **Q.** Whatever you mean.  Is there any problem, did you have any

16  problem with the landlord, did he say anything to you, try to

17  evict you, did he say I don't like you because the FBI is

18  snooping around?

19  **A.** No, nothing like that.

20  **Q.** Did something happen?  Maybe I am missing the right

21  question here, because you are asking me --

22  **A.** In the same time period, I got a letter saying that they

23  were going to renovate the house and do a lot of work on it,

24  and therefore, the residents had to move.  They gave us

25  notice.

**Q.** So you didn't associate that with this event; is that correct?

**A.** It was in the same time period.

**Q.** In your mind, did one have anything to do with the other, at that time?

**A.** No.

**Q.** Now, after Agent Halla left that day in May, is it correct that about four-and-a-half months later, you and Kara both went to speak with law enforcement people involved in this case? If you could look at Exhibit A-3, if you need to refresh your recollection.

**A.** A-3?

**Q.** Yes, A-3.

**A.** October 6, 2006.

**Q.** Well, that's actually the day of the transcription. The actual interview appears to be October 3.

**A.** October 3, 2006.

**Q.** Now, on that day, did you tell them the truth?

**A.** Yes.

**Q.** Did you tell them that you are in fact Briana Waters' cousin?

**A.** That's correct.

**Q.** That was true. Did you tell them your mother and Briana's mother are sisters?

**A.** Correct.

1 **Q.** Did you tell them that Briana moved out to the Olympic

2 area first around June of 1998?

3 **A.** Yes, she moved to the Olympia area first.

4 **Q.** Is that what you told them on October 3 of '06? Is that

5 what you told them?

6 **A.** Correct.

7 **Q.** That was true, correct? Correct?

8 Mr. Corrina, are you with me?

9 **A.** Yes. She -- I thought she was a little earlier than that,

10 but I believe that's correct.

11 **Q.** You were telling him the truth that day; is that correct?

12 **A.** Yes.

13 **Q.** Let's continue. Did you tell them that you and Kara moved

14 to Olympia approximately a year later?

15 **A.** Correct.

16 **Q.** Did you tell them that Briana stayed with you and Kara off

17 and on?

18 **A.** Correct.

19 **Q.** That was true, right?

20 **A.** Correct.

21 **Q.** And the Agent asked you if Briana stayed with you in July

22 of 2000 and then again in the fall of 2001, and you said that

23 those periods sounded correct?

24 **A.** That's right.

25 **Q.** And that was true?

1  **A.**  Correct.

2  **Q.**  Did you tell them that Waters stayed with you prior to her

3  moving to California?

4  **A.**  Yes.

5  **Q.**  And that was true?

6  **A.**  Correct.

7  **Q.**  Did you tell them that Briana stayed in your basement at

8  2411 Capitol Way in Olympia?

9  **A.**  Yes, that's correct.

10  **Q.**  And that was true, right?

11  **A.**  That's correct.

12  **Q.**  And did you tell them that Justin Solondz was Briana's

13  boyfriend and sometimes stayed with Waters at the house?

14  **A.**  Justin did not live at the house.

15  **Q.**  No, sometimes stayed with Waters at the house.  Is that

16  what you told them?

17  **A.**  Does it say that?

18  **Q.**  Yes.  If you look in the third paragraph.

19  **A.**  Last page?

20  **Q.**  First page.

21  **A.**  Yes.

22  **Q.**  That was true?

23  **A.**  Correct.

24  **Q.**  Moving to the fifth paragraph, were you and Kara asked if

25  Briana had a cell phone when she was living in Olympia, and

1    you told the authorities that she did not?

2    **A.**  Correct.

3    **Q.**  And that was true, right?

4    **A.**  That's correct.

5    **Q.**  Were you shown photographs of William Rodgers, Joseph

6    Dibee and Nathan Block and did you indicate you also

7    recognized Avalon from around town but had never met him?

8    **A.**  That's correct.

9    **Q.**  Was that true?

10   **A.**  That's correct.

11   **Q.**  What I would like you to do, if you would, is go through

12   from there on down, the last paragraph on the first page, read

13   to yourself -- no, let me do it this way.  If you move to the

14   second page, did you tell the agents that Briana worked at a

15   frame shop and worked as a nanny?

16   **A.**  Correct.

17   **Q.**  And that was the truth; is that correct?

18   **A.**  Correct.

19   **Q.**  Did you tell them that you couldn't recall the names of

20   the individuals for whom Briana worked as a nanny?

21   **A.**  That's correct.

22   **Q.**  And that was the truth, correct?

23   **A.**  Yes.

24   **Q.**  Did you tell the authorities that you didn't know an older

25   woman friend who Briana may have referred to as an aunt?

1   **A.**  Correct.

2   **Q.**  And did you suggest to the agents that it may have been

3   one of the women who employed Briana as a nanny?

4   **A.**  That's correct.

5   **Q.**  And that was all true so far, right?

6   **A.**  I was answering as honestly as possible, based on my

7   memory.

8   **Q.**  So far we haven't come across anything you told them that

9   isn't true; is that correct?

10  **A.**  That's correct.

11  **Q.**  Did you tell the authorities that Briana held strong

12  opinions concerning environmental issues?

13  **A.**  Yes.

14  **Q.**  And did you tell them, the authorities, that you did not

15  feel she would be easily swayed by other people?

16  **A.**  Yes.

17  **Q.**  Did you tell them that you believed Briana had poor

18  character judgment, citing the relationship with Solondz as an

19  example?

20  **A.**  Yes, I did.

21  **Q.**  Did you tell the agents that you recalled a time when you

22  were helping Briana move some of her clothes out of the

23  basement?

24  **A.**  Yes.

25  **Q.**  Was that true?

1  **A.**  Yes.

2  **Q.**  Moving to the next page for your reference.  Did you tell

3  the agents that you remembered Briana talking about a person

4  named Ocean?

