UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,      )   Docket No. CR05-5828FDB
                               )
          Plaintiff,           )   Tacoma, Washington
                               )   February 20, 2008
vs.                            )
                               )
BRIANA WATERS,                 )   VOLUME 7
                               )
          Defendant.           )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANKLIN D. BURGESS
SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:        MARK N. BARTLETT
                          ANDREW C. FRIEDMAN
                          Assistant United States Attorney
                          700 Stewart Street, Suite 5220
                          Seattle, Washington 98101-1271

For the Defendant:        ROBERT BLOOM
                          Attorney at Law
                          3355 Richmond Boulevard
                          Oakland, California 94611

                          NEIL M. FOX
                          Cohen & Iaria
                          1008 Western Ave., Suite 302
                          Seattle, Washington 98104

Court Reporter:           Teri Hendrix
                          Union Station Courthouse, Rm 3130
                          1717 Pacific Avenue
                          Tacoma, Washington  98402
                          (253) 882-3831

Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.

1

I N D E X

2

INDEX OF WITNESSES
==================

3

WITNESS ON BEHALF OF PLAINTIFF:                          Page

4

ROBERT CORRINA

5

    Cross Continued by Mr. Bloom....................1181
6      Redirect by Mr. Friedman........................1258
    Recross by Mr. Bloom............................1258

7

JACQUELINE BROWN

8

    Direct by Mr. Friedman..........................1261
9      Cross by Mr. Bloom..............................1273

10

DONNA KRAVIS

11

    Direct by Mr. Friedman..........................1276
    Cross by Mr. Bloom..............................1283

12

DAVID PETERSON

13

    Direct by Mr. Friedman..........................1286
14     Voir Dire by Mr. Fox............................1289
    Direct Continued by Mr. Friedman................1289
15     Cross by Mr. Fox................................1292

16

JENNIFER KOLAR

17

    Direct by Mr. Bartlett.........................1294
    Voir Dire by Mr. Fox...........................1360
18     Direct Continued by Mr. Bartlett...............1361
    Voir Dire by Mr. Fox...........................1364
19     Direct Continued by Mr. Bartlett...............1365
    Cross by Mr. Fox...............................1378

20

21

22

23

24

25

1
                              INDEX - EXHIBITS

EXHIBITS                                                              Page

2
   No.  A-194                                                          465
3  No.  778                                                            466
   No.  779                                                            367
4  No.  711                                                            469
   No.  791-B                                                          470
5  No.  528                                                            472
   No.  130                                                            473
6  No.  122                                                            473
   No.  133                                                            475
7  No.  123                                                            477
   No.  752                                                            473
8  No.  617-C                                                          475
   No.  617-E                                                          477
9  No.  617-F                                                          475
   No.  617-G                                                          477
10 No.  121                                                            475
   No.  617-I                                                          477
11 No.  392-A                                                          475
   No.  392-E                                                          477
12 No.  615                                                            475
   No.  617-D                                                          477
13 No.  617-L                                                          475
   No.  614                                                            477
14 No.  A-197                                                          475

15

16

17

18

19

20

21

22

23

24

25

1          WEDNESDAY, FEBRUARY 20, 2008 - 9:00 A.M.

2                              * * *

3     (Jury not present.)

4          THE CLERK:  This is in the matter of United States

5    versus Briana Waters, CR05-5828FDB.

6     Counsel, please make an appearance for the record.

7          MR. FRIEDMAN:  Good morning, Your Honor, Andrew

8    Friedman and Mark Bartlett for the United States.

9          MR. BARTLETT:  Good morning, Your Honor.

10         MR. FOX:  Good morning, Your Honor, Neil Fox and

11   Robert Bloom present with our client, Ms. Waters.

12         THE COURT:  All right.  I believe we had Mr. Corrina.

13   Have him just come back and take the witness chair.

14    We are ready for the jury?

15         MR. BLOOM:  Yes.  I have a matter, but it can wait

16   until another time.  I mentioned there's a brief matter.  I

17   mentioned it to Ms. Miner.

18         THE COURT:  She mentioned about the witnesses?

19         MR. BLOOM:  Yes.  We've been told yesterday that

20   Ms. Larson won't be testifying, and that's their right, but I

21   spent some time preparing for her.  If we could get an update

22   on who, which of the people on the list they do plan to call

23   and which they don't, it would be appreciated.  That's all.

24         THE COURT:  Well, I thought I told them the witnesses

25   they are going to call, give to you the list with the gist of

the testimony and the exhibits they are going to use.  Have they not been doing that?

MR. BLOOM:  They have been doing this more or less the day before, but I just learned yesterday, having spent time preparing for Ms.  Larson, we just learned yesterday that they have decided not to call her, which they have a right to do.

THE COURT:  Was that in the list of things that they gave you?

MR. BLOOM:  Well, they didn't give it.  I mean, it was a list of witnesses.  But the evening before, they have been telling us who they are going to call.  But that's a separate matter.

All I am asking is if they have made a decision not to call one or more witnesses of some significance, that they tell us in advance so that we don't waste time preparing.

THE COURT:  Any reason for not doing that?

MR. BARTLETT:  No, Your Honor.  I assume the Court and Mr. Bloom, who is very experienced, realizes that we need to shoot on the broad side.  We don't know for sure how direct testimony is going to come in.  It's unclear what witnesses we may or may not need, And I know if we don't include somebody on the witness list and then after hearing it we try to put them on, there will be a big to do about it.  So we try to do the best we can.

1          THE COURT:  All right.  They said they will do that

2   the best they can.

3      Mr. Corrina, I will have you take the witness chair.

4      Bring in the jury.

5   (Jury present.)

6          THE COURT:  All right.  You may be seated.  Good

7   morning to you.  Hope you got a good night's sleep and are

8   ready to go.

9      We left off with Mr. Corrina, so, Mr. Bloom, you will

10  continue.

11         MR. BLOOM:  Thank you, Your Honor.

12         ROBERT CORRINA, previously sworn, further testified.

13              CROSS-EXAMINATION - CONTINUED

14  BY MR. BLOOM:

15  Q.  What I would like to do first, this that's on your screen,

16  this is a handwritten note that I actually made.  Does that

17  accurately represent, in very broad terms, the chronology

18  since sometime in early 2006 through February 1st of 2007?

19  A.  Let's see.  I will take a glance at it, and to say in

20  broad terms, then I will say yes.

21         MR. BLOOM:  I would like to move that into evidence,

22  please.  It's been marked as Exhibit A-194.  Here's a copy.

23         MR. FRIEDMAN:  No objection, Your Honor.

24         THE COURT:  Admitted.

25              (Exhibit No. A-194 admitted.)

1  BY MR. BLOOM:

2  **Q.** Just to recap very briefly, this is the day that you

3  learned from Kara that Mr. Friedman and Mr. Halla, Agent

4  Halla, had been to see her at her office; is that correct?

5  January 19 of '07.

6  **A.** Yes, that's right.

7  **Q.** That was the day where you heard from Kara that

8  Mr. Friedman had yelled at her in her office; is that correct?

9  **A.** I was very angry about that, yes.

10 **Q.** Why were you angry about that?

11 **A.** My wife said that someone had raised their voice to her,

12 and that's unacceptable.

13 **Q.** Was that person Mr. Friedman, as far as you understood?

14 **A.** I refer to my previous answer. I told you that yesterday.

15 You asked me that exact same question.

16 **Q.** Was that also the day that your wife told you that Agent

17 Halla, that he believes that the car you rented was used in

18 the University of Washington arson?

19 **A.** Let's see, she called me and said she had seen documents

20 regarding the rental car in May of 2001.

21 **Q.** I am particularly referring to what she informed you about

22 what Agent Halla had said to her about his belief.

23 **A.** Kara called me and told me about this meeting. And I was

24 upset and she was upset, and most of that conversation she was

25 trying to calm me down. So, no, we did not go over these

1  details like you are suggesting that we did.

2  **Q.** Could you get a little closer to the microphone, if you

3  would, please.

4      That was on the phone you didn't go into those details.

5  Did you later that evening go into those details when you

6  spoke with her in person?

7  **A.** At home, she continued to try and calm me down and we

8  began to talk about the need for a lawyer, the need to contact

9  my parents in regards to this meeting.

10  **Q.** The car, what day was it rented?

11  **A.** Saturday.

12  **Q.** Would that have been the 19th of May? You are certainly

13  entitled to look at documents, and feel free to do so. I just

14  want the record to reflect that you are doing so.

15        THE COURT: Can you point to anything you want him to

16  look at?

17        MR. BLOOM: Yes, we are going to be talking -- using

18  Exhibit A-7. That would be the interview of February 1.

19  **A.** Saturday is the 19th of May, 2001.

20  BY MR. BLOOM:

21  **Q.** What document are you looking at to refresh your

22  recollection?

23  **A.** Let's see, 777.

24  **Q.** What does the folder say?

25  **A.** That's what the folder says, 777.

1  Q. 777, thank you. Is that an interview that says Federal

2  Bureau of Investigation?

3  A. I am sorry, say again.

4  Q. Is that generally -- that document, does that say Federal

5  Bureau of Investigation?

6         THE COURT: Has 777 been admitted?

7         MR. FRIEDMAN: It has been admitted, Your Honor.

8  BY MR. BLOOM:

9  Q. It's a calendar. That's the calendar?

10 A. Correct.

11        THE COURT: Do you want to put that up?

12        MR. BLOOM: No, I don't need it up. Thank you.

13 BY MR. BLOOM:

14 Q. So, am I correct that your recollection is that Kara came

15 home -- well, who do you recall coming to your home with the

16 car on Saturday? Was it Kara drove up with the car?

17 A. Briana and Kara.

18 Q. You remember that Briana was there; is that correct?

19 A. That's correct.

20 Q. She was in the car?

21 A. That's correct.

22 Q. And she came back from the Budget, you are saying, with

23 your wife; is that correct?

24 A. I can't guaranty that's where they came from. I was home.

25 I can't guaranty that they came directly from there.

1 **Q.** Is it correct to say that the first memory you have of
2 seeing the car was you personally placing your child seat in
3 the car?

4 **A.** What do you mean by first memory? You mean the first
5 thing I remember or my earliest memory of the car
6 chronologically?

7 **Q.** Would you turn to Exhibit A-7, please? Would you turn to
8 the second page of Exhibit A-7? Would you look at the last
9 paragraph?

10 **A.** I see that.

11 **Q.** I am going to ask you, did you tell, on February 1 when
12 you were speaking to Mr. Friedman and the agent, did you tell
13 them that your first memory of the rental car was you yourself
14 installing a child seat in the car and placing your son in
15 that child seat in the driveway of your residence?

16 **A.** I am looking at the document inside a folder, A-7. It
17 says: "Corrina advised that his first memory of the rental
18 car was him installing a child seat in the car."

19 Not chronological first memory. As I thought back and my
20 memory was triggered, the first way I was able to remember the
21 car was me putting a child seat into it. Not my first
22 chronological memory; my first thing that came back to me.

23 **Q.** In any event, you remember the car in the driveway and you
24 putting your car seat, the child seat in the car; is that
25 correct?

1   **A.**  Do I remember putting a car seat in the car?  Yes, I do.

2   **Q.**  Do you remember, if you look at the last sentence in the

3   paragraph, do you remember that after that you and your wife

4   and your son left in that car?

5   **A.**  Yes, that's correct, that's why I was putting the car seat

6   in.

7   **Q.**  Right.  So the car showed up, Kara driving.  You put the

8   car seat in, and then you drove off at some point.  That

9   afternoon you drove off, you used the car; is that correct?

10   **A.**  That is correct.

11   **Q.**  In fact, you and Kara told Mr. Friedman and the agents on

12   that same day, February 1, that the car was primarily for your

13   purposes, the purposes of your family?

14   **A.**  Where does it say that?

15   **Q.**  Well, you and Kara spoke to the agent -- I am sorry, the

16   agents and Mr. Friedman; is that correct?

17   **A.**  You are asking me a question about the primary use of the

18   car?

19   **Q.**  Yes, sir.  And you and Kara told them, did she not, that

20   the car was rented for the purposes of you, you and your

21   family?

22   **A.**  The transcript is here.  Where are you talking about?

23   **Q.**  Take a look at Exhibit A-8.

24   **A.**  This is a different transcript.

25   **Q.**  That's a reading of what Kara Larson said on February 1.

1    MR. FRIEDMAN:  Objection, Your Honor.  This witness

2  has no personal knowledge of what Kara Larson said on that

3  day.  The two witnesses were interviewed separately.

4  BY MR. BLOOM:

5  **Q.** Did Kara Larson tell you that she had told Mr. Friedman

6  and the agent, Agent Halla, and whoever else was there, that

7  she told them that she did not independently recall the reason

8  that you all decided to rent a car, but that you yourself have

9  told her that you encouraged her to rent a vehicle to help

10  Waters move her possessions out of the residence?  Do you

11  remember having that conversation with your wife, Kara?

12  **A.** What's the question?  That was a long question.

13  **Q.** That was a long question.

14     Basically, between the two of you, you and Kara told them

15  on that day that this car rental was about your purposes?

16  **A.** What day?  This is the day where Kara was the only one

17  with them.

18  **Q.** No, sir.

19  **A.** Yes, that's the last one you had me get.

20  **Q.** No, sir, the day, February 1, you and Kara and your

21  lawyer --

22  **A.** No.  Once we remembered the car --

23  **Q.** Let me finish my question, okay?

24     You and Kara and your lawyer went to the Seattle office of

25  Mr. Friedman at the United States Attorney's Office.

1  **A.** Okay.

2  **Q.** You spoke to them, and separately she spoke to them. Do

3  you remember that?

4  **A.** We went with the lawyer to Seattle.

5  **Q.** Yes, sir.

6  **A.** And we met, yes.

7  **Q.** And you came to learn that day, you spoke with Kara, and

8  you said to her, "What did they ask you?" She said, "What did

9  they ask you?" And you compared notes about what happened; is

10  that correct?

11  **A.** I think that's fair to say.

12  **Q.** All right. Did you learn from her that she had told them

13  that the reason for renting this car was you, your family --

14  you, Kara, and your son -- were going to use that car? Not

15  about Briana Waters using that car; about you, that's the

16  reason the car was rented. Did she tell them that? Did she

17  learn -- did she inform you that she told them that?

18  **A.** I have no memory of that.

19  **Q.** And Kara Larson would be able to tell us about that,

20  right?

21  **A.** I don't know.

22  **Q.** Did Kara Larson tell you that she informed the authorities

23  on that day that she did not actually remember seeing anyone

24  else than herself driving the rental car? If you could look

25  at Exhibit A-8 --

1    MR. FRIEDMAN:  Objection, Your Honor.

2  BY MR. BLOOM:

3  Q.  -- the second page, to refresh your recollection.

4    THE COURT:  Mr. Bloom, are you asking now about

5  testimony of this other person, Ms. Larson?

6    MR. BLOOM:  I am not asking about testimony.  I am

7  asking about whether or not he and his wife discussed what

8  she, Kara Larson, told them.

9    THE COURT:  I thought he answered that.

10    MR. BLOOM:  I am asking a particular question.  He

11  did answer that, he said yes.

12    THE COURT:  You are treading on hearsay unless that

13  witness is going to be here.  Unless you are going to call

14  that witness --

15    MR. BLOOM:  Two things:  I am not offering it for the

16  truth.

17    THE COURT:  I understand.  Listen to what I am ruling

18  on.  If you are treading on that, don't do that.

19    Now continue with your question.

20    MR. BLOOM:  Okay.  I am not asking whether or not

21  it's true --

22    THE COURT:  I don't need an explanation, I just want

23  you to go to the question.

24  BY MR. BLOOM:

25  Q.  Whether or not it was true, I am asking you what she

1 informed you --

2      THE COURT: Are you asking a question now?

3      MR. BLOOM: I am.

4      THE COURT: Okay.

5 BY MR. BLOOM:

6 **Q.** I am asking you whether or not she informed you that she

7 had given certain information?

8      MR. FRIEDMAN: We'd object. It's irrelevant and

9 hearsay.

10      THE COURT: He can answer yes or no. That's it.

11 **A.** So your question is --

12 BY MR. BLOOM:

13 **Q.** I will rephrase it. Do you want me to rephrase it?

14    Yes?

15      THE COURT: Let's see if he understand the question.

16 BY MR. BLOOM:

17 **Q.** I want to make sure you understand the question.

18 **A.** Your question is, when my wife and our lawyer and the

19 government were having a meeting --

20 **Q.** Yes.

21 **A.** -- did she give them information?

22 **Q.** Yes, particular information that I am asking you about.

23 You've already said, yes, that you did have that discussion.

24 Now I am asking you, did she give them particular information?

25      MR. FRIEDMAN: We'd object to this as irrelevant and

1  calls for hearsay.  This witness doesn't have any personal

2  knowledge.

3          THE COURT:  Let's see what the question is.  Ask the

4  question, Mr. Bloom.

5  BY MR. BLOOM:

6  **Q.**  Did your wife inform you that one of the things she had

7  said to them on that day was that the reason for the car

8  rental was that your bikes were in the shop?

9          THE COURT:  Sustained.  You are going in the same

10  area I told you not to go into.  You call the witness, if you

11  want the witness.

12  BY MR. BLOOM:

13  **Q.**  Now, the day that you took the car, that Saturday, how

14  long did you stay with the car?

15  **A.**  Hard to say.  I think there's credit card transactions

16  that track our activity during that time.  If you want to look

17  that up, that would be more reliable than me trying to

18  remember.

19  **Q.**  First try to remember, and then we will get to credit card

20  activity.

21  **A.**  I would estimate a few hours.

22  **Q.**  Do you remember where you went?

23  **A.**  I don't remember where I went, but I have seen the credit

24  card transactions.

25  **Q.**  Other than the credit card transactions, do you recall

1  getting in the car -- you say you recall getting in the car

2  with your wife on Saturday afternoon?

3  **A.**  Uh-huh.

4  **Q.**  The 19th?

5  **A.**  Uh-huh.

6  **Q.**  And your son, and the three of you went off for two, three

7  hours?

8  **A.**  That's what I am saying, yes.

9  **Q.**  That's your best recollection?

10  **A.**  That's correct.

11  **Q.**  Do you remember where you went?

12  **A.**  I know where we went.  We went downtown.

13  **Q.**  You went downtown, and you went to the Lemon Grass; is

14  that correct?

15  **A.**  That's correct.

16  **Q.**  That's a restaurant in Olympia?

17  **A.**  Correct.

18  **Q.**  An Asian restaurant?

19  **A.**  Correct.

20  **Q.**  And you had a meal there?

21  **A.**  Correct.

22  **Q.**  What time was that?

23  **A.**  I don't remember.

24  **Q.**  I am going to put Exhibit 773 in front of you.

25  If you look at this column here and this entry right here,

1  it says May 19, right?  And next to that is the Lemon Grass,

2  right?

3  **A.**  Yes, I see that.

4  **Q.**  And that's what refreshes your recollection that you went

5  to the Lemon Grass on that day, May 19?

6  **A.**  Correct.

7  **Q.**  And now, there's no time indicated there; is that correct?

8  **A.**  Not that I can see.

9  **Q.**  Is there anything that would refresh your recollection as

10  to what time of day it was that you went to the Lemon Grass?

11  **A.**  I don't know.  I don't know the answer to that.

12  **Q.**  In that two or three hours, you had not had a car for a

13  while, is that correct, prior to that rental?

14  **A.**  That's correct.

15  **Q.**  So was it a nice day?

16  **A.**  In what sense?

17  **Q.**  Weather.

18  **A.**  I don't know.

19  **Q.**  Think back.  You've testified here to things that you say

20  you remember.

21  **A.**  Uh-huh.

22  **Q.**  I am just asking you to think back.  What kind of day was

23  it?  Was it a rainy day on the 19th or was it a sunny day or

24  neither?

25  **A.**  It's hard to remember.

1 **Q.** Well, did you take the opportunity to take a nice drive

2 with your family, now that you had a car that you hadn't had

3 in a while?

4 **A.** Our destinations are on the list. I've said we took the

5 car. I don't know what you are asking me.

6 **Q.** Your destinations are on the list, I am not sure what you

7 mean by that?

8 **A.** We went from our house to downtown. I don't think I would

9 describe that as a nice drive.

10 **Q.** That's a short drive, right?

11 **A.** I would say so.

12 **Q.** But you've already testified that you had the car for two

13 or three hours.

14 **A.** That's correct.

15 **Q.** So you must have gone somewhere else other than that short

16 drive downtown, right?

17 **A.** Well the Farmers Market is downtown, too.

18 **Q.** Maybe you walked around; maybe you didn't take a long

19 drive, but at least you kept the car and you used it for your

20 purposes that Saturday afternoon; is that correct?

21 **A.** Yes, it is.

22 **Q.** Now, did there come a time later that day that you saw

23 Briana Waters and she told you she was having stomach pains?

24 **A.** What day are we talking about?

25 **Q.** Saturday, May 19. Take a look, if you are looking for

1  something to refresh your recollection, if you could take a

2  look at Exhibit A-7, the interview with you on February 1st.

3  If you could look at page 3 of that exhibit, look at the very

4  first line.

5          MR. FRIEDMAN:  Objection, Your Honor.  The witness

6  hasn't indicated he's having trouble remembering.  He doesn't

7  need his memory refreshed.

8  BY MR. BLOOM:

9  **Q.**  All right, then don't.  Don't look at any document.

10  However you can answer the question, do you remember --

11  **A.**  You said on Saturday?

12  **Q.**  Yes, sir.

13  **A.**  That was Sunday.

14  **Q.**  What was Sunday?

15  **A.**  You are asking me if Briana was complaining of stomach

16  pains on Saturday.  That was Sunday.

17  **Q.**  That's not what you said on February 1st when you were

18  speaking to Mr. Friedman and Agent Halla and others.  You said

19  it was possibly that same day, the same day you got the car,

20  didn't you?

21  **A.**  Where does it say that?

22  **Q.**  Take a look at page 3, the very first line.

23  **A.**  On which folder?

24  **Q.**  A-7.  February 1st, 2007, you were there with your lawyer

25  giving your best recollection of what happened six years

1 previous.

2 **A.** "Corrina advised that sometime after the previously

3 described incident, possibly the same day."

4 **Q.** Uh-huh.

5 **A.** Right. So that's what you are asking about?

6 **Q.** Yes, I am.

7 **A.** That's written down. I am sure that's what I said.

8 **Q.** That's what you said, possibly on the same day as the car

9 came to your house, was driven by Kara to your house, you put

10 the car seat in.

11 **A.** Right.

12 **Q.** You took off, you went with Kara and your son.

13 **A.** Right.

14 **Q.** You went to the Lemon Grass, and other places, for two or

15 three hours. Then you said that possibly on the same day

16 Ms. Waters told you that she was having sharp abdominal pains

17 and needed to go to the emergency room. Is that correct?

18 **A.** Let's see, basically you have to work backwards. We

19 dropped the car off on Monday, right after Briana gave it back

20 to us from being gone all night. Therefore, that is Sunday.

21 **Q.** Now, that's what you are fixed on. In order to keep

22 yourself out of jail, you have to tell them -- that's what you

23 have to tell these people. But let's talk about what really

24 happened.

25 **A.** All right.

**Q.** This abdominal pain stuff, according to what you said on February 1st, that happened possibly the same day, Saturday. Saturday. Saturday, not Sunday.

**A.** There's an implication in there that I am keeping myself out of jail, which implies that I have been threatened in some way. If I had been threatened in any way, I would neither cooperate nor capitulate in any way.

And if my wife or son had been threatened in any way, or I perceived that, it would be worse than the opposite of cooperation. I would become enraged.

So I am telling the truth. The government asked me to tell the truth. My lawyer asked me to tell the truth. Briana knows I am telling the truth.

**Q.** Yes, she does. She knows you are telling the truth about Saturday, Buster?

THE COURT: That's argumentative. Will you ask a question please, Mr. Bloom?

BY MR. BLOOM:

**Q.** What Briana knows, she knows you are lying.

MR. FRIEDMAN: Objection, Your Honor.

THE COURT: That's argumentative. Question?

BY MR. BLOOM:

**Q.** You just said Briana knows the truth, right?

**A.** I said she knows I am telling the truth right now, yes.

**Q.** Let's get some facts. Did you say on February 1, to

1  Mr. Friedman and to Mr. Halla and whoever else was there, that

2  it was possibly the same day that the car showed up in your

3  driveway that Briana complained about abdominal pains?

4       MR. FRIEDMAN:  Objection, Your Honor.  This has been

5  asked and answered several times.

6       THE COURT:  Answer the question, if you can.

7    Mr. Bloom, it seems like we are covering the same ground

8  over and over again.

9  A.  I refer to my previous answer.

10  BY MR. BLOOM:

11  Q.  And what is your previous answer?  What is your answer?

12      Did you say that?  That's the question.  Did you say that

13  to them on February 1?

14  A.  I refer to my previous answer.

15  Q.  Did you say that to them on February 1.

16      MR. BLOOM:  Can I get a direction that he answer the

17  question?

18      THE COURT:  If you can answer the question, answer

19  it.

20  A.  There's a transcript right here.  I am sure it's accurate.

21  I am sure I said that.

22  BY MR. BLOOM:

23  Q.  Okay.  In fact, it was that night, Saturday night, the

24  19th, that she did not return to your home; is that correct?

25  A.  So you are suggesting it was Saturday instead of Sunday?

1 **Q.** I am asking you a question.

2 **A.** You are asking me if it was Saturday instead of Sunday?

3 **Q.** Yes.

4 **A.** No.

5 **Q.** You remember this today, this is 2008, and you are talking

6 about an event from 2001, and you are saying no definitively.

7 You are saying no, it was not?

8 **A.** Right.

9 **Q.** It was not Saturday, it was Sunday?

10 **A.** Right.

11 **Q.** You remember that?

12 **A.** I remember very specifically we didn't know where she was.

13 We were waiting for her to come home. We had to return the

14 car. That's Monday.

15 **Q.** When did this happen? What time of day did this happen

16 that you were waiting for her to come home?

17 **A.** Afternoon and evening on Monday.

18 **Q.** You and Kara were home waiting for her to get there?

19 **A.** Correct.

20 **Q.** Well, mister, that's a lie isn't it?

21 **A.** No.

22 **Q.** You were working Monday. You weren't at home; you were at

23 work Monday, were you not?

24      MR. FRIEDMAN: Objection, Your Honor. He can

25 question the witness. He can't shout at him, he can't argue

1  with him.
2  BY MR. BLOOM:
3  **Q.** Excuse me.  You were working on Monday.  You were not at
4  home waiting for anybody.  You were working at your job nine
5  miles away in -- what's the name of the place you worked?
6  **A.** There's two questions.  The first question --
7  **Q.** What's the name of the place you worked?
8  **A.** Your first question was, was I at work.  I was at home
9  that day.
10  **Q.** Why were you home that day?
11  **A.** I can't remember why I was off of work, but I was.
12  **Q.** That was Monday, correct?
13  **A.** Yes.
14  **Q.** Was it a holiday?
15  **A.** Not that I know of.
16  **Q.** Was it your birthday?
17  **A.** No.
18  **Q.** Was it anybody's -- was it your son's birthday?
19  **A.** No.
20  **Q.** Was it your wife's birthday?
21  **A.** No.
22  **Q.** You remember that you didn't go to work that day?
23  **A.** Let's see, I remember being home waiting for Briana to get
24  there.
25  **Q.** Why would you have to be home?  You didn't even have a

1  driver's license.

2  **A.** I didn't say I had to be home. I said I was home.

3  **Q.** In fact, there came a time, when you had that car, that

4  Kara took you to work in that car on one particular day; isn't

5  that true?

6  **A.** I don't remember.

7  **Q.** Do you remember, in reconstructing the events with your

8  wife, that she reminded you that she took you to work in that

9  car on one day?

10  **A.** We couldn't figure out if it was that car or if it was a

11  car we had rented for a Christmas vacation.

12  **Q.** Mr. Corrina, your wife took you to work that Monday,

13  didn't she? In that car, didn't she?

14  **A.** That's not correct. We did not have the car on Monday,

15  until the evening.

16  **Q.** That's what you are fixed on. In order to keep yourself

17  and your wife out of jail, you have to say what you just said,

18  and you know that, don't you?

19  **A.** Okay, I would not lie to get Briana in trouble. I would

20  not lie under threat or duress. I would become very

21  uncooperative and very angry if I was threatened or duressed

22  or told a lie. I am telling the truth.

23  **Q.** You know that on January 19 of 2007 Mr. Friedman

24  threatened your wife that the Grand Jury may indict her for

25  perjury, you know that, right?

1  A.  When I heard about that, I became very angry.

2  Q.  Angry because she was threatened; is that correct?

3  A.  She was upset.  And she said that they raised their voice

4  to her.

5  Q.  And you were angry because she was threatened with going

6  to prison.  You were angry because she was threatened with

7  going to prison by Mr. Friedman; is that correct?

8  A.  I don't know if she was threatened with going to prison.

9  She was confronted with documents, and it was an upsetting

10  meeting for her.

11  Q.  Now, on Sunday, you had the car, didn't you?

12  A.  Briana did not take the car until the afternoon or evening

13  of Sunday.  So the car --

14  Q.  You had the car and you used it on Sunday, didn't you?

15  A.  I don't remember.

16  Q.  Check it out.  Did you go to Luna's on May 20, Sunday?

17  A.  That's close to our house.  I can't guaranty that we took

18  the car.

19  Q.  Is it a restaurant?

20  A.  It is.

21  Q.  Well, think about it.  Did you use the car to go to

22  Luna's?

23  A.  It's possible.

24  Q.  Think about it.  Rather than possible, give it some

25  thought.  Sit there and think about it.  On that Sunday, May

1  20, did you go to Luna's for a meal?

2  **A.** I have been to Luna's many times. It's hard to remember.

3  I can't be sure.

4  **Q.** Where is Luna's?

5  **A.** Downtown next to the Farmers Market.

6  **Q.** And did you also, on May 20, go to the Bayview Market?

7  **A.** Correct.

8  **Q.** What time was that?

9  **A.** I don't know. I can't remember.

10  **Q.** Well, think about it. Try to remember.

11  **A.** I go to Bayview almost every day. There's no way I am

12  going to remember.

13  **Q.** Do you remember using a credit card at Bayview Market on

14  May 20, Sunday?

15  **A.** I've been to Bayview a million times and paid with a

16  credit card many times. There's no way I can pick out a

17  specific --

18  **Q.** You indicated earlier that the way your memory was

19  refreshed about the events of that weekend was by looking at

20  this very document; is that correct?

21  **A.** What are you referring to?

22  **Q.** I am referring to your answer to a question about 22

23  minutes ago.

24  **A.** Right. So here's what happened on these days. You are

25  asking me days and times. Some of it is here.

1   **Q.** And some of it refreshes your recollection as to what you
2   did on those days; is that correct?
3   **A.** Correct.
4   **Q.** And my question to you is, looking at those two entries
5   for May 20, Luna's and the Bayview Market, does that refresh
6   your recollection as to what time of day you engaged in those
7   activities?
8   **A.** Must have been morning, because Luna's isn't open late.
9   **Q.** Are they open for lunch?
10   **A.** Until lunch, and then they close.
11   **Q.** They don't stay open on Sundays for dinner?
12   **A.** They never stay open for dinner.
13   **Q.** How about the Bayview Market, is that closed?
14   **A.** No, they stay open.
15   **Q.** So knowing that, does this -- yes or no -- refresh your
16   recollection as to what time of day you used your credit card
17   on those two events, those two transactions?
18   **A.** It would have to be morning, lunchtime, around that time.
19   **Q.** Because Luna's closes after lunch?
20   **A.** That's one reason, yes.
21   **Q.** What would be the other reason?
22   **A.** Because we came home, it was the afternoon.  I remember
23   coming home.  I don't remember what we did that morning.
24   **Q.** Okay.  Now, the following day, the 21st, that was Monday;
25   is that correct?

