1                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
2                        AT TACOMA

3

4    UNITED STATES OF AMERICA,    )   Docket No. CR05-5828FDB
                                  )
5            Plaintiff,           )   Tacoma, Washington
                                  )   February 21, 2008
6    vs.                          )
                                  )
7    BRIANA WATERS,               )   VOLUME 8
                                  )
8            Defendant.           )
     _____)

9

10
                     TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE FRANKLIN D. BURGESS
        SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
     APPEARANCES:
13
     For the Plaintiff:       MARK N. BARTLETT
14                            ANDREW C. FRIEDMAN
                              Assistant United States Attorney
15                            700 Stewart Street, Suite 5220
                              Seattle, Washington 98101-1271
16
     For the Defendant:       ROBERT BLOOM
17                            Attorney at Law
                              3355 Richmond Boulevard
18                            Oakland, California 94611

19                            NEIL M. FOX
                              Cohen & Iaria
20                            1008 Western Ave., Suite 302
                              Seattle, Washington 98104
21

22   Court Reporter:          Teri Hendrix
                              Union Station Courthouse, Rm 3130
23                            1717 Pacific Avenue
                              Tacoma, Washington  98402
24                            (253) 882-3831

25   Proceedings recorded by mechanical stenography, transcript
     produced by Reporter on computer.

1

I N D E X

2

INDEX OF WITNESSES
==================

3

WITNESS ON BEHALF OF PLAINTIFF:                              Page

4

JENNIFER KOLAR

5

    Cross Continued by Mr. Fox.......................1409

6

7

WILLIAM WAKE

8

    Direct by Mr. Friedman..........................1534
    Cross by Mr. Bloom..............................1538

9

JENNIFER KOLAR - Continued

10

    Cross Continued by Mr. Fox.......................1541

11

VALERIE BETTY

12

    Direct by Mr. Bartlett..........................1597
    Cross by Mr. Bloom..............................1622

13

14

TIMOTHY WATKINS

15

    Direct by Mr. Bartlett..........................1628

16

17

18

19

20

21

22

23

24

25

1

INDEX - EXHIBITS

<u>EXHIBITS</u>                                                    <u>Page</u>

No.  A-198                                                    1416
No.  A-73                                                     1420
No.  113                                                      1426
No.  A-200                                                    1431
No.  A-72                                                     1436
No.  A-199                                                    1469
No.  A-67                                                     1474
No.  740                                                      1537
No.  A-201                                                    1542
No.  931-A                                                    1607
No.  931-B                                                    1607
No.  931-C                                                    1607
No.  931-E                                                    1608
No.  931-F                                                    1614
No.  931-G                                                    1614
No.  931-H                                                    1614
No.  391                                                      1632
No.  392-B                                                    1633
No.  392-C                                                    1634
No.  392-D                                                    1635
No.  392-F                                                    1636
No.  392-G                                                    1637
No.  392-H                                                    1638
No.  392-I                                                    1639
No.  392-L                                                    1640
No.  392-N                                                    1640
No.  392-M                                                    1641

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, FEBRUARY 21, 2008 - 9:00 A.M.

* * *

(Jury not present.)

THE COURT:  All right, you may be seated.

THE CLERK:  This is in the matter of the United States of America versus Briana Waters, CRO5-5828FDB.

Counsel, please make an appearance for the record.

MR. BARTLETT:  Mark Bartlett and Andrew Friedman and Special Agent Ted Halla for the United States.

MR. FOX:  Neil Fox and Mr. Bloom present with Briana Waters.

THE COURT:  All right.  Ms. Kolar.

MR. BARTLETT:  Should I bring her back in?

THE COURT:  Bring her back in.

Ms. Kolar, let me have you just retake the witness chair, please.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  We are ready for the jury?

MR. BARTLETT:  We are, Your Honor.

THE COURT:  Bring them in.

(Jury present.)

THE COURT:  All right.  You may be seated.

Good morning to you.  Today is Thursday, anyway.  Ready to go.  We left off with Ms. Kolar.

Jennifer Kolar.

JENNIFER KOLAR, called as a witness, duly sworn

CROSS-EXAMINATION- CONTINUED

BY MR. FOX:

**Q.** Good morning, Ms. Kolar.

**A.** Good morning.

**Q.** When we left off, we were talking about when Special Agent Jane Quimby came by your house in May of 2004.

**A.** Okay.

**Q.** I believe that you had testified that you didn't talk to her, right?

**A.** Other than what I had said, that I said I didn't want to talk to her.

**Q.** You were worried, though, that she wanted to talk to you about something other than your academic career in Colorado, right?

**A.** Sure. That's reasonable.

**Q.** Safe to assume that she wanted to talk to you about possibly some of the things a Grand Jury in Colorado were investigating, right?

**A.** I don't recall if there was a Grand Jury going on at the time or not.

**Q.** Well, there were Grand Juries that had convened between 1998 and 2004 to investigate the Vail arson, right?

**A.** Yes, I am aware of that.

**Q.** You were very aware of it, right?

1  **A.** Yes.

2  **Q.** Because actually, you were part of various animal rights

3  e-mail lists that talked about that, correct?

4  **A.** That's correct.

5  **Q.** And you knew some of the people that had been called to

6  the Grand Jury, right?

7  **A.** That's correct.

8  **Q.** Now, you had committed an attempted arson at the Wray Gun

9  Club just a few weeks before the Vail Ski Resort arson, right?

10  **A.** Correct.

11  **Q.** But you were aware that no fire actually broke out to the

12  gun club, right?

13  **A.** Correct.

14  **Q.** You were aware that the fire at the Vail Ski Resort caused

15  millions of dollars of damage, right?

16  **A.** Yes.

17  **Q.** Based on that, is it safe to assume that down deep, you

18  believe she wasn't there to ask you about the Wray Gun Club?

19  **A.** I can't make any assumption about that.  I don't know what

20  she wanted to talk to me about.

21  **Q.** Now, you committed the gun club crime with Greg Litus,

22  right?

23  **A.** Correct.

24  **Q.** Did you make an attempt to contact Greg Litus after this

25  event, after Jane Quimby came to your door?

1  **A.**  I don't recall.  I don't believe so, but I don't recall.

2  **Q.**  In fact, the person you contacted was not your

3  collaborator in the Wray Gun Club crime, but Joe Dibee, right?

4  **A.**  Correct.

5  **Q.**  You contacted Mr. Dibee because you believe that he knew

6  something about the Vail fire, right?

7  **A.**  I contacted Joe because he was generally involved in the

8  movement, and I wanted him to know that there were

9  investigators in town.

10  **Q.**  But you didn't think that he knew something about the Vail

11  fire?

12  **A.**  I am trying to think.  I don't -- it was not my intent to

13  contact him specifically about the Vail fire, no.

14  **Q.**  I am not asking you what your intent was.  I am asking you

15  whether you believed that Mr. Dibee knew something about the

16  Vail fire, at the time that Jane Quimby came to your door.

17  **A.**  I don't recall.

18  **Q.**  Why don't you take a look at what's been marked for

19  identification as A-27.  It should be in that stack in front

20  of you.

21  **A.**  Okay.

22  **Q.**  This appears, does it not, to be a report about an

23  interview with you on December 16, '05?

24  **A.**  Yes, it is.

25  **Q.**  Take a look at page 5 of that interview, the middle

1  paragraph.  Why don't you read the second paragraph to
2  yourself silently.  Don't read it out loud.  Tell me when you
3  are finished reading that.
4        Does that paragraph refresh your recollection as to
5  what you believe Mr. Dibee knew about the Vail fire?
6  **A.**  As I said -- yeah, my recollection is that he may have
7  known the people who were involved.  I don't think he was
8  directly involved.  All of this would be speculation.
9  **Q.**  Sure.  You don't have any personal knowledge.  I am asking
10  you what your belief was when you contacted Mr. Dibee through
11  Mr. Clark.
12  **A.**  My belief was warning him just generally that there were
13  investigators in the area.
14  **Q.**  Okay.  To answer my question, you believed at that time,
15  did you not, that Mr. Dibee may know something about who set
16  that fire, right?
17  **A.**  Yes.
18  **Q.**  In fact, it was your belief that he supplied the materials
19  and the supplies?
20  **A.**  I speculated that might have been possible.  I wouldn't
21  say I believed it.
22  **Q.**  You speculated that.  Somewhere in the recesses of your
23  mind, you had some thought that:  Hey, Mr. Dibee might know
24  something about this fire, I better tell him, right?
25  **A.**  No, I contacted him just generally to let him know the

1    investigators were there.  I really wasn't focused on Vail.

2    **Q.**  Possibly some other arson that he had committed with you,

3    right?

4    **A.**  No, not anything with me.  Just in general letting him

5    know.

6    **Q.**  Did you have any particular knowledge that Mr. Dibee had

7    committed other illegal activities in Colorado?

8    **A.**  No.

9    **Q.**  So was there something about -- Jane Quimby was from

10   Colorado, right?

11   **A.**  Correct.

12   **Q.**  She told you that.  So you just kind of generally

13   contacted him, said you might want to know the investigators

14   are in town?

15   **A.**  Yeah, that was actually standard practice.  He did that

16   with me one time, too.  That was just standard practice to let

17   people know.

18   **Q.**  When he contacted you that investigators were in town,

19   when was that?

20   **A.**  It would have been before this.  I don't recall.  I think

21   it would have been the time that I mentioned where we had

22   heard that people may have found the buckets that were used in

23   Cavel West.

24   **Q.**  And did Mr. Dibee contact you directly, or did he go

25   through someone else?

1   **A.** I don't recall.

2   **Q.** So you decided to contact your friend. Now, what's his

3   real name, Mr. Clark or Mr. Christ?

4   **A.** My belief is his real name is Clark, Kenny Clark.

5   **Q.** He goes by -- how does he pronounce it, Christ or Cryst?

6   **A.** I don't think he's gone by that in a long time. I believe

7   he pronounced it Christ.

8   **Q.** Now, Mr. Clark also -- you had mentioned some of the

9   activities that he had been involved in yesterday. He was

10   also active with a group called Reclaim The Streets; is that

11   right?

12   **A.** I am not familiar with that.

13   **Q.** Do you know what Reclaim The Streets is?

14   **A.** No, actually, I don't.

15   **Q.** Have you ever heard of episodes where groups of possibly

16   anarchists take over public areas of a city and party in the

17   street?

18   **A.** I have heard of that.

19   **Q.** What does "party" mean to you --

20   **A.** I can't --

21   **Q.** -- in that context?

22   **A.** I can't guess in that context, since I haven't been a part

23   of any of those.

24   **Q.** Well, you've heard of it. It is true, is it not, that

25   when these people party in the streets, they would sometimes

1  break windows, windows would tend to get broken after one of

2  these episodes --

3        MR. BARTLETT:  Objection, Your Honor, she has no

4  personal knowledge of Mr. Clark's involvement in this --

5        THE COURT:  Tell me where this is leading in terms

6  of --

7        MR. FOX:  I will move on.

8  BY MR. FOX:

9  **Q.**  Now, Mr. Clark was not involved in any arsons with you,

10  right?

11  **A.**  No.

12  **Q.**  But isn't it true that in 2001, when you were committing

13  two arsons, by your own admission, you contacted Mr. Clark on

14  the telephone dozens of times?

15  **A.**  He is one of my good friends.  I talk to him regularly.

16  **Q.**  Now, yesterday you identified with the prosecutor and

17  offered into evidence as Exhibit 617-D, and that was the

18  contents of your palm pilot or Handspring Visor address book,

19  right?

20  **A.**  Okay.  I will take your word for it.

21  **Q.**  Do you remember identifying that?

22  **A.**  I remember identifying the palm pilot --

23  **Q.**  Mr. Bartlett went through some of the names and had you

24  identify them?

25  **A.**  Yes.

1 **Q.** But Exhibit 617-D isn't really complete, is it? Let's

2 take a look at 617-D. Hopefully it's still on the table in

3 front of you.  It's probably missing some of the names.  Why

4 don't you count the pages.

5 **A.** This is numbered as 23 pages.

6 **Q.** Twenty-three pages.  Now, it's correct, though, that your

7 Handspring Visor address book has a lot more names than 23,

8 right?

9 **A.** Yes.

10 **Q.** Why don't you take a look at what's been marked for

11 identification as A-198 and flip through that.

12     Does that look familiar to you?

13 **A.** Yes, this would be essentially the full address book.

14        MR. FOX:  Your Honor, I would move for the admission

15 of A-198.

16        MR. BARTLETT:  No objection.

17        THE COURT:  Admitted.

18            (Exhibit No. A-198 admitted.)

19 BY MR. FOX:

20 **Q.** Hold it up to the jury so they can see the thickness of

21 it.

22 **A.** (Complying.)

23 **Q.** Unlike Exhibit 617-D, there's more than one name on each

24 page; is that correct?

25 **A.** That's correct.

1  **Q.** In fact, there's probably about 86 pages of phone numbers

2  there; is that right?

3  **A.** That is correct.

4  **Q.** Now, this was your personal digital assistant from the

5  2001 era, right?

6  **A.** Correct.

7  **Q.** Amongst all those people in that address book, you had

8  your friends, right?

9  **A.** Yes.

10  **Q.** People from the yachting world?

11  **A.** I don't think we had our boat yet, but yes.

12  **Q.** Relatives?

13  **A.** Uh-huh.

14  **Q.** Business people?

15  **A.** Yes.

16  **Q.** Your high school friend, Nicole Crocker is in there?

17  **A.** Yes.

18  **Q.** Mary Pat Sullivan is in there?

19  **A.** Yes.

20  **Q.** Who is Mary Pat Sullivan?

21  **A.** Let me look at the name here.  I am trying to remember the

22  name.  I believe she was somebody -- I am not positive, but I

23  believe she was somebody I met through volunteering with the

24  Washington Mountaineers.

25  **Q.** Okay.

1   **A.**   I am not 100 percent positive.

2   **Q.**   Now, Washington Mountaineers, that's not an arson group,

3   is it?

4   **A.**   No, it's a mountaineer organization.

5   **Q.**   People that get together and they go out into the

6   wilderness, right?

7   **A.**   Yes.

8   **Q.**   They do hikes, correct?

9   **A.**   Yes.

10  **Q.**   Occasionally they might do some lobbying to preserve

11  trails and things like that?

12  **A.**   I believe they do.

13  **Q.**   Now, Mary Pat Sullivan, according to your address book,

14  she lives in Olympia; is that right?

15  **A.**   That's correct.

16  **Q.**   In fact, she was connected to the Evergreen State College?

17  **A.**   That's correct, too.

18  **Q.**   So you had friends that were in Olympia, right?

19  **A.**   Correct.

20  **Q.**   And the mere fact that Ms. Sullivan is in your personal

21  digital assistant address book, that doesn't mean that she's

22  an arsonist, right?

23  **A.**   No.

24  **Q.**   You have no knowledge that Mary Pat Sullivan committed any

25  arsons, right?

1   **A.**   No.

2   **Q.**   She's not in the ELF, right?

3   **A.**   No.

4   **Q.**   When the Government put 617-D on the screen, one name that

5   they didn't show you was Kenny Clark, right?

6   **A.**   That's correct.

7   **Q.**   Why don't you turn to the name Kenny Clark in A-198.

8   **A.**   Okay.

9   **Q.**   Actually's, record number 48, and he has a couple

10  different phone numbers, right?

11  **A.**   It looks like 49 and, yes, he does.

12  **Q.**   One number is (425) 303-8500, right?

13  **A.**   Uh-huh.

14  **Q.**   And then going to the next page, why don't you read out

15  the rest of his phone numbers.

16  **A.**   He has another work number downtown, (206) 381-3453.   Home

17  number (206) 706-2964 and a pager number (206) 642-8242.

18  **Q.**   Now, why don't I refer you to A-73 -- what's been marked

19  for identification as Exhibit A-73?

20  **A.**   Okay.

21  **Q.**   Does that look familiar to you?

22  **A.**   These would be -- looks like my phone records.

23  **Q.**   From what year?

24  **A.**   Starting September -- let's see, starting August 25th of

25  2000.

1  **Q.**  And then what's the last page?

2  **A.**  Through November 24, 2002.

3         MR. FOX:  Your Honor, I would move for admission.

4         MR. BARTLETT:  No objection, Your honor.

5         THE COURT:  Admitted.

6             (Exhibit No. A-73 admitted.)

7  BY MR. FOX:

8  **Q.**  Why don't you turn your attention to the records for the

9  month of May -- the period ending May 24, 2001.  Why don't you

10 turn to page 4 of that.  I am sorry, page 5 of 6.

11 **A.**  Okay.

12 **Q.**  Now, I put on the screen some highlighted -- which are not

13 on the originals, right?

14 **A.**  Correct.

15 **Q.**  Why don't you take a look at call 59.

16 **A.**  Uh-huh.

17 **Q.**  That was a call on May 9, at 7:18 p.m.?

18 **A.**  Okay.

19 **Q.**  That's to Kenny Clark?  Is that his pager?

20 **A.**  It's possible.  I don't have the numbers memorized.

21 **Q.**  Well, did you say (206) 642-8242 was his pager?

22 **A.**  Yes, that's correct.

23 **Q.**  So you called -- you paged him on May 9th and there's an

24 incoming call right after that, right?

25 **A.**  Yes, that's correct.

1  **Q.**  He probably called you right back, right?

2  **A.**  That's possible.

3  **Q.**  Then May 14th, around the time of the -- maybe two days

4  after this meeting that you said you went to in Olympia, you

5  have another call to him; is that not correct?

6  **A.**  That is correct.

7  **Q.**  Although in that case, it doesn't look like he called you

8  right back, does it?

9  **A.**  No, I can't see a call.

10  **Q.**  Why don't we turn to the following page.  May 15th, you

11  called him again, right?

12  **A.**  That would be correct.

13  **Q.**  And then he returned your call, he returned the page?

14  **A.**  I would be speculating.  It just says incoming call.

15  **Q.**  Then let's move to the next month, the period ending June

16  24.

17  **A.**  Okay.

18  **Q.**  Go to page 4 of 6.

19  **A.**  All right.

20  **Q.**  On May 30th, you actually called him twice; isn't that

21  correct?  Line 14 and then line 17, once at his home and once

22  to his pager -- or once to his work?

23  **A.**  I am trying to look at what's on the screen here.  That

24  looks correct.

25  **Q.**  Okay.  So you actually -- you called Mr. Clark before the

1  arson at the Center for Urban Horticulture, right?

2  **A.**  Yes.

3  **Q.**  And then you called him afterwards?

4  **A.**  Yes.

5  **Q.**  Does that mean that he was with you on the night of the

6  Center for Urban Horticulture arson?

7  **A.**  Not at all.

8  **Q.**  Okay.  You actually called him when you got back from the

9  book club at Sisters; isn't that true?

10  **A.**  I am not sure.

11  **Q.**  Well, you mentioned yesterday that there was this book

12  club meeting at Sisters, down in Oregon; is that right?

13  **A.**  Correct.

14  **Q.**  I believe that took place between May 25 and May 27, 2001?

15  **A.**  That sounds correct, approximately.  I would have to look

16  at the calendar.

17  **Q.**  So you called him when you got back from that, right?

18  **A.**  I don't recall.

19  **Q.**  Well, apparently you called on May 30th, right?

20  **A.**  Yeah.  Okay, you are right.

21  **Q.**  Now, yesterday you also mentioned PGP encryption?

22  **A.**  Uh-huh.

23  **Q.**  You have to say yes or no.

24  **A.**  Sorry.  Yes.

25  **Q.**  Do you want to tell the jury what PGP stands for?

1  **A.**  PGP stands for pretty good protection.

2  **Q.**  What is it?

3  **A.**  It's a public private key encryption algorithm invented at

4  MIT.  The idea being that you have a key that you encrypt your

5  messages with to somebody else with another key.  If they have

6  their key, plus a public copy of your key, they can decrypt

7  and read the message.

8  **Q.**  So when you send someone a PGP e-mail -- and this is

9  through e-mail, right?

10  **A.**  Yes.

11  **Q.**  There's a record of the e-mail going off, right?

12  **A.**  Yes.

13  **Q.**  But someone could not be able to read that e-mail unless

14  they have a key?

15  **A.**  That's correct.

16  **Q.**  The message actually looks like gibberish?

17  **A.**  It's encoded.

18  **Q.**  It could be pages of gobble-de-goop, right?

19  **A.**  Yes.

20  **Q.**  Now, you mentioned yesterday an anonymizer.  What's an

21  anonymizer?

22  **A.**  And anonymizer very simply is a proxy server.  It's

23  something that if you go to a web address, it redirects where

24  you are coming from through a couple of other jumps so it

25  looks like you are coming from somewhere else.

1 **Q.** What's the purpose for using that?

2 **A.** So that the location that you are sending an e-mail from

3 or even browsing a web page from can't be seen in the web logs

4 for that server.

5 **Q.** This is something you know a lot about, right?

6 **A.** Yes.

7 **Q.** From your work, right?

8       In fact, I think you told Mr. Bartlett on direct that

9 you taught the members of the book club at Santa Cruz about

10 PGP; is that correct?

11 **A.** That's correct.

12 **Q.** You brought each of them disks or something?

13 **A.** There were disks there that I built up for each person,

14 yes, so they could use PGP for e-mail.

15 **Q.** Now, Briana Waters was not at the book club at Santa Cruz?

16 **A.** That's correct.

17 **Q.** Let me put up on the screen what's been admitted into

18 evidence as 617-E. This is what you referred to as the ailment

19 list?

20 **A.** Correct.

21 **Q.** Basically, these are all of the different aliases of the

22 people that were at that book club, right?

23 **A.** At that particular one, yes.

24 **Q.** Now, some of these people -- well, for instance, Jack was

25 "Shattered Sternum," right?

1  **A.**  Yes.

2  **Q.**  And who is Jack?

3  **A.**  Jack is Stan Meyerhoff.

4  **Q.**  So he had an alias for his alias?

5  **A.**  So, the names on the left were what people referred to

6  each other at that particular meeting.  The names on the

7  right, as I mentioned yesterday -- I don't remember why we

8  picked this theme -- but the names on the right were what you

9  were supposed to refer to each other as in e-mail.

10 **Q.**  Then let's see, Reba, and that's Lacey Phillabaum?

11 **A.**  Correct.

12 **Q.**  Her alias was "Dislocated Shoulder"?

13 **A.**  Correct.

14 **Q.**  So Lacey Phillabaum had an alias of an alias, too, right?

15 **A.**  Yes.

16 **Q.**  Now, you know Lacey Phillabaum, right?

17 **A.**  Somewhat, yes.

18 **Q.**  From these book club meetings, at least, right?

19 **A.**  Yes.

20 **Q.**  Why don't you take a look at --

21         MR. FOX:  Pat, has Government's 113 been admitted?

22         THE CLERK:  No.

23         MR. BARTLETT:  No objection.

24 BY MR. FOX:

25 **Q.**  Before it is admitted, I will put it up on the screen.

1        THE COURT:  Are you offering that exhibit?

2        MR. FOX:  Yes, I did, and Mr. Bartlett said no

3 objection.

4        THE COURT:  All right.  Admitted.

5        (Exhibit No. 113 admitted.)

6 BY MR. FOX:

7 **Q.**  That's Lacey Phillabaum?

8 **A.**  Correct.

9 **Q.**  You know her, right?

10 **A.**  Yes.

11 **Q.**  You went to these meetings with her, right?

12 **A.**  Correct.

13 **Q.**  You taught Lacey Phillabaum PGP encryption?

14 **A.**  Yes, I did.

15 **Q.**  You taught her about anonymizers and e-mailing that way?

16 **A.**  Yes.

17 **Q.**  You also mentioned something about -- in the old days,

18 they used to call them dead letter drops, but maybe in the

19 Internet age you talked about having an e-mail folder where

20 you would check e-mails without having to send them?

21 **A.**  Right.

22 **Q.**  Why don't you tell us what that is.

23 **A.**  I believe that was actually Chelsea's or Bill Rodgers'

24 idea, not mine.  But essentially there was an e-mail account

25 set up where the way we would communicate with each other was

1    to leave a message in the drafts folder.  The subject of the

2    message should somehow identify whether it was for everybody

3    or whether it was for a particular person.  Then everybody was

4    supposed to just go and check this drafts folder at least once

5    a week, just to see if there was anything important happening

6    or a way to communicate with each other.

7    **Q.**  And then the point is that the e-mail wouldn't necessarily

8    be transmitted anywhere, right?  It was off somewhere in

9    cyberspace?

10    **A.**  My recollection was that wasn't so much the point, as a

11    central single place to go to reach people.

12    **Q.**  Okay.  Again, this is something that you taught Lacey

13    Phillabaum about?

14    **A.**  Yes.

15    **Q.**  Now, also in terms of security, you wouldn't ordinarily

16    use your credit card to buy the things that you needed to

17    commit an arson, would you?

18    **A.**  No.

19    **Q.**  Because that could be traced, right?

20    **A.**  Correct.

21    **Q.**  In fact, you probably wouldn't use your credit card on the

22    way to an arson?

23    **A.**  Correct.

24    **Q.**  You probably wouldn't use your cell phone on the way to an

25    arson?

1  **A.**  Probably not.

2  **Q.**  You would take out the battery, wouldn't you?

3  **A.**  Maybe.

4  **Q.**  Because you believe that the Government can spy on you

5  through your cell phone's battery even if the phone is off;

6  isn't that true?

7  **A.**  Yes.

8  **Q.**  So if you are driving down, say, to Susanville for the

9  arson, you wouldn't have your cell phone on, would you?

10  **A.**  I might have it on part of the way.

11  **Q.**  Okay.  But the key parts, like making the arrangements to

12  meet up with someone, you wouldn't be calling them on the cell

13  phone, right?

14  **A.**  I wouldn't be calling from my cell phone, no.

15  **Q.**  If you didn't use your credit card to buy the things

16  associated with the arson, how would you get the stuff?

17  **A.**  Either you'd pay cash, or in some cases people stole it.

18  **Q.**  Then you also talked about putting things in plastic bags

19  so your fingerprints wouldn't be on them?

20  **A.**  Yes.

21  **Q.**  Tell us what that is about.

22  **A.**  Essentially, the idea being that anything that you would

23  use in one of these crimes, you wanted to make sure there was

24  no fingerprints, no hair, nothing left behind in case it

25  didn't go off, so you would clean everything with ammonia,

1  something that destroyed trees.

2     The easiest way to remember what was clean or what was

3  not, one of the ways to remember -- and this is something Joe

4  taught me -- was just to put it in a plastic bag and then you

5  knew it had been cleaned.

6  **Q.** So if you had a map of the site that you were going to,

7  you put those in plastic bags too, wouldn't you?

8  **A.** Potentially.

9  **Q.** So, let's go back to May of 2004. You didn't send a PGP

10  message to Joe Dibee warning him about Jane Quimby, right?

11  **A.** No.

12  **Q.** You used Kenny Clark, your friend who could be trusted, to

13  pass him a note, right?

14  **A.** I had Kenny contact Joe. Joe and I weren't really in any

15  contact at that point.

16  **Q.** But you went through somebody you could trust?

17  **A.** I went through a mutual friend.

18  **Q.** Right. And you trusted Kenny, right?

19  **A.** Sure.

20  **Q.** In fact, there would be no trace -- like a PGP message --

21  there might be an electronic trace of it some place, right?

22  **A.** There could be, although that wasn't really so much the

23  point.

24  **Q.** Now, when Agent Quimby came by your house, you were pretty

25  freaked out, weren't you?

1  **A.**  I was definitely surprised.

2  **Q.**  In fact, after May 6, 2004, you stopped using your cell

3  phone?

4  **A.**  I learned this morning that you have phone records from

5  that.  I recall changing my cell phone from Sprint to

6  T-mobile.  I don't recall if the reasoning for the timing was

7  wanting a different number or just consolidating plans.

8  **Q.**  Well, you actually kept using the same number down the

9  road, right?

10  **A.**  Okay.

11  **Q.**  But the fact is that after Jane Quimby contacted you,

12  there are no cell phone calls listed on your cell phone bill

13  for the next couple of months?

14  **A.**  I'd need to see the bill.

15  **Q.**  Okay.  Why don't you take a look at what's been marked for

16  identification as A-200.

17  **A.**  Okay.

18  **Q.**  Can you identify that?

19  **A.**  These would be charges from my Sprint cell phone.

20  **Q.**  Okay.  Then for what months?

21  **A.**  This starts on April 13, 2004, and it goes until May 12,

22  2004.

23  **Q.**  Okay.  I would -- then there's two additional pages?

24  **A.**  Right.  It just says current charges and previous balance

25  page.

MR. FOX:  I would move for admission of A-200.

MR. BARTLETT:  No objection, Your Honor.

THE COURT:  Admitted.

(Exhibit No. A-200 admitted.)

BY MR. FOX:

**Q.** Why don't we turn to page 9 of 9.

**A.** Okay.

**Q.** The last call is on 5-5; is that not correct?

**A.** That is correct.

**Q.** You have no calls for the rest of that month, even to the end of the billing period?

**A.** Not on this phone, no.

**Q.** Now, one thing you did not do when Special Agent Quimby came to your house is confess to her what you had done, right?

**A.** That is true.

**Q.** You didn't express any remorse to her about what you had done?

**A.** I didn't talk to her about anything.

**Q.** You didn't express any remorse to her?

**A.** You are right.

**Q.** Okay.  You continued to live your secret life, right?

**A.** At the time.

**Q.** So let's just go ahead to -- let me ask you one question about Mr. Dibee.

Now, Mr. Dibee had been your lover at one point; is that

1  correct?

2  **A.**  That's correct.

3  **Q.**  I think you mentioned that's one reason why you moved to

4  Seattle?

5  **A.**  He was one of the reasons, yes.

6  **Q.**  Mr. Dibee, though, he worked for Microsoft, right?

7  **A.**  That's correct.

8  **Q.**  I think he worked in the security -- did something with

9  security for Internet Explorer, something like that?

10  **A.**  He was on the QA team for Internet Explorer security, yes.

11  **Q.**  Mr. Dibee was involved in a variety of groups?

12  **A.**  Yes, that's my understanding.

13  **Q.**  He was involved in a variety of environmental groups?

14  **A.**  Yes.

15  **Q.**  Groups that did not commit arsons?

16  **A.**  That's correct.

17  **Q.**  He was involved with Green Peace at one point?

18  **A.**  Yes.

19  **Q.**  Green Peace, they sometimes block fishing trawlers or

20  things like that, but they don't blow them up, right?

21  **A.**  Correct.

22  **Q.**  He was involved in the Makah whaling campaign?

23  **A.**  Correct.

24  **Q.**  That was a campaign where the animal rights people were

25  taking their speedboats out to try to stop the whale hunts,

1    right?

2    **A.**   Correct.

3    **Q.**   But they weren't burning anything down, right?

4    **A.**   That's correct.

5    **Q.**   You knew a secret side of Joe Dibee, right?

6    **A.**   I guess you could say that, yes.

7    **Q.**   Because he had been in the Cavel West arson with you,

8    along with Kevin Tubbs and Jake Ferguson, right?

9    **A.**   That's correct.

10   **Q.**   Now, let's skip ahead, just 18 months or so, to December

11   2005.

12   **A.**   Okay.

13   **Q.**   You are still working for AOL at that point?

14   **A.**   Yes.

15   **Q.**   You are still with Jonathan Reichhold?

16   **A.**   Yes.

17   **Q.**   You are still living in Wallingford?

18   **A.**   Yes.

19   **Q.**   You are still keeping secrets from Mr. Reichhold?

20   **A.**   I had put that part of my life beyond me and completely

21   moved on.

22   **Q.**   You are still keeping secrets, right?

23   **A.**   Yes.

24   **Q.**   Yes?

25   **A.**   Yes.

1  **Q.** Then on December 7, 2005 you were on a business trip in

2  New York, right?

3  **A.** Yes.

4  **Q.** Were you staying in New Jersey?

5  **A.** On that trip, yes.

6  **Q.** Yes?

7  **A.** Yes.

8  **Q.** At the -- is it the Hilton or something, the George

9  Washington Bridge Hilton in New Jersey?

10  **A.** I don't remember the name.

11  **Q.** You don't remember.  And you found out, even before Agent

12  Quimby called you, that Mr. Dibee had been contacted by the

13  FBI, correct?

14  **A.** Yes, that's correct.

15  **Q.** Because Mr. Clark contacted you, right?

16  **A.** That's correct.

17  **Q.** He called you, not on your cell phone but on a land line,

18  right?

19  **A.** I think he called me on the hotel phone.

20  **Q.** On a land line, right?

21  **A.** Yes.

22  **Q.** You also had found out, did you not, that the FBI had gone

23  to your office to make inquiries about you?

24  **A.** I did find out about that, yes.  That was later, I

25  believe.

1  **Q.**  I am sorry?

2  **A.**  I believe that was later.

3  **Q.**  That the FBI went to your office, or you found out later?

4  **A.**  I believe they went to my office later.

5  **Q.**  Well, did they not go to your office on December 8th?

6  **A.**  I don't remember exactly when they went to my office.

7  **Q.**  Was it before or after Mr. Clark called you?

8  **A.**  I believe it was after.

9  **Q.**  Okay.

10  **A.**  Or at least I heard about it after.

11  **Q.**  But the point is that before Agent Quimby called you when

12  you were on the East Coast, you already knew what was going

13  on, right?

14  **A.**  When she called me, the first notice I got was in the

15  middle of the night when Kenny Clark called me, yes.

