1                            UNITED STATES DISTRICT COURT.
                 WESTERN DISTRICT OF WASHINGTON

2                              AT TACOMA

3

4  UNITED STATES OF AMERICA,   )  Docket No. CRO5-5828FDB
                             )

5         Plaintiff,     )  Tacoma, Washington
                             )  February 22, 2008

6  vs.                   )
                             )

7  BRIANA WATERS,         )  VOLUME 9
                             )

8         Defendant.     )

9

10                       TRANSCRIPT OF PROCEEDINGS

11        BEFORE THE HONORABLE FRANKLIN D. BURGESS
    SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.

12

    APPEARANCES:

13

14  For the Plaintiff:      MARK N. BARTLETT
                         ANDREW C. FRIEDMAN
                         Assistant United States Attorney

15                      700 Stewart Street, Suite 5220
                         Seattle, Washington 98101-1271

16

17  For the Defendant:      ROBERT BLOOM
                         Attorney at Law

18                      3355 Richmond Boulevard
                         Oakland, California 94611

19                      NEIL M. FOX
                      Cohen & Iaria

20                      1008 Western Ave., Suite 302
                      Seattle, Washington 98104

21

22  Court Reporter:         Teri Hendrix
                      Union Station Courthouse, Rm 3130

23                      1717 Pacific Avenue
                      Tacoma, Washington  98402

24                      (253) 882-3831

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

I N D E X

INDEX OF WITNESSES
===================

WITNESS ON BEHALF OF PLAINTIFF:                          Page

TIMOTHY WATKINS

        Direct Continued by Mr. Bartlett................1664

MICHAEL MORGAN

        Direct by Mr. Bartlett.........................1667
        Voir Dire by Mr. Fox...........................1671
        Direct Continued by Mr. Bartlett...............1672
        Cross Continued by Mr. Fox.....................1681

LELAND STICE

        Direct by Mr. Friedman.........................1690
        Cross by Mr. Fox...............................1699

TED HALLA

        Direct by Mr. Bartlett.........................1701

1
INDEX - EXHIBITS

EXHIBITS                                              Page

2

No.  392-J                                            1665
3    No.  392-K                                       1666
     No.  515-H                                       1667
4    No.  509                                         1692
     No.  514-A                                       1694
5    No.  508                                         1695
     No.  506                                         1697
6    No.  521                                         1708
     No.  523                                         1709
7    No.  524                                         1710
     No.  525                                         1711
8    No.  526                                         1711
     No.  527                                         1712
9    No.  531                                         1713
     No.  1021                                        1736
10   No.  1023                                        1737
     No.  561                                         1752
11   No.  740-D                                       1756
     No.  563                                         1757
12   No.  1013-C                                      1761
     No.  541                                         1763
13   No.  542                                         1764
     No.  543                                         1764
14   No.  544                                         1765
     No.  545                                         1765
15   No.  551                                         1766
     No.  552                                         1766
16   No.  548                                         1767
     No.  549                                         1768
17   No.  550                                         1768
     No.  554                                         1769
18   No.  556                                         1770
     No.  738                                         1771
19   No.  712                                         1773
     No.  713 (Illustrative)                          1774
20   No.  714 (Illustrative)                          1776
     No.  715 (Illustrative)                          1778
21   No.  734                                         1779
     No.  734-A (Illustrative)                        1779
22   No.  735                                         1780
     No.  731                                         1783
23   No.  736                                         1783
     No.  737                                         1783
24   No.  741                                         1784
     No.  402                                         1786
25   No.  401-A                                       1788
     No.  515-A                                       1793

1

INDEX - EXHIBITS

2

EXHIBITS                                                    Page

No.  515-B                                                  1793
No.  515-C                                                  1794
No.  515-D                                                  1794
No.  515-F                                                  1795
No.  515-E                                                  1795
No.  515-G                                                  1795
No.  515-I                                                  1796
No.  780 through 785                                        1797
No.  555                                                    1806
No.  553                                                    1806
No.  722                                                    1806
No.  739                                                    1806
No.  740-A                                                  1809

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    FRIDAY, FEBRUARY 22, 2008 - 8:40 A.M.

2                              * * *

3    (Jury not present.)

4         THE CLERK:  This is in the matter of United States of

5    America versus Briana Waters, cause CR05-5828FDB.

6     Counsel, please make an appearance for the record.

7         MR. FRIEDMAN:  Good morning, Your Honor.  Andrew

8    Friedman and Mark Bartlett for the United States.  Also Ted

9    Halla.

10        MR. FOX:  Good morning, Your Honor.  Neil Fox and

11   Robert Bloom present with Ms. Waters.

12        THE COURT:  All right.  It is my understanding that

13   there are now a couple matters we should take up because they

14   will come up this morning with these first witnesses and what

15   have you.

16        MR. BARTLETT:  Yes, Your Honor.

17        THE COURT:  One has to do with, as I understand it,

18   negotiations -- is that the right way to put it -- in terms

19   of -- and I don't know if that's coming up by way of

20   cross-examination.

21        MR. BARTLETT:  It would be by way of

22   cross-examination.

23        THE COURT:  I have read what you submitted; I believe

24   copies have been provided.

25        MR. BLOOM:  Yes, we just got it.

THE COURT: Are you ready to deal with that at this point in time?

MR. BLOOM: Yes.

THE COURT: Let me hear about it.

MR. BARTLETT: As set forth in the motions, the timeframe with regard to Ms. Waters' initial interaction with this case is as follows: Ted Halla contacted Briana Waters on February 24th of 2006. He had a conversation with her and, at the end of that conversation, indicated that we wanted her to cooperate and we thought she should get an attorney.

In fact, she later called Andrew Friedman that very day, and he assisted her in getting two attorneys from the Federal Public Defender's Office, Peter Avenia and Nancy Tenney.

There were discussions and actually even face-to-face meetings over the next several weeks regarding Ms. Waters' decision on whether she was going to come in and cooperate and plead guilty in relation to this investigation.

One of the critical factors, and the reason we were working aggressively to try to resolve this matter is that we had a five-year statute of limitations that was going to run on some of the charges in this case. They were running on May 21st of 2006, so therefore there had to be critical decisions made prior to that date.

Sometime in April, we were contacted by Robert Bloom, and he indicated that he was in the process of being retained and

1  would be representing Ms. Waters, and sometime later actually

2  indicated he had been retained.

3    At that point in time, we told Mr. Bloom, in substance,

4  things were critical, there was not much time left because

5  obviously we were going to have to go to the Grand Jury prior

6  to May 21st and, as a result, there was a discussion in

7  substance providing him with a factual overview of the case so

8  he could assess whether or not coming in and cooperating and

9  pleading guilty was Ms. Waters' best option at that point in

10  time.

11    He now wants to turn around and use our plea discussions,

12  our attempt to resolve this, case against us.  In truth, if

13  that is the path we are going to walk down, then at some point

14  it is going to come up that during a plea settlement

15  negotiation, Ms. Waters indicated her desire to plead guilty

16  to a conspiracy count, and the hold-up in the plea

17  negotiations was they wanted the ability to argue a no-jail

18  sentence, and we were not willing to go that low.

19    That is why plea negotiations are never brought up during

20  trial.  It is a slippery slope that is, first of all, totally

21  irrelevant to the jury and, second of all, presents horribly

22  damaging evidentiary issues both for and against a defendant.

23  This is simply irrelevant.  What has come through the

24  testimony right now, absolutely unchecked, is that there was

25  no discussions prior to Lacey Phillabaum coming in on February

1    21st.  None.

2        Therefore, what might or might not have happened with

3    regard to Ms. Waters is irrelevant.

4            THE COURT:  All right.  Let me ask this question,

5    Mr. Bloom, as you answered this in your presentation:  Is that

6    what you intend to go into, the discussion or what would be

7    classified as plea negotiations between the Government and

8    your client?

9            MR. BLOOM:  Possibly, yes.

10           THE COURT:  Understanding the consequences.

11           MR. BLOOM:  Well, let's talk about what the facts

12   are.

13           THE COURT:  I just want to make sure that I

14   understand what you are doing and that you are doing it

15   knowingly.  That's all.

16           MR. BLOOM:  Let's start with the facts.  At no time

17   ever did I say we wanted to be able to argue for probation.  I

18   said to Mr. Friedman from the beginning that, given that she's

19   facing a 35-year mandatory minimum, that this is a probation

20   case.  If they would offer probation, they would probably get

21   a plea.  Probation.  Not ask for probation; probation.

22       That's clear.  And for Mr. Bartlett to represent

23   otherwise --

24           THE COURT:  No.  What I am asking you is, was the

25   discussion that went on between the two of you, regardless of

what position you are taking, in the area of plea

negotiations?

     MR. BLOOM: Well, let me -- there were plea

negotiations, yes, but what happened on the day of the reverse

proffer is a different story.

  Here's my problem. There have been constant efforts by

the prosecution in this case to keep from the jury very

important, relevant evidence. Unfortunately, nearly always,

this Court has agreed with the prosecution.

  Most recently you have barred us from --

     THE COURT: I just want you to tell me about this.

     MR. BLOOM: I am. I really must preface it with what

I am saying.

     THE COURT: Well, I don't have all day to hear this

motion. Maybe I need to take it up at another time.

     MR. BLOOM: I was here at 8:30.

     THE COURT: I want you to briefly tell me what you

are going to do.

     MR. BLOOM: I was here at 8:30 prepared to talk about

this. I am going to tell you -- they got a chance to talk. I

would like a chance to talk. I represent my client --

     THE COURT: Tell me, please, Mr. Bloom, what you

intend to do, and then I can rule on the motion. If it's

moot, I don't need to be hearing it. That's what I am saying.

If you are going to do something, tell me.

1            MR. BLOOM:  Yes.  We intend to bring out at some

2    point, for the jury's consideration in assessing the

3    credibility of Lacey Phillabaum, Robert Corrina, and Jennifer

4    Kolar, the techniques used by prosecution investigators in

5    order to lead witnesses.

6        We heard testimony from Corrina that his wife was spoken

7    to on January 19th of 2007 by Agent Halla, and in that

8    conversation --

9            THE COURT:  That is not what I am asking --

10           MR. BLOOM:  I am trying to give you an answer.  I

11   want to give you an answer.

12           THE COURT:  What I am asking you is, are you going to

13   do this with other witnesses, or are you going to do this

14   about what went on in the conversation between the Government

15   and you?  That's what I want to know.

16           MR. BLOOM:  Well, I can give you a yes or no answer,

17   but in order for the Court to rule on what we are trying to

18   do, I think it is critical for me to be able to speak on

19   behalf of my client, to explain to the Court.

20       Excuse me a second.

21       Now, if the Court will let me explain, I will.  As I say,

22   I was here at 8:30 ready to talk about this.  The Court has

23   taken the bench a few minutes before 9:00.  Now it is 9:00.

24           THE COURT:  I don't need you to tell me when I took

25   the bench.  I want you to answer my question.

1        MR. BLOOM:  Okay.  I just need to have time.  I don't

2  want to be rushed.  This is not a talk show where I have 30

3  seconds to respond.

4        THE COURT:  Mr. Bloom, I don't know who you are

5  playing to here.

6        MR. BLOOM:  I am playing to nobody.  I am trying to

7  make a record so this is a fair proceeding.

8        THE COURT:  Talk to me about the question that I

9  asked you.  That's what I want you to do.

10        MR. BLOOM:  To suggest I am playing to somebody is

11  inaccurate.  I'm trying to make a record.

12        THE COURT:  Talk to me about the question I asked.

13        MR. BLOOM:  What the Government says in its motion is

14  that Phillabaum has denied that there was any suggestion made

15  to her by a reverse proffer.  That's for the jury to determine

16  based on all the evidence in the case, including

17  circumstantial evidence.

18      We do intend to offer circumstantial evidence that there

19  was a so-called reverse proffer made to Ms. Waters wherein she

20  was told what they wanted her to say, so that the jury can

21  infer from that circumstantial evidence that that is what they

22  did with Ms. Phillabaum, whether she denies it or admits it.

23  That is the jury's determination and not the Court's

24  determination.  This is not about plea negotiations.

25      By the way, if plea negotiations come in, that's okay.  If

the jury is told the truth that I said probation and you may

have a plea, not argue for probation; probation and you may

have a plea, I am prepared to live with that.

THE COURT:  Well, you can make yourself a witness if

you want to.  I don't know.

MR. BARTLETT:  Your Honor, we wouldn't have to do

that.  We can bring down Judge Martinez, and I think Judge

Martinez' memory will be quite different than Mr. Bloom's.

MR. BLOOM:  Well, whatever it is.  He can say what

Judge Martinez said or did not say.  I have never said

anything other than probation and you might have a plea.

Never have I said, argue for probation, ever.  I would never

do that.

Now, continuing, this is about leading potential

witnesses.  That's what it is about.  Now, if the context

happens to be plea negotiations, so be it.  But that's what

it's about.  We know -- we absolutely know, from the testimony

of Corrina -- that Agent Halla told his wife what his theory

was about the particular car.

They do that.  I want to bring out that they did exactly

that -- that kind of thing with Briana Waters.  They told her

what it was they wanted her to say by couching it in terms of

what they call a reverse proffer.  That is legitimate

evidence, and I hope the Court is prepared to reject, at last,

one of the requests by the Government.

1    Thank you.

2          THE COURT:  Well, let me say this.  If it falls in

3    the category -- and I am going to say it in this way, is the

4    best way I can say it to you -- the choice is up to you.  I

5    would hope you and Mr. Fox will get your heads together and

6    discuss this matter as it comes up.

7          If it's in the area of plea negotiations between this

8    Defendant and the Government, you are not to go there.  If you

9    are opening it in a way -- I will have to make a decision

10   about what to do about it.  I don't know what that will be,

11   but if it's opened in that way, I will do that.

12         If you are talking to and cross-examining Mr. Halla about

13   how he would do something, how he did with other witnesses,

14   that's one thing.  I am talking about what happened in terms

15   of negotiations between the Government and this Defendant.

16         Now, like I said, that is not my decision.  That is not my

17   call.  But that is my ruling, that if that is done, then I

18   will have to make a decision.  I am saying, don't go into

19   negotiations about your client and the Government.  That's my

20   narrow ruling.

21         MR. BLOOM:  If you are making a ruling that I cannot

22   do it, then I will not do it.  That will be yet another

23   instance where the Court has barred us -- has agreed with the

24   prosecution.  If that is your ruling, I will follow your

25   ruling.

1    THE COURT:  I haven't barred you from doing it.  I am

2    saying there is a consequence in doing it so -- because I

3    don't believe that would be proper to bring before this jury.

4    That's all I am saying.

5    MR. BLOOM:  So I don't quite understand.  Either I am

6    barred from doing it or I am not barred from doing it.  Could

7    you tell me which, please?

8    THE COURT:  I think you understand my ruling.

9    MR. BLOOM:  I don't.

10   THE COURT:  My ruling is that that is not proper

11   evidence to present to this jury.  If you do something

12   improper, I will have to deal with that issue.

13   MR. BLOOM:  I understand that's your ruling.  It's

14   improper evidence.  I understand that.  As we have followed

15   all your other rulings, almost all of which have favored the

16   prosecution, we have followed them.

17   THE COURT:  Well, whichever way you want to

18   characterize it, that's my ruling.

19   MR. BLOOM:  I understand.

20   THE COURT:  All right.  Then you can do that, I

21   guess, the way you want to do that.  You and Mr. Fox -- you

22   folks have to decide what's in the best interest of your

23   client.

24   The other issue -- and I don't know if that is coming up

25   here this morning or not -- that's about, I believe, 401.

1    MR. FOX:  Your Honor, that is going to be introduced

2  through Agent Halla.  We can do it.

3    THE COURT:  Is he on this morning?

4    MR. BARTLETT:  He's not on first.

5    THE COURT:  We'll take it up later.

6    MR. BARTLETT:  We can do it at the break.

7    THE COURT:  Then let's do that.  Can we have the

8  jury?  I will have the witness, Mr. Watkins have you retake

9  the witness chair.

10    (Jury present.)

11    THE COURT:  All right.  You may be seated.  Good

12  morning to you.  We are ready to go again.

13    MR. BARTLETT:  May I inquire, Your Honor?

14    TIM WATKINS, called as a witness, duly sworn

15    DIRECT EXAMINATION - CONTINUED

16  BY MR. BARTLETT:

17  Q.  When we spoke yesterday, I think you had just introduced

18  the physical items that you had collected at the Susanville

19  arson in relation to device No. 4.

20    Do you remember that testimony?

21  A.  Yes, sir.

22  Q.  Where were those items submitted?

23  A.  Those items were also submitted to the ATF laboratory in

24  Walnut Creek, California.

25  Q.  If you could take a look at what's been admitted as

1  Government's Exhibit 392-J, a photo in front of you.

2      Do you recognize that?

3  **A.**  Yes, sir, I do.

4  **Q.**  What is it?

5  **A.**  That was one of the corrals where the fence had been cut

6  to release the wild horses.

7              MR. BARTLETT:  Offer 392-J.

8              MR. FOX:  No objection.

9              THE COURT:  Admitted.

10                  (Exhibit No. 392-J admitted.)

11  BY MR. BARTLETT:

12  **Q.**  Can you point out for the members of the jury what we are

13  looking at and where you see the fence has been cut?

14  **A.**  Sure.  You can see remnants of the fence here, and in this

15  entire section here.

16  **Q.**  In addition to the cut fencing, did you notice any other

17  type of fencing at the scene that seemed a little out of

18  place?

19  **A.**  There was orange -- like a safety type orange snow fencing

20  that BLM officials indicated was not their fencing, it had not

21  been on the property before, it did not belong to them.

22  **Q.**  Would you look at 392-K, a photo?

23  **A.**  Yes, sir.

24  **Q.**  Do you recognize that?

25  **A.**  That's the same fencing, yes.

1    MR. BARTLETT:  Offer 392-K.

2    MR. FOX:  No objection.

3    THE COURT:  Admitted.

4    (Exhibit No. 392-K admitted.)

5  BY MR. BARTLETT:

6  Q.  Is that all the fencing you saw, or was there other areas

7  that had orange fencing?

8  A.  This was the only -- I mainly concentrated on the devices,

9  so this was the only fencing I was aware of.  The belief was,

10  among myself and FBI agents, that the fencing was used as like

11  a chute or funnel to try to corral horses out of the area.

12  Q.  Finally, one final paragraph.  Could you take a look at

13  what's been marked as Government's Exhibit 516-H?

14  A.  I have 515-H.

15  Q.  Take a look at it.  I probably have a typo on my list.

16  A.  Yes, sir.

17  Q.  Do you recognize that?

18  A.  Yes, sir.

19  Q.  What is it?

20  A.  That is a photo of myself, Agent Jolene Blair, I believe

21  that's a Sacramento ATF Agent, Special Agent Michael

22  Knepshield.

23    MR. BARTLETT:  Offer 515-H.

24    MR. FOX:  I have no objection.

25    THE COURT:  Admitted.

1           (Exhibit No. 515-H admitted.)

2    BY MR. BARTLETT:

3    **Q.**  First of all, do you see yourself?

4    **A.**  Yes, sir.

5    **Q.**  What is going on?

6    **A.**  We were sifting through debris, collecting components from

7    the burned area.

8    **Q.**  Is this a photo that either yourself or FBI agents took

9    that you were aware of?

10   **A.**  No, sir, not that I am aware of.

11          MR. BARTLETT:  No further questions, Your Honor.

12          MR. FOX:  I have no questions.

13          THE COURT:  Then you may step down.

14          MR. BARTLETT:  At this time, the United States calls

15   Michael Morgan to the stand.

16          THE COURT:  Raise your right hand, please.

17          MICHAEL MORGAN, called as a witness, duly sworn

18          THE COURT:  Take the witness chair, please.

19                    DIRECT EXAMINATION

20   BY MR. BARTLETT:

21   **Q.**  Can you tell the members of the jury your first and last

22   name and spell your last name for the Court Reporter.

23   **A.**  Michael Morgan, M-O-R-G-A-N.

24   **Q.**  Where do you work, Mr. Morgan?

25   **A.**  Sir, I work with the Bureau of Alcohol, Tobacco and

1    Firearms, and in that agency I am with the Explosives

2    Technology Branch.

3    **Q.**  Can you walk the members of the jury through your

4    educational background and what happened after you got out of

5    school?

6    **A.**  Yes, sir.  After graduating high school, I went into the

7    Marine Corps, in 1984.  I went into the Marine Corps in 1984

8    and in the Marine Corps for approximately 14 years.  Twelve of

9    those years were spent as an explosive ordnance disposal

10   technician.

11        An explosive ordnance disposal technician, the school is

12   six months long.  I went through in 1986.  I started in 1986,

13   graduated in January of 1987.  It's a six-month school.  In

14   that school, you learn basic explosives handling, some pretty

15   good fundamentals for explosives handling, and then you move

16   on from there into basic ordnance recognition, identification.

17        From there, you start moving on to more specific ordnance.

18   You learn how to identify, render safe, transport and dispose

19   of ground ordnance, aviation ordnance, nuclear weapons,

20   chemical and biological weapons and improvised explosive

21   devices.

22   **Q.**  After graduating from this school, what was your

23   assignment with the Marine Corps?

24   **A.**  For the next eight years after graduating the EOD school,

25   I was an explosive ordnance technician, and that job is

1  basically -- it's the military bomb squad.  We respond out to

2  found ordnance or improvised devices and then we deal with

3  those accordingly.

4      My first two years were spent in Okinawa, Japan at the

5  Marine Corps unit out there.  We were dealing with World War

6  II ordnance there found in hazardous locations, built-up

7  areas, in unknown conditions.

8      From there, my last four years was spent as an instructor.

9  I went back to the EOD school and I was an instructor.

10  **Q.**  When you say EOD, Explosive Ordnance School?

11  **A.**  Yes, sir.  Explosive Ordnance Disposal School.  My last

12  four years in the Marine Corps were spent as an instructor

13  there.  My first year-and-a-half was spent in the ground

14  ordnance division where I was the lead instructor, the subject

15  matter expert for rockets and then land mines and boobie

16  traps.

17      From that section, I ended up going over to the improvised

18  explosive devices, the IED section.  While I was there for

19  approximately two-and-a-half years, I was the lead instructor

20  or SME for that section.  While I was there, I was Designated

21  Instructor of the Year in 1997.

22  **Q.**  In 1999, did you decide to change careers?

23  **A.**  Yes, sir.  In 1999, I left the Marine Corps and joined ATF

24  as a federal law enforcement officer and this job is -- I am

25  not a Special Agent.  A lot of the government law enforcement

officers you've met are Special Agents.

I am an explosives enforcement officer. My career in ATF focuses specifically on explosive devices, incendiary devices, destructive devices.

**Q.** What training, if any, have you received since joining ATF?

**A.** Since joining ATF, after Basic Criminal Investigator School, which is basically learning law enforcement -- remember, I spent my first 14 years in the Marine Corps, so I joined ATF, learned basic law enforcement for, I believe it was about 11 weeks or so.

Then after that, we had a program in our branch that we had set up called EEO 1 and EEO 2, which was explosive enforcement officer 1 and explosive enforcement officer 2.

In those two presentations -- in those two short courses, we basically learned what exactly ATF expected of us and how we were supposed to look at the definition of a destructive device, how that worked into our basic knowledge that we had before, and basically how to look at a destructive device, a pipe bomb, an incendiary bomb, an improvised grenade and, based on our training, knowledge and experience, how to determine whether or not that meets the definition of a destructive device as that term is defined in 26 U.S.C. 5845(f).

**Q.** Are you certified?

1   **A.**  Yes, sir.

2   **Q.**  Do you have any certifications?

3   **A.**  As in?

4   **Q.**  Are you a member of any professional organizations?

5   **A.**  Not many, sir.  I was a member of IABTI, International

6   Associations of Bomb Technicians and Investigators, and I am

7   currently not a member of it.

8   **Q.**  Have you ever testified as an expert in the area of

9   identification of explosives and destructive devices?

10  **A.**  Yes, sir, I have.

11  **Q.**  How many times?

12  **A.**  This is the 13th or 14th time I have testified as an

13  expert witness.

14  **Q.**  Specifically, what do you consider your expertise?

15  **A.**  I have been designated an expert witness in explosives and

16  destructive devices.

17          MR. BARTLETT:  Offer Mr. Morgan as an expert.

18          MR. FOX:  May I voir dire the witness?

19          THE COURT:  You may.

20                    VOIR DIRE EXAMINATION

21  BY MR. FOX:

22  **Q.**  I am Neil Fox.  Is it Agent Morgan or Mr. Morgan?

23  **A.**  Mr. Morgan is fine, sir.

24  **Q.**  Mr. Morgan, you are not a certified arson investigator?

25  **A.**  No, sir.

1          MR. FOX:  Your Honor, I would object to this witness

2     being an expert with regard to arson.

3          THE COURT:  Well, what are you offering his testimony

4     for?

5          MR. BARTLETT:  I am not offering it with regard to

6     arson.  His expertise is with regard to explosive devices and

7     incendiary devices.

8          MR. FOX:  I have made my objection.

9          THE COURT:  All right.  You may testify.

10                   DIRECT EXAMINATION - CONTINUED

11    BY MR. BARTLETT:

12    Q.  Where are you assigned to work in ATF?

13    A.  I am assigned to Benetia, California.

14    Q.  What's there?

15    A.  Our regional office, the Explosives Technology Branch

16    Western Regional Office.

17    Q.  How is it that you get cases?  How do they come to your

18    attention, and what do you do when you get them?

19    A.  There's a couple different ways they come to our

20    attention, but the normal process is -- and I believe this

21    case followed that same avenue -- the incident occurs, either

22    an arrest or a search warrant or a device was used or a fire

23    or explosion or something along those lines, the event.  The

24    evidence is collected.  The scene is investigated.  All those

25    materials make their way back out to the laboratory for

1  physical processing.

2      In ATF's case -- and in this case -- that evidence went to

3  the ATF laboratory in Walnut Creek, California.  At the time

4  of this case, our office was in Walnut Creek.  We were

5  actually right across the hall from the arson chemists.

6      They look at the evidence.  A lot of times we get

7  questions.  They will come right across the hall and ask us to

8  look at it and see what we thought of it, but eventually they

9  will finish with the evidence.

10 **Q.**  You say they will finish looking at the evidence.  Who are

11 you referring to?

12 **A.**  Yes, sir, the chemists.  In particular, I believe Brad

13 Galvan -- I am sorry, Brad Cooper was out here looking.  He

14 had testified.  He looked at the material.  When he was done

15 with it, he would put that back into -- package it back up and

16 then we would get it, and we would look at this evidence.

17 Then we would go through it to determine whether or not it

18 meets the definition of a destructive device.

19         MR. FOX:  I would object, Your Honor, to him

20 concluding or saying he's going to conclude something that

21 meets a legal definition.

22         THE COURT:  Let's let him tell what he did.

23 BY MR. BARTLETT:

24 **Q.**  So were you eventually asked at some point to examine 21

25 items of evidence that had been submitted with regard to an

1 arson that occurred on October 15, 2001 at Susanville,

2 California?

3 **A.** Yes, sir, I did look at that material.

4 **Q.** What type of analysis did you do when you looked at it?

5 Did you already have the conclusions that Mr. Cooper had?

6 **A.** Well, I remember this case pretty specifically.

7 Mr. Cooper would come over and he would talk to me about this

8 case; we would look at the devices. I would just walk across

9 the hall to his tables where he was at, and we would just look

10 at it and he'd have things laid out -- it was a lot easier

11 when he'd have it laid out -- and what he had seen and what he

12 had noticed, and he'd point things out that he had saw. And

13 as I'm looking through it, I remember specifically this case.

14 **Q.** Did you, in fact, have any conclusions with regard to

15 whether there was there any petroleum or heavy distillates

16 found by Forensic Chemist Brad Cooper?

17 **A.** In his report, yes, he determined that there was petroleum

18 based product. I don't remember what he specifically called

19 it.

20 **Q.** Could you take a look at the items that have been

21 introduced into evidence as 392-I, 392-L and 392-M?

22 **A.** Are we talking about this material here?

23 **Q.** Yes.

24 **A.** Yes, sir. Would you like me to bring it over?

25 **Q.** Yes, please. Is this one of the items you analyzed with

1    regards to the Susanville arson?

2  **A.**  Yes.

3  **Q.**  Can you take them one at a time and explain to the members

4    of the jury what, if anything, of relevance you found, taking

5    first 392-I?

6  **A.**  Which item is 392-I?

7        MR. BARTLETT:  Actually, I apologize, Your Honor.

8    It's 392-L, which I believe is ATF Exhibit 19.

9  **A.**  How is that item described, sir?

10   BY MR. BARTLETT:

11  **Q.**  Do you see a --

12  **A.**  Yes, 19.

13  **Q.**  Take the stand and tell me what you found in that.

14  **A.**  Yes, sir.  May I open the container?

15  **Q.**  Yes.

16  **A.**  What we have here is two plastic containers, Ziploc

17   containers, kind of like a Tupperware container.  Basically,

18   these are two separate devices, these are two timing devices.

19   They were wired together, and they were attached to two rocket

20   motor igniters, model rocket motor igniters.  Think of the toy

21   rocket motors that you can purchase at hobby stores, and a lot

22   of -- it's kind of a hobbyist deal.  You probably understand

23   what I am saying, where you launch the rocket in the sky.

24       Well, they have electric rocket motor igniters that fit

25   into the base of those things, and they were attached to here

and they were attached also to -- they were set within two books of matches that were taped to a road flare, a common roadside safety flare.

So we have two devices here. They are similar. So inside of this device, you have a digital alarm clock, a little travel digital alarm clock that you would take with you when you go to a hotel or you are traveling.

You have a 9-volt battery. A little LED light. A light emitting diode, just a small little light bulb, think of it. This thing here, this little electronic device, it's called an SCR, a silicone controlled rectifier.

So, this travel alarm clock, battery in the back, the alarm is set, and at a predetermined time, your travel alarm clock starts to beep.

