1                 UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
2                     AT TACOMA

3

4  UNITED STATES OF AMERICA,   )  Docket No. CR05-5828FDB
                         )
5        Plaintiff,      )  Tacoma, Washington
                         )  February 25, 2008
6  vs.                    )
                         )
7  BRIANA WATERS,          )  VOLUME 10
                         )
8        Defendant.      )

9

10                TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE FRANKLIN D. BURGESS
   SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
  APPEARANCES:
13
  For the Plaintiff:       MARK N. BARTLETT
14                      ANDREW C. FRIEDMAN
                      Assistant United States Attorney
15                      700 Stewart Street, Suite 5220
                      Seattle, Washington 98101-1271
16
  For the Defendant:       ROBERT BLOOM
17                      Attorney at Law
                      3355 Richmond Boulevard
18                      Oakland, California 94611

19                      NEIL M. FOX
                      Cohen & Iaria
20                      1008 Western Ave., Suite 302
                      Seattle, Washington 98104
21

22  Court Reporter:          Teri Hendrix
                      Union Station Courthouse, Rm 3130
23                      1717 Pacific Avenue
                      Tacoma, Washington 98402
24                      (253) 882-3831

25  Proceedings recorded by mechanical stenography, transcript
  produced by Reporter on computer.

<u>I N D E X</u>

INDEX OF WITNESSES
==================

<u>WITNESS ON BEHALF OF PLAINTIFF</u>:                     Page

TED HALLA - CONTINUED

    Cross Continued by Mr. Fox......................1874
    Redirect by Mr. Bartlett.......................1954
    Recross by Mr. Fox.............................1958

GOVERNMENT RESTS........................................1959
DEFENDANT'S MOTIONS TO DISMISS..........................1595


<u>WITNESS ON BEHALF OF DEFENDANT</u>:                     Page

ANTHONY TORRES

    Direct by Mr. Bloom............................1969

HAILA SILVERTREES

    Direct by Mr. Bloom............................1982

LAVERN TROXEL

    Direct by Mr. Bloom............................1992
    Cross by Mr. Bartlett..........................2001
    Redirect by Mr. Bloom..........................2005
    Recross by Mr. Bartlett........................2006

ANTHONY TORRES - CONTINUED

    Direct Continued by Mr. Bloom..................2014

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX - EXHIBITS

EXHIBITS                                                      Page

No.  A-45                                                     1884
No.  A-211                                                    1917
No.  A-206                                                    1932
No.  A-204                                                    1934
No.  A-170                                                    1950
No.  A-212                                                    1952
No.  A-213                                                    2017
No.  A-29                                                     2025
No.  A-27                                                     2057
No.  A-28                                                     2072

1    MONDAY, FEBRUARY 25, 2008 - 8:50 A.M.

2                        * * *

3    (Jury not present.)

4        THE CLERK:  This is in the matter of United States of

5    America versus Briana Waters, CR05-5828FDB.

6        Counsel, please make an appearance for the record.

7        MR. FRIEDMAN:  Good morning, Your Honor, Andrew

8    Friedman and Mark Bartlett for the United States.  Ted Halla

9    is here also.

10       MR. FOX:  Good morning, Neil Fox and Robert Bloom and

11   Ms. Waters is present.

12       THE COURT:  All right.  This morning it's been

13   brought to my attention that two motions have been filed.  One

14   is to strike some evidence.  I am not going to deal with that

15   one at this time, because I think there's time to deal with

16   that.

17       I want to deal with the one that the government has filed

18   in limine, what is identified as character witnesses, and talk

19   about that.  But the motion seems to be saying that they

20   haven't been provided, I guess, information to know what it is

21   these folks are going to talk about or whatever, so they seem

22   to be guessing as to it being character, I guess.

23       MR. FRIEDMAN:  It is.  I mean, we are assuming that

24   they are being offered to show nonviolence, that that's the

25   character trait.  But what we are really doing is objecting to

1 the number of witnesses that are going to be called on this
2 point. There's basically nine or ten listed for today. This
3 is probably just the beginning of the list. And under Ninth
4 Circuit case law this is going to be very repetitive evidence.
5 It's going to be cumulative, and it's going to be wasteful of
6 the court's time and the jury's, and we are asking for a
7 limitation.
8          THE COURT: I understand what you are saying. Until
9 I know what they are saying and how long are these witnesses
10 and what all do they intend to go into, whether we are talking
11 the difference between character and reputation and all those
12 things.
13          MR. FOX: Good morning, Your Honor. A couple of
14 different things. First off, I would note that many of the
15 witnesses that we've endorsed, the government has already
16 interviewed, and there are 302 reports dealing with many of
17 those witnesses.
18          But some of the witnesses are going to be pure character
19 witnesses, you know, reputation for a person and character
20 trait. But some of the other witnesses are going to be
21 dealing with Ms. Waters' life over the period of the time
22 charged in the indictment for the conspiracy charge.
23          Now, the government has spent a lot of time trying to make
24 innuendos that Ms. Waters somehow was part of this vast
25 conspiracy that supports blowing up McDonald's or whatever,

1  and we have to rebut that by showing that during the relevant

2  time period that's charged in the conspiracy count, that

3  wasn't what she was doing.  She was doing things completely

4  opposite to that.

5      It's the government that kind of raised the specter, both

6  through the length of the conspiracy charge.  So Ms. Waters

7  really has to account for what she was doing during the

8  five-year period of time.  And many of these witnesses are

9  fact witnesses, in that sense, who are going to say that

10 Ms. Waters wasn't the type of person that was out meeting with

11 coconspirators and book clubs, talking about burning down

12 McDonald's or Disneyland or anything like that.  So they are

13 fact witnesses.

14     In terms of the number of witnesses, there are different

15 parts of Ms. Waters' life that these different witnesses can

16 speak to.

17     So some people know her as a violin player, some people

18 know her as a nanny, some people know her from the Watch

19 Mountain campaign.

20     So, that's the reason why there are quite a number of

21 these witnesses.

22     The government has spent a lot of time in this trial

23 bringing up information -- technical information about fires

24 that took place at locations that are very remote to the

25 events charged against Ms. Waters.  They brought in witnesses

1  to talk about Superior Lumber Company and Cavel West.

2      And I guess we didn't object to the government putting on

3  its case, and we would expect that we should be able to put on

4  our case in the way that we feel is necessary.

5      So, you know, we are not talking about spending weeks and

6  weeks bringing in these types of witnesses.  I mean, these are

7  all witnesses that are probably going to be on and off, you

8  know, in an hour or so.

9      So I don't think that we are going to delay anything.  If

10  anything, our case is going to be considerably shorter than

11  the case that the government put on.

12      But many of these people are fact witnesses who are going

13  to testify that Briana Waters was not the person who the

14  government is trying to paint.  It does try into the motion I

15  filed about the inflammatory nature of some of the materials

16  off the website and some of the materials from Ms. Kolar's

17  folder.  That's not Briana Waters, and we have to rebut that.

18      Thank you.

19          THE COURT:  Mr. Friedman.

20          MR. FRIEDMAN:  Ms. Waters has not offered any alibi,

21  and so these are not -- these are classic character witnesses.

22  They are really just going to talk about what kind of person

23  she was.  None of them are going to say she was busy doing

24  something else or identify where she was at any particular

25  time at any specific point.

So their testimony is not fact testimony that's inconsistent with her guilt in this case, it really is character evidence masquerading as something else, perhaps, but character evidence about what kind of person she is, and the end result is it's cumulative, it's redundant, and the court should not allow it.

THE COURT: I don't know how I can weigh it in the way that you are saying at this point in time. They have a right to put on -- well, I guess the distinction has got to be made between character, and that's where it gets a little bit afield as to how far you go on that character evidence. As I understand it, it's really trying to tell a person, someone else trying to describe a person, what this person is, I guess, and I don't know how they can do that so much. But they can't talk about her reputation because, as I read this thing, the reputation here that's pertinent is a violent person, nonviolent type conduct.

And then you say the rest of it is fact. If it's fact evidence, then it's fact evidence, and they have a right to put that on.

So I have no way of knowing exactly what that is, other than to say it's a fact that she was a teacher and she taught so many days and she did this and she did that. Well, then that's going far afield when the whole thing is to meet what they have accused her of; they said she's a violent person.

1  She should have a right to show some evidence that will go

2  against the nonviolent aspect.

3      MR. FRIEDMAN:  For the record, could we ask the

4  defense to clarify what traits of character they are actually

5  intending to put into issue by trait --

6      THE COURT:  Well, I have asked them to do that, to

7  tell the gist of the testimony.  I don't know why -- I can't

8  tell from what I see here.

9      MR. FOX:  The character for her -- her reputation for

10 nonviolence.

11     But to respond to something that Mr. Friedman said, that

12 we haven't offered evidence of alibi, the conspiracy charge

13 stretches on for five years, and to the extent that we have to

14 show what Ms. Waters was doing during that five-year period of

15 time, I mean, I guess it's alibi, because it's in the sense

16 that they have alleged that she was doing certain things for a

17 five-year period of time.  We are trying to show that she

18 wasn't doing that for a five-year period of time.

19     I mean, it's not that --

20     THE COURT:  Somewhat they are saying in terms of the

21 overall conspiracy, but on the other hand, there's been

22 testimony here that she wasn't involved in some of the things.

23 She wasn't even around, nobody knew anything about her.  So I

24 don't know if it connects quite the way you are saying.

25     But it doesn't say that -- for the jury to determine what

1  part or what time she got maybe invited into the conspiracy or

2  whatever.  I can't answer those.  But if you are presenting

3  fact information, that's one thing.

4      If it goes as to painting a picture or trying to describe

5  her as a person under what I consider to be character, then

6  that may be taking another place, but what they know about her

7  reputation in the community for this, that, and the other

8  thing, that's one thing.

9            MR. FOX:  Okay.

10           THE COURT:  And that's about the best parameter I can

11 give you.

12     Like I mentioned about this other, that deals with the

13 components of Exhibit -- two exhibits, 402 and 612.  I will

14 deal with that at another time because that's not going to

15 come up right now.

16     Okay, so are we going to see if we've got a jury here and

17 then start?

18     I believe we have Mr. Halla?

19           MR. FRIEDMAN:  We did, Your Honor.

20           THE COURT:  Mr. Fox, are you ready to continue?

21           MR. FOX:  Yes, Your Honor.

22           THE COURT:  All right.  I will have you retake the

23 witness chair.

24     (Jury present.)

25           THE COURT:  All right.  You may be seated.

1    Good morning.  I hope you had a good weekend.  We are

2  ready to go.

3    We left off with Mr. Fox.

4  TED HALLA, previously called as a witness, duly sworn.

5              CROSS-EXAMINATION - CONTINUED

6  BY MR. FOX:

7  **Q.**  Good morning, Agent Halla.

8  **A.**  Good morning.

9  **Q.**  We left off way back on Friday talking about how you and

10  Mr. Friedman and Mr. Martin made a decision not to question

11  Ms. Kolar about the University of Washington after January 5,

12  2006 for a couple month, correct?

13  **A.**  Yes.

14  **Q.**  I think you decided to let her memory improve over time,

15  right?

16  **A.**  Well, we were going to do things like go through her

17  calendar and part of the drive down to Olympia was to see if

18  those type of things would help her remember things as far as

19  details concerning the arson.

20  **Q.**  On January 6, 2006, you didn't ask her any questions about

21  the University of Washington?

22  **A.**  That's correct.

23  **Q.**  And then you had a number of other meetings with her

24  through January and February 2006?

25  **A.**  That's correct.

1  **Q.**  And again, during those meetings, you consciously did not

2  ask Ms. Kolar about Capitol Hill Girl's role in the University

3  of Washington fire?

4  **A.**  Yes, not specifically.

5  **Q.**  And you didn't ask her about Capitol Hill Girl's Punk

6  Boyfriend's role in the fire?

7  **A.**  No, we did not ask Ms. Kolar about that.

8  **Q.**  Now, you agree with me as an FBI agent you cannot get into

9  someone's head, you are not a mind reader?

10  **A.**  I am not a mind reader.

11  **Q.**  When Ms. Kolar says someone was at the fire at the

12  University of Washington apartment, she uses an alias, you

13  only have her words to know what she means, right?

14  **A.**  Partially.  I mean, we are in the room with her, so we are

15  watching her physical language, if you will, tone of her

16  voice, so there's different things that we can use to read if

17  something is being said in the state of speculation, that

18  there's something that's a very firm statement.

19  **Q.**  Sure, but ultimately what she means by something, she has

20  to tell us that, right?

21  **A.**  That's true.  There's a degree of subjectivity in the

22  sense that we take as interviewers of what's being said.  A

23  302 report is really a paraphrase account of what we

24  understand to have been said.  It's not a transcript.

25  **Q.**  Sure, sure, but ultimately it's up to Ms. Kolar to tell

1 everyone what she was thinking when she said a particular

2 name, correct?

3 **A.** That's correct.

4 **Q.** Now, at some point you testified that Ms. Kolar identified

5 the Punk Boyfriend of Capitol Hill Girl as someone named

6 Spencer Moen, MOEN; is that correct?

7 **A.** That's correct.

8 **Q.** Now, you don't have any personal knowledge when she

9 identified the Punk Boyfriend as Spencer Moen, it was the same

10 person she was referring to on December 16, right? You only

11 have what she said, sometime in January, right?

12 **A.** That's correct.

13 **Q.** Similarly, when Ms. Kolar identified Suzanne Savoie as

14 Capitol Hill Girl, you don't have any personal knowledge that

15 that was the same person that Kolar was speaking about on

16 December 16?

17 **A.** I understood that was the same person.

18 **Q.** That's what she told you in January, but December 16 you

19 weren't inside her head, you didn't know what she was thinking

20 when she said Capitol Hill Girl?

21 **A.** I wasn't inside her head, that's correct.

22 **Q.** Now, it's correct on direct you said Susan Savoie pled

23 guilty to the Jefferson Poplar Farm fire?

24 **A.** That's correct.

25 **Q.** And the Superior Lumber fire?

1  **A.**  I believe that's correct.

2  **Q.**  Now, isn't it true that Suzanne Savoie does not have a

3  father named Horace?

4  **A.**  That's true.  She does have a stepfather who was a

5  butcher.

6  **Q.**  But his name was Randy Dong, right?

7  **A.**  I don't personally have knowledge of that.

8  **Q.**  But his name was not Horace?

9  **A.**  It was not Horace.

10  **Q.**  So the possibility is that Capitol Hill Girl might be

11  someone other than Susan Savoie, right?

12  **A.**  At what point?

13  **Q.**  Well, is it possible that Capitol Hill Girl -- that what

14  Ms. Kolar was thinking about Capitol Hill Girl in December was

15  someone other than Susan Savoie, despite what she said in

16  January?

17  **A.**  That's possible.

18  **Q.**  Now, during the course of January 2006, and February 2006,

19  you are still working on that written 302 report, right, from

20  December 16?

21  **A.**  The report was not finalized until early February, yes.

22  **Q.**  And I think that you testified that you and Agent Torres

23  produced it, kind of jointly, right?

24  **A.**  That's correct.  We, you know, we would pass it back and

25  forth and we were working through trying to make it as

1  accurate as possible.

2  **Q.** And at different points, you tried to reconcile

3  differences in your notes and his notes, right?

4  **A.** That's correct, there was a lot of confusion in some

5  portions of the interview.

6  **Q.** So, I think that you said on direct that your notes

7  reflected that Kolar on December 16 said that there was a car

8  used during the fire at the University of Washington, right?

9  **A.** That's what my notes say.

10  **Q.** I think you testified that Agent Torres' notes said there

11  was a car or van?

12  **A.** I believe that's what his notes say.

13  **Q.** So you wrote a report where you resolved this by stating

14  that a vehicle was used, right?

15  **A.** Yes, we did.

16  **Q.** So the final report, not finalized until February 2006,

17  didn't mention car or van, right?

18  **A.** That's correct.

19  **Q.** It kind of left it vague?

20  **A.** That's correct.

21  **Q.** Similarly, the five people that Jennifer Kolar listed as

22  being at the University of Washington fire, Capitol Hill Girl,

23  Crazy Dan, the Punk Boyfriend, of those five people, you did

24  not put the names Capitol Hill Girl, crazy Dan or Punk

25  Boyfriend in your final 302?

1    **A.**  That's correct.

2    **Q.**  In fact, the way that you wrote it out in the typed 302

3    was Kolar, Avalon and a few other individuals, right?

4    **A.**  That's correct.  Ms. Kolar was only sure about herself and

5    Avalon.

6    **Q.**  I understand what you are saying.  But the fact is, when

7    you wrote your report, you did not put into your final report,

8    Capitol Hill Girl, Crazy Dan or the Punk Boyfriend of Capitol

9    Hill Girl; is that correct?

10   **A.**  That's correct.

11   **Q.**  And the language, "Avalon and the others," that was your

12   language; that wasn't her language, right?

13   **A.**  I don't know that it wasn't her language.

14   **Q.**  Well, when she was saying -- let me rephrase that.

15       Let me ask you whether there were other versions of the

16   302 report that you produced in that December 16 meeting, that

17   actually listed Crazy Dan, the Punk Boyfriend and Capitol Hill

18   Girl?

19   **A.**  There are not other versions, they are just drafts.  My

20   computer, every time we do a spell check and we save it, that

21   technically would be a new draft.  Every time I would pass it

22   to Agent Torres, and he made corrections and we saved it, that

23   would be a new draft.

24       There's not different versions.

25       I don't know whether an earlier draft contained the names

1    Capitol Hill Girl, Punk Boy or Crazy Dan.  It may have, but I
2    have no independent memory of that.
3    **Q.**  So what you are saying, in earlier draft, it's possible
4    that the draft said Capitol Hill Girl as being at the UW fire?
5    **A.**  I believe it would have said that Kolar may have
6    speculated that those other names were involved in some
7    context with the arson.
8    **Q.**  And ultimately the final version you took that out, right,
9    the final draft?
10   **A.**  The final draft, we came to a point that Agent Torres and
11   I could agree on these points.  There was a fair amount of
12   confusion over how we understood different things to have been
13   said and we created a report that we both could agree upon.
14   **Q.**  Sure.  Because Agent Torres notes actually had arson with
15   the five names listed?
16   **A.**  I understand this to be true.
17   **Q.**  So the final draft wasn't produced until you said mid
18   February 2006?
19   **A.**  Early February, February 9.  That sounds correct.
20   **Q.**  In the intervening seven weeks between December 16 and
21   February 9, you met with Ms. Kolar a number of times, right?
22   **A.**  That's correct.
23   **Q.**  And you chose not to question her about the names she
24   speculated, as you say, were at the University of Washington
25   fire?

1  **A.**  That's correct.

2  **Q.**  Now, on February 4 I think you said you went with

3  Ms. Kolar to Olympia?

4  **A.**  That's correct.

5  **Q.**  And she taped you?

6  **A.**  That's correct.

7  **Q.**  And you were in the front seat taking notes?

8  **A.**  Yes.

9  **Q.**  Agent Torres was driving?

10  **A.**  That's correct.

11  **Q.**  Now, turn your attention to what's been marked for

12  identification as A-45.  Pull that out.

13  **A.**  This is a copy of my notes from February 4, 2006.

14  **Q.**  Those are the notes you were writing as Ms. Kolar was

15  talking, right?

16  **A.**  That's correct.

17  **Q.**  At some point I think you said on direct that you were

18  talking about different people, characters and whatever?

19  **A.**  We were.

20  **Q.**  Again, you weren't questioning her about Capitol Hill Girl

21  at that point right?

22  **A.**  No, we were not.

23  **Q.**  You weren't questioning her about Crazy Dan or anything

24  like that?

25  **A.**  No, we were not.

1  **Q.** Now, at some point, I think you said you showed Ms. Kolar,

2  or I don't know if you said this, but you showed Ms. Kolar

3  some photographs, right?

4  **A.** Yes, we did.

5  **Q.** You showed her a picture of Justin Solondz, right?

6  **A.** That's correct.

7  **Q.** And she didn't identify Mr. Solondz, right?

8  **A.** I'd have to refer to my report to be sure.

9  **Q.** Okay, do you want to take a look at what's been marked for

10  identification as A-43?

11  **A.** Yes, my report says she did not identify that picture of

12  him.

13  **Q.** I believe this has already been admitted, this is Exhibit

14  115-A. That's Justin Solondz, right?

15  **A.** Yes, it is.

16  **Q.** And you actually got this picture from the Department of

17  Licensing, right?

18  **A.** Yes, this was, I believe a 2002 photograph on his

19  Washington driver's license.

20  **Q.** When you got this from the Washington Department of

21  Licensing, Mr. Solondz' signature is at the bottom of this

22  picture isn't it?

23  **A.** It probably is depending on how I got it.

24  **Q.** This picture differs from some of the other pictures we've

25  seen of Mr. Solondz?

1  **A.**  We've seen him with long hair, yes.

2  **Q.**  I guess my question is at some point he must have changed

3  his hair style, right?

4  **A.**  Apparently he has.

5  **Q.**  When he changed his hair style, he then went to a

6  government agency to have his picture taken?

7  **A.**  That's how it's done, yes.

8  **Q.**  Is it fair to say Mr. Solondz wasn't trying to hide his

9  appearance from the government?

10  **A.**  I don't know what Mr. Solondz intention was.

11  **Q.**  But the point is, he went in and had his picture taken by

12  a government agency; is that correct?

13  **A.**  That's correct.

14  **Q.**  Now at some point on this drive down to Olympia it's

15  correct that Ms. Kolar describes Lacey Phillabaum as a younger

16  version of me?

17  **A.**  That's correct.

18  **Q.**  And that's in your notes?

19  **A.**  Yes.  I quote the "me" in my notes.

20  **Q.**  She also described Briana Waters as outgoing?

21  **A.**  That's correct.

22  **Q.**  Plays music?

23  **A.**  Yes.

24  **Q.**  Clean cut?

25  **A.**  That's correct.

1    **Q.**  In fact you wrote in your notes Ms. Kolar said don't

2    remember Briana and Lacey together?

3    **A.**  That's correct.

4    **Q.**  Your Honor, I would move for admission of just one page,

5    the fourth page of Exhibit A-45?

6              MR. BARTLETT:  No objection.

7              THE COURT:  Admitted.

8                      (Exhibit No. A-45 admitted.)

9    BY MR. FOX:

10   **Q.**  So what you have in your notes is "Don't remember Briana

11   and Lacey together."

12   **A.**  That's correct.

13   **Q.**  Now, after you went down Olympia with Ms. Kolar, you wrote

14   up a 302 report?

15   **A.**  That's correct.

16   **Q.**  And isn't it correct when you typed up that report you

17   wrote in there, Kolar did not recall Briana and Lacey being

18   close friends?

19   **A.**  That's correct.

20   **Q.**  So, when she actually said she didn't remember Briana and

21   Lacey together, you wrote that they weren't close friends?

22   **A.**  I asked a series of questions that were concerning the

23   relationships of different people.

24        When I went and wrote the 302 and saw this notation,

25   "don't remember Briana and Lacey together," I associated that

1　answer with those questions regarding whether they were close

2　friends.

3　**Q.** What she really said is she didn't remember Briana and

4　Lacey being together?

5　**A.** I don't know what she really said.  I understood it she

6　was talking in a social context.

7　**Q.** But in your notes, you put, it's very clear, "Don't

8　remember Briana and Lacey together," the notes you were taking

9　as you were driving down to Olympia?

10　**A.** Yes, and I don't know if that's a quote.  There's no

11　quotations in my note but that's what my notation says.

12　**Q.** Ms. Kolar if in fact said she didn't remember Briana and

13　Lacey being together, that would have been important, right?

14　**A.** It may have been, I understood this to be in a social

15　context.

16　**Q.** In fact, if there's any confusion, the tape that Ms. Kolar

17　took of this meeting would be important, correct?

18　**A.** It could be.

19　**Q.** Because it may have the exact words on there?

20　**A.** It's possible, yes.

21　**Q.** If she didn't remember Briana and Lacey being together,

22　then they couldn't be at any planning meetings together,

23　right?

24　**A.** If Ms. Kolar's statement was saying she did not remember

25　either of them together at any point at any time, that might

1  be possible.

2  **Q.** Sure, and they wouldn't have been together at the

3  Greenlake Bar & Grill, if that's what she was saying, right?

4  **A.** Ms. Kolar never places Lacey with the UW arson.

5  **Q.** And they couldn't have been together in the rental car?

6  **A.** Again, Ms. Kolar does not place Lacey at the UW arson or

7  in the rental car.

8  **Q.** Sure. Now, yesterday when -- I am sorry, last week you

9  were present in court when I was asking Ms. Kolar about her

10 travels to New York City in December of 2005, right?

11 **A.** That's correct.

12 **Q.** And you recall that I asked her some questions about some

13 phone calls she made on December 10, right?

14 **A.** Not specifically, but I was present.

15 **Q.** You recall I asked her whether she had gone to Planet Hemp

16 after being called by agent Quimby right?

17 **A.** I do recall that.

18 **Q.** And I think she said that well, she seems to recall going

19 shoe shopping at some point, right?

20 **A.** That's correct.

21 **Q.** But it's correct that, is it not, that the phone number

22 that I read off to her, apparently is not registered to Planet

23 Hemp?

24 **A.** I understand that might be true.

25 **Q.** It's actually registered to an international travel

1  agency, right?

2  **A.** I believe that might be true.

3  **Q.** A travel agency that specializes in travel to Japan

4  apparently.

5  **A.** I don't know.

6          MR. BARTLETT:  Objection, Your Honor.

7          THE COURT:  Is this leading to some particular --

8          MR. BARTLETT:  I don't believe there's a good faith

9  basis for that last question.

10          MR. FOX:  I will strike it.

11          THE COURT:  All right.  Stricken.

12  BY MR. FOX:

13  **Q.** In any case, Google has the phone number I mentioned

14  registered to Planet Hemp?

15  **A.** I have not looked to see what Google has for it.

16  **Q.** You understand that we and the government have reached a

17  stipulation to that, isn't that correct?

18  **A.** I actually don't understand that, but that may be true.

19  **Q.** Do you want to read the stipulation right now?

20          MR. FOX:  Your Honor, may I read a stipulation to the

21  jury.

22          THE COURT:  Go ahead.

23          MR. FOX:  The United States of America, by and

24  through Jeffrey C. Sullivan, United States Attorney for the

25  Western District of Washington, and Mark Bartlett and Andrew

1  Friedman, Assistant United States Attorneys for said District,

2  and defendant Briana Waters, and her attorneys, Neil Fox and

3  Robert Bloom, agree and stipulate as follows:

4     Telephone number (212) 599-3405, which was called twice by

5  Jennifer Kolar at 4:19 p.m. and 4:20 p.m. on December 10,

6  2005, is the telephone number for HIS International Tours,

7  Inc., which is a travel agency.  HIS International Tours,

8  Inc., has been the subscriber for that telephone number since

9  at least 1999.

10     The telephone number is incorrectly listed on Google as

11  being subscribed to by Planet Hemp.  Based upon that listing,

12  defense counsel, Neil Fox, felt that he had a good-faith basis

13  to ask Jennifer Kolar whether she had telephoned Planet Hemp

14  on December 10, 2005.

15     The parties further agree that this stipulation may be

16  read to the jury.

17     And it's signed by the attorneys and Ms. Waters.  There

18  are also the phone records and the Google listing.

19  BY MR. FOX:

20  **Q.**  Now, you had other meetings in February of 2006 with other

21  people pertinent to this investigation, right?

22  **A.**  That's correct.  We interviewed Chelsea Gerlach and Susan

23  Savoie.

24  **Q.**  But you also interviewed Lacey Phillabaum, right?

25  **A.**  That's correct.

**Q.** I think you said on direct that at some point you called
up her father; is that correct?

**A.** I did.

**Q.** You said that you wanted to talk to his daughter about an
arson investigation, or did you tell him what type of
investigation you wanted to talk about?

**A.** Yeah, I believe I told him that it was an arson
investigation. I distinctly remember him asking me if I was
calling regarding a civil or criminal matter. I told him it
was a criminal matter.

**Q.** At some point on February 21, you had a meeting with her,
with Ms. Phillabaum?

**A.** That's correct.

**Q.** Now, Ms. Phillabaum is Stan Meyerhoff's girlfriend?

**A.** I believe that to be true.

**Q.** She had been on the FBI's radar screen for some time,
right?

**A.** I had been aware of her in this investigation, for a
little while.

**Q.** And you've heard testimony from Ms. Phillabaum that her
boyfriend, Mr. Meyerhoff, had told her that he had turned
everyone in, including her, right?

**A.** I believe that to be true.

**Q.** Now, you only had contact with Ms. Phillabaum in late
February, right?

1  **A.**  That's correct.

2  **Q.**  And you had no other contact with her or her lawyer before

3  then?

4  **A.**  That is correct.

5  **Q.**  Now, you reached out to her because you wanted her to

6  cooperate as soon as possible, right?

7  **A.**  That's correct, we were looking to reach out to both

8  Briana Waters and Lacey Phillabaum at the same time.  It just

9  worked out that we contacted Lacey first.

10  **Q.**  And I think your testimony was that you didn't provide

11  Ms. Phillabaum any information?

12  **A.**  That's correct.

13  **Q.**  Now, there are cases, or there are instances in this

14  investigation, where you did meet with a suspect and his

15  lawyer, and told them information about your investigation;

16  isn't that right?

17  **A.**  There's times when we met with individuals associated with

18  this investigation, where to show them that we were not

19  bluffing, law enforcement frequently, we bluff at times with

20  suspects, to try to gain some cooperation, get them to start

21  talking with us.  In some cases, we wanted to make sure that

22  they knew that we had details that only the participants would

23  have known.  We were very careful not to identify who was

24  involved or give them information that they wouldn't know if

25  they weren't involved, but that is true.

1   **Q.**  In fact, I think on direct you testified how you met with

2   Mr. Dibee and his attorney Robert Goldsmith on December 9,

3   2005?

4   **A.**  That's correct.

5   **Q.**  Now, that's two days after there were a series of arrests

6   from the Oregon indictments, right?

7   **A.**  That's correct.

8   **Q.**  And there were already news reports about who had been

9   arrested?

10  **A.**  That's correct.

11  **Q.**  And I believe you testified that you met with Mr. Dibee

12  and his attorney at -- was it Mr. Friedman's offices?

13  **A.**  In a conference room.

14  **Q.**  At the U.S. Attorney's Office?

15  **A.**  At the U.S. Attorney's Office.

16  **Q.**  Mr. Friedman told Mr. Dibee that he was a suspect in at

17  least one arson, right?

18  **A.**  Yes.

19  **Q.**  The Cavel West case, correct?

20  **A.**  That's correct.

21  **Q.**  He said that time was short, right?

22  **A.**  We were encouraging him to cooperate quickly.

23  **Q.**  You basically told him you needed him to cooperate and

24  that very soon, any information he had would be of little

25  value since other people were already talking, right?

1    **A.** It may have been said, yes.

2    **Q.** And then you gave Mr. Dibee and his attorney, a detailed

3    presentation about Cavel West case, about the physical

4    evidence?

