1            UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
2                  AT TACOMA

3

4  UNITED STATES OF AMERICA,     )  Docket No. CR05-5828FDB
                                 )
5           Plaintiff,           )  Tacoma, Washington
                                 )  February 26, 2008
6  vs.                           )
                                 )
7  BRIANA WATERS,                )  VOLUME 11
                                 )
8           Defendant.           )
   _____)

9

10                  TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE FRANKLIN D. BURGESS
      SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12

   APPEARANCES:
13

   For the Plaintiff:       MARK N. BARTLETT
14                          ANDREW C. FRIEDMAN
                           Assistant United States Attorney
15                          700 Stewart Street, Suite 5220
                           Seattle, Washington 98101-1271
16

   For the Defendant:       ROBERT BLOOM
17                          Attorney at Law
                           3355 Richmond Boulevard
18                          Oakland, California 94611

19                          NEIL M. FOX
                           Cohen & Iaria
20                          1008 Western Ave., Suite 302
                           Seattle, Washington 98104

21

22  Court Reporter:          Teri Hendrix
                           Union Station Courthouse, Rm 3130
23                          1717 Pacific Avenue
                           Tacoma, Washington  98402
24                          (253) 882-3831

25  Proceedings recorded by mechanical stenography, transcript
   produced by Reporter on computer.

1          <u>I  N  D  E  X</u>

2          INDEX OF WITNESSES
           ==================

3
   <u>WITNESS ON BEHALF OF DEFENDANT</u>:                          <u>Page</u>

4
   ANTHONY TORRES - CONTINUED

5
        Direct Continued by Mr. Bloom................... 2088
6       Cross by Mr. Bartlett........................... 2168
        Redirect by Mr. Bloom........................... 2178
7
   HEATHER MOORE
8
        Direct by Mr. Fox............................... 2184
9       Cross by Mr. Friedman........................... 2195
        Redirect by Mr. Fox............................. 2202
10
   JAMES DAWSON
11
        Direct by Mr. Bloom............................. 2203
12      Cross by Mr. Bartlett........................... 2206
13
   JULIE FRANK
14
        Direct by Mr. Bloom............................. 2213
        Cross by Mr. Friedman........................... 2216
15
   GREGORY LADUE-GROVE
16
        Direct by Mr. Bloom............................. 2221
17
   SARAH WALD
18
        Direct by Mr. Bloom............................. 2226
19
   DIANA WRUBEL
20
        Direct by Mr. Bloom............................. 2234
21
   JAY DOANE
22
        Direct by Mr. Bloom............................. 2243
23
   LAWSON DUMBECK
24
        Direct by Mr. Bloom............................. 2246
25

1                   I N D E X

2              INDEX OF WITNESSES
             ==================

3

   WITNESS ON BEHALF OF DEFENDANT:                Page

4

   LAURIE MEEKER

5

       Direct by Mr. Bloom............................ 2255
6        Cross by Mr. Bartlett......................... 2262

7    GARY VARNELL

8        Direct by Mr. Bloom............................ 2262
       Cross by Mr. Bartlett......................... 2273

9

10

               INDEX - EXHIBITS

11    EXHIBITS                          Page

12    No. A-114                        2131
   No. 1114                        2171
13    No. 1117                        2175
   No. 732                         2197

14

15

16

17

18

19

20

21

22

23

24

25

1          TUESDAY, FEBRUARY 26, 2008 - 9:00 A.M.

2                        * * *

3     (Jury not present.)

4          THE CLERK:  This is in the matter of United States of

5     America versus Briana Waters, CR05-5828FDB.

6     Would counsel please make their appearance for the record?

7          MR. FRIEDMAN:  Good morning, Your Honor.  Andrew

8     Friedman and Mark Bartlett for the United States.

9          MR. FOX:  Good morning.  Neil Fox and Robert Bloom

10    for Ms. Waters, who's present.

11         THE COURT:  All right.  We are ready to continue with

12    Mr. Torres?

13         MR. BLOOM:  Yes.

14         THE COURT:  Have Mr. Torres come in and take the

15    witness chair.

16    Mr. Torres, just take the witness chair and remember, you

17    are still under oath.

18    All right.  Bring in the jury.

19    (Jury present.)

20         THE COURT:  All right.  You may be seated.

21    Good morning to you.  We are ready to continue where we

22    left off with Agent Torres.

23         MR. BLOOM:  Good morning.

24    ANTHONY TORRES, previously called, further testified as

25    follows:

1          DIRECT EXAMINATION - Continued

2   BY MR. BLOOM:

3   **Q.** A few more questions about your dealings with Jennifer

4   Kolar.

5      Now, when she spoke to you that same day, December 16th,

6   she told you that she had participated in the Susanville

7   arson; is that correct?

8   **A.** Yes, sir.

9   **Q.** She told you that one of the things that she did was she

10  went in with four buckets of gasoline; is that correct?

11  **A.** I think I testified yesterday that I wasn't sure if that's

12  what she told us.  I'd have to review my 302.

13  **Q.** Could you take a look at the 302, which is Exhibit A-27?

14  I am sorry, I misdirected you.

15     Could you take a look at your notes, which is Exhibit

16  A-29, and look at page -- the last three digits are 309?

17  **A.** Yes, I see that.

18  **Q.** Did she tell you anything about that she went in with four

19  buckets, about the third line down?

20  **A.** Yes.  It says, "I went in with four buckets with Jack.  He

21  set two.  I set two."

22  **Q.** She set two buckets with gasoline to go up in flames to

23  burn down that facility.  That's what she told you, right?

24  **A.** Yes, some kind of flammable liquid.  I don't know if it

25  was gas, but that's correct.

1  **Q.** She was not just a peripheral figure in that arson, she

2  was deeply involved in the actual event; is that correct?

3  **A.** She was involved.

4  **Q.** That's what she told you?

5  **A.** Yes.

6  **Q.** I am going to leave that day, December 16th, and I am

7  going to move on to the next time you spoke to her, which

8  would have been -- am I correct -- about two-and-a-half, maybe

9  three weeks later, January 6th of 2006?

10 **A.** No, sir, I was not at that meeting.

11 **Q.** You were not there?

12 **A.** No.

13 **Q.** Did you come to learn that there was an interview on that

14 date --

15       MR. BARTLETT: Okay. The question should be what

16 this witness has permanent knowledge about, not something he

17 might have learned about reading other reports. He should

18 just go to this witness's personal knowledge.

19       THE COURT: Let me ask you, because this is your

20 witness you are calling --

21       MR. BLOOM: Yes.

22       THE COURT: -- so I am trying to understand why you

23 are going over something involving this case that he says he

24 wasn't there at the meeting.

25       MR. BLOOM: All right. I am going to move on. I

1  don't disagree, except that you shared --

2        MR. BARTLETT:  Objection, we don't need an editorial.

3        THE COURT:  The objection is well taken.  I don't

4  want you to go into explaining anything.  If I rule on it,

5  stop it there and then move to the next question.

6        MR. BLOOM:  That's fine.  I will do just that.

7  BY MR. BLOOM:

8  **Q.**  Did you share information with Agent Halla at this

9  investigation?

10  **A.**  Yes.

11  **Q.**  Did you share information with Mr. Friedman and

12  Mr. Bartlett in this investigation?

13  **A.**  Yes.

14  **Q.**  Did there come a time when you yourself participated in an

15  interview with Jennifer Kolar any time after December 16th of

16  '05?

17  **A.**  Yes.

18  **Q.**  When was that?

19  **A.**  I believe the next one was January 12th.

20  **Q.**  At the January 12th interview, did she tell you of her

21  participation in the Santa Cruz book club meeting?

22  **A.**  That's correct.

23  **Q.**  She gave you the names of the people who were present?

24  **A.**  I believe so.  I would have to refer to the documents, but

25  I believe that's correct.

1  **Q.** When you say the documents, do you mean the 302 or your
2  handwritten notes or both?

3  **A.** Both.

4  **Q.** Do you have in front of you -- I am going to get the
5  exhibit for you to look at. But meanwhile, let me ask you,
6  did she tell you in that interview that she had participated
7  in an arson at the Cavel West --

8      MR. BARTLETT: Objection, Your Honor. Ms. Kolar has
9  testified. That testimony is in front of the jury. If there
10  is a prior inconsistent statement that he wants to elicit from
11  this witness, that is proper at this point in time. But
12  simply to rehash what Ms. Kolar and Special Agent Halla have
13  already testified to is simply not allowed under the Rules of
14  Evidence.

15      He should not be allowed to go over all the evidence that
16  was already heard. If he wants to get prior inconsistent
17  statements out, that's admissible. This is not.

18      THE COURT: Maybe he can tell me what he's trying to
19  do.

20      MR. BLOOM: I am trying to do exactly what
21  Mr. Bartlett suggests, prior inconsistent statements.

22      THE COURT: Then you may ask the question.

23  BY MR. BLOOM:

24  **Q.** I am sorry, I may not have given you A-33. Do you have
25  A-33 in front of you?

 1          THE CLERK:   No.

 2          MR. BLOOM:   Thank you.  It's on the way.  It's in the

 3 mail.

 4 BY MR. BLOOM:

 5 Q.  Now, preliminarily, if you look at page 3 of that

 6 exhibit -- it may not be on page 3, but I am sure you can

 7 remember -- did she tell you about how she had bought a whole

 8 bunch of soap, dozens of bars of soap?

 9          MR. BARTLETT:   Objection, that isn't an inconsistent

10 -- prior inconsistent statement.  That's exactly what

11 Ms. Kolar testified to.  That's what I am objecting to.

12          MR. BLOOM:   If I may --

13          THE COURT:   What's prior inconsistent about that?

14          MR. BLOOM:   That first question is not a prior

15 inconsistent statement, but I am setting the stage for what

16 she told him.  I can only ask one question at a time.

17          THE COURT:   All right.  Answer the question.  What I

18 am concerned about, Mr. Bloom, is we are going over and over

19 and over like a broken record and I am trying -- if we don't

20 have to do that, there's no need to do that.  I want you to go

21 to something that is going to assist the jury in this case.

22          MR. BLOOM:   No witness, other than Ms. Kolar, has

23 testified to this event --

24          THE COURT:   Mr. Bloom, ask the question, please.

25 BY MR. BLOOM:

**Q.** Do you remember she told you she bought dozens of bars of soap and she processed it into a paste of some kind; is that correct?

**A.** Are we referring to the January 12th interview?

**Q.** Yes.  I am thinking, did you take handwritten notes?

**A.** I don't recall if I did or not.  If you have them, I would like to have them, please.

**Q.** What I want to talk about is if there is anything in this document that refreshes your recollection or helps you recall whether she talked about, on January 12th, what she did with regard to Cavel West.

MR. BARTLETT:  Your Honor, I might have the wrong 302.  I am not seeing anything in my report on this issue at all.

MR. BLOOM:  I would appreciate not being interrupted in my examination.

THE COURT:  He's making an objection about whether it's prior inconsistent.

MR. BARTLETT:  I think there's a chance we are on the wrong 302.

THE COURT:  It may be.  Let me see you get some questions down the line and maybe some determination can be made.  If I can stop the two of you from going at each other and jumping up and down, we may get through this.

MR. BLOOM:  I think Mr. Bartlett is actually correct.

1  I think I am discussing the wrong interview.  It was the

2  interview which he was not present.

3          THE COURT:  Then move to the right one.

4          MR. BLOOM:  I am going to move on and not ask

5  questions about that.  Mr. Bartlett is correct that --

6          THE COURT:  I don't need you to editorialize.  If I

7  say just move on, just go on to the next one.  You don't need

8  to comment on it.

9          MR. BLOOM:  Fine.  Fine.

10          THE COURT:  Okay.

11  BY MR. BLOOM:

12  **Q.**  Now, on January 12th, an interview which you were present,

13  that's where she talked about Santa Cruz; is that correct?

14  **A.**  Yes.

15  **Q.**  She gave you -- am I correct -- she gave you names of

16  people who were at that meeting; is that correct?  Look

17  through at page 3.

18  **A.**  Yes, I see that.

19  **Q.**  And Briana Waters was not one of those people; is that

20  correct?

21  **A.**  Her name is not listed.

22  **Q.**  Correct.  That was a meeting where you were informed by

23  Ms. Kolar that what was discussed was Chelsea Gerlach talked

24  about using codes; is that correct?

25          MR. BARTLETT:  Objection, Your Honor.  This is all

1  consistent with what Ms. Kolar testified to. There's nothing

2  inconsistent about these questions.

3           THE COURT: I am waiting. He says he's going to get

4  to something inconsistent, so I am waiting on that to happen.

5  **A.** Can you repeat the question?

6  BY MR. BLOOM:

7  **Q.** Yes. That is the meeting, that discussion of January 12th

8  where she was talking about the Santa Cruz book club meeting,

9  one of the things she told you was that Chelsea Gerlach taught

10 all the people present about how to use codes; isn't that

11 correct?

12          THE COURT: Hasn't that been covered, Mr. Bloom?

13          MR. BLOOM: It's been covered by Ms. Kolar. If I

14 may, I am not limited to just talking about prior inconsistent

15 statements. If I may -- I am talking about, and I am allowed

16 to question about what it is he learned from Ms. Kolar on that

17 day.

18      Even if she has testified consistently, I can still talk

19 about that and where that led the investigation, and that's

20 what I am trying to do.

21          MR. BARTLETT: I disagree. The conversations between

22 Ms. Kolar and this witness, her statements to him, are

23 hearsay. They are inadmissible. The only thing admissible at

24 this time through this witness, that he chose to call, are

25 prior inconsistent statements.

1    Those are the Rules of Evidence.  If he wants to explain

2 what prior inconsistent statement he wants to elicit and go

3 into, that's perfectly allowable.  But simply to rehash what

4 Ms. Kolar has already testified to, that is consistent with

5 her testimony, is not allowed under the Rules of Evidence.

6         THE COURT:  All right.  Mr. Bloom -- let me have you

7 folks step out for a moment.

8    (Jury not present.)

9         THE COURT:  Okay.  Be seated.  Mr. Bloom, it is my

10 understanding now, you called this witness?

11         MR. BLOOM:  Yes, I did.

12         THE COURT:  It is your witness, so you are calling

13 this witness, I guess, to rebut or to find something

14 inconsistent about whatever testimony that you are looking

15 for?

16         MR. BLOOM:  In part.

17         THE COURT:  Otherwise, then it would be your witness

18 as to the events of which this Defendant is here today.  So

19 why are we going and rehashing, going over and over again,

20 what the witness has already testified, if it's not what you

21 are getting from this witness, inconsistent to that?

22         MR. BLOOM:  I don't see where you are saying over and

23 over again.  There was testimony from Kolar --

24         THE COURT:  Then I would suggest you get the

25 transcript and read it, if you don't think you are going over

1  it and over it again.

2     I am talking now about how you approach questions that

3  would be as to this witness.  What do you want from this

4  witness?  Do you want to see something that's different than

5  what you heard?

6          MR. BLOOM:  I would ask that the witness be excused

7  while we discuss this.

8          THE COURT:  All right.  Why don't you step outside.

9          (Witness departed courtroom.)

10         MR. BLOOM:  One of the things, in addition to prior

11  inconsistent statements with regard to the witnesses with whom

12  he spoke, I am also entitled to explore, just as they were

13  entitled to explore, the direction and the events of this

14  investigation.  That's much of what they did.  I don't see why

15  we can't do the same thing.

16         MR. BARTLETT:  And I have no objection --

17         THE COURT:  Wait until he's through.

18         MR. BLOOM:  I am done.

19         MR. BARTLETT:  I have no objection to that.  If he

20  wants to put the witness on the stand and indicate, did you

21  have a conversation with Ms. Kolar on January 12th, yes.

22  Pursuant to that conversation, what did you do in this

23  investigation?  There's nothing improper about that.

24     What is improper is to painstakingly rehash and rehash

25  what Kolar has already testified to.  Her statements to this

1  witness are only relevant with regard to if they are prior and
2  inconsistent.  If they aren't, he can merely ask what he did
3  with this investigation, and that can go fairly quickly and we
4  can get done with this trial.

5          MR. BLOOM:  Judge, they spent two weeks on this
6  trial.

7          THE COURT:  They have to put on a case.  They have
8  the burden here.  But I want -- I am dealing now with what you
9  are trying to elicit from this witness, other than a
10 regurgitation of this over and over or reading these things
11 that are going over and over and over again.  I want you to
12 ask something that would go to the defense of this witness,
13 other than, like I said, I am seeing a wheel here.  That's all
14 I am saying to you.

15         MR. BLOOM:  I am not sure what the Court means by
16 over and over.  Kolar testified to this.  Nobody else
17 testified to this.  This is the first questions about this, of
18 any witness.  What's over and over?

19         THE COURT:  You've asked all the questions of her
20 when she was on the stand.  Now you are asking questions of
21 him, what did she say to him that would be inconsistent with
22 what the testimony would be.

23         MR. BLOOM:  That's one, and as we've acknowledged and
24 Mr. Bartlett has acknowledged --

25         THE COURT:  Let me put it this way.  When I think you

1   are going over and over again, I am going to tell you to move

2   on.

3          MR. BLOOM:  I am asking for the Court's basis of over

4   and over.  I have never asked these questions of him.

5          THE COURT:  When I think you are asking a question

6   improperly, I am going to ask you to move on.

7          MR. BLOOM:  That's legitimate, but I am wondering

8   where the Court gets -- can I be heard, please?

9          THE COURT:  You can be heard.  You keep talking.

10   Tell me when you are through.

11          MR. BLOOM:  I will.  I have never asked these

12   questions.  One witness, Kolar, has testified about what she

13   says happened with regard to, for example, buying a bunch

14   of -- I am sorry, talking about another issue, talking about

15   the codes, what was discussed at the Santa Cruz book club

16   meeting.  She has testified about that.

17     First of all, we are not bound to accept the truth of her

18   testimony.  This is a witness who heard her talk about that on

19   January 12th.  I am entitled to ask what it was that she said

20   on that day.

21     Now --

22          THE COURT:  And your purpose?

23          MR. BLOOM:  -- and where that took the investigation.

24   I am entitled to ask that, in addition to being entitled to

25   ask about prior inconsistent statements.  Both of those things

1 are legitimate areas of inquiry, and this is no over and over.

2 I don't know where the Court is coming from by over and over.

3   THE COURT:  Have you completely made your record,

4 sir?

5   MR. BLOOM:  I am finished, sir.

6   THE COURT:  Bring the jury in.

7   MR. BARTLETT:  If I could just be heard.  It is no

8 different than the United States -- the fact that he is the

9 opposing party is irrelevant with regard to an analysis of

10 whether or not this is admissible testimony.  It would be no

11 different for me to call Ms. Kolar to the stand, get all of

12 the direct out, and then called Ted Halla and say gee, tell us

13 everything she told you, and go through all the direct

14 examination again.  It is not allowable.  He can say it is.

15 It isn't.

16   THE COURT:  This is a little bit different because

17 you are talking about two witnesses who would be your

18 witnesses.

19   MR. BARTLETT:  Prior inconsistent statements, that's

20 the only thing he can bring out through this witness.

21   THE COURT:  Let me do this.  Let me ask the two of

22 you to let me do my best to run this case.

23   MR. BLOOM:  Of course.

24   THE COURT:  Bring in the jury.

25  (Jury present.)

BY MR. BLOOM:

**Q.** Agent Torres, just in general -- I will be very direct here -- you learned from Jennifer Kolar or you heard from Jennifer Kolar on January 12th of '06, that she particularly had brought PGP disks to distribute to each of the participants; is that correct?

**A.** Yes.

**Q.** You came to learn that she instructed the group at some point; is that correct?

**A.** Yes. The 302 states that Kolar taught the group how to use PGP encryption and anonymizer and other security type software.

**Q.** Speaking to her on that day, is it fair to say that you realized that Jennifer Kolar was very much at the center of this group of people, a very important, integral part of the operations of this group of people who were doing arsons?

**A.** Well, I don't know if I would say she was at the center of this or an integral part of it. My understanding is, several people came to the meetings with possibly their own areas of expertise and security. Computer security was maybe her area of expertise. I wouldn't say she was a central part of that. I am not sure.

**Q.** Well, you did also come to learn by that time that she was involved in, count them, four arsons, right?

**A.** Well, the initial meeting, she told us she was involved in

1  three.  Which is the fourth you are referring to?

2  Q.  The Wray Gun Club that she remembered, quote/endquote, at

3  some point before this interview?

4  A.  Yes.  At some point, I do recall her mentioning that she

5  took responsibility for the Wray Gun Club incident, yes.

6  Q.  So by January 12th of '06, you had come to learn that she

7  did instruction of the other people on security, provided PGP

8  disks, and was a person who was actively involved in four

9  separate arsons?

10  A.  What I am saying --

11  Q.  Is that true?

12  A.  No, I haven't answered the question.

13  Q.  Okay.  Go ahead, please answer.

14  A.  What I am saying is on January 12th -- I am trying to

15  recall if that's the meeting where she said she was

16  responsible for the Wray Gun Club or not.

17  Q.  Even if it was after, right, by the time you understood --

18  you understood, did you not, that she was involved -- let me

19  withdraw that.

20      By the date of this interview, January 12th, you

21  understood that she was involved in at least three separate

22  arsons in which she was an active participant?

23  A.  That's correct.

24  Q.  And you understood that she did this instruction at the

25  Santa Cruz book club meeting with regard to security issues?

1  **A.**  Yes.

2  **Q.**  Is it fair to say you had come to understand by that time

3  that this woman was a major criminal?

4       MR. BARTLETT:  Objection, Your Honor.  This is

5  argument.

6       THE COURT:  Sustained.  That's argument.  Move on.

7  BY MR. BLOOM:

8  **Q.**  Now, is it true that she told you that there was -- at the

9  Santa Cruz meeting, there was a next book club meeting that

10  was scheduled for Olympia; is that correct?

11  **A.**  Yes.

12  **Q.**  And that she was asked to find a location for that?

13  **A.**  Yes.

14  **Q.**  Again, an indication to you, was it not, that she was a

15  very active member of this group of people?

16  **A.**  She was a member of this group of people.  It was still

17  unclear how active she was, but she was a member of this

18  group.

19  **Q.**  Did she go on that day, which is January 12, 2006, to talk

20  about the Olympia meeting, the next book club meeting?  If you

21  look at page 6.

22       MR. BARTLETT:  We've just gone through the first

23  meeting.  There's nothing inconsistent.  We are rehashing what

24  we've already heard.  I object to this line of questioning.

25       MR. BLOOM:  Excuse me, you tell me no speeches.

1          THE COURT:   He can make an objection.   What I am

2     asking is, when I say move on to something that would be

3     inconsistent or what's been different than what's been

4     testified to.

5          MR. BLOOM:   I am allowed to ask the progress of the

6     investigation --

7          THE COURT:   Ask the question.

8          MR. BLOOM:   --what he learned.

9          THE COURT:   Ask the question.

10          MR. BLOOM:   -- what he learned from Jennifer Kolar is

11     important.

12          THE COURT:   Ask the question.

13     BY MR. BLOOM:

14     Q.   I am asking you, sir, about what you learned from Jennifer

15     Kolar on January 12th, okay.

16          Did you learn from her that the next book club meeting was

17     in Olympia?

18     A.   The second meeting?

19     Q.   The second meeting she had been to.

20     A.   Yes.

21     Q.   Did she give you the names of the people that she

22     remembered being at that book club meeting?

23     A.   That's what I am trying to find in the 302, where it

24     specifically says who was at that meeting.

25     Q.   Let's just skip that.

1   **A.**   Okay.

2   **Q.**   At the January 12th of '06 interview, was she shown

3   photographs?

4   **A.**   Yes.   On that page, page 6, it says Kolar was shown

5   photographs of the following individuals.

6   **Q.**   Was she shown a photograph of Briana Waters?

7   **A.**   It looks like that's No. 4.

8   **Q.**   Right.   Did she state to you that this person, in that

9   picture, looked like Briana?

10  **A.**   The 302 states that it says, "Kolar stated this individual

11  looked like Briana."

12  **Q.**   Did she say at that point, Briana, the person who was the

13  lookout at the University of Washington arson?   Did she say

14  that?

15  **A.**   I don't recall if that's what she said or not.

16  **Q.**   You certainly would have written that down if she said

17  that, right?

18  **A.**   Perhaps.   I am not sure.

19  **Q.**   Why would you have not written that down if she said that?

20  **A.**   Do you have my notes, sir?

21  **Q.**   I don't have your notes.

22  **A.**   Well, then I don't know if I would have written it down or

23  not.   I am not exactly sure what she said.

24  **Q.**   Whatever it was she said, it didn't wind up in the 302,

25  right?

1   **A.** I am not saying that. Like I have testified before, our

2 notes aren't transcripts of the interview. So we are not

3 writing down everything she says.

4   **Q.** If she had said, Briana Waters, looking at that picture,

5 that's the woman who was at the University of Washington

6 arson, you would surely have put that in your 302, would you

7 not?

8   **A.** Perhaps. I am not sure. I did not write this 302, and if

9 I took notes, I would like to see them.

10   **Q.** You were present and your name is on there with Agent

11 Halla; is that correct?

12   **A.** Yes. That's true.

13   **Q.** You testified about how you collaborated with him in

14 preparing the final serialized version of the documents, the

15 302s, right?

16   **A.** We discuss the interviews. It's a process, yes.

17   **Q.** Try to answer my question. If she had said Briana Waters,

18 that picture, that woman, that's the woman who was at the

19 arson at the University of Washington, can you possibly

20 imagine any reason you would not include that in the 302; any

21 reason whatsoever? You tell the jury.

22   **A.** I am not sure, sir.

23   **Q.** In any event, it's not in the 302, right?

24   **A.** It is not in the 302.

25   **Q.** Now, there was another interview the next day. I think

1  you were not there; is that correct?  The 13th?

2  **A.**  That's correct.  I was not there.

3  **Q.**  Now, on the 17th of January, a few days later, there was

4  another interview.  Were you present for that?

5  **A.**  I don't believe so, no.

6  **Q.**  Okay.  Now, there was another interview two or three weeks

7  after that, another interaction, I should say, between you and

8  Jennifer Kolar.  That would be February 4th of 2006?

9  **A.**  Correct.

10  **Q.**  That was the day that you and Agent Halla and she drove to

11  Olympia from Seattle; is that correct?

12  **A.**  Yes, sir.

13  **Q.**  Was she shown photographs on that day?

14  **A.**  Yes.  Special Agent Halla showed her some photographs.

15  **Q.**  Did she look at a photograph of Justin Solondz?

16  **A.**  I would need to refer to the report.

17       MR. BLOOM:  I am sorry, Pat.  Could he be shown A-43

18  and A-44?  Thank you.

19  BY MR. BLOOM:

20  **Q.**  Could you please look at A-43 and A-44?  Are those both

21  302s, or is one of them notes?

22  **A.**  A-43 is a 302 and A-44 is a 302.

23  **Q.**  Now, on that day, if you can look at page 1, I think it is

24  A-43.  Was she shown a picture -- Jennifer Kolar -- shown a

25  picture of Justin Solondz?  If you look at the first page of

1 picture No. 5.

2 **A.** It says No. 5, correct, Justin Solondz, and then it has

3 "no" afterwards.

4 **Q.** It says Justin Solondz.  Does that mean she looked at the

5 photograph and she said I don't know that person?

6 **A.** I believe so.

7 **Q.** Now, did there come a time when there was a discussion

8 about Briana Waters on that day?  That would be February 4th

9 of '06.

10 **A.** Yes.

11 **Q.** If you could look at page 2 of that document and go to the

12 bottom.  She told you, did she not, that Briana was outgoing,

13 clean cut, into singing and music?

14 **A.** That's what the 302 says.

15 **Q.** It also says, "Kolar did not recall Briana and Lacey being

16 close friends"?

17 **A.** That's what the 302 says, yes.

18 **Q.** Before I get to that specific entry, am I correct that

19 during the discussion of Briana Waters, February 4th,

20 Ms. Kolar did not say Briana Waters, that's the person who was

21 involved with me in the arson at the University of Washington?

22 Did she say that?

23 **A.** I am not sure.  You'd have to understand, this was in a

24 moving vehicle.  I was driving.  We were on I-5 when this was

25 happening.  Special Agent Halla was in the passenger seat.

1    Jennifer Kolar was in the rear seat, and Special Agent Halla

2    is asking her questions.  I have snapshot memories of when we

3    were driving that day, but I was trying to concentrate on

4    driving.

5    **Q.**  Was Agent Halla taking notes?

6    **A.**  I don't recall if he was taking notes or not.

7    **Q.**  Do you recall if he was?

8    **A.**  I don't recall whether -- I would be very surprised if he

9    wasn't taking notes.

10   **Q.**  That's part of your investigative responsibilities; is

11   that correct?

12   **A.**  Yes.

13   **Q.**  There came a time when you arrived in the Olympia area; is

14   that correct?

15   **A.**  Yes.

16   **Q.**  There came a time when you were not driving; is that

17   correct?

