1                     UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
2                          AT TACOMA

3

4 UNITED STATES OF AMERICA,    )  Docket No. CR05-5828FDB
                         )
5        Plaintiff,     )  Tacoma, Washington
                         )  February 27, 2008
6 vs.                    )
                         )
7 BRIANA WATERS,         )  VOLUME 12
                         )
8        Defendant.     )

9

10                   TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE FRANKLIN D. BURGESS
     SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
  APPEARANCES:
13

14 For the Plaintiff:      MARK N. BARTLETT
                      ANDREW C. FRIEDMAN
                      Assistant United States Attorney
15                   700 Stewart Street, Suite 5220
                      Seattle, Washington 98101-1271
16
  For the Defendant:      ROBERT BLOOM
17                   Attorney at Law
                      3355 Richmond Boulevard
18                   Oakland, California 94611

19                   NEIL M. FOX
                      Cohen & Iaria
20                   1008 Western Ave., Suite 302
                      Seattle, Washington 98104

21

22 Court Reporter:         Teri Hendrix
                      Union Station Courthouse, Rm 3130
23                   1717 Pacific Avenue
                      Tacoma, Washington  98402
24                   (253) 882-3831

25 Proceedings recorded by mechanical stenography, transcript
  produced by Reporter on computer.

1                          I N D E X

2                      INDEX OF WITNESSES
                       ==================

3 WITNESS ON BEHALF OF DEFENDANT:                    Page

4 JU-PONG LIN

5       Direct by Mr. Bloom........................... 2309
6       Cross by Mr. Bartlett......................... 2314
        Redirect by Mr. Bloom......................... 2317
7
   DALE MANN (Jury not present)
8
        Examination by The Court...................... 2321
9
   DALE MANN (Jury present)
10
        Direct by Mr. Bloom........................... 2324
11
   BRIANA WATERS
12
        Direct by Mr. Bloom........................... 2363
13      Cross by Mr. Bartlett......................... 2425
        Redirect by Mr. Bloom......................... 2464
14      Recross by Mr. Bartlett....................... 2490
        Redirect by Mr. Bloom......................... 2493
15

16
                     INDEX - EXHIBITS
17 EXHIBITS                                          Page

18 No. 1122                                          2315
   No. A-214                                         2408
19 No. A-203                                         2482

20

21

22

23

24

25

1          WEDNESDAY, FEBRUARY 27, 2008 - 8:45 A.M.

2                            * * *

3      (Jury not present.)

4          THE CLERK:  This is in the matter of the United

5   States of America versus Briana Waters, Cause CRO5-5828.

6      Counsel, please make an appearance for the record.

7          MR. BARTLETT:  Mark Bartlett.

8          MR. FRIEDMAN:  Andrew Friedman for the United States.

9          MR. FOX:  Good morning Your Honor, Neil Fox and

10  Robert Bloom for Ms. Waters, who's present.

11         THE COURT:  Yesterday we spent a considerable amount

12  of time dealing with whether or not Exhibit 169 should be

13  admitted into evidence in the matter.

14     I spent time last night at home looking, watching the

15  Watch video and that presentation of what was put together as

16  to what was happening in the Randle area and recognized some

17  of the folks in the movie.  The only ones that would appear to

18  be in there is Mr. Dawson and Ms. Troxel, and it looked like a

19  person in a wheelchair.  I couldn't make out who that was.

20  The only person I have heard testimony about being in a

21  wheelchair was Ocean.  And then a lot of other folks and the

22  tree houses and all of that, and the occupation of the logging

23  company's office in Seattle, and a lot of celebration going on

24  at the end and all of that.

25     So I say all of that to let you know that I watched it.

1   At the end it was edited by Mr. Varnell, who's testified, and

2   Ms. Waters, and of course it was her production.

3      Now, all the discussion yesterday about that video had to

4   do with why it should be admitted into evidence.  I think I

5   have made copious notes as to what was raised.  It went on and

6   on and on as to what it was intended to be shown and admitted

7   to this jury for.  That had to do with the nonviolent

8   character trait, if you will, of the Defendant, how she spent

9   her time in putting all this together, working on this

10   project.  And it's intended to rebut, I guess, the way it was

11   put in the argument, the evidence of material that had been

12   given -- alleged to have been given by the Defendant to

13   Ms. Kolar, and some rebuttal, I guess, as to Mr. Dawson, who

14   testified here, who talked about the difference between

15   radical and extremist and that kind of thing.

16      Of course, the government placed their objection to it, as

17   to it being irrelevant, having nothing to do with this case,

18   and for that reason, it should not be admitted.

19      The Court has looked at the rules that would govern this

20   kind of thing, because what I am seeing coming out of this is

21   something that goes to the area of rebuttal and character, and

22   the character trait being as to nonviolence on the part of

23   this Defendant.

24      So you have 403, 404(a)(1), and 405 being the rules that

25   the Court should consider in dealing with this matter and the

1    ones the Court should consider.

2        403 normally deals with things bringing about a certain

3    amount of confusion and waste of time and being cumulative and

4    that kind of thing.

5        404(a)(1) deals with character evidence.  That rule states

6    that character evidence is not to be admitted to prove conduct

7    in conformity with the action, except where it may deal with

8    character of the accused as to a trait, and that trait, of

9    course, in this case, has been raised as to being her trait

10   for nonviolence or, as I mentioned, to rebut.

11       405 deals with the method in regard to prove character, or

12   rebut it in some way.  The rule is clear there, says that it

13   is intended to be done by testimony as to reputation or by

14   testimony in the form of an opinion, by going into things that

15   they know in particular that would reflect on that.

16       So it involves what a person does, so to speak, if it is

17   limited to that.  Then what you have, and that's the reason

18   for the rule, whether something becomes too vast or whatever,

19   that it becomes a collateral issue or calls for a separate

20   trial on issues and all of that, separate trial on every act.

21       Now, in looking at the movie and trying to see what that

22   says as to this, it really, to me -- it talks more in the area

23   of character, the movie.  That's what I see that it's about,

24   to say what is projected on that movie would be the way this

25   Defendant would conduct herself, and that's in conformity.

1   And the rule says, well, no, you don't do that.

2        I didn't see anything in this movie that she did, other

3   than it's her movie.  But I don't know about the action of

4   others saying she adopted that, any more than I could say that

5   my wife's mothered two kids and she's the mother of the year.

6   It takes it in an area where it doesn't explain anything.

7        I'm not seeing here that it does anything that the rules

8   would allow to be done.  I'm seeing, and we've heard testimony

9   from about, I don't know, ten witnesses, and they have all

10  dealt with the character issue.

11       So the question becomes, would proof or failure of proof

12  of this character trait by itself actually satisfy an element

13  of the charge or the defense?  And I am not finding that it

14  goes to anything that would satisfy or go to the element.

15       I think it is different than the other matters that have

16  been raised as to the folder, because that evidence came in in

17  terms of fingerprints; it came in in terms of involvement, at

18  least alleged involvement by the Defendant.

19       This is isolated.  It has nothing to do with this case

20  that I can see at all, unless you are trying to raise some

21  political issue, and this trial is not a political trial.

22       Then the issue becomes, if it shouldn't be admitted to

23  character, does it rebut anything?  Well, if it is admitted,

24  it should point to the evidence of involvement.  It doesn't go

25  to any of that.

1      The matters that this court has heard dealing with items

2 that are in evidence has to deal with searches, and it came by

3 the testimony of other folks that have been involved.

4      I am finding nothing germane as to the issue in this

5 trial, and I am finding that the foundation for this admission

6 is inadequate and it's a one-incident thing.  It is not

7 anything that even shows character based on any isolated

8 event.  So I will not admit it.

9      Those are my reasons.

10      MR. BLOOM:  Did I hear the Court just say it is a

11 one-incident thing?

12      THE COURT:  I am saying that tape is about a

13 one-incident occasion, about Randle and the mountain.

14      The bottom line, as I have stated, is that I will not

15 admit that testimony.  I thought I said before this trial

16 started, be careful as to putting forth exhibits and things or

17 talking about things that the Court might not admit.

18      That's exactly what you did, Mr. Bloom.  You walked to the

19 thing and said, I want to show this movie, if the Court will

20 permit, and all kinds of things.

21      I have advised not to do that, and I think that's what you

22 did.

23      MR. BLOOM:  I did say to the jury, if the Court

24 permits it, having in mind that prior to my saying that,

25 probably 20 out of 20 motions that we have filed have been

denied.  So I was cautious about whether or not the Court was
going to permit it, and I certainly contemplated that given
that the prosecutor chose you as the judge, and given your
rulings, that you might not permit it.

THE COURT:  All right.  But I was asking to exchange,
when you do the exchange, the gist of the testimony and the
exhibits, those things can be taken up out of the presence of
the jury so those kind of things won't happen where you can't
produce what you are telling me you are going to produce.

So I am saying in terms of the movie -- I am not talking
about, she can say what she wants to say.  I think that that
point has been clear from Ms. Troxel, from Mr. Dawson, what
was going on in Randle mountain -- I mean Randle, in terms of
the forest, the national forest up there.

There's a way to present it, and it wasn't presented, in
my opinion, in the course of what I recommended and had a full
discussion about how to do these things.

So I guess we live by what we do.

MR. BLOOM:  I certainly hope so.

THE COURT:  Okay.

MR. BLOOM:  I really do hope so.

THE COURT:  Okay, I am going to take a quick recess.

MR. BLOOM:  I have some things to discuss.

THE COURT:  Check and see, if you will, if the jury
is here.

1          MR. BLOOM:   We have some other things, as well.

2          THE COURT:   Is it something that needs to be taken up

3    before we proceed?

4          MR. BLOOM:   Oh, yes.

5          THE COURT:   Would you quickly tell me?

6          MR. BLOOM:   Yes.   I would ask the Court direct that

7    the government ask Jennifer Kolar and her attorney to produce

8    the tape recording that she made of the February 4, 2006,

9    conversation that she had with the two FBI agents.   She has

10   agreed to cooperate with the government.   She has not agreed

11   to cooperate with us.

12        It is clear that if the government asks her to produce

13   that tape, she would have to, under their agreement, produce

14   it.   I think it is direct evidence of particularly what that

15   witness, Ms. Kolar, said with regard to the disputed line;

16   that in Special Agent Halla's notes it indicates that Kolar

17   didn't remember Briana and Lacey being together, whereas in

18   the 302, it's apparently changed to that they were not close

19   friends.

20        The tape would reveal the truth.   This is in search for

21   the truth.   I would ask that the Court direct that the

22   government get that tape from Ms. Kolar so we can use it and

23   so that the jury can hear the relevant portions of it.

24        MR. BARTLETT:   Your Honor, Mr. Martin has told us and

25   he has told the Defendant that he considers this

1  attorney/client privilege and work product, and I am not going

2  to impose -- intrude our office into attorney/client or work

3  product.  I am just not going to do it.

4        MR. BLOOM:  If I may.  This is in no way, 100

5  percent -- cannot be attorney/client material.  This is an

6  interview.  The attorney wasn't even present at the time of

7  the tape recording.  In fact, it was Agent Halla --

8        THE COURT:  I understand your argument and all of

9  that.  Where is the tape?  Do you know where it is?

10        MR. BLOOM:  Where it is?  I have no idea.  Probably

11  --

12        THE COURT:  Do they have it and won't give it to you,

13  is that what you are saying?

14        MR. BLOOM:  No, I don't know if they have it.  They

15  haven't said.  I think they may have said, but whether or not

16  they have said, it's in Mr. Martin's possession, certainly,

17  and the witness has said it's in Mr. Martin's possession.

18  It's available.  It's right here in the northwest.

19        THE COURT:  All right, I think the argument, the

20  motion is clear.  You are asking this court to order them, is

21  that what you are saying, to produce that tape?

22        MR. BLOOM:  Yes.  To ask Mr. Martin to give them the

23  tape.

24        THE COURT:  I understand asking.  I think asking, and

25  you are asking and didn't receive.  Are you asking the Court

1  to somehow exercise some power, order the government or order

2  Mr. Martin, whichever, I don't know which one you are saying,

3  to produce a tape that somebody's got?

4          MR. BLOOM:   Yes.

5          THE COURT:   Who is this order to go to?

6          MR. BLOOM:   To both the government and Mr. Martin.

7          MR. BARTLETT:   To clarify for the record, Your Honor,

8  we do not have the tape.  We have never heard the tape; I have

9  never had it in our possession.  This has always been a tape

10 that Mr. Martin has indicated to us --

11         THE COURT:   I don't think Mr. Bloom is saying that

12 you have it.  He's saying whoever has it should be ordered to

13 turn it over.

14         MR. BLOOM:   Yes.

15         THE COURT:   All right, are we ready to proceed?

16         MR. BLOOM:   I have two other things.

17         THE COURT:   Okay.

18         MR. BLOOM:   Three other things, actually.

19    I want to give the Court and put on the record a list of

20 witnesses that we have decided not to call because we are very

21 concerned that if we call them the Court will strike their

22 testimony and it would not look very good in front of a jury.

23    Those four witnesses are Anthea Lawrence --

24         THE COURT:   Wait, wait.  Slow it down.  Who will it

25 be?

1    MR. BLOOM:   Anthea Lawrence.

2    THE COURT:   Okay.

3    MR. BLOOM:   Carolyn Hart.

4    THE COURT:   Okay.

5    MR. BLOOM:   Naomi Skoglund.

6    THE COURT:   Okay.

7    MR. BLOOM:   Matthew Wright.

8    THE COURT:   All right.

9    MR. BLOOM:   I have two other matters.

10       I am informed by a person who we had intended to call as a

11   witness, and we are probably not going to call -- and that

12   would be Sarah Vekesi -- that sometime during the proceedings

13   yesterday, Mr. Friedman walked up to her in the hallway and

14   tried to talk to her, asked her if she was Ms. Vekesi; that

15   Mr. Friedman was alone, he did not have an investigator with

16   him, and he asked her what is she going to testify to.

17       I am very troubled by that, and importantly, what

18   Ms. Vekesi said is "Who are you?"  Mr. Friedman then

19   identified himself, but not prior to asking her questions, and

20   I am very troubled by that.  For one thing, aside from not

21   identifying himself, which I think is a problem both

22   professionally and ethically in the context of this case, he

23   also potentially made himself a witness in this case.  What if

24   Ms. Vekesi had said something that the prosecution wanted to

25   offer in evidence?  So that's very troubling.

1    I'd ask the Court to inquire of Mr. Friedman as to what

2    happened and whether or not that's factually accurate and

3    whether or not he has an explanation for it.

4        MR. BARTLETT:  Your Honor, it's a little unusual to

5    have Mr. Bloom complaining to us about wanting to talk to a

6    witness, when in this entire trial he's complained about their

7    inability to talk to witnesses.

8        What happened?  Nothing.  Ms. Vekesi did not speak with

9    Mr. Friedman.  There's nothing to argue about.  Mr. Bloom has

10   made his record, and I say we move on to something a little

11   more relevant.

12       THE COURT:  You are not going to call her, is that

13   the idea?

14       MR. BLOOM:  I have decided not to call her.

15   I want to say, Mr. Bartlett's presentation here -- yes, we

16   wanted to talk to witnesses.  We didn't go up to them and talk

17   to them and misrepresent.  Yes, we asked; we went through the

18   proper channels to try to talk to witnesses.  We wrote

19   letters, we made requests, we made motions, all of which, of

20   course, were denied.  We did our best within the rules to

21   speak to witnesses.

22       What I am saying to the Court is, it appears that

23   Mr. Friedman went beyond the rules in so doing.

24       THE COURT:  All right.  But you are not going to call

25   Ms. Vekesi, and those are the reasons you've stated for the

1   record?

2           MR. BLOOM:  I am not saying that's the reason.  I am

3   saying it has nothing to do with why we are or are not going

4   to call her.

5           THE COURT:  But you are not going to call her?

6           MR. BLOOM:  That is another issue; we are not going

7   to call her.

8           THE COURT:  Okay, all right.  Is that it?

9           MR. BLOOM:  That's it.  I would ask the Court to ask

10  Mr. Friedman to get the facts out so that if there's any

11  dispute -- I gather from his silence that what I have

12  presented is the truth.

13          THE COURT:  I don't see anything for the Court to

14  rule on, on that.  That's outside this trial, in terms of

15  folks saying, just like me dealing with the things that you

16  may say outside the jury.

17      Let's deal with stuff that is going to go before the jury.

18  You say she's not going to testify.  I am not finding anything

19  about that, a violation of something, to shut down everything

20  to deal with this.

21      You folks haven't gotten along very well, that I can see,

22  since I have been coming out here on this thing.  We are in,

23  what, the third week, in terms of the lawyers getting along,

24  talking to each other civilly.

25          MR. BLOOM:  I think they are involved in fraudulent

1  activity, so I don't really get along with them.

2          THE COURT:  That's another issue, you want to argue.

3      I want to talk about, so I can get the jury out here.

4  Have you completed now, things you want me to consider?

5          MR. BLOOM:  We have a stipulation that Mr. Fox will

6  address.

7          MR. FOX:  Your Honor, I think the first order of

8  business, there's a stipulation that needs to be read into the

9  record regarding Exhibit A-97 that we've reached.

10          THE COURT:  That's the time when the jury is out

11  here.

12          MR. FOX:  Yes.  Okay.

13          THE COURT:  Do I have a copy of it?

14          MR. FOX:  I thought I left one on your chair, Pat.

15          MR. BARTLETT:  We've read the stipulation and

16  actually signed it.

17          MR. FOX:  I am sorry, I thought I left the original.

18          THE COURT:  I want to stay in the loop.

19          MR. FOX:  Sure.  I thought I had left a copy.

20          THE COURT:  Are we ready for the jury now?

21          MR. BARTLETT:  I have one issue.

22      I notice on the witness list that they indicate they are

23  going to call Dale Mann.  I am aware of what Mr. Mann's

24  testimony is, and I am also aware that the court has ruled, at

25  least in regard to the report that we received as to what his

1   opinion was; it was irrelevant.

2       If Mr. Mann was the expert that was going to say, to be a

3   bomb it had to explode and there had to be supersonic shock

4   waves and all that, the Court has already said that isn't the

5   correct definition.  Therefore, any testimony about that is

6   not only irrelevant, it would be confusing to the jury.

7       But we haven't had an offer of proof as to why Mr. Mann is

8   going to be called in this trial.

9           THE COURT:  Well, perhaps somebody will say, but I

10  want to take that matter up before that witness is called.

11  And I keep saying that.

12          MR. FOX:  Right.  Well, this is the first we've heard

13  from the government that they are objecting to Mr. Mann's

14  testimony.

15      Mr. Bloom?

16          MR. BLOOM:  He's going to testify as an expert as to

17  his understanding of the nature of the device or devices used

18  in this event.

19          THE COURT:  Will you be asking questions in violation

20  of the Court's order and ruling in this particular issue?

21          MR. BLOOM:  Of course not.

22          THE COURT:  Well, I will take that up, and I want to

23  take it up with Mr. Mann and you before he's called, because I

24  will be concerned whether he deliberately violates my ruling

25  or whether you ask a question in violation of my ruling.  I

1    will be strictly concerned about those two, and I just want to
2    say that.
3        Are we ready to go?  And I want to take that up before he
4    takes the witness stand.
5            MR. BLOOM:  Sure.  We have one short witness before
6    him, so if you want to excuse the jury.
7            THE COURT:  I will handle that.  I want to take it up
8    before he testifies, that's all I am saying.
9            MR. BLOOM:  If you want to do it now, we can do it
10   now.
11           THE COURT:  I want to get the jury out here.
12           MR. BLOOM:  That's fine.  Let's do whatever you want
13   to do.  You are in charge.
14           THE COURT:  Well, I am happy to hear that.
15       Would you bring in the jury?
16   (Jury present.)
17           THE COURT:  All right.  You may be seated.
18       Call your next witness.
19           MR. FOX:  Your Honor, before that, we have a brief
20   stipulation.
21           THE COURT:  All right.  Go ahead.
22           MR. FOX:  The United States of America, by and
23   through Jeffrey Sullivan, United States Attorney for the
24   Western District of Washington, and Mark Bartlett and Andrew
25   Friedman, Assistant United States Attorneys for said District,

and Defendant Briana Waters, and her attorneys, Neil Fox and

Robert Bloom, agree and stipulate that:

Exhibit A-97 was the photograph shown to Stanislas

Meyerhoff on March 17, 2006, in the presence of BATF Agent

John Comery.

Dated this 19th day of February 2008 and signed by myself

and Mr. Fox, Mr. Bartlett, and Mr. Friedman.

Thank you.

THE COURT:  All right.

MR. BLOOM:  Yes, we'd like to call Ju-Pong Lin.

THE COURT:  Let me have you raise your right hand to

be sworn.

JU-PONG LIN, called as a witness, duly sworn.

THE COURT:  Just come around and take the witness

chair.

DIRECT EXAMINATION

BY MR. BLOOM:

Q.  Good morning.

A.  Good morning.

Q.  Could you state your name and spell your name, please, and

if you would, speak into the microphone?  Thanks.

A.  All right.  My name is Ju-Pong Lin.  It's spelled J-U dash

P-O-N-G.  Last name is L-I-N.

Q.  Where do you live?

A.  I live in North Providence, Rhode Island.

1    **Q.**  How long have you lived there?

2    **A.**  I've lived there, in Rhode Island, for four years.

3    **Q.**  How old are you?

4    **A.**  Forty-six.

5    **Q.**  Do you have a family?

6    **A.**  Yes, I do.

7    **Q.**  Could you tell the jury, are you married?

8    **A.**  Yes, I am married, and I have two children, a 15-year-old

9    and an eight-year-old.

10   **Q.**  Do they live with you?

11   **A.**  Yes, they do.

12   **Q.**  What are you doing in Rhode Island?

13   **A.**  I am a faculty at Goddard College, which is a low

14   residency college, so most of my work is done from home, and

15   then I also travel to our two campuses in Plainfield, Vermont,

16   and Port Townsend, Washington.

17   **Q.**  Did there come a time in your life when you lived in the

18   Olympia area?

19   **A.**  Yes, I taught at the Evergreen State College from 1996

20   until 2003, and I lived in Olympia at that time.

21   **Q.**  And in what department were you or how was it divided,

22   could you explain to the jury?

23   **A.**  Sure.  We didn't have departments, we had learning units.

24   I worked in the moving image group and taught mainly film and

25   video, and I also taught women studies, international women

1  studies, that kind of thing.

2  **Q.**  In connection with your employment at the Evergreen State

3  College, did you ever meet a person named Briana Waters?

4  **A.**  Yes, I did.

5  **Q.**  How did you meet her?

6  **A.**  Briana was one of the students in a program that we taught

7  regularly called media works, which is an introductory film

8  and video production course -- production and theory.  And

9  when I was teaching with Laurie Meeker, Briana was in that

10  program.  And then after that program, Briana continued

11  studies with me as an independent study.

12  **Q.**  Do you see Briana in the courtroom?

13  **A.**  Yes.

14  **Q.**  Could you point her out?

15  **A.**  She's right there.

16          MR. BLOOM:  Indicating Briana Waters.

17  BY MR. BLOOM:

18  **Q.**  Could you tell us about your interactions with her?

19  **A.**  Sure.  I have had many students in my years at Evergreen.

20  Some students are more memorable than others.  Briana was

21  definitely a very memorable student, especially in working

22  with her in advisory independent study.

23      We had a pretty close relationship.  Independent study

24  means that I was meeting with her once a week one-on-one, and

25  I found Briana to be a very hard worker.  She was extremely

ethical.

I was really impressed by her commitment to social justice; ideals of democracy, really. And she was very sophisticated in her thinking about media representation and how to use it in an ethical and responsible way.

**Q.** The particular project she was working on, do you remember anything about it?

**A.** I do. At the time she was in media works, I believe it was in the last semester of media works, she began shooting some video of a documentary that she planned that was about the Gifford Pinchot Forest and efforts to log it unsustainably, and Briana was interested in the campaign to keep the forest from being logged in an unsustainable way.

So in the independent study she did with me, she did, I believe, two semesters of contract with me. In one semester she continued to shoot footage, videotape.

What was really impressive about that semester was she was really committed to representing very different perspectives and building alliances between groups that historically have been at odds with each other in the Northwest, particularly loggers and the Earth First activists. It was a rare thing to see someone really build conversation and alliance between those groups.

In the second semester, she continued to collect footage and interviews, and then also completed a short promotional

1    piece, and then finished the semester without completing the

2    full documentary.

3    **Q.** And to your knowledge, did she continue after she

4    graduated to produce the documentary?

5    **A.** Yes, that's my understanding.  I left Evergreen not too

6    long afterwards.

7    **Q.** Did there come a time after that that you found your way

8    to her website?

9    **A.** I did recently.  I am not sure how long ago, maybe six

10   months ago; I heard about this case, and so I went on the

11   website to learn more about it.  And I was interested in

12   seeing Briana's video, so I sent an e-mail through the website

13   to try to order it, and there was no answer for quite a while.

14       And then after that, I got really busy with preparing for

15   the residencies in Vermont and in Washington, and so it was, I

16   believe, just before I went to Vermont that I received an

17   e-mail saying that there had been some technical problems with

18   the website.  So, you know, I didn't follow-up.  I never saw

19   the video, but I plan to.

20   **Q.** So is it your sense that the website really wasn't very

21   well maintained?

22   **A.** It seemed as if it was not updated, correct.

23           MR. BLOOM:  I thank you.  I don't have any further

24   questions.  I don't know if these men have any questions for

25   you.

1          MR. BARTLETT:  Your Honor, if I could approach the

2     witness with what's been previously marked as Government's

3     Exhibit 1122.

4                           CROSS-EXAMINATION

5     BY MR. BARTLETT:

6     **Q.**  Good morning.

7     **A.**  Good morning.

8     **Q.**  Could you take a few minutes and take a look through the

9     document I just handed you and tell me if you recognize it?

10    **A.**  Sure.

11         Yes, these are the evaluations for Briana while she was

12    working on the documentary as an independent contract with me.

13    **Q.**  As I understand it at Evergreen, especially on independent

14    studies, there's three parts to class work:  Beforehand the

15    student tells you, here's a contract and this is what I think

16    I am going to get done, which is the first page?

17    **A.**  Yes.

18    **Q.**  And then at the end of the semester, you kind of look back

19    and say, well, you said you were going to do this, and here's

20    how much you got done on it?

21    **A.**  Correct.

22    **Q.**  Then there's also a third part of it where the student

23    actually does kind of their own self-evaluation and

24    self-grade?

25    **A.**  Yes, that's correct.

1  **Q.** And that's what you have in front of you?

2  **A.** Yes.

3     MR. BARTLETT: I would like to offer Government's

4  Exhibit 1122.

5     MR. BLOOM: Let me continue reading it before I take

6  a position.

7     No objection.

8     THE COURT: It is admitted.

9        (Exhibit No. 1122 admitted.)

10 BY MR. BARTLETT:

11 **Q.** Looking at that document, does it refresh your memory as

12 to -- you indicated on direct examination that Ms. Waters did

13 not finish the video she was working on?

14 **A.** She did not complete the editing of the documentary.

15 **Q.** Didn't finish. And part of the reason she didn't complete

16 the editing of the documentary is because she was also very

17 involved in the WTO protest that occurred in Seattle?

18 **A.** Correct.

19 **Q.** She still graduated, though, in December of 1999?

20 **A.** Yes.

21 **Q.** You felt she'd done enough that even though she hadn't

22 finished the video it was close enough?

23 **A.** Yes, it's very common, especially with independent

24 contracts, that as a student progresses through the semester,

25 their focus might expand or shift, and so that's what

1  happened.  To me, the main goal of the contract was to gain a

2  deep understanding of the documentary production and ethics

3  and the issues around that.

4      So her involvement in the WTO included, you know -- was a

5  different perspective; it was a different issue, but it was

6  still within documentary production.  So I felt that it met

7  her goals, you know, although it didn't meet them in precisely

8  the way she had planned.

9  **Q.**  I think at the very end, if you would look at the last

10  sentence on the last page, basically the next to the last

11  paragraph that starts "And I hope to start work as soon as I

12  finish the GP documentary."  Do you see that?

13  **A.**  On the first page?

14  **Q.**  No.  If you look at the bottom right-hand corner, you are

15  going to see Bates stamp number, and I'm looking at page 1058.

16  **A.**  Okay.

17  **Q.**  Do you see two small paragraphs at the top?

18  **A.**  Yes.

19  **Q.**  Do you see where Ms. Waters indicates that she hopes to

20  finish the GP -- I assume that refers to the Gifford Pinchot?

21  **A.**  Gifford Pinchot, correct.

22  **Q.**  -- documentary by the end of January?

23  **A.**  Uh-huh.

24  **Q.**  I am assuming that also played into your mind that she was

25  just about done with it so you were going to let her graduate?

1    A.  Right.

2           MR. BARTLETT:  No further questions.

3                    REDIRECT EXAMINATION

4    BY MR. BLOOM:

5    Q.  I would like to read some of these things.  First I would

6    like to read from something that you wrote.

