1      UNITED STATES DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON
2              AT TACOMA

3

4  UNITED STATES OF AMERICA,    )  Docket No. CR05-5828FDB
                                )
5          Plaintiff,           )  Tacoma, Washington
                                )  February 28, 2008
6  vs.                          )
                                )
7  BRIANA WATERS,               )  VOLUME 13
                                )
8          Defendant.           )
   _____)

9

10              TRANSCRIPT OF PROCEEDINGS
11     BEFORE THE HONORABLE FRANKLIN D. BURGESS
    SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.
12
   APPEARANCES:
13
   For the Plaintiff:      MARK N. BARTLETT
14                         ANDREW C. FRIEDMAN
                           Assistant United States Attorney
15                         700 Stewart Street, Suite 5220
                           Seattle, Washington 98101-1271
16
   For the Defendant:      ROBERT BLOOM
17                         Attorney at Law
                           3355 Richmond Boulevard
18                         Oakland, California 94611

19                         NEIL M. FOX
                           Cohen & Iaria
20                         1008 Western Ave., Suite 302
                           Seattle, Washington 98104

21

22  Court Reporter:        Teri Hendrix
                           Union Station Courthouse, Rm 3130
23                         1717 Pacific Avenue
                           Tacoma, Washington  98402
24                         (253) 882-3831

25  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

1

<u>I N D E X</u>

2

INDEX OF WITNESSES
===================

3

Instruction Conference................................. 2503

4

5

<u>REBUTTAL WITNESS ON BEHALF OF PLAINTIFF</u>:                    <u>Page</u>

6

CHRISTOPHER FORD

7

      Direct by Mr. Bartlett........................ 2546
      Cross by Mr. Fox............................. 2549

8

GOVERNMENT RESTS...................................... 2558

9

EXCEPTIONS TO INSTRUCTIONS............................ 2559

10

COURT INSTRUCTS JURY.................................. 2569

11

<u>CLOSING ARGUMENTS</u>:

12

      By Mr. Bartlett.............................. 2587
13
      By Mr. Bloom................................ 2643
      Rebuttal by Mr. Friedman..................... 2718

14

INDEX - EXHIBITS

15

<u>EXHIBITS</u>                                               <u>Page</u>

16

No. 1124                                              2548
No. A-216                                             2554
17
No. A-217                                             2555
No. A-215                                             2557

18

19

20

21

22

23

24

25

THURSDAY, FEBRUARY 27, 2008 - 8:45 A.M.

* * *

(Jury not present.)

THE CLERK:  This is in the matter of United States of America versus Briana Waters, cause CR05-5828 FDB.

Counsel, please make an appearance for the record.

MR. FRIEDMAN:  Good morning, Your Honor, Andrew Friedman for the United States.

MR. FOX:  Good morning, Your Honor Neil Fox present with Ms. Waters.  Mr. Bloom, I believe, is practicing in front of the mirror.

THE COURT:  What I want to do is go through these instructions with you.

How I want to do it is in this fashion.  The ones I gave you as to the Court's proposed instruction, go through them one-by-one, to see if there's any issue with it.  If there's an issue or comment you want to make about the instructions, that you succinctly make those and I will take them into consideration.

Then from that process, I will issue a new set.  And that new set will be the instruction I am going to give to the jury.

After we've gone through the set I gave you last night, then I will ask you about your particular proposed instructions as to what you think should be added to this.

1          MR. FOX:  Okay.

2          THE COURT:  I will consider that as I go about the

3    new set.

4          MR. FOX:  Okay.

5          THE COURT:  All right.  Now, with the set I gave you

6    last night, dealing with Instruction No. 1, Mr. Friedman, any

7    issue with that instruction?

8          MR. FRIEDMAN:  No, Your Honor.

9          THE COURT:  Mr. Fox?

10         MR. FOX:  No, Your Honor.

11         THE COURT:  No. 2 talks about the indictment is not

12   evidence.  Any issue with that?

13         MR. FRIEDMAN:  Not from the government, Your Honor.

14         MR. FOX:  No, Your Honor.

15         THE COURT:  No. 3 deals with proof beyond a

16   reasonable doubt and tells the jury what that is.  Any issue

17   with that?

18         MR. FRIEDMAN:  No, Your Honor.

19         MR. FOX:  No, Your Honor.

20         THE COURT:  No. 4 tells the jury what evidence is in

21   deciding what the facts are, any issue with that one?

22         MR. FRIEDMAN:  Not from the government.

23         MR. FOX:  No, Your Honor.

24         THE COURT:  No. 4(b) talks about character evidence

25   and how to consider that.  Any issue with that one?

1    MR. FRIEDMAN:  No, Your Honor.

2    MR. FOX:  No, Your Honor.

3    THE COURT:  No. 5 says the defendant has testified

4  and how to treat that.  Any issue with that one?

5    MR. FRIEDMAN:  Not from the government.

6    MR. FOX:  We do Your Honor.  I know this is a pattern

7  instruction from the Ninth Circuit, but I think there's no

8  reason to highlight her testimony.  It's particularly picking

9  out her testimony and telling the jury she's testified.  They

10  know she's testified.  I don't see any need for this

11  instruction.

12    THE COURT:  You are recommending it be deleted?

13    MR. FOX:  Yes.  I don't have strong objections.  I

14  don't see the need for it.

15    THE COURT:  That is your comment.

16    MR. FOX:  Yes.

17    THE COURT:  All right.

18    MR. FRIEDMAN:  From the government we would ask that

19  it be included, remain in.

20    THE COURT:  No. 6 talks about certain things are not

21  evidence.  Any issue with that one Mr. Friedman?

22    MR. FRIEDMAN:  The only thing is the second sentence

23  of paragraph 3.  I don't believe any evidence came in for a

24  limited purpose, so I think in this case, it might make sense

25  to delete that sentence.

1          THE COURT:   Mr. Fox.

2          MR. FOX:   I don't have an objection to Mr. Friedman's

3    suggestion.

4          THE COURT:   All right.

5          MR. FOX:   Although I guess in the interest of

6    caution, it can't hurt.  If at some place in the course of the

7    trial you do that, maybe we should keep it in.

8          THE COURT:   I don't know, let me look at that.  I

9    understand what you are saying.

10     No. 7?

11          MR. FRIEDMAN:   No objections.

12          THE COURT:   Types of evidence, circumstantial or

13    direct.  Any issue with that instruction?

14          MR. FRIEDMAN:   Not from the government.

15          MR. FOX:   No, Your Honor.

16          THE COURT:   All right, No. 8, talking about

17    credibility of witnesses, any issue with that?

18          MR. FRIEDMAN:   No, Your Honor.

19          MR. FOX:   No problem Your Honor.

20          THE COURT:   All right.  No. 9 is talking about expert

21    testimony.  Any issue with that one?

22          MR. FRIEDMAN:   No, Your Honor.

23          MR. FOX:   No.

24          THE COURT:   No. 10 is telling the jury that they are

25    only to determine guilt or innocence as to the charges in the

1  indictment.  Any issue with that one?  Mr. Friedman.

2          MR. FRIEDMAN:  No, Your Honor.

3          MR. FOX:  No, Your Honor.

4          THE COURT:  No. 11 talks about a separate crime being

5  charged in each count and how they are to consider those

6  counts.  Any issue with that one?

7          MR. FRIEDMAN:  No, Your Honor.

8          MR. FOX:  No.

9          THE COURT:  No. 12 deals with possession.  Any issue

10 with that?

11         MR. FRIEDMAN:  No, Your Honor.

12         MR. FOX:  No.

13         THE COURT:  No. 13 deals with the plea agreements,

14 that evidence and how they are to view that testimony coming

15 from folks that have pleaded guilty to crimes.  Any issue with

16 that one?

17         MR. FRIEDMAN:  No, Your Honor.

18         MR. FOX:  I do, Your Honor, have a problem with this

19 instruction.  It deals with what's in my proposed instructions

20 on this subject.  This instruction doesn't have any language

21 about that these people are alleged accomplices and you should

22 view their testimony with caution.

23         THE COURT:  Does it not say that in the last sentence

24 there?

25         MR. FOX:  Right, but the pattern instruction, 4.9 in

the Ninth Circuit, has other categories, which I have proposed

that these people not just have taken plea agreements, but

that they are alleged accomplices.  So it's not just that they

pled guilty and in exchange for a lesser sentence they are

testifying; and you should view their testimony with caution.

But they're alleged accomplices, and alleged accomplices

should have a cautionary instruction attached to it.

Similarly, they both have felony convictions.  The fact

that they have felony convictions in and of itself is an

additional reason why their testimony should be evaluated

differently, so my proposals, and I think these were my

supplemental instructions two days ago, has the additional

language in the pattern instruction.  The Court just focused

on the fact they had plea bargains.

THE COURT:  Are you referring to a pattern

instruction?

MR. FOX:  Yes, 4.9.

THE COURT:  Okay.

MR. FOX:  There's sections both that they pled guilty

to the crime arising out of the same event, but also the

person was alleged to be an accomplice to the crime charged

and also they received favored treatment from the government.

So my proposals improve on what you already have.

THE COURT:  What is your number?

MR. FOX:  The supplemental instructions I filed two

1  days ago.

2  THE COURT:  Is there a number on it?

3  MR. FOX:  I think they are proposed instructions 22

4  and 24.  These were in the supplemental packet.

5  THE COURT:  They have the No. 22 and 24 on them?

6  MR. FOX:  Yes.

7  THE COURT:  Mr. Friedman, any comment.

8  MR. FRIEDMAN:  Yes, I think the instruction as given

9  here is correct and how it should be.  It fully describes

10  everything that's happened in this case.  The pattern

11  instruction has all kinds of different alternatives but what

12  Mr. Fox is really asking for is sentence after sentence of bad

13  information about these people.  The fact that they pled

14  guilty to charges arising out of the same events, that covers

15  the fact that they have a felony conviction and that they are

16  accomplices, so this fully describes what happens and I think

17  it's appropriate.

18  THE COURT:  Does it not say on line 5 they pleaded

19  guilty to crimes arising out of the same events for which the

20  defendant is on trial?

21  MR. FOX:  But the pattern has words specifically

22  about accomplice.

23  THE COURT:  You want the word accomplice?

24  MR. FOX:  Yes, following 4.9.

25  MR. FRIEDMAN:  I would say that would apply to an

1   accomplice who has not pleaded guilty, it would be appropriate

2   in that case, not in this case where they have pleaded guilty

3   to exactly the same thing.

4           MR. FOX:  I would ask that the Court give the one I

5   proposed.

6           THE COURT:  I understand that.  That's why you are

7   saying it should be changed and that's why you are saying it

8   should cover all these other folks that pled guilty and doing

9   the same thing.

10          MR. FRIEDMAN:  I am saying it covered everything and

11  it's as good as it is.

12          THE COURT:  That is what you are saying.

13      Now 14 talks about charts and summaries have been received

14  into evidence.  Any issue with that?

15          MR. FRIEDMAN:  I think none were admitted in

16  evidence.  I think they were actually only demonstrative so I

17  think we should give pattern 4.18 instead of this one, which I

18  believe is 4.19.

19          MR. FOX:  I agree with Mr. Friedman, I don't believe

20  that the charts are going back to the jury.  I think they were

21  offered for illustrative purposes only.

22          THE COURT:  All right, rather than receive -- short

23  of being admitted into evidence, is what you are saying?

24          MR. FRIEDMAN:  Correct.

25          THE COURT:  Okay.

1          MR. FOX:  Right, 4.18.

2          THE COURT:  You are both in agreement on that one, it

3 sounds.

4          MR. FOX:  Yes.  "That have been shown to you" is the

5 wording.

6          THE COURT:  Right.

7     All right, No. 15 talks about "on or about" definition,

8 what that means.  Any issue with that?

9          MR. FRIEDMAN:  No, Your Honor.

10          THE COURT:  Mr. Fox.

11          MR. FOX:  No, Your Honor.

12          THE COURT:  No. 16 is dealing with Count 1, which is

13 the conspiracy count.  Any issue with that one?

14          MR. FRIEDMAN:  Not from the government.

15          MR. FOX:  Well, Your Honor, I guess with all of the

16 to-convict instructions, the problem I have, including with

17 this one, is that we haven't read the indictment to the jury.

18 The government had a proposed instruction, their Instruction

19 No. 1, which you did not include in the packet, which sets out

20 what the charges are with some specificity.

21     The problem with Instruction No. 16, without the

22 indictment and without the Government's proposed No. 1, is

23 that it doesn't tell the jury what some of the facts are that

24 are alleged to have occurred.

25     So I guess generally I think we need to give more

1  information to the jury about what the specific charges are in

2  this particular case.

3     Does that make some sense?

4     THE COURT:  It's not making a whole lot in light of

5  the fact that each count is set forth.

6     MR. FOX:  If you look at Government's proposed

7  Instruction No. 1, they have set out in some detail, what each

8  of the counts involve.  I would ask that their Instruction

9  No. 1 be given so it explains a little more to the jury as to

10  what actually was alleged in the indictment.

11     Right now the jury doesn't really have much sense of what

12  was in the indictment.

13     The other problem is that we believe that Instruction No.

14  16, the conspiracy instruction, needs to name the people who

15  were named in the indictment as the alleged coconspirators.

16  It needs to set out what the objects of the alleged conspiracy

17  were, and then finally, the jurors need to be instructed that

18  they need to be unanimous about who the conspirators were and

19  what the objects of the conspiracy were.

20     I propose instructions that set that out.

21     THE COURT:  I read it, yes.

22     MR. FOX:  I think this is the problem with this

23  instruction, it doesn't specifically tell the jurors they have

24  to be unanimous as to what the object of the conspiracy was.

25     THE COURT:  You are saying your instruction should be

1   the instruction here, is what you are saying.

2           MR. FOX:  I propose some specific instructions on

3   conspiracy, which I believe should be given, and my problem

4   with this instruction, is that it doesn't go far enough in

5   telling the jurors they have to be unanimous both as to --

6           THE COURT:  You would agree it's a pattern

7   instruction.

8           MR. FOX:  I am sorry.

9           THE COURT:  You would agree it's a pattern

10  instruction.

11          MR. FOX:  It is.  There are other pattern

12  instructions that -- there are other instructions that the

13  Court can give about unanimity and I think the case law says

14  in complicated cases, the Court can do that and I am asking

15  the Court to do that.

16          THE COURT:  All right.  Mr. Friedman.

17          MR. FRIEDMAN:  We are preparing and will have a

18  pattern verdict form that would require the jury to be

19  unanimous on the object of the conspiracy, which crime.  So I

20  think that takes care of that.  Beyond that I think this is an

21  appropriate pattern instruction.

22          THE COURT:  You wouldn't suggest, Mr. Fox, that the

23  jury by now would know what this case is about?

24          MR. FOX:  I guess, Your Honor, I am not sure, because

25  the government introduced a lot of evidence as to other

1  arsons, and they have never offered any evidence as to who

2  committed those arsons.  There are communiques that were

3  issued, but some of the early cases that Agent Comery

4  testified to, they have heard no testimony as to who committed

5  those.

6     Boise Cascade, there were these arsons that took place,

7  and the jurors have never been told who committed them.

8     Ms. Phillabaum and Kolar talked about a few of them.

9     I think there is -- this is a conspiracy charge and I

10  think we need to narrow in what the conspiracy is and what the

11  objects were so the jurors aren't left speculating about that

12  or disagree among themselves.

13     THE COURT:  I understand your position.  Anything

14  else to be said?

15     MR. FRIEDMAN:  The only thing I would say we don't

16  have an objection if the Court wants to give our proposed No.

17  1.  I don't think it's necessary, but we don't object.

18     THE COURT:  Government's No. 1.

19     All right, No. 17, it's also dealing with to decide

20  whether there's a conspiracy is going into what they are to

21  do.

22     MR. FRIEDMAN:  No objection from the government.

23     MR. FOX:  Two problems, again, without the jurors

24  knowing exactly what the conspiracy charge in the indictment

25  is, this doesn't make a whole lot of sense.  It goes to our

previous motion, which I know the Court has ruled on, that

there are multiple conspiracies in this case.

THE COURT:  Right.

MR. FOX:  So I believe that this instruction needs to

be more specific in that regard.

I also would ask that the Court include our proposed

language in this instruction from our Instruction No. 11.  "If

you find a conspiracy beyond a reasonable doubt, or if you

find beyond a reasonable doubt the defendant was not a member

of the charged conspiracy."  I have included the "beyond the

reasonable doubt" in our proposed language that is not in

here, so it's just repeating the reasonable doubt.

THE COURT:  All right.  Anything else to be added to

this?

MR. FRIEDMAN:  I think this is an appropriate pattern

instruction and we don't want the burden of proof in every

instruction.

THE COURT:  Of course, Mr. Fox, you understand we are

going through and you know this anyway, that the instructions

will be read as a whole, not as pick out one and say this is

the one that controls.

Okay, No. 18 talks about a timeframe, if you will, as to

conspiracy.  It also tells about how to find if the defendant

was involved in the conspiracy, and it's got some elements

they have to satisfy.

1      Any issue with that one?

2              MR. FRIEDMAN:  No, Your Honor.

3              MR. FOX:  Your Honor, I would object to the last

4      paragraph of the instruction -- I don't think we -- the

5      paragraph that says "It is no defense that a person's

6      participation in a conspiracy was minor or for a short period

7      of time."  I don't think we -- we haven't raised that as a

8      defense, so I don't think we should be telling the jurors it's

9      not a defense when that hasn't been a defense we've offered.

10             THE COURT:  Okay.  Is it fair to say this, that

11     language appears in the pattern instruction?

12             MR. FOX:  I believe so.

13             THE COURT:  Anything to add, Mr. Friedman?  Do you

14     want to add anything to that?

15             MR. FRIEDMAN:  No.  It does appear in the pattern

16     instruction and I think it is appropriate.

17             THE COURT:  No. 19, deals with the elements of Count

18     4.  That's the unregistered destructive device.  Any issue

19     with that?

20             MR. FRIEDMAN:  I think the Court made this correction

21     on another instruction and I think it makes sense.  I think if

22     we insert the word incendiary bomb if parentheses each time

23     destructive device is used, so in the second line --

24             THE COURT:  Unregistered destructive device and then

25     insert incendiary bomb.

1      MR. FRIEDMAN:  -- in parentheses and then did the

2  same in the seventh line, I think that would remove possible

3  issues on appeal.  Right at the end of the seventh line, so

4  right at the end of the first element.

5      THE COURT:  I see, that's where you are saying it

6  should be.

7    All right, Mr. Fox, any comment?

8      MR. FOX:  I agree with Mr. Friedman's suggestion and

9  then I have some other comments.  We've proposed Instruction

10  No. 12 that is more specific.  We believe that this

11  instruction should state who was allegedly aided and abetted.

12  So it should name the other person so there's no confusion as

13  to who the alleged principal is.

14    Secondly, this instruction doesn't include the certain

15  elements we believe are essential.

16    I filed a memorandum prior to trial, saying that when you

17  allege -- when someone is alleged to be an aider and abettor,

18  they have to have specific intent and they have to -- while

19  the principal may not have to know of the registration

20  requirements, when you are accused of aiding and abetting

21  someone, to possess something, the defendant is the aider and

22  abetter has to have specific intent with regard to the

23  registration requirements, otherwise if you pick up a friend

24  and they are driving with their gun on a hunting trip and it

25  hasn't been registered, you could be guilty.

1      So you have to have specific intent.

2      And I have cited a case, a Ninth Circuit case in my memo,

3  the Sayetsitty case, 107 F.3d 1405, 1997, that talks about how

4  aiding and abetting has an additional element of specific

5  intent.

6      So we think the government needs to prove that Ms. Waters

7  knew of the registration requirements for an incendiary bomb,

8  and knowing of these requirements, intentionally assisted the

9  other people to possess it, without registering it, so she has

10 to know the registration requirements to be an aider and

11 abettor.

12     And then finally, the principals have to know the

13 characteristics of the bomb that require it to be registered.

14 So the principal don't have to know the registration

15 requirement but they have to have some knowledge of the

16 characteristics of this thing to cause it to be registered.

17     So our proposed instruction 12 sets that out.

18         THE COURT:  All right.  You are saying instead of

19 this instruction, that's what should be given.

20         MR. FOX:  Right.

21         THE COURT:  Now, I am going to refer you to -- and

22 we'll get to that a little later, but I believe instruction 23

23 addresses aiding and abetting, and that language seems to

24 appear at the bottom, the elements set forth.

25         MR. FOX:  Your Honor, I don't believe this has the

1  element of specific intent.  So a person has to know what the

2  aider and abettor under this instruction has to know,

3  knowingly and intentionally aided, counseled, commanded,

4  induced, or procured that person to do the crime.

5      This doesn't have the specific intent element requirement

6  that Ms. Waters knew of the registration requirements.

7      THE COURT:  I am not so sure that's an element that

8  you touched on there, but anyway, I have it noted and I will

9  look at it.

10      MR. FOX:  I did file -- it's in my trial memo.

11      THE COURT:  Okay.  Let's move then to 20.

12      MR. FRIEDMAN:  For the record, we think this is an

13  appropriate pattern instruction and should not be changed, 19,

14  with the exception of the one correction.

15      THE COURT:  You both agree on the incendiary bomb

16  insertion.

17      No. 20 deals with knowingly.  Any issue with that one?

18      MR. FOX:  Your Honor, the second sentence, "The

19  government is not required to prove that the defendant knew

20  that his or her acts or omissions were unlawful."  It should

21  be "her acts."  That's not the case for aiding and abetting.

22  When you are alleged to be an aider and abettor, the

23  government is required to prove she had specific intent of the

24  registration requirements, for instance, so we would except to

25  the giving of that second instruction.

1          Additionally, I guess we can -- when we deal with this

2   one, we are dealing with my proposed instruction, there's no

3   definition of intent in this instruction, just of knowledge.

4          THE COURT:  All right.  Anything to add to that from

5   your standpoint, Mr. Friedman?

6          MR. FRIEDMAN:  No, I think this is an appropriate

7   pattern instruction and should be given as proposed.

8          THE COURT:  I think it is a pattern instruction and

9   really dealing with the definition of knowingly; do you agree

10  with that?

11         MR. FOX:  Yes.

12         THE COURT:  No. 21, that's the term destructive

13  device and what it means, I believe that's directly from the

14  statute.  Any issue with that?

15         MR. FRIEDMAN:  Not from the government.

16         MR. FOX:  The government filed a brief yesterday

17  asking the Court to limit the definition of destructive device

18  to what's in the indictment.  What's charged in the indictment

19  is incendiary bomb.  That language "incendiary bomb" is going

20  to be in the to-convict instructions, so we believe everything

21  under (I) should be excluded.  So we shouldn't be telling the

22  jurors anything about grenades, rocket, missile, or similar

23  devices.  We've alleged incendiary bomb; that's what we should

24  instruct on.

25         THE COURT:  But this is the statute which the

1  defendant was charged.

2       MR. FOX:  It is the statute, but not what's in the

3  indictment.

4       THE COURT:  All right.  Mr. Friedman, any comment as

5  so what Mr. Fox is saying, everything in this instruction

6  below bomb should be deleted?

7       MR. FRIEDMAN:  I guess I would think it's probably

8  clearest and best for the jury just to have the entire

9  definition, so to go all the way down as it is here, to

10 basically give it in this form, because it tells the jury what

11 the definition is, as opposed to truncating it.  They might

12 draw a different inference from seeing part of the definition,

13 as opposed to the full definition.

14      THE COURT:  Mr. Fox, one other question.  The one you

15 are mainly concerned about, device similar, is that not part

16 of the definition?

17      MR. FOX:  It's part of the definition, but it hasn't

18 been alleged in the indictment.  So we believe that by

19 instructing on VI, the Court will allow possibly the jurors to

20 convict Ms. Waters with something she hasn't been charged

21 with.

22      THE COURT:  All right.  No. 22 talks about

23 destructive device.  Any issue with that?

24      MR. FRIEDMAN:  Just a technical one.  In the third

25 sentence, the sentence beginning "Any device", I think we

1  would want to add the words "Containing combustible material."

2  I think it was in an earlier draft and may have been dropped

3  out.

4  THE COURT:  What language?  Say that again.

5  MR. FRIEDMAN:  "Any device containing combustible

6  material," because towards the end of the sentence there's a

7  reference to that combustible material.

8  THE COURT:  I see what you are saying.  Mr. Fox.

9  MR. FOX:  Your Honor, we've argued about this

10  extensively.  We have strong objections to the Court's

11  definition of destructive device.  We've briefed that.  We've

12  argued about it.  This instruction, you know, we believe goes

13  way beyond what the statute allows, it goes beyond what

14  science allows, we think it's unconstitutionally vague.

15  I mean, under this definition, a match could be a

16  destructive device, and that's just not the law.

17  So, I don't know if the Court wants me to reargue

18  everything.

19  THE COURT:  I don't want you to reargue, I just want

20  you to tell me why you think it shouldn't be given at all.

21  You are saying it's unconstitutionally vague.

22  MR. FOX:  I have written extensive briefing on this.

23  THE COURT:  And I have ruled on this.

24  MR. FOX:  I am telling you my position.

25  THE COURT:  That's why you take the position, the

1 reason why this instruction shouldn't be given, for the

2 reasons you stated in your pleading?

3          MR. FOX:  Right.

4          THE COURT:  If it is given, this language that

5 Mr. Friedman just mentioned, any comment on that?

6          MR. FOX:  I can't agree to anything in this

7 instruction, okay.

8          THE COURT:  All right.  No. 23 talks about possessing

9 an unregistered destructive device, or aiding and abetting in

10 that.

11     Any issue with that one?

12          MR. FRIEDMAN:  No.

13          MR. FOX:  I think I already indicated this

14 instruction does not require specific intent, that the person

15 alleged to be the aider and better knows of the registration

16 requirements.  This would allow for conviction of someone who

17 picks up a friend with an unregistered shotgun without the

18 person knowing that.

19          THE COURT:  Let me ask you exactly what you are

20 suggesting -- you are saying specific intent should be added

21 to this.

22          MR. FOX:  Yes, I believe in my trial brief I have set

23 out that analysis.

24          THE COURT:  All right.  I believe some of this -- I

25 will have to look at some of this that I have ruled on.  These

1  issues have been coming up from the beginning, and the Court

2  has ruled on it.

3  　　　　MR. FOX:  The specific intent I don't think we've

4  ever talked about before.

5  　　　　THE COURT:  Mr. Friedman, did I give you a chance to

6  speak to this?

7  　　　　MR. FRIEDMAN:  You probably did.  I think it's the

8  pattern instruction and it's appropriate.  If we start

9  changing it I think we have a lot of problems.

10  　　　　THE COURT:  You agree it is a pattern?

11  　　　　MR. FOX:  You know, quite honestly Your Honor, I

12  don't have that knowledge right now.

13  　　　　THE COURT:  I am not asking you to like it.

14  　　　　MR. FOX:  I can't recall exactly the pattern

15  instruction.

16  　　　　THE COURT:  Okay.  24 deals with Count 5, arson of a

17  building.

18  　　　　MR. FOX:  May I go back to 23 for a second?  I guess

19  also we would except to the giving of the last paragraph.  I

20  think the government should prove who committed the crime and

21  who was the abettor and aider.

22  　　　　THE COURT:  That's why you are saying they should

23  give specific intent as to specific person doing these things?

24  　　　　MR. FOX:  Specific intent would apply to the alleged

25  abettor and aider, but the jury should be unanimous as to who

1  the principal is, and they should be told who the alleged

2  principals are and they need to be unanimous to that, so we

3  would except to that last paragraph.  Otherwise, six of the

4  jurors may think it was Capitol Hill Girl that was the

5  principal and six of jurors may think it was Lacey Phillabaum.

6  But they should be told who the alleged principals are, they

7  need to agree on it unanimously, so the government should have

8  to prove that.

9          THE COURT:  So you disagree with the paragraph,

10  because you are saying they should prove precisely who was

11  aiding and abetting?

12          MR. FOX:  And who the principals are and they should

13  be unanimous who that was under the Sixth Amendment.

14          THE COURT:  All right.  I haven't seen the form of

15  the verdict so I will see if that cleared up this very thing

16  you are talking about.

17          MR. FRIEDMAN:  Just so the Court knows, it doesn't,

18  but the law doesn't require us to prove that and the pattern

19  instructions specifically say we don't have to.

20          THE COURT:  I understand that.

21      No. 24, Count 5.  That's the arson of the building used in

22  interstate commerce and the elements set forth there as to the

23  proof.

24      Any disagreement with that?

25          MR. FRIEDMAN:  No.

1          THE COURT:   Mr. Fox, any disagreement with that?

2          MR. FOX:   A few things, Your Honor, just for the

3    record, I would repeat our commerce clause argument, that this

4    is not a building that was used in interstate commerce, it

5    wasn't the principal focus, the Court has ruled on that, I am

6    repeating my objection.

7        The problem -- there's another problem, that this

8    instruction doesn't refer to which building and which date.

9    Again, given all of the debates in -- there's been no evidence

10   as to who burned down the Animal Control Unit in Olympia on

11   June 20, 1998, that the government introduced evidence of

12   that.

13       I don't want the jurors to have any confusion that we are

14   talking about the Center for Urban Horticulture.

15          THE COURT:   Isn't that what Count 5 is alleging?

16          MR. FOX:   If the Court gives the Government's

17   proposed instruction, then that cures the problem, but as the

18   instructions are set out right now, the jurors aren't given

19   any dates or times for specific buildings.

20       So I think this instruction should make it very clear what

21   the date is and what the building is.

22       The other issues with regards to this instruction, we

23   believe that the defendant intended the building would be

24   destroyed, not just damaged, but destroyed; And I think we

25   raised that in some of our briefing.

1      Then also, we believe there are additional instructions

2   that the Court should give that we can address in a second as

3   to the jurors determining whether this is truly a building

4   engaged in interstate commerce and what that means.  That

5   should be a jury question with specific instructions.

6           THE COURT:  All right.

7           MR. FRIEDMAN:  As I look at this, I think I actually

8   agree with Mr. Fox.  If we gave instruction 1, it would make

9   it clearer exactly which and avoid changing other

10  instructions.  So I think if we gave Government's instruction

11  1 that would be helpful in resolving a lot of these issues.

12  Otherwise I think it's an appropriate pattern instruction and

13  correctly states the law and should stay as it is.

14          THE COURT:  All right.  No. 25, Count 6 and that's

15  using a destructive device, the incendiary bomb.  And the

16  elements the jurors must find.  Any issue?

17          MR. FRIEDMAN:  Two things:  In the second element, we

18  would ask the Court add "and intentionally" after the word

19  "knowingly."  This is in response to one of the briefs they

20  filed and I think the statute does require that it be "and

21  intentionally."

22          THE COURT:  Do you agree with that Mr. Fox?

23          MR. FOX:  Yes.

24          MR. FRIEDMAN:  Then after destructive device in the

25  same element, I think we should add incendiary bomb in

1   parenthesis, in the very next line, the second element.

2          MR. FOX:   And also in the third element.

3          MR. FRIEDMAN:   It's unnecessary there.

4          THE COURT:   Would that also apply after the

5   destructive device on line 15?

6          MR. FRIEDMAN:   I think it's not necessary because it

7   refers back, but I don't have an objection.

8          THE COURT:   Do you think that about covers that in

9   terms of intentionally and incendiary bomb, Mr. Fox; you are

10  satisfied with those?

11         MR. FOX:   We are satisfied with those additions but

12  we do have other problems with it.

13         THE COURT:   Anything else you want to say?

14         MR. FOX:   For the record we object to this

15  instruction being applied to Count 7; that was the count that

16  was added in the fourth superseding indictment, the count

17  involving an institution receiving federal financial

18  assistance.   We had previously filed and the Court had denied

19  our statute of limitations objection to that count.   I just,

20  for the record, am renewing my objection to that count.

21         THE COURT:   Okay.

22         MR. FOX:   There are also proposed instructions that

23  are in our packet that go further to defining what a crime of

24  violence is and defining what a person is.   We can address

25  those when we get to our proposed packet, if you wish.

1              THE COURT:  Yes, let's do it that way.  No. 26 deals

2   with count 7, the indictment charged with committing the

3   arson, that's the University of Washington, and sets forth the

4   elements.  Any issues with that?

5              MR. FRIEDMAN:  Not from the government Your Honor.

6              MR. FOX:  Two things, Your Honor.  First, again, no

7   date or name of building are in this instruction.  If we give

8   the Government's proposed 1, that would take care of that

9   problem.

10             There is still lingering, and I realized this last night,

11   prior to trial, we had moved to dismiss Count 8 of the fourth

12   superseding indictment alleging that the statute here was

13   unconstitutional because the statute doesn't have any amount

14   in it for how much financial assistance an institution has to

15   receive for there to be federal jurisdiction.  The Court

16   reserved ruling on that saying it needed to see the evidence,

17   and I believe there was an order to that effect issued, which

18   is docket 233, order denying as premature Waters' motion to

19   dismiss Count 7 of the fourth superseding indictment.

20             We believe evidence has come out there's certainly

21   evidence that there's a lot of federal financial assistance

22   going to the University of Washington.  We believe that this

23   statute is unconstitutional for the reasons I set out in my

24   brief; it violates the 10th amendment, it infringes --

25   entrenches on state authority.  The statute doesn't have any

1    numbers in it.  It's just unconstitutional.  I raised it and

2    the Court reserved ruling, and I am renewing my objection now.

3    And I think the Court needs to rule to tie up that issue that

4    I raised at Court's docket 233, that the Court reserved ruling

5    on.

6              THE COURT:  Mr. Friedman, any comment?

7              MR. FRIEDMAN:  I think the statute is constitutional.

8    No other comments.

9              THE COURT:  I don't think I am prepared to say the

10   statute is unconstitutional.  I heard testimony and everybody

11   heard testimony how funds come in.  I think that is sufficient

12   enough for the Ninth Circuit to go to work on the issue.

13             MR. FOX:  Okay.

14             THE COURT:  From that standpoint, anything else other

15   than the constitutional aspect of this?

16             MR. FOX:  Other than what I have said on a prior

17   arson count.

18             THE COURT:  About the date?

19             MR. FOX:  And also the intent that the whole building

20   should be destroyed and not just damaged.

21             MR. FRIEDMAN:  The statute covers damage or destroyed

22   and we charged it that way.  So that's the appropriate

23   version.

24             THE COURT:  No. 27 talks about Exhibits 781 and 785,

25   about whether or not there's a record showing registration as

1　to this device, and it tells them how to view those

2　certificates.　Any issue with that one?

3　　　　　MR. FRIEDMAN:　Just a wording thing.　It says no

4　record of any device being registered to any of the defendants

5　and the other names.　I think it would be better if we put

6　Briana Waters' name in there just to be clear -- "and no

7　destructive device being registered to Briana Waters" and the

8　other folks on the list.

9　　　　　THE COURT:　Mr. Fox do you agree with that?

10　　　　　MR. FOX:　We would object to that -- basically this

11　instruction being given, at least the second sentence being

12　given at all.　I don't think the Court needs to repeat what

13　the evidence says, the certificates speak for themselves.　The

14　Court shouldn't then be telling the jury that the certificates

15　state that a custodian made a diligent search of the record

16　and found no record.　Why should the Court be telling the

17　jurors what the evidence is?　They have the evidence.

18　　　I agree though, that jurors should be instructed that from

19　the certificates, they may, but need not, decide as to whether

20　or not someone actually had a registration.　But I don't think

21　the Court should be repeating what the evidence is.

