UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,      )    Docket No. CR05-5828FDB
                               )
          Plaintiff,           )    Tacoma, Washington
                               )    March 6, 2008
vs.                            )
                               )
BRIANA WATERS,                 )    VOLUME 18
                               )
          Defendant.           )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANKLIN D. BURGESS
SENIOR UNITED STATES DISTRICT COURT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:        MARK N. BARTLETT
                          ANDREW C. FRIEDMAN
                          Assistant United States Attorney
                          700 Stewart Street, Suite 5220
                          Seattle, Washington 98101-1271

For the Defendant:        ROBERT BLOOM
                          Attorney at Law
                          3355 Richmond Boulevard
                          Oakland, California 94611

                          NEIL M. FOX
                          Cohen & Iaria
                          1008 Western Ave., Suite 302
                          Seattle, Washington 98104


Court Reporter:           Teri Hendrix
                          Union Station Courthouse, Rm 3130
                          1717 Pacific Avenue
                          Tacoma, Washington  98402
                          (253) 882-3831

Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.

THURSDAY, MARCH 6, 2008 - 10:10 A.M.

* * *

(Jury not present.)

THE CLERK:  This is in the matter of the United States of America versus Briana Waters, Cause No. CR05-5828 FDB.

Counsel, please make an appearance for the record.

MR. FRIEDMAN:  Good morning, Your Honor, Andrew Friedman and Mark Bartlett for the United States.  Ted Halla is here from the FBI.

MR. FOX:  Good morning, Neil Fox and Robert Bloom for Briana Waters, who's present.

THE COURT:  All right.  I had sent to you a jury note that I intend to send to the jury, and the note is asking them to fill in the verdict form with regard to any count or counts as to which they have reached a unanimous verdict, and do not provide any information with regard to any counts as to which they have not reached a unanimous verdict.

I intend to, with that, take a partial verdict on the matter.  Then after that has been done, I will deal with what the defense has recommended, that is dealing with the remaining -- whatever that may be -- as to whether this jury is deadlocked as to that matter.

That's the fashion in which I am going to do this.  Okay.

MR. FOX:  May I be heard on that, Your Honor?

1    Your Honor, I think that -- I guess the question that we

2    have is what does the Court intend to do with the verdict

3    form?  Because it is our position that it's not a final

4    verdict until it's announced in open court and the jury is

5    polled.

6    THE COURT:  All of that will take place as I get the

7    partial verdict.  The jury will be in the jury box when I do

8    all of that, and then I will deal with what is left that is

9    not dealt with on that verdict form.  I will deal with that in

10    terms of the deadlock.

11    MR. FOX:  So the Court is going to have them fill out

12    the form, come in and announce their verdict on those counts?

13    THE COURT:  That's correct.  They are not going to

14    send the verdict form out.  I just want to know if they have

15    done this in accordance with this.  If they have done that,

16    then I will bring them in and I will ask them the usual

17    questions I normally ask them.

18    MR. FOX:  It is our position if the jury is going to

19    return a partial verdict, that they also have to be informed

20    that that partial verdict is final, that they cannot change

21    their minds if they go back and deliberate on other counts.

22    THE COURT:  I will poll the jury and I will get that

23    information.  All right.

24    So what I have given you, I intend to sign that and date

25    it now; and today, I believe, is the 6th, and the time being

1   10:18.  I am signing it now.  As soon as they indicate to the

2   bailiff that they have done that, I will have them here.  So,

3   we will take a brief recess and get an answer.

4           THE CLERK:  All rise, Court is in recess.

5           (Recess at 10:18 a.m.)

6           THE COURT:  All right.  You may be seated.

7       All right.  Bring them in.

8       (Jury present.)

9           THE COURT:  All right, you may be seated.

10      Good morning to you.  All right, it is my understanding

11  now -- Mr. Martinez, I am speaking to you as the presiding

12  juror -- that in keeping with my last instruction to you, that

13  you would fill out the verdict form as to counts that you have

14  made a unanimous verdict on.  That's been done?

15          PRESIDING JUROR:  Yes.

16          THE COURT:  The ones you didn't make a decision on,

17  nothing has been entered into that part of the verdict form?

18          PRESIDING JUROR:  That's correct, sir.

19          THE COURT:  So the jury now, you've reached a

20  unanimous verdict, have you?

21          PRESIDING JUROR:  Yes, sir.

22          THE COURT:  As to those partial counts?

23          PRESIDING JUROR:  Yes, Your Honor.

24          THE COURT:  It's a unanimous verdict?

25          PRESIDING JUROR:  Yes, Your Honor.

1    THE COURT:  I am going to have you present that to

2  the clerk, please.

3         (Verdict form handed to the bailiff.)

4    THE COURT:  All right.  The clerk will read the

5  verdict.

6    THE CLERK:  United States District Court, Western

7  District of Washington, at Tacoma, United States of America,

8  versus Briana Waters, Cause No. CRO5-5828 FDB.

9    Verdict.

10   We, the jury, unanimously find the following:

11   Count 5, arson of a building in interstate commerce or in

12  activity affecting interstate commerce:  Guilty.

13   Count 7, arson of a building belonging to an institution

14  receiving federal financial assistance:  Guilty.