5  **A.**  Yes.

6  **Q.**  And did you tell them that you recall that Briana had

7  stayed at his house?

8  **A.**  Yes.

9  **Q.**  And did they show you a picture of the house and you told

10  them that you didn't recognize the house?

11  **A.**  Correct.

12  **Q.**  That was all true, right?

13  **A.**  Yes, it was.

14  **Q.**  So basically on that day, you were doing your best to tell

15  the truth about everything they asked; is that correct?

16  **A.**  That's correct.

17  **Q.**  Let's go back to the first page.  Look in the middle

18  paragraph.  Did you tell the agents that Briana never asked

19  you or Kara to rent a car for her?  Did you tell them that?

20  **A.**  Yes.  It's right here.

21  **Q.**  Did you tell them that?

22  **A.**  Yes, I did.

23  **Q.**  Was that true?

24  **A.**  I was telling them the truth based on what I remembered,

25  and I did not remember the car at that time.

1  Q. Was that true, as best you could tell it?

2  A. Okay, so you are asking me, on the day of this meeting,

3  was I telling the truth as best I could?

4  Q. That's correct.

5  A. Yes.

6  Q. Did you also tell them that you did not recall Waters ever

7  renting a car on that day, October 3 of 2006?

8  A. Yes, that's correct.

9  Q. Did you tell them that?

10  A. Yes, I did.

11  Q. So, is it correct to say that everything you told them

12  that day we have seen was the truth, correct?  Everything.

13  A. I had not yet seen the document, done any research or

14  tried to remember or figure out what they were talking about.

15  Q. Now, please answer my question.  Is it true that

16  everything you told them on that day was the truth?

17  A. I was trying to tell the truth, but it turned out I made

18  some mistakes.

19  Q. In fact, it is true that Briana Waters never asked you or

20  Kara Larson to rent a car for her; that is the truth, isn't

21  it?

22  A. No.

23  Q. It's also true that you did not recall Briana Waters ever

24  renting a car; that was also true, wasn't it?

25  A. I don't understand what you are asking.  I said yes, I was

1 trying to tell the truth, and yes, this is before I remembered
2 everything.
3 Q. So you were being questioned in October of '06 about
4 events in May of '01?
5 A. Correct.
6 Q. And without seeing documents, you had no memory at that
7 day, at that time and that interview, you had no memory of any
8 car rental involving Briana Waters, is that correct?
9 A. My memory was triggered by the documents later on.
10 Q. I am sorry, could you say that again?
11 A. My memory was triggered by the documents later on, which I
12 had not seen at this meeting.
13 Q. My question is, you had no memory at that time, because
14 you hadn't seen the documents, you had no memory of having
15 been involved in some kind of car rental event that involved
16 Briana Waters in May of '01, you had no memory of it as you
17 spoke to them at that time; is that correct?
18 A. That's correct.
19 Q. You had already spoken to them once and been shown
20 photographs of Briana; is that correct?
21 A. When they came to my house the first time?
22 Q. Yes, sir.
23 A. Yes, that's correct.
24 Q. When all that traffic was going by and people couldn't
25 hear each other?

1  **A.** That's correct.

2  **Q.** Now, you testified here in some detail about supposed to

3  be Thursday, supposed to be Friday, it turned out to be

4  Saturday, going to the hospital, abdominal pains, all kinds of

5  details, all of which were triggered by seeing a document or

6  two; is that correct?

7  **A.** I was also actively trying to remember. I also looked at

8  my calendar and my notes from that time period, and then I got

9  a picture of that time period and then the pieces came

10 together.

11 **Q.** Your calendar is in evidence now. Could you take a look

12 at your calendar and tell us what it was you referred to?

13 What is it that triggered your memory? What in the calendar

14 triggered your memory?

15 **A.** Let's see, when I looked at this the first time --

16      THE COURT: What exhibit are we talking about here,

17 is there a number on it?

18      MR. BLOOM: I will give it to you in a second.

19      MR. FRIEDMAN: It's 777.

20      THE COURT: Do you want to put it up again? It is

21 admitted.

22      MR. BLOOM: Sure, I will do that, if they can do it

23 easily.

24      Thank you Agent Halla.

25 **A.** Anyway, when I looked at the calendar, actually the notes

1 about bicycle and bicycle repair were the first ones to clue
2 me into that time period.
3 **Q.** So it was about, this car rental was about your bikes
4 being in the shop?
5 **A.** No.  That's just what clued me into the time period.
6 **Q.** In fact, were your bikes in the shop on the weekend of the
7 18th, 19th, 20th, and 21st of May?
8 **A.** No.
9 **Q.** They were not?
10 **A.** No.  It's listed here on the 30th.
11 **Q.** I am sorry, sir?
12 **A.** There's a note here on the 30th.
13 **Q.** When did your bikes go in the shop?
14 **A.** According to this --
15 **Q.** No, according to your memory, and use this if you need to,
16 but when did your bikes go in the shop?
17 **A.** Let' see, I see a note on the 30th of May.
18 **Q.** "Take bike in before noon," correct?
19 **A.** Correct.
20 **Q.** So this had nothing to do -- is it your testimony that
21 this car rental had nothing to do with your bikes being in the
22 shop?
23 **A.** That's correct.
24 **Q.** What's your mother's name?
25 **A.** Excuse me?

**Q.** Your mother's name?

**A.** It's a long name, Lenore Maire Legaux McCuen Collins..

**Q.** Did you tell your mother that the reason for this car rental was that your bikes were in the shop?

**A.** No.

**Q.** You never did say that to your mother?

**A.** Correct.

**Q.** Can you think of any reason that she would tell Briana's mother that that's what you said?

**A.** I have no idea.

**Q.** I will get back to the bikes later.

Now, after October 3, when you had this interview where you told the truth to the best of your knowledge, where apparently you said that Briana never asked you to rent a car for her, and that you didn't recall Waters ever renting a car, were you subpoenaed to go to a Grand Jury a couple weeks later?