1    **A.** You are asking me if the 21st is Monday?

2    **Q.** Yes, sir, let's start with that.

3    **A.** Yes, the 21st is Monday.

4    **Q.** And you looked at your calendar; is that correct?

5    **A.** That's correct.

6    **Q.** And is it also correct that somebody with your credit card

7 went to a Safeway store on May 21, Monday, in Tumwater and

8 made a purchase?

9    **A.** Yes, it's right here.

10    **Q.** Now, did Kara use the credit card for supermarket

11 purchases?

12    **A.** I don't remember what our arrangement was at that time.

13    **Q.** Did you each have a credit card?

14    **A.** Let's see. She was certainly welcome to use my credit

15 card. I don't really remember if she used it that day.

16    **Q.** So sometime Monday, she had the -- well, let me withdraw

17 that. This is in Tumwater; is that correct?

18    **A.** It's also very close to our house.

19    **Q.** It's the next town over, right?

20    **A.** It's around the corner.

21    **Q.** And that purchase, do you know what you bought or she

22 bought?

23    **A.** No. No, I don't.

24    **Q.** Do you know whether or not -- now, is it your testimony

25 that she did not take you to work that day, that Monday?

1 **A.** That's correct.

2 **Q.** In fact, not only did she take you to work, but Briana

3 Waters stayed there with your son on that Monday morning?

4 **A.** That's not correct.

5 **Q.** You remember that?

6 **A.** I remember being home waiting for Briana to return. She'd

7 been out all night. That's what I remember.

8 **Q.** That was Saturday night into Sunday, wasn't it?

9 **A.** So you are saying my memory of Monday morning is actually

10 Saturday night?

11 **Q.** No, I am asking a question.

12 **A.** All right. What's the question?

13 **Q.** That when you were waiting for Briana, that wasn't Monday,

14 it was Sunday?

15 **A.** It was Monday.

16 **Q.** In fact, you were at work Monday. You have lied to this

17 jury when you told them that you did not work on Monday, have

18 you not?

19       MR. FRIEDMAN: Objection, Your Honor, argumentative

20 and asked and answered.

21       THE COURT: I think so.

22       MR. BLOOM: I'm sorry?

23       THE COURT: I think it's argumentative. He has

24 answered it. So you are going to have to present it some

25 other way.

BY MR. BLOOM:

**Q.** Do you remember yesterday when Mr. Friedman was questioning you? Just yes or no.

**A.** Yesterday in this courtroom Mr. Friedman questioned me, yes.

**Q.** Do you remember your testifying that Briana appeared late Sunday, and that he, Mr. Friedman, then lead you with some questions into saying it was Monday?

**A.** There was a lot of questions yesterday. It's hard to keep track of everything.

**Q.** Try to remember that question and that answer. Did you first answer that Briana appeared late Sunday?

**A.** If I stumbled or stuttered, it's because I was nervous being in front of the Court, and I apologize.

**Q.** Those weren't the first questions that were asked of you. That was sometime into your examination, right?

**A.** We were all here. I don't know what you are asking me.

**Q.** When you say you stumbled or stuttered because you were nervous, you stuttered so that the word Monday actually came out Sunday, is that a problem you often have, that when you try to say the word Monday, it comes out Sunday?

**A.** I sometimes stumble when speaking, yes.

**Q.** So when you testified under oath that Briana appeared late on Sunday, that was just a slip of the tongue? What was it?

**A.** I said -- you are trying to make me look foolish.

1  **Q.**  I didn't say anything.  I wasn't questioning you, sir;

2  Mr. Friedman was.

3  **A.**  No, right now.  I am telling you that we were waiting for

4  Briana at my house, that was Monday.  She returned late, said

5  she'd been to Seattle.  That's what I am saying.

6      This is very difficult, and if I stumbled, I apologize.

7  **Q.**  When you in fact answered the question from

8  Mr. Friedman -- Mr. Friedman, not from me -- you first said it

9  was Sunday.  Do you remember that?

10  **A.**  I know what you are talking about, yes.

11  **Q.**  You remember that now, don't you?

12  **A.**  I just said that I did.

13  **Q.**  Okay.  And then Mr. Friedman, over my objection, lead you

14  into saying no, it was really Monday.  Do you remember that?

15  **A.**  It's challenging up here.  If I stumbled, I already

16  apologized.

17  **Q.**  The question is, do you remember that?

18  **A.**  I remember yesterday, yes.

19  **Q.**  You remember that's what happened, you said Sunday, and he

20  lead you into saying Monday.  I objected, and you changed your

21  answer from Sunday to Monday.  Do you remember that?

22  **A.**  I know what you are talking about, yes.

23  **Q.**  You do remember that?

24  **A.**  I already said that I did.

25  **Q.**  And you said on your direct examination, you changed it to

1 Monday, and you said it wasn't just Monday, it was Monday

2 afternoon that she showed up.  Do you remember that?

3 **A.** Yes.

4 **Q.** In fact, Monday afternoon you were not home at all, you

5 were at your place of employment; isn't that correct?

6 **A.** No, I was home.

7 **Q.** You told a blatant lie yesterday, and Mr. Friedman lead

8 you into correcting that?

9      MR. FRIEDMAN:  Objection, Your Honor.  This is

10 argumentative, it's not a question.  It's been asked and

11 answered.

12      THE COURT:  Mr. Bloom, if you could just hold it to a

13 question and answer.

14      MR. BLOOM:  Okay, I will.

15 BY MR. BLOOM:

16 **Q.** You testified yesterday that she returned after that --

17 what we were talking about -- you continued that the car was

18 returned to Budget on Monday afternoon.  Do you remember

19 testifying to that?

20 **A.** Yes.

21 **Q.** Did you return the car on Monday afternoon?

22 **A.** Yes, I did.

23 **Q.** Did you drive the car?

24 **A.** No.

25 **Q.** Were you with the person who drove the car?

1   **A.**   Yes.

2   **Q.**   And who was that?

3   **A.**   My wife.

4   **Q.**   And what time of day was that, that the car was returned?

5   **A.**   Afternoon or evening.

6   **Q.**   Which was it, afternoon or evening?

7   **A.**   In that time period.   Late afternoon, early evening.

8   **Q.**   Late afternoon.   Do you remember late afternoon?

9   **A.**   I remember because we were concerned about whether or not

10   we could get the car back in time.

11   **Q.**   In time for what?

12   **A.**   In time for the end of their day, end of what they count

13   as days.

14   **Q.**   The car had been picked up around 12, 12:30 on Saturday;

15   is that correct?

16   **A.**   I don't know.

17   **Q.**   Well, that's the time you saw it, is that right, about

18   12:30 in your driveway?

19   **A.**   I don't remember specifically what time it was.   It's six

20   years ago.

21   **Q.**   Do you remember telling on February 1st, the day you

22   spoke, February 1st a year ago that you were speaking to

23   Mr. Friedman, do you remember talking about -- withdraw that

24   for a moment.

25       Do you remember the car showing up at around 12:30 on

1  Saturday afternoon at your house with Kara driving?

2  **A.**  I remember the car showing up, yes.

3  **Q.**  Now, when you rent a car, if you want to not pay for the

4  extra day, you want to get it back by about the same time of

5  day that it was rented; is that correct?

6  **A.**  That's not my understanding, no.

7  **Q.**  It's not?

8  **A.**  No.

9  **Q.**  Well, you were concerned about not having to pay extra by

10  getting the car back later than you had hoped to; is that

11  correct?  That's what your testimony is?

12  **A.**  We wanted to get the car back that day before the end of

13  the day.

14  **Q.**  Did you get the car back that day, before the end of the

15  day?

16  **A.**  I think so, yes.

17  **Q.**  Did Kara go in and give the clerk the papers, or how -- do

18  you remember how the car got checked in?

19  **A.**  It's hard to remember, it was pretty fast.  It's hard to

20  remember.

21  **Q.**  Well, tell us what you remember about it?

22  **A.**  I remember dropping the car off and then walking home from

23  the rental place.

24  **Q.**  Was your son with you?

25  **A.**  Yes.

1  Q. You had some kind of stroller?

2  A. Correct.

3  Q. Was there a car seat, a baby seat?

4  A. I don't remember.

5  Q. In order to get to the car rental place, you and your wife

6  and your son, the car seat, the child seat, would have had to

7  have been in the car, is that correct?

8  A. That makes sense. I don't remember how we did it.

9  Q. Did you take the car seat out, the child seat out of the

10 car once you dropped off the car?

11 A. I don't remember.

12 Q. Think about it.

13 A. I did, and I don't remember.

14 Q. Did you go in, you and your son, or just -- who went in to

15 the Budget facility to return the car?

16 A. I don't remember.

17 Q. Do you remember seeing a person from Budget check in the

18 car, you know, the check-in person or the person at the

19 counter?

20 A. I don't remember.

21 Q. Do you remember if the Budget was open at the time you

22 returned the car?

23 A. I don't remember.

24 Q. Do you remember -- I think you testified yesterday, you

25 remembered looking for damages on the car; is that correct?

**A.** Yes, that's correct.

**Q.** Had you ever said that to anyone in life, particularly Mr. Friedman or Agent Halla, before yesterday that you were looking for damages on the car?

**A.** Let's see, I have been asked so many questions. What are you asking me?

**Q.** Before yesterday --

**A.** Before yesterday.

**Q.** -- did you ever say anything --

**A.** Did I ever say anything.

**Q.** -- to Mr. Friedman --

**A.** To Mr. Friedman.

**Q.** -- or Agent Halla --

**A.** Or Agent Halla.

**Q.** -- about looking for damages on the car? Or anyone else in law enforcement.

**A.** Recently I have had several interviews with the government, and often they will say, now, if you remember anything in addition to what you told us, go ahead and let us know.

I got a call from my lawyer and Agent Halla, it was a conference call, and let's see, they were talking to me about that the case was coming up and what days the case was going to be and things like that. Since both my lawyer and Agent Halla was on the phone, I said to my lawyer, you know, "I have

1 been told if I remember anything to mention it.  Since both of
2 you are on the phone, would this be a good time?"
3     My lawyer said that's fine.  Agent Halla said that's fine.
4 I said, "I have been thinking about the calendar, where it
5 says 'call Budget,' and why would I have called Budget after
6 the fact?  It was to find out if there was going to be any
7 damage charges."  So that was a recent telephone conversation.
8 **Q.**  On February 1 of '07, on that day you were there with
9 Kara, at Mr. Friedman's office, you were there with your
10 lawyer, and you spoke to them; is that correct?
11 **A.**  That sounds right.  Do you want me to look at a document?
12 **Q.**  A-7 is the exhibit number.
13 **A.**  This is a meeting in Seattle, February 1.
14 **Q.**  We've talked about that many times; is that correct?
15 **A.**  I am afraid so.
16 **Q.**  Now, in fact, on that day, were you doing your best to
17 tell them the truth?
18 **A.**  Yes, that's correct.
19 **Q.**  Okay.  Do you remember telling them that you can't recall
20 why you called Budget?
21 **A.**  That's right.
22 **Q.**  If you look at page 5, at the top.
23 **A.**  That's right.
24 **Q.**  At the end of that paragraph, you told them --
25         MR. FRIEDMAN:  Your Honor, he's asking the witness

1  questions, and the witness answers he doesn't need to refer to
2  something.  These are not inconsistent with what the witness
3  is answering.
4        THE COURT:  Ask the question, go ahead.
5  BY MR. BLOOM:
6  **Q.**  On the day that you were telling the truth a year ago, did
7  you tell them the truth that you did not remember why it was
8  that you and Kara wanted to call Budget after returning the
9  car?
10  **A.**  As I said, this is something I remembered after February
11  1, and they said if I remembered anything, to inform them.
12  **Q.**  Before you went to see them on February 1, did you consult
13  your calendar to refresh your recollection as to the events of
14  the year 2001?
15  **A.**  That's correct.  You know, the more I have to keep
16  thinking about this time period, the more I am going to
17  remember.  That's all there is to it.
18  **Q.**  The more you are going to remember?
19  **A.**  Sure.
20  **Q.**  And unlike most people, whose memory fades, your memory
21  gets better as time goes on, is that what you are saying?
22  **A.**  That's not what I said.
23  **Q.**  Is that true?
24  **A.**  Is it true?
25  **Q.**  Let me withdraw that.

1      Is it your testimony that your memory gets better as time

2  goes on?

3  **A.** No, it's not that it gets better, but if something comes

4  up, it comes up again, you wonder about it.  Instead of not

5  having to think about it, you are having to answer questions

6  about it.  So, yeah, something is going to trigger your

7  memory.

8  **Q.** I think you testified yesterday that you didn't have

9  particular recollection of certain facts until you were shown

10  documents.

11  **A.** That's correct.  That's an example of something that

12  triggers your memory.

13  **Q.** When you say triggers your memory, is it fair to say when

14  you are shown a document, it's the memory of what's in the

15  document that you remember, not the fact?

16  **A.** When I say -- when I say I know that because I see the

17  document, I say that.  When I say I know this because I have a

18  memory of it, I say that.  Two different things.

19  **Q.** On February 1, after the meeting on February 1, did Kara

20  inform you that she had told the authorities that she drove

21  you to work with that car?

22           MR. FRIEDMAN:  Objection, Your Honor.  Asked and

23  answered.

24           THE COURT:  This has been asked and answered.  If you

25  want to use the witness, call the witness.

1    MR. BLOOM:  I would love to call the witness.

2    THE COURT:  Question.  I don't need an explanation.

3  Question.

4  BY MR. BLOOM:

5  Q.  On Monday, did there come a time -- you say you were

6  actually in the car; is that correct?

7  A.  Monday evening to return the car, I was in the car.

8  Q.  I am sorry?

9  A.  Monday evening, to return the car, yes.

10  Q.  When you say Monday evening, where did you get that from?

11  A.  Late afternoon, evening.

12  Q.  When you just said Monday evening, what was it that made

13  you remember Monday evening?

14  A.  I refer to my previous answer.

15  Q.  What was it that made you remember Monday evening, was my

16  question.

17    MR. FRIEDMAN:  Objection, asked and answered.

18    THE COURT:  If you can answer it, answer it.

19  A.  Let's see.  We wanted to get the car back.

20  BY MR. BLOOM:

21  Q.  You just said Monday evening, you didn't say Monday

22  afternoon or evening.  You started off by saying Monday

23  evening.  My question to you is, do you remember that it was

24  Monday evening?

25  A.  You are splitting hairs here.  I am telling you, I was

1   trying to get the car back, and that's how I knew that it was

2   late evening or whatever.

3   **Q.** It was late evening?

4   **A.** No, not late evening. I am stumbling now because this is

5   going on for so long. I answered you about this already. Ask

6   me something new.

7   **Q.** You don't like my asking you questions?

8   **A.** It's hard to concentrate. I am losing my focus up here.

9   **Q.** Do you want to take a break?

10   **A.** Yes, I do.

11   **Q.** Sure. That's okay with me, if it's okay with the judge.

12       THE COURT: Keep going with your questions.

13       MR. BLOOM: I'm sorry?

14       THE COURT: Keep going with your questions.

15       MR. BLOOM: I need to do it.

16   BY MR. BLOOM:

17   **Q.** When you got in the car on Monday, did it smell like

18   gasoline?

19   **A.** Not that I remember. I don't remember that.

20   **Q.** Did you see any kind of damages on the car?

21   **A.** Briana asked me to look at the car for damages. I did not

22   see any damages.

23   **Q.** Did you see any kind of touchup paint on the car?

24   **A.** I did not see any touchup paint on the car that I can

25   remember.

1  **Q.**  Did you see any dents on the car?

2  **A.**  I looked at the car.  I did not notice any dents.

3  **Q.**  When you say Briana asked you to look, have you ever said

4  that before yesterday?

5  **A.**  You asked me that --

6  **Q.**  No, I didn't ask you that.

7  **A.**  What's the question?

8  **Q.**  When you said that Briana asked you to look for damages --

9  **A.**  Yes.

10  **Q.**  -- did you ever say that before yesterday to any law

11  enforcement officer ever?

12  **A.**  Yes.  You asked me this question, and I described the

13  phone call to you.  Then I said, I --

14  **Q.**  What phone call?

15  **A.**  There was a conference call with my lawyer and Agent

16  Halla.

17  **Q.**  And it was in that call that you remembered that?

18  **A.**  No, I remembered it before, and I was trying to find a

19  good time to let them know that I had remembered something

20  additional.

21  **Q.**  Well, you don't want to tell them too soon, right, because

22  heaven knows what would happen?

23           THE COURT:  Argumentative.  Ask a question.

24  BY MR. BLOOM:

25  **Q.**  When you say waiting for a good time, what does that mean?

1 **A.** Let me explain this to you. My parents are paying for my

2 attorney. When they get a bill, they call me and let me know

3 how much the bill was. I am doing my best to minimize that,

4 so I don't call the lawyer for just anything. Oftentimes I

5 wait for a meeting with him, or for him to call me for some

6 other reason so I can bring up what I need to bring up.

7 **Q.** Did you make a note of it somewhere so you'd remember to

8 say it to him?

9 **A.** I don't think so.

10 **Q.** On February 1, on the day that you told them the truth,

11 did you tell them anything about Briana Waters asked you to

12 look for damages?

13 **A.** No. It was something that I remembered after that.

14 **Q.** In fact, what you told them about the car was what we've

15 already talked about, that you did not remember why you wanted

16 to call Budget after returning the car?

17 **A.** I had not yet remembered, so when I said that, I didn't

18 remember.

19 **Q.** So as time when went on from February 1 of last year to

20 now, a year later, your memory got better, is that right?

21 **A.** It's not that it got better, it's that it came back to me.

22 That's how it works.

23 **Q.** Now, am I correct that this was an arrangement -- let's go

24 to another subject matter. There was an arrangement whereby

25 Briana Waters wanted you to rent a car, and you had an

1    arrangement for a particular day that she was going to show

2    up.  Is that what your testimony is?

3    **A.**  That we were expecting her on Friday?

4    **Q.**  Sure.  You can answer that question, that's fine.

5    **A.**  Yes, my memory is that we were expecting her on Friday.

6    **Q.**  You understand that it's Mr. Halla's belief that this car

7    was used in the arson, right?

8              MR. FRIEDMAN:  Objection, Your Honor.  The witness

9    doesn't know what's in Mr. Halla's mind.  Calls for

10   speculation.

11             THE COURT:  Sustained.  Ask him a question.

12   BY MR. BLOOM:

13   **Q.**  Mr. Halla told your wife that was his belief; is that

14   correct?

15             MR. FRIEDMAN:  Objection, Your Honor.

16             THE COURT:  I think so.  Let's go into what he did.

17   BY MR. BLOOM:

18   **Q.**  In fact, it's your understanding that the claim of the

19   government is that this car was used in connection with that

20   arson; is that correct?

21   **A.**  Yes, that's correct.

22   **Q.**  Does it strike you as odd that the person who was trying

23   to arrange for a car doesn't even show up on the appointed

24   day?

25             MR. FRIEDMAN:  Objection, Your Honor.  Calls for

1 speculation.

2      THE COURT:  I think we are wasting time with these

3 objections.  Let's just see --

4      MR. BLOOM:  I would ask the Court not to comment.

5      THE COURT:  You are doing all the commenting,

6 Mr. Bloom.  Ask the question.

7 BY MR. BLOOM:

8 **Q.**  Briana Waters, who you say this car was rented at her

9 request, she doesn't even show up on the day you say she's

10 supposed to show up; is that correct?

11 **A.**  That's typical Briana.

12 **Q.**  That's typical of Briana, one way or another, whether she

13 does that kind of thing all the time --

14 **A.**  Correct.

15 **Q.**  -- isn't the question.  But on the day that she's supposed

16 to be getting a car for an arson, according to the

17 government's theory, she doesn't even show up?

18 **A.**  Do you want me to speculate about that?

19 **Q.**  No, I want you to answer, did she show up?

20 **A.**  We were expecting her one day; she wasn't there.

21 **Q.**  Now, this person, for whom it was typical, you trusted her

22 with your child; is that correct?

23      MR. FRIEDMAN:  Objection.  Argumentative and asked

24 and answered.

25      THE COURT:  Are we covering this again, Mr. Bloom?

MR. BLOOM:  He has said that's typical of Briana.  I believe that opens the door to a couple questions about whether or not she was a responsible person.

THE COURT:  I think you've covered that, is what I am asking you.  Have you not covered this?

MR. BLOOM:  No.

THE COURT:  Answer the question.

**A.**  What is the question?

BY MR. BLOOM:

**Q.**  This person you say, that's typical of Briana --

**A.**  Uh-huh.

**Q.**  This person to whom that kind of conduct is typical, doesn't show up, you trusted her with your precious child?

**A.**  That's right.  That's her cousin.  That's her responsibility, to protect him.  That's different from being unreliable.  Oftentimes she was supposed to watch him and wouldn't show.  You understand?  Unreliable, that's the difference.  When she did show up, I felt she was trustworthy because that's her cousin.

**Q.**  She's an unreliable person, is that what you are saying?

**A.**  I am saying -- do you want me to give you an example?

**Q.**  No, I don't.

**A.**  Okay.  So when she would show up, yes, I would trust her with my child because that's her cousin, that's her responsibility, to protect him.

1  **Q.** Now, on the day that you are suggesting this car was for

2  her benefit, she doesn't show up. We have that, right?

3  **A.** Correct.

4  **Q.** And on the following day, Kara goes and gets the car; is

5  that correct?

6  **A.** Correct.

7  **Q.** You are saying that Briana was there with her when she

8  came back?

9  MR. FRIEDMAN: Objection, Your Honor. This has been

10 asked and answered several times.

11 THE COURT: Let him ask.

12 **A.** The car was for Briana. Let's see, yes, they went to get

13 the car.

14 BY MR. BLOOM:

15 **Q.** When you say the car was for Briana, do you remember, on

16 February 1, explaining to Mr. Friedman and Agent Halla that in

17 fact it was, the car was rented because your bikes were in the

18 shop?

19 **A.** Where does it say that?

20 **Q.** Do you remember before you referred to that? Do you

21 remember explaining that to them?

22 **A.** I am getting confused about which transcript is which, so

23 you are going to have to tell me.

24 **Q.** Let's stay with A-7, February 1, okay? Do you remember

25 telling the authorities that what this was about was about you

1   not having your bikes available?

2   **A.**   Where does it say that?

3   **Q.**   I will find it.

4   **A.**   Let's see, this is an oversimplification.

5   **Q.**   What do you mean by --

6   **A.**   When thinking about this time period, it was a time period

7   when I was bike commuting to work.  So when I saw notes on my

8   calendar in regard to my bikes, it brought my mind into this

9   timeframe that we are talking about.

10          So that's something that happened, and something that I

11  might have mentioned.  I said, hey, I looked at this calendar,

12  this brought me into this frame of mind of this time when I

13  was commuting by bike to work.  I remember that time period.

14          So it was not meant to be confusing or anything like that.

15  I was trying to explain, that's one way I was able to remember

16  the period of time that we've been talking about.

17  **Q.**   Do you remember on February 1, that you were telling the

18  truth, do you remember telling Mr. Friedman and the agents --

19  if you look on page 1 of Exhibit A-7 -- that you had recently

20  reviewed -- this is the last paragraph on the page -- you had

21  recently reviewed your 2001 calendar, which you and your wife

22  had written notes on?

23  **A.**   Uh-huh.

24  **Q.**   The notes on the calendar suggest that you and your wife

25  had your bicycles repaired around the time of this car rental.

And you told them that bicycles were your primary form of transportation, and the rental car would have been helpful since you would have been without your bicycles. You told them that your office at Patrick Townsend & Associates, located in the Boston Harbor area, is approximately nine miles away from your residence, and having a rental car would have made the commute much easier than taking a bus while the bicycles were being repaired.

Do you remember telling that to Mr. Friedman and Agent Halla and your lawyer and whoever else was present?

**A.** The contents of this was basically what were some reasons that you would go along with renting this car. So something that was -- so I said, well, maybe -- my bikes were on my mind, and I thought it would be good timing to have a car. So it's a little bit of a mischaracterization.

**Q.** I am mischaracterizing it?

**A.** Well, we talked a lot. We talked about why would you rent a car, what was on your mind, what do you remember? This was something I remembered. If you look at the calendar, it shows we had the bikes repaired on a different day.

**Q.** Well, in fact, it shows you took a bike a week and a half later?

**A.** Right.

**Q.** But in fact, as you remembered it, looking at your -- you said, to them, "I wasn't present," right? On February 1 of

1    '07.

2  **A.**  Correct.

3  **Q.**  Briana wasn't present and Mr. Fox wasn't present, right?

4  **A.**  Right.  But it's being taken out of context.

5  **Q.**  Well, did anything that I just asked you when I asked that

6  long question, did I say anything, did I misread it, except

7  for changing a pronoun for clarification?

8  **A.**  Well, this is talking about my reasoning.  So I said a

9  rental car would have been helpful during this time.

10  **Q.**  In commuting to work; is that correct?

11  **A.**  Well, we got it over the weekend, so I guess, no.

12  **Q.**  But your memory was, when you spoke to them, the agents

13  and Mr. Friedman, truthfully on February 1 and you talked

14  about this car would be helpful to you in commuting to work,

15  you said that, right?

16  **A.**  I am sure the transcript is accurate, but it's being taken

17  out of context a little bit.

18  **Q.**  When you said commuting to work, you meant something like

19  the day, Monday, the 21st of February, did you not?  I'm

20  sorry, 21st of May.

21  **A.**  No.  When I said that, I was not referring to Monday.

22  **Q.**  Well, commuting to work, you are certainly talking about

23  Monday through Friday, right?

24  **A.**  Yes.

25  **Q.**  So when you told them that the car would have been -- one

1 reason you wanted to have a car is because it would have been

2 helpful in commuting to work, you meant Monday to Friday,

3 right?

4 **A.** I was talking about my possible reasoning, my mind-set at

5 the time.

6 **Q.** Not only was this car for your use, but you actually, as

7 we have seen from your credit card recollections, you did use

8 the car on Saturday, you did use the car on Sunday, you did

9 use the car on Monday?

10 **A.** Yeah, we shared the car with Briana.

11 **Q.** In fact, one of the reasons you wanted the car -- another

12 reason you wanted the car is because you wanted Briana to get

13 her things out of your basement; is that correct?

14 **A.** That's correct.

15 **Q.** And that was for your benefit, so you could have that

16 space; is that correct?

17 **A.** Yes.

18 **Q.** So again, it's another reason this car is something that

19 you wanted?

20 **A.** Briana asked me to get this car as a favor.  I was trying

21 to find reasons why we could use it, too.

22 **Q.** She's the one who wanted the car and didn't even show up

23 on the appointed day; is that correct?

24 **A.** Exactly.

25 **Q.** Now, Briana stayed with you before she moved to

1  California; is that correct?

2  **A.**  Yes, I think that's correct.

3  **Q.**  When did she move to California?

4  **A.**  After May of 2001.

5  **Q.**  How long after May?

6  **A.**  Let's see, I am going to say sometime in 2001, after May.

7  **Q.**  June?

8  **A.**  It may have been a bit later than June, I am not sure.

9  **Q.**  When did she move back in with you in 2001?

10  **A.**  I can't remember right now, I am sorry.

11  **Q.**  Perhaps you know that she was staying in Ocean's garage

12  for a while until the house, Ocean's house, was renovated for

13  his wheelchair use, do you know that?

14  **A.**  That rings a bell for sure, yeah.

15  **Q.**  Did you come to learn that Ocean actually moved into the

16  house sometime in July of 2001?

17  **A.**  I can't remember that, I am sorry.

18  **Q.**  Do you recall that it was sometime after Ocean actually

19  moved into his own home that Briana came to stay with you?

20  **A.**  That sounds right.  That sounds right to me.

21  **Q.**  What month did she come to stay with you?

22  **A.**  I can't remember right now, I am sorry.

23  **Q.**  Was it in the summer of '01?

24  **A.**  I am sorry, my brain feels a little scrambled right now.

25  I can't remember.

1  **Q.** Take a deep breath and try to remember when she moved in
2  with you.
3  **A.** We are definitely in the right timeframe, sometime in
4  2001, after May.
5  **Q.** My question is, can you identify summer, fall?
6  **A.** She did come back, make some arrangements before she moved
7  to California. She did come back and get her belongings, but
8  I am having trouble remembering the exact dates right now.
9  **Q.** How long did she stay once she did move in, in 2001? How
10 long is it, your recollection, approximately that she stayed?
11 Was it weeks, was it months?
12 **A.** I am having trouble remembering. It could have been weeks
13 or months, I'm not sure.
14 **Q.** Well, in fact, you were getting a little antsy; you really
15 wanted her to move, right?
16 **A.** I don't remember, but that would make sense.
17 **Q.** She was using your phone, and you were not happy, or
18 annoyed with that; is that right?
19 **A.** I think that's true.
20 **Q.** In fact, she moved to California around February 1 of
21 2002, does that ring a bell?
22 **A.** Well, we are getting into a tricky area here because
23 Briana took her things out of the basement and said,
24 "Good-bye, I am moving to California," and she left. And then
25 I got a phone call saying, "This is Briana. I think I left

1    something at the house."

2       And I said, "Well, I don't know, I don't know.  Did you go

3    through your stuff?"

4       So she says, "Well, I need it," and we ended the

5    conversation.

6       During that conversation, I said, "How's California?  How

7    are you doing?"

8       "It's fine.  California is fine, I'm fine."

9       And the next day at my house in Olympia, she pulls up in

10    her car, says, "Where is that item that I am looking for?"

11    **Q.**  An item for her back.  She has back problems, right?

12    **A.**  Right, but she said she was in California.  So she would

13    have had to get off the phone and drive from San Francisco to

14    Olympia.  I don't know how long that would take.  So we are

15    getting into a strange area, and I can't testify as to exactly

16    when and where she was after she left.

17    **Q.**  She said she was moving to California, she didn't say she

18    was in California.  She made it clear she was living in

19    California at the time of that phone call, right?

20    **A.**  She didn't get real specific, but I said, "How is

21    California?"  She said, "California is fine, I'm fine."

22    **Q.**  Let me get back to -- there came a time in January of 2002

23    where she was living with you, and she did get quite sick and

24    she went into a hospital, an emergency room in Olympia, St.

25    Peter's Hospital, on January 21, 2002.  Do you remember that

1  event?

2  **A.**  You are asking me if I remember January 1st, 2002?

3  **Q.**  January 21.

4  **A.**  January 21?

5  **Q.**  Yes, sir.

6  **A.**  2002?

7  **Q.**  Yes, sir.

8  **A.**  Could you give me some more details?

9  **Q.**  Well, whatever the day was, it was the day she was living

10  with you and she got very sick and she went to the emergency

11  room at that hospital -- excuse me, is there a St. Peter's

12  Hospital in Olympia?

13  **A.**  Yes, there is.

14  **Q.**  That's one of the two hospitals you were thinking of

15  yesterday when you said there were two; is that correct?

16  **A.**  Oh, yes.

17  **Q.**  Do you recall that on that day, at that time, she went to

18  the hospital for stomach pains?

19  **A.**  Unless you can give me some more detail, I am not going to

20  be able to remember the incident.

21  **Q.**  You don't have an independent recollection of that?