16  **Q.**  So you knew that there might be a chance that someone

17  would be calling you, right?

18  **A.**  Yes.

19  **Q.**  Now, isn't it true that when you found out that there had

20  been all these arrests that had taken place on December 7th,

21  that your first response was to turn off your cell phone?

22  **A.**  No, I don't believe I did that, no.

23  **Q.**  Well, you are a habitual cell phone user; is that fair to

24  say?

25  **A.**  Yes.

1 **Q.** You are one of those people that has their cell phones on

2 in the elevators possibly?

3 **A.** No, not on the elevator.

4 **Q.** But you are always talking on your cell phone, right?

5 **A.** If I am not in a meeting, yes, I often have it on.

6 **Q.** Let me refer you to what's marked for identification as

7 A-72. Take a look at that and identify that.

8 **A.** These are the phone records for my cell phone -- I don't

9 know if Jonathan's are included, but my cell phone from

10 November 30, 2005 through to March 12, 2007.

11 **Q.** When you say Jonathan's name is on it, that's your

12 boyfriend Jonathan Reichhold?

13 **A.** Correct.

14 **Q.** He's a subscriber technically?

15 **A.** The account is technically in his name.

16 **Q.** But it's your cell phone, right?

17 **A.** Yes.

18 **Q.** (206) 856-8298?

19 **A.** That's correct.

20 　　　　MR. FOX: I would move for the admission of A-72.

21 　　　　MR. BARTLETT: No objection, Your Honor.

22 　　　　THE COURT: Admitted.

23 　　　　　　(Exhibit No. A-72 admitted.)

24 BY MR. FOX:

25 **Q.** Why don't you take a look at what's been marked as page 16

1 of 28 of the first bill.

2 **A.** All right.

3 **Q.** Is it not correct that you have no phone calls at all on

4 December 8th?

5 **A.** I have, it looks like, two incoming and one outgoing --

6 **Q.** On December 8th?

7 **A.** I am sorry, that's January.

8 **Q.** Let's go to 16 of 28 of the bill ending January 8th.

9 **A.** That does look correct, yes.

10 **Q.** So on December 8, 2005, the day after all the arrests, you

11 have no outgoing or incoming calls, right?

12 **A.** So what day of the week is that?

13 **Q.** I don't know.  But you were in New York on a business

14 trip, right?

15 **A.** Right, in back-to-back meetings.

16 **Q.** In fact, a lot of your meetings sometimes are conference

17 calls, conference bridge meetings, right?

18 **A.** Not at that point, now.  I was in town for an on-site

19 meeting.

20 **Q.** But the fact is that on December 8th, you have no phone

21 calls at all?

22 **A.** That is true.

23 **Q.** Didn't your boyfriend, Jonathan Reichhold, call you the

24 night before at Cafe Milano, at the Hilton Hotel you were

25 staying at?  I am not looking at -- not on your cell phone,

1  but didn't he make arrangements to call you on a land line

2  there?

3  **A.**  He called me at my hotel, I believe, just in the room.

4  **Q.**  Pardon me?

5  **A.**  I thought he just called me in the room.  I don't recall.

6  **Q.**  But not on your cell phone?

7  **A.**  Correct.

8  **Q.**  So that wasn't him -- if you had a call to a restaurant at

9  the hotel, not your room, would that have been unusual?

10  **A.**  It would have been unusual, yes.  They were definitely

11  calling me on a line that wasn't traceable.

12  **Q.**  So it's possible that even by December 8th, you had

13  already known about the arrest, right?

14  **A.**  The first I knew of the arrest was Kenny calling me that

15  night.

16  **Q.**  Okay.  And you turned off your phone?

17  **A.**  I don't recall if I turned it off.  Clearly, from here, I

18  didn't use it.  I don't recall why.

19  **Q.**  Well, is it not correct that you believe your phone would

20  have been tapped at this point, right?

21  **A.**  I believed there was a possibility.

22  **Q.**  And you also believed that you should take the battery out

23  as well?

24  **A.**  For possible tracking, yes.

25  **Q.**  So you turned off your phone on December 8th?

1 **A.** I do not recall if I turned it off or not.

2 **Q.** But there's no calls?

3 **A.** There are no calls that day.

4 **Q.** Basically, in the year-and-a-half since Agent Quimby

5 appeared at your door, you kind of fell back on your old ways;

6 isn't that right?

7 **A.** Please explain.

8 **Q.** Well, you communicated with Kenny Clark secretly?

9 **A.** What do you mean by secretly?

10 **Q.** Well, he called you on a land line so that no one would be

11 listening in on your cell phone, right?

12 **A.** I don't see that on here.

13 **Q.** No, but he called you on a land line at your hotel, right?

14 **A.** He called me while I was at the hotel, yes.

15 **Q.** He didn't call you on your cell phone?

16 **A.** That is correct.

17 **Q.** And this is the same Kenny Clark that you used to

18 communicate with Mr. Dibee secretly the prior year; is that

19 correct?

20 **A.** That's correct.

21 **Q.** Now, is Kenny Clark the only person that you've used as an

22 intermediary to communicate with other people?

23 **A.** Kenny Clark is who I used to communicate with Joe Dibee.

24 **Q.** Let's say there were other people that you wanted to

25 communicate with secretly, that Kenny Clark didn't know.

1    Did you ever use other people to communicate with them

2  secretly?

3  **A.**  With Joe?  No.

4  **Q.**  No, with other people, not Joe Dibee.  Let's say you

5  wanted to communicate secretly with Stan Meyerhoff.  Did you

6  ever do that?

7  **A.**  No.

8  **Q.**  Did you ever use a third person to communicate

9  clandestinely with anyone else from the book clubs?

10  **A.**  It -- I think I probably passed messages through Bill

11  Rodgers to reach other people, as a way of reaching them.

12  **Q.**  No one else that you can think of?

13  **A.**  Not that I can recall.

14  **Q.**  Okay.  Is it possible that there were other people?

15  **A.**  It's possible that other people passed messages.  I do not

16  recall.

17  **Q.**  Okay.  Who works at Planet Hemp in Manhattan?

18  **A.**  I don't know.

19  **Q.**  Well, is there a reason that right after Jane Quimby

20  called you on December 10th, you made calls to Planet Hemp in

21  Manhattan, two calls?

22  **A.**  Well, I know that we were trying to find -- while I was on

23  that trip, one of the things we were trying to do is trying to

24  find some shoes.  So it's possible that we were just trying to

25  find the store.

1   **Q.** When you say "we," who is "we"?

2   **A.** My colleague, Tony Wiegering, who was working with me,

3   also one of my good friends.

4   **Q.** Okay.

5   **A.** We stayed in town that weekend.

6   **Q.** Now, unfortunately, Mr. Wiegering has had an accident

7   since then, right?

8   **A.** That's correct.

9   **Q.** And he suffered a lot of brain damage; is that right?

10  **A.** Yes.

11  **Q.** Well, let's take a look at your phone records for December

12  10, 2005.

13  **A.** Okay.

14  **Q.** I see a little bit down the page there's an incoming call

15  at 11:51 a.m.?

16  **A.** Okay.

17  **Q.** From a blocked number?

18  **A.** Apparently so.

19  **Q.** Does that sound about the time that Special Agent Quimby

20  called you while you were in New York?

21  **A.** If that was a Saturday, that would be about right.

22  **Q.** Then the next call immediately thereafter, it says

23  (206) 769-5820, right?

24  **A.** Yes.

25  **Q.** That's Jonathan Reichhold's number, right?

1   **A.**  That's correct.

2   **Q.**  Then you have calls to (509) 768-2868, right?

3   **A.**  Yes, that's correct.

4   **Q.**  Is that the number your Father used?

5   **A.**  Yes.

6   **Q.**  Then the next call -- there's two calls to (212) 599-3405?

7   **A.**  Uh-huh.  Yes, that's correct.

8   **Q.**  Would it surprise you if that was the phone number for

9  Planet Hemp?

10  **A.**  I guess not.

11  **Q.**  Okay.  Because you said you were going to go out and buy

12  some shoes or something, right?

13  **A.**  Right.

14  **Q.**  And Planet Hemp would be a place where you could buy shoes

15  that weren't made from an animal, right?

16  **A.**  That's correct.

17  **Q.**  When Jane Quimby called and said that she wants to talk to

18  you, you were going to go out and buy shoes?

19  **A.**  I was just trying to keep my head together, and just

20  keeping moving, staying focused, and doing something was as

21  good as anything.

22  **Q.**  So FBI Agent Quimby calls you and says you are a suspect

23  in a major investigation?

24  **A.**  That's correct.

25  **Q.**  You call your boyfriend, you call your Father?

1   **A.**   Uh-huh.

2   **Q.**   Then you go buy shoes?

3   **A.**   That's one of the things we were doing that weekend, yes.

4   **Q.**   Okay.  Well, in any case, let me ask you this:  Was there

5   anyone that worked at Planet Hemp that was a secret

6   intermediary for you?

7   **A.**   No.

8   **Q.**   How about anyone that worked at Underwater Sports?

9   **A.**   No.

10   **Q.**   Do you know Christopher Hughes?

11   **A.**   I don't believe so.

12   **Q.**   He's not a friend of Joe Dibee's?

13   **A.**   I don't know.  I don't know if he is or not.

14   **Q.**   You didn't use anyone at any Underwater Sports facility as

15   a secret intermediary?

16   **A.**   No, not at all.

17   **Q.**   Only Kenny Clark?

18   **A.**   Yes.

19   **Q.**   You come back to Washington, right?

20   **A.**   Yes.

21   **Q.**   And before you go in to meet with the U.S. Attorneys and

22   the FBI, you actually met with Kenny Clark again, right?  You

23   met with him in person?

24   **A.**   Yes, he was waiting at my house.

25   **Q.**   You talked to him about what Joe Dibee was doing, right?

1  **A.**  Yes.

2  **Q.**  And basically, you had an opportunity to flee, right?

3  **A.**  That's what I had been told.

4  **Q.**  But you didn't want to do that, right?

5  **A.**  That's correct.

6  **Q.**  You were worried about seeing your Father again, right?

7  **A.**  That's correct.

8  **Q.**  Your Father has some illnesses, right?

9  **A.**  Yes.

10  **Q.**  And he's getting on in years, right?  Well, maybe I

11  shouldn't say that.  He's probably my age, right?

12  **A.**  My Father and I are very close.

13  **Q.**  And you were very worried about seeing him again, right?

14  **A.**  That's correct.

15  **Q.**  Now, your Father lives in Spokane, right?

16  **A.**  In Liberty Lake, yes.

17  **Q.**  And that's -- actually, he doesn't live that far away from

18  where Lacey Phillabaum's parents live; is that correct?

19  **A.**  My understanding -- in looking through these phone

20  records, my understanding is that they are in that area, too,

21  yes.

22  **Q.**  It's an area where both you and Lacey went to the same

23  high school, right?

24  **A.**  Yes.

25  **Q.**  Shadle Park High?

1  **A.**  That's correct.

2  **Q.**  You were there at the same time?

3  **A.**  I believe she was a freshman when I was a senior.

4  **Q.**  Now, your Father, you are very close to, you said?

5  **A.**  Yes.

6  **Q.**  You have gone on camping trips with him, right?

7  **A.**  Yes.

8  **Q.**  In fact, you went on a trip with him to Canada between the

9  two arsons you committed in 2001; is that not correct?

10  **A.**  I am not positive.  We go on a trip every year together.

11  **Q.**  Your Father is also active in animal rights movements?

12  **A.**  He had been.  He isn't now.

13  **Q.**  But in any case, you talked with Kenny Clark, you told him

14  you wanted to be near your Father, right?

15  **A.**  Yes.

16  **Q.**  And that that's the reason -- well, you also told him that

17  you didn't want to give up your life, right?

18  **A.**  I didn't want to give up Jonathan.  I didn't want to give

19  up my Father.  It didn't seem reasonable to go try to be on

20  the run, no.

21  **Q.**  You would lose the life you were leading in Wallingford;

22  is that correct?

23  **A.**  Being in Wallingford was irrelevant.  I did not want to

24  give up my Father and my partner.

25  **Q.**  You'd have to give up your boating life, right?

1   **A.** That's really not that big a deal.

2   **Q.** That's not that big of a deal, it's not that big a part of

3   your life?

4   **A.** It's something I spend time with but --

5   **Q.** I guess if you were on the run, you could still --

6           MR. BARTLETT:  Objection, Your Honor.

7           THE COURT:  Let her answer.

8   BY MR. FOX:

9   **Q.** I am sorry, what was your answer?

10  **A.** My answer is that there were many reasons why I didn't

11  want to leave.  It just didn't seem a viable thing to do at

12  the time.

13  **Q.** So that's why you hired Mr. Martin, right?

14  **A.** That's correct.

15  **Q.** Who's present in court over here?

16  **A.** Yes.

17  **Q.** And you met with him, right?

18  **A.** That's correct.

19  **Q.** And then on the 16th of December, you went in to meet with

20  the FBI and the U.S. Attorneys, right?

21  **A.** That's correct.

22  **Q.** Now, this was -- December 16th was nine days after the

23  first arrests, right?

24  **A.** I don't know exactly what day the first arrests were.

25  **Q.** It was December 7th, okay.

1  **A.** Okay. I will take your word for it.

2  **Q.** Now, your decision to go in and speak with Mr. Friedman

3  and Agent Halla and Agent Torres was a fairly important

4  decision, was it not?

5  **A.** Yes.

6  **Q.** Probably as big of a decision as you've made in your life

7  as anything else, right?

8  **A.** Yes, I would say so.

9  **Q.** Probably even bigger than the decision to commit arson,

10  right? Or would you put them on the same level?

11  **A.** Probably a similar level.

12  **Q.** Now, this was -- what was going to happen in this meeting

13  was going to be really important to you, true?

14  **A.** Yes.

15  **Q.** I imagine that you spent some time thinking about what was

16  going to happen when you went to that meeting, right?

17  **A.** Yes.

18  **Q.** It was important to you to think about what they might ask

19  you, right?

20  **A.** Yes.

21  **Q.** In fact, you had a number of days, from when learning

22  about the arrest from Kenny Clark, you had a number of days to

23  think about your life up until that point, right?

24  **A.** I did. I think I spent most of the time just being

25  stressed.

1 **Q.** Being stressed.  But you didn't think at all about what
2 types of questions the Government -- Agent Halla was going to
3 ask you?
4 **A.** Not until I met with my lawyer, no.
5 **Q.** Then you met with your lawyer, and then after you met with
6 your lawyer, you had some ideas about the types of questions
7 they were going to ask you, right?
8 **A.** I don't think we talked at all about the kinds of
9 questions they were going to ask.  We talked about what I had
10 been involved in.
11 **Q.** I guess my point is -- and I am not asking you to tell me
12 what you told your lawyer.  What I am asking is, by the time
13 you got to the U.S. Attorney's Office on December 16th, you
14 knew that they were going to be chatting with you, not about
15 yachting, but about arson?
16 **A.** That's correct.
17 **Q.** Now, on direct, you said that you were worried that you
18 might possibly face 35 years to life in prison, right?
19 **A.** That is correct.
20 **Q.** That's not completely accurate, is it?
21 **A.** To the best of my understanding, it is.
22 **Q.** Well, it's true that you were -- for one arson committed
23 with a destructive device, you were looking at a mandatory
24 minimum of 35 years, right?
25 **A.** Correct.

1   **Q.** But if you had committed two arsons with a destructive

2   device, the mandatory minimum is actually life; is that true?

3   **A.** That's my understanding.

4   **Q.** And you had been involved in, by your own admission at

5   this point, at least four such incidents, right?

6   **A.** Three and one attempted.

7   **Q.** So you were really looking at life without the possibility

8   of parole?

9   **A.** Yes.

10  **Q.** Now, this really worried you, right?

11  **A.** Yes.

12  **Q.** You did not want to spend the rest of your life in chains,

13  did you?

14  **A.** No.

15  **Q.** That's what you were looking at, life in chains?

16  **A.** Yes.

17  **Q.** Because prison is not the Corinthian Yacht Club, right?

18  **A.** Yes.

19  **Q.** Now, when you went to the U.S. Attorney's Office on

20  December 16th, their office is in the United States District

21  Court courthouse in Seattle, right?

22  **A.** That's correct.

23  **Q.** It's a building more modern than this, but it's the same

24  function as this building, right?

25  **A.** Yes, that's correct.

1  **Q.** And their office is on the 5th floor of the courthouse?

2  **A.** I believe so.

3  **Q.** When you went in to meet with them, you probably had to

4  put on a little security tag as well?

5  **A.** A badge, yes.

6  **Q.** And you went back into the depths of the office with your

7  lawyer?

8  **A.** Yes.

9  **Q.** You went into a conference room?

10  **A.** Yes.

11  **Q.** And it was a fairly large conference room, right?

12  **A.** It probably could seat 10 people.

13  **Q.** Ten people. A large table, right?

14  **A.** Yes.

15  **Q.** There were a bank of chairs on one side and chairs on the

16  other side?

17  **A.** Correct.

18  **Q.** You sat on one side with your lawyer, Mr. Martin?

19  **A.** Correct.

20  **Q.** Facing you was Mr. Friedman?

21  **A.** Yes.

22  **Q.** Agent Halla?

23  **A.** Yes.

24  **Q.** And one other agent, Agent Torres?

25  **A.** That's correct.

1  **Q.**  Now, I would assume when you sat down in the room, the

2  mood was not a relaxed one?

3  **A.**  No.

4  **Q.**  You weren't sitting in lounge chairs?

5  **A.**  Correct.

6  **Q.**  They didn't give you appetizers to eat or anything like

7  that?

8  **A.**  No.

9  **Q.**  It was a serious conversation, right?

10  **A.**  Yes.

11  **Q.**  You spent a lot of time with them that day, right?

12  **A.**  I did.

13  **Q.**  In fact, on your cell phone records, on A-72, would it be

14  fair to say that there are no phone calls between 9:16 a.m.

15  and 5:22 p.m.?

16     Why don't you take a look at A-72.

17  **A.**  Okay.

18  **Q.**  Turning your attention to -- the first month's bill,

19  December 21st.

20  **A.**  Right.  I don't believe that I met with them that entire

21  time.

22  **Q.**  I am just looking at 12-16-05 and 9:16 a.m. seems to be

23  the last call that you made or received, right?

24  **A.**  That's correct.

25  **Q.**  And then at 5:22 p.m. is the next call?

1  **A.**  That's correct.

2  **Q.**  You may not have met with the Government the entire time,

3  but a substantial portion of that time, right?

4  **A.**  I think I was there about five hours.

5  **Q.**  Now, the meeting began with Mr. Friedman telling you of

6  the need to be truthful, right?

7  **A.**  Yes.

8  **Q.**  You knew it was a crime to lie to a Federal law

9  enforcement officer?

10  **A.**  Absolutely.

11  **Q.**  You didn't want to end up like Martha Stewart?

12  **A.**  Yes, I knew it was a crime.

13  **Q.**  You were in enough trouble as it was, right?

14  **A.**  That's correct.

15  **Q.**  You didn't want to get additional time stacked on for

16  lying to them, right?

17  **A.**  Yes, my intent was to be truthful.

18  **Q.**  By the way, you've never been charged with lying to

19  Federal law enforcement officials, have you?

20  **A.**  No.

21  **Q.**  So you went in and were worried about life in prison?

22  **A.**  Yes.

23  **Q.**  Mr. Friedman said he could make no promises about your

24  sentence?

25  **A.**  That's correct.

1    **Q.** You believed that if you told them the truth, you would

2    get some consideration for that, right?

3    **A.** Yes.

4    **Q.** So you essentially -- you entered into some sort of -- at

5    this point -- unwritten arrangement with them, right?

6    **A.** We had a written proffer agreement, I believe, that I

7    would cooperate but that they had made me no promises.

8    **Q.** Right.  But it was your subjective understanding, your

9    belief that --

10   **A.** It was my hope that in exchange for giving them truthful

11   information, they would take that into account.

12   **Q.** So you went in there and you talked about your life?

13   **A.** Yes.

14   **Q.** You talked about the crimes that you were involved in?

15   **A.** Yes.

16   **Q.** You talked about who you committed the crimes with?

17   **A.** Yes.

18   **Q.** Your motivation was to avoid life in chains?

19   **A.** Yes.

20   **Q.** Now, you had had the opportunity to talk to Agent Quimby

21   18 months earlier, right?

22   **A.** Yes.

23   **Q.** But no one else had been arrested at that point, right?

24   **A.** That's correct.

25   **Q.** So now, the fact that you were actually facing a life

1    sentence, that was very real to you?

2    **A.**  Yes.

3    **Q.**  While Mr. Friedman was talking to you, he was taking

4    notes?

5    **A.**  Yes.

6    **Q.**  While Agent Halla was talking to you, he was taking notes?

7    **A.**  I believe so.

8    **Q.**  While Agent Torres was there, he was taking notes?

9    **A.**  I believe so.  I am not confident.

10   **Q.**  I am sorry?

11   **A.**  I believe they were all taking notes.  I am not confident

12   who was or was not.

13   **Q.**  Now, to your knowledge, this meeting wasn't taped, was it?

14   **A.**  No.

15   **Q.**  You don't know, really, whether the Federal Government has

16   secret tape recorders or digital recorders in their conference

17   rooms, right?

18   **A.**  I do not.

19   **Q.**  But would you not agree that a tape -- I keep saying tape

20   because it dates me -- but some digital recording of what was

21   going on would be a very accurate way of recording what

22   actually took place?

23   **A.**  That would be a way.

24   **Q.**  If there was a tape or a digital recorder, that would

25   remove any ambiguity, any question, about what was said,

1    right?

2  **A.**   If it actually picked up the information, yes.

3  **Q.**   I am sorry?

4  **A.**   If it could actually record all of the information, yes.

5  **Q.**   If it was a good tape recorder, right?

6  **A.**   Yes.

7  **Q.**   And someone knew how to operate it?

8  **A.**   Yes.

9  **Q.**   Now, you told them a lot at this meeting on December 16th,

10   right?

11  **A.**   Yes.

12  **Q.**   You talked about the Cavel West arson, right?

13  **A.**   That's correct.

14  **Q.**   That's an arson that took place in July of 1997?

15  **A.**   That's correct.

16  **Q.**   So that was almost four years before the fire that you set

17   at the Center for Urban Horticulture?

18  **A.**   That's correct.

19  **Q.**   And in December of 2005, it was about eight-and-a-half

20   years earlier?

21  **A.**   That's correct.

22  **Q.**   And you actually recalled quite a bit of detail about that

23   arson, right?

24  **A.**   That is also correct.

25  **Q.**   You recall how you got there?

1  **A.**  Yes.

2  **Q.**  You recalled flying to Oregon to meet Jonathan Paul?

3  **A.**  Yes.

4  **Q.**  You recalled buying the type of soap used to make the

5  accelerant?

6  **A.**  Yes.

7  **Q.**  You recalled how you prepared what you called vegan jello?

8  **A.**  Yes.

9  **Q.**  Vegan jello is the mixture of soap, gasoline and diesel?

10  **A.**  Yes.

11  **Q.**  And you actually prepared that, right?

12  **A.**  Yes.

13  **Q.**  You recall testing out the jello, right?

14  **A.**  Jonathan did the testing, yes.

15  **Q.**  You remember him doing it, right?

16  **A.**  Yes.

17  **Q.**  You recall driving to the desert?

18  **A.**  Yes.

19  **Q.**  You recall meeting Joe Dibee?

20  **A.**  Yes.

21  **Q.**  You recall meeting Kevin Tubbs and Jay Ferguson?

22  **A.**  Yes.

23  **Q.**  You recall -- I think on your direct you recalled that

24  Mr. Tubbs was driving a van, right?

25  **A.**  That's correct.

1  **Q.** You actually recalled the color of that van, right?

2  **A.** No.

3  **Q.** You didn't recall it being white?

4  **A.** No.

5  **Q.** Why don't you take a look at what's been marked as A-27.

6  **A.** A-27?

7  **Q.** Yes.

8  **A.** I don't have that.

9  **Q.** You don't have A-27?

10  **A.** I am sorry, it's one we already went through.  I have it.

11  I apologize.

12  **Q.** This is a report that we've already talked about, your

13  first meeting with the Government?

14  **A.** That's correct.

15  **Q.** Why don't you take a look at page 3 of that.  Why don't

16  you look at the last paragraph and read the first couple

17  sentences to yourself silently.

18  When you are finished, let me know.

19  **A.** All right.  I am finished.

20  **Q.** Does that refresh your recollection as to what your memory

21  was as to what the color of the van was?

22  **A.** I recall the Government asking me if I knew what kind of

23  car it was, and I said a van.  I recall them asking me if I

24  knew the color, and I said it might have been white.

25  **Q.** So that was a detail that you think it may have been

1  white, right?

2  **A.**  It might have been.

3  **Q.**  You are not positive?

4  **A.**  That's correct.

5  **Q.**  But it's a detail that they asked you about and you seem

6  to have some memory of it?

7  **A.**  Yes.

8  **Q.**  And it was Mr. Tubbs' van, right?

9  **A.**  Yes.

10  **Q.**  You also remember intricate details about the placement of

11  the devices at the Cavel West slaughterhouse?

12  **A.**  Define intricate.

13  **Q.**  Well, you remembered where you all put the devices, right?

14  **A.**  Yes.

15  **Q.**  You remembered details about things that happened during

16  the course of placing those devices, right?

17  **A.**  Yes.

18  **Q.**  You recall some accident that Mr. Dibee had while placing

19  the devices, right?

20  **A.**  Yes.

21  **Q.**  These were memories that you had that you related to the

22  Government on December 16th, right?

23  **A.**  That's correct.

24  **Q.**  Now, there was some confusion at the beginning of your

25  involvement because no one knew who you were when you arrived,

1  except for Jonathan Paul, right?

2  **A.**  Correct.

3  **Q.**  Not at the sites of the arson, but when you all met up

4  earlier, right?

5  **A.**  Right, yes.

6  **Q.**  And they were like, who's this person, right?

7  **A.**  That's right.

8  **Q.**  And there was some discussion by Jonathan Paul to vouch

9  for you, right?

10  **A.**  That's correct.

11  **Q.**  And to convince them that you were a trustworthy person to

12  go along on this?

13  **A.**  That's correct.

14  **Q.**  Because if you are committing a crime like this, you

15  wouldn't want someone that was working for the Government as

16  an agent provocateur, right?

17  **A.**  Right.

18  **Q.**  You would want to make sure that the people that you were

19  with were people that you trusted?

20  **A.**  Correct.

21  **Q.**  Because actually, you had each other's back, right?

22  **A.**  Correct.

23  **Q.**  So they had to rely on you or you had to rely on them,

24  right?

25  **A.**  Correct.

1  **Q.** You remember that discussion, right?

2  **A.** They went and had that conversation outside of my hearing

3  range.

4  **Q.** But when they came back, you remember you ended up going

5  with them, right?

6  **A.** Correct.

7  **Q.** Now, on December 16th and the meeting at the U.S.

8  Attorney's Office in the courthouse, you also talked about the

9  Susanville fire, right?

10  **A.** Yes.

11  **Q.** And that was the horse farm or the horse release/arson

12  down in Susanville, California?

13  **A.** Yes.

14  **Q.** In your communiqué, you refer to it as Corvallis,

15  California, right?

16  **A.** I believe that's what it says, yes.

17  **Q.** That was your mistake, right?

18  **A.** I don't know if it was my mistake or Joe's mistake.

19  **Q.** But you got the location wrong, I guess?

20  **A.** Apparently.

21  **Q.** Apparently. Well, when the Government -- when

22  Mr. Friedman and Agent Halla and Agent Torres asked you about

23  Susanville, you gave them a lot of details about that fire,

24  right?

25  **A.** That is correct.

1 **Q.** You talked about the debate as to whether it was going to

2 be an arson or just an animal release, right?

3 **A.** Yes.

4 **Q.** You talked about some of the people that might have been

5 there?

6 **A.** Yes.

7 **Q.** You talked about how you set the devices yourself?

8 **A.** That's correct.

9 **Q.** Because you actually set those devices, right?

10 **A.** Some of them, yes.

11 **Q.** And you talked about your memory of the difficulties in

12 the dark of distinguishing between the red and the black

13 wires, right?

14 **A.** Yes.

15 **Q.** And you think you connected the wrong wire?

16 **A.** Yes.

17 **Q.** These were all details that you told the Government on

18 December 16, 2005?

19 **A.** That is correct.

20 **Q.** Now, then the subject turned to the University of

21 Washington, right?

22 **A.** I think at the very end, yes.

23 **Q.** The very end.  Actually, at the very end of the

24 discussion, you talk about Joe Dibee and his planes, right?

25 **A.** I can look at the notes.

1    **Q.** Why don't you take a look at what's been marked for
2    identification as A-27 and look at pages eight and nine.
3            Is it fair to say that at the conclusion of the
4    meeting, you weren't talking about the University of
5    Washington?
6    **A.** My recollection is at the conclusion of the meeting, we
7    were talking about the University of Washington.  As to the
8    order the notes are in, I had no part in writing them.
9    **Q.** Well, why don't you take a look at what's been marked for
10   identification as A-28.
11   **A.** Okay.
12   **Q.** I will refer you to the last two pages.
13           First off, these are handwritten notes?
14   **A.** Okay.
15   **Q.** You don't know whose handwriting this is, do you?
16   **A.** Other than it says Ted Halla, no, I do not.
17   **Q.** If you would go to the very end of the last two pages.
18   **A.** Okay.
19   **Q.** Is it not correct that there was a discussion about Joe
20   Dibee's airplanes, how he was -- what religious background he
21   was, the seed orchard in Canada, pulling trees and got caught.
22           That's following the section about --
23   **A.** You are right, that's at the very end, yes.
24   **Q.** So, do you think Agent Halla wrote his notes -- do you
25   think he started writing at the end and worked his way up?

1  **A.** I have no knowledge of how the notes are written.

2  **Q.** But is it fair to say that you probably talked about some

3  other things after you finished talking about the University

4  of Washington?

5  **A.** It's possible.

6  **Q.** Now, when the subject turned to the University of

7  Washington -- let me back up.

8      When you committed the arson at the University of

9  Washington, I would imagine that this is one of the most

10  memorable incidents in your life?

11  **A.** It was a traumatic incident.

12  **Q.** It was traumatic. You had only -- in your life, you'd

13  only committed three arsons and then you tried to commit the

14  other one, right?

15  **A.** That's correct.

16  **Q.** But none of the arsons that you committed had been so

17  close to where you live?

18  **A.** That is true.

19  **Q.** None of them had been at a University?

20  **A.** That is true.

21  **Q.** And I would imagine that when you do one of these things,

22  you have to prepare yourself mentally before you go out there,

23  right?

24  **A.** Yes.

25  **Q.** And when you are out there, you want to be aware of your

1 surroundings?

2 **A.** Yes.

3 **Q.** Your senses are probably exaggerated, aren't they?

4 **A.** I am not sure.

5 **Q.** Well, you are listening for any little sound, right?

6 **A.** That's true.

7 **Q.** So if you are creeping up to the building and you heard a

8 sound that you didn't know what it was, you would freeze,

9 right?

10 **A.** Yes.

11 **Q.** You would wait to see what that was before you would

12 proceed?

13 **A.** Freeze or probably look for cover.

14 **Q.** But the point is that when you are doing one of these

15 things, you probably weren't drunk, right?

16 **A.** No.

17 **Q.** Is it fair to say that when you are at the Greenlake Bar &

18 Grill, you hadn't been drinking?

19 **A.** That is true.

20 **Q.** You weren't stoned on marijuana or anything like that?

21 **A.** No.

22 **Q.** Your senses were acute?

23 **A.** Yes.

24 **Q.** You were paying attention to every little detail?

25 **A.** Yes.

1  Q. To make sure that this thing went off, right?

2  A. Yes.

3  Q. And again, the people that you were with, these were

4  people that you needed to be able to trust, right?

5  A. Yes.

6  Q. These were your comrades, right?

7  A. Yes.

8  Q. So when the subject turns to the University of Washington,

9  you think everyone is looking at you in this room?

10  A. In this room? Yes.

11  Q. No, in the room at the U.S. courthouse?

12  A. Yes.

13  Q. They are all looking at you, waiting to hear what you are

14  going to say, right?

15  A. That's correct.

16  Q. And Agent Halla is still taking notes?

17  A. Yes.

18  Q. Mr. Friedman is still taking notes?

19  A. Presumably.

20  Q. And they say, well, now let's talk about the University of

21  Washington, right? At some point, someone says that?

22  A. Something to that effect.

23  Q. And this was your time to tell them what had happened,

24  right?

25  A. No, I believe my understanding was we were going to

1  briefly discuss it, it was near the end of the meeting, that

2  we weren't intending to go into great detail at the time.

3  **Q.**  But they were expecting to know from you who did it,

4  right?

5  **A.**  I can't say what they were thinking.

6  **Q.**  Well, was it your expectation when you went into this

7  meeting in the conference room at the U.S. Attorney's Office

8  at the United States Courthouse, that you were going to be

9  asked who committed the University of Washington arson?

10  **A.**  It was my expectation we would be talking about each of

11  these, yes.

12  **Q.**  One of your expectations is that the Government wanted to

13  know who did it?

14  **A.**  Yes.

15  **Q.**  They weren't just chatting with you about the exhilaration

16  you may have felt while committing the arson, right?