Well, if you take the speaker or the buzzer and you clip the wires off of that and you run those into -- basically, you are tapping into this, and you run one of those wires to this silicone controlled rectifier, this SCR, and then back into it.

Think of this silicone controlled rectifier as a light switch. It's a light switch that doesn't have any moving parts. It's found in small electronic items.

If you take a light bulb and a light switch and your regular power coming out of the wall, power goes into the light switch, the light switch is open, it means that no

1  electricity is passing through.

2      The moment you close that light switch, power moves on

3  through.  Well, that has obviously physical motion there.

4  This works in the exact same way, but it doesn't have any

5  power moving through it or any physical motions.

6      So you have -- and I will explain that here in a moment.

7  On the other side of this silicone controlled rectifier, the

8  SCR, you have a 9-volt battery, a wire running out to that up

9  to the SCR, coming back out the other end, the wire goes out

10  to a rocket motor igniter and then back to the battery.

11      That's the circuit that is going to initiate the rocket

12  motor igniter.

13  **Q.**  Why are there two plastic containers there?

14  **A.**  The two plastic containers are there as -- one is a backup

15  to the other to ensure that you will have ignition.

16  **Q.**  Could you take a look at a photo that's already been

17  entered into evidence, 392-I?

18      Do you see the various things you've been talking about.

19  I think it appears on the screen in front of you.

20  **A.**  Yes, sir.

21  **Q.**  Do you see the various items that you talked about?

22  **A.**  Yes, sir, I do.

23  **Q.**  Why don't you point them out to the jury.

24  **A.**  Well, in this picture, you will see off to the left -- you

25  will see the two blue containers, these items here.  You will

1 see the wires running between them and then you will see some

2 wires running up to or beside the road flare that's sitting on

3 top of that five gallon plastic bucket.

4    You will notice that the top is cut open, cut open from

5 the top, or at least a portion of it.  Well, the wires lead

6 over to the other end of the road flare, and attached to that

7 road flare is a book of matches.  There are two paper

8 matchbooks with the covers taken off.  Layered in between that

9 is the two rocket motor igniters, and then that's taped

10 together with electrical tape.

11 **Q.**  If you could take a look at 392-N, which is also beside

12 you, which is a white plastic lid with components from device

13 4.

14 **A.**  Which item was that?

15 **Q.**  392-N.

16 **A.**  Yes, sir, this item here.

17 **Q.**  If you can take that out and tell me what, if anything of

18 relevance, you found in that.

19 **A.**  This right here, you have your book of matches.  There

20 appear to be three books of matches here.  Off here to the

21 side, you have two SD's, model rocket motor igniters, and then

22 the wires that are pretty well connected and moving back off

23 and they have been clipped, right here by where my finger is.

24 Somebody had gone in there and -- a bomb technician had gone

25 in there, I believe, and cut the wires before this device

1 initiated.

2     You also have your standard road flare. Electrical tape.

3 This is the standard way that the chemists -- I've noticed

4 that this is how they set it up afterwards. When they peel

5 the tape off, they stick it onto these little document

6 protectors.

7     And then the lid of the device, and you will notice that

8 there's a big cut off of the lid.

9 **Q.** Looking at 392-I, before the item was sent to the lab,

10 what appears to be in the bucket where that open lid was

11 above?

12 **A.** Sir, there's a brown liquid there.

13 **Q.** Was that analyzed by Brad Cooper?

14 **A.** Yes, sir, it was.

15 **Q.** What was it found to be?

16 **A.** I don't have the paperwork in front of me, what he

17 determined it to be.

18 **Q.** We'll rely on the jurors' memory of his testimony.

19     You looked at -- just take a look at one of the devices

20 which I believe ATF referred to as device No. 4; is that

21 correct?

22 **A.** Which one was No. 4, sir?

23 **Q.** The one found at the house.

24 **A.** This whole device, yes, sir.

25 **Q.** Were there other devices that you analyzed that we are not

1  going to look at?

2  **A.**  Yes, sir.  There were three devices that were already

3  functioned and -- yes, sir, there were three devices and one

4  that was not functioned, I believe.

5  **Q.**  Did you make a determination -- looking at what you've

6  gone through, were you able to reach an opinion as to what it

7  is that you've been talking about?

8  **A.**  Yes, sir.

9  **Q.**  What is your opinion?

10        MR. FOX:  Your Honor, I would object.  His opinion is

11  irrelevant, and the jury will make the ultimate decision.

12        THE COURT:  It's noted.  You may answer.

13  BY MR. BARTLETT:

14  **Q.**  What is your opinion?

15  **A.**  Yes, sir.  My opinion, looking at this, is that there were

16  four destructive devices present.

17  **Q.**  Specifically, what type of destructive devices?

18  **A.**  Incendiary bombs, improvised incendiary bombs.

19  **Q.**  Why do you say that?

20  **A.**  Well, you have an incendiary material, which the chemist,

21  Brad Cooper, had determined.  I don't remember if he called it

22  a petroleum product, a kerosene or in particular what he

23  called it.  They are very specific about that.

24        Then on top of that, you had a means of initiation, an

25  initiating system, and a container where this whole thing is

1 packaged into.

2       MR. BARTLETT:  Thank you.  No further questions.

3                 CROSS-EXAMINATION

4 BY MR. FOX:

5 **Q.**  Good morning, Mr. Morgan.  I am Neil Fox, one of

6 Ms. Waters' attorneys.

7      Mr. Morgan, the case you are talking about relates to a

8 fire down at Susanville, California?

9 **A.**  Yes, sir.

10 **Q.**  In October of 2001?

11 **A.**  Yes, sir.

12 **Q.**  We are not talking about the Center for Urban Horticulture

13 in Seattle, Washington, right?

14 **A.**  No, sir.

15 **Q.**  Now, your background was as a naval explosives officer?

16 **A.**  No, sir.  I was a Marine.

17 **Q.**  I am sorry, Marine.  I think it was the other one that was

18 in the Navy.  You were in the Marine Corps.  I am very sorry.

19      But basically, you dispose of bombs?

20 **A.**  That was my initial training, yes, sir.

21 **Q.**  Then you went into the ATF, I think you said, in 19 --

22 **A.**  1999.

23 **Q.**  And you had some more training at the ATF?

24 **A.**  Yes, sir.

25 **Q.**  But you are not a certified fire investigator?

1    **A.**   No, sir, I am not a certified fire investigator.

2    **Q.**   You also -- with regards to this case, you don't go out to

3    the scene and collect the evidence?

4    **A.**   I do, sir, but not in this particular case.

5    **Q.**   In this particular case, that's not what you did?

6    **A.**   Correct.

7    **Q.**   You are also -- you are not a scientist, right?

8    **A.**   Well, I don't wear a lab coat, no, sir.

9    **Q.**   Mr. Cooper, who works in your office, he's the chemist?

10   **A.**   Yes, sir, he is.

11   **Q.**   So basically, when you are looking at the devices you've

12   been talking about, would you agree that they had three

13   components?

14   **A.**   Three components?

15   **Q.**   Well, there's a time delay mechanism, right?

16   **A.**   Yes, sir.

17   **Q.**   There's an ignition method, right?

18   **A.**   Means of initiation, yes, sir.

19   **Q.**   And then there's the accelerant, whatever that was in this

20   particular case?

21   **A.**   The incendiary material, yes.

22   **Q.**   And that can be gasoline or some petroleum product or

23   kerosene or whatever?

24   **A.**   There's a lot of things it could be, yes.

25   **Q.**   You came to the conclusion this was an incendiary bomb?

1  **A.**  Yes, sir.

2  **Q.**  Now, when you came to this conclusion, is it true that you

3  just basically look at the definition in the code book and

4  make your conclusion whether it fits that definition, right?

5  **A.**  Well, I have several years of training, knowledge and

6  experience where I have to use that to determine whether or

7  not, in my opinion, it meets that definition.

8  **Q.**  But this is basically just your opinion, right?

9  **A.**  Well, there's a lot more to it, sir.  Yes, sir, it is my

10  opinion, but I have been designated -- the Federal Government

11  has designated ATF as the agency that will make the

12  determination of what is a destructive device, and ATF has

13  further defined that down to be in the explosives technology

14  branch of which I am part of.  I am an explosives enforcement

15  officer and that is our task.  That is the main focus of our

16  job.

17  **Q.**  But ultimately, it is the jury's decision, is it not, to

18  make that decision?  It's not your decision.  You are not the

19  jury, right?

20  **A.**  Well, I write the opinions, sir.

21  **Q.**  Right.  You make your opinion, you come to court and you

22  testify, right?

23  **A.**  Yes, sir.

24  **Q.**  Okay.  But the ultimate issue as to whether this device or

25  any device fits the legal definition is up to the jury, right?

1  **A.**  Well, sir, that's how I understand it.  Yes, sir.

2  **Q.**  Now, with regard to the bucket, I think you testified that

3  the lid was open, it was cut open?

4  **A.**  Yes, sir, like a half moon.

5  **Q.**  So it wasn't a sealed container; is that correct?

6  **A.**  Well, it was a container, sir.

7  **Q.**  But it wasn't sealed?

8  **A.**  Completely sealed, no.  There was a cut in the lid.

9  **Q.**  Right.  Isn't it true that there was, with regards to this

10  device, no build-up of pressure inside that container that

11  burst the container?

12  **A.**  No, sir, that's not how this device functions.

13  **Q.**  Basically, the container holds the accelerant, right?

14  **A.**  Yes, sir.

15  **Q.**  Something sets it on fire?

16  **A.**  Yes, sir.

17  **Q.**  Would you agree with me that it doesn't really matter

18  whether you have a rocket -- a model rocket igniter and a road

19  flare that sets it on fire, or if you had a match, the effect

20  would be the same?

21  **A.**  The ensuing fire would have -- it would be similar, yes,

22  sir, but the method of initiation is vastly different.  I

23  mean, that's apples and oranges.

24  **Q.**  Right.  But the method of initiation is different, but the

25  effect, the fire, would be no different than if you used a

1 match or if you used this rocket igniter, right?  Is that fair
2 to say?
3 **A.**  The physical events of the fire as it is starting to burn,
4 bubble over, melt the container down, as the material is
5 burning, yes, sir, that is the same.
6 **Q.**  The fact that there's a timing delay device, that only
7 allows the person to leave the scene before the fire starts,
8 right?
9 **A.**  Well, not just -- but to safely do it, so that you are not
10 there while it's happening.  There's a lot of reasons why
11 people choose that.  But that is a method that -- it's a
12 common technique being used in Iraq right now.
13 **Q.**  But with regards to the timing mechanism, you don't need a
14 timing mechanism to set a bucket of gasoline on fire, right?
15 Would you agree with me?
16 **A.**  Just to set it on fire, no, sir, an open flame.
17 **Q.**  Sure.  And you are familiar with the Vail fire, right, at
18 the Vail Ski Resort?
19 **A.**  I know about it, sir.  I didn't -- I believe that happened
20 before I came on with ATF.
21 **Q.**  Are you aware that there were no sophisticated timing
22 devices for that fire?
23 **A.**  I really don't know much about it, sir.
24 **Q.**  So the fact that there's a timing device, that doesn't
25 make this an incendiary bomb, correct?

1    **A.**  The timing device is a huge factor in making it an

2    incendiary device, an incendiary bomb, yes, sir.

3    **Q.**  Well, let's say someone stood there with a very long stick

4    of Fire Starter or something like that, the effect would be

5    the same, would it not?

6         It doesn't matter whether the person is there or not, it

7    would still cause a fire, right?

8    **A.**  If it was contained, and somehow an individual caused that

9    device to start to burn.

10   **Q.**  Right.

11   **A.**  That would be an incendiary bomb.  Whether you were

12   standing there -- think of it as a molotov.  I mean, you are

13   standing right there when it's being tossed.  It's still an

14   incendiary bomb.

15   **Q.**  In your opinion.

16   **A.**  I believe it's been held up in court several times, yes.

17            MR. FOX:  Your Honor, I would object to his

18   understanding of --

19            THE COURT:  You are asking him the question.

20   BY MR. FOX:

21   **Q.**  Well, with a molotov, there's a containment, is there not?

22   The glass is contained?

23   **A.**  Until the moment that it breaks open and impacts a target.

24   The glass in molotov -- which this is not a molotov, but you

25   are asking a question about a molotov -- the glass of a

1 molotov, think of a liquid container, a glass container and

2 you have the fuel inside. Think of it as gasoline.

3     Then you have some means of ignition on the outside, a

4 wick and it's lit. As long as the container is completely

5 sealed, the fire is not going to get in, there's not going to

6 be oxygen, it's going to be good -- well, it's not good, but

7 you are not going to have this huge fire.

8     The moment that it impacts a hard target, a rock, a cement

9 wall, the asphalt or something that causes that glass to

10 shatter, it's no longer contained, it's exposed to the air.

11 The fuel starts to aerate -- think of it as vaporizing -- that

12 surface, as the fumes are moving up and the flame comes in

13 contact with those vapors, because it is now out in the open,

14 like this device where the flames can get to the fuel, it's

15 open and now you have your fire.

16 **Q.** But it's almost an instantaneous fire spread out over a

17 large surface area, right?

18 **A.** Yes, sir, in that particular case. That's not how this

19 one works.

20 **Q.** Right. This is not a molotov cocktail, right?

21 **A.** Correct, sir.

22 **Q.** Ultimately, would you agree with me that's -- let me

23 strike that.

24     You said that there was a fail safe, like a second timer,

25 right?

1  **A.**  Yes, sir, when you have a backup.

2  **Q.**  If you were standing there hand-lighting the bucket of

3  gasoline on fire, you wouldn't need to have a backup, would

4  you?

5  **A.**  Well, if -- if you are standing there and you have the

6  open flame and it doesn't catch fire the first time, you can

7  do it the second time.  But if you are not going to be there

8  and you want to ensure it goes off, you have a backup.

9  **Q.**  Apparently, in this case it didn't go off, right?  There

10  were two timers and neither of them went off, right?

11  **A.**  Well, they didn't function; the device did not function,

12  yes, sir.

13  **Q.**  So ultimately, if you really wanted it to go up, you'd

14  have to stand there and light it, right, to be completely

15  certain that it goes up?

16  **A.**  But then you are on scene of the crime, sir.  I mean,

17  that's the reason for a time delay, is so that you can set the

18  device, start the initiation sequence by plugging everything

19  together and the clock is ticking or, in this case, it's

20  counting down or it's actually functioning, and you can leave

21  the area so you don't get caught.

22  **Q.**  One final question, sir.  A molotov cocktail is something

23  that one person alone can throw, right?

24  **A.**  Yes, sir.  That's one description of it, it's a

25  hand-thrown device.

1  **Q.** This device, the one from Susanville, that's not something
2  that one person standing alone could like throw, right?
3  **A.** No, sir, that's not the means of delivery for this device.
4  It's not designed anything like that.
5  **Q.** Right. In fact, the means for delivery, someone just has
6  to bring the gasoline in by hand and then set the device right
7  there, right?
8  **A.** Well, this container of fuel, somebody took that, placed
9  it where those devices then functioned and then where this
10 device was recovered; yes, sir.
11 **Q.** And then they set it up at the scene, right?
12 **A.** Portions of it. If you look, there's some connections,
13 some quick disconnects in here.
14 **Q.** So they connected it right there, right?
15 **A.** Well, I wasn't there, sir, I don't know. That does look
16 like how it is designed.
17 **Q.** Have you debriefed with Jennifer Kolar about how these
18 devices were set?
19 **A.** No, sir, I haven't talked to anybody involved in this, any
20 of the defendants or witnesses.
21 **Q.** Thank you.
22         MR. FOX: I have no further questions.
23         MR. BARTLETT: Nothing, Your Honor.
24         THE COURT: All right. You may step down.
25         MR. FRIEDMAN: Your Honor, the Government is going to

1    call Leland Stice.

2        THE COURT:   Would you come forward, sir, and be

3    sworn?

4        Raise your right hand.

5            LELAND STICE, called as a witness, duly sworn

6        THE COURT:   Come around and take the witness chair.

7                    DIRECT EXAMINATION

8    BY MR. FRIEDMAN:

9    **Q.**  Good morning, Agent Stice.

10   **A.**  Good morning.

11   **Q.**  Can you tell us your whole name and spell your last name

12   for the Court Reporter?

13   **A.**  Leland Stice, L-E-L-A-N-D, Stice is S-T-I-C-E.

14   **Q.**  For whom do you work?

15   **A.**  I work for the Bureau of Alcohol, Tobacco, Firearms and

16   Explosives.

17   **Q.**  Where do you work?

18   **A.**  I am a Special Agent and currently assigned to the

19   Portland, Oregon field office.

20   **Q.**  As a Special Agent, what do you do?

21   **A.**  My primary duties are investigating violations of the

22   federal firearms laws and also violations of federal arson

23   explosive laws.

24   **Q.**  You said you are assigned to the Portland office.  Were

25   you in Arizona on December 7th of 2005?

1  **A.** Yes, I was.

2  **Q.** Why were you there?

3  **A.** I had been sent there to assist in the arrest and a search

4  warrant.

5  **Q.** Whose residence -- whose arrest were you assisting in?

6  **A.** The person arrested was named William Rodgers.

7  **Q.** What were you searching that day?

8  **A.** A business and residence located there at -- I believe the

9  address was 109 McCormick Street in Prescott, Arizona.

10         MR. FRIEDMAN:   May the witness be shown Exhibit 501?

11  BY MR. FRIEDMAN:

12  **Q.** It should appear on your screen.  It's been admitted.

13      Do you recognize that?

14  **A.** Yes, I do.  That's the main entrance of the business to

15  the residence.

16  **Q.** Do you see a sign to the left of the door?

17  **A.** Yes.  It says "The Catalyst InfoShop."

18  **Q.** You said this was also a residence?

19  **A.** Yes.  Part of this building was beds and that sort of

20  thing, a residence.

21  **Q.** In general terms, where was the residence within this

22  building?

23  **A.** Well, from this exhibit here, you see the front door.

24  When you walked in the front door, what appeared to be

25  directly inside the front door was the business book shop area

1  and then you could go off to the right in that larger area,

2  you can see in the picture, in the upstairs area were the beds

3  and that sort of thing where the residence was.

4  Q.  Now, you participated in that search?

5  A.  Yes, I did.

6  Q.  Roughly how many agents were involved in that search?

7  A.  There were numerous agents from the FBI there.  I would

8  say probably a total of 10 personnel within the residence,

9  business.

10  Q.  I am going to ask you about some things you found and some

11  things some of the other agents found.

12      Would you take a look at Exhibit 509 and tell me if you

13  recognize that?  Do you recognize it?

14  A.  Yes, I do.

15  Q.  How do you recognize it?

16  A.  I recognize the evidence envelope, the item number.  This

17  is a small note, a handwritten note.  That was a note that I

18  found in a backpack at the residence.

19          MR. FRIEDMAN:  Offer 509.

20          MR. FOX:  No objection.

21          THE COURT:  Admitted.

22              (Exhibit No. 509 admitted.)

23  BY MR. FRIEDMAN:

24  Q.  Do you see what's on the document camera -- what you are

25  looking at?

1  **A.**  Yes.

2  **Q.**  Could you hold it up for the jury so they can see?

3  **A.**  (Complying).

4  **Q.**  Is it fair to say that piece of paper has several names

5  and addresses on it?

6  **A.**  Yes.

7  **Q.**  Do you see a name and some information down here on the

8  right-hand side written in pencil?

9  **A.**  Yes.

10  **Q.**  It's a little unclear on the screen.  Could you read the

11  name and the information you see there for the jury?

12  **A.**  Yes.  On this exhibit right here, there's the name Justin

13  and there is the phone number of 360-796-0379.

14  **Q.**  Now, was one of the other people that participated in that

15  search Agent Kurt Hemphill from the FBI?

16  **A.**  Yes, he was.

17  **Q.**  He's a computer agent, an agent who's involved in computer

18  forensics and studying computers; is that correct?

19  **A.**  Yes.

20  **Q.**  Did he find some computer-related evidence in the house?

21  **A.**  Yes, he did.

22  **Q.**  Would you take a look at Exhibit 514-A and tell me if you

23  recognize that?

24  **A.**  Yes.

25  **Q.**  Can you tell us in general terms what that is?

1   **A.**   Yes.   This is two floppy disks and one compact disk.

2   **Q.**   Are those disks that were found by Agent Hemphill?

3   **A.**   Yes.

4          MR. FRIEDMAN:   The Government offers Exhibit 514-A.

5          MR. FOX:   No objection.

6          THE COURT:   Admitted.

7                  (Exhibit No. 514-A admitted.)

8   BY MR. FRIEDMAN:

9   **Q.**   Was there also an Agent Ann Fasano who participated in the

10  search?

11  **A.**   Yes, she was.

12  **Q.**   Who is she?

13  **A.**   She's an agent with FBI.

14  **Q.**   Would you take a look at Exhibit 508 and tell me if you

15  recognize that?

16  **A.**   Yes, I do.

17  **Q.**   Can you tell us in general terms what that is?

18  **A.**   This is several handwritten pages on 8 1/2 by 11 paper.

19  It appears to have some notes.

20  **Q.**   Are those pages found by Agent Fasano?

21  **A.**   Yes.

22          MR. FRIEDMAN:   Government offers Exhibit 508.

23          MR. FOX:   Subject to our discussions with

24  Mr. Friedman, no objection.

25          THE COURT:   All right.   Admitted.

1                      (Exhibit No. 508 admitted.)

2 BY MR. FRIEDMAN:

3 **Q.** Is it fair to say there are three pages in that exhibit?

4 **A.** Yes.

5 **Q.** I am going to put those on the overhead projector. This

6 is the first page?

7 **A.** Yes.

8 **Q.** I guess there are roughly four paragraphs on there. Can I

9 ask you to read the first paragraph and the fourth paragraph

10 to the jury?

11 **A.** Yes. The first paragraph here says, "Old-fashioned

12 kitchen timer, step 6, attaching bullet connectors -- add,

13 refer to section bullet connectors, use alligator clips."

14 **Q.** Could you read the --

15 **A.** Excuse me.

16 **Q.** Would you read the fourth paragraph for us?

17 **A.** Are you referring to the SCR digital paragraph?

18 **Q.** Yes.

19 **A.** "SCR digital. Caption under diagram should read: We

20 suggest following the written instructions, also under

21 diagram, the wires' lengths are not very clear."

22 **Q.** Turning to the second page, is it fair to say this appears

23 to be an outline for something?

24 **A.** Yes.

25 **Q.** Could you read the headings that are in the boxes?

1    **A.**   Yes.   At the top of the page it says, "Planning and

2    recon."   About midpage it says, "basic monkey wrenching."

3    **Q.**   And there are subheadings under each of those?

4    **A.**   Yes, there is.

5    **Q.**   Turning to the third page, a heading and some boxes?

6    **A.**   Yes.   At the top of the page it says "Creating a strong

7    group."

8    **Q.**   Could I ask you to just read each of the major

9    subheadings?

10   **A.**   It says "Eco Philosophy.   History.   Strategy.   Security.

11   Shoplifting.   Fake ID.   Support Networks."

12   **Q.**   Would you take a look at 506 and tell me if you recognize

13   that?

14   **A.**   Yes.   This is a green folder that was another item found

15   by Agent Fasano at the residence.

16   **Q.**   Was there a label on that at the top of folder?

17   **A.**   Yes, there was a label affixed to the top of the folder.

18   **Q.**   Is that label still there?

19   **A.**   No.

20   **Q.**   Would you look at 507 and tell us what that is in general

21   terms?

22   **A.**   Yes.   This is several labels that were off numerous

23   folders.

24   **Q.**   Is one of those the label that was on the folder that is

25   506?

1    A.  Yes, the label right here, it says "Seattle Biotech."

2          MR. FRIEDMAN:  Government offers Exhibit 506.

3          MR. FOX:  No objection.

4          THE COURT:  Admitted.

5              (Exhibit No. 506 admitted.)

6    BY MR. FRIEDMAN:

7    Q.  I have put a document on the screen that's Exhibit 507.

8    A.  Yes.

9    Q.  This label right down here, is that the one to which you

10   were referring a moment ago?

11   A.  Yes.

12   Q.  What does that label say?

13   A.  "Seattle Biotech."

14   Q.  Turning back to 506, the green folder on which that label

15   was found, can you tell us in general terms what's in that

16   folder?

17   A.  Yes.  There's several 8 1/2 by 11 typed pages that have

18   businesses' and companies' names and addresses.

19   Q.  Towards the back, is there an eight-page document, typed

20   document, with the pages numbered at the bottom?

21   A.  Yes, there is.

22   Q.  If we look for a moment at the first page of that, what

23   does this appear to be?

24   A.  Several listings of research companies and their phone

25   numbers and addresses.

**Q.** Biotechnology Research Lab, Washington Biotechnology, et cetera?

**A.** Et cetera, yes.

**Q.** If we turn to page 7, do you see a large paragraph in the middle of the page that begins with the words "I have"?

**A.** Yes, I do.

**Q.** Could you read that paragraph for the jury, down to where there's an address at the bottom?

**A.** Yes. It says, "I have the name of a fella who does forestry genetics. He's the head of the PMGC poplar molecular genetics cooperative: Toby Bradshaw, 616-1796. He's at the Center for Urban Horticulture (CUH) 16 Merrill Hall. Email address: Toby@u.washington.edu. This has but the greenhouses haven't" --

**Q.** I think you skipped a line there.

**A.** I'm sorry. "This has been visited as well, but the greenhouses haven't. UW's CUH have the Douglas Research Conservatory. It's a huge greenhouse in four main segments. It is completely open on both sides with a fence around the back. It's glass. Seemingly accessible. Didn't see any signs of security. Center for Urban Horticulture, 543-8616, RD Merrill Hall, 3501 N.E. 41st Street."

**Q.** This was found in William Rodgers' residence?

**A.** Yes.

**Q.** Thank you, Agent Stice.

1        MR. FRIEDMAN:   No further questions.

2                    CROSS-EXAMINATION

3    BY MR. FOX:

4    **Q.**  Good morning, Agent Stice.  I am Neil Fox, one of

5    Ms. Waters' attorneys.

6    **A.**  Good morning.

7    **Q.**  I just have a few questions.

8         This book store was in Prescott, Arizona?

9    **A.**  That's correct.

10   **Q.**  And the search was in December 2005?

11   **A.**  Yes.

12   **Q.**  And there was also a residence next door or contained in

13   the same building?

14   **A.**  Yes.

15   **Q.**  So you have a book store that has books, right?

16   **A.**  Yes.   There was an area that had some books and then some

17   adjoining rooms that had like tables and book shelves.  It

18   kind of turned into -- the other side of the residence was

19   more associated with a residence, with storage and beds and

20   that sort of thing.

21   **Q.**  As you indicated from the picture, the book store was

22   identified with a sign, right?

23   **A.**  Yes.

24   **Q.**  Turning your attention to what's been admitted as 509,

25   this was the sheet of paper with names and addresses?

1  **A.**  Yes.

2  **Q.**  It's on the screen now actually?

3  **A.**  Uh-huh.

4  **Q.**  You don't know who wrote these things, do you?

5  **A.**  No, I don't.

6  **Q.**  You don't know when they were written?

7  **A.**  No.

8  **Q.**  And the person writing them, you don't know what they

9  intended when they wrote them?

10  **A.**  No.

11  **Q.**  There are a couple different names and phone numbers on

12  that sheet of paper, right?

13  **A.**  Yes.

14  **Q.**  Turning your attention to what's been admitted into

15  evidence as Exhibit 509, this was the three pages of

16  handwritten notes?

17  **A.**  509 is the note.

18  **Q.**  I am sorry, 508 -- or 506.  I am sorry, 508.

19      There was one additional page that was just kind of a

20  flyer for some graduation party in Olympia, Washington?

21  **A.**  Yes.  I believe that's the back side of one of these

22  pieces of paper; that's correct.

23  **Q.**  So all of those handwritten notes you were just reading,

24  they were written on a flyer for a graduation party of some

25  sort, right.

**A.**   Yes.  It says, "Celebrate Sunday, June 10th from 3 p.m. at the Herridge-Meyer household."  It appears to be, yes.

**Q.**   Chaeli is graduating from Olympia High and headed for Bennington, Vermont?

**A.**   That's correct.

MR. FOX:  I have no further questions.

THE WITNESS:  Thank you.

THE COURT:  This witness may be excused?

MR. FRIEDMAN:  I have no further questions.

THE COURT:  All right.  You may step down.

MR. BARTLETT:  Your Honor, at this time, the United States calls Special Agent Ted Halla to the stand.

THE COURT:  All right.  Raise your hand.

TED HALLA, called as a witness, duly sworn.

THE COURT:  Questions.

MR. BARTLETT:  May I inquire, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. BARTLETT:

**Q.**   Would you tell the members of the jury your first and last name and spell your last name for the Court Reporter.

**A.**   Ted Halla, H-A-L-L-A.

**Q.**   Where were you born and raised?

**A.**   Just outside Milwaukee, Wisconsin.

**Q.**   Can you generally walk us through your education?

**A.** I graduated with a bachelor of arts in biology from Trinity College which is in Deerfield, Illinois.

I worked for a number of different laboratories for the next roughly seven years. Prior to my employment with the Federal Bureau of Investigations, I worked for the Department of Pediatrics Medical College in Wisconsin. I was a senior research technologist there.

**Q.** When did you join the FBI?

**A.** I joined the FBI in February 2000.

**Q.** What happens after a person joins the FBI? What do you do initially? Walk us through how you ended up in Seattle.

**A.** You go to Quantico, Virginia where the FBI has their academy. At the time, it was a 16-week training course that I underwent. You are then transferred to a city. In this case, I was transferred to Seattle. You are assigned -- you are considered a probationary agent for two years after you get to the city that you are sent to, and you have a trainer that you work with.

**Q.** When did you arrive in Seattle?

**A.** In June of 2000.

**Q.** Can you explain, since arriving in Seattle in June of 2000, what have your assignments been with the FBI?

**A.** Initially, I was assigned to a squad that investigated different types of health care fraud and white collar crime. I did that for approximately six months.