5    **A.** It was not about the Cavel West case or the physical

6    evidence.  I gave the detailed account of what we believe he

7    did at that arson.  I used phrases like mail 1, mail 2, mail

8    3, female 1, to account for who might have been standing next

9    to him when he did a particular thing.

10        The Cavel West communiqué is very detailed as far as

11   certain things that happened.  And we had to express that we

12   knew things that were beyond that communiqué that only people

13   who were there would have known.  We were very careful not to

14   reveal who any other of the individuals were that were there.

15   **Q.** Sure.  But it's fair to say, that some of the people that

16   had been arrested already were in the news, right?

17   **A.** There was a lot of news about people arrested, yes.

18   **Q.** You showed Mr. Dibee pictures of the scene, right?

19   **A.** I believe we did show some, at least an aerial photo of

20   the scene.

21   **Q.** So you didn't question Mr. Dibee at that point, right?

22   **A.** No, we were trying to gain his cooperation.

23   **Q.** But this wasn't you interrogating him, this was you

24   explaining things to him, right?

25   **A.** We were showing we were not bluffing with the information

1  we had.

2  **Q.** Sure.  Then after that meeting, that was -- I think you

3  said that was the last time you saw Mr. Dibee?

4  **A.** That's correct.

5  **Q.** He took off?

6  **A.** That's correct.

7  **Q.** Now on direct examination, you were shown what's been

8  admitted into evidence as Exhibit 531:  This was the street

9  screen shot off Mr. Dibee's hard drive, his address book?

10  **A.** That's correct.

11  **Q.** I believe you testified that it shows an entry for Bri,

12  right?

13  **A.** That's correct.

14  **Q.** With an e-mail address at hotmail.com, right?

15  **A.** That's correct.

16  **Q.** Now, hotmail.com is a normal domain?  It's something that

17  I think Microsoft runs, right?

18  **A.** That's true.

19  **Q.** And it's not a secret website or anything like that?

20  **A.** That's correct.

21  **Q.** And in fact on Mr. Dibee's computer, there were probably

22  hundreds of pages of entries in this address book, right?

23  **A.** There were a number of entries, I don't know how many

24  pages.

25  **Q.** This is just one of many entries?

1  **A.**  That's correct.

2  **Q.**  And there's nothing about this entry where it says Briana

3  Waters at ELF.com?

4  **A.**  I don't believe there's an ELF.com.

5  **Q.**  You don't know when this entry was put in the address

6  book?

7  **A.**  We don't know.

8  **Q.**  And you don't know why it was put in the address book?

9  **A.**  I do not.

10  **Q.**  It's just an entry in his address book?

11  **A.**  I think it implies he had some reason to have her name in

12  his entry book.

13  **Q.**  In any case, when Mr. Dibee took off, you weren't

14  following him at that point, were you?

15  **A.**  No, I pursued Mr. Dibee for quite a while.

16  **Q.**  But I guess what I am saying, you hadn't physically

17  tracked his movements after you were at the U.S. Attorney's

18  Office that day?

19  **A.**  That's correct.

20  **Q.**  And did you attempt to monitor his movements through his

21  cell phone at all after he left the U.S. Attorney's Office?

22  **A.**  No, we did not.

23  **Q.**  It's possible that the cell phone battery or the cell

24  phone can be used as a tracking device; isn't that right?

25  **A.**  You can get information from a phone company, as far as if

1  calls are being made, what cell tower they might be being

2  bounced off of.   That's possible.

3  **Q.**  And you hadn't been doing that on an active basis with

4  Mr. Dibee when he left the U.S. Attorney's Office on December

5  9?

6  **A.**  That's correct.

7  **Q.**  Now, you also had not been following Lacey Phillabaum for

8  the two months between her boyfriend's arrest and when she

9  came into the U.S. Attorney's Office, right?

10  **A.**  We didn't have surveillance teams on her, if that's what

11  you are asking.

12  **Q.**  You didn't?

13  **A.**  We did not.

14  **Q.**  So you really have no knowledge as to who she contacted in

15  those two months, right, between the time of Mr. Meyerhoff's

16  arrest and the time she appeared in the U.S. Attorney's

17  Office?

18  **A.**  That's correct.

19  **Q.**  You didn't listen in on her phone calls at all?

20  **A.**  No, we did not.

21  **Q.**  The FBI does have the power to get search warrants to

22  listen in on people's phone calls?

23  **A.**  They are very difficult to get.   In my eight years, I have

24  never got one.

25  **Q.**  Is it not correct that in drug cases they are used a lot?

1  **A.** I would never claim they are used a lot.  It has to be the
2  last means with which to gather certain types of evidence.
3  **Q.** Are you aware of any drug cases within the Western
4  District of Washington in the last few years that used wire
5  taps on phone call conversations as a major part of the case?
6  **A.** I am aware of it, yes.
7  **Q.** So you know people that, in law enforcement communities
8  have used that investigative tool?
9  **A.** That's true.
10  **Q.** In fact, I think there's some huge drug ring in Skagit
11  county that was broken with that type of investigative tool,
12  is that not correct?
13  **A.** I have no personal knowledge of that.
14  **Q.** Now, you also know that when people are prisoners in
15  correctional facilities in jails, and whatnot, their telephone
16  calls are monitored, are they not?
17  **A.** I understand that to be a common practice.
18  **Q.** You were aware that Stan Meyerhoff was in a jail for the
19  months of January and good part of December of 2005, 2006,
20  right?
21  **A.** That's correct.
22  **Q.** If you wanted, you could have gotten copies of the tapes
23  of their phone calls, of Stan Meyerhoff and Lacey Phillabaum's
24  phone calls?
25  **A.** We could have requested that.

1  **Q.** Did you ever?

2  **A.** I have not, no.

3  **Q.** Are you aware of whether or not they actually did talk

4  over the phone? While he was in jail?

5  **A.** It's just general information. I believe they probably

6  did.

7  **Q.** So you have no idea what Stan Meyerhoff and Lacey

8  Phillabaum talked about?

9  **A.** Personally I do not.

10  **Q.** When Stan Meyerhoff was arrested the FBI exercised a

11  search warrant and searched his house?

12  **A.** That's correct.

13  **Q.** They seized -- the FBI seized Mr. Meyerhoff's computer,

14  right?

15  **A.** I believe that to be true.

16  **Q.** During the course of this investigation, you asked

17  Jennifer Kolar to bring in her computer from 2001 for your

18  review, right?

19  **A.** I don't know that I asked specifically for her, she made

20  it aware to us through her attorney that she had found that

21  computer and that they would be turning it over to us, but I

22  did not independently request it.

23  **Q.** But you didn't ask Ms. Kolar to bring in any computers

24  that she currently was using for your review, did you?

25  **A.** No, we did not.

1 **Q.** You could have also executed a search warrant to search

2 Ms. Kolar's office, right, if you wanted to?

3 **A.** I don't know if we had probable cause for that or not.

4 **Q.** Well, at some point, I guess you said that you raided Joe

5 Dibee's office, right?

6 **A.** Yes, we were able to get a search warrant for that.

7 **Q.** And you seized his computers?

8 **A.** Yes, we did.

9 **Q.** You never asked Ms. Kolar to bring in her contemporaneous

10 computers, the computers she was using in December 2005?

11 **A.** That's correct, we had no evidence -- we had no reason to

12 believe there was evidence of a crime on there.

13 **Q.** You didn't ask her to review it, did you? What you

14 believed or not, you didn't ask her, can I take a look at your

15 computer to see who you have been E mailing the last few

16 weeks.

17 **A.** No, we did not.

18 **Q.** Similarly, with Lacey Phillabaum you never asked her to

19 produce her computer if she had one from 2005, 2006, so that

20 you could review who she had been communicating with via her

21 computer?

22 **A.** That's correct.

23 **Q.** Now, you weren't following -- the FBI wasn't following

24 Ms. Kolar either in December 2005 or January 2006?

25 **A.** That's correct.

1 **Q.** And you knew that both Ms. Kolar and Ms. Phillabaum had

2 ties to Spokane, right?

3 **A.** I don't know that I knew that Ms. Phillabaum was

4 associated with Spokane until the time she came in or at least

5 until the time I tried to reach out to her.

6 **Q.** It turns out she has ties to Spokane?

7 **A.** Yes, we eventually learned that.

8 **Q.** You knew that both Ms. Phillabaum and Ms. Kolar had ties

9 to Eugene, Oregon?

10 **A.** As did most of the defendants.

11 **Q.** You knew that they both had ties to Seattle somehow?

12 **A.** I don't know what ties Ms. Phillabaum had to Seattle --

13 **Q.** Well, Ms. Kolar lived in Seattle, right?

14 **A.** Could you ask the question again?

15 **Q.** Did Ms. Kolar live -- or lived in Seattle?

16 **A.** That's correct.

17 **Q.** And Ms. Phillabaum, while she was residing in Spokane, her

18 lawyer was in Seattle, right?

19 **A.** That's correct.

20 **Q.** You also knew by February 21, did you not, that Ms. Kolar

21 had used Kenny Clark as kind of a secret messenger for her at

22 various points in her life?

23 **A.** I don't know I would characterize it as a secret

24 messenger.  I knew that was a friend of hers.

25 **Q.** You knew that by February 21, Ms. Kolar had some

1   communications with Mr. Dibee through a third person, right?

2   Through Mr. Clark?

3   **A.**   I believe Mr. Dibee reached out to Ms. Kolar through

4   Mr. Clark.

5   **Q.**   And two years earlier, or a year and a half earlier

6   Ms. Kolar communicated with Mr. Dibee through Mr. Clark?

7   **A.**   That's correct.

8   **Q.**   Ms. Phillabaum -- you knew both her parents were

9   attorneys?

10   **A.**   I knew her father was an attorney, I did not know her

11   mother was an attorney.

12   **Q.**   Now, when Ms. Phillabaum came in to talk to you on

13   February 21, she was facing a lot of time in prison as you

14   understood it?

15   **A.**   Possibly.

16   **Q.**   When she mentioned Briana Waters' name, she called her,

17   referred to her as Briana, right?

18   **A.**   I believe that's true.

19   **Q.**   She didn't give you a physical description of Briana

20   Waters without a name, she just mentioned the name, right?

21   **A.**   I'd have to refer back to my notes or report for that.

22   **Q.**   She referred to Ms. Waters' boyfriend as Connor?

23   **A.**   That's correct.

24   **Q.**   She told you that he and Briana had just broken up in May

25   of 2001?

1   A.   That's the way I understood it.

2   Q.   And the week before the University of Washington action,

3   she said that she met Briana at the Denny's or Perkins; is

4   that correct; is that right?

5   A.   I believe that's accurate.

6   Q.   And she said that Diver wasn't there, right?

7   A.   I'd have to refer back to my notes.

8   Q.   Sure, why don't you take a look.   A-115?  It's marked

9   14092.

10  A.   What page.

11  Q.   Why don't you identify what's been marked for

12  identification as A-115, so the record is clear.

13  A.   A-115 is a copy of my notes from February 21 interview of

14  Lacey Phillabaum.

15  Q.   2006?

16  A.   2006.

17  Q.   Why don't you take a look at 14092?

18  A.   I see it.

19  Q.   Does that refresh your recollection as to whether she told

20  you that Diver was at Denny's or Perkins?

21  A.   I have Diver not there.   I can't conclusively link that

22  that's to the Denny's or Perkins, I would have to refer back

23  to my 302.

24  Q.   The Denny's or Perkins was immediately above Diver not

25  there?

1  **A.**  That's how it's ordered on the notes.

2  **Q.**  Just to tie up what we are talking about when she mentions

3  Briana's name, it's Briana, right?

4  **A.**  That's what I wrote.

5  **Q.**  Underneath that, you have an entry, do you not, that says

6  slept in bus that night, Saturday?

7  **A.**  I do.

8  **Q.**  So, is it your memory that Ms. Phillabaum, first time she

9  talked to you said she slept in a bus on Saturday night?

10  **A.**  I have to refer to my 302.

11  **Q.**  Okay.  That should be in front of you, as well as 114.

12  **A.**  114?

13  **Q.**  I believe so.

14     I'm sorry, 113.

15  **A.**  I do not appear to have a 113 up here.

16        THE CLERK:  Is it A-113?

17        MR. FOX:  Yes, I am sorry.

18  BY MR. FOX:

19  **Q.**  Why don't you identify for the record A-113?

20  **A.**  A-113 is myself and Agent Torres' 302 concerning the

21  interview of Lacey Phillabaum, February 21, 2006.

22  **Q.**  Why don't you refer to page 6 of that document and see if

23  that refreshes your recollection?

24  **A.**  Yes, the second paragraph states Briana and Connor had

25  recently broke up.

1  Q.  In terms of whether the person known as Diver was at the
2  meeting at Denny's or Perkins, you don't have to read your
3  report into evidence, but does that refresh your recollection?
4  A.  The report does not mention whether Diver was there.
5  Q.  I think a later point in your report you indicate that
6  Phillabaum said Diver was at one of the meetings but doesn't
7  recall which one, right, fourth paragraph down?
8  A.  That's correct.
9  Q.  And then in your 302, is there any mention of the thing
10  about sleeping in a bus that night?
11  A.  No, there isn't.
12  Q.  So do you now, as you sit here -- do you have a memory as
13  to what Ms. Phillabaum -- the context in which she mentions
14  sleeping in a bus?
15  A.  I do not.
16  Q.  Again, you talked to Ms. Phillabaum a couple times, right,
17  over the next couple months?
18  A.  That's correct.
19  Q.  On March 7, you spoke to her again?
20  A.  That's correct.
21  Q.  I believe at that time you talked to her about Ms. Waters,
22  right?
23  A.  That's correct.
24  Q.  And the fact that Ms. Waters played a violin?
25  A.  Sounds accurate.

1  **Q.** Ms. Phillabaum told you -- talked to you about running at
2  a track by the house that Ms. Waters resided at, right?
3  **A.** Yes, she was associating that with the house where Briana
4  Waters was living.
5  **Q.** It's correct that at the time that she talked about
6  Ms. Waters playing the violin and running at the track by
7  Ms. Waters' house, Lacey Phillabaum never said anything about
8  Briana being in the kitchen playing her violin upon her return
9  from running on the track?
10 **A.** I do not recall that --
11 **Q.** Okay.
12 **A.** -- being said.
13 **Q.** Now, on direct you were asked about a sketch that Lacey
14 Phillabaum made of this house on Conger, right?  Or the house
15 that you came to believe was the house at Conger, right?
16 **A.** That's correct.
17 **Q.** Now, if in fact that sketch was of the house on Conger,
18 there's nothing about that sketch that shows that Lacey
19 Phillabaum was at that house in May of 2001, right?
20 **A.** The sketch in and of itself does not place her any
21 particular time at that house.  It's her account of how she
22 knows that home --
23 **Q.** Sure.
24 **A.** -- or that house that is significant.
25 **Q.** She could have been at that house in July of 2001, right,

1  and still made the same sketch?

2  **A.**  It's possible.

3  **Q.**  In fact, the sketch isn't very detailed in terms of what

4  the interior of the house looks like?

5  **A.**  Yes, she did not try to draw the interior of the house.

6  **Q.**  It's just kind of a house and a driveway and an

7  outbuilding?

8  **A.**  That, and she showed on her sketch how she would access

9  the backyard from the side, indicating there was a fence

10  there, indicating there was a school off to the side.

11  **Q.**  But the school would have been there in July of 2001?

12  **A.**  Yes, it would.

13  **Q.**  And the driveway would have been there in July 2001?

14  **A.**  I would expect so.

15  **Q.**  It's only after you met with Lacey Phillabaum on February

16  21, 2006, that you decided to question Jennifer Kolar about

17  Ms. Waters, right, to question her more about the University

18  of Washington case.

19  **A.**  It was after Lacey Phillabaum, that we did have the full

20  debrief of the UW arson.

21  **Q.**  So what you call the full debrief of the UW arson took

22  place on March 6, 2006?

23  **A.**  That's correct.

24  **Q.**  About two weeks after you met with Ms. Phillabaum?

25  **A.**  That's correct.

1  **Q.** So this was really the first time since December 16 that

2  you sat down with Ms. Kolar to talk to her about the

3  University of Washington, right?

4  **A.** Specifically, yes.

5  **Q.** During this interview on March 6, 2006, there's no

6  indication that you questioned Ms. Kolar about Capitol Hill

7  Girl; is that correct?

8  **A.** That's correct.

9  **Q.** You didn't ask her about Crazy Dan at this interview on

10 March 6, right?

11 **A.** We had done other investigations regarding those people --

12      MR. BARTLETT:  Objection, Your Honor let the witness

13 answer the question.

14      THE COURT:  Just a minute.  When you ask a question,

15 let him answer.

16 **Q.** The question is, did you -- you didn't question Ms. Kolar

17 about Crazy Dan on March 6, right?

18 **A.** We did not.

19 **Q.** And you didn't question Ms. Kolar on March 6, 2006, about

20 the Punk Boyfriend of Capitol Hill Girl, right?

21 **A.** We did not.

22 **Q.** And actually, you didn't ask her at all, at that

23 interview, whether she had made any mistakes in her memories

24 or speculation or whatever, back in December, right?

25 **A.** Understood her to be speculating back to December 16 and I

1  did not feel the need to clarify that.

2  **Q.** So you never asked her to clarify whether she had made any

3  mistakes earlier, right?

4  **A.** It was clear to myself that Ms. Kolar was confused when

5  she mentioned those names.  That was consistent when she

6  talked about the detail of the arson on March 6.

7  **Q.** Sure.  But basically, after March 6, 2006, Crazy Dan, Punk

8  Boyfriend, and Capitol Hill Girl really go off into oblivion,

9  right?  There's no more questioning about those people.

10  **A.** They did not go off into oblivion.  We investigated every

11  name that we were given, no matter what the context or what

12  our understanding was during that December 16th interview.  We

13  did not ask Ms. Kolar specifically, but we knew who those

14  people likely were based on other investigations.

15  **Q.** Sure, I understood that, but in terms of your questioning

16  of Ms. Kolar, you never again raised those names with her;

17  isn't that true?

18  **A.** That's correct.

19  **Q.** You went to the Grand Jury on March 15, 2006, right?

20  **A.** That sounds correct.

21  **Q.** To seek an indictment against Ms. Waters?

22  **A.** That's correct.

23  **Q.** And you testified under oath at that hearing?

24  **A.** I did.

25  **Q.** And you referred to Ms. Kolar as CW 3, right?

1  **A.** That's correct, we were trying to hide the identities of
2  these people.

3  **Q.** But CW 3 is cooperating witness?

4  **A.** That's correct.

5  **Q.** And that's how you refer to her in the course of your
6  testimony before the Grand Jury?

7  **A.** I did.

8  **Q.** Now, Ms. Kolar didn't testify in front of the Grand Jury,
9  right?

10 **A.** No, she did not.

11 **Q.** You related to the Grand Jury what Ms. Kolar had said to
12 you?

13 **A.** We provide a summary of what we were told by Ms. Kolar,
14 yes.

15 **Q.** And is it not correct that in your testimony to the Grand
16 Jury, you never once mentioned anything about Capitol Hill
17 Girl?

18 **A.** That is correct.

19 **Q.** And you never once mentioned how Ms. Kolar had "remembered
20 Briana Waters' name, right?

21 **A.** My testimony before the Grand Jury is a summary of the
22 information from years of investigation.

23 **Q.** Sure.

24 **A.** We did not break down specific interviews.  There are
25 general statements of what these cooperating witnesses had

1  told us.

2  **Q.** And then my question to you is you didn't tell them about

3  Capitol Hill Girl, right?

4  **A.** I did not.

5  **Q.** You did not tell the Grand Jury about Crazy Dan, right?

6  **A.** I did not.

7  **Q.** You did not tell them about Capitol Hill Girl's Punk

8  Boyfriend?

9  **A.** That's correct.

10  **Q.** And in fact, you testified to the Grand Jury, that CW 3

11  and CWA, CWA was Lacey Phillabaum, right?

12  **A.** That may be true.

13  **Q.** That they were both consistent that Briana was the

14  lookout, isn't that what you told the Grand Jury?

15  **A.** Yes, and that is true.

16  **Q.** When you say consistent, you didn't tell the Grand Jury

17  that Jennifer Kolar had changed the names of the people that

18  she associated with the University of Washington fire, right?

19  **A.** I don't believe she was associating those other people as

20  being there that night during that arson.

21  **Q.** Well, did Agent Torres list in his note "at arson with

22  those five people"?

23  **A.** You need to ask Agent Torres what his understanding of

24  those notes mean.

25  **Q.** Did you not testify on direct that Ms. Kolar had told you

1  he'd given five names connected to her discussion of the

2  University of Washington arson?

3  **A.**  I believe I testified that those names were given in the

4  context of the arson.

5  **Q.**  Okay.  And my point is, that you didn't tell the Grand

6  Jury about three of those names, is that not correct?

7  **A.**  That's correct.  We did not see that was important.

8  **Q.**  You did not see it as important, but you didn't tell the

9  Grand Jury what had transpired in December 2005, is that not

10  correct?

11  **A.**  My Grand Jury testimony was a summary of what we had been

12  told by Ms. Phillabaum and Ms. Kolar.

13  **Q.**  Now, it's correct in the Grand Jury, the defense isn't

14  present, right?

15  **A.**  That's correct.

16  **Q.**  So, there's no cross-examination; is that right?

17  **A.**  That's correct.

18  **Q.**  It's just the prosecutor asking you questions, right?

19  **A.**  That's correct.

20  **Q.**  Now, before you had testified -- let's just move on a bit

21  about wire taps and things like that, right?

22  **A.**  Yes, you asked me some questions about that.

23  **Q.**  In the course of your -- the FBI's investigation in any of

24  these cases, any of the fires that we heard testimony about in

25  the last two weeks, did the FBI ever use wire taps?

1    **A.**  I am not aware of any wire taps in this investigation at

2    all.

3    **Q.**  Even -- and listening devices in people's apartments and

4    things like that, did you ever use any of those?

5    **A.**  No, I consider that a wiretap.

6    **Q.**  A wiretap would be on a phone, I guess.  Now, the FBI does

7    have forensic laboratories; is that right?

8    **A.**  Yes, we do.

9    **Q.**  And there's all sorts of scientific testing that can go on

10   in those laboratories, right?

11   **A.**  I would assume.

12   **Q.**  And we heard from Ms. Betty about the fingerprint testing?

13   **A.**  That's correct.

14   **Q.**  And there's trace evidence that can be tested, right?

15   **A.**  Yes.

16   **Q.**  Is it not correct that the FBI labs also have the ability

17   to do metallurgical testing on cars and paint?

18   **A.**  I don't understand them to have a forensic body shop if

19   that's what you are asking, but we could give them a paint

20   sample and ask them to tell us something about it.

21   **Q.**  Sure.  And the FBI lab could also send scientists out to a

22   car, for instance, and do testing to see whether there's been

23   damage to that car, is that not correct?

24   **A.**  No, my interaction with the laboratory, I understood that

25   we would have to talk to other law enforcement agencies that

1 would specialize in something like that.

2 **Q.** Which other law enforcement agencies specialize in that?

3 **A.** I believe some of the State Patrols may have forensic body

4 mechanics, if you will.

5 **Q.** So it was something, though, that is within the FBI's

6 ability to ask another law enforcement agency to do that type

7 of testing, right?

8 **A.** Yes, we could have.

9 **Q.** Some of that testing could also look at paint to see

10 whether there's been retouching on the characters right?

11 **A.** That could be.

12 **Q.** Did the FBI bring Judy Barry's car, the environmental

13 activist who was a victim of a car bombing, back to

14 Washington, D.C., for testing?

15 **A.** I have no knowledge of that investigation at all.

16 **Q.** Now, if the car you wanted to test was owned by a private

17 party, you would have to get a court order to test it, right?

18 **A.** We would have to have permission of the owner or search

19 warrant.

20 **Q.** I guess the point is, if you wanted to do the testing,

21 there are ways that you could have done it, right?  I am

22 referring to the car on 775, the vehicle that was rented by

23 Mr. Corrina and his wife?

24 **A.** I spent a considerable amount of time considering whether

25 testing of that vehicle for any damage would have been

1  beneficial to the investigation.  Considering it had been

2  rented approximately 30 times after Mr. Corrina had rented it,

3  and it had transferred hands a number of times to dealerships

4  and five years had passed, any evidence of damage could have

5  in no way have been linked to a particular moment in time five

6  years earlier.

7  **Q.**  Okay.

8  **A.**  So we did not have it tested because it would not have

9  told us anything.

10  **Q.**  Now, the FBI also -- I think you were able to get

11  different phone records, right?

12  **A.**  Yes, we can get phone records.

13  **Q.**  You can even get warrants to look at people's mail, right?

14  **A.**  That would be a warrant issued, at least a court order or

15  warrant.

16  **Q.**  You could review people's e-mails, right?

17  **A.**  I believe that's considered the same as a wiretap.

18  **Q.**  Sure, but there's the ability to be able to track all of

19  that, right?

20  **A.**  If there's probable cause to get those types of orders or

21  warrants.

22  **Q.**  In fact, I think there's some references in the media to

23  national security council tracking people's e-mails even

24  without warrants, right?

25  **A.**  That's true in the media.

1  **Q.**  Now, let's move on a little bit about, I think on direct,

2  after we talked about Lacey Phillabaum's sketching Conger

3  Street or Avenue, you then moved on to discussing the raid of

4  Justin Solondz' cabin in Brinnon, Washington; is that correct?

5  **A.**  That's correct.

6  **Q.**  Now, you raided his cabin -- you searched his cabin in

7  January of 2007, right?

8  **A.**  That's correct.

9  **Q.**  So that is almost six years after the University of

10  Washington fire, right?

11  **A.**  That's correct.

12  **Q.**  And when you went to the cabin, it was uninhabited, right?

13  **A.**  Correct, there was no one there when we arrived on scene.

14  **Q.**  I think you testified about what's been admitted into

15  evidence as Exhibit 543.

16      This is the note, "Hey Tonie, Welcome home!"

17          MR. FOX:  I belive this has been admitted, right?

18          THE CLERK:  Yes, it has.

19  BY MR. FOX:

20  **Q.**  This is the note you found in the cabin?

21  **A.**  That's correct.

22  **Q.**  When you read through this note, it sounds like he's

23  moving out, right; is that correct?

24  **A.**  Let me read the note in detail.

25  **Q.**  Sure.  Do you want to just read the note out loud, I can't

1  recall if you did that yesterday?

2  **A.**  I did not read it out loud.

3  **Q.**  Read it out loud?

4  **A.**  "Hey Tonie, Welcome home!  It's surely not the feeling of

5  how you left it, but as I'm sure you will, make it feel

6  comfortable, especially with the inside.  I am rushing around

7  trying to get everything wrapped up before I go, and I noticed

8  the sink on the cold water side started leaking.  The nut

9  needs to be tightened, but the wrench I need is already moved

10  to Olympia, but I may have time to return before I depart for

11  good.  A few other things:  There are garbage bags of your

12  clothes in the attic space above the living room, which is

13  accessed by way of the sleeping loft (behind black fabric).

14  The front (driver's side) tire has a slow leak which by the

15  time you get here will probably be flat.  There's a 12 volt

16  air compressor that runs off the car battery or off the 12

17  volt charger, both of which I am leaving in the passenger

18  seat."

19  **Q.**  And then it say says, "Take care, Justin"?

20  **A.**  I can't read that on the screen.

21  **Q.**  I am sorry?

22  **A.**  "Take care, Justin."

23  **Q.**  It sounds like he's moving to Olympia?

24  **A.**  I don't know that I understood he was moving to Olympia,

25  but he was moving out of the cabin.

1  **Q.** Then there was garbage bags full of Tonie's clothes
2  apparently that were being left in the attic?
3  **A.** That's apparently how it reads, yes.
4  **Q.** Now, you also testified about Exhibit 544; right?
5  **A.** Yes.
6  **Q.** These were various publications about anarchy that you
7  found in the cabin?
8  **A.** That's correct.
9  **Q.** I take it when you searched the cabin these weren't spread
10 out in quite this manner?
11 **A.** No, we displayed them to show what type of documents were
12 coming out of that box.
13 **Q.** So this display is your display?
14 **A.** It's our display, yes.
15 **Q.** It's true is it not, that there were a lot of other things
16 in that cabin besides periodicals about anarchism?
17 **A.** There were other documents and books.
18 **Q.** There were pictures?
19 **A.** That's correct.
20 **Q.** There were -- I think you talked about some of those
21 pictures yesterday, right?
22 **A.** Yes, we did.
23 **Q.** There were a lot of handwritten notes, right?
24 **A.** Yeah.  There was some notebooks and stuff that looked like
25 it had come from school.

1  **Q.**  I will refer you to what's been marked for identification

2  as A-211.

3      Hopefully you now have Exhibit A-211 in front of you?

4  **A.**  Yes, A-211 is a copy of The Iliad.

5  **Q.**  There's some other articles in there as well?

6  **A.**  Yes, looks like copies of some other literature.

7          MR. FOX:  I would offer what's been marked for

8  identification as A-211?

9          MR. BARTLETT:  No objection.

10         THE COURT:  Admitted.

11                  (Exhibit No. A-211 admitted.)

12  BY MR. FOX:

13  **Q.**  You actually retrieved these with me this morning from the

14  box of documents in Justin's cabin?

15  **A.**  That's correct.

16  **Q.**  There are a lot of other materials we haven't put into

17  evidence?

18  **A.**  That's correct.

19  **Q.**  Is it fair to say this is other materials -- a selection

20  of other materials you found at Justin's cabin?

21  **A.**  That's correct.

22  **Q.**  I think there's the Iliad by Homer?

23  **A.**  That's correct.

24  **Q.**  And there's another article down the road, called "The

25  Fate of the Earth"; is that not correct?

1  **A.**  That's correct.

2  **Q.**  That's written by a nun from Caldwell, New Jersey; is that

3  right?

4  **A.**  That appears to be correct.

5  **Q.**  Sister Miriam MacGillis, a Dominican sister from Caldwell,

6  New Jersey, nun, spoke to an audience in Santa Rosa,

7  California, is that right?

8  **A.**  That's correct.

9  **Q.**  That's kind of a religious analysis of environmentalism?

10  **A.**  I am not familiar with the material.

11  **Q.**  You didn't read this particular article?

12  **A.**  Not in detail.

13  **Q.**  So you just took out the materials on anarchism and

14  displayed them to the jury, right?

15  **A.**  We entered the items we felt relevant to the jury, yes.

16  **Q.**  So you didn't think it was relevant that there were

17  nonanarchist writings, writings by nuns, in Justin's

18  belongings, did you?

19  **A.**  No, I did not.

20  **Q.**  You also talk about these maps that were found and I think

21  the exhibit was 551; is that correct?

22  **A.**  That's correct.

23  **Q.**  Again this is a box of maps you found in Justin Solondz's

24  cabin, right.

25  **A.**  That's correct.

1 **Q.** There are, is it not correct -- there are a number of maps
2 there, right?

3 **A.** There were.

4 **Q.** One for Centralia and Chehalis in Lewis County?

5 **A.** That's correct.

6 **Q.** One for Santa Cruz, right?

7 **A.** That's correct.

8 **Q.** One for Phoenix, Arizona? Right?