18   **A.**  Yes.

19   **Q.**  At any time with her that day, any time, did she say that

20   Briana Waters was involved in the University of Washington

21   arson?

22   **A.**  We went to the Evergreen State College in Olympia and we

23   walked out to the campus and to the library area.  I believe

24   that's when she told us a preplanning meeting happened for the

25   University of Washington, and that Briana Waters had arranged

1   that room for it, because I believe she was a student there.

2   **Q.** Okay. I will get back to that in a moment.

3   **A.** Okay.

4   **Q.** At any time, is there any indication in your 302, or any

5   memory that you have, of her saying Briana Waters participated

6   on May 20th, 21st, in the arson at the University of

7   Washington?

8   **A.** Can I review the 302 before I answer that?

9   **Q.** Of course. Yes. What is your answer to my question?

10   **A.** I don't see in the 302 where it states that.

11   **Q.** And this is the day where she did discuss Briana Waters;

12   is that correct?

13   **A.** Yes.

14   **Q.** Did she also tell you on that day that she recalled --

15   she, Kolar -- recalled calling Lacey Phillabaum from a pay

16   phone once? You can look on page 2, right in the middle.

17   **A.** I see that.

18   **Q.** Do you recall hearing that and possibly thinking this is a

19   woman who knows how to contact anybody she wants to in a

20   clandestine way?

21   **A.** I don't recall that at all.

22   **Q.** You don't recall thinking that?

23   **A.** I don't recall this statement.

24   **Q.** It's not a statement. I am saying, she told you that she

25   called Lacey from a pay phone once; is that correct?

1 **A.** Yes. It says, "Kolar recalled calling Lacey from a pay

2 phone once."

3 **Q.** When you heard her say that, did it occur to you that this

4 is a woman given her skills and intelligence, who was able to

5 contact people in a surreptitious or clandestine way?

6      MR. BARTLETT: This is argument, Your Honor.

7      THE COURT: This is argument.

8 BY MR. BLOOM:

9 **Q.** Did she tell you that day that she regarded Lacey

10 Phillabaum as a younger version of herself?

11 **A.** Yes.

12 **Q.** Now, let's get back to the paragraph on the same page

13 where, in the 302, it says, "Kolar did not recall Briana and

14 Lacey being close friends."

15 **A.** Yes.

16 **Q.** Do you see that? She didn't actually say that, did she?

17 **A.** I don't remember her exact words. My snapshot memories of

18 this drive -- I seem -- I seem to recall this is the time when

19 we were driving back to Seattle north on I-5. I recall

20 Mr. Halla mentioning something to Ms. Kolar, asking her

21 something about the relationship of Briana Waters and Lacey

22 Phillabaum. The snapshot memory I have at the time was

23 something to the effect that they were acquaintances, not very

24 close or something, but just not perfect strangers.

25 **Q.** You see what's on the screen in front of you, right?

1  **A.**  Yes.

2  **Q.**  That's Exhibit A-45, which is in evidence, and it's Agent

3  Halla's notes for that day.  Agent Halla took notes.  Those

4  are his notes.  I represent that to you.

5  **A.**  Yes.

6  **Q.**  His notes say that, Kolar indicated I don't remember

7  Briana and Lacey together.  Is that correct?  That's what his

8  notes say?

9  **A.**  Those are the words on his notes.

10  **Q.**  That's different from people being close friends?

11        MR. BARTLETT:  Objection.  First of all, they are not

12  his notes.  Second of all, they already cross-examined Agent

13  Halla.

14        THE COURT:  His notes have got to speak for

15  themselves.

16        MR. BLOOM:  Fair enough.

17  BY MR. BLOOM:

18  **Q.**  In fact, that's what Kolar told you on that day, "I don't

19  remember Briana and Lacey together"?  That's what she told

20  you, isn't it?

21  **A.**  You would have to ask Mr. Halla that.

22  **Q.**  I am asking you, who was present.

23  **A.**  I was present.  I was driving.  I don't remember her

24  saying, "I don't remember Briana and Lacey together."  What I

25  remember is the snapshot memory, the characterization of it,

1  sir, is that they were not strangers.

2  **Q.** Did you and Agent Halla have a discussion about, let's not

3  put down that they were strangers, let's put down, "I don't

4  remember Briana and Lacey together"?  Let's do that?

5  **A.** No, sir.

6  **Q.** That wouldn't have happened, right?

7  **A.** No, I don't believe it did happen.

8  **Q.** His notes are his notes, and he took down what he heard

9  because that's what you do when you take notes?

10      MR. BARTLETT:  Objection.

11      THE COURT:  It's been asked and answered.  Those are

12  his notes.  They say what they say.

13  BY MR. BLOOM:

14  **Q.** You realize it as you sit there now, if Briana and Lacey

15  were not together, they could not have been together at any

16  meetings involving the University of Washington arson.  You

17  know that, right?

18  **A.** If it was actually true that Briana -- as these notes --

19  as I am reading the notes -- I am not reading the notes --

20  that it was actually true that Briana Waters and Lacey

21  Phillabaum were never, ever together, then I guess you could

22  come to that inference.  However, I don't believe that to be

23  true or the case.

24  **Q.** The same is true that they couldn't have been together at

25  the Greenlake restaurant just before the arson, correct?

1          MR. BARTLETT:  Objection, it's just argument.

2          THE COURT:  It's going into the same thing in the

3  same way, Mr. Bloom.

4  BY MR. BLOOM:

5  **Q.**  Now, we've talked earlier about the FBI regulations

6  requiring accuracy, right?

7  **A.**  I believe we required -- there weren't regulations

8  requiring accuracy.  That was more a common practice or

9  established practice.

10  **Q.**  And the principal thing to do, to be accurate?

11  **A.**  We strive to be accurate; yes, sir.

12  **Q.**  Of course.  So this handwritten note by Agent Halla that

13  was made at the time Kolar was speaking, you would

14  understand -- you would expect that to be accurate, right?

15          MR. BARTLETT:  Objection, it's just argument.

16          THE COURT:  It's been asked and answered and been

17  covered.

18  BY MR. BLOOM:

19  **Q.**  Now, in this particular case, February 4th of 2006, we

20  don't have to rely on your memory or Agent Halla's memory or

21  even the notes; there's a tape recording of the conversation

22  between you and Agent Halla and Lacey Phillabaum; is that

23  correct?

24  **A.**  No.

25  **Q.**  There's no tape recording?

1  **A.**  Not between myself, Agent Halla and Ms. Phillabaum.

2  **Q.**  Do you know that -- I am sorry.  When I said Phillabaum, I

3  was completely wrong.  I am talking about Kolar.

4  **A.**  Yes, there is a recording of that.

5  **Q.**  Kolar herself made a tape recording, right?

6  **A.**  Yes, she did.

7  **Q.**  Does the Government have a copy of the tape recording?

8  **A.**  I don't believe we do.

9  **Q.**  Now, she, Ms. Kolar, has agreed to fully cooperate with

10  the Government; is that correct?

11  **A.**  Yes, she has.

12  **Q.**  If you or Mr. Friedman or Mr. Bartlett or Agent Halla said

13  we'd like to have a copy of that tape recording, that would be

14  part of her agreement to cooperate, to turn that over; is that

15  correct?

16  **A.**  I am not sure if that was asked of her.

17  **Q.**  I am not saying you know one way or the other, but if she

18  were asked, it would be reasonable to believe that she would

19  be -- as part of her agreement, she would be required to turn

20  over a copy of that; is that correct?

21  **A.**  I am not sure because she told us from the very beginning,

22  when she got in our vehicle, that her attorney, Michael

23  Martin, had asked her to record the events of that day.

24  **Q.**  Yes.

25  **A.**  So I don't know if -- I am not a lawyer.  I am just

1  thinking here, is it attorney/client privilege, that she even

2  has the authority to hand that over, or if that's Mr. Martin's

3  authority to hand that over.

4        MR. BLOOM:  Judge Burgess, could you please instruct

5  the jury, with regard to attorney/client privilege, that if

6  there's a conversation between people, not the attorney, that

7  is not subject to attorney/client privilege.  Could you please

8  give the jury an instruction on that?

9        THE COURT:  I don't know if I should instruct them on

10  anything at this point.  He's answering your questions.  So I

11  will let it go at that.  If there is something else I should

12  add to that, I will do that and I will hear you out at the

13  break.  Right now, I want you to get into the questions.  You

14  are asking him the questions and I guess you want him to

15  respond?

16        MR. BLOOM:  Yes.

17  BY MR. BLOOM:

18  **Q.**  You know very well, if it's a conversation between the

19  attorney and the client, then that may be an attorney/client

20  privilege.

21     If it's a conversation involving any other person, there's

22  no privilege.  You know that?  That's basic stuff?

23  **A.**  Maybe so.  What I am saying is, I don't know if the report

24  belongs to her or if the recording belongs to her attorney.

25  But that's what I am saying.

1  **Q.** To whomever the recording belongs, that recording will

2  tell this jury, if we had it, whether or not she said "I don't

3  remember Briana and Lacey together." That would be on there,

4  would it not?

5  **A.** That recording should reflect the words that she spoke on

6  that day.

7  **Q.** Can I ask you to do your best to try to get that recording

8  for us?

9  **A.** No, sir. That's not my responsibility. That's not my

10  job.

11       MR. BLOOM: Could I ask the Court to ask the

12  prosecution?

13       MR. BARTLETT: Objection, Your Honor.

14       THE COURT: That's a bad question. Ask the next

15  question about what you want to know about this case.

16  BY MR. BLOOM:

17  **Q.** Now, on March 6th, about a month later, was there another

18  interview of Kolar at which you were present?

19  **A.** Yes.

20  **Q.** Now, that was the first time, am I correct, that she said

21  that Briana Waters was involved in this incident. First time

22  she said to you?

23  **A.** I believe that's the first time Ms. Kolar told that to me

24  directly.

25  **Q.** Okay. And you understood that she had told that to her

1    lawyer, who had communicated that on January 5 of 2006, to

2    Mr. Friedman?

3    **A.**   That's my understanding.

4    **Q.**   From January 5th, exactly two months later -- I am sorry,

5    March 6th -- there had been no indication from Ms. Kolar that

6    that was true, no statement whatsoever that Briana Waters was

7    involved in the arson; is that correct?

8    **A.**   Can you repeat that question?

9    **Q.**   Right.   Between January 5th -- I am sorry, January 5th,

10   the day that Mr. Martin supposedly told Mr. Friedman what his

11   client had quote remembered, two months, she did not say a

12   single word to you in your presence or in any of the

13   interviews, about seven interviews, that Briana Waters was

14   involved in the incident; is that correct?

15   **A.**   It is my understanding that the following day there was an

16   interview of Ms. Kolar in which she identified Briana Waters.

17   I believe that was on the 6th.

18   **Q.**   Identified her as a person whose picture she remembered,

19   she recognized?

20   **A.**   I believe that's correct.

21   **Q.**   Did she identify her on that day, or any day between

22   January 5th and March 6th, as being a person who was involved

23   in the arson?

24   **A.**   On the January 12th -- let me correct that.   On the

25   February 4th drive to Olympia, she identified, I believe,

1  Briana Waters as being responsible for getting -- I would have

2  to review the notes -- of being at or responsible for getting

3  the room at the Evergreen State College.  I believe that's

4  true.

5  **Q.**  At that time, did she then say:  And then she went on to

6  be involved in the arson?  Did she say that?

7  **A.**  That is involvement in the arson.  It's pre-planning for

8  the arson.

9  **Q.**  Did she say then on May 20th, 21st, she was involved in

10  the arson?  Did she say that?

11  **A.**  I don't believe she said that.

12  **Q.**  So this was involved in getting a room in a public place,

13  a building in a room at Evergreen State College.  They were

14  going to have a meeting there, is that your position?

15        MR. BARTLETT:  Objection, Your Honor, argumentative.

16        THE COURT:  Let him answer.

17  BY MR. BLOOM:

18  **Q.**  Is that your testimony?

19  **A.**  Can you repeat the question?

20  **Q.**  Yes.  Getting a room in a public place where people could

21  be seen, that had something to do with an arson?

22  **A.**  Getting a room?

23  **Q.**  Yes.

24  **A.**  To discuss the planning of an arson, whether it be in a

25  private or public place, in a closed room, is very

1  significant.

2  **Q.**  A closed room?

3  **A.**  Well, a room.  From what I understand, it was a room,

4  almost a study room.

5  **Q.**  Yes.

6  **A.**  With a closed door.

7  **Q.**  Yes.

8  **A.**  If they are in there talking about particulars of an arson

9  and how to conduct an arson or pre-planning or logistics,

10  that's very significant.

11  **Q.**  When you get to that room, you get to that room by being

12  on the campus of the University, right, where you can be seen?

13  **A.**  Yes.

14  **Q.**  And in the building where you can be seen?

15  **A.**  Yes.

16  **Q.**  Now, there are, are there not, eight zillion secluded

17  places -- excuse me, eight zillion secluded places all over

18  the Northwest?

19  　　　　MR. BARTLETT:  It's just argument, Your Honor.

20  　　　　THE COURT:  That's argumentative as to what was going

21  on in the meeting, I guess, as well as can you go there for

22  any innocent purpose.  That's argument.

23  BY MR. BLOOM:

24  **Q.**  You say it's significant?

25  **A.**  I think it is very significant.  There's more privacy

1 there than at the Greenlake Bar & Grill a few hours before the

2 arson when they all get together to discuss it.

3 **Q.** Is there more privacy there than in the woods?

4 **A.** Where than in the woods?

5 **Q.** In a room at the University -- at Evergreen State

6 University? Is there more privacy there in a building where

7 you can be seen going in and out than there is in the woods?

8 **A.** I don't know. It depends on the woods. Is it a

9 campground in the woods? Is it 10 miles into the woods? I

10 can't answer that.

11 **Q.** How about in a car? How about just in a car?

12 MR. BARTLETT: Objection, Your Honor. This isn't

13 cross. This is direct examination.

14 THE COURT: This is beginning to get argumentative

15 here. Let's move on to the next question.

16 BY MR. BLOOM:

17 **Q.** You said it's significant that there was a room arranged

18 for some kind of meeting. You said it was significant?

19 **A.** Yes.

20 **Q.** It's significant because you want the jury to believe

21 there was some arson discussed; is that correct? Is that what

22 you are saying?

23 **A.** That's what I am saying.

24 **Q.** I am asking you questions about whether or not an

25 unlimited number of more secluded, private places where nobody

1   would be seen, if indeed that happened and if indeed that were

2   the subject matter --

3   **A.** Perhaps. Someone's house would be more secure.

4   **Q.** And someone's car would be more secure, right?

5   **A.** Perhaps.

6   **Q.** And the woods would be more secure, right?

7   **A.** It depends.

8   **Q.** Depends on what?

9   **A.** The environment of the woods. I mean, when you say the

10   woods, I don't know.

11       THE COURT: I think that's been asked and answered.

12   You made your point.

13   BY MR. BLOOM:

14   **Q.** Now, on March 6th, did Jennifer Kolar tell you -- I don't

15   know what exhibit it is that Mr. Fox -- March 6th, the 302.

16       MR. FOX: A-50.

17   BY MR. BLOOM:

18   **Q.** Do you have A-50 in front of you? If you can look at that

19   document. Is that the 302 that reflects what happens in your

20   presence, in an interview with Jennifer Kolar on March 6th of

21   '06?

22   **A.** Yes.

23   **Q.** Would you look at the top of page 3? Did Jennifer Kolar

24   tell you on that date, March 6th of '06, that she believes

25   that Avalon may have arranged the rental car?

1   **A.** It says, "Kolar believes Avalon may have arranged the

2   rental car."

3   **Q.** That's just what I asked. Did she tell you that?

4   **A.** Yes.

5   **Q.** She didn't say Briana Waters arranged the rental car, did

6   she?

7   **A.** I don't see that as reflected in this 302.

8   **Q.** Well, this is the first time that she's claiming that

9   Briana Waters was involved in the arson; is that correct?

10  **A.** No, I believe she said in an earlier interview on January

11  6th, that I thought she was involved, but I wasn't there. I

12  would have to clarify that.

13  **Q.** You take a look at any document you want, and you let us

14  know where she says on January 6th or any date before March

15  6th --

16  **A.** I said --

17  **Q.** You take a look. You tell us. Tell this jury where she

18  said that.

19  **A.** I said I believe. I wasn't sure.

20  **Q.** Take a look at anything you want to refresh your

21  recollection. Take a look at January 6th, January 7th, 8th,

22  9th, 10th, 11th, 12th, any day, and you tell the jury where

23  she said that before March 6th.

24  **A.** Before March 6th.

25  **Q.** Before March 6th, that's right.

1  **A.**  Can you refresh my memory as to the January 6th, 302?

2  **Q.**  You mean what number it is?

3  **A.**  Yes.

4  **Q.**  A-30.

5      MR. BARTLETT:  Your Honor, I also ask the witness be

6  provided the stipulation regarding Mr. Martin's phone call to

7  the Government.

8      THE COURT:  I will have you do that when you get a

9  chance to question him.

10  BY MR. BLOOM:

11  **Q.**  While you are looking, you were not there on that day,

12  January 6th?

13  **A.**  I was not.

14  **Q.**  You are looking to see if it refreshes your recollection,

15  correct?

16  **A.**  Correct.

17  **Q.**  About what she had said not in your presence?

18  **A.**  Yes.

19  **Q.**  Please keep looking.

20  **A.**  The only reference that I can see is on the first

21  paragraph where it says Briana, a phone number and a Hotmail

22  account.

23  **Q.**  First page?

24  **A.**  First page, yes.

25  **Q.**  There was some handwritten notes located on the back of a

1   newsletter that had Briana, her phone number and her e-mail

2   address; is that correct?

3   **A.**   Yes.

4   **Q.**   Okay.  After that, does it say anything to indicate she

5   then said that that woman was involved in the arson?  Did it

6   say anything, any of the 10 pages you've looked at?

7   **A.**   I don't see that.

8   **Q.**   So is there any other document you want to look at to see

9   if she said anything else about Briana Waters being involved

10   in the incident prior to March 6th?

11   **A.**   No.

12   **Q.**   You are satisfied that you won't find anything, right?

13   **A.**   I believe so.

14   **Q.**   In fact, in that period, over the course of those seven

15   meetings, Briana Waters' name did come up and she did not say,

16   that's the woman who was with me on May 20th and May 21st?

17   **A.**   Her name did come up, and I don't recall if those exact

18   words were spoken.

19   **Q.**   Or words anything like that, that she was with me at the

20   Greenlake, she was with me at the arson, she was with me in

21   the van, she was with me anywhere on May 20th and 21st?

22      She did not say that even once, before March 6th; is that

23   correct?

24   **A.**   I don't believe so.

25   **Q.**   Going back to March 6th, did she say -- page 3, for your

1    reference, at the bottom -- did Kolar tell you on that day

2    that she recalled no significant events that happened en route

3    from the arson to her vehicle?

4    **A.**   The 302 states, "Kolar recalls no significant events

5    happened en route to her vehicle."

6    **Q.**   She didn't report to you that something huge happened,

7    right?

8    **A.**   No.

9    **Q.**   She didn't report to you that the car or van had an

10   accident, did she?

11   **A.**   I don't believe so.

12   **Q.**   That would be an event of significance, would it not?

13   **A.**   It depends on how significant the accident was.

14   **Q.**   Indeed, in the get-away, whoever did that crime, the

15   get-away from the scene to their escape, if there were an

16   accident, whether it's a small accident or a big accident,

17   that would or would not be an event of significance?

18   **A.**   Again, it depends on how significant an accident.  Depends

19   on how we are defining accident.  If it's a scrape or if it's

20   a big crash, it depends on how significant that is.

21   **Q.**   Well, if it was an escape that Lacey Phillabaum described

22   as seeming huge, that would be a significant event, wouldn't

23   it?

24   **A.**   I think if it was -- well, to different people it varies

25   in significance.

1  **Q.** How about people getting away from an arson?

2  **A.** You'd have to ask the people getting away from the arson.

3  **Q.** I am asking you what one of those people said to you about

4  whether or not there was any significant event that happened

5  in the get-away from the arson to taking her to her car?

6  **A.** If you are referring to what Ms. Kolar said --

7  **Q.** I am.

8  **A.** Okay.  In her 302 it says, "Kolar recalls no significant

9  events happening en route to the vehicle."

10  **Q.** Did she also tell you on March 6th that she went to her

11  boyfriend's, Jonathan Reichhold's, and spent the night?

12  **A.** Yes.

13  **Q.** Did she also tell you that the following day when the news

14  reports of this arson came out, that her boyfriend Jonathan

15  gave her a peculiar look?

16  **A.** Yes.

17  **Q.** You came to learn from that that she was deceiving her

18  boyfriend; is that correct?

19  **A.** It just says she didn't say anything.  I don't know if

20  that's deception or not.

21  **Q.** She'd just committed an arson, you know that.

22  　　　　MR. BARTLETT:  Objection, Your Honor, this is

23  argument.

24  　　　　THE COURT:  I think it is argumentative.

25  BY MR. BLOOM:

1  **Q.** Did you come to the conclusion, when you heard her say

2  that, this is a woman who would go so far as to deceive her

3  live-in boyfriend?

4        MR. BARTLETT: Objection, Your Honor, argumentative.

5        MR. BLOOM: I am asking what conclusion he came to.

6        THE COURT: That's why it's argumentative. You will

7  draw the conclusion when you argue the case.

8  BY MR. BLOOM:

9  **Q.** Let's leave Jennifer Kolar for now and let's talk about

10 Lacey Phillabaum.

11     When was the first time you spoke to her?

12 **A.** I believe it was February 21st.

13 **Q.** And where was that?

14 **A.** At the United States Attorney's Office in Seattle.

15 **Q.** Would that have been with Mr. Friedman?

16 **A.** Yes.

17 **Q.** And Agent Halla?

18 **A.** Yes.

19 **Q.** Was Mr. Bartlett present?

20 **A.** I don't recall if Mr. Bartlett was present or not. I

21 would have to review the 302.

22 **Q.** Would you take a look at Exhibits A-113 and A-114?

23     A-114 is your notes and A-113 is a 302.

24 **A.** For the February 21st, it was at the United States

25 Attorney's Office in Seattle. Mr. Bartlett and Mr. Friedman

1  and Mr. Offenbecher were present.  Ms. Phillabaum came, myself

2  and Agent Halla.

3  **Q.**  And you are reading from the 302?

4  **A.**  I am reading from the 302.

5  **Q.**  Okay.  Now, Mr. Offenbecher was her lawyer?

6  **A.**  Was Ms. Phillabaum's attorney, yes.

7  **Q.**  I am talking now about Phillabaum.

8  **A.**  Yes.

9  **Q.**  How long was that interview?

10  **A.**  I don't recall how long that interview was.

11  **Q.**  Was it 10 minutes, an hour, two hours?

12  **A.**  It was probably -- I don't know for sure.  I would suspect

13  an hour, two hours.

14  **Q.**  You were there.  I am asking you to call upon your memory

15  of the first conversation with Lacey Phillabaum.  About how

16  long was it?

17  **A.**  I don't know, sir.  Maybe an hour, maybe two.  I don't

18  recall.

19  **Q.**  Is it fair to say that you don't know unless you were able

20  to look at your documents, which you can do?  You don't have

21  an independent recollection of how long it was?

22  **A.**  I don't have an independent recollection of exactly how

23  long that meeting was.

24  **Q.**  Had you spoken with Mr. Offenbecher before that date about

25  these events?

1  **A.**  About these events?  No.

2  **Q.**  Had you spoken with him about other events?

3  **A.**  Yes.  While investigating drug cases when I was previously

4  assigned to the organized drug crime squad for the FBI,

5  Mr. Offenbecher defended one or two clients or suspects.

6  **Q.**  Had you spoken with Lacey Phillabaum any time prior to

7  February 21st?

8  **A.**  I don't believe so, no.

9  **Q.**  You took notes, is that correct, on the 21st of February?

10  **A.**  I took a few notes, yes.

11  **Q.**  You say you took a few notes.  I notice there's only three

12  pages.

13  **A.**  I have two pages.

14  **Q.**  Two pages?  Did that cover the entire interview?

15  **A.**  No, it did not.

16  **Q.**  Did you stop taking notes at some point?

17  **A.**  I believe I stopped taking notes at some point.

18  **Q.**  Why did you do that?

19  **A.**  Well, possibly to avoid confusion of what happened on the

20  December 16th interview.

21  **Q.**  You say to avoid confusion.  You say it was confusion.

22  And whatever it was, there was a problem with the December

23  16th interview with the other witness, Kolar, right?

24  **A.**  There was confusion.

25  **Q.**  So you stopped taking notes?

1   **A.**   That's my recollection.   There's only two pages of notes

2   here.   What I could surmise is when we got to the majority of

3   the substance of her interview, I relied on Agent Halla to

4   take the rest of the notes.   So if we can review Mr. Halla's

5   notes, then I would suspect they are substantially longer than

6   my notes.

7   **Q.**   So for the important stuff, you decided not to take notes?

8   **A.**   Well, no, I am not saying for the important stuff, the

9   substantive facts she was telling us.   To avoid the confusion

10   of what happened with Ms. Kolar's interview on December 16th,

11   I am surmising that I probably felt that it was best that I

12   stopped taking notes.

13   **Q.**   Is that contrary to FBI regulations?

14   **A.**   I don't think our regulations state either way.

15   **Q.**   Now, in fact, you had spoken with Lacey Phillabaum prior

16   to that date; is that not correct?

17   **A.**   Prior to the 21st?

18   **Q.**   Yes.

19   **A.**   I spoke to her?

20   **Q.**   Yes.

21   **A.**   I don't know if I did or not, sir.

22         MR. BLOOM:   I would like to move A-114 into evidence.

23         MR. BARTLETT:   No objection.

24         THE COURT:   Admitted.

25               (Exhibit No. A-114 admitted.)

BY MR. BLOOM:

**Q.** This is the first page of your notes, Exhibit A-114.

**A.** 114?

**Q.** Yes.

**A.** Yes.

**Q.** Is that the way they began, with your writing "meeting with Lacey, Peter, Ted, Mark, Andrew"?

**A.** That's the beginning of that page. That's what it says.

**Q.** You refer to her as Lacey, right?

**A.** In my notes, I did.

**Q.** Yes. In your notes, you did?

**A.** Yes.

**Q.** You wrote down Lacey?

**A.** Yes.

**Q.** You knew her from before, didn't you; before that date, didn't you?

**A.** No, I did not.

**Q.** Your reference to her as Lacey indicates a familiarity with her, does it not?

    MR. BARTLETT: Objection, Your Honor, this is just argument.

    MR. BLOOM: It is not just argument. I don't understand what's going on here. I am allowed to ask him questions about what he wrote.

    THE COURT: Mr. Bloom -- answer the question, if you

1  know the answer whether that meant you are familiar with her

2  or not.

3  **A.**  That's not what that means.

4  BY MR. BLOOM:

5  **Q.**  You went through -- who questioned her?

6  **A.**  Who was asking the questions?

7  **Q.**  Yes.

8  **A.**  I don't recall.

9  **Q.**  Whoever was asking the questions, it would likely have

10  been one or both of the prosecutors, is that correct?  As you

11  were not -- or was it you and/or Agent Halla as well?

12  **A.**  I don't recall who was asking the questions, sir.

13  **Q.**  Is there anything that would refresh your recollection as

14  to who was asking the questions?

15  **A.**  I don't know.

16  **Q.**  Did you understand that she was perhaps going to confess

17  to one or more crimes?

18  **A.**  I was not sure what she was going -- it wasn't a

19  confession, it was a proffer, so I am not sure exactly what

20  she was going to tell us in that meeting.

21  **Q.**  Even though you were not sure, did you understand from

22  Pete, her lawyer, that there was going to be an agreement to

23  cooperate and to talk to you about what she had done?

24  **A.**  That's my understanding, that she was coming in to

25  cooperate.  At what level or to what extent, I am not sure,

1  but that was my understanding.

2  **Q.** Did you ask the Special Agent in charge of the FBI office

3  in Seattle -- did you say there could be a confession here, I

4  would like to tape-record it?

5  **A.** It was not a confession, it was a proffer.

6  **Q.** Did you understand there might be a confession that day?

7  **A.** No, it was a proffer. It wasn't a confession. I didn't

8  know what she was going to tell us.

9  **Q.** I am asking you this: It was a proffer from whom to whom?

10  **A.** What do you mean from whom to whom?

11  **Q.** What is a proffer?

12  **A.** A proffer, as I explained yesterday, is a one-sided

13  interview where someone whom we suspect of committing a crime

14  is going to come in and tell us what she knows about the

15  particular crime she may have been involved with.

16  **Q.** So you understood that this proffer which comes from the

17  Government -- I am sorry, does the proffer come from the

18  Government or from the witness?

19  **A.** I believe the proffer comes from the Government -- it's a

20  Government form.

21  **Q.** So the proffer was from the Government, and did you

22  understand that it could well be in response to that proffer

23  that she was going to confess to one or more crimes?