7           MR. BARTLETT:  The document speaks for itself, Your

8    Honor.

9           THE COURT:  He may go ahead.  Let him ask the

10   question.

11   BY MR. BLOOM:

12   Q.  Am I correct that in front of you it's really two

13   documents?  It's your evaluation of Ms. Waters; is that

14   correct?

15   A.  That's correct.

16   Q.  And the other, that's called faculty evaluation of student

17   achievement?

18   A.  Uh-huh.

19   Q.  That's two pages?

20   A.  I believe mine is one page, and then the following page is

21   Briana's self-evaluation.  Student's own evaluation of

22   personal achievement.

23   Q.  I am mistaken; there's actually three documents.

24   A.  Correct.

25   Q.  The first page is individual learning contract, right?

1  A. Correct.

2  Q. The second page is one page also?

3  A. Uh-huh.

4  Q. Faculty evaluation of student's achievement.  Right?

5  A. That's correct.

6  Q. And the next two pages are student's own evaluation of

7  personal achievement?

8  A. Correct.

9  Q. Let's talk for a moment about your evaluation, page 2 of

10  this document.

11  A. Uh-huh.

12  Q. Just reading from the last part, the last paragraph:  "The

13  only regret I think she may have is that she completes her

14  undergraduate education with terrific experiences, but perhaps

15  without the closure on this project that would have been most

16  satisfying.  I have no doubt, however, that she will finish

17  the project eventually and go on to find important ways to put

18  her training to excellent use.  I have very much enjoyed

19  working with Briana and wish her the best of luck."

20      Is that what you wrote?

21  A. That is what I wrote.

22  Q. Did anybody force you to write that?

23  A. Absolutely not.

24  Q. Turning now to the last two pages, the student's own

25  evaluation of personal achievement.  Was this submitted to

1  you, and you eventually signed it, is that correct?

2  **A.**  That's correct.  The typical process is that the student

3  writes their self-evaluation and brings it to a meeting with

4  the faculty, the primary faculty.  And then based on that

5  meeting and the student's self-evaluation, then the faculty

6  writes an evaluation.

7  **Q.**  Could you look at the bottom of that page?

8  **A.**  Yes.

9  **Q.**  And is there a paragraph that you remember reading that

10  goes like this:

11      "As video support for my affinity group during WTO, I

12  gained more valuable experience with video activism and

13  activism in general.  Working within a cluster of affinity

14  groups, we dealt with many issues that surfaced during the

15  process, such as race and gender dynamics and timing.  Our

16  groups are working together in a post WTO effort to become

17  more educated and more prepared and to make our community of

18  activists in Olympia stronger and more effective.  My dream of

19  starting a video collective has started to garner support, and

20  I hope to start work on that as soon as I finish the GP

21  documentary, which will happen by the end of January.

22      "As I interview the residents of Randle and my activist

23  friends about their well deserved victory, I am very excited

24  to produce a positive representation of the encouraging

25  triumph of a grassroots effort over a huge, evil corporation.

1  I have not lost sight of the bigger picture and plan to

2  portray a strong message of inspiration to be carried into

3  campaigns in the GP National Forest and beyond."

4      Do you remember reading -- her writing that?

5  **A.**  Yes.

6  **Q.**  At some point?

7  **A.**  Yes.

8  **Q.**  You signed that document as well; is that right?

9  **A.**  That's correct.

10 **Q.**  Is that Briana Waters?

11 **A.**  That's Briana Waters.

12      MR. BLOOM:  Thank you.

13      MR. BARTLETT:  Nothing further, Your Honor.

14      THE COURT:  All right.  Can this witness be excused?

15      MR. BLOOM:  Yes.  Thank you very much.

16      THE COURT:  Next witness.

17      MR. BLOOM:  Yes, Dale Mann.

18      THE COURT:  I want you to step out and leave your

19 books on the chair before you hear the next witness.

20      (Jury not present.)

21      THE COURT:  Mr. Bloom.

22      MR. BLOOM:  What do you want from me?  I am calling

23 the witness Dale Mann.

24      THE COURT:  I want the witness in the courtroom.

25      MR. BLOOM:  Oh.  I will get him.

This is Mr. Mann.  This is Judge Burgess.

THE COURT:  Mr. Mann, would you come forward.

THE WITNESS:  Good morning.

THE COURT:  You intend to testify in this case, right?

THE WITNESS:  I do.

THE COURT:  I want to place you under oath as we go forward.

DALE C. MANN, called as a witness, duly sworn.

EXAMINATION

BY THE COURT:

Q.  I just want to ask a couple of questions because of the issue as to your testimony.

The Court has issued an order as to your testimony in the case, back in January, and the Court is lead to believe that you would testify that the device used in this particular case was not an incendiary bomb.  So the Court had issued a ruling to this effect, and it's in the order.

Have you had the benefit of the order?  Has anyone shown it to you?

A.  I have seen it.

Q.  You have seen it.  The Court's ruling was this:

"In light of the foregoing" in this order, the "defendant's proposed expert (Mann) is precluded from testifying that to be an incendiary bomb under the statute it

1　must explode, as this opinion is erroneous and contrary to

2　law.  The proposed experts may give their opinion that the

3　device used was a destructive device or not, so long as the

4　opinions are confined to the definition of a destructive

5　device as set forth in this opinion."

6　　　　Is that your understanding of the order?

7　**A.**　Yes, it is.

8　**Q.**　My question to you, do you intend to testify to anything

9　different than -- contrary to this court's order?

10　**A.**　I don't believe so.

11　　　　MR. BLOOM:　Excuse me?

12　**A.**　I don't think I will, Your Honor.

13　BY THE COURT:

14　**Q.**　All right.  The problem would be this:  If it's different

15　than this, and you violate the order, there are consequences,

16　as you well know?

17　**A.**　I understand.

18　　　　THE COURT:　I just want you to be aware of that.　As

19　long as you are not violating the order, you will be allowed

20　to testify.

21　　　　Now --

22　　　　MR. BARTLETT:　Your Honor, if I could just be heard.

23　　　If he's not going to say that an incendiary bomb must

24　explode, then I don't know what his opinion is, because the

25　only opinion I have from this expert is that an incendiary

1   bomb must explode to be an incendiary bomb.

2       If he's changing that opinion, I would like his new

3   opinion, and I would like his basis for the new opinion.

4   Because all I have is things that are excludable.  That's the

5   only opinion I have from Mr. Mann.

6               THE COURT:  Is there an update of anything as to his

7   testimony?

8               MR. BLOOM:  No.  He understands the operative

9   paragraph of this court's order.

10              THE COURT:  Is what I read.

11              MR. BLOOM:  That he's precluded from testifying that

12  to be an incendiary bomb under the statute it must explode.

13  He's not going to testify to that part of his findings.  He

14  feels, as an expert, otherwise, but he's not going to be asked

15  that question by me and he's not going to give the answer that

16  is prohibited by the Court.

17      However, the next sentence says:  "The proposed experts

18  may give their opinion that the device" -- actually it says

19  devise but I think you probably meant device -- "used was a

20  destructive device or not, so long as the opinions are

21  confined to the definition of a destructive device"

22  -- devise -- "as set forth in this opinion."

23      He will testify consistent with following the Court's

24  order.  That's what people do.

25              THE COURT:  That was my order.  If that's the

1   situation, he may testify.

2       I am pointing out my order so everybody is made aware of

3   my order, so if something is contrary to that, then I will

4   deal with that.  That's all I am saying.

5               MR. BLOOM:  Okay.

6               THE COURT:  Are you ready?

7               MR. BLOOM:  I'm ready.

8               THE COURT:  Bring in the jury.

9        (Jury present.)

10              THE COURT:  All right.

11  You may be seated.

12              MR. BLOOM:  This is Dale Mann.

13              THE COURT:  Let the record reflect that he's already

14  been sworn.

15                      DIRECT EXAMINATION

16  BY MR. BLOOM:

17  **Q.**  Good morning, Mr. Mann.

18  **A.**  Good morning.

19  **Q.**  Could you spell your name for the jury, please?

20  **A.**  My name is Dale Mann.  My last name is spelled M-A-N-N.

21  **Q.**  What do you do for a living?

22  **A.**  I am a forensic scientist.

23  **Q.**  How old are you?

24  **A.**  I am 52 years old.

25  **Q.**  Do you have a family?

1 **A.** Yes, I do.

2 **Q.** Who is in that family?

3 **A.** I have two daughters and a lovely wife.

4 **Q.** Where do you live?

5 **A.** I live here in Washington.

6 **Q.** In what city?

7 **A.** In Gig Harbor.

8 **Q.** Do you have a business within which you work?

9 **A.** Yes, I do.

10 **Q.** What is the name of that business?

11 **A.** I am currently a principal in a company called MDE, Inc.

12 It is a forensic engineering and forensic laboratory company

13 based in Seattle.

14 **Q.** I want to go back.  Where did you grow up?

15 **A.** I grew up here in Washington.

16 **Q.** And did you go to college?

17 **A.** Yes, I did.

18 **Q.** And where was that?

19 **A.** I went to the University of Washington, and I graduated in

20 1978.

21 **Q.** That would be the University of Washington in Seattle?

22 **A.** Yes, it is.

23 **Q.** And after that, what did you do?

24 **A.** I graduated with two degrees from Washington, one in

25 chemistry and one in oceanography.

1     Following my graduation, I worked at the Battelle
2 Northwest Laboratories, which is a not-for-profit research
3 company out of Richland, Washington.  Did a lot of
4 environmental chemistry work.
5     Following that, in 1981, I gained employment with the
6 Washington State Patrol Crime Laboratory.  I spent
7 approximately nine years in Seattle, and then was promoted to
8 supervisor in the Tacoma crime laboratory, where I spent the
9 next nine years.
10 **Q.**  May I interrupt you there?  You said Washington State
11 Patrol.  Is that a law enforcement agency?
12 **A.**  Yes, it is.
13 **Q.**  You worked for how long for a law enforcement agency?
14 **A.**  Approximately 17 years.
15 **Q.**  Please continue.  I am sorry to interrupt you.
16 **A.**  Then in 1998, I left the State Patrol and joined MDE as a
17 principal.
18 **Q.**  What year was that, I'm sorry?
19 **A.**  In 1998.
20 **Q.**  Can you tell us about your work experience, what have you
21 worked on?
22 **A.**  Well, with a degree in chemistry, I first -- I was always
23 working in the field of chemistry, of course.  And with the
24 crime lab, that involved a lot of work in all matters that
25 involved knowledge of chemistry, which would include drug

1  work, investigation of fires, explosions, bombings, and on up
2  to microanalytical analysis where I became involved in
3  analysis of paints, plastics, building materials, soils,
4  glass, and all that kind of thing.

5      All along that 17 years, I also worked a lot in what we
6  call general criminalistics, which is the field of impression
7  evidence and deposit evidence and that type of thing.

8  **Q.** What is impression evidence?

9  **A.** Impression evidence would be things like tool marks,
10 footprints, that type of thing, where one object will leave a
11 mark on the second object, and that mark can be evaluated to
12 see whether or not the two objects ever were in contact with
13 each other.

14 **Q.** In connection with that, have you ever done work, either
15 in your private capacity or working with the state, to see if
16 there had been damage to metal, sheet metal?

17 **A.** Impression evidence involving metallic objects is a field
18 called tool marks.  I am aware of that type of work, although
19 I don't normally get involved directly with that type of
20 analysis, though I will look at other type of impression
21 evidence that might -- for instance, painted objects, or
22 painted metal objects and things like that, to look at
23 scratches.  But I am familiar with the deformation of metals
24 and that because I do work closely with a metallurgist at MDE.

25 **Q.** Let me continue with more of your experience.  Have you

1  ever worked on cases involving fire?

2  **A.**  Yes, I have.

3  **Q.**  Could you tell the jury about that, please?

4  **A.**  In the crime laboratory, fire, arson, bombing, explosives

5  was one of my primary interests.  I spent the bulk of my

6  casework time working on evidence from those types of

7  investigations.

8  I was, at one time, the only chemist in Western Washington

9  doing fire debris analysis work and explosives work.  I had

10  that capacity for probably five or six years where I was

11  virtually the only person as part of the state.  So I saw a

12  large variety of case work from all the counties in this area.

13  **Q.**  Have you had any special schooling?

14  **A.**  Yes, I have.  I have attended schools put on by the FBI,

15  by the ATF, by McCrone Institute, who teaches a lot about

16  microscopy.  By the National Center for Forensic Science in

17  Florida.  I have also taught at the FBI several times, and

18  have been a guest lecturer at ATF as well.

19  **Q.**  Have you published anything?

20  **A.**  Yes, I have.  I have eight or ten different publications

21  dealing specifically with laboratory analysis of arson

22  matters.

23  **Q.**  Now, have you done what could be called technical

24  committee work?

25  **A.**  Yes.  I have served on a couple of different national

1  committees. I am on two currently. One is the International

2  Association of Arson Investigators Technical Committee. It's

3  a group of scientists from around the country that writes

4  articles and peer reviews articles of a technical nature.

5      The other committee is the Technical Working Group on Fire

6  and Explosives, and I am on a standards committee within that

7  working group where we write and review methods for analysis

8  of different laboratory procedures.

9  **Q.**  The Technical Working Group on Fire and Explosives, do

10  they call that TWGFEX?

11  **A.**  Yes. The acronym is TWGFEX, yes.

12  **Q.**  In connection with that, does TWGFEX have definitions of a

13  glossary of terms?

14  **A.**  There are several different glossary terms that have been

15  produced by that committee, depending upon -- or geared toward

16  different types of evidence. There's one for fire debris

17  analysis and liquid accelerants, and there's another one for

18  explosives.

19  **Q.**  Have you ever seen the glossary of terms?

20  **A.**  Yes, I have.

21      MR. BLOOM: Can I ask -- I'm sorry, Pat; this is my

22  fault -- could he be shown Exhibit A-180?

23      Thank you.

24  BY MR. BLOOM:

25  **Q.**  Mr. Mann, I would ask that, when you get that, if you

1   could look at the second page of that document.

2     First of all, does that look familiar to you, the

3   approximately four pages that are in front of you?  Have you

4   seen those before?

5   **A.**  Yes, I have.

6   **Q.**  And what is it?  Could you identify for the jury what it

7   is you are looking at?

8   **A.**  This is from the TWGFEX reference library, and this is a

9   glossary of terms.

10       MR. BARTLETT:  Your Honor, I object to this line of

11   questioning.  I believe that they are going to attempt to

12   introduce this and discuss this.  The definition of bomb and

13   incendiary bomb is a legal matter that the Court will provide.

14   This type of testimony will simply be confusing under 403 and

15   shouldn't be brought before the jury.

16       MR. BLOOM:  Do you want me to address this?

17       THE COURT:  Not right now.  I want to send the jury

18   out so we can get into that.

19     Leave your books on your chair.  Don't discuss the case.

20     (Jury not present.)

21       THE COURT:  Okay, Mr. Bloom.

22       MR. BLOOM:  Two things.  One is, we will, absolutely,

23   follow the Court's instruction that Mr. Mann is precluded from

24   testifying that to be an incendiary bomb under the statute it

25   must explode.  He will not testify to that.  I am not going to

1  ask him that.

2      I am going to offer this document in evidence, and I do

3  want to point out that one of the Government's witnesses,

4  Bradley Cooper, already testified about these definitions, and

5  his testimony is in evidence regarding this glossary of terms.

6      So they want to have it both ways; their witness can

7  testify about it and our witness cannot.  I don't understand

8  that.

9          MR. BARTLETT:  First of all, to clarify the record,

10  that came in during cross-examination of Mr. Cooper, so they

11  can't claim that this is it.

12      Second, Your Honor, under 403, this is simply irrelevant.

13  Giving them a definition that is not material to this case is

14  a waste of time and it is not allowable under 403.

15          THE COURT:  Now, my question to you, Mr. Bloom, is

16  that your intent to show the definitions under this glossary?

17          MR. BLOOM:  I intend to talk to this witness about

18  some of the terms that are defined in this glossary; yes, I

19  do.

20          THE COURT:  All right.  So you want him to refer to

21  what the definition of bomb is under the glossary; is that

22  correct?

23          MR. BLOOM:  That may be one of the questions I ask

24  him.

25          THE COURT:  Well, any other reason for it?

1          MR. BLOOM:  I want to ask him about combustion.  I
2    want to ask him about deflagration.  I want to ask him about
3    detonation.  I want to ask him about explosion.  I want to ask
4    him about explosive.  I want to ask him about explosive
5    compound.  I want to ask him about explosive mixture.
6          THE COURT:  And that's what these definitions are
7    about, you're going to ask him about those things?
8          MR. BLOOM:  I am not finished.  I am going to ask him
9    about fuel.  I'm going to ask him about fuse, f-u-s-e, and
10   fuze, f-u-z-e.  I am going to ask him about high explosive.  I
11   am going to ask him about incendiary.  I am going to ask him
12   about pyrotechnic mixtures.  I want to ask him about safety
13   fuse.
14      It's just on this glossary of definitions.
15         THE COURT:  And you want to ask him according to
16   these glossary definitions?
17         MR. BLOOM:  I want to ask him to explain to the jury
18   what those things are and what they mean.
19         THE COURT:  And you want to use the glossary
20   definitions to do that?
21         MR. BLOOM:  Yes.
22         THE COURT:  Then I am going to grant the motion.  You
23   will not admit it into evidence.  You can ask those questions
24   of him and he can answer them.  But he is not to refer and
25   take this definition and supplant it in the order that I have

1  given here.

2  MR. BLOOM:  Sir, I have no intention of asking him

3  whether or not to be an incendiary bomb under the statute it

4  must explode.  That is what I am precluded from doing.

5  THE COURT:  Understand my ruling.  My ruling is that

6  I am not going to admit this into evidence.  That's my ruling.

7  Accept it and move on.

8  MR. BLOOM:  We accept it.  We have accepted all your

9  rulings so far.

10  THE COURT:  I do not need your comment, Mr. Bloom.

11  Are you ready now to continue to examine this witness?

12  MR. BLOOM:  I am, if the government is.

13  MR. BARTLETT:  Yes, Your Honor.

14  THE COURT:  All right.  Bring in the jury.

15  (Jury present.)

16  THE COURT:  All right.  You may be seated.

17  Continue, Mr. Bloom.

18  MR. BLOOM:  I don't know -- could I get the last

19  item?

20  Court Reporter:  "Question: Could you identify for

21  the jury what it is you are looking at?

22  "Answer:  This is from the TWGFEX reference library, and

23  this is a glossary of terms.

24  "MR. BARTLETT:  Your Honor, I object to this line of

25  questioning."

1          MR. BLOOM:  Thank you.

2      I offer this into evidence.

3          THE COURT:  It's denied.  So continue.

4  BY MR. BLOOM:

5  **Q.**  Now, does TWGFEX, the Technical Working Group for Fire and

6  Explosives, define commonly used terms that relate to arson

7  investigation?

8  **A.**  Yes, they do.

9  **Q.**  Is the term "explosive" defined?

10  **A.**  Yes, it is.

11  **Q.**  And what is that definition?

12  **A.**  The exact definition that that committee came up with was

13  "A chemical substance or mixture capable of producing an

14  explosion."

15          MR. BARTLETT:  I am going to object to this, Your

16  Honor.  They are basically trying to read into the record what

17  was excluded under the prior objection.

18          THE COURT:  Mr. Bloom, keep my ruling in mind,

19  please.

20          MR. BLOOM:  I thought you said I could do this?

21          THE COURT:  Keep it in mind, is what I ask you.  Keep

22  my ruling in mind, and continue.

23          MR. BLOOM:  Correct me if I am wrong, I can't --

24          THE COURT:  Ask the question.  But remember my

25  ruling.  How many times do I have to say this?

BY MR. BLOOM:

**Q.** Could you tell us, yes or no -- just yes or no -- in the glossary of terms, the TWGFEX glossary of terms, is there a definition for the word "bomb," just yes or no?

**A.** Yes.

**Q.** And whatever that definition is, do you, as a scientist, agree with that definition?

**A.** I do.

**Q.** Are there other definitions in the TWGFEX glossary of terms? In general, about how many are there? Maybe 60 or 80 or 100?

**A.** Yes. There are approximately four pages of definitions.

**Q.** Are there any with which you do not agree?

**A.** I don't believe I have ever reviewed this glossary with that in mind, so I couldn't say for sure.

**Q.** Okay. Now, in your work investigating and analyzing evidence of fires and arsons and bombings and explosives, have you ever come across what could be called delay devices?

**A.** Yes, I have.

**Q.** Could you explain to the jury what that is?

**A.** Generally speaking, a delayed device would be a component or series of components that will allow the person who wants to set the device off, to safely set it off and be able to get out and away from their device safely. A delay device can be anywhere from a few seconds to hours, even, if you design it

1 appropriately.

2 **Q.** How many kinds of delay devices have you encountered?

3 **A.** I would say I have probably seen probably half a dozen

4 different types of delay devices. Some are very common, you

5 tend to see them over and over again.

6 **Q.** Tell us about -- I will get to that later.

7 Have you ever investigated arson fires in which gasoline

8 was used as an accelerant?

9 **A.** Yes, I have.

10 **Q.** Could you describe to the jury what an accelerant is?

11 **A.** An accelerant, in terms of a fire set, would be any

12 material that would be used to rapidly propagate a fire; to

13 reproducibly and reliably propagate a fire.

14 **Q.** Could you perhaps put that in little more lay terms?

15 **A.** If I want to be sure to set my house on fire, I will use a

16 material -- I would want to use a material that I know is

17 going to start easily and is going to produce a lot of heat

18 and something I know is going to start the structure on fire.

19 Any material I use to accomplish that can be called an

20 accelerant.

21 **Q.** Do you know, have the burning characteristics of gasoline

22 been studied?

23 **A.** Yes. Gasoline as a product is a well studied material in

24 terms of fire dynamics.

25 **Q.** Is there information -- I assume there's literature about

1  this; is that correct?

2  **A.** There's quite a bit of literature about a lot of things

3  that burn these days. The study of science and combustion,

4  it's really a science these days, and gasoline is a fuel

5  that's used as a benchmark for a lot of things. So it's a

6  pretty well-studied commodity.

7  **Q.** Has there been study about what could be called heat

8  capacity?

9  **A.** Yes.

10  **Q.** If so, could you explain what that means?

11  **A.** Heat capacity is a term that defines how much energy an

12  object contains and how much energy it will release when it

13  burns. So the heat capacity is usually defined in terms of

14  mass. So a kilogram of gasoline contains so much energy when

15  it burns.

16      A kilogram of plastic will contain so much energy when you

17  burn it.

18      Those are standards that you can actually measure, and it

19  gives you a way to compare one material to a second material

20  in terms of the amount of heat or energy that it will give off

21  as it burns.

22  **Q.** Is there such a thing -- maybe you just covered it -- as

23  heat release rate?

24  **A.** The heat release rate is a little different. That tells

25  you how fast it gives off energy. For instance, since we are

1    talking about gasoline, it tends to give off its energy rather

2    quickly, but then burns out rather quickly.

3        There are other products that give their energy out a

4    little slower and maybe burn a little longer.  But they may

5    have the same heat capacity, or they contain the same energy,

6    but the heat release rate is different for the two of them.

7    **Q.**  Is what could be called flame height at times a factor in

8    your work?

9    **A.**  Flame height is a quantity that's studied mostly for

10   liquids with known surface areas.  Gasoline is one of those.

11   If I have gasoline in a bucket with a small diameter, it is

12   going to have a lower flame height than if I have a larger

13   diameter bucket.

14       You can relate flame height to diameter for these types of

15   burning liquids.

16   **Q.**  How about the term "ignition energy," could you explain

17   that to the jury, please?

18   **A.**  Ignition energy is how much energy you have to put into

19   the material before you can get it to start to react and

20   combust.

21       So the ignition energy for gasoline is different than the

22   ignition energy for methane, natural gas.  Those have two

23   different -- require different amounts of energy to get them

24   to start to react and burn.

25   **Q.**  Could you explain to the jury what's meant by the term

1  "flash fire"?

2  **A.**  Flash fire would be, in the most general sense, would be a

3  fire that, in which there are a lot of vapors in the air and

4  those vapors are consumed very rapidly, and then the fire goes

5  out because there weren't very many vapors left.

6      The thing to understand about fire is that solids and

7  gases don't burn.  You have to have vapors.  Vapors are what

8  result in the visible phenomenon we see as flame.

9      A flash fire is simply a fire in which there are a lot of

10 vapors present.  You can ignite those.  The flame goes across

11 that environment because it's prime for fire, but then once it

12 does that, there aren't any vapors left to burn and the fire

13 goes out or will subside.

14 **Q.**  Could you explain to the jury the concept of controlled

15 burning?

16 **A.**  Well, a control burn is one where you can kind of define

17 or confine your fire and have a very localized concentrated

18 fuel source that will burn for a prolonged period of time.

19 **Q.**  Fighting forest fires you hear sometimes controlled

20 burning, where they burn a section to stop the progress of the

21 oncoming fire.  Do I have that right?  Is that related?

22 **A.**  That could be one use of that term.  You would have a fire

23 that you are going to confine, keep it focused.  You are going

24 to stay in control of it.

25      In the case of a forest fire, what you are doing is

1  removing fuel that's in front of the path of the fire.  So

2  when the fire, when your uncontrolled fire reaches that

3  burned-out barricade, and there's no field there, it helps you

4  to put the entire fire out.

5  **Q.**  Is there something you could tell the jury about the

6  difference between large scale and small scale in your work?

7  **A.**  We've done, over the course of my 28 years investigating

8  fires and explosions, we've done lots of testing of fires and

9  ignition scenarios.  Some of them are very small scale, where

10  we'll do them in the hood and we will downsize the events so

11  we can study just the general dynamics of it.

12      And then we've done full-scale tests where we've burned

13  down entire shopping mall support to study how a fire, once it

14  gets going, for instance, will progress through an attic or

15  how much heat we need to produce to start a ceiling on fire

16  that's 30 feet up, that kind of thing.

17      So we have done dozens and dozens of scaled testing over

18  the years.

19  **Q.**  Is there a difference between combustion and explosion?

20  **A.**  Yes, there is.

21  **Q.**  Could you explain that to the jury, please?

22  **A.**  It's more a matter of rate of reaction.  An explosion

23  generally is a supersonic reaction front that travels at the

24  speed of sound or faster.  It results in the reaction of all

25  your ingredients in a very short amount of time, usually

milliseconds, thousandths of a second or so.

A combustion is a slower rate of reaction. In a normal fire, you know, a fireplace burning or even gasoline burning, that is considered just normal combustion where it's a very slow rate of reaction. It does not result in any kind of pressure or shock wave, whereas an explosion usually will result in a shock wave.

**Q.** Moving on to this case, your work on this case, did there come a time sometime last year where Mr. Fox contacted you?

**A.** Yes.

**Q.** Did you meet with him?

**A.** Yes, I did.

**Q.** Did he provide to you some materials, written materials, with regard to this case?

**A.** Yes.

**Q.** Can you tell the jury what it was he provided for you?

**A.** I had a series of investigative reports and photographs on three separate fires on the West Coast. The reports were authored by various sections of both the FBI and ATF, as well as Seattle Fire Department.

**Q.** Were there any manuals from the Earth Liberation Front that were provided for you?

**A.** Yes. I also received a manual published by Earth Liberation Front. The title of the manual is -- I forget exactly the title, but it had to do with the manufacture of

1    improvised incendiary devices which could be used to burn down

2    large structures.

3    **Q.**  Now, in the materials before we get to the Earth

4    Liberation Front document, in the materials, the other

5    materials you were provided for this case, was there ever a

6    mention of any bomb in any of the technical reports?

7    **A.**  The word "bomb" didn't come up in any reports until well

8    after the primary investigation of the evidence from the

9    scenes, usually from ATF, and it was an explosives and

10   technology section of ATF who first used that word.

11   **Q.**  And the materials you got, did you find that there was any

12   evidence of any explosion or shock wave?

13   **A.**  I did not.

14   **Q.**  Turning to the manual that was more or less how to set

15   fires, the so-called Earth Liberation Front manual, were

16   devices or a device described in that manual?

17   **A.**  I am sorry?

18   **Q.**  Was a device described in that manual?

19   **A.**  There was a device described in that manual, yes.

20   **Q.**  Did it describe, did the manual describe how to construct

21   such a device?

22   **A.**  Yes, it did.

23   **Q.**  Was there any mention of a delay mechanism in that device?

24   **A.**  Yes --

25   **Q.**  I am sorry, in that manual.

1  **A.**  Yes, that manual talked quite a bit about how to
2  manufacture a delay.

3  **Q.**  And was there a discussion of what fuel or fuels to use?

4  **A.**  Yes, there was.

5  **Q.**  Did it explain whether the damage is due to burning
6  gasoline?

7  **A.**  It described the type of fuel to be used, and where to
8  place that fuel in order to maximize the damage to the
9  structure.

10  **Q.**  Does the manual describe that the intent is to generate a
11  controlled fire to maximize the potential?