22　　　　　THE COURT:　If this instruction is given, you think

23　Briana Waters' name should be shown on there, that she did not

24　have --

25　　　　　MR. FOX:　Yes.

1          THE COURT:   Okay.   Anything else to add to this?
2   This is, as far as you know, a pattern?
3          MR. FOX:   I actually --
4          THE COURT:   You didn't look at any of the patterns?
5          MR. FOX:   I don't know whether this is a pattern.
6          MR. FRIEDMAN:   It is, and the language at issue is
7   part of the pattern language.
8          MR. FOX:   I don't know whether it is a pattern.
9          THE COURT:   Well, if you don't know, you don't know.
10  I thought you guys compared the patterns.
11         MR. FOX:   I did at some point.
12         THE COURT:   Or you just pick your own and send it in.
13  You do your own.
14         MR. FOX:   That's true also.
15         THE COURT:   No. 28 tells them about they are the ones
16  to render the verdict and that sort of thing.   Any issue with
17  that.
18         MR. FRIEDMAN:   No.
19         MR. FOX:   It's kind of the standard.
20         THE COURT:   The punishment provided is for the Court
21  to decide.   Any issue with that?
22         MR. FRIEDMAN:   No.
23         MR. FOX:   I do believe the jurors should be
24  instruction they can't consider punishment insofar as it makes
25  them careful.   I believe your proposal is a pattern

1  instruction, but I don't think that -- I think it violates due

2  process and the right to a jury trial.  The jurors should know

3  the punishment to be considered, so that they are very, very

4  careful about how they evaluate the evidence.

5          THE COURT:  Do I have to tell them to be careful?

6  You say I have to tell them something on one hand and on the

7  other hand don't tell them.

8          MR. FOX:  My authority is Washington State pattern

9  instructions.

10         THE COURT:  You are saying, you want me to add what

11 language?

12         MR. FOX:  That the juror should consider the

13 punishment, insofar as it makes them careful in evaluating the

14 evidence.

15         MR. FRIEDMAN:  We object to that of course, Your

16 Honor.

17         THE COURT:  All right.  No. 30 is talking about when

18 they are electing a presiding juror.  Any issue with that?

19         MR. FRIEDMAN:  No.

20         MR. FOX:  No.

21         THE COURT:  And communicating with the Court and that

22 sort of thing.  Any issue with that?

23         MR. FRIEDMAN:  No.

24         MR. FOX:  No.

25         THE COURT:  Then the form of the verdict, which we

1  will work that out.  Any issue with that?

2      MR. FOX:  Your Honor, could I just go back to

3  something that we dealt with at the very beginning and put

4  something on the record.

5      THE COURT:  What is that.

6      MR. FOX:  This is on Instruction No. 3.  This is a

7  pattern instruction but I would like the record to reflect I

8  do have an objection to this, and I have an objection to the

9  second sentence in the first paragraph:  "It is not required

10  that the government prove guilt beyond all possible doubt."

11  Secondly I would have an objection to the second clause of the

12  next sentence "and is not based purely on speculation."  I

13  don't think the Court should be instructing on the due process

14  clause, instructing the jury kind of in a negative.  You

15  should tell them the government has to prove a case beyond a

16  reasonable doubt.  I don't know -- to say it's not required

17  that the government prove guilt beyond all possible doubt, I

18  think that counteracts the burden of proof.

19      THE COURT:  What line are you reading from?

20      MR. FOX:  Line 4, the second sentence of paragraph 1.

21  I object to, "it is not required that the government prove

22  guilt beyond all possible doubt."

23      I think that that language contradicts the Sixth Amendment

24  and the Fifth Amendment right to a jury trial and right to due

25  process.

1    I think the government should prove guilt beyond all

2  possible doubt. So I don't think the Court should be telling

3  the jury the government doesn't have to do that.

4        THE COURT: Well, the burden of proof is reasonable

5  doubt.

6        MR. FOX: Right, but it's our position that possible

7  doubt is reasonable doubt. If jurors possibly have a doubt,

8  then that's reasonable doubt. Let's just tell them prove

9  beyond a reasonable doubt. We don't have to go forward and

10  tell them what reasonable doubt isn't.

11        THE COURT: Okay. Any comment on that?

12        MR. FRIEDMAN: We'll defend it on appeal, Your Honor.

13        THE COURT: All right.

14    All right, so those are the comments on the instructions.

15  Now, Mr. Friedman, any exception to any proposed instructions

16  by you that's not in here?

17        MR. FRIEDMAN: No. Thank you, Your Honor.

18        THE COURT: Mr. Fox. We talked about -- let's see,

19  let's start where there was --

20        MR. FOX: We have our proposed Instruction No. 3,

21  which is the instruction about "you have heard evidence that

22  Briana Waters has engaged in protests and other types of

23  freedom of speech." Basically what this proposed instruction

24  says, is that you can't convict her based upon the content of

25  protected speech activities.

1    Given the issue of freedom of speech in this case, and

2 reading materials, and things off the Internet, the fact that

3 Ms. Waters was cross-examined about a protest at an office, we

4 think it is very important that the jurors be given a strong

5 direction from the Court that the First Amendment protects

6 freedom of speech.

7    They may not agree with what Ms. Waters has thought or

8 said or done in the past, in the realm of protected speech,

9 but they should not convict her because of those speech

10 activities.

11    THE COURT:  You are saying your Instruction No. 3

12 should be given.

13    MR. FOX:  Yes.

14    THE COURT:  And for those reasons.

15    MR. FOX:  Yes.

16    THE COURT:  Any others -- you had mentioned about the

17 conspiracy instruction.

18    MR. FOX:  Right.  I am going through -- the next

19 ones, Your Honor that we believe should be given is defense

20 proposed Instruction No. 9.

21    THE COURT:  All right.

22    MR. FOX:  Which is a definition of intent.  We gave a

23 definition of knowledge and we think the jurors should be

24 given a definition of intent.  I actually couldn't find a

25 pattern instruction on this, which is why I referenced LeFave

1 and Scott on that issue.

2     I think we should tell the jurors what intent means and

3 not let them speculate.

4     We prepared instructions 10 and 11, are the instructions

5 that we believe make it very clear that the jurors need to be

6 unanimous under the Sixth Amendment as to the scope of the

7 conspiracy, the objects of the conspiracy, that the government

8 has proven the same conspiracy beyond a reasonable doubt.

9     Our proposed instructions make that crystal clear and I

10 have addressed some of that in my trial memo so I would refer

11 the Court to my trial memo for those two instructions.

12     Similarly, and I won't repeat my argument about my

13 objections to the to-convict instructions, but I would ask the

14 Court, instead of the ones you have proposed, to give our

15 proposed Instruction No. 12, with regards to the unregistered

16 firearm.  We think it sets out the specific intent requirement

17 more fully than the way it comes out in the proposed

18 instructions.

19         THE COURT:  Okay.

20         MR. FOX:  The same thing with regard to instruction

21 14, for the reasons that I believe the Court's proposed

22 to-convict on Count 5 is insufficient, we would ask the Court

23 to give ours instead.  I went into some of this in our trial

24 memo.

25     We would ask the Court on defense proposed instruction 15,

1  to define when a building is used in an activity affecting

2  interstate commerce.  We believe the jurors should be the

3  ultimate deciders whether a building's primary function is

4  commercial rather than just having a tacit connection to

5  commerce.

6      I raised a lot in the pretrial briefing, but I think it is

7  ultimately the jury has to decide that.  The Court denied it

8  on legal grounds, but the jurors should be told what

9  interstate commerce means and when a building has a primary

10  connection to interstate commerce.

11      No. 16, our proposed instruction 16 on arson, we -- I am

12  sorry, destructive device, incendiary bomb in relation to a

13  crime of violence, we believe that you should give our

14  proposed instruction 16 for the reasons that I have explained

15  before and in the trial memo, but more particularly,

16  Instruction No. 17 should define crime of violence to the

17  jury, so that jurors know what a crime of violence is.

18          THE COURT:  You are talking about 16 now?

19          MR. FOX:  I moved on to 17.  16 I think I covered

20  when I excepted to the Court's instruction on that.

21      But in terms of 17, I think a crime of violence should be

22  defined to the jury.  It is a definition from the statute.

23  The jurors should be told that a crime of violence has to have

24  an element against a person or property of another.  That ties

25  into No. 18, our proposed Instruction No. 18, that person and

person of another -- and this comes right from the statute -- include individuals, corporations, companies; it does not include sovereign entities.

     I raised a lot of this in pretrial motions.  On legal grounds the Court denied those motions, but ultimately the jurors should determine whether in fact this is truly a crime of violence committed against a person and not a sovereign entity.  So I would ask the Court give these instructions so the jury makes that decision.

          THE COURT:  All right.

          MR. FOX:  Our proposed instruction No. 19, I am not going to repeat all the legal arguments we made about destructive devices, but we believe our proposed No. 19 is the true definition of a destructive device that should be given to the jury.  We've argued about this a lot, I am not going to repeat those arguments right now, but No. 19 conforms to all the legal arguments we made previously.

          THE COURT:  Okay.

          MR. FOX:  Again, instruction 20, that ties into our statute of limitations argument that we raised earlier about count 7 and instruction 20 should be given so the jurors don't convict Ms. Waters of a theory of arson that was charged beyond the statute of limitations.

     With regard to No. 21, it is not enough that Briana Waters was merely present at the scene of a crime of violence, that

1   instruction I think I covered in my memo and I would refer the

2   Court to my motions and memoranda related to destructive

3   devices.

4       Similarly, my "to convict," 22, proposed instruction 22,

5   the to-convict on Count 7, I will repeat -- I will refer the

6   Court to my arguments I made about the Court's to convict

7   instruction on 7.  This is more specific.  It names the Center

8   for Urban Horticulture.  It names the date.

9           THE COURT:  Your 22 should be given, in terms of 22

10  in the Court's packet?

11          MR. FOX:  Instead of 26.  Then two days ago I

12  proposed supplemental instructions, unfortunately I named it

13  22 again.  22, 23, and 24, these are the proposed instructions

14  I filed two days ago, and we talked about this earlier.  These

15  are instructions about the felony convictions of Jennifer

16  Kolar an Lacey Phillabaum.  We think there should be a

17  separate instruction about their felony convictions, and how

18  this should be considered, in addition to the fact that they

19  pled guilty.

20      We think the No. 23 should be given.

21          THE COURT:  Now, are you going to one you've already

22  commented on?

23          MR. FOX:  Yes.

24          THE COURT:  Which one is that?

25          MR. FOX:  When we were talking about Instruction No.

1    13, your Instruction No. 13, I said that I had proposed

2    separate instructions.

3            THE COURT:  That's 22 and 24, you said?

4            MR. FOX:  Yes, and then 23 is an instruction that we

5    proposed specifically about Robert Corrina, a witness who has

6    lied under oath on a prior occasion.  We think there should

7    be -- this is a pattern Instruction 4.8 -- and we think there

8    should be a specific instruction about Mr. Corrina, the fact

9    that he lied under oath and that the jury should consider that

10   along with other evidence.

11       Then today, I proposed an instruction which I didn't

12   number, I think I passed it back about missing witnesses.

13           THE COURT:  You are asking that that be given?

14           MR. FOX:  A witness peculiarly available to the

15   prosecution to maintain its burden of proof which it did not

16   produce or explain why it cannot is presumed one to have

17   testified against the government.

18       There are a lot of people that are not testifying in this

19   trial, who have cooperation agreements with the government.

20   There's Stan Meyerhoff, Suzanne Savoie, Kevin Tubbs.  These

21   are all people that have reached cooperation agreements with

22   the government.  They are peculiarly available to the

23   government.  I would note that my efforts to even talk to any

24   of these people, have been met with refusals by their

25   attorneys to even let their clients talk to me.

1    The government has cooperation agreements with these

2 people, and the fact that they haven't called those witnesses,

3 the jurors need to be told that that means they are not going

4 to help the government.  They can bring them in.  I don't have

5 that ability.  I don't have a cooperation agreement with them.

6    So they are peculiarly available to the government and

7 this is a traditional instruction of missing witnesses.

8    THE COURT:  We are talking now because the attorneys

9 wouldn't let them talk to you, the defendant's attorneys?

10    MR. FOX:  Susan Savoie's attorney, Stan Meyerhoff.

11 There's people I asked to talk to and they said no.  There's

12 cooperation agreements with these people, and the fact that

13 the government has not called them, this should be considered

14 by the jury negatively against them.

15    THE COURT:  I understand.  I don't know what else to

16 say.  You didn't have any that you thought should be given

17 that I haven't.

18    MR. FRIEDMAN:  I disagree with each of the additional

19 ones the defense has asked.  I don't think the Court wants to

20 hear the argument.

21    THE COURT:  I don't want to take argument.

22    MR. FOX:  May I ask the court what it wants to do in

23 terms of formal instructions, because I don't want to have to

24 repeat all the legal arguments I have just made.

25    THE COURT:  What I am saying is this:  What we have

1 taken up here today, now, and as you refer to in terms of your

2 pleadings and the issues we brought up, you don't need to do

3 that again. The record is complete and is sufficient for you

4 to take up what I do here based on that. So you don't have to

5 redo all that over again.

6     So don't feel like you have to do that.

7         MR. FOX: Okay.

8         THE COURT: If I don't give something, or give

9 something, you just make your exceptions and reasons on the

10 record and they will stand.

11         MR. FOX: I guess, does the Court want me at some

12 point, when the Court gives a final packet, to just make an

13 exception to what's given, what's not given, without going

14 into the legal arguments?

15         THE COURT: Correct, because you've already done that

16 and it will serve because I don't want you to do that all over

17 again.

18     The other thing I need to talk to you about is closing,

19 and I will go back and consider all the things you've said and

20 then I will generate the final copy.

21         MR. FOX: The record should reflect Mr. Bloom is now

22 present.

23         THE COURT: Okay.

24     So Mr. Friedman, I will start with you. Are you giving

25 the -- well, I guess Mr. Bloom came in late and Mr. Bartlett

1  is not here, so I assume those two are going to argue the

2  case.

3  　　　　MR. FRIEDMAN:  Mr. Bartlett is going to do the main

4  closing at least.

5  　　　　THE COURT:  And Mr. Bloom.

6  　　　　MR. BLOOM:  Yes.

7  　　　　THE COURT:  Can you speak for him?

8  　　　　MR. FRIEDMAN:  I can.  You mean in terms of how much

9  time we think?

10  　　　　THE COURT:  Yes.

11  　　　　MR. FRIEDMAN:  I think there's a fair amount to

12  address after a three week trial between the two closings.  No

13  more than 2 1/2 hours, if the Court would allow that much

14  time.

15  　　　　THE COURT:  You think it will take you two and a half

16  hours to cover this?  Between two closings?  You folks have

17  been living with this a long time.  You can name Exhibits

18  going to a particular issue without even looking at anything.

19  So I am just trying to understand now.  You think you need 2

20  1/2 hours.

21  　　　　MR. FRIEDMAN:  To be safe.  We will try to be faster,

22  Your Honor.

23  　　　　THE COURT:  Okay.  Mr. Bloom?

24  　　　　MR. BLOOM:  Same.

25  　　　　THE COURT:  All right.  Anybody been practicing?

1          MR. BLOOM:  I am sorry.

2          THE COURT:  Anybody been practicing?

3          MR. FOX:  Well, I represented Mr. Bloom was in front

4    of the mirror.

5          THE COURT:  He said you were back at the hotel in

6    front of the mirror.

7          MR. BLOOM:  No, I don't keep mirrors where I live any

8    more, I am getting too old.

9          THE COURT:  I will tell you what I think about it.

10      All right.  Right now I am going to take a recess and go

11   through these and deal with these instructions and get those

12   ready.

13         THE CLERK:  All rise.

14         THE COURT:  Answer one thing for me, too, we are

15   talking rebuttal witnesses.

16         MR. FRIEDMAN:  We'll have one, and I think it will be

17   less than 15 minutes.

18         THE COURT:  Who is that?

19         MR. FRIEDMAN:  FBI agent Chris Ford.

20         THE COURT:  You've exchanged.

21         MR. FOX:  We've talked.

22         MR. FRIEDMAN:  We are resuming at 10:00.

23         THE COURT:  Hopefully at 10:00, but it's going to

24   take me a while to deal with what I want to be done here.  If

25   we don't go right at 10:00, it shouldn't be too far behind

1    that.

2            THE CLERK:  All rise, Court is in recess.

3            (Brief recess.)

4            THE COURT:  It is my understanding the government has

5    one rebuttal witness.

6            MR. BARTLETT:  Yes, Your Honor.

7            THE COURT:  Are we ready for that?

8            MR. FOX:  Yes.

9            THE COURT:  All right.  Bring them in.

10       (Jury present.)

11           THE COURT:  All right.  You may be seated.

12       Good morning to you.  I believe we have one.

13           MR. BARTLETT:  Yes, the United States calls Chris

14   Ford to the stand.

15           THE COURT:  Come forward, sir and be sworn.

16         CHRISTOPHER FORD, called as a witness, duly sworn.

17           MR. BARTLETT:  May I inquire, Your Honor.

18                        DIRECT EXAMINATION

19   BY MR. BARTLETT:

20   Q.  Could you tell the members of the jury your first and last

21   name and spell your last name for the Court Reporter?

22   A.  Sure.  My name is Christopher Ford, FORD.

23   Q.  Where do you work?

24   A.  I work for the Federal Bureau of Investigation, Seattle

25   office?

1   **Q.** What is your current assignment?

2   **A.** Domestic terrorism squad.

3   **Q.** Are you a Special Agent?

4   **A.** Yes.

5   **Q.** How long have you been with the FBI?

6   **A.** Just coming up on three years.

7   **Q.** Last night after court, did I ask you to do something?

8   **A.** Yes, you did.

9   **Q.** What was that?

10   **A.** You asked me to go down to Olympia, to Ralph's Thriftway

11 and drive a route that you designated, taking I-5 northbound

12 toward Seattle and taking an exit that would lead me to

13 Greenlake Bar and Grill.

14   **Q.** Did you do that?

15   **A.** I did.

16   **Q.** What time did you leave Ralph's?

17   **A.** We left Ralph's at 7:12 p.m.

18   **Q.** And after leaving Ralph's Thriftway at 7:12, how long did

19 it take you to get to the Greenlake Bar & Grill?

20   **A.** 68 minutes.

21   **Q.** How many miles was that?

22   **A.** 67 miles.

23   **Q.** During the time you were driving, did you ever drive over

24 65 miles an hour?

25   **A.** I set my cruise control on my car at 60 miles an hour.

1    MR. FOX:  I am sorry, 60?

2 **A.** 60, 6-0.

3 **Q.** In addition to the drive last night, did I also ask you to

4 try to obtain information as to when sunset was on Sunday, May

5 20 of 2001?

6 **A.** Yes, you did.

7 **Q.** Did you find that?

8 **A.** Yes.

9 **Q.** If you could take a look, I assume you didn't do it off

10 the top of your head?

11 **A.** No, and I have a printout here from the U.S. Naval

12 Observatory Astronomical Applications Department.  You asked

13 me to look at the sun times for Sunday, May 20, 2001, and you

14 wanted me to determine sunrise -- excuse me, sunset, which was

15 at 8:47 p.m., and end civil twilight at 9:24 p.m.

16 **Q.** If you could take a look at Government's 1124 in front of

17 you, do you see that?

18 **A.** I do.

19 **Q.** Your Honor, I think we have a stipulation that these are

20 medical records from Ms. Waters, from January 21, 2002, at

21 Providence St. Peters hospital.

22    MR. FOX:   No objection.

23    THE COURT:  All right, admitted.

24     (Exhibit No. 1124 admitted.)

25 BY MR. BARTLETT:

1  **Q.** Looking at the top line of that document, do you see a

2  registration time for when Ms. Waters checked into those?

3  **A.** Yes, 6:32 a.m.

4  **Q.** And when was she discharged?

5  **A.** Looks like the bottom, 10:20 a.m.

6          MR. BARTLETT:  No further questions.

7                     CROSS-EXAMINATION

8  BY MR. FOX:

9  **Q.** Good morning, Agent Ford.

10  **A.** Good morning.

11  **Q.** I am Neil Fox.  I think we met just briefly.

12  **A.** We did.

13  **Q.** You drove from Ralph's Thriftway in Olympia, to Greenlake

14  Bar & Grill?

15  **A.** Correct.

16  **Q.** I take it you went on I-5 the whole way, you went to I-5

17  and went up to Seattle?

18  **A.** Yes.

19  **Q.** You go past the Tacoma Dome?

20  **A.** Yes.

21  **Q.** You go down through downtown Seattle?

22  **A.** I did.

23  **Q.** Do you know what exit you got off at on I-5?

24  **A.** I don't know the exit number, but I believe it was for

25  Northeast 65th Street.

1  **Q.** That would have been past the Ravenna exit?

2  **A.** That should have been the Ravenna exit.

3  **Q.** That's the Ravenna exit?

4  **A.** Yeah.

5  **Q.** I take it Mr. Bartlett didn't ask you to make a stop at

6  the University of Washington Center for Urban Horticulture?

7  **A.** No, he did not.

8  **Q.** Do you know where that building is, the Center for Urban

9  Horticulture?

10  **A.** I have an idea where it is at.

11  **Q.** If you were to drive to a dumpster near the Center for

12  Urban Horticulture how would you have gotten there?

13  **A.** To be honest, I wouldn't. I have no idea because I didn't

14  attempt to go that way.

15  **Q.** I take it you were not driving with a bunch of gasoline in

16  the back of your car?

17  **A.** I was not.

18  **Q.** And I take it that you -- if you had been stopped for

19  speeding, it wouldn't have bothered you, the speeding ticket

20  perhaps, but you didn't have any fear about being stopped?

21  **A.** I didn't have any fear of being stopped because I was told

22  to not exceed the speed limit.

23  **Q.** Sure, but for some reason you committed a traffic

24  infraction on the way, you would have said, oh, I am an FBI

25  agent?

1   **A.** In theory, yes, but when I drove the route last night, I

2   had no issues and I kept my speedometer at 60 miles an hour

3   and I did my best to hold that speed.

4   **Q.** Sure. But my question is -- you weren't worried anything

5   bad would happen to you if you got stopped?

6   **A.** No.

7   **Q.** And you didn't have any electrical timing devices in the

8   back of your car, right?

9   **A.** I did not.

10   **Q.** Now, there are traffic cameras on I-5, are there not?

11   **A.** From what I hear, yes, when I see the traffic reports in

12   the morning.

13   **Q.** Sure, so if you wanted to get to Seattle to avoid traffic

14   cameras, how would you have gone?

15   **A.** I couldn't tell you, I have never thought of it that way.

16   **Q.** Is there an alternate route that's direct to Seattle

17   that's not on I-5?

18   **A.** There is. I took I-5 yesterday. That was the route I was

19   assigned to take, so that's the one -- but I can tell you

20   that's not the only way to get to Seattle.

21   **Q.** Can you give the jury some ideas of other possible routes?

22   **A.** I honestly can't because I live north of Seattle and I

23   don't ever travel down to Olympia.

24   **Q.** Are you aware of any traffic cameras on streets that are

25   not I-5?

1  **A.** I am not.

2  **Q.** Now, is it fair to say -- what day was yesterday, for the

3  record?

4  **A.** Wednesday, February 27.

5  **Q.** Are you aware of what traffic patterns were like on I-5 on

6  May 21, 2001?

7  **A.** I am not. I can tell you what the traffic patterns were

8  last night.

9  **Q.** Sure, but we are talking May 21, 2001?

10 **A.** Sure.

11 **Q.** Were you aware -- when you go up I-5, you go past the

12 Tacoma Dome?

13 **A.** Correct.

14 **Q.** Were you testing out if there were any events at the

15 Tacoma Dome on May 20?

16 **A.** I was not.

17 **Q.** How about the Mariners, you go right by where the Mariners

18 play, when you go up through Seattle?

19 **A.** In the vicinity.

20 **Q.** Is it not correct that the Mariners were playing the

21 Yankees on May 20, 2001?

22 **A.** I wouldn't know, I didn't check.

23 **Q.** I think they won actually.

24     They were probably playing earlier in the day if they were

25 playing on a Sunday; isn't that correct?

1  **A.** I don't know, the schedule fluctuates, I don't know if it

2  was an afternoon or evening game.

3  **Q.** Isn't it fair to say after the Mariners play a game,

4  there's quite often a lot of traffic on I-5?

5  **A.** One could guess that there would be. Once again, I

6  wouldn't know.

7  **Q.** Are you familiar with the 520 bridge?

8  **A.** I am.

9  **Q.** If you were going to go from downtown Seattle to the

10  Montlake area of Seattle, by University Village, would it be

11  fair to say you could go via 520?

12  **A.** Yes, that's one of many options.

13  **Q.** You would get off the highway, you'd have to cross the

14  Montlake Bridge?

15  **A.** I believe so.

16  **Q.** Isn't it fair to say that that area of Seattle has a

17  highly dense traffic, amount of traffic?

18  **A.** Depends on the time of day.

19  **Q.** Sure. Depends.

20  Now, May 20, 2001, was there not the University StreetFair

21  going on that weekend?

22  **A.** I don't know.

23  **Q.** I would like to show the witness what's been marked for

24  identification as A-216.

25  Take a look at that for a moment.

1       Can you identify what that is?

2   **A.** This is from The Daily.

3   **Q.** What's The Daily?

4   **A.** I am assuming it's literature from the University of

5   Washington or at least a publication from the University of

6   Washington.

7   **Q.** Can you identify what that says?

8   **A.** This is "Performers Keep the Avenue StreetFair

9   Interesting."

10  **Q.** What's the date?

11  **A.** May 21, 2001.

12  **Q.** I would move the admission of A-216?

13          MR. BARTLETT:  No objection.

14          THE COURT:  Admitted.

15              (Exhibit No. A-216 admitted.)

16  **Q.** Is it fair to say this documents the fact that there was a

17  University street fair the weekend of May 21, 2001 at the

18  University of Washington?

19  **A.** That's the way it looks.

20  **Q.** And have you ever been to that street fair?

21  **A.** I have not, no.

22  **Q.** What generally happens, in your understanding, at a street

23  fair?

24  **A.** To be honest I don't frequent street fairs.  If there is a

25  street fair, it usually doesn't catch my interest, therefore I

1   don't go.

2   **Q.** Do you think for a street fair, they block off a street?

3   **A.** Some do, some don't. I don't know if this specific one

4   blocked off the street, unless it says in the article.

5   **Q.** Are you aware of what the traffic patterns were around the

6   University district around that date?

7   **A.** I am not.

8   **Q.** I will hand you what's been marked for identification as

9   A-217. Why don't you take a look at that document?

10   **A.** Sure.

11   **Q.** Can you identify that for the record?

12   **A.** Once again it's from The Daily, University of Washington.

13   It says "Weekend Festivities Mean 50th opens, for time being."

14   **Q.** What's the date of that?

15   **A.** May 20, 2001.

16         MR. FOX: I would move the admission.

17         MR. BARTLETT: No objection.

18         THE COURT: Admitted.

19            (Exhibit No. A-217 admitted.)

20   BY MR. FOX:

21   **Q.** Can you read that in the record starting with "The annual

22   Ave. Street Fair"?

23   **A.** How far do you want me to read?

24   **Q.** Start with the first paragraph.

25   **A.** Sure. "The annual Ave. Street Fair, starting Saturday and

1  lasting all weekend, means more than a festive atmosphere,

2  sidewalk sales, entertainment and food.

3      "The weekend means the removal of four blocks of

4  roadblocks on Northeast 50th Street between 15th Avenue

5  Northeast and 11th Avenue Northeast.

6      "The City of Seattle hopes to open the street by 4 p.m.

7  Friday, and wants to leave it open until 4 a.m. Monday.

8      "The segment of Northeast 50th Street between 15th

9  Northeast and 11th Avenue Northeast is only part of a plan to

10  bury utilities and repave the road.  The section will stay

11  closed until mid-June.  Once that section of 50th is

12  completed, the contractor will move to the blocks of Northeast

13  50th Street between 15 Avenue Northeast and 17th Avenue

14  Northeast."

15  **Q.**  Then just the next paragraph, please.

16  **A.**  "The construction along Northeast 50th Street is not the

17  only roadwork in the area.  Over the last month, the

18  Washington Department of Transportation has clogged northbound

19  Interstate 5 by limiting traffic to as little as one lane.

20  The two projects are independent, but have caused the closure

21  of the Northeast 50th Street on-ramp to northbound I-5."

22  **Q.**  Thank you.  Isn't it correct, that in fact there's

23  substantial construction on I-5 in the month of May, 2001?

24  **A.**  I don't know.  Going by the article, the article claims

25  there may have been.  I don't know personally.

1  **Q.** Let me have you look at what's been marked for

2  identification as A-215.  Can you identify that for the

3  record?

4  **A.** This is from the Seattle Post-Intelligencer.

5  **Q.** What date is it?

6  **A.** May 3rd, 2001.

7  **Q.** What's the title of your article?

8  **A.** "Backups Expected as I-5 Lanes Close for Repaving."

9          MR. FOX:  I would move the admission of A-215.

10          MR. BARTLETT:  No objection.

11          THE COURT:  Admitted.

12              (Exhibit No. A-215 admitted.)

13  BY MR. FOX:

14  **Q.** Have you had an opportunity to review that.

15  **A.** Okay.

16  **Q.** Can you read -- why don't you tell the jury what the

17  article says, while I get this straight?

18      Agent Ford, this article talks about a couple weeks of

19  construction on I-5?

20  **A.** Correct.

21  **Q.** Starting May 3rd, correct?

22  **A.** Correct.

23  **Q.** And talking about how half, I believe -- the northbound

24  half of the Ravenna crossing southeast of Greenlake is going

25  to be closed off to get new pavement, right?

**A.** Yes, that's how it reads.

**Q.** It's supposed to -- the right lanes will remain closed through May 16?

**A.** Correct.

**Q.** And after that, it's expected the two left lanes will be closed so the work can move there, right?

**A.** Yes.

**Q.** So on the weekend of May 20, 21 there was substantial construction on I-5?

**A.** There appears to be quite a bit of construction.

**Q.** Construction in the University district?

**A.** Well, at least around the Ravenna exit.

**Q.** Sure, and the previous article talks about construction on 50th, right?

**A.** Correct.

**Q.** And there's a University StreetFair?

**A.** Yes.

**Q.** And so your driving times didn't take into account any of that type of construction, did it?

**A.** No, they did not.

      MR. FOX: I have no further questions.

      MR. BARTLETT: Nothing further, Your Honor.

      THE COURT: All right. You may step down. Any other -- no more testimony?

      MR. BARTLETT: No more testimony Your Honor.

1        MR. FOX:  We have nothing Your Honor.

2        THE COURT:  Well, to give you the rest of the case, I

3  am going to have you take your lunch hour at this time and

4  maybe I can get you to eat a little bit earlier than you

5  normally eat and have you back here, say, at noon, and you

6  will get the rest of the case or start on the rest of the

7  case.

8        As always, as you go about your business, you are not to

9  discuss the case in any way until it is given to you for that

10  purpose.  When you are back in the building, of course, return

11  to the jury room.  Leave your books on your chair and I will

12  see you at 12:00.

13        (Jury not present.)

14        THE COURT:  All right.  You may be seated.

15        I will get to you, just as soon as possible, the final

16  instructions.  I am having trouble seeing Mr. Fox, looking

17  past Pat's head.  Those of course will be the ones the Court

18  is going to give and any exceptions and all that, your record

19  will stand, you don't need to go through that again other than

20  to say you except.

21        MR. FOX:  Sure.  I will just except to each one.

22        THE COURT:  Other than that, we'll take the noon

23  recess.

24        You folks hang around and be somewhere close and I will

25  get those to you as soon as I can.  Let Pat know your

1 whereabouts.

2          MR. BLOOM:  When do you want us back?

3          MR. BARTLETT:  Depending on how soon you want them.

4 If you want them hopefully by 11:30 you would have them.

5          MR. FOX:  If we go off to eat something, be back by

6 11:30.

7          THE COURT:  So she can give them to you, I want to

8 give them to you just as soon as they're ready.  I don't see a

9 whole lot of change, we have discussed all that.  And of

10 course considering the exceptions to the ones you are

11 recommending, so I don't think there's going to be much change

12 in what you are doing.  I just want you to have them and I

13 like to read the instructions first so you can take those

14 instructions and make your argument, if you want, to use them

15 or refer to them in some way.

16          MR. FOX:  Okay, 11:30.

17          MR. BLOOM:  Two questions about the closing.  Have

18 you decided about the length of the closing?

19          THE COURT:  I think, Mr. Bartlett and Mr. Friedman

20 mentioned something, 2 1/2 hours.

21          MR. BARTLETT:  Yes.

22          THE COURT:  It seems to me, I don't know the need for

23 all of that, but I would say two hours would be a round

24 figure.  That would in my mind give you ample time to conclude

25 this matter and conclude it today.

1       Now, if I go beyond 4:30 to do this, I guess I will do

2   that.   All I am asking you, not to exceed.

3       Sometimes folks like to talk until they run out of

4   whatever, breath, and all those kind of things.   I am asking

5   you not to do that because you've been living with this case,

6   and I think you can get to the gist of it from what I

7   understand the primary issue should be, some discussion about

8   the definition of the device and the rest is Ms. Waters had

9   nothing to do with this and what would indicate that kind of

10  thing.

11      So it seems like those two issues are really the meat

12  issues you want to say about this case, this case is going to

13  turn on that, believability, credibility.

14          MR. BLOOM:   Sure.   I have one logistical question.   I

15  assume you do not allow, if the jury wants read back, I assume

16  you don't allow that.

17          THE COURT:   I won't give them read backs and I am not

18  going to give them a transcript.   I am going to summarize it

19  the way I have said in the instruction and you will be getting

20  a final packet.   And you should have those shortly.

21          MR. FOX:   Two very brief things, the record should

22  reflect that I think it was at 8:45, one page from A-45 had

23  been admitted, we've marked it as A-45A. So the remaining

24  pages from that exhibit, I didn't offer them.   The record

25  should reflect one page from A-45.

1            THE COURT:  Any issue with this?

2            MR. BARTLETT:  No.

3            MR. FOX:  The other is I am moving to dismiss all

4    counts against Ms. Waters based upon insufficiency of the

5    evidence.

6            THE COURT:  I have already ruled on that.

7            MR. FOX:  We did that at half-time; I am making it

8    again.

9            THE COURT:  The record will reflect that.

10           MR. BARTLETT:  I don't think we are going to exceed

11   two hours.  This has been a long trial and an important case,

12   and I would ask the Court for some flexibility with regard to

13   length.  I am not going to be repeating myself.  I have tried

14   to organize it as succinctly as possible.  But I also don't

15   want to be jammed on time.  So I will try to make every

16   effort.  We do have both closing argument and rebuttal.

17   Getting both of those within two hours is going to be tight.

18           THE COURT:  I am looking at it this way.  If we have

19   this jury back here at noon and we are all ready to go, they

20   should be instructed by 12:30.  And I would say your argument

21   would start at 12:30.  That takes you two hours, 1:30, 2:30.

22   And then 2:30, 3:30, 4:30 with Mr. Bloom, and that would get

23   us out of here around 4:30.

24       I will add 15 minutes to each of you so we are out of here

25   at least by 5:00.

1          I don't want it to be disjointed.  I want the jury to get

2     it.  Now, understand -- it is my understanding from what

3     Mr. Friedman was saying, that would include your rebuttal.

4               MR. FRIEDMAN:  It would, the total we are talking

5     about.

6               THE COURT:  So that's why I say, give you 2 hours 15

7     minutes, at the outside.