15   Dated this 6th day of March, 2008.

16   Presiding juror, Mr. Martinez.

17   THE COURT:  All right.  Poll the jury now as to that

18  count.

19   THE CLERK:  Mr. Rose, is the verdict as read, as to

20  each count, your verdict and the verdict of the jury?

21   JUROR:  Yes.

22   THE COURT:  Read it as to Count 5 and then as to

23  Count 7.

24   THE CLERK:  As to Count 5?

25   JUROR:  Yes.

1          THE CLERK:   And as to Count 6?

2          THE COURT:   -- Count 7.

3          THE CLERK:   As to Count 5 and 7?

4          JUROR:   Yes.

5          THE CLERK:   Mr. Gordon, is the verdict as read as to

6  each count, Count 5 and 7, your verdict and the verdict of the

7  jury?

8          JUROR:   Yes, ma'am.

9          THE COURT:   Ms. Penn, is the verdict as read as to

10  each count, Count 5 and 7, your verdict and the verdict of the

11  jury?

12          JUROR:   Yes.

13          THE CLERK:   Ms. Stewart, is the verdict as read as to

14  each count, Count 5 and 7, your verdict and the verdict of the

15  jury?

16          JUROR:   Yes.

17          THE CLERK:   Ms. Hough, is the verdict as read as to

18  each count, Count 5 and 7, your verdict and the verdict of the

19  jury?

20          JUROR:   Yes, it is.

21          THE COURT:   Ms. Terry, is the verdict as read as to

22  each count, Count 5 and 7, your verdict and the verdict of the

23  jury?

24          JUROR:   Yes.

25          THE COURT:   Mr. Rito, is the verdict as read as to

each count, Count 5 and 7, your verdict and the verdict of the jury?

JUROR: Yes.

THE CLERK: Ms. Mezger, is the verdict as read as to each count, Count 5 and 7, your verdict and the verdict of the jury?

JUROR: Yes.

THE CLERK: Ms. Coleman, is the verdict as read as to each count, Count 5 and 7, your verdict and the verdict of the jury?

JUROR: Yes.

THE CLERK: Mr. Martinez, is the verdict as read as to each count, Count 5 and 7, your verdict and the verdict of the jury?

JUROR: It is.

THE CLERK: Mr. Spradley, is the verdict as read as to each count, Count 5 and 7, your verdict and the verdict of the jury?

JUROR: Yes, it is.

THE CLERK: Ms. Kounse, is the verdict as read as to each count, Count 5 and 7, your verdict and the verdict of the jury?

JUROR: Yes.

THE COURT: All right.

As to those two counts, those verdicts will be filed.

1    I have a few more questions for you, and now I am talking
2  to you about the counts which you did not make any kind of
3  decision on.  Would it do any good now for you to go back and
4  deliberate and keep working at this; do you feel you could
5  reach a verdict if that is done?

6            (Jurors shaking heads.)

7            THE COURT:  Are you saying to me if I leave you here
8  until God knows when, you will be in the situation you are in
9  now?

10           (Jurors nodding heads).

11           THE COURT:  Is that to say you are hopelessly
12 deadlocked about those other counts that you are called on to
13 answer?

14           (Jurors nodding heads).

15           THE COURT:  All right.  Well, I think that answers
16 the question on those counts.

17    I will hear from counsel.  It seems to me that it wouldn't
18 make a lot of sense to send them back; they have been out for
19 four days, five days on this matter?

20           MR. BARTLETT:  Perhaps outside the presence of the
21 jury.

22           THE COURT:  Let me do this.  Let me have you folks
23 step out again for a minute, and then I will have you back in
24 here and I will tell you where we go from here.

25     (Jury not present.)

1          THE COURT:  All right.  You may be seated.

2      I think their answer -- I will have you speak to that --

3  they have been out a while.

4          MR. BARTLETT:  Your Honor, the United States is not

5  requesting any further deliberations.

6      I would ask that the jury -- that the Court ask the jury

7  to provide us with a split with regard to the remaining counts

8  which would help us in determining whether or not we will

9  proceed to a second trial with regard to the counts that the

10  jury has not reached a unanimous verdict on.

11          MR. FOX:  We would move for a mistrial, which I am

12  not sure they are opposing.

13          THE COURT:  Tell me what you are talking about,

14  mistrial --

15          MR. FOX:  With regard to the counts for which they

16  haven't reached a verdict on.

17          THE COURT:  Okay.

18          MR. FOX:  I am making a formal motion.

19          THE COURT:  All right, but there are no other issues

20  as to a mistrial.  Okay, then let me -- bring them back in.

21          MR. BARTLETT:  Just for the record, we are obviously

22  opposed to the motion for mistrial, with regard to double

23  jeopardy claims.

24          THE COURT:  Well, I am not granting anything; the

25  jury has spoken.

1          MR. FOX:  While we are waiting, I am curious what

2     this Court's policy is with regard to discussions with jurors.

3          THE COURT:  I am going to deal with that.  You will

4     hear about that as they come in.

5          MR. BARTLETT:  I remind the Court of the local rule

6     which prevents discussions.

7          THE COURT:  I will deal with that issue.

8       (Jury present.)