**A.** That's correct.

**Q.** Did you have a lawyer?

**A.** No, I did not.

**Q.** Did anyone suggest to you it might be a good time to get a lawyer?

**A.** Yes.

**Q.** Who suggested that?

**A.** My father.

1  **Q.** Did you get a lawyer?

2  **A.** No, I did not.

3  **Q.** Did anyone else suggest to you it would be a good time to

4  get a lawyer?

5  **A.** Not that I recall.

6  **Q.** Now, in the Grand Jury, both of you testified and Kara

7  testified, is that the case?

8  **A.** That's correct.

9  **Q.** Would it have been a couple weeks after this interview,

10 October 25th, does that ring a bell?  If you need to, please

11 refer to Exhibit A-4, the next exhibit.

12     There will be a date on the front.

13 **A.** Exhibit A-4.

14 **Q.** Yes, sir.  Is that Grand Jury testimony?

15 **A.** Yes, it is, for October 25, 2006.

16 **Q.** Right.  Was it Mr. Friedman who was the person asking you

17 questions?

18 **A.** That's correct.

19 **Q.** And did you swear to tell the truth under oath as you have

20 done in this courtroom?

21 **A.** That's correct.

22 **Q.** Were you doing the best you can to tell the truth?

23 **A.** Yes, I was.

24 **Q.** Was it explained to you by Mr. Friedman or by Agent Halla

25 or by anyone else in law enforcement why you were called upon

1 to testify in the Grand Jury?

2 **A.** Um, I was basically asked the same questions that you see

3 on here when I arrived.

4 **Q.** Please try to answer my question.  Was it explained to you

5 by anyone from law enforcement why it was you were being

6 summoned to testify before the Grand Jury?

7 **A.** Right before I entered the Grand Jury room to give

8 testimony, it was explained that this was in regards to Briana

9 and what she was accused of.

10 **Q.** Have you ever heard the phrase "perjury trap"?

11 **A.** No, I have not.

12 **Q.** How long have you been represented by Mr. -- pronounce it,

13 please -- Zulauf?

14 **A.** Zulauf, yes.  Since January 2007, perhaps a little

15 earlier.

16 **Q.** More than a year now; is that correct?

17 **A.** That's correct.

18 **Q.** Have you had discussions with him about the phrase

19 "perjury trap"?

20 **A.** No, I have not.

21 **Q.** Have you had discussions with him about perjury?

22 **A.** He has told me to tell the truth.

23 **Q.** Have you had discussions with him about perjury?

24 **A.** No, I have not.

25 **Q.** Have you had discussions with him about obstruction of

1 justice?

2 **A.** No, I have not.

3 **Q.** Have you had discussions with him about lying to a federal

4 official?

5 **A.** No, I have not.

6 **Q.** Now, you understood you were under oath in this Grand

7 Jury; is that correct?

8 **A.** That's correct.

9 **Q.** And Mr. Friedman introduced the circumstance, told you

10 about why you were there, and gave you the lay of the land

11 about what happens in a grand jury more or less; is that

12 correct?

13 **A.** Yes, it is.

14 **Q.** And then he asked you about yourself -- start with page 5:

15 "Where did you grow up?"

16 "I grew up in Philadelphia."

17 Then he went on to ask further questions, and do you

18 remember being asked -- if you would look at page 9. In front

19 of the Grand Jury, under oath, do you remember being asked in

20 front of the Grand Jury:

21 "Question: Did Briana ever ask you to rent a car for

22 her?"

23 Do you remember giving the answer:

24 "Answer: I don't remember."

25 **A.** Yes, I do.

1  Q.  Did you then, were you then asked by Mr. Friedman:

2          "Question:  Did you ever, in fact, rent a car for

3  Briana?"

4      Do you remember being asked that question?

5  A.  Yes, I do.

6  Q.  What was your answer?

7  A.  "No."

8  Q.  Then Mr. Friedman asked you:

9          "Question:  And how do you know that?"

10 A.  Yes, he did.

11 Q.  Did you give an answer?

12 A.  Yes, I did.

13 Q.  What was your answer?

14 A.  It says here, on page 9, "Just because" --

15 Q.  Say it a little slower and louder so the jury can hear it.

16 A.   "Just because that would have required -- we wouldn't --

17 I would not have -- we -- we didn't have much money.  I was

18 starting a new job.  We wouldn't have given away our credit

19 card or risked the liability of renting someone a car on the

20 credit card."

21 Q.  So not only did you say that you didn't rent a car for

22 Briana Waters, but you actually gave an explanation as to why

23 not; is that correct?

24 A.  I speculated about why that might have been.

25 Q.  And you were under oath at that time just as you are now,

1  correct?

2  **A.** Correct.

3  **Q.** Do you remember, if you turn to page 13, do you remember,

4  after Mr. Friedman had asked you questions, a Grand Juror

5  person, who's a member of the Grand Jury, asked you a

6  question? If you look at line 19, a Grand Juror asked you:

7      "Question: Did you ever suspect during this time

8  that Briana stayed with you -- while Briana or Justin that

9  was -- Something that was going on that perhaps wasn't on the

10 up-and-up?"

11     Did you answer: "No, I -- I did not suspect any illegal

12 activity. She was involved with a lot of activism. She

13 mentioned -- she would often mention activist activities at

14 Hood Mountain, protests, things like that, and I viewed them,

15 although some of these weren't appreciated, I believe they

16 were legal."

17     Do you remember giving those answers to those questions?

18 **A.** Yes, I do.

19 **Q.** Is that the truth?

20 **A.** Yes. She asked me, and I answered truthfully.

21 **Q.** If that was your belief in October in front of the Grand

22 Jury, October of '06, what was it that you thought you were

23 protecting her from?

24 **A.** I didn't know. I just knew she was in trouble.

25 **Q.** Because it had been communicated by her that she was in

1    some kind of trouble; is that correct?