22  **A.**  You have to understand, Briana was sick quite a bit.  "I

23  am sick."  "I don't feel good."  "I need to sleep."  "I need

24  to get medicine."  So I wouldn't necessarily have -- so, no, I

25  don't remember, unless you can give me some more detail.

1  **Q.** Are you saying you are sick now?

2  **A.** Am I saying that I'm sick?

3  **Q.** That's fine, I want to understand.

4  **A.** Oh, I'm sorry.  To answer your question, without more

5  details, I don't remember.

6  **Q.** Did you just say that you are sick and you are taking

7  medicines?

8  **A.** No, I didn't say that.

9  **Q.** I misunderstood you then.

10  **A.** I'm sorry.

11  **Q.** You're saying hypothetically, when a person is sick, they

12  take medicine?

13  **A.** I am sorry, I should have answered your question better.

14  I don't remember.

15  **Q.** Do you take any medications?

16  **A.** No.  No, I don't.

17  **Q.** Trying to think back, we are talking January of 2002,

18  approximately six years ago, and May of 2001, six-and-a-half

19  years ago.  As we think about this hospitalization, is it

20  possible that you are confusing this hospital issue,

21  remembering in fact she did go to a hospital with abdominal

22  pains in January of '02, and from six, six-and-a-half years

23  ago, you are confusing the two events?

24  **A.** So you are suggesting I have combined these things in my

25  memory?

1    **Q.** Yes.

2    **A.** I don't think so. But the main point is, Briana said she

3    needed the car, took the car Sunday night.

4    **Q.** Except that you told them on February 1st that it was

5    possibly the same day that the car showed up, meaning

6    Saturday?

7    **A.** Yeah, that's in the transcript.

8    **Q.** Yes, it is, isn't it?

9    **A.** It is.

10   **Q.** I didn't prepare that transcript, did I?

11   **A.** I believe it's a government transcript.

12   **Q.** It's prepared by Agent Halla; isn't that correct? If you

13   look at the first page of that exhibit, Exhibit A-7, bottom

14   left.

15   **A.** I think that's correct.

16          THE COURT: All right. Let's take the morning recess

17   at this time. Don't discuss the case. Leave your books on

18   the chair. Take your break.

19       (Jury not present.)

20          THE COURT: At this time we will take the morning

21   recess.

22          MR. BARTLETT: Thanks, Your Honor.

23          THE CLERK: All rise. Court is in recess.

24       (Morning recess.)

25          THE COURT: All right, you may be seated.

1    Ready for the jury?

2    (Jury present.)

3        THE COURT:  All right.  You may be seated.

4    Continue, Mr. Bloom.

5  BY MR. BLOOM:

6  **Q.**  Yesterday you testified about Briana taking the

7  walk-around phone with her, kind of apologizing for it.  Was

8  that suspicious to you?

9  **A.**  At the time I assumed it was a mistake.

10  **Q.**  But now you know she's been accused of a crime, you think

11  otherwise;  you think that was intentional, she was trying to

12  keep you from using the phone, is that what you are saying?

13  **A.**  Do you want me to speculate about that?

14  **Q.**  I want you to say, what is it about her inadvertently

15  taking the phone with her on Saturday night, or as you would

16  say, Sunday night?  What about that?  Did you have neighbors?

17  **A.**  Yes, certainly.

18  **Q.**  Did the neighbors have telephones?

19  **A.**  Certainly.

20  **Q.**  Did you know the neighbors?

21  **A.**  Some of them, yes.

22  **Q.**  If you needed to use the phone for any particular reason,

23  you could have called, you could have knocked on their door

24  and asked to use their phone?

25  **A.**  I think so, yes.

1  **Q.** All right. Now, yesterday Mr. Friedman asked you about

2  money you put in the bank, you made a deposit of $400; is that

3  correct?

4  **A.** Yes, that's correct.

5  **Q.** Out of that $400, $200 was in cash.

6  **A.** Yes, that's correct.

7  **Q.** Do you remember that?

8  **A.** Yes.

9  **Q.** You testified that the $200 had been given to you by

10 Briana Waters for payment for this car. Do you remember that?

11 **A.** Yes. Yes, I do.

12 **Q.** I would like to go back again to your interview of

13 February 1, 2007, where you were there, Kara spoke to them

14 separately, your lawyer was there, and you were telling the

15 truth. Okay, that's A-7.

16 **A.** Document A-7?

17 **Q.** Yes, A-7. Do you remember telling Mr. Friedman and Agent

18 Halla and other people on that day, do you remember being

19 asked on that day -- and if you want, if you need to, you can

20 look at page 5 of that document, the bottom paragraph.

21 **A.** Page 5?

22 **Q.** Yes, sir. I will wait until you get there.

23 **A.** Okay. I am there.

24 **Q.** Do you remember being asked on February 1, a year ago, if

25 Waters had paid you back for her portion of the car rental

1  expense, and you told them that she had given you
2  approximately $100 in cash sometime before she moved to
3  California, and that this was her payment for the car rental,
4  allowing her storage space in your home, and the use of your
5  telephones?  Is that what you told them on February 1, 2007?
6  **A.**  I don't see that on page 5.
7  **Q.**  Page 5, at the bottom.
8  **A.**  At the bottom?
9  **Q.**  Yes, sir.
10 **A.**  Yes, I see that now.
11 **Q.**  Take a look at it.  I will ask my question again now that
12 you are focused.
13     Did you tell them that you remembered that Briana had
14 given you approximately $100 in cash --
15 **A.**  Uh-huh.
16 **Q.**  -- sometime before she moved to California, and that this
17 was her payment for the car rental, allowing her storage space
18 in your home, and the use of your telephone?  Did you tell
19 that to them, the authorities, on February 1, 2007?
20 **A.**  Yes, I did.
21 **Q.**  And that was your best recollection as to what happened
22 with regard to getting money from Briana Waters; is that
23 correct?
24 **A.**  That's correct.
25 **Q.**  You did not tell them anything about a week after the car

1  rental getting $200 from Briana; is that correct?

2  **A.**  That's correct.

3  **Q.**  You did not tell them the things to which you testified in

4  that regard yesterday; is that correct?

5  **A.**  Yes.

6  **Q.**  Is that correct?

7  **A.**  Yes, that's correct.

8  **Q.**  Is that one of those things where your memory got better

9  as time went on?

10  **A.**  Actually, I saw a document with my handwriting with a $200

11  cash deposit in the bank, and I was asked where could this

12  have come from?  And I could not think of any other source

13  besides Briana.

14  **Q.**  And you thought back, approximately seven years ago, May

15  of 2001, May 28th or 29th, somewhere in there, you thought

16  back, and that's what you remembered from almost seven years

17  ago, that you could not think of any other place where $200

18  would have come from?

19  **A.**  $200 in cash.

20  **Q.**  In cash?

21  **A.**  Correct.

22  **Q.**  And a $200 check from your mother-in-law; is that correct?

23  **A.**  Correct.

24  **Q.**  And that was based on your memory now, recently, of almost

25  six and a half years ago; is that correct?

1  **A.** No, I cannot think of another source.

2  **Q.** You are in trouble here, aren't you, Mr. Corrina?  You

3  face perjury charges, you face obstruction of justice charges,

4  you face the charge of lying to a federal officer, and you

5  know that, don't you?

6  **A.** Well, when these documents came to light --

7  **Q.** Excuse me, that's a yes or no answer, please.  You know

8  that you are facing those problems, don't you?

9  **A.** I am sorry, ask the question again.

10 **Q.** You know you are facing potential charges for perjury,

11 obstruction of justice, and lying to a federal officer.  You

12 know that, do you not?

13 **A.** How would I know that?

14 **Q.** Well, first, from what Mr. Friedman told your wife on

15 January 19th of 2007, firstly.

16 **A.** Let's see.  When he showed my wife the documents --

17 **Q.** When he told her the Grand Jury might want to indict her

18 for perjury?

19 **A.** I see.

20 **Q.** The same day he yelled at her?

21 **A.** I see.

22 **Q.** In her office place?

23 **A.** We saw the documents.  They wanted to know why the

24 documents seemed to conflict with what we said at the Grand

25 Jury.  I thought about this, too.

1  Q. Excuse me --

2       MR. FRIEDMAN:  Objection, Your Honor.

3       MR. BLOOM:  That does not answer my question.

4       MR. FRIEDMAN:  May the witness give the answer he was

5  giving?

6       THE COURT:  Just a minute.  Make sure he understands

7  the question.

8     Do you want the question read back?

9       MR. BLOOM:  That would be helpful.

10      THE COURT:  Read the question.

11      COURT REPORTER:  "Question:  When he told her the

12  Grand Jury might want to indict her for perjury?

13      "Answer:  I see.

14      "Question:  The same day he yelled at her?

15      "Answer:  I see.

16      "Question:  In her office place?

17      "Answer:  We saw the documents.  They wanted to know

18  why the documents seemed to conflict with what we said at the

19  Grand Jury.  I thought about this, too."

20  BY MR BLOOM:

21  Q. Let me rephrase the question.  It was all actually the

22  question before that went into that.

23     You know that you and your wife are facing serious federal

24  charges, potentially?

25  A. I see, so you are saying that I feel threatened.

**Q.** Do you feel like you could be prosecuted for any or all of those crimes?

**A.** I don't know how that works. I don't know a lot about the criminal justice system.

**Q.** Did you have any discussions with your lawyer? Without telling us the intimacies of those discussions, did you and he and Kara not have discussions with Mr. Zulauf about what possible problems you might be facing?

**A.** I went to see my lawyer, and I said, this is the situation so far, start to finish, including the documents coming to light and how that -- and what I had remembered after reviewing my notes from that time period. That was the first part of that meeting.

The second part of that meeting was my lawyer and I agreed, and I said I need a way to say exactly what I have just said to you -- to my lawyer -- to the government. I need to find a way to communicate to them. And he said -- and then we talked about a plan of action.

And he said the plan is, same thing that you told me, I'm going to arrange a meeting with the government. You're going to tell them the same thing. In that meeting, listen to their questions. Tell the truth on every question.

We subsequently went to meet the government. I told them the series of events just as I told my lawyer. The government said, I want you to listen to all our questions, answer

1 truthfully to every question.

2 **Q.** That's what you did on the 1st of February, right?

3 **A.** That's correct.

4 **Q.** Okay. But my question to you wasn't that at all. It

5 was --

6 **A.** Well, no, it is, because you are implying that I went in

7 there and was threatened with these charges in some way. But

8 that's not what happened at all.

9 **Q.** My question to you is, my first question, as you sit there

10 now, do you feel you and/or Kara could be prosecuted for any

11 of those crimes? That was my first question.

12     My second question is, you answered with a question, and I

13 said, did you discuss those matters with your lawyer? That's

14 my question. From the time you first spoke to Mr. Zulauf to

15 today.

16         THE COURT: Let's give him one question. Start over.

17 BY MR. BLOOM:

18 **Q.** My question is, have you discussed with your lawyer

19 possible prosecutions you and Kara might be facing? Have you

20 discussed it with him?

21 **A.** It's just as I described it to you. I explained

22 everything that happened. He said the best course of action,

23 we will go in, have a meeting. You'll tell them everything

24 you told me. They are going to have questions. You are going

25 to tell them the truth. That's what they want.

1    **Q.** Here's my question you have not answered.  Have you
2    discussed with your attorney whether or not you and/or Kara
3    are subject to possible prosecution for perjury, obstruction
4    of justice, and making a false statement to a federal officer?
5    Have you discussed those matters with him?
6    **A.** I see.  The conversation with my lawyer in regards to that
7    was basically I explained the situation, and he said you were
8    right to come and see me, you do need a lawyer, and here's
9    what we are going to do.
10   **Q.** Did he ever tell you that you have a potential problem of
11   being prosecuted for any or all of those crimes?
12   **A.** He explained to me --
13   **Q.** Yes or no, did you discuss it with him?
14          THE COURT:  Let him answer.
15   **A.** He explained to me that what the government wanted was for
16   me to answer all their questions truthfully, to explain the
17   documents, and to explain what I had remembered from that time
18   period.  He said once I did that, once we got to that step,
19   the government would not necessarily be interested in charging
20   me, taking me to court.
21   BY MR. BLOOM:
22   **Q.** Charging you with what?
23   **A.** He didn't say.
24   **Q.** You didn't discuss with him perjury?
25   **A.** I just gave you a synopsis of the conversation.

1  **Q.** So if you told the government certain things. It was his

2  view, as he expressed to you, that the government wouldn't

3  necessarily want to prosecute you; is that correct? Is that

4  what you are saying?

5  **A.** He said they were interested in the truth. They were not

6  necessarily interested in charging me.

7  **Q.** Well, Kara knew and then you knew what they were

8  interested in. They were interested in what Agent Halla told

9  her on January 19 of '07, we believe this car was used in an

10  arson. That's the truth, according to what Mr. Halla wants.

11  You understood that, right?

12       MR. FRIEDMAN: Objection, argumentative and calls for

13  speculation.

14       THE COURT: Answer it.

15  **A.** I would not lie because that's what someone wanted me to

16  do. I would not lie if I felt I was being threatened. I

17  would not cooperate if I thought I was being threatened.

18  That's the answer.

19  **Q.** You are a person who's already lied to Agent Halla; is

20  that correct?

21       MR. FRIEDMAN: Objection, Your Honor. Arguing with

22  the witness.

23       THE COURT: Question.

24  BY MR. BLOOM:

25  **Q.** You are a person who's already lied to Agent Halla; is

1    that correct?

2            MR. FRIEDMAN:  Objection, asked and answered, Your

3    Honor.

4            MR. BLOOM:  He said he wouldn't lie.

5            THE COURT:  Has he not answered that before?

6            MR. BLOOM:  I can ask it at this point, where he says

7    he wouldn't lie.  I can ask if he lied to Agent Halla.

8            THE COURT:  What I am trying to understand, are you

9    going to come to an end here?

10           MR. BLOOM:  Of course I'm going to come to an end,

11   Judge.  I don't want to be here forever.  The jury doesn't

12   want to hear this forever.

13           THE COURT:  Ask your question.  I don't need you to

14   editorialize.  Ask a question.

15   BY MR. BLOOM:

16   Q.  You said you wouldn't lie, and we know you lied.  You

17   testified that you lied, right?

18   A.  That's a bit different.  That's a bit different.  I was

19   trying to protect someone.

20   Q.  Briana Waters got in touch with you sometime in early

21   2006, right?

22   A.  Yes, I think that's correct.

23   Q.  Did she tell you --

24           MR. FRIEDMAN:  Objection, Your Honor.

25   BY MR. BLOOM:

1   **Q.**  -- to expect to be questioned about her?

2          MR. FRIEDMAN:  Objection.  The Court has dealt with

3   this.  It's been asked and answered numerous times yesterday.

4          THE COURT:  Are you going into the same area I ruled

5   on?  Mr. Bloom, are you going into the area that I have ruled

6   on?

7          MR. BLOOM:  No, I am not going to go into the area

8   that you ruled on.  I would never do that.

9          THE COURT:  Then ask your question.

10         MR. BLOOM:  No, I am not going to ask that question.

11         THE COURT:  Ask your question.

12  BY MR. BLOOM:

13  **Q.**  The things you did say to the authorities -- in fact, if

14  you look at the same exhibit, Exhibit A-7, and look on page 6.

15  **A.**  A-7, page 6.

16  **Q.**  Yes, same exhibit, February 1, A-7, page 6.

17  **A.**  I am looking at page 6 of A-7.

18  **Q.**  If you look right in the middle, did you tell the

19  authorities on February 1 that Briana Waters called you and

20  she told you that you should expect to be questioned about

21  her?

22         MR. FRIEDMAN:  Objection, Your Honor, the Court has

23  dealt with this yesterday.  We've raised the issue.  We are

24  going into an area that Mr. Bloom knows he's not supposed to

25  go into.

1   **Q.** I am not at all. I am not going to go into the areas

2   where the Court said no, not at all. I can promise you that,

3   I will not do that.

4         THE COURT: Ask your question.

5   BY MR. BLOOM:

6   **Q.** Did you tell the authorities, Mr. Friedman and Mr. Halla,

7   that in the phone call, Briana said to you that you should

8   expect to be questioned about her? Did you tell that to the

9   authorities on February 1 of '07?

10   **A.** Yes.

11   **Q.** Did you also tell them on that day, February 1, that there

12   was trouble; she told you on the phone conversation that there

13   was trouble? Did you report that, did you say that a year

14   ago?

15   **A.** Yes, I did.

16   **Q.** Did you also say a year ago that she had told you in the

17   telephone conversation that everybody she knows is going to be

18   questioned by law enforcement?

19   **A.** That's true.

20   **Q.** Did you also tell them that Ms. Waters did not tell you in

21   that phone conversation what kind of trouble she was in, nor

22   did she provide details --

23   **A.** Correct.

24   **Q.** -- regarding why law enforcement was investigating her and

25   questioning her associates?

1   **A.**  Correct.

2   **Q.**  And without going into them, she told you other things as

3   well in that phone conversation; is that correct? And please

4   don't go into them. I am not allowed to ask you about that,

5   and you are not allowed to answer about that. But she did

6   tell you other things; is that correct?

7   **A.**  I think that's fair to say, yes.

8   **Q.**  And whatever those other things were, you told them to the

9   authorities; is that correct?

10   **A.**  I described the conversation with them in the best detail

11   I could, so I would say yes.

12   **Q.**  One thing she did not say to you, is she did not ask you

13   in that phone conversation to lie for her?

14        MR. FRIEDMAN: Objection, Your Honor. It has been

15   asked and answered many times.

16        THE COURT: You may answer.

17   **A.**  That was not part of that conversation. She did not tell

18   me to do that.

19   BY MR. BLOOM:

20   **Q.**  Has she ever told you to lie for her?

21   **A.**  No.

22   **Q.**  Has she ever told you to protect her?

23   **A.**  No.

24   **Q.**  Yesterday you testified -- and I am moving on to a

25   different subject matter. You testified that there was, at

1 your home, when Briana was living there, there was some kind

2 of meeting that took place where chairs had been arranged in a

3 circle.

4 **A.** Correct. Briana said --

5 **Q.** Just yes or no for now. Do you remember testifying about

6 that?

7 **A.** Yes, I remember.

8 **Q.** Now, on February 1 of '07, you told the authorities about

9 that meeting; is that correct?

10 **A.** I think so, yes.

11 **Q.** Would you look, just to refresh your recollection, if you

12 need to, again, page 6, the last paragraph? Am I correct that

13 you testified yesterday that there was a time when Briana

14 asked you and your wife to leave the house, to leave your

15 house? Is that right?

16 **A.** That's correct.

17 **Q.** Had you ever said that to anybody before yesterday, about

18 that meeting?

19 **A.** It's hard to remember, but -- that's hard to say. There

20 was a lot of lengthy interviews. I gave as many details as I

21 could.

22 **Q.** Well, in fact, on February 1st of '07, when you told the

23 authorities about that, isn't it a fact that you told him that

24 you remembered that when you and your wife and your son

25 returned to your residence from eating dinner out -- page 6,

1 the last paragraph -- you observed peopling coming out of your

2 house; is that correct?

3 **A.** Yes.

4 **Q.** Is there anything in that statement where you told them

5 that Briana asked you to leave the house?

6 **A.** That's absolutely what happened. She absolutely asked us

7 to leave the house and not come back until a certain time.

8 **Q.** When did you tell anybody that before yesterday?

9 **A.** I can't say for sure, but that's absolutely what happened.

10 **Q.** You've got a whole stack of reports there. After we take

11 a break, you take a look and see if there's a single word

12 anywhere in those reports about your ever saying that before

13 yesterday.

14 **A.** I am saying it now, and it's the absolute truth.

15 **Q.** In fact, it turns out that that was a meeting about how to

16 save old growth forests; isn't that correct?

17 MR. FRIEDMAN: Objection, Your Honor.

18 THE COURT: If he knows.

19 **A.** I have no idea what the content of the meeting was.

20 BY MR. BLOOM:

21 **Q.** In fact, the people that you saw there, you had a

22 conversation, did you not, with your wife and with Briana

23 about what the meeting was about?

24 **A.** I don't remember that.

25 **Q.** Well, tell you what, to refresh your recollection, could

1  you look at the next exhibit, which is A-8, which is Kara's

2  statement of February 1?  If you would take a look at page 2,

3  look at the large paragraph at the bottom.  Why don't you read

4  that to yourself to see if that refreshes your recollection

5  about that was a meeting, a purely legal meeting, a purely

6  lawful meeting about people discussing strategy about how to

7  save the old growth forests from the rape by the timber

8  companies.

9  **A.**  I don't know what that meeting was about.

10  **Q.**  Take a look at that document and see if it refreshes your

11  recollection.  Could you do that?

12            MR. FRIEDMAN:  Objection, arguing with the witness.

13            THE COURT:  Mr. Bloom, I don't know if you need to

14  yell at the witness, but you can ask him to take a look at it.

15  BY MR. BLOOM:

16  **Q.**  Take a look at Exhibit A-8, page 2, the paragraph at the

17  bottom, where it begins "Larson advised."

18  **A.**  All right.

19  **Q.**  Just read it to yourself.

20  **A.**  All right, I have read it.

21  **Q.**  Did you come to learn from Kara, and from discussions with

22  Kara, your wife, that that's what the meeting was about?

23  **A.**  I don't know.  No, she did not tell me that was what it

24  was about.  I do not know what it was about.

25  **Q.**  Did she tell you that she knew one of the people at the

1  meeting -- actually two of the people at the meeting, somebody

2  named Leon?

3  **A.**  Yeah.  No, I remember coming in and seeing those people,

4  yes.

5  **Q.**  It was in your house, and the chairs were in a circle; is

6  that right?

7  **A.**  Yes.

8  **Q.**  It wasn't some clandestine meeting in somebody's basement

9  somewhere; it was in your house, and it was a place for a

10  meeting, right?  There was nothing secret or sinister about

11  that?

12  **A.**  I didn't say that there was.

13  **Q.**  Did she ask you to leave the house?

14  **A.**  Correct.

15  **Q.**  That's what your testimony is?

16  **A.**  Yes.

17  **Q.**  Get out of your own house, that's what she said to you?

18  **A.**  Not in those words.  She said we shouldn't be there.

19  **Q.**  When did that happen?  When did that meeting happen?

20  **A.**  I don't know what the exact date was.

21  **Q.**  What month was it?  What year?  Let's start with what

22  year.

23  **A.**  It was before May of 2001.

24  **Q.**  Before May of 2001.  And how do you remember that?

25  **A.**  How do I remember that?

1  Q. Yes, sir, how do you remember it was before May of 2001?

2  A. Because it was the time -- one of the first times she

3  stayed with us before she had gone away for a while and left

4  her stuff there.

5  Q. That's how you remember it, because it was -- there was a

6  time before she left -- I'm not sure how you remember the

7  year?

8  A. Just like I said.

9  Q. Do you remember the month?

10 A. No, I can't give you a month right now.

11 Q. One of the people there was somebody named Avalon; is that

12 correct?

13 A. That's correct.

14 Q. Did you know Avalon?

15 A. Not really, no.

16 Q. Is he a well-known figure around town, that you would see

17 around town?

18 A. Yes, I had seen him around town.

19 Q. You came to know he was a person involved in a whole range

20 of environmental activities; is that correct?

21 A. Very recently.

22 Q. You learned that?

23 A. Correct.

24 Q. You didn't know anything about that back in 2000, 2001?

25 A. I might have assumed that. No one sat me down and

1  described that to me, as far as I know.

2  **Q.**  Did you know this person Leon that your wife referred to?

3  **A.**  Yes.

4  **Q.**  And was he at the meeting, too?

5  **A.**  Correct.

6  **Q.**  Who else can you identify as having been at the meeting?

7  **A.**  There was other people, but I did not necessarily know who

8  they were or had seen them before.  So it's hard to say.

9  **Q.**  You came home and you saw -- did you see people leaving

10  your home?

11  **A.**  They were wrapping up the meeting, basically.

12  **Q.**  Were they still in the house, or were people actually

13  outside?

14  **A.**  Possibly both.

15  **Q.**  Which was it?  When you showed up, were there people

16  outside or no?

17  **A.**  It's possible.

18  **Q.**  You don't remember, is what you are saying?

19  **A.**  It's possible.  There was definitely some inside, whether

20  some were outside when I got there, I can't say for sure.

21  **Q.**  You don't remember?

22  **A.**  That's correct.

23  **Q.**  When you went in, there was still some people inside and

24  they were milling around, right, talking?

25  **A.**  I think that's correct.

1   **Q.** And when people saw you, did they run out the door?

2   **A.** No.

3   **Q.** Did they hide their faces?

4   **A.** Not at all.

5   **Q.** Did they threaten you?

6   **A.** No.

7   **Q.** It was a meeting about what's going on under the old

8   growth forest defense, that's what you came to learn, is that

9   not correct? You learned it from Briana, you learned it from

10  your wife.

11          MR. FRIEDMAN: Objection. Mr. Bloom is testifying,

12  and this question has already been answered.

13          MR. BLOOM: I am sorry, I am waiting for a ruling.

14          THE COURT: Do you want an answer to that question?

15          MR. BLOOM: Yes, please.

16          THE COURT: Do you know the question?

17          THE WITNESS: I know the question.

18          THE COURT: All right. Answer it.

19  **A.** I don't know what the meeting was about.

20  BY MR. BLOOM:

21  **Q.** Now, I just have a few more questions for you, sir.

22      Do you understand this case is about whether or not your

23  cousin is involved in burning down a building at the

24  University of Washington?

25  **A.** That's my understanding.

1  **Q.** You have known her for a long time, right?

2  **A.** That's correct.

3  **Q.** You trusted her, as you said, with your child, right?

4  **A.** That's correct.

5  **Q.** You trusted her to stay in your home at times when you

6  weren't there, right?

7  **A.** Yes, that's correct.

8  **Q.** You know that she produced this documentary film about the

9  struggle at Watch Mountain, to stop the clear-cutting of the

10 mountain above Randle --

11 **A.** Yes.

12 **Q.** -- Washington, right?

13 **A.** Yes, I do.

14 **Q.** In fact, you saw that film, did you not?

15 **A.** Yes, I did.

16 **Q.** You put it on your calendar and you went to see that film

17 on May 31 of 2001; is that correct?

18 **A.** That's correct.

19 **Q.** Did you like the film?

20 **A.** Yes, I did.

21 **Q.** It's not about arson, was it?

22 **A.** That's correct, it was not.

23 **Q.** It was about a struggle with towns people and tree

24 huggers, environmentalists that tried to stop destruction of

25 the forest, right?

1    A.   That's correct.

2    Q.   That's Briana Waters, isn't it?

3    A.   I would say that's true.

4    Q.   Just one more question.   Going back to February 1, 2007,

5    if you could take a look at page 7 of that document.

6    A.   A-7, page 7?

7    Q.   A-7, page 7.

8    A.   I am on that page.

9    Q.   Do you remember telling Mr. Friedman, Agent Halla, and

10   everyone else who was present during your interview on that

11   day, February 1, a year ago, in the presence of your lawyer,

12   you're telling the truth?  Do you remember that?

13   A.   Yes, I understand the time you are talking about.

14   Q.   Do you remember telling -- you, telling these people,

15   these investigators, that your wife -- the very last line of

16   that page -- that your wife, Larson, believed that the rental

17   car was predominantly going to be used for your family's

18   purposes?

19   A.   Yes, I see that.

20   Q.   Is that what you told them on that date?

21   A.   Yes, it is.

22            MR. BLOOM:   I have no further questions.

23            THE COURT:   Any redirect?

24            MR. FRIEDMAN:   Very briefly, Your Honor.

25            MR. BLOOM:   May I have a moment, please?

REDIRECT EXAMINATION

BY MR. FRIEDMAN:

**Q.** Mr. Corrina, why do you say your wife believed the rental car was primarily for your family's purposes?

**A.** I felt like I had to spin it that way for my wife, because I felt like if I would have told her it was primarily for Briana, that she would not have gone for it, would not have agreed to rent the car.

**Q.** Was there some tension between your wife and Briana Waters?

**A.** That's correct.

**Q.** Did that play into why you spun it this way?

**A.** Yes. Yes, it did.

**Q.** And in fact, for whose purposes was the car?

**A.** It was for Briana.

**Q.** Has the government ever asked you to do anything other than tell the truth in this case?

**A.** I have always been instructed by the government to tell the truth in answering all these questions.

      MR. FRIEDMAN: Thank you very much, Mr. Corrina.

      MR. BLOOM: I have a couple questions.

RECROSS-EXAMINATION

BY MR. BLOOM:

**Q.** You were telling the truth to these people on February 1, a year ago, right?

1   **A.**  Yes.

2   **Q.**  And you just used the phrase out of your mouth, "I spun it

3   that way," right? Did you use that phrase?

4   **A.**  Yes, I did.

5   **Q.**  In other words, you did like a little trick, a little

6   political spin, you weren't exactly telling the truth. Is

7   that what you were telling the jury, that you weren't really

8   telling the truth, you were doing some spinning of the truth?

9   **A.**  No, I was trying to do a favor for Briana.

10   **Q.**  For Briana?

11   **A.**  Correct.

12   **Q.**  I see. I thought you were trying to protect your wife. I

13   thought that's what you just said to Mr. Friedman, you were

14   trying to protect your wife, not Briana?

15   **A.**  I am confused about what you are saying.

16   **Q.**  Wait a minute. A few minutes ago Mr. Friedman got up and

17   asked you a question, and you answered that you spun it that

18   way to protect your wife.

19   **A.**  No. Not to protect my wife, and I didn't -- it wasn't a

20   lie. I was telling my wife the truth. I said, hey, we are

21   going to get this car. Briana needs it, but, hey, look, we

22   can use it for this, we can use it for that. She doesn't need

23   it the whole time. That's what I am saying. But I wasn't

24   hiding anything from my wife. I was saying, hey, look at the

25   benefits.

1  **Q.**  You are basically saying here, you were trying to trick
2  your wife?
3  **A.**  No.  She knew everything I was saying.  I presented it as
4  something that would be okay, something we could do.
5  **Q.**  You left out some stuff?
6  **A.**  I didn't leave out anything.  I said, I asked her to look
7  at the positives.  I presented the whole situation to her.
8  But then I said, hey, look at the positives, to convince her,
9  not to trick her.
10  **Q.**  So when you said on February 1, telling them the truth,
11  you didn't tell that whole story.  You just said to them on
12  February 1 that your wife believed the rental car was
13  predominantly going to be used for the family's purposes,
14  that's what you told them.  Was that the truth?
15  **A.**  It had been a long day and a long process.  It's possible
16  I oversimplified and didn't get into enough details.
17  **Q.**  In other words, you deceived them a little bit, right?
18  **A.**  No.
19  **Q.**  You left out some details?
20  **A.**  It's possible I didn't get into enough detail.  It was a
21  long day, lots of questions, lots of details to remember.
22  **Q.**  You know the expression, a good thing about telling the
23  truth is you don't have to remember anything?
24  **A.**  I think I understand what you are saying.
25          MR. BLOOM:  I have no further questions.

1   THE COURT:  Are we through with this witness?

2   MR. FRIEDMAN:  No further questions.

3   THE COURT:  May the witness be excused?

4   MR. FRIEDMAN:  Yes.

5   MR. BLOOM:  Yes.

6   THE COURT:  All right.  You are excused.

7   Next witness.

8   MR. FRIEDMAN:  The government calls Jackie Brown.

9   Have the witness come forward.  I will have you just come

10  forward and raise your right hand and be sworn.