17  **A.**  That's correct.

18  **Q.**  They wanted to know who did it?

19  **A.**  Yes.

20  **Q.**  They were serious?

21  **A.**  Yes.

22  **Q.**  And you were looking at the rest of your life in prison?

23  **A.**  That's right.

24  **Q.**  You weren't -- when they asked you who did it, it wasn't

25  like you were having some social chat at Safeco Field and

1   someone -- they wanted to know who was with you in your box at

2   Safeco Field. I am not saying you have a box there, but they

3   wanted to know who of a few group of people were with you when

4   you committed this arson, right?

5   **A.** Yes.

6   **Q.** Now, Ms. Kolar, you are a bright person?

7   **A.** Yes.

8   **Q.** You have a degree in applied mathematics?

9   **A.** Yes.

10   **Q.** You started your Ph.D. program?

11   **A.** Yes.

12   **Q.** You have several patents, right?

13   **A.** Yes.

14   **Q.** Is it fair to say that you think you have a pretty sharp

15   mind?

16   **A.** Yes.

17   **Q.** You told us yesterday that your memory of this event is

18   hazy?

19   **A.** That is correct.

20   **Q.** Your memory of Cavel West is clear, but your memory of

21   something that took place four years later is hazy?

22   **A.** My memory of parts of Cavel West are clear. My memory of

23   parts of UW are clear. My memory of other --

24   **Q.** Well, you remember --

25         MR. BARTLETT: Objection, Your Honor. I would ask

1  that the witness be allowed to finish her answer.

2  BY MR. FOX:

3  **Q.**  I apologize.  Please finish.

4  **A.**  I believe I was saying I remember some details very

5  clearly for each arson, and others are very foggy for me for

6  each arson.

7  **Q.**  What's foggy are the identities of the people at the

8  arson?

9  **A.**  That is one of the things, yes.

10 **Q.**  Now, yesterday you testified that you said you were

11 thinking out loud, and you mentioned a couple of names, right?

12 **A.**  That's correct.

13 **Q.**  When you were thinking out loud, you said Capitol Hill

14 Girl, right?

15 **A.**  Yes.

16 **Q.**  Now, were those your terms?  Did you call her Capitol Hill

17 Girl?

18 **A.**  I believe I did, yes.

19 **Q.**  And you said Avalon?

20 **A.**  Yes.

21 **Q.**  Avalon is William Rodgers?

22 **A.**  Yes.

23 **Q.**  Someone named Crazy Dan?

24 **A.**  Yes.

25 **Q.**  And then Capitol Hill Girl's punk boyfriend?

1  A.  Yes.  Those are the names I was thinking out loud.

2  Q.  Those are the names of the people that you were thinking

3  out loud who had been at the arson, right?

4  A.  I believe I said that I was confident that Avalon had been

5  there.  I believe I said the genders and the number of people.

6  Q.  I am sorry?

7  A.  I believe I said the genders of the people who were

8  present, and the numbers of the people who were present, and

9  the others I was thinking out loud.

10  Q.  You were thinking out loud.  But you said those five

11  names, right?

12  A.  Yes, I did.

13  Q.  Why don't you take a look at what's been marked for

14  identification as A-199.

15  A.  199?

16  Q.  Yes.  That list is accurate in terms of the names that you

17  were thinking out loud about?

18  A.  Thinking out loud, yes.

19        MR. FOX:  I would offer A-199 for illustrative

20  purposes only.

21        MR. BARTLETT:  No objection.

22        THE COURT:  Admitted.

23              (Exhibit No. A-199 admitted.)

24  BY MR. FOX:

25  Q.  Now, it is correct that when you were thinking out loud,

1  you never mentioned Briana Waters' name?

2  **A.**  That's correct.

3  **Q.**  Briana Waters is not Capitol Hill Girl?

4  **A.**  No, she's not.

5  **Q.**  You didn't mention Justin Solondz' name either?

6  **A.**  No, I did not.

7  **Q.**  Or anyone named Connor?

8  **A.**  No.

9  **Q.**  In fact, yesterday, I don't believe you even mentioned

10  Justin Solondz' name, right?

11  **A.**  No, I did not.

12  **Q.**  And I don't believe the Government showed you any pictures

13  of Justin Solondz, right?

14  **A.**  They did a couple times --

15  **Q.**  No, in court.

16  **A.**  No, they did not.

17  **Q.**  Now, earlier on December 16th, when you were at the U.S.

18  Attorney's Office, you actually -- in discussing another arson

19  that you were involved in -- you described Capitol Hill Girl,

20  right?

21  **A.**  I believe so.  I know who I meant by Capitol Hill Girl.

22  **Q.**  Who do you mean?

23  **A.**  I meant Suzanne Savoie.

24  **Q.**  At the time, you didn't call her Suzanne Savoie?

25  **A.**  That's right.

Q. Was Capitol Hill Girl her alias?

A. No, I think I was just trying to picture her in my head. She lived on Capitol Hill.

Q. And she was a young, punkish-looking female?

A. She was not punk looking.

Q. She was not punk?

A. No.

Q. But she had a punk boyfriend?

A. Yes.

Q. What do you mean by a "punk" boyfriend?

A. A fair number of piercings, tattoos. I think he had a Mohawk.

Q. Earlier, when you were talking in your interview about the -- I think it was when you were talking about the Susanville arson, you mentioned that Capitol Hill Girl's Father was named Horace?

A. I remember something about that coming up in a book club meeting one time, that she had a notepad -- I believe he was a butcher or something, and she had some notepad that she happened to be using, and she commented on that because she was not close to him.

Q. His name was Horace?

A. I think she said something like that, yes.

Q. H-O-R-R-I-S, right?

A. I think it was H-O-R-A-C-E, but I am not sure.

1 **Q.** Now, you thought that the fact that her father was a

2 butcher, that was funny for someone who was a vegetarian?

3 **A.** I remember she brought that up.

4 **Q.** You being a vegan, you thought -- can you tell the jury

5 the difference between a vegan and a vegetarian.

6 **A.** A vegan versus a vegetarian, a vegan tries not to use any

7 animal products, including eggs or dairy or wear any animal

8 products.

9 **Q.** So you thought it was funny that her father was a butcher,

10 right, and there she was --

11 **A.** She was making a point out of it.

12 **Q.** And you knew Capitol Hill Girl from the book club?

13 **A.** Yes.

14 **Q.** Now, you said you were thinking out loud, right?

15 **A.** Yes.

16 **Q.** Now, do you recall meeting with Mr. Bartlett here last

17 August?

18 **A.** I would have to look at the exact dates. I met with him a

19 couple times.

20 **Q.** You were meeting with him to prepare for trial; is that

21 correct?

22 **A.** Yes.

23 **Q.** And actually, one of the things that when you meet with --

24 when you met with Mr. Bartlett and prepared for trial, he kind

25 of went through what your testimony would be, right?

1  **A.** I believe he did at that time, yes.

2  **Q.** Did he tell you to look at the jury when you testified?

3  **A.** I don't recall.

4  **Q.** You don't recall that.

5      In any case, when you were preparing for trial with

6  Mr. Bartlett, do you recall Mr. Bartlett asked you questions

7  about your memory of the December 16th interview?

8  **A.** I honestly don't recall what exactly we discussed.

9  **Q.** Why don't you take a look at what's been marked for

10  identification as A-67.

11  **A.** All right.

12  **Q.** Why don't you take a minute to read through it.

13  **A.** Okay. All right.

14  **Q.** Does this refresh your memory as to what you may have told

15  Mr. Bartlett back on August 15, 2007?

16  **A.** Yes.

17  **Q.** Is it not correct that you told Mr. Bartlett that -- you

18  indicated you remembered the interview, the interview on

19  December 16, 2005, right?

20  **A.** That is true.

21  **Q.** And that when discussing -- and that you believe that when

22  discussing the University of Washington arson, at the end of

23  the interview, that she -- meaning you -- identified Bill

24  Rodgers, right?

25  **A.** Yes.

1  **Q.**  Avalon?  Herself, meaning you?

2  **A.**  Yes.

3  **Q.**  Capitol Hill Girl, right?

4  **A.**  That's what it says here, yes.

5  **Q.**  A punk male with whom she believed might be Capitol Hill

6  Girl's boyfriend?

7  **A.**  That is also here.

8  **Q.**  And Crazy Dan, as people she believed had participated?

9  **A.**  That is what it says here.

10  **Q.**  There's nothing in there that says that you believed you

11  were just thinking out loud when you said those things; is

12  that correct?

13  **A.**  It does not say that, but I can't control what

14  Mr. Bartlett writes.

15  **Q.**  Well, Mr. Bartlett actually wrote that out, right?

16  **A.**  Yes, he did.

17        MR. FOX:  Your Honor, I would offer what's been

18  marked for admission as --

19        MR. BARTLETT:  No objection.

20        THE COURT:  Admitted.

21            (Exhibit No. A-67 admitted.)

22  BY MR. FOX:

23  **Q.**  Referring to A-67, there's no indication in this

24  certification that you remembered expressing any hesitation

25  about who you named at the arson?

1  **A.** That's true. But nonetheless, I am telling the truth that
2  I did.
3  **Q.** I didn't ask you that. I asked you whether, in this
4  declaration, there's a record of you expressing any hesitation
5  about your memory?
6  **A.** No, there is not.
7  **Q.** Now, when you said that you remembered Capitol Hill Girl,
8  and you had an image in your mind when you mentioned that
9  name, right?
10 **A.** I had an image in my mind of the location of her house.
11 **Q.** And you had a picture in your mind of who Capitol Hill
12 Girl was, right?
13 **A.** I think the clarification to me of who she was came to me
14 later on.
15 **Q.** I am not asking you about that. I am asking you, when you
16 were sitting in the office conference room in the
17 courthouse --
18 **A.** Yes.
19 **Q.** -- and you said Capitol Hill Girl --
20 **A.** Yes.
21 **Q.** -- you had an image of what Capitol Hill Girl looked like
22 in your mind, right?
23 **A.** I believe so.
24 **Q.** And what was that image?
25 **A.** I recalled the white apartment building that she lived in

1  last I saw her and -- I don't know if I recalled exactly what

2  she looked like, honestly.  I had a particular person in mind.

3  **Q.**  You had a particular person in mind?

4  **A.**  Yes.

5  **Q.**  In terms of the punk boyfriend, you just described what he

6  looked like, right?

7  **A.**  Right.

8  **Q.**  Did you remember what his name was?

9  **A.**  At the time, no.

10  **Q.**  Did he have an alias at all?

11  **A.**  I am not sure.

12  **Q.**  But you had a very specific person in mind?

13  **A.**  Yes.

14  **Q.**  Is that person Spencer Moen?

15  **A.**  Yes.

16  **Q.**  When you mentioned Crazy Dan -- the Crazy Dan is your

17  language, right?

18  **A.**  I believe so.  I thought he had been known as that, but

19  yes, that's my language.  I used that wording.

20  **Q.**  Do you have an image in your mind as to what Crazy Dan

21  looked like?

22  **A.**  Yes.

23  **Q.**  What was that image?

24  **A.**  A man with long hair.  I think -- I know who I meant now.

25  **Q.**  Well, I am asking you, back at the time when you are

1  sitting in the office, can you describe the image that was in

2  your mind of Crazy Dan?

3  **A.**  All I can remember is a man with long hair.

4  **Q.**  A man with long hair?

5  **A.**  With long hair, is what was in my head at the time.

6  **Q.**  Do you remember what Crazy Dan said to you at any point in

7  your life?  Do you remember any conversations with Crazy Dan?

8  **A.**  At the time of this meeting, no.

9  **Q.**  Now, what was Crazy Dan's role in the arson at the Center

10  for Urban Horticulture?

11  **A.**  At the time of this meeting, my recollection is that there

12  was myself, Avalon, two other women and another man involved,

13  and my recollection was the men were involved in setting up

14  the devices and bringing the fuel.

15  **Q.**  But when you referred - when you referred to Crazy Dan,

16  and you were talking about what different people did during

17  the arson, was your memory that Crazy Dan was one of the

18  people that set the devices?

19  **A.**  My memory was that it was one of the men who set the

20  devices, so yes.  And again, these were just names I was

21  trying to think out loud of people that might have been

22  associated.

23  **Q.**  Who might have been associated?

24  **A.**  Yes, that I knew had been a part of arsons.

25  **Q.**  Spencer Moen had been part of arsons?

1   **A.** No, not that I know of.

2   **Q.** But he was the person that you referred to as the punk

3   boyfriend, Spencer Moen?

4   **A.** He had been part of the crop pull that we had done and was

5   associated with Capitol Hill Girl at the time.

6   **Q.** The crop pull, this was something that you did up in

7   Canada, right?

8   **A.** Correct.

9   **Q.** This had nothing to do with any crop pulls in Dusty,

10   Washington?

11   **A.** No.

12   **Q.** You weren't at any crop pulls in Dusty, Washington?

13   **A.** No.

14   **Q.** No girdling of trees or anything like that in Oregon?

15   **A.** No.

16   **Q.** But you had some other action -- when was that action?

17   **A.** I don't recall exactly.

18   **Q.** But your memory is that Spencer Moen, the punk boyfriend,

19   was involved in that action?

20   **A.** Yes.

21   **Q.** And when you named him on December 16, 2005, you got it

22   confused, you didn't know -- you got the crop pull confused

23   with the arson?

24   **A.** No. This is the first time I'd ever tried to talk through

25   this arson and tried to think about these people in five

1  years, so I never said that these were the definitive people

2  there.  I was thinking through my head of people that I knew

3  who were involved in activism about that time, who might have

4  been involved.

5  **Q.**  Well, this isn't the first time that you were trying to

6  think it through.  Didn't you just tell us that for the last

7  week or so prior to this, you were thinking about it?

8      You met with your lawyer, right?

9  **A.**  I met with my lawyer and talked through some of them.

10  This was the first time that I went through trying to come up

11  with names.

12  **Q.**  After Agent Quimby knocked on your door in May 2004, you

13  didn't think about this?

14  **A.**  No, I didn't.

15  **Q.**  Because you had moved on in your life, right?

16  **A.**  That's right.

17  **Q.**   Is there any reason why you kept boxes of materials in

18  your basement?

19  **A.**  I was a pack rat.  I should have gotten rid of those long

20  ago.

21          THE COURT:  Mr. Fox, let's hold it right there.  It's

22  time for the break.  I will have you take your break.  Don't

23  discuss the case.  Leave your things on the chair.  I will see

24  you back in 15 minutes.

25      (Jury not present.)

1    THE COURT:  All right.  We will take the recess.
2  Same admonition, don't discuss the case or anything.  We will
3  take a break.  I will have you back here in 15 minutes.
4    THE CLERK:  All rise.  Court is in recess.
5  (Morning recess.)
6  (Jury not present.)
7    THE COURT:  You may be seated.
8  We are ready to continue?
9    MR. FOX:  Yes, Your Honor.
10    THE COURT:  Bring in the jury.
11  (Jury present.)
12    THE COURT:  All right.  You may be seated.
13  Mr. Fox.
14    MR. FOX:  Thank you.
15  BY MR. FOX:
16  **Q.**  Ms. Kolar, before the break, we were finishing up talking
17  about the December 16th interview.
18  **A.**  Yes.
19  **Q.**  Now, is it correct that when you mentioned these names,
20  Capitol Hill Girl, Punk Boyfriend, Crazy Dan, Avalon, that you
21  didn't say to Agent Halla and Mr. Friedman:  I did this with
22  Rodgers and others; is that correct?
23  **A.**  I don't recall my exact wording.
24  **Q.**  Well, if they said, well, who did you do this with, you
25  would not have said, I did this, Rodgers did it and others,

1  right?

2  **A.**  I believe I said that the person I was completely

3  confident about was Rodgers, and that there were other people

4  involved, and then I started thinking about the names.

5  **Q.**  But the term Rodgers, Kolar and others committed this

6  arson, that's not your terminology, right?

7  **A.**  I am not positive.

8  **Q.**  But when you mentioned these names, in your mind you had

9  two males -- or three males and two females, right?

10  **A.**  I had myself, two other women, Rodgers and one other man.

11  **Q.**  Well, no.  The Punk Boyfriend is a male, right?

12  **A.**  Yeah, I guess that's true.

13  **Q.**  Crazy Dan is a male?

14  **A.**  Uh-huh.

15  **Q.**  I am sorry, you have to say yes.

16  **A.**  Yes.

17  **Q.**  Avalon is a male?

18  **A.**  Yes.

19  **Q.**  So the two women were you and Capitol Hill Girl?

20  **A.**  We are the two women on this list, yes.

21  **Q.**  So when you told Agent Halla and Mr. Friedman the people

22  that came to your mind, you mentioned three men and two women,

23  right?

24  **A.**  Right, which is actually a contradiction to my memory of

25  there being the number of women and number of men present.

1  **Q.** Well, your later memory, but I am talking about December
2  16th.
3  **A.** Actually, I think that was my memory even then.
4  **Q.** Your memory even then was that it was three women and two
5  men, but you list three men and two women?
6  **A.** Yes, apparently so.
7  **Q.** Now, yesterday when you were testifying on direct, you
8  testified that either Briana Waters or Bill Rodgers approached
9  you about the University of Washington arson, right?
10  **A.** That's correct.
11  **Q.** But back in December 2005 at this meeting in the
12  courthouse with the prosecutor and the FBI, you didn't say
13  Briana Waters' name, right?
14  **A.** That's also correct.
15  **Q.** In fact, what you said, is it not true, that Avalon
16  contacted you about the fire at the UW?
17  **A.** I would have to take a look --
18  **Q.** Why don't you take a look at what's been marked for
19  identification as A-29.
20  **A.** Yes, there it is.
21  **Q.** These are someone's notes, right?
22  **A.** According to this, they are Anthony Torres' notes.
23  **Q.** I don't want you to read the notes out loud, but why don't
24  you take a look at -- there should be a number in the bottom
25  right-hand corner, 015310?

1    **A.**   Okay.

2    **Q.**   Take a look at the top of that page and see if that

3    refreshes your recollection as to what you said on December

4    16th.

5    **A.**   Tony's notes say the week before arson, Avalon contacted

6    me about fire at UW.

7    **Q.**   So back in -- you call him Tony, I am sorry?

8    **A.**   Tony Torres.

9    **Q.**   So you are on a first name basis with him?

10    **A.**   No.

11    **Q.**   But he's a Special Agent for the FBI, right?

12    **A.**   Yes.

13    **Q.**   When you talk to him, you call him Tony?

14    **A.**   No, I just said that. That's his name.

15    **Q.**   If you look at the cover sheet of that packet, does it say

16    Tony on it?

17    **A.**   My best friend's name is Anthony, and he goes by Tony. I

18    am used to calling Anthony, Tony.

19    **Q.**   So you told Tony Torres that Avalon contacted you, right?

20    **A.**   That's what his notes say.

21    **Q.**   Is that your memory of what you said to him that day?

22    **A.**   I don't recall exactly what I said that day.

23    **Q.**   Okay. Well, is it fair to say that if you had said Avalon

24    and Capitol Hill Girl contacted me, you think you might put

25    that down in his notes?

1          MR. BARTLETT:  Objection, calls for speculation as to

2    what Tony Torres would be doing.

3          THE COURT:  I think so.  Next question.

4    BY MR. FOX:

5    **Q.**  You told him only one person contacted you, right?

6    **A.**  I don't recall exactly what I said.  I am sorry.

7    **Q.**  But it was your testimony yesterday that it could have

8    been Avalon or Briana Waters, right?

9    **A.**  That's correct.

10   **Q.**  That's part of the memory that's grown over the past

11   year-and-a-half right, two years?

12   **A.**  Yes.

13   **Q.**  Were you telling the truth on December 16, 2005?

14   **A.**  I told the truth as I remembered it, yes.

15   **Q.**  And the truth as you remembered it yesterday was

16   different, right?

17   **A.**  Yes.

18   **Q.**  Which version is correct?

19   **A.**  What I am saying today is what is correct.

20   **Q.**  Are you saying today that Avalon contacted you or Avalon

21   or Briana Waters?

22   **A.**  I am saying today I believe it was one of the two.

23   **Q.**  You don't have a memory of that?

24   **A.**  I am not 100 percent positive which one of those two.

25   **Q.**  Where did Avalon contact you about this arson?

1  **A.**  I don't recall if it was in person or by phone that he

2  called to meet me and then we talked in person.  I don't

3  recall.

4  **Q.**  Was the meeting in Seattle or Olympia, or some place in

5  between?

6  **A.**  I don't recall.

7  **Q.**  Did you meet at a restaurant, or did you meet outside some

8  place?

9  **A.**  I would be speculating to say.  I don't recall exactly.

10  **Q.**  Now, it's correct, is it not that -- if I can get this

11  straight -- to this day, you have never identified Lacey

12  Phillabaum as being a participant in the arson of the Center

13  for Urban Horticulture?

14  **A.**  That correct.

15  **Q.**  In fact, you've said on occasion you have no role for

16  Lacey in your head?

17  **A.**  Yes, that is correct.

18  **Q.**  Now, you knew Lacey Phillabaum, right?

19  **A.**  Yes.

20  **Q.**  You believe she was a younger version of you, right?

21  **A.**  I don't know that I would say that.

22  **Q.**  You've never told Agent Torres that Lacey Phillabaum was a

23  younger version of me?

24  **A.**  I said she was somebody that I liked, somebody that I

25  related to.  I don't know if I ever said those exact words.

1  **Q.** Why don't you take a look at what's been marked for

2  identification as A-45.

3  **A.** All right.

4  **Q.** Can you identify that for the record?

5  **A.** These appear to be Agent Halla's notes.

6  **Q.** Why don't you turn to what's marked in the right-hand

7  corner as 014061. Don't read it out loud, but look at it and

8  see if it refreshes your recollection.

9  **A.** All right.

10 **Q.** Does that refresh your recollection that on February 4,

11 2006, you told Agent Halla that Lacey was a "younger version

12 of me" quote unquote, me meaning you?

13 **A.** That's what he has written here.

14 **Q.** Does that refresh your recollection as to what you said

15 that day?

16 **A.** I don't remember saying those exact words.

17 **Q.** Something similar to that?

18 **A.** Potentially. It would be speculating.

19 **Q.** Do you remember what you said?

20 **A.** I don't remember exactly what I said, no.

21 **Q.** Looking down on the page a little bit, have you had a

22 chance to read through this whole page?

23 **A.** No, I have not.

24 **Q.** Why don't you do that for a second.

25 **A.** All right.

1  **Q.**  Now, these are notes from an interview you gave to Agent
2  Halla on February 4, right?
3  **A.**  Yes.
4  **Q.**  That was a day you actually went down to Olympia with him,
5  right?
6  **A.**  Yes.
7  **Q.**  He showed you around.  Now, you weren't -- your lawyer
8  Mr. Martin wasn't with you that day, right?
9  **A.**  That's correct.
10  **Q.**  Actually, you tape-recorded that interview, right?
11  **A.**  Parts of it, yes.
12  **Q.**  And the reason you tape-recorded that interview is that
13  your lawyer wasn't there, right?
14  **A.**  Right.
15  **Q.**  And you wanted to make sure that there was an accurate
16  record of what took place, right?
17  **A.**  He'd asked me to do that, to give him notes.
18  **Q.**  Your lawyer had asked you to tape-record it?
19  **A.**  Yes.
20  **Q.**  Is it fair to say that Agent Halla, as much as you know,
21  did not have a tape recorder?
22  **A.**  Yes.
23  **Q.**  Where's the tape, by the way?
24  **A.**  My lawyer has it.
25  **Q.**  May we see a copy of it at some point?

1  **A.**  I don't have a copy of it.  My lawyer has all copies.

2  **Q.**  Now, on this trip down to Olympia, Agent Halla at some

3  point was taking notes when he was talking to you, right?

4  **A.**  Yes.

5  **Q.**  Is it fair to say that you told him that you don't

6  remember Briana and Lacey together?

7  **A.**  Yes, I believe he asked if I remembered seeing them

8  together, and I said I did not recall them.

9  **Q.**  He asked you whether you had ever seen Lacey Phillabaum

10  and Briana Waters together, right?

11  **A.**  Yes, I believe so.

12  **Q.**  And your answer was, I don't believe so?

13  **A.**  My answer was, I do not remember seeing them together.

14  **Q.**  The question to you wasn't, were Lacey and Briana good

15  friends, right?  That wasn't the question.  The question was,

16  did you ever see them together?

17  **A.**  I believe the question was -- yes, I believe the question

18  was, did I ever see them together or did they spend much time

19  together.

20  **Q.**  Would that particular question and answer be on the tape

21  that you refer to?

22  **A.**  I believe it would be.

23  **Q.**  So if Lacey and Briana were -- you don't recall them ever

24  being together, you don't recall them being together at the

25  University of Washington fire?

1   **A.**   That is correct.

2   **Q.**   You don't recall them being together at any book club

3   meetings?

4   **A.**   That's correct.

5   **Q.**   You don't recall them socializing together?

6   **A.**   That is correct.

7   **Q.**   You just don't recall them being together?

8   **A.**   That's right.

9   **Q.**   Now, you know Lacey Phillabaum has pled guilty to the fire

10   at the Center for Urban Horticulture, right?

11   **A.**   Yes.

12   **Q.**   She pled guilty in this very courtroom the same day that

13   you pled guilty?

14   **A.**   Yes.

15   **Q.**   And you know -- well, let me ask you this. When was the

16   first time that you learned that Lacey Phillabaum was a

17   participant in the Center for Urban Horticulture fire?

18   **A.**   I think when it came out in the papers.

19   **Q.**   When she pled guilty?

20   **A.**   Yes.

21   **Q.**   So you never knew that she was going to plead guilty to

22   this until the day of the guilty plea?

23   **A.**   No.

24   **Q.**   Now, you knew Lacey Phillabaum from the book clubs, right?

25   **A.**   Correct.

1  Q. These were the instruction seminars on sabotage, right?

2  A. Among other things, yes.

3  Q. Among other things, among PGP encryption and that type of

4  thing?

5  A. Yes.

6  Q. Now, it's true, I think you mentioned earlier there was a

7  book club meeting in Sisters, Oregon on the 25th through 27th

8  of May?

9  A. Yes.

10  Q. And you were there, right?

11  A. Yes, I was.

12  Q. May 2001?

13  A. Yes.

14  Q. Just a few days after the Center for Urban Horticulture

15  arson?

16  A. Yes.

17  Q. You were there?

18  A. That's right.

19  Q. Chelsea Gerlach was there?

20  A. Yes, that's correct.

21  Q. Stan Meyerhoff was there?

22  A. Yes.

23  Q. Diana Robin was there?

24  A. I don't know who that is.

25  Q. Why don't I refer you to what's been marked for

1  identification as A-53.

2  **A.**  All right.

3  **Q.**  Can you just identify that for the record.

4  **A.**  It's the typed notes from a meeting with me on -- or a

5  meeting on 3-9-2006.

6  **Q.**  Actually, the date of transcription is 3-9-2006, but the

7  date of --

8  **A.**  Sorry, the meeting was March 7, 2006.

9  **Q.**  There's a section on this about the book club meeting in

10  Sisters, right?  Don't read it out loud, just read it to

11  yourself.

12  **A.**  All right.  Would you like me to read the whole thing?

13  **Q.**  Just read the fist paragraph about the book club meeting.

14  **A.**  All right.

15  **Q.**  Does that refresh your memory as to who was at that

16  meeting at Sisters, Oregon?

17  **A.**  Of the names I recall, yes.

18  **Q.**  And the names -- when I say Diana Robin, that's someone

19  you refer to as Henry?

20  **A.**  Right.  I never knew her actual name.

21  **Q.**  You knew her as Henry?

22  **A.**  Right.

23  **Q.**  You have an image in your mind as to who this person was,

24  right?

25  **A.**  Yes.

1  **Q.** And then is it true also that you believe that Daniel
2  McGowan and William Rodgers were there as well?
3  **A.** Yes.
4  **Q.** Now, when you had this meeting just a few days after the
5  Center for Urban Horticulture arson, you talked about the
6  arson, didn't you?
7  **A.** No, I don't believe so.
8  **Q.** Well, there wasn't a separate group that went off and
9  talked about the arson that you all had just committed?
10  **A.** General practice is that you didn't talk about these
11  things ever again after they happened.
12  **Q.** Let me refer you to what's been marked for identification
13  as A-51.
14  **A.** All right.
15  **Q.** Just identify that for the record.
16  **A.** This is Agent Halla's notes from 3-6.
17  **Q.** Why don't you turn to what's been marked as 14153 down in
18  the right-hand corner, down at the bottom part of that page.
19  **A.** All right.
20  **Q.** There's three lines from the bottom.
21  **A.** Yes, I see that.
22  **Q.** Does that refresh your memory as to what happened at the
23  Sisters book club meeting?
24  **A.** I was speculating that there was a separate group that
25  went off, that I would be amazed if we hadn't talked about it.

1  **Q.** You would be amazed if you hadn't talked about it.  "It"

2  meaning the University of Washington arson?

3  **A.** Yes.

4  **Q.** So it may have been a violation of protocol, but you would

5  have been amazed if you hadn't talked about the fire at a

6  major research institution?

7  **A.** I believe that's what I said then, yes.

8  **Q.** Is that true?  Did you talk about it?

9  **A.** I don't recall specific conversations.

10  **Q.** Okay.  But it would be amazing if you hadn't talked about

11  it, right?

12  **A.** That's what I was thinking, yes.

13  **Q.** Now, Lacey Phillabaum was at this book club meeting,

14  right?

15  **A.** Yes.

16  **Q.** Rodgers was at this book club meeting, right?

17  **A.** I believe so.

18  **Q.** Now, you would have turned off your phone for this book

19  club meeting, right?

20  **A.** Yes, I believe so.

21  **Q.** You didn't see Mr. Rodgers making any phone calls from the

22  book club meeting, did you?

23  **A.** There were times when I wasn't there.

24  **Q.** Well, it would have been -- I don't know, do you think he

25  had his phone on during the day?

1   **A.** I can't speculate what he did or didn't do with his phone.

2   **Q.** Well, you and he talked about security issues, right?

3   **A.** The group as a whole did, yes.

4   **Q.** Isn't it fair to say that each time you would meet, you

5   would turn your phones off, take the batteries out?

6   **A.** Not necessarily, no.

7   **Q.** So there were times where people at these book club

8   meetings would be talking on their cell phones during the

9   course of the meetings?

10   **A.** No, not that I recall.

11   **Q.** Again, you would have been afraid that the Government was

12   spying on you, right?

13   **A.** They could follow us, yes.

14   **Q.** So you probably would not have -- you would not have had

15   your cell phone on, right?

16   **A.** Most likely, no.

17   **Q.** And is it fair to say that other members of your group

18   would have a habit of doing the same thing?

19   **A.** That would be speculation, but yes.

20   **Q.** Okay. Now, Mr. Rodgers, you met him through Joe Dibee,

21   right?

22   **A.** That's correct.

23   **Q.** You called him a gentle person yesterday?

24   **A.** Yes.

25   **Q.** He was involved in a lot of different things other than

1  arson, right?

2  **A.** That's correct.

3  **Q.** He was involved in what you call above-ground activities,

4  right?

5  **A.** Yes.

6  **Q.** He would be part of different efforts to stop

7  clear-cutting of old growth forests?

8  **A.** I am not exactly sure what activities he was involved in.

9  **Q.** You knew he was doing other things besides just burning

10  buildings down, right?

11  **A.** Yes.

12  **Q.** He had a lot of friends in Olympia, didn't he?

13  **A.** Yes.

14  **Q.** He knew a lot of people?

15  **A.** Yes, he did.

16  **Q.** He had a marijuana grow operation at his house, didn't he?

17  **A.** Yes, he did.

18  **Q.** You actually saw that marijuana?

19  **A.** Yes, I did.

20  **Q.** You were there at the Sisters meeting with Rodgers, right?

21  **A.** Yes.

22  **Q.** You were there with Lacey, right?

23  **A.** Yes.

24  **Q.** You were there with Stan Meyerhoff, right?

25  **A.** Yes.

1  **Q.** Stan's former girlfriend Chelsea Gerlach?

2  **A.** Yes.

3  **Q.** You would have been amazed if the subject of the UW arson

4  hadn't come up?

5  **A.** Yes.

6  **Q.** You are saying still that you don't believe Lacey

7  Phillabaum was at the University of Washington arson?

8  **A.** I am not saying I don't believe she was there.  I am

9  saying I don't recall her being there.

10 **Q.** But you didn't have conversations at the book club meeting

11 about what had just transpired a few days before?

12 **A.** We might have.  I don't recall them.

13 **Q.** Well, what did you talk about with Lacey Phillabaum at the

14 Sisters book club meeting?

15 **A.** I don't recall the details of what we talked about.

16 **Q.** Do you think that at that book club meeting, that you --

17 that the details of the University of Washington arson were

18 still fresh in your mind?

19 **A.** Yes.

20 **Q.** So do you think that when you were talking to Lacey at

21 this book club meeting, you would have known that she was

22 involved in this arson?

23 **A.** Yes.  At that time, I would have.

24 **Q.** Now, you have a secret agreement with Lacey Phillabaum,

25 don't you --

1 **A.** No.

2 **Q.** -- that you wouldn't name her?

3 **A.** No.

4 **Q.** And she violated that agreement by naming you?

5 **A.** No, absolutely not.

6 **Q.** Now, I take it you don't remember driving up from Olympia

7 on May 20th with Lacey Phillabaum, do you, the day of the

8 arson?