1    Then I was sent up to Bellingham, Washington, where I
2  worked a drug investigation up there for approximately 18
3  months.
4  **Q.** After finishing the drug investigation in Whatcom County,
5  what did you do?
6  **A.** I was brought back down to Seattle.  I was assigned to a
7  squad that investigates what we consider in the FBI to be
8  domestic terrorism.
9  **Q.** When were you assigned to the domestic terrorism squad?
10  **A.** Late summer or early fall of 2002.
11  **Q.** When you got to that squad, what, if any, cases were you
12  assigned that had already occurred?
13  **A.** I was assigned the case agent of the arson that occurred
14  at the National Wildlife Research Center down in Olympia,
15  Washington, in 1998, and also the Animal Damage Control arson,
16  which occurred on the same evening.
17  **Q.** Who was assigned to the University of Washington arson
18  when you arrived on that squad?
19  **A.** Special Agent Tony Torres was assigned as the case agent
20  for the UW arson.
21  **Q.** Would it be fair to say that you and Special Agent Torres
22  worked closely over the following years?
23  **A.** We did.  We essentially consider ourselves partners.  We
24  don't have official partners with the FBI, but we worked
25  together on the two cases since they were very similar.

**Q.** In addition to the assignments you've had that you described for the members of the jury, have you been assigned any specific specialized task since joining the FBI?

**A.** Yes. I spent approximately four years on the Seattle FBI evidence response team which is similar to what you'd see on TV as the CSI-type team.

In the last four years, I have been the team leader for the hazardous materials response team, which is a specialized crime scene team that deals with either evidence that's of a hazardous nature or dealing with searching an area that may have hazardous conditions.

**Q.** You were assigned to the two arsons that occurred in Olympia, and your partner is working on the UW arson. Do you two work by yourselves, or are there actually a number of different FBI offices that are involved in what you consider related investigations?

**A.** I believe it was around the fall of 2003 we were invited to come down to Eugene, Oregon and participate in some monthly meetings that they had down there. They had a large number of arsons that had occurred between 1996 and 2001, and they had kind of a task force set up composed of federal agencies, state and local agencies. It was kind of an information sharing meeting.

Agents noticed that a lot of the arsons appeared to occur up and down the I-5 corridor, and the arsons that we had up

1 here fit that category, and we were looking at some of the
2 same people and suspects.
3 **Q.** Did something happen in the late summer or early fall in
4 2004 that appeared to be significant in the case?
5 **A.** Yes. Late summer 2004, some of the agents down in Eugene
6 gained the cooperation of Jake Ferguson. He had always been
7 suspected of a number of arsons. They approached him. He had
8 retained counsel and agreed to cooperate with investigators.
9 He had personal knowledge on a number of arsons, including the
10 one I was case agent on at the National Wildlife Research
11 Center arson.
12 **Q.** Over the next year, would it be fair to say that
13 Mr. Ferguson worked with agents down in Oregon on a number of
14 different aspects of this investigation?
15 **A.** Yes, he did.
16 **Q.** When was the first Indictment returned in this case, if
17 you recall?
18 **A.** I believe it was mid to late November of 2005. We
19 returned an Indictment against Kevin Tubbs for his role in the
20 National Wildlife Research Center arson in '98.
21 **Q.** What happened in early December of 2005?
22 **A.** In December 2007, we also added William Rodgers to the
23 Indictment.
24     MR. FOX: Was that 2005 or 2007, the year?
25 **A.** December 2005. We added William Rodgers to the

1  Indictment, and then there was also a number of arrests that

2  occurred around the country.  I believe six arrests were made

3  of people that were involved -- we believed were involved in a

4  number of these other arsons.

5  BY MR. BARTLETT:

6  **Q.**  You described there were Indictments returned in Seattle

7  involving Mr. Rodgers and Mr. Tubbs, correct?

8  **A.**  Correct.

9  **Q.**  Anything going on in Oregon?

10  **A.**  Yes, they also had a number of arrests down there.

11  **Q.**  In addition to the Indictments that were returned and the

12  people that were arrested, were other individuals of interest

13  approached -- not under arrest, but just approached?

14  **A.**  Yes, there were.

15  **Q.**  Can you explain specifically with regard to your

16  investigation, who was approached?

17  **A.**  We were asked to contact Joseph Dibee who lived in

18  Kenmore, Washington, at the time.  Portland had a Grand Jury

19  subpoena, a target letter, for him that they wanted us to

20  serve him.  On the evening of December 7th, myself and a

21  number of agents stopped by his residence, had a short

22  discussion with him and served him the subpoena.

23  **Q.**  After serving Mr. Dibee with that subpoena, did you have

24  any further contact with him?

25  **A.**  We did.  I believe December 9th, which was a Friday, he

 1    came in with his attorney and sat down with myself and

 2    Mr. Friedman.

 3    **Q.**  Without going in -- did you and Mr. Friedman have a

 4    discussion with Mr. Dibee and his attorney?

 5    **A.**  Yes, we did.

 6    **Q.**  After that discussion, have you ever seen Mr. Dibee again?

 7    **A.**  I have not.

 8    **Q.**  Have you tried to find him?

 9    **A.**  Yes, we did.  When I came in the following Monday, I found

10    out that he had flown from Mexico City --

11          MR. FOX:   Objection, Your Honor; it's hearsay at this

12    point.

13          THE COURT:   I am trying to follow up on the

14    objection.  Give me a little more.

15          MR. FOX:   Hearsay -- he's testifying not based on his

16    knowledge, but based on what someone told him.

17          THE COURT:   But is this part of the investigation?

18          MR. BARTLETT:   Yes.

19          THE COURT:   Go ahead.

20    **A.**  I later found plane records that showed that he had flown

21    from Mexico City to Germany, and ultimately to the Damascus

22    area.

23    **Q.**  After finding records that you believed indicated

24    Mr. Dibee had fled the country, did you do anything on

25    December 13, 2005?

1 **A.** Yes, we did. Special Agent Torres had gotten a search

2 warrant for Mr. Dibee's residence in Kenmore, Washington.

3 **Q.** Did you, in fact, help with the search of Mr. Dibee's

4 residence on December 13, 2005?

5 **A.** Yes, I did.

6 **Q.** If you could take a look at a number of exhibits in front

7 of you. I think they are running 521 to 528. Take a look

8 first at Exhibit 521.

9 **A.** Exhibit 521 is a photo of Mr. Dibee's residence in

10 Kenmore.

11            MR. BARTLETT: Offer 521.

12            MR. FOX: No objection.

13            THE COURT: Admitted.

14                   (Exhibit No. 521 admitted.)

15 BY MR. BARTLETT:

16 **Q.** Is this where you went on December 13th?

17 **A.** Yes, it is.

18 **Q.** Can you explain to the members of the jury who was there

19 and how did you handle this scene?

20 **A.** There was a number of agents, both from the FBI and we

21 also had task force members from the joint terrorism task

22 force with us. You can see on the photo, that's what appeared

23 to be the main residence -- the door of the main residence,

24 and after knocking and announcing, it appeared that no one was

25 home. We had to force entry and went into the residence.

1 When we went into the residence initially, we took photographs

2 of all the rooms, we labeled them with letters and began our

3 search.

4 **Q.** You labeled each room with a letter?

5 **A.** Yes, we assigned each room a letter, A, B, C. That helps

6 later when we are recovering evidence to be able to show where

7 it came from.

8 **Q.** Can you take a look at what's marked 523 and tell me if

9 you recognize that?

10 **A.** Yes, 523 is a picture of a fireplace that was in his

11 living room, which is on the second level of the house.

12       MR. BARTLETT: Offer 523.

13       MR. FOX: No objection.

14       THE COURT: Admitted.

15          (Exhibit No. 523 admitted.)

16 BY MR. BARTLETT:

17 **Q.** When you walk into the second level, what do you see?

18 **A.** The house was in great disarray. There was boxes and

19 items all knocked over. In the bedroom, there was clothes

20 thrown all over, the drawers half open. It appeared that

21 someone had left in a hurry, is what it appeared.

22 **Q.** Did it also appear that the fireplace had been used?

23 **A.** Yes, there was a large amount of ash and burnt debris in

24 the fireplace.

25 **Q.** Did you go over and look into that fireplace?

1  **A.**  Eventually, toward later in the evening, we started

2  sifting through the ashes to see if we could see what had been

3  burned.  We had noticed that there was spiral wires like from

4  a wire notebook, and we were finding a little metal piece that

5  you would find on a three-and-a-half-inch by five-inch

6  diskette.  We were finding those in the fire that hadn't

7  burned.

8  **Q.**  Take a look at Government's Exhibit 524 and tell me if you

9  recognize that.

10  **A.**  Yes, I do.  These are -- this is a picture of some ashes

11  or remnants of some burnt pieces of paper that we recovered

12  from the fireplace.

13          MR. BARTLETT:  Offer 524.

14          MR. FOX:  No objection.

15          THE COURT:  Admitted.

16                  (Exhibit No. 524 admitted.)

17  BY MR. BARTLETT:

18  **Q.**  Looking at this picture, obviously we can't see much.  Is

19  there anything specifically that attracted your attention, and

20  perhaps you can point to it in the picture.

21  **A.**  This piece right here near where the dot is on the screen,

22  it says A.L.F.  I believe this piece before it's been

23  handled -- and it looks like it's broken a little bit -- I

24  believe it also had "cell" behind it on another piece.

25  **Q.**  If you could look at Government's Exhibit 525, is that in

1  fact the remnants that we just looked at in the photograph?

2  **A.** That's correct.

3  MR. BARTLETT: Offer 525.

4  MR. FOX: No objection.

5  THE COURT: Admitted.

6  (Exhibit No. 525 admitted.)

7  BY MR. BARTLETT:

8  **Q.** Would you take a look at Government's 526. Do you

9  recognize that?

10  **A.** It's a note. I actually found this up in the attic where

11  there were a bunch of boxes with just miscellaneous papers and

12  documents.

13  MR. BARTLETT: Offer 526.

14  MR. FOX: No objection.

15  THE COURT: Admitted.

16  (Exhibit No. 526 admitted.)

17  BY MR. BARTLETT:

18  **Q.** Perhaps if we could highlight that. What, if anything,

19  did you note with regard to this?

20  **A.** The phrase "Avalon is interested." I knew from our

21  investigation that William Rodgers went by the name of Avalon,

22  so I found this significant.

23  **Q.** Finally, Government's Exhibit 527.

24  **A.** This is a framed photo, and I recognized the individuals

25  as Jennifer Kolar and Joseph Dibee.

1  Q.  Can you show that to members of the jury?  You can just

2  hold it up.

3        MR. BARTLETT:  I think I might have failed to offer

4  it, Your Honor.

5        MR. FOX:  No objection, Your Honor.

6        THE COURT:  Admitted.

7              (Exhibit No. 527 admitted.)

8              (Showing photo to jury.)

9        MR. BARTLETT:  I will put it on the screen.

10       MR. BLOOM:  Thank you.

11  BY MR. BARTLETT:

12  Q.  Finally, if you could take a look at 528, which I believe

13  has already been admitted.

14  A.  Exhibit 528 is a piece of paper.  One side says FBI Agent

15  Jane Quimby with some contact information.  On the back side

16  is what's displayed on the screen.

17  Q.  After conducting the search at Mr. Dibee's house, what did

18  you do with this evidence?

19  A.  The evidence was brought back to the Seattle office of the

20  FBI.

21  Q.  Did it remain there?

22  A.  Yes, it did.

23  Q.  In addition to searching Mr. Dibee's house on December 13,

24  2005, is there eventually a search conducted at his business

25  office of Microsoft?

**A.** Yes, there is. We asked Microsoft to seal Mr. Dibee's office, once we had learned that he had left the country. Agent Torres and a couple other agents obtained a search warrant and went and searched that office.

**Q.** If you could take a look at Exhibit 531. I know you weren't there yourself, but is that one of the items recovered from Mr. Dibee's Microsoft office on March 2nd?

**A.** It's a screen shot that has some information that came off of a hard drive that was seized at his residence.

        MR. BARTLETT: Offer 531.

        MR. FOX: No objection.

        THE COURT: Admitted.

            (Exhibit No. 531 admitted.)

BY MR. BARTLETT:

**Q.** You say screen shot. Can you explain what it is we are looking at?

**A.** We have computer examiners, forensic computer examiners, that will take computer evidence and basically examine it and they will load it onto some software that will allow agents to view it and see what type of material was on that hard drive.

    They had found what was described to me as a DAP file, like from like a Palm Pilot, and when we first looked at it, it was kind of in a garbled format, and you see pieces of e-mail. There was some PGP characters and stuff like that, and it was very mixed up. We noticed what appeared to be an

1 e-mail address of Brianawaters@hotmail.com and it was mixed up

2 in all this other text, and we couldn't tell what the format

3 was.

4     One of our card technicians, Ed Bill, was able to get some

5 Palm Pilot software, just generic software, and put the data

6 file into it so that we could read it in really how it was

7 meant to be read, and that's what this screen shot shows.

8 It's actually an address book that Mr. Dibee had.  The name

9 Bri, and the associated e-mail address just appears in the

10 address book.

11 **Q.** What's the associated e-mail address?

12 **A.** Brianawaters@hotmail.com.

13     MR. BARTLETT:  Offer 531.

14     THE COURT:  I think it's already admitted.

15 BY MR. BARTLETT:

16 **Q.** Did there come a point specifically in December 2005 that

17 you met with Jennifer Kolar and her attorney Michael Martin?

18 **A.** There was.

19 **Q.** Where did that occur, and can you describe the

20 circumstances?

21 **A.** Over the weekend, Special Agent Jane Quimby had

22 telephonically contacted Ms. Kolar and asked her to cooperate

23 and get an attorney and provided AUSA Friedman's telephone

24 number to arrange a meeting.  On December 16th, Ms. Kolar came

25 in with her attorney, Michael Martin, to meet with us.

1   **Q.** What was the timeframe of that meeting?

2   **A.** Between 3:00 and 5:00 p.m. is my best memory of when that

3   occurred.

4   **Q.** Prior to Ms. Kolar meeting with you and AUSA Friedman and

5   Special Agent Torres on that day, did you provide her any

6   information?

7   **A.** No, I did not. SA Quimby talked to her about the overall

8   investigation in the sense that a number of arrests had

9   occurred, but that was the extent of it.

10  **Q.** How long did this discussion take place?

11  **A.** Roughly two hours.

12  **Q.** During this discussion, did there come a point in time

13  when the arson at the Center for Urban Horticulture was

14  discussed?

15  **A.** It was discussed briefly toward the end of the two hours.

16  **Q.** You heard Ms. Kolar testify during this case, correct?

17  **A.** I have.

18  **Q.** You heard her talk about mentioning five different names

19  on that day?

20  **A.** Yes, I do.

21  **Q.** Is that what you remembered?

22  **A.** I do remember the five names being given.

23  **Q.** Why don't you describe the context of that conversation.

24  **A.** She was discussing how this person by the name of Beaches

25  had taken her on a reconnaissance trip of the UW arson. She

1    then began talking about Avalon, herself, she mentioned

2    Capitol Hill Girl, and then I believe a punk boy was mentioned

3    and a Crazy Dan. It was clear to me that she was at best --

4           MR. FOX: Objection, this is speculation. We heard

5    Ms. Kolar testify.

6           THE COURT: Sustained. Next question.

7    BY MR. BARTLETT:

8    **Q.** After listening to and being part of this interview, did

9    you participate in creating what's been called a 302,

10    basically a report relating to this interview?

11    **A.** I did.

12    **Q.** How did that come about? Who started it? How was it

13    written?

14    **A.** Special Agent Torres began the report. The way a 302 is

15    written, it's a macro on our computer system.

16           MR. BLOOM: I am sorry, I didn't hear that.

17    **A.** A macro on our computer system.

18           MR. BLOOM: Thank you.

19    **A.** So we initiate the macro, and a screen will come up and it

20    asks -- there's about five or six different things it will ask

21    for: the date that the investigation occurred on, or the

22    interview date.

23    It will ask -- you can put the name of the person that's

24    being interviewed, city and state, your name, and if you've

25    got other people that are also participating in the interview,

as far as agents, you can put where their name is.  Once you

enter that information, then the macro comes up and you can

start typing the information in.

In a case where you've got an interview where there's

multiple people, then an initial draft is created, and the way

Agent Torres and I would usually work is, whoever started did

the first draft, would then pass it to the other agent and he

would take a look at it, make changes or modifications, and

pass it back and discuss -- try to get to the final version.

**Q.**  You indicated that Special Agent Torres actually started

this process and made a 302?

**A.**  Yes.

**Q.**  Did you file an affidavit at one point saying you were the

one that initiated this 302?

**A.**  I did.  When the 302 is completed, the two names -- or

however many individuals were involved in the interview, as

far as law enforcement individuals -- will appear on the

bottom.  The primary author will type his initials next to it.

In most cases, the primary author is usually the person that

starts the draft.

In this case, I was going to be the primary author, but

the interview of Ms. Kolar occurred on Friday, the 16th.  I

had to fly back to Wisconsin for the Christmas holidays that

next day, so Agent Torres came in on a Sunday and created the

first draft.

1    When we were asked to count, approximately a
2  year-and-a-half later, who had started the first draft, my
3  memory has always been that it was myself.  It wasn't until
4  later that I learned that I had been on vacation and it had to
5  have been Agent Torres who then confirmed yeah, he was in
6  working that day.
7  Q.  With regard to the final report that's written, the words
8  that appear in that report, are they your words?
9  A.  Yes, they are.
10 Q.  Now, you talked about the way a report is written; you and
11 Special Agent Torres talk about it.  How is it eventually
12 finalized?  Is there something that actually happens at the
13 FBI when a report is finished?
14 A.  When it's finalized, we have to get it to our supervisor.
15 He'll look through it, read it, proofread it.  If he finds
16 errors or something he wants changed or corrected, he will
17 send it back to us, and we'll make whatever modifications or
18 changes that he wants, and we'll resubmit it to him.
19     If he's happy with it, then it's block stamped and he
20 initials it.  Then that goes to one of our support
21 professional staff that then places a paper copy into our case
22 file, which is where all the paper documents are, and then the
23 electronic version that I've created on my computer gets
24 uploaded to the main FBI server.
25 Q.  How long did it take for you to finish this record and get

1  it in the finalized version?  When was it actually put in the
2  case file?
3  **A.**  My supervisor initialed off on it, I believe it was,
4  February 9th.
5  **Q.**  A long time between December 16th and February 9th?
6  **A.**  It was.
7  **Q.**  Is that the longest time of any report in this
8  investigation?
9  **A.**  No, it wasn't.
10     THE COURT:  All right.  Let's take the recess at this
11  time.  As always, don't discuss the case.  Leave your books on
12  your chair.  I will have you back in here in about 15 minutes.
13     (Jury not present.)
14     THE COURT:  All right.  We'll take the recess.
15     MR. BARTLETT:  Yes, Your Honor.
16     THE CLERK:  All rise.  Court is in recess.
17     (Morning recess.)
18     THE COURT:  All right.  You may be seated.
19     It is my understanding that this Exhibit 401, 402,
20  whatever it is, will be coming up this morning?
21     MR. BARTLETT:  It will be, Your Honor.
22     THE COURT:  All right.
23     MR. BARTLETT:  I shouldn't say that.  I anticipate it
24  will.  If not, it will be early afternoon.
25     THE COURT:  Mr. Fox has mentioned that it's 200-some

1  pages, and your response is it's been narrowed down to the

2  website and where these communiqués that we've been talking

3  about here have been posted.  Is that the idea?  I am trying

4  to find out where the objection is.  I understand you have

5  some objection, but not totally.

6            MR. FOX:  May I set out?

7            THE COURT:  Yes, go ahead, and then we'll get a

8  response.

9            MR. FOX:  Thank you.  Your Honor, originally, the

10  Government was offering 401, which was the hundreds of pages

11  of stuff from the ELF website.

12           THE COURT:  All right.

13           MR. FOX:  402, Mr. Bartlett pared down, and it's

14  probably about, I don't know, 30 or 40, 50 pages worth.

15      We still have objections to significant portions of their

16  Exhibit 402.  Basically, what we have objections to -- and I

17  could go page by page if we need to -- is to anything not

18  relating to the charges in the conspiracy charge against

19  Ms. Waters.

20      So to begin with, there are references in the website that

21  are contained in 402 to other fires in other parts of the

22  country.  There's references to -- actually, just looking at

23  the exhibit, the first page, we don't have an objection to.

24           THE COURT:  I don't have that exhibit before me.  All

25  right.

1          MR. FOX:  The first page talks about the two fires at

2     the University of Washington and Jefferson Poplar Farm.  It

3     talks about setting fires with electrical timers and continues

4     about the two targets.

5          The second page, we would object to anything below where

6     it starts:  FBI, BATF and OSP raid ELF spokesperson's home.

7          There's more discussion about an arson at a Nike store in

8     Minnesota.

9          The following page, on page 3, talks about smashing

10    windows at Old Navy, a GE site in California, Louisville,

11    Kentucky, subpoenas of Portland activists.

12         Page 4, more of the same, fires at a home on Long Island.

13         Those things are just irrelevant to this case.

14         MR. BARTLETT:  I think we can cut through some of

15    this because I have no objection to what he has suggested.  We

16    will remove everything below FBI, BATF raid starting on page 2

17    of 5, and we will remove all of 3, all of 4.

18         MR. FOX:  The communiqué that has already been

19    entered into evidence, we don't have any objection to that.

20         The tab section that starts with ELF/ALF website library,

21    page 91, I don't have a problem with that.

22         The next section, security culture, page 113 to 155, I

23    have an objection to this.  It's irrelevant.  We don't know

24    who the author is.  It's hearsay.  It's some document security

25    culture, a handbook for activists that's posted on a website.

1  We don't know who wrote it.  It's hearsay, and it's irrelevant

2  to this particular case.

3        THE COURT:  Let me hear from you on that one.

4        MR. FOX:  Your Honor, it might be easier if I finish

5  all the rest of the objections.

6        THE COURT:  Okay.  Go ahead.

7        MR. FOX:  The next section, the library pages, 164 to

8  200, we have no objection to that.  That's setting fires with

9  electrical timers, that's already been entered into evidence.

10  This is the final version; we don't have a problem with that.

11        THE COURT:  Which one is that now?

12        MR. FOX:  Under library, setting fires with

13  electrical timers, pages 164 to 200.  We have no objection to

14  that.

15      The following section, EarthLiberationFront.com prisoners,

16  again, I think it's hearsay and it's irrelevant under 401 and

17  403.

18        MR. BARTLETT:  We'll take that out, Your Honor.

19        MR. FOX:  The next section, pages 213 to 214, with a

20  picture of Craig Rosebraugh and media information --

21        THE COURT:  What's the title on it?

22        MR. FOX:  It's media information, Your Honor, pages

23  213 to 214.

24        MR. BARTLETT:  The relevance of that is it explains

25  actually how this website works which relates back to why the

1  communiqués would be it?

2      MR. FOX:  It's hearsay, not being offered under any

3  hearsay exception under this coconspirator exception.  They

4  have the communiqués; they can put those out, but explanations

5  about what someone thinks the Earth Liberation Front is -- and

6  this goes for 215 and 216 -- explanations that some anonymous

7  person wrote about what the ELF is, is hearsay.  It's being

8  offered for the truth of the matter asserted.

9    It wasn't written by any of the people named in the

10  Indictment.  It's not being offered under any exception to the

11  hearsay rule, and under 401 and 403, it's objectionable

12  because it's not relevant and it can mislead the jury.

13      THE COURT:  Okay.

14      MR. BARTLETT:  Your Honor, with regard to what

15  Mr. Fox indicated, we will remove the security portion.

16      THE COURT:  Let's start at the front of this exhibit,

17  I guess, at 402, so that can be deleted from here.

18    The second page of the first -- I guess 402 is leaving it

19  in up until the second page, FBI, BATF.

20      MR. BARTLETT:  Yes.

21      THE COURT:  The rest of that will be stricken.

22      MR. BARTLETT:  The rest of that portion up to page --

23  there are two communiqués, and Mr. Fox indicated no objection

24  to the two communiqués.

25      THE COURT:  Up to the communiqué, right, Mr. Fox?

1          MR. FOX:  Right.

2          THE COURT:  They will be deleted from where I

3     mentioned to the communiqués.

4        The rest of that, I believe there was no objection to,

5     correct?

6          MR. BARTLETT:  Correct.

7          THE COURT:  Then the next item had to do with

8     library.  Was that an issue, Mr. Fox?

9          MR. FOX:  We have no problem with pages 91 and 92.

10         THE COURT:  Okay.  Then 114.

11         MR. BARTLETT:  The Security Culture, a Handbook For

12    Activists, we will remove that.

13         THE COURT:  All right.  That goes from 113 through --

14         MR. BARTLETT:  132.

15         THE COURT:  Do you agree with that, Mr. Fox?

16         MR. FOX:  Yes.

17         MR. BARTLETT:  Following that, I believe Mr. Fox

18    indicated complaints with regard to an article entitled:  "If

19    an Agent Knocks, Federal Investigators and their Rights," and

20    we have no objection to removing that, which would be pages

21    133 and 138.

22         MR. FOX:  Your Honor, I actually didn't object to the

23    Center for Constitutional Rights --

24         MR. BARTLETT:  We'll keep it in.

25         THE COURT:  All right.  Then we move to a publication

1   starting at 139.  These are the ones, Mr. Fox, you are talking

2   about?

3           MR. FOX:  Yes, 139 to 157.

4           MR. BARTLETT:  Your Honor, the United States would

5   strongly object to this.  If you look at the charges in this

6   case and the evidence that's coming in, specifically with

7   regard to a number of the arsons, but also the University of

8   Washington arson and the Jefferson Poplar arson, these are

9   arsons actually claimed by the ELF.

10          They take credit for these arsons, and the jury needs to

11  understand what is the organization that is in fact taking

12  credit for it, and this is from the very month that these

13  arsons occurred.  This explains what this organization

14  believes and how they act.  It is critical for the jury to

15  understand these questions.

16          Mr. Fox indicates that we don't know who wrote it, and

17  that is accurate because it is an anonymous organization, but

18  it is an organization.  It set up a website -- in fact, this

19  website, to get its information out.  Part of the information

20  it is getting out is:  here are the arsons we are doing and

21  the reasons we are doing it.

22          The other part of the information on this website is:

23  this is what ELF is all about and here is why you should join

24  us.

25          THE COURT:  This came off the website?

1      MR. BARTLETT:  It did.

2      THE COURT:  Mr. Fox, let me have you address it

3  further, because obviously what we've been talking about this

4  whole trial is the ALF and the ELF and all that.  So other

5  than we don't know, or you don't know who the author is, what

6  other reason would there be?

7      MR. FOX:  Your Honor, there's no allegation that

8  there is an entity called the Earth Liberation Front or the

9  Animal Liberation Front.  In fact, the testimony is that

10  basically -- I believe -- is that they are just groups of

11  people that call themselves that and they do these things and

12  they issue a communiqué in the name of some amorphous

13  organization.

14      To have a document called "Frequently asked questions

15  about the Earth Liberation Front," that gives someone

16  anonymous' opinion about what it is, has nothing to do with

17  the conspiracy charge in this case.  There's a specific charge

18  that Ms. Waters entered into a conspiracy with specific

19  people.

20      Sometimes the Indictment alleges that there were

21  communiqués issued in the name of the Earth Liberation Front,

22  but the broader concept of the Earth Liberation Front and the

23  Animal Liberation Front, that it is some broader conspiracy,

24  that's not related to this case, is really irrelevant.  There

25  is also a hearsay problem.  This is someone -- some unnamed

1  person's description of what they believe the Earth Liberation

2  Front is.

3    THE COURT:  Do you see a difference in this from the

4  communiqués that were --

5    MR. FOX:  Yes, the communiqués are related to the

6  particular actions alleged in the conspiracy.  We've heard

7  testimony by the authors of those communiqués.  There's

8  substantive evidence in the sense that Jennifer Kolar or Lacey

9  Phillabaum wrote the communiqués.  They prepared them.  They

10  issued them.  With regards to some of the other arsons, at

11  least those are the communiqués that were tied to the

12  particular charges in this case, but generally --

13    THE COURT:  Now, let me ask one question.  You can

14  address it, Mr. Bartlett.  Other than being a tutorial, what

15  else would this be good for?

16    MR. BARTLETT:  Well, first of all, Your Honor, it's

17  not hearsay because it's not being offered for the truth of

18  the matter asserted.  It's being offered to say -- on a

19  website where they announce the arsons that are at the heart

20  of this case, they also make other claims about their

21  organization, and it explains how the organization is set up

22  and what is its underlying philosophy, which of course goes to

23  motive in this case.

24    Why is it that ELF and people involved in ELF would commit

25  these arsons?  This document explains that.  It goes directly

1   to motive. Why would people do what's been described as

2   horrendous acts in this case?

3      This document answers that question. It is not offered

4   for the truth of the matter asserted. It will be clear that

5   this was just posted on the ELF website, but it does provide a

6   perspective as to why these things occurred.

7          THE COURT: Anything else?

8          MR. FOX: If it's not being offered for the truth of

9   matter asserted, then it is irrelevant and misleading to the

10  jury. The jury is going to confuse what a few people did, who

11  called themselves the Earth Liberation Front, with what some

12  anonymous person claimed was that person's belief about what

13  the ELF is.

14      So it's going to be misleading to the jurors. The jurors

15  have enough -- I guess I should finish by saying, there's so

16  much literature that the Government has already entered or is

17  about to enter about radical movements that are things that

18  are found in the homes of William Rodgers or Joe Dibee or

19  turned over by Jennifer Kolar.

20      I guess the reason is that these are things found by

21  people alleged to have been coconspirators to Ms. Waters, but

22  this is not written -- or not found in any place owned by any

23  alleged coconspirator. It's just off of the Internet.