9 **A.** That's correct.

10 **Q.** One for Los Angeles? Right?

11 **A.** That's correct.

12 **Q.** Then one map you pulled out was identified in 552, I think
13 you -- we have the actual map in evidence as 553?

14 **A.** That's correct.

15 **Q.** There's a map of Portland and it's folded to a particular
16 page, right?

17 **A.** I believe so, I can't read it on the screen here.

18 **Q.** This is Portland, right?

19 **A.** That's correct.

20 **Q.** There's another map in 553, that was folded in a
21 particular way, right?

22 **A.** That's correct.

23 **Q.** And the folding shows a good part of Seattle, south of the
24 ship canal right?

25 **A.** That's correct.

1  **Q.**  And it also shows the University of Washington in the

2  upper part of the section, right?

3  **A.**  That is correct.

4  **Q.**  Now, there's nothing on this map that has the University

5  of Washington circled, right?

6  **A.**  That is correct.

7  **Q.**  No arrow saying this is the place, right?

8  **A.**  That is correct.

9  **Q.**  No marking saying Center for Urban Horticulture May 20,

10  2001, right?

11  **A.**  That is correct.

12  **Q.**  Now, you also testified about Exhibit 549, which was the

13  clothing that you found in those bags, right?

14  **A.**  That's correct.

15  **Q.**  And you talked about black knit hats and things like that?

16  **A.**  That's correct.

17  **Q.**  Now, it's true is it not that you also found pictures in

18  Mr. Solondz's cabin of people in costumes at various times?

19  **A.**  There were pictures of people apparently at a party.

20  **Q.**  And they were goofing around, right?  And it looked like

21  they were goofing around?

22  **A.**  That's what it looked like, yes.

23  **Q.**  Someone had something over their -- like a mask over their

24  face, right?

25  **A.**  That's correct.

1  **Q.** And kind of, I don't know, like they were wearing their
2  underwear or something and were acting really goofy?
3  **A.** That's correct.
4  **Q.** They weren't pictures of people going out on any type of
5  arson actions, right?
6  **A.** No, but the significance of those clothing items we found
7  was that they were found in context with those shower caps,
8  that is what, to me, was very significant and why we grabbed
9  that evidence.
10  **Q.** Sure, but my question though, there were pictures of
11  people dressed up in costume at various times?
12  **A.** Yes.
13  **Q.** Looking like they were having some silly college party?
14  **A.** That's correct.
15  **Q.** Now, Mr. Block's notebook, I believe that has been
16  admitted as 563.
17       MR. BARTLETT:  I believe only one page of that was
18  admitted.
19  **Q.** Right, and I am putting up the page -- this is the page,
20  right?
21  **A.** Yes.
22  **Q.** There's an address 2613 Conger?
23  **A.** Yes.
24  **Q.** And there's the name Joshua over that address?
25  **A.** That's correct.

1  **Q.** So it's apparent, is it not, that someone besides Ocean

2  and Briana Waters at some point lived on Conger Avenue in that

3  house?

4  **A.** That's true.

5  **Q.** In fact a number of the houses you have spoken about

6  during the course of your investigation, there are a lot of

7  people that lived at those places, right? Some of those were

8  like student rooming houses?

9  **A.** I believe that's correct.

10  **Q.** I believe there was testimony about Justin Solondz cabin

11  on Bill Wake's land with having eight separate residences for

12  one phone?

13  **A.** That's correct.

14  **Q.** And the address 135 Percival Street, you investigated that

15  one as well?

16  **A.** We did look at that one.

17  **Q.** I think at some point you said there were calls from

18  Marilyn Waters phone to the phone at that address?

19  **A.** That's correct.

20  **Q.** And then I believe you linked that address to Teresa

21  Howell at some point?

22  **A.** The phone number is subscribed in the name of Teresa

23  Howell during that time period.

24  **Q.** And there were calls from this 280 phone number that you

25  believe was associated with Mr. Rodgers, to Teresa Howell's

1  phone; is that correct?

2  **A.** That's correct.

3  **Q.** But it's true that there were at least eight or nine other

4  people that were staying at that 135 Percival Street address

5  in the spring of 2001?

6  **A.** My understanding from talking to the landlord, was that

7  there were four to six people there at that time period.

8  **Q.** Four to six people registered to stay there, right?

9  **A.** That she believed were occupying the space.

10  **Q.** Now, you also, on direct, you talked about Exhibit 402,

11  and that was the materials taken off the ELF website?

12  **A.** That's correct.

13  **Q.** Now, this is not something that you found in the computer

14  associated with Briana Waters, right?

15  **A.** That's correct, that was taken off the Internet.

16  **Q.** This is something off in cyber space?

17  **A.** That's correct.  It was posted shortly after the UW arson.

18  **Q.** But this is not something you found at Briana Waters'

19  house right?

20  **A.** We did not do a search of Briana Waters' house.

21  **Q.** So you didn't find it at her house?

22  **A.** That's correct.

23  **Q.** Now, you did, before you went down to talk to Ms. Waters,

24  you did -- the FBI did do some surveillance on her, right?

25  **A.** Yes, the agents from our Oakland office were trying to

1   locate where Ms. Waters was living.

2   **Q.** You did some background information on Ms. Waters?

3   **A.** Yes, we did.

4   **Q.** You got her driver's license picture?

5   **A.** That's right.

6   **Q.** You got her transcripts at some point, it may have been a

7   little later but at some point you got her academic

8   transcripts from the Evergreen State College?

9   **A.** We got hers and Justin Solondz and their photos.

10  **Q.** You knew at some point Ms. Waters had made a film about

11  Watch Mountain?

12  **A.** Yes, I learned that.

13  **Q.** And this is -- have you seen the film?

14  **A.** I have.

15  **Q.** It's a film about how nonviolent protests stopped

16  clear-cutting at a town called Randle; is that right?

17  **A.** That's correct.

18  **Q.** And you are aware that this film was shown back in 2001,

19  right?

20  **A.** I understood it was shown somewhere up in the Seattle

21  area, in 2001.

22  **Q.** Also shown in Olympia?

23  **A.** That's very likely.

24  **Q.** This film ultimately documents a successful nonviolent

25  campaign?

1　A.　That's correct.

2　Q.　The film ends on happy notes?

3　A.　I don't recall the details of the end.

4　Q.　Okay.　But the land swap that the residents of Randle were

5　actually trying to stop was actually canceled?

6　A.　I believe that's true.

7　Q.　The film ends with a bunch of people singing and having a

8　fun time, kind of like at a party?

9　A.　I don't remember those specific details.

10　Q.　When you were trying to locate Ms. Waters, you didn't have

11　any difficulties locating her, did you?

12　A.　Actually, we did.

13　Q.　You were able to get her Department of Licensing

14　information from California, right?

15　A.　We were, but I did not believe the address associated with

16　the driver's license was the address that she was living at

17　when we contacted her.

18　Q.　When you contacted her, she was living under her own name?

19　A.　Yes.

20　Q.　There were surveillance of her going in and out of her

21　house, right, with a baby, I think?

22　A.　I believe that's true.

23　Q.　You had a lot more difficulty locating Mr. Rodgers, right?

24　A.　Yes, Mr. Rodgers was very difficult to locate.

25　Q.　In fact, I think you testified that he had a Post Office

1  Box in Seattle, in the Seattle area, right?

2  **A.**  Near the Sea-Tac Airport.

3  **Q.**  But it turned out he was residing in Arizona, right?

4  **A.**  At the time we made the arrest, yes.

5  **Q.**  In December of 2005, right?

6  **A.**  That's correct.

7  **Q.**  And he actually had a car that was registered in Idaho;

8  isn't that right?

9  **A.**  That is true.

10 **Q.**  And the car was purchased in South Dakota, correct?

11 **A.**  That's correct.

12 **Q.**  So he had addresses, addresses all over the place, right,

13 or ties to lots of possible different locations; right?

14 **A.**  That's correct.

15 **Q.**  And then he had a bank account even in another state,

16 right?

17 **A.**  I don't remember what state the bank account is associated

18 with.

19 **Q.**  Okay.  So how long did it take the FBI to locate

20 Mr. Rodgers?

21 **A.**  We actively began looking for him during the fall of 2004

22 and found him early, I believe, mid November 2005.

23 **Q.**  So, a little over a year?

24 **A.**  That's correct.

25 **Q.**  How long did it take you to find where Ms. Waters was

1 residing in the bay area?

2 **A.** I'd say approximately a month and a half, a month.

3 **Q.** Okay. A month, from January until February?

4 **A.** That sounds correct.

5 **Q.** You did credit checks on Ms. Waters; is that correct?

6 **A.** That's correct.

7 **Q.** You found she had different credit cards in her own name?

8 **A.** That's correct.

9 **Q.** Now, with regards to where Ms. Waters was living in 2001,

10 you had some difficulties pinning that down, right?

11 **A.** Yes, that was harder since we were going back in time

12 quite a bit more.

13 **Q.** It was probably harder when you met with Mr. Robert

14 Corrina. He lied to you and said he didn't know Briana

15 Waters, right?

16 **A.** That's correct. He told us he did not know her that first

17 time I met with Mr. Corrina.

18 **Q.** Sure, that was back in what, May of 2006?

19 **A.** Yes.

20 **Q.** He also, did he not, tell you that they had a variety of

21 people stay with them over the years, is that not correct?

22 **A.** I believe he did say that. It was not clear to myself

23 when I was talking to him whether he was talking about the

24 whole building. He didn't mention the tenants next door.

25 **Q.** Sure. Why don't we take at a look at what's been marked

1  for identification as A-2?

2  **A.** This is my 302 report of my first interview with Robert

3  Corrina.

4  **Q.** This was based upon an investigation on May 16, 2006?

5  **A.** That's correct.

6  **Q.** Referring your attention to the third paragraph?

7  **A.** I see it.

8  **Q.** Is it not correct that Corrina said he did not recognize

9  Waters, right?

10 **A.** That's correct.

11 **Q.** And indicated that they have had a variety of people stay

12 with them over the years, right?

13 **A.** That's correct.

14 **Q.** And then only then does -- you have Corrina indicated that

15 the duplex next door had a lot of college students living

16 there over the years?

17 **A.** That's correct.

18 **Q.** So where he talks about a variety of people staying with

19 them over the years, that's in a separate sentence than his

20 reference to the duplex next door?

21 **A.** You are correct.

22 **Q.** Now, at some point after Mr. Corrina said that he didn't

23 know Briana Waters, you found out that his wife actually had

24 rented this car?

25 **A.** Yes, sometime later we found the rental records regarding

1  the car.

2  **Q.** And you visited his wife, Kara Larson, is that her name?

3  **A.** Yes.

4  **Q.** You visited her at her place of employment?

5  **A.** That's correct.

6  **Q.** Would it be fair to say, that was on January 19, 2007?

7  **A.** That sounds correct.

8  **Q.** Would it be fair to say that you were upset with her?

9  **A.** I would say it's accurate that there was some frustration

10  on our part. I do want to clear that in earlier testimony,

11  Mr. Corrina said that his impression from his wife was that

12  Mr. Friedman had yelled at Ms. Larson, and I know that not to

13  be the case. We had our meeting with Ms. Larson out in the

14  lobby area of where she worked and she asked that we whisper.

15  And while we were having our discussion with her, at times our

16  voices got above a whisper and she'd ask us to keep our voices

17  down. I can see where it may be perceived that we were

18  yelling, but I have never seen Mr. Friedman yell at anyone.

19  **Q.** Sure. But her perception might be accurate that your

20  voices were raised a little bit?

21  **A.** Yes, that's probably accurate.

22  **Q.** And you probably weren't too pleased with the fact that

23  she had testified in front of the Grand Jury that she had not

24  rented a car?

25  **A.** I don't know that that had anything -- what we were

1  frustrated with was after showing her the records of the

2  rental car she still had no memory of the rental car while we

3  were sitting with her.

4  **Q.** You actually told her, did you not, that you believe that

5  this particular vehicle was the rental vehicle used by the

6  subjects at the University of Washington arson?

7  **A.** I did believe that.

8  **Q.** But you told her that?

9  **A.** I did say that.

10  **Q.** Isn't it correct that Mr. Friedman here told Ms. Larson

11  that due to the new information regarding the rental of this

12  particular rental car, the Grand Jury may ask that perjury

13  charges be brought against her and her husband?

14  **A.** That was expressed.

15  **Q.** Okay, so there was a conversation in the front lobby of

16  her place of employment?

17  **A.** It was the lobby not the front lobby.

18  **Q.** Voices were a little bit raised?

19  **A.** Yes, that's correct.

20  **Q.** Her perception was that it was a lot louder?

21  **A.** I can't say what her perception was.

22  **Q.** You told her that you thought the car had been used at the

23  University of Washington?

24  **A.** I do believe that.

25  **Q.** And Mr. Friedman said we may charge you with perjury,

1  right?

2  **A.**  No, he never said we may charge you with perjury.

3  **Q.**  The Grand Jury -- we may ask the Grand Jury to return an

4  indictment for perjury?

5  **A.**  He did not word it like that either.

6  **Q.**  He worded it, the Grand Jury may ask that perjury charges

7  be brought against her and her husband?

8  **A.**  That's more accurate.

9  **Q.**  Now, you got records at some point I think you said -- you

10  got records from Mr. Corrina and Ms. Larson's checking

11  account?

12  **A.**  We did.

13  **Q.**  You got records from her discover card?

14  **A.**  That's correct.

15  **Q.**  You reviewed all the canceled checks from their account

16  from 2001; is that right?

17  **A.**  I don't know that we had copies of every single canceled

18  check, but I reviewed a number of canceled checks.

19  **Q.**  Is it fair to say that there were records of checks that

20  Ms. Waters, that were written to Ms. Waters as well, right?

21  **A.**  I'd have to review the checks to know that for sure.

22  **Q.**  Well, let's move on.  Why don't you take a look at what's

23  been marked for identification as A-206.

24  **A.**  It appears to be a photocopy of a check written by Kara

25  Larson and Robert Corrina's account.

1   **Q.** It's actually four checks, is that not correct, four

2   pages?

3   **A.** That's correct.

4   **Q.** I will move for admission of what's been marked for

5   identification as A-206?

6           MR. BARTLETT:  No objection.

7           THE COURT:  Admitted.

8                   (Exhibit No. A-206 admitted.)

9   BY MR. FOX:

10  **Q.** The first page is a check dated May 19, 2001?

11  **A.** That is the date on top of the check.

12  **Q.** It's to Intercity Transit?

13  **A.** That's correct.

14  **Q.** This is May 19, right?

15  **A.** That's correct.

16  **Q.** The second page appears to be what?

17  **A.** That's a check written to Robert Provasoli on May 21,

18  2001.

19  **Q.** Next page?

20  **A.** A check written to Otto's, on May 21, 2001.

21  **Q.** That's a restaurant in Olympia?

22  **A.** I am not familiar with what it is.

23  **Q.** Robert Provalosi is a chiropractor?

24  **A.** What was the question?

25  **Q.** Robert Provalosi, is he a chiropractor?

1  **A.** I do not know that.

2  **Q.** And then finally, the fourth page is a check from May

3  22nd?

4  **A.** That's correct.

5  **Q.** Also to Intercity Transit?

6  **A.** That's correct.

7  **Q.** It says right on the bottom right corner -- you testified

8  on direct that you -- that the FBI searched Mr. Rodgers's

9  home?

10  **A.** That's correct.

11  **Q.** There were a number of things seized in that search,

12  right?

13  **A.** Yes, there were.

14  **Q.** There's also a lot of political literature laying about

15  the house, right?

16  **A.** It was a book store that carried a lot of political

17  literature.

18  **Q.** Turning your attention to what's been marked for

19  identification as A-204.

20  **A.** That's correct.

21  **Q.** Now, not everything in Mr. Rodgers's residence or

22  literature was about arson?

23  **A.** That's correct.

24  **Q.** Can you identify what's marked as A-204?

25  **A.** A 204 is a document that's titled "198 methods of

1  nonviolent action."

2  **Q.** And where was this located, or where did this come from?

3  **A.** At some place in Mr. Rodgers' home.

4  **Q.** I would move for the admission of A-204?

5       MR. BARTLETT: No objection.

6       THE COURT: Admitted.

7          (Exhibit No. A-204 admitted.)

8  BY MR. FOX:

9  **Q.** So in addition to items about arsons, you have this

10  document, methods of nonviolence action, that's correct?

11  **A.** That's correct.

12  **Q.** So is it fair to say, as you said before, there's lots of

13  different things in this home?

14  **A.** There was a large variety of literature in this house.

15  **Q.** Now, just going back for one second to these checks that

16  we talked about from Ms. Larson, we talked about a check for a

17  bus pass on May 22?

18  **A.** Yes.

19  **Q.** And bus pass on May 19?

20  **A.** That's correct.

21  **Q.** There was no record of bus passes on May 20 or May 21, any

22  evidence of payment for one that you found?

23  **A.** That's correct.

24  **Q.** So is it fair to say, I guess she could have paid cash for

25  it, right, if she needed one?

1   A.   I believe that's how most people probably paid.

2   Q.   She apparently used a check to pay for bus passes?

3   A.   Yes, on some situations, she did.

4   Q.   On the 19th an 22nd of May; is that correct?

5   A.   That's correct.

6   Q.   And this rental car was picked up I believe on the 19th of

7   May?

8   A.   That's correct.   Around noon on the 19th.

9   Q.   And checked in on 6:33, checked in, logged in on May 22?

10  A.   That's correct.

11  Q.   So, is it fair -- I will move on.   Now on direct you

12  talked about a search of Mr. Rodgers' computers, right?

13  A.   That's correct.

14  Q.   And he had a number of computers, right?

15  A.   He had a number of computers and large number of disks and

16  different types of media.

17  Q.   And the FBI has a forensic computer laboratory?

18  A.   Yes.

19  Q.   You brought all these things to the 550 -- someone brought

20  these to the FBI forensic computer laboratory?

21  A.   Yes.

22  Q.   And they did a whole bunch of searches on these things?

23  A.   Yes, searches were done by the agents associated with the

24  case.   The laboratory loads it onto a system that allows us to

25  look at it in a forensic way.

1 **Q.** You yourself did some of the searches?

2 **A.** I did.

3 **Q.** Is it not correct in all of the computers and digital

4 media that you seized, that the FBI seized from Mr. Rodgers's

5 house, there's only one mention of Briana Waters?

6 **A.** That's correct.

7 **Q.** And actually the mention of Ms. Waters comes in the

8 context of some academic article about the environmental

9 movement, right?

10 **A.** Yes, it's in a bibliography concerning a thesis on Earth

11 First.

12 **Q.** The article mentions Ms. Waters' film?

13 **A.** That's referenced in the bibliography.

14 **Q.** That's the only reference on all of Mr. Rodgers' computer

15 media to Ms. Waters?

16 **A.** When I searched Ms. Waters --

17 **Q.** Mr. Rodgers?

18 **A.** Mr. Rodgers' computer media I only found reference to

19 Ms. Waters in that instance. I found one reference to Joseph

20 Dibee, one reference to Ms. Kolar and an article by Lacey

21 Phillabaum. I did not find any connections to any of the

22 other defendants in this case or the Portland arsons.

23 **Q.** But the only reference was someone -- a footnote in an

24 academic article about the environment?

25 **A.** That's correct.

1           THE COURT:  All right.  Let's take the break at this

2     point.  Give you your morning recess.  As always, don't

3     discuss the case.  Take advantage of the break.  Leave your

4     books on the chair.  I will have you back in here in about 15

5     minutes.

6         (Jury not present.)

7           THE COURT:  All right.  If nothing else, we will take

8     the morning recess.

9           THE CLERK:  All rise, Court is in recess.

10        (Morning recess.)

11        (Jury not present.)

12          THE COURT:  All right.  You may be seated.

13        Are we ready to continue?

14          MR. FOX:  Yes, Your Honor.

15          THE COURT:  Bring in the jury.

16        (Jury present.)

17          THE COURT:  You may be seated.

18        Mr. Fox.

19    BY MR. FOX:

20    **Q.**  Resuming where we were, Agent Halla, we were talking about

21    going through Mr. Rodgers' computers?

22    **A.**  Yes.  That's correct.

23    **Q.**  I believe that we've seen a number of copies of the manual

24    "Setting Fires With Electrical Timers"; is that correct?

25    **A.**  That's correct.  I believe we've seen a copy from

1  Mr. Rodgers' computer, and one from the ELF website.

2  **Q.**  Turning your attention to that manual and the page out of

3  it that's been admitted as Exhibit 402.  There's a section on

4  creating a clean room, is there not?

5  **A.**  There is.

6  **Q.**  Isn't it correct that it says, "To set up a clean room,

7  choose a location where your hair and skin flakes are not

8  already floating around."  Is that right?

9  **A.**  That's what the text says.

10  **Q.**  Basically, this manual is like a how-to manual on how to

11  build these things?

12  **A.**  It gives advice on those matters.

13  **Q.**  Sure.  One of the things that Mr. Rodgers -- is it

14  Mr. Meyerhoff who also coauthored this with Mr. Rodgers?

15  **A.**  He did contribute to portions of it, I understand.

16  **Q.**  One of their pieces of advice is that you are supposed to

17  do this some place other than where you live, right?

18  **A.**  That is what the manual says, but we know they didn't

19  always do that.  The clean room for the Susanville arson was

20  at Mr. Dibee's residence.

21  **Q.**  But according to the manual, you are not supposed to do it

22  that way, right?

23  **A.**  I believe the manual describes ideal situations, yes.

24  **Q.**  Didn't Ms. Kolar testify yesterday that she and Mr. Dibee

25  didn't know there was going to be an arson -- testify on

1  Thursday -- that they didn't know there was going to be an

2  arson until they got down to Susanville?  Is that your memory?

3  **A.**  I believe that was Ms. Kolar's testimony, it was her

4  understanding that her and Mr. Dibee did not know that.

5  **Q.**  Then also on Mr. Rodgers' computer there was something

6  that's been admitted into evidence as 515I and that is a

7  document called, "Planning the Raid," right?

8  **A.**  That's correct.

9  **Q.**  That also was like a how-to manual on how to do these

10  types of actions, right?

11  **A.**  I don't know what Mr. Rodgers' intent was but --

12  **Q.**  That's what it appears to be?

13  **A.**  That's what it appears to be.

14  **Q.**  Again, you didn't find any of these manuals at Briana

15  Waters' house, right?

16  **A.**  I think I have stated that we did not search Ms. Waters'

17  house.

18  **Q.**  They weren't laying out on the coffee table when you were

19  in the house?

20  **A.**  I was never inside her house.

21  **Q.**  They weren't in the back yard by the garden chairs?

22  **A.**  I did not see them outside.

23  **Q.**  Now, this book "Planning the Raid," it actually recommends

24  to make a timeline, right?

25  **A.**  It does.

1 **Q.** The manual talks about, does it not, "Electrical timers

2 and igniters should be built the week before the action so

3 there is no rush to assemble them," right?

4 **A.** That's what this says.

5 **Q.** It also says, "Plan to have all preparations done at least

6 24 hours before the raid," right?

7 **A.** That's what this says.

8 **Q.** It also says, "This includes getting the vehicle ready,

9 wiping everything free of fingerprints and getting the radio

10 in working order," right?

11 **A.** That's correct.

12 **Q.** The final 24 hours are supposed to be for sleeping in

13 late, right?

14 **A.** That's correct.

15 **Q.** Eating a relaxed dinner together, right?

16 **A.** That's correct.

17 **Q.** And reviewing the plan one last time, right?

18 **A.** That's correct.

19 **Q.** So Mr. Rodgers' how-to manual says to get the car ready

20 before the day of the action, right?

21 **A.** Yes.  What I found significant about these two documents,

22 Chapter 5 and Chapter 6 that's been entered into evidence, is

23 that, according to the computer forensics, it was created

24 after the UW arson.

25     It was created between July 14th and July 17th.  Some of

1    the portions in this I thought were significant because

2    understanding -- and the way I read it is that I think

3    Mr. Rodgers -- I suspect Mr. Rodgers learned some things from

4    the UW arson and incorporated it into this text.  Earlier

5    versions of these chapters do not have some of this material

6    that's in these.

7    **Q.**  You don't know what he may have written out by hand and

8    destroyed?

9    **A.**  That's correct.

10   **Q.**  The next page has a suggested timeline, does it not?

11   **A.**  That's correct.  That was one of the things I found

12   significant in this chapter was this timeline and the idea of

13   eating dinner so late at night, which is -- Ms. Kolar and

14   Ms. Phillabaum talked about when they meet at Greenlake Bar &

15   Grill.  I have not seen this timeline in any other version of

16   the manual that was written before the UW arson.

17   **Q.**  Sure.  Well, the point is that if you follow this timeline

18   of the ideal arrival time as 1:00 a.m., the hangout time at

19   the beginning starts at 5 p.m.?

20   **A.**  That's what the manual says.

21   **Q.**  Sure.  And this includes a 90-minute drive, right?  A

22   hypothetical driving time of 90 minutes, right?

23   **A.**  That's what the text says.

24   **Q.**  The next section, "Getting the Vehicle Ready" says, "Get

25   the vehicle ready 36 hours in advance," right?

1  **A.**  That's correct.  And I found this significant also because

2  I did not see this referenced, the 36 hours, in earlier

3  chapters that, according to the forensics, were created prior

4  the UW arson.

5  **Q.**  But that's what his manual recommends, 36 hours in

6  advance?

7  **A.**  Yes.

8  **Q.**  There's also -- in 502, there was another document that

9  was admitted, 515-D. One of the pages of the document says,

10  "Beware of automatic vehicle locators," right?

11  **A.**  That's correct.

12  **Q.**  And it also talks about Onstar systems, right, which are

13  tracking systems, right?

14  **A.**  Yes, Onstar is associated with GM vehicles.

15  **Q.**  In fact, sometimes in rental cars -- they have tracking

16  devices on rental cars, right?

17  **A.**  I have no personal knowledge of that.  That may be true.

18  **Q.**  Is it fair to say that Olympia is about 60 miles from

19  Seattle?

20  **A.**  That's an approximation.

21  **Q.**  The Greenlake Bar & Grill is on the north side of Seattle,

22  right?

23  **A.**  That's correct.

24  **Q.**  Is it fair to say that the center of Olympia might be

25  Capitol Way South and Fourth Avenue West?

1   **A.**  I wouldn't know where the center of the city is.

2   **Q.**  It's kind of the center of downtown, right?

3   **A.**  That's correct.

4   **Q.**  So if you go from the center of Olympia to the north side

5   of Seattle, what's your estimate about mileage?

6   **A.**  I drove a route leaving from Mr. Corrina's house, directly

7   to the Greenlake Bar & Grill, drove directly to the UW

8   horticulture center to 44th Street, where we believe the

9   vehicle was parked.

10      I then drove back to Greenlake Park, and then drove back

11   to Mr. Corrina's house, driving the most efficient route that

12   I could come up with, and it came out to 129 miles.

13   **Q.**  What's the distance from Mr. Corrina's house to the Center

14   for Urban Horticulture?

15   **A.**  I didn't drive that exact distance. I drove the route and

16   just recorded the total distance.

17   **Q.**  So do you know what each part of that trip took, how long?

18   **A.**  I didn't time it, no.

19   **Q.**  Let's say hypothetically that it was 60 plus miles from

20   the center of Olympia, from the center of downtown, to the

21   Greenlake Bar & Grill.

22      MR. BARTLETT: Objection, Your Honor. He's indicated

23   what he knows. Clearly, if it was 65 miles, it would be over

24   what he's just described the route he took. So we are going

25   to get into a hypothetical that he has no basis on.

1      MR. FOX:  I will move on.  I will ask another

2  question.

3  BY MR. FOX:

4  **Q.**  Why don't you look at what's been marked for

5  identification as A-209.

6      Can you identify that?

7  **A.**  This is a Mapquest written from Capitol Way South and

8  Fourth Avenue to 3501 NE 41st Street.

9  **Q.**  The second address, 3501 NE 41st Street, that's the

10  address for the Center for Urban Horticulture?

11  **A.**  I don't personally know that.

12  **Q.**  Well, look at A-208.  Let's go back.  Hypothetically, if

13  3501 NE 41st is the address for Center for Urban Horticulture,

14  how much distance is there between Capitol Way and Fourth

15  Avenue West?

16      MR. BARTLETT:  Objection.  He's indicated he doesn't

17  know the distances.  He's indicated what he does know.  He

18  can't talk about hypotheticals on guessing what mileage is.

19      THE COURT:  Mr. Fox, let me handle this.  I don't

20  know what you are getting at.  Are you getting at -- he's

21  given you what he drove it to be.

22      MR. FOX:  Well, I am inquiring as to what the

23  distances between Olympia and Center for Urban Horticulture

24  are.

25      THE COURT:  It's not a hypothetical.  If he knows

1    exactly, he can give you that.

2          MR. FOX:  Sure.  Okay.  I would offer, by the way,

3    A-209 for illustrative purposes only.

4          MR. BARTLETT:  It isn't for illustrative.  He wants

5    the Mapquest information in, Your Honor, and he can get it in.

6    It's just not through this witness.  It's irrelevant through

7    this witness.

8          THE COURT:  Mr. Bartlett, let me have you go at that

9    another way.

10          MR. FOX:  Okay.

11   BY MR. FOX:

12   **Q.**  Did you ever clock the mileage between Olympia and the

13   Center for Urban Horticulture?

14   **A.**  No, I did not.

15   **Q.**  What is your best estimate as to the distance?

16   **A.**  I would estimate 60 miles, but I have no reason to know

17   whether that would be correct or not.

18   **Q.**  Is it fair to say that the Greenlake Bar & Grill is north

19   of the Center for Urban Horticulture?

20   **A.**  It's approximately northwest.

21   **Q.**  How far, based upon your best estimate?

22   **A.**  Best estimate, three to four miles.

23   **Q.**  So, under normal traffic conditions, driving from Olympia

24   to the Center for Urban Horticulture, if you go the speed

25   limit, how long do you think it would take on a normal -- with

1 normal traffic?

2 **A.** I don't know what normal traffic from one day to the next

3 is. I would be sitting in traffic for an hour, so I don't

4 know what normal traffic is.

5 **Q.** Let's say you drove it 55, 60 miles per hour -- let's say

6 you drove a little under the speed limit, how long would it

7 take to go from Olympia to the Center for Urban Horticulture?

8 **A.** I would guess approximately an hour-and-a-half.

9 **Q.** May is boating season, right?

10 **A.** I don't know when boating season is.

11 **Q.** If you take the most efficient route from Olympia to the

12 Center for Urban Horticulture, first of all, you have to go

13 through Tacoma, correct?

14 **A.** Yes.

15 **Q.** You go on I-5, right?

16 **A.** That would be the most efficient route.

17 **Q.** There might be -- possibly there might be traffic outside

18 the Tacoma Dome? Don't know?

19 **A.** Fort Lewis, Tacoma Dome, yes.

20 **Q.** You have to go through downtown Seattle, right?

21 **A.** That's correct, unless you came in from the east side.

22 **Q.** Okay. But the most efficient route would be through

23 downtown or through the east side?

24 **A.** Through downtown.

25 **Q.** There might be traffic in downtown Seattle, right?