24  **A.** I didn't know exactly what she was going to tell us prior

25  to that proffer.

**Q.** Say again?

**A.** I didn't know exactly what she was going to tell us prior to that proffer. Again, as I explained yesterday, in 11-and-a-half years, I have never recorded a conversation, a proffer, a confession, an interview, nor am I aware of anyone else in that office who has.

**Q.** Now, try to answer my question. You understood that in response to that proffer, she might well be confessing to one or more crimes? That's my question.

**A.** She may be accepting responsibility or giving us information regarding her involvement in crimes, yes.

**Q.** Would you call that a confession?

**A.** I don't know if I would call it a confession. A proffer isn't a confession.

**Q.** The proffer comes from the Government. I am talking about what comes from her to you.

MR. BARTLETT: Objection, Your Honor, argumentative. In fact, it's misleading to the jury.

MR. BLOOM: Excuse me. You know --

THE COURT: There's an objection, and he has a right to raise an objection, but I think you are going over and over.

MR. BLOOM: I am not going over and over.

THE COURT: Let's accept an answer when he gives you an answer, without going into any other part of it.

1      MR. BARTLETT:  If we could take our morning break, I

2  would like to be heard outside the presence of the jury on

3  this matter.

4      THE COURT:  All right.  Let me have you take your

5  morning break.  Don't discuss the case.  Leave your books on

6  your chair.

7    (Jury not present.)

8      THE COURT:  Same admonition.  Let me have you step

9  out of the room.

10     THE WITNESS:  Yes.

11     (Witness departed courtroom.)

12     MR. BARTLETT:  Your Honor.

13     THE COURT:  All right.  Let me hear your objection.

14     MR. BARTLETT:  The reason these questions and answers

15  are misleading to the proffer session -- is there going to be

16  a confession in the proffer letter -- which we'll introduce on

17  redirect -- paragraph 4 says no direct use -- the Government

18  agrees statements and information contained in your client's

19  proffer may not be used in the Government's case-in-chief

20  against your client should your client be held for trial.

21    So it isn't a confession.  It's a proffer.  It's confusing

22  for the jury to have Mr. Bloom continually go over this

23  activity.  He has a copy of the letter.  He knows it's not a

24  confession.  It's a different breed of cat.

25    It's just misleading, besides the fact that all of the

1    questions are improper given that it's direct examination of a

2    witness he called.

3         MR. BLOOM:  I can't imagine that this can be possibly

4    objectionable.  The point of my question is, you understood

5    that she was going to perhaps, or very likely, tell you of her

6    involvement in a crime.

7         Next question, is there a reason you didn't get in touch

8    with the Special Agent in charge and say you might get a

9    confession here, or a statement admitting to the facts of the

10   crime; I think it's something we should tape.

11        It's as simple as that.  I am allowed to ask him whether

12   he did that, yes or no.

13        MR. BARTLETT:  I have no objection if that in fact

14   had been the question.  If the question had been, did you

15   understand that there was going to be a statement that

16   couldn't be used directly against her during a trial, but

17   could have been used indirectly.

18        That's actually the description of what was going on.  As

19   a result of that, did you ask to tape it.  There's nothing

20   wrong with that.

21        His problem is that he continually calls it a confession.

22   By its definition, a proffer session is not a confession.

23        THE COURT:  Is there any confusion as to the proffer

24   and a confession?

25        MR. BLOOM:  No, the confusion is this.

1    THE COURT:  I understand, but I am trying to ask you

2    a question and maybe I can get you to answer my question.

3    MR. BLOOM:  Sure.

4    THE COURT:  In your mind, is there any difference

5    between a confession and a proffer session?  If you really

6    want to know why they didn't -- would they have been better

7    off if they had taped it, you've asked that question many

8    times, and the answer keeps coming up no, we didn't tape it.

9    We don't do that.

10   Then it becomes argumentative.  Well, they would have been

11   better off if they had taped it, then we wouldn't have this

12   confusion, but that's argument.  That's what I mean by asking

13   the same question over and over and getting the same answer.

14   MR. BLOOM:  I talked about that with regard to the

15   other witness.  I am through with that.  I am now asking with

16   regard to this witness.  She was there on February 21st with

17   an expectation or even the possibility that she was going to

18   say what she did, whether you call it a confession, a sugar

19   pop, I don't care what you call it.  If she was going to say

20   something about yes, I did that crime, why isn't that on tape?

21   Why didn't they make efforts?

22   THE COURT:  You can ask that question in that way,

23   but you are going into explaining a proffer and what it is and

24   what's the difference.

25   MR. BLOOM:  No, I am not.  He's doing that.  He's

 1   standing up and talking about proffers.

 2         THE COURT:  Mr. Bloom, let me rule this way.  Ask the

 3   question whether or not they taped it or had the opportunity

 4   to tape it and why they didn't tape it and get your answer.

 5         MR. BLOOM:  That's all I want to do, and I keep

 6   getting interrupted.

 7         THE COURT:  Let's do this.  Let's take the morning

 8   recess.

 9         MR. BARTLETT:  Thank you, Your Honor.

10         THE CLERK:  All rise.  Court is in recess.

11      (Morning recess.)

12         THE COURT:  You may be seated.

13      Bring them in.

14      (Jury present.)

15         THE COURT:  All right.  You may be seated.

16         MR. BLOOM:  Yes, sir.

17         THE COURT:  Mr. Bloom.

18   BY MR. BLOOM:

19   Q.  Agent Torres, during this recess, did you have occasion to

20   speak with Mr. Bartlett?

21   A.  I did.

22   Q.  About how many different times did you speak with him in

23   these 20 minutes or so?

24   A.  Two or three different times.

25   Q.  At times did he show you documents?

1  **A.** He did.

2  **Q.** Did you discuss your testimony or were you talking about

3  the Mariners or the Red Sox?

4  **A.** I definitely wouldn't talk about baseball. We talked

5  about how things were going in general, not the substance of

6  my testimony, how things were going in general. I believe he

7  showed me a 302, which I was present at.

8  **Q.** In general, he showed you a document relating to this

9  case, right?

10  **A.** Agent -- I reviewed -- he asked me if I was involved in an

11  interview on March 21st, and I was.

12  **Q.** That was just now, just before the jury came in?

13  **A.** That's correct.

14  **Q.** Before that, about three minutes before that, you were

15  standing right near the edge of the jury box and he came over

16  to you, right?

17  **A.** That's correct.

18  **Q.** Did he say something to you, just yes or no?

19  **A.** Yes.

20  **Q.** About this case?

21  **A.** It had to do with the case, yes.

22  **Q.** About your testimony?

23  **A.** Not necessarily about my testimony, about the case.

24  **Q.** Prior to that, did you have a discussion with him at the

25  desk area?

1   A.   I believe so.

2   Q.   Now, we were talking about Lacey Phillabaum, February

3   21st, the interview at the U.S. Attorney's Office.

4        Now, I think you were describing that as a proffer

5   session?

6   A.   Correct.

7   Q.   Am I correct that the proffer is a document that's

8   prepared by the Government and provided to the witness and her

9   lawyer?

10  A.   Correct.

11  Q.   Here's my question:   Did you expect at that time that it

12  would well be that she was going to admit to her participation

13  in one or more crimes?

14  A.   Yes.

15  Q.   Did you make any effort to speak to a Special Agent in

16  charge to get permission to tape-record what might be an

17  admission to crimes?

18  A.   I would never have done that.

19  Q.   The answer is no, you didn't do it; is that correct?

20  A.   That's correct.

21  Q.   There are provisions, am I not correct, in the FBI

22  regulations that prescribe just how you do that if you want to

23  do it?

24           MR. BARTLETT:   Objection, we've gone over this

25  several times.

1    MR. BLOOM:  We've gone over it with regard to the

2  other witness.

3    THE COURT:  Answer the question.

4  **A.**  What's the question?

5  BY MR. BLOOM:

6  **Q.**  There are provisions in the FBI regulations, and I think

7  we particularly referred to Exhibit A-213, that provide how it

8  is done if you want to do it.

9  **A.**  That's correct.

10  **Q.**  It's there, and it's covered in the regulations, right?

11  **A.**  Yes.

12  **Q.**  Just one last question on that.  The reason you might want

13  to have a tape recording is so there would not be any

14  confusion about what the person said; is that correct?

15  **A.**  That would be the result of a recording that her or his

16  exact words would be recorded.

17  **Q.**  You talked about confusion with the other witness, Kolar,

18  on December 16th.  Having already had that experience, did you

19  not think it was a good idea to tape-record this one and there

20  won't be any confusion?

21  **A.**  It never even crossed my mind.

22  **Q.**  Because you don't want to create a tape recording with

23  which the person can be impeached later on if there's a trial

24  and she testifies.  That's really what is going on, isn't it?

25  **A.**  Because it's the FBI's policy not to record interviews,

1  confession, proffer.  I haven't done one in 11-and-a-half

2  years, nor have I known anyone to.

3  **Q.**  It's the FBI's policy so the defense witness can't nail

4  your witness?

5          THE COURT:  It's argumentative, Counsel.

6  BY MR. BLOOM:

7  **Q.**  Now, you came to learn on February 21st, or sometime

8  before February 21st, of the personal history of Lacey

9  Phillabaum; is that correct?

10  **A.**  I don't think it was before February 21st, but I believe

11  it was on that day.

12  **Q.**  You came to learn that she was a smart person, graduated

13  from college in three years, with honors?

14          THE COURT:  Hasn't that been asked and answered?

15          MR. BARTLETT:  It's improper.  It's hearsay from this

16  witness.

17          THE COURT:  The witness answered.  Do you want him to

18  say that again?  Say it again.

19  **A.**  Yes, sir.  I did come to learn that she was an educated

20  person, yes.

21  BY MR. BLOOM:

22  **Q.**  You learned she was involved in ski racing; is that

23  correct?

24  **A.**  I have some recollection of that, yes.

25  **Q.**  She didn't have a yacht, right?

1  **A.** I don't know.  I don't think so.

2  **Q.** Did she tell you on February 21st -- feel free to look at

3  Exhibit A-113 if you need to refresh your recollection -- did

4  she tell you that she went with Chelsea Gerlach and Stan

5  Meyerhoff on some date?

6  **A.** Prior to the arson?

7  **Q.** Yes.  If you look at the first page of the 302, toward the

8  bottom.

9  **A.** Yes.  It says while working at EFJ, which stands for Earth

10  First Journal, Phillabaum met Chelsea Gerlach and Stanislas

11  Meyerhoff.

12  **Q.** Did she volunteer to you that the she, Lacey Phillabaum,

13  may have felt competitive with Gerlach?

14  **A.** No, I don't recall that at all.

15  **Q.** Take a look at the next to last line.

16  **A.** Oh, that's what it says, but I don't recall that.  It says

17  "Phillabaum noted she may have felt competitive with Gerlach."

18  That's the first time that refreshes my memory.

19  **Q.** And the competitive was about that she, Phillabaum,

20  eventually became involved with Gerlach's boyfriend,

21  Meyerhoff?

22  **A.** Perhaps.  Again, I don't recall the nature of the

23  competitiveness, but I don't know.  If you have something that

24  can refresh my memory.

25  **Q.** Well, does this refresh your memory where you have put in

1   your 302 that Phillabaum noted she may have felt competitive

2   with Gerlach?  Does that refresh your memory about what it's

3   about?

4   **A.**  It does.

5   **Q.**  What was it about?

6   **A.**  What was what about?

7   **Q.**  The reason she was competitive.

8   **A.**  I am not sure the reason why she was competitive.  I have

9   come to learn that Lacey Phillabaum has become involved or

10  dated Meyerhoff.

11  **Q.**  Stan Meyerhoff?

12  **A.**  Yes.  Yes.

13  **Q.**  And that had been Chelsea's boyfriend, right?

14  **A.**  Well, yes.

15  **Q.**  Did you come to learn that in 1999 Lacey Phillabaum had

16  traveled to Europe for six months?  If you look at page 2.

17          MR. BARTLETT:  Objection, Your Honor, simply

18  irrelevant from this witness.

19          THE COURT:  I agree.  Next question.

20  BY MR. BLOOM:

21  **Q.**  Did she tell you about her participation at the WTO

22  demonstrations in the year 1999?

23  **A.**  She did.

24  **Q.**  Did she tell you that her role was to help with sleeping

25  arrangements?

1  **A.** I believe that's correct, yes.

2  **Q.** Did she tell you on that day, February 21st of '06, words

3  to the effect that there's nothing in the world like running

4  with a group of 200 people, all wearing black, and realizing

5  each of you is anonymous, each of you can liberate your

6  desires, each of you can make a difference right there,

7  because everyone has your back, everyone is there together,

8  everyone is there for the same reason?  And then to do that in

9  the middle of, you know, the most intense police presence in

10  downtown Seattle, they did that despite the cops being there

11  and they did it under the watching gaze of the cops because it

12  couldn't be stopped.

13  Did she tell you anything like that on February 21?

14  **A.** Where are you reading that from, sir?

15  **Q.** I am reading it from another document.

16  **A.** I don't recall that.

17  **Q.** In fact, she did not tell you, other than she helped with

18  sleeping arrangements, she didn't tell you anything other than

19  that about her participation in those events?

20  **A.** She told us she helped with sleeping arrangements, and I

21  believe that is all.

22  **Q.** Did she tell you on that date, February 21st, that she had

23  a job at the Cville, meaning Charlottesville, Virginia,

24  Weekly, I think it's called.  Did she tell you it didn't work

25  out?

1  **A.** Are you reading that from this 302, sir?

2  **Q.** I am not sure if it's there or not. Did she tell you

3  anything like that either on that day or any other day?

4  **A.** I vaguely remember something like that. I don't know.

5  **Q.** Did she tell you that in fact it didn't work out because

6  she went to an interview when she was drunk?

7        MR. BARTLETT: Objection, Your Honor. He has no

8  knowledge of this. The witness didn't testify with regard to

9  that.

10  BY MR. BLOOM:

11  **Q.** Did she tell you? That is my question.

12  **A.** No. I see in this paragraph where it says she took a job

13  with the Cville Weekly. This job did not work out and

14  Phillabaum was fired in May of 2005.

15  **Q.** What page are you reading from?

16  **A.** Page 3.

17  **Q.** She didn't tell you anything about either being drunk or

18  accused of being drunk; is that correct?

19  **A.** That's correct.

20  **Q.** She did tell you on that day, February 21st, that there

21  were five book club meetings and that Briana -- she was at all

22  of them and Briana was not at any of them?

23  **A.** Well, I need to -- she said there was five meetings,

24  Eugene, Oregon -- first meeting, March 2000 in Eugene, Oregon

25  at a hotel. It says Phillabaum recalled the following persons

1  at this meeting:  Lacey Phillabaum, Avalon, Jeff Hogg, Spring,
2  Al Decker and Ragweed.
3      Second meeting occurred at Tucson, Arizona.  She recalled
4  the following persons:  Lacey Phillabaum, herself, Rod
5  Coronado, Jeff Hogg, Hazel, Avalon, Chelsea Gerlach, Daniel
6  McGowan, Spring.
7      She recalled two guys from Santa Cruz, names unknown,
8  being at the meeting.  Santa Cruz, this meeting occurred in a
9  hotel.  She recalled the following persons at this meeting:
10  Lacey Phillabaum, Avalon, Stanislas Meyerhoff, Jeff Hogg,
11  Hazel, Chelsea Gerlach, Diver, The Mupins.
12      Olympia, no details were discussed during the Olympia
13  meeting due to time constraints.
14      Sisters, Oregon, she recalls that this meeting occurred
15  shortly after the University of Washington arson and she did
16  not elaborate further.
17  **Q.**  Did she at any time identify or say in any way that Briana
18  Waters was in any of those, either book club meetings or
19  incubator meetings?
20  **A.**  Briana Waters is not listed in any of those names.
21  **Q.**  Now, did the discussion then turn to the University of
22  Washington arson?  If you look at page 5 of the document.
23  **A.**  Yes.
24  **Q.**  Did she tell you -- looking on page 6, that is Lacey
25  Phillabaum -- did she tell you that she was dropped off at a

1 Denny's or a Perkins restaurant in Olympia, Washington?

2 **A.** On page 6, it says Phillabaum was dropped of at a Denny's

3 or Perkins restaurant in Olympia, Washington.

4 **Q.** I would just ask you, rather than reading, if you would

5 read to yourself unless and until this is in evidence. I am

6 just asking you to use it to refresh your recollection.

7 Does it refresh your recollection that she said to you and

8 the other people in the conference room of the U.S. Attorney's

9 Office, that she was dropped off at a Denny's or Perkins

10 restaurant in Olympia, Washington?

11 **A.** Yes.

12 **Q.** Then did she at some point, right after she told you that,

13 volunteer to you that she recalled that Briana and Connor had

14 recently broken up?

15 **A.** Yes.

16 **Q.** You didn't ask her that, did you?

17 **A.** No recall how that was asked.

18 **Q.** You wouldn't have asked that, she volunteered that, just

19 as she had volunteered that Chelsea Gerlach and Stan Meyerhoff

20 were at the end of their relationship?

21 **A.** I don't know if she was asked or if she volunteered it.

22 **Q.** This was having heard about the competitiveness of Chelsea

23 Gerlach --

24 MR. BARTLETT: Objection, this is just argumentative.

25 BY MR. BLOOM:

1  **Q.** Having heard about the competitiveness with Chelsea

2  Gerlach that came from the words of Lacey Phillabaum, and the

3  statement here that Briana and Connor had recently broken up,

4  did it occur to you that this is a woman who gets involved

5  with other women's men?

6  **A.** No.

7  **Q.** Now, did she say on that day, February 21st, that the plan

8  for the arson was laid out by Avalon?

9  **A.** Yes.

10  **Q.** Did she tell you that she wasn't sure that Kolar was

11  there?

12  **A.** Diver -- who we've come to know is Kolar -- says it was at

13  one of the meetings that weekend but Phillabaum does not

14  recall which one.

15  **Q.** Do you remember her telling you, she's not sure if Kolar

16  was there at the meeting where the plan was laid out by

17  Avalon?

18  **A.** That's what she says.  She does not recall which one.

19  **Q.** Now, you've seen a manual how to do these arsons that was

20  written, as you understand it, by Rodgers and Meyerhoff; is

21  that correct?

22  **A.** I have seen parts of it.

23  **Q.** Are there parts of it that say everybody has to be

24  together at all the meetings and the planning --

25        MR. BARTLETT:  Objection, Your Honor.

1    THE COURT:  Let me hear the question, then I will

2    take the objection.

3    BY MR. BLOOM:

4    Q.  Does it say in what's called the manual, the how-to book,

5    that the planning has to be done with all the people present

6    so that everybody is on the same page?

7    MR. BARTLETT:  Objection, Your Honor, the manual

8    speaks for itself.

9    THE COURT:  Sustained.  It speaks for itself.

10   BY MR. BLOOM:

11   Q.  Do you have any recollection of the manual talking about

12   those issues?

13   A.  I do not.

14   Q.  Now, do you remember on February 21st, talking to Lacey

15   Phillabaum, that she told you -- if you would look at page 7,

16   did she tell you, about the 5th line down, that at the arson,

17   she claimed, on that day, February 21st of '06, that Briana

18   and Connor were the lookouts?

19   A.  Briana and Connor were the lookouts.

20   Q.  That's what she told you.  Did they say -- did she say

21   rather on that day to you in that conference room, at the U.S.

22   Attorney's Office, that her recollection was that Briana and

23   Connor were the lookouts?

24   A.  Yes.

25   Q.  Did she also tell you that the evening of the arson,

1  Avalon and Connor had dropped off the bags there earlier in
2  the evening?
3  **A.**  Are you referring me to that paragraph?
4  **Q.**  Yes.  If you look at the second paragraph, third line.
5  **A.**  Yes.
6  **Q.**  Did you or anyone else in the room ask her well, when did
7  that happen?  Did it happen before you met with Kolar at the
8  restaurant?  Did anyone ask her that question?
9  **A.**  I don't recall.
10  **Q.**  That would have been important?
11  **A.**  Perhaps, but I don't recall if it was asked or not.
12  **Q.**  You say perhaps.  You wanted the details of what happened
13  at the arson, right?
14  **A.**  She was providing details.
15  **Q.**  Did you ask her, when she said it had been dropped off
16  earlier, did you ask:  Well, is there a time when you were not
17  in the car or the van and they went and did something?  Were
18  you present?  Tell us what you remember.  Were you present
19  when that event happened?  Did you ask her that question?
20  **A.**  I don't recall.
21  **Q.**  A tape recording would help?
22  **A.**  Yes.
23  **Q.**  You weren't taking notes by this time, right?
24  **A.**  I don't believe I was.
25  **Q.**  Did you ask her, at any time before you met with Kolar in

1  the restaurant -- she did tell you they met Kolar at the

2  Greenlake restaurant, right?

3  **A.**  The Greenlake Bar & Grill, yes.

4  **Q.**  Did you ask her:  How did it come to be -- who dropped off

5  this equipment and when did it happen and who was there?  Did

6  you ask her any questions about that?

7  **A.**  About the circumstances of the bags being dropped off?

8  **Q.**  Yes.

9  **A.**  I don't recall.

10  **Q.**  Now, she also told you that Connor had dumpster dived for

11  some equipment; is that correct?

12  **A.**  I recall that, yes.

13  **Q.**  Was that on that same day, February 21st, she told you

14  that?

15  **A.**  I recall that statement.  I don't remember exactly which

16  date it was.  I am looking for it here on the 302.  Is it on

17  the 302?  I don't see it on that page.

18  **Q.**  Yes, I am looking for it too.  If you look at the page

19  before, page 6, in the last paragraph, the second sentence.

20  **A.**  Yes.  Connor dumpster dived for hydro-bags for carrying

21  the fuel.

22  **Q.**  What if he couldn't find any hydro-bags, or whatever they

23  are, in the dumpster, what were you going to do then?

24  **A.**  No, I don't recall her being asked that.

25  **Q.**  What did dumpster diving mean to you when she told you

1 that?

2 **A.** Going through large dumpsters behind businesses or

3 commercial businesses or commercial establishments. Garbage

4 dumpsters, looking inside of them for materials.

5 **Q.** So they were, as she was explaining to you -- they were

6 taking a chance and hoping that he would be able to find some

7 appropriate equipment to use in the arson; is that correct?

8 **A.** By taking a chance, by dumpster diving?

9 **Q.** Taking a chance they might not find what they needed.

10      MR. BARTLETT: Objection, argument.

11      MR. BLOOM: It is not argument. I am asking a

12 question. Did they ask her about that?

13      THE COURT: Well, did you ask her about it?

14 **A.** I don't recall asking her if they were taking a chance.

15      THE COURT: All right. Next question.

16 BY MR. BLOOM:

17 **Q.** Now, did she tell you something on that day about a clean

18 room?

19 **A.** She did -- yes.

20 **Q.** I am going to read to you from an exhibit in evidence,

21 Exhibit A-99. Do you have that in front of you?

22 **A.** A-99?

23 **Q.** Yes.

24 **A.** I don't see A-99. Yes, I have it here.

25 **Q.** Could you take a look at -- first, is that document

1   entitled "Setting Fires with Electrical Timers, an Earth

2   Liberation Front Guide"?

3   **A.**   Yes, that's what it's called.

4   **Q.**   It's dated May 2001?

5   **A.**   That's correct.

6   **Q.**   As you understood it, that was a document created by

7   William Rodgers and Stan Meyerhoff; is that correct?

8   **A.**   I don't know who created this document.

9   **Q.**   Could you turn to the lower right-hand corner, page

10   00722 --

11   **A.**   Yes.

12   **Q.**   It says "Creating a Clean Room," right?

13   **A.**   Yes.

14          MR. BARTLETT:  Objection, Your Honor.  The document

15   speaks for itself.  With regard to what Ms. Phillabaum

16   described, if there's a prior inconsistent statement with

17   Ms. Phillabaum, that's fair game, but this is just argument.

18   This document, which speaks for itself says, and what

19   Ms. Phillabaum testified to --

20          THE COURT:  Let's see what the question says,

21   otherwise it speaks for itself, I guess.  The question on

22   this, Mr. Bloom?

23   BY MR. BLOOM:

24   **Q.**   Could you read the very first sentence that I am pointing

25   to?

1   **A.**   "To set up a clean room, choose a location where your

2   hair and skin flakes are not already floating around."

3   **Q.**   Now, am I correct that that would seem to exclude a place

4   where one of the participants had been living?

5   **A.**   Not necessarily, no.

6   **Q.**   If a person is living there, their hair and skin flakes --

7   wherever you live, their hair and skin flakes, as you

8   understand it, would be floating around?

9             MR. BARTLETT:   Objection, this is argumentative.

10            MR. BLOOM:   He can't just say it's argumentive, a

11  question I am asking of this witness.

12            THE COURT:   I know you are asking a question.  It may

13  be of general knowledge if you live in a house, it's in there.

14  So I am trying to understand why are we going over the

15  question in this fashion?

16            MR. BLOOM:   I have never asked him this question.

17            THE COURT:   Ask the question.  He gave you an answer,

18  but you don't like it.

19            MR. BLOOM:   He didn't give an answer.  There was an

20  objection.

21            THE COURT:   Do you want the question back?

22            COURT REPORTER:   "Question:  If a person is living

23  there, their hair and skin flakes -- wherever you live, their

24  hair and skin flakes, as you understand it, would be floating

25  around?"

BY MR. BLOOM:

Q. Right. Where you live, I live, where anybody lives, your hair and skin flakes would be floating around; is that right?

A. Yes.

Q. From this excerpt in the manual, that's something that should be avoided, creating a clean room and building devices in a place where a participant lived?

THE COURT: That's argumentative now. He's answered it.

BY MR. BLOOM:

Q. At some point, I am going to read from -- there's another Exhibit, 515-I. Could you take a look at that, please? It's also more or less a manual.

A. 515-I?

Q. Yes, sir. I would ask you to look at -- there are no page numbers, but there are section numbers. About three-quarters of the way into the document, there is a Section 6.4 called "Drop offs and safe places to park."

MR. BARTLETT: Objection, this document speaks for itself. If this witness has no -- he doesn't have personal knowledge with regard to these events. That would be the only relevant question.

THE COURT: That's what he asked him, what do you know about it.

BY MR. BLOOM:

1   **Q.** I would ask you to take a look at the document that I put

2   up on the screen. It says, "A lookout arrives at the drop-off

3   ahead of time by foot or bicycle."

4   **A.** That's -- I have never seen this document before. I don't

5   even know what this is. The sentence you took off the

6   screen --

7   **Q.** I am sorry, I was going to move on to something else, but

8   please tell us.

9   **A.** The sentence reads, "The lookout arrives at the drop-off

10   ahead of time by foot or bicycle."

11   **Q.** The story Lacey Phillabaum told you was different than

12   that; is that correct?

13   **A.** I am not necessarily sure. What do you mean?

14   **Q.** She told you that five people drove up to the scene at the

15   same time, right?

16   **A.** That they drove in the same vehicle from the Greenlake Bar

17   & Grill?

18   **Q.** Yes, sir.

19   **A.** Yes.

20   **Q.** She claims one of the people in the car -- or at some

21   point, she claimed that two of the people in the car were

22   lookouts?

23   **A.** That's correct.

24   **Q.** And they didn't arrive, according to her story, on foot or

25   bicycle ahead of time, right?

1   A.   I don't know what she testified to.

2   Q.   What she told you on February 21st, aside from what she

3   testified to, she didn't tell you on February 21st that

4   either -- that any lookout, Briana Waters, Connor or anyone

5   else, arrived ahead of time by either foot or by bicycle.  She

6   didn't tell you that?

7   A.   On the February 21st interview?

8   Q.   Yes, sir, or on any other interview.

9   A.   It says they went from the bar, carpooled in a rental car,

10  drove to a dead-end street where they were dropped off.

11  Q.   She doesn't say anything about any lookout or lookouts,

12  one or two people getting there ahead of time by foot or by

13  bicycle?

14  A.   I don't see that.

15  Q.   You don't see it because that's not what she said.  Let's

16  move on.  Did she say to you on February 21st that she saw a

17  bike and she told Diver about it?

18       If you look on page 7 of the 302 in the second paragraph,

19  right in the middle of the second paragraph.  Just to refresh

20  your recollection.

21       Did she tell you that while she was crouching down and

22  watching the building, she recalled seeing a bicycle parked

23  and that she talked to Diver about it?

24  A.   Yes.

25  Q.   So from your understanding of what Lacey Phillabaum was

1  telling you on February 21st, not only was she and Kolar there

2  together, but they actually had a conversation right there in

3  front of the building they burned down?

4  **A.** That's what that would say.

5  **Q.** So did you think back when she was telling you that on

6  February 21st, how come Kolar doesn't remember her being

7  there?  Does that strike you as odd?

8  **A.** No.  My experience is that two different witnesses often

9  have two different accounts of the same event, just as Agent

10 Halla and I had two different accounts of the same event on

11 December 16th.

12 **Q.** Including who was there?