12        MR. BARTLETT:  Objection, Your Honor.  This is direct
13  examination and he's leading all through this.

14        MR. BLOOM:  This being the first objection, I will
15  withdraw that question and ask a more appropriate question.

16        THE COURT:  Go ahead.

17  BY MR. BLOOM:

18  **Q.**  Was there a description in the manual of what was the
19  intent of using the device?

20  **A.**  Yes.

21  **Q.**  Could you tell the jury what that description is?

22  **A.**  The intent for the device itself was to produce a fire
23  which was very localized and would have a sustained burn time,
24  such that you would be able to take out the roof and rafters
25  above that device.  The thought being if you can get the fire

1  into the attic space of the building, you will effectively

2  total or demolish that building.

3  Q.  And the device or devices described in the manual, could

4  you tell the jury your best recollection of how that device is

5  described in the manual?

6  A.  The device consisted of essentially three parts:  It would

7  be a delay portion, which involved a timer of some time and a

8  battery cell; and then an ignition sequence, which involved,

9  once the timer tripped the current from the battery flowing to

10  a small rocket igniter, which would ignite safety matches,

11  just a regular paper book of matches, which would in turn

12  ignite a road flare.  And that sequence would be their

13  ignition sequence.  The actual fuel then would be a container

14  of gasoline or gasoline/diesel mix.

15      So you have a timer/delay, ignition sequence, and then the

16  fuel load.

17  Q.  In the manual, does it indicate one way or another whether

18  the device is designed to vaporize the gasoline?

19  A.  Well, of course, the gasoline has to vaporize in order to

20  burn.  But the way it was contained, it usually would describe

21  a five-gallon bucket -- the manual would describe a

22  five-gallon bucket as a container.  It was a very controlled

23  evaporation, and in fact what you had then was a small pool

24  fire where the fire would burn for as long as it took the

25  gasoline to evaporate and damage the base of the container.

1  In fact, it was a fairly efficient way of confining your fire
2  to a localized area and maximizing the burn time of that two
3  or three gallons of gasoline.
4  **Q.** According to that manual, was the device designed to
5  explode?
6  **A.** It was not.
7  **Q.** What was the device -- how was the device designed?  What
8  was it designed to do?
9  **A.** It was designed to produce a highly energetic fire over a
10 long period of time in one localized specific location.
11 **Q.** Now, is there a difference between the delay and ignition
12 components from the fuel?  Are they different things?
13 **A.** I am not sure I understand your question.
14 **Q.** Okay.  Are you saying that the device that you studied in
15 connection with this event, did it describe or did you come to
16 an opinion as to whether or not there were, firstly, delay
17 components?
18 **A.** Yes.
19 **Q.** Did you come to an opinion as to whether or not there were
20 ignition components?
21 **A.** Yes.
22 **Q.** Did you come to a conclusion or an opinion as to whether
23 or not there was or were fuel components?
24 **A.** Yes, I did.
25 **Q.** Tell us what your conclusion was or what you found or what

1  your opinion is with regard to the delay component?

2  **A.**  Okay.  We talked about this briefly.  The delay or timer

3  component would be the clock portion of the device.  You can

4  set the clock to where it will not allow current to flow for

5  up to 12 or 24 hours, depending upon the type of clock you

6  have.

7  **Q.**  How about the ignition component, do you have an opinion

8  about, in general, what is an ignition component?

9  **A.**  The ignition is simply the spark, if you will, that will

10  initiate or impart enough energy to your fuel load to start

11  that combustion process.  In this case it's an ignition

12  sequence, where they use a model rocket igniter that requires

13  very little energy to get it to spark.  Enough -- energy from

14  a nine-volt battery would be sufficient.  That in turn has

15  enough energy to start the book of matches on fire, and those

16  in turn have enough energy to start the road flare on fire.

17      Now, any one of those three would give enough energy to

18  start the gasoline on fire.  But to be sure in this case that

19  the gasoline would see a prolonged ignition source, they chose

20  to use a road flare.

21  **Q.**  I think you said that the gasoline is termed the

22  accelerant; is that correct?

23  **A.**  The gasoline in this case is the fuel or the accelerant,

24  yes.

25  **Q.**  Now, is there any function, can you explain the

1  interaction between the accelerant, that is the gasoline, and
2  any containers that are either described in the manual or that
3  you came to believe were used in this particular event, let's
4  call it the University of Washington fire?
5  **A.** The ELF manual describes a five-gallon bucket. I believe
6  in the University of Washington fire it was a Tupperware
7  rectangular container. I saw some reference in the notes to a
8  33-cup container, it's a little over a two-gallon container.
9  So that would hold maybe a gallon to two gallons of gasoline
10 maximum.
11 **Q.** Now, in this particular University of Washington device,
12 was the fuel confined, as you understood it?
13 **A.** Yes, the fuel would be confined by that plastic container.
14 **Q.** And what would be the intent of confining it? Let me
15 withdraw that.
16    Confining within a container as opposed to somebody
17 spreading gasoline on the floor, those are two options; is
18 that correct?
19 **A.** If I had two gallons of gasoline, the two extremes would
20 be, one, to put it in a container that will limit its surface
21 area -- that limits the amount of fuel that's available to
22 vaporize the flames and produce flames -- versus taking that
23 two gallons and pouring it out on the floor, in which case now
24 I have a less localized fuel, much more surface area. It's
25 going to produce more energy much faster because I have more

1   fuel burning at once, but it's going to burn out quicker.

2       So that you have kind of two extremes of what you can do

3   with that same two gallons of fuel.

4   **Q.**  Now, in this particular case, did you get the sense, or

5   did you come to an opinion, I should say, about whether or not

6   a container had been used?

7   **A.**  I did.

8   **Q.**  Was it a -- did you conclude that it was a partially

9   closed container?

10  **A.**  I don't recall that.

11  **Q.**  What would be the purpose of keeping the fuel confined to

12  a container -- what would be the purpose and effect of that?

13  **A.**  Of keeping it confined?

14  **Q.**  Yes, as opposed to -- I think you've already addressed

15  it -- spreading it out.  What would be the intent of keeping

16  it confined rather than spreading the gasoline on the floor?

17  **A.**  If I wanted to have the fire burn for a longer period of

18  time, I would want to keep it confined, or simply reduce the

19  surface area of the fuel that's available to evaporate.

20      So if I had that two gallons of fuel and I put it in a

21  very tall, narrow container, it's going to burn longer.  In

22  fact, it eventually is going to go out whether there's still

23  fuel in it, versus, you know, a two-gallon rectangular

24  container versus spilling it on the floor.  I get a whole

25  different series of combustion properties depending on how I

1   expose that gasoline.

2   **Q.** We've talked about gasoline as an accelerant. Would

3   gasoline also be called the fuel? Is that correct?

4   **A.** In this case, in fire investigation, we call that the

5   first igniter fuel. There are many fuels in a building, of

6   course, because the whole building will eventually become part

7   of that fuel load. So the gasoline would be the accelerant or

8   the first igniter fuel in this case.

9   **Q.** In other work that you've done with regard to arson

10   investigation, can a sofa, an ordinary house sofa, be regarded

11   as fuel?

12   **A.** Absolutely.

13   **Q.** Could you explain to the jury your experience and your

14   opinion with regard to how a sofa could be fuel?

15   **A.** We have started several fires, and there are in fact many

16   studies done with sofas in particular because they are a very

17   common piece of furniture and how readily they will ignite and

18   their burning characteristics.

19      If I put a flare in the sofa, I would produce the same

20   amount of energy, roughly speaking, as two or three gallons of

21   gasoline.

22      So the net heat release, the heat capacity, the amount of

23   energy I impart to that is roughly similar.

24   **Q.** The amount of heat -- were you finished?

25   **A.** Yes.

1  **Q.** The amount of heat produced by just, to use your example,

2  putting a flare on a sofa, how does that compare to a flare

3  igniting a bucket of gasoline, the amount of heat?

4  **A.** The total amount of energy is approximately the same.  The

5  release rate is much quicker for the gasoline.

6      So you have to think of it in terms of plotting a curve of

7  energy versus time.  If I ignite gasoline, my energy spikes

8  relatively quickly and then stabilizes and then falls

9  relatively quickly.

10     With the sofa, my temperature rises, my energy rises

11 slower, takes longer to burn before the fuel is all consumed.

12     The area under those two curves are approximately the same

13 area.  That tells me about the same amount of energy is

14 released, but the rate at which it is released is quite

15 different.

16 **Q.** Now, are you saying -- first of all, will the result of

17 setting a sofa on fire, how would you compare that to using

18 the devices that you worked with in this particular case?

19 **A.** As a fuel load, I could probably burn that building down

20 just as well using a sofa as my first ignited fuel as the

21 gasoline.

22 **Q.** In order to ignite it, you mentioned a flare.  How about

23 an ordinary cigarette?

24 **A.** That in fact is where most of the studies come from, that

25 several agencies have looked at over the years, because a lot

of people do smoke.  It's been found that you can bring your
average living room to a condition known as flashover, where
everything in the room lights on fire spontaneously in about
five to ten minutes once a sofa starts on fire from a
smoldering cigarette.  Based on those studies, there's a lot
of federal regulations about flame-retardant fabrics on
upholstery these days to help -- to prevent that from
happening.  But many studies have been done that shows you can
essentially bring a house down very quickly with nothing more
than a cigarette and sofa.

**Q.**  If a person were to use a cigarette, put it in the sofa
and then leave, would that indicate to you an intent to cause
an explosion?

**A.**  No.

**Q.**  Now, is there a difference -- did you find that there's a
difference between the device that was used in this case, at
the University of Washington, and what's called a Molotov
cocktail?

**A.**  Yes.

**Q.**  Could you tell the jury, what is a Molotov cocktail?

**A.**  Well, a Molotov cocktail is a breakable container, usually
a glass jar or bottle that contains gasoline, and in the neck
of the bottle you stuff a rag, shake it up a little bit so the
rag becomes saturated with that gasoline.  You can then simply
light the rag, which is now your wick, throw the bottle, and

1  when the bottle breaks, you spread that gasoline over a wide

2  area and you'll get a flash fire, and the fire from the wick

3  will spread across the surface area of your spilled gasoline

4  and start that whole area on fire.

5      It's a device intended to be thrown, as opposed to just

6  setting -- it won't in fact work if you just set it without

7  breaking the bottle.  You have to throw it so the bottle

8  breaks.

9  **Q.**  In your work for the government and in a private lab,

10  where you now work, have you become familiar with the federal

11  statutes relating to explosives, fire, weapons, bombs, things

12  of that nature?

13  **A.**  Only on an as-need basis.

14  **Q.**  I am sorry?

15  **A.**  Only on an as-need basis.  If somebody asks me a question,

16  I will study that part of the law.

17  **Q.**  Are you familiar with the parts of the federal code that

18  deal with the term "destructive device"?

19  **A.**  I am.

20  **Q.**  Do you understand that there are, within that, there's a

21  definition of explosive, incendiary, or poison gas?  Do you

22  understand that?

23  **A.**  I understand that.

24  **Q.**  Am I correct that what's listed in that statute is a bomb,

25  a grenade, a rocket having a propellant charge of more than

1　four ounces, a missile having an explosive or incendiary

2　charge of more than one-quarter ounce, a mine, and then the

3　catchall, incendiary device?  Are you familiar with that?

4　**A.**  Yes, I am.

5　　　　MR. BARTLETT:  Objection, Your Honor.  It misstates

6　what is in the code, and it misstates it in a very important

7　way.  I don't have --

8　　　　MR. BLOOM:  Excuse me.

9　　　　THE COURT:  Just a minute.  Is this an objection?

10　　　　MR. BARTLETT:  It is an objection.

11　　　　THE COURT:  As to?

12　　　　MR. BARTLETT:  It misstates exactly what he was

13　trying to read.  That isn't what's in the statute.

14　　　　THE COURT:  Let's do this.  It's close to the break

15　time.  I am going to give you your break now, and I will take

16　this matter up.

17　　　(Jury not present.)

18　　　　THE COURT:  All right, you may be seated.

19　　　Let me get the full thrust of your objection.

20　　　　MR. BARTLETT:  Your Honor, what he just asked is

21　simply, it is erroneous with regard to what the statute says.

22　　　What the statute says, is it sets forth three different

23　categories.  As plain as you can see, there is an explosive

24　bomb, an explosive grenade, an explosive rocket, and explosive

25　missile, an explosive mine, or an explosive device similar.

1    There's also an incendiary bomb, an incendiary grenade, an

2    incendiary rocket, an incendiary mine, or incendiary device

3    similar to any of the devices described in the preceding

4    clauses.  And there's also a poison gas.

5    So he's trying to imply that there's actually six

6    different categories.  There weren't.  There are 18 different

7    categories with regard to this statute.

8    That's always been a problem with Mr. Mann's testimony.

9    He doesn't understand that.  He's not an expert on this law,

10   and that's why his opinion is erroneous, because he doesn't

11   understand that there's a difference under federal statute

12   with regard to an explosive bomb, an incendiary bomb, and a

13   poison gas bomb.

14   What he just stated was, under the destructive device

15   there's only a bomb, grenade, rocket, missile, mine, or

16   incendiary device, and that's wrong, because that's six

17   categories.  There's actually 18 categories.

18            THE COURT:  All right.

19            MR. BARTLETT:  And that's what the Court's ruling

20   was, I could point out.

21            THE COURT:  Let me hear what you are getting at.

22   Then I want to know just how Mr. Mann understands it, as he

23   read the whole thing and having that in front of him.  You are

24   trying to get his opinion.

25            MR. BLOOM:  As Mr. Bartlett so eloquently explained,

1  that's about cross-examination.  If he's wrong, he can

2  cross-examine him.

3      In fact, Judge, we are going to abide by the court's

4  direction at all times.  We will do that.  There will not be

5  any testimony that the Court has forbidden.  If Mr. Mann is

6  incorrect about what he regards as the definition,

7  Mr. Bartlett is a great cross-examiner, he always brings out

8  really important stuff, and he will be able to do that with

9  this witness.

10        MR. BARTLETT:  Your Honor, an expert witness cannot

11  testify with regard to a basis that is in fact erroneous.

12  What he is saying is -- first of all, what he said out of the

13  blocks was, I really don't know this statute, I just kind of

14  looked at it for this case.

15      Second of all, he's going to give an opinion that in fact

16  isn't what the statute says and it isn't allowed.  Under 403

17  it is irrelevant and confusing testimony for the jury.

18      The Court should not allow a subterfuge to allow them to

19  get what clearly is not the law in front of them so I have to

20  clarify that on cross-examination.

21        THE COURT:  That's my ruling.  You've raised the

22  question whether he fully understands this.  He says he knows

23  somewhat about it.  So the question is this statute.

24      I guess you've read it?

25        THE WITNESS:  I did.

1          THE COURT:  Okay.

2          MR. BARTLETT:  But the question did not set forth

3    this statute.  What he says was that there were six categories

4    with regard to the statute.

5       And just as a question, that is erroneous.  There are 18

6    different categories.  If he wants to go through the 18

7    different categories and how this witness understand its,

8    first of all, it is irrelevant to the jury's consideration,

9    and he's not an expert on the statute.

10         THE COURT:  I understand that.

11      Mr. Bloom, I am going to require you to set forth the full

12   statute to him, and then we'll get the question and answer.

13         MR. BLOOM:  Of course.

14         THE COURT:  Then you can cross-examine on that issue.

15      Let's take the morning recess.

16         THE CLERK:  All rise, court is in recess.

17   (Morning recess.)

18   (Jury not present.)

19         THE COURT:  You may be seated.

20         MR. BLOOM:  If I may, I will clarify the question for

21   the witness where there was an objection.  I also have a

22   request.

23      The Court's ruling, I assume, also precludes the

24   prosecutor from asking questions, whether or not an incendiary

25   bomb, whether it must explode.  The question that the Court

1   has forbidden us from asking, I assume the government is also

2   forbidden?

3           MR. BARTLETT:  I am not asking this witness that.

4           THE COURT:  But I don't think that's what my ruling

5   was.  All you have to remember is my ruling, and that's it.

6           MR. BLOOM:  Let me just make sure in the record,

7   here's what your ruling says:  The defendant's proposed expert

8   (Mann) is precluded from testifying that to be an incendiary

9   bomb under the statute it must explode.

10      That's what I am precluded from asking, right?

11          THE COURT:  You read it.

12          MR. BLOOM:  Okay.

13          THE COURT:  I believe you said Mr. Mann had read it.

14  Everybody is aware of what my ruling is.  I have said to you,

15  don't violate it.  Okay.

16      So we are ready?

17          MR. BLOOM:  I am ready.

18          THE COURT:  Bring them in.

19      (Jury present.)

20          THE COURT:  You may be seated.

21      Mr. Bloom.

22  BY MR. BLOOM:

23  Q.  Mr. Mann, where we left off, I was talking about the

24  statute, which actually is 18 United States Code 921(a)(4).

25      Now, as you understand the statute, it defines destructive

1   device; is that correct?

2   **A.** That's correct.

3   **Q.** Does it define it, as you understand it, as an explosive,

4   incendiary, or poison gas; and then it's subdivided, bomb,

5   grenade, rocket having a propellant charge of more than four

6   ounces, missile having an explosive or incendiary charge of

7   more than a quarter ounce, mine, or similar device; is that

8   what you understand the statute to say?

9   **A.** Yes.

10   **Q.** In your opinion as an expert, to each of those, all of

11   those options, 18 options, six times three, do they all have

12   one thing in common?

13   **A.** I believe so.

14   **Q.** What is that?

15   **A.** That they all will explode.

16   **Q.** The device you studied in this case, is it a device that

17   was intended to explode?

18   **A.** It was not.

19   **Q.** How were the devices identified in the particular fire --

20   I am sorry, let me withdraw that.

21      Some of the materials you looked at were from ATF -- ATF

22   meaning Alcohol, Tobacco and Firearms, which is now amended to

23   Alcohol, Tobacco, Firearms, and Explosives, right, a

24   government agency.

25   **A.** It is still BATF, Bureau of Alcohol, Tobacco and Firearms.

1  **Q.** Did you read any of the documents wherein the people who

2  worked for that agency described the device that was used at

3  the University of Washington?

4  **A.** Yes, I did.

5  **Q.** How did they describe -- let me withdraw that.

6     Did they describe the device that was used at the

7  University of Washington arson, did they describe it as

8  incendiary bombs?

9  **A.** They did not.

10 **Q.** Could you give what you think of as the most accurate

11 description of the device that you studied that was used at

12 the University of Washington?

13 **A.** If I were to describe that in a report in my own words, I

14 would describe that as an incendiary field (gasoline) ignited

15 with a time delay device.

16 **Q.** Is it fair to say, if you can answer just yes or no, that

17 you have formed an opinion about the device that was used in

18 this case?

19 **A.** I have.

20 **Q.** Is it your opinion that the device that was used in this

21 case is a destructive device?

22 **A.** In terms of the fact that it is a homemade device and it

23 will cause destruction, it is a destructive device.

24 **Q.** Now, does that mean to you --

25         MR. BARTLETT:  Objection, Your Honor.  These are just

1  leading questions.  This is direct examination.

2  BY MR. BLOOM:

3  **Q.**  Could you, as a scientist, tell us, by that definition, is

4  a match a destructive device?

5  **A.**  I would consider a match an ignition device.  It may

6  ignite a destructive device.

7  **Q.**  If you put a cigarette in a sofa, is that a destructive

8  device on that definition?

9  **A.**  If I were to intentionally place a cigarette in a sofa

10  with the intent to burn down a house and it did so, I would

11  consider that a destructive device.

12  **Q.**  Again, just yes or no, please.  Do you have an opinion, as

13  a scientist, with your experience, studying this device,

14  studying the literature, studying the materials -- just yes or

15  no -- do you have an opinion about whether or not the device

16  that was used in this case at the University of Washington was

17  an incendiary bomb?  Just yes or no, do you have an opinion?

18  **A.**  Yes.

19  **Q.**  If called upon, could you give that opinion to the

20  Court -- I mean to the jury?

21  **A.**  No.

22  **Q.**  Well, if you were allowed, could you give that opinion to

23  the jury?  Would you be able to express it?

24  **A.**  I am unable to.

25  **Q.**  If you were able to?

1    MR. BARTLETT:  Objection, Your Honor.

2    THE COURT:  He can answer.

3  BY MR. BLOOM:

4  Q.  The reason you are not able to --

5    MR. BARTLETT:  Objection, Your Honor.

6    THE COURT:  Sustained.  Move on.

7  BY MR. BLOOM:

8  Q.  Who is Thomas Keller?

9  A.  He's -- Mr. Keller is a rather high profile arsonist who

10  set many fires about a decade ago in Seattle.

11  Q.  And what was his mechanism?

12  A.  His favorite mechanism for starting fires was a Bic

13  lighter and any available combustible he found at the site.

14    MR. BARTLETT:  Objection.  This goes beyond what was

15  provided as to this expert's opinion and testimony.

16    THE COURT:  Any more questions along this line?

17    MR. BLOOM:  No.

18  BY MR. BLOOM:

19  Q.  The device you studied with regard to the University of

20  Washington fire, in your opinion is there a difference between

21  that device and a Molotov cocktail?

22  A.  Yes.

23  Q.  Could you explain to the jury what that is, what the

24  differences are?

25  A.  A Molotov cocktail is designed to rapidly spread the fire

by spreading the fuel when the container breaks on impact.
The device in question here is designed to be very localized
and generate a prolonged combustion time.

Q. I do want to ask you another subject. You are familiar
with work, you said, involving the integrity -- let me
withdraw that. Damage to sheet metal.

MR. BARTLETT: Objection, Your Honor, there was no --
this expert's testimony was not given with regard to this
issue. The government objects.

THE COURT: Was there a report or anything given on
this?

MR. BLOOM: No, apparently not.

THE COURT: All right.

MR. BLOOM: All right. Then I have no further
questions. They may have some questions for you, Mr. Mann.
Thank you.

MR. BARTLETT: I have no questions, Your Honor.

THE COURT: All right. He can be excused?

MR. BARTLETT: Yes.

MR. BLOOM: Yes.

THE WITNESS: Thank you, Your Honor.

MR. BLOOM: Yes, I would like to call Briana Waters.

THE COURT: Ms. Waters, I will have you come forward
and be sworn also.

BRIANA WATERS, called to testify, duly sworn.

1    THE COURT:   Come forward and take the witness chair.

2                    DIRECT EXAMINATION

3    BY MR. BLOOM:

4    **Q.**  Could you state your name for the record, please; spell it

5    for the jury?

6    **A.**  Briana, B-R-I-A-N-A, Waters, W-A-T-E-R-S.

7    **Q.**  How old are you?

8    **A.**  Thirty-two.

9    **Q.**  Are you married?

10   **A.**  No.

11   **Q.**  Do you have a partner?

12   **A.**  Yes.

13   **Q.**  Is he here in court?

14   **A.**  He is.

15   **Q.**  What is his name?

16   **A.**  His name is John Landgraf.

17   **Q.**  How long have you been with John?

18   **A.**  Four-and-a-half years.

19   **Q.**  Where do you live?

20   **A.**  I live at Oakland, California.

21   **Q.**  Do you and John have a daughter?

22   **A.**  We do.

23   **Q.**  What is her name?

24   **A.**  Her name is Calliope.

25   **Q.**  Where were you born?

1   **A.**   I was born outside of Philadelphia, Pennsylvania.

2   **Q.**   What's the name of the town?

3   **A.**   It's a town called Lansdale. It's a small town.

4   **Q.**   With whom did you grow up in your family?

5   **A.**   I grew up with my mom and dad and my younger brother.

6   **Q.**   Could you use the microphone?

7   **A.**   Yes, sorry.

8   **Q.**   What is your younger brother's name?

9   **A.**   His name is Eric.

10   **Q.**   Do you have another brother?

11   **A.**   Yes. I have an older half brother who I didn't actually

12 meet until later.

13   **Q.**   His name?

14   **A.**   His name is Phillip.

15   **Q.**   Are your mother and father together?

16   **A.**   No, they are divorced.

17   **Q.**   Is either one of them here in court today?

18   **A.**   My mom is here.

19   **Q.**   Is her name Marilyn?

20   **A.**   Yes.

21   **Q.**   Where did you go to high school?

22   **A.**   The high school is called North Penn.

23   **Q.**   I am sorry?

24   **A.**   North Penn High School in Lansdale.

25   **Q.**   Did you finish high school?

1   **A.**   Yes.

2   **Q.**   After you finished high school -- did there come a time

3   while you were in high school that you got involved in music

4   in some way, or was it before then?

5   **A.**   I started to play the violin when I was like five or six.

6   **Q.**   And do you play the violin now?

7   **A.**   I do.

8   **Q.**   After you finished high school, what did you do?

9   **A.**   I went to college at the University of Dayton, in Ohio,

10   and I studied photography.

11   **Q.**   How long did you stay there?

12   **A.**   I was there for two years.

13   **Q.**   After that, what did you do?

14   **A.**   Well, I took a little bit of time off, because the college

15   that I was going to was really expensive and I didn't want to

16   graduate with hundreds of thousands of dollars in loans, so I

17   decided I was going to look for a school that I liked but was

18   also more affordable.  So I took a trip all over the country

19   and came to the West Coast and looked at some schools here on

20   the West Coast.

21   **Q.**   Did there come a time when you found yourself in Olympia,

22   Washington?

23   **A.**   Yes.

24   **Q.**   Did you find any schools there that interested you?

25   **A.**   Yes.  I found the Evergreen State College.

1 **Q.** Did you make arrangements to transfer to Evergreen?

2 **A.** Yes, I did that.

3 **Q.** Do you remember what year that was?

4 **A.** I came in the winter quarter of 1997.

5 **Q.** Did you have in mind any particular studies?

6 **A.** Yes. I was still interested in pursuing photography and

7 also video media studies, video images.

8 **Q.** Have you ever testified before today?

9 **A.** No, I haven't.

10 **Q.** Are you nervous?

11 **A.** A little bit.

12 **Q.** Did you say the end of 1997 is when you began at

13 Evergreen?

14 **A.** I think so, yeah.

15 **Q.** Did you make any friends at Evergreen?

16 **A.** Yes.

17 **Q.** Did you get involved with activities at the school?

18 **A.** Yes.

19 **Q.** What kinds of activities?

20 **A.** Well, I was involved with a couple different student

21 groups, the Evergreen Animal Rights Network and the

22 Environmental Resource Center on campus. I was also involved

23 with music there as well.

24 **Q.** I take it from the two groups that you associated with

25 that you had some interest in the environment?

1  **A.**  Yes, I did.

2  **Q.**  What was and is your interest in the environment?

3  **A.**  Just what I would hope everyone's interest would be, which

4  is taking care of it so we can all be healthy and live on the

5  planet in a healthy and sustainable way.

6  **Q.**  Did there come a time when you met a fellow named Justin

7  Solondz?

8  **A.**  Yes.

9  **Q.**  Do you remember what year that was?

10  **A.**  I believe it was in the beginning of 1999.

11  **Q.**  And before that, did you have a boyfriend?  While you were

12  at Evergreen.

13  **A.**  Yes, I did.

14  **Q.**  Did there come a time when that relationship ended?

15  **A.**  Yes.

16  **Q.**  When you met Justin, did you begin a romantic relationship

17  with him?

18  **A.**  A few months after I met him.

19  **Q.**  Was he a student at Evergreen?

20  **A.**  He was.

21  **Q.**  About how many students all together, your guess, in the

22  hundreds, thousands, at Evergreen?

23  **A.**  I think a couple thousand maybe.

24  **Q.**  Now, did there come a time when you were at Evergreen --

25  you've seen the two witnesses testify here in this court with

1   regard to your work on the video "Watch."

2   **A.**   Yes.

3   **Q.**   Ms. Meeker and Ms. Lin; is that correct?

4   **A.**   They were my faculty when I was starting the project.

5   **Q.**   Tell us about how you got involved in that project?

6   **A.**   I believe it was the spring of 1999, the Environmental

7   Resource Center, the people that were working in that group

8   were also the same people that were involved in starting that

9   campaign at Watch Mountain. I just heard about it through

10   them, and I went to meetings and started to get interested in

11   becoming a part of it.

12      It started out, there wasn't any tree sit or anything when

13   it first started. It started talking to the people in the

14   town and doing the research, because there was a long history

15   of land exchanges. So I learned all I could about it and

16   started the documentary project on it.

17   **Q.**   Were those two things separate things, first you got

18   involved in the events and then you decided to make a video,

19   documentary or -- let me withdraw that.

20      At the beginning, was it your intent to make a

21   documentary?

22   **A.**   I don't know. My focus in school was media studies, so I

23   don't know if I could separate the two. It's who I am. I

24   document things, you know. I take thousands of pictures of my

25   daughter all the time. It's just who I am. So whatever I was

1  involved with, I think, I was also involved with documenting

2  those things because that was my focus and that's my

3  personality to do that.

4  **Q.** Did you discuss with your faculty people, Ms. Meeker and

5  Ms. Lin, that you wanted to turn the Watch Mountain campaign

6  into a use it and document it?