8          I am not asking you to use it all up.  I keep saying that.

9     Not to exceed.  I think that's long enough.  You have been

10    living with this case and you know your positions, you've been

11    pulling these Exhibits like you've got them on a rotary or

12    something.  I don't see any more than that.  But it's got to

13    come to an end and that's the way I am going to bring it to an

14    end, so I will give you equal time.

15         The 15 minutes I have added for you I am assuming will be

16    in the rebuttal area.  We'll be in recess.  If you don't leave

17    right now I will find out where the instructions are.  If they

18    are not ready right now you can go get your sandwich and come

19    back.

20              MR. FOX:  Thank you.

21              MR. BARTLETT:  Thank you.

22              THE CLERK:  All rise, Court is in recess.

23      (Luncheon recess.)

24      (Jury not present.)

25              THE COURT:  All right, you may be seated.

1     I understand there was one instruction the government

2   wanted to speak to.

3         MR. BARTLETT:  Yes, Your Honor.  With regard to

4   Instruction 13a which deals with Robert Corrina, it indicates

5   that Robert Corrina, a witness, has lied under oath on a prior

6   occasion.  I believe that's a determination for the jury, Your

7   Honor.

8     Mr. Corrina testified that he did go to the Grand Jury and

9   did not indicate he had rented a car.  He also testified that

10  he had not remembered renting that car until he actually saw

11  the records later.

12    The defense is perfectly capable of arguing that's a lie,

13  but I think whether or not Mr. Corrina's testimony is

14  believable is a matter for the jury.  You are basically

15  directing the jury to not believe Mr. Corrina on this very

16  critical matter, and I think that's a matter for the jury's

17  determination.

18    He indicated that he did not remember the car at the Grand

19  Jury.  It wasn't a lie.  It was an honest mistake on his part.

20  That was his testimony.

21        MR. FOX:  Your Honor, I believe that he testified

22  that he lied to the Grand Jury.  He tried to rationalize it,

23  but he didn't tell them the truth.

24        THE COURT:  I guess the issue becomes, is this a

25  proper way to phrase it.  Did he say one thing before the

Grand Jury and something else at another time. And you can characterize it anyway you want to.

What I think the objection is, you are saying I am telling this jury that he did in fact lie.

MR. BARTLETT: Right. That's for their determination.

MR. FOX: Your Honor, I think the evidence is that he did lie. I don't think there's much of a dispute about it. Whether he intentionally lied, they can argue he didn't intentionally lie.

THE COURT: Well, you can argue it either way about what I said, too. I am talking about how the instruction should read to the jury.

MR. BARTLETT: This is simply, exactly the type of matter that a jury is called to determine. He says one thing, they want to argue it different. It is a factual determination for the jury.

MR. FOX: This is not state court where the Court is prohibited from commenting on the evidence. You are entitled to tell the jury --

THE COURT: I don't want to comment on the evidence. I want you guys to argue that.

Let me take a brief recess here.

THE CLERK: All rise, Court is in recess.

(Brief recess.)

1          THE COURT:   You may be seated.

2      What I have decided to do is strike that instruction, take

3  it out, because I feel, when I look at this, the other

4  instructions talk about credibility of witnesses and things

5  you should look at.   I think it gives you a right to argue

6  from each side without it being considered a comment by the

7  Court.

8      I am taking it out.   The evidence is there; you can argue

9  from what these folks heard.

10     Okay.   The exceptions and all of the other matters, in

11  terms of what you offered, are not there.   The record has been

12  made, and you can identify them for the record.

13          MR. FOX:   Sure.   For all the reasons I stated

14  previously, the defense would except to giving of Instruction

15  No. 3.   Instruction No. 5.

16          THE COURT:   You are speaking of your proposed?

17          MR. FOX:   These are of the Court's instructions, Your

18  Honor.   Of the Court's instructions, these are the

19  instructions I am excepting to:   3, 5.

20          THE COURT:   Okay, 3, 5.

21          MR. FOX:   On 13, Your Honor, I had told Ms. Minor,

22  and she related this back to the Court, I am asking that the

23  phrase "You have heard testimony from witnesses who are

24  alleged to have been accomplices," I would ask that that

25  clause be inserted on instruction 13.   I understand that the

1  Court has denied that.

2       THE COURT:  Yes.  You made the record.  I am going to

3  leave that instruction the way it is.

4       MR. FOX:  We would except to No. 16, No. 18, No. 19,

5  No. 20, No. 21, No. 22, No. 23, No. 24, No. 25, No. 26, No.

6  27, No. 29, for all the reasons I stated earlier.

7       With regard to the proposed instructions that we proposed

8  that the Court is not giving, I object and except to the

9  failure to give the complete Defendant's Proposed Instruction

10  No. 3.  I understand the Court gave part of that instruction,

11  but for the record, I would except to the failure to give the

12  full one.

13       THE COURT:  Your No. 3?

14       MR. FOX:  Right.

15  The failure to give Defense Proposed Instruction No. 9.

16  The failure to give Defendant's Proposed Instruction No.

17  10.

18  The failure to give Defendant's Proposed Instruction No.

19  11.

20  The failure to give Defendant's Proposed Instruction No.

21  12.

22  Defendant's Proposed Instruction No. 14, we except to the

23  failure to give that.

24  The failure to give Defendant's Proposed Instruction No.

25  15.

1    The failure to give Defendant's Proposed Instruction No.
2  16.
3    The failure to give Defendant's Proposed Instruction No.
4  17 and 18 and 19 and 20, 21 and 22.
5    We except to the failure of the Court to give those.
6    Of our supplemental instructions, the main one is the one
7  I filed today about the missing witness.  It's not numbered.
8  It's the witness available to the prosecution who was not
9  produced, and we would except to the failure to give that.
10    We would except to the Court's failure to give our
11  Proposed Instruction No. 23 on Robert Corrina, the one you
12  just took out.
13        THE COURT:  All right.
14        MR. FOX:  The Court did incorporate some of our
15  suggestions on the other two instructions, proposed
16  instructions that I filed two days ago, 22 and 24, and the
17  Court incorporated some of those suggestions.  I except to the
18  failure to give those as we proposed them.
19        THE COURT:  All right.  Are we ready to argue the
20  case?
21        MR. BARTLETT:  We are, Your Honor.
22        THE COURT:  All right.  We will bring the jury in and
23  instruct them.
24    I am sure, because of the length of the argument, I will
25  take a break after the government has argued it, about ten,

fifteen minutes, then go into yours.

MR. FOX: Your Honor, without meaning any disrespect, I am going to step out for a second while you are instructing the jury, if that's okay?

THE COURT: That is up to you and your client.

MR. FOX: Mr. Bloom will be here. I need to step out for a moment.

THE COURT: Sure. I mean, that's fine with me.

(Jury present.)

THE COURT: All right. You may be seated.

Both sides have rested in this case, so members of the jury, you have heard all of the evidence, so it is my duty to instruct you on the law which applies to this case. A copy of these instructions will be available in the jury room for you to consult.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all

1    equally important.  You must not read into these instructions

2    or into anything the Court may have said or done any

3    suggestion as to what verdict you should return -- that is a

4    matter entirely up to you.

5        This is a criminal case brought by the United States

6    Government.  The government accuses the defendant, Briana

7    Waters, of five crimes.  The charges against the defendant are

8    contained in an indictment.

9        Count 1 of the indictment charges that the defendant

10   conspired to commit the crimes of arson, using destructive

11   devices during crimes of violence, and making unregistered

12   destructive devices.

13       Count 4 of the indictment charges that, on or about May

14   20, 2001, the defendant possessed, or aided and abetted the

15   possession of, an unregistered destructive device.

16       Count 5 of the indictment charges that, on or about May

17   21, 2001, the defendant committed, or aided and abetted, the

18   arson of the Center for Urban Horticulture at the University

19   of Washington, a building used in interstate commerce or in

20   activity affecting interstate commerce.

21       Count 6 of the indictment charges that, on or about May

22   21, 2001, the defendant used, or aided and abetted the use of,

23   a destructive device during the arson of the Center for Urban

24   Horticulture at the University of Washington.

25       Count 7 of the indictment charges that, on or about May

21, 2001, the defendant committed, or aided and abetted, the arson of the Center for Urban Horticulture at the University of Washington, a building owned or possessed by an institution receiving federal financial assistance.  This is the same arson charged in Count 5.  The difference is that Count 7 alleges a different basis for jurisdiction.  Count 5 alleges that the building was used in activity affecting interstate commerce, and Count 7 alleges that the building belonged to an institution receiving federal financial assistance.

The indictment is simply a description of the charges made by the government against the defendant.  The indictment is not evidence.  The defendant has pleaded not guilty to the charges.  The defendant is presumed to be innocent and does not have to testify or present any evidence to prove innocence.  The government has the burden of proving every element of the charges beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense, and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the

evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.  On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

The evidence from which you are to decide what the facts are consists of:

(1)  the sworn testimony of witnesses;

(2)  the exhibits which have been received into evidence; and

(3)  any facts to which all the lawyers have agreed or stipulated.

You have heard evidence of the defendant's character for non-violence.  In deciding this case, you should consider that evidence together with and in the same manner as all the other evidence in the case.

The defendant has testified.  You should treat this testimony just as you would the testimony of any other witness.

In reaching your verdict you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.  I will list them for you:

1.  Arguments and statements by lawyers are not evidence.

The lawyers are not witnesses.  What they have said in their opening statements, closing argument and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.    Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the question, the objection or by the Court's ruling on it.

3.    Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some testimony or an exhibit was received only for a limited purpose; where I have given a limiting instruction, you must follow it.

4.    Anything you have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is indirect; that is proof of a chain of facts from which you could find that another fact exists, even though it has not been proved directly.  You are to consider both kinds of evidence.  The law permits you to give

equal weight to both, but it is for you to decide how much weight to give to any evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.    the opportunity and ability of the witness to see or hear or know the things testified to;

2.    the witness's memory;

3.    the witness's manner while testifying;

4.    the witness's interest in the outcome of the case and any bias or prejudice;

5.    whether other evidence contradicted the witness's testimony;

6.    the reasonableness of the witness's testimony in light of all the evidence;  and

7.    any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

You have heard testimony from persons who, because of education or experience, are permitted to state opinions and the reasons for their opinions.

Opinion testimony should be judged just like any other

testimony.  You may accept it or reject it, and give it as
much weight as you think it deserves, considering the witness'
education and experience, the reasons given for the opinion,
and all the other evidence in the case.

You are here only to determine whether the defendant is
guilty or not guilty of the charges in the indictment.  Your
determination must be made only from the evidence in the case.
The defendant is not on trial for any conduct or offense not
charged in the indictment.  You should consider evidence about
the acts, statements, and intentions of others, or evidence
about other acts of the defendant, only as they relate to this
charge against this defendant.

You have heard evidence that Briana Waters has engaged in
protests and other types of freedom of speech.  You are
instructed that the First Amendment of the United States
Constitution protects the right of Americans to speak out
publicly and to protest.  You are instructed that you may not
convict Briana Waters of any crime simply because she
exercised her First Amendment rights.

A separate crime is charged against the defendant in each
count.  You must decide each count separately.  Your verdict
on one count should not control your verdict on any other
count.

A person has possession of something if the person knows
of its presence and has physical control of it, or knows of

its presence and has the power and intention to control it.
More than one person can be in possession of something if each
knows of its presence and has the power and intention to
control it.

You have heard testimony from witnesses who were
accomplices and who entered into plea agreements under which
they hoped or hope to receive lighter sentences in return for
their cooperation, and who pleaded guilty to felony crimes
arising out of the same events for which the defendant is on
trial.  An accomplice is one who voluntarily and intentionally
joins with another person in committing a crime.  These guilty
pleas are not evidence against the defendant, and you may
consider them only in determining the witness' believability.

In evaluating these witnesses' testimony, you should
consider the extent to which or whether the witnesses'
testimony may have been influenced by any of these factors.
In addition, you should exam the witnesses' testimony with
greater caution than that of other witnesses.

Certain charts and summaries have been shown to you.
Charts and summaries are only as good as the underlying
supporting material.  You should, therefore, give them only
such weight as you think the underlying material deserves.

The indictment charges that the offenses occurred "on or
about" a certain date or during a period of time.  The proof
need not establish with certainty the exact date of the

alleged offenses. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that an offense was committed on a date reasonably near the date or time alleged.

The defendant is charged in Count 1 of the indictment with the crime of conspiracy in violation of Section 371 of Title 18 of the United States Code. Specifically, the defendant is charged with conspiring to commit arson, to use destructive devices during a crime of violence, and to make unregistered destructive devices. In order for the defendant to be found guilty of this charge, the government must prove each of the follow elements beyond a reasonable doubt:

First, at some time between 1996 and October 2001, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

Second, the defendant joined the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, at some time between May 11, 2001, and October 2001, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

I shall discuss with you briefly the law relating to each of these elements.

A conspiracy is a kind of criminal partnership -- an

agreement of two or more persons to commit one or more crimes.
The crime of conspiracy is the agreement to do something
unlawful; it does not matter whether the crime agreed upon was
committed.

For a conspiracy to have existed, it is not necessary that
the conspirators made a formal agreement or that they agreed
on every detail of the conspiracy. It is not enough, however,
that they simply met, discussed matters of common interest,
acted in similar ways, or perhaps helped one another. You
must find that there was a plan to commit at least one of the
crimes alleged in the indictment as an object of the
conspiracy (that is, arson, using destructive devices during a
crime of violence, and making unregistered destructive
devices), with all of you agreeing as to the particular crime
which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully
participating in the unlawful plan with the intent to advance
or further some object or purpose of the conspiracy, even
though the person does not have full knowledge of all the
details of the conspiracy. Furthermore, one who willfully
joins an existing conspiracy is as responsible for it as the
originators. On the other hand, one who has no knowledge of a
conspiracy, but happens to act in a way which furthers some
object or purpose of the conspiracy, does not thereby become a
conspirator. Similarly, a person does not become a

conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The government is not required to prove that a defendant personally did one of the overt acts.

You must decide whether the conspiracy charged in the indictment existed, and, if it did, who at least some of its members were. If you find the conspiracy charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. Similarly, if you find the defendant was not a member of the charged conspiracy, then you must find the defendant not guilty, even though the defendant may have been a member of some other conspiracy.

A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members.

Even though a defendant did not directly conspire with

other conspirators in the overall scheme, the defendant has, in effect, agreed to participate in the conspiracy if it is proved beyond a reasonable doubt that:

1.   the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy,

2.   the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired, and

3.   the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.

It is no defense that a person's participation in a conspiracy was minor or for a short period of time.

The defendant is charged in Count 4 of the indictment with possessing an unregistered destructive device (incendiary bomb), in violation of Section 5681(d) of Title 26 of the United States Code.  In order for the defendant to be found guilty of this crime, the government must prove each of the following elements beyond a reasonable doubt:

First, on or about May 20, 2001, the defendant knowingly possessed, or aided and abetted another person's possession of, a destructive device (incendiary bomb); and

Second, the destructive device (incendiary bomb) was not registered to the defendant or the other person in the

National Firearms Registration and Transfer Record;

 An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

 The term "destructive device" means --

(A) any explosive, incendiary, or poison gas --

  (i) bomb,

  (ii) grenade,

  (iii) rocket having a propellent charge of more than four ounces,

  (iv) missile having an explosive or incendiary charge of more than one-quarter ounce,

  (v) mine, or

  (vi) device similar to any of the devices described in the preceding clauses.

 A destructive device includes any incendiary device, be it a military-type weapon or homemade incendiary weapon, the function of which is to ignite and destroy property.  Although it may cause an explosion, an incendiary device does not have to cause an explosion in order to be considered an incendiary bomb.  Any device containing combustible material capable of

producing sufficient heat to destroy property of any kind and having components designed to ignite that combustible material is an incendiary bomb.  The term incendiary bomb does not include any device which is not designed as a weapon for the destruction of property.

The defendant may be found guilty of the crimes of possessing an unregistered destructive device, arson, and using a destructive device during a crime of violence even if the defendant personally did not commit the act or acts constituting the crime but aided and abetted in their commission.  To prove a defendant guilty of aiding and abetting, the government must prove beyond a reasonable doubt:

First, that the crime charged was committed by another person;

Second, the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit the crime; and

Third, the defendant acted before the crime was completed.

It is not enough that the defendant merely associated with the person committing the crimes, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime.

The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit the crime.

The government is not required to prove precisely which person actually committed the crime and which person aided and abetted.

The defendant is charged in Count 5 of the indictment with committing arson of a building used in interstate commerce, in violation of Section 844(i) of Title 18 of the United States Code. In order for the defendant to be found guilty of this crime, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant damaged or destroyed, or aided and abetted in damaging or destroying, a building;

Second, the defendant or the person whom defendant aided and abetted used fire to do so;

Third, the defendant acted maliciously; and

Fourth, the building was used in interstate commerce or in activity affecting interstate commerce.

In order to find that a defendant acts maliciously, you must find that the defendant intends that the building will be damaged or destroyed.

The defendant is charged in Count 6 of the indictment with using a destructive device (incendiary bomb) during and in relation to a crime of violence, in violation of Section 924(c) of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a

1  reasonable doubt:

2  First, the defendant committed, or aided and abetted, the

3  crime of damaging or destroying by fire a building used in

4  interstate commerce as charged in Count 5 or a building

5  belonging to an institution receiving federal financial

6  assistance as charged in Count 7 of the indictment;

7  Second, the defendant knowingly and intentionally used, or

8  aided and abetted the use of, a destructive device (incendiary

9  bomb); and

10  Third, the defendant or the person whom defendant aided

11  and abetted used the destructive device during and in relation

12  to the crime of damaging or destroying a building by fire.

13  A person takes action "in relation to the crime" if the

14  destructive device facilitated or played a role in the crime.

15  The defendant is charged in Count 7 of the indictment with

16  committing arson of a building belonging to an institution

17  receiving federal financial assistance, in violation of

18  Section 844(f) of Title 18 of the United States Code.   In

19  order for the defendant to be found guilty of this crime, the

20  government must prove each of the following elements beyond a

21  reasonable doubt:

22  First, the defendant damaged or destroyed, or aided and

23  abetted in damaging or destroying, a building;

24  Second, the defendant or the person whom defendant aided

25  and abetted used fire to do so;

1    Third, the defendant act maliciously; and

2    Fourth, the building was owned or possessed by an

3    institution receiving federal financial assistance.

4    In order to find that a defendant acts maliciously, you

5    must find that the defendant intends that the building will be

6    damaged or destroyed.

7    Exhibits 781 through 785 are certificates of the custodian

8    of the National Firearms Register and Transfer Record.  A

9    certificate is a written statement of facts signed by a public

10   official.  The certificates state that the custodian made a

11   diligent search of the record and found no record of any

12   destructive device being registered to any of the defendants,

13   Briana Waters, William Rodgers, Justin Solondz, Lacey

14   Phillabaum, or Jennifer Kolar.  From these certificates you

15   may, but need not, decide that no destructive device was

16   registered to any of these persons.

17   Your verdict must be based solely on the evidence and on

18   the law as I have given it to you in these instructions.

19   However, nothing that I have said or done is intended to

20   suggest what your verdict should be -- that is entirely for

21   you to decide.

22   The punishment provided by law for these crimes is for the

23   Court to decide.  You may not consider punishment in deciding

24   whether the government has proved its case against the

25   defendant beyond a reasonable doubt.

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; and I will communicate with any members of the jury on anything

concerning the case only in writing or orally here in open

court.  If you do send out a question, the law requires that I

consult with the lawyers before answering it, which will

necessarily take some time.  You should continue your

deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone -- including me --

how the jury stands, numerically or otherwise, on the question

of the guilt of the defendant until after you have reached a

unanimous verdict or have been discharged.

A verdict form has been prepared for you.  After you have

reached unanimous agreement on a verdict, your presiding juror

will fill in the form that has been given to you, sign and

date it, and advise the bailiff that you are ready to return

to the courtroom.

With that, and these instructions in the jury room, the

lawyers will now give you their closing summary to assist you

in your duties, and we'll start with the Government first,

then we will hear from the defense.

MR. BARTLETT:  Trials, at time, can seem to be a very

strange process.  You all came in here several weeks ago,

forced to answer a number of questions, some of them personal.

You had to speak before everybody.  It seems, I'm sure, to

many of you that randomly people are chosen and let go, and

all of a sudden you are asked to make very important

decisions, but it's not the normal way that you gain facts.

Normally, if you were trying to figure out what happened somewhere, you would have interaction, you would be talking to people. That's not what happens in this case. Instead, you come in here, you don't get to ask questions. You are led in and out at various times, sometimes you have no idea why.

At times, this process can distract you from what a trial is. What a trial is, is very simple. It's a search for the truth. That's what we are all here for, what happened. We are here to decide that. We are not here to speculate about what could have happened, what might have happened.

We are not here to wonder about things that aren't in the record. What we are here to do is very simple: Consider the testimony from that witness stand, look at the physical exhibits that have been entered into evidence, and look at the stipulations.

Those are the three pillars that you will use when you go back to deliberate. That's not my opinion. Judge Burgess just told you that. Using those three pillars and your common sense, you will decide what happened.

I am going to make arguments over the next, probably what will seem to be too long a period of time, that I know you already know. I am going to try to tie pieces of evidence together with testimony and make points that I know you've already put in your own mind. It's not because I think I am a really smart guy. It's because it's my job. That's what the

1  Department of Justice pays me to do, and I am going to do it.

2  I just don't want you to feel like I am trying to insult you.

3      Why are we here?  We are here because this Defendant chose

4  to join a conspiracy with her good friend Bill Rodgers, with

5  her boyfriend Justin Solondz, with Jennifer Kolar and Lacey

6  Phillabaum, and that conspiracy had a very, very serious aim:

7  to destroy the Center for Urban Horticulture at the University

8  of Washington.  And they were successful.

9      We are here because this Defendant helped arrange to have

10 a secure media house at the Evergreen State College the week

11 before this arson.  We are here because this Defendant

12 provided a clean room where incendiary bombs could be used to

13 destroy the Center for Urban Horticulture on May 21, 2001.

14     We are here because she obtained a rental car that was

15 used to transport the core conspirators up to Seattle that was

16 virtually untraceable.  We lucked out.  That's why we found

17 Mr. Corrina.

18     We are here because she chose to sit in the bushes in the

19 early morning hours of May 21st serving as a lookout for her

20 co-conspirators as they went down to plant their incendiary

21 bombs.  We are here because she chose to help them all escape,

22 successfully, for many years.

23     Let's talk about the Government's case.  I want to focus

24 first on Lacey Phillabaum.  I want to suggest to you what is

25 obvious.  When you go back to deliberate, I want you to think

back.  It seems like a lot longer than two weeks ago, at least it does to me, but two weeks ago Lacey Phillabaum came before you and testified.  If you find Lacey Phillabaum a credible witness, and I suggest to you that there are a ton of reasons why that is a compelling conclusion that you will all reach, your job is done.  If Lacey Phillabaum is telling the truth, this Defendant is guilty.

Make no mistake about it, there are many criminal trials where basically you have -- it's kind of a one-witness case, that's all you have to rely on.  Try to remember back, as you watched her walk into this courtroom, to remember her demeanor, how she testified, her attitude.

Ms. Phillabaum was compelling during direct testimony.  For almost an entire day, she was subjected to cross-examination, and this cross-examination was aimed at showing to all of you, all 14 of you, just exactly who Lacey Phillabaum was.  You know what?  They were successful.  You got to see exactly who she was.  It became abundantly clear that Ms. Phillabaum provided you with very distinct descriptions of memories she had and not on others.

She indicated during her testimony, during cross-examination, that she had no ill will toward this Defendant.  In fact, she told you under cross-examination: "Well, you wouldn't speak to me, would you, Ms. Phillabaum?" What was her answer?  "Actually, I would have.  All I wanted

1  was for Briana Waters to be there when I met with you."

2      Think about that.  You are Lacey Phillabaum.  You are

3  framing the Defendant, and your response is:  "Well, I will

4  meet with her, but I want to be face-to-face with the woman I

5  am framing."  Does that make any sense to anybody?

6      "I bear no hostility to Briana.  I feel a lot of sympathy

7  that she's in this situation.  I feel sympathy for Justin who

8  has fled.  The decision of how to deal with a crime like this

9  is heart-breaking and painful, no matter how you choose to

10 deal with it."  Do you remember her speaking those words on

11 that stand?  Do you remember her demeanor, her tone?

12     If she's lying to all of you, then last Sunday the Academy

13 Awards made a mistake.  The award for best actress should have

14 gone to her rather than the French woman who actually won it.

15     Does Lacey Phillabaum have a motive to cooperate with us?

16 Of course she does.  She was looking at a 35-year mandatory

17 minimum sentence.  She has a huge -- she has 35 years worth of

18 motive to cooperate, but that's not really the relevant

19 question, is it?

20     What does she tell you?  "I care greatly about doing the

21 minimum amount of time in prison possible, but I will tell you

22 that if there was any risk, it was that I would have a

23 convenient memory lapse and not remember Briana being there.

24 There have been days when I thought I would kill myself before

25 I would testify against her.  I am not telling the truth

because I owe it to the prosecution. I am telling the truth because I owe it to the victims of the crime."

She has a motive to cooperate. That is a given, but think about the most relevant question. What motive does she possibly have to come in here and fabricate a false accusation against anyone?

Wouldn't that be the worst possible thing you could do -- you would be better off saying nothing -- to come in here and lie and try to frame an innocent person? Because you know what's going to happen. You give a name, and Special Agent Halla and the other FBI agents are going to go out and investigate. And if you accuse Jane Smith of being the lookout and then go and find out that Jane Smith is actually in Chicago that weekend, then you are in worse shape, right?

Remember the circumstances, the exact circumstances, as to how Lacey Phillabaum came to cooperate with us. Do you remember the story she told? And actually, it came out better in cross-examination than it did in direct.

What happens -- we are talking mid February. On February 16th and February 17, 2001, a Thursday and a Friday, Andrew Friedman and Ted Halla go down to Eugene. Why? Because they are going down to interview people that have been indicted in Eugene and are starting to cooperate, Chelsea Gerlach and Suzanne Savoie.

They go down, they spend two days, they talk to them.

They get done, they reach some conclusions, and over that
weekend, Special Agent Halla told you, he was basically trying
to get ahold of either Waters or Phillabaum.  He had a number
for Mr. Phillabaum, so he calls Mr. Phillabaum sometime over
that weekend and says, in substance:  "Your daughter is in
trouble.  We really want her to come in and cooperate, and we
hope she does."  The dad says "Well, is it civil or criminal?"
"It's criminal."  Okay, that's it.

Ms. Phillabaum describes coming to Seattle, and actually
not even having her mind made up at that point in time as to
what she's going to do.  She comes to Seattle, she meets with
her attorney, Mr. Offenbecher, but that isn't the key fact
that she comes up with.

She tells you, "I thought they would tell me something
about it beforehand, but they didn't," referring to us.
"Immediately prior to going to the United States Attorney's
Office, I was told by Lauren Regan" -- that woman that
Mr. Bloom pointed out here in the front row -- "that Chelsea
Gerlach and Suzanne Savoie were cooperating, and in my mind,
the truth was coming out; it was time to be truthful."

It wasn't anything we did that pushed her to cooperate.
It was Ms. Regan providing her what turned out to be accurate
information that two of the individuals involved in the
overall conspiracy were cooperating.  Now, she doesn't know
what they are cooperating about, but obviously in her mind

1   she's anticipating the worst.  So she comes in and spills the

2   beans.

3      Ms. Phillabaum doesn't know that Justin Solondz is out of

4   the country.  She does not know -- clearly she does not know

5   that Jennifer Kolar has not named her as one of her

6   co-conspirators.  There was no deal prior to this meeting.

7   She came in and gave a proffer.  Remember that letter?  There

8   was a little confusion about that.

9      To put this in perspective, a proffer is kind of a little

10   bit of a dance.  There's no agreement at this point in time.

11   Somebody is going to come in and talk to us because they know

12   they are in trouble, and they are hoping to get a break.  It's

13   not a confession.  If it all doesn't work out and an agreement

14   isn't eventually reached, you can see in the letter we can't

15   use their statements against them.  So if Ms. Phillabaum had

16   come in and talked to us on February 21st and later said "Gee,

17   I don't like the plea offer," and she went to trial, I

18   couldn't bring up those statements and say "Oh, hey, when you

19   came in on the 21st, you already confessed to that."

20      We could use it to follow leads; we could do those types

21   of things, but basically it was the start of a process that

22   eventually ended up in her reaching a plea agreement.

23      What happens on February 21st?  She tells us a ton of

24   facts.  Very critical information.  Even more important,

25   virtually everything that she tells us in that interview on

February 21st is confirmed by physical evidence we are able to later recover.

Why do we focus so much on physical evidence, and why do I talk about that so much during this summation?  People can lie.  People can misremember.  But physical evidence stands there.  It's the pillars that you can always look for.  You are always looking for, did somebody else say a similar thing? Is there a record that shows that, in fact, this is what really happened?

Think about Lacey Phillabaum's testimony.  She says she comes in and describes, first of all, a meeting at the Evergreen State College on the weekend prior to the arson. Why do you know that that, in fact, is accurate?  Because you have Jen Kolar's calendar, Government's Exhibit 617C, and what do you see, looking at the weekend prior to the arson?  It's very hard to see, but if look at the 12th right there, you see a notation for "library."

On that initial interview, Ms. Phillabaum describes that there were incendiary bombs built in the house, the little garage behind where Briana Waters was living.  How do you know that's true?  Leap ahead to one of the next interviews, 1013C. We don't know where Briana Waters was living, and we are trying to find out.  So on March 30th, we bring Lacey Phillabaum in and we show her some pictures:  "Hey, is this the house where Lacey Phillabaum was?  Is this the house where

1    Lacey -- excuse me, Briana Waters was?  No, no, no."  So she
2    flips this photograph over that we showed her and she draws --
3    this is the location where it was.  There's a house on the
4    front, and there's a little garage behind and there's a school
5    back here.  You know what?  When we go over to Conger Street,
6    guess what we find?  Exactly this.

7        She describes Justin Solondz taking this Defendant and
8    Ms. Phillabaum back to the clean room to show the incendiary
9    bombs that he's building.  We search Justin Solondz' cabin and
10   what do we find?  Of all the obscure things to find, multiple
11   hair nets and shower caps in a men's clothing room.  What's
12   that there for?  It's exactly what you would use if in fact
13   you were working in a clean room.

14       She tells us that Justin Solondz bragged about coming up
15   with a new device, different than the other ones, that he was
16   using a bladder for gas and Tupperware rather than buckets.
17   Now, keep in mind, when she's telling us this on February
18   21st, nobody has gotten any discovery in this case, nobody's
19   been charged, Mr. Rodgers has already committed suicide, so
20   it's not like:  Oh, these reports are floating all around.

21       But, this is what she tells us, and lo and behold you have
22   Don Sachtleben come in and talk to you about what's recovered
23   in Toby Bradshaw's office on the morning of May 21st and 22nd.
24   What is it?  Well, you've got the Tupperware bag right here,
25   and then you have the bladder.  In fact, you heard all the

descriptions from John Comery about all the other arsons that
we heard about in this case.  This is a new device.  This is a
new design, and it is exactly what Lacey Phillabaum described
on February 21st.

Justin was talking about the incendiary bomb devices and
the improvements in the design that he made which involved
using bags and water bladders, like you would use if you were
running or something, instead of what had been used before,
which I believe was buckets.  That was her testimony.

She describes a meeting in a field where all the
co-conspirators got together and they all pledged that they
would not talk, that they would remain silent if arrested.
What happens when we search Bill Rodgers' house?  We find his
new guide on how to commit arsons and crimes.  If you look at
515I, there's a page that specifically talks about how do you
do an arson.  What is on the pre-action checklist?  At the
bottom here, "confirm that each person pledges to remain
silent if arrested."  Physical evidence corroborating exactly
what Lacey Phillabaum tells us on February 21st.

Most critically, Lacey Phillabaum tells us that Briana
Waters provided the rental car for this arson and, in fact,
she used her aunt to get it.  Who was the only blood relative
in the immediate area of this Defendant's?  Robert Corrina.
He rents one car that entire year.  If you look at the rental
records, 771, there's Mr. Corrina's car for the exact time

1  period of this arson.  Physical records corroborating

2  Ms. Phillabaum.

3      She borrows this car on the night of the arson.  She pays

4  him back in cash.  In fact, you know that's true because you

5  have Exhibit 774, the cash deposit.  Once again, the only cash

6  deposit into Mr. Corrina's account for an eight-month period

7  in 2001.  The entire records that we were able to obtain.

8      Pull up the rental records.  Look at the mileage.  237

9  miles.  Is this a car she used driving around Olympia?  No,

10  this is a car used on a trip.

11      Ladies and gentlemen, that isn't proof beyond a reasonable

12  doubt.  That's proof beyond all doubt.  There is no possible

13  explanation as to how Lacey Phillabaum could know that this

14  Defendant's cousin rented a car one time in 2001 that very

15  weekend, unless that's exactly how it happened.

16      Let's talk about Robert Corrina.  They are first cousins.

17  They are good friends.  They went to high school together for

18  a year.  She comes out to the West Coast, she swings by

19  Greeley to see him.  He moves out to Olympia.  They move in

20  together.  She lives at his house for various periods of time.

21  They are close.  He watches her back.

22      They want you to believe that Robert Corrina will throw

23  all of that away and come in here and commit perjury.  Think

24  about it.  It's not just perjury.  He didn't just come in and

25  say:  "Oh, this Defendant rented the car from me."  He gave

1   you a fairly detailed story, right?  So they want you to

2   believe that not only is he committing perjury and framing his

3   first cousin that's been one of his good friends his entire

4   life, but he's going way over the top.  He's just creating

5   stuff whole cloth all over the place.

6       "There's an implication in there that I am keeping myself

7   out of jail, which implies that I have been threatened in some

8   way.  If I had been threatened in any way, I would neither

9   cooperate nor capitulate in any way, and if my wife or son had

10  been threatened in any way, or I perceive it would be the

11  opposite of cooperation, I would become enraged.  So I am

12  telling the truth.  My lawyer asked me to tell the truth.

13  Briana knows I am telling the truth."

14      Do you remember him telling you that from the stand?  Do

15  you think he's making that up?  Do you think that's another

16  big act here, a big super conspiracy, somebody in here framing

17  Briana Waters?

18      Mr. Corrina would be critical in this trial for just one

19  thing -- just to come in and admit the rental records, and

20  that would be a critical witness.  But think about all the

21  other things he does in this case.  Look at his bank account.

22  Is this a person -- a family, he and his wife and their young

23  son -- that has $200 to throw around so that they can drive a

24  couple blocks down to Otto's to have lunch?

25      You know he's in Olympia the whole weekend because you

have his charge records, right? You know, he does go down to Otto's -- they don't take any trips, so there's absolutely no explanation for Mr. Corrina going 237 miles. Above and beyond that, you've got to think about putting yourself in Mr. Corrina's shoes. He doesn't have two nickels to rub together, yet, he's out this one weekend blowing 200 bucks on a car for the only time this whole weekend, for nothing? Does that make any sense to anybody?

What else does Mr. Corrina tell you? He tells you the Defendant comes in on Sunday and lies to get the car. "I am sick. I have to go to the emergency room. Justin's car is not working, I have to borrow yours."

You heard witnesses from the Olympia emergency room. She didn't go to either of the emergency rooms in Olympia. If she had, she would have been treated and there would have been records of them.

Now, she wants you to believe, conveniently, that: "Oh, gee, there must be some confusion about the other time I went to the emergency room. I am sure that's what Mr. Corrina must be confused about."