9          THE COURT:  You may be seated.

10     All right.  The Court has decided that it wouldn't make

11     much sense for you folks to keep deliberating on these

12     particular counts.  So with that, your inability to do that, I

13     will declare you are deadlocked as to those issues and you

14     won't be called on to deliberate further.

15          With that, that is going to bring your services to an end.

16     You will be discharged to go about your way.

17          Again, I want to thank you for your services.  It's been a

18     long trial and a lot of things going on.  I don't want you to

19     leave here and think that all the time you've spent is gone.

20     I appreciate it.  I want to personally thank you in doing

21     that.  I want to also advise you of what I am going to advise

22     the attorneys on.  I will do that as I talk to you at the same

23     time.

24          Under the local rules I am ordering the attorneys -- and

25     it reads this way:  Counsel shall not contact or interview

1  jurors, or cause jurors to be contacted or interviewed after

2  trial, without having first been granted leave to do so by

3  this Court.

4      So, you are not to talk to the attorneys about the case or

5  anything else.  Go about your way.  Again, I thank you for

6  your services.  I guess they go back through the clerk's

7  office.  I will have you go back through the clerk's office,

8  and they will process you out from there.

9      Again, I thank you and you are discharged.

10      (Jury not present.)

11      All right.  You may be seated.

12      The verdict will be filed.  The jury has spoken, so now

13  the issue is, of course, a sentencing date on this matter.

14      Pat, what date do we have on that?

15          THE CLERK:  May 30, 2008, 10 a.m.

16          THE COURT:  All right.  The sentencing date will be

17  May 30, 2008, 10:00 a.m.

18      I am now signing an order as to the procedure that we will

19  use as we work towards that date.  If any issues need to be

20  ironed out requiring a hearing on something, we'll take care

21  of that.

22      All right.  Now, the other issue, of course, is the

23  defendant's been convicted.  The situation involving her

24  pending sentencing, is that an issue?

25          MR. BARTLETT:  It is, Your Honor.  If I could briefly

1   address the Court.

2      I have a motion that we have prepared, that I will file at

3   this point in time.

4      Your Honor, the defendant has been convicted of a crime of

5   violence. Under the Bail Reform Act, the Court has no

6   discretion. The defendant must be detained pending sentence.

7      It is a "shall," not a "may," and we are asking that the

8   Court follow the law in this case.

9          THE COURT: All right. Mr. Bloom.

10         MR. BLOOM: I would like to read this.

11         THE COURT: Then we'll take a recess to do that.

12         MR. BLOOM: Very brief recess.

13         THE CLERK: All rise, Court is in recess.

14         (Brief recess.)

15         (Back in open court at 11:00 a.m.)

16         THE COURT: All right. Mr. Bloom, I will give you a

17   chance to respond.

18         MR. BLOOM: Good morning, again, Judge Burgess.

19      In the end, this decision is really within the Court's

20   discretion. It is governed by authority from 18 United States

21   Code 3143. It is also governed by a decision in the United

22   States v. Garcia, 340 F.3d 1013, a 2003 Ninth Circuit

23   decision.

24      I would like to bring the Court's attention -- I am sure

25   the Court is familiar with the case and the provisions in

1   general, that the key here is that indeed it is always within

2   the Court's discretion whether it be deemed a crime of

3   violence or not.

4      And the reality is here -- and there are two key factors,

5   and I think there has not even been an argument in the motion

6   or at any time by the government that either Ms. Waters is a

7   risk of flight or presents any danger whatsoever to the

8   community or any member of the community.

9      I want particularly to talk about the issue of risk of

10   flight. I think not only has she always appeared, and she's

11   been exemplary in terms of meeting her obligations with the

12   pretrial people, both in open and here. Most importantly, the

13   fact that she's here this morning, understanding that the jury

14   could have come in and sentenced her, effectively, doomed her

15   to a 35-year mandatory minimum sentence, speaks clearly and

16   eloquently to the issue of whether or not she's in any way,

17   even the slightest way, a risk of flight. She has been here.

18   She will be here for sentence. There's absolutely no

19   question.

20      Is she a danger to the community? There has not been any

21   assertion in the seven years since this incident has happened,

22   that she has in any way been a danger to anybody. Indeed,

23   aside from the ten or dozen or so of the character

24   witnesses -- excuse me, a second, could I get some water --

25   character witnesses you saw and heard, this is -- whatever may

1   have happened seven years ago, this is a person who lives her

2   life with her daughter, who's just turned 3, with her partner

3   John, teaching violin mostly to youngsters, volunteering to

4   help senior citizens, and living really an exemplary life, a

5   life to which we should all aspire.

6      So those two key factors -- and those factors are

7   extremely important as laid out in <u>United States v. Garcia</u>.

8   The Court in that case talked about -- one of the issues they

9   talked about, the conduct of the particular defendant, could

10   it be regarded as aberrational; that is, is it a person with a

11   prior criminal history, who finally got caught?  That's

12   clearly not the case here.

13      This is a woman who's never been convicted of a crime, a

14   woman who is a person of peace.  I try not to interject my own

15   personal observations, but I have known her now for two years,

16   and this is a woman who lives with love in her life, and that

17   is the way she relates to everybody, including me.