2  **A.**    That's correct.

3  **Q.**    And in that same communication, she did not ask you to lie

4    for her; is that correct?

5  **A.**    That's correct.

6  **Q.**    And she did not ask you to protect her; is that correct?

7  **A.**    That's correct.

8  **Q.**    Now, on that day in the Grand Jury, did you pick out

9    Briana Waters' photo?  Look at page 15 if you need to refresh

10    your recollection.

11  **A.**    Yes, they -- you are asking me if they showed the photo at

12    the Grand Jury?

13  **Q.**    Yes.   Look at line 19.   Did you pick out a picture that's

14    identified as RC-4 and say, "That's my cousin Briana"?

15  **A.**    That's correct.

16  **Q.**    So on that day you told the truth, correct?

17  **A.**    At the Grand Jury?

18  **Q.**    Uh-huh.

19  **A.**    On October 25, 2006?

20  **Q.**    That's correct.

21  **A.**    Yes, that's correct.

22  **Q.**    Now, did Kara also testify on that day in the Grand Jury?

23  **A.**    Yes.

24  **Q.**    You were not in the room; is that correct?

25  **A.**    No, I was not in the room.

1 **Q.** They have people separate when they testify; is that

2 correct?

3 **A.** That's my understanding.

4 **Q.** After she testified and you testified, who went first, you

5 or Kara?

6 **A.** I went first.

7 **Q.** And after she testified, you did not have a lawyer; is

8 that correct?

9 **A.** That's correct.

10 **Q.** And Mr. Friedman asked you if you were comfortable

11 proceeding without a lawyer; is that correct?  At the

12 beginning of the Grand Jury session.

13 **A.** I don't remember.   Probably.

14 **Q.** And you said you were?

15 **A.** Yes.

16 **Q.** Now, you knew at that point that you had committed

17 yourself to the position that Briana Waters had not asked you

18 to rent a car and in fact had not rented a car in your memory;

19 is that correct?

20 **A.** I don't understand.

21 **Q.** You knew you were under oath as of that date saying Briana

22 Waters did not rent a car, that you did not rent a car for

23 Briana Waters?

24 **A.** That was my answer at the Grand Jury, correct.

25 **Q.** And you know the meaning, you do know, even without

1  speaking to a lawyer, if you testify under oath that there is

2  a perjury risk if you change that position; is that correct?

3  **A.**  Are you asking me if I know what perjury is?

4  **Q.**  No.  I am asking you, even without consulting a lawyer,

5  it's common knowledge, if you lie in the Grand Jury or under

6  oath in any legal proceeding that you could possibly be

7  prosecuted for perjury; is that correct?

8  **A.**  I think that's common knowledge, yes.

9  **Q.**  Right.  Now, that was October of '06.  I want to move up a

10 couple months to January 19 of '07.  Now, we've already talked

11 about that day.  That was the date Mr. Friedman and Agent

12 Halla went to Kara's place of employment, an office at the

13 State of Washington; is that correct?

14 **A.**  That's my understanding.

15 **Q.**  Do you know what time of day that was?

16 **A.**  I was not there.

17 **Q.**  Well, whatever time of day it was, there came a time after

18 that, that evening or that afternoon, that you learned from

19 Kara that they had been there; is that correct?

20 **A.**  That's correct.

21 **Q.**  Did she call you from her place of work after they left?

22 **A.**  Yes, she did.

23 **Q.**  That would be something really important for her to tell

24 you; is that correct?

25 **A.**  I don't understand.

1 **Q.** It would be an important thing for her to tell you right

2 away, that the FBI and a prosecutor had been to see her?

3 **A.** Yes.

4 **Q.** And did she tell you that the prosecutor Mr. Friedman had

5 yelled at her?

6 **A.** Yes.

7 **Q.** Did she tell you this on the telephone on that very day?

8 **A.** Yes, she called me on the telephone.

9 **Q.** Now, if you need to refresh your recollection for these

10 next questions, could you look at Exhibit A-6. It is the

11 interview with Kara Larson in which you were not present, so I

12 am not going to ask you what you remember from that interview

13 because you were not there. I am going to be asking you

14 questions about what Kara told you had happened at that

15 meeting.

16 Are you at that document?

17 **A.** A-6?

18 **Q.** Yes.

19 **A.** Friday.

20 **Q.** Friday January 19, 2007, right?

21 **A.** Yes, I have the document.

22 **Q.** Did Kara tell you they had shown her a photograph of the

23 car on that day?

24 Let me withdraw that.

25 How long was your telephone conversation with Kara on that

1  day?

2  **A.**  That's hard to say.  I can't be sure.

3  **Q.**  Well, did she tell you some highlights, and then you

4  decided you would talk in detail about it at home that

5  evening?

6  **A.**  I can't remember.

7  **Q.**  Do you remember talking about that meeting, that interview

8  at home that evening, whatever evening it was -- I am not

9  asking you to remember the date -- but whatever day it

10  was that Mr. Friedman and Agent Halla went to see her, did you

11  have a long conversation with her at home that night about the

12  events?

13  **A.**  I spoke with her that same day, probably both on the phone

14  and at home, yes.

15  **Q.**  That would make sense, right?

16  **A.**  I think no.

17  **Q.**  This is an important event?

18  **A.**  I think so.

19  **Q.**  And did she tell you that they had confronted her with a

20  printout of a Budget Car rental?

21  **A.**  That she had seen documents and a photograph, yes.

22  **Q.**  And they had shown, the agent and the prosecutor had shown

23  it to her; is that correct?

24  **A.**  Yes, that's correct.

25  **Q.**  Did she tell you that Agent Halla -- try to follow my

1  question; it's an important question -- did she tell you that

2  at that meeting, Agent Halla had said to her that he believes

3  that the vehicle shown in the picture was used in the arson at

4  the University of Washington?  Did she report that to you,

5  that Agent Halla had said that to her?