11      JACQUELINE BROWN, called as a witness, duly sworn.

12  THE COURT:  Come around and take the witness chair,

13  please.

14                    DIRECT EXAMINATION

15  BY MR. FRIEDMAN:

16  Q.  Good morning Ms. Brown.

17  A.  Good morning.

18  Q.  Can you tell us where you work -- I am sorry, can you tell

19  us your whole name and spell your last name for the Court

20  reporter?

21  A.  Jacqueline Brown, director of emergency services at

22  Providence St. Peter Hospital in Olympia.  Washington.

23  Q.  You are a nurse; is that correct?

24  A.  That's correct.

25  Q.  When did you finish nursing school?

1   **A.** I finished nursing school in 1981.

2   **Q.** Where was that?

3   **A.** At San Francisco State University.

4   **Q.** And did you get a bachelor's degree from there?

5   **A.** I did. I got my Bachelor from San Francisco State

6   University. I went on to get my master's degree at UCSF,

7   specializing in emergency trauma nursing.

8   **Q.** When did you get your master's degree?

9   **A.** Well, I believe it was 1992.

10   **Q.** And where did you do that?

11   **A.** UCSF.

12   **Q.** After that at some point you moved to Washington?

13   **A.** I moved to Washington in the late 1990s, I believe it was

14   19 -- I want to say seven or eight.

15   **Q.** As director of emergency services at Providence St.

16   Peters, what is your job, what do you do?

17   **A.** I am responsible for the operations of the emergency

18   center on a 24-7 basis. We currently have about 39 rooms that

19   we function in. I have about 120 staff that report to me. We

20   deal with patients who come into the hospital in emergent

21   situations and need to be seen.

22   **Q.** You said you have 39 beds. How many emergency rooms are

23   there in Olympia?

24   **A.** Two.

25   **Q.** What's the other one?

1  **A.**  Capitol Medical Center.

2  **Q.**  How many beds do they have?

3  **A.**  I believe they have eight emergency department beds.

4  **Q.**  Now, I assume as director of emergency services you are

5  familiar with procedures followed in the emergency room?

6  **A.**  Very familiar.

7  **Q.**  When a patient comes in, seeking emergency care, walk us

8  through what happens.  What's the first thing they do?

9  **A.**  The first thing they do is walk up to the desk at the

10  emergency center.

11         MR. BLOOM:  Excuse me, I am sorry, I am going to

12  object about what people ordinarily do.  The question is what

13  did a particular person do a particular day if he or she

14  appeared.  You know what, I withdraw.  Excuse me, pardon the

15  interruption.

16  BY MR. FRIEDMAN:

17  **Q.**  Let's start again.  When a patient walks into the

18  emergency room, what do they do?

19  **A.**  A patient will generally walk up to the front desk.  It

20  sits right there at the opening to the emergency department.

21  They present, and are asked a couple key questions, including

22  their name and what brings them to the emergency department.

23  Their chief complaint.

24      Based on that information, they see a triage nurse who

25  identifies their acuity and how quickly they need to be

1  brought back for patient care.

2  **Q.**  When you say acuity, what do you mean by that?

3  **A.**  The emergency room operates off the national standard,

4  it's an ESI scale of 1 to 5.  So we triage patients based on

5  their chief complaint as well as things like vital signs,

6  pain, those type of things to the five-teared system.  Those

7  people who are level 1 and 2 are emergent patient, life

8  threatening condition, need to come back right away.

9  Those that are level 3, have a longer time period where

10  they can be seen.  4s and 5s are people that can be seen in an

11  urgent care center but have come to the emergency department.

12  **Q.**  So the triage nurses figure out how serious the situation

13  is and how quickly the patient needs to be seen.

14  **A.**  She is identifying based on what their presenting

15  complaint is, how quickly they need to come back to have a

16  medical screening exam completed by a physician.

17  **Q.**  In the case of a patient who is in as serious a condition

18  as you can get, what happens to that patient?

19  **A.**  Essentially that patient does not stop.  The triage nurse

20  who identifies the patient will not even do vitals or any of

21  that, she will bring them back directly to the patient care

22  room to be seen.

23  **Q.**  In the other end of the spectrum, a person who walks in

24  with a complaint, somebody that needs urgent care but not as

25  serious as the patient we just discussed, what happens to that

1 patient?

2 **A.** She will go through the full triage process, which will

3 include some vital signs, getting some past medical history,

4 allergies, those type of things, to help us identify a little

5 more clearly how quickly she needs to come back and be seen;

6 he or she.

7 **Q.** Once they have gone through that triage process, what

8 happens next?

9 **A.** Then if a bed is available in the department, they are

10 brought directly back into the department. If a bed is not

11 available they are sent over to the waiting area to await when

12 the bed becomes available.

13 **Q.** Then when a bed becomes available what happens?

14 **A.** They are brought back into the emergency room to be seen

15 by one of our providers.

16 **Q.** I want to talk about a couple specific type situations,

17 the first has to do with ability to pay. Does the hospital,

18 does your emergency room deny treatment to anyone based on

19 their inability to pay?

20 **A.** No. Providence St. Peter hospital has one of the highest

21 charity cares available in the State of Washington. I believe

22 we actually have the highest in the State of Washington. And

23 no one is turned away. There's some strong federal law that

24 requires that you cannot delay a medical screening exam to

25 identify a patient's insurance or their ability to pay. And

1   in fact, we treat a lot of patients who do not have the

2   ability to pay.  We do not turn people away because they

3   cannot pay.

4   **Q.**  So, in the case of a patient in extremely serious

5   condition who comes in with no money, no proof of insurance

6   and they are in a very serious condition, what happens to

7   them?

8   **A.**  Well, their ability to pay wouldn't even be considered.

9   What would be considered is how sick they are and how quickly

10  we need to get them back.

11  **Q.**  In the case of a patient still needing urgent care but not

12  quite as serious with no money and no insurance?

13  **A.**  They would still be seen in the emergency center.  We do

14  have the ability to provide them, after all is done, they have

15  been seen, they have been treated and they are ready to go

16  home, if they like we do actually have financial counselors in

17  the emergency department who can help them look at future

18  payment, getting on Medicare, multiple options available to

19  them.

20  **Q.**  Is it fair to say payment isn't even an issue until after

21  treatment?

22  **A.**  Quite fair to say.

23  **Q.**  What about how busy the emergency room is, how long the

24  wait could be?  When a person comes up to the registration

25  desk, does the registration person give or can they provide an

1   estimate of how long it takes to be seen?

2   **A.** We actually do a lot of training with our registration

3   people and our triage staff. We do not give out estimates of

4   how long it will take to be seen. In fact, we just finished

5   putting out a brochure to educate patients and their families.

6   The problem with trying to give an estimate, although you may

7   be in the waiting room for the emergency room, we have

8   ambulances that arrive on a continual basis; having only two

9   emergency departments in the Olympia area, St. Peters receives

10   the majority of ambulance patients. We have learned --

11   hospitals across the country have learned you try never -- you

12   don't try, you just don't give estimates of time because you

13   can't tell what can be coming through your door at any minute.

14   **Q.** Are patients who are in serious condition and need to be

15   seen immediately, are they delayed if the emergency room is

16   busy on a night, are they delayed in their treatment?

17   **A.** No. What we do is we go through the bed situations and

18   discuss with the physicians and what we do is we actually will

19   pull patients who have had their treatment started or maybe

20   just waiting for tests, maybe waiting for admission, we

21   actually pull them out and place them in hall beds and put a

22   new stretcher in a room to take those highly acute patients

23   out of the waiting room and get them seen.

24   **Q.** Does the emergency room keep records of patients who are

25   treated in the emergency room?

**A.** Yes, federal law requires that we track all patients who come to the emergency department seeking care.

**Q.** Have you looked at some logs for your emergency room in this case?

**A.** Yes, I have.

**Q.** Would you look at Exhibit 778, which should be in front of you and tell me if you recognize that?

**A.** Yes, I do.

**Q.** What is Exhibit 778?

**A.** This is the emergency room department log for St. Peter hospital.

**Q.** Do you recall for what dates?

**A.** I believe this was the 20th and 21st that you have here.

**Q.** These are records that St. Peters keeps in the normal course of its business?

**A.** That's correct, May 20 and 21 of 2001, yes.

      MR. FRIEDMAN:  Government offers 778.

      MR. BLOOM:  I am not finding my copy here.

May I have a moment, please.  This is a recently provided Exhibit, and I haven't had a chance to look at it, yes.

      MR. FRIEDMAN:  For the record, we did provide it several days ago.

      THE COURT:  I don't have it either.

      MR. FRIEDMAN:  I am sorry.  I will bring up a copy to the Court.

1    MR. BLOOM:   Thank you.   We have no objection.

2    THE COURT:   All right.   You are offering it.

3    MR. FRIEDMAN:   We are.

4    THE COURT:   It is admitted.

5    MR. BLOOM:   Now we have no objection.

6    THE COURT:   Admitted.

7              (Exhibit No. 778 admitted.)

8  BY MR. FRIEDMAN:

9  Q.  I am sorry, the Court admitted it?

10   THE COURT:   Yes.

11   MR. FRIEDMAN:   Thank you, Your Honor.

12 BY MR. FRIEDMAN:

13 Q.  You can use the paper copy or there should be a copy on

14 the screen in front of you; this is entitled emergency room

15 log?

16 A.  Correct.

17 Q.  There's actually a number of pages here; is that correct?

18 A.  That's correct.

19 Q.  If we look at the bottom of the payment do you see

20 something that says date and shift?

21 A.  Correct.

22 Q.  Can you tell us what that means?

23 A.  This means this is a log for May 20 of '01.  The 7 a.m. to

24 3:00 p.m. shift.  This is page 1 of 3.

25 Q.  We will switch to later pages in a moment.  Reading across

1 the top line can you tell me what information is recorded in
2 this log?
3 **A.** Yes, we identify the number of patients that came in. The
4 name of the patient, the age. The chief complaint that the
5 patient has presented with. There's a medical record or --
6 actually this is an account number that is assigned for that
7 particular visit. We identify who the physician is that saw
8 the patient. If a referral physician has sent the patient
9 into the emergency department, we also identify that
10 physician. "Disp" represents disposition of the patient, did
11 they go home, were they admitted. And the "time in" is the
12 time they came to be seen in the emergency department, and the
13 "time out" is the time they were discharged or admitted or
14 transferred.
15 **Q.** When is a patient's name written on this log?
16 **A.** When they come up to the triage desk.
17 **Q.** Turning to the seventh page of this Exhibit --
18 **A.** Actually let me clarify, please. The patient's name is
19 written on this log went they get back in the room. But all
20 patients that come in, actually have the time -- they come in
21 and have a piece of paper that the triage nurse completes.
22 That piece of paper has the "in time." So that piece of paper
23 comes back into the back and is added to the log as patients
24 come back. However, if patients leave before they are seen,
25 those papers are also brought back in and they are also placed

1  on the log, the times in and out.

2  Q.  Is it fair to say every patient who comes in and talks to

3  the registration and triage nurse, their name is on this log?

4  A.  Correct.

5  Q.  If we turn to the seventh page of this Exhibit.  The first

6  page you told us was for a shift 7 a.m. to 3:00 p.m.?

7  A.  Yes.

8  Q.  When we turned to the seventh page what is this?

9  A.  This is the 3:00 p.m. to 11 p.m. on 5-20-01.

10  Q.  Is it fair to say the subsequent pages are the same shift?

11  A.  Correct.

12  Q.  Have you reviewed this log and specifically these pages?

13  A.  Yes.  I have.

14  Q.  Have you reviewed the entire log for the dates May 20 and

15  21st?

16  A.  Yes, I have.

17  Q.  Looking at the pages for the 3:00 to 11 p.m. shift, did

18  you look at the time the patients were coming in and going

19  out?

20  A.  Yes, I did.

21  Q.  What were you able to determine from that?

22  A.  It seemed like it was a normal operations type day.  That

23  it wasn't extremely busy and it wasn't extremely slow.  It was

24  just an average day.  I was going to say that it looks like

25  the average length of stay for patients coming in and out of

1 the department was about two hours in length.

2 **Q.** Just to do an example of how you figure out the length of

3 stay, if we look at the first patient on this shift which is

4 the first line, can you tell us what you are doing to

5 determine the length of stay between arrival and discharge?

6 **A.** I need to look at the second patient actually because that

7 one has the out time. But he came in at 1742 in the evening

8 and he went out at 2040, which is about three hours. What I

9 did was I looked at all -- in order to come up with the two

10 hour length of stay, I looked at all those that had the in and

11 out times and looked at the average for them.

12 **Q.** So patients were generally being seen, treated and

13 discharged within two hours that evening?

14 **A.** Correct.

15 **Q.** Have you reviewed the entire log for May 20 and 21 to see

16 whether the name Briana Waters appears in there?

17 **A.** Yes, I did.

18 **Q.** And what did you determine?

19 **A.** I could not find that name on our log.

20 **Q.** And based on that, can you conclude whether Briana Waters

21 came and sought treatment that evening in the hospital?

22 **A.** Based on that I would conclude she did not come to the

23 emergency department on May 20.

24 **Q.** Or 21st?

25 **A.** Or 21st.

1       MR. FRIEDMAN:  Thank you very much Ms. Brown.

2                       CROSS-EXAMINATION

3    BY MR. BLOOM:

4    **Q.**  Hello, Ms. Brown.

5    **A.**  Hello.

6    **Q.**  Have we ever met?

7    **A.**  No.

8    **Q.**  My name is Robert Bloom.  I am an attorney, along with

9    Mr. Fox, for this young woman here, Briana Waters.  I just

10   have a few questions for you.  I believe they won't be a

11   hassle, so relax.

12       Did you check for Briana Waters' name on May 20?

13   **A.**  Actually, I did check for Briana Waters.  The only visit

14   that I could find for this individual was not related, did not

15   occur in May of 2001.

16   **Q.**  Was it January of 2002?

17   **A.**  It was in 2002, I can't tell you exactly the date.

18   **Q.**  Does January 21 ring a bell?

19   **A.**  I am sorry, I don't remember.

20   **Q.**  Was it for abdominal pains, if you remember?

21   **A.**  I don't remember.

22   **Q.**  Has there been a recent request by somebody for those

23   particular records, records of Briana Waters in sometime in

24   2002?

25   **A.**  I believe there was a request of the hospital.  I don't

1 know exactly what they were asking for.

2 **Q.** Okay. Now, you were asked to look for records for May 20,

3 which would have been a Sunday, and May 21, which would have

4 been Monday. Maybe you don't know the dates. You don't?

5 **A.** I don't.

6 **Q.** Days of the week?

7 **A.** I don't know the days of the week.

8 **Q.** You were asked to look for May 20 and 21; is that correct?

9 **A.** That's correct.

10 **Q.** First you were asked to look for May 19?

11 **A.** Pardon me.

12 **Q.** First were you asked to look for May 19?

13 **A.** I wasn't asked to look for May 19 but I looked.

14 **Q.** You looked?

15 **A.** Yes.

16 **Q.** You did not find any record?

17 **A.** I could not find any record except for a visit in 2002.

18 **Q.** If a person made up a story, fabricated a story that

19 somebody had come to your hospital, and that story were not

20 true, is it fair to say there would be no record of a person

21 by whom that story -- there would be no record if it were a

22 made up story; is that right?

23 **A.** Correct.

24 **Q.** Maybe it's an obvious, it seems obvious it's not a trick

25 question, it's obvious.

1    If there were -- if somebody said that Briana Waters came

2  to the hospital, on May 20, and if that were a made up story,

3  there wouldn't be any record of Briana Waters, right?

4  **A.**  For that visit, for whatever they were referring to.

5  **Q.**  Right.  Now, I just have one other question.

6    It can get pretty crowded at that emergency room; is that

7  correct?

8  **A.**  At times.

9  **Q.**  And particularly on weekends, is that fair to say, more so

10  weekends or not?

11  **A.**  Not particularly.

12  **Q.**  Okay.  Do you know, from looking at the log -- of the logs

13  you looked at, was the night, were those days particularly

14  busy days or not busy?  Just give the volume.

15  **A.**  Based on my review of the record, they weren't

16  particularly busy.  They weren't slow, but they weren't very

17  busy as well.  To have a two hour length of stay means they

18  were moving patients through rather quickly.

19  **Q.**  Now, the setup of your emergency room, is it such that

20  when you come to the desk, can you see the waiting room where

21  patients are waiting?

22  **A.**  Yes.

23  **Q.**  So if I were to come, I would suspect you probably know,

24  it's a relatively common experience, somebody comes to the

25  emergency room, takes a look and sees 20 or 30 people waiting,

says I am out of here, I am not even going to sign up.  Have
you had that experience?

**A.**  Yes.

**Q.**  People just look and say this is too crazy, I am out of
here?

**A.**  Correct.

        MR. BLOOM:  I don't have any further questions, thank
you.

        THE COURT:  Anything else?

        MR. FOX:  No, Your Honor.

        THE COURT:  The witness can be excused.

        MR. BLOOM:  Yes.

        THE COURT:  Next witness.

        MR. FRIEDMAN:  The government calls Donna Kravis.
May I approach, I have an exhibit.

        THE COURT:  Let me have you come forward and raise
your right hand.

        DONNA KRAVIS, called as a witness, duly sworn.

        THE COURT:  Just come around and take the witness
chair.

                    DIRECT EXAMINATION
BY MR. FRIEDMAN:

**Q.**  Good morning, Ms. Kravis.

**A.**  Good morning.

**Q.**  Can you tell us your whole name and spell your last name

1 for the record.

2 **A.** My name is Donna Kravis, KRAVIS.

3 **Q.** Where do you work?

4 **A.** I work at Capitol Medical Center in Olympia, Washington.

5 **Q.** If you lean a little closer to the microphone it will pick

6 your voice up a lot.

7 **A.** Sure.

8 **Q.** Now, you are a nurse, correct?

9 **A.** I am a nurse, yes.

10 **Q.** When did you graduate from nursing school?

11 **A.** 1991.

12 **Q.** Where was that, was that in Washington or elsewhere?

13 **A.** It was in Washington.

14 **Q.** After you graduated from nursing school, where did you go

15 to work?

16 **A.** At Capitol Medical Center.

17 **Q.** Where is that?

18 **A.** In Olympia.

19 **Q.** What's your job there currently?

20 **A.** Currently I am the director of quality services in the

21 emergency department.

22 **Q.** As the director what are your job responsibilities?

23 **A.** To oversee the daily functioning of both areas in the

24 emergency room.  I have that as a staff person when the need

25 arises and as the quality director, I help manage all the

1  quality services and handle complaints that come into the
2  hospital.
3  **Q.**  Until a week or two ago, did you also have another title
4  or job?
5  **A.**  Yes, I did.  I had the intensive care unit.
6  **Q.**  You were director of?
7  **A.**  Director of critical care, yes.
8  **Q.**  How many emergency rooms are there in Olympia?
9  **A.**  Two.
10  **Q.**  And what are those?
11  **A.**  St. Peters has an emergency room and we at Capitol have an
12  emergency room.
13  **Q.**  Can you give us an idea of the relative size?
14  **A.**  St. Peters is much larger than we are.  I think they are
15  about 30 beds; ours is a 9-bed emergency department.
16  **Q.**  Are you familiar with the procedures followed in the
17  emergency room in 2001?
18  **A.**  Yes, I am.
19  **Q.**  Can you tell us, when a patient comes to the emergency
20  room for treatment, can you walk us through what happens?
21  Whom do they approach first?
22  **A.**  Sure, when they come into the emergency area, they are met
23  by a registration clerk, who signs them in as a patient and
24  then notifies the emergency department staff that there's a
25  patient that needs to be triaged.

1   **Q.** And what information does the registration clerk get from

2   the patient?

3   **A.** They ask them their name and their reason for visiting the

4   emergency room.

5   **Q.** What do they do with that information?

6   **A.** They bring it straight back to the emergency department so

7   the nurse can go out and triage the department patient.

8   **Q.** Do they record that?

9   **A.** Yes, there's a logbook that the patient's name is written

10  in that states the time they checked in, who they are and why

11  they are there.

12  **Q.** Basically every patient that comes in provides that

13  information and is recorded in that log?

14  **A.** Yes.

15  **Q.** After providing the information to the registration

16  person, what's the next step in the process?

17  **A.** Once the registrar gets the information, they bring up a

18  form back to the emergency department, where the nurse then

19  goes out and calls the name of the patient -- in 2001, they

20  were calling the name.  Now they are not.  Does a quick triage

21  on the patient to do vital signs, assess where they would fall

22  in a triage system, so that those that are the sickest get

23  back to the emergency room immediately and those that

24  unfortunately have the opportunity to wait are returned to the

25  waiting area to wait.

1  **Q.** At some point in the process, does the hospital gather

2  information about insurance and things like that from the

3  patient?

4  **A.** Yeah, after the triage nurse sees the patient,

5  oftentimes -- unless they are so sick that that's not an

6  appropriate step to take, they will ask for medical insurance

7  information.

8  **Q.** Then the patient would be called back to the treatment

9  area?

10  **A.** Correct.

11  **Q.** Once their turn or their number comes up?

12  **A.** Right.

13  **Q.** Let me ask you about insurance.  Does the hospital turn

14  anyone away based on lack of insurance or ability to pay?

15  **A.** No.  It's against the law for one thing.  But no, we don't

16  turn anybody away based on insurance or ability to pay.

17  **Q.** Does the hospital even know whether somebody has insurance

18  or the ability to pay before -- does the hospital know that

19  before the person provides the information to the registration

20  person that's recorded in the registration log?

21  **A.** No.  No.  They have no way of knowing that.

22  **Q.** So their name is recorded before the hospital has any idea

23  about financial situation?

24  **A.** Absolutely, and the paperwork that's initiated by the

25  registrar, to be brought back to the nursing area, doesn't

1 have any of that information listed on it until the triage

2 nurse has seen them and they are seated back in the waiting

3 area, then they are called again for their insurance

4 information. And that information is just a part of a file

5 that stays with the registration people. So the emergency

6 department staff really don't even pay attention to that at

7 that point.

8 **Q.** Is it a fair summary of what you said, names are recorded

9 in the log?

10 **A.** Yes.

11 **Q.** Before the question of ability to pay is ever raised?

12 **A.** Absolutely.

13 **Q.** What about how busy the emergency room is on a given

14 night. Does the registration person provide people who come

15 in an estimate of how long it will take to be treated?

16 **A.** No. That's part of their routine training is to never

17 give anybody an appropriate time. There's all kinds of things

18 that change in an emergency department. You have an ambulance

19 that shows up. Any number of things can happen that will

20 change that time. So they are trained early on, it's standard

21 practice not to give out an estimate of time.

22 **Q.** So again, is it fair to say the name is recorded in the

23 log before the person can get any information about how long

24 treatment will take?

25 **A.** Absolutely.

1   **Q.** Have you examined any of the logs from your emergency room
2   in this case?
3   **A.** Yes.
4   **Q.** Do you recall, did you look at logs for May 20 and 21 of
5   2001?
6   **A.** I did.
7   **Q.** Would you take a look at Exhibit 779.
8   **A.** Is that this?
9   **Q.** That should be in a folder in front of you.  Tell us if
10  you recognize that?
11  **A.** Yes, these are copies of our logbook from the emergency
12  department.
13  **Q.** For those two days?
14  **A.** For those two days, yes.
15  **Q.** Government offers 779?
16          MR. BLOOM:  We have no objection.
17          THE COURT:  Admitted.
18                  (Exhibit No. 779 admitted.)
19  BY MR. FRIEDMAN:
20  **Q.** May we use the document camera?
21      Ms. Kravis, there's obviously a title at the top of this
22  document?
23  **A.** Correct.
24  **Q.** It's highlighted, so it's difficult to read, but I put the
25  date up in the corner, 5-20 of '01, Sunday.

1  **Q.** This is the beginning of the log for May 20 of 2001?

2  **A.** Correct.

3  **Q.** What information is recorded about each person who came to

4  the emergency room on that date?

5  **A.** The patient's name, their address, age, sex, who did the

6  admission, what physician that was working that shift.

7  **Q.** Is it fair to say this Exhibit includes the entire log for

8  May 20 and 21 of 2001?

9  **A.** Yes.

10  **Q.** Have you examined that to see if the name Briana Waters

11  appears anywhere in the log?

12  **A.** Yes, looked through the log.

13  **Q.** What did you find?

14  **A.** I did not find her name.

15  **Q.** Based on that are you able to reach any conclusion as to

16  whether or not Briana Waters came to the hospital for

17  treatment and was turned away on either of those two days?

18  **A.** According to the log she was not in the hospital.

19  **Q.** If she had come to the registration desk, she would be in

20  the log?

21  **A.** Correct.

22       MR. FRIEDMAN:  Thank you.  I have no further

23  questions.

24                    CROSS-EXAMINATION

25  BY MR. BLOOM:

1  **Q.** Hello.

2  **A.** Hello.

3  **Q.** We have never met?

4  **A.** No.

5  **Q.** My name is Robert Bloom. I am a lawyer for Briana Waters.

6  My cocounsel is Neil Fox. I really just have one question for

7  you.

8  **A.** Sure.

9  **Q.** If a person fabricated a story, made up a false story that

10 Briana Waters had come to a hospital, including your hospital,

11 on a particular date, and that story were false, is it fair to

12 say it's pretty obvious there would be no record of Briana

13 Waters having come to your emergency room; is that correct?

14 If it were a false story?

15 **A.** Correct.

16      MR. BLOOM: I don't have any other questions, thank

17 you.

18      THE COURT: The witness may be excused.

19      MR. FRIEDMAN: She may Your Honor.

20      MR. BLOOM: Yes.

21      THE COURT: You are excused.

22      And it's right at the noon hour, so let's take the noon

23 recess at this time. I will have you just grab a bite. As

24 always, do not talk about the case in any way. When you are

25 back in the building, of course, I will have you situate

1 yourself in the jury room.

2     Leave your books on your chair.  See you after lunch.

3     (Jury not present.)

4         THE COURT:  All right.  We will take the noon recess.

5         MR. FOX:  Can I put one thing on the record?

6         THE COURT:  All right.

7         MR. FOX:  I just want the record to reflect, we

8 didn't object in front of the jury to 778 and 779, but earlier

9 we had objected to any testimony from either Ms. Kravis or

10 Ms. Brown.  And the Court had ruled for the government on that

11 issue, but I just want the record clear that we continue to

12 object to the testimony of the last two witnesses.  We didn't

13 repeat the objection in front of the jury, but we are not

14 giving up our objection.

15         THE COURT:  Okay.

16         MR. FOX:  Thank you, just so someone down the road

17 says you needed to object.

18         THE CLERK:  All rise, Court is in recess.

19     (Luncheon recess.)

20     (Jury not present.)

21         THE COURT:  All right, you may be seated.

22     Ready for the next witness?

23         MR. FRIEDMAN:  Yes, Your Honor.

24         THE COURT:  All right.  Bring in the jury.

25     (Jury present.)

1        THE COURT:  All right.  You may be seated.

2    Call your next witness.

3        MR. FRIEDMAN:  The government calls David Peterson.

4        THE COURT:  Just come forward, Mr. Peterson, and

5  raise your right hand and be sworn.

6        DAVID PETERSON, called as a witness, duly sworn.

7        THE COURT:  Just come around and take the witness

8  chair.

9        MR. FRIEDMAN:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11  BY MR. FRIEDMAN:

12  **Q.**  Good afternoon, Mr. Peterson.

13  **A.**  Hi.

14  **Q.**  Could you tell us your whole name and spell your last name

15  for the court reporter?

16  **A.**  David Edwin Peterson, P-E-T-E-R-S-O-N.

17  **Q.**  Where are you from originally?

18  **A.**  Where I was born?

19  **Q.**  Sure.

20  **A.**  San Diego.

21  **Q.**  And at some point you moved to the State of Washington?

22  **A.**  That's correct.

23  **Q.**  When did you first move here?

24  **A.**  1973.

25  **Q.**  To where did you move when you moved here?

1  **A.**  To Raymond.

2  **Q.**  Then in 1978, did you move again?

3  **A.**  Moved up to Olympia in 1978.

4  **Q.**  Have you lived in Olympia since 1978?

5  **A.**  Pretty much.  There was a couple years I was gone to

6  Hawaii and then to California, but then I moved back.

7  **Q.**  What do you do in Olympia?

8  **A.**  I am a real estate broker.

9  **Q.**  Do you focus on a particular kind of real estate?

10 **A.**  Primarily residential.

11 **Q.**  Do you also own some properties that are involved in your

12 business?

13 **A.**  I do.

14 **Q.**  Can you tell us what those are?

15 **A.**  I have single family homes, duplexes, unimproved property.

16 **Q.**  Do you rent those out?

17 **A.**  Yes, most of them.

18 **Q.**  Is 1510 Fifth Avenue one of the houses that you rent out?

19 **A.**  Yes.

20 **Q.**  Let me ask you to take a look at Exhibit 111.  It should

21 appear on your computer screen.  Tell me if you recognize that

22 person?

23 **A.**  Yes.

24 **Q.**  Do you recognize that person?

25 **A.**  Yes, I do.

1   **Q.** How do you recognize him?

2   **A.** He rented from me, my residence at Fifth Avenue, 1510

3 Fifth Avenue.

4   **Q.** When did he start renting from you?

5   **A.** I think about 2001, in that range; somewhere in there.

6   **Q.** Do you think he started or finished renting there in about

7 2001?

8   **A.** I don't recall exactly. I think it was -- I think that

9 might have been when he began renting.

10   **Q.** Do recall whether he lived by himself or rented with

11 anyone else?

12   **A.** I rented to him as a single individual.

13   **Q.** There's a caption under his picture that says William

14 Rodgers. Is that the name by which you knew him?

15   **A.** No.

16   **Q.** By what name did you know this person?

17   **A.** Todd Hager.

18   **Q.** Was Todd Hager the name he gave you when you were first

19 introduced?

20   **A.** Yes, it was on the rental contract lease. That's what he

21 went by.

22   **Q.** Do you still have a copy of that lease?

23   **A.** I don't.

24   **Q.** Did you look for it?

25   **A.** I did.

**Q.** How did this man pay his rent when he lived with you?

**A.** He paid in cashier's checks.

**Q.** Did you go back and see whether you could find copies of the items that he used to pay his rent?

**A.** I believe I did, uh-huh. I couldn't find anything.

**Q.** Did you provide some copies to the government, payments from him to you?

**A.** I don't recall. If I did, I --

**Q.** Take a look at Exhibit 711. There should be a folder to your left. Tell me if you recognize what's in there?

**A.** Yeah, those are some of the checks there.

**Q.** Those are rent payments that you received for the fair use of property?

**A.** Right.

     MR. FRIEDMAN: The government offers Exhibit 711.

     MR. FOX: May I ask one question?

               VOIR DIRE EXAMINATION

BY MR. FOX:

**Q.** Sir, are those rent checks for the property at 1510 Fifth Avenue?

**A.** Yes.

     MR. FOX: I have no objection.

     THE COURT: All right. They are admitted.

          (Exhibit No. 711 admitted.)

         DIRECT EXAMINATION - CONTINUED

BY MR. FRIEDMAN:

**Q.** These are documents that you gathered for the government?

**A.** Yes. My wife handles all of the books, so it's not unusual that I wouldn't know exactly. But those are the checks.

**Q.** But they come from your business, basically?

**A.** Yes.

**Q.** On this page we are going to blow up the third of the three items on here. Is that a cashier's check or a money order?