9 **A.** I didn't.

10 **Q.** You didn't?

11 **A.** No.

12 **Q.** You have no memory of ever being in the car with Lacey

13 Phillabaum that day?

14 **A.** No, I don't.

15 **Q.** In fact, on that day, you didn't go to Olympia. You

16 stayed in Seattle, right?

17 **A.** That's right.

18 **Q.** So you couldn't have been driving up from Olympia with

19 Lacey Phillabaum, right?

20 **A.** That's right.

21 **Q.** Now, both of you are from Spokane?

22 **A.** That's correct.

23 **Q.** You are aware, I think we mentioned this before, she has

24 relatives that still live there?

25 **A.** Yes.

1   **Q.**   You know that she spent a lot of time in Eugene, right?

2   **A.**   Yes.

3   **Q.**   Your mother, Gail Smith, lives in Eugene, Oregon?

4   **A.**   That's correct.

5   **Q.**   You live in Seattle?

6   **A.**   Yes.

7   **Q.**   Your lawyer is in Seattle?

8   **A.**   Yes.

9   **Q.**   You know Lacey Phillabaum has a brother that lives in

10  Seattle?

11  **A.**   I did not know that.

12  **Q.**   You know her lawyer is in Seattle?

13  **A.**   No, I don't know anything about her lawyer.

14  **Q.**   Now, it's possible, is it not, that between December 7,

15  2005 and March 6, 2006 -- actually, between December 7th and

16  December 29, 2005 -- it's possible that you could have been in

17  the same geographical location as Lacey Phillabaum, right?

18  **A.**   It's possible.  I have no idea where she was.

19  **Q.**   Okay.  It's possible you could have met clandestinely in

20  Starbucks in Spokane?

21  **A.**   No, I did not meet with Lacey.

22  **Q.**   I didn't ask you whether you met with her, I asked if it's

23  possible you did?

24  **A.**   It is not possible.

25  **Q.**   Now, you gave the FBI your laptop computer from 2001,

1  right?

2  **A.**  Yes.

3  **Q.**  You also gave them your Palm Pilot or Handspring Visor

4  from 2001, right?

5  **A.**  Yes.

6  **Q.**  In 2005, did you own a computer?

7  **A.**  I don't remember if I have the laptop I have now or I was

8  using a work computer.

9  **Q.**  But you had access to a computer then, right?

10  **A.**  Yes.

11  **Q.**  Did you have a Blackberry or anything like that?

12  **A.**  No.

13  **Q.**  In 2005, December 2005, you had access to the Internet,

14  right?

15  **A.**  Yes.

16  **Q.**  When you gave the FBI your computer from 2001, you didn't

17  give them access to the computer that you were using in 2005,

18  right?

19  **A.**  No.

20  **Q.**  They didn't ask you for your current computer?

21  **A.**  No, they did not.

22  **Q.**  They didn't come to your office, raid your office and

23  seize your work computer, did they?

24  **A.**  No.

25  **Q.**  You are aware, though, aren't you, that the FBI raided Joe

1 Dibee's office at Microsoft and seized his computers, right?

2 **A.** I am aware they raided his house. I wasn't aware they

3 raided Microsoft.

4 **Q.** So the fact that you never gave the FBI your computers

5 from 2005, is it fair to say that there's really no way of

6 anyone knowing whether you are e-mailing Lacey Phillabaum, is

7 there?

8 **A.** Other than my testimony.

9 **Q.** Other than your testimony. We don't have your computer to

10 do a forensic evaluation of it, do we?

11 **A.** No.

12 **Q.** And in fact, you didn't need your computer; you could have

13 gone to the public library and used a computer there, right?

14 **A.** Except that I didn't, but yes.

15 **Q.** Well, you could have gone to the public library and used a

16 computer to send a PGP encrypted e-mail to Lacey Phillabaum,

17 couldn't you?

18 **A.** I could have, but I did not.

19 **Q.** You could have used an anonymizer to communicate with her,

20 right?

21 **A.** I could have. Again, I did not. I wouldn't even know how

22 to find an anonymizer today. I would have to do a search to

23 look to see if they even exist.

24 **Q.** You are a software engineer?

25 **A.** Yes.

1  **Q.** It wouldn't take you very long to do that search, would

2  it?

3  **A.** No, I could find one.  But I haven't used that technology

4  in a long time.  I don't have it off the top of my head.

5  **Q.** But if you needed to, you could, right?

6  **A.** Yes.

7  **Q.** Now, you are also, when you are working with these book

8  clubs, teaching them secrecy, you taught them -- or you

9  learned how to send secret codes to each other by reference to

10  a book, right?

11  **A.** Yes, Chelsea Gerlach taught us that.

12  **Q.** There was a book by someone named Silko or something?

13  **A.** Leslie Morgan Silko.

14  **Q.** Basically, you would send coded messages to each other by

15  reference to the page number, right?

16  **A.** Yes.

17  **Q.** The line number, right?

18  **A.** Yes.

19  **Q.** And what position of letter, right?

20  **A.** Yes.

21  **Q.** So you could send someone a series of numbers, and if

22  someone knew what book to look at, they could look up and

23  figure out what letters, right?

24  **A.** That's correct.

25  **Q.** So this was something that Lacey Phillabaum knew about?

1  **A.** Yes, that's correct.

2  **Q.** So you could have communicated with her through that code,

3  right?

4  **A.** In theory, but I did not.

5  **Q.** Of course, you could always have relied on your friend

6  Kenny Clark to contact whomever you wanted to, right?

7  **A.** I could have.  I don't believe he actually knows Lacey.

8  **Q.** Well, he did forest defense for a while, right?

9  **A.** I believe so.

10  **Q.** He actually, did he not, at one point in his life did go

11  out with Kim Marks?

12  **A.** I know they are friends; I don't know if they ever dated.

13  **Q.** Kim Marks is an activist in the environmental movement,

14  not arsons but normal --

15  **A.** I don't know her but --

16  **Q.** But you knew that Kenny Clark knew her, right?

17  **A.** Yes.

18  **Q.** You knew she lives in Oregon?

19  **A.** Actually, I didn't know where she lived.

20  **Q.** It's your testimony, though, that in the time between

21  December 7th and December 29th, you had no contact with Lacey

22  Phillabaum?

23  **A.** That's correct.

24  **Q.** But really, you have no way of proving that, is that true,

25  other than your testimony?

**A.** Other than my testimony, which I have sworn to tell the truth today.

**Q.** Now, you left the courthouse on December 16th, after meeting with the prosecutors?

**A.** Yes.

**Q.** Over the next couple of weeks, it's true, though, that you talked to Kenny Clark on a number of occasions over the phone?

**A.** I would have to look at my phone records, but it wouldn't surprise me.

**Q.** Why don't you take a look at A-72.

**A.** All right.

**Q.** Why don't we look at the pages from -- after December 16th.

**A.** All right.

**Q.** Now, Kenny Clark, one of his numbers was 706-2964?

**A.** I would have to look again, but I believe you.

**Q.** Well, rather than having you spend a lot of time going through each number, would it be fair to say that over the next of couple weeks, you talked to Kenny Clark?

**A.** Yes.

**Q.** A couple times?

**A.** Probably, yes.

MR. BARTLETT: I am confused on what timeframe we are talking about.

MR. FOX: After December 16, 2005, till December 29.

BY MR. FOX:

Q.   And December 29th is the day that you called Mr. Martin
and said that you remembered Briana Waters' name, right?

A.   That's correct.

Q.   So you talked to Kenny Clark in the intervening time
between December 16th and December 29, 2005?

A.   Yes.

Q.   Then you called up Mr. Martin, your lawyer, and said you
remembered that Briana Waters was the lookout, right?

A.   Yes.

Q.   You didn't talk to anyone else besides Mr. Martin about
Briana Waters during this two weeks?

A.   No, I don't believe so.

Q.   Yet, you didn't talk to Kenny Clark about it?

A.   No, I did not.

Q.   You didn't ask him or anyone else to be an intermediary
for you to talk to anyone else?

A.   No, I did not.

Q.   So when you said that Briana Waters was the lookout, was
Capitol Hill Girl no longer the lookout?

A.   I had never said that Capitol Hill Girl was a lookout.

Q.   What role did Capitol Hill Girl have?

A.   At the time that I was going through those names and
thinking out loud, I didn't have specific roles for them.

Q.   So when you are telling Mr. Martin that Briana Waters was

1  involved, is it still in your mind that Capitol Hill Girl was

2  there, too?

3  **A.**  By that time, I was thinking the only two names that I was

4  clear on were Briana Waters and Avalon, as well as my own.

5  **Q.**  I am asking you, what happened to Capitol Hill Girl and

6  Crazy Dan and the Punk Boyfriend?  When you are calling

7  Mr. Martin, are those people still in your mind as being

8  possibly involved in the arson?

9  **A.**  I don't believe so, no.

10  **Q.**  They were out of your mind, they were gone?

11  **A.**  I am trying to remember.

12  **Q.**  I am sorry?

13  **A.**  I am trying to remember.

14  **Q.**  Why don't you remember for a second.

15  **A.**  At that point, those are the only names I was confident

16  in, were Briana, Avalon and myself.

17  **Q.**  On December 29th, those were the only names?

18  **A.**  Yes.

19  **Q.**  This has been already admitted into evidence as

20  Mr. Bartlett's interrogation, right?

21  **A.**  Yes.

22  **Q.**  In August, you told Mr. Bartlett that you remembered

23  telling him that Capitol Hill Girl, Crazy Dan and the Punk

24  Boyfriend were the people that you believed to have

25  participated?

1    MR. BARTLETT:  Objection, Your Honor.  That isn't

2 what that affidavit says.  It says that the December 16th

3 interview, that's what she identified --

4    MR. FOX:  I apologize if my question was misleading.

5 BY MR. FOX:

6 **Q.** Your memory in August of the December 16th interview is

7 that you had identified those other three people as being the

8 people you believe participated?

9 **A.** No.  My memory is that I identified those as people I was

10 saying out loud, thinking they might have participated.

11 **Q.** But on December 29th, those people vanished into

12 cyberspace or into thin air?

13 **A.** They were -- I was not confident they were involved.

14 **Q.** So when you told Mr. Martin that he could tell the

15 prosecutors about Briana Waters, you didn't tell him to tell

16 the prosecutors Capitol Hill Girl was not in the picture

17 anymore, did you?

18 **A.** I was focussing on what I was confident about.

19 **Q.** Okay.  But my question was, when Mr. Martin told the

20 prosecutors Briana Waters, you didn't also tell him to tell

21 the prosecutor you made a mistake about those other people,

22 right?

23 **A.** I had never said they were explicitly there, so there

24 wasn't really anything to correct.

25 **Q.** Well, when you were listing the people at the arson, and

1  you mentioned those names as possibilities, did you feel like

2  you needed to correct any misimpressions that you had left?

3  **A.**  I can see how that may have left a misimpression.

4  Obviously, it did.  At the time, I thought I was clear.

5  **Q.**  Well, let's jump ahead a little bit.  About a couple weeks

6  after December 29th, you actually ran into Spencer Moen at a

7  cafe, right?

8  **A.**  That's right.

9  **Q.**  Spencer Moen is the person in your mind who was the Punk

10  Boyfriend of Capitol Hill Girl, right?

11  **A.**  Yes.

12  **Q.**  You ran into him at the Globe Cafe, right?

13  **A.**  Yes.

14  **Q.**  That's a vegetarian restaurant on Capitol Hill?

15  **A.**  Yes.

16  **Q.**  Fourteenth Avenue, I think it is?

17  **A.**  Yes.

18  **Q.**  You saw Spencer Moen and you went up and -- did you hug

19  each other or you greeted each other?

20  **A.**  I think so.

21  **Q.**  And you looked into his eyes, and he looked sad or

22  something like that?

23  **A.**  I asked him how he was.  He said he hadn't been doing very

24  well.

25  **Q.**  Okay.  You didn't tell Spencer Moen that you had just

1  named him as being a participant in a major Federal

2  investigation for arson, did you?

3  **A.**  No, we didn't talk very long at all.

4  **Q.**  When you saw him and you embraced him -- embrace him, did

5  you just hug him when you greeted him or shake his hand?

6  **A.**  I think we gave each other a hug.

7  **Q.**  You didn't tell him that like three weeks earlier, his

8  name popped into your mind when you were giving the Government

9  the list of the people at the UW arson?

10  **A.**  Actually, his name I didn't have yet at the time.  It was

11  actually bumping into him and looking through my phone records

12  that helped me remember his name.

13  **Q.**  When you saw him and the thought occurred to you, yeah,

14  that's the Punk Boyfriend, you didn't say oh, my God, I made a

15  horrible mistake, I just named you by accident as being at

16  this arson?  You didn't tell him that, did you?

17  **A.**  We didn't talk about the investigation at all.

18  **Q.**  And you didn't feel the need to tell him that perhaps he

19  should go get legal advice, right?

20  **A.**  We didn't talk about it.

21  **Q.**  You didn't tell him, I made a mistake, did you?

22  **A.**  Again, we didn't talk about it, so no.

23  **Q.**  I am asking you a yes or no question.  You didn't tell him

24  I made a mistake?

25  **A.**  No, I did not.

1   **Q.** So for all you knew, since you hadn't told Mr. Martin to

2   tell the Government you made a mistake, the police were

3   looking for Spencer Moen, right?

4   **A.** That was not my understanding.

5   **Q.** So your understanding is that you mentioned someone as

6   possibly being in an arson to the FBI, and you don't think the

7   FBI is going to go out and look for the person?

8   **A.** I can't say what they would or wouldn't do.

9   **Q.** Well, your expectation, is it not, that the FBI wanted to

10  catch the people that had done this, right?

11  **A.** Yes.

12  **Q.** And you don't think that if you told someone, the Punk

13  Boyfriend, the Capitol Hill Girl, that they would start trying

14  to figure out who that was?

15  **A.** Again, I would be speculating as to what they did.

16  **Q.** And you didn't feel any need to tell Spencer, you might be

17  careful, I just fingered you for something you didn't do?

18  **A.** It didn't come up at the time, no.

19  **Q.** It didn't occur to you?

20  **A.** It didn't come up at the time, no.

21  **Q.** Now, when you mentioned Briana Waters' name, it's clear

22  you knew who she was, right?

23  **A.** Yes.

24  **Q.** And you knew her at least a year before the University of

25  Washington arson, right?

1  **A.** That would be about right. I don't know exactly what day

2  I met her.

3  **Q.** You believe that she -- well, you knew she lived in

4  Olympia?

5  **A.** Yes.

6  **Q.** And that she had a boyfriend?

7  **A.** Yes.

8  **Q.** The boyfriend, though, you didn't really know very well?

9  **A.** That's correct.

10  **Q.** In fact, you couldn't really identify him at all, could

11  you --

12  **A.** No.

13  **Q.** -- if shown a picture of him?

14  **A.** I could identify him if shown a picture.

15  **Q.** But the boyfriend wasn't involved in an arson?

16  **A.** At the time, I didn't think so.

17  **Q.** It's your testimony today that the boyfriend was not

18  involved in the arson?

19  **A.** Without having the outside information I do as to who was

20  involved in the arson, I do not directly remember him, no.

21  **Q.** I am not asking about outside information. I am asking

22  about your memory.

23  **A.** My memory does not include him, no.

24  **Q.** Did you know Briana's boyfriend's name at the time?

25  **A.** At what time?

1  **Q.** In 2001.

2  **A.** Probably.

3  **Q.** You knew him as Justin?

4  **A.** Yes.

5  **Q.** No secret names or anything like that?

6  **A.** I don't remember if he had one or not.

7  **Q.** And Briana, you always talked to Briana as Briana, right?

8  **A.** That's correct.

9  **Q.** Now, you knew that Briana lived in Olympia?

10  **A.** Yes.

11  **Q.** She was an environmental activist?

12  **A.** Yes.

13  **Q.** She was involved in the nonviolent civil disobedience

14  campaign at Watch Mountain?

15  **A.** Okay.

16  **Q.** Did you know about that?

17  **A.** I heard about that later. I don't know if I knew at the

18  time.

19  **Q.** You saw her film, right?

20  **A.** I actually never did see her film.

21  **Q.** You didn't see her film at the 911 Media Center?

22  **A.** No, I didn't actually stay there that night. I saw her

23  outside of it when she was presenting it, but I didn't stay

24  for the film.

25  **Q.** So you saw Waters in Seattle when Waters showed one of her

1  films at the 911 Art Center, but you didn't actually go in and
2  see it?
3  **A.**  That's right.
4  **Q.**  Did you know what the Watch campaign was about?
5  **A.**  No, I don't.
6  **Q.**  At the time, you didn't know?
7  **A.**  I might have at the time.
8  **Q.**  You did some environmental activism?
9  **A.**  That's correct.
10  **Q.**  Not just burning down buildings, but you lobbied people,
11  right?
12  **A.**  Yes.
13  **Q.**  You tried to get Congress to try to change the laws?
14  **A.**  Yes.
15  **Q.**  You sometimes went out into the forests and may have sat
16  down to block something, you weren't necessarily burning
17  anything down?
18  **A.**  That's correct.
19  **Q.**  But isn't it true that you also liked four-wheel driving
20  through the remnants of old growth forests; isn't that true?
21  **A.**  Not through old growth forests, no.
22  **Q.**  Or the remnants of clearcut forests?
23  **A.**  I have gone down logging roads as part of activism, yes.
24  **Q.**  No.  I am talking about a hobby of yours.  You don't like
25  going four-wheel driving through forests that had been

1  clearcutted?

2  **A.**  I enjoyed going four-wheeling down logging roads as a way

3  of getting somewhere, but I never would have gone

4  four-wheeling down an area that was protected or in danger.

5  **Q.**  I will come back to that in a second.

6  **A.**  Okay.

7  **Q.**  Now, these environmental movements that you were involved

8  in, a lot of people from different states were involved in

9  these?

10  **A.**  Yes.

11  **Q.**  People would move around from state to state to be

12  involved in different campaigns?

13  **A.**  Yes.

14  **Q.**  Socialize together?

15  **A.**  Yes.

16  **Q.**  There would be conferences, right?

17  **A.**  Yes.

18  **Q.**  Not necessarily the type of conferences that you talked

19  about yesterday in Minnesota where you would be taught arsons,

20  but you would go to conferences where they talk about

21  perfectly legal things?

22  **A.**  That's correct.

23  **Q.**  It's fair to say that it's pretty fluid, kind of the I-5

24  corridor, people would go up and down between Oregon and

25  Seattle, British Columbia; is that right?

1   **A.** I wasn't really involved in any other activism after I

2 moved out here. So I don't really know how much people moved

3 back and forth.

4   **Q.** But you knew about Briana Waters' movie, right?

5   **A.** Yes, I did.

6   **Q.** It is fair to say that you had a lot of respect for Briana

7 Waters' activism, right?

8   **A.** Yes.

9   **Q.** And at that time, you were ostracized by a large part of

10 the movement, right?

11   **A.** That's correct.

12   **Q.** Because of your involvement in the Makah whaling campaign,

13 right?

14   **A.** Because of taking sides with Joe Dibee, yes.

15   **Q.** Well, this was the whaling campaign out at Neah Bay where

16 the Native American Tribe wanted to hunt whales, right?

17   **A.** Correct.

18   **Q.** And you worked with that group, SEDNA, that was protesting

19 against the whale hunts, right?

20   **A.** For a brief time, yes.

21   **Q.** Well, it's true that you were actually at one point

22 nominated to be on the board of SEDNA, right?

23   **A.** Hm, I don't recall that.

24   **Q.** You don't recall there being a meeting where you were

25 nominated and you never ended up on the board because of your

1  personal connection with Joe Dibee?

2  **A.** I remember they needed more board members when they were

3  trying to get ratified and they were scrambling to come up

4  with board members. I don't actually remember being

5  considered for that, no.

6  **Q.** Okay. Now, there was this lawsuit that took place between

7  Joe Dibee and Jonathan Paul, correct?

8  **A.** Right.

9  **Q.** Kind of uncomfortable, you having gone out with both of

10  them at some point, right?

11  **A.** Yes.

12  **Q.** You took the side of Joe Dibee, right?

13  **A.** Yes.

14  **Q.** You were actually accused in your community of betrayal?

15  **A.** Yes.

16  **Q.** You were accused actually of leaking things to court,

17  right?

18  **A.** Yes.

19  **Q.** Now, whether it was true or not, that's what you were

20  accused of?

21  **A.** Yes.

22  **Q.** And you got harassing phone calls, right?

23  **A.** I believe so.

24  **Q.** People in the activist community didn't trust you?

25  **A.** That's correct.

1  **Q.** So this was really one of the motivations as to why you
2  ended up getting involved with Rodgers and the arson?
3  **A.** No, I don't know that I would say that.
4  **Q.** You were looking for something else to do?
5  **A.** I wasn't any longer a part of the above-ground activist
6  community.  I still wanted to make a difference, and I had
7  been approached by Joe and Avalon about it.
8  **Q.** But when you met Briana Waters, she was kind of the real
9  thing, wasn't she?
10  **A.** Please explain what you mean by that.
11  **Q.** Well, she was someone that was held in esteem in the
12  community, right?
13  **A.** I don't really know what position she was in the
14  community.
15  **Q.** Well, she seemed to be someone that was prominent, people
16  respected her?
17  **A.** I honestly don't know what role she had in the Olympia
18  community.
19  **Q.** Well, you go down to Olympia every now and then, right?
20  **A.** That's correct.
21  **Q.** Joe Dibee had friends in Olympia?
22  **A.** Other than Bill Waters, I am not sure who.
23  **Q.** Bill Rodgers, you mean?
24  **A.** Bill Rodgers, sorry.
25  **Q.** Didn't he have a friend name Ed Glidden that he would go

1  hiking with in Olympia?

2  **A.**   I am not sure.

3  **Q.**   He had a sister, right, Maha Coles?

4  **A.**   That's true, she lived in Olympia.

5  **Q.**   So there would be reasons for Joe Dibee to go to Olympia

6  other than meeting with William Rodgers, right?

7  **A.**   Yes.

8  **Q.**   Is it fair to say that when you were with Joe Dibee, you

9  might have accompanied him to Olympia to see these people

10  socially?

11  **A.**   I met his family there a couple times, yes.

12  **Q.**   Now, when you developed a friendship with Briana Waters,

13  though, it's true that you didn't try to keep things covert,

14  secret?

15  **A.**   No.

16  **Q.**   You called each other by your real names?

17  **A.**   Yes.

18  **Q.**   You became friends?

19  **A.**   Yes.

20  **Q.**   At one time, you actually went to a party at her house

21  where she and her boyfriend were living?

22  **A.**   Yes.

23  **Q.**   You had her address in your phone book?

24  **A.**   Yes.

25  **Q.**   Along with all of your other friends, right?

1  **A.** Yes.

2  **Q.** At some point, did you not bring her a necklace from

3  Hawaii?

4  **A.** I don't remember that.

5  **Q.** Well, is it fair to say that perhaps your interest in her

6  became romantic at some point?

7  **A.** No, not at all.

8  **Q.** You've never had any interests in people of your own

9  gender on a romantic basis?

10  MR. BARTLETT:  Objection, Your Honor.  If he wants to

11  ask about the romantic interest of the Defendant, that might

12  be relevant.  Other is just intrusive.

13  THE COURT:  Where are we going with this, Mr. Fox?

14  MR. FOX:  I'm sorry, are you overruling or

15  sustaining?

16  THE COURT:  Where are we going with this?  Are we

17  just throwing things out now?

18  MR. FOX:  No, we are not.  It ties into what I was

19  just saying.

20  THE COURT:  Is it about this Defendant?

21  MR. FOX:  Yes.

22  THE COURT:  Then continue.

23  BY MR. FOX:

24  **Q.** Is it true that you have had romantic feelings towards

25  people of your own gender?  I am not trying to embarrass you.

1  But is it true?

2  **A.** When I was much younger, yes.

3  **Q.** Well, 1999, possibly?

4  **A.** No.

5  **Q.** I am handing forward to the Court what's been marked for

6  identification as A-203.

7  **A.** Oh, yes, maybe. Thinking of timing, yes, maybe.

8  **Q.** I am just handing you what's been marked as A-203. Do you

9  recognize that?

10  **A.** Let me look at it, and I will see if I do. I remember

11  this time period. I don't remember this exact e-mail.

12  **Q.** Who's redmango7?

13  **A.** That's one of the things I am trying to remember.

14  **Q.** I am sorry?

15  **A.** That's one of the things I am trying to remember.

16  **Q.** Did you have a friend that went traveling in Europe around

17  that timeframe, George Whiteside?

18  **A.** Yes.

19  **Q.** George Whiteside was a boyfriend of yours at one point?

20  **A.** Yes.

21  **Q.** And he went traveling in Europe?

22  **A.** Yes, he did.

23  **Q.** This is an e-mail about "Alo Luvey!?

24  **A.** Yes.

25  **Q.** He was in England?

1   **A.**   Yes.

2   **Q.**   And you were writing to him about your life in Seattle?

3   **A.**   Yes.

4   **Q.**   After you moved here, right?

5   **A.**   Yes.

6   **Q.**   In 1999, right?

7   **A.**   Yes.

8   **Q.**   Is it not correct, Ms. Kolar, that at that point you

9   expressed an interest in women romantically?

10  **A.**   Yes, that's clear in here.

11  **Q.**   Is it not correct, though, that you were attracted to

12  Briana Waters on a romantic basis?

13  **A.**   No, that's not correct.

14  **Q.**   You wanted to keep in touch with her, right?

15  **A.**   As a friend.

16  **Q.**   As a friend.  She spurned you, right?

17  **A.**   No.

18  **Q.**   She didn't want to keep in touch with you?

19  **A.**   No, there was never anything like that.

20  **Q.**   Is it not fair to say that you told George, on the second

21  page of this e-mail, that it's harder to be rejected by one of

22  the same sex?

23  **A.**   I did say that.

24  **Q.**   You weren't angry at Briana Waters at all?

25  **A.**   No, not at all.

**Q.** Okay. Well, your testimony yesterday was that you -- at
some point, Briana Waters gave you a series of articles,
right?

**A.** That's correct.

**Q.** And I think we were talking about Exhibit 614. You don't
have to pull it out. That's one where Mr. Bartlett had you
read all sorts of sections?

**A.** Okay.

**Q.** Do you remember that?

**A.** Yes.

**Q.** Now, you didn't turn the stack of articles over to the
Government until May of 2006, right?

**A.** My lawyer picked them up from me much earlier.

**Q.** Much earlier?

**A.** I believe probably in January.

**Q.** In January?

**A.** December, maybe even December the year before. I don't
remember exactly when.

**Q.** So you didn't bring them in, though, to the first meeting
with the Government, right?

**A.** My lawyer had them at that point in time.

**Q.** Okay. But there was -- I guess my point is that there was
some time, was there not, between when you first found out
about this investigation and when those articles left your
possession?

1  **A.** I believe my lawyer got them from me pretty early on. I

2  would have to look -- he'd have to look at his notes. I don't

3  remember exactly when.

4  **Q.** My point is that you didn't bring them with you the first

5  day you went to the prosecutor's office?

6  **A.** No, he already had them at that point.

7  **Q.** Now, when you were initially questioned about those

8  articles, you were questioned about them in May, right, 2006?

9  **A.** Yes.

10  **Q.** It's true that you initially said that you didn't know who

11  "B" was. You had a guess that it was Briana, but at the time

12  you didn't know who "B" was?

13  **A.** That could be correct. I would have to look at the notes.

14  I have no lack of clarity in my mind that they are from

15  Briana.

16  **Q.** Well, that's what you are saying now, but why don't we

17  take a look at A-59, what's been marked for identification as

18  A-59.

19  **A.** All right.

20  **Q.** Why don't you identify that.

21  **A.** These are the notes from May 12, 2006.

22  **Q.** Notes of a meeting with you and --

23  **A.** Meeting with myself.

24  **Q.** -- and Agent Halla?

25  **A.** Yes, and Andrew Friedman.

1  **Q.**  Take a moment and look through them.

2  **A.**  All right.

3  **Q.**  It's correct that they showed you the folder, the "Hey

4  woman" folder, right?

5  **A.**  Yes.

6  **Q.**  And you said that your first thoughts were that it was

7  from Briana Waters, right?

8  **A.**  Correct.

9  **Q.**  And you followed it up by saying that, Kolar recalled that

10  Waters had -- you recall that Waters had given you some

11  articles on women activism, right?

12  **A.**  Correct.

13  **Q.**  You didn't say anarchism, right?

14  **A.**  That's true.

15  **Q.**  You didn't say animal rights information, right?

16  **A.**  That's correct.

17  **Q.**  You didn't say, she gave me articles about McDonald's or

18  Disneyland or anything like that?

19  **A.**  No, that's correct.

20  **Q.**  What you said is that your memory is she gave you articles

21  about women activism?

22  **A.**  I remember she and I talking about women activism, and she

23  was going to find me articles about that, yes.

24  **Q.**  You also thought that "B" could refer to Suzanne Savoie?

25  **A.**  No.  The Government asked me if "B" could refer to Suzanne

1  Savoie.

2  **Q.** Well, didn't you say that the only other person that may

3  have signed her name by "B" was Suzanne Savoie, who sometimes

4  went by the alias of Black?

5  **A.** That's the only other person I could think of that would

6  use the nickname that might translate to "B."

7  **Q.** Then you said, it wasn't her style and you didn't have a

8  friendship with her, right?

9  **A.** Right.

10  **Q.** But you were friends with Suzanne Savoie's Punk Boyfriend,

11  right?

12  **A.** I didn't have a close friendship with either of them.

13  **Q.** But I guess the point is that you weren't sure, when you

14  saw this folder, that it was in fact Briana Waters who had

15  given it to you?

16  **A.** When I saw this folder, my gut reaction was that it was

17  from Briana.

18  **Q.** That was our gut reaction?

19  **A.** That's correct.

20  **Q.** But you had some uncertainty?

21  **A.** I think at the time, yes.

22  **Q.** Now, when Mr. Bartlett had you read portions of the

23  articles he highlighted yesterday, you had not read any of

24  those articles back in 2001, right?

25  **A.** That's correct.

1   **Q.** You didn't discuss them with Briana Waters, right?

2   **A.** No, I did not.

3   **Q.** In fact, probably the first time you read those articles

4   was in trial preparation, right?

5   **A.** That's correct.

6   **Q.** Now, over the last seven years, you've moved a couple

7   times?

8   **A.** Yes.

9   **Q.** Yet you kept that box intact, right?

10  **A.** Largely.

11  **Q.** You didn't throw it away or recycle it?

12  **A.** No.

13  **Q.** Now, you said yesterday that you are sure that those

14  articles came in that folder, right?

15  **A.** I believe what I said is, I saw no reason why I would have

16  ever taken them out, how that would have changed, that they

17  stayed intact together.

18  **Q.** But if you hadn't read the articles back in 2001 or any

19  time up until trial preparation, you don't really know, do

20  you?

21  **A.** I don't know, unless something else magically changed

22  them.

23  **Q.** Well, you lived with other people, right?

24  **A.** Yes.

25  **Q.** You lived with Jonathan Reichhold, right?

1  **A.**  Yes.

2  **Q.**  And when you are moving, things get disrupted a bit?

3  **A.**  These were all maintained within one sealed plastic crate.

4  **Q.**  It's your testimony that as soon at you got these

5  articles, you put them into a sealed plastic crate?

6  **A.**  No.  I am sure they didn't go in there immediately after I

7  got them.

8  **Q.**  Do you know where they went?

9  **A.**  No, I do not.

10  **Q.**  Probably took them home and had them about your apartment,

11  right?

12  **A.**  I am not honestly sure where I put them.  They would have

13  been at home with me, yes.

14  **Q.**  Is your home completely tidy?

15  **A.**  No.

16  **Q.**  Sometimes you have things laying about?

17  **A.**  Yes.

18  **Q.**  You have cleaners come in and clean your house on

19  occasion?

20  **A.**  Now I do, yes.

21  **Q.**  They might move things about?

22  **A.**  They might.  I didn't have that at the time.

23  **Q.**  But the fact is, you don't have any independent memory of

24  taking those articles in one discreet unit and putting them

25  into a plastic container?

1  **A.**  I do remember putting that folder into that container

2  along with a number of other articles -- not articles, but

3  items from that time period.

4  **Q.**  When did you do that?

5  **A.**  It would have been probably late 2001, early -- I would

6  say late 2001 when I actually moved.

7  **Q.**  Okay.  So up until the time you moved, the folder was

8  laying about some place?

9  **A.**  I am not sure exactly where it was; it would have been in

10  my apartment.

11  **Q.**  Okay.  Actually -- actually, you moved in October 2001,

12  that's when you moved in with Jonathan?

13  **A.**  That's correct.

14  **Q.**  Would you have gotten the articles before or after you

15  moved in with Jonathan Reichhold?

16  **A.**  I am not entirely sure if they were before or after.

17  **Q.**  I guess between the time you got these articles and the

18  time you remember putting them into a box, you really have no

19  idea for sure whether those same articles were the ones that

20  were given to you, right?

21  **A.**  I have no recollection of taking them out of there or

22  putting anything else in there.  My only recollection is of

23  keeping them together.

24  **Q.**  But then again, you don't remember Lacey Phillabaum being

25  at the Center for Urban Horticulture arson?

1 **A.** That's true.

2 **Q.** So there's a lot of gaps in your memory?