24         MR. BARTLETT: Your Honor, it's interesting that

25  Mr. Fox would bring that up because it goes to part of exactly

why we want it.  There were documents found in various
locations.  In fact, some of the documents weren't found at a
location, they were sent by Ms. Waters to Ms. Kolar, and the
description and the philosophical outlook that is put forth in
those documents also is set forth directly in the frequently
asked questions about ELF.

It's clear that the individuals that are discussing these
documents are also mirroring the philosophical underpinnings
of ELF, and that is circumstantial evidence of their
involvement in ELF, and it provides a perspective as to why
these arsons occur.  Why would Ms. Waters be involved in this?
Because she sent Ms. Kolar these documents.  These documents
talk about these exact theories, about anarchists' need to
destroy and erupt the capitalistic system, and there's no
other way to change the world, and that's exactly what is set
forth here.

MR. FOX:  Except these documents in 402 weren't sent
to Ms. Kolar.

THE COURT:  I understand all of that, but I am going
to admit them.  When I draw the conclusion through all of
this, based on the testimony that we've had here in this case,
it's an umbrella-type thing and it shows where it came from,
off the one where the communiqué has been appearing.  So for
those reasons, I will leave it in.

The next one.

1          MR. FOX:  164, setting fires with electrical timers,

2   we don't object to.

3          THE COURT:  Ending at what page?

4          MR. FOX:  The next one, Your Honor.  My copy doesn't

5   have a number, but it's the section on prisoners.

6      Again, this says there's only been a handful of activists

7   connect to the ELF that have ever been arrested or imprisoned,

8   and they have all been in Europe.  I don't see the relevance

9   in this case.

10          THE COURT:  What is that about?

11          MR. BARTLETT:  Your Honor, I think the relevance

12  would be that if you are an individual considering committing

13  an arson in the United States on behalf of ELF, and ELF is

14  telling you, hey, nobody has really ever been arrested in

15  relation to any of our arsons here in the United States, that

16  would be a relevant fact for you to have and it would be a

17  recruitment tool.

18      It's clear -- why would ELF put this out on their website?

19  They put it out because they want people to think you can come

20  join our actions and there's almost no risk of being caught

21  and prosecuted.

22          MR. FOX:  Well, Your Honor, there's no testimony that

23  Ms. Waters ever saw this website or ever was told that.

24          THE COURT:  I don't believe so.  I don't see the

25  relevance of that for the purpose of this trial.  So the Court

will exclude that.  The next one starts at 213.

        MR. FOX:  213 and 14.

        MR. BARTLETT:  We'll remove those, Your Honor.

        THE COURT:  All right.

        MR. FOX:  The final pages, 215 and 216, I am just going to repeat my objections that I mentioned about what is the ELF.

        THE COURT:  It seems to me this goes to the same thing as the one we had all the discussion on.

        MR. FOX:  I made the same objection.

        THE COURT:  I don't think you need them both.

        MR. FOX:  You are taking them out?

        THE COURT:  I am taking this out.

        MR. FOX:  Thank you.

        MR. BARTLETT:  Your Honor, perhaps Mr. Fox and I can meet at the lunch hour and go over to make sure we are all on the same page with regard to the documents that have been removed.

        THE COURT:  Ready for the jury now?

        MR. FOX:  Yes, Your Honor.

        THE COURT:  Bring them in.

   (Jury present.)

        THE COURT:  All right.  You may be seated.  All right.  Continue.

BY MR. BARTLETT:

1  **Q.** Prior to the morning break, Special Agent Halla, we were

2  talking about a report that you wrote relating to a December

3  16, 2005 interview with Jennifer Kolar.

4  Do you remember that discussion?

5  **A.** Yes, I do.

6  **Q.** Yesterday, do you remember hearing the cross-examination

7  of Ms. Kolar with regard to whether or not a van or car picked

8  her up and took her to the University of Washington?

9  Do you remember that?

10  **A.** Yes, that's correct.

11  **Q.** And it made reference to what was in Special Agent Torres'

12  notes?

13  **A.** Yes.

14  **Q.** Just to clarify, what did Mr. Torres' handwritten notes

15  indicate with regard to that?

16  **A.** I believe it said car or van.

17  **Q.** What did your handwritten notes indicate?

18  **A.** Car.

19  **Q.** How did you eventually resolve this when writing your 302?

20  **A.** We just described it as a vehicle.

21  **Q.** You indicated at this point in time, one of the

22  individuals that had been indicted in relation to this case is

23  William Rodgers.

24  What happens with regard to Mr. Rodgers on December 21st

25  and 22nd?

1  **A.**  While I was back in Wisconsin on holiday vacation, I got a

2  phone call indicating that Mr. Rodgers had committed suicide

3  in Arizona while he was in jail.

4  **Q.**  During his opening statement, Mr. Bloom indicated that

5  everyone in relation to this case had pleaded guilty.

6       Was that 100 percent accurate?

7  **A.**  No, that's not.

8  **Q.**  If you could pull up Exhibit 101A. Taking first the

9  individuals across the top, taking them one at a time.

10  **A.**  The first one, William Rodgers, committed suicide as I

11  previously described.

12       Jennifer Kolar and Lacey Phillabaum have pled guilty.

13       Briana Waters, of course, is here.

14       Justin Solondz, I believe, is a fugitive.

15  **Q.**  And the bottom row?

16  **A.**  Stanislas Meyerhoff, Daniel McGowan, Nathan Block, Joyanna

17  Zacher and Suzanne Savoie have all pled guilty.

18  **Q.**  Thank you.

19       MR. BLOOM:  Excuse me, I am going to object to the

20  mischaracterization and a misquote as to what I said.  I said

21  everyone who is not a fugitive pleaded guilty.

22       THE COURT:  You will get a chance to cross-examine on

23  that also.

24       MR. BLOOM:  I understand.

25  BY MR. BARTLETT:

1 **Q.** Last week during the trial, did you recognize anyone in

2 court related to Mr. Solondz?

3 **A.** I did. I recognized his mother, Bianca Franchi.

4 **Q.** When and how did you hear the name Briana Waters?

5 **A.** The first week of January, approximately January 5th, I

6 got a phone call from Mr. Friedman indicating that he had a

7 conversation with Michael Martin who's Ms. Kolar's attorney,

8 and it was related to me that Ms. Kolar had remembered that

9 Briana Waters was the lookout at the University of Washington

10 arson.

11 **Q.** Prior to that time in your investigation, had the name

12 Briana Waters come up?

13 **A.** I had never heard it before.

14 **Q.** On January 6th, did you meet with Ms. Kolar?

15 **A.** Yes, we did.

16 **Q.** What did she do?

17 **A.** We had another interview scheduled with her, and we sat

18 down and interviewed her, and I believe I was with ATF Agent

19 John Comery.

20 **Q.** Did the subject of Briana Waters or the University of

21 Washington arson come up during that interview?

22 **A.** It did not.

23 **Q.** You heard that there was -- during the cross-examination

24 of John Comery, whether or not Ms. Waters -- excuse me,

25 Ms. Kolar was shown a picture of Ms. Waters on that day.

1      Was she?

2   **A.**  No, she was not.

3   **Q.**  Why was that?

4   **A.**  I hadn't obtained a photo at that point.  We had agreed

5   that we would not ask Ms. Kolar anything about the University

6   of Washington arson until a later time and that we and her

7   attorney would try to help her memory out through different

8   things we would do.

9      Her memory was obviously very foggy on that first --

10           MR. FOX:  Objection, Your Honor.

11           MR. BARTLETT:  Don't provide your opinion about what

12   her memory is.

13   BY MR. BARTLETT:

14   **Q.**  At that interview, did you provide any other photographs?

15   What did you talk about, just the general subject matter?

16   **A.**  We talked about the Cavel West arson and showed her a

17   number of photographs.

18   **Q.**  What did you do to try to obtain information about

19   Ms. Waters?

20   **A.**  I requested a driver's license check -- driver's license

21   photo from Washington state.

22   **Q.**  Did you get one?

23   **A.**  Yes, I did.

24   **Q.**  Would you look at Government's Exhibit 1021 and tell me if

25   you recognize that?

**A.** Exhibit 1021 is the Department of Licensing Driver and Plate Search form. This is something that our dispatch center would pull up after we make a request.

**Q.** What is the date on that?

**A.** This indicates it was run January 9, 2006 at approximately 4 p.m.

        BY MR. BARTLETT: Offer Exhibit 1021.

        MR. FOX: No objection.

        THE COURT: Admitted.

            (Exhibit No. 1021 admitted.)

        MR. BARTLETT: We have a glitch. I think our computer went out, and Mr. Friedman doesn't know the password.

    Could we have a short break so Special Agent Halla can come down here to assist? I apologize, Your Honor.

BY MR. BARTLETT:

**Q.** Was that the form of 1021?

**A.** Yes, it is.

**Q.** Did you eventually receive, in response to this form, Ms. Waters' driver's license?

**A.** Yes, I did.

**Q.** Is that Exhibit 1023?

**A.** Yes, 1023A is the driver's license photograph, including her signature and some basic information.

        MR. BARTLETT: Offer 1023A.

        MR. FOX: No objection. Just a minute, 1023A? I

1  only have a 1023.

2        THE COURT:  Was it 1023?

3        MR. BARTLETT:  Yes, Your Honor admitted.

4            (Exhibit No. 1023 admitted.)

5  BY MR. BARTLETT:

6  **Q.**  What's the date of that driver's license, and when did you

7  receive it?  When did she get the driver's license and when

8  did you actually get the copy?

9  **A.**  This form shows an issue date of June 6, 2001, and the

10  report date, which is the date that the FBI requested it, is

11  January 11, 2006, at approximately 1:47 p.m.

12  **Q.**  Looking at January 11, 2006, did there come a point in

13  time where you received information that led you to believe

14  Ms. Waters might be living in the San Francisco Bay area?

15  **A.**  I did.  We had an analyst that's assigned to help us in

16  basic records checks, and through her records checks, it

17  appeared that Ms. Waters was living in the San

18  Francisco/Oakland area of California.

19  **Q.**  How is the FBI set up to deal with leads that are outside

20  your district?

21  **A.**  We have got 53 field divisions.  Within those field

22  divisions, there's also smaller offices that we call RAs.  So

23  if you need investigative work done outside your division, the

24  Seattle office covers the entire State of Washington.  In this

25  case California -- I would call a lead down there and ask for

1    some investigator's action to be conducted.

2    **Q.**  Did you do that?

3    **A.**  I did.  I requested that they conduct a basic

4    investigation to find out where Ms. Waters was living.

5    **Q.**  In addition to contacting the San Francisco office, did

6    you also make other inquiries to other United States agencies?

7    **A.**  I did.  For a lot of the suspects in these investigations,

8    we would request the passport application to find out if they

9    did have a valid U.S. passport, which means you could travel

10   outside of the United States.  Oftentimes, there's also

11   valuable investigative information on there.

12   **Q.**  Did you do that in this case?

13   **A.**  I did.

14   **Q.**  Directing your attention to January 12, 2006, did you have

15   another meeting with Ms. Kolar on that day?

16   **A.**  I believe so.

17   **Q.**  What happened at that meeting?

18   **A.**  I would have to refer to my report for details.

19   **Q.**  Do you have it in front of you?

20   **A.**  Do you know what the number is?

21         MR. BARTLETT:  If I could have a second, Your Honor.

22         MR. FOX:  Is that an exhibit?

23         MR. BARTLETT:  No, that's just a collection of

24   reports.  I believe it's the report related to January 12,

25   2006.

1  A.  Yes, this does refresh my memory.

2  BY MR. BARTLETT:

3  Q.  What do you recall happening on that day?

4  A.  Ms. Kolar provided us a couple diskettes, computer

5  diskettes, that she reported that she had found and wanted to

6  turn over to us.  They were PGP encrypted.

7  Q.  Did you work with her to unscramble those disks?

8  A.  Yes, she provided some printed copies that she was able to

9  print off prior to meeting with us, that she could show us the

10  type of stuff that was on the diskettes.

11  Q.  In addition, did you have a discussion with relation to

12  what she described as the incubator meetings?

13  A.  Yes, we did.

14  Q.  On January 13th, was there an additional interview

15  conducted by the FBI and ATF?

16  A.  Yes, there was.

17  Q.  Can you explain that to the jury?  Not the substance of

18  the interview, just who was involved and the general subject

19  matter.

20  A.  I believe on January 13th, some of the agents from our

21  California office had come up to talk to Ms. Kolar about the

22  Susanville arson.

23  Q.  Would you take a look at your notes, refresh your

24  recollection with regard to that?

25  A.  Those notes are not included in this section.

1  Q. If we could move ahead, we'll get that up to you later.

2  On January 17th, does anything happen that affects your

3  work related to this case with regard to another arson

4  investigation?

5  A. There is. January 17th, there was an arson up on Camano

6  Island, Washington, a large approximately 8,000-square-foot

7  house that was burned.

8  MR. FOX: I am going to object on the grounds of

9  relevancy to this case.

10  MR. BARTLETT: I think there's been some discussion

11  about events that occurred, and we are just providing a very

12  general background with regard to what's going on with Special

13  Agent Halla and his work on this case.

14  THE COURT: You mean that would take him away from

15  work on this case?

16  MR. BARTLETT: Yes.

17  MR. FOX: Your Honor, as long as he doesn't go into

18  detail --

19  MR. BARTLETT: No, we are not at all.

20  THE COURT: Go ahead.

21  BY MR. BARTLETT:

22  Q. You were assigned to work on an arson up in Camano Island?

23  A. There was an arson up on Camano Island.

24  Q. Without going into any facts about that case, how long did

25  you work on that arson approximately?

**A.** I was assigned as the case agent immediately after it happened, and for a fairly solid two weeks worked exclusively on that case.

MR. BARTLETT: If I could approach the witness with a document that might refresh his recollection with regard to the January 13th interview.

**A.** This refreshes my memory.

BY MR. BARTLETT:

**Q.** Who was there and what was the general subject matter?

**A.** Special Agent Jane Quimby from our Denver division and Special Agent John Comery from ATF interviewed Ms. Kolar regarding the Vail Ski resort arson and the attempted arson that happened at the gun range.

**Q.** The Wray Gun Club?

**A.** The Wray Gun Club.

**Q.** Would it be fair to say that Ms. Kolar's admission about an arson and an attempted arson in the same month as the Vail arson created great interest in Colorado?

**A.** It did. The Denver division had hoped that she would have information on the Vail arson, just because she was living there at the time and had been involved in some of the protest activities that took place on that mountain.

**Q.** Are you aware -- you've described that there was periodic meetings between yourself and primarily the Oregon division related investigations.

1    Did those meetings continue on?

2  **A.**  They did.

3  **Q.**  Continual conversations?

4  **A.**  Yes, with the Portland division and some of the agents

5  down there; I was on the phone definitely on a daily basis.

6  **Q.**  What, if anything, happens in Oregon that is relevant to

7  this investigation on January 20th?

8  **A.**  They had a 65-count Indictment that they filed.

9  **Q.**  And a number of additional people arrested?

10 **A.**  That's correct.

11 **Q.**  On January 27, 2006, did you have a further meeting with

12 Jennifer Kolar?

13 **A.**  Yes, I did.

14 **Q.**  Do you recall -- what was the --

15 **A.**  Let me refer to my notes.  January 27th?

16 **Q.**  Yes.

17 **A.**  During that meeting, Ms. Kolar turned over a Dell laptop

18 computer and a Hand Sprint, sort of like a small Palm Pilot

19 device, and some additional documents that she had printed off

20 of those devices.

21 **Q.**  Was there a calendar part of this?

22 **A.**  There was a calendar that she showed us.

23 **Q.**  On February 3rd of 2006, did you actually obtain

24 Ms. Waters' passport application?

25 **A.**  Yes, I did.

1  **Q.** If you would take a look at Government's Exhibit 740-D.

2  We'll move on. Directing your attention to February 4, 2006,

3  do you recall that day?

4  **A.** I believe so.

5  **Q.** What happened? What do you recall?

6  **A.** February 4th, a search of a residence.

7  **Q.** Go ahead, you can take a look at your notes.

8  **A.** On February 4th was the day that myself and Agent Torres

9  drove Ms. Kolar down to the Olympia area of Washington.

10  **Q.** What was the purpose of that trip? What had you been

11  looking for and hadn't been able to find?

12  **A.** We had been trying to find where William Rodgers had been

13  living in Washington for almost a year-and-a-half of

14  investigative work. The only link we could find for him to

15  Washington State was a P.O. Box that he had up near the

16  Sea-Tac Airport.

17  Otherwise, we could not find a single piece of paper that

18  linked him to living in Washington State, despite information

19  that we had received that he had been in Olympia. Ms. Kolar

20  had told us that she believed she could show us the house

21  where he lived.

22  **Q.** Was she able to?

23  **A.** Yes, she was. She directed us to a house. There had been

24  some changes to it since she had last seen it, but we were

25  able to confirm that was a house where he had lived.

**Q.** At the time you are down in Olympia, does Ms. Kolar suggest to you going to any other location besides Bill Rodgers' house?

**A.** Yes. She also directed us over to the Evergreen State library, and we got out and walked around the library campus area. She wanted to show us a room.

**Q.** What was the condition of the library when you were there?

**A.** They were going through remodeling, so a lot of the areas that we were walking through were all partitioned off with plywood and obvious construction was going on. Ms. Kolar was not able to show us the room that she had recalled, as there was obvious construction going on.

**Q.** During the time you are with Ms. Kolar on that day, February 4th, do you ever make any inquiry with regard to Lacey Phillabaum or Briana Waters?

**A.** Yes, we do. I recall -- Agent Torres was driving, I was sitting in the front seat, and we were having a discussion and I was asking questions about kind of the social interactions between different people.

I had asked questions about Briana Waters, what she remembered about her as far as things she was involved in. I asked about Justin Solondz and what she remembered about Briana's boyfriend. I asked about Lacey Phillabaum, just basic questions about what they were like, what they were into.

1  **Q.** If I could stop you just a second.  There's never been any

2  indication that Jennifer Kolar had identified Lacey Phillabaum

3  as being a participant in the University of Washington arson,

4  correct?

5  **A.** Yes, that's correct.

6  **Q.** When did you believe that Ms. Kolar even knew

7  Ms. Phillabaum?

8  **A.** Ms. Kolar had identified Ms. Phillabaum as participating

9  in some of the incubator meetings, and at one point stated

10  that she may have been at the Susanville arson.

11  **Q.** With regard to this discussion, did there come a point in

12  time when you asked Ms. Kolar's opinion whether she thought

13  either of these individuals might cooperate with your

14  investigation?

15  **A.** I did.  Ms. Kolar was -- she said that she believed both

16  Ms. Waters and Ms. Phillabaum would cooperate with us if we

17  approached them and was actually very encouraging that we

18  should do that.

19  **Q.** On February 16th and 17th, do you and Mr. Friedman take a

20  trip down to Eugene?

21  **A.** Yes, we do.  We traveled to Eugene to interview Suzanne

22  Savoie and Chelsea Gerlach.

23  **Q.** Let's stop a second with regard to Suzanne Savoie.  We've

24  heard testimony that on December 16, 2005, during that initial

25  interview, Ms. Kolar had identified Bill Rodgers and herself

1   and had mentioned Capitol Hill Girl, Capitol Hill Girl's punk

2   boyfriend and Crazy Dan.

3       Do you remember that?

4   A.  Yes, that's correct.

5   Q.  Sometime after that 12-6 interview, was Ms. Kolar shown

6   pictures of Suzanne Savoie?

7   A.  Yes, she did, and she identified her as Horace's daughter.

8   Horace was reportedly a butcher, and we understood that

9   Horace's daughter and Capitol Hill Girl were the same people,

10  same person.

11  Q.  You've talked about an Indictment that was returned in

12  Oregon on January 20, 2006.

13      Was Ms. Savoie indicted in that case?

14  A.  She was indicted.

15  Q.  At a result of that Indictment, did Ms. Savoie agree to

16  cooperate?

17  A.  Yes, she did agree to cooperate.

18  Q.  With regard to that December 16th interview, there was

19  also discussion about a Crazy Dan.  Were you able to identify

20  who you believe Ms. Kolar was thinking of with regard to Crazy

21  Dan?

22          MR. FOX:  I am going to object at this point as to

23  this agent's belief as to what Ms. Kolar was thinking.

24          THE COURT:  Let's find out what she might have told

25  him.

BY MR. BARTLETT:

Q. Did she identify a photograph of the person she felt was Crazy Dan?

A. Yes, she did.

Q. Who was that?

A. Jake Ferguson.

Q. Who is Jake Ferguson in relation to this overall investigation?

A. He was the first cooperator that I had referred to early on that Eugene had made contact with in the summer of 2004.

Q. When Ms. Savoie agreed to cooperate in Oregon as part of your communication, were you aware of what she was admitting?

MR. FOX: I am going to object.

THE COURT: It sounds like a yes or no question, without going into that conversation.

BY MR. BARTLETT:

Q. Yes or no. Were you aware of what she had admitted to?

A. Yes.

Q. During the cross-examination of Ms. Kolar, there was continuing questions about, did they ever come back and ask you about Crazy Dan and Capitol Hill Girl, and she indicated you really didn't.

Can you explain why it was that you had not gone back and asked Ms. Kolar follow-up questions on these individuals?

A. We had conducted an investigation --

1    MR. FOX:  Your Honor, I am going to object if this

2  leads to hearsay, and especially if it's going to be offered

3  for the truth of the matter.  I object --

4    THE COURT:  Well, I don't know what he's going to

5  say, first of all, but it sounds like it's in the area of why

6  he didn't go back.  You asked the question, did anybody come

7  back to you?

8    MR. FOX:  I asked Ms. Kolar that.

9    THE COURT:  That's correct.

10    MR. FOX:  Right, but he's not Ms. Kolar.

11    THE COURT:  No, but he can say why he didn't do

12  something.

13  **A.**  We sought to try to learn who these nicknames could be

14  attributed to and who these people were, through other means

15  than talking to Ms. Kolar.

16  BY MR. BARTLETT:

17  **Q.**  With regard to Mr. Ferguson, he was the initial

18  cooperator?

19  **A.**  Yes, he was.

20  **Q.**  What had he done?

21  **A.**  He was involved in a large number of arsons, and he had

22  been interviewed on numerous times and had been asked about

23  any knowledge of the University of Washington.

24    MR. FOX:  I would object based on hearsay at this

25  point and under the confrontation clause.

1    MR. BARTLETT:  It doesn't explain whether it's the

2  truth of the matter, it's explaining as to why this agent

3  didn't do follow-up with regard to Ms. Kolar.

4    THE COURT:  I think that's the question on the table.

5  So you can explain why you didn't do that.  You can

6  cross-examine on that; just don't go into what was said about

7  it.  What he did, is what the question is.

8    MR. FOX:  So if I --

9    THE COURT:  He can ask as to what he did, about any

10  information he had, if he went out and did it himself.

11    MR. FOX:  As to the actual information, we object as

12  to hearsay.

13    THE COURT:  Well, that's correct.  Don't go into

14  that.

15  BY MR. BARTLETT:

16  Q.  You talked with Mr. Ferguson?

17  A.  Yes, I did.

18  Q.  Without going into the specifics of it, did he ever

19  indicate any connection to the University of Washington?

20    MR. FOX:  Objection, hearsay.

21    THE COURT:  I think that calls for hearsay.

22  BY MR. BARTLETT:

23  Q.  Did you also talk with agents and review reports of

24  Suzanne Savoie?

25  A.  I did.

1  **Q.** As a result of reviewing those, did you reach a conclusion

2  as to her involvement?

3  　　　　MR. FOX: Your Honor, I would object again. His

4  knowledge is based upon hearsay and it violates the

5  confrontation clause. Let them bring these people in.

6  　　　　MR. BARTLETT: Withdrawn, Your Honor. We can move

7  on.

8  BY MR. BARTLETT:

9  **Q.** February 16 and 17, 2006 did you take a trip to Eugene?

10  **A.** Yes.

11  **Q.** Who's with you?

12  **A.** Mr. Friedman.

13  **Q.** And what do you do?

14  **A.** We interviewed Chelsea Gerlach and then we interviewed

15  Suzanne Savoie.

16  **Q.** Without going into the substance of those interviews, at

17  the conclusion of that interview, did you reach a decision

18  about approaching anyone?

19  　　　　MR. FOX: Your Honor --

20  　　　　THE COURT: What did he do, is a better question.

21  BY MR. BARTLETT:

22  **Q.** What did you do next?

23  **A.** We decided that we would attempt to approach Ms. Waters or

24  Ms. Phillabaum and ask for their cooperation.

25  **Q.** Did you reach out to Ms. Phillabaum?

1  **A.**  Yes.

2  **Q.**  How?

3  **A.**  I believe we had two telephone numbers that we believed

4  were associated with her, made a couple attempts to get ahold

5  of her during the weekday, with no luck.  On the weekend, I

6  called one of the numbers and spoke to her father.

7  **Q.**  Steve Phillabaum?

8  **A.**  Correct.

9  **Q.**  What did you tell, in substance, to Mr. Phillabaum on that

10  conversation?

11  **A.**  I told him that we were conducting a criminal

12  investigation.  He asked if this was a civil or criminal

13  matter.  I told him we were conducting a criminal

14  investigation.  I believe I probably told him it had to do

15  with arsons and that we would like to talk with

16  Ms. Phillabaum, and that she should probably get an attorney,

17  and I passed on Mr. Friedman's contact information.

18      I expressed that we would be reaching out to another

19  person in short time, and it was to Ms. Phillabaum's advantage

20  to talk to us as soon as possible.

21  **Q.**  Did you provide any information to Steve Phillabaum about

22  our investigation or what we assumed she had been involved in?

23  **A.**  No, I did not.

24  **Q.**  Does Ms. Phillabaum eventually come in and get

25  interviewed?

1  **A.** Yes, she does, I believe that following Tuesday.

2  **Q.** February 21st?

3  **A.** That sounds correct.

4  **Q.** Once again, prior to that February 21st interview, at any

5  time did you provide any information to Ms. Phillabaum about

6  the substance of this investigation or what you expected her

7  to say?

8  **A.** I did not.  I had no contact with her.

9  **Q.** After conducting the interview of Ms. Phillabaum on

10 February 21st, do you eventually assist with any arrests and

11 search warrants on February 23rd?

12 **A.** I did.  We conducted a search and arrest on the residence

13 of Nathan Block and Joyanne Zacher in Olympia, Washington.

14 **Q.** Was that in relation to charges brought in this district?

15 **A.** No, it was charges brought by the Portland division.

16 **Q.** Could you take a look at 561 and tell me if you recognize

17 that?

18 **A.** 561 is a photo of the residence of Nathan Block and

19 Joyanne Zacher.

20          MR. BARTLETT:  Offer 561.

21          MR. FOX:  No objection.

22          THE COURT:  Admitted.

23                  (Exhibit No. 561 admitted.)

24 By MR. BARTLETT:

25 **Q.** Did you assist in the search of the house that you

1 understood Mr. Block and Ms. Zacher would be living in?

2 **A.** I did. I acted as the evidence custodian of the search.

3 **Q.** Were you there and also assisted in the arrest?

4 **A.** I was there when the arrest occurred.

5 **Q.** Take a look at Exhibit 563 and tell me if you recognize

6 that.

7 **A.** I do not appear to have 563.

8 **Q.** If you could show him 740-D. I think that's the correct

9 number on the exhibit.

10 **A.** I do see 740-D.

11 **Q.** As Pat looks for that, let's totally shift gears.

12 Do you remember a discussion earlier about a request for

13 passport application that you put in?

14 **A.** Yes.

15 **Q.** You eventually received a copy of the passport

16 application?

17 **A.** Yes.

18 **Q.** Does that appear at 740-D?

19 **A.** It does not.

20 MR. BARTLETT: 561 has been admitted -- 563?

21 Your Honor, perhaps we could speed things along if we took

22 perhaps an 11:45 to 12:45 break. Rather than have these in

23 alphabetical arrangement, if I could arrange them as to how I

24 think they are going to come in.

25 THE COURT: Well, perhaps we could do that. If I can

have you back here at 12:45, that's okay?

All right. I will have you get your sandwich in there.
Don't discuss the case. As always, when you are back in the
building, report to the jury room. Leave your books there.

I will have you back here about 1:00 or close to.

(Jury not present.)

THE COURT: All right. Anything we need to do other
than take the recess?

MR. BARTLETT: No.

MR. FOX: No.

THE COURT: We'll be in recess.

THE CLERK: All rise. Court is in recess.

(Luncheon recess.)

(Jury not present.)

THE COURT: All right. You may be seated.

Let me ask one question. Mr. Halla, is that your last
witness, or close?

MR. BARTLETT: It is.

THE COURT: Let me ask this question. I don't know
how much examination you have left and how much you are going
to go into on cross in terms of timewise.

I ask this question because if we finish say with this
witness somewhere before 4:00, I probably will not have any
new witnesses until Monday. But if it's necessary, we are
going to go all the way to 4:00.

1          MR. FOX:  I believe from the Government that

2    Agent Halla is going to be on past the break.  My guess is

3    cross would take up the rest the day.

4          THE COURT:  All right.  We will give it the rest of

5    the afternoon.

6          MR. BLOOM:  But there's more than that, so the Court

7    has the full picture.  I had asked, and apparently -- I don't

8    know what he looks like -- Agent Torres is outside waiting to

9    be called.

10        So they have -- I am sure, as they would, they have

11   produced him.  So there is a witness available who will take

12   some time on direct.

13         THE COURT:  Well, I understand that.  I am talking

14   about what the Court would be inclined to do.

15         MR. BLOOM:  Whatever you want to do.

16         THE COURT:  Right, but I am saying, if we are through

17   and we wind up with the witnesses and it's 3:15 or so, I

18   probably wouldn't want to start another witness today.  That's

19   all I'm saying.

20         MR. FOX:  I appreciate that.

21         THE COURT:  I am just giving you a heads up on my

22   thinking, but you are saying it's going to take longer so

23   that's a moot point now.