1  **A.**  That's correct.

2  **Q.**  You have to go on 520, right?

3  **A.**  That's not how I would go.

4  **Q.**  How would you go?

5  **A.**  I would take 45th and go straight, east on 45th.

6  **Q.**  Okay.  There might be some event in the University

7  District, right?

8  **A.**  Possible.

9  **Q.**  There might be traffic there.  With traffic, it could be

10  more than an hour-and-a-half?

11  **A.**  Absolutely.

12  **Q.**  So if you were going from Olympia to the Center for Urban

13  Horticulture and taking bags of fuel and putting them by a

14  dumpster, can you time how long it would take to carry the

15  bags of fuel to the dumpster we saw the other day?

16  **A.**  From what starting point?

17  **Q.**  From wherever -- if you end up at the Center for Urban

18  Horticulture, in that area, and you wanted to walk or drive to

19  where that dumpster was, where Ms. Phillabaum said they had

20  stored some of the fuel ahead of time, do you know how long

21  that would take to carry that fuel?

22  **A.**  No, I don't.

23  **Q.**  Would it be fair to say it could take 15 minutes or so?

24  **A.**  It's possible.  I have no idea how long it would take.

25  **Q.**  Then you have to drive from the Center for Urban

1  Horticulture to the Greenlake Bar & Grill?

2  **A.**  If that's your destination, yes.

3  **Q.**  It might be easy-going, there might be traffic, right?

4  **A.**  That's correct.

5  **Q.**  Actually, if you drive across Seattle, Seattle sometimes

6  is difficult to go east to west?

7  **A.**  It's difficult to go many directions in Seattle.

8  **Q.**  It would take what another 10, 15 minutes to get to the

9  Greenlake Bar & Grill?

10  **A.**  I have no way to estimate what it might be.

11  **Q.**  You've never driven from the Center for Urban Horticulture

12  to the Greenlake Bar and Grill?

13  **A.**  I did on two occasions.

14  **Q.**  Do you remember how long it took you?

15  **A.**  I wasn't timing it, but I would estimate 10, 15 minutes.

16  **Q.**  If it was an hour-and-a-half in good traffic, two hours in

17  heavy traffic to the Center for Urban Horticulture, another 15

18  minutes or so, 10, 15 minutes to go to the dumpsters, and then

19  another 10 minutes to the Greenlake Bar & Grill, we are

20  talking two-and-a-half hours or so?

21  **A.**  That's true.  I don't know that we know at what time the

22  fuel was dropped off by those containers.  If it was earlier

23  in the day on a previous day, we don't know.

24  **Q.**  We don't know.  But let's say this had taken place; we are

25  talking maybe two hours, two-and-a-half hours?

1   **A.** It's possible.

2   **Q.** So if your target to get to the Greenlake Bar & Grill was

3 approximately 8:00, what time do you approximately have to

4 leave Olympia?

5   **A.** I don't know that that was a target time that they were

6 looking to get there. My understanding was late in the

7 evening. That could be any time.

8   **Q.** Sure. Wasn't there testimony that it was 8:00 maybe, I

9 think is what Ms. Kolar said?

10   **A.** I'd have to review the transcripts.

11   **Q.** You don't remember? Yesterday, you testified that you got

12 Ms. Kolar's bank records from the Washington State Employees

13 Credit Union, right?

14   **A.** That's correct.

15   **Q.** You noticed that there were two transactions on her credit

16 card statement that were listed as being May 21st, right?

17   **A.** That's correct.

18   **Q.** But one was a Kinko's transaction and that actually took

19 place on May 19th, right?

20   **A.** Yes. A little over midnight, past midnight.

21   **Q.** Do you have A-170 in front of you?

22   **A.** What was the number?

23   **Q.** A-170. Can you please identify that?

24   **A.** This is a letter from FedEx/Kinko's Company in response to

25 a subpoena that was sent to them.

1  **Q.** There are some records attached to that as well?

2  **A.** Yes, as a certification of business records and what looks

3  to be a computer screen printout.

4  MR. FOX:  I would offer A-170.

5  MR. BARTLETT:  No objection.

6  THE COURT:  Admitted.

7  (Exhibit No. A-170 admitted.)

8  BY MR. FOX:

9  **Q.** This is the document that you referred to, to find out

10  that the credit card or the ATM transaction took place on May

11  19th at 12:10 a.m.?

12  **A.** Yes, that's correct.

13  **Q.** Even though the bank bill or bank statement says it was

14  posted on the 21st, right?

15  **A.** Yes, the bank statement is somewhat vague.  It doesn't

16  tell us when it was posted or what the transaction date was.

17  **Q.** You also testified, did you not, that you attempted to

18  find out the timing of the other transaction that was posted

19  on May 21st, right?

20  **A.** That's correct.

21  **Q.** This was a transaction with Ralph's Thriftway in Olympia?

22  **A.** That's correct.

23  **Q.** A grocery store in Olympia?

24  **A.** Yeah, it's a grocery store that's a couple blocks from

25  Mr. Rodgers' house.

1  **Q.** Okay. You said that you had some difficulties finding the

2  exact -- difficulties finding the records for that

3  transaction?

4  **A.** Yes, the store, because of the change in their computer

5  systems, was not able to tell us what time the transaction had

6  taken place. They had given us a data tape that they

7  indicated may have had some backup information, but it turned

8  out to be a corrupt tape and we weren't able to pull any data

9  off it.

10  **Q.** Isn't it correct that Ralph's actually does have

11  information about the timing of that transaction?

12  **A.** I am not aware of any.

13  **Q.** Well, I will hand you what's been marked for

14  identification as A-212. Take a look at that for a second and

15  identify it. Can you identify that for the record?

16  **A.** This is a response to a subpoena from Ralph's Thriftway.

17  **Q.** What else does it contain?

18  **A.** It has Ralph Thriftway's -- it looks like register

19  records.

20       MR. FOX: I would offer what's been marked for

21  identification as A-212.

22       MR. BARTLETT: Just for the record to clarify, Your

23  Honor. It's a subpoena from Mr. Fox. It isn't a subpoena

24  that Special Agent Halla issued.

25       MR. FOX: I would offer these records.

1    MR. BARTLETT:  No objection.

2    THE COURT:  Admitted.

3              (Exhibit No. A-212 admitted.)

4  BY MR. FOX:

5  Q.  Turning your attention to the third page -- let's back up

6  for one second.

7       The last two pages of that document.  Why don't you take a

8  look.  This appears to be a duplicate of the bank records that

9  were introduced yesterday?

10  A.  That's correct.

11  Q.  And that's for account number 2633428?

12  A.  It's blocked on the screen.  I can't see the account

13  number.  There you go, 2633428.

14  Q.  And then the second page, or the next page, references the

15  transactions we were talking about yesterday; is that correct?

16  A.  That's correct.

17  Q.  May 21st, $13.91?

18  A.  That's correct.

19  Q.  $13.91, right there, May 21st, right?

20       Now, let's turn back to the third page of this document,

21  and this appears to be a listing of all the swipes, customer

22  detail by lane reports at Ralph's Thriftway, right?

23  A.  That's correct.

24  Q.  If you go down to the highlighted portions, it says debit,

25  5-20-01, May 20, 2001?

1  A.  That's correct.

2  Q.  And the timing is 19:12?  That's military time?

3  A.  Correct.

4  Q.  That's what time on standard time?

5  A.  It would be 7:12 p.m.

6  Q.  There's a transaction for $13.91?

7  A.  That's correct.

8  Q.  Then the card number is 2633428; is that correct?

9  A.  That's correct.

10  Q.  That's the same account that Briana Waters' card is on

11  from the Washington State Employees Credit Union?

12  A.  I don't know her card number offhand.

13  Q.  Well, it was the number you just read before.

14  A.  It contains that portion of her account number.

15  Q.  Ms. Waters' debit card was used at 7:12 p.m. on May 20,

16  2001; is that correct?

17  A.  That's what these records say.

18  Q.  Is it fair to say that it would be very difficult for her

19  to be in Seattle at 8 p.m. at the Greenlake Bar & Grill if she

20  drove the speed limit?

21  A.  If they met at 8 p.m. that would be a hard time to reach.

22  Q.  Sure.  Even if it was 8:15 p.m. it would be hard?

23  A.  That's correct.

24  Q.  Even if you made a stop at the dumpsters, or especially if

25  you made a stop at the dumpsters; is that correct?

1  **A.**  That's correct.

2       MR. FOX:  I have no further questions.

3       MR. BARTLETT:  Just a few.

4                    REDIRECT EXAMINATION

5  BY MR. BARTLETT:

6  **Q.**  Special Agent Halla, why don't you tell the members of the

7  jury, what did you try to do to find these records?

8       You have never seen these records before, correct?

9  **A.**  I have not.  I talked to the owner of Ralph's Thriftway

10  and explained to him what we were looking for.  I actually met

11  with him on two occasions.  The second time is when they

12  pulled out these data tapes that they thought would have had

13  the register receipts.

14  **Q.**  So it isn't something that you had this record and you've

15  been hiding it from anybody?

16  **A.**  Absolutely not.  I searched hard for these records and I'm

17  a little perturbed that I did not find out about them.

18  **Q.**  I want to ask, just because it was a little confusing in

19  my mind.  During cross-examination, there was some discussion

20  about the letter that you found when you went into Justin

21  Solondz' cabin at the time of the search.

22       Do you remember those questions?

23  **A.**  Yes, I do.

24  **Q.**  We read this letter, and as part of this letter it talks

25  about this -- kind of the first bullet point, there are

1 garbage bags of your clothes in the attic space above the

2 living room, which is accessed by way of the sleeping loft; do

3 you see that?

4 **A.** Yes, I do.

5 **Q.** You actually introduced and went through garbage bags of

6 clothes. Is this the same garbage bags of clothes?

7 **A.** No, it's not. When I talked to Tonie Woodman, she was

8 very specific about where her personal belongings were, and we

9 did not want to search her personal belongings, and she had a

10 loft, and we looked up there and, based on what we saw from

11 peripheral view, it looked like her items. So we did not

12 search the loft as that was not -- our search warrant wasn't

13 to cover her items.

14 Where we found the bag that had the clothes and the shower

15 caps was in a back room on the first level where we were

16 finding other items that belonged to Justin Solondz.

17 **Q.** During cross-examination, there was a discussion about the

18 interview with Jennifer Kolar that occurred on March 6th of

19 2006. Do you recall that?

20 **A.** That's correct.

21 **Q.** That was the first interview after December 16th where you

22 discussed in depth the University of Washington arson; is that

23 correct?

24 **A.** That's correct.

25 **Q.** Was anything happening the following week that prompted

1  you to bring in Ms. Kolar at that point in time?

2  **A.**  We were going to be going to the Grand Jury and present

3  evidence regarding Ms. Waters.

4  **Q.**  There was a number of questions about Capitol Hill Girl,

5  her punk boyfriend, Crazy Dan, and your questions or lack of

6  questions with regard to follow-up discussions with Ms. Kolar.

7  Do you remember those questions during cross-examination?

8  **A.**  I do.

9  **Q.**  Can you explain to the members of the jury what was going

10  on with regard to your investigation?  Not just kind of the

11  narrow view; the overall view of the investigation.

12  **A.**  We were investigating, you know, every name that was given

13  to us, to find out who they were and determine if they had any

14  involvement in any of these crimes, whether it was

15  specifically at the University of Washington arson, if they

16  were involved in some of the book club meetings.  So we were

17  chasing down every lead that we could.

18  We determined that Crazy Dan was likely Jake Ferguson, who

19  we had interviewed numerous times earlier through 2004, 2005.

20  He had been involved in one reconnoissance trip with the

21  Jefferson Poplar arson but had no information --

22  MR. FOX:  I object on hearsay.

23  THE COURT:  He's saying what he was doing.  You asked

24  the question as to why.

25  MR. FOX:  But what Jake Ferguson says is hearsay.

1    THE COURT:  Don't go into what he said, but what you

2 were doing.

3 BY MR. BARTLETT:

4 **Q.**  Did you have direct discussions with Jake Ferguson as to

5 what actions he was involved in?

6 **A.**  Yes, I did.

7 **Q.**  With regard to his -- the information he provided to you,

8 did you make at least a tentative determination on whether or

9 not he was involved in the University of Washington arson?

10    MR. FOX:  Again, Your Honor, it calls for hearsay.

11    MR. BARTLETT:  It doesn't.

12    THE COURT:  He can say what he did.

13    MR. BARTLETT:  What's in his mind.

14    THE COURT:  You can say what you did.

15 **A.**  I determined that Jake Ferguson was not involved in the UW

16 arson.

17 BY MR. BARTLETT:

18 **Q.**  Ms. Kolar testified and you described that at some point

19 in early January, she identified a picture of Suzanne Savoie

20 as being Capitol Hill Girl.  Do you remember that?

21 **A.**  Yes.  She associated with Horace the butcher, the daughter

22 who we associated with Capitol Hill Girl.

23 **Q.**  With regard to Suzanne Savoie, was she the subject of any

24 investigation in the District of Oregon?

25 **A.**  Yes.  The District of Oregon was investigating her role in

1 the Jefferson Poplar arson and, I believe, the arson of

2 Superior Lumber. At the Jefferson Poplar arson --

3 **Q.** Without going into -- the District of Oregon was

4 investigating -- and I believe you described that on

5 approximately January 20th of 2006, the District of Oregon

6 actually returned an Indictment?

7 **A.** They did. They did indict.

8 **Q.** After that Indictment, was Ms. Savoie arrested and in fact

9 made the decision with regard to cooperation or lack of

10 cooperation?

11 **A.** Yes, Ms. Savoie decided to cooperate.

12 **Q.** And before the end of -- before the beginning of February,

13 were you aware of the contents of her cooperation, the subject

14 matter that she had disclosed to the investigators in Oregon?

15 **A.** I did.

16 **Q.** As a result of those other leads, were you able, in your

17 mind, to answer questions with regard to Crazy Dan, Capitol

18 Hill Girl, her punk boyfriend, without directly talking with

19 Ms. Kolar?

20 **A.** I did.

21       MR. BARTLETT: Nothing else, Your Honor.

22       THE COURT: Anything further?

23                 RECROSS-EXAMINATION

24 BY MR. FOX:

25 **Q.** The bag of clothing that you say you found in the back

1  room, Agent Halla?

2  **A.**  That's correct.

3  **Q.**  It was just left there, right?

4  **A.**  The back room -- there was a back room and then kind of

5  what I would describe as a closet space off in -- there was a

6  bunch of storage tubs, garbage bags, boxes.  It was literally

7  up to our waist, and we had to pull each one out separately to

8  search it.

9  **Q.**  It wasn't buried in the backyard in the dirt?

10  **A.**  No, it was not.

11          MR. FOX:  I have no further questions.

12          MR. BARTLETT:  Nothing further, Your Honor.

13          THE COURT:  All right, you may step down.

14          MR. BARTLETT:  Your Honor, at this time the United

15  States rests.

16          MR. FOX:  Your Honor, we have some matters we should

17  take up outside of the presence of the jury.

18          THE COURT:  Let me have you just step out for a

19  minute.  Leave your books on the chair and don't discuss the

20  case.

21     (Jury not present.)

22          THE COURT:  You may be seated.

23     Mr. Fox.

24          MR. FOX:  Your Honor, we would make a motion to

25  dismiss based on lack of sufficiency of the evidence.  There's

a couple parts to this.

At least for Count 1, the conspiracy count, we believe that the Government's proof differs materially from the allegation of conspiracy as alleged in the Indictment, in the Fourth Superseding Indictment, and that they haven't proven that Ms. Waters was part of the conspiracy as they alleged in the Indictment.

They may have offered some evidence that she was part of another conspiracy, but as for the conspiracy count alleged, they have simply failed to prove that.  So we believe that as regards to Count 1, there's a lack of sufficient evidence.

With regards to the other counts, we also believe there's insufficient evidence, and we would ask that the Court dismiss this Indictment to this point.

All right.

MR. BARTLETT:  Your Honor, with regard to the conspiracy, I think the evidence is fairly compelling.  The fact that Ms. Waters is a member of this conspiracy after it begins and even before it ended is of no moment to the Ninth Circuit and the Supreme Court.

In addition, I would direct the Court's attention to actually an answer given by Ms. Kolar on cross-examination, when Mr. Fox was asking her about whether she really believed in genetic engineering, and in substance her answer was:  "As a scientist, I was actually kind of mixed about it, but what I

1  believed in was in this movement's ability to have a

2  successful operation, and that's why I went on the UW arson,

3  and that's why I went to Susanville, because I believed in the

4  overall goal of this group's activities, and that's what I

5  wanted to support, and that's why there's one conspiracy in

6  this case, because that's how everybody felt."

7      If you look at the communiqués that are issued after each

8  and every one, they are dependent upon each other.  The

9  University of Washington communiqué referenced in the

10  Jefferson Poplar, the Superior Lumber communiqué references

11  other actions being done, and other -- by ELF and ALF.

12      The entire ability of ELF and ALF to impact, at least in

13  their mind, was dependant on multiple actions over multiple

14  times over multiple locations.  It is a single conspiracy.

15          THE COURT:  All right.  Anything else to add?

16          MR. FOX:  Only if Your Honor can go back and look at

17  the Indictment.  It is very different from the type of

18  evidence that's been presented in this case.  It's a

19  completely different set of charges.  There's some overlap for

20  one action, but other than that, the Government has not shown

21  any evidence that puts Ms. Waters in the conspiracy that they

22  alleged in the Fourth Superseding Indictment.

23          THE COURT:  All right.  Well, the Court has heard the

24  evidence overall in terms of the conspiracy and, of course,

25  the testimony of witnesses as to Ms. Waters' involvement.

What the Court is facing here is a motion as to whether or not

a prima facie case has been made as to whether this matter

should go forward and whether the jury that's here should be

the ones to determine whether these matters did in fact take

place.

The Court has already ruled on the conspiracy matter as to

the one versus numerous, and the Court is not going to change

the ruling on that because my conclusion was that it was a one

conspiracy thing, and the various acts that have been talked

about tend to show or -- it doesn't show, but it raises the

question as to her involvement and, if so, when. But as to

what the intent, if you will, of the movement -- call it what

you will -- was, the Court is satisfied that this matter

should go forward, so I am denying the motion.

MR. FOX: Your Honor, two other points. The Court

had made earlier rulings about the definition of destructive

devices, and the Court, in its pretrial orders, had made a

ruling as to what the Court is going to instruct the jury on

about destructive devices.

I would ask the Court, based upon the testimony that the

Court has heard from the scientists involved in this case as

opposed to the law enforcement officers' opinion, that the

Court change the ruling that it previously made based upon the

evidence that we've heard.

On that basis, if the Court changes the definition that it

1  says it is going to give, I would submit that there's

2  insufficient evidence that these are destructive devices, and

3  I would ask the Court to find, as a matter of law, that these

4  are not incendiary bombs and, therefore, dismiss the 924(c)

5  charge.

6          THE COURT:  No, I think it comports with the -- the

7  jury will have to make the final decision as to whether or not

8  it fits that definition.  The definition in the statute will

9  be set forth telling them what an incendiary bomb is, and they

10  either have to find it fits within that or it does not.

11          MR. FOX:  Well, I am asking you to change the ruling

12  that you made saying what the definition is to comport with

13  the evidence that we've heard, which I respectfully submit is

14  different than what the Court said earlier.

15          THE COURT:  It's noted, but I am going to let my

16  ruling stand.

17          MR. FOX:  The final issue, and we might as well

18  address the motion I filed last night on those two exhibits

19  because part of my motion involves a motion for a mistrial, as

20  well as striking the exhibits or a curative instruction.

21      I don't know if the Court wants to address it at this

22  time.

23          THE COURT:  You are talking about 402 and 612?

24          MR. FOX:  Right.  We objected to those exhibits

25  coming in at all.  The inflammatory nature of those exhibits

1 is so great to talk about in the context of this case, after

2 hearing the evidence about University of Washington and

3 Susanville, to start introducing or to underscore to the jury

4 repetitively things about Disneyland and the Statue of Liberty

5 written by someone who isn't in court, has never been charged,

6 based upon some fine print articles and a collection of

7 articles that Ms. Kolar claims were given to her by Ms. Waters

8 but were never read, it's so inflammatory, so prejudicial,

9 that we would ask the Court first to declare a mistrial.

10     Secondly, to strike those portions of those articles as

11 being irrelevant and being overly prejudicial under 403 as

12 being hearsay, as we've argued before or, in the alternative,

13 to give a curative instruction to the jury in the manner I set

14 out.

15     I don't want this trial to be about Disneyland.  The trial

16 is about the University of Washington and whether Ms. Waters

17 was involved, and the jury is going to have the testimony of

18 Ms. Kolar, and they have to judge her credibility, and

19 Ms. Phillabaum's, but to parade around as the prosecutor has

20 done the other -- something that someone who's not on trial

21 wrote is really misleading to the jury and prejudices them in

22 this post-911 climate.

23     THE COURT:  All right.  Respond to that.

24     MR. BARTLETT:  Well, Your Honor, Mr. Bloom is

25 complaining about the selections that his own client made --

1   excuse me, Mr. Fox, I apologize -- Mr. Fox is complaining

2   about the selections his own client made to provide to her

3   coconspirator.  She made the bed that she's now lying in.  She

4   made the choices.  She chose these articles.  She provided

5   them to Jennifer Kolar.  That is the reality.

6       This isn't a case where we went to somebody's home, where

7   they had thousands and thousands of books and we chose three

8   or four to misrepresent what they thought was important.  She

9   has already told us she thought these items were important.

10   She's already told us that she wanted a coconspirator to read

11   them so they could discuss them together.

12       There's nothing at all either wrong or -- in fact, there's

13   nothing that could be more probative of what is in Briana

14   Waters' mind during this exact time period than these articles

15   and the words that are expressed within them.

16       With regard to what was on the ELF/ALF website is relevant

17   for two reasons.  It shows what was in the mind-set of the

18   organization that was claiming credit for this arson, and in

19   addition, it shows the mind-set of ELF was exactly the

20   mind-set of this defendant at that exact point in time.

21       THE COURT:  Well, let me put it this way.  The Court

22   has already ruled on the exhibit, and I admitted the exhibit

23   and I admitted it because of the way it came, because the

24   evidence was showing that the Defendant gave this to the

25   witness.  That was one of the reasons.

1    Now, as to the cautionary -- so I am going to let my
2  ruling stand.  It will either be sufficient -- the Ninth
3  Circuit should look at it -- or it won't be sufficient.  I
4  don't see any basis for that to grant any mistrial at this
5  point on anything that I have heard.

6    If the Ninth Circuit would see things different than I
7  have seen, of course they know what they can do with the whole
8  case.  I have to call them as I see them, and they have to do
9  their job as they see it.

10   The other thing that's brought up here is about giving a
11 cautionary instruction.  I don't see at this point the need to
12 give a cautionary instruction.  My instruction would intend to
13 cover how they are to look at these folks that testified
14 against this Defendant and how to view the evidence.  That's
15 their job.

16   So I am not going to filter it through and through as we
17 go through this case.  I am going to let my ruling stand, and
18 we'll move forward with that explanation.  You've made your
19 record.  I guess we are talking about when we are ready to get
20 going here.  We have about 25 minutes.  I don't know who you
21 are going with first.

22       MR. BLOOM:  We are ready to get going with Agent
23 Torres, but also we have two very short witnesses who are
24 going to meet us at lunch time, and I would like to ask to
25 interrupt Agent Torres in order to put them on.

1    MR. BARTLETT:  If I could be briefly heard, Your
2  Honor.  I am scratching my head as to the relevance of Special
3  Agent Tony Torres' testimony.
4     Prior to trial, in their -- I believe it was their trial
5  brief or maybe their motion in limine, the defense indicated
6  that no witness could be called strictly to be impeached.  I
7  understand that.  So I am merely asking for an offer of proof
8  as to what is Special Agent Tony Torres being called to
9  testify regarding.
10    THE COURT:  Well, you can speak to that.  I don't
11 want to assume anything.
12    MR. BLOOM:  You are asking me to provide an offer of
13 proof?
14    THE COURT:  Yes.
15    MR. BLOOM:  He's going to testify about the contacts
16 with Ms. Phillabaum, Ms. Kolar, Mr. Corrina, and other matters
17 that are not about impeaching Mr. Torres.  There may also be,
18 depending upon what his testimony is -- I may want to impeach
19 him, but that's not the purpose of calling him.  I frankly --
20    THE COURT:  Is this about the 302 mainly, is that
21 what we are talking about?
22    MR. BLOOM:  There may be some discussion about his
23 preparation of the 302, but that's not the import of it.  But
24 I do want to point out, at no point did we ask for an offer of
25 proof as to any of their witnesses.  I am very troubled by

1  their asking for that, A, and the Court requiring it.

2      I have given it because the Court has asked me to do it,

3  but we've had enough problems.  We are trying to get witnesses

4  here.  Ms. Waters is indigent.  Because of the fact that she's

5  indigent, we have had to go through the Court.  For example,

6  with Mr. Carr, the New York Times reporter.  If she had money,

7  he'd have been here testifying.  We wouldn't have had to talk

8  to the Court at all about it.

9          THE COURT:  Well, I would still have to deal with the

10  nature of the testimony.  I told you that was not the issue as

11  to what witnesses she should call.  I had made a ruling on

12  this, and that's why I said I wasn't going to issue that.

13          MR. BLOOM:  No, what I was pointing out was that the

14  Court would not have had to make a ruling at all had

15  Ms. Waters not been indigent, that we would have just called

16  him as a witness, and if there was an objection during his

17  testimony --

18          THE COURT:  Well, we are going far afield now.  Let's

19  get back to Mr. Torres.  We are ready to proceed with him?

20          MR. BLOOM:  I am.

21          THE COURT:  Then you may call him.

22          MR. BARTLETT:  Your Honor, I guess I am a little

23  confused.  He says that he wants to call him about contacts.

24  My understanding is there's no contact between Tony Torres and

25  any of the individuals that he's mentioned, outside the

context of the 302 interview.

MR. BLOOM:  It's in the context of an interview.
It's not a 302 interview.  It's an interview, and if there's a
302 involved as well --

THE COURT:  Let's have Mr. Torres.  Are we ready to
proceed with him?

MR. BLOOM:  I think so, if he's here.

THE COURT:  All right.  Bring him in.

(Jury present.)

THE COURT:  All right.  You may be seated.

The Government has rested as you now know.  The defense
will begin their case.

MR. BLOOM:  We call as our first witness, Special
Agent Anthony Torres.

THE COURT:  Let Mr. Torres -- let me have you come
forward and be sworn.

ANTHONY TORRES, called as a witness, duly sworn.

DIRECT EXAMINATION

BY MR. BLOOM:

Q.  Could you please state your name and your employment and
-- good morning.

I am sorry.  Good morning to you first.

A.  Good morning.  My name is Anthony Torres.  I am a
supervisory agent with the FBI.

Q.  How long have you been with the FBI?

1   **A.**  Just over 11 years.

2   **Q.**  Have you and I ever met or spoken in any way?

3   **A.**  No, we have not.

4   **Q.**  Was it communicated to you at some point that we would

5  like to speak to you?

6   **A.**  Yes.

7   **Q.**  Did you agree to do that or not?

8   **A.**  I agreed to come here and speak with you here today.

9   **Q.**  I am sorry?

10   **A.**  I agreed to come and talk to you here today.

11   **Q.**  You agreed to come testify?

12   **A.**  That's correct.

13   **Q.**  Was there a previous time where it was communicated to you

14  that we would like to interview you some months ago?

15   **A.**  Yes, that's correct.

16   **Q.**  As to that request, did you agree to that or not?

17   **A.**  No, I preferred to talk to you under oath in front of a

18  jury in a courtroom.  That was my preference.

19   **Q.**  So you did not agree to talk to us?

20   **A.**  That's correct.

21   **Q.**  Now, the University of Washington arson on May 20th, 21st,

22  of 2001, you are familiar with that?

23   **A.**  Yes, I am.

24   **Q.**  If it's more convenient, maybe if you put the microphone

25  in front of you, whatever.  Just make yourself comfortable so

1  you will be able to speak through the microphone.  Thank you.

2      Now, when did you begin work on the -- well, let me go

3  back.  Were you in the Seattle office as of May of 2001?

4  **A.**  I was.

5  **Q.**  Were you a supervising agent at that time?

6  **A.**  No, I was not.

7  **Q.**  When did you become a supervising agent?

8  **A.**  I became a permanent supervisory Special Agent in February

9  of last year.

10  **Q.**  There was obviously some temporary status?

11  **A.**  Yes.  I have been, since fall of 2002, a temporary or a

12  relief supervisor for my squad -- my squads that I worked on.

13  I was an acting supervisor for about six months in 2006.

14  **Q.**  Now, Agent Halla has testified that although you don't

15  really have partners in FBI work, that essentially in working

16  on this case you were more or less partners?

17  **A.**  I think that's fair.

18  **Q.**  Is that a reasonable description?

19  **A.**  Yes.

20  **Q.**  Do you remember what day of the week May 21, 2001 was?

21  **A.**  May 21, 2001, was a Sunday -- Monday, so Monday.

22  **Q.**  The 21st was a Monday?

23  **A.**  Yes.

24  **Q.**  When did you personally get involved in the investigation

25  of that incident?

1 **A.** I personally became involved in the investigation in the

2 fall of 2002.

3 **Q.** Is there a reason -- were you doing something else between

4 the time of the incident and fall of '02?

5 **A.** At the time of the arson, I was assigned to our drug and

6 organized crime squad. It's a separate squad within the

7 Seattle division.

8 **Q.** So you were aware that the agency, the Seattle office of

9 the FBI, was involved almost from the beginning; is that

10 correct?

11 **A.** That's correct.

12 **Q.** Was it Agent Halla who was what's called the case agent?

13 **A.** At the time of the arson?

14 **Q.** Who became the case agent at the time of the arson.

15    Well, who did? Was there a case agent?

16 **A.** At the time -- well, I wasn't assigned to the squad at the

17 time, but I believe the original case agent, when the arson

18 happened, was either Jane Stephan or Lee Yates, but I am not

19 certain on that.

20 **Q.** Did there come a time, to your awareness, that the U.S.

21 Attorney's Office became involved in the investigation?

22 **A.** Yes.

23 **Q.** And when would that have been?

24 **A.** I don't know exactly when they became involved in the

25 investigation.

1  **Q.** That would be before your own personal involvement?

2  **A.** Correct.

3  **Q.** The U.S. Attorney is actually a part of the branch of the

4  United States Department of Justice; is that correct?

5  **A.** Yes, that's correct.

6  **Q.** As of the year 2001, I think the Attorney General was

7  Ashcroft; is that correct?

8  **A.** I believe that's correct, yes.

9  **Q.** Then there came a time when he was replaced by Alberto

10  Gonzalez?

11  **A.** Yes.

12  **Q.** Is it fair to say that by the time you got involved in the

13  fall of '02, and the time the arrests were made on the Oregon

14  Indictment in December, what year was it, December of '05?

15  **A.** December of '05.

16  **Q.** By that time in December of '05, some four-and-a-half

17  years had gone by more or less with this crime unsolved; is

18  that correct?