13 **A.** Possibly.

14 **Q.** We are talking about Kolar, a Ph.D. candidate, a really

15 smart person.  She's saying, I don't remember Lacey Phillabaum

16 being there, and now you learn that there was actually a

17 conversation between them, Phillabaum and Kolar, just before

18 they actually torched the place?

19 **A.** That's what Phillabaum is telling us.

20 **Q.** Right?

21 **A.** Right.

22 **Q.** So the connection wasn't just that they were not just

23 there together, there was actual conversational interaction

24 between the two women just before they laid the place to

25 waste?

1   **A.** According to Ms. Phillabaum, they had, apparently, a

2   conversation regarding a bicycle. The extent of that

3   conversation, I don't know. Like I said, two different people

4   are going to have two different accounts of what happened.

5   Ms. Kolar, from the very beginning, said her memories from

6   that event were fuzzy. I can't explain that.

7   **Q.** This is not about what kind of wine Kolar had at her yacht

8   club. This is about the people with whom she burned down a

9   building.

10       MR. BARTLETT: Objection, Your Honor. That's not

11   even a question for him to answer. He's asking this witness

12   to go into Jennifer Kolar's mind and explain what's going on.

13   It's simply improper.

14       THE COURT: Next question.

15       MR. BLOOM: Judge, I object to both the objections

16   and the speeches that he makes. If he doesn't want the jury

17   to hear this --

18       THE COURT: You are giving me one now. You are

19   asking him to explain something, so ask the next question and

20   let him answer and accept the answer.

21   BY MR. BLOOM:

22   **Q.** Did she tell you on that day that the rental car may have

23   been white in color?

24   **A.** Yes.

25   **Q.** She didn't say to you, did she, that I remember it being a

1  two-tone car?

2  **A.** I don't recall that.

3  **Q.** You've seen the picture of the car that's now in private

4  hands in the State of Wisconsin, right?

5  **A.** I am not sure if I have or not.

6  **Q.** You know there was some investigation of the Budget

7  people, and one of them reported -- gave you information about

8  whether or not there were two-tone cars that were available

9  for rental in May of '01 at the Olympia office of Budget?

10  **A.** I don't believe I conducted that investigation.

11  **Q.** Did you come to learn of it?

12  **A.** I don't recall that.

13  **Q.** Did Lacey Phillabaum tell you that Connor side-swiped a

14  car? Did she tell you that on February 21st? If you look on

15  page 7, the next-to-last paragraph or the last full paragraph.

16      "While driving away, Connor side-swiped a parked car."

17  **A.** Yes.

18  **Q.** Did she say and did she use the word "damaging both

19  vehicles"?

20  **A.** That's what it says in the 302. I don't know if that's

21  verbatim, but that's what we refer to her saying.

22  **Q.** The concept that you and Agent Halla decided to write is

23  that both vehicles were damaged?

24  **A.** Yes, that's what it says.

25  **Q.** Did she describe it on February 21st as something huge?

1   **A.**   Huge?

2   **Q.**   Yes.   Did she use the word "huge," the event was huge in

3   her mind?

4   **A.**   I don't recall that.

5   **Q.**   Did you check with Budget, you and Agent Halla and any

6   other investigative officers -- check to see whether there was

7   any, eventually, report of damage that was filed after you

8   zeroed in on Budget?  Did you try to find out if there was

9   damage?

10  **A.**   I did not.   I know Special Agent Halla did.   I don't know

11  the exact conclusions that came from that.

12  **Q.**   Did you investigate whether or not there were any cars

13  that had been in the area of the arson where there had been

14  reports of damage, hit and run damage?

15  **A.**   I don't know exactly.   I seem to recall Agent Halla

16  talking about that, but I don't know what investigation he

17  did.

18  **Q.**   Did that lead anywhere, so far as you remember?

19  **A.**   I don't know.

20  **Q.**   Did the FBI conduct a canvass of the area, after speaking

21  with Phillabaum and Kolar, to learn -- let me withdraw that.

22      Kolar doesn't remember that at all, right?

23  **A.**   I believe so.

24  **Q.**   Did you -- after speaking with Phillabaum, did you

25  discuss -- did you canvass -- let me withdraw that.

1    Did you ask her to pinpoint the area where the accident

2  she said happened, would have been?

3  **A.**  I don't recall.  I don't know if Agent Halla may have done

4  that or not.

5  **Q.**  One of the things that the FBI does is they do conduct a

6  canvass of the neighborhood to get information where it's

7  appropriate, right?

8  **A.**  Where it's appropriate.

9  **Q.**  Was there any canvass that took place of that neighborhood

10  to find out if there had been any hit and run event that had

11  damaged a parked car?

12  **A.**  I don't know if there was or not.  If there was, I wasn't

13  a part of it.

14  **Q.**  Now, the FBI has a very good laboratory, doesn't it?

15  **A.**  It has a lab.

16  **Q.**  Better than CSI?

17  **A.**  I don't know if anything is better than CSI.

18  **Q.**  CSI is pretty good, they do whatever they want and they

19  get results?

20  **A.**  Exactly.

21  **Q.**  The FBI has a good laboratory too?

22  **A.**  It's a good lab.

23  **Q.**  They can analyze metallurgical damage on a fender if need

24  be?

25  **A.**  What kind of damage?

1  **Q.**  Metal damage, the fibers of the metal being dented if

2  there's been damage to a fender?

3  **A.**  I don't know.

4  **Q.**  Did you make any efforts, or did Agent Halla or any of

5  these two prosecutors, make any efforts to have that car

6  tested by the FBI lab in order to ascertain whether or not

7  Lacey Phillabaum was accurate in her recollection?

8  **A.**  I did not make that request.

9  **Q.**  Did you come to learn that we, Mr. Fox and I, had asked of

10  the prosecutor whether such examination had been conducted?

11  **A.**  No, I have no idea.

12  **Q.**  Now, you came to learn during this investigation that a

13  number of the actions, whether they be arsons or crop pulling

14  or girdling -- the perpetrators involved in this group used

15  their own cars at times; is that correct?

16  **A.**  Yes, I believe so.

17  **Q.**  At Susanville, they used Dibee's car and Meyerhoff's car,

18  right?

19  **A.**  I recall Mr. Dibee's car was involved, yes.

20  **Q.**  The fourth arson committed by, not necessarily

21  chronologically, but one of the arsons committed by Kolar, the

22  Wray Gun Club in Colorado, she used her own car?

23  **A.**  I don't know about that.

24  **Q.**  Now, there was some searches conducted, and at the search

25  on December 7th or shortly thereafter, December 7th of '05, in

1 Arizona, Mr. Rodgers' place of business and residence was very

2 thoroughly searched, right?

3 **A.** I believe so, yes.  I wasn't there, but it was searched.

4 **Q.** In all the documents and all the computer disk searches,

5 there was one mention of Briana Waters and it was a footnote

6 referring to her documentary that was called "Watch"; is that

7 correct?

8 **A.** I believe so.

9 **Q.** The search of Justin Solondz' cabin in the year 2007,

10 almost five years after the incident, there was some

11 literature seized; is that correct?

12 **A.** I wasn't there at the search.  I know there was a map

13 seized.  I know there was some caps, I believe, wool caps and

14 stocking caps seized.  I can't recall exactly what was seized;

15 I wasn't there.

16 **Q.** This was four-and-a-half years later; is that correct?

17 **A.** I think so.

18 **Q.** I am sorry?

19 **A.** I think so.

20 **Q.** And there came a time when somebody decided to take a

21 photograph of some of the literature that was seized?

22            MR. BARTLETT:  Objection, Your Honor, he wasn't even

23 at the search.

24            THE COURT:  He wasn't there.  Ask him something about

25 what he participated in.

BY MR. BLOOM:

**Q.** Did you see a photograph of materials and magazines where the one put on top by somebody says "Anarchy"?

**A.** I don't recall seeing any photos from that search.

**Q.** Was there any discussion about, let's make a photograph and let's put the "Anarchy" magazine right out in front because that will really get a jury?

**A.** I wasn't at that search, and I did not have that conversation with anyone.

**Q.** Now, in order to get -- let me withdraw that. Just a couple more questions.

The FBI's job in this investigation, and every investigation, is that's what you do, you do the investigations, right?

**A.** Correct.

**Q.** You don't make decisions -- you follow leads, but you don't make decisions about who's going to be prosecuted, right?

**A.** Correct.

**Q.** That's up to the Department of Justice, the United States Department of Justice, right?

**A.** Yes.

**Q.** In the year 2006, the Attorney General at that time was a person named Alberto Gonzales?

**A.** In 2006?

1  **Q.**  Yes.

2  **A.**  I believe so.

3  **Q.**  So it was the decision of the United States Department of

4  Justice, not the FBI, about who was going to be prosecuted,

5  right?

6  **A.**  I am not sure it went up to that level.  I think it stayed

7  at the level of the United States Attorney's Office in the

8  Western District of Washington.

9  **Q.**  The United States Attorney's Office in the Western

10 District of Washington is under the jurisdiction of the United

11 States Department of Justice which was headed by Alberto

12 Gonzales, and the President was and still is George W. Bush;

13 is that correct?

14 **A.**  Yes.

15       MR. BLOOM:  I don't have any more questions.

16    If you'll give me a minute, Mr. Bartlett, to clear my

17 stuff out.

18                    CROSS-EXAMINATION

19 BY MR. BARTLETT:

20 **Q.**  Just briefly, Special Agent Torres.  During the -- I was

21 going to say cross-examination, that would be wrong.

22    During your examination by Mr. Bloom, there was lengthy

23 discussions about the December 16th interview in 2005 with

24 Jennifer Kolar.  Do you recall that?

25 **A.**  Yes.

Q. At one point, you made a statement, and I am paraphrasing, "there was no reason to believe that Mr. Dibee was involved in the University of Washington arson."

Do you recall that?

A. Yes.

Q. Can you explain what was in your thought process and why you thought that?

A. What was in my thought process --

MR. BLOOM: I am going to object on the same grounds.

THE COURT: You raised the answer, so he may answer.

A. My thought --

THE COURT: Your objection is noted.

A. My thought process was Ms. Kolar, during that interview, had already given up Joseph Dibee for the Cavel West arson. She had already given him up for the Susanville arson, so why protect him on the UW arson.

Q. She could have been, but that was your thought process?

A. Exactly.

MR. BLOOM: Excuse me, I asked a dozen questions about thought process and there was an objection every time, and it was sustained every time.

THE COURT: You've made your objection.

MR. BLOOM: I am just asking the Court to strike that and not to permit any questions about his thought process unless I get to ask about thought process.

1    THE COURT:  You've made your objection.  I have ruled
2  on it.  So let's move on to the next question.
3    MR. BARTLETT:  May I approach, Your Honor.
4  BY MR. BARTLETT:
5  **Q.**  I am bringing up what's previously been marked 114 and
6  117, and I am providing another copy for the Court.
7  BY MR. BARTLETT:
8  **Q.**  Taking a look at the document marked first Government's
9  Exhibit 114.  Could you go through that?  I believe it's a
10  three-page document.
11    THE CLERK:  It's 1114.
12  BY MR. BARTLETT:
13  **Q.**  What did I say?  I apologize, 1114.
14  **A.**  Yes, I have this.  This is a U.S. Department of Justice
15  proffer letter that was provided to Jennifer Kolar on December
16  16, 2005.
17  **Q.**  Is it signed?
18  **A.**  It is signed by Mr. Andrew Friedman, it is signed by
19  Jennifer Kolar, and it is signed by Michael Martin.
20    MR. BARTLETT:  Offer Government's Exhibit 1114.
21    MR. BLOOM:  Even though Mr. Bartlett did give it to
22  me --
23    MR. BARTLETT:  I have an extra one.
24    MR. BLOOM:  Let me take a look at it, and I will give
25  it back to you.  Thank you.

1    THE COURT:  He's offering that.  Any objection to
2  that?
3         MR. BLOOM:  No objection.
4         THE COURT:  It is admitted.
5              (Exhibit No. 1114 admitted.)
6  BY MR. BARTLETT:
7  **Q.**  Prior to speaking with Ms. Kolar on December 16th, was
8  this the letter that was signed?
9  **A.**  Yes.
10 **Q.**  And that you've been referring to as the proffer letter?
11 **A.**  Yes.
12 **Q.**  We can just go through this.  It's dated December 16th,
13 right?
14 **A.**  December 16, 2005.
15 **Q.**  If you can just read the paragraphs, the first paragraph.
16 **A.**  "The government requests that your client, Jennifer Kolar,
17 provide a proffer of information, by way of an in-person
18 interview, relating to the ongoing investigation into arsons
19 committed in the names of environmental or an animal-rights
20 activism.  This letter sets forth the ground rules covering
21 the proffer of information by your client to the Government."
22 **Q.**  No. 1, the purpose.
23 **A.**  The purpose -- read it?  "The purpose of your client
24 making a proffer is to provide the Government with an
25 opportunity to assess the value, extent and truthfulness of

1  your client's information about the potential criminal

2  liability of your client and others."

3  **Q.**  Could you clarify for the jury, at the time on December

4  16th when this proffer letter was presented to Ms. Kolar, is

5  there already a plea reached?

6  **A.**  No plea agreement, no contract, no deal.  It's just her

7  coming in and giving us information.

8  **Q.**  No. 2.

9  **A.**  "No. 2.  Your client's proffer must be a complete and

10  entirely truthful account, with no material misstatements or

11  omissions of fact, regarding arsons and all wrongdoing

12  committed by your client and others.  A knowing, material

13  false statement or material omission may result in prosecution

14  of your client under federal criminal laws."

15  **Q.**  No. 3.

16  **A.**  "No. 3.  No promises:  While your client hopes to receive

17  some benefit by agreeing to be interviewed, your client

18  expressly understands that the Government is making no promise

19  of any consideration."

20  **Q.**  No. 4?

21  **A.**  I am going to have to read this from my hard copy.

22  **Q.**  I can move it up.

23  **A.**  "No. 4.  No direct use:  The Government agrees that

24  statements and information contained in your client's proffer

25  may not be used in the Government's case-in-chief against your

1  client, should charges be filed and a trial held."

2  **Q.** What does that mean?

3       MR. BLOOM:  I am going to object to that.

4       THE COURT:  I think it speaks for itself.

5  BY MR. BARTLETT:

6  **Q.** No. 5?

7  **A.** "Impeachment:  If your client should testify materially

8  contrary to the substance of the proffer, or otherwise present

9  in a legal proceeding a position materially inconsistent with

10 the proffer, the proffer may be used against your client as

11 impeachment or rebuttal evidence, or as the basis for a

12 prosecution for perjury or false statement.  Nothing in this

13 letter is intended to preclude your client from challenging

14 the sufficiency of the Government's evidence; calling into

15 question the credibility of the Government witnesses;

16 questioning Government witnesses about their knowledge and

17 qualifications; challenging inconsistencies in the

18 Government's evidence, or challenging Government's witnesses

19 about their motives for testifying against your client."

20 **Q.** No. 6?

21 **A.** "Derivative use:  The Government may make derivative use

22 of, and may pursue investigative leads suggested by any

23 statements or information provided by your client's proffer.

24 This provision is necessary to eliminate the necessity of a

25 Kastigar hearing wherein the Government would have to prove

1  that the evidence it seeks to introduce at trial or in a

2  related legal proceeding is derived from a 'legitimate source

3  wholly independent' of statements or information from the

4  proffer."

5  **Q.**  No. 7?

6  **A.**  "7.  Sentencing information:  Your client understands that

7  if he is indicted and convicted, the Government, pursuant to

8  18 U.S. Code Section 3661, must provide the contents of the

9  proffer to the sentencing judge.  Pursuant to the United

10 States -- U.S.S.G. 1B1.8, however, the proffer may not be used

11 to determine the appropriate guideline sentence, except as

12 stated in the 'impeachment' paragraph above."

13 **Q.**  No. 8?

14 **A.**  "Brady discovery:  Your client understands that Brady v.

15 Maryland and its progeny require that the Government provide

16 any charged defendant all information known to the Government

17 that tends to mitigate or negate such defendant's guilt.

18 Should your client's proffer contain Brady material, the

19 Government will be required to disclose this information to

20 the appropriate defendants."

21 **Q.**  Finally, 9?

22 **A.**  "9.  Full agreement:  This letter sets forth and

23 constitutes the full and complete agreement of the parties."

24 **Q.**  Does Ms. Kolar and Mr. Martin's signature appear on the

25 third page?

1  **A.**  Yes, they are both on this page.

2  **Q.**  Taking a look at Government's 1117.  Is that the proffer

3  letter for Lacey Phillabaum?

4  **A.**  Yes.

5         MR. BARTLETT:  Offer 1117.

6         MR. BLOOM:  No objection.

7         THE COURT:  Admitted.

8              (Exhibit No. 1117 admitted.)

9  BY MR. BARTLETT:

10 **Q.**  This is identical, with some minor changes in paragraph 5?

11 **A.**  It is identical, but paragraph 5 impeachment --

12 **Q.**  It looks like a shorter paragraph?

13 **A.**  It's a shorter paragraph.

14 **Q.**  There was discussion immediately after the morning break

15 about you and I having conversations during the morning break?

16 **A.**  Yes.

17 **Q.**  Was the conversation that you and I had and the documents

18 I showed you relating to these two letters so I could show you

19 ahead of time what I was going to ask you?

20 **A.**  Yes.

21 **Q.**  There was questions during Mr. Bloom's direct examination

22 of you relating to a photograph of Justin Solondz shown to

23 Jennifer Kolar on February 4th.

24     Do you remember those series of questions?

25 **A.**  Yes.

1   **Q.** I want to clarify for the jury, what photograph was shown

2   to Ms. Kolar on that day? Was it the short hair Mr. Solondz

3   or the long hair Mr. Solondz?

4   **A.** I believe it was the short hair.

5   **Q.** When you say you believe that, why do you say that?

6   **A.** Because of a photo that I have seen -- I remember her

7   later on being shown a photo of him with long hair and

8   becoming more familiar with that photo than the short hair.

9   **Q.** Prior to testifying, did I ask you to look at the 302 from

10   February 4th and the photographs that were attached to refresh

11   your recollection as to what photograph?

12   **A.** That's correct.

13   **Q.** That's the discussion we had also during the break?

14   **A.** Yes. That's correct.

15   **Q.** Just for the record, if we could produce Government's

16   1011-C, which I believe is already admitted into evidence.

17      If the witness could be handed 1011-C.

18      Do you recognize that?

19   **A.** Yes, I do.

20   **Q.** What is it?

21   **A.** This is the picture of Justin Solondz with short hair.

22   **Q.** A copy?

23   **A.** A copy of a picture.

24   **Q.** This is what was shown to Jennifer Kolar on February 4th?

25   **A.** Yes.

1        MR. BLOOM: Objection, that was his testimony, he

2 wasn't sure.

3        THE COURT: Well, ask the question again and let's

4 get the answer.

5 **A.** I believe this was the picture shown to Ms. Kolar.

6 BY MR. BARTLETT:

7 **Q.** Referring to the 302 and the attachments to the 302 of

8 February 4th, did that provide you certainty?

9 **A.** I believe it was photo No. 4 shown to her and that's when

10 she said no.

11        MR. BARTLETT: Offer Exhibit 1011-C.

12        MR. BLOOM: I object. He's not identified that as

13 that's the one shown. He said he isn't certain.

14        MR. BARTLETT: Withdrawn.

15        THE COURT: All right.

16 BY MR. BARTLETT:

17 **Q.** There was a number of questions during your direct

18 examination of Mr. Bloom regarding your failure to ask

19 directly to Ms. Kolar whether Briana Waters was the lookout.

20    Before any discussion on January 6th or 7th, were you

21 aware of Mr. Martin's statement and his providing information?

22 **A.** Prior to January 5 or 6 --

23 **Q.** On January 5 or 6, were you aware -- did you become aware

24 that Mr. Martin had called and provided information?

25 **A.** Yes.

1  **Q.** What did you understand?

2  **A.** I understood that Mr. Martin called, I believe, Andrew

3  Friedman, Mr. Andrew Friedman, and said that Ms. Kolar had

4  remembered that Briana Waters was the third individual at the

5  arson.

6  　　　　MR. BARTLETT:　No further questions.

7  　　　　　　　　REDIRECT EXAMINATION

8  BY MR. BLOOM:

9  **Q.** I just have a very few questions.　About these proffers

10  that both -- the Phillabaum and Kolar proffers that have been

11  moved into evidence.　I actually just have one question.

12  　　　The signatures -- I am sorry, the title page, page 2 of

13  each of those proffers, after it says full agreement.　After

14  it says that, right, it says John McKay, United States

15  Attorney.

16  　　　He was one of the people who was fired by Alberto

17  Gonzales, wasn't he?

18  **A.** I know he is no longer employed.　I don't know if he was

19  fired or asked to leave.

20  **Q.** It was all over the newspapers.　There were hearings.

21  Gonzales testified at least once -- at least twice, I should

22  say -- before the United States Congress, where he testified

23  400 times that he didn't remember.　Do you remember that?

24  **A.** Who testified?

25  **Q.** Alberto Gonzales, the person who was the Attorney General

1   at the time a decision was made to proceed with this

2   prosecution?

3           MR. BARTLETT:   Your Honor, this is totally

4   irrelevant.

5           THE COURT:   Well, is that the only question?

6           MR. BLOOM:   Yes.

7           THE COURT:   Then I will take it up at the break as to

8   where we go with it.

9           MR. BLOOM:   I have no other questions.

10          THE COURT:   Then let's take the noon recess at this

11  time and have you get yourself a sandwich.   Be back into the

12  building, into the jury room.   Don't discuss the case.   Leave

13  your books on your chair.   1:00.

14      (Jury not present.)

15          THE COURT:   All right.   You may be seated.

16      You may step down.   Same admonition.   Let me have you step

17  out so I can see what's going to be said.

18      (Witness departed courtroom.)

19          THE COURT:   All right.   The objection has been raised

20  as to the relevance of this.   Let me have you speak to that.

21          MR. BLOOM:   Sure.   There has been testimony in this

22  case that Stan Meyerhoff -- on March 17th of 2006, Stan

23  Meyerhoff, a person at the center of nearly all the arsons and

24  was involved in the planning of this so-called double whammy,

25  looked at Briana Waters' photograph and said:   "That woman

1  looks familiar.  She's not involved."

2     It's my position -- it's our position that this case

3  should have been over on that date, that the reason this

4  prosecution continued is because of the politics of the George

5  W. Bush/Alberto Gonzales administration and we are entitled to

6  prove that and entitled to prove that the continuing

7  prosecution after at least that event was politically

8  motivated, not based on facts, not based on guilt.

9        THE COURT:  I am trying to understand the question.

10 I heard the speech, but I am trying to understand your

11 question.  The question to the witness was whether or not John

12 McKay was fired by him.

13       MR. BLOOM:  Not by him.  Would you read the question

14 back?

15       COURT REPORTER:  "Question:  I just have a very few

16 questions.  About these proffers that both -- the Phillabaum

17 and Kolar proffers that have been moved into evidence.  I

18 actually just have one question.

19    "The signatures -- I am sorry, the title page, page 2 of

20 each of those proffers, after it says full agreement.  After

21 it says that, right, it says John McKay, United States

22 Attorney.

23    "He was one of the people who was fired by Alberto

24 Gonzales, wasn't he?

25           "Answer:  I know he is no longer employed.  I don't

1    know if he was fired or asked to leave.

2            "Question:  It was all over the newspapers.  There

3    were hearings.  Gonzales testified at least once -- at least

4    twice, I should say -- before the United States Congress,

5    where he testified 400 times that he didn't remember.  Do you

6    remember that?

7            "Answer:  Who testified?

8            "Question:  Alberto Gonzales, the person who was the

9    Attorney General at the time a decision was made to proceed

10   with this prosecution?"

11           MR. BLOOM:  I want to add one more thought to my

12   argument.  As I remember it, Lacey Phillabaum denied that this

13   was a political prosecution.  We are entitled to impeach her

14   with evidence that supports the argument.

15           THE COURT:  I am trying to understand the question.

16   I don't know how -- you want him to answer whether or not John

17   McKay, a yes or no, as to whether or not he was fired when

18   Gonzales was the Attorney General?  Is that the question?

19           MR. BLOOM:  That was my question.

20           MR. BARTLETT:  What relevance is that, Your Honor.

21           THE COURT:  I don't know the relevance of it.  If

22   it's irrelevant, he shouldn't get into it.  This is 403.  He

23   can say whether he knows it or not knows it.

24           MR. BARTLETT:  I want an offer of proof as to how

25   they are going to prove that this was a politically driven

1    prosecution by George W. Bush and Alberto Gonzales.

2         THE COURT:  I can't answer that.

3         MR. BARTLETT:  They can.  You can demand an offer of

4    proof so they don't go down paths that have no basis

5    whatsoever, as opposed to a paranoid innuendo.

6         THE COURT:  I don't know what you are saying,

7    Mr. Bartlett.  I don't know if Mr. Bloom is saying that he's

8    going to follow up that question with a bunch of witnesses to

9    try to show that.

10        MR. BARTLETT:  If he's not, Your Honor, it's

11   irrelevant.  Under 403, the question is totally irrelevant.

12        THE COURT:  Your objection is noted.  He can answer

13   yes or no, and that's the end of it.  That's as far as it is

14   going to go.  Whatever the answer is, accept it and move on.

15        MR. BARTLETT:  Just to clarify the record, I assume I

16   can tell the jury that John McKay was one of my best personal

17   friends and he hired me as first assistant, and of all the

18   people in the Western District of Washington that are upset

19   about John McKay's treatment under Albert Gonzales, I would be

20   at the top of the list.

21        MR. BLOOM:  If he wants to testify.

22        THE COURT:  I am not going to sit here and listen to

23   what's going on here now.  We are at recess.

24        THE CLERK:  All rise.  Court is at recess.

25      (Luncheon recess.)

1    (Jury not present.)

2         THE COURT:  All right, you may be seated.

3    Are we ready?

4         MR. BLOOM:  I have indicated to the prosecutors that

5    I would withdraw the last question, and we have no further

6    questions of the witness.  Mr. Bartlett asked if it was okay

7    for us to let him go; I said yes.

8         THE COURT:  So we are through with Mr. Torres?

9         MR. BLOOM:  Yes.

10        THE COURT:  I don't know what else there is to say

11   about him.

12        MR. BLOOM:  It's determined there are no questions,

13   or however the Court wants to handle it.

14        THE COURT:  You have your next witness?

15        MR. FOX:  Yes, Heather Moore.

16        THE COURT:  You did say the last question was

17   withdrawn?

18        MR. BLOOM:  Yes.

19   (Jury present.)

20        THE COURT:  All right.  You may be seated.

21   The last question posed to Mr. Torres has been withdrawn,

22   so we are moving now to the next witness.

23        MR. FOX:  Your Honor, we would call Heather Moore.

24    Come forward and raise your right hand.

25   HEATHER MOORE, called as a witness, duly sworn.

1    THE COURT:   Just come around and take the witness

2  chair.

3                    DIRECT EXAMINATION

4  BY MR. FOX:

5  **Q.**  Good afternoon.

6  **A.**  Hi.

7  **Q.**  Could you please state your name and spell your last name

8  and also speak into the microphone?

9  **A.**  Heather Moore.   M-O-O-R-E.

10  **Q.**  Ms. Moore, where do you live?

11  **A.**  Tumwater.

12  **Q.**  Who do you live with?

13  **A.**  My husband and daughter.

14  **Q.**  Why don't you bring the microphone a little closer to your

15  mouth.

16    What is your husband's name?

17  **A.**  Jim Dawson.

18  **Q.**  Your daughter's name is what?

19  **A.**  Kierran Winter.

20  **Q.**  How old is your daughter?

21  **A.**  She's seven.

22  **Q.**  Seven.   What do you do for a living?

23  **A.**  I am a legislative aid in the House of Representatives.

24  **Q.**  That's down in Olympia?

25  **A.**  It is.

1   **Q.**  Do you know Briana Waters?

2   **A.**  Yes.

3   **Q.**  How do you know Briana Waters?

4   **A.**  We were in college together.

5   **Q.**  What college was that?

6   **A.**  Evergreen.

7   **Q.**  What years were you in college at Evergreen?

8   **A.**  '96 to 2000.

9   **Q.**  Ms. Waters, was she there at the same time?

10  **A.**  During the same time, yes.

11  **Q.**  Now, when you met Ms. Waters, generally, what types of

12  things was she doing?

13  **A.**  In her life at the time?

14  **Q.**  Yes.

15  **A.**  School, a lot of school.  Hanging out with friends.  I

16  think that was pretty much the circumstances that I was around

17  her.

18  **Q.**  So you were friends with Ms. Waters?

19  **A.**  Uh-huh.

20  **Q.**  Now, did you know Justin Solondz?

21  **A.**  I did.

22  **Q.**  How did you know Mr. Solondz?

23  **A.**  Same circumstances, same circle of friends and school.

24  **Q.**  Who is Ocean?