7  **A.** Yes.

8  **Q.** And did you get, essentially, permission to do that,

9  approval to do that?

10  **A.** Yes, I did.

11  **Q.** Can you tell the jury about when that was?

12  **A.** It was in the summer of 1999.

13  **Q.** How did you go about getting involved in that as a

14  documentarian?

15  **A.** Just started slowly just talking to people, interviewing

16  people. Just being at anything, being at any events I could.

17  There were many groups involved, actually, in this campaign.

18  It was not just our group in Olympia. There was also the

19  Gifford Pinchot Task Force and the Pacific Crest project and

20  the Western Land Exchange Project.

21  There were a lot of people who had been working on this

22  for a while. So I started talking to people and interviewing

23  them and talking with people in Randle and getting to know

24  them.

25  **Q.** Plum Creek, could you tell the jury about Plum Creek?

**A.** Plum Creek is a timber company who I think we heard about from Jim Dawson. He was talking about how -- or maybe Lavern Troxel was actually talking about their policies are basically to clear-cut, they don't really have sustainable logging practices, and that's what they wanted to do with Watch Mountain.

I actually remember clearly going on a hike with an employee from Plum Creek, and unfortunately, my videocamera, it was really foggy and wet and it stopped working, so I didn't get this on film, but I actually was there wanting to film him saying this mountain here is designed to be clear-cut. That's what he said.

**Q.** And was that troubling to you?

**A.** It was, yes.

**Q.** Can you estimate how many hours of footage that you produced in documenting this campaign?

**A.** Seems like thousands, but it was probably maybe 50 to 75 hours. It was a lot. Maybe even more. Maybe even 100. It took me a long time to finish the project, much longer than I had planned. All of that time was mostly spent going through the footage and logging it and deciding which clips to use, because I took a lot of footage.

**Q.** Did there come a time when you finished college?

**A.** Yes. I graduated in the winter, December of 1999.

**Q.** Did the work on the project continue or stop?

1    **A.**   It continued.

2    **Q.**   The documentation?

3    **A.**   Yes.

4    **Q.**   Did you continue working -- I think Ms. Lin testified that

5    you continued working with her even after you graduated; is

6    that correct?

7    **A.**   Yes, I kept in touch with her.

8    **Q.**   You've heard testimony here from Lacey Phillabaum, from

9    Jennifer Kolar, that you were involved in the arson that they

10   committed at the University of Washington in May of 2001.

11   Have you heard that testimony?

12   **A.**   Yes, I have.

13   **Q.**   Were you in any way involved in that arson?

14   **A.**   Absolutely not.

15   **Q.**   Did there come a time, almost exactly two years ago, when

16   you saw Agent Halla?

17   **A.**   Yes, it was almost exactly two years ago.

18   **Q.**   And what date, do you remember the date?

19   **A.**   It was February 24th, 2006.

20   **Q.**   And is that a date that you remember and will remember for

21   a long time?

22   **A.**   Yes.   Probably.

23   **Q.**   Where did you meet Agent Halla?

24   **A.**   At my home where I was living, in Berkeley, at the time.

25   **Q.**   What street was that?

1  **A.**  Summer Street.

2  **Q.**  And was Mr. Halla alone?  Agent Halla, excuse me, was he

3  alone?

4  **A.**  No.  He was with another agent, but I forget who that was.

5  **Q.**  It wasn't Agent Torres; is that correct?

6  **A.**  I don't think so.

7  **Q.**  Was Agent Halla polite to you?

8  **A.**  Yes.

9  **Q.**  Did he yell at you?

10  **A.**  No.

11  **Q.**  Did he give you some information?

12  **A.**  Yes, he did.

13  **Q.**  Did he indicate to you that -- well, tell us what he

14  indicated to you?

15  **A.**  He indicated that he thought that I was involved in the

16  arson at the University of Washington, and he gave -- he asked

17  me some questions.  He asked me some questions about if I knew

18  where Justin was.  I can't remember what else right now.

19  **Q.**  Did he give you the name Andrew Friedman?

20  **A.**  Yes, he advised me to speak with Andrew Friedman about

21  getting a lawyer, I think, because I told him that I

22  wouldn't -- I would have to get a public defender.  So he gave

23  me Andrew Friedman's number.

24  **Q.**  And did he give you any other names and numbers of public

25  defenders or anything like that?

1  **A.**  No.  He said Andrew Friedman was the one that could

2  connect me with a public defender.

3  **Q.**  Did there come a time that day that you called

4  Mr. Friedman?

5  **A.**  Yes, I did.

6  **Q.**  Did he gave you a name and a phone number?

7  **A.**  Yes.

8  **Q.**  Of the federal defender?

9  **A.**  Yes.

10  **Q.**  Do you remember the name?

11  **A.**  It was Peter Avenia.

12  **Q.**  Just for the record, is that A-V-E-N-I-A, if you know?

13  **A.**  Yes, I think so.

14  **Q.**  Do you remember if you called him on that day?

15  **A.**  I did.

16  **Q.**  Just yes or no, did you have a conversation with him?

17  **A.**  Yes.

18  **Q.**  Did there come a time when you learned more details about

19  what it was they wanted to talk to you about?  When I say

20  they, the FBI wanted to talk to you about?

21  **A.**  Yes.

22  **Q.**  Did you eventually learn an approximate date, May 20, May

23  21, 2001?

24  **A.**  Yes.

25  **Q.**  Once you heard that date, or at any point, is it correct

1 to say that that was about four-and-a-half years after the

2 incident?

3 **A.** Yes.

4 **Q.** Did you put your mind to thinking back what you were doing

5 and where you had been?

6 **A.** Yes.

7 **Q.** On the date of the alleged crime?

8 **A.** Yes, I did.

9 **Q.** Did you have any kind of diary?

10 **A.** No.  Unlike some of the people who have testified here, I

11 have moved many times and I haven't kept any calendars or

12 diaries from that time at all.

13 **Q.** And you did not commit the crime; is that correct?

14 **A.** That's correct.

15 **Q.** To you, did you try to think of reference points to help

16 you remember where you might have been on May 20 and 21st?

17 **A.** Yes, I thought about it, yes.

18 **Q.** And what reference point or points did you come up with to

19 help you remember?

20 **A.** I didn't come up with any.  I knew that I had finished the

21 video right around that time.  That was a very major event in

22 my life, completing that project.

23     I knew that I had shown it at Evergreen in April 2001, but

24 that was the only major event around the time that I can think

25 of.

1  Q. So is it fair to say, unlike Jennifer Kolar and Lacey

2  Phillabaum who knew exactly where they were on May 20 and 21,

3  you didn't have that to which you could refer?

4      MR. BARTLETT:  Objection.  This is argumentative and

5  this is direct examination.

6      THE COURT:  Just ask her the question.  She said

7  that's the only thing she can call on, I think.

8  BY MR. BLOOM:

9  Q. Were you able to think back, well, May 20 and 21, that's

10 the day I committed the crime, so I can -- that's how I can

11 refer it?

12     MR. BARTLETT:  Objection, Your Honor.  This is direct

13 examination.

14     THE COURT:  Let her speak.

15 BY MR. BLOOM:

16 Q. Did you have that advantage, that you had committed the

17 crime and therefore you could use that as a reference point?

18 A. No, I did not.

19 Q. I think you said that there was a screening of your video

20 in April of 2001, am I correct?

21 A. Yes, that's correct.

22 Q. At what location was that?

23 A. It was at the Evergreen State College.

24 Q. Were there other screenings of your video that followed

25 that?

1  **A.**  Yes.

2  **Q.**  And do you have any specific recollection of any of them?

3  **A.**  Yes, it was also shown at the Capitol Theater in downtown

4  Olympia, and it was shown in Seattle, I think, a couple times.

5  I know that it was shown all over the country from different

6  groups, you know, that sent me requests for the video, because

7  they wanted to show it at their conference or their event, at

8  their college.  And I also showed it in San Francisco.

9  **Q.**  Do you remember any dates or any years or any months when

10  it was shown?

11  **A.**  Yes.  The San Francisco showing was in October, the

12  beginning of October of 2001, and the Capitol showing in

13  Olympia was the end of May 2001.  And then I showed in Seattle

14  at the Media Arts Center there, I believe, over the summer of

15  2001.

16  **Q.**  Now, there's been discussion of a number of arsons in this

17  courtroom during this trial.  Did you commit any arson, ever,

18  in your entire life, anywhere, any time, any city, any date,

19  with any person?

20  **A.**  No, I did not.  I never have.

21  **Q.**  Did you conspire with anybody, any person, anywhere, any

22  time, anywhere in the world, any date, with anybody to commit

23  any arsons?

24  **A.**  No.

25  **Q.**  Do you think now, have you ever thought, it's okay to burn

1  down buildings?

2  **A.**  No, I don't think it's okay at all.  And I never thought

3  it was.

4  **Q.**  Now, the prosecution has offered in evidence and has

5  testimony from Tiffany Tudder that ten years ago a person was

6  invited to campus and he spoke on campus.  Do you remember

7  that testimony?

8  **A.**  Yes, I do.

9  **Q.**  Were you involved in -- I think you said one of the

10  organizations you were involved in was EARN.  Is that

11  Evergreen Animal Rights Network?

12  **A.**  That's correct.

13  **Q.**  Can you describe that organization to the jury, please?

14  **A.**  Yes.  It was a campus organization whose -- I don't have

15  the vision statement to read, but when I was there, we mostly

16  promoted vegetarianism and veganism, and we held vegan

17  potlucks, and we brought people, different speakers to talk

18  about factory farming and the effects of that on animals and

19  on people and the planet.  We had bake sales to raise money.

20  We had a lot of materials to educate people about animal

21  rights in general.

22  **Q.**  Was this an underground, clandestine, sinister

23  organization?

24  **A.**  No, it was quite the opposite.

25  **Q.**  Did the organization at some point invite a person named

1  Craig Rosebraugh to speak at Evergreen?

2  **A.**  Yes.

3  **Q.**  Do you remember being part of the discussion as to

4  inviting him?

5  **A.**  I remember that we wanted to bring him to talk about

6  dissection and vivisection because there was a pretty big

7  debate going on on campus.  There were some students that did

8  not want to dissect, and it was mandatory for their course to

9  do so, and they would basically fail if they didn't dissect.

10  So we were working on those issues, trying to facilitate

11  communication with the students and faculty and the

12  administration.

13  So that was a hot topic right at that point, and I

14  remember wanting to invite him to talk about that because he

15  was someone that knew about it.

16  **Q.**  He was thought of as a controversial figure?

17  **A.**  Yes, I think he was.

18  **Q.**  Did that have anything to do with him being the official

19  or unofficial spokesperson of the Earth Liberation Front?

20  **A.**  Yes, I think it did.  I don't really remember us talking

21  about wanting to bring him here because of that, because we

22  were really focussed on animal rights, the dissection and

23  vivisection issues.

24  **Q.**  Was there a day he actually did come to speak?

25  **A.**  Yes.

1 **Q.** And what were you doing when he spoke and as he spoke, you

2 personally?

3 **A.** Well, I remember just being in the library and being in

4 charge of the table materials, setting up those, and the bake

5 sale and, you know, kind of giving people information and

6 talking to people. I don't remember actually being able to

7 attend very much of his lecture because I was kind of manning

8 the table in the front of the library building.

9 **Q.** Did there come a time after he spoke that you remember

10 being in a cluster of people where a person who said he was

11 with the newspaper spoke to you?

12 **A.** I have a vague recollection of that.

13 **Q.** Are we talking about, apparently talking about ten years

14 ago?

15 **A.** Yes, ten years ago.

16 **Q.** And you heard Tiffany Tudder testify to her recollection?

17 **A.** Uh-huh, yes.

18 **Q.** Do you remember the reporter, do you remember the

19 reporter's name?

20 **A.** No.

21 **Q.** Do you remember the reporter asking questions of the group

22 of people that was in front of him?

23 **A.** Yes.

24 **Q.** You've heard testimony, you've seen printed out to the

25 effect that you believe in arson or you support arson and mink

1  release, a question something like that?

2  **A.**  Yes, I think so.

3  **Q.**  Do you remember what the actual question was?

4  **A.**  No, I don't.

5  **Q.**  You've seen in print what supposedly your answer was?

6  **A.**  Yes.

7  **Q.**  And the answer is yes, more or less, if nobody gets hurt,

8  more or less, is that right?

9  **A.**  That's what the answer in print was.

10  **Q.**  Do you remember the question or questions and the answer

11  or answers?

12  **A.**  I don't.  I remember that there were a lot of people

13  around.  And it was -- I was having a busy day, but I don't

14  remember exactly what he was asking.

15  **Q.**  Do you deny that those words are accurate?

16  **A.**  No, I am not denying it.  I'm just saying I don't

17  remember.

18  **Q.**  As you stood there then, did you believe that arson was a

19  good idea, that you supported arson?

20  **A.**  No.

21  **Q.**  Do you believe it now?

22  **A.**  No, I don't.

23  **Q.**  Have you ever believed it?

24  **A.**  No.

25  **Q.**  Did there come a time when you met a woman named Lacey

1  Phillabaum?

2  **A.**  Yes.

3  **Q.**  And we've heard Sarah Wald testify yesterday with regard

4  to an event that happened in the Portland area in 2001.

5  **A.**  That's correct.

6  **Q.**  Do you remember -- let me withdraw that for the moment.

7     Do you remember where you first met Lacey Phillabaum?

8  **A.**  Yes, I believe it was at that event in Portland.

9  **Q.**  What makes you recall it was at that event?

10 **A.**  Because it's just the first time I remember actually being

11 introduced, and it was a two-day event so I spent some time

12 with her there.  It's possible I may have seen her somewhere

13 else, but that's the first time I actually met her and spent

14 time with her.

15 **Q.**  About how many people would you say were at that meeting?

16 **A.**  My memory is 20, 25 people.

17 **Q.**  What was the meeting about?

18 **A.**  It was about just strategies, or kind of like a spokes

19 council, I guess, where different people from different

20 organizations came and we all discussed kind of, you know,

21 what's going on now and, you know, where we can go from here.

22 **Q.**  Was it in the Portland area?

23 **A.**  Yes.

24 **Q.**  And what kind of setting was it?  Was it a motel, was it a

25 house, was it something else?

1   **A.**  I remember it was a barn.

2   **Q.**  Can you tell the jury, how many days? Was it one day or

3  more than one day?

4   **A.**  It was two days.

5   **Q.**  Was it a weekend or weekday?

6   **A.**  Yes, it was a weekend.

7   **Q.**  Did Lacey Phillabaum have a particular role in that

8  meeting, if you remember?

9   **A.**  Yes, she was one of the facilitators of meeting.

10   **Q.**  What does that mean, a facilitator?

11   **A.**  It just means a person who is making sure that things are

12  running smoothly and kind of calling on people when they want

13  to speak and things like that.

14   **Q.**  Do you remember, first of all, was there ever what you

15  call a breakout session, where you divided into smaller

16  groups?

17   **A.**  Yes.

18   **Q.**  Do you remember, did you participate in that, were you in

19  one of those groups?

20   **A.**  Yes, I was.

21   **Q.**  Do you remember whether Lacey Phillabaum was in that group

22  or another group?

23   **A.**  I believe she was in the same group as me.

24   **Q.**  About how many people of the 20 or 25 were in that group?

25   **A.**  I think maybe ten or twelve.

1  **Q.**   Okay.  Did you have interaction with her?

2  **A.**   Yes.

3  **Q.**   Did you have interaction with her that entire weekend?

4  **A.**   Yes, I did.

5  **Q.**   Any question in your mind about that?

6  **A.**   No.

7  **Q.**   Was Justin Solondz your boyfriend at the time?

8  **A.**   Yes.

9  **Q.**   Was he at that meeting?

10  **A.**   Yes, I believe he was.

11  **Q.**   Did you observe anything that took place between Lacey

12  Phillabaum and Justin Solondz?

13  **A.**   Yes.

14  **Q.**   You are smiling.  Could you tell the jury what you are

15  thinking, what is your recollection of what you saw?

16  **A.**   I remember them flirting.

17  **Q.**   Had that been a problem with you and Justin in the past?

18  **A.**   Yes.

19  **Q.**   Did it continue to be a problem?

20  **A.**   It did.

21  **Q.**   Did there come a time that evening, I assume Saturday day,

22  Saturday evening, Sunday day; is that correct?

23  **A.**   Yes, I think so.

24  **Q.**   That Saturday evening, was there an event?

25  **A.**   An event -- I think just people hanging out.

1   **Q.**  Did you have your fiddle with you?

2   **A.**  Yes.

3   **Q.**  Did you play it?

4   **A.**  Yes, I played it.

5   **Q.**  Were there other musicians as well?

6   **A.**  Yeah, I think there were a couple other musicians, but I

7   was just, you know, playing the Irish tunes.

8   **Q.**  Now, is there something that's known as ELAW?

9   **A.**  Yes, that's the environmental law conference.

10  **Q.**  Is that something that's publicly sponsored?

11  **A.**  Yes.

12  **Q.**  Is it an annual event or is it haphazard?  How does that

13  work?

14  **A.**  Yes, it's every year.  I don't know when it started.  It's

15  been going on for a while, I think.

16  **Q.**  Is it always held in the same place?

17  **A.**  Yes.

18  **Q.**  Where would that be?

19  **A.**  In Eugene, Oregon.

20  **Q.**  Did you attend the one that took place in the year 2001?

21  **A.**  I did.

22  **Q.**  Do you remember what month that had been?

23  **A.**  I believe in the beginning of March.

24  **Q.**  So perhaps a month after the first time you met Lacey

25  Phillabaum?

1  **A.**  Yes.

2  **Q.**  About how many people would you say were at the ELAW

3  event, ELAW conference in March of 2001?

4  **A.**  A couple hundred.

5  **Q.**  Do you remember seeing Lacey Phillabaum there?

6  **A.**  Yes, I do.

7  **Q.**  Lacey Phillabaum has testified here that she first met you

8  on May 12 or 13 of 2001 at a Denny's restaurant in Olympia,

9  Washington.  Did you hear that testimony?

10  **A.**  Yes, I did.

11  **Q.**  First of all, did you meet her at all at a Denny's

12  restaurant in the year 2001 or any other time?

13  **A.**  No.

14  **Q.**  And as to whether or not her claim that that's the first

15  time she met you, could that be true?

16  **A.**  No.  I definitely did not.  I met her at that meeting.

17  That's where I remember meeting her.

18  **Q.**  She's also testified about a meeting at Evergreen College.

19  Did you hear that testimony?

20  **A.**  Yes.

21  **Q.**  And she testified about a soundproof room.  Do you

22  remember any such meeting with her?

23  **A.**  No, I don't.

24  **Q.**  Are there soundproof rooms at Evergreen College?

25  **A.**  Not that I remember.  I never was in one.

1    Q.   When did you graduate?

2    A.   In the winter of 1999.

3    Q.   So by 2001, you were no longer a student there; is that

4    correct?

5    A.   That's correct.

6    Q.   And you heard testimony from Laurie Meeker yesterday?

7             MR. BARTLETT:   Objection, Your Honor, leading.   This

8    is direct examination.   It goes to argument.

9             THE COURT:   Question.

10            MR. BLOOM:   The question was interrupted.   May I ask

11   the question?

12        Thank you.

13   BY MR. BLOOM:

14   Q.   You heard Laurie Meeker testifying that in order to get --

15   let me withdraw that.

16        Do you know one way or another, in order to get a room

17   reserved, could you do it if you were not a student?

18   A.   No, you had to be a student and have valid student ID.

19   Q.   Did you arrange -- you heard testimony that you supposedly

20   arranged for a room.

21   A.   Yes.

22   Q.   Is that true?

23   A.   No, it's not.

24   Q.   If you had arranged for a room, you understand that there

25   would be a public record if you arranged for a room?

1  A.  Yeah, there probably would be a record from Evergreen, you

2  know, that I checked out some room or something.

3  Q.  It's a State University?

4  A.  Yes.

5  Q.  Now, did there come a time when Justin Solondz, your

6  boyfriend, told you something about himself and Lacey?  In

7  2001.

8  A.  Yes, he admitted to me that they had an affair.

9  Q.  Do you remember approximately when that was?

10  A.  I don't remember exactly.  I know that it was after the

11  video was finished.

12  Q.  When was the video finished?

13  A.  At the end of April 2001.

14  Q.  Do you remember what it was he said to you?  And don't, if

15  you don't want to be explicit, you don't have to be.  In

16  general, what did he say to you?

17  A.  He told me that they had sexual relations.

18  Q.  How did you feel when you heard that?

19  A.  I was very angry.

20  Q.  With whom were you angry?

21  A.  At both of them.

22  Q.  Did it affect your relationship with Justin?

23  A.  Yes, it did.

24  Q.  In what way did it affect your relationship?

25  A.  We actually broke up for a little wile because of it.  I

1  just told him that I just didn't want to be around him for a

2  while.

3  **Q.**  Did there come a time after that, after he gave you that

4  information, and you saw Lacey Phillabaum again.

5  **A.**  Yes.  I saw her --

6  **Q.**  Let me go back because I left out an important piece here.

7      After you finished the video, or at the time you were

8  working on the video, where were you living?  In 2001.

9  **A.**  Well, I was living at the house on Percival Street.

10  **Q.**  Is that in Olympia?

11  **A.**  Yes.

12  **Q.**  Did there come a time when you moved out of that house?

13  **A.**  Yes, I did.

14  **Q.**  Did you know a person named Ocean?

15  **A.**  Yes.

16  **Q.**  Do you know a person named Ocean?

17  **A.**  Yes.

18  **Q.**  Is that actually his name, that he actually changed it to,

19  his official name?

20  **A.**  Yes.

21  **Q.**  What was your relationship with Ocean?

22  **A.**  He was my friend.  He is my friend.

23  **Q.**  Did there come a time when some traumatic event occurred

24  with Ocean?

25  **A.**  Yes, he was in a car accident.

1  **Q.**  Was that in 2000 sometime?

2  **A.**  Yes.

3  **Q.**  Did there come a time when he bought a house in Olympia?

4  **A.**  Yes, he used the money that he got from the insurance

5  settlement --

6  **Q.**  Could you say it a little louder?

7  **A.**  He used the money he got from the insurance settlement to

8  buy the house.

9  **Q.**  What street was that on?

10  **A.**  On Conger Avenue.

11  **Q.**  Is that the house about which there's been so much

12  testimony?

13  **A.**  It is.

14  **Q.**  Did there come a time when you moved into that complex?

15  **A.**  Yes.

16  **Q.**  What part -- is it true that there's a main house and a

17  rear structure?

18  **A.**  Yes.

19  **Q.**  And where did you live?

20  **A.**  I lived in the back structure.

21  **Q.**  Would you describe it to the jury?

22       First of all, how many rooms was it?

23  **A.**  Just one big room, a garage.

24  **Q.**  How did you furnish it?

25  **A.**  I had a bed and a couch and some, you know, bookshelves

1    with my things on it.

2    **Q.** Was there running water in the garage area?

3    **A.** No.

4    **Q.** What did you do for water?

5    **A.** In the main house, if you walked through the backyard and

6    then went into the back door, there was a bathroom right

7    there, and I used the bathroom for water and showers and

8    stuff.

9    **Q.** At the time you lived in the garage area, was something

10   happening with regard to the front house?

11   **A.** It was under construction at that time.

12   **Q.** What do you mean by under construction?

13   **A.** Well, they had to do a lot of construction to make the

14   house accessible for Ocean, so they were doing tons of stuff,

15   making a wheelchair ramp and widening doorways.  Making --

16   they were making a whole new bathroom for him.  Big shower, so

17   that a wheelchair could go into it.  Lowering the counters in

18   the kitchen as well, or taking out -- I think they took out a

19   whole entire counter because a wheelchair couldn't go around.

20   They were just doing a lot of things.

21   **Q.** When you say they, about how many people were doing this

22   work?

23   **A.** I think there were a lot of people, over the period of

24   time that I was there, that were working on it.  I don't know,

25   maybe six or seven different people.

**Q.** Over the period of time, what period of time would that have been?

**A.** Well, I think I moved there the very end of April of 2001. And then I was there through, I believe, the fall of 2001, sometime, September or October.

**Q.** Did there come a time when Ocean moved into that main house?

**A.** Yes, he did. Over the summer, I think it was July.

**Q.** Of 2001?

**A.** Yes.

**Q.** Did you ever live in the main house?

**A.** No, I never lived there. It was under construction, so you couldn't really live in it at that time.

**Q.** What was the purpose of your living there at all?

**A.** Well, they wanted someone to be on the property and help water the garden and just be there. There weren't -- inhabited space, and so they just wanted somebody to be around.

I'd also had a conversation with either Heather or Ocean about wanting to leave the house I was in because there was a lot of people there and it was just getting to be too much for me.

**Q.** It was good for Ocean and good for you?

**A.** Good for everybody, yeah.

**Q.** Did Heather also visit?

1  **A.** Yes, she was there all the time.

2  **Q.** The people who were doing the construction and Heather,

3  did they announce when they were going to be there?

4  **A.** No, they were just doing their thing.

5  **Q.** So if somebody were doing something clandestine or

6  criminal, somebody might walk in on them?

7  **A.** Yeah. Yes.

8  **Q.** Now, did there come a time -- I think this is where I left

9  off -- that you saw Lacey Phillabaum again after the ELAW

10  conference?

11  **A.** Yes.

12  **Q.** Was there anything in between -- when was that,

13  approximately? What time of year was it that you next saw

14  her?

15  **A.** It was the summertime.

16  **Q.** Where was that?

17  **A.** It was at Ocean's house. There was a party there.

18  **Q.** I am sorry?

19  **A.** There was a party at Ocean's house.

20  **Q.** Did you see her any time in between the ELAW conference in

21  March and the party in the summertime at Ocean's house?

22  **A.** No, I don't think so.

23  **Q.** By the time you saw her at the party, you had been given

24  information by Justin about his having had an affair with her;

25  is that correct?

1  **A.**  That's correct.

2  **Q.**  So this summertime at the party was the first time that

3  you had the opportunity to speak with her; is that correct?

4  **A.**  Yes.

5  **Q.**  You could have called her, I suppose, right?

6  **A.**  Well, she wasn't someone that I could talk to.  I didn't

7  have her phone number or anything.  I probably could have

8  gotten her number from somebody, but I didn't.

9  **Q.**  Did something happen -- the party, was it a daytime party

10  or nighttime party?

11  **A.**  It was during the day.

12  **Q.**  Did you actually see her?

13  **A.**  Uh-huh, yes, I did.

14  **Q.**  Did you recognize who she was?

15  **A.**  Yes.

16  **Q.**  Did you know at that time, or believe at that time that

17  she had had a sexual affair with the person who had been your

18  boyfriend?

19  **A.**  Yes.  Justin told me that, and I would have no reason to

20  disbelieve him.

21  **Q.**  When you saw her at the party at Ocean's house, how did

22  you feel about her?

23  **A.**  I was very angry.  I really didn't want her to be at my

24  place of residence.

25  **Q.**  Did something happen between the two of you?

1    **A.** Yeah, I asked her to take a walk with me, because I didn't

2    want to confront her with other people around.

3    **Q.** Why didn't you want to do that?

4    **A.** I just didn't want to make a scene. It was embarrassing

5    enough already. So I asked her to take a walk so I could talk

6    to her about it.

7    **Q.** Did you and she take a walk?

8    **A.** Yes, we did.

9    **Q.** Where did you walk?

10   **A.** I remember walking over to the school, right near Ocean's

11   house.

12   **Q.** Did you go into a building, or did you go somewhere else

13   at the school?

14   **A.** No, we were just outside, like in the football field,

15   track area.

16   **Q.** Did you have a conversation with her?

17   **A.** Yes.

18   **Q.** Do you remember what you said to her?

19   **A.** Yes. I remember telling her that I thought it was just

20   really wrong and disrespectful of her to have, you know,

21   cheated in that way, and that I thought she was -- as a

22   feminist, as an activist, I thought it was really

23   inappropriate and wrong. And I was really angry. I don't

24   remember exactly what I said, but I did tell her that I

25   thought she had been unprincipled and I didn't want her to be

1  around me.  I didn't want her to be at my house.

2  **Q.**  Did you call her any other names?  You've heard some words

3  that were spoken in court.  Did you call her a slut?

4  **A.**  I probably did.

5  **Q.**  Where did you go after that conversation?

6  **A.**  I just walked back to my room, just to calm down and cool

7  off.  I kind of remember just taking off, just walking away

8  from her and just going back to my room.

9  **Q.**  Did you go back into the main house at some point?

10  **A.**  Yeah, a little bit later.

11  **Q.**  Was she there anymore?

12  **A.**  No, she had left.

13  **Q.**  Now, you heard Lacey testify, Lacey Phillabaum testify,

14  that May 20, 21, the weekend this arson apparently took place,

15  that she was there at Conger Avenue.  You heard her testify to

16  that?

17  **A.**  I did.

18  **Q.**  You heard her testify, did you not, that Ocean was living

19  at that building at that time?