It was interesting. She looked at this record yesterday, but they didn't introduce it into evidence. Do you remember that? She said: "Yeah, I went to the emergency room on January 21st, and that must have been the confusion."

Well, I asked it to be introduced today. I wanted you to

1    see this.   Ms. Waters did go to the emergency room on January

2    21, 2002.   She didn't go in the middle of the day, she didn't

3    go late at night.   She went at 6:00 in the morning.   You will

4    see from these records that indicated she had woken up early

5    that morning with very bad stomach pains and went down.   So

6    she's there at 6:00 in the morning; she's out at 10:30.   This

7    is where Mr. Corrina is confused?  I don't think so.

8         The Defendant steals, or I should say borrows,

9    Mr. Corrina's cordless phone that night.   Now, I know that

10   sounds kind of stupid, but I want you to think about it.

11   That, I suggest to you, is simply a fact no one can make up.

12   If you are thinking about making up a story, you can think up

13   a lot of things, but I am telling you, "somebody stole my

14   cordless phone when they left that night" is not one of the

15   facts you would normally come up with.   I suggest to you that

16   shows you that Corrina's telling you the truth.

17        Do you know what else it tells you?  It tells you just how

18   carefully this Defendant was planning this action.   Not only

19   does she arrange to have a car, she arranged to have it in

20   her -- not even in her cousin's name, but in her cousin's

21   wife's name.   When she gets to the house, she steals the one

22   mechanism -- he doesn't have a cell phone -- the one mechanism

23   he has to contact her.

24        What a coincidence.   The Defendant lies about having to go

25   to Seattle.   You heard the emergency room people.   She didn't

have to go to Seattle if she was really sick and had to go to
the emergency room.  She has to have some excuse to explain
the mileage, so she has to come up with a rationale for "how
do I get this many miles on the car?"  "I know I am going to
be in Seattle," so the excuse is, "nobody would take me in
Olympia," no explanation as to why she wouldn't have stopped
in Tacoma.  "I had to go all the way to Seattle."  Therefore
the lie is complete and the story is a good cover.

What's shocking about Mr. Corrina's testimony is, first of
all, I would suggest to you from his demeanor and his
relationship with the Defendant, it is totally credible;
that's what the evidence proved.  But once again, every aspect
of Mr. Corrina's testimony to you, this critical testimony, is
corroborated by physical evidence, something you can't make
up.

Look at Exhibit 771.  It's the rental car records.  Once
again, there's no confusion -- you don't have to remind
somebody, when did I rent the car?  It's this weekend.  This
is the mileage that is used.  These are the times it's brought
back.  Look at the mileage, 237 miles.

Is there another explanation, any rational explanation?
Oh, a bunch of trips around the Olympia area?  Give me a
break.  Look at their bank statements.  Look at their credit
card statements.  They are in Olympia this weekend and they
are poor.  Do you think they have got 200 bucks to throw

1  around to go down to Otto's and go down to Ralph's?  It's

2  their only car rental for the entire year.

3      I say that because, in truth, when you look at all of

4  their records, that's a physical record that confirms what

5  he's saying; it's the lack of any other car rentals that year.

6  Look at the Defendant's reimbursement.  On May 29, 2001, the

7  only time in the records that we have for Mr. Corrina, he

8  makes a $200 cash deposit.  Only time.

9      There's another record that I want you to look at that

10  ironically we have not talked about, although the record is in

11  evidence.  Look at Government's Exhibit 745.  Those are

12  records relating to Justin Solondz.  That's his bank account.

13      If you go to page 55 of Justin Solondz' bank account, you

14  see records for his bank from May of 2001.  If you go to the

15  next page, what do you see?  The day this car is rented, May

16  19th, you see an ATM cash withdrawal of what?  $200.  What a

17  coincidence.  The very day the car is rented, Mr. Solondz is

18  withdrawing the very amount that in fact Mr. Corrina is going

19  to be reimbursed.

20      Both Ms. Phillabaum and Mr. Corrina say that there was a

21  possible scrape on the car that they were both worried about.

22  In fact, Mr. Corrina said this Defendant brought it to his

23  attention and you say "well, that's just kind of his words."

24  It isn't his words.

25      Look at his calendar, Exhibit 777.  He returns the car.

1   The following Monday, on May 28th, what do you see?  Call

2   Budget.  You can say to yourself, maybe I am going to rent

3   another car.  That's why you are calling Budget.  You know

4   that's not true because you've got his records and he doesn't

5   say that.

6       What's the only rational explanation for why he would be

7   calling Budget a week later?  It's the explanation that he

8   gave you.  I was worried about the scrape that the Defendant

9   told me about.  I hadn't seen it, but I was worried there

10  might be another charge; you know how tight money is with

11  them.

12      That is physical evidence corroborating Mr. Corrina's

13  story that this Defendant told him, after she returned the

14  car, there might be a scrape on the side.  That testimony from

15  Mr. Corrina directly incorporates itself with Ms. Phillabaum's

16  story, exactly.

17      Finally, keeping Exhibit 777 up.  In cross-examination

18  there is this kind of implication:  Oh, gee, you really needed

19  the car because you didn't have your bike.  You had to take

20  your bike to the bike shop.  Well, that's just a bunch of

21  garbage because you can see right here on May 25th there is

22  his note, "take bike to bike shop."  He doesn't take the bike

23  to the bike shop the week prior.  It's on May 25th that he

24  takes it to the shop.

25      Let's talk about Jennifer Kolar.  Ms. Kolar's memory,

although suspect, on point is crystal clear and unwavering on
the critical point applicable to this Defendant, and that is
she was the lookout at the Center for Urban Horticulture arson
on May 21, 2001.

Did it appear when Ms. Kolar testified that perhaps she
has not totally addressed her criminal activity? I think that
would be a fair assessment. She indicated she was hoping
maybe, even though the plea agreement calls for her to do a
minimum of five years, and she understands that we are going
to recommend seven years, that gee, maybe out of the blue, the
Judge would cut her a break and give her no jail time.

Maybe that's human nature, that you always hope for some
miracle at the end. But if you look at Exhibit 791, which is
entered into evidence, her plea agreement, that is a dream;
that is a fantasy. There is a contract between us and
Ms. Kolar.

At some point in the near future, we are going to be in
this very courtroom and we are going to be recommending
strongly to this Judge that she be sentenced to a period of
seven years, and the best she can ask for is five years.
That's what the contract is.

Now, technically, could Judge Burgess throw out the plea
agreement? He could. That's always the Judge's prerogative.
If that happened, Ms. Kolar would be back at square one. She
would be looking at charges that would amount to up to a

 1  mandatory life sentence, and I think we all know that's not
 2  really an option that anyone is going to exercise.
 3       Ms. Kolar, like Ms. Phillabaum, has every motive to
 4  cooperate, even more.  She was looking at mandatory life
 5  because she was involved in two arsons involving incendiary
 6  devices, even though I don't think in her mind she really
 7  realized that.  Technically and legally, she was.
 8       But I ask you the same question I asked about
 9  Ms. Phillabaum.  She has a motive to cooperate.  What is her
10  possible motive to identify this Defendant if she wasn't
11  involved?  Think about it.  She realizes, in late December
12  when she calls and identifies this Defendant, in December of
13  2005, that the house of cards is just starting to fall down.
14  In all likelihood, other people are going to be coming in and
15  cooperating.
16       So if she misidentifies people, as with Ms. Phillabaum's
17  case, she will be much worse off than she had been if she had
18  just kept her mouth shut.  Maybe you hold somebody back, but
19  misidentify someone?
20       The first time this Defendant's name is mentioned was when
21  Jennifer Kolar, on December 29th, calls Michael Martin and
22  says:  "I remember who was the lookout at the Center for Urban
23  Horticulture arson.  It was Briana Waters."
24       Certainly not a name that we gave her, because we never
25  heard of the name Briana Waters.  So you've got to ask

1  yourself, when that call was made, what possibly could be

2  going through Jennifer Kolar's mind to frame a totally

3  innocent person?  A person that had been her friend.  A person

4  that they had had a relationship with.

5      You can think about her mindset.  Well, maybe she's

6  protecting somebody.  Maybe she's protecting Joe Dibee or

7  something like that.  That doesn't make any sense.  She comes

8  in, even in the December 16th interview, and mentions that Joe

9  Dibee did Cavel West and did Susanville.  In fact, this was

10  the leader, really, of Susanville, so she's not protecting Joe

11  Dibee.

12      Maybe it's a frame.  Maybe it's the big conspiracy theory.

13  Lacey Phillabaum and Jennifer Kolar are trying to frame poor

14  Briana Waters.  Well, that's just a bunch of garbage, and you

15  all know it is.

16      First of all, there's absolutely not one scintilla piece

17  of evidence that there was any connection between the two, but

18  ignore that.  You know they are not trying to frame her

19  because Lacey Phillabaum doesn't know that Jennifer Kolar

20  didn't ID her.

21      If they were going to get together and get a story, trust

22  me, one thing they would be clear on is, "hey, I am not going

23  to name you, Lacey, so don't confess."  Don't you think that

24  would be the one fact they would be absolutely clear on?

25      The last thing in the world Lacy Phillabaum would have

done on February 1st was come in and confess if she knew her

buddy and co-conspirator Jennifer Kolar was protecting her.

Think about the February 4th Olympia trip. That's the

trip where Tony Torres drives down to Olympia. They can't

find where Rodgers was living, so Kolar thinks they are going

to be able to find the house. That works out; they do find

Rodgers' house. She mentions, "Gees, I remember a meeting

over at the Evergreen State College," they go over there, but

there's construction and they can't really find the office.

But think about the little things she tells you on the way

back. On the way back, they are talking, and they are trying

to kind of prod her memory along. That's really what's going

on all during January and February. They are not giving her

information, but they are providing mechanisms for Ms. Kolar

to try to refresh her memory. Let's go over the computer

records you have. Let's go through your calendar. Let's go

down to Olympia and drive around. Maybe any of these things

will prompt her. It's not really working that well, but

that's what's going on.

On the way back, Special Agent Halla says: "Hey, you

know, we are looking to approach people. We are thinking

about talking to Briana Waters, we are thinking about talking

to Lacey Phillabaum," you know, "What do you think about

them," talk back and forth. What does she say? "I think you

should try Briana Waters. I think she might cooperate with

1  you."

2      What does that tell you about Jennifer Kolar's mind?  If

3  her mind was:  "I am framing Briana Waters for a crime she had

4  nothing to do with," would you tell Special Agent Halla:  "Oh,

5  hey, go talk to this woman so she can tell you I had nothing

6  to do with this and this is a big frame?"  Of course not.  If

7  I was framing Andrew Friedman, I would tell Special Agent

8  Halla, "Don't go talk to that darn Andrew Friedman, he's such

9  a liar, he will probably deny everything in the world about

10 this stuff."

11     That isn't what Jennifer Kolar does.  She says, "You

12 should go talk to her.  I think she will cooperate.  I think

13 she will help you out."  A comment of someone who is framing

14 an innocent person?  I don't think so.

15     She doesn't remember Lacey Phillabaum and Justin Solondz

16 being there.  It's strange, no question.  I would suggest to

17 you, though, that if you use your common sense, you would

18 expect -- if she in fact was fabricating the story, it would

19 have broken one of two ways.  Either you say "Lacey was

20 involved, but I don't remember Briana and Justin being there,"

21 or "I think Briana and Justin were there," but you forget

22 Lacey.

23     The fact that she would specifically remember Briana being

24 involved, not ID her boyfriend and not ID Lacey, I suggest to

25 you that in fact it is not an intentional coverup, but that is

1   a determination for you to make.  It is a determination that

2   would be relevant but not critical, because the critical

3   action is she did ID this Defendant.

4       What do we know about this Defendant, even before she gets

5   on the stand to testify?  Well, we have her quote from the New

6   York Times, Exhibit 740B, "As long as people don't get hurt, I

7   totally support it."  I suggest to you there's no other way to

8   read that sentence, that the "it" she is fully supporting is

9   arsons.  That's what she's saying in 1998.

10      You heard Tiffany Tudder say this is a big deal.  I mean,

11  who gets mentioned in the New York Times when they are in

12  college?  No one.  This Defendant wants you to believe, "I

13  didn't even read the article."  Yeah.

14      What was the Defendant thinking during this time period?

15  None of us really knows.  Obviously, we can't get inside her

16  mind.  What we can do is look at other things, and we have

17  Exhibit 614 that provides us some guidance on that.  Exhibit

18  614 is the manila folder that had the articles in it.

19      First of all, her fingerprint is on the article.  Second,

20  you can read the words:  "Hey, woman, here's some stuff" --

21              MR. BLOOM:  Objection to fingerprints on the folder.

22              MR. BARTLETT:  Did I misspeak, Your Honor?

23              THE COURT:  I think so.

24              MR. BARTLETT:  I apologize.  It's clearly on the

25  folder:  "Hey, woman, here's some stuff to read that I was

1   telling you about.  We'll hang out soon.  Heart-B."

2        Now, there's been a lot of discussion about whether this

3   is unfair.  I didn't choose these articles to put in here.

4   She did.  I didn't write the note to a co-conspirator saying,

5   here are some articles I am choosing to send to you.  Not only

6   am I sending them to you, I want to talk to you about them.

7        Clearly, she thinks these are important.  You will hear

8   Jennifer Kolar's description of the articles.  She doesn't

9   even read them.  She kind of glances through them, throws them

10  in a box and eventually turns over the box.  But there's

11  supposed to be some kind of big conspiracy, she really did

12  read it, somehow Justin Solondz -- it is absurd.  These are

13  her articles.  You know the timeframe that these articles are.

14  If you look through -- forget looking at what the substance of

15  the articles are.  You can see, for example, that the article

16  "It ain't easy being green.  Echo means promo" -- if you look

17  at the very bottom, this article was downloaded on January 18,

18  2001 at 3:55 a.m.

19       This is someone who is really into looking into this

20  philosophical and theological angle of the green movement.  If

21  you look at one of the other articles, you will see that it is

22  downloaded from the Internet on January 4, 2001.  These aren't

23  articles that came out of the blue.  This is right during the

24  time these conspiracies are being discussed, 2001.

25       What are the articles about?  They are echo anarchist

articles.  The only way to really save the earth is to destroy
capitalism.  The Defendant chooses to talk to the New York
Times in 1998 and indicate that she supports arson.  The
Defendant chooses to select these articles and send them to
her co-conspirator and say let's talk about them, and then she
complains to you that it's so unfair that they are doing this.

    At some point in her life, this Defendant must realize
that part of being an adult is accepting consequences for the
actions that you choose to undertake.

    Where do you see identical language to the thoughts
expressed for the articles she chooses to send to Jennifer
Kolar?  Look at Exhibit 401A, the ELF website, their ideology,
exactly the same.

    Look at the articles recovered from Justin Solondz' cabin.
Look at the articles recovered from Bill Rodgers' cabin.
These are the articles not only associating with each other
and hanging out together; they are exactly the type of echo
anarchist articles that are the backbone of the ELF.

    I want to talk briefly about the Plum Creek Watch Mountain
campaign.  We heard a lot of discussion about that.  I think
it's fair to say that there's a lot of people who were very
happy about the eventual outcome of it, and I don't want to
talk about that.  I want to focus on another aspect that
everybody has kind of ignored.

    The protest was eventually successful, but when it was

1　eventually successful was when the protest went from kind of

2　the tree sitting, nonviolent to let's go into Seattle and

3　occupy the Plum Creek Lumber Company offices and get in their

4　face.  That's really what turned the tide.  So I would suggest

5　to you what is really learned from Plum Creek isn't that

6　sitting around the fire singing "Kumbaya" is the way to win

7　these things, it is direct action against corporate entities

8　that is the only effective way to win environmental campaigns.

9　　　"That really isn't my thought."  If you look at the

10　self-evaluation that this Defendant wrote to her teacher in

11　December of 1999, you will see her describe how the campaign

12　went.  "The most intense period of time came the week before

13　the deeds were to be signed over to Plum Creek Timber Company.

14　In conjunction with the many environmental groups putting

15　pressure on politicians and Plum Creek, the Cascade Defense

16　Network decided to put their own kind of pressure and make a

17　visit to Plum Creek's headquarters in Seattle."

18　　　"This action plan in a couple days' time was meant to

19　force Plum Creek into negotiating with the mainstream groups

20　to remove the Watch Mountain and Fossil Creek parcels from the

21　land exchange."

22　　　"15 out of 23 activists made it to the 23rd floor to Plum

23　Creek's office where they presented the office with an

24　'eviction notice' and confronted employees about the trade.

25　The next day, Plum Creek entered into negotiations with

members of the Gifford Pinchot Task Force.  After a few days,
Watch Mountain and half of Fossil Creek were dropped off the
exchange with PC as willing sellers of the other half of
Fossil Creek."

Those are this Defendant's description of why that
campaign worked in December of 1999, and you remember during
her cross-examination, she told you that as they were in the
Plum Creek office, what were they telling them?  "We are not
going away.  We are going to keep coming back.  We are going
to keep doing this.  We are not going to let you cut these
areas.  Whatever it takes, we are going to push.  We are
committed.  Whatever it takes.  We are going to push."

Should we take a short break, Your Honor?

THE COURT:  Do you need a break or can we keep going?

MR. BARTLETT:  One of the things that's interesting
about this case, it is not just the big things that line up,
it's just not that Lacey Phillabaum and Robert Corrina and
Jennifer Kolar and the bank records all line up.  When you
look at it, even the little things add up.

Exhibit 712.  This Defendant gets Bill Rodgers a cell
phone.  She who has no money, no cell phone of her own, feels
close enough to Bill Rodgers that she goes out and gets him a
cell phone because she knows she can trust him, because they
are very close.  She knows he will always pay his bill.  She
knows she's in no risk of being hurt by this.  She doesn't

 1    just do this for a while.  She has his cell phone, Bill

 2    Rodgers' cell phone, in her name for 18 months.

 3        Exhibit 713, look at the phone calls from Bill Rodgers'

 4    phone.  Who gets called the most?  I would suggest to you that

 5    it's clear this Defendant gets called more than anybody.  All

 6    of the calls to Robert Corrina, virtually all the calls to

 7    Ocean -- you can look at the diagram where it shows the calls

 8    ending as soon as she moves out of the house.  If you add just

 9    three or four of the Teresa Howell calls to her, Bill Rodgers,

10    the acknowledged leader of this conspiracy, calls this

11    Defendant more than anyone else.

12        Yet she wants you to believe when she testifies, "oh, we

13    never talked about environmental matters.  That never even

14    comes up."  Her whole life has been working on environmental

15    matters.  His whole life is centered on environmental matters.

16    Yet, she gets on the stand and wants you to believe, "oh, no,

17    we never talked about that."

18        MR. BLOOM:  Excuse me.  Objection, that misquotes the

19    testimony.

20        MR. BARTLETT:  Both she and Mr. Rodgers have no calls

21    during the critical period in May of 2001.  Exhibit 715, a

22    graph of Mr. Rodgers' phone -- no phone calls during that

23    weekend.

24        Exhibit 735 is a graph of the Conger Street home.  Once

25    again, no toll calls during that weekend.  No. 4, you have the

1   two calls from Mr. Dibee.  Once again, something small.  This

2   isn't like the whole case is resting on this.  Another small

3   fact, two calls from Mr. Dibee's phone.  Five years worth of

4   phone records.  Two phone calls ever to an address --

5   Mr. Corrina's address -- from Mr. Dibee.  When did they occur?

6   Just before Susanville and just after Susanville.  What a

7   coincidence.

8       You have Exhibit 550, the police scanner.  Once again,

9   something small.  But this is a police scanner with an earbud.

10  It is recovered from Mr. Solondz' cabin.  It is exactly what

11  the lookout at the Center for Urban Horticulture would have

12  been wearing as she sat in the bushes watching for police,

13  listening for police or firemen to come by.

14      You have the photographs of Mr. Solondz.  You have the

15  before photograph and then you have the after photograph.

16  Does that look like somebody who is trying to change the way

17  he looks?  I would suggest yes.

18      You have the billing records for Ralph's Thriftway.

19  Really two different sets of Ralph's Thriftway records.  The

20  first are the charges to her ATM, her Debit card, her credit

21  card.  In the entire year of 2001, there are three charges

22  that show up on her billings, all during the week prior to

23  this arson, all at a location three blocks from Mr. Rodgers'

24  house.

25      Now, before she had the records, she told you, "I go to

1    Ralph's all the time," "I am there all the time," but then

2    when she looked at the records, she was never there.  She

3    says, "oh yeah, there must have been charges to use your debit

4    card so I must have paid cash."  Sure.  Just a coincidence

5    that the three times -- three charges are there the week prior

6    to the arson, and the entire rest of the year, not one single

7    time does she make a charge there.

8         Then there was their big dramatic evidence, that, wow,

9    here's the linchpin that will get us off:  she made a charge

10   at 7:12 p.m. on May 20th.  I would have loved to have had that

11   record.  That is exactly when I assume they were leaving

12   Olympia.  Think about it.  You heard the records today.  It

13   doesn't even get dark until 9:24 on May 20th.  Use the

14   StreetFair and all that crap.  Who cares.  They are leaving at

15   7:12.  She's there three blocks from Mr. Rodgers' house.  The

16   arson occurs sometime a little before 3:00.  This is somehow

17   some kind of exculpatory evidence?  Don't be ridiculous.

18        You have Solondz' bank records once again showing the $200

19   deposit.  Again, something small but exactly on the right

20   date, exactly in the right amount.  You have the map from

21   Mr. Solondz' cabin.  Once again, something small, but here you

22   have a map; there are 29 panels on the map.  Where is it open

23   to?  Of all the places in Seattle, it's open to the Center for

24   Urban Horticulture.

25        I want to talk to you -- changing direction for just a

bit -- I want to talk to you about the jury instructions.  I
am not going to talk about all of them, but some of them.

Instruction No. 4 tells you what is evidence, and we
talked about it at the very beginning of the case.  When I
talked about the three pillars, it wasn't my opinion.  It is
what the Judge has told you -- the sworn testimony of
witnesses, the exhibits that have been received into evidence,
and any facts that have been agreed to or stipulated on.
That's what you focus on.

What isn't evidence?  Instruction No. 6.  In reaching your
verdict, you may consider only the testimony and exhibits
received into evidence.  That's it.  Certain things aren't
evidence.  No. 1, arguments and statements by lawyers are not
evidence.  The lawyers are not witnesses.  I say that to you
because at times when you sit through a trial like this, it
might get a little confusing when you hear something, you say
where did I actually hear that?  Did I hear that from a
witness on the stand, or was that one of the lawyers just
talking?

In the defense opening statement, there were a lot of
claims about she's innocent, she had nothing to do with this,
over and over again.  After a while, I would suggest to you
that has a bit of an effect on you.  You begin to think:  Gee,
there must be something there.  But this instruction tells
you, in fact, that you just ignore that.

My opinion, utterly irrelevant.  Anybody else's opinion, utterly irrelevant.  The only thing that is relevant to you is testimony, exhibits and stipulations, and you have to ignore all the rest.

Even if perhaps on the street, if you were talking to somebody, and somebody was really adamant about something, you would say, "Gee, I really need to give him a little break on that, he must know what he's talking about."  In here, you can't do that.  The instruction actually tells you, you cannot do that.

Look at Count 1.  It's the conspiracy instruction, and it appears in Instruction No. 16.  There are three things that the Government must prove beyond a reasonable doubt, and when we are talking about reasonable doubt, of course we are talking about the elements of the crime.

This is what we must prove to you beyond a reasonable doubt, and when you go back to deliberate, this is going to be the focus.  What are those three things?

First, at some time between 1996 and October 2001, there was an agreement between two or more people to commit at least one of the crimes charged in the Indictment.  I suggest to you that you are not going to waste a lot of time on that one, because clearly there was a conspiracy, there was stuff going on.  There were a lot of arsons involved in this case.  You've heard summaries of them.  July 21, 1997, Cavel West, Jennifer

1  Kolar's first action.

2      November 29, 1997, the Bureau of Land Management Wild

3  Horse Corral in Burns, Oregon.

4      June 21, 1998, something I always refer to as the "mini

5  double whammy."  It was the two arsons in Olympia in 1998.

6  The one at the National Wildlife Research Center, and the

7  second at the Animal Damage Control Facility.

8      May 9th, 1999, Childers Meat Company, Eugene, Oregon.

9  December 25, 1999, Monmouth, Oregon, the Boise Cascade

10  offices.

11      January 2, 2001, Superior Lumber in Glendale, Oregon.  The

12  "double whammy," May 21, 2001;  the Jefferson Poplar Farm arson

13  down in Clatskanie, Oregon.

14      The Center for Urban Horticulture arson at the University

15  of Washington in Seattle.

16      Finally, the Bureau of Land Management arson in

17  Litchfield, Oregon at Susanville, October 15, 2002.

18      There is a conspiracy here.  There is an agreement to

19  commit crimes.

20      The second element.  The Defendant joined the conspiracy

21  knowing of at least one of its objects and intending to help

22  accomplish it.  And then third, sometime between May 11, 2001

23  and October 2001, one of the members of the conspiracy

24  performed at least one of the overt acts.  One of the overt

25  acts, clearly.  So what are you really going to focus on when

1  you go back to deliberate?  Number 2, right?  Was this

2  Defendant -- did she join them?  That's going to be the focus

3  of your deliberations.

4      There are some related instructions.  Instruction No. 17

5  deals with multiple conspiracies.  There might be an argument

6  that:  Gee, the conspiracy changed over time.  Other people

7  were involved.  Well, when you think about it, and you look at

8  the category set forth in Instruction No. 18, you will see

9  that, in fact, in this case, there was clearly only one

10  conspiracy.  How do you know that?

11      Well, first of all, you have the continuity of people

12  involved at various times throughout the entire course of the

13  conspiracy:  Jennifer Kolar, Joseph Dibee, William Rodgers.

14  You have the targets, the same types of targets.  You have the

15  types of devices showing a continuity of plan.

16      Do you remember the development of the devices?  It was

17  almost like watching the Discovery Channel.  You have the very

18  simple devices, the gallon milk jug with the sponge in the

19  handle.  Then you've got the next development.  Then you've

20  got the next development.

21      But the key, the key that -- how you know this is one

22  conspiracy really lies in two things:  the communiqués where

23  you have ELF and ALF jointly claiming responsibility for every

24  one of these arsons.  Why do they claim responsibility?

25  Because doing one arson does nothing for this group.  Nothing.

They know that burning anything down one time is not going to
affect anything.  In their mind, to have an effect, you have
to do a number of them.

Why do they do a "double whammy"?  Because they want more
bang for their buck.  They want to do it on the same night.
Why do the communiqués reference other activities?  Because
they want to tie it together.  They want corporations to
change their activity because they feel threatened, and the
only way they feel threatened is to have a number of
activities, a number of arsons being threatened against them.

Do you remember Jennifer Kolar talking in
cross-examination about, gee, you know, GE, genetic
engineering, wasn't really a big deal to her.  Her response
was very telling.  It tells how the conspiracy worked and why
there was one conspiracy and why they all depended on each
other for their benefit.

"It was an issue that we as a group had agreed was an
issue that societally people were going to be in support of
what we are doing.  It was something that we thought we could
change or win, and I did support that.  It's the aim of the
group, it's the aim of the conspiracy.  That is what's being
driven by these arsons."

Mr. Friedman, if you could put Instruction No. 19 on the
overhead.

Counts 2 and 3 obviously don't exist for this Defendant,

so we are skipping right to 4. The Defendant is charged in
Count 4 of the Indictment with possessing an unregistered
destructive device, an incendiary bomb, in violation of
Section 5681 of Title 26. Two elements. The first is that on
or about May 20, 2001, the Defendant knowingly possessed -- or
in her case, it's almost always aided and abetted or helped
someone else possess -- a destructive device, an incendiary
bomb.

And second, the destructive device, the incendiary bomb,
was not registered to the Defendant or other persons in the
National Firearms Registration and Transfer Record.

Let's take the easy one first. Number two, you have got
the certified records at 781, 782, 783, 784, 785 -- the five
people in this Indictment -- you have the certified record
saying they are not registered. So I don't think you will
spend a lot of time on that one.

Element one is possession of the destructive device, in
this case, an incendiary bomb. The first question you are
going to ask yourself is whether it's a destructive device.
If what was recovered at the University of Washington, what
you have seen, the plastic here, what Donald Sachtleben
described -- is that a destructive device?

Look at Instruction No. 21. It might have been kind of
hard to follow because you don't see it in front of you, but
what Judge Burgess was reading to you is that, in the code, in

 1  the United States Code, our laws, a destructive device can be
 2  really one of three types.  It can be an explosive type.  It
 3  can be an incendiary type, or it can be a poison gas type.
 4      Of those three types, you kind of have six different
 5  categories.  You could have an explosive bomb, an explosive
 6  grenade.  You could have an incendiary bomb, an incendiary
 7  grenade; all of those.
 8      Do you remember Brennan Phillips, the guy from ATF?
 9  Actually, he was our first explosive expert.  Do you remember
10  him being on the stand talking -- he was the guy that had been
11  in the Army for a long time and now works at ATF.  He told you
12  about these three.  He said they work in different ways.  An
13  explosive device works by exploding, supersonic shock wave,
14  buildings are knocked down; that's how they work.
15      An incendiary bomb doesn't work like that.  A incendiary
16  bomb works by burning things.  That's why they call it
17  incendiary.  A poison gas bomb works by poison gas.  So it's
18  really the three different categories.
19      In this case, you had Donald Sachtleben testify about the
20  incendiary bomb found at the University of Washington.  Mike
21  Morgan, for the bomb found at Susanville, and Brennan
22  Phillips, for the bomb found at the Jefferson Poplar Farm.
23      I would like to tell you that that was some kind of clever
24  plan on our part to bring in three experts, but the truth is
25  that's just the way the evidence was analyzed, and that's why

we ended up bringing in three experts for you.  But in some way, it makes your job easier because the truth is, you heard the devices described, and it was clear they were all set up the same way; all of them.

Now, you also heard the expert that the defense called, Dale Mann.  You probably noticed that I didn't cross-examine him at all, and that's because he just didn't know what he was talking about.  He did not understand the federal law.  I will read to you why I say that.

"Question:  In your opinion, as an expert, to each of those, all those options, the 18 options -- referring to these 18 options, the explosive bomb grenade, the incendiary bomb grenade, the poison gas bomb grenade -- with regard to all of those 18 options, six times three, they all have one thing in common?

"Answer:  I believe so.

"Question:  What is that?

"Answer:  That they all will explode."

Instruction No. 22.  Well, actually, you are instructed on what a destructive device is and what an incendiary device is in Instruction No. 22.  "A destructive device includes any incendiary device, be it a military-type weapon or homemade incendiary weapon, the function of which is to ignite and destroy property.  Although it may cause an explosion, an incendiary device does not have to cause an explosion in order

1  to be considered an incendiary bomb."

2      So when Dale Mann says, they have to explode to be a bomb,

3  he simply is wrong.  That's not my opinion; that's the law.

4  He didn't know the law.  When thinking about his testimony,

5  that's how much weight you should give it.

6      "Any device containing combustible material capable of

7  producing sufficient heat to destroy property of any kind and

8  having components designed to ignite, that combustible

9  material is an incendiary bomb.  The term "incendiary bomb"

10 does not include any device which is not designed as a weapon

11 for the destruction of property."

12     You remember Brennan Phillips talking to you about that.

13 There are some things -- in fact, I think the example was the

14 soap.  Well, it might burn things down, but it's really not a

15 weapon.  You have to have both in this case.  I would suggest

16 to you that you heard overwhelming evidence that both existed

17 in this case.  It was, in fact, a weapon designed to cause

18 damage by burning things and, in fact, it was designed to be a

19 weapon.

20     So the question you have once again, I believe, is fairly

21 simple, whether this Defendant possessed or aided and abetted

22 in the possession of that destructive device.

23     I want to talk about Counts 5 and 7 because they are both

24 arsons.  They are really pretty similar.  One of them is arson

25 under a theory that the Center for Urban Horticulture was a

building used in interstate commerce or activity affecting interstate commerce.

Count 7 is arson again, but the theory is that it's an arson of a building owned or possessed by an institution receiving federal financial assistance. So those are kind of the two hallmarks of this.

What are the four elements we have to prove? Instruction No. 24. First element, the Defendant damaged or destroyed property, or aided and abetted in damaging or destroying a property, a building.

If you think back on the photographs, Exhibit 320, I don't think there's a lot of debate about whether there was damage to a building based on the arson at the Center for Urban Horticulture.

Number two, the Defendant aided and abetted the use of fire to do so. Once again, if you remember, the video that you actually have to see -- you don't have to listen to anybody's testimony; you can see the fire that in fact caused this damage.

Three, the Defendant acted maliciously. In other words, it wasn't an accident. It wasn't somebody dropping a cigarette carelessly. It was intentional. You saw this exhibit. You saw the components. You've heard about the careful planning that went into this. Ladies and gentlemen, this could be the furthest thing from an accidental fire that

you will ever hear about.

With regard to Count 5, the fourth element is a building used in interstate commerce or activity affecting interstate commerce. It was kind of dry testimony, but I want to direct your attention back to Gary Quarforth. He was the budget director that came in and testified. Do you remember him? He came in and talked about what the University of Washington is. I don't know about you, but for me it was really very shocking, surprising.

It is a $2 billion holding company. That's how he described it. A $2 billion holding company that he views in kind of a three-tiered category. The first category is education. That's what they are selling: Education.

The second category is research. They are not really selling research; they are getting money to do research.

The third category is housing, food and entertainment.

He told you specifically that in 2001, housing, food and entertainment generated for the University of Washington $267 million.

He went on to explain to you that the University of Washington, for budgetary reasons, actually targets students from out of state so they can get the increased out-of-state tuition to help their budget. For undergrads, in 2001, they had almost 11 percent of the student body was from out of state, and 39 percent of the grad students.

1    And with the Center for Urban Horticulture, you heard Toby

2    Bradshaw say that actually one of his primary sources of

3    funding was a cooperative that he had set up for businesses on

4    poplars, and although he wasn't doing genetic engineering, he

5    was helping businesses involved with poplar growing plants.

6    And in fact, they got first dibs on his research when he got

7    done with it; they got first dibs on the seeds when he

8    produced them, and in exchange for that, they gave him money.

9    I would suggest to you that there really was no question

10   that this, in fact, was a building used in affecting

11   interstate commerce with respect to the element of Count 5.

12   What about Count 7?  Was the building owned or possessed

13   by an institution that needed federal financial assistance?

14   Once again, you had Mr. Quarforth describe to you -- I had

15   never realized, the University of Washington is the second

16   leading school in the United States for receiving federal

17   funding.  Only Johns Hopkins receives more federal funding

18   than the University of Washington.

19   In 2001, $571 million of federal money came pouring into

20   the University of Washington.  Specifically, with regard to

21   the College of Forest Resources in 2001, over $5 million came

22   in from federal funding.  In addition to Mr. Quarforth, you

23   had Sarah Reichard, Toby Bradshaw -- I am forgetting

24   Mr. Hinckley's first name, but they all came in to describe to

25   you that not only does the school get money, but they as

professors and assistant professors are expected to get their
own federal grants, and they walked you through the various
grants that they all have.

Finally, Mr. Quarforth described that, with regard to the
Center for Urban Horticulture, they specifically have a
strange breed of federal funding. It's called the McIntyre
Stanis Funding. It's federal funding for any college that's
involved in forest research, and in 2001 they received between
$350,000 and $425,000.

Once again, I would suggest to you that although there are
four elements with regard to Count 5 and Count 7, when you go
back to deliberate, there's really only one question you are
going to be asking yourself: Whether this defendant aided and
abetted that arson.