18      I have seen it.  I have seen her friends.  I know her

19   family.  I know her mother.  I know her brothers.  I see who

20   she is.  And that's one of the factors that is set forth in

21   <u>U.S. v. Garcia</u>.

22      It also talks about, is there a prior history of violence

23   that should be a factor?  Needless to say, there is no prior

24   history of violence.

25      The next question set forth in <u>Garcia</u>, and that is, is she

1   likely to contribute to society if she remains on bail?  Well,
2   I have already addressed that.   And it is our view that indeed
3   she is a person who does contribute to society every day.

4      Garcia specifically addresses the question of whether or
5   not the act is a violent act and what -- how the Court in this
6   case, this Court, should view that.   It actually -- the Court
7   actually and specifically addresses that issue.

8      The language that it uses, the Ninth Circuit, that even if
9   the act were a violent act, they do consider the possibility
10  of the opportunity for discretion for the Court in this case,
11  even if it was a violent act, if it did not involve a threat
12  or injury to another person.

13     Now, it is true that arson by its nature presents a risk
14  to fire fighters and first responders.   It appears that the
15  people who were responsible for this arson at the University
16  of Washington did take into account the possible danger to
17  other individuals.   The fire was set at 2:00 or 3:00 in the
18  morning, or thereabouts.   And it appears from the testimony of
19  the two women -- that would be Kolar and Phillabaum -- that
20  there was even a discussion of the presence of a bicycle,
21  would that mean that maybe somebody was present?

22     So the people who did commit this crime were very much
23  mindful of the possibility of injuring people.   And that is
24  not in any way to suggest that arson is a good thing; indeed
25  it's not good at all.

But as the Ninth Circuit contemplated in <u>Garcia</u>, even a
violent act has to be examined and can't be regarded just as a
violent act without examination by the judicial officer, in
this case yourself, as to the nature of the violent act.

There also is the factor set forth in <u>Garcia</u> as to whether
or not incarceration would undermine the result of a
successful appeal.  Obviously that translates to, if there are
nonfrivolous appellate issues, keeping a person in to serve
his or her time wherein there is an eventual successful
appeal, very much undermines, completely undermines the
concept of prevailing on appeal.

<u>Garcia</u> also mentions the factor of whether imprisonment
would be unduly harsh for a particular defendant.  And it does
mention the fact that <u>Garcia</u> itself -- <u>Garcia</u> involved two
correctional officers in the state prison in California; and
one of them had a cancer diagnosis -- lymphoma diagnosis.  And
the Court actually remanded the case to the District Court of
Appeals and remanded the issue to the District Court for
determination as to whether or not under that particular
issue, the illness of one of the two defendants should be
assimilated into the court's decision.

In this case, there fortunately is no physical illness,
but there really is a very important factor here that I would
ask the Court to consider, especially given the utter
reliability of Ms. Waters in terms of appearing, in terms of

1  who she is, and whether or not she presents a risk to anyone

2  in the population.

3      Her daughter is everything to her, and she is everything

4  to her daughter.  I don't -- this may be addressed again the

5  end of May at the time of sentencing, but I really urge the

6  Court to call upon its humanity and understand that the

7  concept of hardship does and should contemplate the

8  significance to the daughter and to Ms. Waters and to her

9  family; and for her to prepare to be sentenced on May 30.  I

10  don't see any harm.  There's no harm to the state.  There's no

11  harm to the federal government for her to remain on the same

12  bail conditions until the date of sentencing at least.

13      The case cited in <u>Garcia</u> is <u>United States v. Handy</u>,

14  H-A-N-D-Y, 761 F.2d 1279, at 1280.  And it addresses the issue

15  of whether or not there are substantial appellate issues.  And

16  it essentially defines the term "substantial" as issues that

17  are not frivolous.

18      We believe that there are a number of issues that are not

19  frivolous, and I am not going to go deeply into them, but I do

20  want to mention some of them.

21      It is true that the Court has not found, in our motions,

22  has not found that relief would be required at the time of the

23  motions.  But there are a number of things -- and this is not

24  an exhaustive list, just what has come to mind last night and

25  today -- as issues that are not frivolous.

1    The first one that comes to mind is the -- not just

2 introduction to the jury in closing arguments by the

3 prosecutor of a document that was not in evidence, it was not

4 just a casual mention, that it was very much a part of the

5 argument that was made by the prosecution in its closing

6 arguments.  And that document would be records of -- bank

7 records of Justin Solondz.  I forget the exhibit number, but

8 the document was not in evidence.  And the thread of the story

9 was that Mr. Solondz withdrew $200 from his account which

10 wound up -- from his bank account, which the argument went --

11 wound up being given to Mr. Corrina, the cousin, whose wife

12 rented the car.

13    So even though the Court did give a corrective

14 instruction, we believe it is a substantial appellate issue.

15    The second substantial appellate issue involves what we

16 regard as extremely serious Brady violations, that continue to

17 this day.  That there are issues with regard to --

18 particularly the interview of Jennifer Kolar on December 16,

19 2005.  We believe that the testimony of Agent Halla -- that

20 procedurally -- I should say logistically, there exists --

21 there would exist in the FBI computer records of earlier

22 versions of the 302s finalized, as he said on February 9 of

23 '06, that would reflect -- that the earlier versions which are

24 in the possession today of the United States Government, that

25 would constitute an extremely serious Brady material.