6  **A.**  She did not report that to me.

7  **Q.**  Did she talk to you about, at all, about whether or not

8  there was something that had come up during that meeting that

9  it may be or they believed or they want to believe that this

10  car was used in connection with the arson at the University of

11  Washington?  Did that subject matter come up at all when you

12  spoke to Kara Larson?

13  **A.**  Well, we knew they had asked us questions about the car in

14  interviews and at the Grand Jury.  So, when the documents and

15  photograph came to light, we were wondering if we were --

16  yeah, we put two and two together, and we said that must be

17  the car they have been asking about.

18  **Q.**  Well, did you get a little help?  Did she tell you she'd

19  gotten a little help in putting two and two together, that

20  Agent Halla had said to her on that day that we believe, or I

21  believe that this car was used in the UW arson?  Did she tell

22  you that Agent Halla gave her a little bit of a gigantic hint

23  about what they were doing and saying?  Did she tell you that?

24  **A.**  No.

25  **Q.**  Take a look at that first page of the interview with your

1   wife.  Would you look at the middle paragraph that begins with

2   the words "The writer."

3   **A.**  I see the paragraph.

4   **Q.**  Okay.  Could you look at the middle sentence there, it

5   also begins with the words "The writer also advised"?

6   **A.**  I see that.

7   **Q.**  Does that in any way either refresh your recollection or

8   cause you to reconsider your testimony with regard to the

9   issue of whether or not Agent Halla advised your wife that he

10  believes that this particular vehicle was the rental vehicle

11  used by the subjects of the 2001 University of Washington

12  arson?  Does reading that in any way refresh your recollection

13  or cause you to reconsider your answer --

14  **A.**  No.

15  **Q.**  -- as to whether or not Kara told you that he had said

16  that?

17  **A.**  No.

18  **Q.**  You know from television or from common knowledge, you

19  know the concept of leading a witness; is that correct?

20  **A.**  I think so.

21  **Q.**  It's kind of what I am doing a little bit, right?

22  **A.**  Correct.

23  **Q.**  The idea of giving a person information, potential witness

24  information about what the questioner believes, do you

25  understand that to be leading?

1  **A.**  I don't understand what you said.

2  **Q.**  Has Kara told you about what happened at this meeting?

3  **A.**  Uh-huh.

4  **Q.**  Did she tell you that "They made it clear to me that they

5  want us to say that the car that we rented was used in the

6  arson"?  Did she say things like that to you?

7  **A.**  No.

8  **Q.**  She did report the important aspects of the interview with

9  her, right?

10 **A.**  She told me she had seen documents and photographs, and

11 how could that be, because we had not yet remembered.

12 **Q.**  In fact, did she tell you at some point that afternoon on

13 the phone or that evening in person that Mr. Friedman had

14 advised her that due to the new information regarding the

15 rental of this particular car, the Grand Jury may ask that

16 perjury charges be brought against her and you?

17     If you look at the paragraph just below the one we looked

18 at before, the paragraph that begins with A.U.S.A Friedman,

19 Assistant United States Attorney Friedman.  Could you read

20 that paragraph to yourself?

21 **A.**  Yes.

22 **Q.**  Did Kara tell you that upon hearing that she asked

23 Mr. Friedman if she was being threatened with going to jail?

24 **A.**  I see that, yes.

25 **Q.**  Did she tell you that Mr. Friedman advised her that she

 1   was not being threatened, but that the Grand Jury may

 2   interpret her and your statements as perjury, and that they,

 3   the Grand Jury, may ask for charges to be brought against the

 4   two of you?  Did she tell you that?

 5   **A.**   No, that's not what we talked about.

 6   **Q.**   You didn't talk about that.  You talked about what a nice

 7   day it had been and the color of the sky and stuff like that?

 8   **A.**   That's not correct.

 9   **Q.**   Did you talk about the possibility that you might not get

10   to see your son if you had to go to jail?

11   **A.**   That's not correct.

12   **Q.**   Have you told anybody that you were concerned that if you

13   go to jail or prison, you might not get to see your son for a

14   while or for a long time?

15   **A.**   That's not correct.

16   **Q.**   Is it correct, soon after that event and your discussion

17   that night with your wife, you contacted an attorney?

18   **A.**   Soon after, yes.

19   **Q.**   How soon after?

20   **A.**   I would say a few days to a week.

21   **Q.**   And was Mr. Zulauf the first attorney you contacted?

22   **A.**   That's correct.

23   **Q.**   Did somebody recommend him to you?

24   **A.**   Indirectly, yes.

25   **Q.**   Did you and Kara both go to see him?

1  **A.**  That is correct.

2  **Q.**  And you decided to retain him?

3  **A.**  Yes, we did.

4  **Q.**  Did he ask you to tell them -- I am not going to ask you

5  lawyer-client privilege information -- but did you tell him

6  the situation?

7  **A.**  Yes.  He wanted to hear all the events from the beginning

8  until we had come to see him, and we discussed that.

9  **Q.**  How much time did you spend together with him the first

10  time you met with him?

11  **A.**  I would say two to three hours.

12  **Q.**  You did or did not have a discussion about perjury?

13  **A.**  Most of the time it was me explaining what had happened

14  and why and his advice about what was going to happen next.

15  **Q.**  Did you talk about perjury?

16  **A.**  No, we did not.

17  **Q.**  Am I correct that maybe a week before, Mr. Friedman had

18  told Kara that the Grand Jury may ask that perjury charges be

19  brought against the two of you; did you tell him that?

20  **A.**  We told him everything from start to finish.

21  **Q.**  Did you tell him that?

22  **A.**  We explained there was a contradiction between the

23  documents and the memories that that triggered and what had

24  been said at the Grand Jury.