**A.** A money order.

**Q.** To whom is it made out?

**A.** Myself.

**Q.** Can you see the name of the person making that out to you?

**A.** Todd Hager.

**Q.** It's for $490. What's this a payment for?

**A.** That's for rent.

**Q.** At the house that we discussed?

**A.** That's right.

**Q.** Then if we turn to the next page of that -- it should appear on the screen right in front of you. Again, we are going to turn to the third item on there.

Again, a money order. To whom is that?

**A.** Yeah.

**Q.** Can you tell to whom that payment is made out?

1  **A.**  That is to me.

2  **Q.**  By whom?

3  **A.**  Todd Hager.

4  **Q.**  Is this again a payment for rent on the house you rented

5  to him?

6  **A.**  That's correct.

7  **Q.**  Turning to the third page, the second item on there.  Can

8  you tell us what that is?

9  **A.**  Rent check also made out to me from Todd Hager.

10  **Q.**  And the fourth page, the second item.  Can you tell us

11  what that is?

12  **A.**  That's a money order made out to me for rent from Todd

13  Hager.

14  **Q.**  And the address that he's paying rent for, is that listed

15  on there?

16  **A.**  1510 Fifth Avenue.

17  **Q.**  Then finally the fifth page.  If you would look at the

18  third item.

19  **A.**  A traveler's check for rent from Todd Hager for 1510 Fifth

20  Avenue.

21  **Q.**  Is it fair to say these checks were all made out to you by

22  the person shown in Exhibit 111?

23  **A.**  That's correct.

24  **Q.**  The person you knew as Todd Hager?

25  **A.**  Yes.

1        MR. FRIEDMAN:  Thank you.

2               CROSS-EXAMINATION

3 BY MR. FOX:

4 **Q.** Good afternoon, Mr. Peterson. I am Neil Fox, one of the

5 lawyers for Briana Waters.

6     I just want to clarify about the rent checks that

7 Mr. Friedman just showed you. You have a series of other

8 checks in that exhibit as well that don't relate to the

9 property at 1510 Fifth Avenue, right?

10 **A.** Yes.

11 **Q.** So that was my question before. Not all of those checks

12 relate to Mr. Rodgers; you have other rental property, and

13 those are other checks?

14 **A.** Yes, that's correct.

15 **Q.** Okay. So there's probably, what, five pages of documents,

16 and maybe one per page that relates to Mr. Rodgers?

17 **A.** Whatever it is. I didn't count it.

18 **Q.** Just to clarify that.

19     Now, you knew Mr. Rodgers as Todd Hager?

20 **A.** That's correct.

21 **Q.** You know him as Avalon, as well?

22 **A.** He never used that name with me.

23 **Q.** Did you have any knowledge of whether or not Mr. Hager or

24 Mr. Rodgers was growing marijuana at your property?

25 **A.** I had no knowledge of that.

**Q.** He seemed like a very quiet, nice guy?

**A.** Yeah, he was always very cooperative, paid his rent on time.  Never had any problems.

**Q.** He lived alone?

**A.** As far as I know.  He had visitors from time to time, but he lived by himself.

**Q.** And is it correct that you don't really know any of his visitors?

**A.** I don't.

**Q.** Finally, you say you own some other rental properties in Olympia?

**A.** That's right.

**Q.** I imagine there are a lot of students who rent from you?

**A.** I wouldn't say a lot.  I have rented one property on the west side to some students a couple years ago.

**Q.** When you say some students, is it your experience that there might be multiple people living in the same house who are all students?

**A.** If I set the contract up that way.  I am in control of that.

**Q.** Right.  So typically you might have a group of people that decide to rent one house, right?

**A.** I have done that on one occasion.

**Q.** It worries you about parties, isn't that why you don't like to rent to students?

1    A.  That's one of the concerns, yeah.

2           MR. FOX:  No further questions.  Thank you.

3           MR. FRIEDMAN:  No further questions, Your Honor.

4           THE COURT:  He can be excused?

5           MR. FRIEDMAN:  Yes.

6           THE COURT:  You are excused.

7           MR. BARTLETT:  At this time, the United States calls

8    Jennifer Kolar to the stand.

9           THE COURT:  Ms. Kolar, come forward and be sworn.  I

10   will have you raise your right hand, please.

11          JENNIFER KOLAR, called as a witness, duly sworn.

12          THE COURT:  Come around and take the witness chair,

13   please.

14          MR. BARTLETT:  May I inquire?

15          THE COURT:  You may.

16                      DIRECT EXAMINATION

17   BY MR. BARTLETT:

18   Q.  Can you tell the members of the jury your first and last

19   name and spell your last name for the court reporter.

20   A.  My name is Jennifer Kolar, K-O-L-A-R.

21   Q.  Ms. Kolar, where were you born and raised?

22   A.  I was born in Spokane, Washington.

23   Q.  Were you raised there?

24   A.  Yes, I lived there until I was 18.

25   Q.  Can you just briefly walk us through where you lived,

where you went to high school, where you went to college.

**A.**   Sure.  I was born in Spokane.  I went to high school at Shadle Park High School, graduated in 1991.  Then I moved to Colorado to attend the University of Colorado at Boulder, got my undergraduate in applied mathematics and engineering.

**Q.**   When did you get your undergraduate degree?

**A.**   In 1995.

**Q.**   You mentioned that you went to Shadle Park High School in Spokane?

**A.**   Yes, I did.

**Q.**   Previously in this trial, we heard from a witness named Lacey Phillabaum who indicated she also attended Shadle Park High School in Spokane.

Did you know Ms. Phillabaum when the two of you were in high school?

**A.**   No, I did not.  My understanding was she was in a different year than me.

**Q.**   Do your parents still live in Spokane?

**A.**   My father lives in Liberty Lake, which is outside Spokane. My mother lives in Eugene, Oregon.

**Q.**   You graduated with a Bachelor of Science in 1995 from the University of Colorado?

**A.**   That's correct.

**Q.**   Did you get a job, or did you continue with your schooling?

**A.** When I was undergraduate, I was taking a fair number of graduate classes already. I then continued on in a Ph.D. program in atmospheric physics.

**Q.** Did you finish that program?

**A.** No. I finished my Masters in astrophysics in 1997, and then I stayed on for about another year working on the Ph.D. program and then left to go into the professional field.

**Q.** Starting just with your college, did you work during the time that you were in college?

**A.** I did. I worked the entire time.

**Q.** Can you just briefly describe your employment history up to the present?

**A.** When I moved to Boulder, I had a job as a canvasser at the Colorado Public Interest Research Group for one Summer. Then through that ended up meeting people who were environmental activists in the Boulder area.

I then had a job doing environmental education programs and conference organization at the University Environmental Center. I then got a job as a general manager at a computer store, worked there for a while.

Finally, had a job working part-time while I was in grad school at a scientific software company doing technical support and consulting work.

**Q.** Would it be fair to say that as you were finishing your doctoral program, the computer area attracted your attention

1  more than your doctoral program?

2  **A.**  Yeah, and a lot of the work I did in graduate school in

3  physics involved computer modeling, so I learned computer

4  programming along the way and decided that was an area that I

5  really I wanted to stay in more than staying in pure research.

6  **Q.**  What did you do employment-wise?

7  **A.**  I went to the scientific software company and worked there

8  full-time for the next year.

9  **Q.**  What year was that?

10  **A.**  That would have been probably '96 or '97 through '99 when

11  I finally left and moved back to Seattle.

12  **Q.**  What brought you back to Seattle?

13  **A.**  A mix of things.  I wanted to live closer to my father

14  again.  I had a Great Aunt who lived in Denver, who is sort of

15  a second mother to me, and as she was getting older, she moved

16  to Tacoma to be near her daughter, and I wanted to live closer

17  to her.  So I followed her back here.  Then finally, I was

18  dating Joe Dibee at the time who also lived in Seattle.

19  **Q.**  Since coming to Seattle, can you briefly walk us through

20  where you've worked and what your jobs have been.

21  **A.**  Sure.  When I moved here, I took a job at an Internet

22  company doing software development, stayed there about eight

23  months -- this would have been sort of the heart of the .com

24  days in Seattle -- took a job at a search start-up company,

25  and was there through a couple different acquisitions through

1 a role of everything from software engineer up to finally

2 being the lead manager and then an architect for the search

3 work in the company.

4     Then left there in September, a year ago, and since then I

5 have been a senior architect at an Internet firm in Kirkland.

6 **Q.** You are testifying today before this jury pursuant to a

7 plea agreement, correct?

8 **A.** That's correct.

9 **Q.** It was an agreement reached between yourself, the United

10 States, with your attorney Mike Martin?

11 **A.** That is correct.

12 **Q.** In fact, you have two plea agreements?

13 **A.** Yes.

14 **Q.** What do the plea agreements cover?

15 **A.** So the first plea agreement is with the Western District

16 of Washington.  It essentially covers the four charges I have

17 there, and the agreement that I will cooperate truthfully,

18 tell the truth regardless of whether it helps or hurts the

19 Government in their case, and in exchange for that, I will --

20 the Government will recommend a sentence between five and

21 seven years in exchange for my cooperation.

22         MR. BARTLETT:  Could the witness be handed what's

23 been --

24 BY MR. BARTLETT:

25 **Q.** Actually, I think it's in front of you, 791-B?

1       Do you see that document?

2   **A.**  Yes.

3   **Q.**  Do you have that in front of you?

4   **A.**  Yes.

5         BY MR. BARTLETT:  Your Honor, I would like to offer

6   791-B.

7         MR. FOX:  Technically, she should identify it.

8   BY MR. BARTLETT:

9   **Q.**  What is it you are looking at?

10  **A.**  This is the plea agreement that I signed.

11        MR. FOX:  I have no objection.

12        THE COURT:  It's admitted.

13            (Exhibit No. 791-B admitted.)

14  BY MR. BARTLETT:

15  **Q.**  When did you sign that?

16  **A.**  I am looking for the date on here.  I signed it on July

17  31, 2007.

18  **Q.**  In Count 1, you pleaded guilty to being a member of a

19  conspiracy that began in 1997 and lasted until May 21, 2001,

20  involving yourself, Briana Waters, Lacey Phillabaum, William

21  Rodgers, Justin Solondz and others?

22  **A.**  That's correct.

23  **Q.**  In Count 2, you admitted to attempting to commit an arson

24  in Wray, Colorado, at the Wray Gun Club on October 4, 1998?

25  **A.**  That's correct.

1   **Q.**  That actually is a charge that should have been brought in

2   Colorado, correct?

3   **A.**  Correct, but it was consolidated up here.

4   **Q.**  In Count 3, you admitted to helping commit the arson that

5   occurred at the Center for Urban Horticulture at the

6   University of Washington on May 21, 2001?

7   **A.**  That's correct.

8   **Q.**  In Count 4, you admitted to helping the use of destructive

9   devices in committing the arson at the Center for Urban

10  Horticulture?

11  **A.**  That's correct.

12  **Q.**  If you could take a look at what's also been marked in

13  front of you as 791-D, as in dog.

14  **A.**  Uh-huh.   That's what I have in my hand.

15  **Q.**  Do you recognize that?

16  **A.**  Yeah.

17  **Q.**  Is that a separate plea agreement?

18  **A.**  Actually, D is just the Washington plea agreement.   B and

19  D, yes.

20  **Q.**  Is D covering -- it's a Washington plea agreement that

21  actually covers activities that occurred in the District of

22  Oregon?

23  **A.**  Yes, yes.

24  **Q.**  And what happened in Oregon that you were pleading guilty

25  to?

1    **A.**   Pleading guilty to an arson against the Cavel West Meat

2    Processing Plant where wild horses were slaughtered.

3    **Q.**   Now, that was in July of 1997 that that occurred?

4    **A.**   Yes.

5    **Q.**   What is your understanding of what you could have been

6    looking at jail-wise if you hadn't entered into this plea

7    agreement?

8    **A.**   My understanding is that I could have been looking at a

9    mandatory minimum of 35 years to life.

10   **Q.**   So by entering into this, you've clearly saved yourself a

11   lot of jail time?

12   **A.**   Yes.

13   **Q.**   That's your hope?

14   **A.**   Yes.

15   **Q.**   When you are eventually sentenced before Judge Burgess,

16   what is your understanding that the United States will be

17   recommending?

18   **A.**   The United States will recommend seven years.

19   **Q.**   What are you hoping for?

20   **A.**   Five years.

21   **Q.**   Who will make the ultimate decision on where within that

22   range you will reach?

23   **A.**   Judge Burgess.

24   **Q.**   Was it an easy decision for you to cooperate with the

25   investigation?

**A.** No, not at all. A lot of these people are people who were my friends. Briana was my friend. Part of all of this was making a commitment to these people to not cooperate.

**Q.** You were first approached and asked by the United States to cooperate with an ongoing -- with our ongoing investigation back in May of 2004.

Do you remember that incident?

**A.** Yes, I do.

**Q.** Why don't you turn to the jury and tell them what happened on May 6th of 2004.

**A.** Two agents, a man and a woman from Colorado, Officer Quimby was a woman, came to my door. I answered it. She said she wanted to talk to me. She identified herself as from the FBI in Colorado. She said she wanted to talk to me, and I asked what about. She said events in Colorado, and I said I didn't wish to talk to her. She handed me her card as a way of reaching her and then left. That's the last I heard from her until I was contacted again about the investigation.

**Q.** After Special Agent Quimby left in May of 2004, did you make any notes to either yourself or people you knew that were involved in this conspiracy?

**A.** I wrote down the information that was on her business card and essentially wrote down a summary of that conversation I just described to you and handed it to my friend Kenny Clark, who's a mutual friend of Joe Dibee to be given to Joe just to

1  let him know that I had been contacted and that people were

2  doing an investigation in the area.

3  **Q.** Could you take a look at Government Exhibit 528 that's in

4  front of you.

5  **A.** 528?

6  **Q.** 528. Could you take a look at that and tell me if you

7  recognize that.

8  **A.** Yes, this is a copy of the note I gave to Joe.

9          MR. BARTLETT: I would like to offer Government's

10 Exhibit 528.

11         MR. FOX: No objection.

12         THE COURT: Admitted.

13              (Exhibit No. 528 admitted.)

14 BY MR. BARTLETT:

15 **Q.** Maybe we can blow it up a little bit.

16     Can you read that for us since your handwriting isn't

17 horrible but not the best?

18 **A.** What this note says is: Showed up at my house at about

19 5:00 p.m. on 5-6. Asked -- I can't even read my own

20 handwriting -- asked if they can talk to me. I asked what

21 about. They said Colorado. I said no. They asked why. I

22 said I didn't feel like it. The partner asked if I had

23 something to hide. I said no. And they left.

24 **Q.** On December 10th of 2006, did you have a second contact

25 with Special Agent Jane Quimby from Colorado?

1   **A.**  Yes.  She called me on my cell phone.  I was in New York

2   for work, and she called and the first thing she said is just

3   please listen, don't hang up, just please listen.

4   **Q.**  What did she tell you?

5   **A.**  She told me about the arrest that had just happened.  She

6   told me about that there was a target letter for me, that my

7   name had come up, that there was a great deal of information

8   about my involvement, that a number of people were coming in

9   to cooperate, and she encouraged that I should do the same as

10   soon as possible.

11   **Q.**  Did she provide you any information?

12   **A.**  She gave me her contact information and Andrew Friedman's

13   contact information.

14   **Q.**  Before Special Agent Quimby called you on February --

15   excuse me, December 10, 2006, had you already been aware of

16   events related to this investigation?  For example, an arrest

17   being made?

18   **A.**  I found out, not originally from reading the paper, I

19   found out that the same friend, Kenny, had gone over to my

20   boyfriend's house and my house and had told him what was going

21   on, and that Joe Dibee had come in for an interview, had been

22   very scared, that there had been a great deal of information

23   about me as well as him, and that he felt he was going to be

24   spending the rest of his life in jail and he wanted me to know

25   what was going on.

1  **Q.** You said he --

2  **A.** He, meaning Joe Dibee. He gave this information to Kenny.

3  Kenny called me in the middle of the night, my time in New

4  York, and told me what was going on and told me about Joe's

5  reaction. That's when I then looked at the paper. I had been

6  in meetings all day and hadn't seen any news. That's when I

7  looked online, saw what happened with about the first six

8  arrests, heard about how serious it was, about the level of

9  detail they had and about Joe's reaction.

10  **Q.** You indicated that you know Ms. Waters. Just for the

11  record, where is she seated and what is she wearing?

12  **A.** She's seated at the table to your left in the middle

13  wearing a brown jacket, brown pants.

14  **Q.** Is there any bad blood between the two of you?

15  **A.** No, not at all. She was a friend of mine. She was one I

16  really cared about.

17  **Q.** I want to stop you and jump back a little bit.

18      You talked earlier about a point in your life when you

19  began attending the University of Colorado at Boulder.

20      Do you remember those answers?

21  **A.** Yes.

22  **Q.** During the time that you were going to the University of

23  Colorado, did you become involved in any environmental

24  movements or animal rights movements?

25      Can you explain that to the jury.

**A.** Sure. So, when I moved to Colorado, it was really my first experience with people who were activists. I had been raised vegetarian. I had been raised to believe in compassion for all beings, but I had never really known anybody else with those values outside of my family.

So I moved to Boulder, met other people who were vegetarian/vegan and a bunch of activists and immediately, as I mentioned, got involved in the Environmental Center at the college. Through there, met people and got involved with an animal rights group called Rocky Mountain Animal Defense.

**Q.** Rocky Mountain Animal Defense?

**A.** Yes.

**Q.** What were they primarily concerned about?

**A.** Largely concerned with land use issues in the west, so prairie dogs, contest killings, some -- a bit about circuses, but primarily land use, animal protection for animals. I also got involved with the Rocky Mountain Peace Center working on prisoner rights issues and social justice issues.

**Q.** What kind of things did you do? When you say "I belonged to the Rocky Mountain Animal Defense group", what did you do?

**A.** Could be everything from education programs at schools to speaking at court, as far as trying to get injunctions or motions to writing articles, to protesting different events. I went to meetings. Sort of public, above-ground environmental animal activism.

1  **Q.** In 1996, did there come a point when you traveled back to

2  Minneapolis to attend a conference?

3  **A.** Yeah. There were a number of online e-mail lists that

4  environmental activists around the country were using to

5  self-organize, and I met a number of people through that, and

6  they decided to have a conference in Minneapolis to get

7  together to talk about what was deemed to be radical grass

8  roots activism.

9  **Q.** Did you go to that conference?

10  **A.** I did.

11  **Q.** Can you describe briefly kind of what happened there and

12  tell us about anybody of importance that you met.

13  **A.** That was the first time I met in person a lot of the

14  people who at the time were respected and sort of the more

15  radicalized environmentalists; Jonathan Paul, I met there,

16  most significantly.

17  **Q.** What was talked about at the conference?

18  **A.** So, at the conference, they talked about fur farm raids

19  and releases. They handed out a list of all the fur farms in

20  the country and information on how people had done releases.

21  They talked about arson and the use of that as a tactic. They

22  handed out diagrams or schematics for how to build timers.

23  **Q.** A step up from what you'd been doing?

24  **A.** Yeah, a big step up.

25  **Q.** Can you take a look at Exhibit 130 that's in front of you.

1  Do you recognize that photo?

2  **A.** That's Jonathan Paul.

3      MR. BARTLETT:  Offer Exhibit 130.

4      MR. FOX:  No objection.

5      THE COURT:  Admitted.

6           (Exhibit No. 130 admitted.)

7  BY MR. BARTLETT:

8  **Q.** Not the most attractive picture of Mr. Paul?

9  **A.** No.

10 **Q.** At the time that you meet him, what is his position?

11 Obviously, there's no formal position, but is he someone that

12 was respected within the movement?

13 **A.** He's very much considered a leader in the movement.  He's

14 revered for being somebody who spent, I think, nine months in

15 jail for refusing to testify at a Grand Jury.  He's very

16 charismatic.  He's wealthy.  He's deemed powerful.  He's

17 handsome, not that you can tell from the picture.  So he was

18 very influential amongst people at that time.

19 **Q.** Did you, in fact, get to know him more than just going to

20 a meeting?

21 **A.** Yeah.  He and I ended up in a long-distance romantic

22 relationship for about seven or eight months to a year.

23 **Q.** You were in Minneapolis.  I assume you returned to Boulder

24 to continue your schooling?

25 **A.** Yes.

**Q.** You were having a long-distance relationship with Mr. Paul?

**A.** That's correct.

**Q.** Does he eventually ask you to come visit him?

**A.** Yes. After I finished my Ph.D. comprehensive exams, I had some time off so I flew --

**Q.** Is this in 1997?

**A.** Correct. So I flew out to Seattle and then drove with him down to Williams, Oregon, where he lives and spent a few weeks with him.

**Q.** What, if anything, happens during the time that you are at Williams, Oregon with Mr. Paul during this timeframe?

**A.** Probably the two most key things are I got very, very sick with an E.coli blood infection and ended up in a hospital for a few days. Then also that was where Jonathan approached me and asked if I had heard of the ELF or ALF, asked if I was interested in being involved.

**Q.** What did you tell him?

**A.** I told him I had heard of it and that I was interested.

**Q.** When you say the ELF and the ALF, what are we referring to?

**A.** The Earth Liberation Front or the Animal Liberation Front as they were called.

**Q.** In July 1997, do you and Mr. Paul have specific conversations about an action that he's planning or

1  participating in?

2  **A.**  He told me about Cavel West.  He told me that it was a

3  slaughter facility where wild horses had been rounded up from

4  public BLM land and were taken there for slaughter.

5  **Q.**  BLM, Bureau of Land Management?

6  **A.**  Bureau of Land Management.  He said that there was a plan

7  to have an arson there to try to stop this facility.  He

8  asked -- he said that they needed help.  He asked if I would

9  help.

10  **Q.**  What did you tell him?

11  **A.**  I said yes.

12  **Q.**  And what kind of help did you provide Jonathan Paul in

13  relation to this plan?

14  **A.**  Ultimately, I helped him go -- his job was apparently to

15  provide fuel for the fire, so I helped him go around to a lot

16  of different stores and get vegetable glycerin soap and cut it

17  up into a lot of different pieces and mix it up in a blender

18  with gasoline and diesel to fill large buckets of fuel.

19  **Q.**  How long did this take you?

20  **A.**  A couple days.

21  **Q.**  What eventually happens?

22  **A.**  So, Jonathan and I drove out into the desert in Oregon and

23  met up with the other people who were involved.

24  **Q.**  Did you know them at this time?

25  **A.**  No, I did not.

1  **Q.** Who do you meet up with?

2  **A.** We meet up with Kevin Tubbs, Joe Dibee and Jake -- I can't

3  remember his last name.

4  **Q.** If you can take a look at Government's Exhibit 122 and 123

5  and tell me if you recognize those.

6  **A.** 122?

7  **Q.** 122.

8  **A.** I don't have 122.

9      MR. BARTLETT:  Pat, could you pull 123 also.  I

10  apologize, Your Honor.

11  BY MR. BARTLETT:

12  **Q.** Let's try again.  Do you have Exhibits 122, 123 and 133?

13  **A.** I need 123.  I have 122 and 133.

14  **Q.** Taking a look first at Government Exhibit 122, what is

15  that?

16  **A.** It's a picture of Joseph Dibee.

17      MR. BARTLETT:  Offer, Your Honor.

18      MR. FOX:  No objection.

19      THE COURT:  Admitted.

20          (Exhibit No. 122 admitted.)

21  BY MR. BARTLETT:

22  **Q.** This is one of the individuals you met in the Oregon

23  desert?

24  **A.** Yes.

25  **Q.** Looking at Exhibit 133 --

1  **A.** This is a picture of Kevin Tubbs.

2       MR. BARTLETT:  Offer 133.

3       MR. FOX:  No objection.

4       THE COURT:  Admitted.

5            (Exhibit No. 133 admitted.)

6  BY MR. BARTLETT:

7  **Q.** Finally, 123?

8  **A.** Jake Ferguson.

9       MR. BARTLETT:  Offer.

10      MR. FOX:  No objection.

11      THE COURT:  Admitted.

12           (Exhibit No. 123 admitted.)

13 BY MR. BARTLETT:

14 **Q.** Had you ever met any of these individuals before or talked

15 to them or seen them?

16 **A.** No.

17 **Q.** Describe what happens.  Where do you see them and what

18 happens?

19 **A.** We got there.  It was clear that nobody was expecting

20 Jonathan to be bringing anybody.  So as soon as we got there,

21 the reaction from Joe and Kevin was that of anger that

22 Jonathan had brought another one of his ditsy girlfriends with

23 him.  They walked off together to talk outside of my hearing,

24 came back and decided to go forward with the action with me

25 there.

1  **Q.** Just in general terms, how did the action actually take
2  place? What did you do, what did other people do and what
3  eventually happened?

4  **A.** So we left -- Kevin had a van. We left all of our cars at
5  the spot in the desert that we met at. We drove to Redmond,
6  Oregon, to a little town. Drove there, left the van with
7  Kevin in it in a parking lot outside of a grocery store. The
8  rest of us with fuel cans walked across the street, down the
9  railroad tracks to where the building was.

10  **Q.** When you say "the building", are we talking about the
11  Cavel West Bureau of Land Management Corral?

12  **A.** Correct.

13  **Q.** What time of night -- what time during the day or night is
14  this?

15  **A.** It would have been probably about 11:00 or 12:00 at night.

16  **Q.** So what happens?

17  **A.** So we walk there. We make sure that -- there's a little
18  outbuilding that's a house on one side -- we make sure no one
19  is there. Joe Dibee is drilling holes in the wall along the
20  building with a drill. Apparently they had previously
21  determined that the walls were hollow, so he was drilling
22  holes in the walls, and he's setting up devices. He has a
23  funnel that he's putting in the holes, and I am helping pour
24  the fuel into the funnel to fill in the walls.

25      At one point, Jonathan and Paul and I go around the corner

1 and pour butyric acid, which is a really smelly acid used for

2 cleaning pools, into the ventilation shafts.

3 **Q.** For what purpose?

4 **A.** In case the fire doesn't go off, essentially it pretty

5 much is so noxious to smell that it makes the area

6 uninhabitable.

7   So we pour that in, set up another device around the back

8 side of the main building, come back.  Joe is still setting up

9 devices.  Somewhere along the way, one of them ignites in his

10 hand while he's setting it off.  No one gets hurt, but we take

11 off immediately, run back down the tracks, jump in the van and

12 leave.

13 **Q.** If you could take a look at what's already been admitted

14 into evidence as Government Exhibit 212-A.

15   Generally, do you recognize that area?

16 **A.** Yeah, this is the area around Cavel West.

17 **Q.** Where did you walk in from, if you could just point to the

18 screen.

19 **A.** So, where the green building is, where the green building

20 is, is the grocery store that we would have parked in front

21 of.  The Cavel West area is over to the left.  We would have

22 walked down the railroad tracks and then set up near the area

23 that's burned out essentially, would have been where we walked

24 down, and started drilling holes, sort of right on the side of

25 this building.

1   **Q.** If we can pull 212-D, which has also been admitted.

2   Do you see a milk bottle in the lower left-hand corner of

3   the photo?

4   **A.** Yes.

5   **Q.** Do you recognizes that, and can you describe what it is?

6   **A.** This is the kind of device that people were using at the

7   time.  It was also the kind of device that we got a schematic

8   handed out for at the conference.  Essentially, you have a

9   timer -- you have a timer that hooks up to a battery at one

10  end and then a light bulb filament at the other that's put

11  inside of a matchbook.

12  There's usually something like Sterno placed over that or

13  fire starter tape.  Then you'll have a soaked sponge that sits

14  in a handle of the milk jug, and in the milk jug is gasoline,

15  the idea being that that ignites just enough to get it

16  started, and then there's fuel spread elsewhere that

17  ultimately carries the fire further.

18  **Q.** If you hit the lower left-hand corner of your screen, you

19  will see an exhibit.

20  So where do you go afterwards?  What happens when you and

21  the rest of the individuals get back to the van?

22  **A.** We get back to the van.  We all change clothes.  We take

23  all the buckets that originally had the fuel.  We put our

24  clothes and gloves in it, pour in the remainder of the butyric

25  acid, bury the buckets in the desert and then leave.  Jonathan

1   and I left.

2   **Q.**  Where do you return?

3   **A.**  We drove back to William's, and then shortly thereafter I

4   flew back to Colorado.

5   **Q.**  To do what?

6   **A.**  To go back to school.

7   **Q.**  If you take a look at Government's Exhibit 752 and tell me

8   if you recognize that.  752.

9   **A.**  That's the check that Jonathan Paul gave me to pay for my

10  airfare to come out there --

11            MR. BARTLETT:  Offer 752.

12            MR. FOX:  One second, Your Honor.  No objection.

13            THE COURT:  Admitted.

14                   (Exhibit No. 752 admitted.)

15  **A.**  I was in school and --

16  BY MR. BARTLETT:

17  **Q.**  If we could blow up perhaps the top portion, that's a $500

18  check?

19  **A.**  Correct.

20  **Q.**  What's the date on that?

21  **A.**  7-22-1997.

22  **Q.**  That was in relation to various -- basically, you had a

23  plane ticket and other things getting out to visit him in

24  Oregon?

25  **A.**  Right.  After I had been there for about that three week

1    to a month period, I flew to Colorado and this essentially

2    paid for the ticket to bring me back for this action.

3    **Q.** After this arson was committed, did you ever become aware

4    that a communiqué had been written in relation to it?

5    **A.** Yes, I had heard about that.

6    **Q.** Did you read it?

7    **A.** Yes.

8    **Q.** If Government's Exhibit 213 could be brought up.

9        Since it's being brought up, in your mind, what did you

10   understand the purpose of sending out communiqués after an

11   action to be?

12   **A.** The purpose was to essentially get media attention to let

13   people know that the action had happened and why.  In our

14   words, as opposed to say the words of the Government or

15   whatever property it was, both to try to encourage other

16   actions and to try to encourage these industries to stop and

17   let people know about them.

18   **Q.** Were there any rules -- did you have anything to do with

19   this communiqué?

20   **A.** No.

21   **Q.** As you read it, do you see any facts discussed that are in

22   fact accurate, facts that perhaps only the people involved in

23   this arson would have known?

24   **A.** Yes.

25   **Q.** Why don't you read that to the jury and explain what you

1  understood the purpose behind putting those types of facts in

2  to be.

3  **A.**  Just read the whole thing?

4  **Q.**  Just the section dealing with the specific facts related

5  to the Cavel West arson.

6  **A.**  "So, on Monday, July 21, 1997, under a nearly full moon,

7  the Animal Liberation front paid a visit to the Cavel West

8  Horse Murdering Plant at 1607 SE Railroad Avenue in Redmond,

9  Oregon.  About 35 gallons of vegan jello was brought in with

10  the team.  Next, a large number of holes were drilled into the

11  rear wall of the slaughterhouse office to bypass potential

12  alarms on the door and windows.  Next, the area that housed

13  the refrigeration units was located and again large holes were

14  drilled through the wall of the slaughterhouse.  Two teams

15  then poured the jello into the numerous holes and quickly

16  began to assemble the three electrically-timed incendiary

17  devices that would bring to a screeching halt to what

18  countless protests and letter writing campaigns could never

19  stop.  While these devices were being assembled, some members

20  of the team entered a storage shed/office/construction site

21  (all part of Cavel West's operations) and left the remaining

22  10 gallons or so of jello for dessert.  Then two gallons of

23  muriatic acid was poured into the air conditioning vents to

24  taint and destroy any horse flesh that may have survived the

25  fire.  Finally, the devices were set to ignite at exactly the

1 same time.  Unfortunately, as the battery was being connected

2 to the device at the refrigeration unit, a spark started that

3 entire area on fire!  Fortunately we had very thorough back-up

4 plans in case anything went wrong and that insured that our

5 departure went quick and smooth."