3 **A.** That's true.

4 **Q.** Now, the note says: "Hey Woman! Here's some stuff to

5 read that I was telling you about. We'll hang out soon."

6 Right?

7 **A.** Yes.

8 **Q.** Is it your testimony that Briana Waters handed you the

9 folder with that note attached?

10 **A.** Yes.

11 **Q.** Why didn't she just tell you we'll hang out soon?

12 **A.** I have no idea.

13 **Q.** Your memory is that -- well, do you have any particular

14 memory of what she said to you when she handed you the folder?

15 **A.** I don't remember the exact words, no.

16 **Q.** You don't have any memory of where she handed you the

17 folder, where physically?

18 **A.** No.

19 **Q.** Was it when you were taking a walk by the water before she

20 went to California?

21 **A.** There were times that I know we were in Olympia together

22 and there were times in Seattle. I don't remember which

23 instance she would have handed it to me.

24 **Q.** Okay. It's possible, is it not, that the folder contained

25 articles about women activism?

1  **A.** The folder as I have it now and as I remember getting it.

2  Now that I have actually read the articles does not contain

3  information about women in activism.

4  **Q.** Back then, you hadn't read the articles?

5  **A.** That's correct.

6  **Q.** So you don't even know what was in there, other than you

7  think it was all together?

8  **A.** That's correct.

9  **Q.** Now, would it be fair to say that it would be a

10  substantial breach of security to pass along articles about an

11  event if you were involved in the arson?

12  **A.** These articles weren't about the event.  There was

13  reference to the arson in there.

14  **Q.** In fact, Mr. Bartlett had you read that section?

15  **A.** That's correct.

16  **Q.** But when Briana Waters -- according to you, Briana Waters

17  gave you these articles, she didn't say, hey, woman, there's

18  something about what we just did last week, right, or last

19  month?  She didn't make any reference to anything in there

20  about --

21  **A.** No.

22  **Q.** -- about the University of Washington arson, right?

23  **A.** No, not that I recall.

24  **Q.** Didn't you -- I guess, you once got in trouble in your

25  group because you left a message on India's phone using your

1  aka, your alias, right?

2  **A.**  That's correct.

3  **Q.**  So wouldn't you think that it would be a breach of

4  security for one member of this group to give another articles

5  about the very event that they had just committed?

6  **A.**  I don't know.  I don't know that it would be.  People had

7  copies of articles for events on the research site, events

8  people were involved in and they were not.

9  **Q.**  The research site, you mean the secret e-mail server that

10  you set up?

11  **A.**  That's correct.

12  **Q.**  Now, it's possible you could have gotten the articles from

13  Justin Solondz?

14  **A.**  I don't remember ever getting them from him.

15  **Q.**  Okay.  But you were at parties with him, right?

16  **A.**  I was at one party with Briana where he was at.

17  **Q.**  Did you talk to him at all?

18  **A.**  I don't remember really ever talking to him much.

19  **Q.**  It wouldn't be possible that he would have given you a

20  stack of articles?

21  **A.**  It wouldn't make sense.  I barely knew him.

22  **Q.**  Let's move on.

23      You heard yesterday that there was a stipulation that your

24  lawyer told the United States Attorney that you remembered

25  Briana Waters on January 5th, right?  That's when he told

1   them?

2   **A.** Yes.

3   **Q.** Now, the very next day on January 6th, you again met with

4   United States Attorney's Office, right?

5   **A.** I know we had multiple meetings in January. I don't

6   remember the exact dates of all of them.

7   **Q.** Well, is it not correct that you met with Mr. Friedman the

8   day after Mr. Martin told him this information?

9   **A.** I would have to look at the list of notes. I don't

10  remember the exact dates we met.

11  **Q.** Why don't we take a look at what's been marked for

12  identification as A-30.

13  **A.** All right. These are the notes from January 6, 2006.

14  **Q.** Does that refresh your recollection as to the date in

15  January that you met with them?

16  **A.** Yes.

17  **Q.** So Mr. Martin tells the prosecutors Briana Waters,

18  something on January 5th, you go in to meet with the U.S.

19  Attorneys again on January 6th?

20  **A.** Yes.

21  **Q.** Actually, you met with them again on January 12th; is that

22  correct?

23  **A.** I remember meeting with them a number of times in January.

24  I don't remember the exact dates.

25  **Q.** Look at A-33.

1  **A.**  All right.  Yes.

2  **Q.**  January 12th was a meeting?

3  **A.**  Yes.

4  **Q.**  Look at A-35.

5  **A.**  All right.  January 13th.

6  **Q.**  Then let's look at A-40.

7  **A.**  All right.

8  **Q.**  The date on that one is?

9  **A.**  January 27th.

10  **Q.**  Another the meeting with U.S. attorneys and the FBI?

11  **A.**  Yes.

12  **Q.**  Then let's look at A-43.  Another meeting?

13  **A.**  On February 4th.

14  **Q.**  Okay.  Then let's look at A-46.

15  **A.**  This was -- the transcript date is 3-20.

16  **Q.**  Look down at the investigation on the bottom left.

17  **A.**  February 24th.

18  **Q.**  Then let's look at A-50.

19  **A.**  Pardon, which number?

20  **Q.**  A-50.

21  **A.**  Okay.  Thank you.  All right, this would be marked the

22  6th.

23  **Q.**  Then let's look at A-53.

24  **A.**  Is that one we already looked at before?

25  **Q.**  At some point, yes.

1  **A.**  All right.

2  **Q.**  The date on that meeting was?

3  **A.**  March 7th.

4  **Q.**  And then one more in March.  Let's look at A-59.  I am

5  sorry, A-56.

6        THE COURT:  Those are all the ones you want her to

7  look over?

8        MR. FOX:  Not to look over, just to get the dates,

9  Your Honor.

10       THE COURT:  All right.  Before you go into any

11  questioning, let's take the noon recess before you get into

12  that.

13  **A.**  This is March 30th.

14  **Q.**  Yes.  Thank you.

15       THE COURT:  I will give you a chance to get a

16  sandwich.  As always, don't discuss the case.  When you are

17  back in the building, I will have you report in the jury room.

18  Leave your books on the chair.  See you after lunch.

19    (Jury not present.)

20       THE COURT:  All right.  Ms. Kolar, same admonition.

21  See you after lunch also.  All right.  We'll be in recess.

22       THE CLERK:  All rise.  Court is in recess.

23    (Luncheon recess.)

24

25    (Jury not present.)

1    THE COURT:  All right, you may be seated.

2    It is my understanding that there's a witness to be taken

3 out of turn?

4    MR. BLOOM:  That would be fine.  We would consent to

5 that.

6    MR. FRIEDMAN:  We have a brief witness, Your Honor.

7 We would like to do that.

8    THE COURT:  All right.

9    What's the name of this witness?

10    MR. FRIEDMAN:  Bill Wake, William Wake.

11    (Jury present.)

12    THE COURT:  All right, you may be seated.

13    We are going to interrupt the testimony of Ms. Kolar and

14 take a witness out of turn, and we'll get back to that

15 testimony.

16    Call that witness.

17    MR. FRIEDMAN:  Your Honor, the government calls Bill

18 Wake.

19    THE COURT:  All right.

20    Come forward and raise your right hand, please.

21    WILLIAM WAKE, called as a witness, duly sworn.

22    THE COURT:  Okay.  Please take the witness chair.

23                    DIRECT EXAMINATION

24 BY MR. FRIEDMAN:

25 Q.  Good afternoon, Mr. Wake.  Could you tell us your full

1 name and spell your last name for the record?

2 **A.** William Gordon Wake. W-A-K-E.

3 **Q.** You are from Olympia?

4 **A.** Yes.

5 **Q.** You're a handyman there?

6 **A.** Yes.

7 **Q.** Do you also own a plot of land?

8 **A.** Yes.

9 **Q.** What's the address of that land?

10 **A.** 5529 Keating Road Northwest, Olympia, Washington 98502.

11 **Q.** Do you live there?

12 **A.** Yes.

13 **Q.** Are there any other cabins or houses on the land?

14 **A.** Yes.

15 **Q.** How many?

16 **A.** Well, I have seven habitats.

17 **Q.** So six others in addition to the one in which you live?

18 **A.** Correct.

19 **Q.** Do you rent those out to people?

20 **A.** Yes.

21 **Q.** Do you rent to Evergreen students, in particular, on

22 occasion?

23 **A.** Whomever.

24 **Q.** I ask you to take a look at Exhibit 115, that should

25 appear on the screen to your left. Tell me if you recognize

1   the person shown in that.

2   **A.**   No, nothing is coming on.

3   **Q.**   Do you recognize that person?

4   **A.**   Yes.

5   **Q.**   Who is that?

6   **A.**   Well, that's the gentleman that I rented to for two or

7   three months.

8   **Q.**   Do you recall his name?

9   **A.**   Well, it's right there, Justin.

10  **Q.**   Did you recall it before you saw it?

11  **A.**   Kind of vaguely.  I knew it started with a J.

12  **Q.**   How much did you charge -- what was the rent for the

13  cabin?

14  **A.**   $100.

15  **Q.**   A month?

16  **A.**   A month.

17  **Q.**   During the time that he lived there, do you recall whether

18  he was dating or romantically involved with anyone?

19  **A.**   He was romantically involved with a woman named Briana

20  Waters.

21  **Q.**   Would you take a look at Exhibit 740, and that should be

22  in a folder that you were probably handed a moment ago.

23  **A.**   Oh, okay.  The check.

24  **Q.**   Do you recognize that?

25  **A.**   It's my signature.

1          MR. FRIEDMAN:   The government offers Exhibit 740.

2          MR. BLOOM:   No objection.

3          THE COURT:   Admitted.

4                (Exhibit No. 740 admitted.)

5    BY MR. FRIEDMAN:

6    **Q.** Mr. Wake, what was this check for?

7    **A.** Rent for Justin.

8    **Q.** In the top left corner, can you see whose account it was

9    written on, who actually paid you the check?

10   **A.** Oh, yeah.  Briana Waters, right.

11   **Q.** On the signature line, is there an indication of what this

12   check is for?

13   **A.** Justin's rental.

14   **Q.** Could that say rent and bills?

15   **A.** It could be, yeah.

16   **Q.** The amount is $124?

17   **A.** Right.

18   **Q.** Do you see a date on this check?

19   **A.** 8-31-01.

20   **Q.** August of 2001?

21   **A.** Uh-huh.

22   **Q.** Is that the time period during which you were renting the

23   cabin to Justin Solondz?

24   **A.** Odds are.

25   **Q.** Can you tell us, do you have a personal phone?

1  **A.**  I do.

2  **Q.**  Where is that located?  Is it in your home?

3  **A.**  It is in my home, yes.

4  **Q.**  Were there phones for the tenants who lived in the six

5  other cabins on your property?

6  **A.**  There was.

7  **Q.**  One or more?

8  **A.**  Just one.

9  **Q.**  Where was that located?

10  **A.**  Well, it was located in the building that I lived in, but

11  kind of a garage or shed that's attached it to.

12  **Q.**  Do you recall the telephone number for that phone?

13  **A.**  It was 866-6433.

14  **Q.**  Area code (360)?

15  **A.**  (360), correct.

16  **Q.**  866 --

17  **A.**  -- 6433.

18  **Q.**  6433, okay.

19  Were all of your tenants free to use that phone?

20  **A.**  Yes.

21  MR. FRIEDMAN:  Thank you, Your Honor.  No further

22  questions.

23  CROSS-EXAMINATION

24  BY MR. BLOOM:

25  **Q.**  Could you sit there for just a minute, Mr. Wake.

1  **A.** I am sorry. I am unfamiliar with this.

2  **Q.** I am just getting used to it myself.

3  My name is Robert Bloom, and I, along with Neil Fox, we

4  are the attorneys for Briana Waters.

5  Have you ever seen Briana Waters before just now?

6  **A.** Well, yes, back then, saw her two or three times. Not

7  very much.

8  **Q.** Maybe one time when she brought you a check?

9  **A.** Correct.

10  **Q.** And you had no real serious interaction with her, I

11  assume; is that correct?

12  **A.** Not to speak of.

13  **Q.** The telephone that you spoke of that was -- is it a pay

14  phone, is that what it was?

15  **A.** No, it was just a regular phone, land line.

16  **Q.** And you allowed people to use it, people who were renting

17  from you; is that correct?

18  **A.** Correct. And then people paid accordingly.

19  **Q.** For toll calls, long-distance calls?

20  **A.** Right.

21  **Q.** The building that Justin Solondz lived in, could you

22  describe that to the jury, please?

23  **A.** Well, it was kind of a handmade motor home on the back of

24  a 1954 three-ton truck.

25  **Q.** Could you speak into the microphone, please.

1  **A.**  It was a handmade motor home on the back of a 1954

2  three-ton truck.

3  **Q.**  So how large would you say the living space was in that

4  particular facility?

5  **A.**  It is approximately 25 foot by eight foot.

6  **Q.**  Twenty-five by eight?

7  **A.**  Uh-huh.

8  **Q.**  Approximately.  Did you ever see inside it?

9  **A.**  Well, sure; I rented it.  I didn't see much of it after

10  Justin rented it because he put a lock on there, a hasp and a

11  lock that prevented me from entering.

12  **Q.**  Did you ever see, was there room for much more than a bed

13  and a chair or two?

14  **A.**  Not really.  It was fairly limited, but, you know, 25 feet

15  is rather long.  It has a wood stove and it has upstairs

16  ceiling storage.  It has a place over the cap of the truck

17  that is the bedroom.

18  **Q.**  Was it a bed or was it a fold-out bed that you remember,

19  or a regular bed?

20  **A.**  It was a mattress.

21  **Q.**  Just a mattress?

22  **A.**  Yeah.

23  **Q.**  Now, was there some place other than the mattress where

24  one could sit?

25  **A.**  Yes.

1  **Q.** So if you were to go in there, you could choose either to
2  sit on the bed or on a chair or a counter or something; is
3  that correct?
4  **A.** That's correct.
5  **Q.** You wouldn't have to sit on the bed?
6  **A.** No, no.  It would be more inconvenient to sit on the bed,
7  actually.
8         MR. BLOOM:  I have no further questions.  Thank you.
9         THE COURT:  Anything else?
10        MR. FRIEDMAN:  No questions, Your Honor.
11        THE COURT:  All right.  He's excused.
12  Retake the witness chair.  Remember you are still under
13  oath.
14        THE WITNESS:  Yes, sir.
15              CROSS-EXAMINATION - CONTINUED
16  BY MR. FOX:
17  **Q.** Good afternoon, Ms. Kolar.
18  **A.** Good afternoon.
19  **Q.** You should have in front of you what's been marked for
20  identification as Defendant's Exhibit A-201, hopefully.
21  **A.** Yes.
22  **Q.** Can you briefly identify that.
23  **A.** It looks like a calendar that you put together starting
24  with the December 2005.
25  **Q.** Ending March of 2006?

1  **A.**  That is correct.

2  **Q.**  Now, right before the break, I had you go through all the

3  different meetings that you had?

4  **A.**  Yes.

5  **Q.**  The dates that you gave me, do they accurately -- are they

6  accurately reflected on these three pages?

7  **A.**  I would have to -- do you want me to look through the

8  list?  I would have to double-check.

9  **Q.**  Go back through all --

10  **A.**  December is correct.

11  **Q.**  December 6th, December 29th.  We did February 6th,

12  February 12th, February 13th, February 27th -- I am sorry,

13  January 27th.  January 6th, January 12th, January 13th,

14  January 27th, February 4th, February 24th?

15  **A.**  That's correct.

16  **Q.**  Is that correct?

17  **A.**  Those are correct.

18       MR. FOX:  Your Honor, for illustrative purposes only,

19  I would offer A-201.

20       MR. BARTLETT:  No objection.

21       THE COURT:  Admitted.

22             (Exhibit No. A-201 admitted.)

23  BY MR. FOX:

24  **Q.**  So moving from December to January, on January 5th, this

25  is when Mr. Martin told the prosecutors about Briana Waters,

1 right?

2 **A.** That is my understanding, yes.

3 **Q.** Then the very next day, on the 6th of January, that's when

4 you went to meet with Mr. Friedman again, right?

5 **A.** Yes, that's correct.

6 **Q.** And Agent Halla was there, right?

7 **A.** Yes.

8 **Q.** I bet you were expecting that they were going to ask you

9 questions about this new name you provided?

10 **A.** I don't remember what I was expecting at the time.

11 **Q.** Well, the previous month you had given them a list of

12 names?

13 **A.** That's correct.

14 **Q.** Then you came up with this other name, right?

15 **A.** Yes.

16 **Q.** So, is it fair to say that you were perhaps thinking that

17 they might ask you about this name?

18 **A.** I honestly don't know what I was expecting each time I

19 went into a meeting with them. They told me the topic they

20 wanted to have that day.

21 **Q.** So it was your understanding that they were not going to

22 ask you who Briana Waters was at that meeting?

23 **A.** That was not my understanding. I did not know what the

24 topic of meeting would be until I was there.

25 **Q.** There was no off-the-record conversation saying, we're not

1  going to talk to you about Briana Waters?

2  **A.** No, not at all.

3  **Q.** So you go in for another session with the prosecutors at

4  the United States Courthouse, another conference room -- same

5  conference room and table probably, right?

6  **A.** Yes.

7  **Q.** It's true, is it not, that throughout the entire interview

8  on January 6th, Mr. Friedman didn't ask you one question about

9  Briana Waters?

10 **A.** That is true.

11 **Q.** Agent Halla didn't ask you one question about Briana

12 Waters?

13 **A.** That is true.

14 **Q.** Was Agent Torres at that meeting?  You don't have to look

15 it up if you don't --

16 **A.** I don't recall.

17 **Q.** The fact is, how long did you meet with them?

18 **A.** I don't recall the exact length.  We can look it up.

19 **Q.** Well, was it a couple hours?

20 **A.** Yes.

21 **Q.** It's true that you were shown a series of photographs that

22 day; isn't that right?

23 **A.** That's correct.

24 **Q.** In fact, you were shown 42 different pictures that day?

25 **A.** Yes, that is correct.

1  **Q.** Including one of Suzanne Savoie?

2  **A.** Yes.

3  **Q.** And that's when you said oh, that's Horace the butcher's

4  daughter, right?

5  **A.** Yes.

6  **Q.** And you talked about the fact that she lived on Capitol

7  Hill, right?

8  **A.** Yes.

9  **Q.** And that she was the one with the boyfriend with the

10  piercings involved in the tree action in Canada, right?

11  **A.** Yes, that's her.

12  **Q.** Now, you know actually that in fact Suzanne Savoie does

13  not have a Father named Horace?

14  **A.** I do not know that.

15  **Q.** Well, when they showed you this picture of Suzanne Savoie,

16  did you say, oh, you know, the person that I named as having

17  committed the University of Washington arson, that was a

18  mistake, that's not the one that was there?  Did you say that?

19  **A.** As I said, at the time of going through this, I wasn't

20  under the impression the Government was pursuing this as the

21  people that were involved in the arson.

22  **Q.** But my question to you is, did you ever say, I made a

23  mistake last month?

24  **A.** I don't believe so.

25  **Q.** Okay.  Did you ever say, Crazy Dan wasn't there?

1  **A.** I believe I focused on who I felt confident in saying was

2  there, rather than speculating.

3  **Q.** Well, you didn't say -- you never said at that meeting

4  that Briana Waters was at the University of Washington arson?

5  **A.** They never asked me.

6  **Q.** But you never told them that?

7  **A.** I told my lawyer, he gave them the information, they never

8  asked me.

9  **Q.** I understand.  I asked a simple question.

10 **A.** No, I did not bring the topic up.

11 **Q.** You had a chance to talk about it, didn't you?

12 **A.** I could have.

13 **Q.** Yeah.  Now, on the 12th of January, the Government did

14 show you a picture of Briana Waters; isn't that true?  If you

15 want to look at A-33.

16 **A.** Yes.  According to these notes, yes.

17 **Q.** But they didn't ask you any questions about her?

18 **A.** No, not that I recall.

19 **Q.** Okay.  Actually, you were back again the following day on

20 the 13th, right?

21 **A.** Yes, that is correct.

22 **Q.** And they showed you more pictures that day?

23 **A.** Yes.

24 **Q.** In fact, Agent Torres showed you a picture of the person

25 that you thought was Crazy Dan; isn't that true?

1  **A.**  Yes.

2  **Q.**  At this time, you did not say, oh, I made a mistake about

3  Crazy Dan?

4  **A.**  It wasn't my understanding at that point that they were

5  pursuing him as somebody associated with the University of

6  Washington.

7  **Q.**  Even though you had named him earlier, the month before?

8  **A.**  I had been thinking out loud of possible people.

9  **Q.**  You were thinking out loud.  Actually, did you not tell

10  Agent Torres that you don't know why you thought he was the

11  one at the University of Washington?

12  **A.**  I might have.  I don't recall directly.

13  **Q.**  Well, take a look at A-37.

14  **A.**  Okay.  Sorry, I am trying to keep all these straight.

15  **Q.**  Sure.  Sorry, it's cumbersome.

16  **A.**  Is A-37 notes from one of the meetings?

17  **Q.**  Yes.  Can you identify what A-37 is?

18  **A.**  I am not finding it.

19  　　　　THE CLERK:  It wasn't on the list.

20  　　　　MR. FOX:  I am very sorry.

21  **A.**  These are notes from Agent Torres.

22  BY MR. FOX:

23  **Q.**  From a meeting with you on --

24  **A.**  On January 13, 2006.

25  **Q.**  Take a look at his notes and see if that refreshes your

1    recollection.

2    **A.**  I am trying to read it.  Right.  It looks like I was

3    commenting on not being sure if he was there or the woman was

4    there or what they looked like.

5    **Q.**  In fact, you were talking about this weird, sickly guy

6    that you wonder may have been at the University of Washington,

7    right?

8    **A.**  That's right.

9    **Q.**  So the subject of the University of Washington came up in

10   that meeting; isn't that correct?

11   **A.**  That's correct.

12   **Q.**  And at that point, you were talking about Crazy Dan,

13   right?

14   **A.**  Yes.

15   **Q.**  At that point, you didn't say, I made a mistake, he wasn't

16   there, did you?

17   **A.**  I still wasn't sure who was there besides Briana and

18   Avalon and myself that I was confident of.

19   **Q.**  Well, when you say you were sure that Briana was there

20   when they showed you the picture of Briana, you didn't say

21   that's the woman who was at the University of Washington, you

22   just identified the picture, right?

23   **A.**  That's all I was asked to do.

24   **Q.**  Okay.  But you didn't volunteer that this is the person

25   that was the lookout?

1  **A.**  I don't think at that particular time, no.

2  **Q.**  And the subject again went back to Crazy Dan, the

3  following week, right?  And again, you didn't say, it wasn't

4  Crazy Dan, it was Briana Waters, right?  You didn't say that?

5  **A.**  That is true.

6  **Q.**  Now, was Joe Dibee at the Center for Urban Horticulture?

7  **A.**  No.

8  **Q.**  Are you sure about that?

9  **A.**  Yes.

10  **Q.**  Didn't you tell the agents that you weren't sure if he was

11  there?

12  **A.**  Did I say that?

13  **Q.**  Did you say that?

14  **A.**  What is your question, please?

15  **Q.**  Well, did you ever tell Agent Torres or Agent Halla that

16  you weren't sure if Joe Dibee was at the Center for Urban

17  Horticulture?

18  **A.**  I believe early on I did say that, yes.

19  **Q.**  So when you were -- this is your boyfriend or your

20  ex-boyfriend and you weren't sure if he was with you or not at

21  the arson?

22  **A.**  Yes, my memory is very foggy of this event.

23  **Q.**  So in December, you actually mentioned a sixth name as

24  maybe someone that was there, right?

25  **A.**  Which name would that be?

1 **Q.** Well, Joe Dibee.

2 **A.** Yes.

3 **Q.** So it may have been Crazy Dan, it may have been the Punk

4 Boyfriend, it may have been Capitol Girl, and now it may have

5 been Joe Dibee that was there too?

6 **A.** At the time, I was just thinking through possible names

7 saying that I was or was not confident.

8 **Q.** You weren't just saying possible names, you were talking

9 about people that you thought might have been with you that

10 night.

11 **A.** People I was not confident were not there, yes.

12 **Q.** I'm sorry?

13 **A.** I was talking about names of people that might have been

14 there, but I was not confident, yes.

15 **Q.** You were not confident. Okay. You were not -- I will

16 move on.

17 So then you had another meeting on the 27th of January?

18 **A.** Yes.

19 **Q.** And they didn't ask you any questions about Briana Waters

20 and the University of Washington arson?

21 **A.** No.

22 **Q.** And then you go down to Olympia on the 4th of February,

23 right?

24 **A.** Was it the 4th or the 24th?

25 **Q.** I think it was the 4th. It doesn't really matter.

1  A.  But yes, in February we went down.

2  Q.  You went to different sites at the Evergreen State

3  College?

4  A.  There, yes, as well as a couple other places in Olympia.

5  Q.  Now, Agent Halla took you to the library, right?

6  A.  Yes.

7  Q.  And to the computer lab?

8  A.  I believe so, yes.

9  Q.  Now, yesterday you testified on direct that you went to

10  some meeting on May 12th at the Evergreen State College,

11  right?

12  A.  I believe so, yes.  If that was that Saturday, then yes.

13  Q.  A week before the arson?

14  A.  Yes.

15  Q.  And you testified that this was a soundproof music lab,

16  right?

17  A.  My recollection is that it was a soundproof room in the

18  library.

19  Q.  Well, I think your testimony yesterday was that it was a

20  soundproof music --

21  A.  A music room.

22  Q.  So it was a room that people could go and play, practice

23  instruments, right?

24  A.  That was the term I used.  The school that I went to, we

25  had soundproof rooms just to listen to music for people just

1   to be at.  So that's what I am used to associating soundproof

2   rooms and libraries with.

3   **Q.**   What do you remember the library looking like?

4   **A.**   At Olympia?

5   **Q.**   Was it at Olympia or Evergreen State College?

6   **A.**   At Evergreen State College in Olympia.  I remember walking

7   in the front doors, having computers on one side on the right,

8   the entrance to the library on the left.

9   **Q.**   Where was the room?

10  **A.**   Back somewhere in the library area.  I don't remember

11  exactly where.

12  **Q.**   Can you see -- when you were inside the room, could you

13  see books from inside the room?

14  **A.**   I don't remember.

15  **Q.**   How large a room is it?

16  **A.**   I don't remember it being that large.

17  **Q.**   Was there a big table in the middle?

18  **A.**   I don't recall if there was or not.

19  **Q.**   Now, a soundproof room is not the same thing as a bug

20  proof room, right?

21  **A.**   Yes.

22  **Q.**   Someone could still put recording devices in the room,

23  right?

24  **A.**   Yes.

25  **Q.**   And simply because it's soundproof doesn't mean no one can

1 listen in on you, right?

2 **A.** That's true.

3 **Q.** Now, is it not correct that until yesterday, you have

4 never said to anyone that you met at a soundproof music room,

5 in the library, on May 12th?

6 **A.** No, that's not true.

7 **Q.** Well, let's go back to A-40. Well, let me ask you this.

8 To whom did you say the word "soundproof music room" before

9 yesterday?

10 **A.** I believe that I told the agent that my belief is we met

11 in the library in something like a soundproof room, a

12 soundproof music room. I would presume when we went through

13 the detailed discussion about the University of Washington,

14 but I am not positive.

15 **Q.** Well, let's take a look at A-40.

16 **A.** All right.

17 **Q.** Can you identify that?

18 **A.** Yes, these are the notes from January 27th.

19 **Q.** This was -- you were going through your Palm Pilot

20 explaining what was -- or your Visor and explaining what was

21 in it, right?

22 **A.** That's correct.

23 **Q.** The date book.

24    At some point, you have something about a meeting on May

25 12th, right?

1  **A.** Yes.

2  **Q.** Now, I believe this has been admitted. You have an entry

3  on the 12th, do you not, for library, right?

4  **A.** Correct.

5  **Q.** Nothing on this document says that you met with Briana

6  Waters in the library, right?

7  **A.** No.

8  **Q.** Now, you do have, in other instances, meetings with

9  specific people marked out, right? You name the person,

10  right?

11  **A.** In some cases, yes.

12  **Q.** And in fact, I think you testified yesterday, to refresh

13  your memory as to when you went to the Susanville arson, you

14  had a meeting with Joe Dibee on there, right?

15  **A.** Right.

16  **Q.** But nothing on this calendar says Briana Waters, right?

17  **A.** Right. No, there's no names for any of the gatherings or

18  meetings about the gathering.

19  **Q.** In fact, when you were explaining this on A-40, you said

20  you met Avalon, Briana, "X" and Sabrina at the Olympia

21  library, right?

22  **A.** Right.

23  **Q.** They usually met in the computer labs?

24  **A.** Yes.

25  **Q.** You didn't say anything about a soundproof music room.

1  **A.** Let me look where this is here.  I have been using Olympia

2  library and Evergreen State College library interchangeably.

3  **Q.** The City of Olympia has a library, I presume?

4  **A.** Right.

5  **Q.** Evergreen State College is different than the City of

6  Olympia, right?

7  **A.** That's true.  Just so you are aware, in my testimony, I

8  have been using them interchangeably.

9  **Q.** Okay.  Well, let's take a look at A-50.

10  **A.** All right.

11  **Q.** What is A-50?

12  **A.** Notes from March 6th.

13  **Q.** This is the date where you first formally made an

14  allegation that Briana Waters was at the University of

15  Washington arson?

16  **A.** This is when the Government first asked me the details of

17  the University of Washington arson.

18  **Q.** But this is the first time in two-and-a-half months that

19  you told Mr. Friedman and Agent Halla directly yourself that

20  Briana was --

21  **A.** I had told my lawyer to tell them, but yes, this is the

22  first time I personally had told them, yes.

23  **Q.** Something that hadn't come up previously in all the other

24  times you met with the Government in the previous two months?

25  **A.** They set the agendas for the meetings; I did not.

1 **Q.** I understand. So when you are telling them about the
2 meeting in Olympia, take a look at the second paragraph. Read
3 that to yourself. You don't have to read it out loud.
4 **A.** All right.
5 **Q.** Isn't it correct that the word "soundproof music room"
6 doesn't appear once?
7 **A.** You are right. I called it a study room.
8 **Q.** So when you said soundproof music room, that's something
9 you added in yesterday, right?
10 **A.** I thought I had said that before. Apparently, I hadn't.
11 But my recollection is a meeting room, study room, soundproof
12 room, music room, something of that nature.
13 **Q.** Well, when you went down with Agent Halla to the Evergreen
14 State College, did you not go to the library?
15 **A.** I believe we did.
16 **Q.** That's when you were tape recording?
17 **A.** In the car, I had the tape recorder running.
18 **Q.** Would it be okay if you asked your lawyer if we can get a
19 copy of that tape?
20 **A.** That was just information that I recorded for my lawyer
21 for notes.
22 **Q.** So could you ask him to give us a copy?
23 **A.** You can talk to my lawyer.
24 **Q.** So when you went into the Evergreen State College -- A-43,
25 page 3.

1    **A.**  A-43?

2    **Q.**  Yes.

3    **A.**  All right.

4    **Q.**  Take a look at that for a second.  The second paragraph,

5    the small one.

6    **A.**  On page 3?

7    **Q.**  Right.  You are taking them around the library at the

8    Evergreen State College?

9    **A.**  Yes.

10   **Q.**  There seems to have been some remodeling that had been

11   done?

12   **A.**  Yes.

13   **Q.**  Is it correct that you never said to them at that time

14   that this was a music room, a soundproof room?

15   **A.**  I don't remember exactly what I said as we were walking

16   around.

17   **Q.**  But you didn't tell them that it was a soundproof music

18   room, did you?

19   **A.**  Again, I honestly don't remember exactly what I said at

20   that time.

21   **Q.**  Does this document refresh your recollection?

22   **A.**  This document has what the agents wrote down.

23   **Q.**  Right.  Does it refresh your memory at all?  If it

24   doesn't then --

25   **A.**  No.

1  **Q.** Okay. So on March 6th, this is, as we said, the first

2  time that you blame Briana, right, specifically to the agents?

3  **A.** This is the first time I had directly talked about her to

4  them, yes.

5  **Q.** At that meeting with the prosecutors and Agent Halla, it's

6  correct that no one ever asked you what happened to Crazy Dan?

7  **A.** That would be true.

8  **Q.** No one ever asked you what happened to Capitol Hill Girl?

9  **A.** I believe the understanding was that I was focussing on

10 who I was confident of and that none of the other names were

11 people I was confident of that were worth talking about.

12 **Q.** When you say the understanding, did Mr. Friedman or Agent

13 Halla tell you that, or was that just your belief?

14 **A.** That was my belief based on I never felt that I had said

15 distinctly that they were there in the first place.

16 **Q.** Okay. Well, did anyone ever at that meeting on March 6th

17 try to clear up any misunderstandings that you had created?

18 **A.** I remember them asking me if I was confident about anybody

19 else.

20 **Q.** At that point, did you say --

21 **A.** And I said no.

22 **Q.** And did you say, what I said about Crazy Dan wasn't

23 correct?

24 **A.** I don't believe so.

25 **Q.** In fact, today is the first time that you've ever been

1 asked about that; isn't that true?

2 **A.** I am not completely positive.