24        Otherwise, unless we get through with this witness, we are

25   going to go until 4:00 like we've always done.

1    MR. BLOOM:  You are in charge.

2    THE COURT:  Okay.  Thank you, sir.

3  Bring them in.

4  (Jury present.)

5    THE COURT:  All right.  You may be seated.

6    MR. BARTLETT:  May I continue, Your Honor?

7    THE COURT:  Yes.

8  BY MR. BARTLETT:

9  Q.  Special Agent Halla, this morning there was some

10  discussion or confusion about Exhibit 740-D.

11  Do you have that in front of you?

12  A.  I do.

13  Q.  What is it?

14  A.  It's a certified copy of the passport application for

15  Briana Waters.

16    MR. BARTLETT:  Offer 740-D.

17    MR. FOX:  I have no objection.

18    THE COURT:  Admitted.

19    (Exhibit No. 740-D admitted.)

20  BY MR. BARTLETT:

21  Q.  What, if anything, did you use that passport for -- the

22  passport application, I should say?

23  A.  On the passport application, which is dated August 10,

24  1999, it shows basic information of where Ms. Waters was

25  living.  There's an address, a phone number.  Also for the

1  emergency contact, it identifies a Marilyn Waters with an

2  address and a phone number.

3  Q.  Thank you.  You had just been discussing a search that you

4  and other FBI agents had been conducting following the arrest

5  of Nathan Block and Joyanna Zacher on February 23, 2006.

6      Do you remember that?

7  A.  Yes.

8  Q.  Pursuant to that search, did you recover any items from

9  that house yourself?

10 A.  Yes.

11 Q.  Take a look at 563.  Do you recognize that and what is it?

12 A.  563 is a notebook.

13            MR. BARTLETT:  Offer 563.

14            MR. FOX:  No objection subject to --

15            THE COURT:  Admitted.

16                  (Exhibit No. 563 admitted.)

17            MR. BARTLETT:  Your Honor, I just wanted the jury to

18 be aware, although we are offering the entire notebook as it

19 was found at the scene, when this goes back to the jury room,

20 there will just be a Xerox copy of one of the pages of this

21 notebook.

22            MR. FOX:  That's fine, Your Honor.

23            THE COURT:  All right.

24 BY MR. BARTLETT:

25 Q.  Did you go through all the pages in this book?

1   **A.** Yes, I have reviewed them.

2   **Q.** In relationship to those pages, did you find anything of

3   relevance?

4   **A.** I noticed that in the lower left corner here, it says:

5   Joshua, 2613 Conger Ave., Oly, then a zip code. And I

6   recognized that address to be the address where an individual

7   named Ocean lives.

8   **Q.** Thank you. This occurred on February 23rd?

9   **A.** Yes.

10   **Q.** What did you do on February 24th?

11   **A.** On February 24th, I flew down to Oakland, California and

12   met with Briana Waters.

13   **Q.** Was this a pre-arranged meeting? Did she know you were

14   coming down?

15   **A.** No, she did not.

16   **Q.** Could you describe how it is that you first saw her and in

17   general, broad terms the substance of the conversations.

18   **A.** We approached the house. We observed her partner John,

19   talked with him briefly, and then saw Ms. Waters walking back

20   towards the house. We went over and asked if we could talk

21   with her.

22   We went into her backyard and sat down and had a short

23   conversation. I talked about some of the arrests that had

24   occurred back in December recently, and we asked for her

25   cooperation and gave her information on how to obtain an

1   attorney.  I also passed on AUSA Friedman's contact number.

2   **Q.**  Approximately how long was this entire conversation?

3   **A.**  I would guess 15, 20 minutes.

4   **Q.**  On March 6, 2006, did you have an interview of Jennifer

5   Kolar?

6   **A.**  We did.  That was our interview where we did a full

7   debrief of her account of the University of Washington arson.

8   **Q.**  Was anything happening the following week that prompted

9   you to seek out this interview on that week?

10   **A.**  We were planning on indicting the following week.

11   **Q.**  Did you interview Lacey Phillabaum for a second time on

12   March 7, 2006?

13   **A.**  I believe that sounds right.

14   **Q.**  Did you interview Lacey Phillabaum a third time on March

15   30, 2006?

16   **A.**  Yes, that sounds correct.

17   **Q.**  During the March 30, 2006 interview of Lacey Phillabaum,

18   did you show her any photographs?

19   **A.**  I believe so.

20   **Q.**  Can you describe what photographs -- were they photographs

21   of individuals or of houses?

22   **A.**  I know I showed her a photograph of two houses, one was

23   the house at 2411 Capitol Way South, which is the house where

24   Robert Corrina was living, and then I also showed her a

25   picture of the house at 129 Percival Street.

1   **Q.** Did she recognize any of those photographs?

2   **A.** She did not.

3   **Q.** What, if anything, did she do?  What were you asking her

4   about?

5   **A.** We were asking if either of these homes looked like the

6   home where Briana Waters was living at the time that the

7   incendiary devices were being built.  She flipped over one of

8   the photos and sketched out what she remembers the layout of

9   the house and yard and relative position of the neighborhood.

10  **Q.** Could you take a look at Government's Exhibit 1013-C. Do

11  you recognize that?

12  **A.** Yes, this is 129 Percival Street.

13  **Q.** Is there anything on the back of that?

14  **A.** On the back is the sketch that Lacey Phillabaum filled

15  out.

16  **Q.** What was 129 Percival Street?

17  **A.** It was a house that -- we knew that an individual by the

18  name of Kim Marks had lived there, but it's operated by the

19  Olympia Housing Collective, and it was a house that I didn't

20  know who had lived there but a number of students had lived

21  there.

22              MR. BARTLETT:  Offer Government's Exhibit 1013-C.

23              MR. FOX:  Actually, Mr. Bartlett, I don't have that

24  exhibit.

25              MR. BARTLETT:  It's a new exhibit that was provided

in the last several days.

MR. FOX:  Your Honor, I actually object on the grounds of hearsay.

THE COURT:  Well, I don't have it here to see.  I haven't found it.

MR. FOX:  We believe it's hearsay that they want to introduce.

THE COURT:  What are you talking about, drawing on it?

MR. FOX:  Someone's drawing is an out of court assertion --

MR. BARTLETT:  He watched her.  He watched her draw it, Your Honor.

THE COURT:  I think so.  We can get her back here to say that she drew it if that --

MR. FOX:  I made my objection.

THE COURT:  Okay.  But I think with that testimony that way -- I need the exhibit.  What happened to it?

MR. BARTLETT:  Offer 1013-C.

THE COURT:  This drawing here, this is actually on the photo?

MR. BARTLETT:  Yes.

THE COURT:  All right.  Admitted.

(Exhibit No. 1013-C admitted.)

BY MR. BARTLETT:

1  **Q.** Taking a look at the front photo, if Mr. Friedman can

2  bring that up.

3      What appears on the back side?

4  **A.** (Showing jury).

5  **Q.** If you could pass the exhibit to the jury. Special Agent

6  Halla, can you look at what's already been admitted as

7  Government's Exhibit 773 and tell us if you recognize that?

8  **A.** Yes, 773 is a photo of the house at 2613 Conger Avenue.

9  **Q.** Looking at the drawing that Ms. Phillabaum gave you on

10  March 30th, could you tell us, when you eventually found this

11  house, was her drawing in fact accurate, from your

12  perspective?

13  **A.** It was. There's a little walkway on the side here that

14  leads to the backyard and the other side here, which is better

15  depicted by this photograph, there's an outbuilding in the far

16  back that's consistent with the drawing. Also, just off to

17  the side of this picture is a school, which is also marked on

18  the drawing.

19  **Q.** Would you take a look at -- withdrawn.

20      Did there come a point in time where you identified a

21  location which you believed had been the last location where

22  Justin Solondz had been living?

23  **A.** There was. We identified an address in Brinnon,

24  Washington.

25  **Q.** Where is Brinnon, Washington?

1  **A.** It's over on the Olympic Peninsula.

2  **Q.** Is it a large town or small town?

3  **A.** Very small town. I had never heard of it prior to this

4  investigation.

5  **Q.** Did you obtain a search warrant for this location?

6  **A.** Yes, we did.

7  **Q.** On January 22nd of 2007, did you and other agents conduct

8  a search of this house?

9  **A.** We did.

10  **Q.** Why don't you explain to the members of the jury -- why

11  don't you take a look at 541 and tell me if you recognize

12  that.

13  **A.** Exhibit 541 is a photo of the cabin at 140 Seal Drive.

14         MR. BARTLETT:  Offer 541.

15         MR. FOX:  No objection.

16         THE COURT:  Admitted.

17                (Exhibit No. 541 admitted.)

18  BY MR. BARTLETT:

19  **Q.** Is this how the cabin looked prior to your entry?

20  **A.** Yes, it did.

21  **Q.** Obviously a very rural location?

22  **A.** Yes, very rural.

23  **Q.** If you could look at 542 and tell me if you recognize

24  that.

25  **A.** Yes.  542 is a picture of the first room as you come in

1    from the main entrance.

2               MR. BARTLETT:  Offer 542.

3               MR. FOX:  No objection.

4               THE COURT:  Admitted.

5                    (Exhibit No. 542 admitted.)

6    BY MR. BARTLETT:

7    **Q.**  Could you take a look at Exhibit 543 and tell me if you

8    recognize it.

9    **A.**  Yes.  543 is a note that says, "Hey, Tonie, welcome home",

10   and it's signed at the bottom, "Take care, Justin."

11              MR. BARTLETT:  Offer 543.

12              MR. FOX:  No objection.

13              THE COURT:  Admitted.

14                   (Exhibit No. 543 admitted.)

15   BY MR. BARTLETT:

16   **Q.**  Did you and other agents conduct a search of that

17   location, the cabin we've been looking at?

18   **A.**  Yes.

19   **Q.**  Did you recover various items within that cabin?

20   **A.**  Yes, we did.

21   **Q.**  Would you look at 544 and tell me if you recognize that?

22   **A.**  Yes, 544 is a photo of a number of brochures and pamphlets

23   and documents that came from a box up on a shelf in the main

24   room.

25              MR. BARTLETT:  Offer 544.

1  MR. FOX:  No objection.

2  THE COURT:  Admitted.

3  (Exhibit No. 544 admitted.)

4  BY MR. BARTLETT:

5  Q.  If you could step off where you are seated and grab what I

6  think is on a chair beside you, Exhibit 545.

7  Do you recognize that?

8  A.  Yes, 545 is some of those documents from this photograph.

9  Q.  In addition to the pamphlets that you have there --

10  MR. BARTLETT:  Offer 545.

11  MR. FOX:  No objection.

12  THE COURT:  Admitted.

13  (Exhibit No. 545 admitted.)

14  BY MR. BARTLETT:

15  Q.  In addition to the pamphlets there, did you also discover

16  any other items that were seized on that day?

17  A.  There were.  From the same group of boxes that were up on

18  that shelf, agents found a number of maps.  Three of them, we

19  thought, may have had some evidentiary value and were seized.

20  Q.  Could you take a look at 551, 552 and 553?

21  A.  551 is a photo of a box with a number of maps that were

22  found in the box.

23  MR. BARTLETT:  Offer 551.

24  MR. FOX:  No objection.

25  THE COURT:  Admitted.

1    (Exhibit No. 551 admitted.)

2    BY MR. BARTLETT:

3    **Q.** Looking at 552.

4    **A.** 552 is a photograph, and I know this photograph to be from

5    the FBI laboratory of three of the maps that were collected.

6         MR. BARTLETT:  Offer 552.

7         MR. FOX:  Object on relevancy grounds, Your Honor.  I

8    believe we discussed this earlier.

9         THE COURT:  Well, I don't --

10        MR. FOX:  I am renewing my objection, Your Honor.

11        THE COURT:  This is from the previous report, when

12   the trial started?

13        MR. FOX:  Yes.

14        THE COURT:  All right.  It's still noted.  Admitted.

15             (Exhibit No. 552 admitted.)

16   BY MR. BARTLETT:

17   **Q.** With regard to the three maps we are looking at, did one

18   of the maps draw your particular attention?

19   **A.** It did.  There was a map that looked as though it was from

20   the Seattle area, and it was folded in a way to depict in the

21   upper half of the map, the University of Washington campus.

22   **Q.** Is that the map that appears on the left-hand side of the

23   screen?

24   **A.** That's correct.

25   **Q.** Looking finally at Exhibit 553, is that the actual map

1  recovered on that date?

2  **A.**  This is the map that was recovered.

3  **Q.**  In addition to the maps that you just described, was there

4  also any plastic bags that you recovered?

5  **A.**  We did.  In one of the back rooms, we recovered a plastic

6  bag that contained a number of garments and some shower caps.

7  **Q.**  Would you look at Exhibit 548 and tell me if you recognize

8  that photo?

9  **A.**  Yes, 548 is a photograph of the bag containing those

10  garments.

11         MR. BARTLETT:  Offer 548.

12         MR. FOX:  Objection, relevancy.

13         THE COURT:  This was found in this shed or house?

14         MR. BARTLETT:  In this cabin.

15         THE COURT:  It is noted.

16         MR. FOX:  Your Honor, it's from January 2007.

17         THE COURT:  All right.  It's admitted.

18              (Exhibit No. 548 admitted.)

19  BY MR. BARTLETT:

20  **Q.**  If you could step off your chair and go over to the black

21  chair.  Do you see Exhibit 549?

22  **A.**  I do.

23  **Q.**  Do you recognize that?

24  **A.**  Yes, this is that same bag of garments and shower caps.

25  **Q.**  Could you --

1      MR. BARTLETT:  Offer 549.

2      MR. FOX:  Your Honor, same objection, relevancy.

3      THE COURT:  Admitted.

4           (Exhibit No. 549 admitted.)

5  BY MR. BARTLETT:

6  **Q.**  Could you go through that bag and tell us what you found

7  in the search that day?

8  **A.**  This is a black sweatshirt.  This is a black knit hat.

9  Another black stocking cap.  There is a belt, a brown hat, a

10  blue baseball cap and some black gloves.  There's also what is

11  described as different types of shower caps.  This one is

12  called a wig cap.  There was actually two plastic bags.  There

13  was an additional brown bag that was contained within this

14  black bag.

15  **Q.**  Could you -- you can pack that back together and put it

16  back on the chair.  While you are down there, if you could

17  grab Exhibit 550.

18      Do you recognize that?

19  **A.**  I do.  This is a scanner and a GPS unit.  The scanner has

20  got an ear piece.

21      MR. BARTLETT:  Offer 550.

22      MR. FOX:  Objection, relevancy.

23      THE COURT:  Admitted.

24           (Exhibit No. 550 admitted.)

25  BY MR. BARTLETT:

1  **Q.** When you say that's a scanner, specifically what are you
2  referring to?
3  **A.** It's a programmable scanner that would allow you to put
4  in, for example, police radio frequencies, firefighter
5  frequencies, and listen to public airway type frequencies.
6  **Q.** Looking in front of you, do you see Exhibit 554?
7  **A.** I do.   554 is a large envelope.   On the front of the
8  envelope, it reads Briana Waters, 2217 Summit Lake Shore Road
9  Northwest, Olympia, Washington, 98502.
10             MR. BARTLETT:   Offer Exhibit 554.
11             MR. FOX:   No objection.
12             THE COURT:   Admitted.
13                   (Exhibit No. 554 admitted.)
14 BY MR. BARTLETT:
15 **Q.** Do you see Exhibit 555 in front of you?
16 **A.** I do.
17 **Q.** Do you recognize that?
18 **A.** I do.   This is a back country use permit.   The name on it
19 is Justin Solondz at 140 Seal Drive, Brinnon, Washington, and
20 the emergency contact is listed as Ocean, (360) 570-0226.
21 **Q.** Was that name familiar to you?
22 **A.** Yes, it is.   I know Ocean to have lived at 2613 Conger
23 Avenue.
24 **Q.** Did you also find any rolls of film at the cabin when you
25 were doing the search?

1  A.  Yes, we did.  We found a large number of film.

2  Q.  Could you take a look at Exhibit 556 and tell me if that's

3  one of the rolls of film you had developed?

4  A.  That is.

5          MR. BARTLETT:  Offer Exhibit 556.

6          MR. FOX:  No objection.

7          THE COURT:  Admitted.

8              (Exhibit No. 556 admitted.)

9  BY MR. BARTLETT:

10 Q.  Without going through all the photographs, do there appear

11 to be pictures of Justin Solondz, based on your looking at

12 photographs of Mr. Solondz in there?

13 A.  Yes, there is.

14 Q.  Any other individuals you appeared to recognize?

15 A.  There's an individual that appears to be Briana Waters.

16         MR. FOX:  Mr. Bartlett, could I have a page reference

17 for that?

18 A.  There's an individual on page 2, page 3.

19 BY MR. BARTLETT:

20 Q.  With regard to Mr. Solondz, if you could look at page 23,

21 perhaps.

22 A.  Yes.  On page 23, there's a picture of an individual that

23 appears to be Justin Solondz.

24 Q.  Go ahead, you can put that aside.

25     As part of your investigation into this case, did there

1  come points in time where you acquired various business

2  records, bank records, phone records, those types of things?

3  **A.**  Yes, we did.

4  **Q.**  Can you take a look at Exhibit 738 and tell me what that

5  is?

6  **A.**  Exhibit 738 is banking records from the Washington State

7  Employees Credit Union for Briana Waters.

8  **Q.**  For what dates?

9  **A.**  Starting in May of 2000 and continuing to May of 2006.

10         MR. BARTLETT:  Offer Exhibit 738.

11         MR. FOX:  No objection.

12         THE COURT:  Admitted.

13                (Exhibit No. 738 admitted.)

14  BY MR. BARTLETT:

15  **Q.**  If you could turn to exhibit page 3553.

16  **A.**  I see it.

17  **Q.**  Do you recognize this page?

18  **A.**  I do.

19  **Q.**  Looking at this page, there appears to be two different

20  transactions that occur on May 21st. Do you see those?

21  **A.**  I do see them.

22  **Q.**  What ones are they?

23  **A.**  The first one is a 13.91 debit purchase at what appears to

24  be Ralph's Thriftway in Olympia, Washington.  The second one

25  is also at Ralph's Thriftway for $1.51.

1       MR. FOX:  I am sorry.

2       THE COURT:  What is this page number again,

3  Mr. Bartlett?

4  **A.** My mistake on there, the $1.51 purchase is from Kinko's in

5  Olympia.

6       THE COURT:  What is the page number on this?

7       MR. BARTLETT:  003553.

8       THE COURT:  All right.  Go ahead.

9  BY MR. BARTLETT:

10 **Q.** With regard to the Kinko's purchase, did you investigate

11 that?

12 **A.** Yes, we did.  The way the banking records are on this --

13 at least for this particular timeframe, May 21st may not

14 represent the actual day that the transaction was run.

15 There's a transaction date and a posting date.  We had to go

16 to Kinko's and see if they had more detailed records of the

17 actual date and time of the transaction.

18 **Q.** What did you find?

19 **A.** That the transaction actually occurred on May 19th at

20 approximately 12:00 a.m.

21 **Q.** With regard to the Ralph's Thriftway?

22 **A.** The Ralph's Thriftway, we contacted Ralph's Thriftway, and

23 they provided us with two data tapes.  In approximately

24 2000 -- 2002, 2003 they had switched over to a new register

25 system, and they could not go back this far.  They provided us

1 with data tapes that they thought may contain back up register

2 information. We did extensive work trying to recover the data

3 from those tapes but was unsuccessful.

4 Q. In addition to looking at bank records, did you also

5 analyze various phone records that you obtained?

6 A. Yes, I did.

7 Q. Could you take a look at Exhibit 712 and tell me if you

8 recognize those records and whether you conducted any analysis

9 with regard to those?

10 A. 712 is records from approximately April 2000 to December

11 2001. The account is in the name of Briana Waters.

12           MR. BARTLETT: Offer 712.

13           MR. FOX: No objection.

14           THE COURT: Admitted.

15                (Exhibit No. 712 admitted.)

16 BY MR. BARTLETT:

17 Q. What's the phone number on those records that are billed

18 to Briana Waters?

19 A. (360) 280-3354.

20 Q. Did that number -- as you looked at other records, were

21 you able to recognize that number?

22 A. I recognized that phone number as a phone number that

23 Jennifer Kolar had in her address book, her Palm Pilot address

24 book, for Avalon.

25 Q. William Rodgers?

1   **A.** William Rodgers.

2   **Q.** Have you had a chance prior to testifying today to go

3   through and analyze the various calls that appear on this

4   record?

5   **A.** I did.

6   **Q.** Could you take a look at Exhibit 713 and tell us if that's

7   a chart you prepared to assist this jury in understanding

8   these records?

9   **A.** Yes, 713 is.

10  **Q.** What is it?

11  **A.** We took a look at basically the frequency of calls on this

12  particular cell phone, and this chart represents calls --

13  telephone numbers that were called greater than six times from

14  this particular cell phone number, and it was for the time

15  period of January 1, 2001 through 12-12-2001 that we created

16  this chart.

17          MR. BARTLETT:  Offer 713 for illustrative purposes.

18          MR. FOX:  For illustrative purposes, no objection.

19          THE COURT:  Admitted.

20          (Exhibit No. 713 admitted for illustrative purposes.)

21  BY MR. BARTLETT:

22  **Q.** Can you kind of take us through this?

23  **A.** The first number is just a voicemail number for that

24  particular telephone.  If you call your voicemail, that's how

25  it appears on the record.

1    The next number most frequently called is a number

2 associated with Teresa Howell.  It's for an address at 135

3 Percival Street, and the phone number is registered in the

4 name of Teresa Howell.

5    The next number is registered to Erica Frandsen.

6    We had an unknown subscriber, which means we were not able

7 to get subscriber information from the phone company for some

8 reason.

9    The fifth line down for the phone number (360) 570-0226 is

10 the phone number for 2613 Conger Avenue, which is registered

11 in the name of Ocean.

12    The next number, the sixth line, (360) 705-2035 is a phone

13 number for Robert and Kara Corrina, and there were 25 calls.

14 **Q.**  With regard to the various calls, taking them one at a

15 time, at that point, did you also have information relating to

16 Briana Waters' mother's phone number?

17 **A.**  Yes, we did.

18 **Q.**  How?

19 **A.**  From the passport application, there was a number

20 associated with Marilyn Waters listed in the emergency contact

21 box, and then we also had another number that we got

22 subscriber information on, that came back to Marilyn Waters.

23 **Q.**  When you analyzed the phone number related to Briana

24 Waters' mother, were you able to -- at least in general

25 terms -- find various periods of time when it appeared that

her mother was calling either Ms. Howell's or Ocean's number?

**A.** Yes. During the Spring of 2001, the months of January, February and March, we see calls to the number at Teresa Howell from Marilyn Waters, one of her telephone numbers.

**Q.** Could you take a look at Exhibit 714 and tell me if you recognize this?

**A.** Yes, 714 is a chart that I created that chronologically shows calls to phone number (360) 280-3354 to a residence that had been occupied by Briana Waters and Justin Solondz.

MR. BARTLETT: We'd like to offer 714 for illustrative purposes.

MR. FOX: Your Honor, I guess I would object to this testimony because I think it's based upon hearsay where different people lived, and we heard testimony that there was one phone for eight cabins. It's misleading to present that to them in this fashion. So I would object.

THE COURT: Well, are you saying they didn't live there at any time?

MR. FOX: Well, I think when they lived there and who lived there and how many people were there.

THE COURT: Well, the period of time of this exhibit is January 1st through December 12th.

MR. FOX: I've made my objection, Your Honor.

THE COURT: Admitted.

(Exhibit No. 714 admitted for illustrative purposes.)

1  BY MR. BARTLETT:

2  **Q.**  Looking at the first listings to Bill Wake, how is it that

3  you believe that those phone calls are associated with either

4  Briana Waters or Justin Solondz?

5  **A.**  I know from talking to William Wake that Justin Solondz

6  had --

7          MR. FOX:  Objection, Your Honor, hearsay.  We heard

8  from Mr. Wake yesterday.

9          THE COURT:  Did this matter come up with Mr. Wake?

10         MR. BARTLETT:  I believe it did.  I believe he

11 testified that was the time frame that Mr. Solondz was living

12 there.

13         THE COURT:  I don't know what you are getting ready

14 to say about the phone call, and I don't know what you are

15 objecting to yet, unless I hear something.

16         MR. FOX:  I'm objecting on hearsay grounds, Your

17 Honor.

18         THE COURT:  Well, I need to know what --

19         MR. FOX:  I am objecting as to what Mr. Wake told the

20 agent.  It's hearsay.

21         MR. BARTLETT:  We will move on, Your Honor.

22 BY MR. BARTLETT:

23 **Q.**  Could you take a look at Exhibit 715 and tell me what, if

24 anything, that is?

25 **A.**  715 is a bar chart for telephone calls on cellular phone

1    (360) 280-3354.  It's for the month of May 2001.  It just

2    shows the number of calls made from that phone, excluding

3    voicemail calls.

4             MR. BARTLETT:  Offer Exhibit 715 for illustrative

5    purposes.

6             MR. FOX:  For illustrative purposes, no objection.

7             THE COURT:  Admitted.

8        (Exhibit No. 715 admitted for illustrative purposes.)

9    BY MR. BARTLETT:

10   **Q.**  Was there any three-day period where no phone calls were

11   made from this cellular phone?

12   **A.**  There was, between the period of May 19th through the

13   21st.

14   **Q.**  If you could go back to Exhibit 712, which are the actual

15   records of this cellular phone, and look at page 14.

16       Would you tell the members of the jury, when was the last

17   call made on the 18th and when was the next call made on May

18   22nd of 2001?

19   **A.**  The last call made on May 18th was at 7:07 a.m.

20       The next phone call that is made or received is May 22nd,

21   at 4:07 p.m.

22   **Q.**  Thank you.  Did you also obtain records from 2613 Conger

23   Avenue, the home I believe owned by Ocean?

24   **A.**  I have.

25   **Q.**  Can you take a look at 734 and tell me if you recognize

1    those records?

2    **A.** Yes. These are Qwest phone records for telephone number

3    (360) 570-0226.

4              MR. BARTLETT: Offer Exhibit 734.

5              MR. FOX: No objection.

6              THE COURT: Admitted.

7                   (Exhibit No. 734 admitted.)

8    BY MR. BARTLETT:

9    **Q.** In addition to having phone numbers connected to Briana

10   Waters' mother, did you have any phone numbers connected to

11   Briana Waters' brother Eric?

12   **A.** We did. We identified a Santa Cruz number that at the

13   timeframe came back to Eric Waters.

14   **Q.** Did you prepare a calendar for the month of May indicating

15   calls to either Briana Waters' mother or her brother from this

16   Conger Avenue residence?

17   **A.** I did.

18   **Q.** Does that appear at 734-A?

19   **A.** Yes, that's a chart I created.

20             MR. BARTLETT: Offer 734-A.

21             MR. FOX: For illustrative purposes?

22             MR. BARTLETT: For illustrative.

23             MR. FOX: No objection.

24             THE COURT: Admitted.

25        (Exhibit No. 734-A admitted for illustrative purposes.)

BY MR. BARTLETT:

Q. If I could approach, Your Honor. Looking at this chart, were there calls during the week of May 13th, one call during the week of May 22nd and two calls during the week of May 27th?

A. That's correct.

Q. And these were calls from the Conger Avenue address, Ocean's phone, to phone numbers associated with either Ms. Waters' mother or brother?

A. That's correct.

Q. You were showed a graph of the number of calls made from the cellular phone that Ms. Waters rented.

Did you also have a graph of the calls made from the Conger Avenue residence during 2001?

A. I do.

Q. Would you take a look at Government's 735 and tell me if you recognize that?

A. Yes, 735 is a bar graph depicting long-distance toll calls from the phone number at 2613 Conger Avenue.

          MR. BARTLETT: Offer 735.

          MR. FOX: No objection.

          THE COURT: Admitted.

                    (Exhibit No. 735 admitted.)

BY MR. BARTLETT:

Q. Once again, during the timeframe -- during the week of May

1 18th and going into the second week, was there a time when

2 there was a gap in calls made from the Conger Avenue address?

3 **A.** There's a gap in the long-distance calls from May 19th

4 through the 21st.

5 **Q.** If you look back at Exhibit 735, specifically -- excuse

6 me, 734 -- which are the actual phone records, could you tell

7 the members of the jury when the last call was made on May 18,

8 2001?

9         MR. FOX:  Your Honor, the last long-distance call?

10         MR. BARTLETT:  The last long-distance call.

11 **A.** The last long-distance call was made on May 18th at 7:12

12 p.m. to Santa Cruz, California.

13 BY MR. BARTLETT:

14 **Q.** And the next call?

15 **A.** The next call occurs on -- the next long-distance call

16 occurs on May 22nd at 2:01 p.m. to Pennsylvania.

17 **Q.** Do you recognize that number?

18 **A.** Yes, that's the number that's on the passport application

19 for Marilyn Waters.

20 **Q.** Thank you.  You can put those records aside and take a

21 look at the large envelope next to you and tell me if you can

22 recognize those records.

23 **A.** These are the phone records for Joseph Dibee for telephone

24 number (206) 683-5313.

25 **Q.** If you could look specifically at two pages.

1          MR. BARTLETT:  I would like to offer 722.

2          MR. FOX:  Your Honor, objection based upon previous

3   arguments.

4          THE COURT:  Well, I don't know if I have that fresh

5   in my mind, the previous argument.  You mean the previous

6   exhibit?

7          MR. FOX:  Right, I believe we did address this in

8   some matters earlier -- some motions earlier.  I had objected

9   to it.

10          MR. BARTLETT:  They are the phone records for Joseph

11   Dibee, Your Honor.

12          THE COURT:  Any objection -- other than that, I will

13   have to take it up at the break.

14          MR. FOX:  I am preserving my objection.  We can take

15   it up at the break.

16          MR. BARTLETT:  Would it be okay to go into the

17   records right now?

18          THE COURT:  I don't know.  Can we proceed at the same

19   time?