19  **A.** More or less, yes.

20  **Q.** Is it fair to say that it was a very important -- it was

21  important work for you to try to solve this crime; is that

22  correct?

23  **A.** Yes, all of our investigations are important.

24  **Q.** Well, this one was a celebrated arson; is that correct?

25  Highly publicized?

1  **A.**  There was a lot of publicity regarding this arson, yes.

2  **Q.**  And it was your investigation, and the lack of information

3  was a little bit frustrating; is that fair to say?

4  **A.**  It was -- well, I don't know if I would classify it as

5  frustrating.  We didn't have much information in terms of

6  being able to solve the crime in the first couple of years.

7  **Q.**  There were several crimes, a number of arsons, maybe 17 or

8  so arsons, for which the Earth Liberation Front took credit in

9  a period between 1996 and 2001; is that correct?

10  **A.**  Yes.

11  **Q.**  That was -- this was part of the effort -- trying to solve

12  this crime was part of the effort trying to solve those

13  crimes; is that correct?

14  **A.**  Yes, that's correct.

15  **Q.**  There came a time in 2004 --

16          MR. BARTLETT:  Your Honor, objection.  This isn't

17  cross-examination.  This is actually direct examination, and I

18  have let it go on quite a bit, but the questions should not be

19  leading.

20          THE COURT:  He's calling, I believe, this witness as

21  his witness.

22          MR. BLOOM:  That's correct.  Certainly, this is a

23  preliminary matter.  Secondly, I am allowed to lead a witness

24  who would be regarded as an adverse witness.

25          THE COURT:  Go ahead.

BY MR. BLOOM:

**Q.** You work for the FBI and I am the lawyer for Briana Waters. We have adverse positions, don't we?

**A.** I wouldn't classify it as an adverse position. We have different roles in the Government.

**Q.** Now, in 2004, there was a break -- Jake Ferguson, correct?

**A.** A break in the overall conspiracy? There was a break in the case.

**Q.** The overall conspiracy.

**A.** Yes, there was.

**Q.** It was -- you got ahold of Jake Ferguson and he agreed to cooperate; is that correct? The FBI did, not you personally, the FBI?

**A.** Not me personally, but yes, he did agree to cooperate with the FBI.

**Q.** By that time, 2004, you were actively involved in the UW investigation; is that correct?

**A.** I was the co-case agent in the investigation, yes.

**Q.** With Agent Halla?

**A.** With Agent Halla, correct.

**Q.** Now, did there come a time when you understood that a woman named Jennifer Kolar was going to come and talk to you?

**A.** Talk to me, yes.

**Q.** Talk to you, to Mr. Friedman and to Agent Halla; is that correct?

1 **A.** That's correct.

2 **Q.** Did you come to learn that she had been contacted -- well,

3 did you see her on December 16th of 2005?

4 **A.** I interviewed her. I participated and interviewed her on

5 December 16th, yes.

6 **Q.** Did you come to learn that she had in fact been contacted

7 about five or six or even seven days before that by Agent

8 Quimby, a woman from the Denver office; is that correct?

9 **A.** Yes, that would be agent Jane Quimby.

10 **Q.** You understood that Ms. Kolar had been contacted and

11 either a message left or a communication that the FBI would

12 like her to get a lawyer and cooperate?

13 **A.** Yes. I don't know what the exact message was, but that

14 was essentially the message.

15 **Q.** To that effect?

16 **A.** Yes.

17 **Q.** So it was your understanding, as you saw her on December

18 16th, that here was a woman who had had at least a week to

19 think about what she was going to do, what she was going to

20 say?

21 **A.** Well, I don't know what she was thinking prior to that

22 meeting.

23 **Q.** No, I am just talking about the timing. I am not

24 suggesting you would know what she was thinking, but in terms

25 of her being made aware of the fact that she had to think

1  about what she was doing with regard to her activities, she

2  had about a week to think about it, at least; is that correct?

3  **A.**  There was about a week from the time Agent Quimby

4  contacted Jennifer Kolar until she came and talked to us.

5  **Q.**  Once you came to meet with Jennifer Kolar, and you met

6  with her several times; is that true?

7  **A.**  I met with her three or four times.

8  **Q.**  Isn't it fair to say you understood her to be a highly

9  intelligent person?

10  **A.**  Before she came into the meeting?

11  **Q.**  No, once you met her.

12  **A.**  I would characterize her as an intelligent person.

13  **Q.**  Do you know of her background?  She's --

14         MR. BARTLETT:  Objection, this is leading.  This is

15  direct examination.  He is not an adverse witness.  They

16  called him.  The questions should be nonleading, open-ended

17  questions.

18         MR. BLOOM:  All right.

19  BY MR. BLOOM:

20  **Q.**  Did you come to learn about her background?

21  **A.**  Yes.

22  **Q.**  What did you learn about her academic background?

23  **A.**  I learned that she graduated from high school in Spokane.

24  I learned that she attended the University of Colorado in

25  Boulder.  I believe she received a degree in applied

1  mathematics and was a Ph.D. candidate, at some point was a
2  Ph.D. candidate.
3  **Q.**  When you spoke with her, did you have an impression of her
4  intelligence?
5  **A.**  Well, based on her education and based on her position in
6  the community, I thought she was an intelligent person.
7  **Q.**  How about based on how she spoke with you?
8  **A.**  She was coherent, articulate.
9  **Q.**  Now, did you come to understand, was she there with an
10  attorney on December 16th?
11  **A.**  She was with her attorney.
12  **Q.**  Would that have been Michael Martin?
13  **A.**  That's correct.
14  **Q.**  Was it your understanding that she was going to speak
15  about the incident at the University of Washington?
16  **A.**  At some point I became aware that she was going to talk
17  about that arson, yes.
18  **Q.**  Was it your understanding that she was going to confess to
19  that crime and perhaps others?
20  **A.**  It was my understanding just prior to the meeting that
21  that's what she was going to confess to.
22  **Q.**  What is one of the FBI regulations called?  Something like
23  MIOG?
24  **A.**  There's MAOP and there is MIOG.
25  **Q.**  What are those?  Could you please tell the jury what those

1   are?

2   **A.**   Sure.   They are administrative procedures or guidelines

3   which guide our investigations or which guide administrative

4   duties.   It's basically a policy or a guideline book for the

5   FBI.   There's two of them.

6   **Q.**   Are there provisions in those guidelines -- is it fair to

7   describe them generally as guidelines?  Is that a fair

8   description?

9   **A.**   Yes, that's fair.

10  **Q.**   Are there provisions in those guidelines for recording --

11  using either digital or tape recorder -- when you are speaking

12  to witnesses or suspects?

13  **A.**   It's not our policy to record interviews or confessions.

14  **Q.**   Well, let me just try to answer that question.   Are there

15  provisions in the guidelines about doing that?

16  **A.**   There are some provisions.

17  **Q.**   When you say it's not your policy, it's not the FBI's

18  policy or not your policy?

19  **A.**   No, it's not the FBI's policy to record interviews or

20  confessions.

21  **Q.**   Now, are there provisions for doing so?

22  **A.**   What do you mean by provisions?

23  **Q.**   Well, let's mark this next exhibit.   I don't have any

24  copies.   I would ask you to look at it to refresh your

25  recollection, if we could mark it for identification, please.

1    I will make copies so the Court has it and the prosecutor

2  has it.

3         THE COURT:  Have you had a chance to see that?

4         MR. BARTLETT:  I have no idea what it is.

5         THE COURT:  Share that with the Government.

6         MR. BLOOM:  I will.

7         THE COURT:  Let's do this.  Let's take the noon

8  recess at this time, and we'll clear this up over the noon

9  recess.  Have yourself a nice lunch.  Keep your books on your

10  chair.  Don't discuss the case when you are back in the

11  building, in the jury room.  See you around 1:00.

12     (Jury not present.)

13         THE COURT:  All right.  You may be seated.  Is it

14  something -- why don't we do it this way.  Let me let you two

15  get together.  If copies need to be made, do that.  If there's

16  an issue on it, let me know so I can take it before 1:00.

17         MR. BLOOM:  Okay.  Could I now make the request that

18  if my two brief witnesses show up, that we can interrupt?

19         THE COURT:  Any problem with that?

20         MR. BARTLETT:  Who are they?

21         THE COURT:  I don't know.

22         MR. BLOOM:  One would be Haila Silvertrees and the

23  other would be Lavern Troxel.

24         MR. BARTLETT:  I have no objection to that, Your

25  Honor.

1       THE COURT:  All right.

2       MR. BLOOM:  Thank you.

3       THE COURT:  We'll be at recess.

4       MR. BARTLETT:  You can talk, but not about the case.

5       THE COURT:  Yes.  Don't discuss the case.

6    (Luncheon recess.)

7    (Jury not present.)

8       THE COURT:  All right.  You may be seated.

9    Now, the exhibit we are talking about, I understand that's

10   all taken care of.

11      MR. BLOOM:  Yes, the marking of the document.  I left

12   a -- it was a portion of the FBI regulations.  That was marked

13   --

14      THE COURT:  This is A-213?

15      MR. BLOOM:  212.  No, it must be 213.

16      THE CLERK:  A-213.

17      THE COURT:  Ready for the jury?

18      MR. BLOOM:  Would you please tell the jury that the

19   Court has agreed to let us call two witnesses out of order.

20      THE COURT:  All right.  The first one is?

21      MR. BLOOM:  Haila Silvertrees.  The second person

22   will be Lavern Troxel.

23   (Jury present.)

24      THE COURT:  All right.  You may be seated.

25   Instead of continuing now with Mr. Torres like we have, there

1   will be a witness now called out of turn.  That's, of course,

2   approved by the Court.

3           MR. BLOOM:  Thank you for accommodating the

4   schedules.  I would like to call Haila Silvertrees.

5           THE COURT:  All right, Ms. Silvertrees, would you

6   just come forward, ma'am, and raise your right hand and be

7   sworn?

8           HAILA SILVERTREES, called as a witness, duly sworn

9           THE COURT:  All right.  Just come around and take the

10  witness chair right there.

11          THE WITNESS:  Thank you.

12                  DIRECT EXAMINATION

13  BY MR. BLOOM:

14  **Q.**  Thank you for coming.

15  **A.**  Uh-huh.

16  **Q.**  Could you fix the microphone in front of your face and

17  speak into it, please.

18      Could you please --

19  **A.**  Is this good?

20  **Q.**  That sounds good, yes, thank you.

21      Have you ever testified before?

22  **A.**  Gosh, I think maybe years ago.

23  **Q.**  Please tell the jury your name.

24  **A.**  Haila Silvertrees.

25  **Q.**  What city do you live in?

1   **A.**  Olympia.

2       THE COURT:  Have her spell the last name for the

3 record.

4   **Q.**  Please spell your last name.

5   **A.**  S-I-L-V-E-R-T-R-E-E-S.

6   **Q.**  Maybe spell the first name too, if you would.

7   **A.**  H-A-I-L-A.

8       MR. BARTLETT:  For the record, I couldn't hear her

9 answer with regard to have you ever testified before?

10   **A.**  I believe I did, yeah, years and years and years ago.

11 BY MR. BLOOM:

12   **Q.**  How long have you lived in Olympia?  What year did you

13 move to Olympia?

14   **A.**  In 2001.

15   **Q.**  How old are you?

16   **A.**  65.

17   **Q.**  Where did you grow up?

18   **A.**  Oh, gosh, Midwest mostly.

19   **Q.**  Can you speak a little bit louder?

20   **A.**  Midwest.

21   **Q.**  Did there come a time when you moved out to the west?

22   **A.**  Yes.

23   **Q.**  Did you at some point move to Washington State?

24   **A.**  Yes.

25   **Q.**  Do you remember what year that was?

1  **A.**  Oh, I think it was '85, 1985.

2  **Q.**  Where did you move to, what city?

3  **A.**  Edmonds.

4  **Q.**  Where is Edmonds in relation to Tacoma?

5  **A.**  It's a little bit north of Seattle.

6  **Q.**  Do you have any children?

7  **A.**  Yes.

8  **Q.**  How many do you have?

9  **A.**  Two.

10  **Q.**  Is one of your children named Ocean?

11  **A.**  Yes.

12  **Q.**  Did there come a time -- was he born with the name Ocean?

13  **A.**  No.

14  **Q.**  Did there come a time when he changed his name officially

15  to Ocean?

16  **A.**  Yes.

17  **Q.**  Do you remember how old he was then?

18  **A.**  I think he was 18.

19  **Q.**  Did there come a time that he moved to the Olympia area?

20  **A.**  Yes.

21  **Q.**  Do you remember about when that was?

22  **A.**  I think it was '88 or '89.

23  **Q.**  Okay.  I want to take you back to a time that was some

24  trouble for you.  Did there come a time when Ocean was

25  involved in a serious automobile accident?

1   **A.**   Yes.

2   **Q.**   Do you remember what year that was?

3   **A.**   2000.

4   **Q.**   As a result of that accident, what were the physical

5   injuries to him?

6   **A.**   He's a quadriplegic.

7   **Q.**   Does he use a wheelchair?

8   **A.**   Yes.

9   **Q.**   In the year 2000, after his accident, was he in rehab for

10  some time?

11  **A.**   Yes.

12  **Q.**   Do you know what state this accident was in?

13  **A.**   I believe it was Pennsylvania.

14  **Q.**   Did there come a time when he was able to come back to the

15  Olympia area?

16  **A.**   Yes.

17  **Q.**   Sometime in the year 2001 -- well, let me ask you, was it

18  in the year 2001, or was it 2000?

19  **A.**   It was in 2000.

20  **Q.**   Was he married at the time?

21  **A.**   Yes.

22  **Q.**   To whom was he married?

23  **A.**   Heather Moore.

24  **Q.**   Did they have any children?

25  **A.**   They have now, yeah.

1   **Q.**  That is they together had a child?

2   **A.**  Yes.

3   **Q.**  Is that a daughter?

4   **A.**  Yes.

5   **Q.**  And her name?

6   **A.**  Karen.

7   **Q.**  In the year 2000 when he moved to Olympia, what kind of

8   place was he living?

9   **A.**  A friend of his owned a house, and she arranged to have a

10  ramp built to fix the house so he could live there.

11  **Q.**  I assume this is not easy for you to talk about?

12  **A.**  No.

13  **Q.**  It's painful?  Did there come a time when you decided that

14  you should move to where he was going to be?

15  **A.**  Yes.

16  **Q.**  Was it clear that he was going to stay in Olympia, or was

17  that not clear at the time?

18  **A.**  I wasn't sure, right when he first moved back to Olympia,

19  I wasn't sure that they were going to stay in Olympia.  I

20  think they mentioned possibly moving to Portland.  I am not

21  sure.

22  **Q.**  So the place where he first moved when he came back to

23  Olympia, you say it was a place fitted to accommodate the

24  wheelchair and his condition; is that correct?

25  **A.**  Correct.

1  **Q.**  Now, did there come a time when you came down to Olympia

2  to look for a place to stay for yourself?

3  **A.**  Yes.

4  **Q.**  Do you remember about when that was?

5  **A.**  It was the end of March, beginning of April of 2001.

6  **Q.**  As a result of the accident, was there some sort of

7  insurance settlement?

8  **A.**  Yes.

9  **Q.**  Was there any decision made regarding buying a house --

10  **A.**  Yes.

11  **Q.**  -- with that money?  Was a house purchased --

12  **A.**  Yes.

13  **Q.**  -- for him to live in?

14  **A.**  Yes.

15  **Q.**  Were you -- first of all, do you remember the month and

16  the year that that happened?

17  **A.**  The settlement was towards the end of March, and I believe

18  the house was bought at the same time, right immediately,

19  almost immediately.

20  **Q.**  Did you have any official role in the purchase of the

21  house?

22  **A.**  Well, I am the trustee of his special needs trust, and I

23  just transferred funds from the insurance settlement.

24  **Q.**  Now, when you came down, did you say you came down from

25  Edmonds, is it, to look for a place to stay?

1  A.  Yes.

2  Q.  Where were you staying when you first got here?  When I

3  say here, when you first got to Olympia.

4  A.  To Olympia?  Well, I stayed in a motel.

5  Q.  When the house was purchased, was it Conger Avenue?

6  A.  Yes.

7  Q.  Did there come a time when you met somebody named Briana

8  Waters?

9  A.  Yes.

10  Q.  Do you see her in the courtroom?

11  A.  Yes.

12  Q.  Could you point her out, please?

13  A.  (Indicating.)

14  Q.  Do you remember the circumstances of meeting her?

15  A.  Yes.

16  Q.  Could you please tell the jury.

17  A.  Sure.  One of the times that I came down to Olympia --

18  Q.  Could you speak into the microphone.

19  A.  Sorry.  One of the times that I came down to Olympia

20  specifically to look for a home because I wanted to move close

21  to my son, I met Briana and somehow it came up that I was

22  staying in a motel, and she said she was going to be out of

23  town for a few days, and she said, don't spend money on a

24  motel, stay in my room while I'm gone.

25  Q.  Let me interrupt you.  Where was her room?

1  **A.**  She was staying in a building that was behind Ocean's
2  house.
3  **Q.**  How would you describe that building?
4  **A.**  Well, it was just a building that was about the size of a
5  two-car garage, just a one-room.
6  **Q.**  Did you actually stay?
7  **A.**  Yes.
8  **Q.**  For about how long did you stay?
9  **A.**  Two or three nights, I think.
10  **Q.**  Could you describe the furnishings in that one room?
11  **A.**  There was a bed.
12  **Q.**  Do you want some water?
13  **A.**  No, I'm fine, thank you.
14      There was a bed, carpet, rug, book shelves, book shelf
15  that had books, and some clothes folded on it.
16  **Q.**  Was it clear to you that a person was living there?
17  **A.**  Yeah, it was a bedroom.
18  **Q.**  When you stayed there for, I think you said, two nights or
19  three?
20  **A.**  Yes.
21  **Q.**  What was happening -- was there a main house?
22  **A.**  Yes.
23  **Q.**  Was that the house -- what was happening with that house?
24  **A.**  Well, there was construction going on in the main house to
25  fit it for Ocean, a ramp being built and moving walls and

1  plumbing, and doorways had to be expanded.

2  **Q.** Was that house livable at that time?

3  **A.** Oh, no.

4  **Q.** In particular, the kitchen of that house, the main house,

5  was that under construction?

6  **A.** I think there was something going on with the stove or the

7  electricity in there.

8  **Q.** Was there anything going on with regard to counters,

9  changing the level of counters?

10  **A.** That was changed, yes.

11  **Q.** Did you -- in the back -- in the back house --

12  **A.** Uh-huh.

13  **Q.** -- in the back room where you stayed, where Briana had

14  stayed -- by the way, did she come back and then stay there?

15  **A.** No.

16  **Q.** When you left, did she come back and stay --

17  **A.** Well, I assume she did. I don't know. I wasn't there

18  when she came back.

19  **Q.** Now, was there running water in the back?

20  **A.** No.

21  **Q.** If you needed water, what did you do?

22  **A.** There was a bathroom right by the back door.

23  **Q.** Back door of what?

24  **A.** Of the house.

25  **Q.** Did you get water there to wash up and drink?

1   **A.** Yeah.  There was a shower, yes.

2   **Q.** Now, did there come a time that Ocean actually -- that the

3   construction was done to the point where Ocean was able to

4   move into Conger Avenue?

5   **A.** Yes.

6   **Q.** Do you remember what month that was?  Would you remember

7   what season it was?

8   **A.** It was in the summer.

9   **Q.** What year would that have been?

10  **A.** That was all in 2001.

11  **Q.** That same year?

12  **A.** Yes.

13  **Q.** Prior to his actually moving in, in the summer of 2001,

14  was he able to live there at any time given the state of the

15  house?

16  **A.** No.

17  **Q.** So if a person went to see him at the house living there,

18  it would have to be in the Summertime, as you best remember?

19  **A.** Yes.

20  **Q.** Now, did you come to know Briana Waters at all during that

21  period?

22  **A.** A little.

23  **Q.** What was your impression of her?

24  **A.** She was very, very kind to me in a time that was very

25  difficult for me.

1 **Q.** Do you have a sense of her that you can tell the jury

2 about whether she was a person of peace or, on the other hand,

3 a person of violence?

4 **A.** Oh, absolutely peaceful, kind, warm.

5 **Q.** As you sit there now, you know she's accused of having

6 been involved in an arson?

7 **A.** Yes.

8 **Q.** Tell the jury what you think of that.

9      MR. BARTLETT:  Objection, Your Honor.

10      THE COURT:  Sustained.

11      MR. BLOOM:  I have no further questions.

12      MR. BARTLETT:  Nothing, Your Honor.

13      THE COURT:  All right.  You may step down.

14   Next witness.

15      MR. BLOOM:  LaVerne Troxel.  I will go get her.

16      THE COURT:  Raise your right hand to be sworn.

17      LAVERNE TROXEL, called as a witness, duly sworn.

18      THE COURT:  Just take the witness chair

19                DIRECT EXAMINATION

20 BY MR. BLOOM:

21 **Q.** Thank you for coming.  Would you use the microphone?

22 **A.** Yes, I will.  Is this okay?  Can you hear me?

23 **Q.** Yes, we can.  Thank you.

24   Could you tell the jury your whole name and spell it for

25 us, please?

1   **A.**   Yes.  It's LaVerne Adele Troxel.  That's L-A, capital V,

2   E-R-N-E, Adele, A-D-E-L-E, Troxel, T as in Tom, R-O-X-E-L.

3   **Q.**  Where do you live?

4   **A.**  I live in Randle, Washington, which is a little town up in

5   the Cascades.

6   **Q.**  About how far from here is that?  How long a drive is

7   that?

8   **A.**  It's 90 miles to Olympia, so however far it is from

9   Olympia to here on top of that.

10  **Q.**  When did you and I first meet?

11  **A.**  We met, oh, probably an hour ago out in the hall in the

12  main lobby.

13  **Q.**  Have we spoken on the phone?

14  **A.**  Yes, very briefly.

15  **Q.**  Could you tell us -- how old are you?

16  **A.**  63.

17  **Q.**  Could you tell us what you do or have done for a living?

18  **A.**  Yes.  For almost 40 years, I was a flight attendant, a

19  stewardess before then and then they changed the term, and my

20  final about 10 years, I was an on-board service coordinator or

21  later changed to on-board service leader, flying basically

22  international flights.

23  **Q.**  What particular airline?

24  **A.**  I started out with National, which merged with Pan

25  American, and then Delta bought part of Pan American and took

1  personnel, and I went to Delta. So I finished my last 10

2  years with Delta.

3  **Q.** Have you -- how do you spend your time now?

4  **A.** I am basically retired, but I say I am going to have to

5  get a job so I can rest because I have several businesses, and

6  I have a farm, which is my greatest love, and I raise horses.

7  **Q.** Is that in Randle?

8  **A.** Yes, it is.

9  **Q.** Is there a mountain in the area of Randle called Watch

10 Mountain?

11 **A.** Yes, there is.

12 **Q.** Could you tell the jury -- I don't know if it's called the

13 Watch Mountain Project, but could you tell the jury what

14 happened with regard to Randle and Watch Mountain and Plum

15 Creek.

16 **A.** Yes, I would be glad to.

17     When I first moved to Randle, I thought it was a very

18 beautiful, scenic and a great place to raise my child. I had

19 no idea about the dangers that existed in that area. I am

20 still very happily entrenched there, and I love it there, but

21 we have massive landslides and we have a lot of flooding.

22     We are in part of Lewis County which you may have heard

23 about the flooding that has taken place just recently there.

24 We are in a valley, and there's a river that runs through the

25 valley, and there is a mountain that sits above the entire

1  town called Watch Mountain.

2  Watch Mountain is basically comprised of volcanic ash

3  which is very unstable.  If you pick up the soil, it almost

4  looks like little glass ball bearings.  When you have any

5  rain, which is all winter long, we have quite a few landslides

6  that come down off that mountain.

7  In fact, a few years ago we had a landslide that was so

8  phenomenal, it cost almost $14 million to clear that

9  landslide, and we were trapped in the town for 10 days.  It

10  went across the road and they had trucks and cranes clearing

11  the highway 24 hours a day, and they finally had to move the

12  road over because it was still coming down.

13  Well, I was on vacation and I came home in '95, and there

14  was a group of young people that had come into our town in the

15  two or three weeks that I had been gone, and they had

16  established a tree sit in the mountains up on Watch Mountain.

17  At that time, I learned that Watch Mountain was slated to

18  be traded off in a land exchange, which is something -- I

19  don't know if you call it a law or a policy or whatever that

20  can be done with Forest Service land.

21  And what happened was the people in Seattle had approached

22  the Sierra Club and they had given them donations and they

23  wanted no more clear-cuts along the I-90 corridor in their

24  backyard, and they wanted an Alpine park and they were going

25  to trade Forest Service land in different parts of Washington

1  for this I-90 corridor land to create this Alpine park, and

2  the land was basically owned by Plum Creek Timber Company.

3      Plum Creek Timber Company has been called the Darth Vader

4  of the timber industry and has no replanting policies.  They

5  just strictly clear-cut everything they do, and they are no

6  longer allowed to even log in Maine because of the destruction

7  they caused there.

8      So Plum Creek was initiating the exchange for old growth

9  timber for this stumped Alpine along I-90, and part of the

10  exchange was the land called Watch Mountain which goes over

11  the entire town of Randle, and the town sits underneath this

12  mountain, and we have landslides off that mountain all the

13  time with trees.  Without trees, it would have been

14  devastation.

15      Well, normally, when you do something like this, and you

16  do these land exchanges, they have to go through a series of

17  government processes.  One, I think is called a NEPA process

18  where they evaluate safety issues.

19      The timber company was getting anxious to get its hands on

20  this land, and they knew that it would not pass through the

21  safety issues, so they asked senator Slade Gorton, who they

22  had contributed greatly to his re-election campaign, to help

23  them, and he took and put a rider on the omnibus bill, the

24  appropriations bill, in the last day of Congress, to legislate

25  an exchange of this land and bypass all the legal processes,

which included the input of the town meetings and the input of
the people that lived below this mountain.

We knew nothing about it.  In the town we had heard
whispers and rumors, but we all figured there would be
meetings and it could be discussed and at that time the safety
issues would be brought up and this would never happen.

Well, because it was legislated, our voice was completely
removed, and we would not even have known that this had gone
through until they started cutting that mountain, except that
these young people -- a great deal of them from Evergreen
College, including Briana -- came to our town and told us what
was going on.

And where they were able to do this, the exchange sort of
got thrown on the table because there was other parcels
involved.  One of the parcels had Purple Martin, which is an
endangered species, and when the timber company realized that
they were not going to be able to log that piece of land
because of the Purple Martin in it, they decided to throw
everything back on the table and they wanted another piece of
property for the piece with the Purple Martin.

When that happened, it opened up the entire exchange for
argument.  So these young people showed up and they set up
tree platforms.  And you have to realize that Randle is a
logging town, and people that come and set up tree platforms
are called tree huggers, and basically they are in danger in a

logging town.  You've got men that walk around with suspenders
and cork nail boots that would knock down a tree hugger in a
second and not give it a second thought.

So these kids were really putting themselves in harm's way
to some extent in this town.  I love my town, but nevertheless
we do have some shortcomings in this way.

Well, the kids -- and I call them kids because I am 63 --
these young people started going door to door, and they
started telling people about this imminent danger in our town
and what was going to happen, and they took a lot of guff.
They really did.

I saw them take guff in some instances, but they were
determined, and they were so diplomatic and they were so quiet
and respectful to the townspeople that the entire town, with
the exception of a few hard noses who really didn't know the
facts, did a total about face, and I was never -- I came from
Florida to Washington, so I am not involved in the timber
industry, certainly wasn't at that time.

I had to read and get up to speed to find out what was
going on because I was concerned about my town.  But
apparently, it's almost unheard of for there ever to be a
cooperation between the timber community and quote unquote
tree huggers.

In this case, there was a very unusual situation, where
the townspeople and these young people joined forces to

1 protect this piece of land above our town.

2 The town was -- it was a double-edged sword. The

3 townspeople were fighting to preserve the town from this

4 terrible danger because if this mountain had been logged, the

5 whole thing would have slid down on us and buried us, and we

6 had soil experts that confirmed that and said not "if," it's

7 just a matter of time.

8 So here you have loggers in their suspenders that said

9 loggers on them, and you had kids that were quote-unquote tree

10 huggers, and they were sitting together around campfires

11 planning strategy, and it was the most amazing thing.

12 But the reason that it was so successful, and the reason

13 that these young people were able to get as far as they did in

14 this logging community with this tradition -- I mean, many,

15 many, years of tradition of logging economy -- was because

16 they were so respectful, and they conducted themselves in such

17 a wonderful manner, and they even went to the food bank and

18 helped pass out food. They got involved in community projects

19 at the time they were there. They did all kinds of things.

20 Briana was their film editor. She was doing a documentary

21 at the time, and she filmed all the different phases of what

22 was going on, and she was very conscientious and very

23 diplomatic dealing with some of these older people in this

24 town.

25 And frankly, I've dealt with people all my life, that's

1  what my job has been is dealing with people, and I was so

2  impressed.  I was impressed with them as people, but I was

3  impressed with them doubly because of their youth.

4      I cannot imagine that -- and another thing that was so

5  great was there was no violence in this thing.  This was right

6  above my town, and it could have really heated up.  But it

7  stayed so calm because of the diplomacy of these young people

8  and the way they handled themselves.  I was proud to be a part

9  of this, and I just cannot imagine that somebody involved in

10  this, with the depth of dedication that Briana had, could

11  completely do an about face on her personality and do some of

12  the things that she's being accused of here.  It just doesn't

13  follow.

14      This woman was a -- I had a chance to observe her over

15  many months.  I think I am a very good judge of character.

16  That's what I built my life on.  That's what my profession has

17  been, working with people, and I think her character is

18  exemplary.

19          MR. BLOOM:  I think I have run out of questions.

20  BY MR. BLOOM:

21  **Q.**  Was it called the Watch Mountain Campaign?

22  **A.**  They called it the Watch Mountain Campaign in some places,

23  and it just depended.  You saw it, but the Watch Mountain

24  Campaign, the Watch Mountain Issue, the Watch Mountain

25  Exchange.

**Q.** What was the result, by the way?

**A.** The result was that through the actions of these young people getting the town motivated, that the young people and the townspeople worked together, formed an amazing force. We sent a group to Washington and lobbied. We went to San Francisco and addressed the Sierra Club.

The Sierra Club did a total about face when they found out the safety issues involved with logging this mountain above this town and actually fought the exchange.

So the whole thing was basically -- Watch Mountain is still Forest Service land, and we still have our trees which will aid us in not having future landslides or massive flooding.

MR. BLOOM: Thank you. I don't have any further questions.

CROSS-EXAMINATION

BY MR. BARTLETT:

**Q.** Good afternoon.

**A.** Good afternoon.

**Q.** I am going to show you a picture which has already been entered into evidence. It's Government's Exhibit 111 and tell me if you recognize this, ma'am.

Do you recognize that, ma'am?

**A.** I don't think so.

**Q.** Try to think back during the Watch Mountain Campaign.

1       When we did a search of this man's house -- his name is

2   Bill Rodgers.  He had a resume that indicated he was a

3   consultant for the Watch Mountain Campaign.