25  **A.**  My ex-husband.

1  **Q.** And when did you meet Ocean?

2  **A.** When did I meet Ocean? In '98.

3  **Q.** 1998. And at some point -- you said he was your

4  ex-husband -- you got married to him?

5  **A.** Yes.

6  **Q.** Is your child his child as well?

7  **A.** Yes.

8  **Q.** Now, in 2000 -- taking you back to the spring of 2000, did

9  anything significant happen to you during that timeframe?

10  **A.** To me, in the spring of 2000?

11  **Q.** Yes. With Ocean.

12  **A.** The significance of 2000 with Ocean. Oh, yes, we were in

13  a car accident together.

14  **Q.** Okay. As a result of this accident, what happened with

15  Ocean?

16  **A.** He is a quadriplegic as a result.

17  **Q.** Over the next year from -- when was the car accident; do

18  you remember what month?

19  **A.** It was April 5th.

20  **Q.** Of 2000?

21  **A.** Yes.

22  **Q.** Over the next, the course of the next year, where did you

23  and Ocean reside?

24  **A.** Over the course of the next year?

25  **Q.** Right.

1  **A.** For a period of time, the University of Washington

2  Rehabilitation Center, and then on Dickerson.

3  **Q.** Dickerson, in which city?

4  **A.** In Olympia. And then after that on Conger in Olympia.

5  **Q.** You say on Conger, do you remember the address on Conger?

6  **A.** 2613.

7  **Q.** Conger. I am showing you --

8  **A.** Or 1326.

9  **Q.** I am showing you what has been admitted into evidence as

10 Exhibit 733. Does that look familiar?

11 **A.** Oh, look at that. Yes, that's the house.

12 **Q.** That's the house. Now, did you rent the house or did you

13 buy the house?

14 **A.** Bought it.

15 **Q.** Do you recall when you bought the house?

16 **A.** I remember getting keys days before Procession of the

17 Species, which was in April.

18 **Q.** Days before what?

19 **A.** Procession of Species, which is in April.

20 **Q.** So April of what year?

21 **A.** Of 2000.

22 **Q.** 2000 --

23 **A.** Oh, a year later, so 2001.

24 **Q.** Now, when you bought the house, what was its condition?

25    Do you remember anything about the house when you bought

1 the house?

2 **A.** Well, I remember that we couldn't live in it until it was

3 fixed, because it couldn't accommodate Ocean's needs.

4 **Q.** What were Ocean's needs?

5 **A.** He needed a ramp to get into the house and a bathroom that

6 had, you know, facilities that would allow him to wheel into a

7 shower and a bedroom large enough for a bed for him. So there

8 was some significant changes that happened to the house.

9 **Q.** How about the kitchen?

10 **A.** There was not, at the time, any significant changes to the

11 kitchen.

12 **Q.** So the changes that took place in the house, do you

13 remember when the construction started?

14 **A.** It was soon after we had bought it. We started sort of

15 evaluating what things needed to happen and finding people to

16 do it and discovering what sort of requirements there were

17 from the state. That was right after we got the house that we

18 started that process.

19 **Q.** When you started that process, where were you and Ocean

20 living?

21 **A.** I was living with my parents, and Ocean was living on

22 Dickerson.

23 **Q.** Dickerson in Olympia?

24 **A.** Yes.

25 **Q.** Do you remember when Ocean was able to move into the

1  house?

2  **A.** It was in August.

3  **Q.** Of?

4  **A.** Of 2001.

5  **Q.** Okay. Is that the time you moved into the house as well?

6  **A.** Uh-huh.

7  **Q.** You have to say yes or no.

8  **A.** I am sorry, yes.

9  **Q.** Now, were there any other buildings on your property,

10 other than the house itself?

11 **A.** A garage.

12 **Q.** Do you remember what the garage was like back when you got

13 possession of your house?

14 **A.** It was what we had imagined, was a garage used for

15 carpentry work, because it had a fair amount of wood there and

16 debris.

17 **Q.** And was this a dry garage or a wet garage?

18 **A.** Dry or wet? Well, it had a flat roof on it, and that sort

19 of created some problems as far as water draining not

20 properly.

21 **Q.** Where would the water end up?

22 **A.** Inside.

23 **Q.** Inside?

24 **A.** The garage.

25 **Q.** Did this cause any other problems inside the garage?

1  **A.** Yeah, the dry wall was replaced later on because it had
2  mold on it.
3  **Q.** Now, you say that you had contractors come in and do some
4  of this work on the house?
5  **A.** Not contractors, but they were people skilled in
6  construction, yes.
7  **Q.** The people that came in to do the work, did they just
8  start work and work straight through the next couple months?
9  **A.** Yeah, it was pretty much nonstop, because they started
10  with some demolition and there was plumbing that needed to
11  happen and a whole variety of things.
12  **Q.** How many people do you think worked on this house?
13  **A.** I would say a safe estimate would be 10 to 15.
14  **Q.** That was over the whole timeframe, right?
15  **A.** Yeah.
16  **Q.** Now, who lived in the house while the work was being done
17  on the house?
18  **A.** Nobody lived in the actual house itself. Briana --
19  **Q.** Go ahead.
20  **A.** Briana was staying in the garage that was in the back of
21  the property.
22  **Q.** Did she pay you rent?
23  **A.** No, she stayed there and kept an eye on it for us.
24  **Q.** Okay.
25  **A.** And watered the garden.

1 **Q.** Was there a garden in the backyard?

2 **A.** Uh-huh.

3 **Q.** I am sorry, you have to say yes or no.

4 **A.** Yes, I am sorry.

5 **Q.** Was there a garden already there when you got the house?

6 **A.** No, I put that in. There was raised beds, but I planted.

7 **Q.** Do you recall when you planted them, the garden?

8 **A.** It was sometime before summer actually kicked in.

9 **Q.** So, would that have been, what, like the first month you

10 got it or --

11 **A.** It wasn't right away. I would say sometime like May/June.

12 **Q.** Now, earlier you had said -- did anything have to be done

13 in the kitchen at all in terms of the counters or anything

14 like that?

15       MR. FRIEDMAN: Objection, Your Honor, leading.

16       MR. FOX: Let me rephrase.

17 BY MR. FOX:

18 **Q.** Was there any work done in the kitchen?

19 **A.** Well, I removed cabinet door fronts. That's something

20 that happened in the kitchen. The floor was sanded and

21 refurbished.

22 **Q.** Okay.

23 **A.** And there was a piece of -- I think there was a piece of

24 the countertop that was removed, if I remember correctly.

25 **Q.** Do you recall exactly when?

1  **A.** When that happened?

2  **Q.** When any of the work in the kitchen took place.

3  **A.** That was over a period of time.

4  **Q.** Okay.

5  **A.** It started right away. When we got the house in April, I

6  went in and did the cabinet changes. And then I think the

7  countertop was removed after that, and it was like a

8  countertop with a base to it. And then the floors were worked

9  on sometime after that.

10 **Q.** Now, while this construction was going on, did you have

11 occasion to ever stop by the house?

12 **A.** Oh, yeah. Frequently -- yes, frequently.

13 **Q.** When you say frequently, is this every day?

14 **A.** Not every day, but a number of times during the week I

15 would go by there.

16 **Q.** What type of things would you do when you stopped by the

17 house?

18 **A.** Admire the work. Check in with people, see if they needed

19 anything. Say hi. See what's happening.

20 **Q.** Did you ever see Briana Waters when you would stop by?

21 **A.** Occasionally.

22 **Q.** Did you ever go to the garage?

23 **A.** Yes.

24 **Q.** Now, did there ever come a time when you stopped by the

25 house in May of 2001 and you saw anything strange or odd?

1   **A.** In May, no.

2   **Q.** Did you ever see plastic on the walls of the garage?

3   **A.** No.

4   **Q.** Did you ever see strange people that you'd never seen

5   before hanging out at the house?

6   **A.** No.

7   **Q.** Now, did you ever see any gasoline hanging out?

8   **A.** No.

9   **Q.** How long did Briana Waters live at this house?

10  **A.** It was until sometime in September, August, right around

11  there. I want to say beginning of September. From May until

12  then, or sometime in May. I am a little foggy about what

13  time.

14  **Q.** It was about the time you moved in?

15  **A.** That I moved in?

16  **Q.** Yes.

17  **A.** That she left? She left after I moved in.

18  **Q.** Now, during the whole time that the construction is going

19  on, I guess you just said that you would come by a couple

20  times a week. For how long would you come by? Were these

21  long periods of time?

22  **A.** It really depended on -- there were different

23  circumstances, like why I was there, you know. It could have

24  taken longer than other times than if I had my daughter with

25  me, you know. That impacted how long I stayed. If I didn't,

1    then, you know, how long I had childcare for would affect how

2    long I could stay.

3    **Q.**  Were there ever periods of time where you might not come

4    by for a couple days at a time?

5    **A.**  Maybe two or three, maybe, yeah.

6    **Q.**  Now, when you would stop by the house, did you ever call

7    Briana Waters up and say, hey, I am stopping by the house?

8    **A.**  Never.

9    **Q.**  After Ms. Waters left the house, how much contact did you

10   have with her after that, after she left the house?

11   **A.**  After she moved out of Washington?

12   **Q.**  Yeah.  Well, let's say after she moved out of the house.

13   **A.**  Not a lot of contact between us.

14   **Q.**  You still consider her to be a friend?

15   **A.**  Yeah, I would consider her a friend.

16   **Q.**  Now, at some point, did you ever have occasion to meet any

17   FBI officers?

18   **A.**  Would I?

19   **Q.**  Did you?

20   **A.**  Did I?

21   **Q.**  Yes.

22   **A.**  At that time?

23   **Q.**  No, subsequently, like in the last two years.

24   **A.**  Yes.

25   **Q.**  What happened?

1   **A.**   With?

2   **Q.**   With the FBI officers.

3   **A.**   Well, they arrived at my place of work looking for me,

4   wanting to ask me some questions about something that I hadn't

5   heard of.

6   **Q.**   Subsequently, did you meet with any prosecutors?

7   **A.**   Yes.

8          MR. FOX:  I have no further questions.

9          THE COURT:  Any cross?

10         MR. FRIEDMAN:  Yes, Your Honor.

11                  CROSS-EXAMINATION

12  BY MR. FRIEDMAN:

13  **Q.**   Good afternoon, Ms. Moore.

14  **A.**   Hi.

15  **Q.**   The last question you were asked was did you ever meet

16  with any prosecutors.  You in fact came to our office and met

17  with me once, is that correct?

18  **A.**   Yes.

19  **Q.**   Probably in 2006?

20  **A.**   Sure, yes.

21  **Q.**   You told us you were married to Ocean.

22  **A.**   Yes.

23  **Q.**   Is that correct?  Beginning in about 1998?

24  **A.**   '99.

25  **Q.**   1999.  Then you were involved in a serious car accident

1  with him in 2000?

2  **A.** Correct.

3  **Q.** And he became a quadriplegic as a result of that?

4  **A.** Yes.

5  **Q.** And then I guess you spent some time together at the

6  University of Washington and then back in Olympia?

7  **A.** Correct.

8  **Q.** And you separated from him in 2002; is that correct?

9  **A.** Yes.

10 **Q.** And you had bought the Conger Street house with him before

11 that, correct?

12 **A.** Yes.

13 **Q.** Back in 2001?

14 **A.** Yes.

15 **Q.** You bought that house actually in March of 2001; is that

16 correct?

17 **A.** I think that's when the process began.

18 **Q.** That's actually when you settled on the house; isn't that

19 correct?

20 **A.** I could not say for certain.  I just know when I got the

21 keys in my hand.

22 **Q.** Could you take a look at Exhibit 732?

23 **A.** Yes.

24 **Q.** It should appear on the screen in front of you.  It's

25 already been admitted into evidence.  It will just take a

1   moment, I think.

2      Would you take a look at Exhibit 732 and tell me if you

3   recognize that?

4      Is it fair to say it's a deed for the house?

5   **A.**  Yes.

6        MR. FRIEDMAN:  The government offers 732.

7        MR. FOX:  No objection.

8        THE COURT:  Admitted.

9            (Exhibit No. 732 admitted.)

10  BY MR. FRIEDMAN:

11  **Q.**  Now it should appear on the screen in front of you.

12      If you look at the middle of that, do you see the date on

13  which the --

14  **A.**  On the front page?

15  **Q.**  The middle of the front page, there should be a date for

16  the --

17  **A.**  March 16.

18  **Q.**  March 16, 2001?

19  **A.**  Uh-huh.

20  **Q.**  So that's when the sale closed and when you and Ocean

21  officially became owners?

22  **A.**  Okay.

23  **Q.**  After that, you said there was some renovation that needed

24  to be done before --

25  **A.**  Yes.

1  **Q.** -- he could move into the house?

2  **A.** Yes.

3         THE COURT:  Is this to be displayed?

4         THE CLERK:  It's not coming up.

5     Is it on the document camera or on the computer?

6         MR. FRIEDMAN:  It is on the computer.

7         THE CLERK:  Okay, I misunderstood.  Thank you.

8  BY MR. FRIEDMAN:

9  **Q.** So the construction happened in some period of months

10 beginning after March of 2001?

11 **A.** Yes.

12 **Q.** Now, you testified that you had known Briana Waters from

13 school, I guess, the same circle of friends?

14 **A.** Yes.

15 **Q.** Did you consider her a good friend back before the time

16 she moved into your house?

17 **A.** I considered her a friend.

18 **Q.** Have you given money to her legal defense?

19 **A.** No.

20 **Q.** Let me ask you again about the house and the garage.  We

21 looked at a picture a moment ago.  If you could look at

22 Exhibit 733, the third page, and that should show up on the

23 screen in front of you.

24     Is that a picture of the garage and the outbuilding at

25 your Conger Street house?

1    **A.**  This is not what it looked like when I lived there.  But
2    yes, that's it.
3    **Q.**  That's the same building?
4    **A.**  Yes.
5    **Q.**  Just painted a different color, I take it?
6    **A.**  Yes.
7    **Q.**  That's the building in which Briana Waters was living back
8    in 2001?
9    **A.**  Yes.
10   **Q.**  When she lived there, she had access to the main house
11   also, right, she had keys to the house?
12   **A.**  Yes, she was able to go in it.
13   **Q.**  You had a telephone in the house, correct?
14   **A.**  Yes.
15   **Q.**  And she had access to and could use that telephone?
16   **A.**  Yes.
17   **Q.**  Do you know whether she had her own car at that time?
18   **A.**  Not that I remember.
19   **Q.**  In fact, she didn't have a car at that time; that's
20   correct, isn't it?
21   **A.**  Sure, yes.
22   **Q.**  And she didn't have a cell phone of her own that she used
23   at that time, correct?
24   **A.**  Not that I know of.
25   **Q.**  Your sense was that she didn't have a lot of money?

1    **A.**  That's correct.

2    **Q.**  To have a car or a cell phone of her own?

3    **A.**  That's correct.

4    **Q.**  You told us a minute ago that you stopped by sometimes at

5    the house.  Do you recall being interviewed when you came to

6    our office about talking about how often you came to the

7    house?

8    **A.**  I don't.

9    **Q.**  Do you recall discussing who was supposed to live here

10   during this period?  Do you recall discussing whether anyone

11   other than Briana Waters was allowed to live in the house

12   during that period?

13   **A.**  Allowed to live in the house?

14   **Q.**  Did you give permission to anyone other than Briana Waters

15   to live in the house or the garage?

16   **A.**  At the same time?

17   **Q.**  Yes.

18   **A.**  There was a friend of my daughter's who stayed there for a

19   couple of nights in the main house.

20   **Q.**  But with that exception, you didn't -- Justin Solondz

21   wasn't supposed to live there, correct?

22   **A.**  No.

23   **Q.**  In fact, you specifically told Briana Waters he wasn't

24   supposed to live there?

25   **A.**  He wasn't invited to live there.

1  **Q.** Do you recall being interviewed and discussing how often

2  you visited the house and whether you visited it enough to

3  even know whether Justin Solondz was living there?

4  **A.** No, I don't remember that.

5          MR. FRIEDMAN:  May the witness be shown an exhibit,

6  the report of her prior interview?

7  BY MR. FRIEDMAN:

8  **Q.** Do you think looking at that report might refresh your

9  memory about what you said?

10  **A.** Sure.

11  **Q.** Would you turn to the third page of the report of your

12  interview?  Read the top full paragraph to yourself.

13  **A.** Okay.

14  **Q.** Does that refresh your memory of how often you stopped by?

15  **A.** It speaks to my memory at the time, yeah.

16  **Q.** In fact, you said that you stopped by rarely enough -- you

17  stopped by rarely; isn't that correct?

18  **A.** The back.

19  **Q.** You stopped by rarely enough that you wouldn't even have

20  known if anyone was visiting or if Justin Solondz was living

21  there?

22  **A.** If anybody was visiting her, correct.

23  **Q.** Or if Justin Solondz was living there, correct?

24  **A.** There was no -- well, there was no way to know if he was

25  or was not.

1  Q. Because you stopped by rarely enough that --

2  A. In the back, correct.

3      MR. FRIEDMAN:  Thank you very much, Ms. Moore.

4      THE COURT:  Anything else?

5                  REDIRECT EXAMINATION

6  BY MR. FOX:

7  Q. Ms. Moore, you said rarely.  Is that like -- I mean, how

8  many hours in a week would you say you would be by that house?

9  A. How many hours?

10 Q. Yes.

11 A. On an average?

12 Q. Yes.  During the time of the construction.

13 A. Every week would be different.  Circumstances of what was

14 happening would be different.  Five, maybe, over -- you know,

15 five to seven over the course of a week.

16 Q. So the majority of the time you weren't at the house,

17 right?

18 A. Exactly.

19      MR. FRIEDMAN:  Objection, Your Honor, leading.

20      MR. FOX:  You are right.

21 BY MR. FOX:

22 Q. I guess the times that you did come by, did you ever

23 announce that you were coming by?

24 A. Never.

25      MR. FOX:  I have no further questions.

1    MR. FRIEDMAN:   No further questions, Your Honor.

2    THE COURT:   All right.   You may step down.

3    THE WITNESS:   Thank you.

4    MR. BLOOM:   James Dawson, please.

5    THE COURT:   Let me have you come forward and raise

6  your right hand and be sworn.

7        JAMES DAWSON, called as a witness, duly sworn.

8    THE COURT:   You may take the witness chair.

9                     DIRECT EXAMINATION

10  BY MR. BLOOM:

11  **Q.**  Hi.   Could you please tell the jury your full name,

12  please?

13  **A.**  It's James Edward Dawson.

14  **Q.**  And are you married?

15  **A.**  Yes, I am.

16  **Q.**  Who are you married to?

17  **A.**  Heather Ellen Moore.

18  **Q.**  How old are you?

19  **A.**  I am 28.

20  **Q.**  Where were you born?

21  **A.**  I was born in Michigan.

22  **Q.**  When did you come up here to the northwest?

23  **A.**  In the fall of 1998.

24  **Q.**  When you came here, please tell the jury where you moved

25  to, what city?

1  **A.**  I moved to Olympia, Washington.

2  **Q.**  What did you do when you moved there?

3  **A.**  I went to the Evergreen State College.

4  **Q.**  For how long did you stay there?

5  **A.**  In Olympia or Evergreen?

6  **Q.**  At Evergreen.

7  **A.**  I graduated in 2003, but I took a year off of school, too,

8  during that time.

9  **Q.**  Stay in the microphone.

10  **A.**  No problem, sorry.

11      I took a year off during that time, but I graduated in

12  2003, and I was away for a year also during that time.

13  **Q.**  When were you away?

14  **A.**  I was gone in an environmental leadership training program

15  from the summer of 2000 until September of 2001.

16  **Q.**  How are you employed now?

17  **A.**  I work for a nonprofit advocacy organization called the

18  Washington Toxics Coalition as a community organizer.

19  **Q.**  How long have you been with them?

20  **A.**  Since May of 2006.

21  **Q.**  Where do you live now?

22  **A.**  I live in Tumwater, Washington.

23  **Q.**  In relation to Olympia, where is that?

24  **A.**  About a half mile away from Olympia.

25  **Q.**  Who do you live with?

1  **A.**  I live with my wife and my stepdaughter, who's seven, and
2  a dog and cat.
3  **Q.**  And her name?
4  **A.**  Her name is Kierren Winter.
5  **Q.**  Is Ocean her biological father?
6  **A.**  Yes, that's correct.
7  **Q.**  How long have you been with Heather?
8  **A.**  We have been together since March of 2002.  And we've been
9  married since October of 2003.
10  **Q.**  Do you remember meeting Briana Waters?
11  **A.**  I don't remember the first time I met Briana Waters, but I
12  remember meeting her.
13  **Q.**  Do you see her here in the courtroom?
14  **A.**  Yes.
15  **Q.**  Could you point her out, please?
16  **A.**  She's right over there.
17  **Q.**  Indicating Ms. Waters?
18  **A.**  Yes.
19  **Q.**  Is she a friend of yours?
20  **A.**  Yes, a great friend.
21  **Q.**  Can you tell us how you met her?
22  **A.**  I met her doing political work at the Evergreen State
23  College.
24  **Q.**  What kind of political work would that have been?
25  **A.**  Well, I think we might have met in the student activities

1   area because we were both involved in different environmental

2   student groups, I believe is the first time we met.

3   **Q.** Tell the jury about what you remember of your interactions

4   with her?

5   **A.** I have always really enjoyed my interactions with Briana.

6   She's a fun, honest person I trust greatly, and we've done a

7   lot of, I think, great work together to help make the world a

8   better place and also had a lot of fun doing it.

9   **Q.** Do you have a sense -- can you evaluate or give us your

10  opinion as to whether she is a violent person or a nonviolent

11  person?

12  **A.** I would say she's definitely a nonviolent person.

13          MR. BLOOM:  I don't have any further questions.

14                      CROSS-EXAMINATION

15  BY MR. BARTLETT:

16  **Q.** Good afternoon.

17  **A.** Hi.

18  **Q.** In addition to being a friend of Briana Waters, you are

19  also a friend of Justin Solondz?

20  **A.** That's correct.

21  **Q.** Good friend?

22  **A.** I was very good friends with him, uh-huh.

23  **Q.** When's the last time you talked to him?

24  **A.** I haven't talked to him in a couple years.

25  **Q.** As I understand it, you were out of the country for some

1    portion of 1999 until September of 2001?

2    **A.**  No, I was in the country; I was out of state.  And that

3    was what I previously said, the environmental leadership

4    training program.  I was traveling from the summer of 2000,

5    and I returned in September of 2001.

6    **Q.**  Got you.  So you weren't here in May of 2001?

7    **A.**  No, I was not.

8    **Q.**  Was there a point in time when you lived at 880 Division

9    Street?

10   **A.**  I don't remember the address exactly, but yeah, that

11   sounds right.

12   **Q.**  Kind of a group home?

13   **A.**  What was that?

14   **Q.**  Kind of a group home?

15   **A.**  It wasn't --

16   **Q.**  You lived there?

17   **A.**  I lived there, yes.

18   **Q.**  Ocean lived there?

19   **A.**  Yes.

20   **Q.**  Briana lived there?

21   **A.**  That's correct.

22   **Q.**  And Mr. Solondz lived there?

23   **A.**  Yes.

24   **Q.**  How long did the four of you live together?

25   **A.**  I believe it was for nine months or ten months, something

1  like that.  I don't remember the exact dates.

2  **Q.**  Have you donated any money to Ms. Waters?

3  **A.**  No.

4  **Q.**  In addition to knowing Justin Solondz, did you know a

5  person named Bill Rodgers or Avalon?

6  **A.**  I did know him, uh-huh.

7  **Q.**  I assume you've met Mr. Rodgers during the Watch Mountain

8  campaign?

9  **A.**  That would probably be the case, yeah.

10  **Q.**  In addition to knowing him, you were aware that

11  Mr. Rodgers and Briana were good friends?

12  **A.**  No, actually I wasn't aware that they were good friends.

13  **Q.**  The Watch Mountain campaign, as I understand it, that was

14  a campaign primarily sponsored by Earth First?

15  **A.**  Well, the Cascade Defense -- I am sorry, I am forgetting

16  the name of it.  The group that leads in some Earth First

17  values.

18  **Q.**  You said Earth First values.  I believe Mr. Bloom

19  described it as people from Earth First -- people from Earth

20  First, the hippies, the tree huggers, the people who wanted to

21  save the earth.  Those are the people that were involved in

22  the Watch Mountain campaign, correct?

23  **A.**  I guess you could call them hippies.  I wouldn't

24  necessarily categorize them that way.

25  **Q.**  Would you describe Earth First as a mainstream

environmental group or radical environmental group?

**A.** I think -- well, Earth First isn't really a group. So each individual person who thinks that they're associated with Earth First, I think, is different. I think our group would be considered radical in the way we went about things. When you look at the work that we did, we brought together people who were fighting, and we brought them together and successfully won.

So we brought a former timber community together with fairly radical college students. And up until that point -- that was at the end of the big spotted owl controversy when timber workers and environmentalists hated each other, and we brought them together to protect their communities.

So it was very impressive in the work that we were doing, and in that way I think it was radical.

MR. BARTLETT: If I could approach the witness?

BY MR. BARTLETT:

**Q.** I hand you what's been previously marked as Government's 1105.

Do you recognize that as the website for Earth First?

**A.** I am not familiar with the appearance of this website. I haven't -- I don't even know if I ever went to Earth First website.

**Q.** Looking at the back page, do you recognize the symbol for Earth First? It's not in color, but normally you see a green

1  fist in the air, with the name "Earth First!" with their

2  motto, which is "No compromise in the Defense of the Earth!"

3          MR. BLOOM:  Excuse me, but it says "Defense of Mother

4  Earth!"

5  BY MR. BARTLETT:

6  **Q.**  "No compromise in the Defense of Mother Earth!"

7  **A.**  I've heard it; I have seen this symbol before.  I don't

8  know that it's the symbol of Earth First.  It's a symbol that

9  someone who aligns themselves with Earth First created.

10  **Q.**  And Earth First within this website describes itself as --

11          MR. BLOOM:  Excuse me.  First of all, it's not in

12  evidence; and secondly, the witness has said he doesn't

13  recognize it.  I object.

14          THE COURT:  Let's ask him questions.  Question and

15  answer.

16  BY MR. BARTLETT:

17  **Q.**  You are aware that Earth First's self-description is that

18  they are a radical environmental group, correct?

19  **A.**  I guess so.  Again, Earth First is people who come

20  together in local areas and agree on something and go out and

21  do it together, and so it's hard to characterize it.  It's not

22  a top end organization.  There aren't rules for getting

23  involved in it.  And the groups are all different in what they

24  actually do.

25          I can only talk about the work I did, and in some ways I

think it was radical because it was stepping outside of what was being done at the time. But I don't think it's extreme. I think it's the type of change that I want to see in the world and the type of change that I would like to see -- that I would like to have my daughter inherit, too.

So I think that there's a very big difference between radical and extreme.

I think that we were radical in doing the things that people weren't doing, that I believe should have been doing; bringing together labor unions, bringing together environmentalists, bringing together economically depressed communities, and working to fight for rights of people who have been disadvantaged and combining a lot of different tactics to be successful. And we were very successful in doing that.

But again, I don't think the things that I was involved in was extremist. It was radical, but radical in a very positive way.

Q. When you first heard about Earth First, one of their primary trademarks was monkeywrenching, doing civil disobedience that would impact, for example, spiking trees; those types of activity?

MR. BLOOM: If I may, Judge, I object. This is further continuation, an attempt to smear Ms. Waters with Disneyland, Statue of Liberty. It's just not right. I would

1   ask the Court to stop it.

2           THE COURT:  Well, just a minute.

3       Any response to this?  Should I have the jury out on this.

4           MR. BARTLETT:  My sole question to this witness is

5   have you ever heard the term monkeywrenching in reference to

6   Earth First activities?

7           THE COURT:  You can answer yes or no, and I will see

8   where it goes.

9   **A.**  I have heard of monkeywrenching, and I have heard of it

10  being associated with certain Earth First groups.  But it's

11  not a term -- monkeywrenching is not something that I

12  participated in; I never saw Briana Waters participate in.  We

13  actively campaigned against it because it hurt the people that

14  we were working to work with and to build alliances with.

15  So we weren't interested in participating in that, and we

16  didn't.

17      So I don't think that you can associate the work that we

18  did in Olympia, Washington, with anything else that was done

19  by other Earth First groups in other states.  They are all

20  independent.