20  MR. BARTLETT:  Objection, Your Honor.  Misrepresents

21  what the testimony was.

22  THE COURT:  Well, rather than repeat the testimony as

23  you heard it, why don't you ask her a question that might

24  bring the same answer, but do it that way.

25  MR. BLOOM:  Okay.

BY MR. BLOOM:

**Q.** In May 2001, was Ocean living at Conger Avenue?

**A.** No, they were still doing a lot of construction at that point.

**Q.** You heard testimony about devices being built in the garage where you were staying. You heard testimony about that?

**A.** Yes.

**Q.** Firstly, in your presence, did any such thing happen?

**A.** No, not at all.

**Q.** Did you at any time, in the spring of 2001, go to your living space and see any evidence, any indication that there was any plastic sheeting had been put up in any part of your living space?

**A.** No.

**Q.** Have you ever, have you seen -- you've seen pictures of the devices throughout this trial, right?

**A.** Yes.

**Q.** Have you ever in life seen, other than pictures, have you ever seen any devices like that?

**A.** No, never have.

**Q.** Have any devices like that ever, to your knowledge, been built in any living space that you've ever been in your entire life?

**A.** No, not to my knowledge.

1   **Q.** Let's move on to the car that they say was involved in

2   this incident. Did you ask anyone to rent a car for you in

3   May of 2001, or thereabouts, any time during that period?

4   **A.** No.

5   **Q.** Now, did you have a cousin?

6   **A.** Yes.

7   **Q.** Robert Corrina, who lived in Olympia?

8   **A.** Yes.

9   **Q.** Was he married?

10   **A.** Yes -- well, I don't think they were married at the time,

11   but he had a partner.

12   **Q.** Is her name Kara Larson?

13   **A.** Yes.

14   **Q.** And they have a child -- do they have a child?

15   **A.** They do.

16   **Q.** What's the child's name?

17   **A.** His name is Xie.

18   **Q.** In terms of moving to Olympia, who moved to Olympia first,

19   you or Corrina?

20   **A.** I did.

21   **Q.** Did there come a time when he contacted you and asked you

22   about how is living in Olympia?

23   **A.** Yes. He was interested in moving there.

24   **Q.** And after he did that, did you have a conversation with

25   him and tell him what Olympia was like?

1  **A.** Yes.

2  **Q.** Did he then move to Olympia?

3  **A.** Yes, he did soon after that, moved to Olympia.

4  **Q.** Did they have a child at that time?

5  **A.** No.  She was pregnant at that time.

6  **Q.** When they first moved to Olympia, with whom did they stay?

7  **A.** They stayed with me.

8  **Q.** Do you remember where you were living at that time?

9  **A.** It was on the west side.  I think it was East End Street.

10  **Q.** End N Street?

11  **A.** East End Street.

12  **Q.** About how long did they stay with you?

13  **A.** A couple months, I think.

14  **Q.** Did you charge them rent?

15  **A.** No.

16  **Q.** Did there come a time when they found a place of their

17  own?

18  **A.** Yes.

19  **Q.** Was that in Olympia?

20  **A.** Yes.

21  **Q.** Is that on Capitol Way?

22  **A.** That was the place.

23  **Q.** Is that the right street?  Did you have contacts with them

24  from the time they moved there until you left to go to the Bay

25  area?

1  **A.**  Yes.

2  **Q.**  When did you move to the Bay area?

3  **A.**  In February, beginning of February, 2002.

4  **Q.**  I will get back to that later.

5       In terms of dealing with them, how often would you see

6  them?  Not when you were living with them or they were living

7  with you, but when that wasn't happening, how often would you

8  see them or speak to them?

9  **A.**  Well, there was a time when we weren't actually talking at

10  all.

11  **Q.**  Why is that?

12  **A.**  Well, when they were staying with us --

13  **Q.**  You say us, who was us?

14  **A.**  Me and there was my boyfriend and there were two other

15  housemates.

16  **Q.**  Is it the same boyfriend, Justin, or someone else?

17  **A.**  No, it was someone else.

18  **Q.**  What was his name?

19  **A.**  Paul.

20  **Q.**  I am sorry to interrupt you, continue.  You said they were

21  staying with us, you, Paul, and two housemates.  And what

22  happened?

23  **A.**  When they were staying with us, Paul was a smoker,

24  cigarette smoker.  I guess there was a time when they didn't

25  feel like he was being very respectful around Kara and

1  smoking, and they got really angry, and we just had a falling

2  out about it because I wanted them to communicate directly

3  with Paul about it and not really put it on me, even though I

4  agreed he shouldn't be smoking around her. I wanted them to

5  communicate with him and not make me be the one to do that.

6      And they just, I felt like they just -- they overreacted,

7  and they were angry and we didn't really talk much after that

8  for, it would probably be maybe over a year. Because the next

9  time I ran into them at the Capitol Theater, they had their

10  son and I just said, you know, there's no reason for us not to

11  be talking, can we just make up? And at that point,

12  everything was patched up. And then from then on, you know, I

13  probably just saw them for dinner sometimes, you know, every

14  once in a while.

15  **Q.** You said Capitol Theater. Was that the time you showed

16  your documentary, or was it sometime before that?

17  **A.** It was before that. I think I was just seeing a movie

18  there, and I ran into them there.

19  **Q.** So after that approximately year of not being real close

20  with them, then you had a cousin-to-cousin relationship, is

21  that a fair way to describe it?

22  **A.** Yes.

23  **Q.** Now, you've heard testimony about Mr. Corrina renting a

24  car; that is, Kara actually renting the car.

25  **A.** Yes.

1  **Q.** Do you have a particular memory of, firstly, of them
2  renting a car?
3  **A.** Yes.  I have memory of them renting a car a couple
4  different times.
5  **Q.** A couple different times?
6  **A.** Yes.
7  **Q.** Do you have a particular memory of when it was that they
8  rented -- if they rented a car sometime in 2001, do you have a
9  particular memory, before you heard anything in court, of when
10 that would have been?
11 **A.** No, it doesn't stick out in my mind.
12 **Q.** Is that a memorable event for you, the fact that they
13 rented a car for a weekend?
14 **A.** No.
15 **Q.** Now, you heard testimony about requests to move some of
16 your things out of their house.
17 **A.** Yes.
18 **Q.** And was that something that happened once, or did it
19 happen more than once?  That would be the request to get your
20 things moved.
21 **A.** More than once.
22 **Q.** How did he feel about your things being in the house?
23 **A.** Well, Rob is an interesting person.  He sometimes will say
24 something, and then it will turn out later that he didn't
25 actually mean it.  Like my impression is that it was fine for

1   me to move some things there, but then it turns out he was

2   actually annoyed about that and wanted me to move my things.

3           MR. BLOOM:  Judge, before I go into the next area,

4   can we take a break for lunch now?

5           THE COURT:  This will be a new area?

6           MR. BLOOM:  No, same area but complex.

7           THE COURT:  Let's take the noon recess at this time.

8   It's close enough.  I will have you get a bite.  Don't discuss

9   the case when you are back in the building, into the jury

10  room.  Leave your books on the chair.  Don't discuss the case.

11  See you at 1:00.

12      (Jury not present.)

13          THE COURT:  Anything we need to do other than take

14  the recess?

15          MR. BARTLETT:  The only thing I would ask, if this is

16  the last witness, Ms. Waters?

17          THE COURT:  Any other witnesses?

18          MR. BLOOM:  No other witnesses.

19          THE COURT:  All right.

20          MR. BLOOM:  Could we be notified if there are

21  rebuttal witnesses?

22          THE COURT:  What?

23          MR. BLOOM:  Will we be notified now if there are

24  rebuttal witnesses?

25          THE COURT:  If this is the last witness, you can

1    probably answer that.

2        MR. BARTLETT: Actually I can't. I need to hear what

3    she has to say.

4        THE COURT: All right. We'll be in recess.

5        THE CLERK: All rise, court is in recess.

6    (Luncheon recess.)

7    (Jury present.)

8        THE COURT: All right. You may be seated.

9    We are examining Ms. Waters, so we are ready to begin?

10        MR. BLOOM: Yes.

11        THE COURT: Ms. Waters, let me have you come back and

12    take the witness chair.

13    We are ready for the jury, too?

14        MR. BLOOM: Yes.

15        THE COURT: Bring them in.

16    (Jury present.)

17        THE COURT: All right, you may be seated.

18    Mr. Bloom.

19        MR. BLOOM: Yes.

20   BY MR. BLOOM:

21   **Q.** Before we continue where I was, I wanted to go back. I

22   forgot to ask you one thing about the facilities at Evergreen.

23    Do they have music recording studios there?

24   **A.** Yes. I recorded in the recording studios there before.

25   **Q.** Are there any soundproof rooms that are recording studios?

A. I am assuming that the recording studio would be soundproof. Most recording studios are.

Q. Now, we were talking about your cousin Rob Corrina and his partner, Kara Larson. Did you live with them at any time during the year 2000?

A. Yes, I lived with them that summer.

Q. That summer?

A. The summer of 2000.

Q. Is that when you left some of your belongings there?

A. Yes.

Q. Did you baby-sit in that period?

A. Yes.

Q. Now, with regard to the testimony that Mr. Corrina gave about renting a car, do you have any particular recollection of that period, of the car being rented by him and/or his wife in that period, that would be the spring of 2001?

A. Yeah, I remember him asking me if I would move some of my stuff around that time.

Q. Do you have any memory of actually using a rented car, the car that he and his wife had rented?

A. No, I don't.

Q. Now, there's been testimony with regard to your giving him money.

A. Uh-huh.

Q. Did you give him money sometime just before you moved to

1  California?

2  **A.** Yes, I did. I wanted to contribute for the phone calls I

3  made, and just, you know, for being able to stay there.

4  **Q.** Could you speak louder?

5  **A.** For being able to stay there, for their bills and

6  everything, I just wanted to contribute.

7  **Q.** Was any part of the money that you gave him -- about how

8  much do you remember giving him?

9  **A.** About $100.

10  **Q.** Did any part of that money have anything to do with the

11  rental car?

12  **A.** No.

13  **Q.** I want to go back now to the Watch Mountain campaign.

14  Could you give the jury -- well, let me ask this question

15  first. Was this -- did you and the people who were involved

16  in the campaign have any dealings with federal officials about

17  that campaign?

18  **A.** Yes. With the Forest Service?

19  **Q.** Yes. The Forest Service, yes.

20  **A.** Yes.

21  **Q.** What happened? Please tell the jury what happened with

22  regard to the Forest Service.

23  **A.** Well, we obtained a permit to be able to have, I think it

24  was called, some kind of an extended stay permit. Because of

25  the national forest, you are only allowed to camp for a

1  certain number of days, I think it might be two weeks or maybe
2  a month, I forget.  Whatever time it was, that time was
3  running out.  So we kind of got together with the town and
4  applied for a permit to stay longer from the Forest Service.
5  **Q.** Do you remember whether or not there came a time when that
6  permit was renewed?
7  **A.** Yeah, they renewed it as many times as we needed to, as we
8  wanted to.
9  **Q.** So this was not an operation where the Forest Service had
10 no idea you were going to be there, right?
11 **A.** Well, they didn't know at first, but then subsequently
12 they give us permission to be there.
13 **Q.** Did the people in the town of Randle at any time come out
14 to the -- let me withdraw that.
15      Would it be called, or could it be called a tree sit?
16 **A.** Yes.
17 **Q.** Could you explain to the jury what a tree sit is?
18 **A.** A tree sit is when people raise platforms, wooden
19 platforms, really high into the trees, I would say over 100
20 feet, and they would occupy the platforms 24-hours a day.
21 **Q.** What was the purpose of that?
22 **A.** The purpose was that -- the idea is that if there's
23 someone in the tree, then people wouldn't want to cut it down.
24 But our purpose also, just as a group, was we know that tree
25 sits gain media attention, so it was definitely a tactic to

1    get some media attention on that campaign.

2    **Q.** Were you aware of other tree sits at other times, with

3    other people in other places?

4    **A.** Yes.

5    **Q.** Does the name Julia Butterfly ring a bell?

6    **A.** Yes. Julia Butterfly had a tree sit in California that

7    was very well-known to the media.

8         MR. BLOOM: I would ask to mark some exhibits for

9    identification, please.

10       I will give a copy to the other side.

11        MR. BARTLETT: What's the exhibit number on this?

12        THE CLERK: A-214.

13   BY MR. BLOOM:

14   **Q.** Could you take a look at what's in front of you, Exhibit

15   A-214. Could you just, in general terms, describe what you

16   are looking at?

17   **A.** This is the permit from the Forest Service that we got.

18   It says August 9 of 1999.

19   **Q.** I am sorry, a little louder?

20   **A.** August 9, 1999.

21   **Q.** Is there anything else in that exhibit?

22   **A.** Yes, there's a lot of stuff in here.

23   **Q.** Well, take a look.

24   **A.** There's a flier for the Support Watch Mountain Randle

25   community picnic.

1   **Q.** Anything else?

2   **A.** There's another permit that was renewed in October of

3   1999.

4   **Q.** Anything else?

5   **A.** Yeah, this is all permit stuff. Here's some pictures from

6   the tree sit.

7   **Q.** Is any of those pictures anybody you recognize?

8   **A.** Yes. Well, there's one picture of just looking up at the

9   platforms, and then a picture of me on the traverse lines.

10      Should I explain what those are?

11      The traverse lines are just the ropes that were attached

12  to go in between the platforms, because there were two

13  platforms. So we had traverse lines that you could walk

14  across so you could travel around, we call it a tree village,

15  more than one platform. So you could go back and forth

16  between the platforms.

17      And then there was a woman from Randle who was climbing.

18  The people from Randle, some of them learned how to climb the

19  trees.

20  **Q.** Was she one of the residents of Randle?

21  **A.** Yes.

22          MR. BLOOM: I offer that exhibit in evidence.

23          MR. BARTLETT: No objection.

24          THE COURT: Admitted.

25              (Exhibit No. A-214 admitted.)

BY MR. BLOOM:

**Q.** Is that the woman from Randle?

**A.** Yes.

**Q.** Do you remember her name?

**A.** I don't. I am really bad with names. I always remember a face, but you can't count on me for a name.

**Q.** How about this other person here?

**A.** That's me.

**Q.** All together, how much time did you spend on the Watch Mountain campaign, from the time you first became aware of it till the time it was over?

**A.** Till the time the campaign itself was over?

**Q.** Yes.

**A.** It was -- I guess it was about a year, a little under a year.

**Q.** And you documented that as much as you could?

**A.** Yes.

**Q.** What was the result of the Watch Mountain campaign?

**A.** It was a successful campaign for the most part. Watch Mountain was completely saved, taken out of the land exchange. They negotiated with our groups to log some acreage in Fossil Creek, which was another part of the land exchange, so they did log some of that. But the most old growth sections of that exchange in Fossil Creek were also saved.

So it was mostly a success.

1   **Q.** Was there a party?

2   **A.** Yes. I think there was more than one party.

3   **Q.** Were people from the town at the party?

4   **A.** Yes.

5   **Q.** You heard Ms. Troxel's testimony about bringing people

6   together, more or less?

7   **A.** Yes.

8   **Q.** Could you tell the jury your experience and your learning

9   experience from those events?

10   **A.** Well, yeah. It was really one of the most exciting

11   experiences of my life, just to have such diverse and unique

12   people come together and work together on a common goal,

13   especially when it was such a very intense situation, with the

14   people feeling like their lives were actually in danger with

15   the mud slide -- with the possibly of a mud slide.

16      It was just a wonderful experience to know those people

17   and to bridge those gaps that were between, you know,

18   environmentalists and loggers, you know, stereotypically. And

19   for me, I mean, it was really just a great example of the way

20   that things should be done for a change.

21   **Q.** Did it make you want to commit an arson?

22   **A.** No, it had the opposite effect.

23   **Q.** I want to talk about Bill Rodgers for a moment. Was Bill

24   Rodgers in the video that you made?

25   **A.** No. I don't think he was in there.

1   **Q.**  Now, do you remember meeting Bill Rodgers at some point?

2   **A.**  I remember meeting him on the campus.  I think it was at

3   one of the earlier meetings for -- it was either at an early

4   meeting for Watch Mountain, or possibly a meeting about -- we

5   did an action with the steelworkers in Tacoma, it might have

6   been at that meeting.  I forget which one it was.

7   **Q.**  You say an action with the steelworkers.  What do you

8   remember?

9   **A.**  We worked with the steelworkers in Tacoma to do an action

10  where we tried to block the shipment of some oar that was

11  coming in.  It was an alliance that was formed, based on the

12  company MAXXAM, and we were coming together to protest their

13  logging practices and to the way they treated their employees,

14  and steelworkers were working with us about that.

15      So it might have been a meeting about that.

16  **Q.**  What year would that have been, more or less?

17  **A.**  Early, I think, it was either around -- yeah, it was late

18  1998 or early 1999, something around there.

19  **Q.**  Did you come to know Bill Rodgers by any other name?

20  **A.**  I knew him as Avalon.

21  **Q.**  Describe what kind of person he was.

22  **A.**  He seemed nice to me.  As I started to get to know him

23  better, I learned he was a very depressed person and pretty

24  needy.

25  **Q.**  I am sorry, needy, did you say?

1   **A.**   Needy, yeah.

2   **Q.**   Did he call you from time to time just to talk?

3   **A.**   Yes.

4   **Q.**   Did you ever have a romantic relationship with him?

5   **A.**   No.

6   **Q.**   Did there come a time when he asked you to do him a favor?

7   **A.**   Yes.

8   **Q.**   What was that favor?

9   **A.**   He asked me to get him a phone, because his credit was bad

10  and he needed a phone.  He said he would pay me, you know,

11  each month for it.

12  **Q.**   Did you have to put out, except for a week or two or

13  three, did you either lose any money or make any money on

14  those events?

15  **A.**   No, he just gave me money for the bills.  I didn't have a

16  lot of money, so I am sure he gave it to me in advance because

17  I probably wouldn't have been able to cover it.  My memory is

18  that he just gave me money in advance for it.

19  **Q.**   Did you think it had anything to do with any criminal

20  activity?

21  **A.**   No, I didn't think so.  I didn't have any reason to

22  believe that.

23  **Q.**   Did you get this phone in your own name?

24  **A.**   Yes.

25  **Q.**   Did you hide anything from anybody?

1    **A.**   No.

2    **Q.**   When you paid -- was it Verizon, if I remember correctly?

3    **A.**   Yes.

4    **Q.**   Did you pay them with your own checks?

5    **A.**   Yes.

6    **Q.**   Checks with your name printed on them?

7    **A.**   Yes.

8    **Q.**   Were you trying to hide anything?

9    **A.**   No.

10   **Q.**   Did you ever commit any crime of any kind with Bill

11   Rodgers?

12   **A.**   No, I did not.

13   **Q.**   Or Avalon?

14   **A.**   No.

15   **Q.**   There was some testimony about your website that was

16   brought up by the prosecution in cross-examining, I think,

17   Ms. Troxel.   What was your financial condition before the day

18   Agent Halla came to see you two years ago?

19   **A.**   Just living paycheck to paycheck.   My partner and I get

20   by, but we don't have -- unfortunately, even though I try

21   really hard, we never have any -- are able to save anything.

22   **Q.**   How do you make a living?   How do you make income?

23   **A.**   I teach violin to both children and adults and perform

24   sometimes.

25   **Q.**   Perform by yourself or in bands?

1  **A.** With different various bands, in a couple different bands.

2  **Q.** What kind of music do you perform?

3  **A.** A variety of different types of traditional music and

4  original music that I write for people that are in my bands,

5  everything from Keltic to Balkan to middle eastern, that type

6  of music.

7  **Q.** We are talking violin here; is that correct?

8  **A.** Yes.

9  **Q.** John, your partner, what kind of work does he do?

10 **A.** He's a carpenter.

11 **Q.** I don't mean to embarrass anybody, but does he bring in a

12 lot of money?

13 **A.** He tries, but, you know, it's not the easiest job to make

14 a lot of money at.  So it's pretty much, you know, can cover

15 our bills, but not much beyond that.

16 **Q.** So as of the day Agent Halla came around, I think you said

17 paycheck to paycheck?

18 **A.** Yes.

19 **Q.** Since that time, has it gotten better or worse?

20 **A.** Well, there have been many financial pressures due to this

21 case.  So it's definitely gotten worse.

22 **Q.** From the request for money that's on your website --

23 **A.** Uh-huh.

24 **Q.** -- have you been making a living off that?

25 **A.** No.  All that money goes towards paying for this case.

1  **Q.**  Did there come a time when you ran out of money to pay me?

2  **A.**  Yes.

3  **Q.**  And the money that you had paid me, was that money of your

4  own, or was that other people's money?

5  **A.**  It was a combination of loans from different family

6  members and fund-raisers.  We had many different fund-raising

7  events, concerts and silent auctions and things like that.

8     So I still owe people a lot of money.

9  **Q.**  This is not a money making scheme, is it?

10  **A.**  No.  Unfortunately, it's not.

11  **Q.**  I want to go back to one question about the ten-year-ago

12  New York Times reporter.  You noticed, or did you not, in the

13  question that the reporter asked, he asked both about arsons

14  and, I think, mink release, as I remember?

15  **A.**  Uh-huh.

16  **Q.**  Do you remember one way or the other whether you were

17  answering about arsons, mink releases, both, or neither?  Do

18  you have any recollection one way or the other?

19  **A.**  Well, I am sure I wouldn't have been answering about

20  arsons because I have never agreed with arson.

21  **Q.**  Why not?

22  **A.**  Just for the obvious reasons, it's very dangerous to human

23  lives, and I have always been someone who feels very strongly

24  about not hurting people in any way.  You know, it's just a

25  tactic, too, you know, not putting it aside.  The human

1    element, I think that it's very alienating and not effective.

2    **Q.** There was some testimony where there was some magazine

3    articles that were introduced into evidence, do you remember

4    that?

5    **A.** Yes.

6    **Q.** These were articles that had been turned over by Ms. Kolar

7    to the prosecution?

8    **A.** Yes, that's correct.

9    **Q.** Do you remember being in court when the content of some of

10   those articles was read?

11   **A.** Yes.

12   **Q.** Do you remember seeing that there had been highlighting of

13   some of the language?

14   **A.** Yes.

15   **Q.** The yellow highlighter.  Did you come to learn who it was

16   who had done the highlighting?

17   **A.** It was Mr. Bartlett.

18   **Q.** This man right here?

19   **A.** Yes.

20   **Q.** Were those your words that were highlighted?

21   **A.** No, they were not my words.

22   **Q.** Do you remember even ever having read those words?

23   **A.** No, I don't remember having read any of those articles or

24   those words.

25   **Q.** How did you feel about that testimony coming in against

1  you?

2  **A.**  I felt like it was extremely inappropriate and wrong,

3  really unfair to try and show that I was thinking these things

4  or I read these things, because I have never thought those

5  things.  And I thought -- I just thought it was really

6  inappropriate to use that as evidence against me, to try

7  convict me based on things that I have never thought or read

8  and that I actually believe are quite extremist and that I

9  definitely disagree with.

10  **Q.**  Are you a person who wants to burn down Disneyland?

11  **A.**  No.

12  **Q.**  And the Statue of Liberty?

13  **A.**  No.  Absolutely not.

14  **Q.**  Or anything anywhere ever at any time?

15  **A.**  No.

16  **Q.**  Now, did there come a time, at any time when you were

17  living with Rob and Kara, when you went to a hospital?

18  **A.**  Yes.

19  **Q.**  When was that?

20  **A.**  That was, I remember it was right before I moved to the

21  Bay area.  It was January of 2002.

22  **Q.**  Did we finally get the hospital records?

23  **A.**  Yes.  They were delivered.

24  **Q.**  I won't bother showing them to you, but do they

25  demonstrate that in fact you were at St. Peters Hospital in

1  January of -- I am sorry, Providence St. Peters Hospital in
2  Olympia, in January of 2002?

3  **A.**  Yes, that was an unforgettable event.  I was really sick.

4  **Q.**  What happened?

5  **A.**  Well, I thought I had food poisoning, and the hospital
6  labeled it with some really big medical term, like
7  gastroendometrio -- I don't remember what it was.  I just
8  could not keep anything down.  I thought I was going to die.
9  I was so, so, so sick.

10      And Justin took me to the emergency room because I had
11  been talking to the advice hotline, the nurse, because I was
12  like, am I dying?  How am I going to survive?  And they just
13  encouraged me to come into the hospital to get some fluids and
14  some IV for some fluids, because I would drink water and throw
15  it up.  It was just really bad.

16  **Q.**  Did Rob, your cousin, Rob Corrina, did he become aware of
17  the fact that you went to the hospital?

18  **A.**  Yes.  I was staying with him at the time, so I told him
19  about that.

20  **Q.**  Am I correct, that was about seven or eight months after
21  May of 2001?

22  **A.**  Yes.

23  **Q.**  Now, obviously that was before you moved to California,
24  which was what month?

25  **A.**  February of 2002.

1 **Q.** Have you been in the Bay area ever since?

2 **A.** Yes.

3 **Q.** I want to talk about Jennifer Kolar for a minute. Do you

4 remember meeting her at any point?

5 **A.** Yes, I met her. I don't recall the exact circumstances.

6 **Q.** Did it involve any kind of environmental event?

7 **A.** No. I think it was just in Olympia somewhere.

8 **Q.** Did you ever commit an arson with her?

9 **A.** No, I never committed any arson with her.

10 **Q.** Did you ever commit any crime with her?

11 **A.** No.

12 **Q.** Did there come a time when she gave you a present?

13 **A.** Yes.

14 **Q.** Do you remember when that was, approximately?

15 **A.** I know that it was after she had come back from Hawaii.

16 **Q.** How do you remember that?

17 **A.** Because the gift was from Hawaii. She told me it was from

18 Hawaii. It was a necklace from Hawaii. I think that it was

19 definitely before I moved to the Bay area.

20 **Q.** Did you meet with her at any point where she gave you that

21 necklace?

22 **A.** Yes, we were having dinner.

23 **Q.** And what city, do you remember?

24 **A.** In Olympia.

25 **Q.** Do you remember where it was you were having dinner?

1  **A.** I think it was a Thai restaurant, but I am not sure.

2  **Q.** Did she say something to you that you remember?

3  **A.** Yes.

4  **Q.** First of all, in relation to giving you the gift, was it

5  before that, at that time, or after that?  When did she say

6  this thing to you?

7  **A.** After giving me the gift.

8  **Q.** What was it that she said to you?

9  **A.** Well, she was telling me that she's never felt the kind of

10  connection with anybody that she's felt with me, with any

11  other women.  And she kind of lead into that she was

12  romantically interested in me.

13  **Q.** Did you respond to her, did you say something to her?

14  **A.** Yes.  I was surprised, because I wasn't expecting it.  I

15  just told her that I didn't feel the same way.

16  **Q.** Do you remember what her response or reaction was?

17  **A.** She got really upset, and I think -- I got the impression

18  that she was expecting a different answer.  She was really

19  hurt.  I remember her saying that she thought that I would

20  have a different response to that.

21  **Q.** What was her attitude at that moment?

22  **A.** Just kind of embarrassed, but also like, how could you be

23  rejecting me?  Sort of like she's used to getting everything

24  she wants, you know, is how her attitude was.

25  **Q.** Let me move on to something else.

1    The government introduced a check for 100-some dollars

2  that you wrote to Justin's landlord, Mr. Wake.  Do you

3  remember that?

4  **A.**  Yes.

5  **Q.**  Do you remember writing such a check?

6  **A.**  I don't actually remember it, but it could have been when

7  Justin went away to the east coast that he asked me to take

8  care of some things, because I believe he was gone for about a

9  month one summer.

10  **Q.**  Were you paying his rent?

11  **A.**  No.

12  **Q.**  Was that your relationship?

13  **A.**  Oh, no.  He was always the one that had more money because

14  his dad was supporting him while he was in school.  So on the

15  contrary, it was actually him that was often helping me

16  financially with things, food and things like that.

17  **Q.**  I want to talk about Ralph's Thriftway.

18  **A.**  Okay.

19  **Q.**  Do you remember, as you sit there now, do you remember the

20  transaction that took place at seven minutes after 12:00 on

21  May 20 at Ralph's Thriftway?

22          MR. BARTLETT:  I think Mr. Bloom meant 12 after 7:00.

23          MR. BLOOM:  I have to make sure.

24  BY MR. BLOOM:

25  **Q.**  That's what I meant.  I am better with the alphabet and

1  not so good with numbers.

2  **A.**  No.

3  **Q.**  Do you remember that transaction?

4  **A.**  No, I don't.

5  **Q.**  When did you first see written printed evidence of that

6  transaction?

7  **A.**  Just a couple weeks ago.

8  **Q.**  How did that come about?

9  **A.**  Mr. Fox, my lawyer, found it and he showed it to me.

10 **Q.**  Is that a place that you sometimes shopped?

11 **A.**  Yes.

12 **Q.**  Now, there was a question, I think Agent Halla said

13 something about it's near where Mr. Rodgers or Avalon lived;

14 is that correct?