Count 6 is using a destructive device during and in
relation to a crime of violence. You've heard a lot about
this count, and I am not going to kid you. This is the one
and only count that carries a 30-year mandatory sentence. I
am not going to hide that from you.

Before you get to this count, you have to focus on Counts
5 and 7, because the first element says that the Defendant
committed or aided and abetted in the commission of a crime
damaging or destroying a building by fire in interstate
commerce as charged in Count 5, or a building belonging to an
interstate institution receiving federal financial assistance

as charged in Count 7.  So you have to get to Counts 5 and 7
to make up your mind, and then you get to this count.

Second element, the Defendant knowingly and intentionally
used or aided and abetted the use of a destructive device,
once again an incendiary bomb.  I want to specifically make
sure you understand that.  It's not just that she aided and
abetted the arson.  She actually had to have aided and abetted
the use of the incendiary device.

Third, the Defendant or a person whom the Defendant aided
and abetted used the destructive device during and in relation
to the crime of damaging or destroying a building by fire.
Again, I would suggest to you that's very much a given.

Looking at, did this Defendant do things that aided and
abetted this incendiary bomb, I would suggest to you the
evidence is overwhelming.  She supplied the clean room, she
supplied the car to transport it, she provided the lookout
which was the security to make sure that the destructive
device was effectively put into Toby Bradshaw's office so that
the building could be destroyed, and she helped with the
get-away.  Any one of those things make this Defendant guilty.
All of them make her overwhelmingly guilty.

Let's talk about the defense case for a bit.  Stan
Meyerhoff, remember the name?  Stan Meyerhoff -- you heard
through John Comery's testimony that on March 17th,
Mr. Meyerhoff was shown this picture of the Defendant and

1   indicated "familiar," "not involved."  And I guess we are to

2   believe that that means she's totally innocent; let's just all

3   go home.  But there is really more to the story than that,

4   because what Mr. Comery tells you is that actually before

5   March 17, 2006 when he made that comment on the photograph,

6   Mr. Meyerhoff actually had talked about a woman with blonde,

7   curly hair that played the violin and was from the Bay area

8   who was involved in the Susanville arson.

9       Now, he may have missed the photograph, but I would

10   suggest to you that that verbal description fits only one

11   person in this small group:  This Defendant, to a "T," even

12   getting the violin right.

13       Mr. Comery further describes that six days after that

14   January 25th interview where he physically described the

15   Defendant, he actually looked at the photograph of Ms. Waters

16   and said, "This looks like the blonde woman who was at

17   Susanville if her hair was blonder."

18       Mr. Meyerhoff, as the "oh, this case should be dismissed"

19   witness?  No.

20       The December 16, 2005 interview with Ms. Kolar -- we have

21   heard a lot about that.  I am going to cut right to the chase.

22   You have the notes, and you can look at them yourself when you

23   go back to deliberate.  Special Agent Halla's notes about the

24   University of Washington -- this is what he writes:  "A.

25   Organized the fire.  5 to 6.  Capitol Hill Girl."  Then it

1  goes on.  But that's really the heart of what we are talking

2  about right here.

3      Then you have Special Agent Torres' notes.  "Avalon

4  organized the arson.  Unknown female, Capitol Hill Girl,

5  number two.  Crazy Dan guy, number three.  Punk Boyfriend,

6  number four.  And me, number five."

7      What does that tell you?  That tells you that they both

8  clearly heard something different.  If Special Agent Halla

9  thought there were five people positively identified at that

10 point in time, you know it would have been in his notes.  You

11 know he would have put it there.

12     What's interesting is, if you actually go to the next page

13 of both Special Agent Torres' and Special Agent Halla's

14 notes -- because if you look on the next page, a continuation

15 of the discussion, you see that Ms. Kolar on that day

16 described "left someone in bushes, lookout with radio."

17     Then you see with regard to Mr. Torres, right here,

18 "Someone at car for lookout.  We left someone at car for

19 lookout."  "Car/van and came in car/van and we left someone at

20 car for lookout."

21     That's what's in their notes.  They eventually write a

22 written report, and they say, "The night of the arson, Kolar,

23 Avalon and a few other individuals met at a bar or restaurant

24 across from Greenlake in Seattle."  From this, we are supposed

25 to devise the huge conspiracy how everybody is lying;

everybody is framing poor Briana Waters, from that simple choice.

They didn't throw away their notes. They didn't try to doctor anything; they turned everything over. They made choices. From that, they are trying to build a mountain out of a mole hill.

There's an old adage that's heard around courthouses: If you have the facts on your side, you pound the facts. If you have the law on your side, you pound the law. If you have neither, you pound the table.

I suggest that all of the cross-examination, all the innuendo about all of the horrible things that these FBI agents did with regard to this initial interview is just that: Pounding the table. No one tried to insert that Jennifer Kolar identified Briana Waters on that first day. No one threw away their notes. Agents work hard. They made the best choices they felt and went forward with an investigation.

The February 4th interview of Ms. Kolar, when they are driving down to Tacoma, you heard a big to-do about that. In Special Agent Halla's notes he says, "don't remember Briana and Lacey being together," and 302 says, "Kolar did not recall Briana and Lacey being close friends."

Once again, you hear the big conspiracy; everybody is framing Briana Waters. It's ridiculous.

First of all, what difference does it make? Kolar has

never said Lacey Phillabaum was at the University of
Washington arson. So to make the argument that somehow saying
that she never remembered them together proves that Briana
Waters wasn't at the University of Washington is ridiculous;
it doesn't make any sense. She's never remembered her being
at the University of Washington arson.

I want to remind you of something that struck me the first
week. Remember Dan Priest? He was the Lieutenant from the
Seattle Fire Department, in all honesty, kind of a throw-away
witness. He came in and talked about he was the first
responder to the scene. Do you remember the guy? He was a
Lieutenant at the first fire house. Do you remember this
series of questions and answers:

"Question: Your information is that the mechanism
went off at 3:22 a.m.; is that correct?

"Answer: That's when we were dispatched.

"Question: You say dispatched. That was your unit.
Was that your unit?

"Answer: Engine 38.

"Question: Do you know someone named Butler, first
initial E?

"Answer: That doesn't ring a bell.

"Question: Do you remember the University of
Washington Police Department, being interviewed yourself on
the 26th of June of 2001, by the University of Washington

1  Police Department, by someone named E. Butler of the

2  University of Washington Police Department?

3          "Answer:  It doesn't stick in my brain, but it could

4  have happened.

5          "Question:  If you don't remember the name, do you

6  actually remember the interview?

7          "Answer:  No.

8          "Question:  Do you remember telling anyone on June

9  26, 2001, any official at the University of Washington that at

10  approximately 4:15 in the morning, Station 38 responded to an

11  automatic fire alarm at the University of Washington Center

12  for Urban Horticulture?  4:15 a.m. Do you remember telling

13  anybody that?

14          "Answer:  No, I don't.

15          "Question:  May this be shown to the witness, please?

16  I am going to ask if this refreshes his memory."

17      "Is there anything on that he might have done?  There's

18  one paragraph that says he doesn't remember.  I withdraw my

19  objection.  Thank you.  May it be marked for identification?

20  Could we start a different series, D.-1?

21          "Question:  Having read that, does that refresh your

22  recollection as to whether or not you were interviewed by

23  somebody from the Police Department?

24          "Answer:  I don't know.  I don't recall the

25  interview.

1    "Question:  Do you remember having any interviews,

2   whether that date or any other date, and telling somebody,

3   'tell us what happened, give us your best memory'?

4    "Answer:  That makes sense.  The University of

5   Washington would conduct such an interview, but I don't recall

6   it happening.

7    "Question:  Do you remember telling anyone from the

8   University of Washington that you responded at 4:15 in the

9   morning?

10    "Answer:  If I said 4:15 in the morning, it was

11  probably an approximation.

12    "Question:  We are talking about an alarm at 3:22.

13  We are talking about almost an hour later that it appears you

14  told someone you responded.  Does that refresh your

15  recollection as to what happened with regard to your response

16  or what was said to the University police with regard to your

17  response?

18    "Answer:  No, I think your --"

19  What is going on here?  We all know when they responded.

20  There are call records on when calls have gone out, when they

21  respond to go back in.  What's going on?  What, is this part

22  of the big conspiracy?  Poor Dan Priest who gets blind-sided

23  coming in here, that oh, you said 4:15 in the morning, so you

24  are lying.

25    Another part of the defense case, Phillabaum's alleged

affair with Justin Solondz.  It was almost two weeks ago, but do you remember when that first came up, what Ms. Phillabaum's response to it was?  She kind of laughed, like are you serious?

Conveniently, the one witness who could confirm or deny this is Justin Solondz, and he's a fugitive; he's out of the country.

You've heard testimony that allegedly there was a party at Ocean's house, that's over the summer, and that's when she saw Ms. Phillabaum, and that's when there's a confrontation.  This Defendant has no burden to bring anybody in to testify, but in your mind, I assume many people would have thought this was a party at her friend's house with her friends.  Other people would come in and testify and tell us that yes, this all happened.

She has no burden, but she clearly could have brought in other witnesses to tell us about all these things.  In fact, in her own description, there's never a huge confrontation that you are kind of expecting in a public setting, where she and Ms. Phillabaum really get into it, the kind of venomous anger that would make someone frame an innocent person for a very serious crime.  Her story is ridiculous.

It is a grasp at straws from someone who is unable to accept responsibility for her own actions, so therefore she will pattern her story and change it to fit whatever slim hope

1   she feels she can force upon you.

2        The Kolar spurned lesbian lover defense, that somehow this

3   one e-mail that we get in 1999, with Ms. Kolar mentioning in

4   passing that she found a woman attractive at a party somehow

5   leads us to believe that Ms. Kolar, despite her friendship

6   with this Defendant, is framing her because she's really

7   bitter because they are not lovers, even though Ms. Kolar has

8   had platonic relationships with men; and, in fact, described

9   to you in detail that she's been with her present partner for

10  over seven years; and, in fact, it was her love for her

11  present partner that got her out of the movement.  He wasn't

12  in the movement, she loved him and so therefore she felt she

13  had to get out of the movement.

14       Their big smoking gun, the Ralph's Thriftway record.  I

15  told you already, I wish I would have seen those before

16  because it's exactly when she should have been at Ralph's

17  Thriftway:  7:12 p.m. on May 20th, on their way out, three

18  blocks from Mr. Rodgers' house, on their way up.  It doesn't

19  get dark until 9:24 that night.  You heard that today.

20       The arson -- the fire isn't called into the police until

21  3:10 -- a little after 3:10.  We somehow think this is an

22  alibi that she's in Olympia at 7:00?

23       Are there discrepancies that you will be able to hear

24  about?  We know about them.  There are discrepancies in the

25  Government's story.  You heard that -- are the devices in the

1    trunk, or are they left behind at the dumpster?  Does

2    Mr. Solondz go down to the Center for Urban Horticulture and

3    go behind the building, or does he remain in the car?  Does

4    the car, in fact, get into a small accident and engage in a

5    little scratch?

6         These are the types of discrepancies that tell you people

7    are remembering things differently and doing the best they can

8    without talking to each other, without looking at other

9    reports to remember what happened.

10        You heard from a fair number of character witnesses on

11   behalf of the Defendant.  Actually, I think they are

12   important.  I am not going to denigrate them at all, but I

13   would ask you to do this.  Imagine if Jennifer Kolar was on

14   trial.  Can you imagine all the people that would come in from

15   Jennifer Kolar's work and talk about the great things -- she's

16   just a workaholic within the .com industry, and her diving

17   friends, and the people from her sailing club?

18        She would have people to come in and say equally great

19   things about her.  Lacey Phillabaum.  She was a journalist for

20   a long time, and actually clearly a spokesperson because you

21   heard from their own witnesses that they went to some activist

22   meetings and Lacey Phillabaum was a facilitator at this.

23        Really, clearly a level higher than this woman, and Lacey

24   Phillabaum told you about it.  It was a slow process.  I

25   didn't do an arson right out of the blocks.  I was involved in

above-ground activities.  I wrote articles, and I just kind of morphed into it.  You heard from Lacey Phillabaum how this happened.

The Defendant wants you to believe that she is the unluckiest person in the world.  Actually, the unluckiest person in the history of the world, really.  Make no mistake about it, when you go back there to deliberate, when you talk about Jennifer Kolar and Lacey Phillabaum and everybody else, they all have motives to lie, but who has the greatest motive to lie?  This Defendant.

I would suggest to you that you try not to appeal to your emotions.  She has a child, and we can all relate to that, but I don't think you have to hear about the child in virtually every answer that came out of her mouth.  Why did she say that to you?  What she really wants you to do is to avoid and ignore the Court's ruling that you must base your decision on the evidence, and instead base it on your emotion.  But you all took a vow, a pledge, that you would not do that, and I know you won't.

She's telling the truth, and everybody else is lying.  Not only is she telling the truth and everyone else is lying, but every other piece of physical evidence is lying.  Her lies tell you she's guilty.  She can't come up with a better story than this.  She wants you to believe:  "I don't think I ever said anything to the New York Times."  "Those really aren't

1 the articles I sent to Jennifer Kolar."

2     Now, I think there was a different car that Robert Corrina

3 is confused about and a different emergency room visit.

4     Every Defendant has a right to trial. They have a right

5 to be represented by counsel. They have a right to have their

6 evidence presented by a jury of their peers such as yourself,

7 to have it presented by an impartial Judge. Society also has

8 certain rights. The public is entitled to have people who

9 commit serious violent crimes be held accountable. When

10 evidence is presented that proves a Defendant's guilt beyond a

11 reasonable doubt, the public has a right to a verdict of

12 guilty.

13     The victims of these crimes -- and you heard from a few of

14 them: Sarah Reichard, Toby Bradshaw, Don Rice from Jefferson

15 Poplar -- these victims and all the victims we didn't call

16 that have been impacted by this case deserve to know that

17 people who commit such horrible crimes, that devastated their

18 lives, will be required to face the consequences of their

19 actions.

20     Lacey Phillabaum and Jennifer Kolar made difficult

21 decisions to plead guilty and cooperate, a choice that cost

22 them many, many of their friends and will leave them to be

23 serving several years in jail.

24     The Defendant is hoping that if she mentions her daughter

25 enough and Watch Mountain enough, that you will take pity on

1   her and ignore what she chose to undertake back in 2001; that
2   you will choose to ignore the testimony from the witness stand
3   and the exhibits that have been entered into evidence.

4       Ladies and gentlemen, we are a nation of laws, not
5   individuals.  Everyone that comes into court, whether they are
6   nice and sympathetic or horrible and despicable, deserve a
7   fair trial and deserve to be treated the same.  Everyone
8   should be treated the same:  No better, no worse.

9       It is time for this Defendant to be held accountable, for
10  her to finally face reality and admit and accept
11  responsibility for what has happened.  I ask you to find this
12  Defendant guilty of all charges.  Thank you.

13          THE COURT:  All right.  Before we hear from the
14  defense, we are going to take the afternoon recess.  Don't
15  discuss the case.  You haven't gotten it for that purpose.
16  Just take advantage of the recess and have your books on the
17  chair, and I will have you back in here shortly.

18      (Jury not present.)

19          THE COURT:  All right.  You may be seated.  We'll
20  take the afternoon recess.

21          THE CLERK:  All rise.  Court is in recess.

22      (Afternoon recess.)

23      (Jury not present.)

24          THE COURT:  You may be seated.  Bring them in.

25      (Jury present.)

1          THE COURT:  All right.  You may be seated.

2      You heard from the Government, their closing, now you will

3  hear from the defense.

4          MR. BLOOM:  Good afternoon.  Thank you for your

5  attention.

6      More than that, thank you for undertaking -- it really is

7  one of the great responsibilities that citizens can undertake

8  on behalf of justice.  That's what we are looking for here, is

9  justice.  This woman is innocent.  She didn't do this.  The

10  evidence that's been presented to you is not credible

11  evidence.

12      We will show -- we will absolutely show that it is lies,

13  and you cannot convict a person of any crime, much less a

14  serious crime, based on lies.  It's just not right.  It's not

15  fair.  It's not within the Constitution, and it's not moral.

16      I want to say one thing first.  If for any reason any of

17  my conduct or, less so, Mr. Fox's -- if you thought I was too

18  aggressive or anything that troubles you, firstly I apologize,

19  and secondly, please, whatever you do, don't take it out on

20  Briana Waters.  I don't think I have done anything.  I have

21  tried not to, but if that's the case, I ask you to please look

22  past me and look at Briana Waters.

23      Needless to say, what this is about is the Government's

24  evidence is on trial.  That's what the burden of proof means.

25  They have to come forward with credible evidence to prove to

1    meet their burden beyond a reasonable doubt, and I agree with

2    Mr. Bartlett.  This case is about one thing.  It is about

3    whether or not there is credible evidence from credible

4    witnesses beyond a reasonable doubt that Briana Waters was

5    involved in the University of Washington arson, not the Cavel

6    West arson, not any other arson.  That is the incident which

7    she's accused of participating in.

8        It's not about sympathy.  We can agree on that.  We are

9    not asking you to find Ms. Waters not guilty because of

10   sympathy.  She told you the truth.  She told you the truth

11   about her family situation, and we told you the truth about

12   her character.

13       This case is very much about character.  Ms. Waters'

14   character on the one hand -- and you've heard maybe 10 or 12

15   witnesses talk about who she is, who she was, and, indeed, who

16   she will always be.  You have seen before you Lacey

17   Phillabaum, you've seen Jennifer Kolar and you've seen Robert

18   Corrina and, of course, I will be talking about each of them.

19       It's simple.  To begin with, she is not a person who would

20   in any way be involved in a crime like this.  She just isn't.

21   Those people that you heard, who know her, who've known her so

22   well, they wouldn't be here.  The Assistant Attorney General

23   of the State of Washington, do you think he would be here if

24   he thought there were any possibility that she committed this

25   crime?

1    Now, I have, of course, an outline for what I want to say,

2  and perhaps I shouldn't be tempted into it, but there's

3  certain things that Mr. Bartlett has said to you that I really

4  feel I need to address right up front before I go into what it

5  is I had planned to say.

6    One of the things he was talking about came up more than

7  once, but toward the end of his presentation, and it had to do

8  with how pleased they were if only they had had the Ralph's

9  Thriftway records at some earlier time, that would have been

10  helpful to them.  That is what you call nonsense.

11    If you believe, or if they want you to believe Lacey

12  Phillabaum, Lacey Phillabaum had people arriving in Seattle,

13  the people herself and the people who were supposedly with

14  her, in the early evening.  Jennifer Kolar said that they met

15  at the restaurant at 8:00, maybe 9:00.

16    Now, one of the important things about that event, the

17  so-called trip from Olympia to Seattle -- and it was reflected

18  in the last witness this morning, Agent Ford -- they went from

19  the Ralph's Thriftway to Seattle.  I don't think it would be a

20  lot of time between Ralph's Thriftway and Conger Avenue --

21  maybe five minutes, maybe 10 minutes -- but the whole idea is

22  a distortion.

23    This isn't about going from Rodgers' house.  All the

24  action, if you believe Lacey Phillabaum, supposedly took place

25  at Conger Avenue.  That's where supposedly the devices were

made.   That's where supposedly there was a clean room.   So the trip wouldn't have been from Thriftway, and it wouldn't have been from Rodgers' house.   It would have been from Conger Avenue.   So I don't quite understand what it is they are trying to say.

It's a good thing for Briana Waters, for their purposes, that Briana Waters was in Olympia at 12 minutes after 7:00 on Sunday, May 20th?   That's not true.   That's not a good thing for them.   It proves that she could not have been in Seattle at the time they say she was in Seattle.   It's as plain as that.   It's just not possible.

Even with no traffic -- I am talking about Agent Ford who testified today -- even with no traffic, it took him 68 minutes.   And Mr. Fox asked some questions -- it turns out that Mr. Fox in his research found there was actual construction on I-5 on that day and at times it was a one-lane road.

Now, people, you all live in the area here, in the corridor.   You know what happens to I-5 when it's a one-lane road.   It's not 68 minutes.   It's maybe an hour and 68 minutes.

Then, of course, Mr. Bartlett and Mr. Friedman didn't ask Agent Ford to go to the location where they want you to believe that the equipment was dropped off, at a dumpster somewhere near the Center for Urban Horticulture.   Well, if

you take that detour, that takes another at least 10 minutes, maybe 15 minutes, maybe 30 minutes, maybe 40 minutes, to surreptitiously drop off some equipment before they go to meet Jennifer Kolar.

So we are talking about -- and if you follow Mr. Rodgers' and Mr. Meyerhoff's manual, you want to get there in plenty of time, you want to relax, you want to chill out, you want to get yourself together, you want to be there long before, you don't want to leave at the last minute. You want to leave -- and apparently, if Phillabaum is right, they did leave at maybe 5:00 or 5:30.

Well, if they left at 5:00 or 5:30 or 6:00 or even 6:30, Briana Waters could not have been with them, could not have been with them because she was at Ralph's Thriftway at 12 minutes after 7:00. It's critical. It's really important. It's objective evidence, not subject to anybody's whims, not subject to anything. She was there at 12 minutes after 7:00 on that Sunday night. We know she was there because we found the records.

With regard to that, when Ms. Waters testified, you heard her say -- I asked: Once you saw those records, aside from feeling very good about it, did that help her remember that she was in fact at Ralph's Thriftway? Well, she said no; she told the truth.

Here's the key fact. Unlike Lacey Phillabaum, who burned

down this building, the Center for Urban Horticulture, unlike Jennifer Kolar who burned that down, plus three other arsons I am going to talk about, Ms. Waters doesn't have a reference point. She doesn't have a way to remember where she was on the 28th and 21st of May of 2001, and she didn't make one up.

She came here and she told you, "I don't remember where I was. I must have been asleep somewhere because that's all I can remember." This was four-and-a-half years -- Agent Halla came to see her in February of 2006 -- four-and-a-half years after the incident.

Now, I challenged myself, and in a general way I challenge each of you, to think about if I came to you today and I said to you, where were you four-and-a-half years ago on a particular night, unless you had somebody's birthday or something on a calendar or some noteworthy event, I suggest to you there's just no way you could possibly, in an honest, reasonable way, say oh, yes, I was here, here or here. She doesn't have that.

She doesn't have the reference point that these two criminals -- and I say criminals; they have pleaded guilty to this felony. They have said, "I thought about it. I participated in the planning, in the carrying out of the arson, burning down this building."

These are two criminals who have come here and testified, each of whom -- one of whom is facing a mere 35 years

mandatory minimum -- that would be Lacey Phillabaum; and the other who was facing a mandatory life sentence, Jennifer Kolar, doing very well for herself, a woman with a yacht, a woman who was, I have to say it, a serial criminal, a woman without a moral compass, a woman who just went on and on and committed at least four arsons, four times.

She was involved in preparing, mixing fuel, putting together devices, planting devices, going to get gasoline, intending to burn down buildings. That's the woman that they have put before you that they want you to believe. I will spend some time specifically about some of the things that she has done and she has said, and the facts that she has put forth, as she calls them.

You are not going to see a lot of high-tech stuff from us. We are going to use the overhead projectors, to the extent we need to.

The story that Mr. Bartlett has told you, the propositions he puts before you as facts, they are facts and they come -- except for the documentary facts -- but the facts that are critical come from the mouths of Lacey Phillabaum, Robert Corrina and Jennifer Kolar. Every count in this Indictment, every count depends upon the one fact, as I have said and Mr. Bartlett said: Did Ms. Waters participate in this criminal act?

That's the question, and the answer comes from an

1 analysis, a weighing -- as in every criminal case, not a

2 balancing who is right, is this right. A balancing is not

3 what you do in a criminal case. What you do is you look at

4 the evidence that's presented by the prosecution and you weigh

5 it. It, in fact, is what's on trial.

6     The Government's evidence is on trial, and it's up to you

7 to decide: Is this evidence I am comfortable with? If I had

8 somebody who I knew, who I cared about, who I loved, was on

9 trial and this was the evidence, would I be happy with this?

10 Would I say this is okay to convict my friend or my partner or

11 my relative, based on this kind of evidence? That's what you

12 are asked to do. That's what you are called on to do.

13     It's obviously a very serious responsibility. You know

14 what the stakes are. Judge Burgess, during jury selection,

15 said something that I would like to adopt. He said, in

16 picking the jury -- he asked each of you in some way or

17 collectively: "Do you feel you can start from neutral?" I

18 think that's a very good concept, a very good way to begin

19 your work and your evaluation.

20     One of the things you have to do is step back and look at

21 and consider this entire apparatus. We have the Judge, staff,

22 prosecutors, defendant, defense counsel, an audience,

23 choreographed, obviously, by Ms. Waters. She dictates who

24 comes to court. Come on, grasping at straws, Mr. Bartlett;

25 Ms. Waters doesn't dictate who comes to court.

1    That's not my point.  My point is, this whole apparatus is
2  here, and you think and you feel there must be something here.
3  This couldn't be happening unless there was something to the
4  charges.
5    Well, starting in neutral means that you have to put that
6  out of your head.  You have to take each of the pieces of
7  evidence both, individually and collectively, and think about
8  them and consider them.  Consider if this person, Lacey
9  Phillabaum, were a person sitting in front of you, across the
10 table from you, just the two of you, telling you the things
11 that she's said here, would you want to rely on the word of
12 that person?  I will go into the specifics of her.  That's
13 where we are at.  The same with Kolar and the same with
14 Corrina.
15   So let's start in neutral.  Let's talk about the facts.
16 Before we talk about the witnesses who have been here, I would
17 like to talk about the one witness who was mentioned by
18 Mr. Bartlett who is not here, and that's Stan Meyerhoff.  He
19 could be here if they wanted him here because he's a person
20 who, when he was arrested on December 7th, a little over two
21 years ago, he agreed pretty quickly that he was going to be a
22 cooperating witness, and he started giving names of people who
23 were involved in the many, many arsons that he was involved
24 in.
25   He was one of the central figures in these arsons.  He, as

you've heard, pleaded guilty in the Oregon case and his
sentence was the highest sentence of all the people who
pleaded guilty.  He's the fellow who knew he was involved in
the planning of what's been called the double whammy, the
University of Washington arson and the arson of the Jefferson
Poplar Farm in Oregon.

He is a really knowledgeable person about who was involved
in these arsons.  He was naming people.  He had no reluctance
to name people.  He was naming everybody he could in order to
help himself.  One of the people he named -- he went so far as
to name his girlfriend, Lacey Phillabaum, to become his
fiance.  He named her, he said she was involved, she was
involved in the planning of the double whammy.

There came a time -- and he was not reluctant to name
anybody.  In fact, it helped him to name people.  The more
people he named, the more it could be said by his attorney and
by him to the prosecutor in Oregon and to anyone, that I am
cooperating, I am doing my best, here's a name, here's a
person who was involved, here are the details.

In fact, there came a time on St. Patrick's Day 2006, just
under two years ago, when he was shown a photograph by ATF
Agent Comery, and it was a picture of Briana Waters, and he
looked at the picture of Briana Waters, having said whatever
he said before, and I will go back to that -- having said
something about a blonde woman who originally was from

1  California, not Ms. Waters.

2      He looked at that picture and he said to Agent Comery,

3  "That woman looks familiar to me, but she was not involved in

4  any of the arson activities that I was involved in or that I

5  know about." He said that. He said it. Where is he? Why

6  don't they call him?

7      It is their burden of proof to call -- to prove beyond a

8  reasonable doubt and to call the witnesses. That witness is

9  available to them to call. Wherever he is in prison, he could

10  be brought here by the prosecution to get up on the witness

11  stand and say, I didn't say that, I didn't mean that, I didn't

12  have my glasses on, I am protecting her, whatever else it is.

13      They didn't call him, and please understand that one of

14  the instructions that you have before you is that your verdict

15  has to be based on both the evidence and/or the lack of

16  evidence. What is there to say about looking at that

17  photograph and saying that woman was not involved? What more

18  powerful evidence could you have, than the man in the middle

19  of this conspiracy saying no, she was not involved?

20      If there were nothing else in this case, if we presented

21  nothing else to you, that would be enough, in my humble

22  opinion, to say I have a reasonable doubt. Mr. Meyerhoff, he

23  knows. He knows who did this. He knows who didn't do it.

24  That's a reasonable doubt. You don't have to listen to

25  Jennifer Kolar, who doesn't even identify who was at the

1    arson, her partner, her crime partner, Lacey Phillabaum.

2        What is so odd, a little odd, Mr. Bartlett, would have you

3    say.  It's more than a little odd; it's astonishing.  This is

4    not a woman of limited intelligence, Jennifer Kolar.  She's

5    probably the smartest person in the room, or one of them

6    anyway, and she said that she doesn't remember any role for

7    Lacey Phillabaum in that arson?

8        There's something fishy there.  It's not just fishy.  That

9    is a lie.  What Mr. Bartlett presented to you was a scenario

10    that depends upon the credibility of their witnesses, so when

11    he says that this happened -- this happened and this

12    happened -- it happened or didn't happen, depending upon

13    whether or not the person who reported it was telling the

14    truth.

15        That's what is critical here.  It's not a fact because

16    Mr. Bartlett or Mr. Friedman or I or anybody else say it's

17    true or not true.  It comes from the witness stand.  It's for

18    you to evaluate whether or not this has the ring of truth.

19        For a moment, let's talk about -- before we do talk about

20    the witnesses who did testify, I want to talk about some other

21    witnesses who were not called by the prosecution to assist

22    them in meeting their burden of proof.  I repeat -- forgive me

23    if I repeat -- not only is the burden of proof on them, but it

24    always stays on them.  We don't have to prove innocence.  We

25    think we have, but we are not asking you to make that

1   determination. We are not saying innocent, guilty.

2      We are saying what a jury does in this country, not just

3   in this courtroom -- in every criminal case in every state and

4   every federal court in this country, the burden is always on

5   the prosecution to come forward with evidence that's credible

6   to prove guilt. Always.

7      So who else did they not call? They did not call Chelsea

8   Gerlach. They asked Ms. Waters, "Did you know her," the

9   inference -- the implication being well, if you knew her and

10   then a whole list of other people, then you must be guilty;

11   you must be involved in this conspiracy.

12      Well, that's not the way it works. Let them call Chelsea

13   Gerlach to say I knew her and she was involved in this or

14   involved in that. Well, they didn't call her because she

15   wasn't. That is, Ms. Waters wasn't involved with any kind of

16   criminal activity with Chelsea Gerlach.

17      They didn't call a man named Tubbs for the same reason.

18   Both Gerlach and Tubbs have pleaded guilty in the Oregon case.

19   They didn't call either one of them. A guy named Thurston

20   also pleaded guilty in the Oregon case. They didn't call him.

21   Suzanne Savoie -- they didn't call her. She's also pleaded

22   guilty in the Oregon case.

23      Jake Ferguson, the original first person to cooperate who

24   has pleaded guilty and has been sentenced to probation -- they

25   didn't call him to say "Ms. Waters -- I knew her, she was

1  involved in one crime or another, one event or another."  Of

2  course they didn't, because she wasn't.  She was not involved.

3  That's clear.  We know -- I am not telling you something that

4  is not easy to figure out -- they would have called each of

5  these people if there would have been criminal activity.

6      They would have; they had to, because she's accused,

7  Ms. Waters is, not just of this act but of being involved in

8  the conspiracy.  You have to understand, not to get ahead of

9  myself, but there were five meetings that are called book club

10  meetings or incubator meetings, where the participants, the

11  actual co-conspirators, had meetings.  They talked about their

12  strategy, their planning, their tactics.

13      Jennifer Kolar was there.  Lacey Phillabaum was there.

14  They all have aliases.  Ms. Waters was not at a single such

15  meeting, none.  She doesn't have an alias.  She's either

16  Briana or Bri.  She was not involved in this.  But they list,

17  I think among the last questions that was asked by

18  Mr. Bartlett when Ms. Waters took the stand -- he went through

19  a list of people.  "Do you know this one, do you know this

20  one, do you know this one," suggesting -- wanting to trick

21  you, if I may say, into thinking that if she knows these

22  people, she must be involved in the conspiracy.  That's just

23  not a fact.  It's not true and it's not fair.

24      Who else did they not call?  Well, they didn't call Kenny

25  Clark, the friend of Jennifer Kolar who was a go-between, at

1   least for messages between Ms. Kolar and Joseph Dibee -- one

2   of her -- her real crime partner with whom she committed

3   several arsons.  They didn't call him.

4       They didn't call Corrina's wife, Kara Larson, to tell

5   us -- remember, there was an issue that I will go back to, and

6   this is kind of a critical issue.  Mr. Corrina's position was

7   that he was waiting at home for Ms. Waters to return with the

8   car that he says -- the rental car that he rented -- they

9   rented -- that would be himself and his wife -- to bring back

10  the car so that it could be returned.

11      He was waiting at home to do that.  Well, not that it was

12  great detective work, but he had said in the beginning of

13  cross-examination that he had a job, and he named the place

14  where he had the job.  I asked him, "Is that a Monday to

15  Friday, 9:00 to 5:00 job?"  And he said yes.

16      It turns out that the timing -- he's actually proven -- he

17  has proven that Ms. Waters could not have been involved in

18  this, and more particularly, that the car that was a rental

19  car could not have been involved in this incident.

20      How does that happen?  Because if he's waiting at home for

21  the car, it could not have been on Monday, the 21st. It had to

22  be on Sunday, the 20th, because then he would have been home.

23  But as we learned, his wife had used that car to take him to

24  work one day.  The only day that could have been was Monday,

25  the 21st.  So he was at work; he was not at home.

1    When I questioned him about that, that was some days ago,
2  you can believe that they went to his job -- I forget the name
3  of the corporation or the company -- you can believe that that
4  night or the following morning they went to his job and they
5  said, "We need to know if Rob Corrina was at work on May 21,
6  2001."
7    You can believe that if they had any evidence at all that
8  he was not at work that day, we would have seen that witness
9  on the witness stand.  You see how thorough they are.  They
10  have got every piece of data on everybody:  Briana's mother,
11  her grandmother, her friends, everybody.  They leave no stone
12  unturned.  You've seen data until your eyes glaze over.  I
13  know I have.
14    Who else did they not call?  They didn't call a fellow
15  named Spencer Moen.  Who is Spencer Moen?  He was the
16  so-called punk boyfriend of Capitol Hill Girl.  He's around.
17  He's available.  They didn't call him.  Where is he?
18    How do they meet their burden?  They have to meet their
19  burden of proof by coming forward with credible evidence.
20  It's their burden of proof.
21    Who else did they not call?  A New York Times reporter
22  named David Carr.  You may recall when Lacey Phillabaum
23  testified, I was able to show her a report of our investigator
24  where David Carr said to our investigator, "Lacey Phillabaum
25  told me that she didn't tell the Feds anything they didn't

already know." Well, if that didn't happen, David Carr would
have been here, called by the prosecution, to testify: "No,
she never said that to me, and I never said that to
Ms. Waters' investigator."

So they didn't call him -- David Carr. That's another
witness. That's maybe eight, nine witnesses now. Who else
didn't they call? They didn't call anybody from the
celebrated FBI laboratory in Washington to come and tell you,
"We looked at this car -- this rental car; we got a search
warrant -- or the fellow who owns it in Wisconsin now -- this
particular car -- agreed to let us analyze it, we looked at
it, there was depression damage to prove that there had been
an accident on the left quarter panel or the left rear or the
left fender, or whatever part of that car Lacey Phillabaum
says was damaged."