1      A third issue that we believe is substantial is the impact

2  of the fires that were set, I think it was early Monday

3  morning.  And before the Court had the opportunity to address

4  the jury on those issues, which occurred about -- between

5  about 9 or 10 a.m. on that Monday, there was very likely

6  substantial exposure to the jurors as to those fires.

7      And there were two aspects to it that are of some

8  importance.  One is the explanation and the actual showing of

9  the bedsheet that had been spray painted, which included the

10  logo, as it were, "ELF."

11      The other thing is that at that time, the newspaper

12  reports all spoke of not just hearing explosions, but it was

13  clear that timing devices had been used.  Again, this is all

14  before the Court -- before we had the opportunity to bring it

15  to the attention of the Court and the Court had the

16  opportunity to address the jurors on.  So I am not faulting

17  anybody at all here.  I'm saying the circumstances were such

18  that this was presented to the jury at an extremely delicate

19  time.  They had deliberated on a Friday; they were resuming

20  their deliberations on Monday.

21      It appears now -- and I have something I want to put in

22  the court file -- a story from yesterday's Seattle Times,

23  indicating that the reports of the timing devices and

24  explosions were erroneous.

25      Now, what in fact happened, the Court did instruct the

1   jury:  Don't read, don't watch the news and don't listen to

2   the radio, not just at our request, but I am sure the Court

3   was going to do that anyway.  The practical effect of that is

4   the corrective aspect that there were no timing devices and

5   there were no explosions, is something the jury probably does

6   not know.

7       So the damaging part they got, I believe, and the, let's

8   call it more helpful part, they didn't get.  All I am saying

9   is -- I am not asking the Court to make any determination; all

10  I am saying is we regard it as a substantial and nonfrivolous

11  appellate issue.

12      We also believe that another nonfrivolous appellate issue

13  is the introduction by the government of so many other arsons

14  that were attributed to, or taken credit for, by the Earth

15  Liberation Front.  Without belaboring it, the Court knows that

16  we objected to it.  We found that -- and we would understand

17  that, yes, in order to prove up the conspiracy, there had to

18  be some evidence of that nature, but we feel that it was so

19  overdone that it inured to the detriment of our client.

20      As a separate issue, but related, there is this literature

21  that Jennifer Kolar turned over to the government, at some

22  time a couple months after she was first questioned.  And

23  according to Jennifer Kolar, it was in a folder that had

24  Ms. Waters' fingerprint on the folder.  None of the literature

25  had Ms. Waters' fingerprints, although some of it did have

1    Justin Solondz' fingerprints.

2          We believe that a nonfrivolous issue -- that was raised in

3    that way and another way, and we believe that it was raised to

4    instill fear in the jury, and we believe it may have been

5    successful -- is that Mr. Bartlett apparently took a yellow

6    highlighter, and on his own he highlighted the exhibits and

7    had a witness read some very inflammatory material from some

8    of those documents that may or may not have been provided to

9    Ms. Kolar by Ms. Waters.

10         Again, without belaboring it, among the issues there were:

11   We -- presumably the anarchists or the Earth Liberation

12   Front -- won't stop here.  It's going to be the Statue of

13   Liberty.  It's going to be Disneyland.  It's going to be, as I

14   remember, other national historic sites.

15         We regard that as very inflammatory, unnecessary; and in

16   short, presents a substantial nonfrivolous appellate issue.

17         Another -- and the last of these issues that come to mind

18   now, although there are others -- is some of the impeachment

19   that was utilized in cross-examining Briana Waters suggesting

20   that, for example, that she had found a way to make money from

21   being accused in this case and facing 35 years in prison, was

22   so over the top and so inflammatory and so prejudicial, that

23   in itself presents a nonfrivolous issue for appeal.

24         Similarly, the suggestion that Ms. Waters orchestrated who

25   comes to Court, and when they come to court, was also

1  unnecessarily inflammatory, had no basis in fact, and was

2  intended to, and we believe may well have, prejudiced the

3  jury.

4      I say all this simply to say that we believe that there

5  are very substantial, nonfrivolous, appellate issues.  And

6  those, taken in conjunction with the apparently undisputed

7  assertions that we make that Ms. Waters is in no way a flight

8  risk, is in no way a danger to anyone in the community,

9  combined with one more factor, that is, Judge, you have seen

10  Ms. Waters.  You have seen her family.  You have seen her

11  friends.  We have not brought her child to court because we

12  thought that would be inappropriate, both for the child and as

13  an indication that we were seeking sympathy.

14      The Court has seen what kind of person she is.  I ask the

15  Court to reach into its heart and at least through May --

16  through the sentencing date, permit Ms. Waters to be with her

17  child and to be with her family.

18      Thank you.

19          THE COURT:  All right.

20          MR. BARTLETT:  Your Honor, with regard to the Court's

21  discretion, I want to be clear the Court does have discretion;

22  it has discretion in a very limited matter.  The discretion

23  the Court has would be defined that there are exceptional

24  circumstances that this defendant presents to the Court.  I

25  would suggest to the Court that there's nothing close to

1    exceptional circumstances this defendant presents to the

2    Court.

3    Mr. Bloom indicated, I believe the quote was, that "She's

4    lived a life to which we all aspire."