25  **Q.**  Did you tell him that Mr. Friedman had said to Kara, on

1   the 19th of January, maybe a week before you were actually

2   talking to this attorney, did you tell him that Mr. Friedman

3   had told Kara that the Grand Jury may interpret her and your

4   statements as perjury, and that the Grand Jury may ask for

5   charges to be brought against you? Did you tell that to your

6   lawyer?

7   **A.** I described the interview to my lawyer as best I could.

8   **Q.** Well, did Kara describe, because she's the one who did the

9   interview?

10   **A.** Let's see. No, she did not.

11   **Q.** Before you went to see Mr. Zulauf, did you and Kara have a

12   conversation where you said to each other, listen, we can't

13   tell this lawyer that Mr. Friedman was talking about a Grand

14   Jury indictment for perjury, we can't tell that to our lawyer?

15   Did you make a decision that you weren't going to tell him

16   about it?

17   **A.** No, not at all.

18   **Q.** It just never came up?

19   **A.** I think you are misunderstanding the nature of the

20   interview.

21   **Q.** Perhaps I am. Did it ever come up that Mr. Friedman had

22   suggested that maybe the Grand Jury might want to indict you

23   for perjury?

24   **A.** At the first interview, Mr. Zulauf was deciding whether or

25   not he was going to take us on as clients. So the goal was to

1 tell the whole story, and then have him make a decision at the

2 end or the next day.

3 **Q.** And as part of that story, did you think it would be wise

4 and full disclosure to tell him what Mr. Friedman had said to

5 your wife?

6 **A.** Yes, I described that interview as best I could.

7 **Q.** My question specifically is, did you discuss with

8 Mr. Zulauf, Mr. Friedman thought the Grand Jury might be

9 considering charging you and your wife with perjury? Did you

10 tell him that?

11 **A.** Not in those words, no. I did the best I could to

12 describe the interview without having been there.

13 **Q.** After that two- or three-hour meeting, Mr. Zulauf decided

14 he was going to represent both of you; is that correct?

15 **A.** Yes.

16 **Q.** Did you have any more meetings with him?

17 **A.** Yes, in the future we did.

18 **Q.** About how many meetings did you have with him?

19 **A.** Meeting implies that we were in person, but there were

20 also times I spoke with him on the phone.

21 **Q.** Everything, the works: Telephone, in person, e-mail.

22 **A.** Let's see, to the best of my recollection, I am going to

23 say twice in person and several times on the phone.

24 **Q.** Did you ever tell him that Mr. Friedman had told Kara that

25 the Grand Jury might want to consider perjury charges against

1  you?  Did you ever tell him that?

2  **A.**  I told him something along the lines of -- that, to the

3  best of my knowledge, during the interviews, the penalty for

4  perjury was brought up.

5  **Q.**  By whom?

6  **A.**  By Mr. Friedman.

7  **Q.**  And you told this to Zulauf; is that correct?

8  **A.**  That's correct.

9  **Q.**  As you sit there right now today, is it, in your mind,

10  that a Grand Jury could well indict you for perjury?

11  **A.**  I am trying to concentrate pretty hard on the question and

12  answer right now.

13  **Q.**  Before you walked into the room, before Mr. Friedman and I

14  asked you any questions, he -- let me withdraw that.

15      From the day Kara and you talked about the interview with

16  her --

17  **A.**  Yes.

18  **Q.**  -- has it been on your mind that you could be indicted for

19  perjury and she could be indicted for perjury?

20  **A.**  Yes.

21  **Q.**  As you sit there now, I understand there's a lot on your

22  mind, but is it in your mind that you could be indicted for

23  perjury for what you said in the Grand Jury?

24  **A.**  Yes.

25  **Q.**  Is it also in your mind that the people who can make that

1   choice are these two gentlemen right here, Mr. Friedman and

2   Mr. Bartlett? It's up to them what happens to you, isn't it?

3   **A.** I don't know the answer to that.

4   **Q.** Do you believe that's true?

5   **A.** I am not sure how that works.

6   **Q.** Do you believe that it is true that Mr. Friedman holds

7   your fate in his hands?

8   **A.** No.

9   **Q.** Do you believe that it is true that Mr. Bartlett holds

10   your fate in his hands?

11   **A.** No.

12   **Q.** Do you believe you would get indicted for perjury if you

13   came and told this jury, "I didn't rent this car for Briana; I

14   rented this car for ourselves"? Do you think you might get

15   indicted for perjury if you did that?

16   **A.** No, I don't think so.

17   **Q.** Did there come a time about two weeks after Kara had been

18   interviewed that you and Kara both went to the prosecutor's

19   office in Seattle and spoke to Mr. Friedman again?

20   **A.** Is this along with our lawyer?

21   **Q.** Yes, with your lawyer.

22   **A.** After the Grand Jury and so forth?

23   **Q.** Yes. If you look at Exhibit A-8, in February, February

24   1st, about two weeks after they had come to Kara's place of

25   employment.

Let me help you, and maybe it will help the jury, too.

      MR. BLOOM:  Can I get a hookup here, please, Pat?

Thank you.

BY MR. BLOOM:

**Q.**  I have written this out by my scratchy handwriting, just to help you and the jury understand the chronology.

There came a time you were contacted by Briana; is that correct?

**A.**  By telephone, yes.

**Q.**  And sometime thereafter, is it correct, that on May 16, that's when Agent Halla came to see you, showed you a picture of Briana, and you said, "I don't know that person"?

**A.**  Correct.

**Q.**  Then October 3, there was another visit from the FBI.  Do you remember that?

**A.**  Yes.

**Q.**  And that's the one where I went through where you told the truth about everything.  Do you remember that?

**A.**  Do I remember when you were asking me questions?

**Q.**  Yes, I do.  That's what I mean.

**A.**  Yes, I remember when you were asking me questions.

**Q.**  That's where you said during that interview that Briana never asked you or your wife to rent a car for her, and that you and your wife did not recall Briana ever renting a car. It's that interview right there, October 3rd?

1  **A.** Right.  That's right.