6 **Q.**  Thank you.  All those facts that appear in there are in

7 fact what happened on that night?

8 **A.**  That is correct.

9 **Q.**  You returned to Colorado.  How long did you remain in

10 school there?

11 **A.**  I remained in school partway through 1998.

12 **Q.**  Speaking of 1998, did you yourself become involved in an

13 action in October of 1998, in Colorado?

14 **A.**  I did.

15 **Q.**  Why don't you explain that to the jury?

16 **A.**  So, having sort of learned about arsons and been

17 introduced to this and having spent the last number of years

18 involved with trying to stop contest killings against prairie

19 dogs, myself and another friend --

20 **Q.**  If I could stop you a second.  I assume most of the people

21 do not know what contest killings are with regard to prairie

22 dogs in Colorado.

23 **A.**  So, in Colorado, and in the west in general, there's a lot

24 of just sporting contests, activities where people will kill

25 animals that are considered varmints for fun, or they will

1  maim them and in this case they actually get extra points if
2  they mane them and don't kill them.
3  **Q.**  These were the types of contests you found most offensive?
4  **A.**  Yes.  So there was a hunt club that the varmint militia,
5  as they were called, typically used in that area, which is the
6  Wray Gun Club.  We had been unsuccessful -- we as in Rocky
7  Mountain Animal Defense -- for a number of years with protests
8  in trying to stop them, so we decided to burn that gun club
9  down.
10 **Q.**  What happened -- what was your plan and what happened?
11 **A.**  The plan was using the same exact plan that I had gotten
12 at the conference that had been used at Cavel West.  We built
13 a couple of devices, drove out to Wray, made sure that there
14 was nobody in the building, in the area.  We drove the truck
15 up to the building, just a little small building, left the
16 cans of fuel there next to the building in the bushes, drove
17 the car over sort of -- probably about a half a mile away
18 across a field.  Left the car there, walked across.  I broke
19 in through a window in the building.  We set up a couple of
20 devices and then left.
21 **Q.**  You say "we" and "they".  How many people were involved in
22 this action?
23 **A.**  Two of us.
24 **Q.**  Who was it?
25 **A.**  Myself and my friend Greg Litus.

**Q.**  Did you become aware of whether or not this was a

successful action?  Did, in fact, the Wray Gun Club burn down?

**A.**  No, it did not.  We hadn't heard anything in the news, and

so my friend drove back out at one point to look and see what

had happened, saw that the club was still standing there.  So

no, it was not successful.

**Q.**  This is in October of 1998?

**A.**  That's correct.

**Q.**  And this is the attempted arson that you pleaded guilty to

earlier that you described?

**A.**  That is correct.

**Q.**  In 1999, did you develop a personal relationship with Joe

Dibee?

**A.**  Yes.  After meeting him at Cavel West and then getting to

know him a little bit more over e-mail, the phone, we ended up

dating long-distance.

**Q.**  Your relationship with Mr. Paul ended?

**A.**  Yes, had been for some time.

**Q.**  Where does Mr. Dibee live at this point in time?

**A.**  He lives in Seattle, Washington.

**Q.**  You talked about an Aunt earlier.  What happened with your

Aunt?

**A.**  My Great Aunt Bernice, she was in Reston at an assisted

living center.  I was flying out monthly to visit her until I

moved out.  She ultimately died from Alzheimer's and old age.

1  **Q.** In the spring of 1999, there was a fairly high profile

2  environmental action here in the Western District of

3  Washington involving the Makah Indian Tribe and whale hunting.

4     Were you aware of that?

5  **A.** I was.

6  **Q.** Were any of the individuals that you knew, were they

7  involved in trying to protect the whales?

8  **A.** Joe Dibee and Jonathan Paul had started an organization

9  called SEDNA, the Sea Defense Alliance, that was focused

10  around trying to stop this primarily and other marine hunts,

11  as well as other activists that were active in the area.  Josh

12  Harper and Jake Conroy were also part of this.  I came out one

13  weekend for a protest.

14  **Q.** Do you remember about when that was?

15  **A.** It was before I moved out; it would have been the Summer.

16  **Q.** Was there any tension between Mr. Dibee, yourself and Mr.

17  Paul based on the fact that you had dated Mr. Paul but now you

18  are dating Mr. Dibee?

19  **A.** No, it was all very amicable.

20  **Q.** When do you actually make the move?  When do you leave

21  Colorado and make a move out to Seattle?

22  **A.** I moved out later in the Summer of '99.

23  **Q.** What happens when you moved out here?  Where do you move

24  and what kind of employment do you get?

25  **A.** So, I had an apartment lined up in Fremont that I had a

1  cousin look at for me, that I moved into after I had been out

2  here a couple weeks. I got a job as a software engineer and

3  essentially started a new life in Seattle.

4  **Q.** You talked about Mr. Dibee and Mr. Paul being involved in

5  the Makah whaling actions up at Neah Bay. Does there reach a

6  point where there's bad blood and conflict between the two of

7  them as a result of this action?

8  **A.** Yes. Jonathan Paul was supposed to have registered the

9  corporation in both of their names and put the two boats they

10  owned in both of the names. It turned out that he hadn't.

11  He'd only put them in his.

12     Joe ended up filing a lawsuit when they were having

13  disagreements about how to actually use these boats. Joe

14  filed a lawsuit; Jonathan filed a countersuit, and it pretty

15  much formed a big rift. Most sort of public activists or

16  people that were part of the movement at the time took

17  Jonathan's side. He was much more the sort of popular person.

18  Joe was never sort of popular in any public way. I took Joe's

19  side. For a while, I tried to be a liaison between the two of

20  them since I was on good terms with both. That ultimately

21  broke down.

22  **Q.** Eventually, do you end up being introduced to activists

23  here in the Western District of Washington through Joe Dibee?

24  **A.** Yes. Joe and I had broken up, and he didn't want to be

25  involved with any action with me, do any environmental work

1 with me.  He introduced me to Bill Rodgers and said they were

2 trying to start an incubator group to train activists how to

3 do arsons and other below-ground radical activities to try to

4 get more people involved.

5 **Q.**  Would you take a look at Government's Exhibit 111 which

6 has already been admitted.

7   Do you recognize that?

8 **A.**  I do.

9 **Q.**  Who is that?

10 **A.**  That's Bill Rodgers.

11 **Q.**  Do you, in fact, eventually meet Bill Rodgers?

12 **A.**  Yes, I do.

13 **Q.**  Do you remember about when?

14 **A.**  It would have been, I think, in 2000, down at his house in

15 Olympia.

16 **Q.**  Did you eventually become friends with him?

17 **A.**  Yes.

18 **Q.**  Did you like him?

19 **A.**  Yes, I did.  He was a very gentle person.

20 **Q.**  We've talked about a concept that you were aware that

21 Mr. Dibee and Mr. Avalon were thinking of -- you called them

22 incubators --

23   MR. FOX:  Objection, Your Honor, that misstates her

24 answer.  She didn't say Mr. Dibee was involved, she said

25 Mr. Rodgers was --

1    THE COURT:  Ask the question, see what her answer is.

2  BY MR. BARTLETT:

3  **Q.**  Ignore everything I just said.

4    Did you become aware that there was discussions about what

5  you've called incubator club meetings?

6  **A.**  Yes.

7  **Q.**  How did you become aware of it and what is your

8  understanding?

9  **A.**  So, Joe Dibee, as I mentioned, Joe Dibee had introduced me

10  to Bill Rodgers, although under a different name at the time.

11  **Q.**  What did you know him as?

12  **A.**  Later, I got to know him as Avalon.  At the time, I think

13  he used the name Kurt, but I am not positive.

14    Joe told me that he and Bill were wanting to start up

15  incubator groups to try to teach people about how to do this

16  kind of activism.

17  **Q.**  Do you eventually go to a meeting?

18  **A.**  Yes.  There were three meetings, three primary meetings

19  that I went to.

20  **Q.**  What was the first one you attended, if you recall?

21  **A.**  The first one was in, I think, January of 2001, in Santa

22  Cruz, California.

23  **Q.**  You said January 2001 in Santa Cruz?

24  **A.**  I think so.  Is that right?  I'm actually not positive.

25  That was in Olympia.  I am not positive of the dates on that

1    one.  I would have to look at a calendar.

2    Q.  If you could take a look at Government's Exhibit 617-C

3    that's in front of you.

4        Do you recognize that?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's copy of the calendar that was in my Handspring.

8    Q.  What's a Handspring?

9    A.  It's kind of like a simple palm pilot, before there were

10   fairly complex palm pilots.

11                MR. BARTLETT:  Offer 617-C.

12                MR. FOX:  Just one moment, Your Honor.  No objection.

13                THE COURT:  Admitted.

14                    (Exhibit No. 617-C admitted.)

15   BY MR. BARTLETT:

16   Q.  Ms. Kolar, if you could take a look through there, you

17   said that there were three meetings and you've just described

18   a January 2001 meeting.

19       Did you have a chance to look at that?

20   A.  I am looking at this now.

21   Q.  Does that refresh your recollection as to what, if any,

22   incubator meeting occurred in January 2001?

23   A.  Well, there was one meeting from the 5th through 7th of

24   January that I had listed as gathering.

25   Q.  Was that the one in Olympia?

**A.** Yes, that would have been the one in Olympia. It would have been before this, and it was in the Summer. I remember we were outdoors in a pool, so it would have been in the Summer before this.

**Q.** When you say we were outdoors in a pool, what are we referring to?

**A.** The meeting was held at a motel in Santa Cruz, that about 12 to 15 of us attended. So at one point during the break in the meetings, when it was hot we went outside and a number of us were swimming in the pool at the hotel.

**Q.** Can you generally talk about what were the topics of discussion that occurred during the Santa Cruz meeting?

**A.** So, this was my first introduction to a lot of this. My job at the meeting was to teach about Internet security, essentially to teach people what PGP -- pretty good encryption -- was for sending e-mail messages back and forth that were encrypted with public private keys, for teaching people how to use anonymous remailers online, how to use web anonymizer proxies that mimicked what your address was that you were coming from, to set up PGP disks for everybody who was there so they could communicate with each other privately.

**Q.** Prior to going to the meeting, did you in fact set up these PGP disks where people could get them so they could send secret e-mails?

**A.** I had done -- prior to the meeting, I had done a build of

1  PGP that could fit on a disk that was smaller, but I actually

2  set up the disks at the meeting for everybody.  I had brought

3  down the software and then copied it onto the disks at the

4  meeting.

5  Q.  If you would take a look at Government's Exhibit 617-E.  Do

6  you recognize that?

7  A.  Yes.

8  Q.  What is it?

9  A.  So, these are the nicknames that everybody who we made

10  disks for used on the e-mails.  The names on the left are the

11  names people actually used during the meeting.  The names on

12  the right are the names people actually were supposed to refer

13  to each other when they were e-mailing.

14            MR. BARTLETT:  Offer 617-E.

15            MR. FOX:  No objection.

16            THE COURT:  Admitted.

17                  (Exhibit No. 617-E admitted.)

18  BY MR. BARTLETT:

19  Q.  Taking them one at a time, using just the first one as an

20  example of how it worked, how it was supposed to work.

21  A.  At the beginning of each of these meetings, people would

22  essentially say:  For this meeting, my nickname will be

23  whatever.  For example, my nickname was Diver, which is the

24  fourth from the bottom.

25        So those would be the names that people went by during the

meeting.  For the e-mails, I don't know, but we came up with a theme of ailments, and everybody was given a nickname that was used so if we were sending e-mails to each other, that's who you'd refer to if you wanted a specific person to read the message as opposed to somebody else.

**Q.**  How do we have this list?

**A.**  I gave this to you.

**Q.**  As you look down this list, do you remember any of the people on this list and what their real names were?

**A.**  Yes, the majority of them.

**Q.**  Take them one at a time.

**A.**  Dillon, I could recognize her picture, I don't know her actual name.  It was a woman.

Peaches is Al Decker.

Ishi is Suzanne Savoie.

Jack is Stan Meyerhoff.

Sabina is Joanna Zacher.

Jamie is Dan McGowan.

Rupert, I do not remember who that is.

Josie is Chelsea Gerlach.

Leroy, I also don't remember who that was.

Reba is Lacey Phillabaum.

Michael is Rod Coronado.

Puck is Jeff Hogg.

Diver is me.

Henry was a woman that was there. I could recognize her picture; I never knew her real name.

Hasan is Nathan Block, and Mr. Green was Bill Rodgers.

**Q.** These were the people who were actually at the Santa Cruz meeting with you?

**A.** Yes.

**Q.** What do you go over and what do you tell these people?

**A.** So, I talked to them about those Internet security topics I talked about. I helped each person make a disk that they would take away with them.

We also set up e-mail, an e-mail account that we could use, the idea being that if you wanted to put out a message for people, you would save a message in the draft folder and then other people were supposed to check it weekly for that information.

**Q.** And then the draft folders were eventually deleted each week?

**A.** Once all the e-mails had been read, yeah, it would be deleted.

**Q.** Could you take a look at Government's Exhibit 617-F, as in Frank, and tell me if you recognize that.

**A.** This is the info on the e-mail account that we set up. There was one for general research, sort of longer-term media and then logistics, which was one that everybody was supposed to check at least once every week or two.

1          MR. BARTLETT:  Offer 617-F.

2          MR. FOX:  No objection.

3          THE COURT:  Admitted.

4                (Exhibit No. 617-F admitted.)

5    BY MR. BARTLETT:

6    **Q.**  These are general descriptions you created and are handing

7    out?

8    **A.**  That's correct.

9    **Q.**  Once again, how is it we have these?

10   **A.**  I gave you these.  I had the master PGP disk still at my

11   house that I discovered and so I gave that to you.

12   **Q.**  Finally 617-G, as in go.

13   **A.**  This is a direction -- a list of directions essentially

14   that I had cut and pasted together for various places for how

15   to use PGP, for how people could send and receive e-mail

16   messages.

17         MR. BARTLETT:  Offer 617-G.

18         MR. FOX:  No objection.

19         THE COURT:  Admitted.

20                (Exhibit No. 617-G admitted.)

21   BY MR. BARTLETT:

22   **Q.**  This is part of what you are providing to the various

23   people at the Santa Cruz meeting?

24   **A.**  Correct.

25   **Q.**  If I can take that off and shift your attention.

1       The Santa Cruz meeting occurs.  Looking at your calendar,

2  you believe there's a second meeting in Olympia, Washington?

3  **A.**  That is correct.

4  **Q.**  When does that occur and what, if any, were your duties in

5  relation to that?

6  **A.**  That occurs on January 5 through 7, 2001.  I was

7  originally supposed to find the meeting location for where we

8  would meet.  I was never able to do that.  So last minute,

9  Bill Rodgers borrowed a house from a friend in Olympia and

10  that's where we met.

11  **Q.**  What is discussed at this meeting?

12  **A.**  So, at this meeting, a couple of different topics.  One of

13  the big topics was a blow up over whether Bill Rodgers had

14  supposedly molested a young woman or not and just sort of his

15  romantic dealings with Chelsea Gerlach and generally just how

16  he was with young women in his life.

17  **Q.**  I assume this has nothing to do with the movement.

18  **A.**  No, not at all.

19  **Q.**  But?

20  **A.**  But it came up.  There was sort of -- because the young

21  woman supposedly was involved in activism in town that he was

22  accused of being with, one of the things at the start of each

23  meeting people needed to say how they got there, if they had

24  gotten there securely.  I know one of the questions that came

25  up was about me because I was not with an activist boyfriend

1    and people were worried about that being a risk.  So there

2    were sort of a number of peripheral personal things that came

3    up, and this came up and it was a pretty big rift there.  It

4    sort of ended up separating the men and women there, at least

5    one of the evenings.

6    **Q.**  You indicated that there was concern about you because at

7    this point in your life, you did not have what you called an

8    activist boyfriend?

9    **A.**  That's correct.

10   **Q.**  You talked about you dated Jonathan Paul and Joe Dibee.

11   Did there come a point in time when you formed a new

12   relationship?

13   **A.**  So, when I started at one of the companies in Seattle, I

14   met Jonathan Reichhold, my current partner, I guess about

15   eight years ago now, and he's never been involved in activism

16   of any sort.  So he was who I was dating at the time.

17   **Q.**  And you are still dating?

18   **A.**  Yes.

19   **Q.**  At some point are you approached about concerns

20   individuals have about the University of Washington and

21   genetic engineering allegedly being done at the Center for

22   Urban Horticulture?

23   **A.**  This group as a whole had agreed on trying to pick a

24   single topic to focus on, that we thought might be winnable,

25   and genetic engineering was decided to be that topic.   There

1    was a fair amount of public sympathy against it.

2        Al Decker approached me earlier in 2001.  We bike road

3    over to the Center for Urban Horticulture.  He didn't have a

4    whole lot of information at the time.  He mentioned Toby

5    Bradshaw was a researcher there doing genetic engineering.  He

6    didn't know which office was Mr. Bradshaw's.

7        At the time it seemed like the plan would have been to go

8    in through the outside of the building, which seemed pretty

9    dangerous to me.

10       So at the time I said I wasn't interested in being

11   involved.

12   **Q.**  I failed to clarify two important facts.  You indicated

13   you went to the Santa Cruz meeting and you went to the Olympia

14   meeting.  Ms. Waters was at neither of those meetings,

15   correct?

16   **A.**  She was not at Santa Cruz.  I don't remember clearly

17   whether she was or was not at the Olympia meeting.

18   **Q.**  Can you take a look at Government 112 and tell me if you

19   recognize that?

20   **A.**  That's a picture of myself.

21   **Q.**  I am sorry, I switched the numbers around.   121?

22   **A.**  I do not have 121.

23   **Q.**  Do you recognize that?

24   **A.**  Yes, this is a picture of Al Decker.

25                MR. BLOOM:   Offer 121.

1    MR. FOX:  No objection.

2    THE COURT:  Admitted.

3         (Exhibit No. 121 admitted.)

4    BY MR. BARTLETT:

5    **Q.** Taking the actual arson that occurs on May 21, can you

6    estimate how much earlier you and Al Decker went to the Center

7    for Urban Horticulture?

8    **A.** Probably a few months.

9    **Q.** Could you take a look at Exhibit 617-I? Do you recognize

10   those papers?

11   **A.** This was posted to the research site that we set up at the

12   Santa Cruz meeting, and essentially it's a list of potential

13   research priorities, that focused on genetic engineering.

14        MR. BARTLETT:  Offer 617-I.

15        MR. FOX:  No objection.

16        THE COURT:  Admitted admitted.

17             (Exhibit No. 617-I admitted.)

18   BY MR. BARTLETT:

19   **Q.** Is Professor Toby Bradshaw discussed in those papers?

20   **A.** Yes, he's mentioned -- yes, he's mentioned on the first

21   page, sort of right in here.

22   **Q.** So you and Mr. Decker go over, you walk around the

23   University of Washington.  You are not too enthused.

24        Did there come a point in time when you were approached a

25   second time about a plan to perhaps commit an arson at the

1 Center for Urban Horticulture?

2 **A.** I was approached again, either by Bill Rodgers or by

3 Briana Waters, saying that they now had a plan. They were

4 wanting to do this jointly with an arson in Oregon. That the

5 plan was to go through Toby Bradshaw's office, and they needed

6 somebody to cut the glass. And they came to me because I was

7 doing stained glass work, and they knew I knew how to work

8 with glass.

9 **Q.** What do you mean you were working with stained glass?

10 **A.** I had recently taken a class at the Seattle Stained Glass

11 Center and just finished. Sort of as a personal hobby had

12 been working with stained glass.

13 **Q.** What was your response?

14 **A.** I agreed to do it.

15 **Q.** Did there come a point in time when you actually went to a

16 meeting involving this plan?

17 **A.** I went to a couple different meetings.

18 **Q.** Maybe if you could take a look at your calendar, which is

19 617-C in front of you. Tell me if that refreshes your memory.

20 **A.** The primary meeting I was thinking of was May 12.

21 **Q.** What day of the week is that?

22 **A.** Pardon?

23 **Q.** What day of the week is that?

24 **A.** Saturday.

25 **Q.** What do you recall about that meeting on Saturday, May 12?

1  **A.** My note says library, but it was at the Olympia library at
2  the Evergreen State College -- or the library at the Evergreen
3  State College.  Pretty much everybody who was involved in
4  either the Oregon action or the Seattle action met there.
5  **Q.** Who do you recall being there?
6  **A.** So Briana, who had been a student there, was the one who
7  set up the room we were meeting at.  So she was there.  Bill
8  Rodgers was there.  I recall Chelsea Gerlach.  Stan Meyerhoff
9  being there.  I recall Nathan Block and Joanna Zacher being
10  there, and probably a couple others.
11  **Q.** Where did the meeting take place?
12  **A.** It takes place in -- most schools, including Evergreen,
13  had soundproof music rooms, so it takes place in a soundproof
14  room in the library for a few hours.
15  **Q.** What, if anything, is discussed in that meeting?
16  **A.** I don't remember the details of what was discussed, other
17  than it was about preparation for the arsons.  I remember we
18  agreed we wanted everybody accounted for, at least a few hours
19  before we were supposed to meet.  So, for Seattle, we all
20  agreed where we would meet.
21  **Q.** Where was that?
22  **A.** At the Greenlake Bar & Grill in Seattle.
23  **Q.** You talk about Briana Waters twice.  You've never really
24  explained how is it that you know her at this point in your
25  life?

1  **A.**  I had met her through Bill Rodgers.  She was a friend of

2  his, sort of -- my understanding was in the above ground

3  Olympia environmental community, and he introduced me to her.

4  **Q.**  Did you get along with her?

5  **A.**  Yes, I liked her a lot.

6  **Q.**  Did you see her socially?

7  **A.**  I saw her a couple times.  Not a large number of times,

8  but a couple other times.

9  **Q.**  Looking at your calendar, it indicates there's a second

10  meeting in Olympia on Wednesday, May 16.  Do you see that?

11  **A.**  Yes.

12  **Q.**  Do you remember what occurred on that day?

13  **A.**  I don't remember exactly what we talked about.  I presume

14  I meet with at least Bill --

15      MR. FOX:  I object the way she presumes, Your Honor.

16  BY MR. BARTLETT:

17  **Q.**  Do you have a specific memory of that meeting?

18  **A.**  I remember going down in the evening shortly before the UW

19  event.  I do not remember exactly what was talked about.  It's

20  reasonable to assume that it was about the fire that took

21  place two days later.

22  **Q.**  But you do not know?

23  **A.**  I do not know.

24  **Q.**  Can you tell the members of the jury, when you are talking

25  about events, important events, after all of these arsons, did

1    you try to remember all the details?

2    **A.**  No, the exact opposite.  The general protocol or agreement

3    between all the activists is that you would never talk about

4    these again, not with each other, not with anybody else.

5         So as soon as they were over, I pretty much tried to block

6    the information out of my mind immediately.

7    **Q.**  They are going to hear eventually that you were involved

8    in an arson in Susanville in October 2001.  After that, were

9    you involved in any others?

10   **A.**  No.

11   **Q.**  Did your life change after that?

12   **A.**  Yeah, after that I moved in with my boyfriend.  I really

13   changed -- both because I wasn't seeing what we were doing

14   actually having a positive effect.  And there had been more

15   and more conversations about whether it was acceptable to use

16   violence toward humans at part of these meetings, and that was

17   something I really disagreed with.

18        I decided this wasn't something I wanted to be a part of

19   any more.  I really focused my life on my job, on my partner,

20   and really walked away from all of this.

21   **Q.**  I am sorry, I don't mean to interrupt the flow.

22        You have on your calendar there was a meeting on

23   Wednesday, May 16, but you really have no specific

24   recollection?

25   **A.**  No.

**Q.** What is the next thing you specifically do remember relating to the University of Washington arson?

**A.** That took place on the 19th or the 20th. I guess it took place on the 20th of May.

**Q.** Why do you say that?

**A.** I remember that it was that weekend.

**Q.** What do you remember?

**A.** So, we met at -- I drove my car up to Greenlake. Parked in the area of the Greenlake Bar & Grill. The five of us who were involved met at the Grill, probably around 9:00 at night, 8:00 at night, just so that everybody was accounted for at least a few hours before the arson.

**Q.** Who do you remember being at the Greenlake Bar & Grill?

**A.** I remember there were five of us. I remember that Bill Rodgers and myself were there. And then I remember that two other women and another man were there.

**Q.** Do you remember any of the other women?

**A.** At the time when I first started thinking about it, I didn't. One of the other women is Briana Waters, though.

**Q.** What happens?

**A.** We were there essentially waiting for time to pass. Some of us have dinner.

Then we drive over in a rental car that everybody else had brought up from Olympia. Drove to a dead-end street, just above where the Center for Urban Horticulture is in a

1  residential area.  Left the car.

2      Briana stayed behind in some bushes at the end of the

3  street with a scanner, a police scanner to listen for

4  activity.

5      And radio, we all had radios so that she could communicate

6  with us.  The rest of us walked --

7  **Q.**  If I could stop you for a second.  Was that fairly common,

8  for example, when you went to Cavel West, did that same thing

9  occur?

10  **A.**  Yes, you always had the driver, the lookout left behind

11  with the police scanner, and everybody would have radios.

12  **Q.**  I am sorry.  So what happens?

13  **A.**  We walked down, there was a grassy slope on the other side

14  of the street.  We walked down the hill.  We walked down the

15  road a bit.  Crossed the street, cut across a grassy field,

16  kind of behind where the Center for Urban Horticulture is.

17      Set up there in the bushes.  Myself and one other person

18  went up to the building.  I started cutting glass.

19      We got a call on the radio that a car -- from Briana --

20  that a car had pulled in front of the building.  It was a

21  security car.  We all waited, sort of stayed in the shadows by

22  the building.  I did, that is.  The car drove away without

23  anybody getting out.

24          MR. FOX:  I object to the narrative, and ask for a

25  question at this point.

BY MR. BARTLETT:

**Q.** You are at the back of the Center for Urban Horticulture. What is your job, and what do you do?

**A.** My job is to cut the glass. So what I do is walk up to the building with my glass cutting material. The idea was to score -- essentially score a rectangular box, score an X, and then use suction cups to break the glass, so it could be pulled apart without falling. I ended up cutting it a little deeply, so it shattered -- or it broke.

After that fell, I waited. I didn't see any movement or activity or response, so I pulled the rest of the pieces out and went back to the bushes and waited..

**Q.** What do you remember after that?

**A.** After that Bill Rodgers and the other man went inside the building. They went inside the building and pulled out any research papers they thought they could find that might be relevant to give us more information.

They found sort of what was like a small aquarium that they thought might have had an animal in it. They took it out and they moved it way back in the field across from the building.

They had large fuel bags that they had put inside. Set up devices, and then we all left.

**Q.** If you could take a look at Government's Exhibits 616. It's a demonstrative exhibit.

1    MR. BARTLETT: Perhaps we can take the afternoon

2 break right now and get some exhibits set up.

3    THE COURT: Let's do that. Take the break. Don't

4 discuss the case, leave your books on the chair and be back

5 here in about 15 minutes.

6  (Jury not present.)

7    THE COURT: All right, we will take the recess.

8 Yes, you may step down.

9  (Afternoon recess.)

10  (Jury not present.)

11    THE COURT: You may be seated.

12  Bring them in.

13  (Jury present. )

14    THE COURT: You may be seated.

15    MR. BARTLETT: May I continue, Your Honor.

16    THE COURT: Yes.

17 BY MR. BARTLETT:

18 Q. Ms. Kolar, just prior to the break we talked about being

19 at the back of the Center for Urban Horticulture on May 21 and

20 cutting the glass yourself.

21  Taking a look behind you, at the carpet behind your chair,

22 do you see Exhibit 616?

23 A. Yes.

24 Q. Do you recognize that?

25 A. That was the backpack I carried that night.

1 **Q.** How do we have it here today?

2 **A.** I gave it to you.

3 **Q.** Why have you kept it?

4 **A.** I was somewhat of a packrat.  It was a useful backpack, so

5 I still had it.

6 **Q.** What eventually happens?  You are at the back of the

7 building, you've cut the glass.

8 **A.** I cut the glass.  As I sort of mentioned, Bill and another

9 person had gone in and set up the devices, lit the fuel bags.

10 Then we all left, looped back around through the field where

11 we had come back in.  Briana picked us up, and then we left.

12 I got dropped back off at my car, and I went home.

13 **Q.** What, if anything, did you hear about the action?

14 **A.** I had a police scanner in my car that I listened to on the

15 way back.  I don't remember hearing anything then.

16 The next morning when I went to work, there's newspaper

17 boxes right in front of my office downtown.  So it was a front

18 page, a big picture on the front of The Seattle Times saying

19 what had happened.

20 **Q.** Would you take a look at what's been previously entered

21 into evidence as Exhibit 304-A?  You don't have to pull it

22 out.  It will show up on your screen.

23 Do you recognize that?

24 **A.** That's the Greenlake Bar & Grill where we met.

25 **Q.** Looking at what's also been admitted as Government Exhibit

1  304-C, do you recognize that?

2  **A.**   That is -- the end of that street is where we left Briana

3  as a lookout and where we walked down the hill toward the

4  Center for Urban Horticulture.

5  **Q.**   Looking at 304-E, do you recognize that?

6  **A.**   That's just essentially a close-up of the same street and

7  the gate where Briana stayed and where we walked down.

8  **Q.**   Looking at 304-F?

9  **A.**   That's looking back up the other direction at the same

10  spot.

11  **Q.**   And 304-G?

12  **A.**   That's essentially looking forward as if you just walked

13  through that fence looking down the field below that spot.

14  **Q.**   And 304-K?

15  **A.**   That's dumpsters that were at the edge of the field, that

16  looks roughly like the field where we walked through and

17  around to get to the Center for Urban Horticulture.

18  **Q.**   Finally 304-M, as in March?

19  **A.**   That's essentially as we crossed this field, we dropped

20  down where there's a runoff gulch where those trees are, and

21  then behind that is the Center for Urban Horticulture.

22  **Q.**   This arson is obviously a major action within the

23  movement, correct?

24  **A.**   Yes.

25  **Q.**   Were you also aware that there was a second action planned

1  for that night?

2  **A.**  Yes.  There was a sister action planned at Jefferson

3  Poplar Farm in Oregon.

4  **Q.**  In your mind, why was there two actions planned for the

5  same night?

6  **A.**  Because it would have more media impact, because it would

7  have more impact on the industry.  If two things happen at

8  once, it would feel more profound.

9  **Q.**  Did you help with the drafting of the communiqué in re --

10  in relation to the Center for Urban Horticulture arson?

11  **A.**  No.

12  **Q.**  Did you eventually see one?

13  **A.**  Yes.

14  **Q.**  This happens on May 21 of 2001?

15  **A.**  Yes.

16  **Q.**  Obviously, you are still working and here on September 11,

17  the World Trade Center --

18  **A.**  Yes.

19  **Q.**  Yet you choose to engage in another arson in October 2001?

20  **A.**  Yes.

21  **Q.**  Can you explain that to the jury?

22  **A.**  Joe Dibee approached me, and it had been a long time since

23  I'd done any work with him.  He approached me and said he owed

24  an animal action to someone that he often got funding from to

25  carry out actions.  He said that it was going to be a release

of wild horses that had been rounded up on BLM land that were
going to be slated for slaughter.  So the goal was a release
of the horses.  So I said I'd participate.

**Q.**  In looking at your calendar, 617-C, does it show
approximately when it was in October that you met with
Mr. Dibee?