3 **Q.** Well, in all the meetings that you had with the

4 Government, with the prosecutors and the agents, did they ever

5 tell you -- or did they ever ask you, what about Capitol Hill

6 Girl, was she there or not? Anyone ever ask you that?

7 **A.** I am trying to think. As I said, the conversations were

8 focused on who I was confident was there, not who I was

9 speculating.

10 **Q.** So they were interested in -- I will strike that. I won't

11 even ask that.

12 Joe Dibee?

13 **A.** Yes.

14 **Q.** Did your mind ever get clear as to whether he was there or

15 not?

16 **A.** I believe I said I didn't believe he was there.

17 **Q.** But not originally. Later on you --

18 **A.** Yes.

19 **Q.** You told that to the Government?

20 **A.** I believe so, yes.

21 **Q.** And the Punk Boyfriend of Capitol Hill Girl, did anyone

22 ever say, what, you were just wrong that time or --

23 **A.** I don't recall.

24 **Q.** So basically, after March 6, 2006, Capitol Hill Girl,

25 Crazy Dan and the Punk Boyfriend kind of floated into

1 oblivion, right? Nobody talked about them anymore?

2 **A.** Right. We were talking about the people I was confident

3 about, and at that point I decided I just couldn't really be

4 confident about anybody else, and I didn't want to say

5 something that was incorrect.

6 **Q.** But you had said something earlier that you think was

7 incorrect, right?

8 **A.** Earlier on, I had speculated. I believe those

9 speculations were wrong.

10 **Q.** But you never told them that?

11 **A.** I think I probably did.

12 **Q.** You told them -- when did you tell Mr. Friedman and Agent

13 Halla that Capitol Girl wasn't at the University of Washington

14 arson?

15 **A.** I am not sure if I said that directly or not. I just know

16 that I said to them, the people I was completely confident

17 about and that I was not confident about anybody else at any

18 level that I was comfortable with.

19 **Q.** When did you say to Agent Halla or Mr. Friedman or anyone

20 else from the Government that you were confident that Spencer

21 Moen, or the Punk Boyfriend of Capitol Hill Girl, was not at

22 the arson?

23 **A.** I don't think we ever discussed it in that term. I think

24 it was always the flip term of who I was confident was there

25 as opposed to who was not there.

1 **Q.** So again, these names kind of float off into oblivion,

2 right?

3 **A.** I presumed they were doing their own investigation about

4 them.

5 **Q.** When you pled guilty to the Center for Urban Horticulture

6 arson, you didn't mention any of them, right?

7 **A.** No.

8 **Q.** To this day, you've not identified in your mind, other

9 than the first meeting, any of the other people that were

10 there?

11 **A.** Other than what I had been told, no.

12 **Q.** Now, when you pled guilty, you agreed to cooperate with

13 the Government, right?

14 **A.** That's right.

15 **Q.** Actually, let me step back for one second.

16 In terms of Lacey Phillabaum, did you say this morning

17 that you found out that she was at the University of

18 Washington arson, the day that you pled guilty?

19 **A.** I found out when it came out in the press.

20 **Q.** So your lawyer never told you?

21 **A.** No.

22 **Q.** You hadn't seen anything on any websites or anything like

23 that?

24 **A.** No. I was actually purposefully avoiding them and had

25 been asked by my lawyer not to look at any of those sites.

1  **Q.** You hadn't heard any buzz anywhere that there was this

2  other person that went to high school with you that was

3  pleading guilty?

4  **A.** No.

5  **Q.** Were you surprised when she pleaded guilty?

6  **A.** Yes, actually, I was.

7  **Q.** Because you didn't see her there?

8  **A.** Because my memory does not include her there.

9  **Q.** But, Ms. Kolar, you remember the color of the car at the

10 Cavel West arson?

11 **A.** I remember the color it might be, yes.

12 **Q.** And you don't have a memory of the person who was with you

13 when you burned down the Center for Urban Horticulture?

14 **A.** I agree it may sound odd, but it is the truth.

15 **Q.** Now, you understand that -- I think you said yesterday

16 that you are looking at a sentence of five to seven years,

17 right?

18 **A.** Yes.

19 **Q.** If you get five years in prison that's, what, about 1.25

20 years per arson or attempted arson?

21 **A.** Yes.

22 **Q.** You were looking at life, right?

23 **A.** Yes.

24 **Q.** Now, the top end of that range is seven years, right?

25 **A.** Yes.

1  **Q.** And you said that the Government was going to ask for
2  seven years?
3  **A.** Yes.
4  **Q.** You are hoping for five, right?
5  **A.** Yes.
6  **Q.** But you understand that under the terms of your deal, that
7  if the Judge, Judge Burgess gave you less than five years, you
8  could conceivably get less than five years. The Government
9  would have to object, but if the Government didn't object, you
10 could get less than five years?
11 **A.** If Judge Burgess did not accept their agreement, yes.
12 **Q.** Technically, you could get probation, right?
13 **A.** I could, but I don't expect that.
14 **Q.** Well, didn't Jake Ferguson get probation for his role in
15 the ELF cases?
16 **A.** I actually don't know what happened to Jake.
17 **Q.** Jake Ferguson was the person that you helped set the fire
18 at Cavel West?
19 **A.** I am aware of who he is. I don't remember what happened
20 with his ultimate sentence.
21 **Q.** Is it correct that he was the founder of the Earth
22 Liberation Front?
23 **A.** I don't think there is any such thing as a founder.
24 **Q.** He was involved in a whole series of other arsons, right?
25 **A.** Yes, that is correct.

1   **Q.**  He was the one that wore a wire, right?

2   **A.**  Yes.

3   **Q.**  Went around, got the different people to say things on

4   tape?

5   **A.**  Yes.

6   **Q.**  But technically, you could get less than five years,

7   right?

8   **A.**  Could.  That's not the terms of my agreement right now.

9   **Q.**  But down deep, aren't you hoping that something like that

10   might happen?

11   **A.**  Yes.

12   **Q.**  And in fact, you believe, do you not, that the plea

13   agreement that you reached gives you too high of a sentence?

14   **A.**  I agreed to the plea agreement.

15   **Q.**  I understand that, but don't you think that's too high,

16   five to seven years?

17   **A.**  I am not sure if I do.

18   **Q.**  Well, in October of 2006, after you pled guilty, were you

19   not hoping to re-work your plea bargain and get a lesser

20   sentence?

21   **A.**  Obviously, I was hoping for as little time in jail as

22   possible.  Anybody would.

23   **Q.**  Sure.  But after you pled guilty, did there come a time

24   where your friend Kenny Clark came to your house?

25   **A.**  Probably.

1   **Q.** And were you not looking at the terms of your plea bargain

2   in his presence?

3   **A.** I am not sure if I was or not.

4   **Q.** Well, would you have told Mr. Clark that you were hoping

5   to re-work your plea bargain and get a lesser sentence?

6   **A.** There was a time after all the sentencing happened in

7   Oregon that I was hoping that might have influence on mine and

8   they might re-work my agreement.

9   **Q.** So basically 1.25 years per arson at the low end, you

10  thought was too high?

11  **A.** If I could reduce the amount of time spent, to me that

12  would be a good thing.

13  **Q.** And you understand that I have no control over how much

14  time you spend in prison?

15  **A.** I do understand that.

16  **Q.** You understand Briana Waters has no control?

17  **A.** I understand that.

18  **Q.** You understand that Judge Burgess is going to sentence

19  you?

20  **A.** Yes.

21  **Q.** You understand that these people sitting at the table

22  directly in front of me, Mr. Bartlett and Mr. Friedman, they

23  have a lot to say about what sentence you get?

24  **A.** Yes.

25  **Q.** In fact, if you violate -- if they believe that you

1  violated the terms of your plea agreement, you are back at

2  life?

3  **A.**  The terms of my plea agreement are just to tell the truth,

4  and I have not violated that.

5  **Q.**  I am not asking you that.  I am asking you whether if they

6  believe you violated the terms of your plea agreement, you are

7  looking at life in chains?

8  **A.**  Potentially, yes.

9  **Q.**  In fact, the sentencing, your sentencing -- you haven't

10  been sentenced, right?

11  **A.**  No.

12  **Q.**  You are not in jail now, right?

13  **A.**  That's correct.

14  **Q.**  Your sentencing has been postponed to the conclusion of

15  this trial?

16  **A.**  That's correct.

17  **Q.**  So really what you say on the stand impacts what is going

18  to happen to you in a big way?

19  **A.**  It potentially could, but all I am doing is telling the

20  truth.

21  **Q.**  I understand that you say that, but if you came in on the

22  witness stand and said, you know, my memory that came back to

23  me in December of 2005, I was wrong, it was really Capitol

24  Hill Girl, do you think at that point that the Government is

25  going to like what you say?

1   **A.**  The terms of my deal are to tell the truth, whether it

2   helps or hurts the Government, and that is what I am doing.

3   **Q.**  I understand what you are saying.  What I am asking you

4   is, if you came in and said, my memory was faulty, Briana

5   Waters wasn't there, it was Crazy Dan and the Punk Boyfriend

6   that were there, or Joe Dibee, do you think the Government

7   would be pleased with you?

8   **A.**  I think they would care more that I told the truth.

9   **Q.**  So you are saying that with regards to the Center for

10   Urban Horticulture fire, that you were asked to be involved

11   late in the game, right?

12   **A.**  Yes.

13   **Q.**  Now, you had been approached by this guy, Al Decker, a few

14   months earlier?

15   **A.**  Yes.

16   **Q.**  You told him you didn't think it was a good idea, right?

17   **A.**  That's correct.

18   **Q.**  Al Decker, he wasn't at the arson, was he?

19   **A.**  No, he was not.

20   **Q.**  Now, it's true that bioengineering, genetic engineering,

21   that wasn't an issue that you cared much about?

22   **A.**  It's an issue I do care about, but I am torn on it.

23   **Q.**  I'm sorry?

24   **A.**  It's an issue that I do care about, but I do have mixed

25   feelings -- as a scientist, I have mixed feelings on it.

1   **Q.** In fact, you weren't really strongly opposed to it.

2   **A.** I am strongly opposed to some of its uses.

3   **Q.** But this wasn't an issue that was pressing for you, right?

4   Did you care about poplar trees before?

5   **A.** It was an issue that we as a group had agreed was an issue

6   that societally people were going to be in support of what we

7   were doing.  It was something we thought we could change or

8   win, and I did support that.

9   **Q.** The issues that you spent most of your life on have really

10   been other issues, right?

11   **A.** Yes.

12   **Q.** But you decided you still wanted to get involved in direct

13   action, right?

14   **A.** I believe in that issue, and I believed in the notion of

15   working on something we thought we could have an impact on.

16   **Q.** Do you still believe it was a good thing to do?

17   **A.** No, I do not.

18   **Q.** Have you paid any restitution?

19   **A.** Not yet.

20   **Q.** Have you paid any monies to Cavel West?

21   **A.** Not yet.

22   **Q.** In fact, haven't they sued you?

23   **A.** No, they have not.

24   **Q.** But there was a lawsuit, wasn't there?

25   **A.** Against Jonathan Paul.

1  **Q.** You haven't voluntarily paid any money to the victims of

2  your crime?

3  **A.** Unlike Jonathan Paul, I don't have cash sitting around to

4  pay out.

5  **Q.** But you have a boat?

6  **A.** No, I do not.

7  **Q.** You did have a boat?

8  **A.** That already went to pay for this.

9  **Q.** You are in the .com business, right?

10  **A.** Yes.

11  **Q.** Now, this approach that Mr. Rodgers made to you or who you

12  originally thought was Mr. Rodgers, you didn't note this in

13  your Palm Pilot, did you?

14  **A.** No.

15  **Q.** You did go down to the meeting, right, in Olympia?

16  **A.** Yes.

17  **Q.** Now, you've gone to other meetings in Olympia, haven't

18  you, that were at the library that weren't related to the

19  Center for Urban Horticulture; isn't that correct?

20  **A.** Yes, I believe so.

21  **Q.** In fact, didn't you go down in January of 2002?

22  **A.** Yes, I went down. I saw Bill Rodgers and I think Briana

23  potentially, but I don't remember the date, just socially for

24  a couple months afterwards.

25  **Q.** So the fact -- well, let's take a look at your calendar,

1   A-42.  I am referring to A-42, but I am sorry, I don't

2   remember the number in which it was admitted yesterday.

3            THE CLERK:  617-C.

4   **A.**  It's right here.  All right.

5   BY MR. FOX:

6   **Q.**  It's correct, is it not, that January 15, 2002 -- can you

7   turn to that page?

8   **A.**  Yes.  I went to the Olympia library.

9   **Q.**  You have engineering meeting 10:00 to 11:00, Oly library,

10  5:00 to 11 p.m. and then Gail?

11  **A.**  6:00 to 11:00, it looks like.

12  **Q.**  And then "Gail"?

13  **A.**  Gail is my massage therapist.

14  **Q.**  Now, this was a meeting that you had at the Olympia

15  library that had nothing to do with the Center for Urban

16  Horticulture, right?

17  **A.**  No.

18  **Q.**  Had nothing to do with arsons?

19  **A.**  No.  I don't believe so, no.

20  **Q.**  So the mere fact that you have in your calendar an entry

21  Oly library, that doesn't necessarily mean that you were

22  planning an arson down there, right?

23  **A.**  That's correct.

24  **Q.**  Let's turn back to May 19th, the weekend of the arson.

25       Now, Saturday night, May 19th, you did not go to Olympia,

1  right?

2  **A.**  On May 19th?

3  **Q.**  Yes, May 19th.

4  **A.**  No.

5  **Q.**  What do you have on your calendar for May 19th?

6  **A.**  I have a party at Kenny Clark's house.

7  **Q.**  Again, the term partying, we talked about that earlier,

8  right?  Anarchists --

9  **A.**  It could mean many things.

10  **Q.**  That wasn't what you were doing with Kenny, was it?

11  **A.**  No, he was having friends over for dinner and drinks.

12  **Q.**  Then the next day you have nothing on your calendar on the

13  20th, right?

14  **A.**  That's correct.

15  **Q.**  You didn't put anything down about a meeting at the

16  Greenlake Bar & Grill?

17  **A.**  No, I do not.

18  **Q.**  You didn't put down "prepare for arson"?

19  **A.**  No, I did not.

20  **Q.**  What did you do on the 20th?

21  **A.**  I don't remember what I did in the morning.  As I

22  described, by probably 8:00 at night is when I met people at

23  the Greenlake Bar & Grill.

24  **Q.**  When you say 8:00 at night, you wanted to meet up with

25  everyone pretty early so that everyone was accounted for?

1  **A.** My recollection is that Bill particularly wanted everybody

2  to be accounted for to make sure that people weren't using

3  their phones and everybody was there and in one place well in

4  advance.

5  **Q.** I think probably also you wanted to eat something, right?

6  **A.** Some of us ate a little, yes.

7  **Q.** And kind of communicated with each other, right?

8  **A.** I think the focus was more just to make sure we were

9  prepared.

10  **Q.** Now, when you were at the Greenlake Bar & Grill -- first

11  off, you drove there yourself, right?

12  **A.** Yes.

13  **Q.** I think you said earlier you didn't drive up from Olympia

14  with Lacey Phillabaum?

15  **A.** No.  I lived in Seattle and just I drove there.

16  **Q.** What type of car did you have at that time?

17  **A.** I had an Isuzu Rodeo.

18  **Q.** I'm sorry?

19  **A.** I had an Isuzu Rodeo.

20  **Q.** That's an SUV?

21  **A.** Yes.

22  **Q.** So carbon emissions wasn't your thing either?

23  **A.** I actually had that car as part of helping with the hunt

24  sabotage in Colorado.

25  **Q.** You know that Stan Meyerhoff has pled guilty to burning a

1  series of SUV's at Romania Chevrolet in Eugene?

2  **A.**  Yes.

3  **Q.**  So you didn't see any particular irony that you were

4  driving your SUV to something like this?

5  **A.**  I definitely questioned and saw irony occasionally that I

6  had an SUV.

7  **Q.**  So did you get to the restaurant first and everyone else

8  came in, or were they there when you got there?

9  **A.**  I don't recall exactly.

10  **Q.**  Had you had a prearranged meeting time?

11  **A.**  Yes, I believe so.

12  **Q.**  That was 8:00, you say?

13  **A.**  Approximately.

14  **Q.**  Now, my guess is that you did not want to stay there until

15  after closing, right?

16  **A.**  Correct.

17  **Q.**  You didn't want to be conspicuous and be the last people

18  in the restaurant, right?

19  **A.**  That would be reasonable.

20  **Q.**  Did you -- when you were sitting in the restaurant, what

21  type of table did you sit at?

22  **A.**  We had a big long table that we were at together.

23  **Q.**  When you say big long table, was it as long as the counsel

24  table here?

25  **A.**  No, I don't believe it was that big.  It might have been.

1 There was room for five of us to be there comfortably.  I

2 don't think it was quite that big.

3 **Q.** Were you sitting across from people?

4 **A.** My recollection is that I was sitting at the end and that

5 there were two people on either side.

6 **Q.** So you could see the faces of the four people there?

7 **A.** Yes.

8 **Q.** Where was Capitol Hill Girl sitting?

9 **A.** I don't recall her -- since I couldn't recall her

10 explicitly being associated with it, I didn't recall where

11 anybody was there, other than myself.

12 **Q.** Who was sitting immediately to your left?

13 **A.** I don't recall where anybody was sitting besides myself.

14 **Q.** You spent how long at the Greenlake Bar & Grill?

15 **A.** Probably two hours.

16 **Q.** Did you talk to them?

17 **A.** Two, three hours.  Yes.

18 **Q.** Was it a particularly noisy place?

19 **A.** I would say it was an average restaurant level of noise.

20 **Q.** So you could hear what other people were saying?

21 **A.** Yes.

22 **Q.** You didn't have any problems with that?  Was it a

23 particularly dark restaurant?

24 **A.** I would say average lighting for a restaurant.  Maybe a

25 little darker than a typical restaurant.

1 **Q.** But you were sitting close enough that you could see the
2 faces of the people you were sitting next to, right?
3 **A.** Yes.
4 **Q.** You don't remember Lacey Phillabaum sitting there?
5 **A.** No, I am afraid I don't.
6 **Q.** Now, what time do you think you left the restaurant?
7 Maybe 10:00 or so, is that what you are saying?
8 **A.** Maybe 10:00 or 11:00. I don't remember exactly.
9 **Q.** I think you testified about a rental car before?
10 **A.** Yes.
11 **Q.** Do you know where the car was parked?
12 **A.** We walked from the restaurant to the car. It was in the
13 Greenlake area. I don't remember exactly which block.
14 **Q.** And you don't remember anything about this car, do you?
15 **A.** I remember it being a typical nondescript four-door sedan
16 type rental car.
17 **Q.** Well, didn't you at one time describe it as possibly a
18 van?
19 **A.** I don't believe so, not for this action.
20 **Q.** Take a look at A-29.
21 **A.** A-29?
22 **Q.** Yes. Identify that for the record.
23 **A.** These are the notes of Agent Torres from December 16th.
24 **Q.** Take a look at the page that's marked 15310.
25 **A.** All right.

1  **Q.** Take a look at the third paragraph down.

2  Does that refresh your recollection as to what you told

3  Agent Torres on December 16th?

4  **A.** Yes.

5  **Q.** Is it not correct that you said car -- well, you didn't

6  say slash, but car or van?

7  **A.** My recollection is I was saying that it was a rental car,

8  that somebody was tasked with getting a rental car or a car.

9  I don't know why Agent Torres put car/van.

10 **Q.** You don't think you said van at all during that --

11 **A.** I don't believe so.

12 **Q.** So that was a mistake on his part?

13 **A.** I don't know if I did say that. I don't recall ever

14 thinking there was a van there.

15 **Q.** Now, when you got into this car or van, did it smell like

16 gas?

17 **A.** Not that I recall, no.

18 **Q.** Now, this idea of a rental car, you didn't need to have a

19 rental car to go to an arson, right?

20 **A.** No, but generally you didn't want a car associated with

21 anybody there.

22 **Q.** Well, isn't it true that when you went down to the

23 Susanville arson, you drove with Mr. Dibee in his four-wheel

24 drive vehicle?

25 **A.** Right, but we didn't actually take his car to the site.

1  **Q.**  Well, Stan Meyerhoff was there with his car, right?

2  **A.**  Yes.

3  **Q.**  And Kevin Tubbs was there with his car, right?

4  **A.**  Yes.

5  **Q.**  So did you have a rental car as well?

6  **A.**  No, we did not.

7  **Q.**  For the Cavel West arson, I believe you told us earlier

8  that it was a white van?

9  **A.**  It was Kevin Tubbs' van registered in a different name.

10  **Q.**  But it was a van that he drove, right?

11  **A.**  That van was used only for actions, as I understood it.

12  **Q.**  Now, when you went to Susanville, you actually drove to

13  get gas, right?

14  **A.**  Yes.

15  **Q.**  Whose car was that that you took?

16  **A.**  I don't remember exactly whose car.

17  **Q.**  Well, you've testified that you are sure that it was a

18  rental car, right?

19  **A.**  For the University of Washington?

20  **Q.**  Yes.

21  **A.**  My recollection was that people coming up from Olympia

22  were supposed to bring a rental car.

23  **Q.**  Well, actually, didn't you actually once say that Avalon

24  may have arranged the rental car?

25  **A.**  Yes.

1 **Q.** Not Briana Waters, Avalon?

2 **A.** I had no knowledge of Briana renting the car. That wasn't

3 something that I was a part of.

4 **Q.** Now, on December 16th, weren't you asked how you got to

5 the scene?

6 **A.** By whom?

7 **Q.** By Agent Halla.

8 **A.** Yes, I believe they asked me -- how I got to the

9 University of Washington horticulture center or how I got to

10 the bar and grill?

11 **Q.** No, to the University of Washington horticulture center.

12 **A.** Yes, I believe I was.

13 **Q.** Isn't it true that you said you don't remember who had a

14 car?

15 **A.** I don't know who was responsible for acquiring the car.

16 Everybody else came up in the car together.

17 **Q.** Did you also at another time say -- they asked you if it

18 was a rental, and you said you didn't remember?

19 **A.** That could be. I don't recall either way.

20 **Q.** Take a look at A-28. Can you identify that as Agent

21 Halla's notes?

22 **A.** Yes.

23 **Q.** Take a look at the page marked as 14005.

24 **A.** Yes.

25 **Q.** The middle of the page.

1  **A.**  Yes, I see what you are referring to.

2  **Q.**  Does it say "don't remember who had car"?

3  **A.**  Yes.

4  **Q.**  "Rental" and it's written down --

5  **A.**  It's written down "don't remember."

6  **Q.**  So that's another fact that you remembered down the road,

7  right?

8  **A.**  I am not exactly sure when I remembered that.  To me, in

9  my head, it was a car that was being brought up from Olympia,

10  and my recollection was it being a rental car.

11  **Q.**  Well, now it is your recollection, but in December 2005,

12  you didn't remember?

13  **A.**  Apparently I was uncertain, yes.

14  **Q.**  So at some point, did you come to learn that Lacey

15  Phillabaum talked about a rental car?

16  **A.**  No.  I know nothing about Lacey's testimony.

17  **Q.**  So it's your testimony that you got into this rental car

18  or this car, whatever, van, and you drove to the University of

19  Washington?

20  **A.**  Yes.

21  **Q.**  How far a drive is it from the Greenlake Bar & Grill to

22  the University of Washington?

23  **A.**  Maybe 15 minutes 20 minutes.

24  **Q.**  Who was driving?

25  **A.**  I am not positive who was driving.

1  **Q.**  Where were you sitting in the car?

2  **A.**  I was sitting in the back.

3  **Q.**  There were two other people with you?

4  **A.**  I believe so, yes.

5  **Q.**  Who was sitting immediately to your left?

6  **A.**  I don't recall.

7  **Q.**  There was conversation in the car on the way to the arson?

8  **A.**  I don't recall.

9  **Q.**  Did Crazy Dan say anything to you?

10  **A.**  As I've said, I didn't recall him being there necessarily,

11  so no.

12  **Q.**  But he could have been there?

13  **A.**  No, I am positive that he was not there.

14  **Q.**  So the person -- you are saying right now you are positive

15  there were how many men and how many women?

16  **A.**  That there were -- I should restate it.  I can't say I am

17  positive Dan was not there.  I can say I am not positive he

18  was there.

19  **Q.**  You are not positive -- he could have been there?

20  **A.**  Except that I know today he was not.

21  **Q.**  Well, I am talking about your memory.

22  **A.**  Right.  In my memory, it is unclear to me who was there

23  besides Avalon, Briana and myself.

24  **Q.**  So when you got to the Center for Urban Horticulture, is

25  it your memory that there was no gasoline or anything like

1   that in the back of the car by the time you got there?

2   **A.**  The back of the car had bags.  My recollection is the back

3   of the car having bags full of gasoline.

4   **Q.**  And those hadn't been unloaded earlier?

5   **A.**  Not in my recollection, no.

6   **Q.**  So you remember physically picking up the bags of gasoline

7   and carrying them?

8   **A.**  I remember a conversation about worrying about there being

9   the smell of gasoline and the residue of gasoline in the back

10  of the car.

11  **Q.**  But you hadn't smelled any gasoline?

12  **A.**  Well, earlier while I was inside -- or my understanding is

13  while I was inside -- no, I did not notice any smell of

14  gasoline.

15  **Q.**  There was nothing about a dumpster?

16  **A.**  That's not part of my recollection.

17  **Q.**  So the bags hadn't been -- according to your recollection,

18  the bags had not been dumped or left by the dumpster earlier?

19  **A.**  That is correct.

20  **Q.**  And the devices, where were they?

21  **A.**  My recollection is that they were in a backpack that was

22  carried.

23  **Q.**  Who carried the backpack?

24  **A.**  I believe one of the men, but I don't recall which.

25  **Q.**  The people that you were trusting to watch your back,

1  right?

2  **A.**  Yes.

3  **Q.**  And then you are saying only Briana Waters stayed back as

4  a lookout, right?

5  **A.**  Yes.

6  **Q.**  Didn't Bill Rodgers want the lookout to get to the scene

7  much earlier?

8  **A.**  That's not familiar to me at all, no.

9  **Q.**  Then you went up to the building with Rodgers and these

10  other people, right?

11  **A.**  Correct.

12  **Q.**  The other woman that you are saying was there -- I am

13  sorry.

14      Under your calculations today, there was one woman that

15  was remaining, right, that you haven't identified?

16  **A.**  Correct.

17  **Q.**  Did she go up to the building, too?

18  **A.**  I don't recall who came up with me to hold the glass

19  cutting materials while I was cutting the window.

20  **Q.**  Well, was there a woman standing next to you when Bill

21  Rodgers went into the Center for Urban Horticulture, into Toby

22  Bradshaw's office?

23  **A.**  My recollection is that yes, there was a woman with me in

24  the bushes waiting.

25  **Q.**  Well, I am talking about being right up at the window.

1  **A.**  After I had cut the glass, I went back into the bushes.

2  **Q.**  With this other woman?

3  **A.**  Yes.

4  **Q.**  How close were you to her?

5  **A.**  Or I should say, I don't know if she came up with me.  I

6  remember being in the bushes subsequently with a woman.  She

7  would have been right next to me.

8  **Q.**  You could see her face, right?

9  **A.**  No, I can't.

10  **Q.**  No, but I mean at the time you could have, right?

11  **A.**  I could have at the time.  Granted it was dark, but I

12  could have.

13  **Q.**  So did this other woman ever pull any research papers out

14  of the building?

15  **A.**  I remember research papers being taken out of the building

16  and put in a backpack.  I don't remember who had them.

17  **Q.**  Did you ever physically go into the building itself?

18  **A.**  No, I did not.

19  **Q.**  You didn't actually set the devices, right?

20  **A.**  No, I did not.

21  **Q.**  Now, you had experience setting devices, right?

22  **A.**  I had obviously -- not well, but yes, I had experience

23  trying to set them.

24  **Q.**  It was of something of interest to you, right?

25  **A.**  I don't know that I would say interested me.

1  **Q.**  Well, you did it at Susanville, right?

2  **A.**  That's correct.

3  **Q.**  You did it at the gun club, right?

4  **A.**  Yes.

5  **Q.**  Did you ever plan any other arsons where you talked about

6  setting the devices?

7  **A.**  No.

8  **Q.**  Well, you talked a little bit about Jake Ferguson, right?

9  **A.**  Yes.

10  **Q.**  Now, you know Jake Ferguson, right?

11  **A.**  Not very well.

12  **Q.**  You committed an arson with him?

13  **A.**  Yes.

14  **Q.**  Did there ever come to be a time when you were in Eugene

15  during the seven-week revolt?

16  **A.**  I was never in Eugene for the revolt.

17  **Q.**  I'm sorry?

18  **A.**  I was never in Eugene for that.

19  **Q.**  The seven revolt was what?

20  **A.**  I heard about it recently, and I think I heard about it at

21  the time it happened, but I was actually never at it.

22  **Q.**  It was a bunch of black clad kids who were kind of causing

23  havoc in the streets, right --

24  **A.**  That's my understanding.

25  **Q.**  -- for a period of time?

1       But isn't it correct that you were with Bill Rodgers and
2   Jake Ferguson in Eugene during the seven-week revolt?
3   **A.**  No.
4   **Q.**  And did you not plan to commit another arson in Eugene
5   with Jake Ferguson?
6   **A.**  No, I did not.
7   **Q.**  You didn't plan to do a double whammy back in 2000 --
8   **A.**  No.
9   **Q.**  -- of a veal restaurant and a building that had a timber
10  office?
11  **A.**  No.
12  **Q.**  Or a restaurant that served veal?
13  **A.**  No, I did not.
14  **Q.**  This is all -- you have no knowledge of that?
15  **A.**  No, none.
16  **Q.**  Now, when you left the Center for Urban Horticulture, I
17  think you testified that Briana Waters was driving or who was
18  driving?
19  **A.**  I believe Briana was driving.
20  **Q.**  Justin Solondz wasn't the one driving?
21  **A.**  Since I hadn't identified him as being there, I wouldn't
22  identify him as the driver.
23  **Q.**  Well, on the way away from the arson, was there -- it's
24  true there was no events of significance that took place,
25  right?

1    **A.**  Correct.

2    **Q.**  You don't remember any accidents taking place?

3    **A.**  No.

4    **Q.**  You don't remember any collisions taking place?

5    **A.**  No.

6    **Q.**  You don't remember any havoc in the car as you were

7    driving away?

8    **A.**  I remember a discussion of making sure to wipe down the

9    car.

10   **Q.**  Discussion with who?

11   **A.**  The people in the car.

12   **Q.**  And particularly which -- the male, the unidentified male

13   or the unidentified female or who?

14   **A.**  I am not sure who exactly it was with.

15   **Q.**  You don't remember listening to the firefighters on the

16   scanner at all?

17   **A.**  I remember listening to the scanner in the car and

18   listening on my car as well as I drove away.

19   **Q.**  But you don't remember listening to the firefighters at

20   all, do you?  I think earlier you said you listened -- you had

21   a scanner in your own personal car?

22   **A.**  That's right.

23   **Q.**  Did you listen -- was there any mention on the scanners of

24   how long it was going to take to put out the fire?

25   **A.**  I don't remember ever hearing any information about the

1  fire in the first place on the scanners.

2  **Q.** Do you remember any of the reactions of the people in the

3  car?

4  **A.** No.

5  **Q.** So no one was high-fiving or anything like that?

6  **A.** Not that I recall. I don't recall.

7  **Q.** When you met at Sisters the following week, were there

8  congratulations all around for what you had done?

9  **A.** I don't recall what the conversations were at Sisters

10 honestly. I don't recall explicit conversations about UW.

11 **Q.** Now, these underground activities that you were involved

12 in, it was important to trust the people that you were with,

13 right?

14 **A.** Yes.

15 **Q.** You would not do it -- do something like that with someone

16 you had never met before; is that correct?

17 **A.** You might if somebody you trusted vouched for them.

18 **Q.** You personally?

19 **A.** Well, I did do something like that with people I had never

20 met before at Cavel West.

21 **Q.** Cavel West, but not on the night of May 20, 2001?

22 **A.** That is correct.

23 **Q.** There were no discussions about hey, who are you?

24 **A.** That's correct.

25 **Q.** So after the arson, you went to Jonathan's house?

1 **A.** Yes.

2 **Q.** You spent the night there?

3 **A.** Yes.

4 **Q.** Now, it's true, in your mind, the idea wasn't really to

5 burn down the whole Center for Urban Horticulture, right?

6 **A.** That's right.

7 **Q.** You just thought that you were going to burn

8 Mr. Bradshaw's office, right?

9 **A.** That's right.

10 **Q.** It surprised you that the whole building went up, right?

11 **A.** Yes.

12 **Q.** But despite your surprise in the last seven years, up

13 until December of 2005, you never did anything about that, did

14 you?

15 **A.** No, I tried to put this whole part of my life behind me.

16 **Q.** Now, let's just go back a little bit to the Makah case.

17 **A.** All right.

18 **Q.** Earlier you had said that you were involved with Joe Dibee

19 who was active in that campaign?

20 **A.** That's correct.

21 **Q.** And a lot of people would come up for weekends to help out

22 to Neah Bay?

23 **A.** That's my understanding.

24 **Q.** Neah Bay is at the very Northwest tip of the Olympic

25 Peninsula?

1   **A.**   Yes.

2   **Q.**   That's where the tribe was?