20          MR. FOX:  I would ask that we deal with it briefly.

21          MR. BARTLETT:  I will skip over it and we can go on

22   to some other matters.

23          THE COURT:  All right.  Then we'll get back to that.

24   BY MR. BARTLETT:

25   Q.  Why don't you set that down so you don't lose track of

1  them.

2      Could you take a look at 731 and tell me what that is?

3  **A.**  731 are phone records, Qwest phone records for the

4  telephone number (360) 705-2035 in the name of Robert and Kara

5  Corrina.

6              MR. BARTLETT:  Offer 731.

7              MR. FOX:  No objection.

8              THE COURT:  Admitted.

9                  (Exhibit No. 731 admitted.)

10  BY MR. BARTLETT:

11  **Q.**  Exhibit 736?

12  **A.**  736 are Sprint NEXTEL records for the phone number

13  (510) 209-9363 in the name of Briana Waters.

14              MR. BARTLETT:  Offer 736.

15              MR. FOX:  No objection.

16              THE COURT:  Admitted.

17                  (Exhibit No. 736 admitted.)

18  BY MR. BARTLETT:

19  **Q.**  737.

20  **A.**  737 is subscriber information for phone number

21  (610) 940-0733 in the name of Marilyn Waters.

22              MR. BARTLETT:  Offer 737.

23              MR. FOX:  No objection.

24              THE COURT:  Admitted.

25                  (Exhibit No. 737 admitted.)

1 BY MR. BARTLETT:

2 **Q.** Finally, 741.

3 **A.** 741 is Qwest Communications subscriber information for the

4 land line (360) 866-6433 in the name of Bill Wake.

5       MR. BARTLETT: Offer 741?

6       MR. FOX: No objection.

7       THE COURT: Admitted.

8           (Exhibit No. 741 admitted.)

9 BY MR. BARTLETT:

10 **Q.** I think we are through with the phone records for a little

11 while anyway.

12     Can you take a look at Exhibit 201 and tell me if that is

13 an illustrative map that you created?

14 **A.** Yes, it is.

15 **Q.** Why don't you explain what it is and how you created it.

16 **A.** This is just a map showing various arsons and actions

17 covering the states of Washington, Oregon, California. The

18 map indicates the name that we've referred to the action as,

19 and the date of the action and the city and the state.

20       MR. BARTLETT: Offer 201 for illustrative purposes.

21       MR. FOX: I believe it's already been admitted.

22 BY MR. BARTLETT:

23 **Q.** If you could just start in the State of Washington and

24 quickly walk us through, going down the map, going from top to

25 bottom.

**A.**   The first star on the very top represents the University of Washington arson, which occurred May 21, 2001.  Following down the map, the next star represents the two arsons that occurred in Olympia on June 21, 1998, at the Animal Damage Control Facility and the National Wildlife Research facility.

When we swing to the right, there's a star indicating a genetic engineering action at Monsanto, Incorporated in Dusty, Washington, that occurred on July 31, 2000.

Moving down the left side of the screen again, there's a star indicating the Jefferson Poplar Farm arson which occurred on May 21, 2001 in Clatskanie, Oregon.

Next below that is a star indicating the arson at Boise Cascade which occurred December 25, 1999 in Monmouth, Oregon.

The next one is an action that occurred at Oregon State University in March of 2001, in Corvallis, Oregon.

The next one slightly to the left and center above where it says Oregon is a star indicating the Cavel West arson, which occurred on July 21, 1997, in Redmond, Oregon.

Next one below that is a star indicating the Childer's Meat Company arson, which occurred May 9, 1999 in Eugene, Oregon.

On the far right of the Oregon symbol is a star indicating the BLM Burns arson, which occurred on 11-29-1997 in Burns, Oregon.

Below that is a star indicating the arson at Superior

1  Lumber Company in Glendale, Oregon.

2      Last, the arson down in California, the BLM Litchfield

3  arson that's indicated by a star.  That occurred October 15,

4  2001 in Susanville, California.

5  **Q.** Thank you.  If you can take a look at Exhibit 402 and tell

6  me if you recognize that.

7  **A.** 402 is a printed copy of the download of the ELF website

8  from May of 2001.

9  **Q.** Look over your left shoulder.  Do you see a disk behind

10 you?

11 **A.** I do.  This is a CD that contains the download from the

12 website and an associated 302 concerning this download.

13         MR. BARTLETT:  Offer Exhibit 402.

14         MR. FOX:  Subject to earlier discussions, Your Honor.

15         THE COURT:  All right.  Admitted.

16              (Exhibit No. 402 admitted.)

17 BY MR. BARTLETT:

18 **Q.** Could we pull up just the first page of Exhibit 402?

19     What was name of the website this was downloaded from?

20 **A.** EarthLiberationFront.com.

21 **Q.** Looking, first of all, at the bottom right picture, you

22 describe this as a website that was downloaded?

23 **A.** Special Agent Michael Shuler downloaded it in June of

24 2001 -- a correction, from what I said earlier.

25 **Q.** In the lower right-hand corner, it appears that this was

1  downloaded on August 15, 2007.

2      Can you explain what we are looking at here?

3  **A.**  When you take the CD and put it in the computer and print

4  off of it, it prints the dates that you are making the print

5  from the CD, so that's where the 8-15-2007 comes from.

6  **Q.**  Looking at the first page of this, what is it we are

7  looking at?

8  **A.**  This is I guess what you'd call the -- if you went onto

9  the website, this would be the first page, the screen shot

10  that you would see.

11  **Q.**  Do you recognize these articles?

12  **A.**  I do.  The first one is a little article about the arsons

13  at the UW Center for Urban Horticulture and the Jefferson

14  Poplar arson in Clatskanie, Oregon.

15  **Q.**  If you were to go to page 3 of this website, do you see

16  the communiqués that have been issued in relation to these

17  arsons?

18  **A.**  Yes, you would.

19  **Q.**  In addition to having the short article and the

20  communiqués, was there also news advisories that ELF was

21  putting on their website at that point in time?

22  **A.**  Yes, that's correct.

23  **Q.**  Take a look at -- is this one of the urgent news

24  advisories that appeared?

25  **A.**  Yes, dated June 1, 2001.

1  **Q.**  In addition to the news releases that we've looked at, was
2  there also a section of this website that was titled FAQ,
3  frequently asked questions about ELF?
4  **A.**  Yes, there was.
5  **Q.**  Does that appear in Exhibit 402?
6  **A.**  Yes, it does.
7  **Q.**  Now, when you download the frequently asked questions from
8  this website, is it easy to decipher?
9  **A.**  No.  It prints the pages horizontally, and they are mixed
10  up, so you can't read like you would with a book because you
11  are jumping from different pages.
12  **Q.**  Prior to coming to court today, did we ask you to
13  basically cut those pages apart and put them in order?
14  **A.**  Yes.
15  **Q.**  Is that what appears in Government's 401-A?
16  **A.**  That's correct.
17          MR. BARTLETT:  I would like to offer 401-A.
18          MR. FOX:  Subject to previous objections.
19          THE COURT:  All right.  Admitted.
20              (Exhibit No. 401-A admitted.)
21  BY MR. BARTLETT:
22  **Q.**  If you could page ahead to page 5 of the frequently asked
23  question about ELF.
24      Are you there?
25  **A.**  I am.

1 **Q.** Is the title of this section, "What is the ideology of

2 ELF"?

3 **A.** Yes, it is.

4 **Q.** Could you read the bottom paragraph that appears --

5 **A.** "The ELF recognizes that the poplar environmental movement

6 has failed miserably in its attempts to bring about the

7 protection needed to stop the killing of life on this planet.

8 State sanctioned means of social change rarely on their own

9 have and will have any real effect in obtaining the desired

10 results. This is due to the obvious fact that the legal means

11 of protest in solving grievances do little more than reinforce

12 the same system which is a root of the problem. The state

13 system is not going to allow any real change within it unless

14 the state structure (Government) big business and finally the

15 main stream consumer society feels that change is really

16 necessary."

17 **Q.** Does that paragraph continue on to the next page?

18 **A.** "Yet it is the same state structure, big business, and

19 consumer society that is directly responsible for the

20 destruction of life on the planet for the sake of profit.

21 When these entities have repeatedly demonstrated their

22 prioritizing of monetary gain ahead of life, it is absolute

23 foolishness to continue to ask them nicely for reform or

24 revolution. Matters must be taken into the hands of the

25 people who need to more and more step out of this societal law

1  to enforce natural law."

2  **Q.**  Does this section on the ideology of ELF continue on to

3  page 8 and on into page 9?

4  **A.**  Yes, it does.

5  **Q.**  If you could just briefly read the last page, last

6  paragraph on page 8 and first paragraph on page 9.

7       MR. FOX:  I am going to object.  The exhibit speaks

8  for itself.  There is no need --

9       THE COURT:  I understand.  Go ahead.  It's noted.

10  **A.**  Last paragraph, page 8, "Using real direct action in the

11  form of economic sabotage, the ELF is targeting what the

12  greedy entities care about, their pocketbooks.  By inflicting

13  as much economic damage as possible, the ELF can allow a given

14  entity to decide it is in their best economic interests to

15  stop destroying life for the sake of profit."

16      Continue?

17  **Q.**  Yes.

18  **A.**  "Capitalism as a target is not easily identifiable due to

19  it being an ideology rather than a physical object.  But forms

20  and symbols of capitalism can be targeted successfully to

21  greatly influence the impact capitalist state has on life.

22  These symbols and forms can take the shapes of individuals,

23  businesses, governmental and nongovernmental organizations and

24  items which aid in directly destroying life and/or the spread

25  of the destructive propaganda of the American dream.  This

1   list is endless but could include symbols, such as Mt.

2   Rushmore, Statue of Liberty, Disney, Wall Street, et cetera."

3   **Q.** If you could turn ahead to page 17. At the top of the

4   page, does it list the three major goals that ELF actions have

5   in mind?

6   **A.** Yes, it does.

7   **Q.** If you could read that to the jury.

8   **A.** "One, to cause as much economic damage as possible to a

9   given entity that is profiting off the destruction of the

10   natural environment and life for selfish greed and profit.

11     "Two, to educate the public on atrocities committed

12   against the environment and life.

13     "Three, to make it known that any entity profiting off the

14   destruction of life for profit may be considered the next

15   target."

16   **Q.** Finally, on page 29, does the ELF website have a

17   discussion about law enforcement and law enforcement's ability

18   to stop the work at ELF?

19   **A.** Yes.

20   **Q.** If you could read the first paragraph.

21   **A.** "From 1997 through 2000, not a single person has been

22   arrested and charged with an ELF related crime in North

23   America. Then, on January 25, 2001, the first ELF related

24   arrest in North America came. Since that time there have only

25   been a few others. The ELF by all accounts has been extremely

1 successful in evading law enforcement due to anonymous cell

2 structure."

3 Q. Changing gears, there's been discussion of a search that

4 was conducted at William Rodgers' house on December 7, I

5 believe, 2005. Do you remember that discussion?

6 A. I do.

7 Q. In addition to various physical items that were introduced

8 into evidence, were there also some electronic items that at a

9 later point in time were downloaded and documents created from

10 them?

11 A. There was.

12 Q. If you would take a look at Government's Exhibit 515-A,

13 actually a series of exhibits. I think it's Exhibit 515-A

14 through I. If you can get all of those in front of you.

15    Do you have those?

16 A. I do.

17 Q. Taking a look at Government's Exhibit 515-A, what is that

18 and how do you recognize it?

19 A. 515-A is a -- appears to be a Florida driver's license in

20 the name Todd Eugene Hager, and I recognize the individual

21 photo -- in the photograph as William Rodgers.

22 Q. Where was that recovered from?

23 A. That was recovered from, I believe, a diskette found at

24 William Rodgers' residence.

25         MR. BARTLETT: Offer 515-A.

1   MR. FOX:  No objection.

2   THE COURT:  Admitted.

3                (Exhibit No. 515-A admitted.)

4   BY MR. BARTLETT:

5   **Q.**  515-B?

6   **A.**  515-B is a copy of a document entitled "Setting Fires with

7   Electrical Timers - an Earth Liberation Front Guide."  It's

8   dated May 2001.

9          MR. BARTLETT:  Offer 515-B.

10         MR. FOX:  No objection.

11         THE COURT:  Admitted.

12               (Exhibit No. 515-B admitted.)

13  BY MR. BARTLETT:

14  **Q.**  Have you seen that before, a document similar to that?

15  **A.**  Yes, I have.

16  **Q.**  Where?

17  **A.**  Ms. Kolar had a copy of a document like this.

18  **Q.**  Is there a document similar to that on the ELF website

19  also?

20  **A.**  Yes, there is.

21  **Q.**  Look at 515-C.

22  **A.**  515-C is a document entitled, "Fundamentals of Fire.  A

23  Brief History of Arson."

24         MR. BARTLETT:  Offer 515-C.

25         MR. FOX:  No objection.

1    THE COURT:  Admitted.

2              (Exhibit No. 515-C admitted.)

3    BY MR. BARTLETT:

4    **Q.**  515-D.

5    **A.**  515-D is a document titled, "See EF! Journal Eostar 1997,

6    p27 top."

7              MR. BARTLETT:  Offer 515-D.

8              MR. FOX:  No objection.

9              THE COURT:  Admitted.

10             (Exhibit No. 515-D admitted.)

11   BY MR. BARTLETT:

12   **Q.**  515-E.

13   **A.**  515-E is a document that appears to be an article from the

14   Oregonian dated October 30, 1998, and it says -- it's titled

15   "BLM Cuts, Roundups of Wild Horses" from the Animal Liberation

16   Frontline Information Service.

17   **Q.**  515-F?

18   **A.**  515-F appears to be a news article dated Friday, November

19   9, 2001, and it's entitled "September 11 Fails to Dissuade

20   Environmental Saboteurs," and it's from the Associated Press.

21   **Q.**  What's it regarding?

22   **A.**  It's regarding ELF actions that have occurred after

23   September 11th.

24             MR. BARTLETT:  Offer 515-F.

25             MR. FOX:  No objection.

1        THE COURT:  Admitted.

2                (Exhibit No. 515-F admitted.)

3   BY MR. BARTLETT:

4   Q.  515-G?

5        THE COURT:  You offered D, but I don't see that you

6   offered E and F.

7            MR. BARTLETT:  I am offering them.

8            MR. FOX:  No objection.

9                (Exhibit No. 515-E admitted.)

10  BY MR. BARTLETT:

11  Q.  Finally, G.

12  A.  G is another article from the North American ALF press

13  office.  It's dated October 17, 2001, and it's an article

14  about the arson in Litchfield, California.

15  Q.  That's Susanville?

16  A.  Yes.

17           MR. BARTLETT:  Offer 515-G.

18           MR. FOX:  No objection.

19           THE COURT:  Admitted.

20               (Exhibit No. 515-G admitted.)

21  BY MR. BARTLETT:

22  Q.  515-H?

23  A.  515-I?

24  Q.  No, H.  I think it's already been admitted.  I believe

25  Mr. Watkins admitted it earlier today.

1          MR. FOX:   H was admitted.

2          MR. BARTLETT:   We can just pull it up.   Thank you.

3    BY MR. BARTLETT:

4    **Q.**   That photo was found from some of the electronic media

5    recovered from William Rodgers' house?

6    **A.**   It was.

7    **Q.**   And finally, 515-I?

8    **A.**   515-I is a document entitled, "Chapter 5:   Planning the

9    Raid."

10   **Q.**   Is there a second chapter in there?

11         MR. BLOOM:   Excuse me, I am confused about what's on

12   the screen here.

13   **A.**   This document contains both Chapter 5, which is entitled,

14   "Planning the Raid" and Chapter 6, which is entitled

15   "Executing the Raid."

16         MR. BARTLETT:   Offer 515-I, which are Chapters 5 and

17   6.

18         MR. FOX:   No objection.

19         THE COURT:   Admitted.

20              (Exhibit No. 515-I admitted.)

21   BY MR. BARTLETT:

22   **Q.**   Finally, Agent Halla, do you have in front of you five

23   records from the National Firearm Record Center, Exhibits 781,

24   782, 783, 784 and 785?

25   **A.**   I do.

1   **Q.** What are those records?

2   **A.** These are certified records that indicate that the named

3   individuals are not licensed for any destructive devices.

4   **Q.** What are the names of those individuals in those five

5   documents, taking them one at a time starting at 781?

6   **A.** 781 is William C. Rodgers.

7      782 is Jennifer Kolar.

8      783 is Lacey Phillabaum.

9      784 is Briana Waters.

10     785 is Justin Solondz.

11        MR. BARTLETT:  Offer 781 through 785.

12        MR. FOX:  Your Honor, we'd object on the grounds of

13   the confrontation clause and hearsay.

14        THE COURT:  That's the basis of it?

15        MR. FOX:  Yes.

16        THE COURT:  It is admitted.

17        (Exhibit No. 780 through 785 admitted.)

18        MR. BARTLETT:  Nothing further, Your Honor.

19     Perhaps we could have a break here.  I think there was a

20   set of phone records that we have not gotten to.  I think it's

21   probably the last item.

22        THE COURT:  Let's take the afternoon recess at this

23   time.  Don't discuss the case.  Leave your books on the chair.

24     (Jury not present.)

25        THE COURT:  722, was that the number?

1           MR. FOX:  Earlier, it seems like a very long time

2   ago, I made an objection to Mr. Dibee's phone records on a

3   variety of grounds.

4           I believe that you addressed it at the pretrial hearing.

5   However, I would like to add that since the Government has not

6   proffered any evidence that Ms. Waters was at the Susanville

7   horse arson, Ms. Kolar and Ms. Phillabaum did not identify her

8   as having participated in that, we believe that 722 is

9   irrelevant.

10          Mr. Dibee's phone records, particularly any phone calls

11  that may have been made to the Corrina residence, are

12  irrelevant and misleading.

13          Initially, the Government was going to bring in a witness

14  who, through a period of time, has come to say that Ms. Waters

15  was there.  They haven't called that witness, and at this

16  point, there's no evidence tying Ms. Waters to anything in

17  California.  So it's just irrelevant at this point.

18          MR. BARTLETT:  Your Honor, we are not going to argue

19  that it shows a connection between Ms. Waters and Susanville.

20  It will show a connection between an individual that has

21  identified as being involved in these arsons at a critical

22  time.

23          The connections between coconspirators, both named and

24  unnamed in the Indictment, is relevant information.  The fact

25  that the only contact between Mr. Joe Dibee and Mr. Corrina's

1   phone occurs just prior and just after the Susanville arson,

2   we are not going to argue that that indicates that she was

3   that Susanville arson.  We will definitely argue that it's

4   circumstantial evidence of connections to coconspirators at a

5   critical time in the conspiracy.

6          MR. FOX:  Well, Your Honor, there's been testimony

7   that Ms. Kolar, for instance, has had contact with Kenny Clark

8   before and after a critical time, but the Government is not

9   claiming that that is in any way evidence that Mr. Clark is a

10   coconspirator.

11     So we think that their argument is the very reason why

12   these records are misleading and should be excluded under

13   Evidence Rule 403.

14          THE COURT:  Now, all of these records -- am I to

15   understand that this whole line full of these phone calls, all

16   this is about California?

17          MR. BARTLETT:  No, Your Honor.  Just the Joe Dibee

18   record.  The records --

19          THE COURT:  Well, then why are we putting in this

20   whole exhibit?

21          MR. BARTLETT:  Well, we could just put in the two

22   pages, Your Honor.  We usually put in all the records that we

23   get pursuant to the subpoena, but it's only the two pages that

24   are relevant.

25          MR. FOX:  Well, we believe that those two pages are

1  misleading because --

2        THE COURT:  Well, I understand that, but I am trying

3  to deal with the whole exhibit here, I guess.

4        MR. FOX:  Well, I am only objecting to the two pages

5  that they want to put in.  So if they want to put in the whole

6  exhibit, they can put in the whole exhibit, but I am objecting

7  to the two pages from October of 2001.

8     The mere fact that Mr. Dibee calls someone before he

9  commits an arson and he calls someone after he commits an

10  arson has absolutely no bearing on whether Briana Waters was a

11  participant in the University of Washington in May of 2001.

12        MR. BARTLETT:  It shows a connection between

13  coconspirators, Your Honor.  It shows a connection.

14        THE COURT:  Well, it may show that, but the Dibee

15  phone call went to -- who was the recipient of that phone

16  call?

17        MR. BARTLETT:  Mr. Corrina's house, and Mr. Corrina

18  testified he did not know Joe Dibee and had never had a phone

19  call from him, is my memory.

20        THE COURT:  Your memory?  Is that your memory also?

21        MR. FOX:  Well, Kara Larson hasn't testified, so we

22  don't know.  But he also -- Mr. Corrina also testified that

23  there were different people that lived in his house at various

24  times.

25        THE COURT:  I understand that, but that doesn't

1    answer the question that I am looking for.  Mr. Dibee's call

2    went to the house where the Defendant had been living?

3              MR. FOX:  At some point, yes, but --

4              THE COURT:  Well, their guess is that it shows

5    contact between Mr. Dibee and who they are saying was there

6    around that time.  Obviously, they are saying the Defendant or

7    some indication pointing in that direction.

8              MR. FOX:  Sure.  But there's lots of contacts between

9    Mr. Dibee and lots of people that have nothing to do with the

10   case.

11             THE COURT:  I understand that, but that's why

12   evidence comes together as a way to -- and it's going to speak

13   in a whole at some point in time, but that's your point.  The

14   call could have been going to somebody else in the household?

15             MR. FOX:  Right.  Who knows?  Who knows whether

16   Mr. Dibee was using his phone --

17             THE COURT:  That's your objection?  You don't know

18   who the recipient is?

19             MR. FOX:  And it's misleading because it's inferring

20   that Ms. Waters had something to do with the Susanville arson

21   when in fact there's no evidence that she did, and she didn't

22   have anything to do with it.  So what they are trying to do is

23   make the jury think that there's something sinister because

24   there's a phone call, and there's no relevance to this case.

25             MR. BARTLETT:  There's relevance, Your Honor, because

1  it shows a connection between coconspirators.  That's the

2  relevance.  And it shows a connection at a critical time in

3  the conspiracy, which makes it further relevant.

4       What he is talking about is argument.  He's free to make

5  all those arguments to the jury.  It doesn't --

6            THE COURT:  I understand.  I don't want you to argue

7  the case now.  I am trying to get to why you are saying it

8  should be and why you think it shouldn't be.

9       I will give you my answer after the break.

10           THE CLERK:  All rise.

11      (Afternoon recess.)

12           THE COURT:  All right.  You may be seated.

13      I want to discuss with you the phone records that's been

14  identified.  We are talking about two pages, page 76 and 81?

15           MR. BARTLETT:  Yes.

16           THE COURT:  Everybody is in agreement with that?

17           MR. FOX:  Those are the ones from October?

18           THE COURT:  Right.  The Susanville incident was on

19  October 15 of '01, and these records appear to cover a period

20  of time from October 12th to 18th, am I correct?

21           MR. BARTLETT:  I believe it's the 12th through the

22  24th.

23           THE COURT:  Well, it may be.  I am talking about in

24  terms of any calls that may have gone to Olympia.  Am I

25  correct?

1      MR. BARTLETT:  Yes.

2      THE COURT:  Mr. Corrina's telephone number is

3  (360) 705-2035, and what I am finding there, on page 76, there

4  appears to be two calls to that number.  On page 81, one call.

5  There were some other Olympia matters in that, but these are

6  the ones we are talking about involving the timeframe.

7      Then I have reviewed the testimony of Mr. Corrina, and he

8  says, of course, that he doesn't know Mr. Dibee and didn't

9  talk to him, doesn't recognize his picture, and that Briana

10  lived there.  He hadn't seen her for a while, but she lived

11  there and her stuff was still in the basement.  That was the

12  scene at the time of these phone calls.

13      Are you in agreement with that?

14      MR. FOX:  Your Honor, my memory is -- and I haven't

15  checked this against the transcript, so I haven't read the

16  transcript -- my memory is that he was vague as to exactly

17  when Ms. Waters was living with him at the end of 2001.

18      THE COURT:  What he said exactly was that, by May of

19  2001 she was still living in that house, her belongings were

20  still there, including her clothes and furniture, but I hadn't

21  seen her in some time.  That's what he said.

22      MR. FOX:  By May of 2001, yes.

23      THE COURT:  Right.  So that's the -- the question is,

24  of course, he went on to say, "Did you understand she was

25  living somewhere else?"  And he said yes, he did, but she was

1 occupying the space as though he expected to see her at any

2 time, but as far as he knows, she was with her boyfriend some

3 place else.

4 　　　　MR. FOX:  Or some place else?  And I believe he

5 testified that she went to California at some point in the

6 summer time.

7 　　　　THE COURT:  Well, that could be.  The whole question

8 here is whether, because of the conspiracy thing, it's

9 relevant; and it can be said that this is part of that because

10 this is -- this Susanville thing is an overt act.

11 　　　　MR. FOX:  Your Honor, you are correct, it's an --

12 　　　　THE COURT:  So that's why I am asking these

13 questions.  But that's what they are talking about, not that

14 she had anything to do with Susanville, but it's part of the

15 overt act of the conspiracy, correct?

16 　　　　MR. FOX:  I understand what the Court is saying.

17 　　　　THE COURT:  I understand your objection, but that's

18 what they have charged, that Susanville was an overt act.

19 　　　　MR. FOX:  They have charged -- although not listing

20 her as one of the people that committed the overt act.

21 　　　　THE COURT:  Well, when you talk about a conspiracy, I

22 don't know who to throw out and who to keep in, if I use your

23 analysis.  I am just trying to get you to agree that the

24 timeframe -- and I don't have to ask you to agree with me.

25 Your objection is still on the table.

1      I am asking this because these things are crucial in terms

2   of what I say.  If she was long gone on something else, then I

3   have a question with that, but that's not the testimony as I

4   understand it.  Now, whether you can explain something

5   differently than that, that's argument.

6          MR. FOX:  The testimony is that Mr. Corrina said that

7   Ms. Waters left for California sometime after May, possibly in

8   the summer.  So he also said he doesn't know Mr. Dibee --

9          THE COURT:  Well, I don't find what you are saying.

10  Your recollection is different than what I found in the

11  transcript.  That's what I am going by.

12     So I am saying for that reason, those two pages that would

13  deal with that, those calls going directly to that number, I

14  will admit that for whatever it says.  All right.  And I told

15  you what I found on the pages pertaining to that particular

16  phone number.  That's the only one I'm talking about.

17     Call in the jury.

18     (Jury present.)

19         THE COURT:  All right.  You may be seated.  You may

20  continue.

21         MR. BARTLETT:  In cross checking my notes, I believe

22  I failed to admit an item, Exhibit 555, the back country

23  permit that was recovered from Mr. Solondz' cabin.  I would

24  like to offer that at this point in time.

25         MR. FOX:  No objection.

1    THE COURT:  Admitted.

2              (Exhibit No. 555 admitted.)

3    MR. BARTLETT:  Just to clarify the record, I also

4 offered, I believe, Exhibit 553, which is the map of Seattle.

5    MR. FOX:  I believe it has been admitted.  If it

6 hasn't -- we made our relevancy objections already.

7    THE COURT:  Yes.  He's not objecting.

8    MR. FOX:  Correct.

9    THE COURT:  Admitted.

10             (Exhibit No. 553 admitted.)

11 BY MR. BARTLETT:

12 Q.  Special Agent Halla, do you have 722 in front of you?

13 A.  I do.

14 Q.  What is that?

15 A.  Telephone records for Joe Dibee at (206) 835 -- excuse me,

16 (206) 835-3513.

17    MR. BARTLETT:  I would like to offer Exhibit 722,

18 specifically two pages from Exhibit 722.

19    MR. FOX:  We made our record.

20    THE COURT:  All right.  And it is admitted, but your

21 objections are there.  Admitted.

22             (Exhibit No. 722 admitted.)

23 BY MR. BARTLETT:

24 Q.  Would you take a look at page 76 of Exhibit 722?

25 A.  I see it.

1    **Q.** What timeframe is that?

2    **A.** This page shows October 5th through October 12, 2001.

3    **Q.** Looking at the phone numbers that were dialed from

4    Mr. Dibee's phone, do you see any record match?

5    **A.** I do, five lines up from the bottom, October 12th, 3:38

6    p.m. I see a phone call to phone number (360) 705-2035, a

7    one-minute call.

8    **Q.** Whose phone number do you recognize that to be?

9    **A.** Robert Corrina's phone number.

10   **Q.** Taking a look at exhibit -- page 81.

11   **A.** I see it.

12   **Q.** Do you recognize any calls made on that day?

13   **A.** On Wednesday, October 24th, at 1:46 a.m., I see a call to

14   (360) 705-2035, a one-minute call.

15   **Q.** Once again, what number is that?

16   **A.** That's the phone number for Robert Corrina.

17   **Q.** What, if anything of significance, happened in regard to

18   this investigation between the dates October 12, 2001 through

19   --

20        MR. FOX:  Your Honor, objection, asked and answered.

21   There's been lots of evidence about this, and it's misleading

22   to ask that question.

23        THE COURT:  You may answer.

24   BY MR. BARTLETT:

25   **Q.** On October 24, 2001.

1   **A.**  October 15, 2001, was the arson in Litchfield, California.

2   **Q.**  Could you take a look at Government's Exhibit 739?

3      Do you have that in front of you?

4   **A.**  I do.

5   **Q.**  Would you take a look at it and tell me if you recognize

6  it?

7   **A.**  These are copies, front and back, of four checks in the

8  name of Briana Waters.

9         MR. BARTLETT:  Offer Exhibit 739.

10        MR. FOX:  No objection.

11        THE COURT:  Admitted.

12            (Exhibit No. 739 admitted.)

13  BY MR. BARTLETT:

14   **Q.**  Taking the first check, when was this written?

15   **A.**  It's dated October 4, 2001.

16   **Q.**  Written to?

17   **A.**  Verizon.

18   **Q.**  In the lower left-hand corner, do you see an area noting a

19  number where it says "for" and then a number?