4       Do you remember seeing him around?

5   **A.**  No, I actually don't, but let me tell you, there was a

6   core group that contributed to the Watch Mountain Campaign of

7   which Briana was one.

8       There was a number of young people, but we did have a

9   bunch of other people that came and went.  There were no

10  leaders in this campaign, and some of the people that came and

11  went were rowdy.  There was even some young girls that wound

12  up there a little bit nude, and the people that were in

13  Briana's group, sort of -- they agreed that nobody would tell

14  anybody you can't do this or do that, but they were diplomatic

15  in telling them to calm down, to leave, to cover up.

16      So with this influx of people coming and going, this

17  gentleman very well might have been one of the people that

18  came and went and I just don't recognize him.  Also, he has

19  facial hair and he might have been shaved while he was there.

20  **Q.**  As I understand it, the final compromise for Watch

21  Mountain occurred on November 4, 1999.  Does that sound about

22  right?

23  **A.**  I am not sure on that.

24  **Q.**  Are you aware that in 1998, Ms. Waters was interviewed,

25  and at that point in time she was a student at Evergreen

1  College?

2      Have you ever seen that New York Times article with her

3  interview in it?

4  **A.**  No, I don't think so.

5  **Q.**  Can you take a look at 740-E?

6      In November 1998, a man named Craig Rosebraugh came up and

7  spoke at Evergreen State College, and a reporter named Robert

8  Sullivan was with him.  At the end of the presentation by

9  Mr. Rosebraugh, there was a brief conversation between the

10  reporter and Ms. Waters.

11  **A.**  I would have no knowledge of that.

12  **Q.**  Let me have you take a look at just the portion of the

13  conversation that was reported in the New York Times involving

14  Ms. Waters, not the whole conversation.

15      Can you look at that, please, for me?

16      In 1998, it was reported that:  "The talk was sponsored by

17  EARN, the Evergreen Animal Rights Network."  And one

18  individual indicated, "'We all pretty much know Craig and the

19  Liberation Collective,' said Tiffany Tudder."

20      "I" -- referring to the reporter Robert Sullivan -- "asked

21  the EARN members if they supported arsons and mink-farm

22  releases."

23      "'As long as people don't get hurt, I totally support

24  it,' said Briana Waters, a senior."

25      As you read that sentence, "As long as people don't get

1  hurt, I totally support it," it clearly appears that Briana

2  Waters is referring to arsons, that she totally supports the

3  work of arson --

4          MR. BLOOM:   Objection, the words speak for

5  themselves, not --

6          THE COURT:   Let her read it and say what she gets out

7  of it.

8          MR. BLOOM:   I'm sorry?

9          THE COURT:   I said, let her read it.

10 BY MR. BARTLETT:

11 Q.  Do you see that?

12 A.  I see that sentence.  If I had been there, I would have

13 said to Briana:  "Do you mean the release of animals, or do

14 you mean in particular arson?"  And I would have said to her:

15 "I don't think that that's such a good idea to be doing arson

16 stuff."

17      But there's really -- this isn't very clear to me exactly

18 what she would have meant on that, and as far as releasing

19 animals, I understand something about farm raised animals and

20 how if you release them, they can't survive in the wild, but

21 there are other people who don't.

22 Q.  The animals can't survive in the wild?

23 A.  Right.

24 Q.  Like when you have a mink release, I don't think there's

25 much of a danger of people getting hurt, that's just the

1   animals might not survive.  The only thing where individual

2   people would get hurt would be during an arson, wouldn't you

3   agree, Mrs. Troxel?

4   **A.**  No, I do not agree.  Because if you are releasing animals

5   and somebody -- if someone came and turned my horses loose,

6   and I happened to be on the farm at the time that they were

7   doing so, I would make an effort to stop them from turning my

8   horses loose, and there is a possibility I could be injured,

9   if they were violent people.

10     So, you know, this is a very good sentence for your case,

11   but I don't see where it actually makes the point of your case

12   because it's too -- it's not definite.  It's just very

13   wishy-washy.

14   **Q.**  Does it surprise you to see those words there?

15   **A.**  No.

16        MR. BARTLETT:  No further questions.

17        THE COURT:  She can be excused?

18        MR. BLOOM:  I have one question.

19                 REDIRECT EXAMINATION

20   BY MR. BLOOM:

21   **Q.**  Having read that article, does that in any way change your

22   opinion of Briana Waters?

23   **A.**  No, because you have to take -- you can't take something

24   like this that is said on the spur of the moment with probably

25   not a whole lot of thought.

1    A lot of us say things that we don't actually mean when we
2    are just talking, but when it comes to actual action, there's
3    a big difference between action and talk, and I saw Briana in
4    action, and her action was above reproach.

5    So therefore, a couple of sentences in an article are not
6    enough to convince me that the character of this person is any
7    different than what I think it is.

8  **Q.** Let me ask this question:  Have you ever been a baseball
9  fan?

10  **A.** Yes and no.

11  **Q.** Have you ever heard the expression when an umpire makes a
12  questionable call?

13  **A.** Kill the umpire?

14  **Q.** Kill the umpire, yes.  How about that?  Do you think
15  that's a killer?

16  **A.** I have been in a baseball field when the stands were up --
17  the people in the stands were on their feet and they were
18  screaming "kill the umpire," and I am sure not one person
19  there has ever killed an umpire.

20        MR. BLOOM:  I don't have any further questions.

21        MR. BARTLETT:  I have some follow-up, Your Honor,
22  with regard to Ms. Troxel's last statement.

23                    RECROSS-EXAMINATION

24  BY MR. BARTLETT:

25  **Q.** Ms. Troxel, you just indicated that from what you know of

1  Ms. Waters, she is beyond reproach.

2      Do you remember making that statement to the jury?

3  **A.**  What I said was that what I know of her, and I know of her

4  personality, is that she is a wonderful person and her general

5  behavior has been irreproachable.  However, she is human.

6          MR. BARTLETT:  Could I have the Court Reporter refer

7  back -- read back and see if the words "above reproach" were

8  indicated, please?

9          COURT REPORTER:  "Question:  I have one question.

10 Having read that article, does that in any way change your

11 opinion of Briana Waters?

12          "Answer:  No, because you have to take -- you can't

13 take something like this that is said on the spur of the

14 moment with probably not a whole lot of thought.  A lot of us

15 say things that we don't actually mean when we are just

16 talking, but when it comes to actual action, there's a big

17 difference between action and talk, and I saw Briana in

18 action, and her action was above reproach."

19 BY MR. BARTLETT:

20 **Q.**  Thank you.  That was the phrase I was referring to.

21     Do you remember making that statement?

22 **A.**  Yes, I do, sir.

23          MR. BARTLETT:  If I could approach the witness and

24 provide a document previously marked as Government's Exhibit

25 1102.

1    If I could approach, Your Honor.

2         MR. BLOOM:   Before the question continues, we would

3    ask that Mr. Bartlett be required to point out to us what he's

4    focussing on.   There may or may not be an objection.   I just

5    want to know what he's focussing on.

6         THE COURT:   The issue is in this document?

7         MR. BARTLETT:   I am focussing on the statement that

8    Briana Waters is above reproach, and I want to point out some

9    facts to this witness that might make her reconsider her

10   opinion of Ms. Briana's (sic) character as above reproach.

11        MR. BLOOM:   I would like to know what in this

12   document indicates such action.

13        MR. BARTLETT:   I will give an offer of proof, Your

14   Honor.

15        THE COURT:   All right.

16        MR. BARTLETT:   In this document --

17        MR. BLOOM:   Well, the offer of proof should not be in

18   front of the jury.

19        THE COURT:   Do you want the jury out so we can go

20   through it?   It's your witness, and he has a right to

21   cross-examine based on her statement.

22        MR. BLOOM:   I have no idea where he's going.

23        THE COURT:   Ladies and gentlemen, step out for me.

24   Leave your books on the chair.

25    Do we want the witness to step out also?

1    Ms. Troxel, we will have you step out and wait in the
2 room.

3    (Jury not present.)

4         THE COURT:  All right.

5         MR. BARTLETT:  The offer of proof, Your Honor,
6 referring to page 3 of this -- first of all, this is from
7 Ms. Waters' website, SupportBriana.org.  It was downloaded on
8 February 19, 2008.

9    Looking at page 3, the third paragraph -- I will read the
10 following:  "Briana has found two great lawyers, Robert Bloom
11 of Oakland and Neil Fox of Seattle.  They will be working
12 extremely hard in the coming months as approximately 100,000
13 pages of discovery will need to be carefully examined."

14    "She" -- referring to Briana -- "and her family are now
15 asking for your help to raise the fees necessary to pay these
16 highly-skilled and seasoned lawyers, as well as helping to
17 offset travel expenses.  We have a mountain to climb."

18    My cross-examination will go to the fact that this
19 statement is totally fraudulent; that in fact, since the day
20 he walked into court, Neil Fox has been appointed by the
21 Court, has been paid by the Court, and Ms. Waters has never
22 given him so much as a nickel.

23    Second, in June of last year, Mr. Bloom changed --
24 ultimately -- and he had been retained but now he is appointed
25 by the Court.  So she is asking for people to give her money

1  to pay her two attorneys, when in fact that is a lie.  That is

2  fraud.  She doesn't pay her two attorneys.  The two attorneys

3  are being paid by the Court.

4      Therefore, I can confront this woman, who said she is

5  above reproach, with the fact that she is fraudulently trying

6  to obtain money for her appointed attorneys.

7          MR. BLOOM:  Well, Your Honor, it's quite astonishing

8  to hear this argument.

9      The fact is, we've had to come to this Court to ask for

10 money to bring witnesses here so that the Court becomes a gate

11 keeper.  She, in fact, needs money.  In fact, she did retain

12 me at first and she ran out of money.  We had a fee

13 arrangement, and she was unable to pay me.  So when this was

14 first -- whenever this was first written, it was absolutely

15 true.

16         THE COURT:  I don't remember when you came to the

17 case, but that was early on as I recall.

18         MR. BARTLETT:  It was always a lie with regard

19 Mr. Fox.  It was always a lie with regard to Mr. Fox.

20     With regard to Mr. Bloom, she had the obligation to keep

21 her website up to date.  If she doesn't, she can get on the

22 stand and explain what the big mistake was.  But with regard

23 to cross-examination of a character witness, this is exactly

24 on point.

25         MR. BLOOM:  Tell you what, let him ask.

```
 1              THE COURT:  All right.  Bring the jury back.
 2              MR. FOX:  For the record, I have never been paid a
 3  cent by anyone.  I have never submitted a voucher.
 4              THE COURT:  I don't believe Mr. Fox -- he kept saying
 5  Mr. Fox.  I don't know if you meant Mr. Fox or not.
 6              MR. FOX:  I have been appointed, but I have never
 7  been paid a dime in this case.
 8              THE COURT:  I don't know what that means.
 9              MR. FOX:  I mean, I expect at some point to submit a
10  voucher.
11              THE COURT:  That's what I thought.
12              MR. FOX:  I have never been paid anything.
13              THE COURT:  Okay.  I think the issue has been
14  settled.
15              MR. BLOOM:  Sure.
16              THE COURT:  Bring them in.
17      (Jury present.)
18              THE COURT:  All right.  You may be seated.
19  BY MR. BARTLETT:
20  Q.  Ms. Troxel?
21  A.  Yes, sir.
22  Q.  Are you aware that Ms. Waters has a website
23  "SupportBriana.org"?
24  A.  No, I am not.
25  Q.  Could you take a look at what's previously been marked for
```

1    identification as Government's Exhibit 1102 in front of you.

2        Do you see that?

3    **A.**   Yes, sir.

4    **Q.**   If you would look at page 3 of that document.

5              MR. BLOOM:   May I just interject, for the record, to

6    reflect that we are withdrawing the objection to any of these

7    questions.

8              THE COURT:   All right.

9    BY MR. BARTLETT:

10   **Q.**   Do you see at the third major paragraph on that page the

11   following:   "Briana has found two great lawyers, Robert Bloom

12   of Oakland and Neil Fox of Seattle.   They will be working

13   extremely hard in the coming months as approximately 100,000

14   pages of discovery material will need to be carefully

15   examined.   She and her family are now asking for your help to

16   raise the fees necessary to pay these highly skilled and

17   seasoned lawyers, as well as helping to offset travel

18   expenses.   We have a mountain to climb."

19       Do you see those words?

20   **A.**   Yes.

21   **Q.**   Did you ever give Ms. Waters money in relation to this?

22   **A.**   No.

23   **Q.**   Would it change your opinion that she was above reproach

24   if you were to know that Neil Fox, the person she was asking

25   for donations for, is in fact an attorney appointed by the

1    Court and paid by the Court?

2        Would that change your opinion as to her honesty?

3    **A.**  No, sir, because probably this wasn't even written by her.

4    This is obviously written by another party, and I think you

5    are grasping at straws.  It's just a simple -- maybe a

6    misstatement.  Mr. Bloom is getting paid, and she's a working

7    person.  You have to have money for these things.  It costs a

8    lot.

9    **Q.**  Ms. Troxel, could you look at the fourth paragraph where

10   it says "she and her family are now asking for your help"?

11       Wouldn't you agree that anyone reading that, "she and her

12   family are now asking for help," would read that as Ms. Waters

13   herself, not someone on her behalf, but Ms. Waters herself is

14   asking for donations?  Wouldn't you agree?

15   **A.**  I would agree that she is, but that doesn't mean she wrote

16   this, and if I had read this, I would have given her some

17   money.

18   **Q.**  If you were to know a second thing -- if you were to know

19   that, correct, Mr. Bloom was originally retained in this case,

20   but in June of 2007, he switched from being retained to where

21   his fees are also all being paid by the Court, therefore

22   Ms. Waters isn't paying him anything.  Would that change your

23   opinion as to her character being above reproach?

24   **A.**  No.  It makes me think much more highly of Mr. Bloom,

25   though.

1          MR. BARTLETT:   No further questions.

2          THE COURT:   All right.   She can be excused?

3          MR. BLOOM:   Let me just ask one question.

4     No, I have no questions.

5          THE COURT:   Then you are excused.

6          THE WITNESS:   Thank you, Your Honor.

7          MR. BLOOM:   I would like to offer this in evidence.

8          MR. BARTLETT:   That section, Your Honor --

9          MR. BLOOM:   I would like to offer the entire document

10    in evidence.

11         MR. BARTLETT:   I only asked for that section, Your

12    Honor.   There are other self-serving hearsay statements in

13    there that I object to --

14         THE COURT:   I will look at it if it goes beyond that.

15    That was only admitted for one issue?

16    All right.   We are back to Mr. Torres?

17         MR. BLOOM:   Yes, please.

18         THE COURT:   All right.   We will have him back.

19    Retake the stand.   Remember, you are still under oath.

20         ANTHONY TORRES, previously sworn further testified.

21              DIRECT EXAMINATION - CONTINUED

22    BY MR. BLOOM:

23    Q.  I think when we left off we were talking about the FBI

24    regulations, and we were talking about whether or not

25    taping -- making an audiotape of a person being interviewed

1  was possible.

2      Do you remember?  I think that's what we were talking

3  about.

4  **A.**  The recorded conversations, yes.

5  **Q.**  Now, you understood on that day -- we are talking about

6  December 16th of 2005, nine days after the arrests in the

7  Oregon case?

8  **A.**  Correct, 2005.

9  **Q.**  Did I say 2005?

10  **A.**  I was just confirming for myself, 2005.

11  **Q.**  You understood that there was a real possibility that

12  Ms. Kolar was going to confess to having burned down the

13  Center for Urban Horticulture; is that correct?

14  **A.**  No.  Actually, I had no idea what Ms. Kolar was going to

15  come in and tell us.  There was no contract ahead of time.

16  There was no agreement on what we thought she was going to

17  say.

18      We were advised by her attorney that she was going to come

19  in and talk about something to do with the conspiracy.  I had

20  no idea if she was going to confess to something or just give

21  us some minor details of some involvement.

22  **Q.**  In Mr. Friedman's office, the Office of the Department of

23  Justice, Western District of Washington, United States

24  Attorney, I assume there are recording devices; is that

25  correct?

1    **A.**  I have no knowledge of that.

2    **Q.**  Your office -- your FBI office is not very far from the

3    U.S. Attorney's Office at the time?

4    **A.**  No, not very far.

5    **Q.**  You had such equipment there; is that correct?

6    **A.**  We do have recording equipment in our office.

7    **Q.**  There are tape recorders that are manageable to carry, not

8    too big?

9    **A.**  I can imagine I could come up with one.  I don't know

10   where one is.  I don't keep one in my office, but I am sure if

11   asked I could come up with a small recording device.

12   **Q.**  Now, in the event that there were going to be -- was going

13   to be a confession, would it be important to be able to

14   tape-record that confession in order to make sure that the

15   person confessing -- that there was good documentation of a

16   confession?

17   **A.**  Well, again, it was never a consideration.  It never even

18   crossed my mind to record that conversation with Ms. Kolar.  I

19   never have before.  I never considered it before.  So I don't

20   know why I would have considered it this time.

21   **Q.**  Well, there are provisions in the FBI regulations for tape

22   recording an interview; is that correct?

23   **A.**  Well, I believe, yes, there are some provisions in

24   which -- I believe there's -- I don't know if it's a

25   provision.  It's certainly not a criteria, but I could ask,

1  according to the provisions, but it never even crossed my mind

2  because that's not our policy to do so.

3  Q.  Take a look at Exhibit A-213, which was introduced and

4  marked before you got off the witness stand.

5     If you could look at the first page of that, section 7-8,

6  recording of interviews.  Do you see that?

7  A.  7-8?

8  Q.  Yes, the last paragraph on that page.

9  A.  Yes, I see that.

10 Q.  Does it indicate that the use of recording devices to

11 record the confessions or interviews of witnesses is

12 permissible and authorized by the Special Agent in charge or

13 his or her designees.  And then there's a reference to the

14 specific regulation, the so-called MIOG, is that what it says?

15 A.  That's what it says, but it's not our practice, sir.

16        MR. BLOOM:  I offer in evidence Exhibit A-213.

17        MR. BARTLETT:  No objection.

18        THE COURT:  Admitted.

19           (Exhibit No. A-213 admitted.)

20 BY MR. BLOOM:

21 Q.  This part here, right?  That's what I just read, right?

22 A.  Let me read it to myself first, so I know what I am

23 agreeing to.  Yes.

24 Q.  The idea of the FBI's investigative work is to be as

25 accurate as possible in recording events that happened; is

1  that correct?

2  **A.** We were as accurate as possible when we were recording

3  this interview.

4  **Q.** I am sorry, could you say that again?

5  **A.** We were as accurate as possible when we were recording

6  this interview, when we were taking notes in this interview.

7  By recording meaning taking notes, I should clarify.

8  **Q.** Let's clarify that. When you say you were as accurate as

9  possible, was there any dispute at any time between you and

10  Agent Halla as to what exactly the witness Kolar said on that

11  day?

12  **A.** There were some disagreements. There was some confusion

13  between Mr. Halla and myself as to what Ms. Kolar said that

14  day.

15  **Q.** Had there been a tape recording, there would not have been

16  any confusion?

17  **A.** Perhaps.

18  **Q.** When you say perhaps, there would not have been any

19  confusion if her words were on tape; is that correct?

20  **A.** Well, it would have accurately recorded what she would

21  have said.

22  **Q.** Are there regulations, general FBI regulations about

23  making sure your notes are accurate?

24  **A.** I don't know, sir. I am not sure -- I can't think of a --

25  I don't know. I can't think of an actual procedure. If there

1   is one, I am not aware of.

2       What you are showing me here regarding the recording of

3   interviews, these are the guidelines that I'm aware of for

4   recording devices, but we strive to be as accurate as

5   possible.

6       We do our best -- I do my best -- to be as accurate as

7   possible.  If there are guidelines, then perhaps you can show

8   them to me.

9   **Q.**  Well, you are a supervising agent now; is that correct?

10  **A.**  I am.

11  **Q.**  And you know the guidelines, right?

12  **A.**  Which guidelines?

13  **Q.**  All the guidelines.  All the FBI guidelines.  You know

14  them, don't you?

15  **A.**  No, I do not.

16  **Q.**  You certainly know that the guidelines require accuracy in

17  both your notes and in your 302s, your FBI reports; is that

18  correct?

19  **A.**  That's not what I am saying, sir.

20  **Q.**  I am asking you --

21      MR. BARTLETT:  Objection.  First of all, they are

22  leading.  Second, he's not even letting him answer the leading

23  questions.

24      THE COURT:  If you give him a question, let him

25  answer.

1   **A.**  I think my testimony, sir, is I am not aware of a specific

2   guideline requiring that we are accurate in our interviews. I

3   try to be as accurate as best as possible. I am not aware of

4   a specific guideline or policy. It's common sense, sir, that

5   we would like -- we strive to be as accurate as possible.

6   **Q.**  Why would that be? Why would you want to be as accurate

7   as possible?

8   **A.**  To record -- well, to be fair.

9   **Q.**  There might be a time when you might have to testify in

10   court about the interview that you were giving; is that

11   correct? Or taking, I should say.

12   **A.**  Yes, there may be a time when I have to testify.

13   **Q.**  Right. So it's important to have an accurate record of

14   what the person said and the questions that he or she was

15   asked?

16   **A.**  It is important.

17   **Q.**  You don't need guidelines to come to that conclusion,

18   right?

19   **A.**  No.

20   **Q.**  Now, who was the Special Agent in charge on December 16th

21   of 2005?

22   **A.**  We have had several over the past several years.

23   **Q.**  Try to remember --

24   **A.**  I am trying, sir. In December of 2005 --

25   **Q.**  December 16, 2005.

**A.** Right. Possibly Mr. Charlie Mandigo, possibly Mr. Pat
Adams.

**Q.** Now, if the Special Agent in charge is out on some mission
somewhere or out to lunch, there is a person who would be the
acting Special Agent in charge; is that correct?

**A.** In the absence of the Special Agent in charge, there can
be a designated Special Agent in charge, yes.

**Q.** There is always a person to go to if you learn oh, this
witness is going to make a confession, maybe we should tape
it; there's always a person in charge to whom you could go to
get authorization; is that true?

**A.** If I needed authorization for any matter from an SAC in my
division, there's always somebody to go to.

**Q.** Did there come a time on December 16th -- we are talking
only about Jennifer Kolar -- what happened with her on
December 16th, that's what I am talking about, of the year
2005, her first interview with you. That's the reference
point.

Now, did there come a time during that -- the early part
of that interview that you understood that she was going to
confess to one or more crimes?

**A.** I remember prior to the interview beginning her attorney
stating to us -- and I don't believe Ms. Kolar was in the room
at the time -- that she was going to give us information on
three arsons. I don't remember if the words "confess" were

1  used, but I know that she was going to give us some

2  information on three arsons that she had knowledge of.

3  **Q.**  That she what?

4  **A.**  Had knowledge of, personal knowledge of.

5  **Q.**  So explain the timing again.  When did you learn this?

6  **A.**  If my memory recalls, it was just prior to, I guess you

7  would say, the official start of the interview, on which was

8  the preamble by her attorney, and I don't believe Ms. Kolar

9  was in the room at the time.  I think it was more of an

10  administrative matter.

11  **Q.**  Did you or Mr. Friedman or Agent Torres say:  "Hey, we

12  better get a tape recorder, there's a confession coming?"

13  **A.**  It never even crossed my mind.

14  **Q.**  That's because if the confession turns out to be something

15  that you eventually don't go with -- let me withdraw that.

16      Statements of witnesses.  You eventually put them in a

17  302; is that correct?

18  **A.**  The statements of witnesses, what they say, are reports

19  for the FBI.  There's a 302.  It's a report.

20  **Q.**  If a person is accused of a crime --

21      MR. BARTLETT:  Objection, Your Honor.  There's no

22  attempt to even give these open-ended questions.  It's just

23  leading, leading, leading.  This is direct examination.  I

24  would ask again that Mr. Bloom make an attempt to ask

25  nonleading questions.

1          MR. BLOOM:  Judge Burgess, it's very clear.  There's

2     no question ever, in four years, that the FBI agent involved

3     in the investigation is an adverse witness and we are

4     permitted to lead him.

5          THE COURT:  Let's see if I can get the two of you to

6     -- hold down any statements.  Ask the question, get a complete

7     answer and then move on to the next one, because over and over

8     and over again -- and if you can quickly get there, do that.

9          MR. BLOOM:  That's what I am trying to do, and I get

10    interrupted by Mr. Bartlett.

11         THE COURT:  All right.  Sometimes I don't know if you

12    need to preface a question before the question comes.  Just

13    ask the question and get an answer.

14         MR. BLOOM:  That's what I am trying to do, but I get

15    interrupted.  I will continue.

16    BY MR. BLOOM:

17    Q.  Once you prepare your 302, which is the typed report, am I

18    correct?

19    A.  Yes.

20    Q.  Is it correct that there's a good likelihood that that

21    statement will have to be turned over to a defense witness if

22    there's a criminal prosecution?

23    A.  The 302 should be turned over?

24    Q.  Yes.

25    A.  Yes.

**Q.** So that when you are preparing the 302, one of the FBI regulations, is it not correct, is that you should be accurate with that 302, bearing in mind that defense counsel may get a copy of that?

**A.** Again, I am not aware of any FBI regulations stating that we must be accurate in our reports or note-taking.

**Q.** Is there any discussion in any FBI regulations to the effect that -- which reminds you that defense counsel may ask for the FBI's written reports?

**A.** I don't quite follow the question.

**Q.** Is there a regulation that's entitled, "Reporting information that may become testimony," wherein you are instructed that when a Government witness testifies in court for the prosecution, the defense counsel may ask for the FBI's written record of the information brought out in the testimony; the FBI must have such information readily available for production in court?

Does that ring a bell to you as one of your regulations?

**A.** The process and the procedure rings a bell, and that's what I have always thought in understanding the processes. I am not sure if I learned that from a guideline or if I learned it from a manual or just instruction at the academy. I know that my notes and my 302s are discoverable.

**Q.** Discoverable, that's the word, meaning defense counsel such as myself and Mr. Fox may or probably will have that

1  document in order to cross-examine Jennifer Kolar?

2  **A.** I understand.

3  **Q.** Now, did there come a time during that interview that you

4  made notes of what Jennifer Kolar was staying?

5  **A.** The December 16th interview, yes, I made notes.

6  **Q.** Was Mr. Friedman also making notes?

7  **A.** Yes.

8  **Q.** Was Agent Halla also making notes?

9  **A.** Yes.

10  **Q.** Let me show you an exhibit.

11    Will you look at what should be in front of you A-29?

12  **A.** Yes.

13  **Q.** Are those your notes of the December 16th, 2005 interview

14  of Jennifer Kolar?

15  **A.** These are my handwritten notes from that interview on that

16  day.

17        MR. BLOOM:  I move those into evidence.

18        MR. FRIEDMAN:  No objection.

19        THE COURT:  Admitted.

20            (Exhibit No. A-29 admitted.)

21  BY MR. BLOOM:

22  **Q.** Could you look at the page with the Bates number on the

23  bottom right, 15307?

24  **A.** Yes, 15307.

25  **Q.** Do you remember Ms. Kolar saying to you that, "I

1  participated in three arsons, the University of Washington,

2  Cavel West and Susanville"?

3  **A.**  That's what my notes reflect.  I don't have an exact

4  recall of her saying those words, but since my notes reflect

5  that, then I would -- I don't know the exact words, but she

6  did say something to that effect, yes.

7  **Q.**  We would have the exact words if you had a tape recording,

8  right?

9  **A.**  Would we have the exact words of what she -- yes, we would

10 have the exact words if we had a tape recording.

11 **Q.**  But we don't have a tape recording?

12 **A.**  My policy is not to have a tape recording.  In my 11 years

13 I have not --

14 **Q.**  Why is that?  I'm sorry to interrupt.

15     You say that is not your policy.  Why is that your policy?

16 **A.**  Why is it the FBI's policy?

17 **Q.**  Why is that your policy?

18 **A.**  I don't know, sir, why that's the FBI's policy not to

19 record interviews.  I have always been taught, since my first

20 day -- my first days in the academy.  It's what I have always

21 understood from training agents and supervisors.  It's our

22 policy not to.  I don't know why that is.

23 **Q.**  It seems like you'd want to be able to have a tape

24 recorder to show a jury who really wants to know what Jennifer

25 Kolar said exactly on December 16th, right?

1    That would make sense, right?

2  **A.**  Well, my testimony and the testimony of agents will tell

3  the jury and others what she said on that day.

4  **Q.**  If there's a conflict in your handwritten notes between

5  you and the other agent, then a tape recording, needless to

6  say -- and I won't ask any more questions on this -- there

7  wouldn't be a problem of a conflict if there were a tape

8  recording, right?

9  **A.**  Perhaps; maybe there would not be confusion to the words

10 that were spoken.

11 **Q.**  Now, as to the words she spoke, she in so many words told

12 you she participated in three arsons, the University of

13 Washington, Cavel West and the California, Susanville, right?

14 **A.**  Yes, sir.

15 **Q.**  She didn't tell you, did she, at that time, that she'd

16 also tried to burn down the Wray Gun Club in Colorado?

17 **A.**  Not at that first interview, no.

18 **Q.**  So she said she was involved in three arsons, not four?

19 **A.**  During the first interview, I believe that's correct.  Her

20 memory was very fuzzy.  She was unsure about a lot of things,

21 and I believe at the time it was just those three arsons, yes.

22 **Q.**  And that fuzziness or uncertainty would be confirmed if

23 you had a tape recording, right?

24     MR. BARTLETT:  Objection, Your Honor, asked and

25 answered.

1    THE COURT:  I think you've covered that enough, Mr.
2  Bloom.
3  BY MR. BLOOM:
4  **Q.**  The fuzziness about what she said about the three
5  arsons -- let me withdraw that.
6      Did she ever tell you that day anything about a fourth
7  arson she was involved in?
8  **A.**  I don't recall, no.
9  **Q.**  Now, we did talk earlier about this was clearly a highly
10  intelligent woman; is that correct?
11  **A.**  I would characterize her as an intelligent woman, yes.
12  **Q.**  Now, did there come a time during that interview that she
13  told you about what had happened at Susanville?
14  **A.**  Yes.
15  **Q.**  If you could look at the page marked 15308.
16  **A.**  Yes.
17  **Q.**  Your handwriting says -- am I correct -- this is putting
18  up that page.  It says at Susanville; is that correct?
19  **A.**  That's correct.
20  **Q.**  Was she telling you, at the point that you wrote that, who
21  were the people who were involved in the Susanville horse
22  release and arson?
23  **A.**  Well, you have to understand the nature of this interview.
24  It was all over the place.  There was at one point when we
25  were so confused, we weren't sure -- I wasn't sure -- if she

1   was saying these people were absolutely there, if they

2   weren't.

3       She was going back and forth from arson to arson.  She

4   was -- I wasn't sure -- I mean, the notes reflect that she

5   wasn't sure in certain areas, and to my memory, it was just a

6   lot of confusion, but it does say at Susanville with some

7   names on it.

8   **Q.**   Look at the top of that page.  It says Susanville, right?