21      Again, it's not an organization.  It's a set of beliefs,

22  and people interpreted those beliefs differently.  And our

23  group of my friends, the people that I worked with, actually

24  were vehemently against tree spiking and other things that

25  caused harm to people, and we didn't participate in it, and we

1   actively worked to make sure it didn't happen on any of the
2   campaigns that we worked on.
3           MR. BARTLETT:  I have no further questions, Your
4   Honor.
5           MR. BLOOM:  I have no questions, Your Honor.
6           THE COURT:  You may step down.
7           MR. BLOOM:  Next will be Julie Frank, please.
8           THE COURT:  Let me have you come forward and raise
9   your right hand and be sworn.
10          JULIE FRANK, called as a witness, duly sworn.
11                      DIRECT EXAMINATION
12  BY MR. BLOOM:
13  **Q.**  Could you please tell the jury your full name?
14  **A.**  Julie Elizabeth Frank.
15  **Q.**  Where do you live?
16  **A.**  Olympia, Washington.
17  **Q.**  If I may ask, what do you do for a living?
18  **A.**  I got a new job yesterday.
19  **Q.**  You did?
20  **A.**  Yes.  I will be selling and marketing for a small company
21  that installs wind energy projects.
22  **Q.**  Are you married?
23  **A.**  Yes.
24  **Q.**  Do you have any children?
25  **A.**  I have two children.

1  **Q.** Any of them in this courtroom?

2  **A.** Yes, there's one over there in the corner, 12.

3  **Q.** Where did you grow up?

4  **A.** I grew up in Philadelphia.

5  **Q.** When did you come to the northwest?

6  **A.** In 1993.

7  **Q.** What -- since you've been here, what have you done?

8  **A.** I worked for a recycling company doing marketing for a

9  while.  I raised two children whom Briana babysat for.

10  **Q.** I'm sorry?

11  **A.** Briana babysat for my children.  And until recently, I was

12  the president of a technology start-up.  We were putting

13  together pumps, industrial pumps and renewable energy

14  turbines.

15  **Q.** Did there come a time in the past couple of years when you

16  spoke with either FBI agents or prosecutors?

17  **A.** I am going to guess, eight months ago, give or take, two

18  FBI agents knocked on my door one morning.

19  **Q.** Did they ask you questions?

20  **A.** Yes.

21  **Q.** Did you answer their questions?

22  **A.** I did.

23  **Q.** Now, do you know Briana Waters?

24  **A.** I do.

25  **Q.** Do you see her in the courtroom?

1    **A.**   Yes, I do.

2    **Q.**   Could you identify her?

3    **A.**   Yes, Briana right there.

4    **Q.**   How did you come to know her?

5    **A.**   I believe I put an ad in the paper, or maybe at Evergreen,

6    for a baby-sitter to take care of my children.

7    **Q.**   About what year would that have been?

8    **A.**   I believe it would have been sometime in 1999 or early

9    2000.

10   **Q.**   Briana responded to your ad?

11   **A.**   Yes, she did.

12   **Q.**   And did you decide to engage her as a person to take care

13   of your child or children?

14   **A.**   I did, And she was a wonderful sitter.  We were going

15   through some difficulty with our eldest, who is here.  She had

16   a tumor in her femur and was in and out of wheelchairs and

17   body casts for about 18 months.  And then I have a younger

18   daughter who's three years younger, and Briana was very

19   helpful during that time.

20   **Q.**   Could you describe, as you remember, your interactions

21   with Briana Waters?

22   **A.**   Certainly.  I didn't bring my kids into the world to

23   ignore them, and so I carefully interviewed people that spent

24   time with my kids and checked their references carefully.

25   Then I spent time with them getting to know them, find out

1  what they think about taking care of children and behavioral

2  issues.  And so Briana and I spent quite a bit of time

3  chatting through the couple of years she worked for us.  At

4  one time my husband and I decided it was okay to go away for a

5  night, and Briana stayed with the kids, and that was really

6  nice.

7  Q.  In general, could you describe your opinion of

8  peacefulness, violence, nonviolence; what is your sense of

9  her, your opinion of her with regard to whether she's a

10  violent person or a nonviolent person?

11  A.  Well, she was always good with my kids as far as offering

12  them positive suggestions on how to do things.  There was

13  never a threat or punishment.  It was always how do you

14  encourage with positivity.  And tickling, of course, was on

15  the list of important things.

16      I would trust -- I mean, she took our car and drove them

17  to the library or wherever they needed to go.  And I trusted

18  her with the lives of my children.

19  Q.  Thank you.  I don't have any further questions.

20                      CROSS-EXAMINATION

21  BY MR. FRIEDMAN:

22  Q.  Good afternoon, Mrs. Frank.  My name is Andrew Friedman.

23  I'm one of the prosecutors in this case.

24      I just have a few questions for you.

25      You obviously -- Briana Waters worked for you over the

1  course of a couple years?

2  **A.**  Yes.

3  **Q.**  And you met her boyfriend at the time; is that correct?

4  **A.**  A couple of times probably.

5  **Q.**  Do you recall his name?

6  **A.**  Justin.

7  **Q.**  Justin Solondz?

8  **A.**  I don't know that I ever knew his last name.

9  **Q.**  But you didn't meet many of her other friends from school,

10  did you?

11  **A.**  No.

12  **Q.**  And you didn't meet the people with whom she was involved

13  in environmental work or campaigns or projects, did you?

14  **A.**  No.

15  **Q.**  I am going to show you a series of pictures, and tell me

16  if you know any of those people.  They should all appear on

17  your computer screen in front of you.

18      Exhibit 111, someone named William Rodgers.  You didn't

19  know him, did you?

20  **A.**  No.

21  **Q.**  Then Exhibit 119, Joyanna Zacher?

22  **A.**  No.

23  **Q.**  Exhibit 118, Nathan Block?

24  **A.**  No.

25  **Q.**  Exhibit 117, Daniel McGowan?

1    **A.** No.

2    **Q.** Exhibit 120, someone named Suzanne Savoie?

3    **A.** No.

4    **Q.** Exhibit 116, Stan Meyerhoff?

5         MR. BLOOM: Excuse me a second. I'm going to object

6    -- I don't object to the showing of the photographs. The

7    introduction was people with whom she was involved in

8    activities. That is not --

9         THE COURT: Just show the pictures and see if she

10    knows.

11         MR. BLOOM: I object to the introduction, because

12    that is actually testimony by Mr. Friedman, and that is not

13    our position. It is not our position that she was involved

14    with these people.

15         THE COURT: You've made it clear.

16    BY MR. FRIEDMAN:

17    **Q.** You didn't know this man, did you, Stan Meyerhoff?

18    **A.** No.

19    **Q.** And then Exhibit 112, Jennifer Kolar, you never saw her

20    either?

21    **A.** No.

22    **Q.** Exhibit 113, Lacey Phillabaum?

23    **A.** No.

24    **Q.** So it's fair to say, isn't it, you never saw Briana Waters

25    with any of the people we've just looked at?

1  **A.** No, I certainly didn't.

2  **Q.** We talked a minute ago about, or you talked on direct

3  examination about being interviewed by a couple of FBI agents.

4  You said they came to your door, correct?

5  **A.** Yes.

6  **Q.** And they asked you some questions?

7  **A.** Yes.

8  **Q.** And they asked specifically questions about Briana Waters?

9  **A.** Yes.

10 **Q.** And they also asked you questions about Justin Solondz,

11 correct?

12 **A.** Yes.

13 **Q.** And they asked you questions about an arson that took

14 place at the University of Washington, correct?

15 **A.** Yes.

16 **Q.** You told them that you wouldn't be surprised if Briana

17 Waters new the people who had committed that arson, didn't

18 you?

19 **A.** I believe that we all have the opportunity to make efforts

20 for social change in our lives, and as a journalist, that is

21 what Briana did.  And it's natural that she might have known

22 some of these people through her work making the movie.

23 **Q.** You told them you would not be surprised if she knew

24 people who had committed the arson?

25 **A.** Well, certainly.  How else would she have made the movie

if she didn't meet some of those people?  I don't know that
the people in the tree sitting were the same people that did
the arsons, but it wouldn't be surprising if some of that --
there was overlap in those groups.

          MR. FRIEDMAN:  Thank you very much, Ms. Frank.

          THE WITNESS:  Certainly.

          MR. BLOOM:  Thank you.  I have no further questions.

          THE COURT:  All right, you may step down.

     Next witness.

          MR. BLOOM:  May I request -- the witness would like
to stay for two minutes to watch the proceedings.  Is there
any problem with that?

          MR. BARTLETT:  No objection.

          THE COURT:  She's been excused.  She can stay as long
as she likes.

     Let me have you come forward, sir.

          MR. BLOOM:  This is Greg Grove.

          THE COURT:  Just come forward and raise your right
hand and be sworn.

     GREGORY GROVE, called as a witness, duly sworn.

          THE COURT:  Just come around and take the witness
chair.

          MR. BARTLETT:  We were never provided notice that
Mr. Grove was going to testify.

          MR. BLOOM:  I think I did yesterday.  Isn't that

1  true?

2         THE COURT:  Is there an issue with him testifying

3  now?

4         MR. BARTLETT:  I have no idea who he is.  I have

5  never heard the name before.

6         MR. BLOOM:  He's a character witness.

7         MR. BARTLETT:  I have no objection.

8                    DIRECT EXAMINATION

9  BY MR. BLOOM:

10  **Q.**  Could you state your name to the jury, please?

11  **A.**  Yeah, my name is Gregory Allen Ladue-Grove.

12  **Q.**  Could you use the microphone, please?

13  **A.**  Okay.  My name is Gregory Allen Ladue-Grove.

14  **Q.**  How old are you?

15  **A.**  I am 49.

16         THE COURT:  Have him spell the last name for the

17  record.

18  BY MR. BLOOM:

19  **Q.**  How do you spell your last name?

20  **A.**  G-R-O-V-E.  It's a hyphenated name, L-A-D-U-E hyphen

21  G-R-O-V-E.

22  **Q.**  Where do you live?

23  **A.**  I live in Tumwater, Washington.

24  **Q.**  And are you married?

25  **A.**  I am, 29 years.

**Q.** Do you have any children?

**A.** I have two children, both grown, and a granddaughter of about four months ago.

**Q.** Where did you grow up?

**A.** I was born up in Seattle, Washington, over on Magnolia. Part of my youth was in Eatonville with my mom and grandparents. And most of my young high school, junior high, grade school life was down in the Medford, Oregon, area. I went to high school in Ashland, a Community College in Grants Pass. And came back home up here, I can't remember, 15, 20 years ago, something like that.

**Q.** Have you been in the military?

**A.** Yes, the 5th Marines, 9th marines, 1975 to 1979. I was a full 351 anti-tank, assault man with the ground unit.

**Q.** Could you stay with the microphone, if you would, please?

**A.** I'm sorry.

**Q.** Sure. What do you do for a living now?

**A.** I drive truck. I'm a truck driver locally within the greater Puget Sound area.

**Q.** What have you done for a living in the past?

**A.** In my younger years, just about anything, but mostly it was around driving truck. I have 18 years of driving truck. In the middle of that I had a job as a GIS mapper for the archaeology office, Office of Archaeology and Historic Preservation. I was also the tribal liaison for that office.

**Q.** Let me stop you there for a moment. Is that for a public entity?

**A.** That's the State of Washington. It's the shiphold office. The term that they use is OAHP.

**Q.** What year was that?

**A.** I went back to truck driving four years ago, and I spent three years working for the state.

**Q.** Just prior to that, just before that?

**A.** Yes. I have been back truck driving for four years, and just prior to that I was working for the state for three years.

**Q.** Okay. Did you have occasion to meet someone named Briana Waters?

**A.** Yes, I did.

**Q.** Do you see her in the courtroom?

**A.** Yes. Right to your left, sitting right there, yes.

MR. BLOOM: Let the record reflect that the witness has identified Briana Waters.

THE COURT: Yes.

BY MR. BLOOM:

**Q.** How did you come to meet her?

**A.** I met Briana a few years before I was working for the state. I am real sketchy on the years. I was -- I belong to the Cowlitz Tribe. I am a tribal member of the Cowlitz Indian Tribe, and I spent a lot of years trying to follow and living

1 and learning traditional value systems within the tribe. I

2 spent a lot of time in the sweat lodge and stuff and had been

3 going to dam relicensing meetings representing the tribe and

4 things like that, and it just so happens I was at the Cispus

5 Center --

6 **Q.** The what?

7 **A.** The Cispus Center up on the Cispus River by Randle,

8 Washington, and there was some folks trying to educate people

9 about the value of forests and healthy environment and such,

10 which, you know, is a lot of traditional tribal values with

11 clean water, fish passage, things line that.

12 And Briana was doing a documentary for her school -- she

13 was going to Evergreen College -- and she wanted to sit down

14 and interview me. So that's how I met her, is we started

15 talking about values and about indigenous thought patterns and

16 how elders and people see the forests and see the water and

17 see the fish and that relationship with that. And she was

18 doing a documentary, and I sat and did interviews for her.

19 And my family, too.

20 **Q.** When you say your family, too, could you tell us about

21 that?

22 **A.** Briana had a real interest in the idea of fish passage and

23 tribal value systems. And we developed a friendship, and she

24 interviewed my mother. She was there at Chehalis Tribe when

25 there was a traditional drum with an elder by the name of Noah

1  Longcrane there.  These were real traditional people, very --
2  you don't come from the outside into these circles.  And
3  Briana was very accepted through me because I spent a lot of
4  time with these folks, plus related to some of them.  And
5  Briana came around and she was making that documentary and she
6  interviewed folks.  She interviewed my mother.
7  **Q.**  Was there something special about you introducing her to
8  your mother?
9  **A.**  Yes, it was huge.  You know, Briana's integrity and the
10 way that she was carrying herself and how she was handling
11 herself, she was one of the few people that I would have come
12 around my family, much less people like Lillian Young, who was
13 the oldest tribal member of the Chehalis Reservation at the
14 time.  She was a person that spoke her language.  Her mother
15 saw the first coming of Europeans into the Cowlitz Valley.  I
16 can't express enough how these were very traditional folks.
17     And Briana, her integrity and her values.  I know that
18 she's on trial right now or I wouldn't be here.  There was
19 no -- I wouldn't have brought Briana around had I thought that
20 there was any lack of integrity or peacefulness in who she
21 was.
22 **Q.**  That's my last question.  Do you have an opinion about
23 her, whether or not she's a violent person or a nonviolent
24 person?
25 **A.**  My opinion is she's nonviolent.  We had a lot of

1  conversations about the violence of the forests, about how you

2  can't take violence and create peace.  I knew Briana as a very

3  peaceful person.  She always represented herself as such

4  around my family, around my children, around a traditional

5  Lakota tribal drum in the middle of Chehalis.

6      I know her as a peaceful person.

7          MR. BLOOM:  I thank you.  I don't have any further

8  questions.

9      Maybe the prosecutors have some questions for you.

10          MR. BARTLETT:  Nothing, Your Honor.

11          THE COURT:  You may step down.

12          MR. BLOOM:  Thank you.

13          THE COURT:  Next witness.

14          MR. BLOOM:  May this witness stay as well?

15          MR. BARTLETT:  No objection.

16          THE COURT:  Yes.

17          MR. BLOOM:  Sarah Wald, W-a-l-d.

18          THE COURT:  Just come forward, please.

19      Raise your right hand and be sworn.

20          SARAH WALD, called as a witness, duly sworn.

21          THE COURT:  Come around and take the witness chair.

22                      DIRECT EXAMINATION

23  BY MR. BLOOM:

24  Q.  Could you please state your name?  Speak into the

25  microphone, if you would, please, and state your name slowly

1 to the jury.

2 **A.** My name is Sarah Wald.

3 **Q.** Could you spell it, please?

4 **A.** Sarah is S-A-R-A-H, and Wald is W-A-L-D.

5 **Q.** How old are you?

6 **A.** I am 28 years old.

7 **Q.** Right now, where do you live?

8 **A.** I live in Providence, Rhode Island.

9 **Q.** What do you do in Providence, Rhode Island?

10 **A.** I am a graduate student at Brown University.

11 **Q.** Where were you born?

12 **A.** I was born in Ann Arbor, Michigan.

13 **Q.** And did there come a time when you -- how old were you

14 when you left Ann Arbor?

15 **A.** I left Ann Arbor -- I went back and forth from my parents'

16 house in Ann Arbor and my grandparents' house. I moved --

17 **Q.** Where was your grandparents' house?

18 **A.** They live in southern California. And so I went back and

19 forth between their house -- my mother was very sick, which is

20 why I had to go to my grandparents' house -- until I was 17.

21 I moved to Portland, Oregon, to go to college.

22 **Q.** Where did you go to college?

23 **A.** I went to Reed College from 1997 to 2001.

24 **Q.** How long have you been in Rhode Island?

25 **A.** I moved to Rhode Island in the fall of 2003, which is when

1    I started graduate school.

2    **Q.** Had you been in Portland before that, after school?

3    **A.** I stayed in Portland from when I graduated until when I

4    left for graduate school.

5    **Q.** Are you married or single?

6    **A.** I am single.

7    **Q.** Now, do you know a woman named Briana Waters?

8    **A.** I do know Briana Waters.

9    **Q.** Do you see her in the courtroom?

10   **A.** Yes.

11   **Q.** Indicating over this way. Is that Briana over there?

12   **A.** That's Briana over there.

13   **Q.** And do you remember where you met her and when you met

14   her?

15   **A.** I met Briana -- the first time I really put her face and

16   her name together, was in February of 2001. We were at a

17   meeting together in Portland, Oregon.

18   **Q.** And what was that meeting about?

19   **A.** It was a regional meeting for people who were involved in

20   forest campaigns and campaigns to protect forest areas, such

21   as the Watch campaign up in Washington and the campaign to

22   protect the Eagle Creek area in Portland, Oregon, to talk

23   about issues that had come up with sexism and around gender in

24   the different campaigns. So there were people there from both

25   Oregon and Washington.

**Q.** About how many people were at that meeting?

**A.** There was no more than a couple of dozen people. It was a pretty small meeting.

**Q.** What kind of setting was it?

**A.** It was held at a house that was up on a hill, kind of on the west side of Portland, up near Lewis and Clark College, but it wasn't right near the college -- but that area of Portland. And we actually held meeting in a big barn structure that was on that property. It was a pretty comfortable, dry, warm space.

**Q.** I am going to show you a picture. Do you recognize that person?

**A.** That is Lacey Phillabaum.

**Q.** Now I am going to take that off there. Do you remember meeting her at any time?

**A.** I met Lacey the first time I put my name -- I may have been in the same room with her before, but the first time I really knew that I was meeting Lacey was at that same meeting in February of 2001. She was -- she played quite a prominent role at the meeting. She was doing a lot of the facilitating. It was a two-day meeting. She spoke prominently during the meeting.

**Q.** Did there come a time at the meeting -- do you remember the date of the meeting?

**A.** I believe the meeting was held February 3rd and 4th. It

1  was held the first week of February, for sure.  I was

2  starting -- it was the spring semester of my senior year and

3  it was important for me to go to regional meetings at that

4  point because I was graduating college and I was going to be

5  spending less time working with organizations on campus and

6  working more time with organizations in the community.  And it

7  was right at the beginning of the semester, as we were getting

8  started for the school year.

9  Q.  Is there anything else that helps you identify and

10  remember the date, the approximate date of the meeting?

11  A.  There was a conference at Portland State University that

12  had a name like the global justice conference, that I was

13  helping with.  It was a group of Portland State University

14  students, Lewis and Clark College students, and the students

15  worked together on this global justice conference, and the

16  conference was February 16th through 18th.  I went and looked

17  through my files.  I saved the fliers from the conference, and

18  I remember the meeting was a couple of weeks before the

19  conference.

20  Q.  Was there any other conference that took place in the same

21  period that helps you identify the date?

22  A.  That was the only year I went down to an environmental

23  regional conference they held every year at the University of

24  Oregon, and that was held in the last weekend of January.  And

25  I remember that meeting was held between when I went to the

1  Eugene conference, which I went with a group of Reed College

2  students, and to the one when I went to this global justice

3  conference at Portland State University. And that was -- I

4  also saved the fliers for that -- was January 27. So I knew

5  it was the weekend after that that I had gone to this meeting

6  in Portland.

7  Q. Did there come a time during the meeting at the barn,

8  let's call it, that the couple of dozen people broke into what

9  they might call breakout groups? Is that the phrase that you

10 use?

11 A. Uh-huh, yeah. We often -- we went around the circle

12 several times introducing ourselves throughout meeting, but

13 during one point in the meeting we broke into groups, a group

14 of mostly women and a group -- a group of all women and a

15 group of all men. And there was one group that was for women

16 and men who wanted to talk about these issues together.

17     Almost all the women went to the group for the women only.

18 The facilitator was a women, and I think one other woman went

19 to that group. But for the most part, all the women were in

20 that one big breakout group, and so we spent several hours at

21 that point talking about issues that had come up in people's

22 campaign.

23 Q. In that breakout group -- was Lacey Phillabaum in that

24 group?

25 A. I don't remember if Lacey was in that group. She was for

1  sure, but I can't quite remember who the two women who went to

2  the other group were. But I know that she was -- when we

3  finished the breakout groups we came back together. We spent

4  most of the meeting in a big group, and so I think it's highly

5  likely she was in the group that had all but two of the women

6  there. There were a lot of women at those meetings. There

7  were more women than men at the meetings. And I can't quite

8  remember who those two women who were at the other group were.

9  But we spent most of the meeting in the big groups and sharing

10  what we come up with in that one time we spent in the breakout

11  groups.

12  **Q.** Did that meeting go for one day or two days?

13  **A.** It was a two-day meeting, so it was all day Saturday and

14  then people stayed and talked and played music on Saturday

15  night and the meeting continued on Sunday. So there was quite

16  a lot of socializing time at the meeting. It was a pretty

17  memorable event.

18  **Q.** And when you say played music, do you have any

19  recollection of Briana Waters being involved in music?

20  **A.** That's why I really remember that she was there. She

21  brought her fiddle down and she played her fiddle. I really

22  love violin music, so I was very excited to see someone bring

23  the fiddle.

24  **Q.** Do you have any connection with violin music?

25  **A.** I played violin as a child until I was probably about -- I

1  played in the school orchestra until I graduated high school.

2  So that was pretty close to when I played violin at that

3  point. I was never very good at it, but I loved hearing

4  people who were very good at playing.

5  Q. Is there any doubt in your mind that the first weekend of

6  February of 2001, Briana Waters and Lacey Phillabaum were at a

7  meeting together with about two dozen people?

8        MR. BARTLETT: Excuse me, Your Honor. The testimony

9  was a couple dozen.

10       MR. BLOOM: A couple of what? A couple of dozen?

11       THE COURT: I don't know. Just ask her the question,

12  if she remembers anything. That's your question, I believe.

13       MR. BLOOM: I am not so sure what I said, it was

14  different from --

15       THE COURT: Do want her to read it back?

16       MR. BLOOM: No, I will ask it again.

17       THE COURT: Okay.

18  BY MR. BLOOM:

19  Q. Is there any doubt in your mind that at that meeting, the

20  first weekend in February, Briana Waters was there and Lacey

21  Phillabaum was there? Is there any doubt in your mind?

22  A. I have absolutely no doubt that Lacey Phillabaum and

23  Briana Waters were at this meeting that had no more than 30

24  people, but probably closer to 20 people at it, for two days,

25  where we spoke repeatedly within the group and met everyone

1   there.

2         MR. BLOOM:  Thank you.  I don't have any further

3   questions.

4         MR. BARTLETT:  No questions, Your Honor.

5         THE COURT:  You may step down.

6     Next witness.

7     Let me have you come forward, if you would, and raise your

8   right hand and be sworn.

9     DARIA ELIZABETH WRUBEL, called as a witness, duly sworn.

10         THE COURT:  Just come around and take the witness

11   chair.

12                 DIRECT EXAMINATION

13   BY MR. BLOOM:

14   Q.  Good afternoon.

15   A.  Good afternoon.

16   Q.  Have you traveled up here today?

17         THE COURT:  Have her identify herself.

18   BY MR. BLOOM:

19   Q.  Could you please state your name and spell your name?

20   A.  Daria D-A-R-I-A, Elizabeth, E-L-I-Z-A-B-E-T-H, Wrubel,

21   W-R-U-B-E-L.

22         MR. BARTLETT:  Your Honor, once again, this is a

23   witness we've never been notified about.  We have no notice of

24   this.

25         MR. BLOOM:  That's not true.  This is a notice I gave

1  him over the weekend.

2       THE COURT: If you look at the witness list, I think

3  she's listed as 32.

4       MR. BLOOM: Excuse me a second.

5       THE COURT: Is that the same witness?

6       MR. BLOOM: My apologies. This is also a character

7  witness. If there's any objection, I will do whatever the

8  Court directs.

9       MR. BARTLETT: It's 2:15, Your Honor. I would like

10  to be heard outside the presence of the jury.

11       THE COURT: All right. Let me have you take the

12  afternoon recess at this time. I will take this matter up,

13  and then you'll be back in here.

14    Don't discuss the case. Leave your books on your chair.

15    (Jury not present.)

16       THE COURT: All right, you may be seated.

17    Should the witness be out of the room?

18       MR. BARTLETT: I would ask that.

19       THE COURT: Let me have you step down and remain

20  outside.

21       (Witness departed courtroom.)

22       MR. BARTLETT: Our objection is twofold. First of

23  all, we didn't receive prior notice of this witness. And more

24  importantly, I wouldn't object that much if it's a character

25  witness. From my count, this is the sixth character witness

1   that we are calling.  I think it is cumulative.  We've heard
2   that a lot of people think very highly of her.  This is just
3   cumulative.
4           THE COURT:  Well, let me have Mr. Bloom respond to
5   that.
6       I have two witness lists here.  I have one in pencil, and
7   it says 2/26, and of course her name is not on this list.  I
8   don't know if number 32 on the witness list submitted at the
9   beginning of the trial, it says Dana Wrubel, is that the same
10  person?
11          MR. BLOOM:  Yes.
12          THE COURT:  This says Dana, and I believe she said
13  her name was Daria or something like that.
14          MR. BLOOM:  It is in handwriting, Judge?
15          THE COURT:  I don't have anything about a name --
16  yes, Daria, her name is on this list that was submitted today.
17  Do you have that?
18          MR. BARTLETT:  I never got that, Your Honor.
19          THE COURT:  Pat, you gave this to me.  Did you give
20  everybody a copy?
21          THE CLERK:  No, I thought Mr. Bloom did that.
22          THE COURT:  All right, let's do this.  Let me have
23  you look at the list -- I assume this is the list you are
24  intending to call today?
25          MR. BLOOM:  Yes.  Let me give you all the names.

1          THE COURT:  Well, the government is claiming they

2     didn't get it, or you gave it to Pat, but Pat didn't

3     disseminate it or something.  So let's find out, let them take

4     a look at the list.

5          Let me have you respond to the question as to whether all

6     of these witnesses will come and say that she's a person that

7     they know of as to have a reputation of nonviolence.  Is that

8     the thrust?

9          MR. BLOOM:  That's not the sole purpose of this

10    particular witness.

11         THE COURT:  Which one, could you identify solely for

12    that?  That's where the distinction's from.

13         MR. BLOOM:  For character?

14         THE COURT:  If they have something else to add to

15    that about something else, that's different; that becomes a

16    factual thing.

17         So let me have you -- we'll take the recess.  I will have

18    you look at it and make those kind of identifications, then I

19    can tell you something, what I think about it.  Okay?

20         We are at recess.

21         THE CLERK:  All rise, court is in recess.

22    (Afternoon recess.)

23         THE COURT:  You may be seated.

24         All right, we were talking about witnesses, how many of

25    them are purely character witnesses, and what's the end of the

1    line on that kind of witness, other than fact witness.  I have

2    a new list here that's been provided.  So I guess I am asking

3    both of you about this list.  These are folks coming the rest

4    of the afternoon, is that right?

5         MR. BLOOM:  Yes.  And I want to say that none of

6    these witnesses is just purely a character witness.  Each one

7    has important facts to talk about that relate to the issues of

8    this case.

9         MR. BARTLETT:  I have no objection to those fact

10   witnesses getting on and testifying as to those facts, and it

11   should end there.  They shouldn't be able to bootstrap

12   themselves by having a fact witness get on, talk a few seconds

13   about a fact, and then have them launch into more character

14   witnesses.  These are eight additional witnesses.  We've

15   already heard from five character witnesses.

16        The Court has had a chance to look at the cases.  You know

17   they are not allowed to have just endless, endless, endless,

18   endless calling of character witnesses.

19        THE COURT:  I understand that.  You are talking about

20   an additional question, as to what do you think about

21   nonviolence; I suppose that is the issue.  You are cutting a

22   fine line on the matter.

23        MR. BARTLETT:  They just shouldn't be allowed to ask

24   the questions.  They should get their facts on, and that

25   should be the end of it.

1          THE COURT:  You made the objection, and the record is

2    made, and I have to see where that goes and where it leads to.

3    If it leads to something that's prolonged, then I would agree.

4    If it's strictly on the character thing, you are not parading

5    112 folks in to say the same thing.  That's what I am talking

6    about when I say character.

7          MR. BLOOM:  You've seen it, with the exception of

8    yesterday's witness who did go on for a while, Ms. Troxel, the

9    witnesses you've seen I've just asked a few questions.  I

10   haven't prolonged it.