15 **A.**  Yes.

16 **Q.**  Was there any other connection?  Is that the Eastside of

17 Olympia?

18 **A.**  Yes, that's what's referred to as the Eastside.

19 **Q.**  Did you have any other dealings with any other people or

20 any other places on the Eastside of Tacoma -- I am sorry, of

21 Olympia?

22     Sorry, I am losing it here.

23 **A.**  Yes, I had a lot of friends all over Olympia, but on the

24 Eastside particularly is where I had my band practice.

25 **Q.**  You had a band?

1  **A.**  Yes, I was in a band.

2  **Q.**  When you say band practice, what kind of location was

3  that?

4  **A.**  It was at someone's house, my friend Jason, we had band

5  practice there.  And Anthea Lawson, who I baby-sat for, and I

6  also took lessons with Anthea, she lived pretty close to

7  Ralph's Thriftway, that store.  And other friends, I also had

8  numerous other friends that had houses around that area.

9  **Q.**  The Lawson you talked about, is that the Lawson that

10  testified yesterday?

11  **A.**  Yes.

12  **Q.**  The assistant attorney general?

13  **A.**  Yes.

14  **Q.**  Now, when you first were shown by Mr. Fox, were shown the

15  documentation of this transaction, did you think about whether

16  you could remember whether that happened?

17  **A.**  Yes.

18  **Q.**  Was it of any significance to you that you learned a few

19  weeks ago that there was documentary evidence that you were in

20  Olympia at 12 minutes after 7:00 on May 20?

21  **A.**  Yes.  I was really thrilled about that.

22  **Q.**  Why were you thrilled?

23  **A.**  Well, because it would show that I was in Olympia at that

24  time.

25  **Q.**  Had you heard the testimony of Phillabaum and Kolar about

1    where they say you were?

2    **A.**    Yes.

3    **Q.**    Did something happen when you saw that document?

4    **A.**    Yeah, I got emotional.  I cried.  It was really -- it just

5    gave me some hope.  I mean, I already have a lot of hope, but

6    it gave me more hope.

7    **Q.**    I just have a few more questions.

8          Before Agent Halla came to see you two years ago, could

9    you describe what your daily life was about and what it was

10   like prior to that date?

11   **A.**    Well, I had just had a daughter in January 2005, so just

12   raising her and continuing on with teaching my violin lessons

13   and, you know, trying to perform as much as possible.

14   **Q.**    Was it a happy time for you?

15   **A.**    Yes, very much.

16   **Q.**    And did that change in any way after Agent Halla showed

17   up?

18   **A.**    Well, I still have happiness, but, yes, it's been really

19   stressful.

20   **Q.**    Has your life been different since that day?

21   **A.**    Yes.

22   **Q.**    Are you scared?

23   **A.**    Yes.

24   **Q.**    Why are you scared?

25   **A.**    Well, for the obvious reasons, that I don't want to be

1 separated from my child.

2 **Q.** Have you told the truth here today, everything?

3 **A.** Yes.

4          MR. BLOOM:   Thank you.

5      Your witness.

6          MR. BARTLETT:   May I inquire, Your Honor?

7          THE COURT:   Yes.

8                          CROSS-EXAMINATION

9 BY MR. BARTLETT:

10 **Q.** Since you were just talking about the records from Ralph's

11 Thriftway, let's just focus on that for a second.

12      You indicated that several weeks ago you received these

13 records from Ralph's Thriftway indicating that your

14 transaction occurred on 7:12 p.m. on May 20, would that be

15 fair to say?

16 **A.** Yes.

17 **Q.** And after you got those records, you didn't share them

18 with us, did you?

19 **A.** Well, I don't share anything with you.   My lawyers do all

20 that.

21 **Q.** You knew that we've been trying to look for those records

22 for a significant period of time, a number of years, correct?

23 **A.** No, I didn't.   I have no idea what you guys do.

24 **Q.** Now, would it be fair to say that the closest grocery

25 store next to the Conger Street address was Olympia Food

1  Co-Op?

2  **A.**  Yes, I shopped there a lot, too.

3  **Q.**  But you also shopped at Ralph's a lot?

4  **A.**  Yes.  Well, whenever I was on the Eastside and I needed

5  something, I would go over to Ralph's.

6  **Q.**  If you could take a look at Government's Exhibit 738, page

7  29.

8  **A.**  Am I supposed to have that?

9       THE COURT:  It is admitted?

10      MR. BARTLETT:  Yes.

11  BY MR. BARTLETT:

12  **Q.**  If we could highlight the transactions that occurred

13  during this period.

14      Are you able to see those?

15  **A.**  Yes.

16  **Q.**  As I look down through this list, these are transactions

17  that occurred on May 16, 17, 18, 20, through the 30th, do you

18  see those?

19  **A.**  Yes.

20  **Q.**  And I see a transaction that occurs on May 17 at Ralph's

21  Thriftway, correct?

22  **A.**  Yes.

23  **Q.**  There's a May 18 transaction.

24      Let's start over.  There's a May 17 transaction at Ralph's

25  Thriftway for $8.49.  Do you see that?

1  **A.**  Yes.

2  **Q.**  There is another $8.49 transaction at Ralph's Thriftway on

3  May 18, correct?

4  **A.**  Correct.

5  **Q.**  And then there's a third transaction, May 21, for $13.91

6  at Ralph's Thriftway?

7  **A.**  Yes.

8  **Q.**  As I understand it, Ralph's Thriftway is about three

9  blocks from Mr. Rodgers' house?

10  **A.**  I think so.

11  **Q.**  How far do you think it is?  From the Conger Street

12  address, it's what, a little over a mile, couple miles?

13  **A.**  Yeah.

14  **Q.**  And you say that you shop at Ralph's Thriftway a lot.

15  Would you do me a favor?

16  **A.**  Sure.

17        MR. BARTLETT:  Could the witness be handed up the

18  entire exhibit, Exhibit 738?

19  BY MR. BARTLETT:

20  **Q.**  Ms. Waters, these are your bank records for at least all

21  of 2001; is that correct?

22  **A.**  Well, there's 2000 --

23  **Q.**  Why don't you go through until you find January 2001.

24        What I am going to ask you to do, I'm going to ask you to

25  take your time and walk through all of your bank records for

1   2001 -- January, February, March, April, May, June, July, all

2   the way through December -- and I would like you to point out

3   to the members of the jury all the other times your bank

4   records show transactions at Ralph's Thriftway.

5       When you get to one, if you can just give us the page

6   number, I will show it on the screen.

7   **A.** I take it you've already looked through these and there

8   probably isn't any. Is that what you are getting at, or do

9   you want me --

10  **Q.** I don't want to testify for you, Ms. Waters. I want you

11  to look through and show me the other transactions for Ralph's

12  Thriftway throughout the year 2001.

13  **A.** Okay.

14      I think this is the end, June 30, 2001 --

15  **Q.** There are other records in there.

16  **A.** Oh, I see.

17      Okay, I am done.

18  **Q.** There weren't any others, are there?

19  **A.** No.

20  **Q.** If you could be handed up -- actually, if we could just

21  pull up on the screen the quote from the New York Times, which

22  is 740-E.

23      During your direct examination, Mr. Bloom asked you a

24  number of questions about this article that appeared in the

25  New York Times magazine section in December of 1998. Do you

1 remember those questions?

2 **A.** Yes.

3 **Q.** You indicated you couldn't remember exactly what was said

4 during that timeframe, correct?

5 **A.** Correct.

6 **Q.** I think that's understandable. But at the time, in 1998

7 when this article comes out, it must have been a big deal to

8 you. You'd never been quoted in the New York Times before,

9 had you?

10 **A.** I don't actually remember even knowing about this.

11 **Q.** Tiffany Tudder never said a word to you? She didn't come

12 over and say, "Oh, my God, look, we're in the New York Times"?

13 **A.** No, I don't remember that.

14 **Q.** Never happened?

15 **A.** I don't remember it happening.

16 **Q.** Ms. Waters, looking at the quote where it says that the

17 reporter asked, "I asked the EARN members if they supported

18 arsons and mink-farm releases," and it has in quotations,

19 correct, "'As long as people don't get hurt, I totally support

20 it,' said Briana Waters, a senior."

21 Wouldn't you agree that the only fair reading of "as long

22 as people don't get hurt" would refer to the arson? People

23 don't get hurt in mink-farm releases, do they?

24 MR. BLOOM: Excuse me. I would call that

25 argumentative.

1          THE COURT:   This is cross-examination.

2          MR. BLOOM:   I understand.

3     MR. BARTLETT:

4     **Q.**  Ms. Waters, wouldn't you agree that the only fair reading

5     of that is that the "it" referring -- in your statement

6     referring to what you support, is the arsons?

7     **A.**  No.  I don't think so.  I think the people could get hurt

8     in a mink farm release, too, if there was a confrontation

9     between the people that were trying to release the animals and

10    the person who owned the mink farm.  Also people can get hurt

11    in other ways, other than physically.

12    **Q.**  I want to ask you a few questions about the Watch Mountain

13    campaign.  Watch Mountain is in Lewis County?

14    **A.**  Yes.

15    **Q.**  And that's where a lot of the activities that we've talked

16    about occurred, the tree sitting?

17    **A.**  Yes.

18    **Q.**  The activities with Randle?

19    **A.**  Yes.

20    **Q.**  But there were other activities relating to Watch Mountain

21    that didn't occur in Lewis County, correct?

22    **A.**  That's correct.

23    **Q.**  In fact, there were actions that occurred in the City of

24    Seattle?

25    **A.**  Yes.

1   **Q.** And those were actions directed against the offices of

2   Plum Creek Lumber, correct?

3   **A.** That's correct.

4   **Q.** And their offices were in a building in downtown Seattle,

5   the Wells Fargo building?

6   **A.** I think so. I forget what the building is called, but it

7   was in downtown Seattle.

8   **Q.** In October of 1999, individuals involved in your

9   campaign -- and I assume you were part of this -- actually

10   left leaflets on Plum Creek Lumber employees' desks warning

11   them that further actions were going to occur if they didn't

12   change their ways, correct?

13   **A.** We went to their offices. I don't remember leaflets.

14   **Q.** Do you remember going to their offices, a number of the

15   people you were working with, and a number of individuals put

16   bike locks around their necks and chains and locked themselves

17   to the desks in the front lobby?

18   **A.** I wasn't there for that one. That was a different one.

19   That was before the tree sit happened.

20   **Q.** On October 28, you were at the Wells Fargo building,

21   correct?

22   **A.** That's correct.

23   **Q.** You had your videocamera there?

24   **A.** Yes.

25   **Q.** Your boyfriend was there, Justin Solondz?

1  **A.**  Yes.

2  **Q.**  And the plan was that 20 to 25 of you were basically going

3  to take over the Plum Creek Lumber offices?

4  **A.**  No.  We didn't want to take it over.  We just wanted to

5  just talk to the employees there.

6  **Q.**  You say talk.  What you really wanted to do was harass the

7  employees there, correct?

8  **A.**  That's probably a fair word to use.

9  **Q.**  You planned to go up to their offices and provide them

10  eviction notices?

11  **A.**  Yeah, I forgot about that part.  Yeah, that happened.

12  **Q.**  In fact, there was security guards and police there

13  telling you not to enter, correct?

14  **A.**  No, they didn't tell us not to enter.  We went in and they

15  told us they wanted us to leave.

16  **Q.**  Eventually there was physical altercations between some of

17  the people there and the security guards?

18  **A.**  Yes.

19  **Q.**  People were arrested?

20  **A.**  Only Justin was arrested.

21  **Q.**  Employees were yelled at and confronted in the office?

22  **A.**  Yes.

23  **Q.**  To clarify, the people being confronted, they are not the

24  owners of Plum Creek Lumber, these are just everyday people

25  going to their work, right?

1   **A.**   Yes.

2   **Q.**   And during this confrontation, individuals that you were

3  working with indicated that they are not going to go away,

4  they are going to keep coming, they are going to keep doing

5  this. We're not letting you cut these areas. Whatever it

6  takes, we are going to push. We're committed, whatever it

7  takes.

8      You heard those words, didn't you?

9   **A.**   Yeah, you probably got that from my video documentary. It

10  was in there.

11  **Q.**   When you heard the words on October 28 of 1999 that if the

12  takeover of Plum Creek Lumber Company didn't work, the next

13  step would be something greater, what did you understand the

14  next step to be? What is the "whatever it takes"?

15  **A.**   I think to me it just means we are going to keep trying.

16  Just keep pursuing all the avenues we could pursue to get the

17  timber sale -- the land exchange dropped.

18  **Q.**   You indicated in your direct examination how serious you

19  felt this arson was. Do you remember that?

20  **A.**   Yes.

21  **Q.**   And do you remember Mr. Bloom talking in his

22  cross-examination of Toby Bradshaw, that he thought this was

23  beyond a horrible crime? Do you remember hearing that?

24  **A.**   Yes.

25  **Q.**   But your statement on direct examination and Mr. Bloom's

1  statement during his cross-examination isn't the only time

2  that you have indicated an opinion about how serious the

3  University of Washington arson is?

4      Do you remember March of 2007 --

5          MR. BLOOM:  Excuse me, can she answer that question,

6  please?

7  BY MR. BARTLETT:

8  **Q.**  That isn't the only time you've had an opinion about how

9  serious the University of Washington arson is, is it?

10  **A.**  No.

11  **Q.**  In fact, in March of 2007, a document was filed with this

12  very court setting forth your view of how serious the

13  University of Washington arson was, in a written filing.  You

14  are aware of that?

15          MR. BARTLETT:  Could the witness be handed up what's

16  been previously marked as Government's Exhibit -- actually,

17  Your Honor, I think I have it here.

18          MR. BLOOM:  Are we talking about a pleading prepared

19  by one or both of her lawyers, is that what we are talking

20  about?

21          THE COURT:  I am not sure.  Is this something

22  admitted?

23          MR. BARTLETT:  A pleading filed by Ms. Waters through

24  her attorneys.

25          THE COURT:  Well, do you have a copy of this?

1      MR. BLOOM:  We have a copy, but we now have a copy

2  that has been given to us.

3      MR. BARTLETT:  It's a pleading they filed.

4      MR. BLOOM:  Right.  I am not saying otherwise.

5      THE COURT:  All right.  Your question on this?

6  BY MR. BARTLETT:

7  **Q.**  Does the witness have it in front of her?

8  **A.**  I don't have it.

9      MR. BLOOM:  What's the exhibit number, please?

10      MR. BARTLETT:  1101.

11      MR. BLOOM:  The date of the pleading?

12  BY MR. BARTLETT:

13  **Q.**  Do you have that in front of you?

14  **A.**  Yes.

15  **Q.**  You recognize that as a written document that was filed by

16  you and your attorneys in this court?

17  **A.**  I don't remember ever seeing this before, but I am seeing

18  it now.

19  **Q.**  Looking at page 3, starting at line 15, do you see where

20  in this written document there is a description of the

21  University of Washington arson which appears as follows:  That

22  it was "An act which did not injure anybody, which was not

23  intended to injure anyone, and which, at most, was a misguided

24  act by those desperate to preserve the Earth against corporate

25  onslaughts."  Do you see where that appears?

1  **A.**  Can you tell me where it is?

2  **Q.**  Looking again on page 3 at line 15.

3  **A.**  Oh, line 15, okay.

4  **Q.**  Do you see where, in describing the University arson,

5  University of Washington arson, it describes it as, quote, "An

6  act" --

7  **A.**  I see that now.

8  **Q.**  Wouldn't you agree that that description is significantly

9  different than what you testified to?  This actually sounds as

10  though somebody is a little sympathetic to these people.

11  **A.**  Well, my lawyer might be, but I am not, and I didn't write

12  this.  My lawyers wrote this.  I don't have a lot of time in

13  my life outside of just living my life and trying to spend

14  time with my daughter.  I don't help them write these things;

15  they write what they write.

16  **Q.**  Isn't it true, Ms. Waters, that prior to coming in front

17  of this jury, you wanted all of your friends in the

18  environmental community, to let them know that you really

19  supported them, that you thought this was a de minimis act, a

20  property crime?  That's what you told everybody prior to

21  testifying, correct?

22  **A.**  No.  I didn't tell that.

23  **Q.**  So your lawyers totally misrepresented what your true

24  beliefs were?

25  **A.**  I just trust they are going to write, you know, what their

1  job is, to write things that will help defend me.  This is not

2  my words.

3  **Q.**  Isn't it true, Ms. Waters, that you change your position

4  when you are in front of these 14 people so that you think you

5  will be more sympathetic?  Isn't that what's going on?

6  **A.**  No.  No, it's not.

7  **Q.**  This morning we heard testimony from your prior teacher,

8  Ms. Lin.  Do you remember that testimony?

9  **A.**  Ms. Lin, yes.

10  **Q.**  And in her testimony, she talked about, during direct

11  examination, that the website appeared to be an outdated, and

12  not updated very often.  Do you remember that testimony?

13  **A.**  Yes.

14  **Q.**  If you could take a look at what's already been marked as

15  an exhibit, Exhibit 1102 for identification.

16      Do you have that in front of you?

17  **A.**  Yes.

18  **Q.**  That's your supportbriana.org website?

19  **A.**  It is.

20  **Q.**  In fact, when you look at the very beginning of that

21  website, it actually has two updates since this trial.  It's

22  been updated twice since the trial started, correct?

23  **A.**  Yes.

24  **Q.**  One of the things that the website asks is for supporters

25  of you to come to the trial and support you, correct?

1  **A.**  Yes.

2  **Q.**  And in fact, it isn't just that website, there are other

3  websites that provide your supporters guidance on coming to

4  court and how to get here and what to wear, correct?

5  **A.**  I don't know.  I really don't have a lot of time to look

6  at the websites.  Any time that I am not dealing with this

7  right now, I am spending with my daughter every minute.  So I

8  really couldn't tell you the answer to that.

9  **Q.**  Last Friday there was a class of -- a teacher brought a

10  class in, correct?

11  **A.**  Oh, yes.  That was my friend.

12  **Q.**  Your friend brought her class in for the morning, right?

13  **A.**  Yes.

14  **Q.**  And I noticed during that morning time that none of your

15  supporters were here, it was empty.  Do you remember that?

16  **A.**  Well, I think there were some.  John's been here every

17  day.

18  **Q.**  But then in the afternoon when your class was gone, a new

19  six people showed up.  Do you remember that, six people showed

20  up right after lunch?

21  **A.**  I think you are keeping track more than me.  I am not

22  sure.

23  **Q.**  That's because it was so organized, everybody knew the

24  class was going to be in the morning and they needed to come

25  in the afternoon, right?

1  **A.** I am sorry, no, I am not organizing any of the supporters'
2  comings or goings. I don't do any of that stuff.
3  **Q.** You are aware that there are individuals in Olympia that
4  organize people, coming in and actually providing direction on
5  how they should act, what they should wear. In fact, they
6  instruct them that they should camouflage how they normally
7  appear, correct?
8  **A.** I don't know. I haven't seen any of that.
9  **Q.** With regard to your web page, it is correct that you did
10 solicit funds for attorney fees for your two attorneys,
11 Mr. Fox and Mr. Bloom, correct?
12 **A.** In the very beginning, yes.
13 **Q.** It still appears on your web page, right? When it's
14 downloaded, it still appears there?
15 **A.** Yes.
16 **Q.** In fact, you've never paid a dime to Mr. Fox?
17 **A.** No, I haven't, but I didn't know that in the beginning. I
18 didn't know if I was going to have to pay him or not. All the
19 text on the website, aside from the recent update, was written
20 by my brother, who volunteered to do this for me. I give him
21 a general idea of what to do, and then he does it. I don't
22 have the time to maintain it myself.
23 **Q.** The website also says people can actually get a tax
24 deduction by donating?
25 **A.** That's right.

1  **Q.** How does that work?

2  **A.** There's a group in Portland who have provided their

3  501(c)(3), I think it's called, the nonprofit umbrella for

4  people to make tax deductible donations.

5  **Q.** Does that seem right to you, that they could actually give

6  money to you for your legal defense but wash it through a

7  charity?

8  MR. BLOOM: I've sat down long enough. I really must

9  objected to this.

10  THE COURT: Move on to the next question.

11  BY MR. BARTLETT:

12  **Q.** During your direct examination there was discussion about

13  you and your partner's financial situation.

14  Just so I can be clear, what's the primary source of your

15  income on a month-to-month basis?

16  **A.** My partner's income, which is from his carpentry work.

17  **Q.** I want to talk about your relationship with Bill Rodgers.

18  You indicated you moved to Olympia if 1996?

19  **A.** It was 1997.

20  **Q.** Started taking classes at Evergreen College during the

21  winter of 1997, would that be accurate?

22  **A.** That's correct.

23  **Q.** Had attended the University of Dayton two years and then

24  transferred out?

25  **A.** Yes.

1  **Q.** While you were in Olympia, you met Bill Rodgers, or was it

2  during the Watch campaign?

3  **A.** It was before the Watch campaign.

4  **Q.** You knew him as Avalon?

5  **A.** Yes.

6  **Q.** You became friends with him?

7  **A.** Yes.

8  **Q.** Close friends?

9  **A.** Just friends. I wouldn't say very close.

10 **Q.** He was part of the Watch campaign?

11 **A.** I remember him at some of the meetings in Olympia, but I

12 don't remember actually seeing him at the tree sit or in

13 Randle.

14 **Q.** Not at all?

15 **A.** No.

16 **Q.** Speaking of the Watch campaign, it's true that at the time

17 the Watch Mountain land transfer was proposed, it was unusual

18 in that there was a number of people normally associated with

19 pro-environmental stands that supported it, correct?

20 **A.** In Seattle, yes, because they wanted to have their areas

21 preserved and they weren't necessarily thinking about the

22 areas down south.

23 **Q.** I just want to clarify, though. Senator Patty Murray and

24 Senator Gorton both supported it, correct?

25 **A.** I think so.

1   **Q.**  And the Sierra Club?

2   **A.**  Yes.

3   **Q.**  And the Alpine Lakes Protection Society?

4   **A.**  Yes.

5   **Q.**  And the Mountaineers?

6   **A.**  Yes.

7   **Q.**  Going back to Bill Rodgers, at some time in the spring,

8   probably around April of 2000, he asked you to get a cell

9   phone for him; correct?

10   **A.**  Yes.

11   **Q.**  At this point in time you are very poor, you don't have a

12   cell phone?

13   **A.**  That's right.

14   **Q.**  You are living hand-to-mouth?

15   **A.**  Yes.

16   **Q.**  And he turns to you to get the cell phone?

17   **A.**  Yeah, for whatever reason he asked me to do it for him as

18   a favor.

19   **Q.**  Taking a look at Government's Exhibit 712, page 38.

20      It is admitted.  We can just pull it up on the screen,

21   Pat.

22      Do you see that bill?

23   **A.**  The text is really small, but yes I see that.

24   **Q.**  In looking at the amount, do you see how much that bill

25   was?

1  **A.**  $91.37.

2  **Q.**  It's a lot of money, correct?

3  **A.**  Yeah.

4  **Q.**  So you are relying on Bill Rodgers to make sure he doesn't

5  stick you with this bill every month it comes in, he's got to

6  pay you?

7  **A.**  Yes.

8  **Q.**  And you write checks out from your bank account, and we've

9  seen those checks?

10  **A.**  Yes.

11  **Q.**  And in addition to your covering the bill every month, he

12  also uses the phone to call you a fair amount, correct?

13  **A.**  I think he called me once in a while, yes.

14  **Q.**  Could we pull up Exhibit 713.  You've seen this chart

15  before, correct?

16  **A.**  Yes.

17  **Q.**  And all of the calls that Mr. Rodgers uses with your cell

18  phone to call Robert and Kara Corrina, all 25 of those, those

19  are all for you; correct?

20  **A.**  Yes.

21  **Q.**  With regard to the 25 calls to Ocean, those are also all

22  for you, correct?

23  **A.**  I don't know.  There are other people working there and

24  living there, so it could have been for other people.

25  **Q.**  A huge majority, can we agree on that?

1  **A.** I don't know.  I don't remember.  I didn't keep track.

2  **Q.** Some of the phone calls that go to Teresa Howell, you

3  lived with Teresa Howell for a while, correct?

4  **A.** Yes, but I would say for that, those were probably going

5  to her or other people in the house, because they were really

6  good friends.

7  **Q.** So never you?

8  **A.** Well, maybe occasionally.  I know they were better friends

9  than me, than me and him were.

10  **Q.** But some of them went to you?

11  **A.** Yes.

12  **Q.** So if you were to add up those calls, the 25 calls to

13  Mr. Corrina, most of the calls to the Conger Street address

14  for Ocean, some of the calls made to the Howell residence, it

15  means that he called you more than anybody on this list, isn't

16  that accurate?

17  **A.** Well, I wouldn't say that it was most of the calls to

18  Ocean's house.  I said I don't know how many those calls would

19  be.  So I don't know.

20     MR. BLOOM:  I would ask it be pointed out the time

21  period this covered.

22     THE COURT:  I don't know -- are you talking about --

23     MR. BLOOM:  I think a fair question of the witness

24  would indicate it's from the first of the year to the last of

25  the year, covering the entire year's period.  I think the

1  question should include that.

2          THE COURT:  It's listed right there, isn't it?

3          MR. BLOOM:  It is.

4  BY MR. BARTLETT:

5  **Q.**  Mr. Rodgers and you had opportunities to talk on a number

6  of different occasions about his environmental views?

7  **A.**  The primary aspect of our friendship that I remembered was

8  really me being just a support person for him.  He was pretty

9  depressed and lonely.  And that's the majority of what we

10  talked about.

11  **Q.**  You've heard people describe his writing and rewriting of

12  the manual "Setting Fires with Electrical Timers," the Bible

13  for how to make incendiary devices for ELF; you've heard all

14  about that?

15  **A.**  Yes.

16  **Q.**  And you've heard Jennifer Kolar talk about the actions he

17  was involved in, how important it was, and the constant talk;

18  you've seen that, you've heard that?

19  **A.**  Yes.

20  **Q.**  And you've seen the things from his house at the time he's

21  arrested in December of 2005, where there's articles.  He's

22  reworking manuals.  Don't all those things lead one to believe

23  that Bill Rodgers was obsessed with these types of activities,

24  direct actions to protect the environment?

25  **A.**  That's not really how I knew him; but that might be, might

1  lead someone to believe that.

2  **Q.** You are involved in environmental movements?  You are

3  involved in all these above-ground environmental movements and

4  you want this jury to believe that, gee, this topic never

5  comes up?

6  **A.** I didn't say it never came up.  You said numerous times.

7  I didn't think that numerous times categorized it or

8  characterized it, but sometimes, sure.

9  **Q.** In addition to knowing Bill Rodgers, obviously you knew

10 Justin Solondz?

11 **A.** Yes.

12 **Q.** Your boyfriend?

13 **A.** Yes.

14 **Q.** He graduated from the Evergreen State College in 2003?

15 **A.** I am not sure what year it was.  But that sounds right.

16 **Q.** Would you take a look at Exhibit 115?  This is what

17 Mr. Solondz looked like for a long time during the time you

18 knew him, correct?

19 **A.** Correct.

20 **Q.** But there came a point in time when he changed his

21 appearance, correct?

22 **A.** Yes.

23 **Q.** That's Exhibit 115A, correct?

24 **A.** Yes.

25 **Q.** And you remained in contact with Mr. Solondz?  For

example, Special Agent Halla contacted you on February 24 of
2006. You indicated that you had received an e-mail from him
just prior, a couple weeks before?

**A.** I don't know if it was a couple weeks, but yeah, he sent
me an e-mail from his travels.

**Q.** And he's currently a fugitive, you know that?

**A.** That's right --

MR. BLOOM: Objection, he's not technically a
fugitive. A person who's been arrested is a fugitive. As I
understand it, he was not arrested.

THE COURT: You will get a chance to redirect or do
something. There's no sense in keep jumping up and down
unless it really goes to something.

MR. BLOOM: This is the second time I jumped up. I
am trying not to object, but he's not a fugitive.

THE COURT: Leave it there. Question.

BY MR. BARTLETT:

**Q.** In fact, his mom came out and sat through the first week
of your trial, Bianca, didn't she?

**A.** Yes.

**Q.** At the time you knew Mr. Solondz, he also was involved in
music?

**A.** No.

**Q.** He wasn't in a band?

**A.** No.

1  **Q.** He didn't play music with Nathan Block?

2  **A.** I think they might have started doing some electronic

3  stuff like after I left; but when we were together, he wasn't

4  doing that.

5  **Q.** But you knew Nathan Block, though?

6  **A.** Yes.

7  **Q.** Exhibit 118. He also lived in Olympia?

8  **A.** Yes.

9  **Q.** And you knew his girlfriend, Joyanna Zacher?

10  **A.** A little bit.

11  **Q.** Exhibit 119.

12  **A.** Yes.

13  **Q.** And you knew Suzanne Savoie, India?

14  **A.** I believe I met her once.

15  **Q.** Exhibit 120. And you knew Chelsea Gerlach?