I am not saying that Lacey Phillabaum is wrong about there
being an accident. On the contrary. I think as to that,
she's credible. There was an accident. But to show -- they
could have shown, had they just taken it to the lab -- they
could have shown Lacey Phillabaum was right; this is the car.
Whatever the vehicle that was used, whether it was a car or,
as Jennifer Kolar first said, maybe a van -- whatever the
vehicle was that was used, it was not the car that was rented
by Rob Corrina and his partner Kara Larson.

They could have proven that it was -- just send the

quarter panel or part of the car, or you do something to get
that investigated by the FBI lab which, as you can imagine and
to which there's been testimony, is very capable of performing
that kind of test.  You would know, you would absolutely know
that that car, that rental car, was used in this incident,
because it would confirm what Lacey Phillabaum said, but they
didn't do that because they knew it was not that car.  It was
some other car.

Lacey Phillabaum made a big fuss, "Well, we have to get a
rental car for these kinds of actions; you have to get a car
that's not associated with any of the people who were involved
in the incident."  That's false.  That's a lie.  I think we
cited maybe seven or eight different instances where at some
of these activities, some of which were arsons, one of which
was a crop pull and one of which was what she called a
girdling operation, that they took -- those people who
participated in it, not Ms. Waters; she was not involved in a
single incident, nothing, not a crop pull, nothing -- but the
people who were, they used their own cars.

Joe Dibee took his car to Susanville.  Stan Meyerhoff took
his car to Susanville.  Kolar took her car to the Wray Gun
Club in Colorado.  So the tale that Ms. Phillabaum tells in
order to conflate or suggest that you have to get, let's call
it an outside car, rental, borrow, whatever it is -- that's
just false.  That's just not true.

So there are all these people they didn't call.  They have Count 1, this conspiracy count, and I don't know if you are going to see the Indictment or not, but there are 25 what they call overt acts which are listed in that Indictment.  One would be the Cavel arson.  Another would be the Susanville arson, and another would be the Center for Urban Horticulture, the University of Washington arson.

There were 25 overt acts.  Ms. Waters is named in one overt act.  She's alleged to have participated in the University of Washington arson.  Everything is in there, and you may recall the first witnesses after the arson investigators -- I am sorry, the firefighters -- they talked about all those other acts, with no mention of Ms. Waters. Just to lay it on you, this is a serious crowd and they burn down a lot of things, and indeed they did.  Lacey Phillabaum was one of them, and Jennifer Kolar was another.

While I am on the first witness, it is true that I got this document and it said the first response was at 4:15.  I asked firefighter Priest about it.  He didn't remember it.  I think the following day or the next witness was another firefighter, and we became convinced that it was just a typo, so it never got pursued.

To suggest that -- remember, this is the first witness, and we see a document that shows a serious discrepancy that the response wasn't at 3:23, it was almost an hour later.  I

1　chose to ask a question about it.  I didn't scream at witness

2　Priest.  I just said, "Does this ring a bell," and he said

3　"No," and we dropped it.  We learned later that it was

4　probably a typo.

5　　　I am not quite sure what the point was about -- do we go

6　after and say everyone is a liar?  No, we are not saying that

7　everyone is a liar.  We are saying where the evidence supports

8　it, certain people did not tell the truth.

9　　　I will go back to Lacey Phillabaum for a moment.  It took

10　forever for us to get out of her that she indeed had told the

11　FBI, the Feds, what they already knew.  I am going to get back

12　to it in a little while but -- maybe I should read it now.

13　　　Reading from page 146 of her testimony, the second day's

14　testimony, I asked her:

15　　　"Question:  That's what you meant, that nobody is

16　going to prison because of you?"

17　　　Then she answered:

18　　　"Answer:  I didn't think I had given any names that

19　the federal authorities did not already know."

20　　　She denied it four or five times before she finally came

21　out with it.  Now, how did she know what they already knew?

22　How did she have any information about what they already knew?

23　We've heard from Mr. Corrina.  We've heard that his wife Kara

24　Larson told him that on January 19th of '07, when Agent Halla

25　and Mr. Friedman entered her place of employment -- she worked

1  for an agency of the State of Washington, I believe, a place

2  where Mr. Friedman yelled at her.

3     One thing that Agent Halla did -- and I am not saying he

4  did it maliciously, and I have no idea if he did it

5  intentionally -- what's clear is that he did tell her, "We

6  believe that the car you rented was used in an arson at the

7  University of Washington."

8     A questioner -- common sense tells you that a questioner

9  is not supposed to give information to the person being

10  questioned because it's leading; it's being suggestive.

11     We know that they did the same kind of thing when they

12  went and got Joe Dibee.  They came and talked to him, and they

13  gave him information.  Unfortunately, it's the way they

14  sometimes work, and they shouldn't do that, but once you do

15  it, then the person has information, and if the person wants

16  to, quote, tell them what they already know, he or she -- in

17  this case, Lacey Phillabaum -- has a clue about what they

18  already know.

19     How did that happen?  Frankly, I was thinking this week,

20  if I am going to give a closing argument, what happened here?

21  Something struck me as I read the Lacey Phillabaum transcript.

22  She talked about how she told her parents about what was

23  happening, and she jumped on it and she said my parents, you

24  know, my lawyers -- I spoke to them as my lawyers.

25     What is that about?  I thought, that's a little bizarre.

I thought maybe it was just kind of a personality quirk. That's very important, because here's the way they did it. Here's how she figured out what they already knew and what it is she should be saying to them. It's really important, because an important part of their argument is "I have Kolar saying it" and "we have, independently, Lacey Phillabaum saying Briana Waters was involved." Well, it wasn't independently at all.

Lacey Phillabaum told them what she believed they already knew. How did she know that? Because innocently -- I am not saying her father did anything wrong. On the contrary, I think her father did -- when he was contacted by the FBI, obviously the FBI told him some things, and he, as a father and a lawyer and a person who loved his daughter, was sharing information with her. That's how she figured out what they already knew, because that's how the information got to her.

You know what? We can't call him as a witness because he's her lawyer, the father is her lawyer, and he would get up there and say "lawyer-client privilege; I am not going to testify." That was what the fuss was about. That's why she said, "Yes, not just my father, but he's my lawyer, as is my mother; they are my lawyers." That's what that is about. So that he can't tell you, "The FBI gave me the information and I passed it on to her."

That's how she knew what to say to help herself, because

what do they want?  They want it to be consistent with the
other information they have.  If you look at the timing --
speaking of timing, supposedly Jennifer Kolar -- and it's
probably true -- two weeks after she first spoke to Mr.
Friedman and the agents, December 16th, the day we'll spend
some time with, she says that apparently she contacted her
lawyer, Mr. Martin, and she said the person who was the
lookout, I just remembered, with my little feeble mind -- I
just remembered that it was Briana Waters.

Well, of course, I am being sarcastic when I say feeble
mind.  She had quite the opposite of a feeble mind.  She knew
very well and she knows very well what she is doing.  She's
also a sociopath, a person who has committed four arsons.
She's walking the streets now.  She will be sentenced sometime
after this trial.  They are holding it over both their heads.
They are not getting sentenced until after this trial because
they don't want them to go sideways on them.

But Jennifer Kolar is on the street now.  She's out there.
She's a four-time arsonist.  She is going to get probably
seven years, maybe five years, depending upon what Judge
Burgess decides to do.

This woman tells her lawyer at the end of December of 2005
that Briana Waters was involved in this case; she was the
lookout.  On January 5th, a few days later, her lawyer, Mr.
Martin, tells Mr. Friedman of that conversation.  The very

next day, there's a scheduled meeting with her -- an interview
with her, January 6th.  They do not ask her a single question
about Briana Waters being the lookout.

What kind of police work is that?  That's not logical.
Common sense tells you that if they believed that was true,
they would say:  "Ms. Kolar, your lawyer told us yesterday
that you remember that Briana Waters was involved as the
lookout."

Common seasons tells you that.  But they made a choice, an
intentional choice, not to ask her.  They didn't ask her on
January 6th.  They didn't ask her the next time on January
12th, January 13th, I think January 27th, a couple times in
February, and they don't ask her about it until after Lacey
Phillabaum has come in and told the FBI what she believed they
already know.

What's the significance of that?  Why would they not ask
Jennifer Kolar?  Well, they know that on December 16th she
gave -- and even Agent Halla said so -- she gave five names:
herself and four other people.  In fact, she confirmed that --
something Mr. Bartlett failed to tell you in his closing
argument this afternoon -- she confirmed that she gave those
names as the participants in the crime in October of last
year.

She spoke to Mr. Bartlett and he asked her:  "Do you
remember what happened in that first interview, December 16th,

1   with regard to these names, these particular names, Capitol

2   Hill Girl, Boyfriend, Crazy Dan, Avalon and herself?"

3   Remember, no Briana Waters.  Very important, the first time

4   she did not remember Briana Waters.

5       What happened?  She told Mr. Bartlett, "Yes, I've

6   identified those people, myself and those four other people,

7   as the participants."  Mr. Bartlett chose not to tell you that

8   this afternoon.

9       Mr. Bartlett put on the screen for you Agent Torres' notes

10  from the interview on December 16th and talked about -- yes,

11  one, two, three, four, five.  Before you look at what's on the

12  screen, I would ask that you consider what does that mean when

13  Agent Torres sat there -- she gave names; he puts the numbers

14  one, two, three, four, five next to them.  Is there any doubt

15  that you are being deceived when you are told that it was

16  anything other than those five participants?  That's what she

17  said.  That document is in evidence, and I ask you to look at

18  it.

19      Now, look at the page before that's on the screen.  I have

20  talked about this, and I just want to point it out.  When the

21  agents and Mr. Friedman were interviewing Jennifer Kolar about

22  a different crime -- this is just one page before the

23  University of Washington -- they were interviewing her about

24  Susanville, and it says Susanville, and she listed the names

25  of the people that she remembered were present at the

1   Susanville crime.

2       Where she did not remember, where she was not sure, she

3   said to them, "I'm not sure."  That's why Agent Torres, of

4   course, wrote "not sure" next to three of the people.  There's

5   no getting around that.  They are fooling you if they tell you

6   otherwise.  It's not true.  She said about Susanville --

7   where's she's not sure, she's not sure, but when it came to

8   the next event, the University of Washington, there's no "not

9   sure"; she was sure.  She gave them the five participants, and

10  in August of last year, she reaffirmed that to Mr. Bartlett.

11      I want to talk some more about Jennifer Kolar.  I don't

12  mean to be harsh, and I feel bad that she's going to prison.

13  She was a dedicated person, involved in the environment.

14  Frankly, she went bad.  She committed four arsons.  At first

15  she told them she committed three, and then she remembered the

16  fourth.

17      This is a person with a criminal mind, as I said earlier,

18  a person without a moral compass, a person who really, really

19  doesn't care for anything but herself.  She is a woman of some

20  means, she has a yacht -- or she just sold it apparently --

21  and she is a woman who does well at her work.  She was

22  involved in planning four arsons.  She was involved in

23  executing four arsons.  She mixed fuel.  She bought fuel.  She

24  went with her then boyfriend, Joe Dibee, to commit these

25  crimes.  She thought them through.

1    She did that.  She's a criminal.  She's a person who, if
2  you just step back and knew nothing about this case and you
3  heard, here's a person who in a period of a couple, three
4  years committed four arsons, burned down four buildings, you
5  are thinking, there is a person that worries me; here is a
6  person that I am wondering if I can really accept the word of
7  such a person.  She planted devices.  She increased the fuel
8  load.
9    We talked about character.  We talked about integrity.
10  It's not there.  Jennifer Kolar.  Intelligence, yes.  Honesty,
11  no.  How do we know she's lying?  Well, she's lying
12  specifically about today.  She got up there and lied to you in
13  your faces, and in our faces.  She lied to you about who
14  committed the crime at the University of Washington.
15    She's telling you that Lacey Phillabaum -- I don't
16  remember Lacey Phillabaum being there.  I am not talking
17  about, do you remember -- I think I may have said this at the
18  trial during the cross-examination -- do you remember.  This
19  is not about what kind of wine did you have two months ago at
20  a particular dinner.
21    This is -- she doesn't remember, she says, that Lacey
22  Phillabaum was one of four other people with whom she burnt
23  down this majestic building.  That's not a mistake.  That's a
24  lie.  She sat up there, swore to tell the truth, took an oath
25  to tell the truth, and she has lied in this very courtroom,

1    and they are asking you to rely on her to convict Briana

2    Waters.

3        She was facing -- when she went in on December 15th of '05

4    to speak to the prosecutors and FBI, she was facing life in

5    prison, the rest of her life in prison, and she decided, I

6    don't want to do that.  I am going to cooperate.

7        On that day, they said to her, "Tell us who committed this

8    crime that took place four-and-a-half years ago."  They were

9    thinking, this is a crime that they have been wanting to solve

10   for a long time.  It was a big deal, and it is a big deal.

11   And here was the first person who was going to be telling

12   them -- the first person -- who committed the crime.

13       Unfortunately, Agent Torres was there and he took careful

14   notes.  Agent Halla was there, and he took less careful notes.

15   That happens.  When you are taking notes, you are busy

16   listening, so he only wrote down Capitol Hill Girl, but Agent

17   Torres wrote down all the names, and he put numbers next to

18   them.

19       When Ms. Kolar talked about who had committed that crime,

20   one person that she did not say committed the crime was, of

21   course, Briana Waters.  She was there, and the very first

22   thing that she was told was how important it is to tell the

23   truth.  She was told that by Mr. Friedman, and presumably she

24   was told that by her lawyer.  So she sits there and she gives

25   them names:  Capital Hill Girl, Boyfriend, Crazy Dan, Avalon

and herself.

What does it mean when you are asking somebody who's telling the truth, who committed the crime, and she says names that don't include persons she eventually comes to accuse? How do you evaluate that?

Well, it's not difficult. I have to say, of all the difficult decisions that you are going to have to make in the jury room, this may be the easiest. This woman is a liar and not to be trusted and not to be believed. It's simple. There's absolutely no question that she is a liar, none.

The question is, do you feel comfortable convicting anybody, much less, if I may say, an innocent person? You know the consequences here. You've heard them. There's no secret.

The day after, or a year after, if Briana Waters gets convicted, you're always going to be thinking, I really have a doubt. I can't believe that I convicted somebody based at least in part on the testimony of Jennifer Kolar. I can't believe it.

Remember, as I mentioned, they are holding sentencing over her head. She's not going to be sentenced until after this trial so that she couldn't come in here and change her mind. If she had been sentenced a couple of months ago, she could come in here and say "No, I was lying about Briana Waters," and they wouldn't have any recourse. So that's why -- one of

1 their techniques is they hold it over their heads, both Lacey

2 Phillabaum and Jennifer Kolar.

3     Why does she lie about Briana Waters?  She realized that

4 some of what she had told law enforcement people on the 16th

5 of December was not true and that they would soon know that,

6 so she had to come up with another name.

7     Now, we don't know -- I can't say to you -- we can't get

8 into her head, and we can't say to you that the reason she

9 chose Briana Waters was because a few years back Briana Waters

10 has rejected her.  It is a fact that Briana Waters rejected

11 her, and we know that not only from Briana Waters, we know

12 from the way she answered the questions about her interest in

13 a same-gender relationship.

14     She got very nervous, and I understand she would.  It's

15 not a comfortable position for her to be in, to be exposed in

16 public like that.  But she said "Oh, I don't remember when it

17 was, maybe a long time ago," and then she had to

18 acknowledge -- now we have in evidence -- I don't need to read

19 it -- we have in evidence her e-mail to a friend of hers,

20 explaining her interest, her real interest in another woman,

21 how she was pursuing that other woman, she was on her way to

22 the restaurant where that woman was working, and she was

23 wondering if she herself, Kolar, would have the nerve to ask

24 her out.

25     So, when faced with proof -- Jennifer Kolar is faced with

proof that she had indeed put in writing her interest in women, she stumbled through it and she said "Oh, yes, now I remember." It's kind of a familiar scenario, if you remember how Lacey Phillabaum suddenly remembered certain things about Justin Solondz when she was confronted with staying in his cabin. I will talk about Lacey in a little while.

Just one more thing about Kolar not naming Phillabaum. Phillabaum has pleaded guilty to this crime. Not only is it a lie, but -- I don't speak for you, but everybody in this courtroom knows it's a lie. Everybody. Everyone.

Trust me, it would not be fair, it would not be right, it would not comport with the Constitution; it would not comport with whatever theological beliefs you may have; it would not comport with morality to count on or to in any way rely upon the testimony of this woman. It's just not right.

What does it mean that Kolar spoke to Mr. Bartlett last August and reaffirmed to him that indeed she had named herself and the other four people as the participants? That's the wording of his sworn statement. What does it mean that he can hear that from her, and then he can come up and tell you she was vague about it. I dare say, we are not judging the credibility of Mr. Bartlett. We are judging the credibility of the witnesses.

But I suggest to you that the arguments that Mr. Bartlett has made before you, while eloquent, really cannot be relied

upon if he's going to tell you, in the face of what Ms. Kolar told you last August, that she was vague about what she said in that first interview.  That just is not square.  Those two items do not square.

Why is it -- let me get back to the question I had approached -- why is it that for two months, in the seven or so interviews with Kolar, January 6th to March 6th, that they don't ask her about Briana Waters?  In fact, Briana Waters' name came up.  There was a picture.  There was some conversation, and when it came up in one or more of those seven meetings in those two months, there was conversation very briefly about Briana Waters.

At no time -- not only at no time did they ask her about, is this the woman that you say was the lookout, which defies logic, defies common sense, but at no time when the name came up did Kolar say, "That's the woman I am talking about; that's the woman who was involved as the lookout."  That also defies common sense.  What is that about?  Why is it not in any of their reports between January 6th and March 6th?

Well, you have heard and you have seen, both in the FBI regulations that we have talked about and in testimony, that there's a process called discovery.  When somebody is accused of a crime, eventually they get documents.

If there is a document -- let's say Kolar changed her mind and said it was Joe Smith or Joe Dibee who was involved in

1  this arson, the lawyer for Joe Smith -- let's call it -- would

2  eventually get the document where she said Briana Waters was

3  involved.  So Joe Smith's lawyer could use that to impeach

4  Kolar.  That's why there's no document.  That's why they

5  didn't talk to her.  It wasn't about letting her chill out.

6      They didn't want to create another document that would

7  further undermine her credibility as to which they clearly had

8  doubts.  If you don't doubt it, if you think she's telling the

9  truth, then you ask her about it and you document it.  But

10  they didn't want to do that because there would be a trail of

11  her naming Briana Waters that could be used by the lawyer for

12  the next person to impeach Jennifer Kolar.

13      That's the reason they don't ask her in those seven

14  meetings that took place in those two months.  They don't want

15  to create a paper trail that would help the next person she's

16  going to lie about.

17      Think about it for a moment, if you are sitting there and

18  you are an investigator or an Assistant United States

19  Attorney, and you have information that Briana Waters -- from

20  the witness sitting in front of you, that Briana Waters was

21  the lookout, the first thing you are going to say is, in this

22  crime that they have been trying to solve for four-and-a-half

23  years -- you are going to say, is this the Briana Waters --

24  tell us about Briana Waters.  Your lawyer told us that you

25  named Briana Waters.  Who is she?  What happened?  When did

1   you meet her?  Who is she?  What does she look like?  Where
2   does she live?  That's what they do in investigations.  That's
3   what they are supposed to do.  That's what they should do.

4        Again, we don't know if the reason she chose to name
5   Briana Waters is because Briana rejected her at some point,
6   which would have been toward the end of 2001 or early 2002,
7   before Briana moved to the Bay area.

8        What we do know is that Jennifer Kolar is what
9   criminologists and law enforcement people who are objective
10  would describe as a sociopath.  She's committed at least four
11  arsons -- planned, not happenstance, not spur of the moment;
12  she's helped put together devices, she's bought gasoline,
13  she's mixed gasoline, she's bought soap, she's mixed fuel.

14       This is not just the casual participant.  This is a
15  central figure, with her former boyfriend Joe Dibee and by
16  herself.  Joe Dibee wasn't even in Colorado when she and
17  another friend of hers tried to burn down the Wray Gun Club.

18       Let's move on to another interview with Kolar.  One of the
19  interviews in that two-month period, January to March, was
20  February 4, 2006.  That was the day that she and Agent Halla
21  and Agent Torres drove down from Seattle to Olympia to look
22  around, to look at buildings and to talk, and they interviewed
23  her.

24       We know because Agent Halla's notes tell us so, that what
25  Jennifer Kolar said to the two agents on that day, whether

they were driving or stopped, but at a time when Agent Halla
was taking notes -- we know because he wrote it, and what
Jennifer Kolar said to them was, "I don't remember Briana and
Lacey together." That's what he wrote. That's what she said.

Now, what does that mean? That means, obviously, that if
they were not together, Briana Waters could not have committed
the crime because we know that Lacey Phillabaum committed the
crime. We know that Briana Waters could not have been at the
restaurant before the arson. We know that she could not have
been in the vehicle, either going to the restaurant or leaving
the restaurant or leaving the scene of the arson, if they were
not together.

We know that they couldn't have been together at a time
when there was a claim, at this meeting at Evergreen -- by the
way, I am going to talk about that. Why would there be a
meeting at Evergreen? Why in Heaven's name would you create a
record -- if you are going to have a meeting about an arson,
why would you have it in a room where Briana Waters could have
been seen, where the other people could have been seen, where
there could have been a record of getting a room? Ridiculous.

Why? Because Lacey Phillabaum thought that was her clever
way, her debater way, her Cum Laude graduate with honors way,
her three-year graduation -- her three-year finishing school
way, her intelligence, her cleverness, her deviousness, how
can I hook Briana into this. If I claim that Briana was

involved in it that is going to be credible, I have to say
that there was a meeting at Evergreen.

I will get to Lacey in a minute, but just keep in mind
that she's as clever as she can be. But she tripped herself
up, and we'll talk about it in a while. But back to Jennifer
Kolar.

On February 4th, either in the car or in Olympia, it's
conclusive -- if Lacey Phillabaum and Briana Waters were not
together, Briana Waters could not have committed the crime.
It's conclusive, dispositive evidence, and that came out of
the mouth of the other witness, Jennifer Kolar.

What did they do? Instead of including that language in
their typed 302, they changed it. They changed it to, they
were not close friends, a completely different meaning.
Because they understood, and they understand as they sit there
now, how conclusive, how important, how devastating it is that
if Lacey Phillabaum and Briana Waters are not together, it
means Briana Waters could not have committed the crime. It's
as simple as that.

Now, how do we know that's what happened? Well, we know
because Agent Halla did the handwritten notes, but we also
know -- or we could know some other way -- exactly what was
said because Jennifer Kolar made a tape recording of that
date, that day's events. What she said is on tape.

Now, Jennifer Kolar is a cooperating witness. If they

wanted to, they could just say to her lawyer, give us the tape
as part of her cooperation agreement.  It is not -- anyway,
think of common sense.  It is not a lawyer-client
connection -- conversation.  It's a conversation with Jennifer
Kolar and two FBI agents.  This is not a conversation between
a lawyer and a client.  This is not protected.  Mr. Martin,
the lawyer, couldn't say "no, no, this is lawyer-client."
It's not lawyer-client.  It's a conversation between a witness
and two agents.  They could get it in a minute if they wanted
to, but they don't want you to hear that because that's where
she says, "I don't remember Lacey and Briana being together."

Now, there's also no tape for the very first interview,
the infamous December 16th interview.  The FBI regulations, as
we see, provide for taping confessions or possible confessions
or statements by anyone they want to.  There's provisions.
All you have to do is go to the Special Agent in charge of the
office and say, we want to tape it.  That's why we don't have
to be experienced with law enforcement work.  From everything
we know, we see true story after true story.  Forget Law and
Order, but the true story that you see on television about
confessions.

Police tape confessions all the time.  That's what they
do.  That's what they are supposed to.  Why do they do it?  So
that there won't be any doubt that there was really a
confession.  Both Lacey Phillabaum and Jennifer Kolar each

1  came in on different dates, December 16th for Kolar, February

2  21st apparently for Phillabaum, and they make confessions.

3      Now, maybe at the very first moment it wasn't clear there

4  was going to be a confession, but as soon as it was clear they

5  were told by the lawyer, "She's going to tell you what

6  happened," you get a tape recorder.  You don't hide it.  You

7  are in Mr. Friedman's office.  You don't think they have tape

8  recorders in the U.S. Attorney's Office?

9      Is it okay if we tape this; or we are going to tape this,

10  is that okay?  You don't think they could have done that if

11  they wanted to do it?  Well, maybe the FBI doesn't do it as a

12  policy.  Maybe they do.  But we haven't heard about the policy

13  of the U.S. Attorney's Office.  There's Mr. Friedman, the guy

14  who yelled at Kara Larson.  You don't think he has the

15  wherewithal to get himself a tape recorder and say okay,

16  Jennifer Kolar, we are going to put this on tape?

17      That way, there wouldn't be any confusion, falsification,

18  dispute, if you believe it, between the agents about what she

19  said.  It would be right there.  You'd hear it.  Capitol Hill

20  Girl, Punk Boyfriend, Crazy Dan, me and Avalon.  That's what

21  you'd hear.

22      Just one last word on Jennifer Kolar.  She was facing life

23  in prison.  She has bought her way out.  They are holding the

24  sentence over her head to see what she did here.  She's going

25  to keep her deal because she came in here and she said what

she was supposed to say.  She said Briana Waters committed

this crime.  So she's all right now.  She has bought her way

out of a life sentence.  I pray to you that you don't let

Briana Waters fall, based on the testimony of this very

unhealthy person.

Let's talk about Lacey Phillabaum.  One of the first

questions she was asked is, "Do you bear any ill will toward

Briana Waters?"  And her answer wasn't yes or no.  Her answer

was, "I have sympathy for everyone in this case, or these

cases."  She didn't answer the question.

When I was able to talk to her on cross-examination -- of

course we didn't talk to her any time before that because she

wouldn't talk to us -- I asked her:  "In fact, you do bear ill

will toward Briana Waters because you had an affair with her

boyfriend, Justin Solondz, she found out about it and she

called you lots of names."  She said "No, no, no, nothing like

that happened."  Then I asked her another time, and she said

"Oh, now, that you say it, now it is ringing a bell."  Now,

come on.

Again, we are talking about a witness upon whom they are

relying to come -- and they are claiming this is a woman who

is a truth teller.  This is a woman who has found the

spiritual way, she says.  She wants to shout it from the

mountaintops that I am now here, I am born again.  That's what

she's telling us:  "I am an honest person," and she comes in

here and the first thing she does is she lies about -- forget
the affair part, just about the confrontation between her and
Ms. Waters.

After she says, "Gee, now that you mention that, she
called me unprincipled; now it rings a bell."  Also, this is a
woman who is pretty much as smart as Jennifer Kolar, and she
tells you and she wants you to believe, "Yeah, I didn't
remember that about what happened to me and Briana Waters."
Well, I submit to you that's a lie.  She has lied to you in
this courtroom.

Let's go back to some other testimony.  She indicated that
one of the book club meetings that she went to, and Jennifer
Kolar went to -- I think it was the middle of the third one --
she had been -- Phillabaum had been at all of them -- was at
all of them.  She had an alias, Reba, and she thought she
remembered, but wasn't sure.  Another lie.

At the third meeting -- I think that was the one in Santa
Cruz, California -- they learned ways to communicate
anonymously, to use proxy servers, whatever that is, in
computer work, to use codes.  And Kolar -- her first meeting,
her first book club meeting, Kolar was an instructor and she
brought a disk for everybody.  It's called a PGP disk where
you can encrypt messages so that law enforcement cannot read
your messages.  That's these two people at this meeting, this
book club meeting in Santa Cruz.

1    Well, they also learned lock-picking, breaking windows,
2  breaking and entering.  We're talking about criminals here.
3  We are not talking about people who they dress up.  She wanted
4  to wear civilian clothes.  Remember she told you that?  She
5  was wearing her jail outfit, looking pretty tragic and
6  pathetic.  She walked in here and she sat there and she looked
7  sad and contrite and remorseful.  She wanted to wear civilian
8  clothes, but the Prosecutor said "No, you wear those jail
9  clothes."  Why?  Why would they say that?  Because they want
10  her to look pathetic, contrite and remorseful.  That's what
11  happened here.
12    That's the way she looked.  That was her act, until the
13  afternoon when, had it been a movie, the director -- and she
14  came out with her obscenity -- had it been a movie, the
15  director would have said cut, cut, cut.  Listen, Lacey, you
16  are supposed be pathetic and sad, and not confident and
17  tragic.  You can't do that.  You can't say words like that.
18  You can't do that; let's do this again.
19    But it's not a movie.  It's a trial.  There she was,
20  having first denied, having first denied that she had any
21  sexual relations with Justin Solondz, she pretty much admitted
22  it.  When did she admit it?  When she was confronted with the
23  302 form where she, for whatever her reasons, she told the
24  agents -- I think Agent Halla was one of them -- that she had
25  gone to Justin Solondz' cabin.

1    No reason she went to that cabin, except for one reason,

2  and she knew that.  She knew when she was shown that document

3  or when she was read that information; she knew she was

4  snagged.  She knew there was only one reason.  She already

5  said she went there and sat on the bed.  She had told them in

6  that interview that he took a nap.

7    Now, this is not about criticizing her or trashing her for

8  having a sexual affair with any particular person.  That's not

9  what it's about.  It's about the confrontation that later

10  happened between her and Briana Waters.  That's what it's

11  about.  But there came a time on the witness stand that this

12  person just busted out.  I asked her about what were you doing

13  in that cabin, more or less.  She said "I did not have sex

14  with that man," or "I did not have sex with him."  And I kind

15  of, in a light question, said, "Do you remember Bill Clinton,"

16  and she came out with "I did not" -- and I don't need to say

17  the words; I am sure you remember them.

18    You could feel the courtroom change.  You could feel that

19  this is a woman that busted herself -- her act.  It's

20  absolutely invalid anymore.  She was not a person -- she

21  revealed herself to be not the person she was portraying.

22    Then after that, she couldn't remember anything about May

23  20th and May 21st. She couldn't remember what time of day she

24  said that they left from Olympia to go to Seattle.  Was it the

25  morning?  I don't remember.  Was it the afternoon?  I don't

1   remember.  Was it the evening?  I don't remember.

2       I think what busted her most was when she was confronted

3   with the memorandum that our investigator prepared after our

4   investigator had spoken to the New York Times reporter,

5   Mr. Carr, who was her mentor, and she said that Mr. Carr had

6   told our investigator that she, Lacey Phillabaum, had told

7   Mr. Carr, "I didn't tell the Feds anything they didn't already

8   know."  It's such a critical concept that she would be telling

9   us, anybody, that "I didn't tell the Feds anything they didn't

10  already know."

11      What's so important about that is -- I have said it

12  before, and I want to repeat it -- that their claim is that

13  she was an independent witness, independent from Jennifer

14  Kolar, that she came up with Briana Waters' name on her own.

15  Well, in fact, she did not.  For whatever reasons, in whatever

16  way -- and my surmise is that she got it through information

17  given to her father.  I want to repeat, I don't think the

18  father did anything wrong whatsoever.  He did exactly what a

19  father should do.  He told her the information he had.

20      But once she saw that David Carr, a person whose respect

21  she wanted, no longer respected her, I suggest to you that's

22  about when she gave it up.  That's when she became who she

23  really was:  a person who would lie, who would come out with

24  that obscenity for no reason, who would try to deceive you,

25  who said at that point, which is probably true, "I don't

remember what time of day," I don't remember the script anymore. I don't remember what I am supposed to do. Did we leave Olympia in the afternoon? Did we leave in the morning? Did we leave in the evening? I don't remember. I don't remember. I don't remember. That happened all after the David Carr event and the obscenity that she came out with.

A little more about Lacey Phillabaum. She went and did a crop pulling. Not a word about Briana Waters being involved in that. She went to another place, and she did a girdling of trees. The woman is a criminal. It wasn't an arson. Those two weren't arsons, but they were criminal activities, and she knows it, and they know it, and we know it.

She told us that Stan Meyerhoff, who became her boyfriend after she -- Stan Meyerhoff had been the boyfriend of Chelsea Gerlach, and they were just breaking up also. That's her MO, to tell you that, "Oh, yeah, I got involved with that guy because that couple was just breaking up." That was her excuse with Justin Solondz.

So Stan Meyerhoff, she told us, was one of the people who planned the double whammy, the University of Washington event and the Jefferson Poplar Farm event the same morning. Then she said -- she started to talk about this incident. This is on direct examination, and she said that the meeting at Denny's a week before the arson in Olympia is the first time I saw Briana Waters.

1    That was a lie, and we know it is a lie because Sarah Wald
2  came in and testified before you, and there was not a single
3  question from anybody at that table of Sarah Wald.  Sarah Wald
4  explained that in February, the first week in February of
5  2001, there was a meeting with 20 to 25 people, that Justin
6  Solondz was there, Briana Waters was there and Lacey
7  Phillabaum was there, and that Lacey Phillabaum was one of the
8  facilitators of the event; they broke into three groups.
9  There's no question that everybody knew everybody that was
10  there, and in the evening there was a party; Briana played the
11  fiddle.
12    There's no question that Briana Waters, who testified that
13  she remembered meeting or seeing Lacey Phillabaum at that
14  event in February -- not in May, in February.  What's the
15  significance of it?  The significance of it is that she, Lacey
16  Phillabaum, came and she lied to you.  She lied that this was
17  the first meeting, and there were details around the meeting
18  of what happened at Denny's, assuming people who are getting
19  ready to commit an arson are going to meet in a public place
20  like Denny's.
21    She made up a detail.  She's a debater, you may recall.
22  She is very clever.  She made up a detail, and in order to
23  make it credible, she said, this is the first time so that it
24  would be -- she was pretending this would stand out in her
25  head, this is the first time I met her.

1    Well, she had met her at least there the first week in
2  February and then a few weeks later at what's called the ELAW
3  conference; she met her there, too.  So it wasn't in any way
4  the first time she met her.  The importance is the drama that,
5  "Oh, I remember this is the first time I met her" is
6  completely false.
7    She also made up another lie.  She lied and she said that
8  at the time she went to -- she says she went to Conger Avenue,
9  and she saw Briana Waters in the kitchen playing the violin,
10  and this was the weekend of the incident, the arson.  That
11  could not have been.
12    You heard Haila Silvertrees, the mother of Ocean, testify.
13  You heard Heather Moore testify.  At that time, in May of
14  2001, that house -- that kitchen was under construction.
15  She's not going to be playing the violin in the kitchen while
16  it's under construction.  That's crazy.
17    She also said Briana Waters was not living there at the
18  time she says she was there in May.  Well, she wasn't there in
19  May.  There was no clean room in May.  You have seen the
20  manual.  You don't do a clean room where somebody lives.
21  There was no clean room.  There was one room in the garage.
22  You don't do it.  It's clear; it's explicit in the manual.
23  There's skin flakes and there is hair.  You don't want to have
24  DNA evidence.
25    It could not have possibly been there if Briana were a

1  participant.  But Lacey Phillabaum has a story to tell, and

2  she has a story to tell -- it has to be consistent with what

3  she believed the FBI already knew.  That's the key to it.

4  That's why it had to be Briana Waters.

5      She talked about a meeting, as did Kolar, on the campus of

6  Evergreen.  I mentioned this already.  Why possibly would they

7  want to create any kind of trail that could be traced, that

8  they had a meeting where somebody could walk in on them, some

9  faculty member would be there, some clerk would be there who

10  checked out the room?  Ridiculous.  How did that happen?  Why

11  was Evergreen mentioned?  Only because they knew that Briana

12  Waters had a connection to Evergreen.

13      So to tie her into this, Lacey Phillabaum did what liars

14  do.  She made up a detail to make herself more credible.