5    I beg to differ. This defendant is now a convicted felon.

6    She was an integral part of one of the most serious arsons

7    ever to occur in this district. She committed an arson that

8    caused over $6 million in damages. She destroyed the life of

9    Sarah Reichard.

10    She has shown not one wit of remorse with regard to her

11    actions. And in fact, since the day this arson occurred, all

12    she has shown is an incredible inability to deal with her own

13    actions.

14    In addition, to compound her prior felony actions, she

15    came into this court and committed perjury, not just blatant

16    perjury, but she cleverly tried to weave a story fitting the

17    physical records that she had to explain, lies upon lies. I

18    would suggest to the Court that is not a life to which we all

19    aspire.

20    What she has shown is an inability to accept what I

21    believe was always inevitable: That she would be held

22    accountable for these charges and she would go to jail for

23    five years. Today is the first time that she is realizing

24    this is what's going to happen.

25    Mr. Bloom has repeatedly told us how devoted she is to her

1  child.  So I ask the Court to consider, what is she going to

2  do?  She's going away for at least five years.  And I would

3  suggest to the Court it will be substantially more than that

4  when the government's sentencing recommendation is finally

5  before the Court.

6      So what is her choice; to stay here, go away for a number

7  of years, miss the heart of her child's stuff, or to run, to

8  flee?  I would suggest it's an easy choice for this defendant.

9      There is nothing Mr. Bloom said, not one thing he said,

10  that allows this court to say there are exceptional

11  circumstances.

12      She is a mother with a child.  In fact, that is what many

13  defendants before this court unfortunately are.  In her case,

14  she's actually more fortunate than most.  She has a partner

15  who is devoted to their child.  There is a support group that

16  exists that will raise the child.

17      This defendant needs to understand there are not special

18  rules for Briana Waters.

19      Congress has passed a law which requires defendants such

20  as her to be incarcerated, not to be incarcerated at some

21  point in time, but to be incarcerated as soon as they are

22  convicted.

23      We are asking the Court to follow the law.

24          THE COURT:  All right.  Now, of course I guess in

25  anticipation of this particular time as to what could possibly

happen, the Court has reviewed and looked at 3143, which talks
about this very thing in terms of crime of violence, and of
course it fits that description.

It says that upon conviction the Court shall detain,
unless the Court makes certain findings, and under 3143, it's
not in the disjunctive; the Court must find for an acquittal
or new trial, that the evidence would tend to point to that;
or that the government would recommend no sentence of
imprisonment.  We know that's not the case, as she faces under
the statute a mandatory minimum of, as I see it, five years on
this conviction.  And then, which is an "and," clear and
convincing evidence that she won't flee or pose a danger.

Now, that's under 3143.  The exceptions really come in to
refer to 3145, and these things are not always easy to read,
but they talk about appeal of a detention order.  That is, if
she's ordered detained, what she can do there -- and it calls
for exceptional circumstances, or at least reasons --
exceptional reasons as to release; and the case law deals with
that.

One of the cases I have looked at dealing with this very
thing says that this is mandated unless it is done in this
way.  Now, what I have heard here, I don't know if I would
classify it maybe as a detention hearing, because I really
haven't heard anything to get into some exceptional reasons or
some proof that would be acceptable to the Court.  I don't

1  know where those are, but under 3145, she is entitled to what
2  I have determined to be a prompt hearing on that issue.  I
3  guess that's where this case is.

4      So in light of all I have read on this and what I know
5  about this case, and all the things I have considered, she has
6  appeared; there's no question about that, but I think that the
7  burden has shifted in terms of all of this.

8      So I see the Court has no alternative here at this point
9  other than to order her detained pending sentencing, subject
10  to 3143, and that would be a prompt hearing as to whether or
11  not the exceptional reasons can be satisfied, that that can be
12  done.

13      So that will be the Court's decision, that she will be
14  remanded into the custody of the Marshals, and I need to talk
15  to you now about having this prompt hearing as to exceptional
16  reasons why she should be released pending sentencing.

17      I will hear from you on that.

18          MR. BLOOM:  Could we have just a moment, please?

19          THE COURT:  All right.

20          (Brief pause.)

21          MR. BLOOM:  May I inquire of the Court; I am not

22  quite clear what the Court has in mind in terms of a hearing,

23  presentation of evidence?

24          THE COURT:  Other than your allocution, I guess,

25  something beyond that; I don't know what you've got to say

1  here to deal with something that would convince me that it's

2  exceptional in some way.

3      I can refer you to a case, if you want to look at that, or

4  whatever you've got other than -- it seems to say that flight

5  in and of itself, that issue doesn't always carry the day that

6  everything has been done up to now in that sort of a way to be

7  convinced otherwise.  Let me refer you to -- and maybe you

8  might want to look at this case that deals with these issues.

9      Why don't you take a look at United States v. Schlesinger?

10 I am not finding the exact cite here on it.  It's in the --

11 let me send that out to you from the law clerk.  In fact, I

12 may just have them duplicate a copy from that; but I want you

13 to do your own thing as to the things you think I should

14 consider.