2  **Q.** About three weeks later you went to the Grand Jury; is

3  that correct?

4  **A.** Correct.

5  **Q.** And you said it again?

6  **A.** That's correct.

7  **Q.** No car, not connected with Briana Waters; is that correct?

8  **A.** That was my Grand Jury testimony.

9  **Q.** Uh-huh.  Then January 19, that's when Mr. Friedman and

10  Agent Halla went to Kara's place of work and yelled at her?

11  **A.** January 19, that was the interview at Kara's work.

12  **Q.** And then I put the word attorney in.  About a week later

13  you got an attorney?

14  **A.** That's basically correct, yes.

15  **Q.** And then about a week after that, there was another

16  interview by the FBI, February 1st?

17  **A.** That's basically correct, yes.

18  **Q.** Let's talk about that interview.

19        MR. BLOOM:  Judge, this will take a while.  Perhaps

20  it's a good time to break for the day.  I can continue, but

21  it's been a long day.

22        THE COURT:  Let's get what you got.  Let's go until

23  4:00.

24  BY MR. BLOOM:

25  **Q.** In that interview, you were in Mr. Friedman's office.  If

1   you could look at -- I think we were already there, let me get

2   back to it.

3       That would be Exhibit A-7, I believe.  Do you have it in

4   front of you?

5   **A.**  Are we talking A-8 or A-7?

6   **Q.**  A-8 is the interview with Kara.  A-7 is the interview with

7   you.

8   **A.**  A-7?

9   **Q.**  I think so.

10  **A.**  February 1st, 2007?

11  **Q.**  Yes.  Is that correct?

12  **A.**  Yes, I have that one.

13  **Q.**  Now, did you believe -- you believed you were in trouble

14  enough that you got yourself a lawyer; is that correct?

15  **A.**  Well, I thought I was finished after the Grand Jury, I

16  thought I was finished with the whole thing.  So since it was

17  continuing, it was time to get a lawyer.

18  **Q.**  When you say it was continuing, Mr. Friedman and Mr. Halla

19  had come to Kara's place of work, and they told her things

20  that she regarded as a threat, right?

21  **A.**  Wait, what's your question?

22  **Q.**  My question is, on January 19 --

23  **A.**  Yes, they came to Kara's work.

24  **Q.**  I am sorry.

25  **A.**  On January 19, yes.  That was the interview at Kara's

1  work.

2  **Q.** So you knew, from what Kara told you that day, January 19,

3  that this wasn't over at all?

4  **A.** That's true.

5  **Q.** And that's why you got a lawyer?

6  **A.** That's true.

7  **Q.** So is it fair to say you thought on that date, February 1,

8  you might be in some trouble?

9  **A.** I think that's fair to say, yes.

10 **Q.** What trouble was it, in your mind, that you might be in?

11 **A.** I was worried at that time, when I came and said that the

12 documents had triggered my memory, that people wouldn't

13 believe me based on having been interviewed about it several

14 times.

15 **Q.** So you thought the trouble was perjury?

16 **A.** No.

17          MR. FRIEDMAN:  Objection.  He's arguing with the

18 witness.

19 BY MR. BLOOM:

20 **Q.** What kind of trouble did you think you might be in?

21 **A.** I was worried people wouldn't believe me.

22 **Q.** So you were afraid they wouldn't be your friend or you

23 would be accused of a crime, or both?

24 **A.** Well, there had been a miscommunication.

25 **Q.** Were you afraid that you might be accused of one or more

1  crimes?

2  **A.**  No.  I needed to resolve the miscommunication, and I was

3  concerned that I would not be able to do that.

4  **Q.**  I am sorry, your voice is dropping.  Could you say it

5  louder?

6  **A.**  I was concerned there was a miscommunication I needed to

7  resolve, and I was concerned I might not be able to do that

8  effectively.

9  **Q.**  Now, you knew that you had intentionally failed to

10  identify Briana's picture; you knew that, right?

11  **A.**  That's not what was prominent in my mind in the timeframe

12  you are talking about now.

13  **Q.**  When you were going to see them, at the time you went to

14  find a lawyer --

15  **A.**  Right.

16  **Q.**  -- you knew one of the things that had happened is you had

17  lied to Agent Halla about the photograph of your cousin.  You

18  had lied to him, and you knew that?

19  **A.**  I was not worried about that.

20        MR. FRIEDMAN:  Objection.

21  BY MR. BLOOM:

22  **Q.**  You were not worried about that.  Did you speak with

23  Mr. Zulauf to tell him?  Did you tell him that fact, that you

24  had lied?

25  **A.**  I gave him all the information that I had.

1  **Q.** Did you tell him that fact, that you had lied to Agent

2  Halla?

3  **A.** I must have.

4  **Q.** Did he say to you, oh, I am sorry to have to tell you

5  this, but that's a separate federal crime that can put you in

6  prison?

7  **A.** That was not the context in which we discussed that.

8  **Q.** In the several times that you spoke to Mr. Zulauf, did he

9  ever tell you that lying to Agent Halla on that first day that

10  you saw him is a separate federal crime? Did he ever tell you

11  that?

12  **A.** That's not the nature of the conversation.

13  **Q.** Whatever the nature of the conversation was, did he ever

14  tell you that?

15  **A.** That's not what we were talking about. That's not what

16  happened.

17  **Q.** Ever, in any of the conversations you had with him?

18  **A.** I don't remember. There were many conversations for many

19  hours. It's possible it came up. But you --

20  **Q.** Are you telling this jury that you were never informed,

21  and to this day you are not aware of the possibility that you

22  committed a crime of making a false statement to a federal law

23  enforcement officer? Is that your testimony?

24  **A.** No. I already told you, yes, I did make that statement.

25  **Q.** No, no. Not the statement that you made. We know you

1 lied.  You've said that.

2     The question is, are you aware, as you sit there today,

3 that that lie constitutes a federal crime?