**A.**  It would be October 11.

**Q.**  Where are we looking?

**A.**  Right there (indicating).

**Q.**  So what happens?

**A.**  So Joe picked me up.  We drove in his truck down to
California, actually Nevada.  It was right near the border out
in the desert.  Met up with a group of people down there,
including Stan Meyerhoff.  Stan had a number of devices with
him.  I don't know how much, but Stan had a number of devices
with him.

**Q.**  When you say number of devices?

**A.**  Incendiary devices.  He told Joe that he wanted to do more
than rescue, he also wanted to do an arson.

   I remember Joe being a little surprised or disturbed by
that, because he had organized for some people to come who he
didn't have the same level of trust that he might have wanted
to have with somebody to do an arson as opposed to a release.

   Nonetheless, that's what we decided to do.  I drove into
town with a couple other folks to pick up fuel.

**Q.** How much fuel did you get, do you recall?

**A.** I don't remember exactly, but we filled a number of --
probably a couple five gallon containers.

We drove back. We were all camping in the desert.

While we were getting all the materials prepared, we were
trying to clean everything to make sure there were no
fingerprints. Joe Dibee ended up getting maced in the eye.
We ended up delaying the action a day so he could recover.

Then eventually drove up, walked down to where the horses
were kept. Do you want me to --

**Q.** Yes.

**A.** We walked down to where the horses were kept. Most people
stayed behind with handsaws to work on cutting through the
fences.

Stan Meyerhoff and myself climbed the outside fence,
walked along the edge of the corral where most of the horses
were, through a couple back corrals. Moved the domesticated
horses back there away from the building so they wouldn't be
near it. Set up four devices, incendiary devices; two in the
barn nearby the main building, and then one at the porch of
the office building, and one under a truck near the office
building.

**Q.** You helped to set those up?

**A.** Yes.

**Q.** What happens afterwards?

1  **A.**  We set those up.  We -- Stan and I go back to where people

2  are working on the fences.  They are still trying to -- they

3  managed to cut through somewhat of a section of the fence.

4  The horses are not coming anywhere near that section, avoiding

5  the people.

6      Joe had brought some big orange plastic fencing, like you

7  might see at a construction site.  The idea to use that as a

8  net to sort of drive the horses toward the opening.  We tried

9  to do that for a while.  We weren't real successful.  We were

10  worried about getting trampled.

11      So we ended up just -- we left, we left the fences open

12  and left.  We got dropped back off where we had been camping,

13  and then Joe and I left.

14  **Q.**  And you returned to Seattle?

15  **A.**  Uh-huh.

16  **Q.**  Did you have anything to do with the communiqué in

17  relation to Susanville?

18  **A.**  Yes.  Joe was driving.  I was riding.  We were talking

19  through what the communiqué would be together.  I ended up

20  writing it up and e-mailing it out from a little Internet cafe

21  on Capitol Hill.

22  **Q.**  Could you look at Government's Exhibit 393 and tell me if

23  you recognize that?

24  **A.**  Yes, that was the communiqué sent out.

25  **Q.**  That's your wording?

1  **A.**  Yes.

2  **Q.**  Could you read that for the jury?

3  **A.**  October 17, 2001.  "In opposition to the Bureau of Land

4  Management's (BLM) continued war against the Earth - the Earth

5  Liberation Front targeted the Wild Horse Holding Facility in

6  Corvallis, California on October 17, 2001.  For years the BLM

7  has rounded up thousands of wild horses and burros to clear

8  public land for grazing cattle.  Many of these wild animals

9  are sent to slaughter.

10     "We cut through and removed four 60 foot sections of

11  wooden fence to corrals holding more than 200 wild horses in

12  order to free them from captivity.

13     "After moving domestic horses to a safe distance, we set

14  four timed incendiary devices aimed at destroying two barns,

15  two vehicles and one office building.

16     "In the name of all that is wild we will continue to

17  target industries and organizations that seek to profit by

18  destroying the Earth."

19  **Q.**  When you said that you sent this out from an Internet

20  cafe, where did you send it?

21  **A.**  Sent it to the Earth Liberation Press Office, a known

22  e-mail address that we send e-mail to.

23          MR. BARTLETT:  Could we pull up what's already been

24  entered as 391 -- excuse me, I misspoke, 392-A.

25  BY MR. BARTLETT:

1  **Q.** Do you recognize that?

2  **A.** That's the site where -- the barn that did burn down, the

3  site at Susanville.

4  **Q.** Finally, if you would take a look at Government Exhibit

5  392-B?

6         THE CLERK:  What number is that?

7         MR. BARTLETT:  It's not admitted.

8  BY MR. BARTLETT:

9  **Q.** Take a look at 392-A.  Do you recognize that?

10 **A.** Yes, this is the site where the barn that did burn down

11 and the barn that did not, in Susanville.

12        MR. BARTLETT:  Offer 392-A.

13        MR. FOX:  No objection.

14        THE COURT:  Admitted.

15            (Exhibit No. 392-A admitted.)

16 BY MR. BARTLETT:

17 **Q.** Looking at 392-E, do you recognize that?

18 **A.** I do not have 392-E.  This is the site of the barn that

19 didn't -- where the device didn't go off, and one of the

20 incendiary devices.

21        MR. BARTLETT:  Offer.

22        MR. FOX:  No objection.

23        THE COURT:  Admitted.

24            (Exhibit No. 392-E admitted.)

25 BY MR. BARTLETT:

1  **Q.** When you say barn, you are talking about a pole barn?

2  **A.** Pardon?

3  **Q.** A pole barn?

4  **A.** Yes.

5  **Q.** You said that there was a device that didn't go off.  Can

6  you point that out to the members of the jury?

7  **A.** That's this white bucket with the blue Tupperware

8  container on top of it.

9  **Q.** What happens when you return to Seattle, what goes on with

10  your life?

11  **A.** I moved in with my current boyfriend, Jonathan.  That was

12  the last action I was a part of.  I talked to a couple more of

13  the folks in Olympia, socially, and then pretty much lost all

14  touch with everybody involved in any activism whatsoever and

15  moved forward with my life.

16  **Q.** Were there times after the University of Washington arson

17  where you were in contact with the defendant in this case,

18  Ms. Waters?

19  **A.** I remember seeing her probably a couple times in Olympia.

20  I remember seeing her one time at the 9/11 media art center

21  near REI.  She was giving a video presentation.  I don't

22  remember if that was before or after the fire.  I remember she

23  was a part of helping Bill Rodgers move out of his house,

24  using her car.  I never made it down to help that day.

25  **Q.** You've talked about a point when the FBI approached you in

1  December of 2005 and asked for your cooperation.  Do you
2  remember your testimony earlier?
3  **A.**  Yes.
4  **Q.**  Did you in fact eventually decide to cooperate?
5  **A.**  Yes, I did.
6  **Q.**  Can you explain that process?
7  **A.**  I was in New York for work.  I got the phone call from
8  Agent Quimby.  She explained what was happening.  I was
9  originally scheduled to go back to Virginia, which is the
10  headquarters of the company I was at.  I ended up cutting the
11  trip short, coming home.  Hired Mr. Martin as my lawyer, and
12  came in to meet with the government within a couple days after
13  that.
14  **Q.**  You came in to meet with Special Agent Halla?
15  **A.**  Yes, Mr. Halla, with Mr. Friedman.
16  **Q.**  That was on December 16 of 2005?
17  **A.**  That sounds correct.
18  **Q.**  Who was with you?
19  **A.**  My lawyer, Michael Martin, who's behind you.
20  **Q.**  Did you have any formal agreement at that point in time;
21  had any promises been made to you?
22  **A.**  None whatsoever.
23  **Q.**  What was your understanding?
24  **A.**  My understanding was that I was potentially facing a
25  mandatory minimum of 35 years to life.  That if I cooperated

1   it was likely that the government would recommend some

2   reduction in that, but I had no commitment. I had no promise.

3   I just decided to go in and tell the truth as I knew it in

4   order to try to put this behind me.

5   **Q.** When you went in and talked on December 16, had you been

6   provided any information by the United States prior to

7   meeting?

8   **A.** Other than the very brief phone call with Agent Quimby,

9   no.

10   **Q.** What topics do you recall discussing with the United

11   States on that day?

12   **A.** At the beginning of the meeting, I recall saying that the

13   events around the UW arson were foggiest for me. We talked

14   over Susanville. We talked over Cavel West. We talked about

15   sort of my history of the book club meetings. Generally --

16   probably spent about five minutes at the very end talking

17   about the UW arson.

18   **Q.** Why was the UW arson the foggiest in your mind?

19   **A.** I am not exactly sure why. As I said, I tried to block

20   out all the details after it happened. It was getting near

21   the end of my involvement in activism. It was probably, of

22   any of the events I was in, the one that I can look back and

23   question the most my involvement in it. I am not exactly sure

24   why.

25   **Q.** What do you remember telling Special Agent Halla and

1 Mr. Friedman on December 16th about the University of

2 Washington, who was involved?

3 **A.** I remember saying that I was there. That Bill Rodgers was

4 there. That I was confident that there were two other women

5 and a man there.

6 I remember thinking out loud, trying to think of the

7 people who I remember being involved or talking to. I

8 mentioned Capitol Hill Girl and her Punk boyfriend. I

9 mentioned someone known, that I was thinking through the name

10 of, Crazy Dan at the time. I was thinking out loud about who

11 might have been involved or who else might have been there at

12 the time.

13 **Q.** After you left the courthouse on December 16, when did you

14 next meet with the United States?

15 **A.** I don't remember the exact date.

16 **Q.** Early January?

17 **A.** Okay, yeah, that sounds correct.

18 **Q.** Prior to that date, did something happen that led you to

19 recall specific facts about the University of Washington

20 arson?

21 **A.** Yes, so after -- the first time I'd really talked about

22 any of these events ever was first with my lawyer and then

23 with the government in December. So that jarred a lot of

24 memories.

25 After those, I was at home writing notes to myself. I

1  ended up looking through my phonebook on my phone, and I saw

2  Briana's name.  And that brought back the memory of saying,

3  oh, right, Briana was one of the other people who was

4  involved.

5      So I called my lawyer and told him that.

6          MR. BARTLETT:  Your Honor, at this point I would like

7  to read a stipulation that the parties have entered into.

8          MR. FOX:  That's fine, Your Honor.

9          THE COURT:  All right.

10         MR. BARTLETT:  The United States of America, by and

11 through Jeffrey C. Sullivan, United States Attorney for the

12 Western District of Washington, and Mark Bartlett and Andrew

13 Friedman, Assistant United States Attorneys, for said

14 District, and defendant Briana Waters, and her attorneys, Neil

15 Fox and Robert Bloom, agree and stipulate that, if called to

16 testify, Michael Martin would testify to the following:

17     No. 1.  I am an attorney licensed to practice in the State

18 of Washington.

19     No. 2.  I have represented Jennifer Kolar in connection to

20 a federal criminal investigation and prosecution since

21 December 2005.

22     No. 3.  On approximately December 29, 2005, Jennifer Kolar

23 called me and told me she had remembered that Briana Waters

24 had been one of the participants in the arson at the Center

25 for Urban Horticulture at the University of Washington.

No. 4.  On January 5, 2006, pursuant to a request from
Ms. Kolar, I -- referring to Michael Martin -- called Andrew
Friedman and told him that Ms. Kolar had identified Briana
Waters as the lookout during the May 2001 arson at the Center
for Urban Horticulture arson at the University of Washington.
BY MR. BARTLETT:

**Q.** Does that stipulation sound accurate to you?

**A.** Yes.

**Q.** You understand, as you testified today, that Lacey
Phillabaum has pleaded guilty to being a participant in the
University of Washington arson?

**A.** Yes.

**Q.** Yet you never identified her?

**A.** That's correct.

**Q.** As you sit here today, do you remember her being a
participant?

**A.** No, I do not.

**Q.** Since -- when is the last time you recall talking with
Lacey Phillabaum?

**A.** It probably would have been around the end of 2001.

**Q.** Have you had any communications -- have you communicated
with her through a third party?

**A.** No, not at all.

**Q.** You provide the name Briana Waters through your attorney
to the United States.  What, if anything, do you do, does your

1    attorney tell you to do to try to refresh your memory about

2    these events?

3            MR. FOX:  I object, hearsay.  It's not what the

4    attorney is saying.

5    BY MR. BARTLETT:

6    **Q.**  Did you do anything to try to improve your memory.  Did

7    you try to obtain any documents, collect any items?

8    **A.**  No, other than going through and just trying to remember,

9    looking through my phonebook, no.

10   **Q.**  In addition to looking through your phonebooks, were there

11   other things you had at your house that you collected and

12   looked through?

13   **A.**  I did have a crate of information that I had kept for a

14   number of years, and included in there was a folder of papers

15   that Briana had given to me to read, with a note in it from

16   her.

17       So that also, you know, that correlated in my head the

18   recollection of Briana being involved.

19   **Q.**  Did you also have any, for example, old computers or hard

20   drives or zip disks?

21   **A.**  Yes, which is where some of this information came from.

22   I'd had an old laptop I had at the time.  I still had the zip

23   disks that I had used to pull the PGP disks from; a number of

24   files I had downloaded from the research site or old e-mails

25   that were encrypted, left over from those days.

1  **Q.** If you could take a look at the carpet behind you and look
2  at Government's 615.  Tell me if you recognize that.
3  **A.** Yes, this would have been a scanner, some gloves and
4  batteries for the scanner and some LED lights that were in
5  this crate that I had left.
6  **Q.** What did you do with the crate?
7  **A.** I called my lawyer, Mr. Martin, and told him that I had
8  it.  He acquired it and eventually gave it to you.
9        MR. BARTLETT:  I would like to offer 615.
10       MR. FOX:  No objection.
11       THE COURT:  Admitted.
12             (Exhibit No. 615 admitted.)
13 BY MR. BARTLETT:
14 **Q.** Did you use those scanners, if you recall, in regard to
15 any of these actions?
16 **A.** This would have been a scanner I had in my car as I was
17 driving away after the UW action.  I don't recall it ever
18 being used in any of these actions.
19 **Q.** Is there anything specific about the batteries that sticks
20 out in your memory?
21 **A.** No, other than the sort of typical idea was once you had
22 cleaned something completely clear of fingerprints, you'd put
23 it in a Ziploc bag, so that you knew it was clean and then you
24 put it away.  That would be my recollection.  But no, they
25 were just batteries for radios, I believe.

1  **Q.** Take a look at Government 612, and tell me if you
2  recognize that.
3  **A.** This is a copy of a newsletter that was in that same box,
4  that on the back of it has Briana --
5  MR. FOX: Your Honor, I would object at this point
6  before it's been admitted, from the witness --
7  BY MR. BARTLETT:
8  **Q.** Do you recognize that newsletter?
9  **A.** I do.
10  **Q.** That was one of the items you had in the box you turned
11  over to Mr. Martin?
12  **A.** Yes, that's correct.
13  MR. BARTLETT: Offer 612.
14  MR. FOX: May I voir dire the witness?
15  VOIR DIRE EXAMINATION
16  BY MR. FOX:
17  **Q.** Good afternoon, Ms. Kolar. I am Neil Fox. You don't know
18  where you got this newsletter; is that right?
19  **A.** I remember it being handed to me. I don't remember
20  exactly who wrote the information on it. But it was when a
21  group of us were together and it was handed to me with
22  everybody's name.
23  **Q.** Do you know when it was handed to you?
24  **A.** It would have been sometime early 2002 or late 2001. I
25  don't remember exactly.

**Q.** You don't know whose handwriting is on the back?

**A.** No.

MR. FOX: I would object to the last page of this document being admitted.

THE COURT: I don't know what all is there. Is there something that can hold to the break?

MR. BARTLETT: It can, Your Honor.

THE COURT: I will take it up then.

DIRECT EXAMINATION - CONTINUED

BY MR. BARTLETT:

**Q.** Would you take a look at government 617-D, as in dog. Do you recognize that?

**A.** Yes. This is a copy of the address book that was in my Hand Spring Palm Pilot.

MR. BARTLETT: Offer 617-D.

MR. FOX: No objection.

THE COURT: Admitted.

(Exhibit No. 617-D admitted.)

BY MR. BARTLETT:

**Q.** Do you recognize that?

**A.** Yes, that's Avalon or Bill Rodgers' cell phone number.

**Q.** Did you ever use that number to call Bill Rodgers?

**A.** Yes, I did.

**Q.** Did you always know him as Avalon, or did you call him both Bill and Avalon?

**A.** In general I just called him Avalon or Mr. Green.  I did know his name was Bill, but that's not usually what I called him.

**Q.** Taking each page one at a time.

**A.** This is David Barbarash.  He and I dated briefly.  He lived up in Canada.

**Q.** Was he also involved in activities?

**A.** He was, although none of the ones that we're discussing here today.

This is Jake Conroy.  He was one of the activists I met through that conference in Minneapolis that I went to.

This is Joe Dibee, who I dated and was involved in this.

I am not sure -- Ryan, I think, was one of the activists. I am not sure who this is.

**Q.** If we could skip ahead a few pages to I.

**A.** This is India or Suzanne Savoie's voice mail number.

**Q.** Why do you have just a voice mail number?

**A.** That was how she checked messages.  A lot of times people didn't have direct personal contact numbers.  Part of the idea was not really knowing how to reach somebody directly.

**Q.** I am looking ahead to your P page.

**A.** This is Greg Litus, who was my friend in Colorado in the Wray arson.

**Q.** And 13?

**A.** Jonathan Paul, who was part of the Cavel West.

1  **Q.**  And the next page?

2  **A.**  Reba is Lacey Phillabaum.

3  **Q.**  Finally, looking ahead to W?

4  **A.**  Briana Waters, her e-mail address that she'd given me and

5  phone number.

6  **Q.**  Had you called her at this phone number?

7  **A.**  I don't recall.

8  **Q.**  Finally, X?

9        MR. BARTLETT:  I am sorry, Your Honor.  I guess we

10  don't have that page here.

11  BY MR. BARTLETT:

12  **Q.**  Could you take a look at 617-L and tell me if you

13  recognize that?

14  **A.**  This is a copy of the book that Bill Rodgers was working

15  on on how to commit arsons.

16        MR. BARTLETT:  Offer 617-L.

17        MR. FOX:  No objection.

18        THE COURT:  Admitted.

19              (Exhibit No. 617-L admitted.)

20  BY MR. BARTLETT:

21  **Q.**  Explain, first of all, how do you have this book?

22  **A.**  Bill had given it to me on a disk asking me to proofread

23  it and also look at the schematics and see if they looked

24  correct.

25  **Q.**  How is it that we have it here today?

1   **A.**  I gave it to you as part of what was on my computer.

2   **Q.**  Did you in fact go through and look at this and edit it?

3   **A.**  No, I never had time.  I never got to it.

4   **Q.**  As you look through the book prior to testifying today, is

5   it a fairly accurate description as to how you remember the

6   devices being set up in both Susanville -- down in Susanville,

7   I should say?

8   **A.**  Yes, from what I recall.  I haven't looked at it lately.

9   **Q.**  Finally, could you take a look at Government 614.

10         MR. BARTLETT:  If I could approach the witness, Your

11   Honor, or approach the clerk.

12   **A.**  This is a folder Briana gave me, the series of articles

13   that she encouraged me to read to get some background and

14   history in the movement.

15         MR. BARTLETT:  Offer 614.

16         MR. FOX:  May I voir dire the witness?

17               VOIR DIRE EXAMINATION

18   BY MR. FOX:

19   **Q.**  Is it true you never looked at any of these articles?

20   **A.**  I hadn't looked at them until I was asked to recently by

21   the government.

22   **Q.**  You don't know for sure that the contents of the folder

23   were the same in 2006 as they were when you received them?

24   **A.**  I have no reason to believe otherwise.  I kept them

25   together.  Never taken them apart.  I have no reason to

1  believe they are not.

2  **Q.** And you moved several times in the intervening time?

3  **A.** I moved twice, yes, but they were always in the same box

4  and nothing taken out.

5  　　　　MR. FOX:  I object based on my previous argument.

6  　　　　THE COURT:  Well, what would you add to what you are

7  objecting to, anything?

8  　　　　MR. FOX:  No.  I would defer the Court to my previous

9  argument.

10  　　　　THE COURT:  All right.  Then it will be admitted.

11  　　　　　　　　(Exhibit No. 614 admitted.)

12  　　　　　　DIRECT EXAMINATION - CONTINUED

13  BY MR. BARTLETT:

14  **Q.** Obviously this is not how the documents were given to you?

15  It's clear that they have been processed by the FBI?

16  **A.** Yes.

17  **Q.** If you could take out first of all the manila folder, the

18  white manila folder.  And you can take it out of its actual

19  folder there?  Do you recognize that?

20  **A.** Yes, this is handwriting from Briana.

21  　　　　MR. BARTLETT:  If we could publish, Your Honor, 614.

22  BY MR. BARTLETT:

23  **Q.** What does it say?

24  **A.** It says "Hey Woman!  Here's some stuff to read that I was

25  telling you about.  We'll hang out soon.  Love B."

**Q.** Before testifying today, had I asked you to go through and actually read these articles?

**A.** Yes.

**Q.** Not the originals that are in front of you, but copies that were provided?

**A.** Yes.

**Q.** Did you do that?

**A.** Yes, I did.

**Q.** Mr. Fox -- before I get to that, Mr. Fox was asking you some questions about how these articles work. Can you explain to the members of the jury, do you remember exactly how you get these articles?

**A.** Briana handed me this folder, with these articles in it to the best of my recollection. In general there had been, at these various book club meetings we'd had and various times we'd talked, the idea was to try to learn from history, to try to learn both sort of the philosophy as to why people were involved in various movements, to learn from what had worked for them and what hadn't worked for them.

So Briana was handing me these articles to say, "Hey, read these, here's some information that will be valuable to you."

**Q.** I notice on the document we are looking at it says "hey woman", and the WO is underlined?

**A.** That was sort of a common way for -- sort of a somewhat feminist way to emphasize woman as opposed to the word man in

1 the word "woman".

2 **Q.** If you could pull out all the documents and put them on

3 the desk in front of you.

4 You will notice in the lower right-hand corner of most

5 pages, there is a very small handwriting, do you see those?

6 **A.** Yes, I do.

7 **Q.** Can you make them out?

8 **A.** Yes, mostly.

9 **Q.** If you look at the -- if I could have the overhead on?

10 Looking at Q94. Do you have that in front of you?

11 **A.** Yes.

12 **Q.** First of all, this article is titled, "Willful

13 Disobedience, An Anarchist Bimonthly, Volume 2, No. 8,

14 APRIL-MAY, 2001."

15 **A.** Correct.

16 **Q.** In general, how would describe the tenor of most of the

17 articles you read?

18 MR. FOX: I would object, she didn't read them

19 contemporaneous with the events.

20 THE COURT: Well, let's see if she can answer that.

21 You can cross-examine on that.

22 **A.** In reading these through these are articles, I would say

23 all of them were pretty much focused on anarchy as a

24 philosophy and it is sort of a pure way of being as opposed to

25 any sort of watered down pop culture notion of anarchism.

BY MR. BARTLETT:

Q. Looking at Q94, on the right side, do you see the second paragraph that I have had highlighted where it states "In the heart of a riot one can catch a glimpse of the spirit" --

MR. FOX: I would object to Mr. Bartlett reading the exhibit. It's one thing for the witness but for Mr. Bartlett to read it.

THE COURT: What would be the difference whenever remember is looking the a it.

MR. FOX: Let the jurors read it in the jury room.

THE COURT: Do you want her to read it is that what you want her to do.

MR. FOX: I am making my objection.

THE COURT: You made it. Okay. You made it.

BY MR. BARTLETT:

Q. "In the heart of a riot one can catch a glimpse of the spirit of revolt without a price. It is there in the glee of the looter who, when asked how she felt about stealing, replied, 'Nobody's stealing. It's all free today.' It is there in the festive atmosphere in the midst of battle with the forces of order. Here the enemy has been eclipsed."

MR. BLOOM: Excuse me, there's a typo there, it says "economy."

A. It says "the economy".

BY MR. BARTLETT:

1  **Q.**  The economy?

2  **A.**  Yes.

3  **Q.**  What was your understanding at the time, was there a

4  discussion about the anarchist philosophy during this time?

5  **A.**  I know that some of the members, there was some discussion

6  amongst it in the book group.  There were some members that

7  were more anarchist focused than others.

8      There was just general discussion of wanting to understand

9  different philosophies and learn from them and understand how

10  people were thinking and what people were doing around the

11  world.

12  **Q.**  If you turn ahead to Q104, which is in the first set of

13  documents.

14      Once again, we are still in the first booklet, "Willful

15  Disobedience, An Anarchist Bimonthly."

16      Do you see two short stories that appear on the right of

17  the page?

18  **A.**  Yes.

19          MR. FOX:  Could we clarify that's Mr. Bartlett who's

20  highlighted that and not the witness?

21          THE COURT:  All right.  That's what happened.

22          MR. BARTLETT:  I just am trying to make it easier.

23  BY MR. BARTLETT:

24  **Q.**  Do you see those?

25  **A.**  Yes.

1  **Q.**  What do those two articles -- what are they in reference

2  to?

3  **A.**  They are in reference to the Jefferson Poplar Farm fire

4  and the Center for Urban Horticulture fire that happened in

5  May of 2001.

6  **Q.**  Looking at the first packet that you have, how many

7  different pamphlets were provided to you relating to "Willful

8  Disobedience, An Anarchist Bimonthly"?

9  **A.**  There are three.

10  **Q.**  Looking at -- the very last one, it begins Q110.

11  **A.**  Okay.

12  **Q.**  Looking at the second page of that pamphlet, Q111, the

13  lower right hand paragraph.

14  **A.**  Uh-huh.

15  **Q.**  Do you see that paragraph, can you read that for the jury?

16  **A.**  "But for me revolt is not a hobby, anarchy is not a word I

17  use to make myself feel more radical.  These are my life's

18  project, the way of being I am striving to create.  The ideas

19  I develop are not mere opinions, but the outgrowth of the

20  passionate reason of my project, based on my life, my desires,

21  and my dreams as they encounter the world.  They are as fluid

22  as lived desires and dreams, but this fluidity is strong,

23  assured and determined.  And if, as some have said, this makes

24  me dogmatic and arrogant, then we need more dogmatic and

25  arrogant anarchists.  Because it is not the ceaseless

1  negotiation of opinions, of democratic discourse, that will

2  bring down the ruling order, but the revolt of indomitable

3  individuals who refuse to compromise themselves, coming

4  together to destroy all domination."

5  **Q.**  Finally, at the very last page of that pamphlet, that has

6  the Venomous Butterfly Publications on the back side, do you

7  see that, the very last page that has the publication down at

8  the bottom?

9  **A.**  Yes.

10  **Q.**  And actually, the last phrase in the article, can you read

11  that?

12  **A.**  The one that's highlighted?

13  **Q.**  Yes.

14  **A.**  "In the face of ten thousand years of institutional

15  oppression, ten thousand years in which a ruling class and the

16  structures that support its power have determine the

17  conditions of our existence, what we need is not therapy, but

18  strong-willed revolt aimed at developing a revolutionary

19  project that can destroy this society and its institutions."

20  **Q.**  Looking ahead in the packets,, if you can turn to Q158,

21  which I think will take you through several packets, to an

22  article entitled, "Insurgent Ferocity:  The Playful Violence

23  of Rebellion."

24  **A.**  Uh-huh.

25  **Q.**  Do you see that?

1  **A.** Yes, I do.

2  **Q.** Looking on the second page of that document at the bottom,

3  can you read that for the jury, the last paragraph?

4        MR. FOX:  Can I clarify the originals are

5  highlighted?

6        MR. BARTLETT:  They are not, Your Honor.

7        THE COURT:  All right.

8  **A.** "The playful violence of insurgence has no room for

9  regret.  Regret weakens the force of blows and makes us

10  cautious and timid.  But regret only comes in when violence is

11  dealt with as a moral question, and for insurgents who are

12  fighting for the freedom to live their desires, morality is

13  just another form of social control.  Wherever rebel violence

14  has manifested playfully, regret seems absurd.  In riots

15  (other than police riots) and spontaneous uprisings - as well

16  as in small-scale vandalism - a festive attitude seems to be

17  evident.  There is an intense joy, even euphoria, in the

18  release of violent passions that have been pent up for so

19  long.  Bashing in the skull of society as we experience it on

20  a daily basis is an intense pleasure, and one to be savored,

21  not repudiated in shame, guilt or regret.  Some may object

22  that such an attitude could cause our violence to get out of

23  hand, but an excess of insurgent violence is not something

24  that we need to fear.  As we break down our repression and

25  begin to free our passions, certainly our gestures, our

1   actions, and our entire way of being are bound to become

2   increasingly expansive and all we do we will seem to do to

3   excess.  Our generosity will seem excessive and our violence

4   will seem excessive.  Unrepressed, expansive individuals

5   squander in all things.  Riots and insurrections have failed

6   to get beyond temporary release, not because of excess, but

7   because people hold themselves back.

8   **Q.**  Ms. Kolar, if you could look at the very last page of the

9   very last document.

10  **A.**  In the same packet?

11  **Q.**  No, the very last packet, Q162?

12  **A.**  Okay.

13  **Q.**  Looking at the very last inside page, do you see two

14  articles?

15  **A.**  Yes.

16  **Q.**  Is one entitled "Beyond the ELF?"

17  **A.**  Yes.

18  **Q.**  Who is it written by?

19  **A.**  Craig Rosebraugh.

20       MR. FOX:  Objection, hearsay, Your Honor.

21       THE COURT:  This is out of the same packet I have

22  admitted.

23       MR. BARTLETT:  It is, Your Honor.

24       THE COURT:  You may continue.

25  **A.**  What's the question?

BY MR. BARTLETT:

**Q.** Do you know the name Craig Rosebraugh?

**A.** Yes, I do, he was at the press office for the Earth Liberation Front.

**Q.** Looking down on this article, midway through, there's a paragraph that starts "There needs to be a direct focus." Do you see that?

**A.** Yes.

**Q.** Can you read that and the following paragraph to the jury?

**A.** There's need needs to be a direct focus on fighting the desire created by industrialization and the westernized way of life. It needs to be a direct action focus using not stale sanctioned forms of protest but underground guerrilla tactics in the form of economic sabotage and beyond."

Do you want me to read the next one?

**Q.** Yes.

**A.** "So how do we go about combatting this desire? How do we go about choosing targets that have the most impact? The idea in the United States is to look at just what makes the country what it is. What symbols, what propaganda, what physical objects are involved in creating the atmosphere of desire? What makes the United States economically operate? Who and what are the information sources in the U.S. that push and create the propaganda? Are there targets that could be selected which involve and effect many corporations? Are

1  there symbolic targets that if destroyed would place a major

2  blow to the false reality?"

3  **Q.** And the next paragraph?

4  **A.** "Think big.  Wall Street, the stock market, Statue of

5  Liberty, U.S. Capitol, Mt. Rushmore, Disneyland, media

6  conglomerates, military installations, government agencies

7  (CIA, FBI, BATF, USFS, etc.) large multinational corporations,

8  automobile manufacturers, etc.  Realize the difference between

9  pulling up an acre of G.E. crops and destroying Monsanto.  The

10  difference between sabotaging logging equipment and destroying

11  MAXXAM/Pacific Lumber.  The difference between spray paint and

12  fire."

13  **Q.** Finally, Ms. Kolar, do you see, next to the "Beyond the

14  ELF" article, there is an article entitled "What is the Earth

15  Liberation Front"?

16  **A.** Yes.