3   **A.**   Yes.

4   **Q.**   That's where SEDNA had its boats that they would try to

5   disrupt --

6   **A.**   I think they were in Sekiu.

7   **Q.**   In Sekiu.   Some of the people -- you went out there how

8   many times?

9   **A.**   I believe just once.

10  **Q.**   When you were out there, you were actually on the boat,

11  weren't you?

12  **A.**   Yes.

13  **Q.**   Bulletproof I think it was called, or what was the other

14  one?

15  **A.**   One was a Zodiac and one was a metal boat.  I don't recall

16  their names.

17  **Q.**   It's correct that you chatted with other people when you

18  were out there, right?

19  **A.**   Yes.

20  **Q.**   You would talk to them about your experiences in the

21  animal rights movement?

22  **A.**   Probably some.  I don't recall any specific conversations.

23  **Q.**   Well, you told people about some of the other direct

24  actions that you were involved in, right?

25  **A.**   Not that I recall, no.

1  **Q.**  Well, do you recall being on the Bulletproof one day in
2  May of 1999, with Josh Harper?
3  **A.**  I remember Josh being out there.  I don't remember a
4  specific time with him on a boat.
5  **Q.**  Josh Harper is an animal rights activist that you know?
6  **A.**  Yes.
7  **Q.**  You were actually in the cabin with him at some point?
8  **A.**  I don't recall specifically.
9  **Q.**  Well, isn't it correct that you were talking with a
10  volunteer on that boat, and you volunteered that you were
11  involved in a wild horse release action in Wyoming in 1998?
12  **A.**  No, that's not true.
13  **Q.**  That's not true.  And didn't you suggest that you knew
14  about the Vail case as well?
15  **A.**  No, that's not true at all.
16  **Q.**  Josh Harper didn't overhear that conversation?
17  **A.**  No, not from me.
18  **Q.**  Well, is this a conversation you may have had but you've
19  forgotten?
20  **A.**  No, I wouldn't have had that conversation.
21  **Q.**  I am sorry?
22  **A.**  No, I would not have had that conversation.
23  **Q.**  Well, later on that same day, Kenny Clark was out there,
24  right?
25  **A.**  Yes.

1  **Q.** And Kenny was the mechanic on the boat, right?

2  **A.** That's correct.

3  **Q.** You were friends with him?

4  **A.** Yes.

5  **Q.** But he was involved in different actions, right?

6  **A.** Yes.

7  **Q.** And you got into some sort of argument with him, didn't

8  you?

9  **A.** I didn't; they did.

10  **Q.** They did?

11  **A.** There was an argument between some of the people in the

12  campaign and Kenny.  I wasn't a part of it.

13  **Q.** But you were present?

14  **A.** I am trying to remember if I was actually out there when

15  the argument broke out.

16  **Q.** Well, Josh Harper was there, right?

17  **A.** Josh Harper, I believe was there at the time I was out

18  there.

19  **Q.** Do you recall saying to Kenny Clark:  You better watch it

20  or I'll roll on you?

21  **A.** No, absolutely not.

22  **Q.** Absolutely not.  "Rolling" means turning state's evidence,

23  right?

24  **A.** "Rolling" would mean giving evidence, yes.

25  **Q.** Giving evidence against someone?

1  **A.**  Yes.

2  **Q.**  Didn't Ken Clark say:  Well, you don't have anything on me

3  to roll over on me?

4  **A.**  No, that conversation never happened.

5  **Q.**  Didn't you say:  I'll roll on you anyway?

6  **A.**  No, that conversation never happened.

7  **Q.**  You are sure that conversation never happened?

8  **A.**  I am positive.

9  **Q.**  And Josh Harper would not have heard you say those words?

10  **A.**  No, he would not have.

11  **Q.**  Is it not correct that you threatened to turn someone in

12  even though they were innocent?

13  **A.**  That's absolutely not correct.

14  **Q.**  And you have a clear memory of being on that boat, right?

15  **A.**  I do remember being on that boat.  I am absolutely

16  positive I never had that conversation.

17  **Q.**  Just like you are absolutely positive that Lacey

18  Phillabaum wasn't at the Center for Urban Horticulture, right?

19  **A.**  I have never said I am positive she was not there.

20        MR. FOX:  I have no further questions.

21        MR. BARTLETT:  Nothing, Your Honor.

22        THE COURT:  No redirect?

23        MR. BARTLETT:  Nothing.

24        THE COURT:  All right.  You may step down.

25  The next witness?  How long is the next witness?  Is this

1  a good time to take the break?

2       MR. BARTLETT:  It would be a good time just so we can

3  get the desk cleared out and get the rest of the exhibits out.

4       THE COURT:  Let's take the afternoon recess at this

5  time.

6       MR. FOX:  Can we put one thing on the record after

7  the jury goes?

8       THE COURT:  Let me get through with this.

9     Take your break.  Don't talk about the case.  Leave your

10  books on the chair.

11     (Jury not present.)

12       THE COURT:  All right.  You may be seated.

13       MR. FOX:  Two brief things I wanted to put on the

14  record, something that we found disturbing that I told

15  Mr. Bartlett about.

16     After this morning, after the break, before lunch, there

17  was a person who -- I don't know who she was -- who was

18  distributing fliers outside the courtroom.  I just want to

19  make a record; I will pass up a copy of the flier.  It's not

20  someone my client knows.  It's not someone -- I actually think

21  she knows Jennifer Kolar.  Who she is, I guess is important in

22  the fact that I want the Court to know that it's not someone

23  that we asked to pass out any fliers.  I have a copy of the

24  flier.  I would ask the Court -- I don't know how to do it

25  with the jury, to make sure that they don't get copies of the

1 flier. It's not specific to the case.

2     May I pass it forward to the Court?

3        THE COURT: Yes.

4        MR. FOX: We asked her -- both Mr. Bloom and I told

5 her to please put those away, we don't want this happening. I

6 feel like I need to bring it to the Court's attention.

7        THE COURT: I appreciate that. I am not sure what to

8 make of it.

9        MR. FOX: I am not sure either, but it's just

10 something I found very --

11        THE COURT: These are folks that you are saying are

12 out front protesting?

13        MR. FOX: No, one woman outside this courtroom.

14        THE COURT: Outside this courtroom in the hallway?

15        MR. BARTLETT: I misunderstood, Your Honor. I

16 thought she was outside on the street. This is in the

17 hallway?

18        THE COURT: Do you know who that person is?

19        MR. FOX: I don't know, actually.

20        THE COURT: Can you identify that person?

21        MR. FOX: Tall, thin, long hair. I think she was

22 someone who thought she was doing something okay and --

23        THE COURT: I don't know what the person thought, but

24 we don't need that activity. But if I know who you are

25 talking about, I can have somebody look into this.

1      MR. FOX:  I am more concerned about the effect on the

2   jury, Your Honor.  Once we told her to put those away, she put

3   them away.

4      THE COURT:  So you are no longer concerned about it.

5   And we'll have security look to see if anyone is out there

6   doing something --

7      MR. FOX:  If there's fliers floating around --

8      THE COURT:  Well, if you see anything else, report

9   it.  I don't know what to say.  I thought you were indicating

10  there was some way to handle this differently --

11     MR. FOX:  Well, I don't know if the Court wants to

12  make a special admonition to the jury, not about this

13  particularly but --

14     THE COURT:  I think you've heard me tell them, when

15  they are outside and when they come back in go directly into

16  the jury room.  You heard me say all these things for the

17  obvious reasons.  But if something is going on that you think

18  is going on in their presence, I want to know because I don't

19  think anybody should be doing anything to influence them one

20  way or the other about what decision they should make.

21     MR. FOX:  That's fine.  I don't think it was being

22  done in their presence, but I was just concerned that --

23     THE COURT:  All right.

24     MR. FOX:  The other thing, Your Honor, is previously,

25  like David Carr, we had made a motion ex parte to have Josh

1  Harper transported from Sheridan, from the prison in Sheridan,

2  to testify as an impeachment witness of Jennifer Kolar,

3  particularly on the issue of her conversation where she

4  threatened to roll on someone when they hadn't done anything.

5  The Court had denied our motion, and we are renewing that

6  motion and we ask that he be transported so that he can give

7  rebuttal testimony.

8       THE COURT:  So you are renewing your request on what

9  I have ruled on, in terms of both Carr and --

10      MR. FOX:  Right, based upon Ms. Kolar's testimony.

11      THE COURT:  I understand.  All right.

12      MR. BARTLETT:  I just put on the record, Your Honor,

13  it appears that they are having a lot of conversations with

14  Kenny Clark, and I assume if they want to impeach Ms. Kolar's

15  testimony, they will bring in Mr. Clark.

16      MR. FOX:  Well, Mr. Clark, who's a friend of

17  Ms. Kolar's, has convenient memory lapses, but Josh Harper was

18  present during that time and he remembers.

19      THE COURT:  All right.  Anything else?

20      MR. BARTLETT:  No.

21      MR. BLOOM:  Actually, several things.  May I suggest

22  -- we can wait until 4:00.

23      THE COURT:  Do what?

24      MR. BLOOM:  There are several things I want to talk

25  about and we can wait until 4:00.

1          THE COURT:   Then we'll take it up at that time.
2  Let's take the recess.
3          THE CLERK:   All rise.   Court is in recess.
4     (Afternoon recess.)
5          THE COURT:   All right.   You may be seated.
6     I believe we are ready for the next witness.
7          MR. BARTLETT:   Yes, we are, Your Honor.
8          THE COURT:   Defense ready, Mr. Fox, Mr. Bloom?
9          MR. FOX:   Yes, Your Honor.
10    (Jury present.)
11         THE COURT:   All right, you may be seated.
12    Next witness.
13         MR. BARTLETT:   Yes.   At this time, the United States
14 calls Valerie Betty to the stand.
15         THE COURT:   Please come forward and raise your right
16 hand to be sworn.
17          VALERIE BETTY, called as a witness, duly sworn
18         THE COURT:   Just come around and take the witness
19 chair.
20                     DIRECT EXAMINATION
21 BY MR. BARTLETT:
22 Q.  Could you please tell the members of the jury your fist
23 and last name, and spell your last name for the Court
24 Reporter?
25 A.  Valerie Betty, B-E-T-T-Y.

1 **Q.** Where do you work, Ms. Betty?

2 **A.** I work for the Federal Bureau of Investigation.

3 **Q.** What is your job with the Federal Bureau of Investigation?

4 **A.** I am a fingerprint specialist.

5 **Q.** Can you just generally walk us through where you were born

6 and raised, where did you go to school and how far did you go

7 in school?

8 **A.** Okay. I was born in Baltimore, Maryland and raised in

9 Baltimore also. I went to school there at the Baltimore

10 Polytechnic Institute, that is a high school, and I completed

11 the 12th grade and received a diploma.

12 **Q.** After graduating from high school, where did you get a

13 job?

14 **A.** With the FBI.

15 **Q.** What was your first job with the FBI?

16 **A.** My first job was as a fingerprint examiner.

17 **Q.** You testified you are a fingerprint specialist right now.

18 Can you kind of explain the difference between the two and

19 perhaps give us a little bit on your training.

20 **A.** Okay. As a fingerprint examiner, I received training in

21 the different types of fingerprint patterns, also to identify

22 them and classify them and compare them to other inked

23 fingerprints. All of this training I received while I was

24 there at the FBI.

25 **Q.** How long were you a fingerprint examiner with the FBI?

1   **A.**  Eight years.

2   **Q.**  After those eight years, I assume you got a bit of a

3   promotion?

4   **A.**  Yes.

5   **Q.**  What was your promotion?

6   **A.**  As a trainee in the science of fingerprints, as a

7   fingerprint specialist.

8   **Q.**  What did that involve?  What was your training?

9   **A.**  The training as a fingerprint specialist included the

10  different techniques that are used to develop latent prints on

11  an item or surface, also the different methods that are used

12  to preserve fingerprints once they develop, and how to compare

13  latent prints to ink prints.

14  **Q.**  Did you eventually have to pass any tests given by the FBI

15  or by any international certifications?

16  **A.**  Yes.

17  **Q.**  Why don't you explain that.

18  **A.**  Once I successfully completed training, I received

19  certification by the FBI as a fingerprint specialist.

20  **Q.**  What year was that?

21  **A.**  That was in 1989.

22  **Q.**  Since becoming a fingerprint specialist with the FBI in

23  1989, can you estimate how many different examinations you've

24  done and how many times you've testified as an expert?

25  **A.**  I have testified 34 times as a fingerprint expert, and I

1    have conducted well over 800,000 comparisons during that time

2    as a fingerprint specialist.

3    **Q.** During the time that you've been at the FBI -- focussing

4    specifically since the time you've been a fingerprint

5    specialist -- are you required to obtain certification,

6    basically take a test each year?

7    **A.** I did gain certification, but every year we receive

8    proficiency tests.

9    **Q.** What does that proficiency testing involve?

10    **A.** Proficiency testing involves -- I am given about four or

11    five known exemplars, and known exemplars are like ten

12    10-print fingerprint cards. In addition to the four or five

13    exemplars, I am also given anywhere from 15 to 18 latent

14    prints to compare the latent prints with the known exemplars.

15    **Q.** That happens every year?

16    **A.** Yes.

17    **Q.** Have you ever failed any of those exams?

18    **A.** Yes.

19    **Q.** When did that happen?

20    **A.** Once in 1995 and once in 2002.

21    **Q.** What happens when you fail that examination? First

22    explain, what mistake did you make -- or mistakes?

23    **A.** In the science of fingerprints, there are two types of

24    errors that can occur. The first type of error is the more

25    serious one, and that is an erroneous identification. With an

erroneous identification, a fingerprint has been attributed to the wrong person.

The second type of error that can occur in fingerprints is a missed identification. With a missed identification, a fingerprint has not been attributed to a person when, in fact, it should have been.

In both instances, the type of error that I have committed was a missed identification.

Q. What happened when you took the test -- did you miss a number of fingerprint examinations, one, two, five?

A. On each instance, in 1995 and again in 2002, there was one identification that I missed, and in order to pass the proficiency test, you must get 100 percent.

Q. What happens as a result of your missing that?

A. I was immediately removed from casework and put on probation for three months. During this probation period, I was given retraining as to why I committed this type of error. Also, any casework that I had worked six months prior was also re-examined, given a technical review, to determine if this type of error had appeared in any of my previous work.

Q. Can you explain to the members of the jury, as a fingerprint examiner, what do you do each day? What do you look at and how do you work?

A. Each day I look at the casework that I have assigned to me, and according to the priority in the cases that I have, I

1  begin examining the objects or the evidence inside of a case

2  to determine if latent prints can be developed on that

3  particular item or surface that is part of the case.

4  **Q.** What's a latent print?

5  **A.** A latent print is a print that is left on an item or

6  surface after the finger or the palm side of the finger comes

7  in contact with that item or surface.  Usually there's

8  perspiration or oils or other matter that are present on the

9  palm side of the fingers when they come in contact with that

10 surface.

11      Latent prints are usually hidden and not easily seen and

12 requires other means, such as alternate light sources, such as

13 a laser, which we use.  Also, chemicals or powders to make the

14 latent or hidden print become visible.

15 **Q.** If I were to pick up this piece of paper, are you

16 guaranteed that you'd be able to get a fingerprint from me on

17 this piece of paper?

18 **A.** The chances are good that I will be able to develop a

19 latent print on that paper.

20 **Q.** Not 100 percent?

21 **A.** That's correct.

22 **Q.** Can I direct your attention -- take a look at Exhibit 614.

23 I believe it's a plastic bag in front of you.  Do you see

24 that?

25      Do you recognize those items?

1  **A.**  Yes.

2  **Q.**  How do you recognize that?

3  **A.**  I recognize these items because my initials appear on it.

4  **Q.**  In fact, before you testified today, you and I have had a

5  chance, outside the presence of the jury, to go through all of

6  them?

7  **A.**  Yes.

8  **Q.**  Tell the members of the jury, when a packet like this

9  comes in to you at the lab, what do you do?

10  **A.**  Well, all of these items are paper items, so the first

11  thing I do is give a visual exam over all of these items.  I

12  physically look at the paper to see if I am able to determine

13  if there are any prints present without any other means, if

14  there are any other prints present on the items.  That is

15  called a visual exam.

16      After the visual exam, there is a laser exam, and this

17  exam does not interfere with any other exams that may come

18  afterwards.  With the visual and the laser exam, there were no

19  prints of value for comparison purposes present on the items.

20  **Q.**  When you say there were no prints of value, what does that

21  mean?  What's the difference between a fingerprint and a

22  fingerprint of value?

23  **A.**  "Of value" is the term I use to mean that with a latent

24  print, a sufficient amount of characteristics must be present

25  in the latent print in order for me to be able to conclusively

1  say that it belongs to an individual or it does not belong to

2  an individual.

3      Latent prints of value determine whether or not it can be

4  compared.  A latent print can be developed but not be of value

5  for comparison purposes.

6  **Q.**  Can you take a look at the very first item?  I believe

7  it's Q93, which is a manila folder?

8  **A.**  Yes.

9  **Q.**  Do you recognize that?

10  **A.**  Yes.

11  **Q.**  Can you explain to the members of the jury, what did you

12  do with that piece of paper?  You said you visually looked at

13  it and then you did a laser examination.

14      What's the next thing that you did?

15  **A.**  With paper items, the next step that I use is to use a

16  chemical called ninhydrin that is sprayed onto the item.  The

17  chemical is sprayed and then the item is left to dry, or

18  sometimes I can use a steam iron or a humidity cabinet once

19  the object or the paper has dried.  Any latent prints that

20  develop on this paper item will appear purplish in color.

21  **Q.**  Did you do that with Exhibit Q93, the manila folder?

22  **A.**  Yes.

23  **Q.**  Were you able to develop any fingerprints of value?

24  **A.**  Yes.

25  **Q.**  Why don't you take that out and explain to the members of

1 the jury what, if anything, you saw and what you compared it
2 to.
3 **A.** After spraying this item with ninhydrin, I noticed the
4 purplish color which let me know that latent prints had
5 developed on this item. I examined the latent prints to
6 determine if they were of value for comparison purposes, and I
7 determined that one of the latent prints developed on this
8 item was of value for comparison purposes.
9 Any time a latent print has been developed, before the
10 next process, latent prints are photographed for record
11 purposes.
12 **Q.** Did you do that?
13 **A.** Yes.
14 **Q.** So you have a latent print that you think is of value, you
15 take a photograph of it. What do you compare that latent
16 print to?
17 **A.** This latent print was compared with two individuals named
18 in the communication that I received.
19 **Q.** Could you take a look at Government's Exhibit 931-A and
20 931-B and 931-C?
21 Do you recognize those items?
22 **A.** Yes.
23 **Q.** What are those?
24 **A.** 931-A --
25 **Q.** Without going into the details, would it be fair to say

those are all inked fingerprint cards?

**A.** Yes.

MR. BARTLETT: Your Honor, at this time I would like to make the jury aware of a stipulation that the parties have entered into.

THE COURT: All right.

MR. BARTLETT: I would like to read that to the jury.

THE COURT: Go ahead.

MR. BARTLETT: Stipulation regarding fingerprint cards. The United States of America, by and through Jeffrey C. Sullivan, United States Attorney for the Western District of Washington, and Mark Bartlett and Andrew Friedman, Assistant United States Attorneys for said District, and Defendant Briana Waters and her attorneys Neil Fox and Robert Bloom, agree and stipulate that the following exhibits contain inked fingerprint of the identified individuals and are admissible at trial without calling a witness, without laying a foundation or without proof of authenticity, except that the parties reserve evidentiary objections based on relevancy and prejudice under Federal Rule of Evidence 401 and 403.

No. 1, Exhibit 931-A, inked fingerprints of Briana Waters.

No. 2, Exhibit 931-B, inked fingerprints of Justin Solondz.

No. 3, Exhibit 931-C, inked fingerprints of Jennifer Kolar.

1    THE COURT:  All right.

2    MR. BLOOM:  So stipulated.  No dispute.

3    THE COURT:  All right.

4    MR. BARTLETT:  Offered, Your Honor.

5    THE COURT:  Yes.  It's agreed.

6    MR. BLOOM:  No objection.

7    THE COURT:  Admitted.

8    (Exhibit Nos. 931-A, 931-B, 931-C admitted.)

9    BY MR. BARTLETT:

10   Q.  You did a comparison with the inked fingerprint cards with

11   that of the latent?

12   A.  Yes.

13   Q.  Were you able to make an identification?

14   A.  Yes.

15   Q.  Prior to coming to court today, did I ask you to prepare a

16   chart that perhaps might explain to the members of the jury

17   exactly how you went about this identification process?

18   A.  Yes.

19   Q.  Does that chart appear at 931-E?

20   A.  Yes.

21   MR. BARTLETT:  Your Honor, I would like to offer

22   931-E for illustrative purposes.

23   MR. BLOOM:  I am sure I have no objection.  Show it

24   to me.

25   MR. BARTLETT:  Your Honor, if I could approach the

witness, Mr. Bloom would like to take a look at it.

THE COURT: Yes.

MR. BLOOM: No objection.

THE COURT: Admitted.

(Exhibit No. 931-E admitted.)

BY MR. BARTLETT:

**Q.** Ms. Betty, if you could stand up, perhaps, or if you could stand up there and look over at it and explain to the members of the jury what we are looking at on both sides, first of all.

THE WITNESS: Your Honor, may I approach the jury?

THE COURT: Yes.

**A.** 931-E are enlargements of the identification that was effected on item Q93. The enlargement entitled "known print" is an enlargement of the right little finger on the fingerprint card with the name Briana Waters.

The enlargement entitled "latent print" is an enlargement of the latent print that was developed on item Q93.

The numbers, lines and the wording was placed there by me to help in my illustration.

Beginning with the known print, fingerprints have a certain type of characteristics, and it is these type of characteristics that we examine when we are comparing fingerprints one to the other.

Basically, the three types of characteristics are an

ending ridge, which is a ridge that has a certain path that comes to an abrupt end. A bifurcating ridge, which is a ridge that runs singular and then divides into two, and then a short ridge, a very short ridge.

Calling your attention to the enlargement of the known print, on the upper left-hand side, there is a ridge that comes to an end. This ridge, I believe, is labeled point No. 1.

Counting down from point No. 1 --

Q. When you say counting down, what are you actually counting?

A. Counting ridges.

Counting six ridges down from point No. 1, there is a ridge that comes to an end, and this end I have labeled point No. 2.

Counting down one ridge below point No. 2 and to the right of it is another end of a ridge, which I have labeled point No. 3.

Now, in order for these two prints to have been made by the same individual, the points that I just now illustrated in the enlargement of the known print must also appear in the same relative position and area in the enlargement of the latent print.

In the upper left-hand corner, near the top of the enlargement of the latent print, is an end of a ridge which I

1   have labeled point No. 1.  Six ridges below point No. 1 is a
2   ridge that comes to an abrupt end that I have labeled point
3   No. 2.
4       Then one ridge below point No. 2 and to the left of it is
5   the end of a ridge, which I have labeled point No. 3.
6       I have just illustrated three points on the enlargement of
7   the known print and the enlargement of the latent print, and
8   it is these points that I have illustrated, in addition to
9   some other points that are present but I have not yet
10  illustrated -- it is this method of comparison that I
11  determined that the latent print developed on Q93, and the
12  inked print present in the No. 5 fingerprint block, which is
13  the right little of the fingerprint card bearing the name
14  Briana Waters, were made by one and the same individual.
15  **Q.**  Thank you, Ms. Betty.  You can retake the stand.
16      You talked about -- in fact, carefully walked through --
17  three of the identification points on that.  Were there other
18  identification points?  For example, the other three on the
19  other side that you didn't explain?
20  **A.**  Yes.
21  **Q.**  And even other points beyond that?
22  **A.**  Yes.
23  **Q.**  You talked about taking a photograph that you used to
24  analyze it.  If you could take a look at Government's Exhibit
25  931-F, which I believe is in front of you.

1    **A.**  Is 931-F a photograph?

2    **Q.**  There should be three photographs in there, 931-F, G and

3    H. Did you see those?

4    **A.**  Yes.

5    **Q.**  Taking them one at a time, looking first at 931-F, what is

6    it you are looking at and how is it used?

7    **A.**  Okay.  Exhibit 931-F is a photograph of the latent print

8    that was developed on Q93.

9    **Q.**  That's the actual print that you used?

10   **A.**  Yes.

11   **Q.**  Looking at 931-G, what is that?

12   **A.**  Exhibit 931-G is also -- or a duplicate photograph of the

13   latent print that was developed on Q93.

14   **Q.**  How is that used in the FBI lab?

15   **A.**  931-F is a photograph of the latent print that was

16   developed.  It is one of the photographs that I used to

17   compare the latent print that was developed with the ink

18   prints on the fingerprint card bearing the name Briana Waters.

19   **Q.**  If the jurors wanted to look at that, they could see it's

20   a little -- you have a little more detail in that than when

21   you have it -- when you blow it up, correct?

22   **A.**  Yes.

23   **Q.**  Do you have supervisors and other individuals that

24   cross-check your work?

25   **A.**  Yes.

1  **Q.** Why don't you explain that to the jury.

2  **A.** Whenever an identification is made, an identification is

3  verified by an independent examiner who takes the print that I

4  claimed as an identification, and they conduct their own

5  analysis of that print to determine whether or not they agree

6  with my analysis.

7  **Q.** Did that happen in this case?

8  **A.** Yes.

9  **Q.** Who did it, and how do we know it happened?

10  **A.** Whenever a person -- a second person looks at a

11  fingerprint identification and they verify that they agreed

12  with the conclusion that I reached, they mark the photograph

13  with their name and the finger number from which the

14  identification was made, as well as the name of the person

15  that the fingerprint identification was made with.

16  Whenever there is a single conclusion, such as a single

17  identification, a second person also examines the print to

18  determine if they agree with the first and the second

19  conclusions that were reached.

20  That second person also writes their name, the name of the

21  person that it was identified with, and the finger number of

22  the person it's identified with.

23  **Q.** With the second examination that you've talked about --

24  let's take the first one.  Did someone verify your

25  examination?

1  **A.**  Yes.

2  **Q.**  Who did?

3  **A.**  Timothy Wagner.

4  **Q.**  What photo are you looking at, looking at the back of

5  that?

6  **A.**  931-G.

7  **Q.**  After Mr. Wagner verified it, what happens with the second

8  verification?  Is that done the same way?

9  **A.**  No.

10  **Q.**  Why don't you explain that.

11  **A.**  Okay.  With the first round of verification, the second

12  examiner who is about to do their own comparison is given the

13  correct fingerprint card and told what finger it is.  Then

14  from that point on, they must conduct their own comparison.

15      When it comes to comparing, the points that I use in order

16  to reach my conclusion may not be the same points that the

17  second person uses.

18      So the second person is not told what points to use.  They

19  are only told that it is an identification and what finger it

20  is identified with.

21      On the second round, the second individual who is to take

22  a look at this after the first person made the identification

23  and the second person made the verification, the next person

24  to look at this is not told who the identification is made

25  with.

1    In fact, they are not told that an identification is made.

2  They are given a clean photograph of the latent print, as well

3  as one or two fingerprint cards or known exemplars of

4  individuals to compare that clean photograph with.

5    So, their comparison is made without any prior knowledge

6  of whether or not an identification has been made and also

7  whatever finger it happened to be identified with.

8  **Q.**  With regard to that second kind of blind comparison, I

9  will call it, was there a blind comparison done in this case?

10 **A.**  Yes.

11 **Q.**  Who did it and what did he find?

12 **A.**  Melissa Ish was the second person.  She was what we call

13 the blind verifier.  She also put her name, the date, and the

14 finger number it was identified with and the name of the

15 person it was identified with.

16 **Q.**  Was it the same finger of Ms. Waters that you found?

17 **A.**  Yes.

18    MR. BARTLETT:  I would like to offer Government's

19 Exhibits 931-F, G and H.

20    MR. BLOOM:  No objection.

21    THE COURT:  Admitted.

22    (Exhibit Nos. 931-F, G, H admitted.)

23 BY MR. BARTLETT:

24 **Q.**  Now, as I understand it, that was the only fingerprint you

25 found of Ms. Waters' on all of these documents; is that

1  correct?

2  **A.**  That's correct.

3  **Q.**  Did you also compare pages that were found in the rest of

4  these pages and documents?

5  **A.**  Yes.

6  **Q.**  As a result, were you able to make identifications of

7  other individuals?

8  **A.**  Yes.

9  **Q.**  If you could take a look at Q117, which I believe is a

10  document entitled "Willful Disobedience."

11       Do you have that in front of you?

12  **A.**  Yes.

13  **Q.**  Looking on the last page of that document -- are you to

14  Q117?

15  **A.**  Okay.  I see three documents here with "Willful

16  Disobedience."

17  **Q.**  You have three different documents entitled "Willful

18  Disobedience"?

19  **A.**  Yes.

20  **Q.**  Let's take them one at a time.  First, Q117.  Are you able

21  to find that page?

22  **A.**  I don't see Q117 written on the page.

23            MR. BARTLETT:  If I could approach, Your Honor.

24            THE COURT:  You may.

25  BY MR. BARTLETT:

1  **Q.** The documents have handwriting on them?

2  **A.** Yes.

3  **Q.** Who put that handwriting on them?

4  **A.** I did.

5  **Q.** Would it be fair to say it's fairly small?

6  **A.** Yes.

7        MR. BARTLETT:  I apologize, Your Honor.

8  BY MR. BARTLETT:

9  **Q.** Did you find it?

10 **A.** Yes.

11 **Q.** Why don't you explain what you have.

12 **A.** Q117 is the last page of a document entitled "Willful

13 Disobedience."

14 **Q.** If you look at the title, see if you can provide a month

15 that allows the jury to figure out which one you are referring

16 to.

17 **A.** August to September, 2001.

18 **Q.** Thank you.  So you are looking at the very back page of

19 this document?

20 **A.** Yes.

21 **Q.** Looking at that, do you see a latent print that you were

22 able to develop on the document when you examined it at the

23 lab?

24 **A.** Yes.

25 **Q.** Why don't you show it to the jury and explain what they

1 are looking at.

2 **A.** On the back of this document are purplish-colored

3 markings, and these markings are the result of the chemical

4 called ninhydrin that I sprayed on this item, and the markings

5 represent latent prints.

6 **Q.** Did you find one you were able to identify?

7 **A.** Yes.

8 **Q.** What ink prints were you looking at?  Who was the person

9 you pulled a print off of?

10 **A.** I was asked to compare any latent prints developed on

11 these items with the fingerprints of Briana Waters and Justin

12 Solondz.

13 **Q.** Did you find either of those prints on there?

14 **A.** Yes.

15 **Q.** What print?

16 **A.** I was able to make an identification on Q117 with the

17 fingerprints of Justin Solondz.

18 **Q.** And what finger specifically, do you recall?

19 **A.** Finger No. 9, which is the left ring finger.

20 **Q.** We are not going to walk through all the steps, but when

21 you make an identification, for example with regard to this

22 one, is the same process followed; a person verifies it and

23 there's a double blind that looks at it?

24 **A.** Whenever an identification is made, it is always verified

25 by a second examiner.  Blind verifications only occur if there

1   is a single conclusion, such as one identification in a case.

2   **Q.** You found Mr. Solondz' print on Q117. Could you put all

3   those documents away and move on to Q118, which I believe is

4   the next document you have in front of you?

5      It will be in one of your other folders, a document

6   entitled "It Ain't Easy Being Green."

7      Were you able to find a latent print on that document,

8   Ms. Betty?

9   **A.** Yes.

10   **Q.** Can you point out where you found it and whose fingerprint

11   it was?

12   **A.** On the back of this document entitled "It Ain't Easy Being

13   Green," there's a latent print that was developed near the top

14   of the side of the document on the back of it, and this print

15   identified with the fingerprints of Justin Solondz.

16   **Q.** Which one specifically, if you recall?

17   **A.** It was finger No. 7, which is the left index.

18   **Q.** Finally, if you can take a look at Government's Exhibit

19   Q120 which is the first page of a document entitled "Against

20   War and Pacifist Bliss."

21      Do you have that in front of you?

22   **A.** Yes.

23   **Q.** Were you able to develop a print of value on that

24   document?

25   **A.** Yes.

1  **Q.** Can you explain where it was and what fingerprint you

2  found?

3  **A.** On the paper entitled "Against War and Pacifist Bliss," on

4  the front part of the paper, near the top, a latent print was

5  developed, and that latent print I identified with the

6  fingerprint of Justin Solondz, finger No. 6 which is the left

7  thumb.

8  **Q.** Thank you.

9     Looking at the next document which I believe is Q134, a

10 document entitled "Against War and Pacifist Bliss."

11    Do you have that document in front of you?

12 **A.** You say it's Q134?

13 **Q.** I believe it's the last page on the document that will be

14 in a separate folder.  It should be Q134.

15 **A.** Okay.

16 **Q.** In addition to comparing Ms. Waters' and Justin Solondz'

17 print, were you also asked to compare for prints from Jennifer

18 Kolar?

19 **A.** Yes.

20 **Q.** Is that the inked prints that you previously looked at and

21 have been entered into by stipulation, 931-C?

22 **A.** Yes.

23 **Q.** Going back to Q134, which is the document "Against War and

24 Pacifist Bliss," were you able to find fingerprints on that?

25 **A.** Yes.