20   **A.**  I do.  It appears to read 1020-6711915.

21   **Q.**  Have you compared that number with the account number for

22  the cellular phone associated with Bill Rodgers?

23   **A.**  I have.

24   **Q.**  What is that?

25   **A.**  The numbers are the same.

1  **Q.** Could you look at 712 just to cross check that for

2  yourself?

3  **A.** Yes, the number on this account is 1020-6711915.

4  **Q.** If you go through all of the checks that appear in 739,

5  the first check is for what amount and on what date?

6  **A.** The first check is for $50.95, dated October 4, 2001.

7  The second check is dated November 1, 2001 for $55.00.

8  The third check is dated February 20, 2001, for the amount

9  of $200.

10  The last check is dated May 3, it looks like 2001, for

11  $200.

12  **Q.** Thank you. Finally, if you could take a look at

13  Government's 740-A?

14  **A.** These are bank card records.

15  **Q.** For?

16  **A.** Bank card records for Briana Waters.

17  MR. BARTLETT: Offer Government's Exhibit 740-A.

18  MR. FOX: No objection.

19  THE COURT: Admitted.

20  (Exhibit No. 740-A admitted.)

21  **Q.** Looking at those bank records, can you tell what it is

22  they are associated with? A bank account? A credit card?

23  **A.** Based on the card number, which starts with a 4, I

24  understand that to be a Visa card.

25  **Q.** Thank you. Just to clarify for the record, Special Agent

1  Halla, with regard to 722, the Dibee phone records, only two

2  pages of those phone records are actually going in as

3  exhibits.  So if you could take out just those two pages and

4  remove the other ones, pages 76 and 81.

5      Do you have those separated?

6  **A.**  I do.

7          MR. FOX:  Mr. Bartlett, do you have any objection to

8  including page 75?

9          MR. BARTLETT:  I have no objection.  Could you please

10 include page 75?

11 BY MR. BARTLETT:

12 **Q.**  Special Agent Halla, did you try to analyze all of the

13 other pages in Mr. Dibee's phone records?

14 **A.**  I have looked at a great portion of them, yes.

15 **Q.**  Did you ever find any other calls besides those two calls

16 related to any of the numbers that you've identified in

17 relation to this investigation?

18 **A.**  No, those are the only ones I have seen.

19         MR. BARTLETT:  No further questions, Your Honor.

20         THE COURT:  Questions?

21

22                  CROSS-EXAMINATION

23 BY MR. FOX:

24 **Q.**  Good afternoon, Agent Halla.

25 **A.**  Good afternoon.

1  Q. Just to clarify, you've looked through all of Mr. Dibee's

2  records, but he had lots of phone calls, right?

3  A. Yes, he did.

4  Q. He was probably like Jennifer Kolar in terms of being a

5  habitual cell phone user?

6  A. He used his phone a lot.

7  Q. Why don't we take a look at Mr. Dibee's phone records,

8  which has been admitted as 722.

9      Before I put this up on the screen, is it fair to say as

10 you are going through all these phone records, you try to find

11 out who the subscriber was to a lot of the different phone

12 numbers we saw, right?

13 A. Yeah, we did. I can't say that we pulled every subscriber

14 number, the subscriber information for every single number,

15 but we did for the high frequency calls.

16 Q. So why don't you take a look at what's been admitted. In

17 the course of your investigation -- yesterday we heard

18 testimony from Ms. Kolar that her friend Kenny Clark had a

19 phone number of (206) 706-2964; is that correct?

20 A. I don't have an independent memory of that.

21 Q. Well, let's take a look at Exhibit 722. Let's take a look

22 at page 76.

23     Let's direct your attention to line 110. On Friday,

24 October 12th. Do you see that there?

25 A. I do.

1 **Q.** Is it not correct that there's a phone call at 1:46 p.m.

2 to (206) 706-2964?

3 **A.** That's correct.

4 **Q.** And that lasted for one minute?

5 **A.** That's correct.

6 **Q.** Now, that's a couple days before the fire at the

7 Susanville horse facility?

8 **A.** That's correct.

9 **Q.** Let's turn our attention to the next page, which is page

10 81. Let's look at line 20, on Saturday, October 20th.

11 Tell me what phone number was called from Mr. Dibee's cell

12 phone on that date.

13 **A.** (206) 706-2984.

14 **Q.** 2964 or 84?

15 **A.** It could be a 6.

16 **Q.** Now, that call lasted a whole minute, right?

17 **A.** That's correct.

18 **Q.** As we heard testimony yesterday, Mr. Clark is a friend of

19 Jennifer Kolar's?

20 **A.** Yes.

21 **Q.** That call took place, what, five days after the arson?

22 **A.** That's correct.

23 **Q.** So is Mr. Clark involved in the arson at Susanville?

24 **A.** I had no information to that.

25 **Q.** It was just a phone call that took place before and after,

1  right?

2  **A.**  That's correct.

3  **Q.**  Well, let's go up to line 5 on the same page, October

4  16th.  There's a telephone call to (360) 352-3218, right?

5  **A.**  That's correct.

6  **Q.**  Now, that call lasted, what, three minutes?

7  **A.**  That's correct.

8  **Q.**  Now, that's just the day after the arson at Susanville,

9  right?

10  **A.**  That's correct.

11  **Q.**  Now, it's correct, is it not, that that phone, 352-3218,

12  is subscribed to by somebody named Ed Glidden; is that not

13  correct?

14  **A.**  That's correct.

15  **Q.**  There were a lot of calls that Mr. Dibee made to

16  Mr. Glidden in Olympia, right?

17  **A.**  Yes, I believe they are close friends.

18  **Q.**  Well, let's take a look at page 75.  Let's look down at

19  line 77.  October 4th, 7:29 p.m.

20      Is it not correct that there's actually two calls?  There

21  is one at 6:06 and one at 7:29 to Mr. Glidden's phone; is that

22  not right?

23  **A.**  That's correct.

24  **Q.**  So Mr. Dibee made calls to Olympia before the arson,

25  right?

1  **A.** That's correct.

2  **Q.** And he made calls after the arson?

3  **A.** That's correct.

4  **Q.** Mr. Glidden was just a friend of Mr. Dibee's, right?

5  **A.** I understand that to be true.

6  **Q.** Okay.  Now, let's take a look at Exhibit 714.  It's been

7  admitted.  Those are phone records of phone number 280-3354.

8  Do you have those in front of you?

9  **A.** I don't have those in front of me.

10  **Q.** Why don't they put up on the screen, a page from those

11  records.

12      This is the phone number that you testified Jennifer Kolar

13  had listed in her address book as belonging to -- the number

14  associated with Mr. Rodgers, right?

15  **A.** That's correct.

16  **Q.** Now, is it not correct that the last phone call made on

17  the Kolar cell phone before the Center for Urban Horticulture

18  fire was on May 18th, at 7:07 a.m.?

19  **A.** That's correct.

20  **Q.** It's a phone call to Bothell, Washington, right?

21  **A.** That's correct.

22  **Q.** (425) 788-5081, right?

23  **A.** That's what it says.

24  **Q.** Now, that's a phone number associated with Tamera

25  Bernstein; isn't that correct?

1    **A.** That's correct.

2    **Q.** So the very last phone call that purportedly, under your

3 theory, Mr. Rodgers made to anyone was to Tamera Bernstein?

4    **A.** That's correct.

5    **Q.** Now, this phone number, 280-3354 -- there are a lot of

6 calls to a lot of different people, right?

7    **A.** That's correct.

8    **Q.** There's lots of calls to Oakly Myer?

9    **A.** That's correct.

10    **Q.** Calls to Justin Wood?

11    **A.** That is correct.

12    **Q.** Lots of calls to Tamera Bernstein during 2001?

13    **A.** That is correct.

14    **Q.** Lots of calls to Erica Fransend in 2001?

15    **A.** Yes.

16    **Q.** Lots of calls to someone named Brina Talsky?

17    **A.** That's correct.

18    **Q.** Isn't it correct that Brina Ann Talsky, there were 10

19 calls to her in 2001?

20    **A.** That may be.

21    **Q.** You didn't count them up?

22    **A.** I don't know that off the top of my head.

23    **Q.** Well, weren't there calls from this phone to Brina Ann

24 Talsky on May 4, 2001?

25    **A.** There may be. I don't have the records in front of me.

1    **Q.** Well, would you take my word that there's calls to her on
2    May 4th, May 7th, May 27th and May 29, 2001?
3    **A.** Yes.
4    **Q.** Before and after the fire at the Center for Urban
5    Horticulture, right?
6    **A.** Yes.
7    **Q.** To someone named Brina Ann; is that correct?
8    **A.** That's correct.
9    **Q.** There's somebody called Arial Stonewound that there was
10   calls to, right?
11   **A.** Yes.
12   **Q.** Arial Stonewound was called twice on May 3rd, right?
13   **A.** That may be true, yes.
14   **Q.** She was called twice on May 23rd?
15   **A.** That's correct.
16   **Q.** Before and after the arson, right?
17   **A.** Yes.  That's correct.
18   **Q.** Andrea Williams, she got calls on May 8th, May 23th, May
19   25th, May 27th?
20   **A.** That may be correct, yes.
21   **Q.** Now, you've analyzed all of these phone records in this
22   exhibit, the one from 280-3354?
23   **A.** I have looked through them, yes.
24   **Q.** Is it not -- why don't we take a look, put up on the
25   screen what's been admitted for illustrative purposes, 714.

1  　　　Now, this is something you produced for purposes of this

2  trial, right?

3  **A.**  That's correct.

4  **Q.**  And it purports to be telephone calls from 280-3354 to

5  residences that have some connection to Briana Waters or

6  Justin Solondz?

7  **A.**  That's correct.

8  **Q.**  Now, you heard the testimony from Mr. Wake yesterday that

9  there were eight cabins on his property?

10  **A.**  That is correct.

11  **Q.**  And they had one phone for all the residents of those

12  cabins?

13  **A.**  Yes, it appeared they have a community phone.

14  **Q.**  So just the fact that there is a phone call from 280-3354

15  to this property with one phone for eight cabins, we don't

16  know who got those phone calls, right?

17  **A.**  That's absolutely correct.

18  **Q.**  In fact, is it not correct that in May of 2001, there are

19  absolutely no phone calls made from 280-3354 to the Conger

20  Street residence?

21  **A.**  That's correct.

22  **Q.**  So of all the phone calls that were made from that phone

23  to Conger Street, they start after the arson at the University

24  of Washington?

25  **A.**  That's correct.

1    Q.  So you seem to want to have it both ways, don't you?  The

2    lack of phone calls, the presence of phone calls; it doesn't

3    really mean anything, does it?

4    A.  This chart is just to show the phone calls made to these

5    residents.  I am not trying to drawing assisted conclusions

6    from them.

7    Q.  Now, you heard the testimony yesterday.  You know from

8    Jennifer Kolar that Mr. Rodgers was at the book club meeting

9    in Sisters, Oregon, right?  You heard her testify to that?

10   A.  Yes.

11   Q.  I believe the testimony was that it was May 25th to May

12   27th of 2001.  That's what she had in her Palm Pilot, right?

13   A.  That's what she had in her calendar.

14   Q.  Now, isn't it correct that this phone number, 280-3354,

15   was used consistently during that time period?

16   A.  I don't know that independently without looking at the

17   records.

18   Q.  Well, why don't we take a look at that.  So there appear

19   to be phone calls on the 25th?

20   A.  That's correct.

21   Q.  Phone calls on the 26th?

22   A.  That's correct.

23   Q.  Phone calls on the 27th?

24   A.  That's correct.

25   Q.  The very days that Jennifer Kolar said that people were at

1  this book club meeting, correct?

2  **A.**  That's correct.

3  **Q.**  From your analysis of the phone records, people who go to

4  these events tend to turn off their cell phones, right?

5  **A.**  I believe that's true for actions.  I don't know if that's

6  true for meetings.

7  **Q.**  Well, have you looked at Jennifer Kolar's cell phone

8  records for the time she was at Sisters?

9  **A.**  I have not.

10  **Q.**  Well, we could put those up in a few seconds, but if for

11  instance someone had gone to one of these meetings and didn't

12  take their cell phone, someone else could be using the cell

13  phone, right?

14  **A.**  Yes.

15  **Q.**  You don't know who's making the calls?

16  **A.**  That is correct.

17  **Q.**  All you have is the fact that there were phone calls made?

18  **A.**  That's true.

19  **Q.**  Similarly for Mr. Dibee's phone calls or for his phone,

20  you don't know that he is the one that was pushing any the

21  numbers?

22  **A.**  That's correct.

23  **Q.**  He may have been down in Susanville and someone was using

24  his phone?

25  **A.**  That's very possible.

1  **Q.** With regard to the phone 280-3354, did you see whether

2  there were any calls to the number associated to the number

3  for Nathan Block?

4  **A.** I believe there are.

5  **Q.** Isn't it true that those calls from this phone to Nathan

6  Block's don't start until August 1, 2001?

7  **A.** I believe that's accurate, yes.

8  **Q.** Now, Nathan Block pled guilty to the fire at the Romania

9  Chevrolet dealership, right?

10 **A.** That's incorrect. I think he pled guilty to the fire at

11 Jefferson Poplar.

12 **Q.** Wasn't he involved in the other one, too?

13 **A.** No, I don't think so.

14 **Q.** You haven't looked at his plea agreement?

15 **A.** No, I have.

16 **Q.** Would it surprise you if he had been involved in that

17 particular incident?

18 **A.** No, it wouldn't.

19 **Q.** So, in the time that that particular arson had taken

20 place, there were no calls between 280-3354 to Nathan Block;

21 is that right?

22 **A.** That may be true.

23 **Q.** In the time leading up to the joint Center for Urban

24 Horticulture and the Jefferson Poplar Farm action, there were

25 no calls between Mr. Rodgers and Nathan Block?

1    **A.**  That's correct.

2    **Q.**  So those calls only began months later; is that correct?

3    **A.**  That's correct.

4    **Q.**  Now, let's talk about Exhibit 735.  We don't have to put

5    it on the screen, but this was the bar chart you prepared

6    involving phone calls from (360) 570-0226?

7    **A.**  That's correct.

8    **Q.**  From the Conger Street address?

9    **A.**  Yes.

10   **Q.**  You pointed out that there were no calls on the 19th, 20th

11   and 21st of May?

12   **A.**  That's correct.

13   **Q.**  These are just long-distance tolls, right?

14   **A.**  That's correct.

15   **Q.**  This is not a record of every call made from that phone?

16   **A.**  Yes, that's correct.

17   **Q.**  It's not a record of the calls that came into the phone?

18   **A.**  That's correct.  It doesn't capture those.

19   **Q.**  Because (360) 570-0226 is a land line?

20   **A.**  Yes.

21   **Q.**  So the phone records are very different than the records

22   for a cell phone?

23   **A.**  That is correct.

24   **Q.**  So you have no idea whether there were calls made to that

25   residence on those days; you didn't put anything on the bar

1  chart?

2  **A.** That's correct.

3  **Q.** You have no idea whether there were any calls made from

4  the residence on the days you didn't put anything on the bar

5  chart?

6  **A.** That is correct.

7  **Q.** You also mention that there were calls to Ms. Waters'

8  mother, right?

9  **A.** That's correct.

10  **Q.** And calls to her brother in California?

11  **A.** That's correct.

12  **Q.** And you notice that there's no calls on those particular

13  dates, right?

14  **A.** That's correct.

15  **Q.** You don't know what her brother and mother were doing on

16  those dates, do you?

17  **A.** I don't.

18  **Q.** Maybe she didn't call them because they were out of town

19  some place?

20  **A.** That's possible.

21  **Q.** I notice that earlier in the month, there were no calls

22  made on May 15th.

23  **A.** That may be true.

24  **Q.** There were no calls on May 17th?

25  **A.** That's true.

1   **Q.** There were no calls made on May 24th and 25th?

2   **A.** That's true.

3   **Q.** In fact, no phone calls made, no long-distance toll calls

4   from the 1st and the 10th of May?

5   **A.** That's correct.

6   **Q.** Well, let's go back to Exhibit 734 which has been

7   admitted.

8       Exhibit 734 is the record of the Kolar toll calls on

9   Conger Street?

10  **A.** That's correct.

11  **Q.** Isn't it true that between April 21st and May 27th, there

12  are no calls coming from this residence?

13  **A.** That's correct.

14  **Q.** So for a period of almost three weeks, there were no

15  calls?

16  **A.** That is correct.

17  **Q.** Did you look at the toll records of Robert Corrina?

18  **A.** I have looked at some of them, yes.

19          MR. FOX:  I am sorry, has 731 been admitted?

20          THE CLERK:  Yes.

21          MR. FOX:  I will put up a page from Exhibit 731.

22  BY MR. FOX:

23  **Q.** It's correct that in the month of May, there's a toll call

24  from Mr. Corrina's residence on May 16th, right?

25  **A.** That's correct.

1   **Q.** And that was to Port Orchard, Washington?

2   **A.** That's correct.

3   **Q.** That was for about a month?

4   **A.** Appears so.

5   **Q.** Go then on May 22nd, just one day after the arson, there

6 was a toll call to Port Orchard, again, that lasted 15

7 minutes?

8   **A.** Yes, that's correct.

9   **Q.** So the mere fact that there are calls from a residence

10 before an arson and after an arson are really meaningless,

11 isn't it?

12   **A.** It is what it is.

13   **Q.** It is what it is, right. But it's true you presented

14 certain things without presenting other things, right?

15     For instance, you pulled out calls from this 2880 phone

16 number to addresses associated with Briana Waters and Justin

17 Solondz?

18   **A.** Yes.

19   **Q.** And you made a chart on that?

20   **A.** Yes.

21   **Q.** And you presented that to this jury as evidence in this

22 case?

23   **A.** That's correct.

24   **Q.** The chart shows there were no calls to Conger Street in

25 the month of May, right?

1 **A.** Can you repeat that?

2 **Q.** The chart that you produced itself shows that there were

3 no phone calls from that phone number associated with

4 Mr. Rodgers to the Conger Street address?

5 **A.** That's correct.

6 **Q.** So it is what it is, right?

7 **A.** That's correct.

8 **Q.** Let's step back, Agent Halla.  You've been an agent how

9 many years?

10 **A.** Eight years.

11 **Q.** Before that, you said you had a science background?

12 **A.** That's correct.

13 **Q.** What type of work did you do?  You were a researcher or

14 something?

15 **A.** I worked in a medical research lab.

16 **Q.** Doing what, out of curiosity?

17 **A.** I worked for the pediatrics department in Milwaukee,

18 Wisconsin.  We were studying improved treatments for children,

19 infants suffering from pulmonary hypertension.

20 **Q.** Now, when you went through your training at the FBI, you

21 learned how to do interviews, right?

22 **A.** We did have training on interviews, yes.

23 **Q.** Is it not correct that the FBI has a policy that

24 discourages tape recording of interviews?

25 **A.** I know that we need special permission in order to tape

1  record an interview, and in the eight years I have been an

2  agent, I have never done one.

3  **Q.**  You actually need to get the approval of a supervisory

4  agent, right?

5  **A.**  No, the Special Agent in charge is the highest ranking FBI

6  official for our division.

7  **Q.**  So in Seattle, who would that be?

8  **A.**  It would be SAC Laura Laughlin.

9  **Q.**  So if you wanted to record -- and I say tape recording,

10  but if you had a digital recorder, you would still need to get

11  permission of the agent at the top, right?

12  **A.**  That's correct.

13  **Q.**  Now, the FBI does own digital recorders, right?

14  **A.**  I am sure we have them.

15  **Q.**  You have videotape cameras?

16  **A.**  Yes, that's correct.

17  **Q.**  In fact, the FBI used tape records when -- in this

18  particular investigation, when Jake Ferguson was involved; is

19  that correct?

20  **A.**  That's correct.

21  **Q.**  And Jake Ferguson, to refresh everyone's memory, he was

22  the person that was wired, wasn't he, and he was sent off to

23  talk to different people suspected of being involved in these

24  arsons?

25  **A.**  That's correct.

1  **Q.** He was the person that started cooperating in 2004?

2  **A.** Yes, that's correct.

3  **Q.** So he was wired actually with a recording device?

4  **A.** Yes.

5  **Q.** And he went around the country --

6  **A.** Yes.

7  **Q.** -- to different people.

8     Chelsea Gerlach, for instance?

9  **A.** Yes.

10 **Q.** Stan Meyerhoff, for instance?

11 **A.** Yes, that's correct.

12 **Q.** And Daniel McGowan?

13 **A.** Yes.

14 **Q.** Mr. Rodgers?

15 **A.** Yes.

16 **Q.** And some other people as well?

17 **A.** Yes.

18 **Q.** But those were mainly the ones he went too, right?

19 **A.** That's correct.

20 **Q.** And he wore a secret recording device?

21 **A.** Yes.

22 **Q.** Was it Agent Ferrara from the Eugene office that was

23 monitoring it?

24 **A.** Yes, he was overseeing the recordings.

25 **Q.** You had conversations with all of these people over, I

1  think, what took almost a year, right?

2  **A.**  Sounds correct.

3  **Q.**  Based upon those conversations, the original Indictments

4  were handed down in November-December of 2005?

5  **A.**  That's correct.

6  **Q.**  Now, the reason that the FBI uses a recording device with

7  an informant is so that there's no ambiguity about what was

8  said, right?

9  **A.**  It's so that we don't expect that individual to testify to

10  what was said, if the recording captures what was said.

11  **Q.**  It's also pretty good evidence, too, against the target if

12  they say something incriminating?

13  **A.**  That's correct.

14  **Q.**  Because you have their words on tape; is that correct?

15  **A.**  Yes.

16  **Q.**  And because the FBI ultimately had these people's word on

17  tape, some of them cooperated immediately?

18  **A.**  That's correct.

19  **Q.**  In fact, I believe that the FBI played some of the tapes

20  for some of the people that were arrested?

21  **A.**  I believe that might be true.

22  **Q.**  This was in December of 2005, right?

23  **A.**  That's correct.

24  **Q.**  Now, Jennifer Kolar, I believe, used a tape-recorder when

25  she went with you to Olympia?

1  **A.** That is correct.

2  **Q.** She actually recorded you, right?

3  **A.** Yes, she recorded our questions for her attorney.

4  **Q.** Have you heard that tape?

5  **A.** I have not.

6  **Q.** Now, Ms. Kolar is a cooperating witness for the

7  Government?

8  **A.** That's correct.

9  **Q.** So if you asked her for the tape, she'd turn it over,

10  wouldn't she?

11  **A.** I understand that to be attorney/client privilege, and I

12  wouldn't go there.

13  **Q.** You wouldn't go there. Are you aware the Government has

14  asked for a copy of that tape?

15  **A.** I am not aware of that.

16  **Q.** When you do your interviews, you don't tape record, right?

17  **A.** That's correct.

18  **Q.** You take notes, right?

19  **A.** I do.

20  **Q.** And then you transfer your notes to -- after you write up

21  your notes, you put together a report, right?

22  **A.** Right, I use my notes to guide my memory of what occurred

23  at the interview.

24  **Q.** And ultimately, after the interview, if there are two

25  agents, you each would have your notes, right?

1  A.  That's correct.

2  Q.  And you would talk -- well, one agent would be assigned to

3  prepare the report, right?

4  A.  That's correct.

5  Q.  And you would use your notes to help you write that

6  report?

7  A.  That's correct.

8  Q.  You would share that version of the report with the other

9  agent?

10  A.  That's correct.

11  Q.  They would use their notes to make any corrections or

12  additions?

13  A.  That's correct.

14  Q.  Ultimately, you produce a final report, right?

15  A.  That's correct.

16  Q.  And it's called a 302 --

17  A.  That's correct.

18  Q.  -- in FBI jargon?

19      Now, these reports are really important, are they not?

20  A.  Yes, they are.

21  Q.  Because they memorialize what took place on a particular

22  date?

23  A.  That's correct.

24  Q.  And years down the road, you need to have a record of what

25  took place?

1  **A.** Yes, that's correct.

2  **Q.** Particularly, if you are not tape recording the interview,

3  it's going to be the best record of what happened, right?

4  **A.** That's correct.

5  **Q.** And these reports are sent on to other law enforcement

6  officers?

7  **A.** Yes, they can be.

8  **Q.** They are disclosed to the defense in the case?

9  **A.** That's correct.

10  **Q.** If you transfer cases, those reports will go with the

11  case, right?

12  **A.** Yes.

13  **Q.** So someone else can go back and take a look back at that

14  and see what happened?

15  **A.** That's correct.

16  **Q.** Now, in this particular case, you interviewed Ms. Kolar on

17  December 16, 2005?

18  **A.** That's correct.

19  **Q.** You were at Mr. Friedman's office and Mr. Bartlett's

20  office?

21  **A.** That's correct.

22  **Q.** Mr. Bartlett wasn't there, right?

23  **A.** I don't believe he was.

24  **Q.** But Agent Torres was there, right?

25  **A.** That's correct.

1  **Q.** You'd have to say this was a fairly important interview?

2  **A.** Yes, it was.

3  **Q.** This was kind of a newly-breaking case, right?

4  **A.** Yes, you could say that.

5  **Q.** Well, there had just been a series of arrests within the

6  last 10 days or so?

7  **A.** That's correct.

8  **Q.** You had been working on this case for a long time, right?

9  **A.** We had been, yes.

10  **Q.** You particularly -- if you just started with the FBI in

11  2000, you got the case in 2002; is that right?

12  **A.** Special Agent Torres was the case agent on it. I was the

13  case agent on the National Wildlife Research arson and the

14  A.D.C. arson, but I assisted Agent Torres on this case.

15  **Q.** Now, you really wanted to find who committed the crime,

16  right?

17  **A.** That's correct.

18  **Q.** Ms. Kolar was an important witness, right?

19  **A.** That's correct.

20  **Q.** She was willing to come in and talk, correct?

21  **A.** Correct.

22  **Q.** This was a big fire, right?

23  **A.** Yes.

24  **Q.** At a state university, a fairly high publicity case?

25  **A.** Yes.

1   **Q.** You also thought that she might have information about

2   other arsons as well?

3   **A.** That was very possible, yes.

4   **Q.** She had been on the radar scene for a while?

5   **A.** Yes.

6   **Q.** We heard about Agent Quimby trying to contact her about a

7   year-and-a-half earlier?

8   **A.** That's correct.

9   **Q.** In the beginning of the meeting, you heard Mr. Friedman

10   tell Ms. Kolar that it was important to tell the truth, right?

11   **A.** That's correct.

12   **Q.** And as you know, lying to a federal law enforcement

13   officer is a separate crime?

14   **A.** That's correct.

15   **Q.** As far as you know, Jennifer Kolar has not been charged

16   with obstruction or lying; is that right?

17   **A.** That's correct.

18   **Q.** Now, you were taking notes during the meeting?

19   **A.** That's correct.

20   **Q.** You were trying to report the best you could the important

21   things, right?

22   **A.** That's true.

23   **Q.** It's correct that during this meeting, Jennifer Kolar did

24   not mention Briana Waters' name?

25   **A.** That's true.

1  Q. In fact, I think you said that the first you heard of
2  Briana Waters' name was early January?
3  A. That's correct.
4  Q. 2006?
5  A. That's correct.
6  Q. So the whole month of December, there was no mention of
7  Brian Waters' name that you knew of?
8  A. That's correct.
9  Q. Now, let's take a look at A-28.  This is just marked for
10  identification.
11       Can you identify what you have in front of you?
12  A. These are my notes from the December 16, 2005 interview
13  with Jennifer Kolar.
14  Q. Why don't you count how many pages there are.
15  A. Fifteen pages, including the cover sheet.
16  Q. So when you are in this room, you are on one side of the
17  table; is that right?
18  A. That's correct.
19  Q. You are seated next to Agent Torres?
20  A. Agent Torres or Mr. Friedman.
21  Q. Then Ms. Kolar and Mr. Bartlett are on the other side of
22  the table?
23  A. That sounds accurate.
24  Q. Mr. Friedman is asking the questions, or are all three of
25  you asking questions?

1  **A.**  I think we all asked questions at some point.

2  **Q.**  Is Mr. Friedman taking notes, too?

3  **A.**  I believe he was.

4  **Q.**  So the three of you are on one side of the table taking

5  notes and Ms. Kolar and Mr. Martin are on the other side?

6  **A.**  Yes.

7  **Q.**  Mr. Martin is taking notes probably too?

8  **A.**  Yes, that's correct.

9  **Q.**  Ms. Kolar wasn't taking notes, most likely?

10  **A.**  No.

11  **Q.**  So you started out asking Ms. Kolar about her background,

12  right?

13  **A.**  Yes.

14  **Q.**  Why don't we count how many pages there are, as just kind

15  of a general background.  I am sorry, I thought you were

16  counting.

17  **A.**  I believe there's approximately eight pages.

18  **Q.**  Ms. Kolar starts talking about the Cavel West arson.

19  That's the one in 1997.  How many pages of notes do you have

20  for the Cavel West arson, or did she not talk about it

21  continuously or did you talk about other things in between?

22  **A.**  I believe that did occur.  I can't tell from my notes

23  exactly where the Cavel West section is without looking in

24  detail.

25  **Q.**  Then why don't we skip ahead to the Susanville section.

1   **A.** Okay.

2   **Q.** Is it fair to say that she talked about Susanville for

3   maybe a little over two pages of your notes? It goes from --

4   there's three pages that it's actually on, but one part that's

5   blank at the bottom, right?

6   **A.** That's correct.

7   **Q.** And one part that talks about something else, right?

8   **A.** Yes.

9   **Q.** So about two pages on Susanville, right?

10  **A.** That's correct.

11  **Q.** Then you move to the University of Washington, right?

12  **A.** That's correct.

13  **Q.** There's actually about two-and-a-half pages on that,

14  right?

15  **A.** Yes, that looks to be correct.

16  **Q.** After you finished talking about Susanville, there's an

17  entry, March 2000, right? A seed orchard in Canada?

18      I am sorry, not Susanville. The University of Washington,

19  right?