9   **A.**   Yes.

10  **Q.**   She told you she went down with Joe to California to do

11  it, right?

12  **A.**   Correct.

13  **Q.**   That was clear, right?

14  **A.**   I don't remember it being clear -- whether it was clear or

15  not.  Just because my notes say Susanville at the top doesn't

16  necessarily mean that everything below there is going to be an

17  accurate account of what happened at Susanville.

18  **Q.**   Let's go through this line by line.

19  **A.**   Sure.

20  **Q.**   Did you write the word "Susanville"?

21  **A.**   At the top of the page, I wrote that, yes.

22  **Q.**   Did you write that because now you were talking with her

23  about Susanville?

24  **A.**   My understanding, at the beginning of this page, that we

25  were going to talk about Susanville.

1  Q.  She was talking -- am I correct -- about going down with

2  Joe to California to do it?  And that would be Joe Dibee,

3  correct?

4  A.  Correct.

5  Q.  That was her former boyfriend?

6  A.  Yes.

7  Q.  That was a person who, at the time of Susanville, she was

8  a close friend?

9  A.  I would assume they were close friends, yes.  I guess --

10  yes.

11  Q.  And that she told you that Joe owed someone a job, an

12  animal rights job; is that correct?

13  A.  That's what she said.

14  Q.  That was clear and you wrote that down, right?

15  A.  Well, I mean, that seems to be more clear than anything

16  else in my notes because it has quotations around it.  So that

17  would tell me those were her exact words.  If there's a place

18  in my notes I put quotation marks, then that's how I remember

19  later those were her exact words.

20  Q.  Then did she tell you that Joe had been asked to cut out

21  fences and release horses?

22  A.  That's what my notes say.

23  Q.  And that's what she told you?

24  A.  Yes.

25  Q.  Did she tell you she knew Jack, who was dating Chelsea at

1   the time?

2   **A.**   That's what she said.

3   **Q.**   And that's what you wrote?

4   **A.**   That's what I wrote.

5   **Q.**   Did she tell you that she thought they were going down to

6   release horses?

7   **A.**   Yes, there was -- I can't remember exactly if she

8   thought -- if she was saying to us, I thought we were going

9   down to release horses, her and Joe thought.  I wrote I

10  thought we were going down to release horses, so I assume

11  that's what she told us, yes.

12  **Q.**   Whatever you wrote, you tried to make it an accurate

13  representation of what she was saying to you and Mr. Friedman

14  and Agent Halla; is that fair?

15  **A.**   I tried to make an accurate representation of what I

16  thought she was telling us.

17  **Q.**   Okay.  Did she say that when they got down, Jack and Joe

18  argued about something, a particular thing you wrote down?

19      Why be vague.  "When we got down there, Jack and Joe

20  argued about it now becoming an arson."

21  **A.**   Yes.

22  **Q.**   Who is Jack, by the way?  Is that Meyerhoff?

23  **A.**   Yes.

24  **Q.**   "Jack had built devices, buckets with" -- I can't read

25  that word.  What is that word after "buckets"?

1  **A.**  I believe it says "Meyerhoff."

2  **Q.**  You've written that under the word "Jack" as an indication

3  that you --

4  **A.**  Possibly, possibly.

5  **Q.**  And then you wrote "at Susanville," right?

6  **A.**  Yes, I wrote that.

7  **Q.**  Then there's a list of names; am I correct?

8  **A.**  There is.

9  **Q.**  Am I correct that she is telling you her best memory of

10  who was at Susanville; is that correct?

11  **A.**  Again, her best memory is not very good.

12  **Q.**  Sir, was she giving you her best memory of who was at

13  Susanville?

14  **A.**  She was trying to.

15  **Q.**  Other than your evaluation of it, that's what she was

16  telling you or trying to tell you?

17  **A.**  That's what she was trying to tell me, or us.

18  **Q.**  Did she tell you Joe was there?

19  **A.**  Yes.

20  **Q.**  Did she tell you Chelsea, also known as Josie --

21  **A.**  I don't want -- you weren't there.  You have to understand

22  the nature of this interview.  She was thinking out loud.  She

23  was confused.  At times, she was emotional.  I don't want to

24  commit to myself -- to you right now, if I have this name down

25  here, that she's absolutely saying these people were there.

1  **Q.**  Well, when she was not sure, she would tell you she wasn't

2  sure, didn't she?

3  **A.**  Not every time.

4  **Q.**  Take a look.  Dan McGowan.  Jay, question mark.  Not sure.

5  And you wrote "not sure," did you not?

6  **A.**  I wrote "not sure" then, but I am telling you, I am not

7  sure of when she told me Joe or Jack or Avalon or Crazy Dan,

8  if she was absolutely sure or not.

9  **Q.**  But you didn't write -- go down Crazy Dan and Tubbs,

10  right?  Take a look.  As to Dan McGowan, Crazy Dan and Tubbs,

11  you have both a question mark and the words that you wrote,

12  "not sure."

13     Is that correct?

14  **A.**  What's the question, I'm sorry?

15  **Q.**  I will ask it again.  When it comes to Dan McGowan

16  (Jamie), Crazy Dan, Tubbs, as to each of those three names,

17  you wrote a question mark and you wrote "not sure."

18     Is that correct?

19  **A.**  That's what my notes say.

20  **Q.**  Is that correct?

21  **A.**  That's what my notes say.

22  **Q.**  In fact, when she was not sure, she told you she was not

23  sure and you wrote "not sure"?

24  **A.**  Not necessarily, no.  There were times when I felt she was

25  absolutely confused and not sure, just by her nature, by her

1  hesitation, by her being emotional, by the overall confusion.

2      It was obvious to us that she was not sure about certain

3  things, and whether she told us she was not sure or not --

4  **Q.** I am saying, this jury has seen this person sitting just

5  where you are sitting.

6  **A.** I understand.

7      MR. BARTLETT:  Objection, Your Honor, this is

8  argumentative.

9      THE COURT:  Question.

10  BY MR. BLOOM:

11  **Q.** When you spoke to this woman, is this a woman that doesn't

12  have confidence and is not sure?  Is that what you are saying?

13  That that woman, Jennifer Kolar, is not a confident person,

14  speaking directly on that day?

15  **A.** During the December 16th interview, she was not confident

16  and she was not sure.

17  **Q.** And where she was not sure, that is what you wrote in your

18  handwriting?

19      MR. BARTLETT:  Objection, Your Honor, asked and

20  answered.

21      THE COURT:  He's answered it, so you will have to

22  accept the answer.

23  BY MR. BLOOM:

24  **Q.** Is there a "not sure" after Joe?

25  **A.** Are you asking on my notes is there a "not sure"?

1  Q.  Yes, sir, I am asking you that.

2  A.  No, there is not.

3  Q.  Is there a "not sure" after Chelsea (Josie)?

4  A.  No, sir, there is not.

5  Q.  As to Darren (Canada) Thurston, is there a "not sure"

6  after that?

7  A.  No.

8  Q.  She told you that he, Darren Thurston, he knew that it was

9  going to be an arson, right?

10  A.  That's what my notes reflect.

11  Q.  Those are the notes that you want to be as accurate as

12  possible, right?

13  A.  The notes aren't a transcript of what happened.  They are

14  just used to aid my memory later on.  Every single word that

15  Ms. Kolar or any subject or witness that I interview -- I am

16  not going to put down every single word that they say in my

17  notes.

18  Q.  But if they say they are not sure, you put that down

19  because that's important?

20  A.  I don't know if I would or not.

21  Q.  Now, at some point she said there, the last one, there was

22  an "un male," meaning unidentified male?

23  A.  The very last --

24  Q.  The last person who was at Susanville.

25  A.  Where it is says "un male, punk kid"?

1  **Q.**  That one.  Yes.  So she couldn't identify the person, but
2  she described him as a punk kid; is that correct?
3  **A.**  I don't know how she described him.  I don't know if she
4  just said punk kid as in a nickname or she described him as
5  someone would describe in their opinion someone who looks like
6  a punk.
7  **Q.**  Did she tell you that at Susanville, the people had camped
8  for three or four days?
9  **A.**  Yes, that's what I have in my notes.
10  **Q.**  So it's fair to say that you understood if that was true,
11  those are people she'd be able to identify she was with.  She
12  wasn't with them for an hour or two.  She was with them for
13  three or four days, as you understood it; is that correct?
14  **A.**  Well, I don't know if that necessarily means that she
15  would be able to identify them --
16  **Q.**  Please answer my question.  Did you understand that they
17  were there for three or four days together?
18  **A.**  I understood that they camped three to four days prior to
19  the arson.
20  **Q.**  You've investigated bank robberies where victims get to
21  see the robbers for 30 seconds or three minutes or five
22  minutes?
23  **A.**  A few.
24  **Q.**  And there's possible identification problems with a short
25  period of the person being -- a suspect being in the vision of

1  the witness, right?

2  **A.** At times.

3  **Q.** Three four days is about as long as it gets, isn't it, to

4  get to know who's with you?

5  **A.** Well, I don't know if they were all together that entire

6  time for the three, four days.  I don't know what happened

7  during those three, four days.

8  **Q.** Did you come to learn that there was a period where she

9  got in the car and went to get gasoline to use at that arson?

10  Did you come to learn that?

11  **A.** I don't recall that specific statement.  I don't know

12  that.  I don't know.

13  **Q.** Did there come a time that afternoon where you talked to

14  her, you and Agent Halla and Assistant United States Attorney

15  Andrew Friedman, spoke to her about the University of

16  Washington arson?

17  **A.** Yes, we did.

18  **Q.** Was that immediately after you talked about Susanville?

19  **A.** I don't know if it was immediately after.  I know we took

20  a few breaks here and there.  It was during the same

21  interview.

22  **Q.** The next subject matter that was discussed?

23  **A.** Yes.  But I am not sure if it was immediately after.  It

24  was the next subject matter.

25  **Q.** Just after you discussed the University of Washington,

1  there was still another discussion about a couple of other

2  matters, right?  About Joe Dibee having two airplanes -- look

3  at page 310 -- Joe Dibee having two airplanes and other things

4  about Joe Dibee, as somebody who was raised Catholic and Joe

5  has a powerful family in Syria, may be involved in the

6  military.  That was discussed at the end of meeting; is that

7  correct?

8  **A.**  That's correct.

9  **Q.**  But before the end of the meeting, you talked about the

10 University of Washington arson; is that correct?

11 **A.**  That's correct.

12 **Q.**  That was really important to the Seattle office of the

13 FBI, right?

14 **A.**  It is an important investigation.

15 **Q.**  Now, by the time that subject came up, you knew that she

16 was confessing to crimes; is that correct?

17 **A.**  Yes.

18          THE COURT:  Mr. Bloom, let me stop you there as we

19 get into the University of Washington matter to take the break

20 and then let you deal with that situation.  Take your

21 afternoon break.  Don't discuss the case.  Leave your books on

22 the chair.  I will have you back in here in about 15 minutes.

23     (Jury not present.)

24          THE COURT:  Then we'll be in recess.  Same

25 admonition, don't discuss the case.

1      THE CLERK:  All rise.  Court is in recess.

2    (Afternoon recess.)

3      THE COURT:  All right.  You may be seated.

4    Ready?  Bring them in.

5    (Jury present.)

6      THE COURT:  All right.  You may be seated.

7  Mr. Bloom.

8      MR. BLOOM:  Sure.

9  BY MR. BLOOM:

10  **Q.**  We were about to talk about what Jennifer Kolar told you

11  on December 16th of 2005, but just one preliminary question.

12      You understood that she had about nine days to think about

13  what she was going to say, nine days after the arrest of the

14  people in the Oregon case, right?

15  **A.**  There was about a week before.

16  **Q.**  December 7th and December 16th, a little over a week?

17  **A.**  Yes, a little over a week.

18  **Q.**  So when she told you -- you asked her about the University

19  of Washington Center for Urban Horticulture, she told you

20  about somebody named Peaches, a tall, lanky, blonde guy.  I

21  will put up this page of your notes.

22      They will be up here.  You can look at page 05103, if you

23  need to.  She told you that a tall, lanky, blonde guy from the

24  southwest showed up in Seattle to go scout the University of

25  Washington, right?

1  **A.**  Yes.

2  **Q.**  Was she clear on that?

3  **A.**  You know, I am not sure how clear she was on that.

4  **Q.**  If you had a tape, it would be clear, right?

5  **A.**  A tape recorder?

6  **Q.**  Yes, sir.

7  **A.**  If I had a tape recorder, I would know exactly the word

8  she said during the proffer.

9  **Q.**  And then she told you who was at the arson, did she not?

10  Did she not?

11  **A.**  She told us --

12  **Q.**  I am sorry.  Go ahead, I'm sorry.

13  **A.**  She told us that she was certain there were two people at

14  the arson.

15  **Q.**  Now, at this point, she was telling you who was at the

16  arson and we know that because you wrote the words "at arson"?

17  **A.**  Well, again, you know, there's differences in my notes and

18  there's differences in Agent Halla's notes, and we can compare

19  those if we need to.

20      But in terms of what she was saying to us, she was

21  certain -- and at one point we asked her, because there was so

22  much confusion, "what are you sure about, regarding the

23  University of Washington?"  And she said, "I am sure that I

24  was there and Avalon was there."

25  **Q.**  Now, let's get back to the question I asked.  You wrote

1    the words "at arson"; is that correct?

2    **A.**   I did write those words, yes.

3    **Q.**   Aside from conflicts or differences in your notes, and

4    Mr. Friedman's notes perhaps, we don't know.   Have you ever

5    seen Mr. Friedman's notes?

6    **A.**   No.

7    **Q.**   Now, whatever confusion may have -- there may have been

8    between your notes and Agent Halla's notes in the preparation

9    of the typed 302, on the day you were there, the afternoon of

10   December 16, you wrote the words "at arson," right?

11   **A.**   I wrote those words.

12   **Q.**   And then did she tell you that Avalon had organized -- he

13   was the person who organized the arson?

14   **A.**   Yes.

15   **Q.**   You put the number one next to Avalon; is that right?

16   **A.**   I did put the number one, yes.

17   **Q.**   And then she told you that there was another person there,

18   an unidentified female that she called Capitol Hill Girl; is

19   that correct?

20   **A.**   No.   She said that she was not certain if that person was

21   there or not.

22   **Q.**   This is Susanville.   Do you see that?   What's that say?

23   **A.**   Those words say "not sure."

24   **Q.**   What's that say?

25   **A.**   "Not sure."

1  **Q.** What's that say?

2  **A.** "Not sure."

3  **Q.** University of Washington, do you see any "not sure" there?

4  **A.** No, but --

5  **Q.** Do you see any "not sure" there?

6  **A.** No, sir, I do not see the words "not sure."

7  **Q.** Do you see any "not sure" next to any of those names?

8  **A.** Those words are not on there.

9  **Q.** In fact, she told you that person number two -- you wrote

10 the number two; that's your writing, the number two?

11 **A.** That's number two.

12 **Q.** And you wrote the words "unidentified female, Capitol Hill

13 Girl," right?

14 **A.** Those are the words I wrote, yes.

15 **Q.** And then you wrote "Crazy Dan guy" and you wrote the

16 number three, right?

17 **A.** Yes.

18 **Q.** And then you wrote "Punk Boyfriend, number four," and then

19 you did an arrow between the unidentified female and the Punk

20 Boyfriend to show that's the person she clearly told you, the

21 Punk Boyfriend of that woman, was person number four?

22 **A.** No.

23 **Q.** She didn't tell you that, but you put the number four

24 there, right?

25 **A.** I did put the number four there.

1  **Q.** And there's a number five and it says "me," and that means

2  Kolar, right?

3  **A.** Yes.

4  **Q.** Then she went on to say, the night of the arson somebody

5  met at the Greenlake bar to coordinate?

6  **A.** Yes.

7  **Q.** And what she told you is these are the five people that

8  met at that Greenlake bar to coordinate?

9  **A.** No, that's not what she told me.

10  **Q.** You are saying she was unsure, right?

11  **A.** I am saying she was unsure other than herself and Avalon.

12  **Q.** Now, did there come a time, jumping ahead to August of

13  2007, about six, seven months ago, do you remember -- I don't

14  know if you were present.

15      Did you come to learn that Mr. Bartlett, right here --

16  that he interviewed Jennifer Kolar?

17  **A.** I was not present during that interview.

18  **Q.** Did you come to learn that he had interviewed Jennifer

19  Kolar on August 15th of 2007?

20  **A.** I don't know that for sure.  I don't know.

21  **Q.** This is in evidence.  This is Exhibit A-67.

22      Could you read the highlighted part, please?

23  **A.** Paragraph 2?

24  **Q.** Yes.

25  **A.** "In preparing for Waters' upcoming trial, I met with

1   Jennifer Kolar and Michael Martin on Wednesday, August 15,

2   2007, to review the questions I anticipated asking her.

3   Toward the end of the interview, we reviewed Kolar's memory of

4   her first interview with federal law enforcement agents on

5   December 16, 2007.  Kolar indicated she remembered the

6   interview and believed that, when discussing the University of

7   Washington arson at the end of the interview, she identified

8   Bill Rodgers (Avalon), herself, Capitol Hill Girl, a punk male

9   whom she believed might be Capitol Hill Girl's boyfriend, and

10  Crazy Dan as people she believed had participated."

11  **Q.** So she apparently -- let me go to page 2 of that

12  declaration by Mr. Bartlett.

13      Could you read that line, please?

14  **A.** The last line?

15  **Q.** I declare.

16  **A.** Yes.  "I declare under penalty of perjury that the

17  foregoing is true and correct."

18  **Q.** Dated?

19  **A.** Dated this 27th day of August, 2007.

20  **Q.** That's 10 days -- I am sorry -- 12 days after Mr. Bartlett

21  interviewed Ms. Kolar, he filed this, he prepared and signed

22  this affidavit?

23  **A.** I am not sure when -- I don't know.  I wasn't there, so I

24  am not sure when the interview took place.  If you are saying

25  it's 10 days before, I don't know.

1 **Q.** In fact, Ms. Kolar stated to you on December 16th that

2 one, two, three, four, five -- those are the five people who

3 did this crime, didn't she?

4 **A.** No, she did not.

5 **Q.** And why would Mr. Bartlett report that that's what he told

6 her on the 15th of August, if that were not true?

7 **A.** I don't know.  The part you have highlighted here is

8 believed, and there's no certainty in this, that she believed.

9 This is not my affidavit, sir.  I did not participate in the

10 interview prior to this with Ms. Kolar.  I don't have any

11 knowledge of what happened or what was said in that interview.

12 **Q.** Does this in any way refresh your recollection, looking at

13 Exhibit A-67, as to in fact she told you those are the people

14 who committed the crime?

15         MR. BARTLETT:  Objection, Your Honor.  We've gone

16 over this 50 times.  This is my affidavit --

17         THE COURT:  Last time, I guess.

18 BY MR. BLOOM:

19 **Q.** Does it refresh your recollection?

20 **A.** My notes from December 16th refresh my recollection.

21 **Q.** You say your notes?

22 **A.** Refresh my recollection.

23 **Q.** These babies right here, right?

24 **A.** That's correct.

25 **Q.** Was I there?

1  **A.**  At the interview?

2  **Q.**  Yes.

3  **A.**  No.

4  **Q.**  Did I tell you to put one, two, three, four and five next

5  to these names?

6        MR. BARTLETT:  Objection, argumentative.

7        THE COURT:  This is argumentive now.  You will get a

8  chance to argue to the jury.

9        MR. BLOOM:  Fair enough.

10  BY MR. BLOOM:

11  **Q.**  Going back to some of the initial questions I asked, it's

12  important, FBI regulations and common sense tells you that you

13  want to be accurate in your notes, and you want to be accurate

14  in your typed record?

15  **A.**  Yes.

16  **Q.**  Did you do everything you could to be accurate in you

17  writing these words and these numbers on December 16th, the

18  very day she was talking, you were writing?

19  **A.**  I did my best to write down what I thought she was telling

20  us, and what was most accurate was using this as a guide to my

21  memory, for my memory in preparation for the FD-302.

22  **Q.**  Now, did there come a time when you and Agent Halla

23  prepared a 302 that reflected what had happened at the

24  December 16th interview?

25  **A.**  Yes.

1   **Q.**   When did you do that?

2   **A.**   When did I prepare the 302?

3   **Q.**   Yes, sir.

4   **A.**   Apparently -- and I have no recollection of this -- on a

5   Sunday.  I would have to review -- I believe it was the 18th,

6   two days after the interview, I initiated a draft of that 302.

7   **Q.**   All right.  Was Agent Halla with you?

8   **A.**   No, he was not.

9   **Q.**   How did you prepare it?  What instrument did you use to

10  prepare it?

11  **A.**   The 302, my desktop.

12  **Q.**   A computer?

13  **A.**   That's correct.

14  **Q.**   Do you have what's called a macro for preparing 302s?

15  **A.**   Yes, it's an FD-302 macro.

16  **Q.**   Could you explain to the jury what a macro is, please?

17  **A.**   A macro is a preloaded form, if you will, in which -- if I

18  want to generate a 302, there are some fields that I populate,

19  if you will, like the date, time, location.  And then that is

20  captured on certain parts of the FD-302, and then I can go

21  into my narrative.

22  **Q.**   Now, you typed some words into that macro form; is that

23  correct?

24  **A.**   I typed some words into that macro form -- are you talking

25  about the initial population of the form or the text?

1  **Q.** Whatever. Tell us what you did.

2  **A.** Okay. On the 18th of December, two days after the

3  interview, I initiated an FD-302 macro. One of the very first

4  things you do is, it asks you what date the investigation

5  happened on or the interview happened on.

6       It asks you to fill in the location, just certain basic

7  information like that. Then it brings you down to almost a

8  free form area where you can type a narrative of what

9  happened. On December 18th, I at least started that macro

10 process.

11 **Q.** When you started the macro process, there came a time,

12 whatever time that was on that Sunday, that you stopped,

13 right?

14 **A.** Yes.

15 **Q.** And did you save that document?

16 **A.** I must have saved that document.

17 **Q.** You wouldn't do otherwise?

18 **A.** Exactly.

19 **Q.** You don't want to duplicate your work?

20 **A.** No.

21 **Q.** You saved the document. When you save it, did you save it

22 within your computer?

23 **A.** Yes.

24 **Q.** Is that a desktop or laptop?

25 **A.** No, it's a desk computer.

**Q.** Did the document -- what word processing system do you use?

**A.** At that time, I don't know. I can't remember if it was Word Perfect, maybe Word Perfect. I can't remember.

**Q.** Could you speak a little louder, please.

**A.** At that time, I don't know if it was Word Perfect or not. I believe it was Word Perfect, but we switched. I am not sure. I don't remember.

**Q.** You titled the document and you hit save, right?

**A.** Yes.

**Q.** And then did you upload it to the FBI computer?

**A.** What do you mean by upload?

**Q.** Did you send it anywhere?

**A.** Well, I saved it, which would have saved it on my hard drive of the computer. I don't know if I sent it anywhere. I may have emailed a draft to Agent Halla, but I don't know. I know I saved it.

**Q.** You saved it to your hard disk on your desktop, correct?

**A.** Yes.

**Q.** So it should be there today?

**A.** No, it's not there today.

**Q.** Why not?

**A.** Because eventually, when it's uploaded as you say, then it's taken off our desktop hard drive, and I don't know what happens to it, actually, but it's off the hard dive and then

1   uploaded.

2   **Q.** If you were to give your hard drive to an expert, is it

3   your understanding that what -- the first thing you wrote, the

4   first macro you wrote, the first population of the what

5   happened section, that would be able to be reproduced or

6   reproduced by an expert?

7   **A.** It's my understanding that no, that very first draft or

8   even subsequent drafts is not kept anywhere. I am not a

9   computer expert. I don't know our operating systems

10   intimately, but it is my understanding it's not there.

11   **Q.** Would it be okay if you gave us your hard drive so we

12   could have it analyzed? Would you do that?

13   **A.** That is not up to me.

14   **Q.** It's your hard drive?

15   **A.** No, it's not. It's the Government's.

16   **Q.** Would you give them your approval to do it?

17   **A.** If the Government told me -- if the FBI told me to hand

18   over my hard drive, I would. But like I say, that is nowhere

19   near my area of approval or anything.

20   **Q.** It hasn't happened. You have not been asked by either

21   Mr. Friedman or Mr. Bartlett or Attorney General Gonzalez or

22   any of his designees to turn over your hard drive?

23   **A.** No.

24   **Q.** So whatever you first wrote on that hard drive, the very

25   first draft -- is that the right word? Is "draft" a good

1  word?

2  **A.**  I believe "draft" is fair.

3  **Q.**  Okay.  That would reflect -- if somebody had that -- that

4  would reflect just what it was you wrote based on your notes

5  of what happened at that interview, right?

6  **A.**  Are you saying if we had a copy of the draft I wrote on

7  that Sunday --

8  **Q.**  Yes, sir.

9  **A.**  -- we would know what it said?

10  **Q.**  Yes, sir.

11  **A.**  Yeah, sure.

12  **Q.**  Now, there came a time where there were several revisions

13  of that document; of the 302, I mean.

14  **A.**  Theoretically, yes.  There were several drafts, you know,

15  going back -- you know, Special Agent Halla and I were in

16  disagreement of what was said or what we understood what was

17  said, and so I remember having some, not disagreements, but

18  some discussions about that.

19      I remember having some confusion about that and going back

20  to our notes and our notes differing and our notes not being

21  exactly the same.  I don't recall the specifics of what we

22  were confused about.

23  **Q.**  Well, your notes were more complete in terms of the names

24  that were mentioned, more complete than Agent Halla's with

25  regard to the names that were mentioned in connection with the

1  University of Washington arson; is that correct?

2  **A.** I would need to refer to Mr. Halla's notes.

3  **Q.** Okay. Let me show them to you.

4  **A.** Okay.

5  **Q.** Or they are probably up there. If they are not, I think

6  it would probably be A-28.

7        MR. BARTLETT: Your Honor, I have no objection to

8  these notes being admitted either.

9        MR. BLOOM: I haven't offered them. I may offer

10  them. I would ask Mr. Bartlett not interrupt my questioning.

11  I am offering something during my examination. I think it's

12  improper.

13        THE COURT: Let's stay on track and get to the

14  questions and stop the bickering here. There's no need for

15  that.

16      I will give you my copy while we are waiting for the Court

17  copy.

18  BY MR. BLOOM:

19  **Q.** To save you time, you can look through any part you want,

20  but if you look at the page where the Bates number is

21  014005 -- I am sorry, start with 004.

22      That's where it begins about the University of Washington?

23  **A.** Yes.

24  **Q.** Is it fair to say in terms of names, your notes are more

25  complete than Agent Halla's notes? Your names include Crazy

1    Dan guy, and the punk boyfriend of the Capitol Hill Girl?

2    **A.**  My notes contain more names than his notes.

3    **Q.**  Right.

4    **A.**  Which speaks to the whole confusion of the matter.

5    **Q.**  Was she confused or were you confused or was he confused?

6    **A.**  We both were.

7    **Q.**  But, of course, once again, tape recorder, no confusion?

8    **A.**  A tape recorder would have recorded the exact words that

9    were said.

10   **Q.**  You understand in criminal cases, the burden of proof is

11   always on the prosecution?

12              MR. BARTLETT:  Objection, Your Honor, argument.

13              THE COURT:  Sustained.  I will tell them what the law

14   is.

15              MR. BLOOM:  Okay.

16   BY MR. BLOOM:

17   **Q.**  Was it in your mind -- withdraw.

18       Now, in fact, when was the completed version, the final

19   version of the typed 302 completed?

20   **A.**  I don't know exactly what day it was completed -- that

21   Special Agent finished typing it.  It was submitted and

22   finalized for serialization on February 9th.

23   **Q.**  How many different versions or drafts of that document

24   were prepared?

25   **A.**  Just one version, but I don't know how many drafts.

1  **Q.** I don't want to quibble with words, but there were drafts

2  and then there were changes, another draft would be made and

3  then there may be changes?

4  **A.** There may be, yes.

5  **Q.** How many different times was it changed before you all

6  arrived at the version, the final version?

7  **A.** I have no recollection of how many drafts there were.

8  **Q.** You have no recollection but the computer would tell the

9  story, right?

10  **A.** How so?

11  **Q.** The computer would have each of the drafts; is that

12  correct?

13  **A.** I am not sure if it would or not; I don't know.

14  **Q.** Now, there came a time on February 9th, I think you said,

15  that there was a version -- that was the version of what was

16  going -- did you say serialized?

17  **A.** Yes.

18  **Q.** What does serialized mean?

19  **A.** It's the way -- our supervisor initials the bottom part of

20  the 302, maybe Block stamps it with a date stamp, and then

21  that's when it becomes serialized. It becomes one of the

22  serials for the entire case file. It's given a number. Just

23  like our exhibits are given a number -- the 302s are given a

24  number.

25  **Q.** Now, are you able to -- did you have anything to do with

1  executing the search warrant at Mr. Dibee's either workplace

2  or home?

3  **A.** I did.

4  **Q.** Did you do an affidavit in support of getting a search

5  warrant wherein you talked about recovery of deleted files?

6  **A.** I did have an affidavit regarding a search warrant in

7  Mr. Dibee's residence. I did participate in a search of

8  Mr. Dibee's office at work. I don't recall the exact language

9  of that in terms of deleted files, if that's what you are

10  asking.

11  **Q.** Do you remember in an affidavit, an attempt to get the

12  search warrant, writing that "when a person deletes a file on

13  a home computer, the data contained in the file do not

14  actually disappear. Rather, the data remain on the hard drive

15  until they are overwritten by new data. As a result, deleted

16  files or remnants of deleted files may reside in free or slack

17  space, i.e., space on the hard drive that is not allocated to

18  an active file, or that is unused after a file has been

19  allocated to a sentinel block storage space for long periods

20  of time before they are overwritten."

21     Do you remember swearing to the truth of that statement?

22  **A.** No. I don't remember that statement at all. I remember

23  swearing to an affidavit for a search warrant, but I cannot

24  recall what was in the specific language of that affidavit.

25  **Q.** Now, when you prepared the typewritten -- I want to get

1  back to serialization.  Serialize kind of means what it says,

2  it has a chronological record of the documents that are filed

3  in the investigation; is that correct?

4  **A.**  Yes.

5  **Q.**  So that whatever serialization this numbered document is,

6  the 302 reflecting the Kolar interview, it would be in a

7  series of numbers; there would be a number before it, a number

8  after it, a lot of numbers before it, a lot of numbers after

9  it, right?

10 **A.**  Yes.

11 **Q.**  That's to keep track of the FBI work with regard to a

12 particular investigation, right?

13 **A.**  Yes.

14 **Q.**  So that even though the date, December 16th, would -- I am

15 sorry, December 18th would appear as the date of

16 transcription --

17           MR. BLOOM:  And I move in evidence A-27, which is the

18 302.

19           MR. BARTLETT:  For completeness, I think Special

20 Agent Halla's notes should also be, A-28, also.

21           MR. BLOOM:  If I may, Judge --

22           THE COURT:  When you get a chance to cross-examine,

23 we'll deal with that.