11         THE COURT:  All right, are we ready now?  I guess we

12   had Ms. Wrubel on.

13       Bring in the jury and bring her in.

14       Ms. Wrubel, do you want to bring her in?

15       (Jury present.)

16         THE COURT:  All right, you may be seated.  Questions.

17         MR. BLOOM:  I don't know how far we got, but let's

18   kind of start over.

19   BY MR. BLOOM:

20   **Q.**  Could you give the jury your name, please?

21   **A.**  Daria Elizabeth Wrubel.

22   **Q.**  Spell the last name.

23   **A.**  W-R-U-B-E-L.

24   **Q.**  How old are you?

25   **A.**  Thirty-four.

**Q.** Where do you live?

**A.** I live in Berkeley, California.

**Q.** And are you married?

**A.** I am.

**Q.** Do you have any children?

**A.** I have an 18-month-old son.

**Q.** Do you know Briana Waters?

**A.** I do.

**Q.** Let me go back. What do you do for a living?

**A.** I teach nutrition and gardening at an elementary school in Hayward, California.

**Q.** Do you know Briana Waters?

**A.** I do.

**Q.** Is that she over there?

**A.** It is.

**Q.** For how long have you known her?

**A.** We -- well, we met, I think, in December of 2001. We had both been at Lark in the Morning music camp together in the summer of 2001, but I don't really remember meeting her there. But we did meet again in December, and then she moved in with me at the beginning of February in 2002. I owned a house in Oakland, California, and she was my tenant and my roommate.

**Q.** Could you describe how you remember that she moved in February of 2002?

**A.** Well, I had just bought the house. It was the first house

1   I ever bought, so I remember distinctly it was December 5,

2   2001, that I closed escrow; it was a very exciting day.  And

3   Briana came up in December to look for a place to -- or came

4   down, I guess -- to look for a place to live.  We were

5   introduced by my friend Maleca, and I remember she needed to

6   go back to pack in January.

7   **Q.**  Back to where?

8   **A.**  Back to Olympia to get her things and drive down, and so

9   she moved in in February.

10  **Q.**  And how would you describe your interactions with her when

11  she moved down?

12  **A.**  Well, she became a very good friend very quickly.  She was

13  just a pleasure to live with, a very generous and warm

14  roommate.  I was really impressed at how she handled any

15  conflict in our household.  If she thought that I was upset

16  about something or that maybe I had misunderstood anything

17  that she said, she was very quick to ask me about it and to

18  sit down calmly and talk about:  How can we work this out?  I

19  really want to make sure that you feel cared for and that we

20  understand each other and we don't have any misunderstandings.

21     So we became really good friends.

22  **Q.**  And you know what she's accused of; is that correct?

23  **A.**  I do.

24  **Q.**  Did that in any way deter you from coming up to testify on

25  her behalf?

**A.** Not at all.  I knew as soon as I heard what the accusations were that they must be false, knowing her as I did.  And I have been a really strong supporter ever since.  I have donated money.  I have helped care for Calliope when Briana needed to meet with you.  I have, you know, I've been more than willing to come up here even though I had to take time off from work and be away from my son because I know what a good person she is.

MR. BLOOM:  I don't have any further questions, thank you very much.  I don't know if they do or not.

MR. BARTLETT:  Nothing, Your Honor.

THE COURT:  All right.  You may step down.

MR. BARTLETT:  Your Honor, I renew my objection. This last witness was strictly a character witness.

MR. BLOOM:  Excuse me.

THE COURT:  I understand what you are saying.  She came down and she moved in with her.  That doesn't go to the ultimate issue in the case.  So what I am trying to do is get you to limit the testimony either as it goes to the factual matters of issues in the case or a character witness.

MR. BLOOM:  Each of the witnesses I am going to call have factual things to talk about and they also know her.  I want to be able to ask traditional character questions.

THE COURT:  Bring in the witness, and just remember what I will accept.

1    MR. BLOOM:  Just go over there, thank you.

2    JAY SCOTT DOANE, called as a witness, duly sworn.

3                    DIRECT EXAMINATION

4    BY MR. BLOOM:

5    **Q.** Could you state your name, please, and spell your last

6    name for the jury, please?

7    **A.** Jay Scott Doane.  D-O-A-N-E.

8    **Q.** When did you come to town this week?

9    **A.** I think our plane landed at 10:30.

10   **Q.** Could you speak a little louder?

11   **A.** 10:30 a.m.

12   **Q.** Would that be today?

13   **A.** Yeah.

14   **Q.** Now how old are you?

15   **A.** Forty-three.

16   **Q.** Where do you live?

17   **A.** San Francisco, California.

18   **Q.** What do you do for a living?

19   **A.** Computer programmer.

20   **Q.** How long have you done that?

21   **A.** Hmm, 15 years.

22   **Q.** Are you involved in the music world?

23   **A.** Yeah, I play the violin.

24   **Q.** For how long have you done that?

25   **A.** Same amount of time.

1  Q.  I am sorry?

2  A.  About the same amount of time, 15 years.

3  Q.  Do you know Briana Waters?

4  A.  Yes.

5  Q.  Do you see here in the courtroom?

6  A.  Yes.

7  Q.  Could you identify her, please, point to her?

8  A.  She's sitting over there.

9          MR. BLOOM:  Indicating Briana Waters.

10  BY MR. BLOOM:

11  Q.  I want to take you back to the fall of 2001.  Do you

12  remember seeing Briana Waters at about that time, in the Bay

13  area?

14  A.  Yes, I do.

15  Q.  Could you describe the circumstances?

16  A.  Yes.  She flew down for a week.  She stayed at my

17  apartment some of the time, maybe most of the time, in a spare

18  bedroom I had.  And she was -- basically, I introduced her to

19  some fellow musicians, showed her around town a bit.  And I

20  have a recollection of us going to -- at least one place to

21  find a venue for her to play Watch, her recently made video.

22  Q.  Did you say to play Watch?

23  A.  To -- yeah, to show it.

24  Q.  To screen it?

25  A.  To screen it, yeah.

1   **Q.**  Did you ever see it?

2   **A.**  Yeah, I have a copy.

3   **Q.**  Are you saying that one of the reasons she visited was to

4   try to get her video screened?

5   **A.**  Oh, absolutely.  That was one of the highest priorities.

6   **Q.**  Was she involved in any -- so far as you know, did you

7   have any discussions with her about any violent activities?

8   **A.**  No.

9   **Q.**  Have you ever had any discussions with her about any

10   violent activities?

11   **A.**  No.

12   **Q.**  Now, that week that she was there, in the Bay area, were

13   there any music events that you attended together or

14   participated in together?

15   **A.**  Yeah, I believe.  I don't have a clear recollection, but

16   there were at least one jam session that we went to with some

17   of my friends.  I think it was actually at my apartment.

18   **Q.**  You know what she's accused of; is that correct?

19   **A.**  I don't know the exact counts, but I have a good idea of

20   what she's accused of.

21   **Q.**  She's accused of committing arson, you know that?

22   **A.**  Right.

23         MR. BLOOM:  Judge, I just have one question I would

24   like to ask, a character question, if I may.

25         THE COURT:  Ask it.

BY MR. BLOOM:

**Q.** Do you have an opinion -- how many times have you seen
Briana Waters in your life?

**A.** Hundreds.

**Q.** Have you formed an opinion about whether or not she is a
violent person or a nonviolent person?

**A.** Yes.

**Q.** What is that opinion?

**A.** She's a nonviolent person.

      MR. BLOOM:  I don't have any further questions.

      THE COURT:  All right.

      MR. BARTLETT:  Nothing, Your Honor.

      THE COURT:  You may step down.

    Next witness.

    I will have you come forward, if you would, and raise your
right hand and be sworn.

      LAWSON DUMBECK, called as a witness, duly sworn.

      THE COURT:  Come around and take the witness chair.

                 DIRECT EXAMINATION

BY MR. BLOOM:

**Q.** Could you please state your name and spell both the first
and last name?

**A.** My name is Lawson Dumbeck.

**Q.** Use the microphone, if you would, please.

**A.** Lawson Dumbeck; L-A-W-S-O-N, D-U-M-B-E-C-K.

1  Q.  How old are you?

2  A.  I am 44.

3  Q.  Are you married or single?

4  A.  I am married.

5  Q.  Do you have any children?

6  A.  I have one daughter, a seven-year old.

7  Q.  Are you employed?

8  A.  I am employed as an assistant attorney general by the

9  State of Washington.

10  Q.  And what does that involve, what kind of work do you do?

11  A.  I am a lawyer, and I advise the State of Washington,

12  Department of Transportation, on labor and personnel matters

13  primarily.

14  Q.  How long have you had that employment?

15  A.  It's been a short period of time that I have been with

16  them, just two months, and I have worked for them also as a

17  clerk in the past.

18  Q.  A clerk?

19  A.  Law clerk in the past.

20  Q.  I am missing the last couple of words.

21  A.  Oh, excuse me.  A law clerk.

22  Q.  In the past?

23  A.  In the past.

24  Q.  That's what I was missing.  Thank you.

25      Prior to that what kind of work did you do, or what did

1  you do?

2  **A.**  I was in private practice, and I did appellate work in the

3  courts of appeal.

4  **Q.**  In the state court or the federal court or both?

5  **A.**  Both.

6  **Q.**  Now, did there come a time when you met someone named

7  Briana Waters?

8  **A.**  Yes, I did.

9  **Q.**  Do you see her in the courtroom?

10  **A.**  Yes, I do.

11  **Q.**  Could you point her out, please?

12  **A.**  She's sitting next to that man right there.

13       MR. BLOOM:  Indicating Briana Waters.

14  BY MR. BLOOM:

15  **Q.**  What were the circumstances of how you met her?

16  **A.**  She appeared in my house.  My wife teaches violin/fiddle

17  an she was a student of my wife's.  We became friendly.  She

18  was an excellent musician and had just a great way about her,

19  a very good personality, and so we became friends that way.

20  **Q.**  Were there any further dealings that Briana Waters had

21  with you and members of your family?

22  **A.**  Oh, yes.  She would take care of my daughter when my

23  daughter was very young, and I developed a trust of Briana and

24  gotten to know her, so she was, I think, probably my

25  daughter's first baby-sitter.  And really the, you know, the

1  nervous parents, the first time you step out, you want to give

2  your daughter to someone you trust.  We had developed that

3  with Briana.  So we really entrusted her with the most

4  precious thing that we had.

5  **Q.**  Now, did she spend time with you and your wife in the

6  year's -- well, when did she spend time with you and your

7  wife?

8  **A.**  From, I would say, late 1998 until 2002, we interacted

9  with her the most.  There is a vibrant musical community in

10 Olympia, and we introduced Bri to that.  We called Briana Bri.

11 And we watched her, you know, sort of get her wings as a

12 musician there and interact with those people and, you know,

13 just sort of light up the musical community, as she developed

14 her skills.  And I had the honor of playing with her on her

15 first professional gig -- I think it was first professional

16 gig -- at Evergreen State College.  And, you know, just having

17 seen over the years her go from sort of a beginning student to

18 playing just, you know, fabulously and making the music

19 together was something that was very meaningful to me.

20 **Q.**  Do you ever recall talking about or advocating any kind of

21 violence?

22 **A.**  Absolutely not.  It would have been shocking to me if she

23 had.

24 **Q.**  Is it fair to say that you are saying that the time you

25 spent with her did not in any way involve any kind of

1  violence?

2  **A.**  In no way whatsoever.

3        MR. BLOOM:  I have no further questions.

4        MR. BARTLETT:  Nothing, Your Honor.

5        THE COURT:  You may step down.

6     Next witness.

7        MR. BLOOM:  He's going to get the witness who is his

8  wife.

9        THE COURT:  Is her testimony the same?

10       MR. BLOOM:  Except in more detail about the music.

11    What's the problem?  Why can't we call our witnesses?  You

12  let them call their witnesses.  Why can't we call our

13  witnesses.

14       THE COURT:  Don't be yelling out when I am asking you

15  a question about anything.  Now, if you want to address me,

16  you had better address me properly.

17       MR. BLOOM:  Yes, sir.  I was addressing the standing

18  up --

19       THE COURT:  You were talking to me.

20    Step out for a minute, please.

21    (Jury not present.)

22       THE COURT:  Now, let me say this.  I raised the

23  question, I have raised it all along, about duplication, folks

24  saying the same thing.  My question to you, what is different

25  in this witness's testimony than her husband, and that's when

1   you started shouting at me.

2           MR. BLOOM:  I am sorry for shouting at you.

3           THE COURT:  Now, tell me, if you will, what's

4   different in this testimony?

5           MR. BLOOM:  That she is another fact witness who will

6   testify to what it was that Briana Waters was doing in the

7   period of the alleged conspiracy.  That she is a witness who,

8   although she will testify to the same thing now, they have

9   called Lacey Phillabaum as a fact witness, and they have

10   called Jennifer Kolar as a fact witness.  They are testifying

11   to the same thing.  There's nothing wrong with that.

12           THE COURT:  I understand that, but that's going to

13   the elements and the charges against this defendant.  Here we

14   are talking about playing the violin and other things.

15   Granted, she may be an excellent musician.  That's not the

16   issue here.

17     I am saying, if that's what it's about and that

18   interaction and baby-sitting, you are doing the same thing

19   over and over again.  It's of no benefit here; it's prolonging

20   the case unnecessarily.  That's what I am saying.

21     If it's purely a character witness, her husband has

22   testified to that, what he thinks of her, and I assume her

23   testimony is exactly the same.  So now we are going to talk

24   about playing the violin again.  Is that what we are going to

25   talk about again?

1          MR. BLOOM:   About how Briana Waters was spending her
2    time in the period of the alleged conspiracy.   That's --
3          THE COURT:   Would they be talking about the same
4    period of time in the same way, is what I am asking you?
5          MR. BLOOM:   Yes, of course.
6          THE COURT:   Then I don't need that testimony.
7          MR. BLOOM:   Well, you don't need it, but we do.
8          THE COURT:   I am not going to let you have somebody
9    come in and say the exact same thing.   If you bring in a
10   witness that says the same thing, I am going to tell the jury
11   to disregard it.
12         MR. BLOOM:   If I may say this, as I pointed out, they
13   were allowed to, and they did, bring in not one but two
14   witnesses.
15         THE COURT:   I understand your objection, but --
16         MR. BLOOM:   Can I talk?
17         THE COURT:   -- are you going to let me control this
18   courtroom, or are you going to stand up and forever tell me
19   how I should do this; or are you going to accept my rulings as
20   I give them and move on?   Are you going to do that?
21         MR. BLOOM:   I am going to accept your rulings, but
22   when I am speaking, I would like to be able to be permitted to
23   finish what I am saying.
24         THE COURT:   You are never through, Mr. Bloom.
25         MR. BLOOM:   I am sorry?

1    THE COURT:  Finish.

2    MR. BLOOM:  What I am saying is they are entitled to,

3    and they have, called fact witnesses to testify to the same

4    things.  A party is permitted to do that unless it gets to be

5    like ten witnesses testifying to the same thing.

6    What Mr. Dumbeck has testified to, and Anthea Lawrence

7    will testify to, are two witnesses to testify as to what

8    factually Briana Waters was doing during the period of the

9    conspiracy.

10   We're not talking about ten witnesses.  We're not talking

11   about over and over again.  We are doing exactly what the

12   Court has permitted the prosecution to do; call more than one

13   witness about fact, about the facts of the case.  That's what

14   this is about.

15   Now, if they also happen to like her and trust her, if you

16   want to tell the jury to disregard nice things that people say

17   about her, well, that's the court's prerogative.  But these

18   are fact witnesses, and I want to call them as fact witnesses.

19   It's not the same thing over and over again.

20   THE COURT:  They are fact witnesses, but fact about

21   what is the issue here.

22   MR. BLOOM:  That she was not involved in any illegal

23   activity, so far as these witnesses knew, during the period of

24   the alleged conspiracy, period.

25   MR. BARTLETT:  That description, Your Honor, is the

1    exact description of what a character witness is.

2            MR. BLOOM:  Of course it is not.

3            THE COURT:  I guess you and Mr. Fox are together, but

4    I don't know if you gather on some of these things or not.

5            MR. BLOOM:  Mr. Fox thinks I should not tell this to

6    the Court.  Well, I am telling this to the Court.  It is

7    important for the record and for me to convince the Court.

8            THE COURT:  You have made the record, and you have

9    convinced me that her testimony is the same as her husband's.

10   That's enough.  Now move on to something different.

11           MR. BLOOM:  So are you saying if she's going to

12   testify as to what Ms. Waters was doing -- not what a good

13   person she was, but what she was doing during the

14   conspiracy -- that I cannot call that witness?

15           THE COURT:  You have told me that her testimony would

16   be the same:  she worked for them, she babysat, she played the

17   violin, she was her teacher.  All of that, that's got nothing

18   to do with this case.  That's the same thing over again.

19   Unless you've got something going to some other fact, her

20   husband has said it.

21       So how many folks are you going to bring before this court

22   to say that they have had contact with her, and all of that

23   contact with her has been nonviolent?

24           MR. BLOOM:  Judge, you are missing what I am saying.

25   I have said it, and I will say it again.  It's not about that

1  she's nonviolent.  It's about during the period that they knew

2  her, she was not talking about conspiracy to commit arson or

3  any other crimes.  It is a fact witness that addresses the

4  allegations made in the Count 1 of the indictment, where they

5  describe a broad, far reaching conspiracy involving 17 arsons

6  with various people --

7          THE COURT:  Bring her on.

8          MR. BLOOM:  -- and you have permitted them to put in

9  evidence --

10         THE COURT:  Enough talk.  You bring her on, we'll

11 see.

12         MR. BLOOM:  Okay.

13         THE COURT:  See if she says the same thing her

14 husband says.  Okay.

15    (Jury present.)

16         THE COURT:  You may be seated.

17    Have him bring in the next witness.

18    I will have you come forward, ma'am, if you would, and

19 raise your right hand and be sworn.

20         LAURIE MEEKER, called as a witness, duly sworn.

21         THE COURT:  Just come here and take the witness

22 chair.

23                   DIRECT EXAMINATION

24 BY MR. BLOOM:

25 Q.  Good afternoon.  Could you please tell the jury your full

1  name and spell your name for the jury, please?  And if you
2  could use the microphone, that would be good.
3  **A.**  Good afternoon.  My name is Laurie Meeker, L-A-U-R-I-E,
4  last name Meeker, M-E-E-K-E-R.
5  **Q.**  How old are you?
6  **A.**  I am 50 years old.
7  **Q.**  Do you have -- are you employed?
8  **A.**  Yes.  I work at the Evergreen State College.  I am a
9  college professor.
10  **Q.**  Could you use the microphone, if you would?  Pull the
11  microphone to you.
12  **A.**  Certainly.
13  **Q.**  Thank you.
14      What kind of professor?
15  **A.**  College professor at the Evergreen State College.
16  **Q.**  How long have you been there?
17  **A.**  Since 1989.
18  **Q.**  What did you do before that?
19  **A.**  Before that I lived in Portland and worked at the Portland
20  Art Institute, Portland Art Museum, and taught some film
21  classes there.
22  **Q.**  And you say taught film classes.  Are you in a particular
23  department at Evergreen?
24  **A.**  We don't actually have departments, but I am in the
25  expressive arts program planning area, so I teach media

1  studies primarily.  And we do interdisciplinary studies there,

2  so we also have some disciplinary programs like a media

3  program, called media works.

4  Q.  For how long have you done that?

5  A.  Well, since I started at Evergreen in 1989, I have been

6  teaching in that area.

7  Q.  And were you teaching there -- do you know Briana Waters?

8  A.  Yes, I do.

9  Q.  Do you see her in the courtroom?

10  A.  Yes, I do.

11  Q.  Could you point her out, please?

12  A.  That's her right over there.

13  Q.  Thank you.  Did there come a time during your teaching

14  tenure that you came to meet Briana Waters?

15  A.  Could you repeat that?

16  Q.  Did there come a time when you, while you were teaching at

17  Evergreen, that you met Briana Waters?

18  A.  Yes.  She was a student in the media works program.  And

19  at Evergreen, it is year-long program, so the students take

20  that full-time.  That's the only thing they take, so we get to

21  know our students fairly well.

22  Q.  Would you describe her; were you an advisor or teacher, or

23  how would you describe your relationship with her?

24  A.  I was teaching that program.  There were two of us.  So I

25  was her proffer while she was a student in my class.  And I

1    also supervised her work directly.  The first quarter my

2    colleague supervised her work.  In the second and third

3    quarter I was her faculty supervisor, so that means that I was

4    responsible for evaluating her work and meeting with her

5    individually, as well as interacting in the classroom with

6    other people.

7    Q.  How was your relationship with her?

8    A.  Cordial, professional, student-teacher relationship.

9    Q.  Did there come a time when she got involved in a

10   particular media project?

11   A.  Yes.  In the spring quarter, all the students had the

12   opportunity to develop their own projects, and so that was the

13   time when she started to develop a documentary.  And as I

14   recall -- and this is true for every spring quarter in media

15   works, the students develop a proposal and do some research

16   and start the project development, and I believe that her

17   project Watch was started at that time.

18   Q.  You say watch; is that the word you used?

19   A.  I believe that's the name of the documentary.

20   Q.  Could you describe, as you understood it, what it was she

21   was doing with that project?

22   A.  As I recall -- well, it was in initial development at that

23   time, so she was -- she was doing research about the Gifford

24   Pinchot National Forest, about forest preservation, and I

25   think it was in initial development at the time.  So I think

1 she was doing mostly research and some initial shooting for

2 the project.

3 Q. What was the interaction between you and Ms. Waters with

4 regard to that project?

5 A. I evaluated her proposal and probably talked to her about

6 some of the ideas. I don't have a lot of memory about

7 specifics around where the project -- how the project was

8 developing, except for the sort of general topic of forest

9 preservation and protecting old growth forests in the national

10 forest.

11 Q. Did it work so that there were periodic updates or you had

12 discussions with her about how the project was going?

13 A. I think so. But as I said, it was in, you know, the

14 initial phase of development. So we probably had critiques

15 during the program where she might have shown some footage,

16 but I think it was just in its beginning phases. And after

17 she was out of media works, she continued to work on it. I

18 believe we had one or two meetings about it after that, just

19 as providing support and encouragement for the project.

20 Q. Do you remember whether or not she finished the project

21 while she was still in school, or did she finish it after she

22 graduated?

23 A. I don't remember.

24 Q. Did there come a time when you viewed either a work in

25 progress or a final cut of the documentary?

**A.** I think I saw the work in progress, but I don't believe I saw the final version of it.

**Q.** Okay.

**A.** I don't remember seeing one.

**Q.** In your dealings with her, were there any problems?

**A.** No problems. She was a responsible student. She was probably one of the best students I have had. She followed the rules. Even though we don't have grades at Evergreen, we have high standards for getting work in on time, and she did all of that really well. She was enthusiastic and engaged as a student. And I just remember her as being really sweet; a sweet, nice person to work with.

**Q.** Is that campus, the buildings in that campus -- are they all pretty much open 24-hours a day, seven days a week or are they locked? How do you remember how the facilities are managed?

**A.** It depends on the facility. Our building, the communications building, we had -- we have regular staffed hours, but because it's kind of isolated, it closes at a certain time. It closes at 9 or 10 or 11:00 at night, and it's locked and closed after that.

**Q.** I assume in that building there is some expensive equipment that would need to be secured, is that fair to say?

**A.** Yes.

**Q.** Now, can someone reserve a room for use at off hours or

1  business hours?

2  **A.** Yes.

3  **Q.** How would one do that?

4  **A.** There's a process for -- once students have been in a

5  media program and become proficient with the equipment, their

6  ideas are put onto a list through media loan, which is part of

7  the library, and so they can check out a key and have access

8  to the equipment.  There were -- at any of the suites, that

9  were 24-hour access with a key access.

10  **Q.** You would have to get a key from someone?

11  **A.** During business hours at media loan, yes.

12  **Q.** So in order to do that, you would have to go to a person,

13  an employee at Evergreen, and say I want to use the room, and

14  my name is so-and-so, and can I have a key?

15  **A.** That's right.  You'd have to be a student in good

16  standing, and that means that you return equipment regularly

17  and don't check it out over your deadlines and so forth.

18  **Q.** If you were not a student any longer, could you check out

19  a room?

20  **A.** No.

21  **Q.** When somebody would do that, would there be some kind of

22  record kept that that happened?

23  **A.** Yes.

24  **Q.** Did that have to do with just plain security, right?

25  **A.** Yes, and keeping track of the equipment and keeping things

1    in good working order.  That's correct.

2    **Q.**  Okay.  I don't have any further questions.  They may or

3    not.  Thank you very much.

4    **A.**  Thank you.

5                         CROSS-EXAMINATION

6    BY MR. BARTLETT:

7    **Q.**  The description that you talked about, checking out a

8    room, refers to the building that you work in, correct?

9    **A.**  Yes.  That building, and also the library building where

10   some of the other media equipment is housed.  So it refers to

11   both buildings.

12            MR. BARTLETT:  Thank you.

13            THE COURT:  This witness can be excused?

14            MR. BLOOM:  I don't know if they are finished.

15            MR. BARTLETT:  No further questions.

16            THE COURT:  You may step down.

17       Let me have you step up here and raise your right hand and

18   be sworn.

19           GARY VARNELL, called as a witness, duly sworn.

20            THE COURT:  Take the witness chair.

21                       DIRECT EXAMINATION

22   BY MR. BLOOM:

23   **Q.**  What is your name?

24   **A.**  Gary Varnell.

25   **Q.**  Could you spell that, please, for the jury?

1  **A.**  Yes.  G-A-R-Y, V-A-R-N-E-L-L.

2  **Q.**  How old are you?

3  **A.**  I am 34.

4  **Q.**  Are you married or single?

5  **A.**  Single.

6  **Q.**  Where do you live?

7  **A.**  In Lacey, Washington.

8  **Q.**  Where is Lacey in relation to, let's say, Olympia?

9  **A.**  It's right next to Olympia.

10  **Q.**  Could you use the microphone?

11  **A.**  Yes.  It's right next to Olympia.

12  **Q.**  Thank you.

13  And what do you do for a living?

14  **A.**  I am a graphics artist.

15  **Q.**  Graphics artist, did you say?

16  **A.**  Yes.

17  **Q.**  What does that mean?

18  **A.**  I do graphics art, like 3D animation, video editing, and

19  then also computer programming.

20  **Q.**  For how long have you done that?

21  **A.**  Over ten years.

22  **Q.**  Were you doing that in -- obviously, you were doing

23  that -- well, what year did that begin?  Ten years ago?

24  **A.**  Yeah, ten years ago.

25  **Q.**  Did you come to know somebody named Briana Waters?

1  **A.**  Yes.

2  **Q.**  Do you see her in the courtroom?

3  **A.**  Yes, I do.

4  **Q.**  Could you identify her?

5  **A.**  Yes, she's sitting in the chair right over there.

6  **Q.**  Are you in the world of environmental work?

7  **A.**  Me personally?

8  **Q.**  Yes.

9  **A.**  No.

10  **Q.**  How did you come to meet Briana Waters?

11  **A.**  She was working at the mall, at a company called Picture

12  It.  And she was working with Photoshop, and I had been

13  working with Photoshop for a long time and just struck up a

14  conversation, and we became friends after that.

15  **Q.**  You say working at the mall.  Was she employed at that

16  place or was she using the equipment?

17  **A.**  She was employed.

18  **Q.**  And you struck up a conversation with her?

19  **A.**  Yes.  She was doing some work in Photoshop, doing some

20  photo retouching.

21  **Q.**  What did you talk about with her?

22  **A.**  Mostly technical aspects of Photoshop.

23  **Q.**  Did you come to learn from her that she was working on a

24  particular project?

25  **A.**  That was before she was working on any particular project.

1  Like the Watch video, I assume is what you are talking about?

2  **Q.**  Yes, I am.

3  **A.**  It was prior to that.

4  **Q.**  Did there come a time when she discussed with you working

5  with you, or you working with her, on the Watch video project?

6  **A.**  Yes.

7  **Q.**  Can you remember what year that was?

8  **A.**  Not -- I can look and see.

9  **Q.**  Did you bring with you -- did I ask you to bring with you

10  a printout that would reflect the work that you did on the

11  Watch video project?

12  **A.**  Yes, you did.

13  **Q.**  Have you done that?

14  **A.**  Yes, I have.

15  **Q.**  If looking at that refreshes your recollection, feel free

16  to look at it.

17  **A.**  Yes, it was in 2001.

18  **Q.**  Okay.  And what part of 2001?

19  **A.**  Around March.  We discussed the project prior to doing any

20  computer work.  All I have with me are computer printouts of

21  when files were created, when we logged video footage, that

22  type of stuff.

23  So we would have discussed the project prior to that.

24  **Q.**  About how long prior to that, would you say?

25  **A.**  My guess would be maybe a year prior to that.

1  Q. You say a year?

2  A. Yeah, possibly.

3  Q. So is it fair to say we are describing a collaboration

4  that began with general conversations about how to get into

5  it?