16  **A.** Yes.

17  **Q.** And you knew Joe Dibee?

18  **A.** Yes.

19  **Q.** In fact, Mr. Dibee made two phone calls to you, correct?

20  **A.** That's what the phone records say.

21  **Q.** You've had a chance to go through them?

22  **A.** What's that?

23  **Q.** You and your attorneys have had a chance to go through the

24  hundreds of pages of Mr. Dibee's phone records; you've had a

25  chance to look at them, correct?

1    **A.**  I haven't personally looked at them.

2    **Q.**  Was there more than two phone calls?

3    **A.**  I don't think so.  I think those were the only ones.

4    **Q.**  And the two phone calls from Mr. Dibee, to Mr. Corrina's

5    house, were immediately prior and immediately after the

6    Susanville arson, correct?

7    **A.**  That's the information that's been presented.

8    **Q.**  You also knew Jennifer Kolar?

9    **A.**  Yes.

10   **Q.**  You saw her testify?

11   **A.**  Yes.

12   **Q.**  And she was more than just an acquaintance, you considered

13   her a friend?

14   **A.**  Yes.

15   **Q.**  She's smart?

16   **A.**  Yes.

17   **Q.**  Someone you could talk to?

18   **A.**  Yes.

19   **Q.**  And in fact, when you were screening for the Watch video

20   that occurred in Seattle at the 9/11 Studio, you invited her?

21   **A.**  I don't remember.  Possibly.

22           MR. BARTLETT:  Could the witness be handed what's

23   been previously marked and entered into evidence as government

24   Exhibit 614.

25   BY MR. BARTLETT:

1  **Q.** Taking a look at that, you recognize that manila folder,

2  don't you?

3  **A.** Inside this?

4  **Q.** Yes, you can take it out.

5  **A.** Okay.

6  **Q.** You can take it out of the plastic and take a look at the

7  inside page. You recognize that folder, correct?

8  **A.** I don't remember the folder itself.

9  **Q.** The writing that appears on that folder is your

10 handwriting?

11 **A.** It looks like my hand writing.

12 **Q.** It says, "Hey Woman! Here's some stuff to read that I was

13 telling you about. We'll hang out soon. Heart, B."

14      So you provided a number of articles to Ms. Kolar within

15 this folder?

16 **A.** That's apparently what it looks like. These articles that

17 are here are not the ones I remember giving her, but it looks

18 like I gave her a folder with something in it.

19 **Q.** What was in the folder?

20 **A.** I don't remember.

21 **Q.** Are you saying that this definitely was not the items that

22 were in the folder, or "it could be and I just don't

23 remember"?

24 **A.** I am saying that these articles were not articles that I

25 recognize or that I think I ever read. So I think it would be

1   odd if I had given her these articles.

2      What her and I had talked about were issues of women and

3   activism and vegetarianism and things like that.  So I would

4   think that I would have given her those types of articles.

5      We had a pretty extensive library of materials in the

6   Evergreen Animal Rights Network, in the office, we had a

7   library.  We didn't have any of this stuff.  There wasn't

8   anarchist materials or anything like that.

9   **Q.**  You saw that Justin's fingerprints were on a number of

10   these articles?

11   **A.**  Yes.

12   **Q.**  And you saw that two of the articles were written by Chris

13   Dixon, and you know who Chris Dixon is?

14   **A.**  Yes.

15   **Q.**  Chris Dixon actually went to Evergreen with you?

16   **A.**  Yes.

17   **Q.**  And he was a member of EARN?

18   **A.**  Yes.

19   **Q.**  And as I understand it, it's your belief that Ms. Kolar at

20   some point became attracted to you in a physical way?

21   **A.**  Yes.

22   **Q.**  You heard her testify?

23   **A.**  Yes.

24   **Q.**  You heard her talk about the various men she was involved

25   with, and the fact that she's been in a relationship for the

1  past seven years?

2  **A.**  Yes.

3  **Q.**  But it is your testimony that she became fixated upon you?

4  **A.**  I guess.

5  **Q.**  And when you rejected her, it created such venom in her

6  that she's falsely framing you for this crime?

7  **A.**  Unfortunately.

8  **Q.**  Could you point out all of the e-mails that Ms. Kolar sent

9  you as she was obsessed with you?

10 **A.**  I don't believe that we communicated through e-mail.

11 **Q.**  Could you point out in the phone records, all of the phone

12 calls that Ms. Kolar called to you as she was obsessed with

13 you?

14 **A.**  I don't think I was saying she was obsessed with me.  I am

15 just saying that she told me that she was romantically

16 interested in me.  That's all.

17 **Q.**  You heard her testimony that she went down to the 9/11

18 Studio on the night that Watch was premiering?

19 **A.**  Yes.

20 **Q.**  A big day for you?

21 **A.**  Well, it was a showing.  It actually wasn't the premier of

22 the film.

23 **Q.**  But it was an important day for you?

24 **A.**  Yes.

25 **Q.**  But Ms. Kolar did not have even enough interest to even

1 stay and watch the film?

2       MR. BLOOM: Objection to phrasing.

3 BY MR. BARTLETT:

4 **Q.** Do you remember her testimony Ms. Waters?

5 **A.** Yes.

6 **Q.** This was the woman that was obsessed with you, obsessed to

7 the point where she's come in and fabricated the charges

8 against you, right?

9       MR. BLOOM: Excuse me, she did not testify -- in fact

10 the question was: Was she obsessed with you? And she said:

11 No.

12       THE COURT: You can redirect if you heard it

13 differently.

14       MR. BLOOM: He can't misrepresent.

15       THE COURT: You can redirect. Ask the question.

16 BY MR. BARTLETT:

17 **Q.** At long as we are talking about this area, I understand

18 that your testimony today is that Lacey Phillabaum also was

19 enraged with you?

20 **A.** Enraged with me?

21 **Q.** Yes.

22 **A.** I can't say how any of these people felt. I am not inside

23 their minds.

24 **Q.** You are indicating that they came into court and committed

25 perjury and are falsely framing you for a very serious

1 offense, right?

2 **A.** Yes.

3 **Q.** And it's your belief that she did that because at some

4 point in time, you called her "an unprincipled slut?"

5 **A.** I don't know why she's doing it.  I am just testifying to

6 the truth of what happened.

7 **Q.** I want to talk about Mr. Corrina.  You saw him testify?

8 **A.** Yes.

9 **Q.** Do you know him?

10 **A.** Yes.

11 **Q.** He's your first cousin?

12 **A.** Yes.

13 **Q.** And actually, unlike some first cousins, it sounds like

14 you had quite a bit of contact over the years.  You went to

15 high school with him?

16 **A.** He was a little bit older, so we were like one year in

17 high school.

18 **Q.** One year overlap?

19 **A.** Yes.

20 **Q.** When you made the trip from Dayton, out to what eventually

21 becomes Olympia, you actually go out of your way to stop by

22 Greeley, Colorado, and see him and Kara?

23 **A.** Yeah, we had lunch together.  I don't know if it was out

24 of my way, but we had lunch one day.

25 **Q.** When Mr. Corrina moves to Olympia, he moves in with you?

1  A.  He didn't move in, they just stayed on the living room

2  floor until they found their own place.

3  Q.  Eventually they did get their own place, the duplex?

4  A.  Yes.

5  Q.  And at some point you actually move in with them?

6  A.  Well, again, I was staying there.  I wasn't really moved

7  in for good.

8  Q.  They had pretty simple lives; they didn't own a car?

9  A.  No.

10  Q.  Not overly wealthy?

11  A.  No.

12  Q.  There was never any huge blowup where he indicated a huge

13  hatred for you and Justin?

14  A.  No.

15  Q.  You heard testimony from Lacey Phillabaum, and actually

16  from Special Agent Halla, talking about Ms. Phillabaum's first

17  interview on February 21, of 2006; do you remember those

18  questions and answers?

19  A.  Yes.

20  Q.  On February 21, Lacey Phillabaum came in and identified

21  you as the lookout?

22  A.  Apparently that's what happened.

23  Q.  And in addition, she indicated that you had got the rental

24  car and thought it was through an aunt, correct?

25  A.  I think that's what she said, yes.

1  **Q.** And there's only one blood relative of yours in all the

2  northwest, isn't there, Mr. Corrina? That's the only person

3  you are related to by blood in this area?

4  **A.** I don't know about all throughout the northwest. I think

5  I have a couple cousins in Portland.

6  **Q.** How about the Seattle area?

7  **A.** No.

8  **Q.** When we eventually find Mr. Corrina, he has records about

9  one car rental that entire year, 2001, correct?

10  **A.** I think so.

11  **Q.** And those car records indicate it was for the very weekend

12  of this arson, correct?

13  **A.** Yes.

14  **Q.** And his bank records indicate a $200 cash deposit

15  immediately after the car rental, correct?

16  **A.** Yes, I saw that testimony.

17  **Q.** The only cash deposit into his account that entire year,

18  correct?

19  **A.** That's what the testimony was.

20  **Q.** And you want this jury to believe that Ms. Phillabaum's

21  statement on February 21, as she's falsely framing you, that

22  your cousin who rented the car, and it turns out the records

23  match up exactly, is simply a lucky guess on her part; is that

24  what you want them to believe?

25  **A.** Well, she didn't say my cousin. And I don't know, I don't

1  know how that would have happened.

2      THE COURT:  Are you going into another line of

3  questioning?

4      MR. BARTLETT:  I am.

5      THE COURT:  Then let's take the afternoon recess at

6  this time.

7      Leave your books on the chair, and of course don't discuss

8  the case.  I will have you back in here in about 15 minutes.

9      (Jury not present.)

10      THE COURT:  Let's take the afternoon recess.

11      THE CLERK:  All rise, court is in recess.

12      (Afternoon recess.)

13      THE COURT:  All right.  You may be seated.

14      We are ready to continue.  Bring in the jury.

15      (Jury present.)

16      THE COURT:  All right.  You may be seated.

17      Mr. Bartlett.

18      MR. BARTLETT:  Thank you, Your Honor.

19  BY MR. BARTLETT:

20  Q.  Ms. Waters, I wanted to go back to the document we were

21  talking about earlier in the afternoon, Exhibit 713.

22  Specifically, I want to look at the calls made to Ocean's

23  house at Conger.  Do you see those?

24  A.  Yes.

25  Q.  I believe you indicated that there were a number of

1   individuals that might have received calls from Mr. Rodgers

2   during the time that you were over there.

3      Do you remember your answer?

4   **A.**  Yes.

5   **Q.**  Can you take a look at what's been also entered into

6   evidence as Government's Exhibit 714. Do you recognize that

7   to be a listing of the calls from Bill Rodgers' phone, the

8   cell phone you got for him, to various locations?

9   **A.**  Yes.

10   **Q.**  Looking at that, do you see that the first call that it

11   goes to, the Conger Street address, appears on June 3rd?

12   **A.**  Yes.

13   **Q.**  That would be about one week after the arson, correct?

14   **A.**  I guess so.

15   **Q.**  As you look through it, there are a number of calls in

16   June, July, going on through -- finally, do you see the very

17   last call -- the call basically on -- around September 13th,

18   although there are two additional calls after that.

19      Do you see that?

20   **A.**  Yes.

21   **Q.**  As I understand your testimony on direct examination,

22   around September 13th was when you moved out of the Conger

23   Street address, correct?

24   **A.**  I don't remember exactly when it was. I think it was

25   September or October.

1  **Q.** So wouldn't you agree, looking at this chart, that it

2  seems to be at least a fair inference that the huge majority

3  of calls made to Ocean's house on Conger Street were in fact

4  intended for you?

5  **A.** I am sure that many of them were, but like I said, there

6  were a lot of people there and a lot of people working there,

7  and Heather was also there even though she didn't live there,

8  so I really can't say exactly how many of the calls were to

9  me.

10 **Q.** But you do realize that after you moved out, there were

11 but two very short calls from then on?

12 **A.** Sure.

13 **Q.** I want to go back to Exhibit 614, the documents that

14 you've already had a chance to look at with regard to the --

15 first of all, if you could just pick that up again.  Maybe I

16 didn't get it clear enough.  The manila folder that you looked

17 at --

18 **A.** Yes.

19 **Q.** -- that is your handwriting inside, correct?

20 **A.** Yes, I think so.

21 **Q.** If you can take a minute and go through and see if any of

22 those documents are documents that you sent to Ms. Kolar that

23 you were going to talk with her about at some point in the

24 future.

25      As I understand it, there's three pamphlets called

1    "Willful Disobedience, An Anarchist Bimonthly"?

2    **A.** You say that I sent to her or that I gave to her?

3    **Q.** Sent or gave.

4    **A.** Okay.

5    **Q.** Are any of those "Willful Disobedience, An Anarchist

6    Bimonthly" part of the packet that you gave her?

7    **A.** No.  I don't remember giving her those.

8    **Q.** How about any of the other documents in there?  Is it your

9    testimony that not one single page of all of these documents

10   are any of the things that you gave her?

11   **A.** My testimony is that I don't remember giving her any of

12   these things because I actually don't remember reading these

13   things.  So I don't think I would have given her these things.

14   It's possible that Justin might have given me things to give

15   to her.  I don't remember.

16   **Q.** So it's your testimony that possibly Justin was interested

17   in passing these things on to Ms. Kolar?

18   **A.** It's possible.

19   **Q.** But the note is in your handwriting, correct?

20   **A.** Yes.

21   **Q.** And the note says, these are things you want to talk to

22   Ms. Kolar about, correct?

23   **A.** Yes.  But what I said before is that I remember that her

24   and I had discussions about much different things than are in

25   these documents here.  So I probably would have given her

1  something different in this folder.

2  **Q.** So sometime between when you gave her that folder and when

3  she turned over the bucket to her attorney, as she described,

4  she somehow got rid of your documents and put Justin's

5  documents in this folder?

6  MR. BLOOM: Objection, he's asking her to speculate

7  on what another person did.

8  THE COURT: Well, I guess he's trying to get it

9  straight as to what she's saying. Do you understand the

10  question?

11  BY MR. BARTLETT:

12  **Q.** Is that what you think happened?

13  **A.** I don't know. I can't say what happened.

14  **Q.** Do you know Bill Rodgers?

15  **A.** Yes.

16  **Q.** Do you know Justin Solondz?

17  **A.** Yes.

18  **Q.** Do you know Jennifer Kolar?

19  **A.** Yes.

20  **Q.** Do you know Lacey Phillabaum?

21  **A.** Yes.

22  **Q.** Do you know Nathan block, Joyanna Zacher, Joseph Dibee?

23  **A.** Yes.

24  **Q.** In late December of 2005, when Ms. Kolar calls to name you

25  as the lookout at the UW arson, it is your belief she's doing

1   it because she was a spurned lesbian lover?

2       Is that what you want this jury to believe?

3           MR. BLOOM:  Objection, calls for speculation as to

4   why Kolar is doing what she's doing.

5           THE COURT:  You may answer the question, if you

6   understand it.

7   **A.**  I understand the question.  I don't know why she's doing

8   what she's doing.  She obviously doesn't have very good

9   memories of anything.  I know what happened between us, and I

10  know that she was probably very scared of facing life in

11  prison.  So I could speculate about why she's doing it, but I

12  don't actually know because I don't live inside of her head.

13  BY MR. BARTLETT:

14  **Q.**  Two months later, Ms. Phillabaum comes in, independently,

15  and also happens to choose you as the lookout for the UW

16  arson?

17          MR. BLOOM:  Objection, we don't know.  It's a fact

18  for the jury to find if she came in independently.

19          THE COURT:  She can answer the question, if she

20  understands it.

21  BY MR. BARTLETT:

22  **Q.**  Is that your testimony?

23  **A.**  I am sorry, what's the question?

24  **Q.**  That two months later, Lacey Phillabaum comes in and

25  independently names you as the lookout?

1          MR. BLOOM:  I object to the form of that question.

2          THE COURT:  Well, your objection is noted.

3          MR. BLOOM:  I don't want it noted.  I want it

4  sustained.

5          THE COURT:  It's overruled.  If you understand the

6  question, answer it.

7  **A.**  I don't know that that's what happened.  I wasn't there.

8  BY MR. BARTLETT:

9  **Q.**  And the quotation of yours in the New York Times isn't

10  this quotation?

11  **A.**  No, I didn't say that.  I said, I don't remember saying

12  that.

13  **Q.**  And the articles that appear at 614 aren't your articles?

14  **A.**  No, these aren't my articles.

15  **Q.**  And the rental car records that Mr. Corrina described are

16  simply his misremembering what was occurring during the

17  weekend of May 20th and 21st?

18  **A.**  Would you like me to speculate about why he's saying the

19  things that he said?

20  **Q.**  I am asking you, it's your testimony that it has nothing

21  to do with the University of Washington arson, those rental

22  records, it was merely a coincidence?

23  **A.**  Rob is obviously really scared, and he's making up a lot

24  of things.

25  **Q.**  You never took the wireless phone ever, that never

1  happened?

2  **A.** I think that he's confusing that with the time that I went

3  to the hospital in January of 2002.

4  **Q.** So in January of 2002 when you went to the hospital, you

5  did take his wireless phone?

6  **A.** I have a vague memory that that may have happened, but I

7  am not sure. I am not positive.

8        MR. BARTLETT: No further questions.

9        MR. BLOOM: I have some questions, if I may.

10                REDIRECT EXAMINATION

11  BY MR. BLOOM:

12  **Q.** Ralph's Thriftway, you indicated that you shopped there on

13  some occasions; is that correct?

14  **A.** Yes.

15  **Q.** Did you ever go there and shop with cash?

16  **A.** Oh, yes. I didn't always use my card. I think I tried

17  not to use my debit card because they charge every time you

18  use a debit card; at least that's what I remember. So I am

19  sure I used cash a lot of the times that I went shopping.

20  **Q.** Other than Bill Rodgers living -- Bill Rodgers is

21  deceased; is that correct?

22  **A.** Yes.

23  **Q.** And when you learned about that, how did you feel about

24  that?

25  **A.** It was sad to learn that he was deceased.

1 **Q.** You indicated that he was a depressed person; is that

2 correct?

3 **A.** Yes.

4 **Q.** And you learned that he had taken his own life?

5 **A.** Yes.

6 **Q.** Was that consistent to you with a person who was in

7 depression?

8 **A.** Yes, I wasn't surprised. He actually talked about that

9 with me before, about suicide.

10 **Q.** Did he have conversations with you about how he was

11 feeling in life?

12 **A.** Yes. He was really lonely. He was obsessed with not

13 having a girlfriend. He really wanted a partner, and he

14 talked to me a lot about that.

15 **Q.** Did he ever try to get connected with you, hit on you?

16 **A.** No, not that I knew of.

17 **Q.** Now, on the east side of Olympia, did you say Anthea,

18 Anthea Lawrence and Lawson Dumbeck lived there as well?

19 **A.** Yes, they lived close to there.

20 **Q.** Did you spend time with them from time to time?

21 **A.** Yes. I babysat for their daughter and I also took violin

22 lessons, fiddle lessons, because I played the violin, but then

23 I learned the Irish fiddle when I moved to Olympia. So she's

24 the first one that taught me a lot of tunes. So I spent a

25 considerable amount of time over at their house.

**Q.** Would that take you near Ralph's Thriftway?

**A.** Yes.

**Q.** Now, you said band practice was over in that area?

**A.** Yes.

**Q.** Could you give us the name of a person who was in the band, if you remember?

**A.** Well, I know the people's first names. I am not remembering their last names.

**Q.** Was that anywhere near Ralph's Thriftway?

**A.** Yes, that was also near that store.

**Q.** I notice that when Mr. Bartlett asked you about Ralph's Thriftway, he asked you about how many times you were there. He asked you about Rodgers. He never once asked you, did he, this afternoon, you were at Ralph's Thriftway at 12 minutes after 7:00 when Lacey says you were in Seattle.

Did you hear him asking any of those questions?

**A.** No, I don't think so.

**Q.** Now, he asked you some questions about Plum Creek and the office, going into the Wells Fargo building in Seattle?

**A.** Yes.

**Q.** Do you remember answering that there's footage of that in your video?

**A.** Yes.

MR. BLOOM: I offer Exhibit A-169, the door having been opened, the video that depicts those events.

1    THE COURT:   Same answer.   Same ruling.

2    MR.  BLOOM:   The door has now been opened.

3    THE COURT:   Same ruling.

4  BY MR.  BLOOM:

5  **Q.**  Mr. Bartlett read from a pleading, a document filed by

6  Mr. Fox and myself back in March of 2007, about 11 months ago.

7    Do you remember his reading --

8  **A.**  Yes.

9  **Q.**  -- some of that.  I am going to read you the entire

10 paragraph --

11    MR.  BARTLETT:   Objection, Your Honor.

12    MR.  BLOOM:   The rule of completeness.

13    MR.  BARTLETT:   Objection, Your Honor.   The only thing

14 I asked about was their position compared to how serious the

15 University of Washington arson was.   That's the only thing I

16 asked about --

17    THE COURT:   You may deal with that issue.   That

18 wasn't the issue -- I don't believe it's offered --

19    MR.  BLOOM:   He read from part -- it's not.   He read

20 from part of the paragraph.  I can read the whole thing.  I

21 can read the paragraph.

22    THE COURT:   Just a minute.

23    MR.  BARTLETT:   I would like to have this outside the

24 presence of the jury.

25    THE COURT:   Do I need to have this outside the

1  presence of the jury?

2      MR. BARTLETT:  Yes.

3      THE COURT:  All right.  Leave your books on your

4  chair and I will have you back here.

5    (Jury not present.)

6      THE COURT:  All right.  There's an objection.  Let me

7  hear that.

8      MR. BARTLETT:  Your Honor, the objection is that the

9  rest of the paragraph is irrelevant, has a number of items

10 that this jury should never hear under 403 or any other

11 analysis.

12    The only thing relevant in that is the Defendant's

13 statement through her agents on how serious the University of

14 Washington.  That statement is complete.  The rest of it with

15 regard to what the possible sentences are and what might

16 happen in the State of Washington is absolutely irrelevant.

17     THE COURT:  All right.  Mr. Bloom, let me hear from

18 you.

19     MR. BLOOM:  This statement is not complete.  The

20 thrust of this, which was written eloquently I believe by

21 Mr. Fox, talks about -- what the motion is, is a motion that I

22 think -- as I remember, the Court denied Defendant Waters'

23 motion to dismiss Counts 5 and 6 based on the commerce clause

24 and the 10th Amendment.

25    The motion, which of course the witness -- the Defendant

1  never saw -- in the motion, one of the things that Mr. Fox,

2  the point he's making in this paragraph is that this is a

3  crime -- assuming it was committed -- this is a crime that did

4  not injure anybody, was not intended to injure anybody, was a

5  misguided act by those who wanted to preserve the Earth, and

6  the whole point -- it's not telling the jury the whole point

7  of why -- even if it's attributable, and that's apparently the

8  thrust of what these prosecutors want to do, attribute these

9  words to our client, it explains -- it's necessary to

10 understand the context.

11     Now, what it is about is a claim that to bring this charge

12 in federal court with Draconian consequences is simply an

13 effort to put people in a position -- here we go, the last

14 sentence of that paragraph:  "Yet, the threat of such an

15 excessive sentence is being utilized by the government to

16 coerce guilty pleas and so-called 'cooperation' agreements by

17 former political activists who fear spending the rest of their

18 lives in prison."

19     The point is that Mr. Fox was pointing out that this is a

20 crime that indeed did not injure anybody and so on, the part

21 that was read by the prosecutor, but it has to be in context.

22     It's not like -- first of all, it's not attributable to

23 our client, but secondly we're not saying this was not a

24 crime.  We are saying that if this were prosecuted where it

25 should be prosecuted, in the state court, instead of a person

1  facing a 35-year mandatory minimum, the sentence prescribed by

2  the State Court is somewhere between 21 and 27 months,

3  approximately two years, compared to 35 years.

4       That's why it was phrased the way it was.  To keep the

5  jury from knowing that, to let them hear just what he read,

6  would be a continuation of slamming us and not letting the

7  jury hear the whole picture.  I don't like it.  It's not

8  right.  It's not fair.

9            THE COURT:  Tell me what you are pointing at here

10  that would make that complete.

11           MR. BLOOM:  That paragraph, beginning with -- on page

12  3, "somehow this offense," ending with "lives in prison," that

13  one paragraph, a third of which has already -- a quarter of

14  which has been presented to the jury.

15           THE COURT:  All right.  Your comments to that?

16           MR. BARTLETT:  First off, Your Honor, with regard to

17  the legal analysis, it is without question that a filing by a

18  defense attorney is an agent's admission on behalf of their

19  party.  So there's no question that statements --

20           THE COURT:  The issue seems to be about completeness.

21           MR. BARTLETT:  Your Honor, with regard to

22  completeness it is -- first of all, the United States is in a

23  different position.  We are the party-opponent.  Therefore,

24  what appears in this motion are admissions by a

25  party-opponent.  It is not hearsay for us.  We are not

1  offering the paragraph.  What we are trying to do is impeach
2  this witness's credibility with a specific statement.
3      The entire paragraph is utterly irrelevant under 403.  It
4  is utterly irrelevant as to why this statement is in here.
5  The only relevance of this paragraph is that it appeared, from
6  my hearing of her direct testimony, that she had changed her
7  position with regard to how serious the University of
8  Washington is.
9      That's exactly what Mr. Bloom did time and time again,
10  trying to impeach a witness with a prior inconsistent
11  statement.  This statement in this motion, just that
12  statement, is a prior inconsistent statement by a witness.
13  That is why it was introduced.  Why it appeared in this motion
14  is utterly irrelevant.
15      The Court has already ruled that this is not a relevant
16  argument and the jury should not be prejudiced and blackened
17  by all of the -- basically by the argument that's already been
18  rejected by the Court.
19      THE COURT:  Point me to where this goes to a prior
20  inconsistent statement.
21      MR. BARTLETT:  She talked about how serious and
22  horrible the University of Washington arson was.  During his
23  cross-examination, he actually described it as just horrible,
24  horrible.  But when you read this, I would suggest a fair
25  reading of this statement is:  "It's an act which did not

1  injure anybody, basically property crime, which did not intend

2  to injure anybody, and which at most was a misguided act by

3  those desperate to preserve the Earth against corporate

4  onslaughts."

5      That isn't a horrible crime.  That's basically a property

6  crime committed by people who have a good heart.  That's a

7  different position, Your Honor, and I am able to point that

8  out to the jury.

9          THE COURT:  What I am reading here is that, to start

10  at the beginning of the sentence, it says "35 years in prison

11  for an act which did not injure anybody, which was not

12  intended to injure anybody, and which, at most, was a

13  misguided act by those desperate to preserve the Earth against

14  corporate onslaughts, is far outside the pale of humaneness

15  and rationality."

16      It talks about folks outside.  It doesn't seem to say it

17  was her, necessarily.

18          MR. BARTLETT:  Well, it's her position, Your Honor,

19  which --

20          THE COURT:  I understand what you are saying it's her

21  position.  I am talking about now in terms of completeness as

22  to what is being said in that paragraph, and that's what they

23  are talking about.

24          MR. BARTLETT:  It is, Your Honor.

25          THE COURT:  Okay.  In all fairness, I think we ought

 1  to hear the whole thing.

 2          MR. BARTLETT:  The whole paragraph or the whole

 3  sentence?

 4          THE COURT:  That whole sentence, and I think that's

 5  what -- I think that says it.  What I read says exactly how it

 6  was expressed here.  I don't think we need to go into the

 7  argument as to Count 5 and 6.  But as to this thing, talking

 8  about, I guess, how unfair, if you will, and facing this term

 9  of imprisonment or this act by other folks, that's what I am

10  gathering from that, not necessarily to say she has to adopt

11  this in something different and contrary.

12      I am saying this whole sentence can be read as to starting

13  with "35 years" and ending in "rationality".

14          MR. BARTLETT:  Okay, Your Honor.

15          MR. BLOOM:  Starting with "35".

16          THE COURT:  Starting with "35" and ending at

17  "rationality".  You can read that whole -- because that's what

18  we are talking about here in terms of changing her view.

19          MR. BLOOM:  That's all I will read.

20          THE COURT:  Bring them in.

21      (Jury present.)

22          THE COURT:  All right.  You may be seated.

23          MR. BLOOM:  After the Court's ruling, may I read that

24  one sentence?

25          THE COURT:  You may.

1  BY MR. BLOOM:

2  **Q.**  We were talking, Ms. Waters, about cross-examination by

3  Mr. Bartlett a little while ago where he read you some portion

4  of a pleading that was filed by Mr. Fox and myself on your

5  behalf.

6      Do you remember that?

7  **A.**  Yes.

8  **Q.**  Let me just read you one sentence from that pleading.  "35

9  years in prison for an act which did not injure anybody, which

10  was not intended to injure anybody, and which, at most, was a

11  misguided act by those desperate to preserve the Earth against

12  corporate onslaughts, is far outside the pale of humaneness

13  and rationality."

14      Now, let me ask you a question, did you participate in

15  writing any of this pleading or any other of the many

16  pleadings that we filed?