15  Think about the liars you have known in your lifetime.  Think

16  about -- look at the con men and women that you see covered on

17  television.  How do they fool people?  They fool people by

18  making up details that convince the mark, the victim, the

19  person to be fooled.  They convince that person by details, by

20  making up details that are credible.  I remember that event

21  because it was my cousin's birthday, or I remember that event

22  because I was watching this particular show on television, I

23  will never forget it, it was my favorite singer, or whatever.

24      They come up with details because that's what makes them

25  credible, and that's what Lacey Phillabaum does.  At least she

did it until she busted herself, and then she couldn't
remember anything.

She said that when she went over to Conger Avenue, where
she said there was a clean room and that's where the
incendiary devices were supposedly being made, Ocean was
there.  Ocean wasn't there.  He didn't move there until July
or August.  His mother said so, and his ex-wife said so and
Briana said so.  There's no dispute.  There's no evidence
whatsoever that that house was finished any time other than
July or August.  That's when he moved in there.

When she was there, it was after -- as Briana Waters
testified -- she was there after the house was ready and Ocean
was there.  That's why she did see Ocean there at that house,
and that's the day Briana Waters saw her there and said, let's
go for a walk.  She went for a walk and she called her the
names and told her the riot act about, "You shouldn't be here
in my house, I don't ever want to see you, get out of here,
you have had an affair with my boyfriend, you are
disrespectful, you are anti-feminist, you are an unprincipled
slut."

That's when she was there.  That's why she could draw a
sketch on the back of a photograph.  It's a pretty sketchy
sketch, but that's how she could draw anything about -- she
was there.  There's no question that she was at Conger Avenue,
and no question that she knew there was a schoolyard with a

track because that's where Briana Waters said, "Let's go," and they went outside and they took a walk on that track; and that's where Briana Waters, in her anger -- which she had been carrying for several months -- said what she said to her. That's the conversation where Lacey says "Oh, yeah, now that you mention it." That's something you don't forget, and she pretended to forget it.

She made a big deal on direct examination, Lacey Phillabaum did, that it was important to have a car that was not registered to any of the people involved in the incident. I think she called it a big issue, and it was the linchpin of the actions. That's just not so.

Without going through it, there were seven or eight events that took place, some of them arsons, where people used their own cars. In fact, it is said that they used Solondz' car that very night at the Jefferson Poplar Farm event. Dibee's car went to Susanville. Meyerhoff's car went to Susanville. Kolar's car went to, I think, a crop pull or another event. Kolar used her car at the Wray Gun Club.

So the claim that "a car that was not associated with any of the participants is essential" is not true. It's bogus. It's a lie. Forgive me for saying this again, but I feel I have to. In an American courtroom, when people are facing a conviction of a very serious crime that has very serious consequences, you really cannot rely -- you cannot permit

yourself to be pushed into relying on people who have lied to you, people you know that in your daily lives, if you looked across at them, they would -- you would say, I don't know that I can count on this person telling me the truth. That's how important this is.

It's important, firstly, because Briana Waters is completely innocent. Secondly, because you have a really deep responsibility to not permit that to happen, to not be the person sitting at home 12 years from now and it turns out that Kolar comes out of prison seven years from now and says, "I lied; Briana Waters had nothing to do with it. I had to lie; I was facing life imprisonment." You don't want to be that person. Those jurors that you see on television who have been in that position are devastated. Please don't let that happen. That's not what's supposed to happen in criminal cases in this country.

Lacey Phillabaum is a person of bad character. She's an arsonist, a phony person who is trying to tell you that she wanted to scream from the mountaintops how she's reformed. Well, she waited a while. She learned on December 7th of 2005 that her boyfriend had been arrested in Virginia, and it took her more than two months, two-and-a-half months, before she decided to go in and be remorseful, as she would have you believe. She didn't speak to them until February 21st of 2006, two-and-a-half months later.

1        Why do you think it was that the prosecutors did not

2   cross-examine Sarah Wald who testified that Lacey Phillabaum

3   had met with Briana Waters in early February of 2001?  Because

4   they just wanted to get her off the witness stand and not have

5   you remember it.  I am here to remind you of her testimony.

6   She was clear.  She was truthful.  She was honest.  She told

7   you what it was about.  Why is it important, again?  Because

8   of the drama that Lacey Phillabaum created that this was the

9   first meeting at Denny's in May, a week before the incident,

10  and it will always stand out in her mind.

11       An interesting thing happened.  They will tell you -- and

12  they have told you that they wish -- I wish we had the Ralph's

13  Thriftway document.  I say to that:  Give me a break.  I

14  suggest to you that they actually did have it.  And the way we

15  know they had it --

16            MR. BARTLETT:  Your Honor, there's no foundation for

17  this.  I am objecting.  This is just pure speculation.

18            MR. BLOOM:  Excuse me, I am going to cite a portion

19  of the transcript.

20            THE COURT:  All right.  Cite it.

21            MR. BLOOM:  Lacey Phillabaum testified -- I am going

22  to get back to that.  Mr. Fox is going to help me find the

23  reference.

24       What happened is, minutes were taken and they resumed the

25  numbering and there's two page 63s, so I have the wrong page.

1    On direct examination, the very first day that

2 Ms. Phillabaum testified, question by Mr. Friedman -- line

3 four at page 63:

4         "Question:  I am sorry, before the crime, did you

5 leave Olympia?

6         "Answer:  At some point, we went to Seattle.

7         "Question:  Do you recall when that was?

8         "Answer:  In the evening.

9         "Question:  The evening before the arson?

10         "Answer:  Of the arson.

11         "Question:  The evening that becomes the night or the

12 morning of the arson?

13         "Answer:  Yes."

14    Then there's a couple more questions, and then there's a

15 question, just a lead in that's not relevant:

16         "Question:  Can you tell us why?

17         "Answer:  It looks just like a Tupperware that was

18 used to hold the fuel."

19         And then Mr. Friedman asked the question:

20         "Question:  Now, you said on Sunday night you drove

21 up from Olympia to Seattle.  Where did you go when you got to

22 Seattle?"

23    Well, Mr. Friedman wanted to change it to "tonight" rather

24 than "evening."  Why?  Because, I submit to you, that they --

25 in their thoroughness, they knew very well that we had

proof -- or we might have proof -- that Briana Waters was in
Olympia at Ralph's Thriftway at 12 minutes after 7:00.

So Mr. Friedman wanted to lead her into saying that the
meeting was at night so that it could have been that she was
in Olympia -- Ms. Waters -- and could have gotten there Sunday
night rather than Sunday evening.

You have seen evidence of how thorough the FBI is in their
work. It's to be admired. To suggest that they went to
Ralph's Thriftway and didn't get the full package defies
common sense. Based on your experience of what you've seen in
the courtroom about how thorough they are, they got
everything: They got telephone records, they got credit card
records, they got hard disks, they have soft drives,
magazines; they got everything.

We are talking about the debit card, the ATM card, of
Briana Waters. To suggest that they did not have the
Thriftway document defies common sense.

I see that I am going to have to move along a little more
quickly here.

One of the points here seems to be, if you listen to
Mr. Bartlett, it looks like Justin Solondz is on trial here.
Justin Solondz' records, Justin Solondz' phone calls, Justin
Solondz' maps, Justin Solondz' received phone calls. He made
phone calls. He visited -- Justin Solondz is not on trial
here. Briana Waters is on trial here, and I ask you to keep

1  that in mind.

2      Lacey Phillabaum talks about -- somewhere she said, "When

3  we went from Olympia to Seattle, Justin had pre-positioned the

4  devices and the gasoline." Well, when did that happen? The

5  FBI didn't even ask her: Who did that? Were you with him?

6  Did you have two cars? What happened? That's an important

7  part of this event. How did they get from Olympia and how did

8  they get -- what time did they go? Where did they stop?

9      Clearly, the importance of that is, if they left Olympia

10 and they went right to the restaurant where they met Kolar,

11 well, that would be one thing. That would make it a little

12 earlier -- I am sorry, later -- that they could leave, but if

13 they had to stop and they had to go from Olympia to the

14 dumpster to leave the materials and look around, make sure

15 nobody was watching, that would be another 15 minutes -- 40

16 minutes, which means that they would have had to leave Olympia

17 even earlier.

18     Any examination of when they would have to leave Olympia,

19 in order to get to meet Kolar -- as she said 8:00, that was

20 the figure that she gave, and Phillabaum said early evening --

21 they would have had to leave Olympia at 5:00, maybe 5:30 at

22 the latest, given what traffic could be and given what Mr. Fox

23 was able to discover last night, was the actual traffic

24 conditions for that Sunday, May 20th, in that part of Seattle.

25     Construction on I-5, the block parties, if you will, in

the neighborhood -- and they don't want to rush, and they can't speed because they can't get caught because they have gasoline in bags in the trunk of their car or the van, whichever it was.  They also have -- if it was that car -- if it was the Corrina car, whoever was driving it was not Kara Larson, the wife of Corrina.  It was an unauthorized driver, so they couldn't speed; they couldn't get a traffic ticket, so they had to go slowly.

They probably, as Mr. Fox suggested in his questions of the agent today, would have had to take a more roundabout way rather than go on I-5, so they really needed, rather than -- I think the testimony was it was 68 minutes last night that the agent drove -- they need two hours, maybe two-and-a-half hours to get to drop off the devices and to meet Kolar.

What does that mean?  It means that if Ms. Waters, Ms. Briana Waters was in Olympia at 12 minutes after 7 -- and that seems to be undisputed -- that there's absolutely no way she could have been part of this, none.

The testimony of these two women is that they drove to the scene.  Well, that's not exactly true.  The testimony of Phillabaum, they drove to the scene, and then Ms. Waters was in the car and she was the lookout.

Well, the manual that was written by William Rodgers and Stan Meyerhoff, Phillabaum's fiancee, says very clearly that the lookout is supposed to get there ahead of time, either on

1   foot or on bicycle.  That's in evidence.  I think it's called

2   How to Set Fires.  An unpleasant book to read, but it's a

3   manual.  It tells what the people who in fact were involved in

4   these arsons -- not Ms. Waters, but Ms. Phillabaum and Ms.

5   Kolar -- what they were doing, how they did it, and that's how

6   they did it.

7       One of the things that is in the manual that they are

8   supposed to do is make sure the lookout is there ahead of time

9   and go by foot or bicycle.

10      Now, Phillabaum testified that at the scene, right there

11  at the scene, she crouched down with Kolar, and she saw a

12  bicycle and she said to Jen, as she called her -- she talked

13  about the bike and does that mean somebody's here.

14      She actually said at the scene of the fire, "I had

15  conversations with Jennifer Kolar," which makes it all the

16  more ridiculous that Kolar is claiming that she doesn't

17  remember Phillabaum being there.  They spoke to each other in

18  the hush of the morning, right at the edge of the fire, or

19  where the fire is about to be.  They spoke to each other.

20      Phillabaum also said that Avalon looked -- he was in the

21  office and looked for documents.  She first said there weren't

22  any, and then she changed her mind -- there were some.  She

23  also said -- and this is of great importance -- she told them

24  the very first day, February 21st, when she spoke to them in

25  their offices; she said that Justin Solondz and Briana Waters

were the lookouts, two people.  That was her memory.  That's
what she believed had been told to the FBI, because she was
telling them what she believed they already knew, so she gave
them that information.   But sometime between then and the time
you saw her on the witness stand, that changed to Briana
Waters alone.

What does that mean?  Here you do an arson -- she says
it's her only arson.  She's a smart person.  You would think
that she would have a good memory of it.  What does she do?
She says two people, one of whom absolutely was not there --
Briana Waters -- were the lookouts.  Then she changes.  What
does that tell you?  It tells you that she's not a person
who's telling the truth, or at least it's a person as to whom
you have to have a doubt as to whether she's telling the
truth.  You've seen who she is.

We talked about Corrina.  I want to keep it brief about
Corrina.

Briana Waters, after she was approached by Agent Halla in
February two years ago, contacted friends and family and said:
"I look like I am in some trouble."  By the way, when Agent
Halla came there to say to her, "We're investigating whether
or not you were involved in an arson at the University of
Washington in May of '01," Briana Waters testified that she
denied that.  There's been no testimony from anyone to dispute
that.

1    When Briana Waters was accused, not exactly -- asked to

2  cooperate by Agent Halla, one of the first things she did is

3  she got in touch with friends and family and said, "The FBI

4  may come around," and she said specifically to Corrina, her

5  cousin, "I am innocent.  Tell them the truth."

6    Well, they did come around eventually, and he didn't tell

7  them the truth.  He committed the federal crime of lying to a

8  federal officer.  He said he doesn't even know a Briana

9  Waters.  She didn't ask him to do that.  She certainly didn't

10  want him to do that; and he got himself in a big jam; and they

11  wound up eventually putting him in front of a Grand Jury and

12  he testified falsely; and now they really had him.  That's

13  what they call a perjury trap, and that's what happened with

14  Rob Corrina and his wife Kara Larson.

15    Mr. Friedman, the power of the Department of Justice,

16  decided to put them in the Grand Jury, to lock them in and put

17  them in a place where they really were going to have to

18  cooperate, and that's exactly what happened.  They scared the

19  pants off Corrina, and they scared the pants off his wife.

20  Then he comes and tells stories, and it turns out that the

21  story he tells, that the car was rented for Briana Waters at

22  her request, and the timing that he gives which I went through

23  earlier, exonerates her.

24    Remember -- I am going to say it again -- that on Monday,

25  the 21st, he said that he was waiting for her to bring back

1  the car and he was waiting at home.  It could not be.  He was

2  not at home.  He was at work.  So the day he was waiting for

3  her to bring back the car, even if you believe his story, even

4  if she did use the car, which she didn't, had to be Sunday.

5  It had to be Sunday.

6      So the whole story of her taking the car Sunday evening,

7  telling the story about going to the hospital, was all made

8  up.  Heaven knows why he made up that detail, but he was

9  completely, absolutely wrong.  As I said before, if there were

10  any proof at all that Rob Corrina was not at work that Monday,

11  you would have seen that witness.  He was at work that Monday.

12  His story could not have been true.

13      If she did use that car at all, which she does not

14  remember -- understand, when I say that she doesn't remember,

15  I will repeat something that's really critical.  She, unlike

16  the arsonists, does not have a reference point for that

17  weekend or that month.  The only reference she has is April,

18  when she finished producing her video, and a couple of dates

19  when she remembers showing it.

20      In fact, on Corrina's calendar, it was shown on May

21  31st -- Capitol Theater in Olympia -- but she can't remember

22  back four-and-a-half years to events that were of no

23  consequence, of no meaning.  I suppose it's possible to use

24  the car for an errand or not.  She doesn't remember that.  But

25  she certainly didn't take the car, and she certainly didn't

commit an arson.

Now, the mileage that was put on the car -- I think the mileage adds up to about -- between Olympia and Seattle, round trip adds up to about 140 hours, a little less. Well, there's 237 miles on that. How do they explain that?

Well, they say Corrina was penniless. He wasn't penniless. Not at all. He had a job. He was working. I don't know where they came up that he was penniless. Further, about being given money by Briana, well, he now says that he was given $200 at that time by Briana.

There's no record of it being given to him by Briana, but he did say when he spoke to them at first, that just before Briana left to go to the Bay area, she gave him $100 and she gave it to him -- and she remembers giving to him about $100, not for a car, but for food and mostly for telephone.

So it got changed. No matter how you slice it, they are relying on his testimony being truthful. He first told them it was $100 -- it was just before she moved to California, and it didn't have anything to do with the things they say that it had to do with. That was his first statement. They want to take people's first statements, and they say don't pay any attention to that -- just youthful folly.

If that rental car had been used for that incident, for that arson -- I have said this, and I want to say it again -- the FBI lab person would be up there telling you, "I looked at

the rear quarter panel and there was evidence of damage."

Remember, Lacey Phillabaum used the word "damage" and she used the word "dent." She used the word "dent." I am not just talking about paint scraping. When she comes and testifies here, "We were only going five miles an hour," that's just not true. That can't be true. First of all, because she said it seemed "huge." That's the word she used, "huge."

Test the car. Have the FBI get the car. Ask the owner in Wisconsin, is it okay? We'll give you a loner, and we'll have your car back, painted, good as new; let us test the car. If they said no, they get a court order. They could have tested it. They didn't test it. They could have tested it because they knew it's not the car.

How do they know? In part, because Rob Corrina and his wife used the car themselves that weekend. She had us -- she uses -- apparently she wrote two checks for $1.25 twice, once on the 19th of May and once on the 22nd of May, maybe the 21st; somehow she paid $1.25 in checks to use public transportation.

So they used the car that weekend. That's the whole point. They used the car. Now, he had said when he first spoke to them, the reason they got the car was because their bikes were in the shop. That's his memory. Now, it may be that the notation on the calendar later on says "bike to

1    shop." Maybe it just wasn't working on the weekend of the

2    20th and 21st, and maybe he did finally take it in after that,

3    but he said to them that it was about -- the whole purpose of

4    the rental was because our bikes were not operable.

5        Indeed, they did use the car that weekend. They used the

6    car Saturday and Sunday. There are at least three charges --

7    actually, four charges for restaurants and for supermarkets in

8    those two days. They used the car.

9        Why do you think, when they finalized the 302, the FBI

10   report, and as they say in February of '06, Jennifer Kolar had

11   told them -- and we saw it in Agent Halla's notes or Agent

12   Torres' -- I think it was Agent Halla's notes -- it was a car

13   or van. Why do you think they left out van when they

14   finalized and serialized the document?

15       Wouldn't you want to make it accurate? If she said car or

16   van, that's what you would want to write, unless you have a

17   reason for not writing it. They wanted the car. They wanted

18   it to be a car because they wanted this to be the car, because

19   by that time, as of January 5th, they were now focussing on

20   Briana Waters. That's what was happening.

21       So now -- that's why it's safe to say, because Agent Halla

22   seems like a pretty nice guy and his testimony was quite

23   credible -- he said, by the way, she named --  she, Kolar,

24   identified five people. That was his testimony. He didn't

25   say "vague." He said she identified five people.

1     But when the deal went down, he decided there was going to
2  be a little bit of fudging of the FBI reports.  You will see
3  it.  Not because I say it.  You take a look at it.
4  Particularly that February 4th document, where it got changed
5  from Lacey and Briana not together, to Lacey and Briana not
6  good friends.  There's no other explanation for that.
7     What do we know from this so far?  We know that Briana
8  Waters was in Olympia at 12 minutes after 7:00.  We know that
9  given the traffic and the potential traffic, Lacey Phillabaum
10 and the people who apparently committed the arson with her
11 would have had to leave Olympia by 5:00 or 5:30.  That's what
12 we know.  We know that Meyerhoff says not involved.  We know
13 Kolar has lied to you about who was involved in the incident;
14 lied on the witness stand.
15     When we offered the Ralph's Thriftway document, there were
16 no questions.  It just went in.  They hoped you would forget
17 it, but please don't forget it.  It proves conclusively that
18 Briana Waters was in Olympia at 12 minutes after 7:00
19     Ms. Troxel from Randle testified -- one of the first
20 character witnesses -- and she testified as to what happened.
21 She told you the story of the Watch Mountain campaign as a
22 Randle resident, about how meaningful it was to her, about how
23 meaningful it was to associate with Briana Waters and her
24 friends.  Then she was cross-examined, and I actually don't
25 remember right now what the subject matter was, about what she

was cross-examined about, but Ms. Troxel said to Mr. Bartlett:
"You are grasping at straws, Mr. Bartlett." So much of the
evidence that's put before you is grasping at straws.

What moment is it that Briana Waters, in one particular
month, paid the rent for Justin Solondz? What is that about?
That has absolutely no meaning. What is it they wanted you to
believe? Why did they put that into evidence -- that she is
supporting him? I don't get it. Grasping at straws.

Tiffany Tudder. What does that mean, that a college
student said, "I support it, if nobody gets hurt." What does
it mean that Dibee called her -- and obviously there was no
answer; it's a one-minute minimum -- sometime before a
Susanville arson of which she's not accused and sometime after
the Susanville arson? What does that mean? That's just to
taint you. That's just to trick you into thinking that she
was involved in something that there is no accusation she was
involved in.

They tried to impeach her by using a pleading that Mr. Fox
and I had prepared which tries to minimize the impact of the
crime. They said, "This is you, you wrote this, you are
responsible for this." That's nonsense. That's a smoke
screen. That's grasping at straws.

They actually went so far as to suggest that she
orchestrated who comes to court to watch. A class came to
court and when they left in the afternoon, or the following

1   day -- six people came to court.  What does that possibly

2   mean?  Why would they introduce that?  Why would they

3   cross-examine that?  What is that about?

4        The materials -- this is very important.  They want you to

5   believe that it was Briana Waters that sent those.  Let's call

6   them the inflammatory pamphlets to Jennifer Kolar.  There's no

7   fingerprints of Briana Waters on anything but the folder.  I

8   think it's clear that she sent or gave Jennifer Kolar some

9   things to read.  This is the same Jennifer Kolar who has

10  decided to name her, so it was she who gave them the folder

11  with some things in it.  How can they possibly rely upon the

12  proposition that those are the documents that were originally

13  in the folder?  No fingerprints of Ms. Waters on any of those

14  documents.

15       Justin Solondz, yes.  Briana Waters, no.  Justin Solondz

16  is not my client.  He's not on trial.  Briana Waters is here.

17  She's innocent.  She's pleaded not guilty.  She has testified

18  before you.  She didn't have to, but she wanted you to see and

19  hear who she is and what she had to say.  We have produced

20  about a dozen people, wonderful people who have come here from

21  afar to testify to her character.

22       They searched Rodgers' place in Arizona.  They found one

23  document, a reference -- a footnote that had a reference to

24  the Watch video.  That's all they found in connection with

25  Briana Waters.  They had you believe -- they showed you a

document where it revealed approximately 50 phone calls from Mr. Rodgers to the places where Briana was staying, but it covered the period of the entire year of 2001. It comes to about one phone call a week.

The suggestion is he's calling you all the time. Well first of all, that's not true. It was about once a week. But then they do this, and they say there were no phone calls in that period of May 19, 20, 21. Well, if there had been phone calls, they would have said: Ah-hah, there were phone calls. Now they are saying, ah-hah, there were no phone calls. What is it? What does it prove?

In fact there are no phone calls -- it proves that Mr. Rodgers apparently was busy that weekend and he may very well have been busy committing an arson with Lacey Phillabaum and Jennifer Kolar, but he was not committing an arson with Briana Waters because she doesn't commit arson. She didn't.

She didn't do crop pulls. She didn't do girdling. There's been no proof whatsoever, not a single word that she did anything other than what she told you she did.

They went to her website and cross-examined her website. Talk about grasping for straws. Aren't you making money off of this case? How ridiculous.

She told you, and she didn't have to tell you -- you can imagine what her life has been like since the day Agent Halla showed up. Agent Halla was nice, polite and professional.

1  But to understand that you are accused of a serious crime that
2  is going to put you -- I guess I can say it because it's out
3  there -- in prison for a minimum of 35 years, what do you
4  think her life has been like?  Do you think she's making money
5  off her website?  How ridiculous.  Give us a break.
6      The map at Justin's.  There was a lot of maps at Justin's.
7  They pick out that map and they say, this is the map that's
8  going to prove what?  Something about Ms. Waters?  Of course
9  not.  That's called grasping at straws.  They see some
10  literature at Justin's, and they position the magazines in
11  such a way so that they can take the picture.  They put the
12  anarchy magazine right out in front.
13      This literature that -- Mr. Bartlett himself took a yellow
14  highlighter, and he looked at the literature that Jennifer
15  Kolar had given to them, saying this came from Briana Waters;
16  and he took a yellow highlighter and he picked out the stuff
17  that was most inflammatory, where he would hope that you would
18  say, oh, this Briana Waters, she wants to burn down the Statue
19  of Liberty; she wants to burn down Disneyland.
20      How dare he attribute that.  First of all, the source of
21  it was from a woman who's a liar, Jennifer Kolar, and how dare
22  he -- no question that he's trying to say to you that this is
23  what Briana Waters thinks about it.  That's what he's trying
24  to say to you.  That's false.  That's fraudulent.  That's
25  dishonest.  You can't let that happen.  He thinks you will be

1    fooled.  He thinks you aren't sophisticated.

2        If he shows you this stuff, they will believe it, or maybe

3    some of them will believe it.  It's not Briana Waters.  You

4    heard who she is.  You saw who she is.  She subjected herself

5    to cross-examination.  I wish I can say more.  My time is

6    limited.

7        Could I get another 15 minutes and then that will be it?

8    May I make that request?

9            THE COURT:  Go ahead, Mr. Bloom.

10           MR. BLOOM:  Thank you.

11           THE COURT:  Go ahead, but please close it down.

12           Mr. BLOOM:  I will eliminate some stuff.

13           THE COURT:  Please.

14           MR. BLOOM:  Thank you.  I appreciate it.

15       What is it that Ms. Phillabaum said about a rental car?

16   She didn't say it was a cousin.  She said it was an aunt, an

17   older woman.  Where do you think she got that?

18       I suggest you are all familiar with the game, party game

19   called "telephone," where a message is passed through a lot of

20   people.  By the time she got the information of what she

21   thought the FBI knew, she decided what she was going to say to

22   them: that it was an aunt.  That's what she had heard.  That's

23   what she had made up.

24       She was getting information, and legitimately so, from her

25   father who admittedly -- the FBI has told you that her father

1    was called, and surely he was given some information about

2    what it was about.

3        When Lacey Phillabaum testified, she was a person who was

4    very much attentive to detail.  When she looked at the

5    document we gave her that had to do with the New York Times

6    reporter, Mr. Carr, she said -- she only looked at it for a

7    little while, and she said the e-mail address is wrong here.

8    She's no fool.  She understands it.

9        She had the information wrong.  The reason she had it

10    wrong is because she made it up.  That's what happens when two

11    people tell a story that's not true.  That's how they get

12    caught.  They make up details, and Mr. Bartlett has

13    acknowledged to you there are some discrepancies.  One thing

14    that makes discrepancies -- and I would have to agree that

15    people see things and remember things in different ways, but

16    the discrepancies here don't fit that description.  The

17    discrepancies are major.

18        What about the Rodgers telephone?  Ms. Waters was asked by

19    Mr. Rodgers to buy a cell phone for him.  She did, because she

20    did him a favor, and she explained who he was, what the nature

21    of their relationship was: that he was a depressed person and

22    she agreed, as a friend, to buy him a telephone.  Whose name

23    did she buy it in?  Not some phony name.  Not Reba.  Not

24    Diver.  Her own name.  She wrote her own checks, with her name

25    printed on it.  That's not a deception.  That's not some

1    dishonest act.   That has nothing to do with arson.   It has to

2    do with a friendship.   Another grasping at straws.

3         Lacey Phillabaum wrote an e-mail to a friend of hers, and

4    here's what she said.   She said, "The Feds overcharge, they

5    force plea deals; taking a case to trial is not a right, but a

6    very risky proposition."   That's what she wrote to a friend of

7    hers.   That's what we've seen here, and we certainly see it's

8    a risky proposition.

9         When you see it, look at the energy they have put into

10   trying to put this woman in prison for 35 years.   What can

11   that possibly be about?

12        What is that about?   Yes, they overcharge.   They force

13   plea deals.   They forced a plea deal with her.   They forced a

14   plea deal with Jennifer Kolar.   Lacey Phillabaum knows it, and

15   that's what she told her friend, and that's what she has in

16   effect told you.   Please keep that in mind.

17        That's what they do.   Look at their power.   Look at what

18   they did with Rob Corrina and Kara Larson.   They put them in

19   the Grand Jury.   In another setting, they would simply be

20   called bullies.

21        Briana Waters supposedly wanted the car, asked Corrina to

22   rent a car so that she could use it with her associates in an

23   arson.   Well, Corrina told you, the day that she was supposed

24   to show up, she didn't even show up.   Does that seem

25   consistent with wanting to use the car, to secure the car, to

1  get the car; secure it in advance so you can be sure you have

2  a car?  She doesn't even show up.  Obviously, she had nothing

3  to do with the car.

4      If indeed the car was supposed to be used for an arson,

5  you would show up a day early, rather than a day late.  How

6  can they possibly say that this car -- given what Mr. Corrina

7  said, no, he didn't rent the car at the request of Waters.  He

8  didn't.  That's what happened.

9      Then they got him to change his mind, and then they had

10 him in the perjury trap, and that's why he was here, looking

11 very unhappy and being very unhappy.

12     I am sorry to take time here, but I am trying to go past

13 some items here that I think I can skip.

14     I want to talk about Lacey Phillabaum again.  She came out

15 with the crude language the afternoon of her

16 cross-examination.  Not only was it crude, and not only was it

17 inappropriate, but it's the kind of thing -- the act that she

18 denied -- just the way it came out, it had what you would call

19 the ring of truth, that when she said that, you know that's

20 exactly what did happen.

21     Remember the testimony of Mr. Wake, the very brief

22 testimony of Justin's landlord?  He testified about the

23 structure of the cabin, that there was a bed, that there were

24 places to sit other than the bed.  Well, why would she sit on

25 the bed?  Of course she sat on the bed because of the obvious.

It was a plan.  Why did she go to the cabin at all with Justin?  Obviously, it's not just that she had relations with him.  It's just that she wasn't forthcoming to tell the truth.

When she was first asked, "Do you have any ill will towards Briana Waters?"  "Absolutely not; I have sympathy towards everybody."  Then she repeated no, no, no.  Then she got snagged, she got caught, and then she got further caught when it was revealed that she was in his bus with him and she realized she better come up with something, and then she started to remember.

Lacey has admitted that she was a drug abuser.  She's admitted to -- I think she called it a marijuana addiction.  She's admitted that she used the drug ecstasy.  She's followed this case.  She has read the pleadings in this case.  She's very smart.  She has been able to adjust her testimony, adjust her story based on what she reads about this case.

That is how -- that is who she is.  She came in trying to look pathetic and sad and beaten down and remorseful, but she eventually -- toward the afternoon, she answered a question with words that I didn't understand, that were beyond my comprehension, beyond my vocabulary.  She's an extremely smart person who was playing dumb.

Eventually, she gave up the act.  I asked her about Stan Meyerhoff, and Stan Meyerhoff, just a few weeks after she, Lacey, decided to name Briana Waters.  That was the time that

1  Meyerhoff looked at Briana's picture and said "not involved,"

2  and I asked her about that, and her answer was:  "Stan has a

3  different memory of what happened than I do."

4     Well, Stan already had his deal.  He had made his deal on

5  December 7th, or he began to make his deal on December 7th,

6  the day he got arrested.  She was now making a deal, and she

7  had to remember it differently than Mr. Meyerhoff because she

8  couldn't help herself unless she came up with a name that she

9  thought would please the FBI.  That's what happened here.

10    Remember, the key concept here is that she gave them

11 names, information that she thought they already had.  She

12 finally came around to acknowledge that.

13           THE COURT:  Final words, Mr. Bloom.

14           MR. BLOOM:  I am sorry.

15           THE COURT:  Final words.

16           MR. BLOOM:  Thank you.

17    You are the conscience of the community.  I ask each of

18 you to bring your conscience to these deliberations.  This is

19 about a very important matter.  It couldn't be more important

20 to Briana Waters and the people around her, and it can't be --

21 let me put it this way.  If you find that a person who is

22 innocent is not guilty, everybody wins.  Everybody in this

23 room wins.  Everybody in this country wins.  If you do the

24 right thing, if you follow the principles of not convicting

25 anybody unless there's credible proof beyond a reasonable

1    doubt, you will have served everybody, and it will be an event

2    you will never forget, and you have done the right thing.

3        I ask you to really bring your conscience to this, and

4    don't be overwhelmed by the nature of the setting, by the

5    nature of the accusations, by the federal government.  It

6    isn't right.  It isn't fair.  It isn't just to convict this

7    woman who did not commit this crime.

8        Thank you.

9            THE COURT:  Mr. Friedman, you are giving rebuttal?

10           MR. FRIEDMAN:  In light of the hour, could we restart

11   in the morning at 9:00 and do that?

12           THE COURT:  Let me ask the jury.  Are you receptive

13   to getting the rest of this case?  Tell me how long you are

14   talking about here.

15           MR. FRIEDMAN:  Probably half an hour.

16           THE COURT:  Well, first of all, let me give you a

17   quick break and have you back here.  Leave your books on the

18   chair and don't discuss the case, and we'll get to this.

19       (Jury not present.)

20           THE COURT:  You may be seated.

21       What I want to do is get this case completed today so that

22   this jury can go to work in the morning.  So I would ask you

23   to think about what you need to rebut and do that.  Let's take

24   a 10 minute break and have them back in here.

25           THE CLERK:  All rise.  Court is in recess.

1    (Afternoon recess.)

2    (Jury not present.)

3        MR. BLOOM:  Thank you for the extra time.

4        THE COURT:  Are we ready?  Bring them in.

5    (Jury present.)

6        THE COURT:  You may be seated.

7    Mr. Friedman.

8        MR. FRIEDMAN:  Thank you, Your Honor.

9    Good afternoon, Ladies and Gentlemen.  There's a list of

10   names on the screen in front of you:  Jennifer Kolar, Lacey

11   Phillabaum, Robert Corrina, Ted Halla, Tony Torres.

12      To believe what Mr. Bloom wants you to believe, to accept

13   what he wants you to accept, to conclude that the Defendant is

14   innocent of the charges in this case, you have to believe that

15   all of those people are lying, that they all came in and lied

16   to you.  Not one, not two, not three or four -- all five of

17   them.  You have to believe that they worked together; that

18   they conspired together to frame this Defendant.

19      Jennifer Kolar.  Jennifer Kolar, who told you that she

20   really liked the Defendant.  According to the Defendant,

21   Jennifer Kolar, who had a strong connection with the

22   Defendant, and yet now when she needs to pick someone to

23   frame, she picks the Defendant.

24      Lacey Phillabaum.  Lacey Phillabaum, who testified so

25   compellingly for nearly a day on cross-examination, who told

1  you that she felt a great deal of compassion for everyone

2  involved in this process, including the Defendant, and yet

3  she's lying to frame the Defendant.

4       Robert Corrina, the defendant's cousin.  Mr. Corrina told

5  you that the first time the FBI came by, he pretended not to

6  recognize a photo of her.  He did that in an effort to protect

7  her.  He said he didn't think.  That's just what you do to try

8  to protect your family.  And now Mr. Corrina is lying.  In the

9  Defendant's words, he's making things up to frame her.

10      Agents Halla and Torres.  They have never heard of Briana

11  Waters.  They had never heard that name until January 5th when

12  Mr. Martin called to report that name to the Government.  This

13  isn't someone they were looking to convict.  This isn't a

14  long-time target.  And yet, you have to believe that they both

15  also joined in the conspiracy to frame Briana Waters.

16      There's, of course, been no evidence of such a conspiracy.

17  It makes no sense.  It's contrary to all the evidence in the

18  case.  It's contrary to all the evidence which proves beyond

19  any doubt that this Defendant did exactly what she's charged

20  with, and that she's guilty of the crimes with which she's

21  charged.