15     What I guess what I am asking, in terms of the hearing and

16 giving her that right to have that hearing and present that

17 evidence to deal with the detention aspect of it --

18         MR. BLOOM:  Could we break for lunch and address the

19 Court on that after lunch?  I would like to look at that case.

20         THE COURT:  All right, you can do that.

21     Advise my chambers after lunch as to a date.

22     I will have to round up the attorneys on that.  I will

23 have you all back here and have that done.

24     As of now, the defendant will be remanded.

25         MR. FOX:  Your Honor, before we break, could I ask

1  the Court something else on another subject?

2          MR. BLOOM:  Can I just stay with this for a moment?

3          MR. FOX:  Sure.

4          MR. BLOOM:  Thank you.  I am also going to ask the

5  Court to consider, given that there have been -- I really

6  reassert that there's zero risk of flight, despite

7  Mr. Bartlett's claim here, but we have -- if it's possible to

8  in some way amend the bail conditions so that there's

9  additional security.

10          THE COURT:  I will hear whatever you have to say

11  about it.  I am trying to give you a chance to tell me when

12  would be the appropriate time to do that.  Do you want time to

13  look at whatever you have, and then you need to advise the

14  Court so the Court can set that?

15      It says prompt hearing, but until I hear something, what

16  you are saying to me, then I can answer that question.

17          MR. BLOOM:  If we could plan to see you at 1:00.

18          THE COURT:  I have a meeting, so I probably won't be

19  back here until 1:30, somewhere close to 2:00, but in that

20  timeframe.  You can let my staff know ahead of time.  They

21  will get word to me, but I will be back here in chambers at

22  least by that time.

23          MR. BLOOM:  Okay.

24          THE COURT:  All right.

25          MR. FOX:  The other quick matter, I wonder, given the

1  Court's order, or the recitation of the local rule on contact

2  with the jurors, we would like permission to contact the

3  jurors to find out whether they were exposed to the

4  prejudicial publicity of those fires on Monday morning.

5      So I am asking the Court now, while we are all here, to

6  give us the authority to contact the jurors and find out what

7  they heard and whether it in fact had played a role in their

8  deliberations.

9      The only way to do that is by contacting them and finding

10 out what happened on the way to court on that day.

11         THE COURT:  All right.

12         MR. BARTLETT:  Your Honor, the United States would

13 object.  First of all, the Court polled the jury on whether or

14 not that had any impact.  They indicated it had not.

15     Second of all, the verdict indicates they were not unduly

16 prejudiced by any more information.

17     Third, I think especially in their case, given what's gone

18 on and what they are probably going to read about on all the

19 news articles they haven't read over the last couple days, I

20 think it would be very disconcerting for these jurors to have

21 defense or defense investigators contacting them at their home

22 or work with regard to this issue.

23     I strongly object it to, and I don't think there's any

24 need for it at this point in time.

25         THE COURT:  I understand the question.  You want to

1  contact them.  You said no.

2      I will give you my answer when I talk to you folks this

3  afternoon.

4              MR. BARTLETT:  Thank you.

5              THE COURT:  All right.

6              THE CLERK:  All rise, Court is in recess.

7              (Court in recess.)

8  AFTERNOON SESSION

9      (Back in open court at 2:25 p.m.)

10             THE COURT:  All right.  I guess I said I'd come back

11  out to see where we are in terms of trying to deal with any

12  hearing if any is necessary.  Of course, it's on the defense

13  to present that.

14             MR. FOX:  Good afternoon, Your Honor.

15     Two things which relate to the hearing.  I would

16  respectfully suggest that the Court is not required to detain

17  Ms. Waters until that hearing takes place.  The reason I say

18  that is that if that were the case, Jennifer Kolar would be in

19  custody right now.

20     It is not mandatory that someone be detained pending

21  sentencing.  I know what the statute says, but I know also

22  that Ms. Kolar, who pled guilty to crimes of violence, who is

23  out pending sentencing, and whether the government has made a

24  motion or not, isn't really dispositive.

25     The issue is:  Has the Court put her in custody pending

1   sentencing, and the Court has not.

2       So I would ask the Court to release Ms. Waters on

3   electronic home monitoring, on some heightened level of

4   custody, until we have a detention hearing.

5       There's no requirement, given what's happened with the

6   other defendants, that she be taken into custody today.

7       In terms of setting the detention hearing, there are

8   witnesses that we would like to present to the Court.  It's

9   going to take a little bit of time to get that lined up.

10      So that's why we were looking for a hearing next week some

11  time.

12          THE COURT:  When would you be talking about?  The

13  Court will be out of the jurisdiction until sometime on

14  Thursday.

15          MR. FOX:  Well, when we raised possibly next Friday,

16  Pat indicated that we could have a Magistrate before then.

17  The government indicated that if we went in front of a

18  Magistrate that, you know -- they believe that neither side

19  would be appealing to Your Honor in any case.  So I think the

20  government was requesting that you hold the detention hearing.