4          MR. FRIEDMAN:  Objection, Your Honor.  This has all

5 been asked and answered several times.

6          THE COURT:  You may answer, if you can any different

7 than you have before.

8 **A.**  Are you asking, am I aware that that's considered a crime?

9 BY MR. BLOOM:

10 **Q.**  Yes.

11 **A.**  Yes, I am aware of that.

12 **Q.**  When did you become aware of that?

13 **A.**  I don't know.  I don't know.

14          THE COURT:  All right.  Let's break at this point.

15 It's 4:00.  You may go home, get a good night's sleep.  See

16 you back here, hopefully, at the same place at 9:00.

17     As always, don't discuss anything.  Don't start reading

18 anything or looking at anything.  Anything you need to decide

19 this case you will have here in this courtroom.

20     Leave your books on the chair.  I will see you then.

21     (Jury not present.)

22          THE COURT:  All right, you may be seated.

23     The witness, you may step down.

24     I will have you go back outside in the waiting room.

25          THE WITNESS:  Thank you, Your Honor.

1    MR. BARTLETT:  Just for scheduling purposes, Your

2  Honor, perhaps Mr. Bloom could provide us a timeframe when

3  he's going to end this.

4    MR. BLOOM:  I don't want to commit to that, but just

5  as a courtesy, I would say another two or three hours.

6    THE COURT:  Well, okay.  I don't know how often we

7  have to go over these things back and forth.  There comes a

8  point in time where you have to accept the answer whether you

9  agree with it or whatever.  It sounds sometimes like a broken

10  record.  I'd like you to keep that in mind as you go through.

11    Anything else I need to take up?  Have you got a list of

12  witnesses, you know, who's coming?

13    MR. FOX:  I believe Ms. Kolar is coming.

14    THE COURT:  You might not need her tomorrow.

15    Let me mention about that.  Everything you have that deals

16  with the witnesses, bring it all with you when you come so you

17  won't forget it and leave it back in the hotel or some place.

18    MR. FOX:  I didn't forget it, but I have a lot of

19  boxes and they told me she wasn't on.

20    THE COURT:  Don't listen to them, listen to what I am

21  telling you.  Bring everything you have so you have it here.

22  If somebody falls out of line or somebody gets hit in the

23  street, or whatever, I don't want to close the case down.

24    MR. FOX:  Sure.

25    THE COURT:  I appreciate that.

1          MR. FOX:  There are a couple of loose ends.  I don't

2     know whether you want to deal with them now or tomorrow

3     morning.

4          THE COURT:  I don't know.  Tell me what they are.

5          MR. FOX:  One thing, Your Honor.  I sent back to the

6     Court a courtesy copy of -- I am afraid I don't remember the

7     evidence number that Pat marked them as.  Exhibit A-193, is

8     that right?

9          THE CLERK:  Is it the video?

10          MR. FOX:  The DVD.

11          THE COURT:  What is that about?

12          MR. FOX:  That was possibly impeachment evidence for

13     Lacey Phillabaum.  It's actually a different video than we

14     were talking about in court.

15        I provided a copy to the government, I provided a copy to

16     the Court.  Should the need arise that we would want to play

17     that or -- I am following up on our final conversation on

18     Friday.  So I provided a copy to the Court and to the

19     prosecutor so you can review it if need be.  There was one

20     particular clip on that DVD that directly contradicts what

21     she's testified to in court.

22          THE COURT:  Why don't you give me the exact thing

23     that contradicts.  When I look at it, I will have that in mind

24     when I look at it.  I don't know what's in it.  I haven't seen

25     it.

1    MR. FOX:  Sure.  I will get the Court the minute site

2  by tomorrow.

3    THE COURT:  I want to know exactly what you are

4  talking about so I can know what I am looking for.

5    MR. FOX:  Sure.

6    The other thing, Your Honor, is that based on Lacey

7  Phillabaum's testimony and the impeachment of her with her

8  prior statements to David Carr, the New York Times reporter,

9  where she denied ever telling David Carr that she had told the

10  FBI and U.S. Attorney what she believed that they already

11  knew, we would like to renew our prior motion that we made ex

12  parte to have David Carr served with an out-of-district

13  subpoena and brought to court to testify to tie up that

14  impeachment.

15    THE COURT:  I believe I ruled on it.

16    MR. FOX:  You ruled on it previously to her

17  testimony.  She has now testified.  She has now denied making

18  that statement.  She went on for a long time saying that

19  Mr. Carr's memory of the conversation was wrong, and besides,

20  my investigator's notes were probably incorrect, given the

21  fact that she misidentified the e-mail address.  But we

22  believe that now that prior inconsistent statement is ripe and

23  that we are obligated, actually, to tie up that impeachment by

24  bringing David Carr into court.

25    THE COURT:  Present it to me in the same way I am

1 talking about the video.

2        MR. FOX:  I will file something in writing.

3        THE COURT:  Okay.  All right, anything else we need

4 to take up?

5        MR. BARTLETT:  I just missed the number on the video.

6 A-138?

7        THE COURT:  A-193.  Do they have a copy of this?

8        MR. FOX:  Yes.

9        THE COURT:  The same one you submitted around

10 noontime?

11        MR. FOX:  Yes.

12        THE COURT:  Okay.  I think it has Lacey on it?

13        MR. FOX:  Yes.  Tomorrow I will get you the minute

14 site.

15        THE COURT:  All right.  Anything else we need to get

16 in today?

17        MR. BARTLETT:  Not that I am aware of.

18        THE COURT:  All right.  See you all at 8:30.

19        THE CLERK:  All rise, court is adjourned.

20        (The Court recessed to Wednesday, February 20, 2008,

21 at the hour of 9:00 a.m.)
          *  *  *  *  *

22             C E R T I F I C A T E

23    I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

24

/S/  Teri Hendrix_____       May 2, 2008
25 Teri Hendrix, Court Reporter            Date