17  **Q.** In large print in the middle of that, does it indicate

18  what are the guidelines for the Earth Liberation Front?

19  **A.** Yes, it does.

20  **Q.** What are those guidelines?

21  **A.** It says "To inflict economic damage to those who profit

22  from the destruction of the national environment.

23     "To reveal and educate the public on the atrocities

24  committed against the environment and all the species that

25  co-habitate in it.

1      "To take all necessary precautions against harming any

2   animal or nonhuman."

3   **Q.** You can put those back in the large envelope.

4      Ms. Kolar, you've talked about meeting with members of

5   this investigation in December 16 with your attorney, do you

6   recall that?

7   **A.** Yes.

8   **Q.** Did there come a point in time where you meet, long and

9   short periods of time, in January and February of 2006?

10  **A.** Yes.

11  **Q.** Do you remember those?

12  **A.** In general, yes.

13  **Q.** What happened?

14  **A.** We went through essentially the different book club

15  meetings that had been held, the three different book club

16  meetings.  We went through detail about Wray.  We went

17  through --

18  **Q.** When you say Wray, the --

19  **A.** Wray, Colorado, gun club.

20     We went through details about Susanville and Cavel West.

21  Various meetings where whatever the government wanted to ask

22  me questions about, I would answer truthfully.

23  **Q.** Did there come a point in time where you went to Olympia?

24  **A.** Yes.

25  **Q.** Was that February 4?

1  **A.**  That sounds correct.

2  **Q.**  How did you get down there?

3  **A.**  Agent Torres and Halla --

4  **Q.**  It should be Agent Halla, I'll help you out here.

5  **A.**  Agent Halla and Agent Torres drove, picked me up in the

6  morning, and we drove down to Olympia.

7  **Q.**  What happens down there?

8  **A.**  The primary goal was to try to identify where Bill Rodgers

9  lived and other people lived in the area.  We drove around,

10  identified what was probably Bill Roger's house.  They asked

11  if I remembered where Briana or her boyfriend lived at the

12  time.  I did not.  I remembered just sort of the rough area.

13  We looked for the sort of junkyard area where Nathan Block

14  and Joyanna Zacher lived.  It looked like a fair amount of

15  development had happened since then, and we couldn't really

16  get back into the area we were at.

17  That was about it, and we drove back.

18  **Q.**  Did you ever go to Evergreen during that trip?  Evergreen

19  State College, I should say.

20  **A.**  Yeah, I think we walked up to the library, walked around

21  there a little.

22  **Q.**  Was there any discussion during this trip on February 4,

23  2006, about Lacey Phillabaum or Briana Waters?

24  **A.**  I recall them asking me about meeting Briana, about what I

25  thought about her, did I like her or not.  I said I did.  I

recall them asking me if she and Bill were friends.  Just sort
of a small amount of information about how I knew her, what
she did, what her personality was like.  They asked if I
thought that if she was approached she would cooperate, and I
said I thought she would, that I thought she was pretty mild
mannered.

**Q.**  On March 6, do you come in and speak with -- about the
University of Washington arson?

**A.**  I did.

**Q.**  That had been a long gap between your initial interview
and March 6?

**A.**  That's correct.

**Q.**  Do you have any explanation for that?

**A.**  That was when you guys asked me to come in and talk about
it.

**Q.**  As you sit here and testify today, is there any doubt in
your mind about Ms. Waters' participation?

**A.**  No.

**Q.**  Would you testify if there was?

**A.**  I would testify that there was doubt in my mind, if there
was doubt in my mind.

                MR. BARTLETT:  Nothing further, Your Honor.

                THE COURT:  All right.

                        CROSS-EXAMINATION

BY MR. FOX:

1  **Q.**  Good afternoon, Ms. Kolar.

2  **A.**  Good afternoon.

3  **Q.**  Again, I am Neil Fox.  I'm one of Briana Waters' lawyers.

4  **A.**  Yes.

5  **Q.**  Currently, right now, you live in Seattle; is that

6  correct?

7  **A.**  That's correct.

8  **Q.**  And you live in the Wallingford neighborhood?

9  **A.**  That's right.

10  **Q.**  That's north of Lake Union; is that right?

11  **A.**  Correct.

12  **Q.**  And you are fairly close to the University of Washington,

13  right?

14  **A.**  That's correct.

15  **Q.**  In fact, you are probably -- your house right now is

16  probably about a mile or two from the Center for Urban

17  Horticulture?

18  **A.**  That would be correct.

19  **Q.**  You have a view from your street of the lake; is that

20  right?

21  **A.**  From our balcony you can see a little bit of the lake.

22  **Q.**  Okay.  And if you walk down the street, you can see all of

23  the downtown lake, right?

24  **A.**  No.  If you go down the hill -- if you go down the hill,

25  you eventually see the lake.

1    **Q.**  You are familiar with the area around the University of
2    Washington, right?

3    **A.**  Yes.

4    **Q.**  You would not need a map to get to the Center for Urban
5    Horticulture; is that right?

6    **A.**  No, I would not.

7    **Q.**  The building itself, the Center for Urban Horticulture,
8    have you ever been there?  Apart from the date of this arson.

9    **A.**  Other than the one time beforehand where we looked at --
10   where I looked at it with Al Decker, no.

11   **Q.**  So you've never been to any banquets there?

12   **A.**  No.

13   **Q.**  Never been to any master gardener programs or anything
14   like that?

15   **A.**  No.

16   **Q.**  Now, you do know people that work at the University of
17   Washington; is that correct?

18   **A.**  Yes, I do.

19   **Q.**  You know people who study there?

20   **A.**  I know people that have studied there in the past, yes.

21   **Q.**  Have you ever used any of the facilities at the University
22   of Washington?

23   **A.**  Yeah.  When I was in grad school, I went to conferences
24   there.  I took a class there a couple years ago.

25   **Q.**  Where did you take the class?

1   **A.**   In the computer science department.

2   **Q.**   Now, you currently work for America Online; is that

3   right -- or not currently, but up until about six, eight

4   months ago; is that right?

5   **A.**   Until September, a year ago.   So about a year and a half

6   ago I worked for AOL, yes.

7   **Q.**   You were a software engineer for them?

8   **A.**   At the time I was a technical manager, and architect at

9   the time.

10   **Q.**   Then you testified on direct that you started working on

11   your Ph.D., right?

12   **A.**   I had previously, yes.

13   **Q.**   And you were studying, what was it, atmospheric and

14   oceanic physics?

15   **A.**   The department name was technically astrophysics --

16   astrophysical, planetary, and atmospheric sciences.

17   **Q.**   And then your bachelor's degree was in applied

18   mathematics?

19   **A.**   Applied mathematics and engineering, yes.

20   **Q.**   And what is applied mathematics?

21   **A.**   It's part of the engineering department.   Essentially

22   using mathematics in applied technologies.   So rather than

23   theoretical math, it's math applied to science.

24   **Q.**   When you were getting your Ph.D. at the University of

25   Colorado, did you have an office at the University?

1   **A.**  All the grad students essentially were in one big office

2   where we had desks.

3   **Q.**  And were there laboratories in the building that you were

4   studying in?

5   **A.**  There was a computer lab that all the grad students

6   shared.  A couple of other physics labs.

7   **Q.**  Did you ever do research in the laboratory?

8   **A.**  Uh-huh.

9   **Q.**  So you know from your own experience the type of valuable

10  work that would be contained in the University research

11  facility; isn't that true?

12  **A.**  Yes.

13  **Q.**  You would know, from your own experience, what the impact

14  of your actions at the Center for Urban Horticulture would be

15  on the scientists that were doing your research there; isn't

16  that true?

17  **A.**  That's correct.

18  **Q.**  People like Sarah Reichard, right?

19  **A.**  I am not familiar with that name.

20  **Q.**  You don't know who Sarah Reichard is?

21  **A.**  No.

22  **Q.**  Now, I would assume that -- well, the neighborhood that

23  you live in, Wallingford area of Seattle, there is shops up

24  on, what is it, 45th Street?

25  **A.**  Yeah, about half a mile down.

1  **Q.** And there's a grocery store, Food Giant, now a QFC?

2  **A.** QFC.

3  **Q.** There's a restaurant there?

4  **A.** Yes.

5  **Q.** And there are a lot of people that live in your

6  neighborhood that are connected to the University of

7  Washington, right?

8  **A.** I have no idea.

9  **Q.** You have no idea. You don't know anyone in your

10  neighborhood that has any tie at all to the University of

11  Washington?

12  **A.** Of the people I know in my neighborhood, none of them have

13  a tie to the University of Washington.

14  **Q.** Do you think that over the last seven years or so, that

15  while you were on 45th Street, in Seattle, that you would have

16  occasion to meet someone that may have worked at the

17  University of Washington?

18  **A.** I could presume that, but I have no direct knowledge of

19  that.

20  **Q.** I would assume that when you were out and about on 45th

21  Street, you weren't wearing a sweatshirt that said Earth

22  Liberation Front?

23  **A.** No.

24  **Q.** You wore the type of clothes you are wearing right now?

25  **A.** Not quite like this.

1  **Q.**  Or jeans or something like that, Birkenstocks?

2  Or you don't wear Birkenstocks, do you?

3  **A.**  No.

4  **Q.**  Because they are made with animals?

5  **A.**  No, just because they are not comfortable.

6  **Q.**  Do you think that when you were possibly meeting people

7  from the University of Washington, do you think that any of

8  them knew whether you had burned down the Center for Urban

9  Horticulture?

10  **A.**  As I said, I don't know if I actually met anybody from the

11  University of Washington; but no, they would not know.

12  **Q.**  Because you tried to blend in with the other people in

13  that area, right?

14  **A.**  I had put that part of my life completely past me.  I did

15  blend in with that part of the area.

16  **Q.**  Well, let's go back to 2001.  You were living in the

17  Fremont area, right?

18  **A.**  At the time, yes.

19  **Q.**  And Fremont had a lot of businesses there, right?

20  **A.**  Yes.

21  **Q.**  Restaurants?

22  **A.**  Yes.

23  **Q.**  Would it be fair to assume that there were people from the

24  University of Washington that may have lived in that area?

25  **A.**  You could presume that.  I have no direct knowledge.

1  Q.  So when you were out and about in the Fremont area, again,

2  you weren't wearing an ELF sweatshirt, right?

3  A.  No.

4  Q.  So back in 2001, you tried to blend in to your

5  neighborhood, right?

6  A.  Yes.  I felt like you would probably think that just about

7  anybody involved in these kind of actions look like a normal

8  person.

9  Q.  So, for instance, you mentioned that there was a newspaper

10 headline, when all this took place, about the fire at the

11 Center for Urban Horticulture, right?

12 A.  Yes.

13 Q.  I imagine there was a fair amount of talk, possibly at

14 your own office, about what had happened?

15 A.  Uh-huh.

16 Q.  I am sorry, you have to say yes or no.

17 A.  Yes, I believe there was.

18 Q.  And you were privy to those conversations, right?

19 A.  I don't remember any specific conversations about it.  I

20 remember seeing the paper on the street when I was walking

21 down.

22 Q.  You remember people in your office possibly talking about

23 it?

24 A.  It wouldn't surprise me if they had.  I have no direct

25 recollection of the conversations.

1  **Q.** I assume that back in 2001 you didn't volunteer to the
2  people in your office that you had just been the person that
3  burned down the Center for Urban Horticulture?
4  **A.** No, they had no idea.
5  **Q.** They had no idea. You basically lived a lie every day of
6  your life; isn't that true?
7  **A.** That was the whole point of this kind of activism. It was
8  a different life.
9  **Q.** Right. And you were living a double life, right?
10 **A.** That was the point, yes.
11 **Q.** No one knew about the deceptive actions that you had
12 previously taken, right?
13 **A.** No.
14 **Q.** The people that you worked with, right?
15 **A.** They did not know at the time.
16 **Q.** In fact, the boyfriend that you had back in 2001 is the
17 very same boyfriend you have today?
18 **A.** That's correct.
19 **Q.** His name is Jonathan -- how do you spell the last name,
20 for the record?
21 **A.** Reichhold, R-E-I-C-H-H-O-L-D.
22 **Q.** And you testified that he wasn't an activist?
23 **A.** That's correct.
24 **Q.** He wasn't involved in any arsons?
25 **A.** That's correct.

**Q.** And you -- well, you weren't living with him in 2001, but you saw him a lot, right?

**A.** Correct.

**Q.** Sometimes spent the night at his place?

**A.** Yes.

**Q.** In fact, the very night of the Center for Urban Horticulture arson, you spent the night at his place, right?

**A.** Yes, that's correct.

**Q.** So you come to his house after the arson, right?

**A.** Uh-huh.

**Q.** You talk with him, right?

**A.** No. He was asleep.

**Q.** He was asleep. You crawl into bed with him?

**A.** Yes.

**Q.** Wake up the next morning with him?

**A.** Yes.

**Q.** You go to work together?

**A.** Probably.

**Q.** In fact, he was with you when you saw that newspaper headline; isn't that right?

**A.** Yes, he was.

**Q.** And you looked into each other's eyes at some point that morning, right?

**A.** I don't know if we did or not.

**Q.** But the fact is, you didn't even tell your boyfriend what

1  you had done the night before?

2  **A.**  Well, of course not.  That was the point.  You didn't tell

3  anybody.

4  **Q.**  You didn't tell anyone.  So you lived a lie that very day

5  with your boyfriend, your life partner, right?

6  **A.**  At the time I was -- yes, I was living a different life

7  then.

8  **Q.**  Okay.  Well, you were living with the same boyfriend, or

9  you were involved with the same person back then, correct?

10  **A.**  Yes.

11  **Q.**  And you were working -- before AOL bought out your

12  company, it was singingfish.com, right?

13  **A.**  That's correct.

14  **Q.**  So you were with the same company, basically, that you

15  were working with up until a year and a half ago?

16  **A.**  That's correct.

17  **Q.**  So you weren't living that different of a life, were you?

18  **A.**  Just this one part of my life.

19  **Q.**  Just that one part of your life.

20      Now, when you moved here, you started working for the

21  Cobalt Group, right?

22  **A.**  Correct.

23  **Q.**  Another software company, right?

24  **A.**  Correct.

25  **Q.**  Then you moved over in 2000 to singingfish.com?

1  **A.**  That's correct.

2  **Q.**  And you were in the video software group, is that right?

3  **A.**  Singingfish was a multimedia audio/video search engine.

4  **Q.**  So what were your doing specifically for them?

5  **A.**  It varied over the years, but I did development as part of

6  the search engine.  I worked on binary image extraction

7  utilities.

8  **Q.**  In fact, you hold several patents, do you not?

9  **A.**  Yes, I do.

10  **Q.**  Now, your job, the job you had in December 2005, was still

11  the Singingfish that became AOL, right?

12  **A.**  Correct.

13  **Q.**  You liked your job, right?

14  **A.**  Yes.

15  **Q.**  You felt it was interesting?

16  **A.**  Uh-huh.

17  **Q.**  I'm sorry, you have to say yes or no.

18  **A.**  Yes.  Sorry, yes.

19  **Q.**  You traveled for your job quite a bit?

20  **A.**  Yes, I did.

21  **Q.**  You went to New York, is that right?

22  **A.**  Yes.

23  **Q.**  The headquarters of AOL were in Virginia, is that right?

24  **A.**  That's correct.

25  **Q.**  You knew Lacey Phillabaum was living on the east coast,

1  did you not?

2  **A.**  No, I had no idea.

3  **Q.**  You traveled out of the country for your company?

4  **A.**  Yes.

5  **Q.**  You went to India?

6  **A.**  Yes.

7  **Q.**  You would go to the Bay area?

8  **A.**  The Bay area?

9  **Q.**  Yes.

10  **A.**  Oh, you mean the San Francisco area?  I went once or twice

11  there for due diligence for a company we were going to

12  acquire.

13  **Q.**  You went to Chicago every now and then for work?

14  **A.**  I don't believe I ever went to Chicago for work.

15  **Q.**  Did you go for pleasure?

16  **A.**  My entire family is from Chicago.

17  **Q.**  Is Helen Smith in your family?

18  **A.**  She's my grandmother.

19  **Q.**  Now, you have an office at Singingfish, right, or you had

20  one?

21  **A.**  I had a shared office near the end, yes.

22  **Q.**  And you kept materials in your office that were important

23  to you, right?

24  **A.**  Related to my job, yes.

25  **Q.**  Perhaps some personal items as well?

1   **A.**  Sure.

2   **Q.**  Okay.  Now, Mr. Reichhold -- is it Reichholds or

3  Reichhold?

4   **A.**  It's Reichhold.

5   **Q.**  You own a house with him right now?

6   **A.**  That's correct.

7   **Q.**  And you own a boat with him?

8   **A.**  No, I no longer own any part of the boat.

9   **Q.**  You sold your part of the boat?

10  **A.**  I sold off the part of it I had when all of this started

11  so I could pay my legal expenses.

12  **Q.**  You sold the boat to Mr. Reichhold?

13  **A.**  Yes, that's correct.

14  **Q.**  So you still have access to the boat, right?

15  **A.**  That is correct.

16  **Q.**  And the name of the boat is the Manta Ray?

17  **A.**  Correct.

18  **Q.**  And you actually, you race boats competitively, right?

19  **A.**  For fun, yes.  You know, in a club.

20  **Q.**  You are a member of the Corinthian Yacht Club, is that

21  right?

22  **A.**  Right.  Anybody -- in order to race, you have to belong to

23  a yacht club.  It could be a tavern, but you have to belong to

24  a yacht club.

25  **Q.**  So you have a yacht called the Manta Ray and you are an

1   officer of the Corinthian Yacht Club?

2   **A.** No. I was a volunteer board member at one point. When

3   all of this came out, it was deemed better for the club for my

4   name not to be associated with it, obviously, and I resigned.

5   **Q.** But is it not true that you ran to be a member of the

6   board for a two-year term in November of 2006?

7   **A.** No. I volunteered, probably less than a year, with a

8   volunteer board, for a volunteer club.

9   **Q.** Is it not true that in November of 2006, you ran for a

10   two-year term for the board of your yacht club?

11   **A.** I believe they did put names on the ballot for election of

12   board members, yes.

13   **Q.** And your name was one of those?

14   **A.** Yes.

15   **Q.** So you did run for a two-year term, is that right?

16   **A.** Yes.

17   **Q.** And this was in November of 2006?

18   **A.** I don't remember the exact date.

19   **Q.** Well, it was after you pled guilty to burning down the

20   Center for Urban Horticulture; isn't that true?

21   **A.** No. I was part of that board before any of this was

22   actually public. So that would have been before I pled

23   guilty.

24   **Q.** Ms. Kolar, I am handing you what's been marked for

25   identification as Defendant's Exhibit A-197.

1   **A.**   Okay.

2   **Q.**   Why don't you take a minute and familiarize yourself with

3   that.

4   **A.**   Uh-huh.

5   **Q.**   Can you identify that?

6   **A.**   I can.

7   **Q.**   Why don't you identify it for the jury?

8   **A.**   This is the annual meeting notice, including nominees for

9   board members for the Corinthian Yacht Club of Seattle.

10  **Q.**   What's the date on that?

11  **A.**   November 29, 2006.

12          MR. FOX:   I would offer Defendant's Exhibit A-197.

13          MR. BARTLETT:   No objection.

14          THE COURT:   Admitted.

15              (Exhibit No. A-197 admitted.)

16  BY MR. FOX:

17  **Q.**   You pled guilty on what date?

18  **A.**   It would have been sometime in fall of 2006.

19  **Q.**   Does October 4, does that remind you of the day?

20  **A.**   I would have to see it in front of me.   I will take your

21  word for it.

22  **Q.**   Okay.   Well, the point is, is that it was before this

23  meeting, is that not correct?

24  **A.**   When they put this out, they literally withdrew my name

25  after the information became public.

1 **Q.** Let's turn to page 4 of that document.

2 **A.** Correct.

3 **Q.** That does show, does it not, your name?

4 **A.** Yes.

5 **Q.** As being a candidate for a two-year term as director?

6 **A.** Yes.

7 **Q.** In November of 2006?

8 **A.** As I said, they put this out prior to the time of the

9 announcement and then later withdrew my name.

10 **Q.** I understand that they put it out and then withdrew your

11 name, but did you consent to having your name listed as a

12 candidate for director for a two-year term?

13 **A.** At the time, yes.

14 **Q.** So in November 2006, is it fair to say you were expecting

15 to serve out your full term as director?

16 **A.** That's the only length they do. It's a volunteer

17 position.

18 **Q.** Sure. So you ran, you put forth your own name, right?

19 **A.** Actually, they asked me to put my name in.

20 **Q.** Okay. And you said, sure, I'll do that?

21 **A.** Yes.

22 **Q.** For a two-year term, starting in November of 2006?

23 **A.** Right. I had been volunteering with the board probably

24 six months before then.

25 **Q.** Sure. I guess the point is, is that had you not just pled

1  guilty to a crime where you were expecting to get five to

2  seven years in prison?

3  **A.**  As I said, at the time, this was before that happened.

4  And my understanding was that the time period it could take

5  for this all to resolve could be greater than two years.

6  **Q.**  Okay.  Apart from yachting, you also like to scuba dive,

7  is that not correct?

8  **A.**  That is correct.

9  **Q.**  And that's why your nom de guerre, as they say, is Diving,

10  right?  That was your alias, right?

11  **A.**  Correct.

12  **Q.**  Because you like to go scuba diving?

13  **A.**  That's correct.

14  **Q.**  And this is something that you shared in common with Joe

15  Dibee?

16  **A.**  Yes.

17  **Q.**  This is something you shared in common -- well, you have a

18  lot of friends that go diving, right?

19  **A.**  Yes.  I don't dive much anymore, but at the time I did.

20  **Q.**  In fact, not long after the Susanville arson, you went on

21  a diving trip to Hawaii, is that not correct?

22  **A.**  That would be correct.

23  **Q.**  So you commit an arson, and then you went -- well,

24  actually you went to Chicago for a while, right, in November

25  of 2001?

1    **A.**  Okay.  I will believe you.  I don't recall going to

2    Chicago.

3    **Q.**  You don't recall going to Chicago, okay.  But you do

4    recall going to Hawaii, right?

5    **A.**  Yes, I do.

6    **Q.**  And that was with Mr. Reichhold?

7    **A.**  Yes.  We hadn't taken any vacation all year.  I finally

8    had time to take vacation.

9    **Q.**  On the day of the arson at the Center for Urban

10   Horticulture, is it not correct that the very next evening you

11   went on a sailboat race?

12   **A.**  I'd have to look at my calendar.  Do you want me to do so?

13   **Q.**  Why don't you take a look at your calendar.  Let's take a

14   look at the -- there's another version in A-42.

15   **A.**  All right.  Would you prefer I look at that one?

16   **Q.**  What's been marked for identification as A-42.

17        I believe it's -- I don't have the number in front of me

18   of what it's already been admitted as, but --

19   **A.**  Okay.

20             MR. FOX:  If the government doesn't have any

21   objection, I am going to take a page from my A-42.

22             MR. BARTLETT:  No objection, Your honor.

23   BY MR. FOX:

24   **Q.**  I put it on the screen, May 2001; is that correct?

25   **A.**  Yes.

1  **Q.** Why don't you look down at -- it's listed for May 21st.

2  **A.** Uh-huh.

3  **Q.** Would you read that to the jury, please?

4  **A.** It says: 4 to 8 p.m. STYC, which is the Salute Tavern

5  Yacht Club. They were casual Monday evening races that we

6  were doing at the time.

7  **Q.** So the day after, or the day of the fire at the Center for

8  Urban Horticulture, you went on a yacht race?

9  **A.** I continued on with my normal life, yes.

10 **Q.** And I take it you didn't tell any of the people at the

11 yacht club that you had just burnt down a research institution

12 at the University of Washington?

13 **A.** Of course not.

14 **Q.** So basically you just participated in this action and go

15 back to your normal life, right?

16 **A.** Yes.

17 **Q.** Now, when you were down in Susanville for that arson down

18 there, you testified on direct that Mr. Dibee hurt himself or

19 maimed himself or something like that?

20 **A.** Yes.

21 **Q.** And you had to delay everything one day?

22 **A.** Yes.

23 **Q.** And it's true that you had to get back to work, right?

24 **A.** That is also true.

25 **Q.** And you were concerned that your absence might be noted at

1  work, right?

2  **A.**  Yes.

3  **Q.**  So you actually contacted a gentleman by the name of Kenny

4  Clark?

5  **A.**  That's correct.

6  **Q.**  And Mr. Clark contacted your employer?

7  **A.**  Yes.

8  **Q.**  So you asked him to contact your employer?

9  **A.**  Actually I believe I asked him to contact Jonathan.

10  **Q.**  Jonathan?

11  **A.**  Reichhold, my partner.

12  **Q.**  To tell him to tell Jonathan to tell your employer you

13  would be late?

14  **A.**  Yes.

15  **Q.**  You also had him contact your massage therapist as well,

16  Gail?

17  **A.**  I might have had a massage then, I don't recall.  I

18  usually had them every few Tuesday days for arthritis.

19  **Q.**  So Mr. Clark, he has a couple different names; isn't that

20  right?

21  **A.**  I knew him as either Kenny Clark, or I think at one point

22  he went by Kenny Cryst.

23  **Q.**  C-R-Y-S-T?

24  **A.**  Yes.

25  **Q.**  Isn't his real name Richard McDermitt?

1  A. Not that I am aware.

2  Q. You are not aware of that name?

3  A. No.

4  Q. Mr. Clark is a friend of yours?

5  A. Yes, he is.

6  Q. He's been involved in a number of animal rights campaigns

7  with you?

8  A. He was a part of the SEDNA campaign. There was no

9  other --

10  Q. SEDNA campaign is what?

11  A. The Makah whaling campaign. He was the diesel mechanic

12  down there.

13     There are no other campaigns that he and I were involved

14  in directly that I recall at the same time. We were just part

15  of the same environmental circles.

16  Q. Now, let's jump ahead to May of 2004. Right?

17  Mr. Bartlett asked you about that earlier, when Special Agent

18  Quimby came by your house?

19  A. Yes.

20  Q. You were at home one night, right?

21  A. Yes.

22  Q. Were you living in the same house as you currently live

23  in, in the Wallingford neighborhood?

24  A. Yes.

25  Q. Nice night in May?

1  **A.** I don't remember the night.

2  **Q.** You don't remember that. You remember the knock on the

3  door, though?

4  **A.** I do.

5  **Q.** You were probably pretty surprised to see two FBI agents

6  on your doorstep, right?

7  **A.** Yes.

8  **Q.** One of them was Special Agent Jane Quimby?

9  **A.** Correct.

10  **Q.** Do you know the name of the other one?

11  **A.** I do not.

12  **Q.** They introduced themselves to you?

13  **A.** Yes, they did.

14  **Q.** They told you that they wanted to talk to you about

15  Colorado?

16  **A.** That's correct.

17  **Q.** You said -- well, I assume you didn't think that they

18  wanted to talk to you about your work on the atmospheric

19  sciences at the University of Colorado, right?

20  **A.** True.

21  **Q.** You believed that they wanted to talk to you about arson?

22  **A.** I didn't assume arson. I assumed they wanted to talk

23  about some actions or activities. They did not say of what

24  type.

25  **Q.** But you thought that they wanted to talk you about the

1  arson at the Vail Ski Lodge, is that true?

2  **A.**  No, that is not what I said.  I did not know what they

3  wanted to talk about.  I just assumed they wanted to talk

4  about activist activity in Colorado.

5  **Q.**  You didn't think they wanted to talk to you about the Wray

6  Gun Club arson, or attempted arson?

7  **A.**  I genuinely had no idea what specifically they wanted to

8  talk about in Colorado.

9  **Q.**  Now, when you said that you didn't want to talk to Agent

10  Quimby, she asked you whether you had something to hide,

11  right?

12  **A.**  I think her partner did, but yes.

13  **Q.**  Her partner did, and you said no?

14  **A.**  That's correct.

15  **Q.**  That was a lie, wasn't it?

16  **A.**  I had nothing to hide about Vail.  But, yes, I essentially

17  said I didn't want to talk to them.

18  **Q.**  Well, you didn't just say you didn't want to talk to them;

19  you said you had nothing to hide, correct?

20  **A.**  That is correct.

21  **Q.**  But you had something to hide, didn't you?

22  **A.**  Potentially.

23  **Q.**  Well, you tried to burn down a gun club in Colorado just a

24  few weeks before the Vail Ski Lodge was done; is that right?

25  **A.**  Yes.

1  **Q.** So you did have something to hide?

2  **A.** Yes.

3  **Q.** Now, when you tried to burn down the Wray Gun Club, you

4  did this with Greg Litus, is that right?

5  **A.** That's correct.

6  **Q.** And that's L-I-T-U-S, is that right?

7  **A.** That's correct.

8  **Q.** He's a friend of yours?

9  **A.** Uh-huh.

10  **Q.** I'm sorry?

11  **A.** Yes.  I'm sorry, yeah.

12  **Q.** And you and Mr. Litus actually manufactured the devices

13  that you tried to set off at the Wray Gun Club, right?

14  **A.** That is correct.

15  **Q.** And when you manufactured those devices with Mr. Litus,

16  you manufactured them on the property that he lived on; is

17  that correct?

18  **A.** That's correct.

19  **Q.** And there was another person that lived on that property

20  named Nicole Rose Marino(phonetic), is that not true?

21  **A.** She lived in one of his buildings, yes.

22  **Q.** And she was what you would call an above-ground activist,

23  right?

24  **A.** That's correct.

25  **Q.** When you say above ground, that means that she was engaged

1  in perfectly lawful activities, right?

2  **A.**  Lawful, as well as what you would call maybe civil

3  disobedience.

4  **Q.**  Perhaps she would sit down and block a timber company from

5  clear-cutting something, right?

6  **A.**  Yes.

7  **Q.**  But she wasn't burning anything down?

8  **A.**  No, she was not.

9  **Q.**  And she lived on this property, right?

10  **A.**  She did.

11  **Q.**  And she did not know anything about yours and Mr. Litus's

12  plans, right?

13  **A.**  She was not a part of it.

14  **Q.**  So you manufactured these devices near where Nicole Rose

15  Marino was living without her knowledge?

16  **A.**  That's correct.

17         THE COURT:  Mr. Fox, let me stop you there.

18         MR. FOX:  Okay.

19         THE COURT:  We've reached the 4:00 hour.  As I

20  mentioned, we would recess at this time each day.  We will

21  take this up again tomorrow morning at 9:00.

22      As always, out go about your business.  You are not to

23  discuss the case, research or do anything along those lines.

24  Have a good night's sleep, and see you back here tomorrow at

25  9:00.  Leave your books on the chair, and have a good evening.

1  (Jury not present.)

2  THE COURT:  All right, you may step down.

3  MR. BARTLETT:  Ms. Kolar, you should not talk about

4  the case or your testimony overnight.  Could you please come

5  back here at 8:45 tomorrow?

6  THE COURT:  And we need you back here, yes.  Don't

7  discuss anything about what's going on here.

8  Anything else we need to discuss here?

9  MR. FOX:  No.

10  THE COURT:  Then I will see you folks at 8:30.

11  THE CLERK:  All rise.  Court is adjourned.

12  (The Court recessed to Thursday, February 21, 2008,

13  at the hour of 9:00 a.m.)

14  *    *    *    *    *

15  C E R T I F I C A T E

16

17  I certify that the foregoing is a correct transcript from

18  the record of proceedings in the above-entitled matter.

19

20  /S/  Teri Hendrix _____          May 2, 2008

21  Teri Hendrix, Court Reporter                Date

22

23

24

25