1   **Q.** Why don't you explain to the members of the jury what you
2   found.
3   **A.** On item Q134, I developed two latent prints of value for
4   comparison purposes on this document.
5   **Q.** What were those and where are they?
6   **A.** Both of the fingerprints are located on the front part, on
7   the face part of the page, and on the right-hand side.
8   **Q.** Whose are they?
9   **A.** One of the fingerprints is identified with Justin Solondz,
10  and the other fingerprint is identified with Jennifer Kolar.
11  **Q.** Thank you.
12     Did you also examine a document that is found -- it will
13  be in a separate folder -- a multipage document entitled,
14  "Ecoterror"?  Specifically Q138.
15     Were you able to find any fingerprints on Q138?
16  **A.** Yes.
17  **Q.** How many prints were you able to find that were of value,
18  and what were you able to identify?
19  **A.** On Q138, four latent fingerprints were identified on this
20  item.
21  **Q.** Whose prints were they, and where are they on the item?
22  **A.** Of the four latent prints developed, two are near the very
23  top and two are near the middle of the document, and all four
24  fingerprints are identified as Justin Solondz.
25  **Q.** If you could put that away and take out in a separate

1  document Q159, the last page of an article entitled,

2  "Pacifists Attack Against WTO Protest."

3      Do you see that document?

4  **A.**  Yes.

5  **Q.**  Are you on Q159?

6  **A.**  Yes.

7  **Q.**  Were you able to develop a print of value on that page?

8  **A.**  Yes.

9  **Q.**  Where is that located, and whose print did you find?

10  **A.**  Two latent fingerprints were developed on Q159 near the

11  bottom half of the page, on the left-hand side, and both of

12  the prints were identified with Jennifer Kolar.

13  **Q.**  Finally, Ms. Betty, I have one more document for you to

14  look at.  If you could take out a rather large pamphlet that

15  will be in a separate package entitled "Killing King Abacus,"

16  Q160, which I believe will be the first page of that document.

17      Do you see that?

18  **A.**  Yes.

19  **Q.**  Were you able to develop any prints of value on that

20  document, Q160?

21  **A.**  Yes.

22  **Q.**  Can you point out where those were and what was your

23  identification?

24  **A.**  On document Q160, two latent fingerprints.  In addition

25  to, two latent palmprints and one latent impression were

1 developed on this document.  The two latent fingerprints

2 developed on this document were on the back page, one near the

3 right-hand side and one near the bottom left-hand side, and

4 both of these prints were identified with Justin Solondz.

5       MR. BARTLETT:  Thank you, Your Honor.  I have no

6 further questions of this witness.

7                       CROSS-EXAMINATION

8 BY MR. BLOOM:

9 **Q.**  Good afternoon, Ms. Betty.

10 **A.**  Good afternoon.

11 **Q.**  Have we ever met?

12 **A.**  No, sir.

13 **Q.**  My name is Robert Bloom.  I am an attorney for Briana

14 Waters, along with Neil Fox, who's also her attorney.  I just

15 have a few questions for you, once I get my glasses.

16     About how many documents -- let me withdraw that for a

17 moment.

18     The letter "Q" that appears before the numbers, that's

19 short for the idea of questioned documents, right?

20 **A.**  Yes.

21 **Q.**  That's why it's the letter "Q," right?

22 **A.**  Yes.

23 **Q.**  And the idea is you look at a questioned document and see

24 if, one, you can get a usable fingerprint and then compare it

25 to known fingerprints; is that essentially what happens?

1  **A.** Yes.

2  **Q.** Now, in this particular event, the investigation that you

3  did, approximately how many documents, questioned documents,

4  did you look at? We're up to at least Q160, so there's at

5  least 160; is that correct?

6  **A.** It was from Q94 to Q162.

7  **Q.** So Q1 to Q92 would be something else?

8  **A.** I am sorry, say that again.

9  **Q.** You started with Q93?

10  **A.** Q93 is the folder.

11  **Q.** Right.

12  **A.** And then starting with Q94 through Q162 are the documents.

13  **Q.** Do you know what would have been before Q93, like Q92?

14  Were those documents that you also looked at in connection

15  with this inquiry?

16  **A.** Q92 would have been a separate submission from what I

17  received in this particular submission.

18  **Q.** So we are talking about this submission, the folder and

19  approximately 80 documents; is that correct?

20  **A.** That's correct.

21  **Q.** Approximately. Now, am I also correct that the one

22  document upon -- or the one, not even document -- the one item

23  on which you found Briana Waters' fingerprint was a folder; is

24  that correct?

25  **A.** That's correct.

1  **Q.**  That would be Q93, right?

2  **A.**  Yes.

3  **Q.**  Her fingerprints were not on any of the literature; is

4  that correct?

5  **A.**  That's correct.

6  **Q.**  Now, there were approximately six or so documents, maybe

7  seven, that apparently -- let me go back.

8      What that means is -- on the folder -- that Briana Waters

9  at some point touched that folder and left her fingerprint,

10  right?

11  **A.**  That's correct.

12  **Q.**  And there are six or seven documents apparently that

13  Justin Solondz touched at some point; is that correct?

14  **A.**  Yes.

15  **Q.**  Maybe six, maybe eight, somewhere in that range, right?

16  **A.**  Yes.

17  **Q.**  Am I correct that of those documents, approximately 80

18  documents, you do not have any fingerprint evidence that

19  Briana Waters touched a single one of them; is that correct?

20  **A.**  That's correct.

21  **Q.**  Now, there are two documents where you were able to

22  determine that Jennifer Kolar had touched those documents; is

23  that correct?  That would be Q134 and Q159?

24  **A.**  That is correct.

25  **Q.**  Q134 is entitled, "Against War and Pacifist Bliss"; is

1  that correct?

2  **A.**  Yes.

3  **Q.**  And Q159 is entitled, "Insurgent Ferocity:  The Playful

4  Violence of Rebellion"?

5  **A.**  Yes.

6  **Q.**  And those are the two that have Jennifer Kolar's

7  fingerprints; is that correct?

8  **A.**  That's correct.

9  **Q.**  From your analysis, you can't prove that she read the

10  document, just that she touched them?

11  **A.**  That is correct.

12  **Q.**  You don't have any way of knowing if she just touched it

13  for a second or handled it, read it, put it down, picked it up

14  again; you don't know that; that's not part of your analysis,

15  right?

16  **A.**  That is correct.

17  **Q.**  Now, with regard to -- on any of those documents that you

18  looked at, was there any yellow -- you know what highlighters

19  are, right?

20  **A.**  Yes.

21  **Q.**  Was there any yellow highlighting that was put on any of

22  those documents by anybody that you know of, Mr. Bartlett,

23  myself, Ms. Waters, Ms. Kolar, Mr. Solondz?

24      Is there any yellow highlighting on any of those

25  documents?

1    **A.** I don't remember. I can look through the document to see

2    if there are any now, but I don't remember at the time of my

3    examination.

4    **Q.** You described that there was basically a triple check on

5    the accuracy of your conclusions; is that correct?

6    **A.** On at least one of them, yes.

7    **Q.** Is that pursuant to FBI regulations that you do that?

8    **A.** Yes, sir.

9    **Q.** The regulations -- if you follow the regulations, the FBI

10   is very thorough; the FBI lab is very thorough; is that

11   correct?

12   **A.** Yes, sir.

13   **Q.** And you followed the regulations?

14   **A.** Yes, sir.

15   **Q.** That's important to you, both as a matter of personal

16   integrity and as a matter of what your job is; is that

17   correct?

18   **A.** That is correct.

19   **Q.** The FBI regulations are created for a particular purpose;

20   is that correct?

21   **A.** Yes, sir.

22   **Q.** Could you tell the jury what that purpose is?

23   **A.** The purpose of our regulations are to ensure that the type

24   of examination done is done in a manner that is in line with

25   the standard operating procedures that we have in place, with

1  the FBI.

2  **Q.**  Is it fair to say that it's to ensure -- the regulations

3  exist to ensure the integrity of the work of the FBI?

4  **A.**  Yes.

5  **Q.**  Now, what is your lab called?  Is it called the

6  fingerprint lab or something like that?

7  **A.**  Latent Print Operations Unit.

8  **Q.**  How many different labs, approximately, does the FBI have?

9  Scientific labs, approximately?

10  **A.**  The main lab is the lab I work in, which is located in

11  Quantico, Virginia.

12  **Q.**  Are there different sections of the main lab?

13  **A.**  Yes.

14  **Q.**  Is there either a separate lab or a section of the main

15  lab where the FBI lab can analyze an automobile to see if

16  there has been metallurgical damage to that automobile?

17      Does such a lab exist?

18  **A.**  I believe so, yes.

19          MR. BLOOM:  I have no further questions.  Thank you

20  very much, Ms. Betty.

21          MR. BARTLETT:  Nothing, Your Honor.

22          THE COURT:  Then you may step down.

23          MR. BARTLETT:  At this time, the United States calls

24  Tim Watkins to the stand.

25          THE COURT:  Just come forward and raise your right

1    hand and be sworn.

2           TIMOTHY WATKINS, called as a witness, duly sworn

3           THE COURT:   Just come around and take the witness

4    chair.

5                      DIRECT EXAMINATION

6    BY MR. BARTLETT:

7    **Q.**  Could you tell the members of the jury your first and last

8    name and spell your last name for the Court Reporter?

9    **A.**  Timothy Watkins, W-A-T-K-I-N-S.

10   **Q.**  Where do you work, Mr. Watkins?

11   **A.**  I am employed as a Special Agent with the United States

12   Bureau of Alcohol, Tobacco, Firearms and Explosives, commonly

13   known as ATF.

14   **Q.**  Where do you work?

15   **A.**  At Reno, Nevada.

16   **Q.**  Can you walk us through your educational background,

17   professional training and how long you've been at the ATF?

18   **A.**  Certainly.   I graduated with a Bachelor of Science degree

19   in criminal justice from California State University in

20   Sacramento in 1996.

21          After that, I was employed by the United States

22   Immigration and Naturalization Service.   After the INS,

23   employed as a Special Agent with the United States Naval

24   Criminal Investigative Service for a couple years.   In 2001, I

25   joined ATF.

1   **Q.** Where were you first assigned?

2   **A.** Reno, Nevada, and I have been there my whole career with

3   ATF.

4   **Q.** What's your job arena, and has it changed over the years?

5   **A.** No, sir.  I'm a Special Agent and I was hired on as a

6   Special Agent.

7   **Q.** On a day-to-day basis, what do you do down in Reno?

8   **A.** In Reno, basically the science of firearms and narcotics

9   investigations -- federal violations of firearms and narcotics

10  investigations.

11  **Q.** Directing your attention back to October of 2001, were you

12  working with ATF then?

13  **A.** Yes, sir.

14  **Q.** How long had you been there?

15  **A.** Less than a year.  That was October of 2001, so

16  approximately nine months.

17  **Q.** Still learning the ropes?

18  **A.** Yes, sir.

19  **Q.** Did you receive a call on October 15th -- Monday, October

20  15, 2001 -- about a possible arson investigation?

21  **A.** My training officer did and he related that to me.

22  **Q.** What did you do in response to that?

23  **A.** We both traveled north to Susanville, California.

24  **Q.** Why would you respond?  I thought you were working in

25  Reno.  You don't just work on Nevada cases?

1  **A.**  No.  Actually,  Susanville,  California would not be our

2  normal  district.   That would actually fall under Sacramento,

3  California,  but we were the closest proximity-wise for ATF to

4  respond.

5  **Q.**  So you did respond?

6  **A.**  Yes, sir.

7  **Q.**  Who went from the Reno ATF office?

8  **A.**  Myself, my field training agent, Steven Lowenhurst, and

9  Special Agent Jolene Blair.

10  **Q.**  How long does it take you to get from your Reno office

11  over to the arson location near Susanville?

12  **A.**  It was approximately an hour-and-a-half drive.

13  **Q.**  Where do you go when you get there?

14  **A.**  Well, we met with Lassen County Sheriff's investigators,

15  and right outside of Susanville you can see the smoldering, I

16  guess -- ashes, smoke, and you could see some fire trucks on

17  the scene also.

18  **Q.**  Can you describe the general area?  Are we talking about a

19  heavily populated, very rural, something in between?

20  **A.**  A very rural area.

21  **Q.**  What was the location you were actually responding to?

22  **A.**  It was a Bureau of Land Management Wild Horse facility.

23  **Q.**  As you pull up, what is it that you actually see?

24  **A.**  Again, I see some fire trucks, firemen putting out a --

25  working on putting out a fire.

**Q.** Besides yourself and the local county sheriff department,
is anybody else at the scene?

**A.** FBI agents also responded, not from the Reno area but from
the Sacramento area office. Also a bomb squad task force was
called in.

**Q.** What, if anything, do you notice when you got there? Just
give us a general description of what items of relevance are
pointed out to you or what you see on your own.

**A.** Again, firemen working to put out a fire that's pretty
much contained at that point. Talking to some of the firemen
there, they said that they had discovered some -- what they
believed to be devices that had not went off, so they were
waiting and they called the bomb squad to come and defuse
those devices.

Other than that, it looked like a -- there were horses
there. It was a -- it was an adoption facility basically.
They rounded up horses and kept the horses there, maintained
the horses there until they were adopted.

**Q.** Could you take a look at Government's Exhibit 391 in front
of you?

**A.** Yes, sir.

**Q.** Tell me if you recognize that.

**A.** Yes, I do.

**Q.** What is that?

**A.** Well, in the main picture there, that would be where --

1  **Q.** If you can just tell us, is that an aerial photo of the

2  Bureau of Land Management farm that you responded to?

3  **A.** Yes.

4  　　　MR. BARTLETT: Offer 391.

5  　　　MR. FOX: No objection.

6  　　　THE COURT: Admitted.

7  　　　　　(Exhibit No. 391 admitted.)

8  BY MR. BARTLETT:

9  **Q.** Can you give us some perspective on what we are seeing

10  here?

11  **A.** In the main part of the picture there, you see the pole

12  barn that has burned to the ground.

13  **Q.** If you touch the screen, a little arrow will show up.

14  **A.** Okay. Here.

15  **Q.** What else do you see?

16  **A.** To the right of that is an additional pole barn that we

17  later located a device that did not function and subsequently

18  did not burn. That would be here.

19  **Q.** Take a look at Government's Exhibit 392-A, which has

20  already been admitted and which you can show to the jury.

21  　　What are we looking at from this picture?

22  **A.** Again, it's a different angle, but again, here the pole

23  barn --

24  **Q.** Special Agent Watkins, if you notice in the lower

25  left-hand part of the screen, there's an indication for exit.

1    If you tap at that, the little arrows will go away.

2        Do you see that?

3    **A.**  Yes, sir.

4    **Q.**  Special Agent Watkins, what are we looking at?  If you can

5    give us a little perspective.

6    **A.**  Sure.  Again, it's basically a different angle.

7    Obviously, it's a photograph taken from the ground and again,

8    here's the pole barn that burned and behind it here is a pole

9    barn that is still standing.

10   **Q.**  Looking at 392-B, do you recognize that?

11   **A.**  Yes.

12   **Q.**  What is it you are looking at, another photo?

13   **A.**  Another photograph of basically the same thing.  This is

14   obviously a closer perspective of the pole barn that burned.

15           MR. BARTLETT:  Offer 392-B.

16           MR. FOX:  No objection.

17           THE COURT:  Admitted.

18               (Exhibit No. 392-B admitted.)

19   BY MR. BARTLETT:

20   **Q.**  Now, looking at that, there appear to be some metal posts

21   with red flags and some other things on the ground.  What has

22   happened since the fire started?  What, if anything, are you

23   doing with regard to this investigation?

24   **A.**  You can see yellow tape that's been cordoned off into

25   different sections.  I believe the red flags you see as in

1  here, here, are marking what used to be the actual poles

2  holding the barn.

3  **Q.** Did you find anything of value in this area?

4  **A.** In one section, a device that in fact initiated and is

5  believed to be the cause of the destruction of the barn.

6  **Q.** Could you take a look at 392-C and tell me if you

7  recognize that?

8  **A.** Yes, sir.

9  **Q.** What is that?

10  **A.** That would be the remnants of the device that was found in

11  that same general area that it did initiate.

12          MR. BARTLETT:  Offer 392-C.

13          MR. FOX:  No objection.

14          THE COURT:  Admitted.

15              (Exhibit No. 392-C admitted.)

16  BY MR. BARTLETT:

17  **Q.** After seeing this on the ground, what if anything did you

18  do?

19  **A.** That was collected as evidence.

20  **Q.** Take a look at 392-D. Do you recognize that?

21  **A.** Yes, sir.  These are items collected as evidence, I

22  believe to be part of the device that caused the destruction.

23          MR. BARTLETT:  Offer 392-D as in "dog."

24          MR. FOX:  No objection.

25          THE COURT:  Admitted.

(Exhibit No. 392-D admitted.)

BY MR. BARTLETT:

**Q.** So basically, you had an area set off where you were recovering things from this burnt out pole barn, you are putting it over there?

**A.** Yes, sir.

**Q.** What do you do when you collect all these various items? What exhibit numbers were these, if you recall?

**A.** These were the first items submitted. Without having it in front of me, I want to say 1, 2 and 3.

**Q.** ATF Exhibits 1, 2 and 3?

**A.** Correct.

**Q.** What did you do with those items?

**A.** These items are collected and sent to the ATF lab for evaluation, analysis.

**Q.** If Special Agent Halla can pull up 392-E which has already been admitted. Do you recognize that photo?

**A.** Yes.

**Q.** What is it that we are looking at?

**A.** That is the pole barn that we saw in the previous photographs that is still standing. Here you can see a device that is rendered safe by the bomb squad and then collected as evidence.

**Q.** And you did that collection?

**A.** Yes, sir.

1  **Q.** Take a look at 392-F which has not been admitted into
2  evidence and tell me if you recognize that photo.
3  **A.** Yes, sir.
4  **Q.** What is that?
5  **A.** Again, that was a device that was rendered safe and then
6  collected as evidence.
7  **Q.** Basically a close-up of the pole barn device which we had
8  just taken a look at?
9  **A.** Yes, sir.
10              MR. BARTLETT:  Offer 392-F.
11              MR. FOX:  No objection.
12              THE COURT:  Admitted.
13                   (Exhibit No. 392-F admitted.)
14  BY MR. BARTLETT:
15  **Q.** Is this how it appeared when you first were looking at it?
16  **A.** Yes.
17  **Q.** Once again, what did you do with these various items?
18  **A.** They are collected as evidence and again sent to our
19  laboratory for analysis.
20  **Q.** Would these be ATF Exhibits 4, 5 and 6 which would be
21  liquid samples?
22  **A.** Correct.
23  **Q.** No. 7, which was electronic components?
24  **A.** Sounds correct.  Again, I don't have the list in front of
25  me.

1  **Q.** Do you have your notes outside?

2  **A.** I believe so. It's 7, 8 and 9.

3  MR. BARTLETT: If I could approach the witness, Your

4  Honor.

5  THE COURT: Yes.

6  **A.** Yes, No. 7 was the suspected timing mechanism. No. 8,

7  plastic bucket and lid. And No. 9, plastic bag containing

8  lid, road flare and suspected igniter.

9  **Q.** Thank you. Could you take a look at Government's Exhibit

10  392-G and tell me if you recognize that photo?

11  **A.** Yes, sir.

12  **Q.** What is it that we are looking at?

13  **A.** That is a device, again rendered safe by the bomb squad,

14  that was found under a vehicle at the same location, same

15  facility.

16  MR. BARTLETT: Offer 392-G.

17  MR. FOX: No objection.

18  THE COURT: Admitted.

19  (Exhibit No. 392-G admitted.)

20  BY MR. BARTLETT:

21  **Q.** How close was this red truck with the bucket underneath it

22  to the pole barns and the other burned-out barn that we've

23  just been looking at?

24  **A.** Same facility.

25  **Q.** General area?

1   **A.**  Same general area, yes.

2   **Q.**  What happened when you saw this? What did you do with it?

3   **A.**  Again, after it was rendered safe, in the same manner

4   collected for evidence and submitted to our laboratory.

5   **Q.**  Looking at 392-H, is that a close-up of the device?

6   **A.**  Yes.

7         MR. BARTLETT: Offer 392-H.

8         MR. FOX: No objection.

9         THE COURT: Admitted.

10           (Exhibit No. 392-H admitted.)

11  BY MR. BARTLETT:

12  **Q.**  Once again, perhaps referring to your list, did you submit

13  a number of items to the ATF lab in relation to this device,

14  which I think you referred to as device No. 3?

15  **A.**  Yes, that's correct.

16  **Q.**  What did you send into the lab?

17  **A.**  Again, in the same manner, three separate glass vials

18  containing the liquid and then again the suspected timing

19  devices, buckets, lid, road flare and igniter.

20  **Q.**  What lab were they sent to?

21  **A.**  The ATF lab in Walnut Creek.

22  **Q.**  Just to clarify, those were ATF Exhibits 10, 11, 12, 13,

23  14 and 15?

24  **A.**  Yes, sir.

25  **Q.**  Finally, if you could take a look at Government's Exhibit

1   392-I and tell me if you recognize that photo.

2   **A.**   Yes, sir, I do.   Again, a device very similar to the other

3   devices located -- this is actually by the facilities office.

4           MR. BARTLETT:   Offer 392-I.

5           MR. FOX:   No objection.

6           THE COURT:   Admitted.

7                   (Exhibit No. 392-I admitted.)

8   BY MR. BARTLETT:

9   **Q.**   Where was this?

10  **A.**   This was at the door of the Bureau of Land Management's

11  office, same general area.

12  **Q.**   Close to where the other devices were?

13  **A.**   Yes.

14  **Q.**   If you could go over and take a look at the various items

15  that we've brought out and you've had a chance to look at

16  before, 392-L, 392-M and 392-N as in "Nancy."

17      Taking them one at a time -- you can bring that all back

18  up and sit down.

19      Do you recognize those?

20  **A.**   Yes, I do.

21  **Q.**   What are those?   Are those the items we were just looking

22  at in the photograph?

23  **A.**   Yes, they are.

24  **Q.**   Taking them one at a time.

25  **A.**   Yes, sir.   These are items collected, one device and

again, separated individually, these are timing mechanisms.

**Q.** For the record, what is the exhibit number on there?  Do you see the little white sticker up there?

**A.** 392-L.

      MR. BARTLETT:  Offer 392-L, Your Honor.

      MR. FOX:  No objection.

      THE COURT:  Admitted.

          (Exhibit No. 392-L admitted.)

BY MR. BARTLETT:

**Q.** Looking at the plastic bag -- go ahead, grab that.

   Do you recognize that?

**A.** Yes, it's a plastic lid and road flares and matches collected at the scene, 392-N.

      MR. BARTLETT:  Offer 392-N, Your Honor.

      MR. FOX:  No objection.

      THE COURT:  Admitted.

          (Exhibit No. 392-N admitted.)

BY MR. BARTLETT:

**Q.** Finally, the white bucket next to you, do you recognize that bucket?

**A.** Yes.

**Q.** Is this the bucket we were seeing in the photograph?

**A.** Yes.

      MR. BARTLETT:  Offer 392-M.

      MR. FOX:  No objection.

1      THE COURT:   Admitted.

2                  (Exhibit No. 392-M admitted.)

3      THE COURT:   Let me ask you, how much further do you

4  have?

5      MR. BARTLETT:   A bit.   It depends on the

6  cross-examination, I can probably wrap up within five minutes.

7      MR. FOX:   Why don't we wrap up.

8      THE COURT:   You have cross?

9      MR. FOX:   It's not going to be very long.

10     THE COURT:   Well, it's 4:00.

11     MR. FOX:   Okay.

12     THE COURT:   You going to have some time for cross,

13  right?

14     MR. FOX:   It's going to be very limited.

15     THE COURT:   We are going to stop you right there and

16  get back into the exhibits tomorrow.

17     As always, don't discuss the case.   Don't research, don't

18  do anything like that.   Have a good night's sleep.   Be back

19  here at 9:00, ready to go.

20     Leave your books on the chair.

21     (Jury not present.)

22     THE COURT:   Okay.   You may be seated.

23     You may step down.

24     THE WITNESS:   Thank you, sir.

25     THE COURT:   Let me ask the question in terms of

1  witnesses.  Where are we now, so everybody can know how far we

2  are.

3         MR. BARTLETT:  Your Honor, I think we are fairly

4  close on the United States side, although I do think Special

5  Agent Halla will be a fairly extensive witness and there will

6  be fairly extensive cross examination, so I would be surprised

7  if we would rest tomorrow, but it could be close.

8         THE COURT:  You are saying depending on

9  cross-examination, you will rest your part tomorrow, do you

10  think?

11         MR. BARTLETT:  I hope, yes.

12         THE COURT:  But I want them to have an idea when to

13  get ready and have their folks on tap and all of that.

14     So with that in mind, you will have your first witness

15  somewhere?

16         MR. BLOOM:  Well, Mr. Bartlett asked me earlier who

17  would be our first witness, and our first witness -- we would

18  ask them to have them available -- is Anthony Torres, Special

19  Agent Tony or Anthony Torres.

20         THE COURT:  Okay.

21         MR. BLOOM:  And I think that should cover us, given

22  what we've been told.  It appears that the Government -- it's

23  okay, it's their prerogative -- they were going to call

24  Heather Moore, they were going to call Kara Larson, they were

25  going to call Suzanne Savoie.  It appears that's not going to

1  happen.

2  THE COURT:  Mostly what I ask you to do is consider

3  your own time.  Don't factor in cross-examination and you

4  won't be late.  That's all I am saying.

5  MR. BLOOM:  Okay.

6  THE COURT:  You know if you are going to

7  cross-examine somebody and to what extent, but at the same

8  time, have somebody ready to go.  Don't make me quit in the

9  middle of the day.

10  MR. BLOOM:  I am asking them to please produce --

11  MR. BARTLETT:  We'll have Special Agent Torres -- at

12  least to make sure he's at work in Seattle and available to

13  come down.

14  MR. BLOOM:  Good.

15  THE COURT:  Just have him close so they can be here.

16  I don't know, if you cross-examine Agent Halla -- I don't know

17  how long it takes you to do whatever you've got to do, so I

18  can't gauge that time.  But I am asking them to tell me how

19  long they are going to take, and that will give you an idea

20  what you need next.

21  Anything else I need to take up?

22  MR. BLOOM:  Yes, a couple of things.  We actually

23  need to enlist the Court's assistance with something, a phone

24  call.

25  You may recall yesterday there was testimony about

1  Ms. Waters being in St. Peters Hospital in Olympia in January

2  of '02.  We have made, or are about to formalize by fax, the

3  actual request to the hospital to get those records to the

4  Court.

5      Ms. Waters has been told that it could take up to 10 days.

6  We would ask, if it would permit, the Clerk of the Court to

7  call St. Peters Hospital to ask them to expedite the

8  submission of that, of those records.

9      If the Court would do that, we would appreciate it.

10         THE COURT:  I hear what you are saying.  Is there a

11  reason why any request wasn't made prior to --

12         MR. BLOOM:  We didn't know -- this event didn't come

13  up until Corrina testified, and as soon as he testified with

14  clarity about what he was going to say -- we did have some

15  hints about it, and in fact what happened is that during the

16  testimony, Ms. Waters realized that he may be confusing that

17  visit in January '02 -- he may be in some way conflating those

18  with what he says was a visit in May of '01.

19      As soon as we realized that, she moved on it immediately,

20  so that's why it wasn't done right away.

21         THE COURT:  Well, I don't know if I can answer your

22  question because I don't know what that may exercise if the

23  Court calls down there in terms of this whole thing.  Have you

24  served them with anything, or you just made a phone request?

25         MR. BLOOM:  There have been phone conversations.  We

1  now have a fax prepared which, as soon as we get out of court,
2  we are going to fax it to them.
3        THE COURT:  Let's see what kind of response you get
4  from that.
5        MR. BLOOM:  Okay.  Secondly, we would like to add a
6  witness whose name is Haila, H-A-I-L-A, Silvertrees, to our
7  witness list for information of the Government and the Court.
8        THE COURT:  Spell the name now.
9        MR. BLOOM:  Haila, H-A-I-L-A.
10       THE COURT:  Is that the last name?
11       MR. BLOOM:  That's the first name.  The last name is
12 Silvertrees.
13       THE COURT:  Just like it sounds?
14       MR. BLOOM:  Yes.
15       THE COURT:  Okay.
16       MR. BLOOM:  That's a real name, not a forest name.
17 There are also some other matters pending before the Court,
18 one of which I believe was a proposed instruction that was
19 submitted by my co-counsel with regard to -- pattern
20 instructions about how a jury is to evaluate the credibility
21 of cooperating witnesses.
22       THE COURT:  I mentioned that.  I will address the
23 jury with instructions at the close of the case.  They will
24 know exactly, and the pattern instruction that you both
25 submitted, that probably will be the one I will give, telling

1   them how to view the testimony and how to look at it.  I am

2   not going to do it every time a witness is called.  I am not

3   going to piecemeal it like that.

4            MR. BLOOM:  May I have just a second?

5            THE COURT:  Okay.

6            MR. BLOOM:  So what is pending before the Court that

7   is of some importance because of travel plans, and it has to

8   do with the New York Times reporter, David Carr, whose

9   testimony is related to the testimony of Phillabaum, where

10   there was a very clear denial by Ms. Phillabaum of important

11   facts, material facts, as to what she said to Mr. Carr, and we

12   have renewed our request to call Mr. Carr in light of her very

13   clear testimony that should be impeached as to very material

14   matters.

15            MR. BARTLETT:  Before the Court rules, the Court

16   should be aware that the United States filed a response to

17   that motion sometime this afternoon, and perhaps the Court

18   would want to look at it.

19            THE COURT:  I haven't seen it.  I haven't had a

20   chance to go through it because I think I got the DVD along

21   with it, didn't I?

22            MR. BARTLETT:  No, that was a different issue.

23            THE COURT:  I thought it was on the same issue.

24            MR. FOX:  It was impeachment of Ms. Phillabaum but --

25   I'm sorry.

1    MR. BLOOM:  That's okay.

2    MR. FOX:  It was impeachment of Ms. Phillabaum but on

3  a different point.  There were two points of impeachment.  One

4  was the DVD; one was David Carr.  I haven't seen the

5  Government's brief and I'll review it when I get back tonight.

6    THE COURT:  Okay.  I will look at it.  I haven't

7  looked at any of this that we are talking about now.  The

8  other name is Mr. Harper, I believe?

9    MR. BLOOM:  That has been renewed today based on the

10  testimony of Ms. Kolar --

11    THE COURT:  I am just trying to get everything on the

12  table here.  We are talking about your request for some

13  records from St. Peters Hospital, Ms. Silvertrees being a new

14  witness in the matter, and to renew your motion as to Carr and

15  Harper.

16  Is that what you are saying?

17    MR. BLOOM:  Yes.  That's already been done but we --

18    THE COURT:  You are asking me to revisit that?

19    MR. BLOOM:  Yes, given the testimony of each of the

20  two witnesses.

21    THE COURT:  I understand.  Now, I will do that.  Let

22  me ask the Government this:  This new witness, any issue with

23  that?

24    MR. BARTLETT:  I have no idea.  Mr. Silvertrees --

25    MR. BLOOM:  It's a woman.

1       THE COURT:  I assume that Mr. Bloom will provide you,

2  like I asked you to provide them, this person, the gist of the

3  testimony and the exhibits, so I can determine what this

4  witness is about.  Right now, I don't know what it's about.

5       MR. BARTLETT:  I would love to hear that for all 32

6  of their witnesses.  We have had nothing.

7       THE COURT:  So I am asking you, as your witnesses are

8  called, of course tell them what you are going to -- I think

9  it is probably obvious as to the agents.  But the other

10  witnesses, what they are going to be called on to do, so I can

11  make some ruling as to whether they can testify on the subject

12  matter that they are called to testify on.  I guess that would

13  be the issue.  I don't know what your witnesses will testify

14  to.  I don't know.

15       MR. BLOOM:  One thing that -- I was just reminded

16  that there's another new witness named Kathryn Baker,

17  B-A-K-E-R. We'll tell the prosecution about each of those

18  witnesses today.

19       THE COURT:  All right.  But do it in the fashion I

20  mentioned.  If you've got some exhibits you are using with

21  those witnesses, they can do that so they can pull theirs and

22  see if they have anything to contradict, the same way that I

23  obligated them to do in your case.  That will make it move

24  faster.  I will take them up at a time like we are doing now

25  or before trial, before the day starts.

1    MR. BLOOM:  Mr. Fox suggested -- and I think it's a

2  good suggestion -- that rather than burden the Court with a

3  phone call, to do it -- if we were to just get a subpoena for

4  those records, I think the hospital might respond more

5  expeditiously.  So we may do that, to make it easier on

6  everyone.

7    THE COURT:  Okay.  All right.  Anything else I need

8  to take up today?

9    MR. BLOOM:  I don't think so.

10    THE COURT:  Then I will see all of you here at 8:30

11  in the morning and see how much of this I can review tonight.

12    All right.

13    MR. FOX:  Thank you.

14    THE COURT:  We are at recess.

15    THE CLERK:  All rise.  Court is adjourned.

16    (The Court recessed to Friday, February 22, 2008, at

17  the hour of 8:30 a.m.)

18                *   *   *   *   *

19              C E R T I F I C A T E

20

21    I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23

24  /S/  Teri Hendrix_____        May 5, 2008

25  Teri Hendrix, Court Reporter              Date