20  **A.** That's correct.

21  **Q.** Pulling trees out and got caught for something, right?

22      Then there's a section about Joe Dibee, right?

23  **A.** That's correct.

24  **Q.** So in fact, the discussion about the University of

25  Washington was not at the very end of the interview, right?

1  **A.**  It wasn't the last -- very last thing discussed, no.

2  **Q.**  So after you finished talking about the University of

3  Washington, she talked about some other things?

4  **A.**  For a few minutes, yes.

5  **Q.**  Enough to take about a half a page of notes?

6  **A.**  Yes.

7  **Q.**  I assume that during the course of this interview, you

8  want to find out who had committed the arson?

9  **A.**  That's true.

10  **Q.**  I would say that was probably on the top of your list?

11  **A.**  Yes, we wanted to know that.

12  **Q.**  In fact, you wanted to know that because if there were

13  people out there that hadn't been apprehended, you wanted to

14  go out and catch them?

15  **A.**  That's true.

16  **Q.**  So I assume you asked Ms. Kolar who did this with her,

17  right?

18  **A.**  That's correct.

19  **Q.**  And I think on direct, you testified that she gave you

20  five names, right?

21  **A.**  There were five names that were mentioned in the context

22  of this.  Six, including Peaches.

23  **Q.**  Peaches was the person that she said initially approached

24  her?

25  **A.**  That's correct.

1  **Q.** But in terms of who committed the fire at the Center for
2  Urban Horticulture, it's your testimony that she gave you five
3  names, right?

4  **A.** There were five names that were mentioned in context with
5  this arson.

6  **Q.** Capitol Hill Girl?

7  **A.** That was one of the names.

8  **Q.** The punk boyfriend of Capitol Hill Girl?

9  **A.** Yes.

10 **Q.** Crazy Dan?

11 **A.** That's correct.

12 **Q.** Avalon?

13 **A.** That's correct.

14 **Q.** And Ms. Kolar?

15 **A.** That's correct.

16 **Q.** Then after she gave kind of a summary of what took place,
17 she moved on and talked about some other things, right?

18 **A.** We asked her a few remaining questions, yes.

19 **Q.** And then she left?

20 **A.** That's correct.

21 **Q.** Now, I think your testimony was that Agent Torres was
22 assigned the task of putting together the draft of the 302?

23 **A.** I don't think he was assigned to do the draft, but he did
24 the first draft since I was away on vacation.

25 **Q.** I think you testified that at one time, you thought you

1    had started the draft but it turned out he had done it?

2    **A.**   That's correct.   I earlier had misstated and thought that

3    I was the one who created the first draft.

4    **Q.**   Now, we've met before?

5    **A.**   That's correct.

6    **Q.**   Whenever I have wanted to look at some physical evidence,

7    you've obliged me in this case?

8    **A.**   That's correct.

9    **Q.**   I have called you on your cell phone many times, right?

10   Not many times?

11   **A.**   You called me on my hard line.

12   **Q.**   If I wanted to look at documents or any physical evidence

13   in this case, you've obliged me?

14   **A.**   I have, yes.

15   **Q.**   But there came a time, did there not, when I wanted to

16   interview you about the preparation of your report in this

17   case?

18   **A.**   That's correct.

19   **Q.**   I wanted to talk to you -- or it was communicated to you

20   that I wanted to talk to you about how you produce the 302 in

21   this case?

22   **A.**   I don't know exactly what you wanted to talk to me about,

23   but in relation to this 302, yes.

24   **Q.**   And you declined to talk to me about it?

25   **A.**   That's correct.

1  **Q.** So really this is the first time that I have been able to

2  talk to you about what happened with regard to the preparation

3  of this report?

4  **A.** That's correct.

5  **Q.** So as an FBI agent, you are making up a draft of a 302,

6  you have a computer at your office?

7  **A.** Yes.

8  **Q.** The computer is tied into the FBI server?

9  **A.** Yes, that's correct.

10  **Q.** So when you save a draft of your report, the draft is

11  saved on the FBI server?

12  **A.** Yes, that's correct.

13  **Q.** Now, even when you've made changes to a document, it's

14  correct that some of these changes might still exist in some

15  portion of the computer server?

16  **A.** I have no personal knowledge of that.

17  **Q.** Well, you do have personal knowledge that when you execute

18  search warrants to seize people's computers that quite often

19  when you seize a computer, you need to use sophisticated

20  software, but you could do searches of the unallocated space

21  of the computer?

22  **A.** That sounds correct.

23  **Q.** The unallocated space is after you've erased something,

24  it's probably still there for a while?

25  **A.** Sometimes, it is.

1 **Q.** It's hidden in the depths of the computer, but you just

2 can't pull it up on the screen quickly?

3 **A.** That's correct.

4 **Q.** The FBI has software like EnCase or FTK that can go into

5 those areas of the computer and find documents that have been

6 erased or deleted?

7 **A.** That's possible.

8 **Q.** Even if you made multiple versions of the 302 report from

9 this interview, it's probably copied someplace on that server?

10 **A.** It's my understanding that there isn't. We inquired as to

11 whether there's a way to pull up any older versions, and we

12 were told no.

13 **Q.** You inquired after I asked for that to be done, right?

14 **A.** Yes. I was asked to look into that.

15 **Q.** In fact, we wanted access to the FBI server?

16 **A.** I believe that's true.

17 **Q.** You haven't given me access to the FBI server?

18 **A.** I don't have that authority.

19 **Q.** Who would have that authority, just out of curiosity?

20 **A.** I do not know that question.

21 **Q.** It would probably have to be someone much higher than the

22 agent in charge of your office, right?

23 **A.** Probably true.

24 **Q.** Well, in any case, you completed this 302?

25 **A.** That's correct.

1   **Q.** Then at some point on January 5th, I think you testified

2   that you received information that Ms. Kolar had named someone

3   else?

4   **A.** That's correct.

5   **Q.** Now, the very next day, January 6th, you had another

6   interview scheduled?

7   **A.** That is correct.

8   **Q.** I think you said you made some arrangement through her

9   attorney that you were not going to question Ms. Kolar about

10  Briana Waters that day?

11  **A.** I didn't have any communication with her attorney

12  concerning that, but myself and Mr. Friedman had talked, and

13  since her memory concerning the UW arson was not very good on

14  December 16th --

15  **Q.** Well, what I am asking you is, did you have sort of an

16  arrangement internally that you weren't going to question her?

17  **A.** We agreed that we were not going to discuss the UW arson

18  for some time.

19  **Q.** Now, did you talk to her, or were you aware of

20  conversations with her lawyer, that you were not going to talk

21  to her about it?

22  **A.** I didn't have any firsthand conversations with him, no.

23  **Q.** Were you aware of any conversations like that?

24  **A.** I believe her attorney understood that that would be a

25  good idea.

1    **Q.** To help her memory improve over time?

2    **A.** He communicated that her memory seemed to be getting

3    better just in the short time from when we had talked to her,

4    and it would be a good thing to hold off asking detailed

5    questions at that point.

6    **Q.** Now, on January 6th then, you spent about how many hours

7    with Ms. Kolar?

8    **A.** I don't remember offhand, but our meetings were

9    approximately two hours in length.

10   **Q.** You asked her questions about lots of different things,

11   right?

12   **A.** That's true.

13   **Q.** You showed her 42 pictures?

14   **A.** Sounds correct.

15   **Q.** You didn't show her any pictures of Briana Waters?

16   **A.** That's correct.

17   **Q.** I think on direct you said it took time to get a

18   photograph of Ms. Waters?

19   **A.** That's correct. When we ask the Department of Licensing,

20   sometimes they have to mail them if they are older photos and

21   it takes a few days.

22   **Q.** So let's say you, as an FBI agent -- you needed a

23   photograph immediately of someone, could you not get the

24   photograph immediately?

25   **A.** It depends upon the circumstances and where we are trying

1    to get the photo from.  In some cases, we could probably

2    expeditiously try to get one.

3    **Q.**  Well, it's correct, is it not, that there are a lot of law

4    enforcement agencies that have sophisticated computer systems,

5    right?

6    **A.**  I don't know what you mean by sophisticated.

7    **Q.**  Isn't it correct that the FBI has a computer system that's

8    sophisticated?

9    **A.**  I don't know if I'd say that.

10   **Q.**  Well, let me ask you this.  You didn't try to get a

11   picture of Briana Waters until January 9th or 10th or

12   something like that, right?

13   **A.**  That's what -- I know we received one during that time.  I

14   can't remember when I requested our analyst to start working

15   on that.

16   **Q.**  Did you request on January 5th that they get a picture?

17   **A.**  I don't know.  I have no idea of that, but I can tell you

18   when I requested it.

19   **Q.**  At this meeting on January 6th, you also showed Ms. Kolar

20   a picture of Suzanne Savoie?

21   **A.**  That's correct.

22   **Q.**  That's when Ms. Kolar said something about this was Horace

23   the butcher's daughter?

24   **A.**  That's correct.

25   **Q.**  Suzanne Savoie's father isn't named Horace, is it?

1  **A.**  I don't believe so.

2  **Q.**  In fact, he's not a butcher?

3  **A.**  I don't believe so.

4  **Q.**  Then Ms. Kolar also said that Susan Savoie's boyfriend had

5  some piercings or something like that?

6  **A.**  She may have said that.

7  **Q.**  If fact, she identified him as Spencer Moen?

8  **A.**  Later on she did, yes.

9  **Q.**  Did you ever go out and interview Mr. Moen?

10  **A.**  I have not interviewed Mr. Moen.

11  **Q.**  Then on the 12th of January, you again met with Ms. Kolar?

12  **A.**  Sounds correct.

13  **Q.**  There were discussions about the book clubs; is that

14  correct?

15  **A.**  That's correct.

16  **Q.**  That's when you showed her Briana Waters' picture,

17  correct?

18  **A.**  That's correct.

19  **Q.**  But you didn't question her about Briana Waters?

20  **A.**  That's correct.

21  **Q.**  Ms. Kolar didn't volunteer any information about Briana

22  Waters, other than that's her; is that correct?

23  **A.**  That's correct.

24  **Q.**  At some point on direct examination, you were asked if

25  Ms. Kolar was shown a picture who she believed was Crazy Dan,

1  right?

2  **A.**  That's correct.

3  **Q.**  Now, Crazy Dan she said was Jake Ferguson?

4  **A.**  That's correct.

5  **Q.**  At least that's what she said in January, right?

6  **A.**  That would be correct.

7  **Q.**  And Jake Ferguson was the informant that wore the wire,

8  right?

9  **A.**  That's correct.

10  **Q.**  Now, it's also true that you showed her pictures of Justin

11  Solondz in the course of your investigation, right?

12  **A.**  We have.

13  **Q.**  And Ms. Kolar has never identified Justin Solondz' picture

14  as -- she's never picked him out?

15  **A.**  I believe that's correct.

16  **Q.**  When you took Ms. Kolar down to Olympia, you said Agent

17  Torres was driving?

18  **A.**  That's correct.

19  **Q.**  You were sitting in the front seat taking notes?

20  **A.**  That sounds correct.

21  **Q.**  Ms. Kolar was in the back seat?

22  **A.**  Yes.

23  **Q.**  At some point, I think you were asked on direct

24  examination if you had conversations about different people?

25  **A.**  That's correct.

1  **Q.** And she talked about Lacey Phillabaum, right?

2  **A.** Yes, she did.

3  **Q.** And she -- you asked her about Briana Waters?

4  **A.** Yes, I did.

5  **Q.** So you did ask some questions about Briana Waters in

6  February?

7  **A.** I did.

8  **Q.** Ms. Kolar talked about Briana Waters a little bit, right?

9  **A.** Yes, that's correct.  She answered the questions I was

10 asking.

11 **Q.** You were talking about different people's personalities

12 and the like?

13 **A.** That's correct.

14 **Q.** Let me turn your attention to A-45.

15     THE COURT:  Let's do this.  I think it's been a long

16 week, so it's a good place to stop and have you enjoy a good

17 weekend.  I understand the sun might be out for a while.

18 Let's hope so.  I will have you back here on Monday, rested,

19 hopefully in the place you are now, at 9:00.

20     Don't discuss the case, research anything or do anything.

21 I keep saying this.  All you need to decide the case you will

22 receive here in this courtroom.  Leave your books on the

23 chair.  Have a nice weekend.

24     (Jury not present.)

25     THE COURT:  You may be seated.  Anything we need to

1   take up?

2       MR. FOX:  We still have on the table our motions for

3   David Carr and for Joshua Harper to be transported.

4       THE COURT:  I am prepared to deal with that.  Do you

5   want to deal with it tonight?

6       MR. FOX:  Sure, and Mr. Harper as well.

7       THE COURT:  The motions are on the table.  I have

8   looked at the material submitted, and I am ready to hear from

9   you, if anything needs to be added to that.

10    You may step down.

11       MR. FOX:  Well, with regards to Mr. Harper, Ms. Kolar

12   adamantly denied that she has ever said, on the boat

13   Bulletproof by the Makah whaling protest, she denied that she

14   had ever said, "If you don't watch it, I will roll on you."

15    When the individual, Mr. Clark, said, "There's nothing to

16   roll on me over," she said, "That doesn't matter.  I will roll

17   on you anyway," which was a threat to turn state's evidence

18   for no reason.

19    As I indicated the other day in the offer of proof,

20   Mr. Clark, who was a friend of Ms. Kolar's, claims to have no

21   memory of that, but there was a third person who was on the

22   boat, Mr. Joshua Harper, who is imprisoned in Sheridan, and I

23   have interviewed him, and he told me exactly what I just told

24   you, and he would testify that Ms. Kolar said those words that

25   she denied saying.

1    So he is a necessary impeachment witness to tie up the

2    impeachment on that issue, which is she would threaten to roll

3    on someone even though there's nothing they had done.

4    So with regard to Mr. Carr, I have seen the Government's

5    pleadings.  Ms. Phillabaum was very evasive on the stand as to

6    what she actually told her friend Mr. Carr, but she quibbled

7    with the issue of whether she -- whether she told him that she

8    believes she was telling the Government what they already

9    knew.

10    She argued up and back with Mr. Bloom about that.  They

11    argued for quite a long time about that, but she denied saying

12    it in that way, and we provided, I think -- I don't have the

13    exhibit number in front of me, but there is an exhibit that we

14    offered to her to review, which is the contents of the

15    conversation with Mr. Carr from our investigator.

16    So we believe he is a necessary impeachment witness as

17    well.  If we don't call him or call Josh Harper, we are

18    concerned that the Government will, in closing, argue the fact

19    that there is no evidence -- I am sorry, Counsel is handing me

20    A-190, which is the record of the phone call for Mr. Carr, and

21    for purposes of the record, we would make that offer of proof

22    as to what he would say.

23    But we are concerned that the Government will argue in

24    closing:  Well, these witnesses denied it, and you have proved

25    nothing to contradict that.  If we can't call up the

1 impeachment witnesses, that's exactly what we are concerned

2 about.

3      MR. BARTLETT:  Your Honor, with regard to David Carr,

4 you don't have to listen to Mr. Fox's argument about what

5 Ms. Phillabaum said because, in fact, we provided you a

6 transcript.  She did not make the statements they are

7 alleging.  There is no inconsistency whatsoever, so they are

8 building up a straw man and knocking it down.  It just doesn't

9 exist.

10     With regard to Josh Harper, Mr. Harper is a convicted

11 felon serving jail currently on an ALF/ELF related action.

12 What they are trying to do is bring in this individual on an

13 incredibly collateral matter with regard to a comment that

14 could be interpreted a number of different ways.

15     Under 608, it's clearly not allowed.  They even concede

16 that the person allegedly that this conversation occurred with

17 has no memory of it, so there are two people that have no

18 memory of it, and a convicted felon sitting in jail on a

19 related activity that wants to come in and give evidence on a

20 collateral matter.  The Court should not allow this kind of

21 activity in this courtroom.

22      MR. FOX:  Well, Your Honor, the Government's case is

23 based on the testimony of two convicted felons.  The fact that

24 Mr. Harper is a convicted felon just means that Ms. Kolar's

25 associates are of dubious character.

1    Putting that aside, she threatened to turn state's

2  evidence on someone when they had not done anything wrong, and

3  that goes directly to her motives and her biases and something

4  clearly we have a right to go into.

5    The Government didn't object to those questions.  We are

6  obligated to tie up the impeachment.  If we can't tie up the

7  impeachment, the Government should be ordered not to refer to

8  that in closing argument because it would be manifestly unfair

9  when the Government had no problem transporting prisoners

10  across the country and putting them on ice to wait --

11        THE COURT:  I don't think that's the issue, whether

12  they --

13        MR. FOX:  Well, if we could just bring Mr. Harper up

14  the way the Government can bring its witnesses up from prison,

15  we wouldn't be here asking you.  We would just have them come

16  in and they could object --

17        THE COURT:  I understand that, if they were out free,

18  roaming around, I suppose they could.

19        MR. FOX:  If we had the power over the Bureau of

20  Prisons, but we don't have that power, which is why we are

21  asking you.

22        THE COURT:  Well, that argument is kind of misplaced

23  in terms of what I have been called on here to do.

24    Let me preface this thing by saying, the Court has ruled

25  on these two individuals more than once, as I recall.

1          MR. FOX:  Prior to trial, Your Honor.

2          THE COURT:  Prior to trial, and now you are saying

3   because of what the Court has heard here in the trial, I

4   should revisit and change my mind based on what the witnesses

5   have said; is that correct?

6          MR. BLOOM:  Exactly.

7          MR. FOX:  Exactly.

8          THE COURT:  All right.  Mr. Carr, let's start with

9   that.  Mr. Carr is a person that supposedly had something to

10  do with what Ms. Phillabaum might have said at some point in

11  discussion with him.

12     I have looked at the transcript, and Mr. Bloom spent a lot

13  of time on this, back and forth, back and forth.  He was never

14  satisfied on this issue.  But finally it got to, I guess, a

15  bottom line, if you can get there on a bottom line, about the

16  discussion.  I am trying to find the transcript I have on that

17  particular --  well, I am going to have to take a recess

18  because I need to go find my -- I don't have my record here.

19     Let me take a recess.

20          (Brief pause.)

21          THE COURT:  All right.  You may be seated.

22     I am back now dealing with the Carr matter.  I had pulled

23  the transcript on this issue because after Mr. Fox had raised

24  the motion -- renewed the motion based on the testimony of

25  Ms. Phillabaum -- and the record that I reviewed, this is the

question that came from Mr. Bloom saying:

"Question: Did you say to him in a telephone conversation" -- he's talking about Mr. Carr -- "that you had been accused of cooperating with the feds, but that you had never told the feds anything that they didn't already know? Did you say that to David Carr? No matter what this letter is about, no matter who he spoke to, the question is: Did you say to the New York Times journalist, David Carr, 'I didn't tell the feds anything they didn't already know?'

"Answer: I don't know.

"Question: Try to remember.

"Answer: I confessed to a prominent person who I knew that I had been involved in a major federal crime. I wanted to apologize to him and to kind of find out where we stood with each other. That's what I remember of the conversation.

"Question: So your testimony is that you don't remember whether -- one way or the other -- whether you said you didn't tell the feds anything that they didn't already know? You don't remember one way or the other if you said that to David Carr?

"Yes, sir, that is my testimony. Three times so far, I believe."

That's the testimony. And that's the answer. I haven't found anything in that examination to cause the Court to

1    change the decision of the order already entered.

2         Based on all this, the ruling will stand.

3              MR. BLOOM:  Is it your ruling that you will not pay

4    for him to come here, or he cannot testify?

5              THE COURT:  The ruling is that this is not a prior

6    inconsistent statement.  I won't let him testify as to this.

7              MR. BLOOM:  That is your ruling?  You will not let us

8    call him, is that correct, to say that?

9              THE COURT:  My ruling is the same as I ruled in the

10   order as to why I made the ruling.  The record is complete,

11   and I don't want you to shape my words.  I have made my

12   ruling, and that's it.

13             MR. BLOOM:  We cannot call him to say that?  That is

14   your --

15             THE COURT:  You have my ruling.  I guess it's fair to

16   say that if that's my ruling, then he won't testify because

17   the question here doesn't bring that about.  All right.

18        Now we can move on to Mr. Joshua Harper.

19             MR. BLOOM:  Excuse me, may I stay with that a moment

20   and ask the Court a question?  Even if it's not impeaching

21   testimony, are you saying we cannot call him to testify that

22   she said that to him?

23             THE COURT:  Yes.

24             MR. BLOOM:  So you won't let him testify even on that

25   rule of evidence as well?

1    THE COURT:  I have ruled.

2    MR. BLOOM:  Okay.  I understand what you are doing.

3    THE COURT:  Okay.  Now, it's been raised again that,

4  after testimony here, Ms. Kolar's testimony, that -- and she

5  denied knowing what Mr. Harper -- that he claims that he was

6  somewhat close, he overheard conversations, and this is what

7  she said.  And we have talked about what that is and what

8  rolling over means.

9    Additionally, the pleading talks about, well, he can also

10  testify about the truthfulness.  This was the original thing

11  about his reputation among -- how did he put it -- among

12  animal right activists.  That's a new twist.

13    But the Court has ruled that this testimony shouldn't come

14  in.  I don't see anything to make me change that ruling.  I

15  hear what you are saying on this matter, but I think it is

16  trying to paint a picture as to who is the biggest liar, I

17  suppose.

18    I don't know what it's trying to paint, but it's going

19  beyond the material facts of this case.  It is collateral, as

20  I see it, and I see no reason to let that testimony in to do

21  that.

22    MR. FOX:  Your Honor, if that's your ruling, I would

23  ask that the Government be ordered not to refer to that in

24  closing argument because --

25    THE COURT:  What do you think they are going to say?

1       MR. BARTLETT: We will not refer to the allegations

2   made against Ms. Kolar with regard to those statements as long

3   as I assume defense isn't going to refer to it either.

4       MR. FOX: I will not. What I don't want is for the

5   Government to say: Aha, they haven't called Josh Harper.

6       THE COURT: No, I am not giving them the right to do

7   that. I am saying there's no place here for that testimony.

8       MR. FOX: As long as that's not going to happen, we

9   except to your ruling.

10      THE COURT: All right. The other thing, I guess,

11  that's a part of this whole thing, I have looked at that DVD,

12  and I am seeing nothing in there that I would change to let

13  that in because it doesn't say anything.

14      I don't know what it's trying to create, but I am not

15  finding anything there that would tell me that that's a part.

16  Her testimony had to do with -- when she explained about

17  running with two other folks and about some incident in

18  England.

19      MR. FOX: That's the point, is that -- for the

20  record, I don't have the evidence number, but this is the DVD

21  of Lacey Phillabaum --

22      THE COURT: She had a discussion -- she was being

23  interviewed.

24      MR. FOX: Right. What she testified to is that this

25  was in England that she was referring to, when in fact on the

1 DVD she's talking about Seattle during the DVD.

2 THE COURT: She also referred to Seattle. She said

3 she took that same mind-set into Seattle about she didn't want

4 anybody to know who she --

5 MR. FOX: Well, that's what he testified to. She

6 didn't want to admit to doing anything in Seattle, but if you

7 listen carefully to her words, she said that's what they did

8 in Seattle. They did this under the watchful gaze of the

9 police. The police couldn't do anything when we were running

10 down the street, or they were running down the street.

11 THE COURT: Well, she can say everything about what

12 she's done, how radical she was and all these things.

13 Everything about her that would give you ammunition to say why

14 would you believe this lady, is there. So I am not going to

15 go into any collateral matters. If that's not good enough,

16 then I don't know what would make it good enough.

17 MR. BARTLETT: Your Honor, we do have one final

18 request. There's has been a bit of a log jam with regard to

19 defense witnesses. Last night, we made an inquiry with regard

20 to the defense witnesses. And at that time, for the first

21 time, all the defense provided is a witness list that had 33

22 people.

23 Mr. Bloom indicated last night that they were thinking

24 about calling two people, and those two people were not even

25 on the witness list.

1    Now he's indicated that he -- I don't believe he intends

2  to provide us a list of the witnesses they are going to call,

3  a summary of their testimony and exhibits that are relating to

4  them.

5    As a courtesy, we have provided them throughout this

6  trial, and I am asking for the same courtesy.

7    THE COURT:  I assume they will do that.  Otherwise,

8  why I ask you to do it that way is so we don't waste time

9  giving them time to hand it at the last moment and we have to

10  take time out to do these things.

11    The Court has to make decisions on that.  You know who you

12  are going to call.  You know what they are going to say or at

13  least the gist of it.  I am not asking you to give away any

14  particular secrets.  That's why I want them to give it to you,

15  so you are not saying, I don't have that exhibit or I don't

16  know what exhibit I want to cross-examine with.  I want this

17  case to be heard and let the jury make a decision.

18    MR. BLOOM:  Well, we want that too.  We'd like it

19  heard with admissible evidence --

20    THE COURT:  Well, I am not talking about -- I assume

21  that you would give him something about admissible evidence

22  because that's the decision I have to make, whether somebody

23  is getting up here and talking about something that I would

24  say, no, I ruled against that.  I don't know that.  I can't

25  make those rulings.  So at some point, I have to know what the

1  person is going to testify to.

2        MR. BLOOM:  Whatever.  To address the issue, we will

3  do what they have done.  We will provide the names of

4  witnesses.  I told Mr. Friedman and Mr. Bartlett that we will

5  e-mail them tomorrow morning as to who our Monday witnesses

6  are, and I will do that, and they will have a synopsis of what

7  each of those witnesses will testify to.

8      That's what they have done with us, and what we will do

9  with them.  If there are documents they should have, we will

10  consider as a courtesy whether or not to provide those.

11  Unless the Court orders us to do anything other than that,

12  that's what we will do.  We will meet our obligations.

13        THE COURT:  All I am saying is this:  If you have a

14  document that you want to offer through this witness, the

15  other side has a right to see it.  That's all I am saying.

16  They will get a chance to see it before it's published or

17  anything else.  This is an easy way to do it in advance, so we

18  don't have delays or down time trying to deal with it.  That's

19  why I am asking these questions.

20      That's all.  You say you will do it, so I trust you that

21  you'll do that.

22        MR. BLOOM:  Yes.

23        THE COURT:  Let me ask another question of the

24  Government.  After Agent Halla, any other witnesses?

25        MR. BARTLETT:  We don't anticipate any.

1          THE COURT:   Then as soon as you are through, I assume
2    you will have witnesses lined up to make the rest of the day.
3    I don't know how much longer you have on --
4          MR. FOX:   I probably have about another hour,
5    hour-and-a-half on Agent Halla.   Then we have Agent Torres.
6          MR. BLOOM:   Yes, I would like to have Agent Torres
7    back.
8          MR. BARTLETT:   He will be here.
9          THE COURT:   I don't know if you need anything on him;
10   you know what that's about.
11         MR. BARTLETT:   They are free to call whoever they
12   want.
13         THE COURT:   No, I meant as to giving the gist of the
14   testimony.   Is that true also of anybody being called off your
15   list?
16         MR. BARTLETT:   We are done with our list, Your Honor.
17         MR. BLOOM:   They are through with their list, and we
18   have not given them a synopsis as to Agent Torres, but I think
19   they can anticipate that there will be some questions about
20   fraudulent preparation of documents.
21         THE COURT:   Well, that's what I'm saying.   I don't
22   think they need that for Agent Torres.   They ought to know
23   that answer.
24         MR. BARTLETT:   We do, Your Honor.   We are expecting
25   no summary on Special Agent Torres, nor any exhibits.   It's

1    the other witnesses we are concerned about.

2         MR. BLOOM:   Okay.

3         THE COURT:   Anything else?

4         MR. BLOOM:   Yes, one other thing.  I asked Pat -- we

5    are having a logistic problem; I mentioned this yesterday --

6    to get Ms. Waters' medical records from St. Peter's Hospital

7    for her visit there in the month of January 2002, and we have

8    put in process everything.

9         Apparently, we have learned that one of the clerks there

10   is very nice and is trying to expedite matters, but the best

11   we have right now is that she has to show up on a weekday to

12   get the documents.

13        THE COURT:   Why is it not possible?

14        MR. BLOOM:   If the Court will ask Pat to call Monday

15   morning, or if it's not too late maybe this evening, call and

16   ask them to please expedite it, and maybe fax it to the Court.

17   It won't be a long record, maybe just a few pages, and that

18   way we won't have the logistical problem we have.

19        I asked Pat about it.  She asked me to ask you, which is

20   what I'm doing, if we could get authorization for her to call

21   St. Peter's Hospital to expedite the production of those

22   papers.

23        THE COURT:   I am trying to understand why you can't

24   get them.  You are saying she can't get there?

25        MR. BLOOM:   They are in Olympia.  They are only

1  available on a weekday.  She can't get them.  She's staying

2  here with her three-year-old child.  She has to be here at

3  8:30.  They are only open regular daytime court hours.  The

4  answer is no, she cannot get there.

5       THE COURT:  I understand, but you can always

6  authorize somebody to do things for her.  She can authorize

7  her attorney.

8       MR. BLOOM:  They have told us they will only give it

9  to her.

10      THE COURT:  I don't know what to do with that.

11      MR. BLOOM:  If you could make a phone call, they tend

12  to respond to a request by federal judges.

13      THE COURT:  That may be, but I don't want to exercise

14  my influence on what somebody should do.

15      MR. BLOOM:  You won't even do that for us.  Thank

16  you.

17      THE COURT:  I understand what you are saying, but you

18  are asking me --

19      MR. BLOOM:  Thank you.  We will do what we can.  I

20  really appreciate what you've done for us.

21      THE COURT:  We'll be in recess.

22      MR. BLOOM:  Have a good weekend.

23      THE COURT:  8:30.

24      THE CLERK:  All rise.  Court is in recess.

25      (The Court recessed to February 25, 2008, at the hour

of 9:00 a.m.)

\* \* \* \* \*

C E R T I F I C A T E

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/  Teri Hendrix _____                    May 5, 2008

Teri Hendrix, Court Reporter                         Date