24           MR. BLOOM:  That's right.  I may do that; I may not

25 do that.  But for now, I am allowed to conduct my own

1   examination.  Could he please be instructed that he shouldn't

2   be doing that?  He shouldn't be interrupting me to offer

3   exhibits in evidence during my examination.

4          THE COURT:  I agree.  Let's wait the turn.  At the

5   same time, we don't need to spend a lot of time on this.

6   Like I said, stop the bickering; let's get to the issue.

7          MR. BLOOM:  This is it, Judge.  This is about what

8   Jennifer Kolar said --

9          THE COURT:  Would you ask the question, please?

10          MR. BLOOM:  I am, and I would appreciate --

11          THE COURT:  Would you ask the question?

12          MR. BLOOM:  -- Mr. Bartlett not interrupting me.

13      I offer into evidence Exhibit A-27, which is the typed 302

14   form.

15          MR. BARTLETT:  No objection.

16          THE COURT:  This is A-27?

17          MR. BLOOM:  A-27, yes.

18          THE COURT:  All right.

19                (Exhibit No. A-27 admitted.)

20   BY MR. BLOOM:

21   Q.  This is the first page of that document.  There's a copy

22   before you.  It says date of transcription 12-18-05?

23   A.  That's correct.

24   Q.  That's not exactly accurate.  It really should say 2-9-06?

25   A.  My practice, and from what I understand, the process is --

1    and what I've always done from the beginning of my career --

2    the date of transcription is the date I initiate that macro.

3    **Q.** Would you look at page 8 of the document? Right there.

4    **A.** Yes.

5    **Q.** Am I correct that the document I am touching is the

6    document that's finalized, serialized, approximately a month

7    and-a-half, almost two months after the interview; is that

8    correct?

9    **A.** Yes. I don't see a serialized stamp on here, but this

10    seems to be that final version, yes.

11    **Q.** Two months after the interview, you and Agent Halla agreed

12    that it should say, "The night of the arson, Kolar, 'Avalon',

13    and few other individuals met at a bar/restaurant."

14    Is that correct?

15    **A.** Well, I don't know whether we agreed on that paragraph,

16    whether it was early on in that time period or whether it was

17    on February 9th. But eventually, that's what we agreed on.

18    **Q.** That's what you put out there; is that correct?

19    **A.** Excuse me?

20    **Q.** That's what you put out there sometime after Briana Waters

21    had become a suspect?

22    **A.** That's what we put in this 302.

23    **Q.** Yes, sir. That's my question.

24    **A.** If you are asking me -- this 302 was finalized after the

25    name Briana Waters was given to me?

1  **Q.**  Yes, sir, that's my question.

2  **A.**  Yes, that's true.

3  **Q.**  Okay.  Is it fair to say what you didn't want to have in

4  your 302 was Avalon, Capitol Hill Girl, Capitol Hill Girl's

5  boyfriend, Crazy Dan?  You didn't want to have those names in

6  there when you were going to be accusing, perhaps, Briana

7  Waters; is that correct?

8  **A.**  What we wanted in this 302 was what our understanding is

9  the most accurate version, or the most accurate report, I

10 should say, of what was said to us on December 16th.

11 **Q.**  On December 16th, referring to your notes, this is what

12 you wrote?  You wrote in your handwriting?

13 **A.**  This is my handwriting.

14 **Q.**  And you wrote it?

15        MR. BARTLETT:  Objection, Your Honor, we have gone

16 over this quite a few times.

17        MR. BLOOM:  I will move on.

18 BY MR. BLOOM:

19 **Q.**  In fact, on the typed form, you didn't say anything there

20 about names, those three names, Capitol Hill Girl, punk

21 boyfriend, (Crazy Dan), not sure.

22        You didn't even put that in there, did you?

23 **A.**  That is not in the 302.  What was put in the 302, like I

24 said, is the most accurate understanding of what she meant and

25 what she said during her proffer.

1  **Q.**  You are sitting here in front of this jury and you are

2  telling this jury that this is not accurate --

3        MR. BARTLETT:  Your Honor, objection, argumentative.

4        MR. BLOOM:  I am not finished with my question.

5  BY MR. BLOOM:

6  **Q.**  Your handwriting statement is not accurate?  Is that what

7  you are saying?

8  **A.**  Well, it depends on what you mean -- it depends on what we

9  are talking about, the context we are talking about.

10     If you are talking about, is it accurate these are the

11  words I wrote, yes, those are the words I wrote.  That's

12  accurate.

13     Is it accurate in what she was telling us in who she

14  believed was at the arson, or not necessarily?  What was

15  accurate was she believed and she told us that she was

16  absolutely certain that Avalon and herself were at the arson.

17     If you compare my notes with Mr. Halla's notes, it

18  reflects that confusion.

19  **Q.**  I want to compare your notes about the University of

20  Washington to your notes about Susanville where you wrote "not

21  sure," when she wasn't sure.

22        MR. BARTLETT:  This is argumentative, objection.

23        THE COURT:  I think we are going back and forth now.

24  That's been covered and answered.

25  BY MR. BLOOM:

**Q.** Okay. Now, in fact, at the beginning of that interview, Mr. Friedman said to her, "It's most important to tell the truth." Is that true?

**A.** Yes.

**Q.** Was it explained to her what she was facing in terms of possible punishment?

**A.** I don't think so. I think what was explained to her is that it's most important that you tell the truth. I believe she was given what is called a proffer letter.

**Q.** I am sorry, a what?

**A.** A proffer letter.

**Q.** What's that?

**A.** A proffer letter -- a proffer is more of a one-sided conversation, not a confession. It's for someone -- like a pre-interview, pre-confession if you will.

It's someone coming to us, coming to the Government saying, this is what I know about a particular crime and perhaps my involvement in that crime.

Then it is up to the Government, based on that, whether we decide to file charges or not. It's more of a one-way interview, if you will.

**Q.** I am not quite clear on that. Who prepares that kind of document?

**A.** The U.S. Attorney's Office does.

**Q.** What does the document say more or less?

1  **A.**  More or less that you have to be truthful -- I don't know

2  specific -- I don't know the nuances of the legal proffer

3  procedure, other than you have to be truthful, that if no

4  charges are ultimately filed against you, then we cannot use

5  this information against you, from what I understand.

6  **Q.**  Does such a proffer say what she's accused of or give any

7  of the facts for which she's accused of?

8  **A.**  I don't know.  I don't believe so.  I would need a copy of

9  that in front of me.

10  **Q.**  In general, in other situations, other than Jennifer

11  Kolar?

12  **A.**  I don't know.  I can't remember.

13  **Q.**  So you can't remember if it says -- somebody says that

14  you -- maybe Stan Meyerhoff says you were involved or Joe

15  Dibee says you were involved, or somebody says you were

16  involved in a particular event, does it say anything like

17  that?

18  **A.**  I believe no.  I am not sure for certain, but I don't know

19  if a proffer letter has those specifics, other than the caveat

20  that she tells the truth and if we decide not to charge her

21  based on the information she gives us, that that information

22  cannot be used against her.  It's like a five-paragraph

23  document.  I would need it in front of me to --

24  **Q.**  So this letter, this proffer letter -- is the word

25  letter -- give me the word if I am not using the right word.

1    Proffer document?  Or just proffer?

2    **A.**  Just proffer.

3    **Q.**  And that's presented to the potential witness, potential

4    cooperating witness?

5    **A.**  Yes.

6    **Q.**  Through her lawyer -- his or her lawyer?

7    **A.**  Yes.

8    **Q.**  Is that your recollection of what happened on that first

9    day?

10   **A.**  Yes.

11   **Q.**  Do people sign that document?

12   **A.**  From what I recall, I believe she signs it and possibly

13   her attorney.  I don't know.  I don't know.

14   **Q.**  Think back.  That day, what time of day was it that you

15   first saw her?

16   **A.**  It was afternoon, late afternoon.  I am not sure exactly

17   what time it started.

18   **Q.**  Think back.  This proffer was given to her?

19   **A.**  Yes.

20   **Q.**  Did everybody around the table sign it, Ms. Kolar, her

21   lawyer, maybe Mr. Friedman, maybe not the agents, but maybe

22   Mr. Friedman?

23   **A.**  I don't recall signing it.

24   **Q.**  Do you remember Mr. Friedman signing it?

25   **A.**  I don't recall that.

1  **Q.** Did she say to you, myself -- I did it with Avalon and a
2  few other individuals? Did she say that?
3  **A.** No, she said she did it with herself and Avalon. That's
4  what she was certain about.
5  **Q.** You wrote -- what you wrote was, "The night of the arson,
6  Kolar, 'Avalon', and few other individuals met at a
7  bar/restaurant," that's what you wrote?
8  **A.** This is not what I wrote. Mr. Halla prepared this 302.
9  **Q.** Your name is on it; is that right?
10 **A.** My name is on it.
11 **Q.** Right there?
12 **A.** But that doesn't necessarily mean I typed or wrote those
13 words. If it's on page 8, I would submit that I did not write
14 those words.
15 **Q.** So you are putting it on Agent Halla?
16 **A.** I am not putting it on him. He's the one that wrote the
17 document.
18 **Q.** She told you that a few other individuals met at a bar;
19 did she tell you that?
20 **A.** Yes, she did.
21 **Q.** What is index -- tell the jury what indexing is.
22 **A.** Indexing?
23 **Q.** Yes, sir.
24 **A.** Indexing a document, when we submit our FD-302 to our
25 supervisor for serialization, we submit a second copy of it.

1    On the second copy, we would circle or underline a name, a

2    phone number in red ink or pen or pencil, and that would tell

3    the secretary, when she uploads it, to enter whatever is

4    circled, that name or phone number or address, into our FBI

5    database.

6    **Q.**  That's a really key part of how the FBI's investigations

7    work, is it not?  You get a name, you put it in the database

8    so that you and every other agent in the country can have

9    access to that; is that correct?

10   **A.**  Yeah.  It is accessible by -- most of the time, it is

11   accessible by -- you mean the 302s are accessible?

12   **Q.**  The names that are indexed.  Let me make clear what I am

13   asking.  Indexing is a very important part of FBI work?

14   **A.**  It is very important, yes.

15   **Q.**  It is important because indexing means you hear a name and

16   you write it.  You write it first in hand and then you put it

17   in a 302?

18   **A.**  Yes.

19   **Q.**  And then a clerk of some kind, an assistant at the FBI,

20   takes the 302, and does what they call indexes?

21   **A.**  Yes.

22   **Q.**  And indexing is you look at the name -- in fact, I don't

23   know if it's still true, but you used to put a vertical line

24   through the name to show that that name had been indexed.

25        Is that still the practice?

1  **A.**  Perhaps.  I don't know.

2  **Q.**  Well, you've seen 302s in the recent five years?

3  **A.**  Sure.

4  **Q.**  That's the way it's done.  In some way, there's an

5  indication from the clerk that the clerk has indexed the name?

6  **A.**  I am not sure.  I usually don't refer to the indexed

7  version of a 302 afterward.  I don't know what the checks and

8  balances are in terms of how it's indexed.

9  **Q.**  Whatever it is, it's important to get names and if you get

10  -- from the person being interviewed -- and when you get a

11  name, you put it in the 302 with whatever explanatory language

12  you need to do, to explain that this is a name that was

13  mentioned, but she wasn't sure.

14      That's what you do, just so that the names are there so

15  that you and whoever else takes up the investigation

16  understands that she mentioned the name and that you wrote

17  whatever it was that was pertinent about that name.

18      Now, if that's too long a question -- it is a long

19  question.

20  **A.**  Yes.

21  **Q.**  I will break it down for you.  I am sorry.

22      The importance of indexing is that way you know that any

23  name that you heard from a witness gets into the database?

24  **A.**  Not any name.  I can't sit here and say every name is

25  indexed, but I think the main names are indexed, the reference

1  names are indexed.  If it's significant, it's indexed.  I
2  can't say that every name is.  I am not sure.
3  **Q.**  If somebody is talking about politics and says Fidel
4  Castro, you don't index that, but if there's a mention that
5  this person was or may have been a person who committed the
6  arson, you would put that name down so it could be indexed?
7  **A.**  Yes.
8  **Q.**  She mentioned to you Capitol Hill Girl on December 16th,
9  did she not?
10  **A.**  She did mention the name Capitol Hill Girl.
11  **Q.**  She mentioned the punk boyfriend of Capitol Hill Girl?
12  **A.**  Yes, she did.
13  **Q.**  She mentioned Crazy Dan?
14  **A.**  She did.
15  **Q.**  Yet, none of those names wound up in your 302?
16  **A.**  At this point in the 302, soon after, I don't know how
17  soon -- relatively soon after Jennifer Kolar's interview,
18  there was an entire investigation going on, between
19  California, Oregon and Washington, and we very soon afterwards
20  discovered that those three individuals she named most likely
21  were not involved in the arson.  We knew that Crazy Dan was
22  the source.  To protect the source, we are probably not going
23  to index that person.
24      We knew that Capitol Hill Girl was another individual,
25  Savoie, who was confessing to crimes down south.   And punk

1  boy, eventually we found out who he was and never really

2  suspected him of anything.

3      And the serialization of the 302 happens when we -- I am

4  sorry, the indexing for the 302 happens at the point of

5  serialization and approval.  So if it was done on February

6  9th, then we've had several weeks to figure that out.

7  Q.  So, in other words, what you are saying is, you came to

8  determine that she was not telling you the truth on December

9  16th; is that correct?

10 A.  No, that's not correct.  She told us the truth when she

11 said she was certain that herself and Avalon were there, and

12 that she was uncertain about everyone else, we believed her.

13 Q.  She didn't say that.  She told Mr. Bartlett in August of

14 last year that she identified all those four people and

15 herself; she identified them as the participants.  That's what

16 she said then to Mr. Bartlett and that's what your notes tell

17 us.

18 A.  I wasn't there for that interview with Mr. Bartlett.

19 Q.  Oh, Mr. Bartlett is certainly not going to lie in a sworn

20 document, is he?

21 A.  No.

22      THE COURT:  Haven't we covered that?  Mr. Bloom,

23 haven't you already covered that?

24      MR. BLOOM:  I am now impeaching this witness because

25 he is clearly not telling us the truth.

1        MR. BARTLETT:  Objection, Your Honor.

2        THE COURT:  That's editorializing.  He won't agree

3   with you, and I think that's where it's at a standstill.

4        MR. BLOOM:  He doesn't have to agree with me.  It's

5   up to the jury to figure out once I present what he says and

6   what the facts are.

7        THE COURT:  What I am trying to get you to do, sir,

8   is not ask the same question over and over and over again and

9   get the same answer over and over again.

10       MR. BLOOM:  Fair enough.

11       THE COURT:  All right.

12  BY MR. BLOOM:

13  Q.  Now, you understood that this 302 that you finalized,

14  serialized on February 9th, that some defense lawyer of some

15  defendant would very likely discover that, get that document

16  disclosed to him or her; is that correct?

17  A.  Yes.

18  Q.  So you made a decision not to include Capitol Hill Girl,

19  boyfriend, and Crazy Dan in the 302?  You made that

20  decision -- you and Agent Halla together made that decision?

21  A.  That's correct.

22  Q.  The reason that you made that decision is because that

23  person -- in this case, Briana Waters -- could show a jury

24  that she, Jennifer Kolar, had given different names the very

25  first time she spoke to law enforcement?

1    **A.**   No.

2    **Q.**   You already told us she was cautioned how important it was

3    to tell the truth?

4    **A.**   Ms. Kolar?

5    **Q.**   Yes, sir.

6    **A.**   Yes.

7    **Q.**   Let's move to something else.

8    I want to talk about some other things that Jennifer Kolar

9    told you on that very -- at the very first interview.  If we

10   could look at your notes, which is Exhibit A-29, I think.  If

11   you could look at the page that's designated 015310, and the

12   reason I use that is because you didn't number the top of the

13   pages 1 through whatever, right?

14   I am not saying you should have.  I am just saying they

15   are not otherwise numbered.

16   **A.**   Okay.  I have A-29 in front of me.

17   **Q.**   If you look at page 015310.  The last three digits are

18   310.

19   **A.**   Yes.

20   **Q.**   Okay.  Now, use that if you like, but I am going to put it

21   up.

22   Now, did Jennifer Kolar tell you that about a week before

23   the arson, Avalon contacts me about fire at UW?

24   **A.**   That's what she told us at this interview.  That's what I

25   wrote down.

1  **Q.** At that interview, she didn't say, did she, it was either

2  Avalon or Briana Waters?

3  **A.** No, that was at a later interview.

4  **Q.** In fact, at this interview, she never once mentioned

5  Briana Waters; is that correct?

6  **A.** That's correct.

7  **Q.** If you were to be told that she testified it was either

8  Avalon or Briana Waters who contacted her a week before the

9  fire, that would not be supported by what she told you at the

10  first interview, would it?

11  **A.** I believe she told us that at a subsequent interview.

12  **Q.** Right, after she had made a decision that she was going to

13  try to pin it on Briana Waters --

14       MR. BARTLETT:  Objection, Your Honor.  This is just

15  argument.

16  BY MR. BLOOM:

17  **Q.** At this first interview, she said it was Avalon who came

18  to her, who contacted her about the fire, right?

19  **A.** That's what I have in my notes, and I am just wondering if

20  --

21  **Q.** Take a look at Agent Halla's notes, if you like.

22  **A.** I would like.  Thank you.

23  **Q.** Sure.  Anything to refresh your recollection.

24  **A.** Which exhibit is his notes?

25  **Q.** I think that would be A-28.

1          MR. BLOOM:  For Mr. Bartlett, let me offer that into

2    evidence.

3          MR. BARTLETT:  Thank you, Mr. Bloom.

4          MR. BLOOM:  Sure, Mr. Bartlett, any time.

5          (Exhibit No. A-28 admitted.)

6    **A.**  I have his notes in front of me, but I can't --

7    BY MR. BLOOM:

8    **Q.**  Just take a look at any part of them you want.  Perhaps it

9    would help chronologically to try to find -- it's about the

10   University of Washington event.

11        So if you look in that section of his notes and see if it

12   refreshes your recollection about what it was that Jennifer

13   Kolar told you, Mr. Friedman and Agent Halla, about who if

14   anyone contacted her a week before the incident.

15   **A.**  Well, his notes are -- he has Capitol Hill Girl here, and

16   he has Avalon next to a five and six.  I think chronologically

17   that's where we would be at a week or two before the arson.

18        I am assuming that's shorthand for maybe that's who

19   approached him -- I don't know.  His notes are not --

20   **Q.**  Not as complete as yours?

21   **A.**  I don't know if they are not as complete, but they are

22   more fragmented, I should say.

23   **Q.**  That's why the two of you took notes, and perhaps

24   Mr. Friedman also, so that with them all, you could put

25   together a 302, right?

1  **A.**  Yeah, Agent Halla's notes and my notes were used to
2  generate the 302.
3  **Q.**  Not Mr. Friedman's notes?
4  **A.**  I never saw Mr. Friedman's notes.
5  **Q.**  So, is there anything -- is it fair to say there's nothing
6  in Agent Halla's notes about what Kolar told you about arson
7  -- I am sorry, about Avalon contacting her about a week before
8  the fire?  It doesn't say one way or the other, right?
9  **A.**  It doesn't say those words.
10 **Q.**  Is there anything in there that refers to that at all?
11 **A.**  It says "months before, walked around building."
12 **Q.**  Well, the months before refers to when Peaches came to her
13 and the two of them went and scouted or reconned the Center
14 for Urban Horticulture, right?
15 **A.**  Yes.
16 **Q.**  That's what that refers to?
17 **A.**  I think so.  Then below that, it just has "A," which I
18 assume is Avalon organizing the fire, because that's what I
19 understood, and then Capitol Hill Girl.  You have to ask Agent
20 Halla if that's what he meant.
21 **Q.**  So fragmented seems to be a good word, that his notes are
22 more fragmented than yours?
23 **A.**  That's my characterization of his notes.
24 **Q.**  And that can happen, people take notes in different ways,
25 right?

1  **A.** Yes.

2  **Q.** And your notes, as you learned -- you had five names and

3  numbers next to them, right?

4  **A.** Yes.

5  **Q.** Now, if you look at the same page of your notes, page 310,

6  and it's up there --

7  **A.** Yes.

8  **Q.** -- did she tell you and Mr. Friedman and Agent Halla that,

9  "We all drove from someone else's car.  We were all in one

10  car/van and we left someone at the car for lookout"?

11  **A.** That's what I wrote.

12  **Q.** Did you write "van" because she said it could have been a

13  van?

14  **A.** You know, I don't recall exactly.  I don't know if I was

15  thinking van or thinking car, but that's what I wrote.

16  **Q.** You were probably real tired, it was the end of the day,

17  and you like to write the letters V-A-N?

18  **A.** That's not what I am saying.

19  **Q.** Why did you write "van"?  Because she told you it could

20  have been a van?

21  **A.** Perhaps, I don't know.

22  **Q.** Well, you wouldn't have written it for any other reason,

23  right?

24  **A.** I don't know.  I have "car/van."  Agent Halla has "car."

25  I remember that's what we were in disagreement about, and

1   that's why "vehicle" ended up in the 302.

2   **Q.** So you went to "vehicle" because you didn't want to put

3   the word "van," V-A-N, in the 302, did you?

4   **A.** It's because we weren't sure.

5   **Q.** But this is one thing that she wasn't sure about, whether

6   it was a car or a van, so she said it could have been a car,

7   it could have been a van, she wasn't sure. Isn't that what

8   happened?

9   **A.** No. I don't know. I don't think so.

10   **Q.** Is it fair to say that you can't give us a reason, other

11   than she might have said it, why you would have written the

12   word "van"?

13   **A.** I cannot give you a reason.

14   **Q.** Did she also tell you on that day -- did she tell you

15   earlier in the interview or did you know otherwise -- did you

16   know Joe Dibee? Did you know the name?

17   **A.** Yes.

18   **Q.** In fact, did you go to see him shortly after December 7th?

19   Did he come in? Were you involved in questioning him?

20   **A.** When he came into the U.S. Attorney's Office?

21   **Q.** Yes.

22   **A.** Yes, I was there.

23   **Q.** He came in, you let him go home and before you knew it, he

24   was long gone, right?

25   **A.** That's correct.

1 **Q.** And so you knew who he was, right?

2 **A.** Yes.

3 **Q.** You knew he had been involved in a number of arsons; is

4 that correct?

5 **A.** That's correct.

6 **Q.** You also knew that -- what did you know about his

7 association with Jennifer Kolar?

8 **A.** Before that meeting or as a result of meeting with

9 Ms. Kolar?

10 **Q.** What have you come to learn about his relationship to

11 Jennifer Kolar?

12 **A.** I have come to learn that they were friends, at times

13 close friends and dated on and off, maybe dated for a

14 six-month period.

15 **Q.** Did you ever see a picture of the two of them together?

16 THE COURT: Mr. Bloom, you are going into the Court's

17 file now.

18 MR. BLOOM: I am sorry, because I am not remembering

19 the exhibit number.

20 MR. FOX: May I help you?

21 MR. BLOOM: What's the photograph?

22 BY MR. BLOOM:

23 **Q.** Now, did you have a discussion with Jennifer Kolar about

24 Joe Dibee?

25 **A.** We asked her some questions about Joe Dibee.

1   **Q.**  Did you ask -- did she say something about Joe Dibee?

2            MR. BLOOM:  Exhibit 527, thank you.  I am going to

3   put it up on the screen.

4   BY MR. BLOOM:

5   **Q.**  Putting up Exhibit 527 that's in evidence, what does that

6   depict?

7   **A.**  That is a picture of Joe Dibee and Jennifer Kolar.

8   **Q.**  This is also Jennifer Kolar?

9   **A.**  I believe so.

10  **Q.**  Was that seized either at Dibee's work or home?

11  **A.**  I do remember seeing this before.  I believe it was taken

12  from his residence, not his office.

13  **Q.**  Did there come a time when his name came up with Jennifer

14  Kolar on December 16th of '05, in connection with the UW

15  arson?

16  **A.**  Did he come up as -- when we were discussing the UW arson?

17  **Q.**  Yes, sir, that's my question.

18  **A.**  Okay.  It's not one of the names.  I remember asking -- I

19  think we asked if he was there or not, and I think she said

20  she wasn't sure, or no, she wasn't sure, or -- there it is.

21  **Q.**  There it is.

22  **A.**  Joe wasn't there, not sure.

23  **Q.**  Joe wasn't there, and she said not sure of that, right?

24  **A.**  Uh-huh.

25  **Q.**  This guy right here, right?

1  **A.** Yes, that's Joe Dibee.

2  **Q.** Her boyfriend?

3  **A.** Uh-huh.

4  **Q.** She wasn't sure if he was there or not?

5  **A.** Well, she wasn't sure -- she had characterized him as the

6  grandfather of a lot of things in the movement, providing

7  materials, providing maybe money, providing equipment for

8  direct actions.  So I have some recollection that she wasn't

9  sure if he had provided some tools or --

10 **Q.** I am sorry?

11 **A.** Some tools or some equipment.

12 **Q.** How about providing himself, picking her up and going to

13 Susanville and committing an arson with her?  How about that?

14 Did he do that, too?

15 **A.** I think that's what she said, that Joe picked her up; I

16 went down with Joe to California to do it.

17 **Q.** To do it, the arson, Susanville, right?

18 **A.** Yes.

19 **Q.** She said, when discussing the University of Washington

20 arson, she said she wasn't sure if he was there?

21 **A.** Right.  That's not what I am saying.

22 **Q.** No, I am asking you.  Withdrawn.  Please answer.  I'm

23 sorry.

24 **A.** I am not saying that that specifically-- that those words

25 "not sure" means she's saying she's not sure he wasn't there,

1  rather than not sure he provided some kind of assistance,

2  whether it's there or not.

3  **Q.** It says, the words you wrote, "Joe wasn't there, (not

4  sure)." That's what you wrote. It wasn't about providing

5  assistance. The question was, was Joe Dibee there, and she

6  said he wasn't there, but I am not sure of that.

7  **A.** No, I am not sure that's what she said. I am not even

8  sure that's what the question was. The notes aren't a

9  transcript of the interview. They are just used to aid my

10 memory later.

11 **Q.** You know to this day that Jennifer Kolar has not

12 identified Lacey Phillabaum as being at that incident, the

13 University of Washington? You know that, right?

14 **A.** Yes.

15 **Q.** And you know, as we've said, that she, Kolar, is a very

16 intelligent person?

17 **A.** She is, yes.

18 **Q.** With lots of responsibilities that require intelligence

19 and memory and the kinds of skills that intelligent people

20 have?

21 **A.** I would say so.

22 **Q.** Did it occur to you that she was perhaps covering for Joe

23 Dibee when she said he wasn't there, not sure?

24 **A.** I had no reason to believe that.

25 **Q.** Now, Joe Dibee, she described him; is that correct? As

1    the interview went on, if you look at the bottom of the page.

2  **A.**   Yes.  I remember -- the majority of the interview had

3    concluded and we were wrapping things up, and we knew

4    Mr. Dibee had fled the country and we were asking her some

5    intelligence questions that may help us track him down.

6  **Q.**   She told you he had two airplanes?

7  **A.**   Yes.

8  **Q.**   And he would fly to -- could you read --

9  **A.**   I think that refers --

10 **Q.**   I can't read them, fly to?

11 **A.**   I think that refers to California, New Mexico, Canada,

12   often.

13 **Q.**   And he was raised Catholic, or she was?

14 **A.**   I believe that refers to he was raised Catholic.

15 **Q.**   Am I correct that you came to learn that they committed

16   the crime at Susanville five months later together?

17 **A.**   Yes.

18 **Q.**   That was one month after the disaster of September 11th;

19   is that correct?

20 **A.**   Yes.

21 **Q.**   In the Susanville arson, did you come to learn that they

22   went to Susanville in his car, in Joe Dibee's car?

23 **A.**   I believe that's what she said.

24 **Q.**   Right, and they didn't go in a rented car.  They went in

25   his car, a car registered in his name?

1  **A.**  I don't know if it's registered in his name, but I believe

2  she said they went down in his vehicle.

3  **Q.**  Now, Cavel West, did she talk to you -- if you go back to

4  page 04 of your notes, 15304, when she talked about Cavel

5  West, which she admitted to, right?

6  **A.**  Yes.

7  **Q.**  Did she tell you she went in either a Subaru or 4-Runner?

8  You can take a look at that page.

9  **A.**  Yes, either -- it looks like I have Subaru crossed out,

10  and then a 4-Runner.

11  **Q.**  That was Joe Dibee's car, right?

12  **A.**  I assumed -- I believe Joe Dibee drove a 4-Runner, so I

13  think so.

14  **Q.**  So at Susanville, he committed the arson with her, right?

15  **A.**  Yes.

16  **Q.**  At Cavel West, he committed the arson with her, correct?

17  **A.**  Yes.

18  **Q.**  He was the one who brought the timing devices to Cavel

19  West; is that correct?

20  **A.**  My notes say, "Joe brought the timing devices.  Went off

21  prematurely."

22  **Q.**  This is Cavel West, right?

23  **A.**  This is Cavel West.

24  **Q.**  And it's an arson, right?

25  **A.**  Yes.

1  **Q.** If you also look on 307, did he also tell her -- did she

2  report that he had told her, with regard to the Vail fire,

3  Vail, Colorado -- you remember that, right?

4  　　Do you remember investigating -- that's part of your

5  investigation, the Vail fire?

6  **A.** It's part of the overall conspiracy, yes.

7  **Q.** She reported that Joe had said to her, "I'm not directly

8  involved in Vail. I may have supplied the equipment"?

9  **A.** Joe said, "I'm not directly involved in Vail. May have

10 supplied equipment." That's what I have in quotes.

11 **Q.** Joe Dibee was a busy guy when it came to these arsons,

12 wasn't he?

13 **A.** He was.

14 **Q.** Joe Dibee is her boyfriend, right?

15 **A.** At one time, they were boyfriends. I can't remember

16 during which arsons they were boyfriend and girlfriend,

17 together, but at one time they dated, yes.

18 　　　　MR. BLOOM: May we break for the day, please? I have

19 substantial more questions.

20 　　　　THE COURT: All right. Then we'll recess for the

21 day. I will have you back here in the morning, hopefully

22 where you are, at 9:00. Don't discuss the case as you go

23 about your business with anybody. Leave your books on the

24 chair. Have a good evening.

25 　　See you at 9:00.

1    (Jury not present.)

2         THE COURT:  All right.  You may be seated.

3    Of course, you may step down and you are, of course, not

4    to discuss your testimony.

5         THE WITNESS:  Yes, sir.

6         THE COURT:  Anything else we need to do?

7         MR. BARTLETT:  Not from the United States.

8         MR. BLOOM:  No, thank you.

9         MR. FOX:  I don't think so.

10        THE COURT:  All right.  I will see you in the

11   morning.

12        THE CLERK:  All rise.  Court is adjourned.

13        (The Court recessed to Tuesday, February 26, 2008, at

14   the hour of 9:00 a.m.)

15                    *   *   *   *   *

16                   C E R T I F I C A T E

17

18   I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20

21   /S/  Teri Hendrix                May 5, 2008

22   Teri Hendrix, Court Reporter              Date

23

24

25