6  A. Yes.

7  Q. And your recollection is that it was maybe a year before

8  the actual editing was done that you had these first

9  discussions?

10  A. Yes, something like that.

11  Q. How often before you actually got to the editing -- about

12  how many times would you say you and Ms. Waters discussed the

13  project?

14  A. I can't recall exactly. I know that she -- I offered to

15  help with the editing of the project, so, you know, she let me

16  know when she was filming and kind of what she was doing, kept

17  me, you know -- kept me up-to-date as to what was going on and

18  when we would actually, you know, start working on the

19  project.

20  Q. Did you understand more or less what the project was

21  about, what the subject matter was?

22  A. Yes.

23  Q. What was that?

24  A. About deforestation mostly.

25  Q. And the word "Watch," where did that come from? Do you

1  know what that related to?

2  **A.**  Yes, Watch Mountain.  It was a particular mountain that

3  was proposed to be clear-cut, that would have had

4  consequences, and so they were protesting to stop.

5  **Q.**  Now, when did you actually begin the editing?

6     Let me withdraw that?

7     What does editing involve?  Describe that to the jury.

8  **A.**  First you have to go through all the footage, log it all

9  so you have a record of what's on what tape and whereabouts.

10     Then you capture all that in the computer.

11     Then basically edit it, and we were doing it nonlinearly,

12  meaning we could take pieces and drag and drop them wherever

13  we wanted to help, you know, tell the story.

14  **Q.**  That means that you are not there snipping pieces of film;

15  you are doing it digitally, is that correct, with a computer?

16  **A.**  That's correct.

17  **Q.**  And that's a lot easier than snipping, right?

18  **A.**  A lot easier than snipping it.  It becomes a lot more

19  creative process because you can do things, make changes, see

20  how this will look, decide you don't like it.  Whereas

21  physically cutting tape is a linear process, and going back

22  and redoing anything involves a lot more time.

23  **Q.**  The footage, the raw footage, where did that come from?

24  **A.**  Briana provided all the raw footage for the video.

25  **Q.**  And then somehow was it -- I don't know if this is the

1  right word -- digitalized?

2  **A.**  Yes.  The original footage was in several different

3  formats.  Some was film, eight millimeter.  Some was digital

4  already.  Some was on VHS.  So various formats.

5  **Q.**  You have the skills to be able to put it all into digital

6  form; is that correct?

7  **A.**  That's correct, yes.

8  **Q.**  That's who you are; that's what you do?

9  **A.**  Uh-huh.

10  **Q.**  People might call you, what, a computer nerd, right?

11  **A.**  Yeah.

12  **Q.**  That's a phrase that is used for people with your kind of

13  skills, right?

14  **A.**  Uh-huh.

15  **Q.**  How much were you paid to participate in this?

16  **A.**  I don't believe I was paid anything.  It was a long time

17  ago, so my recollection isn't that great.  But I don't have

18  any records of a computer, of ever receiving any money for the

19  project.

20  **Q.**  Was Briana a person of means at the time?  A lot of

21  money -- did she have a lot of money?

22  **A.**  No.

23  **Q.**  Now, when did you actually begin the processing, the --

24  would digitalizing or -- tell us what you did first.

25  **A.**  Digitizing, yeah, that would be correct.  After watching

all the footage and logging it into the computer, at what time what scene occurs, you know, we are looking through the video for scenes of interest, things that we might want to use in the final video, or particular scenes that, you know, might be useful in the final video.

　　After logging all that, then we are able to basically say, for this tape we want scene A, B, C, D, E, F, G, and the computer will rewind, fast forward the tape, and grab just those scenes and digitize them.

**Q.** When did you begin that process?

**A.** Of actually capturing thumbnails?

**Q.** Yes.

　　MR. BLOOM: May the record reflect the witness is looking at a document.

**A.** It will take me a couple pages here.

BY MR. BLOOM:

**Q.** Sure.

**A.** These are all files from an animation sequence, so there's a lot of them.

**Q.** Animation sequence in Watch or in something else?

**A.** In Watch.

　　If I had the computer, I could do all this a lot faster.

**Q.** Okay. Take your time. Just come up with the best answer you can.

**A.** Well, I've got -- I mean, these are the batch lists that

1　show all the files.　Unfortunately, I don't have the dates on

2　these printed out.

3　Q.　Let me withdraw that question.

4　　　As you remember what year it was, I think you said it was

5　2001?

6　A.　Yeah.　Well, I know we didn't render out the intro-

7　animation until we started editing the project, and that was

8　on March 25 that that was rendered out.　The first news clip

9　in the video, we captured that on March 24.

10　Q.　Now, did there come a time when the editing -- as the

11　editing was going along, that there was a decision made about

12　the very first scene that was going to be shown?

13　A.　Yes.

14　Q.　And that was somebody breaking a television set with a

15　sledge hammer; is that correct?

16　A.　That's correct.

17　Q.　And whose television set was that?

18　A.　It was my television set.

19　Q.　Was it already broken?

20　A.　Yeah, it didn't work any more.

21　Q.　Who was the person that you -- did somebody actually film

22　that, or take that --

23　A.　Yes, I filmed that scene.　That scene was actually kind of

24　my idea.　It provided some technical difficulties,

25　rotoscoping, and so I wanted to do that scene.

1    **Q.**  To develop your technical skill?

2    **A.**  That's correct.

3    **Q.**  Who was the person who was holding the sledge hammer?

4    **A.**  Briana was.

5    **Q.**  So when, if your records indicate, the work on the

6    project, was it 9:00 to 5:00, was it -- when, do you recall,

7    or if your records reflect --

8    **A.**  We were mostly working late, like 6:00, 7:00 on, because I

9    was running a business.  So we would do it after business

10   hours.

11   **Q.**  You say 6:00, 7:00; you mean 6:00, 7:00 p.m.?

12   **A.**  That's correct.

13   **Q.**  Until about when?

14   **A.**  Sometimes 3:00 or 4:00 in the morning.

15   **Q.**  You would be working on it together?

16   **A.**  Yes.

17   **Q.**  And for how long did that go on; was it days, weeks,

18   months?

19   **A.**  Weeks.

20   **Q.**  Did there come a time when there was a finished product?

21   **A.**  What was that?

22   **Q.**  Was there a time there became a final, finished product?

23   **A.**  Yes, that's correct.

24   **Q.**  About when was that?

25   **A.**  Let's see, the last day I have would be like April 17th,

1    was when we printed out the cover for the video.  So the video

2    would have been produced at that point.

3    **Q.**  If you were to see it, would you be able to recognize that

4    that's your work?

5    **A.**  Yes.

6            MR. BLOOM:  I would like to start the film, with the

7    Court's permission.  I would like to offer it into evidence.

8            THE COURT:  Just a minute.  Is there an issue with

9    this?

10           MR. BARTLETT:  I do, Your Honor.  I object.

11           THE COURT:  All right.

12           MR. BARTLETT:  I have no objection to the video being

13    entered into evidence.  The jury can see it back in the jury

14    room, if they choose to see the 60 minute video.  I think it

15    is irrelevant to this jury's deliberation.

16    BY MR. BLOOM:

17    **Q.**  Does this video reflect how Briana Waters was spending her

18    time, both editing and filming?

19    **A.**  Yeah, I think so.

20           MR. BLOOM:  I would like to show this to the jury,

21    please.

22           THE COURT:  I will take it up at the end of the day

23    as to this movie, but continue asking whatever questions you

24    may have.

25           MR. BLOOM:  I don't have any other questions of this

1  witness.

2         THE COURT:  Okay.

3                  CROSS-EXAMINATION

4  BY MR. BARTLETT:

5  **Q.**  Can I just clarify one thing in my mind.  You said that

6  there was -- I understand the video was finished April 17?

7  **A.**  Uh-huh.

8  **Q.**  With regard to the actual film footage that you put into

9  the computer that you are kind of cutting and pasting, was

10  that filming going on during this time period at Watch

11  Mountain?

12  **A.**  No, all the footage had already been filmed at that time.

13  **Q.**  Do you know when that filming had ended?

14  **A.**  No, I do not.

15         MR. BARTLETT:  Nothing further.

16         THE COURT:  Do you have any other questions for this

17  witness?

18         MR. BLOOM:  No, I don't.

19         THE COURT:  Then you may step down.

20     Your next witness.

21         MR. BLOOM:  May I have a moment, please?

22     We've offered A-69 into evidence, and I would like to play

23  it for the jury.

24         THE COURT:  I said I would like to take it up at the

25  end of the day.

1      MR. BLOOM:  It affects what we have here because we

2  have witnesses --

3      THE COURT:  I will take it up at the end of the day.

4  You may call your next witness.

5      MR. BLOOM:  Well, we have a problem because the next

6  witnesses have been objected to.

7      THE COURT:  Well, I don't know if you have anybody

8  else to call or not.  You should have your witnesses lined up,

9  so you can go see if you have any out there.

10      MR. BLOOM:  Could I ask the jury be excused so we can

11  discuss this?

12      THE COURT:  All right.  Keep your books on your chair

13  and step out for a moment.

14    (Jury not present.)

15      THE COURT:  All right, you may be seated.

16    Yes.

17      MR. BLOOM:  Yes.  Apparently there's no objection to

18  it being admitted.  Given that the prosecution was able to

19  publish and should be able to publish anything that's in

20  evidence, I would like to publish what's in evidence.  I don't

21  see any problem with that.

22      THE COURT:  Okay.

23      MR. BLOOM:  Now, the fact is that because of the

24  issues raised by the prosecution with regard to their efforts

25  to limit our character witnesses, the witnesses that we have

1  prepared to testify are going to be a problem.  The Court has

2  indicated that if they testify to character, you are going to

3  strike the testimony of the witnesses.  We surely don't want

4  that to happen.

5          THE COURT:  I want you to talk about that exhibit

6  there.

7          MR. BLOOM:  There's no objection to it going into

8  evidence.

9          THE COURT:  Well, I heard an objection.  I have to

10  hear from that side.  You tell me -- you don't think there's

11  any objection, it's admitted, and they should see it.  Is that

12  right?

13          MR. BLOOM:  Yes.

14          THE COURT:  Then let me hear from you.

15          MR. BARTLETT:  Your Honor, I misspoke earlier.  I am

16  tired, it's at the end of the day, I apologize to the Court.

17    I do not want this video admitted into evidence.  I am

18  objecting to its admission on the grounds of 403, relevance,

19  and I will put that on the record before the jury.  I wasn't

20  trying to sandbag anybody.

21    I don't think it's relevant.  I would ask the next witness

22  be called, and the argument with regard to the relevance of

23  the Watch video be put off until after the witnesses are

24  called, and we can get through some stuff today.

25          THE COURT:  Do you have any other witnesses?

1        MR. BLOOM:  I have.

2        THE COURT:  I don't remember this coming up before

3 about this video, other than discussion about it, in terms of

4 it being an exhibit, and the court hasn't addressed that in

5 any way.  So I would have to not only go over the objections;

6 I need to see what that is because I don't know what you are

7 trying to make of this.  So I would be concerned about it from

8 that standpoint.

9    I will look at it.  I don't know if it says any more than

10 the witnesses have said, but I need to look at it to see.

11        MR. BLOOM:  There has never been, before now, any

12 objection to this exhibit.  They have never filed any motion

13 with regard to a motion in limine.  We gave them a copy of

14 this maybe a year ago.  There's never been any indication that

15 there was going to be an objection.

16    Mr. Bartlett talks about not trying to sandbag us.  In

17 fact, there has never been an objection.  They had every

18 opportunity.  We have said we were going to put this in

19 evidence.  I have said it in my opening statement, that I hope

20 you get to see it, if the judge permits it.

21        MR. BARTLETT:  And that's an indication, Your Honor,

22 that Mr. Bloom in his opening statement realized --

23        MR. BLOOM:  Excuse me, but I wasn't finished.

24        MR. BARTLETT:  I'm sorry, Your Honor, I thought he

25 was done.

1          MR. BLOOM:   There has never been an indication before

2    now that we would not be permitted to show this video.   Never.

3    Never any indication that they were going to object to it, not

4    once.   Not one objection after the opening statement.   Not one

5    objection when we put it on our exhibit list.   Nothing.   They

6    now are trying to stop this jury from seeing what it was and

7    how Briana Waters spent her time, after putting in Disneyland,

8    Statue of Liberty.

9        Judge, this is just not right for the jury not to see how

10   she spent her time for a period of three years during the

11   period of the alleged conspiracy; how she spent her time

12   editing this day and night with regard to the period just

13   before the arson of which she's accused.

14          THE COURT:   And that's what you wanted to show, is

15   that the purpose of it?

16          MR. BLOOM:   It also rebuts the very clear efforts to

17   prove, by the government, that she's promoting violence.   This

18   proves what she did, who she is, how she was spending her

19   time, both during the filming and the campaign and the editing

20   and later the distribution of this video.

21          THE COURT:   If you have to sum it up in one statement

22   as to what you intend to have this movie portray, tell me

23   that.

24          MR. BLOOM:   What I just said.

25          THE COURT:   You are going on and on.   Can you briefly

1  summarize it for me?

2        MR. BLOOM:  How, during the period of the alleged

3  conspiracy, how she spent her time.  How she was not involved

4  in violence.  How she was involved in what was testified to,

5  as an effort to bring together diverse forces; the loggers on

6  the one hand --

7        THE COURT:  You are getting as long on this one as

8  the other one.

9    I am going to get to you, Mr. Bartlett.

10    I am trying to understand -- let me see if I can

11  summarize.  You want the film to show what she was doing at

12  this point in time, correct?

13    Is that correct?

14        MR. BLOOM:  That's partly correct.

15        THE COURT:  Is it correct or not?

16        MR. BLOOM:  That part that you have stated is

17  correct, but it is not --

18        THE COURT:  This is going to be something about what

19  she was about in terms of character or whatever?

20        MR. BLOOM:  No, the part that you stated was correct,

21  but that's not all.  What's also important is to show that

22  contrary to the major efforts of the government to prove

23  otherwise, she was not a person who was promoting violence.

24  On the contrary.

25        THE COURT:  That's what the movie is intended to do,

1   to show that she was not promoting violence?

2           MR. BLOOM:   That is one of the things.   The Court

3   stated one thing, and I have added to it.

4           THE COURT:   Okay.

5           MR. BLOOM:   That this is how she was spending her

6   time.   That's part A.

7       Part B, that she was not promoting violence.

8       C, that she was working on this very lawful project during

9   the time, in particular, just preceding the arson that was

10  committed by the Government's witnesses.

11          THE COURT:   How she's spending her time is the same

12  thing as working on this project, isn't it?

13          MR. BLOOM:   I was being specific as to the time

14  period; that there are really two time periods here.   One is

15  the time period that's alleged in Count 1, with regard to the

16  conspiracy; and two is the time period just preceding the

17  arson that was committed by the government witnesses.   To show

18  how she was spending her time specifically at that critical

19  time.

20          THE COURT:   All right.   Have you included everything

21  that I should know about in terms of making a decision as to

22  whether or not they should see it?

23          MR. BLOOM:   Let me consult with my cocounsel.

24          THE COURT:   All right.

25          (Brief pause.)

1        MR. BLOOM:  Yes, there's an additional reason, it's

2    to rebut the evidence that was submitted -- not only submitted

3    and put in evidence over our objection, in the folder, the

4    folder of materials that the witness Kolar claims she received

5    from Briana Waters, the materials where Mr. Bartlett took a

6    yellow highlighting pen and highlighted inflammatory parts of

7    those exhibits and had a witness read to the jury those

8    particular parts.

9        THE COURT:  Those particular parts would go to what?

10        MR. BLOOM:  The reason it appears, and it was stated,

11    that the alleged relevance of those parts would demonstrate --

12    and I can't see any other reason -- demonstrate that

13    Ms. Waters was somehow in agreement with the portions that the

14    prosecutor highlighted in yellow pen and then had a witness

15    read to the jury.

16        THE COURT:  I wish I could get you to narrow things

17    down.  Are you saying it's going to rebut some evidence about

18    what the material in those folders said?  Is that about

19    violence versus nonviolence?

20        MR. BLOOM:  That's a third reason why we would like

21    to play this.  And a fourth reason is that she has a Sixth

22    Amendment right to present her case, and that she will be able

23    to testify, it would be hoped, if she testifies, that this is

24    how she was spending her time.

25        This is just to make sure, to answer the question, the

1   Court's question directly, we have given so far, now, four

2   reasons why the Court should permit the jury -- should admit

3   this evidence and permit the jury to see it.

4        Staying on the third reason that I was talking about, for

5   whatever reasons, the Court decided that it was okay for

6   Mr. --

7             THE COURT:  I know, I have ruled on all of that.  I

8   am trying to get all of your reasons why this should be in.

9   Once I get all of your reasons, I will hear from the other

10  side as to what they think about it, because they are

11  objecting to it.  I am trying to get you to give me a

12  completeness of what your position is.

13            MR. BLOOM:  That's what I'm doing.

14            THE COURT:  Have you done it all?

15            MR. BLOOM:  No, I haven't.  I wasn't quite finished.

16            THE COURT:  What else is there?

17            MR. BLOOM:  I was continuing as to the third reason,

18  that Mr. Bartlett chose to essentially adulterate an exhibit

19  by highlighting what clearly are inflammatory portions of

20  materials that were among many documents, and not only chose

21  to highlight it, but actually had a witness read to the

22  jury --

23            THE COURT:  I thought you just mentioned that.  I

24  heard all of that and saw all of that.  I don't think you need

25  to go through all that again.  You just need to highlight and

1 tell me what it is you are trying to show.

2 　　　　MR. BARTLETT:  Your Honor, could I suggest that we

3 finish with witnesses today and bring this up tomorrow morning

4 at 8:15 so we are not wasting the jurors' time?  Or at the end

5 of the day.

6 　　　　THE COURT:  If we keep talking it will be 4:00, and

7 maybe that's the point of it all, I don't know.

8 　　Do you have another witness out there?

9 　　　　MR. BLOOM:  We don't have another witness ready to

10 testify.

11 　　　　THE COURT:  Let's bring the jury in so that I can let

12 them go, and then I will take this matter up.

13 　　　　MR. BLOOM:  Thank you.

14 　　　　THE COURT:  And then I am going to deal with the rest

15 of the witnesses.

16 　　　　MR. BARTLETT:  Your Honor, my understanding is Sarah

17 Vekesi is outside the courtroom.

18 　　　　THE COURT:  Who?

19 　　　　MR. BARTLETT:  That Sarah Vekesi is outside the

20 courtroom.

21 　　　　MR. BLOOM:  I have not had an opportunity to speak

22 with her.

23 　　　　THE COURT:  If you have a witness out there, can the

24 witness be through in ten minutes?

25 　　　　MR. BLOOM:  I am sorry?

1          THE COURT:   Just a minute.

2     Mr. Fox.

3          MR. FOX:   I thought we were rising for the jury.

4          THE COURT:   Yes.   Do you have a witness there?

5          MR. FOX:   There are people that Mr. Bloom has called.

6     I don't believe that Mr. Bloom has prepped one of the

7     witnesses yet.

8          THE COURT:   You call these witnesses; surely you've

9     talked to them.   You don't call somebody you haven't talked

10    to, do you?

11         MR. BLOOM:   I have called and asked this witness to

12    appear.   She has come from out of town --

13         THE COURT:   All right, you have two minutes to go out

14    there and talk to this witness, and I will bring the jury and

15    you can call your witness.

16         MR. BLOOM:   I am asking if we can break today so that

17    I can have the opportunity to prepare my witness.   Is the

18    Court denying me that opportunity?

19         THE COURT:   Mr. Bloom, you know, you are really

20    trying my patience.

21         MR. BLOOM:   I am sorry I am doing that, Judge.   I am

22    just asking for a ruling, and I am asking the question.   I am

23    giving you the facts.

24         THE COURT:   I will bring in the jury and I am going

25    to let them go home, but let me say this to you:   You are

1   pushing the envelope with me.  Stop it.

2       Bring in the jury.

3       (Jury present.)

4           THE COURT:  Okay, you may be seated.

5       Ladies and gentlemen, I am going to recess this matter for

6   tonight and you are going to get your next witness first thing

7   tomorrow morning at nine clock.  Rather than have you around

8   while we take care of some business here, you might as well --

9   we have ten minutes to go, so you might as well be on your

10  way.

11      As always, do not discuss the case or do anything about

12  the case.  Everything you need to decide the case you will

13  receive here in the courtroom.

14      Have a good evening.  Leave your books on the chair.  See

15  you here at 9:00.

16      (Jury not present.)

17          THE COURT:  All right, you may be seated.

18          MR. FOX:  Your Honor, there is another person out

19  there, but I think he would probably --

20          THE COURT:  Well, I just wanted --

21          MR. FOX:  He would probably fit under the character

22  thing that the prosecutor is objecting to.

23          THE COURT:  Stop your stalling, and let's get this

24  case moving.

25      Are you finished saying what you have to say about the

1  exhibit?

2         MR. BLOOM:   No, I have one more thing to say.

3         THE COURT:   Briefly give that to me, if that's

4  possible.

5         MR. BLOOM:   Today in the court, Mr. Bartlett did a

6  masterful job of attempting to impeach the witness --

7         THE COURT:   What is it you want me to see in this

8  exhibit?  I am talking about this exhibit.  Is that what you

9  are talking about?

10        MR. BLOOM:   Yes, I am.

11        THE COURT:   Then please get to the point.

12        MR. BLOOM:   -- did a masterful job of attempting to

13 impeach the witness James Dawson with reference to the Earth

14 First, suggesting that they were involved in violence.

15 Indeed, the people who were involved with Ms. Waters in the

16 town of Randle, some of them were members of Earth First.

17     We want to show this video for yet another reason, and

18 that reason is to neutralize and to address the devastating

19 impeachment brought upon by Mr. Bartlett of the witness James

20 Dawson.

21     There was no question that the jury would be affected by

22 those kinds of questions, and we want to -- yet another

23 reason, a fifth reason we want to show this video, is to rebut

24 the implications that were raised by Mr. Bartlett's

25 interrogation -- I should say questioning, cross-examination

1   of Mr. Dawson.  So that's yet another reason why we believe

2   this video should be shown.

3           THE COURT:  Have you completed everything on it?

4           MR. BLOOM:  Yes.

5           THE COURT:  Mr. Bartlett?  Let me hear from you.

6           MR. BARTLETT:  Your Honor, it's the equivalent of

7   somebody being charged with a bank robbery and wanting to

8   bring in that during the pendency of the bank robbery they

9   have also written a fine novel and want to introduce and read

10  the novel to the jury.  It is simply irrelevant.  She's talked

11  about this.  In fact, we've heard a lot of information from

12  the witness exactly what she was involved in.

13      It is my understanding she's going to testify, and she can

14  describe all of those things.

15      But in truth, the video itself is irrelevant.  It has

16  nothing to do with this case.  She can talk about what she's

17  done.  In fact, we've heard a lot of testimony about it.  I

18  don't think there's any question in the jury's mind.  But

19  under a 403 analysis, it's simply not relevant to this jury's

20  consideration.

21      She was involved in making a video, as I understand it,

22  all of the filming of which was finished in 1999 and the

23  editing of which was finished in April 2001.  I just don't

24  understand the relevance of that to the jury.

25      I simply don't think that the Court should waste an hour

1  of this Court's time watching this video.

2  　　　　THE COURT:　That's your objection?

3  　　　　MR. BLOOM:　May I ask to rebut that?

4  Mr. Fox has some ideas that he's trying to convey to me,

5  but I think it would save time if the Court would hear him

6  directly.

7  　　　　MR. FOX:　To do the rebuttal to Mr. Bartlett rather

8  than Mr. Bloom.

9  　　　　THE COURT:　I will hear this.　It's a motion; I will

10  hear this.

11  　　　　MR. FOX:　Your Honor, if the government hadn't

12  consistently raised issues about what was inside of

13  Ms. Waters' mind in the spring of 2001; if the government

14  hadn't brought in the Hey Woman folder and argued to the jury,

15  hey, this is what Briana Waters -- this is the type of thing

16  that she was thinking at the time -- if the government hadn't

17  brought in Tiffany Tudder to talk about the statements to the

18  New York Times reporter, to argue this is the type of

19  person -- because of their statements, because of their

20  beliefs, is the type of person who could commit an arson,

21  well, then perhaps the actual video of Watch would be

22  irrelevant.

23  But we need to show this video to rebut what the

24  government has raised about Ms. Waters' beliefs.

25  They have presented their evidence.　We've objected; you

1  let it in.  We would like now to present evidence of what

2  Ms. Waters was thinking and what her belief system was, only

3  to rebut what they plan to introduce and what they plan to

4  argue to the jury.

5      Thank you.

6          MR. BARTLETT:  Your Honor, under Federal Rule of

7  Evidence 404, you can prove character through reputation and

8  opinion.  You cannot prove it through specific instances.

9  What they are attempting to do is to violate Rule 404.

10         MR. FOX:  It's not character, Your Honor.

11         MR. BARTLETT:  It is character, Your Honor.

12         THE COURT:  At some point in time you have to stop

13 talking and then it's going to become my decision.

14         MR. FOX:  That's true.

15         THE COURT:  Now, I think I have heard everybody as to

16 why you say it ought to be in and why you say it shouldn't be

17 in.  That's what the Court will have to look at and decide.

18     I don't know what this exhibit is about.

19         MR. FOX:  Would the Court like to see it tonight?

20         THE COURT:  I don't know if I want to sit up all

21 night and watch this.  I might want to watch something else.

22 But I will have to know something about this before I make my

23 decision.

24     I think it is fair to say, and I can take this from your

25 position, it's not about any of this.  It's about -- and I

1  think we heard the testimony of Ms. Troxel, I think it was,

2  about what was going on and all this good work about the

3  logging and what it would do to that community.  It's all

4  about Watch Mountain and those kind of effects.  So it's all a

5  good thing, I guess, in terms of what Ms. Waters was doing as

6  it comes to conservation and those kind of things.

7           MR. FOX:  Or really what is inside her mind, Your

8  Honor.  I guess if the government brings in the Hey Woman

9  folder, Tiffany Tudder, to say this is the real Briana Waters,

10  well, this rebuts that.

11          THE COURT:  That wasn't my question.  My question, is

12  it about what I just said?

13          MR. FOX:  No, is the topic of the movie about that?

14          THE COURT:  Yes.

15          MR. FOX:  Yes.

16          THE COURT:  And then it's going to show then, maybe,

17  what's going on in her mind by what she's producing?

18          MR. FOX:  Yes.

19          THE COURT:  I think that's what I said.  Somehow I

20  don't seem to get through to folks very well.  But that's the

21  issue?

22          MR. FOX:  Right.

23          THE COURT:  All right.  You have some witnesses lined

24  up for tomorrow now, and you have all the time you need to

25  talk to them?

1          MR. BLOOM:  Yes.

2          THE COURT:  I want you to do the same thing I have

3    asked before.  Give the other side who's going to testify and

4    the gist of that testimony so we don't have to stop all these

5    things because they don't know what these witnesses -- I asked

6    them to do it for you.  I am asking you to do it for them.  I

7    don't know what the problem is here.

8          MR. BLOOM:  Fair enough.

9          MR. FOX:  Your Honor, if the Court does want to take

10   the time, there is a copy here.  We can get you another copy.

11         THE COURT:  Okay.  I would imagine one is there, if

12   you did what I asked you to do.

13         MR. FOX:  It's been premarked, so it is there.

14         THE COURT:  That's what I said.

15         MR. FOX:  It's A-169.  Thank you.

16         THE COURT:  All right.  And we say we are ready at

17   9:00 in the morning for the jury.  If anything else needs to

18   come up about this -- I am expecting you to have witnesses

19   here and ready to go.  If I don't get to that during that

20   time, I want you ready to go at 9:00.

21         MR. BLOOM:  We will be.  And I should point out, we

22   put on ten witnesses today.  Not easy.  We have done the best

23   we can.

24         THE COURT:  I am talking about tomorrow.

25         MR. BLOOM:  And we will do the best we can tomorrow.

1         THE COURT:  But we came short at the end of the day

2  today.

3     Let me ask you to do this -- and I mentioned this once

4  before -- don't assume because you bring in a witness there

5  will be cross-examination, if you are trying to figure time in

6  the day.  Bring enough witnesses assuming nobody is going to

7  cross-examine, and you don't run out of witnesses.  I want to

8  do a day's work, and that's what I come here to do.  So don't

9  make me quit early, okay?

10     We'll be at recess.  I will see you back here at 8:30.

11         THE CLERK:  All rise, court is adjourned.

12         (The Court recessed to Wednesday, February 27, 2008,

13  at the hour of 8:45 a.m.)

14             *   *   *   *   *

15             C E R T I F I C A T E

16

17     I certify that the foregoing is a correct transcript from

18  the record of proceedings in the above-entitled matter.

19

20  /S/  Teri Hendrix _____          May 5, 2008

21  Teri Hendrix, Court Reporter        Date

22

23

24

25