17  **A.**  No.  Like I said to Mr. Bartlett, this case has taken up a

18  lot of my time, but any time that's not spent meeting with you

19  and working, I spend with my daughter.  So I have told you

20  that as little as possible, time wise, is what I need to be

21  able to be with my daughter.  So no, I haven't participated in

22  writing any of the pleadings.

23  **Q.**  So did you preapprove the wording that was in that

24  document?

25  **A.**  No.  Actually -- of course, I think that often you will

1  send me things that you wrote, but I often don't have time to
2  read through all of it, unfortunately.
3  **Q.** Well, thanks a lot.
4  **A.** Sorry. I appreciate it anyway.
5  **Q.** Having read that, I guess the thrust of Mr. Bartlett's
6  question is, do you feel, personally feel, that this arson
7  that was committed by Lacey Phillabaum and committed by
8  Jennifer Kolar, do you feel this was a minor, petty,
9  meaningless crime?
10  **A.** No. I think that it was -- like I said, I think it was
11  very serious and unspeakably horrible for the people who were
12  affected.
13  **Q.** You have come to understand, from the evidence in this
14  trial, that Ms. Kolar is a person who's admitted to at least
15  four arsons?
16       MR. BARTLETT: Objection, Your Honor, it goes beyond
17  the scope of cross-examination.
18       THE COURT: I think so.
19  BY MR. BLOOM:
20  **Q.** Now, there were some questions about -- there was a class
21  full of students here, I guess last Friday.
22       Do you remember those questions by Mr. Bartlett?
23  **A.** Yes.
24  **Q.** Have you been choreographing who shows up in this
25  courtroom?

1  **A.** I would be amazed if I had any time to do such things. I

2  can barely feed myself and take care of my daughter and sleep

3  enough during all of this.

4  **Q.** Where are you living during this trial?

5  **A.** We have rented a house in the Proctor area of Tacoma.

6  **Q.** And how do you spend your time, other than when you are

7  not in court?

8  **A.** Just spending time with my daughter, who's not at all

9  happy with me being away so much because she's used to me

10  being home during the daytime, because I usually teach and

11  have gigs in the evening.

12     So as soon as I walk in the door, she's like Velcro. I

13  can't really do too much more except be with her and have

14  dinner and get her ready for bed.

15  **Q.** Has this been, just logistically, an easy time or a

16  difficult time just since you've been up here in Tacoma and

17  since the trial began?

18  **A.** It's been very difficult.

19  **Q.** Are you paying rent in this place where you are living?

20  **A.** Yes, we are.

21  **Q.** Have you had to scrape around to get the money to rent the

22  place?

23  **A.** Yes. Thankfully, there have been friends and people who

24  have donated to help us able to afford to be here.

25  **Q.** Now, Mr. Bartlett showed you two exhibits dealing with

1  telephone calls from Mr. Rodgers, apparently many of which

2  were to you?

3  **A.**  Yes.

4  **Q.**  You understand that on those two exhibits, at the top of

5  the exhibits, it indicates that the period of the phone calls

6  is an entire year, January 1 of 2001 to the last day of the

7  year, December 31?

8  **A.**  Yes, that's correct.

9  **Q.**  Did you notice that?

10  **A.**  Yes.

11  **Q.**  So he was talking about something like 50 or 55 phone

12  calls in the period of a year; is that correct?

13  **A.**  Yes.

14  **Q.**  That's maybe one a week, right?

15  **A.**  Yes.

16  **Q.**  Did it seem like a lot of calls, one a week?

17  **A.**  No.

18  **Q.**  This was a lonely guy who was leaning on you, is that fair

19  to say?

20  **A.**  That's fair to say.

21  **Q.**  You have heard testimony here that when Mr. Rodgers' home

22  and store was raided by the FBI -- let me take that back, were

23  searched by the FBI on December 7th of '05, you've heard that

24  there were thousands, thousands upon thousands of pages of

25  documents seized?

1    **A.**  Yes.

2    **Q.**  Including hard disks, hard drives?

3    **A.**  Yes.

4    **Q.**  You've heard testimony, have you not, that of all the

5    material, there's one mention of you, one, and that's a

6    reference to a Watch Mountain video?

7    **A.**  Yes, that's what I heard.

8    **Q.**  Did you hear Ms. Troxel when she testified, did you hear

9    her use the phrase "grasping at straws"?

10          MR. BARTLETT:  Objection, Your Honor, argumentative

11   and goes beyond the scope of cross.

12          THE COURT:  I think so.  It's been covered.  You can

13   say what you need to say about it.  She was here.  Everybody

14   heard it.

15          MR. BLOOM:  Fair enough.

16   BY MR. BLOOM:

17   **Q.**  Now, Justin Solondz' mother, did you come to know her

18   during the time that you were in a relationship with her son?

19   **A.**  A little bit, yeah.

20   **Q.**  Did you become friends?

21   **A.**  Yes.

22   **Q.**  Were you surprised to see her here?

23   **A.**  Well, I didn't know she was coming, so I was a little bit

24   surprised.  I think she lives in New Jersey, so I was a little

25   bit surprised, but it makes sense that she would want to be

1    here.

2    **Q.** There's been testimony about her son; is that correct?

3    **A.** That's correct.

4    **Q.** And did she develop a relationship with you while you were

5    relating to her son?

6    **A.** Yes.

7    **Q.** Do you have a friendly relationship?

8    **A.** Yes, we do.

9    **Q.** When Mr. Bartlett uses the term "fugitive", what is your

10   understanding -- now, people were arrested, as you've heard,

11   on December 7th of '05.

12        What is your understanding about when Justin Solondz took

13   a trip outside the country any time prior to that?

14   **A.** He left -- he told me he was leaving, I believe, in

15   October.

16   **Q.** Of what year?

17   **A.** 2005.

18   **Q.** Now, there was some further questions about Mr. Dibee

19   making phone calls to, I think it would be, the Corrina number

20   in October of 2001?

21   **A.** Yes.

22   **Q.** Mr. Bartlett himself prefaced this question by saying

23   there are hundreds of pages of calls.  And here are two calls,

24   each of which is a minute.

25        Do you remember speaking to Mr. Dibee in that period?

1    A.   No, I don't.

2    Q.   You've had -- you now have a cell phone, right?

3    A.   Yes.

4    Q.   And you also have a land line, or at least at home?

5    A.   At home.

6    Q.   At home in Oakland, you do?

7    A.   Yes.

8    Q.   Is it correct to say that even if you dial a wrong number

9    or get an answering machine, you get charged for at least a

10   minute, right?

11   A.   I think so, yeah.

12   Q.   There's no charge for like four seconds; you have to be

13   charged for at least a minute?

14   A.   Right.

15   Q.   About these articles, you've heard testimony from the

16   woman from Washington, the fingerprint expert, you heard her

17   testimony?

18   A.   Yes.

19   Q.   And you heard her testimony that on all the articles she

20   looked at -- I think it was approximately 80, maybe 70, but

21   that many articles -- that your fingerprint did not appear on

22   a single article?

23   A.   Yes.

24   Q.   Now, is it fair to say you don't know what, if anything,

25   Ms. Kolar did with whatever it was that you sent to her?

1  **A.** Yeah, I don't know what happened. I don't know what she

2  did with anything.

3  **Q.** So when she turned over, through her lawyer, turned over

4  articles to the prosecution, you don't know whether or not she

5  intentionally put inflammatory articles in the folder, do you?

6  **A.** No, I don't know.

7  **Q.** Well, you do know that she's lying about you participating

8  in the arson, right?

9      MR. BARTLETT: Objection, Your Honor, this is just

10  argument.

11      THE COURT: This is argument. I think she's answered

12  this once before, so we are just going through the same thing

13  all over again.

14  BY MR. BLOOM:

15  **Q.** Given that you know that she's lying about you, about the

16  arson, would it surprise you that she would want to nail you

17  further?

18      MR. BARTLETT: Objection, Your Honor, this is just

19  argument.

20      THE COURT: That's argument. Any other questions on

21  redirect?

22      MR. BLOOM: Yes, I do have some other questions.

23  BY MR. BLOOM:

24  **Q.** Now, Mr. Bartlett asked you questions about Jennifer Kolar

25  and he prefaced his question by saying Jennifer Kolar has and

1 had boyfriends, correct?

2 A. That's correct.

3 Q. Did we ever show you an exhibit, Exhibit A-203, wherein

4 Ms. Kolar describes in an e-mail to a friend of hers, whose

5 e-mail address is redmango7, a description of how Ms. Kolar

6 was talking about approaching a particular woman to ask her

7 out?

8 A. Yes, I have seen that.

9        MR. BLOOM:  It's A-203.  I would offer it into

10 evidence.

11        MR. BARTLETT:  No objection.

12        THE COURT:  Admitted.

13            (Exhibit No. A-203 admitted.)

14 BY MR. BLOOM:

15 Q. I am going to read from it.  This is dated October of

16 1999.

17        MR. BARTLETT:  Objection, Your Honor, the e-mail

18 speaks for itself.  He can make argument during closing.  The

19 e-mail speaks for itself.  He doesn't have to read it.

20        MR. BLOOM:  I don't have to, but I want to.  Kit's in

21 evidence.

22        THE COURT:  You can publish it.

23 BY MR. BLOOM:

24 Q. I am reading from toward the bottom where Ms. Kolar wrote:

25 "So...I am not going out with anyone...proud of me?  Things

1    fell apart with Gary.  I should have expected it.  He was just
2    not ready to jump right into another relationship..  so..we
3    are doing okay at work..as we all work together...Joe is
4    becoming a much better boyfriend as an ex than he ever was
5    before -- funny...so there is still that connection...but it
6    is simpler."

7        Continuing, "Actually..last night I went to a pumpkin
8    carving party and became obsessed with this woman there-
9    Jessica- who I literally could not stop staring at all
10   night...which I think she very much noticed.  She was the only
11   person I talked to besides my friend Alison, who the party was
12   at..anyhow..she works in Fremont (where I live) at a coffee
13   house here - so I am planning on going by there today on my
14   way to work and seeing if I can see her - if I have the guts
15   to ask her out."

16       Do you remember us showing you this document?
17   **A.**   Yes.
18   **Q.**   Did we have a discussion about the event that took place
19   between you and Jennifer Kolar, the event where she gave you
20   the necklace?
21   **A.**   Yes.
22   **Q.**   By the way, I don't know if I asked you this and I meant
23   to, did you keep the necklace, or did you give it back to her?
24   **A.**   I ended up giving it back.
25   **Q.**   Mr. Bartlett asked you some questions about Mr. Corrina.

1   After Agent Halla came to you, came to your home in Berkeley

2   on February 24th, two years ago, did you contact people, your

3   friends, your family members, to tell them anything?

4   **A.**   Yes, I wanted to let people know what was going on.

5   **Q.**   Did you indicate to them one way or another whether they

6   could expect or might expect to be approached by the FBI?

7   **A.**   I said that they might be.  I said that they might be,

8   especially if I had lived with them, that they might be

9   questioned.

10  **Q.**   Do you expressly have a recollection of contacting

11  Mr. Corrina to tell him that information?

12  **A.**   Yes, I did.

13  **Q.**   What did you tell Mr. Corrina?

14  **A.**   Well, I just told him that -- what was going on and that

15  he might be visited by the FBI, and I told him not to worry

16  about it, that I didn't do anything, I am innocent and just

17  tell the truth.

18  **Q.**   Did you ask him to lie?

19  **A.**   No, I didn't.

20  **Q.**   Did you ask him to -- if he was shown a picture of you, to

21  say that he doesn't know you?

22  **A.**   No, I didn't say anything like that.

23  **Q.**   Lacey Phillabaum, Mr. Bartlett asked you some questions

24  about Lacey Phillabaum and about a car.  Do you remember

25  hearing at this trial and/or seeing any documents that Lacey

1 said that you were going to ask an older woman to rent a car

2 for you?

3 **A.** Yes.

4 **Q.** Is Kara Larson an older woman?

5 **A.** No, I think she's a little bit younger than me.

6 **Q.** That you were supposedly going to ask an aunt to rent a

7 car, do you remember testimony and statements to that effect?

8 **A.** Yes.

9 **Q.** Is Kara Larson an aunt?

10 **A.** No.

11 **Q.** Now, Mr. Bartlett asked you some questions about -- to the

12 effect of -- he used the word "independently", that Lacey

13 Phillabaum and Jennifer Kolar independently named you.

14 Do you remember those questions, and I objected?

15 **A.** Yes.

16 **Q.** Now, do you remember that evidence was introduced when

17 Agent Torres testified that his notes of the February 21st

18 interview of Lacey Phillabaum, he calls her "Lacey" and he

19 calls her lawyer "Pete".

20 Do you remember that?

21 **A.** Yes.

22 **Q.** Does that strike you as somebody who had had prior

23 dealings with those people?

24        MR. BARTLETT:  Objection, Your Honor, it's argument.

25        THE COURT:  That's argumentative.  How would she know

1   that?  Next question.

2   BY MR. BLOOM:

3   **Q.**  Now, did there come a time during the testimony that you

4   learned from Robert Corrina that apparently Agent Halla had

5   given a certain factual piece of information to Kara Larson on

6   January 19th of '07, when he went to Kara Larson's place of

7   work.

8        Do you remember that?

9   **A.**  Yes.

10  **Q.**  Do you remember hearing that he, Agent Halla, told Kara

11  Larson that, we believe that the car you rented was used in

12  the arson, words to that effect?

13  **A.**  Yes.

14  **Q.**  To you, was that giving information to a possible witness?

15  **A.**  Yes.

16  **Q.**  Did there come a time when you, as a potential possible

17  witness, if you were going to cooperate, were given a lot of

18  information about what the Government's theory was?

19            MR. BARTLETT:  Objection, Your Honor.

20            THE COURT:  I am going to sustain the objection.  I

21  think we've dealt with this issue, and I think it might be in

22  an area where the Court has ruled.

23            MR. BLOOM:  He's opened the door at this point.

24            THE COURT:  I am saying, whatever ruling I made on it

25  will stand.

1          MR. BLOOM:  Okay.  Okay.

2  BY MR. BLOOM:

3  **Q.**  Now, this is Exhibit A-212.  I asked you a few minutes ago

4  if you remember being questioned by Mr. Bartlett this

5  afternoon about the Ralph's Thriftway transaction.

6  **A.**  Yes.

7  **Q.**  Do you remember those questions?

8  **A.**  Yes.

9  **Q.**  And in fact, is it your recollection that what you were

10  asked about was whether or not Mr. Rodgers lived near the

11  Ralph's Thriftway?

12  **A.**  Yes.

13  **Q.**  Take a look, if you would, right there.  Is that 7:12

14  p.m.?

15  **A.**  Yes.

16  **Q.**  Is that May 20th?

17  **A.**  Yes.

18  **Q.**  Can you think of any reason Mr. Bartlett didn't ask you a

19  single question about being in Olympia at Ralph's Thriftway at

20  that time on Sunday night?

21     Can you think of a single reason he didn't ask you that

22  question?

23          MR. BARTLETT:  Objection, Your Honor.  It's

24  argumentative and asks her to speculate what's going on in my

25  head.

1    THE COURT:  I think so.

2  BY MR. BLOOM:

3  **Q.**  Now, you've testified that you don't actually remember

4  that transaction; is that correct?

5  **A.**  That's correct.

6  **Q.**  Now, if you were going to lie to the jury, is it fair to

7  say:  Oh, I remember that.  Of course I was there.

8    MR. BARTLETT:  Objection, Your Honor, it's just

9  argument.

10    THE COURT:  It's argumentative.  She said she doesn't

11  remember it.

12  BY MR. BLOOM:

13  **Q.**  Now, did you come -- was there some time on the weekend

14  that you now know you heard that Rob and Kara rented a car?

15  We talked about that weekend?

16  **A.**  Right.

17  **Q.**  Now, did there come a time on that weekend, as you

18  remember it, that Justin actually did bring some things of

19  yours that had been at Rob and Kara's to your place, to

20  Ocean's place?

21  **A.**  Well, I remember that I asked Justin to pick up some

22  things for me after Rob had been asking me to get some things,

23  and he did do that.

24  **Q.**  Now, were you -- did some things show up at your house

25  that were in Ocean's garage?

1          MR. BARTLETT:  Objection, Your Honor, it's way beyond
2    the scope of cross-examination.
3          THE COURT:  I think so, and we've covered this.  You
4    are going far afield now in terms of this redirect.
5          MR. BLOOM:  Well, he asked about the car and I am
6    addressing the car issue.
7          THE COURT:  Well, then let me hear something about
8    the car issue.
9          MR. BLOOM:  Sure.  I am just asking a preliminary
10   question.
11         THE COURT:  Well, just ask the question.
12         MR. BLOOM:  I will.  I can't just jump into it.  I
13   have to --
14         THE COURT:  Mr. Bloom, we go through this every time
15   I make a ruling here.  So would you please get to the next
16   question.
17         MR. BLOOM:  Sure.
18   BY MR. BLOOM:
19   Q.  Were you home -- let me withdraw that.
20       Did there come a time when you found a couple of your
21   boxes in your garage?
22   A.  Yes.
23   Q.  Boxes that had been at Rob and Kara's?
24   A.  Yes, I remember Justin brought over some things.
25   Q.  Do you know -- were you present when he brought them?

1  **A.** I don't think so. I mean, I have a pretty vague memory of

2  this. It wasn't a major event. But yeah, I remember him

3  bringing over some things to my place.

4  **Q.** Now, you have come to learn that Justin's car was not

5  available that weekend; is that correct?

6  **A.** That's correct.

7  **Q.** So do you know, or does that help you piece together,

8  whether or not Justin used the Rob and Kara rental car to

9  bring the things to your house?

10      MR. BARTLETT: Objection, Your Honor. Mr. Bloom is

11  testifying. He's trying to put items into evidence that have

12  not been admitted.

13      THE COURT: Sustained. Next question.

14      MR. BLOOM: Excuse me, one second.

15    I don't have any further questions.

16                 RECROSS-EXAMINATION

17  BY MR. BARTLETT:

18  **Q.** Ms. Waters, during his redirect examination, Mr. Bloom

19  asked you some questions about a phone call that you made to

20  Mr. Corrina.

21    Do you remember those questions?

22  **A.** Yes.

23  **Q.** It was the phone call where you told him: I'm innocent.

24  If anybody in law enforcement comes, you should tell them the

25  truth.

1     Do you remember that phone call?

2   **A.**   Yes.

3   **Q.**   Do you remember those questions?

4   **A.**   Yes.

5   **Q.**   On February 24th of 2006, Special Agent Halla came to your

6   house --

7   **A.**   Yes.

8   **Q.**   -- correct?  And you talked to him?

9   **A.**   Yes.

10   **Q.**   It lasted, what, 15 to 20 minutes?

11   **A.**   I think it was maybe a little bit -- yeah, probably about

12   that.

13   **Q.**   About 15 to 20 minutes?

14          MR. BLOOM:  Excuse me, I am going to object.  I don't

15   think that I raised anything about that visit.

16          MR. BARTLETT:  Absolutely, he did.  That's the

17   context of --

18          THE COURT:  Is it about after the visit that she made

19   the phone call?

20          MR. BLOOM:  After the visit.

21          THE COURT:  Let's get the question out on the table

22   there.

23   BY MR. BARTLETT:

24   **Q.**   During that -- I did not hear your answer.  How long do

25   you think Special Agent Halla was there?

1  **A.**  It was probably around 15 to 20 minutes.

2  **Q.**  And during that entire 20-minute conversation, did you

3  ever once turn to Special Agent Halla and say, I am totally

4  innocent of this arson you are accusing me of?

5          MR. BLOOM:  Given the rulings of the Court, I really

6  must object to that.  You know what, I withdraw it.  I don't

7  object.  I don't object.

8  BY MR. BARTLETT:

9  **Q.**  Did you ever say that to Special Agent Halla?

10  **A.**  I did.

11  **Q.**  You are certain about that?

12  **A.**  Yes.  I told him that I was not involved, and I am sure he

13  remembers that.

14  **Q.**  With regard to the phone call to your cousin, that call

15  did not occur for several months, correct?

16  **A.**  I think it was a couple weeks after.

17  **Q.**  Several months.  Actually, what happened is that you had

18  attorneys -- you indicated you had Mr. Avenia for a while?

19  **A.**  Yes.

20  **Q.**  And then eventually you had Mr. Bloom?

21  **A.**  Yes.

22  **Q.**  And after you were represented by Mr. Bloom, that's when

23  you decided to make your call and tell Mr. Corrina that you

24  were innocent and they should tell the truth, correct?

25  **A.**  Well, I actually technically retained Mr. Bloom --

1 **Q.** Correct.

2 **A.** -- but we had a lot of conversations and he was -- we were

3 having meetings even before I retained him.

4 **Q.** You never called Mr. Corrina before that -- that call was

5 several months after the February 24th visit, correct?

6 **A.** I think it was actually just a few weeks after that was my

7 memory.

8       MR. BARTLETT: No further questions.

9       THE COURT: All right.

10                 REDIRECT EXAMINATION

11 BY MR. BLOOM:

12 **Q.** Is there any doubt in your mind that's what you said to

13 him: I'm innocent. Tell the truth?

14 **A.** No, that's what I remember saying.

15 **Q.** Did you tell the truth?

16 **A.** Of course.

17 **Q.** Did you have any problem with the truth?

18 **A.** No.

19 **Q.** Can you handle the truth?

20       MR. BLOOM: Thanks. I have no further questions.

21       THE COURT: All right. You may step down.

22       THE WITNESS: Should I just leave all these things up

23 here?

24       THE COURT: Just leave them. All right.

25       MR. BARTLETT: I believe we are going to have brief

1  rebuttal tomorrow morning, Your Honor.

2         MR. BLOOM:  Well, we rest now.

3         THE COURT:  You are resting?

4         MR. BLOOM:  Yes, sir.

5         THE COURT:  All right.  Then I guess you are going to

6  get a 20 minute early jump on going home.

7      Let me ask this question:  Timewise, how much rebuttal are

8  we talking?

9         MR. BARTLETT:  Less than an hour, Your Honor.

10        THE COURT:  Let me have you step out just for a

11 minute, then I will have you back.

12     (Jury not present.)

13        THE COURT:  All right.  You may be seated.

14     What I would like to discuss with you is, I think we are

15 thinking about another hour, which means that rather than

16 having a lot of down time with this jury, I am concerned now

17 about a starting time and taking maybe the witnesses at a

18 later time and getting you folks to hang around and start an

19 initial process on some instructions here.

20     Does anybody want to be heard on that?

21        MR. BARTLETT:  I think that's a great idea.  It's not

22 the normal case.  There's actually some jury instructions that

23 kind of present more of an issue than normal.  I would like to

24 see what the Court is going to propose.

25     Is the Court planning on summing up tomorrow?

1          THE COURT:  Well, yes, I want to keep working.  What

2   I am concerned about is having you folks -- let these folks go

3   home now and a time for them to come back because I want to

4   give you an initial set of instructions for you to look over

5   so we can take some comments, and I will tell you how we are

6   going to do that, before we settle out on what the final

7   instructions are going to be.  So I want to give the jury a

8   time to come back here when they can start hearing this.

9        I think I will have them come back here say around 10:00,

10  and that way, I can have you hear at 8:30 and we can do some

11  work.  I want you to hang around tonight and do some more work

12  and then we are going to get this thing to the jury.

13       Okay.  Bring them in.

14       (Jury present.)

15          THE COURT:  All right.  You may be seated.

16       All right.  Ladies and gentlemen of the jury, I am going

17  to have you folks come back to get the rest of the testimony

18  at 10:00 tomorrow, rather than be here at 9:00.

19       As you go about your business, don't discuss the case,

20  research anything or do anything.  Everything you need to

21  decide the case, as you heard me say, you receive here in this

22  courtroom.

23       I want you to have a good night's sleep and leave your

24  books on the chair, and I will see you back here hopefully

25  ready to go at 10:00.

1    (Jury not present.)

2         THE COURT:  Okay.  You may be seated.

3    What I would like for the attorneys to do, and your

4    clients to do, hopefully by 4:30, I hope to have an initial

5    set of instructions that I want you to look through, take home

6    tonight and we'll take that up at 8:30 in the morning,

7    whatever you are going to do on that.

8         So I want you to come back around 4:30, and I will give

9    you that.

10        MR. FOX:  Ms. Waters can go?

11        THE COURT:  I don't know if you want her here.

12   Nothing is going to happen, except I want you to receive the

13   packet and take it home to do that.  She doesn't need to sit

14   here to do that.

15        MR. FOX:  Before we recess for the instructions, may

16   I be heard on one matter, Your Honor?

17        Based upon Mr. Bartlett's questions of Ms. Waters, I

18   believe that he's probable going to call Agent Halla tomorrow

19   to testify that --

20        THE COURT:  I don't know.  Before you make an

21   argument and waste a lot of time, maybe he'll tell us who he's

22   going to call tomorrow in terms of rebuttal.

23        MR. BARTLETT:  Your Honor, honestly, I have to talk

24   to Mr. Friedman.  I think we have one witness coming in, and

25   there's a chance we are calling Special Agent Halla.

1    Actually, at this point I am unclear.

2         THE COURT:  But Mr. Halla will probably be one of

3    them?  All right.  Go ahead.

4         MR. FOX:  Well, if the Government plans on calling

5    Agent Halla to testify that his memory is that Ms. Waters did

6    not deny anything and that she remained silent, we would

7    object to that testimony.

8         We believe that we raised this prior to trial and the

9    Government testified they would not be offering any evidence

10   of what took place at that meeting between Ms. Waters and

11   Agent Halla, other than I told her there's a case, you should

12   get a lawyer, we want you to cooperate.

13        We were very careful in our presentation of Ms. Waters'

14   direct testimony not to talk about very much in the way of the

15   substance of what took place in that meeting, particularly the

16   fact that Ms. Waters, in fact, freely acknowledged that she

17   knew Mr. Rodgers, didn't try to hide anything.

18        But for the Government then to violate what it said

19   earlier it was not going to do through a question on

20   cross-examination for the purpose of calling Agent Halla to

21   rebut that, to impeach that, that's improper.  They set this

22   up.  They told us they weren't going to introduce any evidence

23   of Ms. Waters' silence, although she does not remember her

24   remaining silent, but they can't create that to impeach it.

25   So we would ask that Agent Halla not testify about that

1   conversation.

2       That's improper.  It violates what they said they were not

3   going to do, and they can't create that by violating their own

4   promise to set that situation up.  So I would object --

5           THE COURT:  I hear what you are saying.  Let him

6   respond to that.

7           MR. BARTLETT:  Your Honor, I am looking at the

8   response that we filed, and what we responded to is that we

9   did not intend to do so during our case-in-chief, and we have

10  not violated that, and we'll talk it over tonight, and I will

11  call Mr. Fox before 7:00.

12          THE COURT:  You understand what he's saying?  He's

13  saying that you raised this issue and now you want to rebut

14  this issue.  Okay.  We'll deal with that before he's called.

15  I will give you an answer to that.  I assume it may be

16  somebody else in terms of rebuttal on some other issue?

17          MR. BARTLETT:  Yes, Your Honor.

18          MR. BLOOM:  Could we be informed sometime this

19  evening about who that would be?

20          THE COURT:  I would think so.  You should be given it

21  the same way I have done all the way through the trial, and I

22  expect that.

23          MR. BLOOM:  I also wanted to ask the Court, if we'll

24  have an hour's worth of testimony tomorrow, I would wonder

25  what the Court has in mind for when we would give closing

1 arguments.

2       THE COURT:  Well, that's why I am giving you

3 instructions tonight.  I want to get to it as soon as we can.

4       MR. BLOOM:  Given that it's a three-week trial, I

5 would ask that no matter what we do tomorrow, the closing

6 arguments be on Friday.

7       THE COURT:  I will listen to what you have to say.  I

8 will look at the timeframe.  Like I say, I wanted to try to

9 give the Government a full day's work, if I can.

10       MR. BARTLETT:  Just for my own edification, I thought

11 the Court was not going to have session on Friday.

12       THE COURT:  Yes.  I cleared Friday.  I see no reason

13 why we can't finish this case up this week.  It seems like

14 that's the best way to go, and I want to try to do it in a way

15 that's not disjointed in any way.

16     I will talk to you in the morning, because the other thing

17 I want to talk to you about is closing.  By that, I mean

18 time-wise.  I will hear from you tomorrow about that, as to

19 how much time I am going to allow you.

20     If you think you need to practice or do some things in the

21 mirror, this would be a good time to think about some of that.

22     All right.  We'll be in recess.

23       THE CLERK:  All rise.  Court is in recess.

24       (The Court recessed to Thursday, February 28, 2008,

25 at the hour of 9:00 a.m.)

```
1                    *    *    *    *    *

2                    C E R T I F I C A T E

3

4        I certify that the foregoing is a correct transcript from

5    the record of proceedings in the above-entitled matter.

6

7    /S/  Teri Hendrix_____        May 5, 2008

8    Teri Hendrix, Court Reporter             Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```