22      You've already -- we have gone through the evidence a

23  couple times, but let me ask you to take a look at it in a

24  different way, through a different lens, to look

25  chronologically at what happened in this case, the

 1    investigation as it went forward.  If you do that, you will
 2    see that there's no way in which these witnesses could provide
 3    this information.
 4         Each witness, as they came in -- no way unless it were
 5    true -- each witness as they came in provided information that
 6    was subsequently corroborated by physical evidence, physical
 7    evidence they could not know existed if they were not telling
 8    the truth.  This investigation started at the time of the UW
 9    arson in May of 2001 -- or the investigation of that fire, and
10    for four-and-a-half years, there was almost no progress,
11    almost no break.
12         Then in December of 2005, Jennifer Kolar came in for a
13    meeting with the Government, and she admitted that she had
14    participated in that arson and she provided some information
15    about the arson.
16         You've heard a great deal about that meeting and the
17    agent's notes.  You've seen the agent's notes.  You've heard
18    about the report.  The central thing -- and there's no dispute
19    on this -- she didn't identify Briana Waters in that first
20    meeting, but two weeks later her lawyer called and said that
21    she had recalled the identity of one more of the people
22    involved in the arson, Briana Waters.
23         That information has been corroborated by other physical
24    evidence developed since that time.  Ms. Kolar's computer
25    contains old files that corroborate what she had said.

There's an address book that has entries for Avalon, for other
people.  There's a calendar that shows a meeting at the
library in Olympia, a meeting that the Defendant was
instrumental in arranging.

Most tellingly, there's Exhibit 614, the folder of
documents that the Defendant gave to Jennifer Kolar back in
2001; the articles that she wanted her to read.  When
Ms. Kolar came in, she didn't recall that she'd been given
that document.  It had been stored away for four years in a
tub of documents.  She turned it over to her lawyer, and her
lawyer in time turned it over to Agent Halla, and he looked
through and he found the folder with the note signed by her,
and the documents, and he sent those to the lab.

The folder came back -- the report on the folder came back
saying there was a fingerprint on there, and it was the
Defendant's, and the articles inside had the fingerprints of
her boyfriend, Justin Solondz.  Ms. Kolar didn't -- when she
came in, in December, when she passed Briana Waters' name on
to the Government, she didn't know that that folder would be
found in the tub.  She didn't know that it would have the
Defendant's fingerprints.

She didn't know what her old computer files would say,
files she hadn't thought of for years.  All of that evidence
is evidence subsequently found that corroborates what Jennifer
Kolar told the Government about Briana Waters' participation.

1    Moving on to mid February, by mid February, Agent Halla

2    had concluded that Lacey Phillabaum was involved.  Agent Halla

3    contacted Lacey Phillabaum, and Lacey Phillabaum came in

4    within three days and she also provided information.  She

5    provided information implicating the Defendant in this crime.

6    There's been a lot of suggestions thrown about, a lot of

7    aspersions cast by Mr. Bloom, that somehow Lacey Phillabaum

8    and Jennifer Kolar are working together, that somehow the

9    Government leaked the information to Jennifer Kolar, one

10   theory after another, all of them inconsistent, all of them

11   unsupported by any evidence in this case.

12   There's no connection in the phone records between

13   Jennifer Kolar and Lacey Phillabaum.  They both told you they

14   were out of touch with each other.  There's no suggestion, no

15   credible suggestion, that the Government actually provided

16   information to Lacey Phillabaum.  Agent Halla testified that

17   no such information was provided, and Lacey Phillabaum

18   testified to that effect herself.  She was asked a couple of

19   questions.

20   She was asked:  "Question:  Did you receive any

21   information from the Government about what happened at the

22   University of Washington arson?

23   "Answer:  No.

24   "Question:  Do you have any reason to believe that

25   your attorney received any information from the Government

about what happened at the University of Washington arson?

"Answer: No."

So even today's newest theory that somehow the information was given to her father, her father is her attorney and her father does what any father would do and leaked the information to her; there's nothing to support that. In fact, the clear testimony given in this case, the testimony of Agent Halla and of Lacey Phillabaum, is that that didn't happen.

Lacey Phillabaum's testimony, like Jennifer Kolar's -- Lacey Phillabaum's account is corroborated by physical evidence, physical evidence that she could not have known would exist to corroborate her account if she were not telling the truth.

At the time that Lacey Phillabaum came in, the Government didn't know where the Defendant was living at the time of the arson. Yet Lacey Phillabaum provided the sketch -- you've seen the sketch, Exhibit 1013C, I believe -- of the house in which the Defendant was living with a separate outbuilding in the garage in back. In time, when Agent Halla found it, that turned out to be exactly where the Defendant was living at this time. That's the place where the bombs were built for the University of Washington attack.

Even more important, Lacey Phillabaum said that the Defendant was the person who had arranged for a rental car.

She recalled that the Defendant was having a relative, and she
referred to her as an aunt, and Lacey Phillabaum understood
that that term was used a little loosely, not necessarily an
aunt, but that she had this aunt get a rental car to be used
in the University of Washington arson.

If that weren't true, Lacey Phillabaum couldn't have had
any knowledge of it.  That was the first the Government had
heard of it.  The Government didn't have any records of a car
like that.  The Government couldn't leak that to Lacey
Phillabaum, and Jennifer Kolar didn't know what the source of
the car was, so that's clearly not coming from her either.
It's not a conspiracy between the two of them.

Agent Halla took that piece of information, he spent most
of a year trying to figure out who it was that the Defendant
knew, who her relatives were.

MR. BLOOM:  I am sorry, but there's some statements
here, materials that are not in evidence, and I would object
to that.

THE COURT:  All right.

MR. FRIEDMAN:  Thank you, Your Honor.

He spent most of a year trying to figure out who might
have rented this car and eventually, through hard work, he
found the car rental record: a rental by Kara Larson, the wife
of Robert Corrina, the Defendant's cousin, for exactly the
weekend when this arson was committed.

If Lacey Phillabaum was not telling the truth about what happened, there would be no way that she could know about that rental, and there would be no way that that rental would even have happened.

The fact that after looking diligently, Agent Halla was able to come up with a record that corroborated exactly what Lacey Phillabaum told him is the proof that what you have heard is true: The Defendant was a participant in this arson, that she was the person who rented the car.

Moving on to Mr. Corrina, he also provided information that subsequently corroborated, by physical evidence, about which he did not know at the time.

When Mr. Corrina came in and was interviewed and indicated that the Defendant had asked him to rent a car and he had rented a car, and he explained how she had come on the day before it was due back, the Sunday, taken the car with the story about needing to go to the hospital and not reappearing until the next day, he had just been presented with those records.

He did not have his old bank records. He didn't know that those records, which the Government obtained subsequently, would show the payment for that -- the $200 payment -- that they would confirm his account -- that this was not a rental for him, this was a rental for the Defendant, a rental that he did at her request so that she would have a car to use for

1    this arson.

2        Mr. Corrina also had not looked back at his calendar and

3    subsequently provided his calendar, and that has a note on it,

4    "call Budget," a week after the rental.   The only explanation

5    for that is another fact that Mr. Corrina knew nothing about.

6    Mr. Corrina didn't know that there had possibly been a scrape

7    or minor accident to the car.   He's not in -- he has no

8    contact with Jennifer Kolar or Lacey Phillabaum.   They move in

9    completely separate worlds.

10       There's no suggestion that Agent Halla provided any

11   information like that to him.   Yet, he provides a calendar

12   that says "call Budget."   As he looks at that, he recalls that

13   that was because Briana Waters, when she brought the car back,

14   expressed some concern about damage, and that he was calling

15   Budget to find out if there was in fact any damage to the car

16   that had resulted in an extra charge.

17       So the calendar, the bank records, are physical evidence

18   that Mr. Corrina could not have known about; they are details

19   that he provides that match with what the other witnesses have

20   said, that he could not provide if he were not telling the

21   truth.

22       When you look at all of the evidence, it all fits

23   together.   Each of the witnesses provide additional

24   information that they could not provide if they were not

25   telling the truth.   It's information that could not come from

1   the Government because the Government didn't know it at the

2   time of the interview. It's information that could not come

3   from other defendants -- other witnesses who had already come

4   in and agreed to cooperate because those witnesses did not

5   know that information.

6      So the physical evidence corroborates what Jennifer Kolar

7   says. It corroborates what Lacey Phillabaum says. It

8   corroborates what Robert Corrina says, and it corroborates it

9   in a way that proves that what they are telling you is what

10   happened.

11      I want to address a few of the things that Mr. Bloom said

12   when he spoke to you earlier. He referred to Stan Meyerhoff

13   again and the episode on March 17th of 2006 where he's shown a

14   picture of the Defendant and says "familiar," "not involved."

15      As you already heard, before that, back in January,

16   Mr. Meyerhoff had described the Susanville arson, and he had

17   said that one of the participants was a blonde violinist from

18   the Bay area. He had described the Defendant before he was

19   ever shown a picture. I submit to you that Mr. Meyerhoff is

20   not here. He's not been called as a witness, so you may want

21   to put the evidence about what he said aside. But if you want

22   to consider it, it's evidence that suggests that the Defendant

23   was involved in this conspiracy, not evidence that exculpates

24   the Defendant.

25      Mr. Bloom also questioned why the Government had not

called Stan Meyerhoff. The Government called the witnesses
with the relevant information in this case. Five people
participated in the University of Washington arson. William
Rodgers is dead. He committed suicide shortly after arrested.
The Defendant's boyfriend, Justin Solondz, at the time is a
fugitive.

The two remaining people who knew about this, who were
there, are Jennifer Kolar and Lacey Phillabaum, and the
Government called them, and they testified to you and they
told you what happened, and they identified the Defendant as
one of the people who was there with them.

Mr. Meyerhoff is available to both sides. If the
Defendant actually thinks that he would exculpate her, that he
has important evidence that would prove that she was not
involved in this, the defense is free to call him. The
Government has no lock on him. The Government called the
witnesses who were there, who committed the arson at the
University of Washington with the Defendant.

Mr. Bloom talked about Sarah Wald. He asked why the
Government didn't cross-examine Sarah Wald. Sarah Wald, if
you remember, is the witness who said that she had been at a
meeting in Portland in early February of 2001, and that both
the Defendant and Lacey Phillabaum had been there, and the
implication is well, they were both there so they must have
met there, and so Lacey Phillabaum is lying when she says that

1   she met the Defendant on May 12, 2001 at a Denny's restaurant

2   in Olympia.

3       If you remember, it was Ms. Wald's testimony that there

4   were 20 to 30 people at that meeting.  Lacey Phillabaum was a

5   leader at the meeting, a facilitator; she was someone quite

6   visible to other people.  There was no similar testimony about

7   the Defendant.  There was testimony that she played the fiddle

8   that night.  There wasn't any testimony that Lacey Phillabaum

9   was around at that point, that Lacey Phillabaum was there for

10  the evening, or anything like that.

11      So the only thing that Sarah Wald tells you, the only fact

12  that you can take from her testimony, is that she was at a

13  meeting in Portland attended by 20 to 30 people several months

14  before the episode, the incidence of May 2001, and that Lacey

15  Phillabaum and the Defendant were both there.

16      She didn't provide testimony about them having any

17  contact, about seeing any contact, about seeing any

18  conversation.  Even if both of them were there, there's no

19  reason to think that Lacey Phillabaum would necessarily

20  remember that.  Lacey Phillabaum could easily be at a meeting

21  with 30 people and not recall it.  So for her, when she meets

22  the Defendant at a restaurant with five people in preparation

23  for the arson several months later, she believes she's meeting

24  her for the first time.  The Government didn't cross-examine

25  Sarah Wald because nothing about what she had said disproved

1　in any way what Lacey Phillabaum told you.

2　　　You heard a lot about Lacey Phillabaum.  Mr. Bloom -- it

3　ranged from -- it ranged all across the spectrum.  Mr. Bloom

4　made a big point again about how Lacey Phillabaum was dressed

5　when she came here, that it was all an act, that she wanted to

6　wear street clothes, and the Government said no, don't do

7　that, we want you to look pathetic, we want you to look

8　sympathetic to elicit sympathy from the jury.

9　　　Lacey Phillabaum addressed that when she was on the stand.

10　She said she had asked to wear street clothes and that she had

11　been told, you are in prison, you should look like you are.

12　If you try to look somehow different, you are trying to fool

13　the jury.  There was no attempt to elicit sympathy, there was

14　no attempt to do anything improper.  She was told to appear --

15　she was encouraged to appear as she was.  If she were out of

16　prison like Jennifer Kolar, she would have worn street

17　clothes.

18　　　Mr. Bloom said that Lacey Phillabaum had admitted having

19　sex with Justin Solondz, or basically admitted having sex with

20　Justin Solondz.  I think if you recall the testimony -- and

21　what Mr. Bloom and I say about it really isn't the test, your

22　memory is the test -- you won't find that Lacey Phillabaum

23　basically admitted that.  You will find that Lacey Phillabaum

24　said she was in Justin's cabin/home, which is a very small

25　home, very briefly.  She denied having sex.

1    As she continued to be raked over the coals -- as
2  Mr. Bloom continued to question her, to ask the same thing
3  again and again to suggest that she had done this and crossed
4  the line, she snapped back at one point, but she never
5  admitted having sex with Justin Solondz, and to suggest that
6  she did, or that she basically did, mischaracterizes what she
7  said in this courtroom.

8    On a similar point, Mr. Bloom said Robert Corrina said his
9  wife used the rental car to take him to work that week.
10 Again, that mischaracterizes what the evidence was in this
11 case.  Mr. Bloom suggested that.  He suggested it with his
12 question.  But Mr. Corrina's answer was not that she used the
13 car to take him to work that week.  They had rented a car the
14 year before for Christmas, and he referred to that as possibly
15 a car in which that had happened.

16   So Mr. Bloom's question:

17       "Question:  In fact, there came a time when you had
18 that car, that Kara took you to work in that car, on one
19 particular day; isn't that true?

20       "Answer:  I don't remember.

21       "Question:  Do you remember in reconstructing the
22 events with your wife that she reminded you that she took you
23 to work in that car one day?

24       "Answer:  We couldn't figure out if that was the car
25 or if it was a car that we had rented for Christmas vacation."

So again, the description you've heard of the evidence is not what the evidence was. Mr. Corrina did not say he'd been taken to work in that car or that he had gone to work in that car. Mr. Corrina's testimony was that he was home that day. He didn't recall why, but that he was home that day.

Mr. Bloom talked a little about the Conger house, and he referred to the testimony of Haila Silvertrees -- that's Ocean's Mother -- and of Heather Moore, and he suggested that their testimony showed that what Lacey Phillabaum had said about seeing the Defendant playing the violin in the kitchen one day, that that couldn't be true, and if you look back at the testimony you will see that that's not the case either.

Each of them did describe some work in the kitchen over the course of several months, but neither of them was clear about when precisely that work took place. Neither of them suggested that it was tremendously extensive work. Heather Moore, I believe, talked about replacing a countertop.

There's nothing in what either of them said that shows the Defendant could not have been playing the violin in the kitchen on the weekend in which Lacey Phillabaum was at the house.

Mr. Bloom talked about a check to Bill Wake. He said, why are they showing you that? What are they trying to hint at? What improper purpose are they pursuing? If you remember, Mr. Wake is Justin Solondz' landlord, and one of the pieces of

1    evidence that you have is a check written by Briana Waters to

2    him to pay the rent for Justin Solondz.

3         The Government is not trying to show anything improper by

4    doing that.  The check is relevant in two ways.  One,

5    Mr. Wake's memory of exactly when Justin Solondz rented that

6    cabin from him is not precise.  He says it was for a period of

7    several months.  When he sees the check, he knows that's the

8    time.  So the check establishes when the rental took place.

9    It also shows some connection between the Defendant and Justin

10   Solondz.  There's nothing improper about that.  The Government

11   is not suggesting anything more sinister than the fact that

12   this is one more piece of evidence of a connection between the

13   two of them.

14        One of the most astounding things we heard was the

15   suggestion that the Government already had the Ralph's

16   Thriftway record.  If you remember, Mr. Bloom said he thought

17   the Government had it, and the evidence is exactly to the

18   contrary.

19        Agent Halla was asked about that.  He explained all the

20   steps that he went to with Ralph's to try to gather records,

21   about getting old data tapes for an obsolete system and going

22   to considerable effort to get data pulled off of those to find

23   out everything possible from Ralph's, and that he had failed

24   to do that and that he had not seen this record before trial.

25        Mr. Bloom's evidence to the contrary, the basis for his

1  claim that the Government had this record, is apparently the

2  fact that at one point in the question I referred to -- in a

3  question to Ms. Phillabaum, I referred to her driving to

4  Seattle during the evening of May 20th, and six or seven

5  questions later I used the word "night."  Somehow this is

6  evidence that the Government had this record, that we hid this

7  record, that we knowingly concealed it for some purpose.

8        Ladies and Gentlemen, I talked a moment ago about the car

9  rental and how important that is as corroborating physical

10 evidence in this case.  Every aspect of that rental provides

11 evidence that corroborates the testimony that you've heard

12 from Jennifer Kolar and Lacey Phillabaum and from Robert

13 Corrina:  the timeframe, the mileage, the payment, the

14 subsequent bank records.

15       The car is rented midday on May 18th, a Saturday,

16 approximately a day before the arson.  You saw records in this

17 case on cross-examination -- I am sorry, it's the 19th.

18       You saw records on cross-examination of what was done with

19 the car on the first day or so.  Mr. Corrina told you that

20 they took it downtown, they went to get lunch at a local

21 restaurant, probably did that again Sunday.  He lives a few

22 miles from downtown; we are probably talking about 20 or 30

23 miles to go in and out of town a couple times.

24       Mr. Corrina didn't go anywhere else.  He didn't take any

25 trip.  There's no charges on his credit card anywhere further

away than downtown Olympia, and his bank records which you
have and his credit card statements will show you that he
didn't have a tremendous amount of money.  This is a $200
rental.  He had no real purpose for the rental for himself,
and he obviously doesn't take the car anywhere.

It may be a minor perk to him to be able to use it to
drive downtown once, but it's not a rental that he's going to
make for that purpose.

Mr. Corrina told you that the next day, Sunday, the
Defendant showed up at his house, and she said that she felt
ill and she needed to go to the hospital.  She wanted to take
the car, and that Justin Solondz was nearby and he would come
and he could drive her to the hospital.

They left the house in the evening.  You know from the
testimony of Jennifer Kolar and the testimony of Lacey
Phillabaum what ended up happening with that car.  You know
from the testimony of Lacey Phillabaum that they met the other
people involved in the arson in Olympia, including William
Rodgers.

The record that we have here is a record that shows that
at 7:12, the Defendant stopped in the Ralph's Thriftway a
couple blocks from Williams Rodgers' house and purchased
approximately $13 worth of something.  I suggest to you that
four people are about to drive up to Seattle; it's probably
some soda and chips for the road.

1    The testimony concerning when they arrived in Seattle,
2  Mr. Bloom referred to 8:00.  Actually, Jennifer Kolar had
3  initially estimated 8:00 or 9:00.  On direct, she said the
4  five of us who were involved met at the grill, probably around
5  9:00 at night, 8:00 at night.  On cross-examination, she was
6  asked questions again about it, and she said approximately
7  8:00.
8    But considered as a whole, her testimony suggests
9  somewhere in the 8:00 to 9:00 region.  Leaving Olympia at 7:12
10  is entirely consistent with that.  There's no reason to
11  believe that that car went anywhere else, that it went to the
12  dumpsters before it went to the Greenlake Bar & grill.  If you
13  leave Olympia at 7:12, according to the testimony you heard
14  this morning, you'd be in Seattle at the Greenlake Bar &
15  Grill, on a normal night, at 8:20.
16    You heard a lot of testimony suggesting that traffic was
17  bad, there was road construction, things like that.  Even if
18  that slowed you up a few minutes, first, it's probably not
19  something they planned on, they probably figured they'd be
20  there around 8:20 and, second, nothing inconsistent was asked
21  about planning to meet there at 9:00.
22    So that car rental record does nothing to show that the
23  Defendant is not part of this conspiracy, that things did not
24  happen in exactly the way Jennifer Kolar and Lacey Phillabaum
25  said it happened.

1     I submit to you that the real proof is what happened with

2     that car rental record, because although the Government didn't

3     have it before trial, the defense did.  If what we were

4     talking about is a plane ticket to New York, proof that the

5     Defendant was in New York, don't you think they would have

6     called us a minute after they got it and said:  "We've got the

7     proof our client is innocent.  We don't need to have a trial."

8     But what actually happened with it is, the defense waited

9     and sprung it at trial in an attempt to somehow ambush one of

10    the witnesses to find something inconsistent.  The fact that

11    that record was not presented when it was found is the

12    clearest proof that it is not in any way evidence that the

13    Defendant is innocent.  It's entirely consistent with her

14    being guilty.

15    In addition to the time records, the mileage on this car

16    also fits exactly what it should.  Mr. Corrina probably used

17    approximately 30 miles just going downtown and back.  I think

18    his testimony was that it was about 9 miles from his house to

19    downtown.  That may be incorrect.

20    The round-trip to Seattle is approximately 130 miles.  If

21    you add in a round-trip from there to the University, probably

22    two round-trips if one is to stash equipment after the initial

23    trip up to the Greenlake Bar & Grill, you would end up very

24    near the mileage that we have, just over 200 miles.

25    The payment also shows that what you've heard about that

1  car is what happened with it.  Justin Solondz -- if you look

2  at his bank records -- and Mr. Bartlett showed you those

3  earlier -- there was a $200 cash withdrawal on May 19th --

4        MR. BLOOM:  Excuse me, it is not in evidence.

5        MR. BARTLETT:  It is in evidence.

6        MR. FRIEDMAN:  Thank you, Your Honor.

7        MR. BLOOM:  I am mistaken then.  I am sorry.

8        MR. FRIEDMAN:  If you look at the bank records, you

9  will see a $200 cash withdrawal that morning.  The rental

10  charge is $187.87.  So that $200 cash withdrawal matches

11  almost perfectly.  The other interesting thing is, if you look

12  at Justin Solondz' bank records, $200 isn't a normal amount

13  for him.  That's the first time that year that he's withdrawn

14  $200.  $200 is exactly the amount of money that gets deposited

15  into Mr. Corrina's bank account a week later.

16        So Justin Solondz is pulling out $200 to cover the cost of

17  the car rental.  Either he or the Defendant give it to

18  Mr. Corrina.  A few days later, Mr. Corrina makes it to the

19  bank and deposits the money.  Financial records show that that

20  is why Mr. Corrina rented this car.

21        He didn't have the money to be splurging on a car for no

22  real purpose, for himself.  He's being paid for the car, to

23  cover the cost of the car rental, because that rental is not

24  for him; it's for someone else.  As he tells you, it's for the

25  Defendant, and it's a car that she took that night, and she

1   took it to commit the arson at the University of Washington.

2        Over the last couple of days, Ladies and Gentlemen, we

3   heard from a number of witnesses who came in and talked to you

4   about the Defendant's character -- her character for

5   nonviolence -- and they said a number of other things about

6   her, generally very complimentary.  The Government -- that's

7   important evidence, as Mr. Bartlett said.

8        Obviously, you will consider that.  But none of the

9   evidence that you heard from the Defendants involved facts

10  that showed or tended to show the Defendant was innocent of

11  this crime.  There was no factual evidence that rebutted or

12  undercut the Government's case, the Government's evidence.

13       One thing that was interesting about that evidence is how

14  similar it showed the Defendant was to Lacey Phillabaum.  You

15  heard a lot of evidence about Watch, about being a peaceful

16  activist.  If you think back to Lacey Phillabaum's testimony,

17  she told you that she spent years working for Oregon Tilth,

18  which is an organic certification organization.  Basically,

19  pro environmental work and peaceful and good work.

20       Both of them moved from there or became involved in

21  actions a little less innocent.  Lacey Phillabaum told you

22  about a plan to take over Cargill's offices as part of an

23  environmental protest, and you've heard the evidence about

24  what happened at the Watch campaign, how people working on

25  that campaign came up to Seattle and basically invaded Plum

1   Creek's offices.

2      Lacey Phillabaum told you that she was involved in WTO.

3   You know the Defendant was involved in that because you heard

4   from the professor who talked about the fact that that

5   interfered with her progress on her documentary.

6      Lacey Phillabaum told you about being invited to the book

7   club and how she was basically recruited through there by

8   William Rodgers.  The Defendant wasn't at the book clubs

9   because she had a close direct relationship with William

10  Rodgers; he just recruited her directly.

11     Lacey Phillabaum told you that it took her six years to

12  cross the line, to go from being a peaceful, non-violent

13  activist to finally committing that arson.

14     There's one big difference, though, because Lacey

15  Phillabaum has accepted responsibility for what she's done.

16  After seeing her testimony, clearly she feels tremendous

17  remorse.  She's doing what she can to make the situation

18  better.

19     She talked from the stand, and you saw the quote earlier

20  about the fact that her main motivation is what she feels is

21  her moral obligation to the researchers, to try and make up to

22  the people she hurt by her actions.

23     The Defendant is exactly the opposite.  When she took the

24  stand, she told you a lot of things that just don't mesh; a

25  lot of things that just aren't true.  She told you about the

New York Times quote. She didn't deny that she said that.
She said she never would have meant anything like that. She
told you she hadn't seen the article when it came out. That
doesn't make any sense. If you are in the New York Times,
particularly if you are in the New York Times and you are
young, you'd remember that.

Tiffany Tudder knew about it. She told you about how she
found out about the article. Do you think Tiffany Tudder
didn't have a copy of it and showed it to the Defendant? The
Defendant said she was close to William Rodgers, and we've
heard a lot of talk about these phone calls and oh, it's just
an average of one a week.

If you look at that list, first, they are not spread over
a year. The calls are over a space of approximately three or
four months, so we are talking about several calls a week.
But second and more important, the Defendant is the person
Williams Rodgers is calling the most often, the person who is
the closest to him.

The Defendant supposedly is passionate about environmental
activism, and you know that William Rodgers is. This is
William Rodgers' focus. Yet, the Defendant would have you
believe they didn't talk about that.

The Ralph's purchases. The Defendant went to Ralph's and
made point of sale purchases four times in 2001, all of them
within a space of four days, from May 17th to May 21st; four

1   times in the whole year.

2       Initially, when she was asked about it, she said that she

3   was there all the time, she babysits for someone near there,

4   there is band practice, and stuff like that.  She looked at

5   the records; there's no other point of sale purchases all

6   year.  The reason the Defendant is there that week is she's

7   working closely with William Rodgers, preparing for the arson.

8       Finally, the folder with the document, Exhibit 614.  The

9   Defendant would have you believe that she gave a manila folder

10  to Jennifer Kolar, that she wrote a note on it saying here's

11  some articles to read, and there is a stack of articles in

12  there.  Those aren't the articles that she gave Jennifer

13  Kolar.  She gave an entirely different set of articles on, I

14  believe it was, women activism; and at some point Jennifer

15  Kolar must have pulled those articles out and subbed in a

16  different set of articles, the anarchy articles, and put them

17  in the folder -- although Jennifer Kolar told you that's not

18  what happened -- and somehow Jennifer Kolar had a set of

19  articles to sub in that had Justin Solondz' fingerprints all

20  over them.  Jennifer Kolar told you she doesn't even know

21  Justin Solondz -- or she barely knows Justin Solondz.

22      Does that story make any sense?

23      The reason the Defendant is lying to you about these

24  things is she knows that this evidence is significant.  It's

25  important.  So she lied to you about each of those pieces of

1 information.

2     She did it in a way that was very carefully planned and

3 carefully crafted.  Remember, Jennifer Kolar had initially not

4 read the articles.  She basically took the set of articles and

5 put it in a tub somewhere.  Jennifer Kolar apparently thought

6 they were about women activism.  It wasn't until preparing for

7 trial that Mr. Bartlett asked her to read the articles, that

8 she read them and found out that's not what they were.

9     Let me put it to you -- have you ever heard the phrase

10 women activism, or articles about women activism?  The reason

11 the Defendant says these are articles about women activism is

12 that she's read a report of Jennifer Kolar's interview where

13 Jennifer Kolar said articles about women activism, so in

14 tailoring her story, she picked that phrase.

15     It's a phrase you never would come up with if you weren't

16 trying to tailor your story to fit the facts; to minimize, to

17 escape, but to fit the little pieces that you can.

18     The Defendant hasn't just lied to you herself.  She hasn't

19 just denied blame herself or refused to accept responsibility.

20 She's attacked each of the people -- each of the important

21 witnesses who have testified against her in this case.

22     Lacey Phillabaum -- she has accused Lacey Phillabaum of

23 being an unprincipled slut.  You've seen cross-examination

24 about Lacey Phillabaum's sex life, about her supposed preying

25 on men or stealing other women's men.

1    Jennifer Kolar.   Jennifer Kolar was outed on the stand.

2    And Robert Corrina, the cousin who initially tried to

3    protect her.   Robert Corrina, you hear, is making up stories

4    and she doesn't know why he'd make up stories.

5    Ladies and gentlemen, there is no evidence to support what

6    the Defendant has said about Jennifer Kolar, about Lacey

7    Phillabaum, or about Robert Corrina, except the Defendant's

8    own words.

9    For Jennifer Kolar, there's no collection of love letters,

10   no collection of e-mails.   Even the one gift, the necklace,

11   which she supposedly returned.   Nothing but her word to say

12   that Jennifer Kolar professed her love for her and the

13   Defendant turned her down, and that's why Jennifer Kolar is

14   bitter.

15   Justin Solondz -- he's not around to say he had an affair

16   with Lacey Phillabaum.   All you have is the Defendant's word

17   that Justin Solondz admitted to her that he had such an affair

18   and then the Defendant's claim that she confronted Lacey

19   Phillabaum about that.   There is absolutely nothing to

20   corroborate -- not a piece of physical evidence to corroborate

21   what the Defendant has told you about these women.

22   Briana Waters may not look like what you expected when you

23   got your jury summons, when you first came into the room --

24   didn't know anything about the case except that it was

25   probably a criminal case.   She may not look like what you

1  thought a criminal defendant would look like, but as

2  Mr. Bartlett said, we are a nation of laws and one of the

3  basic principles is that everyone is treated the same, whether

4  they look sympathetic, whether they look unsympathetic.

5      You took an oath to do that, and I know you will follow

6  that oath.   The evidence in this case has shown beyond any

7  doubt that the Defendant participated in this conspiracy, that

8  the Defendant was one of the people who went to the University

9  of Washington, the Center for Urban Horticulture, on May 21st

10  of 2001 and burned that building down.

11      I'd ask you to return a verdict consistent with that

12  evidence, a verdict finding the Defendant guilty of

13  conspiracy, guilty of arson, guilty of the crimes with which

14  she is charged.

15      Thank you.

16          THE COURT:   All right.   Now I am going to eliminate

17  two of you, as I indicated.   I will have the clerk now put the

18  names in the wheel and she will draw out two.   Those two will

19  be excused.

20      When you are excused, of course, you won't be part of the

21  deliberations but you will still be part of this jury, which

22  means that you are not to talk about this case or do anything

23  about it until after this matter is over with.

24      I never know if I may need you because something may

25  happen or any other reason.   So the same admonitions you've

1    been given during the course of this trial, you will be held

2    to that standard.

3        All right.

4        THE CLERK:   Tera Hammermeister and Sean Thompson may

5    be excused.

6        THE COURT:   All right.  Are there any instructions

7    for them as they go through to pick up their belongings and to

8    the clerk's office?

9        THE CLERK:   There's two certificates on the table,

10   and leave their badges.

11       THE COURT:   Steve, let me know when they have

12   cleared.

13       Of course, you 12 will be the ones that will deliberate

14   and decide the case.

15       The hour now is 6:00, and so the same admonition that I

16   have been giving you throughout this trial will be in place as

17   you go about your evening.  You are not to discuss the case in

18   any way until all 12 of you are in that jury room together.

19       Now I have to treat you like sheep.  You all have to do

20   things together, smoke together, stand around together and do

21   what you do.  That will be the system until you decide the

22   case.

23       Now, all of the exhibits will be brought into the jury

24   room, along with the instructions that I gave you.  All of

25   that before you start.

1          Now, you can do it this way.  You can tell me -- I know I

2     kept you here later than I normally do.  In terms of reporting

3     back to the jury room, are you able to report back at 9:00 to

4     begin?  All right.  Then I will have you report to the jury

5     room at 9:00.

6          All of these items that I have talked about -- and when

7     they have been cleared with the attorneys -- they will be

8     there waiting on you.  You are not to start any discussion,

9     anything about this case, until all 12 of you are in that

10    room.  You will each know what the other person is doing, what

11    you are talking about, and that's how you will make your

12    decision.

13         So I will have you then excused, as you go through the

14    jury room and report at 9:00 to begin deliberations.

15         You can take your tablets now, but leave the tablets in

16    the jury room until you come to pick them up tomorrow.

17         (Jury departed at 6:00 p.m.)

18              THE COURT:  All right.  We will recess this matter.

19         What I want you to do, the attorneys, is to come and make

20    sure that everything that goes into that jury room has been

21    approved and admitted and all of that.  I want the two of you

22    to have that responsibility.  If there's any dispute about it,

23    we'll deal with that.

24              MR. FOX:  Your Honor, I know it's very late.  I have

25    one matter very briefly that I would like to put on the

1  record.

2      THE COURT:  All right.  You may be seated.

3      MR. FOX:  Two things.  With regard to Justin Solondz'

4  bank account records, where there was an objection in the

5  course of testimony, my records that I got -- the Government's

6  Amended Exhibit List from the clerk -- shows that Exhibit 745,

7  which is statements of the bank account belonging to Justin

8  Solondz, was never admitted into evidence.  Maybe I am wrong.

9      MR. BARTLETT:  I checked the record last night, and I

10 had it as admitted.

11     THE COURT:  Let me find out what we are talking

12 about.

13     THE CLERK:  We have a stipulation for the records.

14     MR. FOX:  Well, there was a stipulation with regard

15 to the custodian of records, that we would not require the

16 custodian to come in, but I don't believe that these records

17 were ever offered or admitted.

18     THE COURT:  Do what I ask you to do.  Come over with

19 her and let's go through it, and we'll find out.  You talked

20 about everything that's been reserved on --

21     MR. FOX:  Well, I guess the reason why there was the

22 objection is that these were not records that were admitted

23 into evidence.

24     THE COURT:  The question is:  Are they admitted as an

25 exhibit -- admitted or not?

1          MR. FOX:   They are not.

2          THE COURT:   Then come over and check it through with

3    the clerk, and we will find out.   If I have to deal with it, I

4    will deal with it.   That's what I am asking you to do, to come

5    here and determine what should be going to this jury.

6          MR. FOX:   Sure.   I just want to put on the record the

7    reason for our objection is that we didn't see that on the

8    clerk's list.

9        The other thing, Your Honor, I would move for a mistrial

10   based on the rebuttal argument of Mr. Friedman, because he

11   started out basically by saying that to find Ms. Waters

12   innocent, you have to find these five people were lying, and

13   that is not the standard.

14       The jury doesn't have to find anyone is lying.   They have

15   to find that there's reasonable doubt that what they say is

16   true, and there are cases that have reversed convictions where

17   that precise argument has been made.

18         THE COURT:   Well, you make the record, but I am

19   denying the motion.   The jury will decide the case.   You have

20   made your record.

21         MR. FOX:   Okay.

22         THE COURT:   And then the two of you come and deal

23   with that exhibit.   I will be in recess, but I will be close

24   by if --

25         MR. BLOOM:   Your Honor, 10 seconds.   I think we may

1  have some other objections, but they can wait until the

2  morning.

3            THE COURT:  All right.  I can meet you here at 8:30

4  like usual.

5            MR. BLOOM:  9:00 would work.  I think it will just

6  take a moment.

7            (The Court recessed to Friday, February 29, 2008, at

8  the hour of 9:00 a.m.)

9                    *    *    *    *    *

10                 C E R T I F I C A T E

11

12      I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14

15  /S/  Teri Hendrix _____         May 5, 2008

16  Teri Hendrix, Court Reporter              Date

17

18

19

20

21

22

23

24

25