21      We are satisfied with a Magistrate, if we could have a

22  hearing Tuesday or Wednesday.  But if that's not going to

23  happen, then we would ask the Court to hold it as soon as the

24  Court can hold it.

25          THE COURT:  Well, I don't think the fact that it's an

1    appealable thing from them is the real issue here.

2        The issue is she's entitled to it and how quickly you can

3    get it to.  So I don't think there's a prohibition as -- it

4    may add another step, but you deal with the extra step and

5    that's it.

6            MR. FOX:  Wednesday for us would be fine.

7            THE COURT:  I won't be here Wednesday.  I won't be

8    back in hearing, as far as court, until Thursday.

9            MR. BARTLETT:  Wednesday afternoon after 2:00.

10   Mr. Friedman has a Ninth Circuit argument, so would not be

11   available until 2:00.

12           THE COURT:  Like I said, I won't be here until

13   Wednesday.  Do you want it set before a Magistrate?

14           MR. FOX:   Magistrate after 2:00 would be fine.

15           THE COURT:  Now, I need to find their availability in

16   terms of that.  I don't know, we have to find out -- Pat, can

17   you find out?

18       It may involve the two-step process, that's all I am

19   saying.  But you have a right for them to -- this is an issue

20   that they can deal with as well.

21           MR. FOX:   Releasing Ms. Waters on electronic home

22   monitoring?

23           THE COURT:  I am going to leave it as set until that

24   hearing.

25           MR. FOX:   Okay.

1      THE COURT:   Then I will hear everything you have to
2  say.  I understand what you are saying.  You are asking this
3  court to also -- and I suppose you will make the same
4  presentation to the Magistrate Judge.  You see no difference
5  in the situation involving Ms. Kolar as you see this
6  defendant; that's what you are saying.
7      MR. FOX:  Right.
8      THE COURT:   Now, that of course wasn't involved in
9  any statute at some time -- I don't remember addressing that
10  issue in that fashion, but I understand what you are saying.
11    All right, anything else?
12      MR. BARTLETT:  No.
13      THE COURT:   Anything else?
14      MR. BLOOM:  Excuse me, we do have a couple other
15  things.
16      MR. FOX:  Other than this issue?
17      THE COURT:   I want Pat to make sure that's available
18  before we say that's it.
19    We are looking at Wednesday, March 12, 2:00 p.m.; find out
20  if that's a go.
21    All right.  Something else you want to present?
22      MR. FOX:  Your Honor, there's still the issue I
23  raised this morning regarding contact with the jurors,
24  particularly to find out about their exposure to the arsons in
25  the media from Woodinville Monday morning.

1    So we are asking permission to contact the jurors to find

2 out what they knew and whether this was discussed at all, and

3 what effect this all had on their deliberative process.

4    The only way we can do that is by talking to them.  We

5 have no other way of finding that information out.

6    So, to find out whether or not Ms. Waters's Sixth

7 Amendment right to a jury trial and her due process rights

8 under the Fifth Amendment were violated, we have to conduct

9 those interviews.

10    THE COURT:  All right.  I thought about what you

11 said, but my ruling is the same, not to make any contact with

12 them; and I say that because I am finding no reason to do

13 that.

14    I think my instruction, as I instructed them concerning

15 that charge, was there, and you saw the results of that.  And

16 I think perhaps the fact that the jury deadlocked on these

17 other things kind of answered that question in a sort of a way

18 anyhow.  So it didn't impact them that they will say, okay, I

19 am going to dump this whole thing.  That didn't happen.

20    So my ruling will stand.  Okay.

21    MR. BLOOM:  One other brief matter.

22    Ms. Waters suffers from asthma.  She does have an inhaler.

23 The Marshals were very nice, but apparently the particular

24 inhaler she has is dated, but the Marshal assures me if they

25 somehow decide they want to take that from her, they will

1  provide a new one.

2        THE COURT:  I would think that whatever issues may be

3  along that line, they would make that request to the Marshals.

4  I am sure they will address that.

5        MR. BLOOM:  It can be a serious matter.

6        THE COURT:  I understand, and I would assume she will

7  keep them up-to-date with a certain amount of forewarning, if

8  you will, on issues she needs to have in a period of time that

9  they can react to it.

10        MR. BLOOM:  She's been having trouble breathing since

11  she's been taken into custody, although it's not cured at the

12  moment.

13        THE COURT:  I would say she should keep them informed

14  in some way.  They will see about that; that's their job.

15        MR. BLOOM:  So we'll await word?

16        THE COURT:  We need to await word on that.  If that's

17  not a go, then you need to let me know so I will come back

18  here and we'll do something else.  But right now, if they can

19  take it, one of them, I don't know who that will be.  I know

20  that Judge Arnold is out of town; he's due back Sunday.

21        THE CLERK:  They are both here.

22        THE COURT:  Then find out.

23        THE CLERK:  I will.

24        THE COURT:  All right.  We are at recess.

25        THE CLERK:  All rise, Court is at recess.

1    (Proceedings concluded.)

2                *   *   *   *   *

3              C E R T I F I C A T E

4

5    I certify that the foregoing is a correct transcript from

6  the record of proceedings in the above-entitled matter.

7

8  /S/  Teri Hendrix              May 5, 2008

9  Teri Hendrix, Court Reporter        Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25