1               UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
2                     AT TACOMA

3

4  UNITED STATES OF AMERICA,   )  Docket No. CR05-5828FDB
                       )
5       Plaintiff,    )  Tacoma, Washington
                       )  June 19, 2008
6     vs.             )  9:10 A.M.
                       )
7  BRIANA WATERS,          )
                       )
8       Defendant.    )
  _____)
9

10                TRANSCRIPT OF SENTENCING
11     BEFORE THE HONORABLE FRANKLIN D. BURGESS
        SENIOR UNITED STATES DISTRICT COURT JUDGE.
12

13  APPEARANCES:

14  For the Plaintiff:      MARK N. BARTLETT
                     ANDREW C. FRIEDMAN
15                 Assistant United States Attorney
                     700 Stewart Street, Suite 5220
16                 Seattle, Washington 98101-1271

17  For the Defendant:      NEIL M. FOX
                     Cohen & Iaria
18                 1008 Western Ave., Suite 302
                     Seattle, Washington 98104
19

20  PROBATION OFFICER:      KALEN THOMAS

21  Court Reporter:         JULAINE V. RYEN
                     Union Station Courthouse, Rm 3131
22                 1717 Pacific Avenue
                     Tacoma, Washington 98402
23                 (253) 882-3832

24

25  Proceedings recorded by mechanical stenography, transcript
   produced by Reporter on computer.

1     (Defendant present.)

2          THE CLERK:  This is in the matter of United States of

3     America versus Briana Waters, Cause No. CR05-5828FDB.

4       Counsel, please make your appearance for the record.

5          MR. BARTLETT:  Good morning, Your Honor.  Mark

6     Bartlett, Andrew Friedmann, and Ted Halla for the United

7     States.

8          MR. FOX:  Good morning, Your Honor.  Neil Fox, on

9     behalf of Ms. Waters, who is present.

10          THE COURT:  I notice the absence of Mr. Bloom.

11          MR. FOX:  Right.

12          THE COURT:  I have received a letter from him saying

13     that he wouldn't be here, and that he wouldn't be here at the

14     request of Ms. Waters.

15       Do you agree with that, Ms. Waters?  Do you want to

16     proceed in his absence?

17          THE DEFENDANT:  Yes, please.

18          THE COURT:  All right.  And the matter is on for

19     sentencing this morning, and the Court has reviewed,

20     obviously, as you can see by the load I brought in, a lot of

21     documents involved in this case.  It seems like there were

22     letters reaching in the area of past 250, that I recall -- a

23     few duplications in there -- saying nice things about Ms.

24     Waters, as well as speaking of things that it seemed like they

25     knew very much about her.  I don't know how they got the

1  information, but they were all speaking on her behalf.

2      So I've had a chance to read those, and the other filings

3  in the matter, along with the presentence report prepared by

4  probation.  I've had the benefit of that and the briefs of the

5  sentencing memorandum filed by both counsel in the matter to

6  assist the Court in making a decision here in passing a fair

7  sentence.

8      Now, have I not mentioned something that I should have had

9  the special benefit of in order to proceed here today?

10         MR. BARTLETT:  No, Your Honor.

11         MR. FOX:  No.

12         THE COURT:  All right.  And Mr. Fox, you've had the

13  benefit of the presentence report, to go through that with Ms.

14  Waters?

15         MR. FOX:  Yes, Your Honor.  As I indicated in our

16  memo, we had some objections that we brought to the Court's

17  attention.

18         THE COURT:  All right.  And the Court has read those

19  objections.  I don't know if we need to amplify on those in

20  any way.  Is there anything else to be said about that?  Any

21  factual situation involved in the report other than as they

22  may go to calculations under the guidelines, anything along

23  that line?

24         MR. FOX:  Well, Your Honor, we have some objections

25  factually which I will address in the course of my

1   presentation.

2          THE COURT:  All right.  But the presentence, you've

3   had a chance to go through that with Ms. Waters, so we're

4   ready for sentencing at this time?

5          MR. FOX:  Yes.

6          THE COURT:  I will hear from the government first.

7          MR. BARTLETT:  Your Honor, I think the Court has had

8   a chance to read some of the written victim statements by

9   people who were impacted by this crime.  One of the

10  individuals from the University of Washington has come down

11  today and asked whether or not she could be permitted to make

12  just a brief statement to the Court.  It's Linda Chalker

13  Scott.  I would ask her to come up and make a brief statement

14  to the Court.

15         THE COURT:  Let me hear from counsel first on this

16  matter before I hear from any victims.  I believe this person

17  testified in the course of the trial?

18         MR. BARTLETT:  No, that was Sarah Reichard, Your

19  Honor.

20         THE COURT:  Okay.  All right, I will hear from any

21  victim at a later time, but right now I will hear from

22  counsel.

23         MR. BARTLETT:  Your Honor, today we are here to

24  sentence Briana Waters.  She's 32 years old.  She was

25  convicted by a jury of her peers after committing one of the

most serious arsons to occur in the district in the last
quarter century.

The defendant's actions caused not only millions of
dollars in damages to one of the greatest public universities
in the world, the University of Washington, but it, as the
Court has heard both at trial and in the written submissions,
impacted many, many victims.

Ironically, defendant's actions -- self-described as a
noble protest to help mother earth -- actually had totally the
opposite effect. There was no genetic engineering being
conducted by Professor Toby Bradshaw. The fire did nothing
but destroy some of the rarest plants, some that are
irreplaceable. It destroyed hundreds of rare, irreplaceable
books. It destroyed and set back innumerable research
projects, all of which were aimed at helping the environment.

Despite the seriousness of her crime and the huge impact
this arson had on the community, she stands before this Court,
spectacularly unrepentant, self-indulgent and unreflective.
In fact, the defendant continues to use every possible means
to avoid accepting any responsibility for her actions,
choosing instead to blame everyone but herself for her current
predicament. Why? Because Ms. Waters has failed to ever
grasp one of the most fundamental lessens of being an adult:
actions have consequences, decisions carry repercussions.

This defendant chose to become best friends with Bill

Rodgers, a person who devoted his entire life to planning and carrying out arsons and other violent attacks and perfecting how to build incendiary bombs. This defendant chose to get and purchase a cell phone and pay for that cell phone for Bill Rodgers so he could remain anonymous as he carried out his illegal acts.

This defendant chose to help arrange and find a location at Evergreen State College so the coconspirators of the double whammy could meet in safety and anonymity.

This defendant chose to manipulate her cousin and close friend, Robert Corrina, so a safe car could be obtained for this arson. This defendant chose to plan the arson so carefully that she even stole Robert Corrina's cordless phone on the night of the arson so police could not be inadvertently notified of her absence.

The defendant chose not to cooperate with law enforcement throughout this activity. Instead, continued to claim that she was innocent.

The defendant chose Bob Bloom to represent her.

The defendant chose to engage in what could only be described as total character assassination with regard to anyone that might hold her accountable for her prior actions: Jennifer Kolar, Lacey Phillabaum, Special Agent Ted Halla, Special Agent Tony Torres, AUSA Andrew Friedmann, even this Court.

Defendant chose to get on the stand at trial and commit perjury time and time again.

And finally, the defendant chose to continue this charade, even after conviction, choosing to portray herself as a noble idealist wrongly convicted by a corrupt judicial system, in effect a martyr.

Now, on the day of reckoning when she is about to face the consequences of her many decisions that she's made over the past years, she comes before this Court and begs for herself, for mercy.  To save her, she wants you, Your Honor, to save her from her choices.  The sense of arrogance and entitlement that underlies this request would almost be comical if the situation weren't so serious.

What is the proper sentence for this defendant? Supervising United States Probation Officer Kalen Thomas prepared a draft presentence report.  He looked at input from both the United States and from the defendant.  He talked the matter over with senior members of the United States Probation Department here in this district, and they finalized her presentence report.  After fully staffing and venting this individual, the U.S. Probation Office for the Western District of Washington has recommended that this defendant receive a term of imprisonment of ten years.

The United States strongly joins that recommendation, that this Court impose a sentence of no less than ten years

1  imprisonment on this defendant.  It is the absolute lowest

2  sentence of imprisonment that will accomplish the goals set

3  forth by the Supreme Court in its Booker decision and codified

4  in Title 18, Section 3553.

5      What does the Court and the Code tell you?  A sentence

6  must reflect, first, the seriousness of the offense; second,

7  it must promote respect for the law; third, it must provide a

8  just punishment for the specific crime; fourth, it must

9  provide adequate deterrence to future criminal conduct; and

10  finally, it must protect the public from further crimes from

11  this defendant.

12      In attempting to arrive at a sentence that "reflects the

13  seriousness of the offense and promotes respect for the law,"

14  obviously one of the most important factors that not only this

15  Court, but all federal courts, consider in arriving at a

16  sentence is the sentencing guidelines.  After Booker, they are

17  not mandatory, but they are still critical factors for the

18  Court to consider.  They provide every district court in the

19  United States an objective guidepost as to how other

20  defendants that have committed similar crimes should be

21  treated.

22      As calculated by both the United States Probation

23  Department and our office, the defendant's sentencing

24  guideline range is 360 to 480 months, 30 to 40 years of

25  imprisonment.  That is the place, 30 to 40 years of

imprisonment, where this Court should start in analyzing what is the proper sentence for this defendant.

The probation office and the government's joint recommendation of a ten-year term of imprisonment is one third from the bottom of that applicable sentencing guideline range. By any measure, our ten-year recommendation is extremely lenient.

I am not going to go into a detailed discussion of all the sentencing guideline calculations; that has been hashed out in detail in the written submissions, and I'm not going to waste the Court's time in going through it. I do want to mention one thing, however, in regard to the terrorism enhancement.

Judge Aiken, in Oregon, has considered all the arguments raised by both the United States and by the defendant. In ruling in Oregon in her very detailed memorandum, Judge Aiken indicated and, in fact, decided that the defendants involved in the Jefferson Poplar crime should in fact receive the terrorism enhancement, and they did.

But the Court is well aware, the Jefferson Poplar crime, if anything, might be argued less applicable in regard to terrorism enhancement because that was a private farm. In this case, the University of Washington arson involved a public university, a government institution. It is clear that Judge Aiken, and I urge the Court, this Court, also, should apply the terrorism enhancement to individuals involved in the

1   Center for Urban Horticulture arson.

2       In addition to looking at the sentencing guidelines,

3   obviously this Court will also look at, as set forth in the

4   Booker decision and in 3553(a), what is a just punishment for

5   the crime.   One of those factors will be how a similarly

6   situated defendant has been treated.

7       The most analogous defendant for this Court to consider is

8   Eric McDavid.   On May 8th, a little over a month ago, in the

9   Eastern District of California, Judge Morrison England

10  sentenced Eric McDavid to a term of imprisonment of 19 years

11  and seven months.   That sentence was based on Mr. McDavid's

12  participation in the conspiracy, in the Earth Liberation Front

13  conspiracy, to commit arson.

14      By almost any objective analysis, McDavid's crime was less

15  serious than this defendant's.   It was a serious crime.   It

16  was a conspiracy to destroy a number of government buildings

17  and institutions, but it was never completed.   No bomb was

18  actually set, no building was actually destroyed.

19      And second, although Mr. McDavid chose to go to trial and

20  asked the government and demanded that the government prove

21  his guilt beyond a reasonable doubt, he did not get on the

22  stand and commit perjury.

23      That case and his actions in that case and the crime in

24  that case stand in stark contrast to Ms. Waters' situation,

25  where a building was destroyed, a multi-million dollar

building, in an urban setting, and she did get on the stand, and she did commit perjury, time and time again. And there's a price to pay for that action.

In addition to looking at Eric McDavid, the Court will also, obviously, look at some of the codefendants in this case. I would suggest to the Court that the most analogous and applicable codefendants for this Court to consider are the sentences imposed by Judge Aiken on Joyanna Zacher and Nathan Block. In many ways they are the defendants that most closely resemble this defendant. Both Block and Zacher were from Olympia, both were friends of Bill Rodgers. Both were involved in the double whammy, although in Zacher's and Block's case they were involved in the Jefferson Poplar arson as opposed to the University of Washington arson.

Unlike this defendant Zacher and Block pleaded guilty, admitted their criminal conduct, and accepted responsibility for their actions.

Unlike this defendant, Zacher and Block also met with law enforcement, and although they refused to name other names, they fully and in detail described their own criminal conduct. They received sentences of 92 months from Judge Aiken.

In looking at the next criteria set forth in Booker and in Title 18, fashioning a sentence that affords adequate deterrence to future conduct, this Court must, of course, look at the specific crime that was committed.

1    This arson was not burning a horse corral in a rural

2   setting, such as at Susanville.  It did not destroy pole sheds

3   on a privately owned farm in rural Oregon, such as Jefferson

4   Poplar.  This crime was different.  This crime destroyed a

5   multi-million dollar facility in a densely populated urban

6   area.  It destroyed a teaching and research facility at a

7   public institution.  Firefighters were put in serious risk of

8   harm.  There were hundreds of victims of this crime:

9   Individuals who were employed at the Center for Urban

10  Horticulture; the graduate students who were trying to finish

11  their masters and doctorates, who saw their academic careers

12  either delayed or in some cases totally ruined; the

13  undergraduate students who went to class at the specific

14  facility; and finally, the citizens of the State of Washington

15  are victims.  It is the taxpayers in this state that had to

16  foot the 6.2 million dollar bill that was required to rebuild

17  this institution because of this defendant's actions.

18      It took from May 21st, 2001, the day of the arson, until

19  January of 2005, when the new center was opened, for the many

20  victims in this case to have their lives returned to some

21  semblance of normality.

22      The librarian of the center, Brian Thompson, wrote a

23  letter to the Court and he described how over a thousand books

24  were destroyed, irreplaceable books.  He further described how

25  he personally spent the next years doing grunt work trying to

salvage books and articles as opposed to the work that he was
trained to do, the research work he was supposed to be doing.

Sarah Reichard, a professor at the school, also wrote to
the Court, and she summed it up better than anything I could
ever say: "The people who worked at the Center for Urban
Horticulture are without exception good people whose main
concern is doing something positive for the environment. This
violent act devastated us and from which we, as individuals,
will never fully recover. They took years away from us and
changed how we look at our fellow human beings."

Hopefully, after hearing from the victims at trial and
reading their statements to the Court, I will never have to
again endure the repeated statements made prior by this
defendant and her supporters that this was nothing but a
property crime, that no one was really hurt.

In addition to looking at specifics of the crime, I think
the Court has to consider the motive underlying this crime.
It's a crime of terrorism, and terrorism is different. The
defendant and her partners held a joint role. They were
attempting to intimidate and coerce the government and the
universities into adopting their extremist views. In this
instance, they wanted to force the government and universities
to stop all work on genetic engineering. I'm not speculating
on that. The Earth Liberation Front communiqué that was
issued after this arson said, described it in detail:

"As long as universities continue to pursue this reckless science, they run the risk of severe losses. Our message remains clear: We are determined to stop genetic engineering. From the torching of Catherine Ive's office at Michigan State University, to the total incineration of GE seeds at the D & PL warehouse in Visalia, California, the Earth Liberation Front is growing and spreading. As the culture of domination forces itself into our very genes, wild fires of outrage will continue to blaze."

Terrorism is the antithesis of America. It is the polar opposite of how democracy works in a free and open society. Terrorists, instead, attempt to impose their elitist views through the use of violence and intimidation.

It is the arrogance of a bitter minority trying to impose their will and rationalizing it by saying the end justifies the means. It makes their crimes more serious and more dangerous. As a result, terrorists are treated more harshly by the law, and they should be.

I'm not going to spend a great deal of time rebutting the many arguments raised in defense sentencing memo. I will note that the argument that this Court can avoid a mandatory minimum five-year sentence, as described in the legal argument, is about as helpful as their other 30 motions that have been raised and denied by this Court.

There are some arguments, however, that demand response.

First and foremost is the assertion that appears at page 16 of the defendant's sentencing memorandum. At that page they make the following statement: "The conviction was the result of a series of errors at trial and a climate of fear."

This defendant was convicted because the government put on overwhelming evidence of her guilt. We introduced hundreds of pieces of physical evidence. We put on compelling testimony from witnesses that was corroborated by physical evidence. Her guilt was proven beyond all doubt. That's why she's convicted. Not because there was fear in this courtroom or in this jury or that there were any errors. She was convicted because she's guilty.

Jennifer Kolar identified this defendant in December of 2005 out of the blue. She was on no one's radar screen, and there has never been even a hint of an explanation as to why Jennifer Kolar would make up this defendant's participation.

Weeks later, Lacey Phillabaum, totally independent of Jennifer Kolar, also identified this defendant's participation and describes how she participated.

Totally independent, two people involved in the conspiracy, neither of them talking to each other, both identified the defendant.

Even more damning, during this very first interview, Lacey Phillabaum tells us something no one had ever heard, that this defendant not only helped arrange for meetings, provided a

safe house for where the incendiary bombs were made, but she had her aunt get the car that was used to transport the people to the arson. After almost a year of work, what do we find? The physical evidence that shows that's exactly right.

And in addition, Robert Corrina, her cousin, her friend, comes in and tells this Court not only did he get the car at this defendant's request, but all the lies and deceit that she did to try to hide her activity.

Phone records show how close Bill Rodgers and her were. Not only did she buy his cell phone, but he talked to her more than anybody else, according to the phone records. And what is most especially aggravating, is not only is this the evidence that we put on at trial that proved beyond all doubt her guilt, but there was a lot of other evidence that was not admissible at trial that also showed her guilt. I am just going to give you one example.

One of the coconspirators in Oregon was Daniel McGowan. Daniel McGowan was part of the group that said I'm going to plead guilty, I'm going to accept responsibility for my crime, and I will tell you what I did with regard to these actions, but I'm not going to name names. That was his deal in Oregon he cut.

I was at the debriefing for Daniel McGowan, and what does he say? He describes in detail his actions, and eventually he talks about his activity with regard to the double whammy. He

was one of the participants in the Jefferson Poplar arson.  He

describes coming to Olympia.  He says that one of the other

participants, one of the participants in the U.W. arson,

arranged for a clean room where the incendiary bombs were

made.  And, in fact, I, Daniel McGowan, went to this room and

I made the incendiary bombs.  And where was the room?  It was

in a garage that was separate from the house where this was

arranged, and I and other people went back there and in this

clean room made the bombs.

The exact description of Lacey Phillabaum's clean room

where this defendant lived.  And they know this exists.  And

yet they continue to come before this Court, even now, to

claim, oh, I'm innocent.

By falsely protesting her innocence and by continually

alleging gross government and judicial misconduct, defendant

fuels an environment where additional crimes, such as the

Street of Dream arsons that occurred during jury

deliberations, will continue.

Briefly addressing the defendant's main arguments.

She says that I really had a really small role in this

arson so I should have a reduction.  Mitigating role in the

offense.

That just simply factually isn't accurate.  With regard to

this specific arson, she actually had a much greater role than

either Lacey Phillabaum or Jennifer Kolar.

Now, clearly, Kolar was involved in many more arsons and involved a longer period of time.  But with regard to mitigating role in the offense, all we're looking at is this arson, the Center for Urban Horticulture arson.  Her involvement was much more than either Phillabaum or Kolar.

Second, defense says that she should be given a break because of family circumstances.  The defendant loves her daughter.  There's no argument with regard to that.  She's very devoted to her daughter.  There's no argument with regard to that.  Is it some kind of an extraordinary and unique relationship?  Does Mr. Fox really think that this defendant loves her daughter more than he loves his two daughters?  More than I love my two daughters?  I doubt it.

Any sentencing of a mother of a young child is incredibly hard and it involves a very, very severe imposition on that daughter, but it's nothing unique and it's nothing extraordinary.

Finally, defendant indicates that she has a lifetime of good works the Court should consider.  The defendant is a person who enjoys playing and teaching the violin.  By all accounts, she's incredibly talented.  She's given benefit concerts in the Bay Area.  She provides violin lessons.

She's not Mother Teresa.  She's not out trying to cure cancer.  She's not even helping the homeless.  What she is doing is what thousands and hundreds and millions of people do

every year.  They live in their community, they belong to the
PTA, they go to community meetings, and they try to raise
their kids.  Extraordinary?  It's ordinary.

Now, she has collected a large number of letters in
support.  The problem with those letters is that they are
based on a lie.  The lie is:  I'm an innocent person who was
wrongly convicted, and for goodness sake, please write and
tell the Court and help me.

Victoria Canby's letter captures the common theme that
appears in many of the letters:

"Honorable Judge Franklin Burgess:

"My friend Briana Waters has been tried and convicted of
arson at the University of Washington.  I and many others who
know Briana are certain of her innocence."

Jessica Bottomley's letter:

"I have known Briana Waters for 8 years now... I know from
the core of my being that she did not commit these crimes she
has been accused of... I humbly ask that you please take a
moment to listen to my heart, to listen to the many
outstanding citizens who are standing up to assure you that
you have the wrong person in prison for these crimes."

If all the letter writers knew the truth, that in fact
this defendant had committed the arson, that she not only
committed the arson but chose to get on the stand and lie
under oath and that she engaged in the most guttural attacks

against any witness who dared to try to help hold her accountable, I would submit that the huge majority of these letters wouldn't have been written.

The support is based on a house of cards that doesn't stand even the most cursory examination.

There are two minor matters I want to bring up to the Court before I conclude.

The first is the defendant has asked that you recommend that the Bureau of Prisons assign her to FCI Dublin. In all honesty, in 25 years, I don't ever remember even commenting on a designation, but in this instance, my understanding is that the Bureau of Prisons is trying to keep all defendants separate involved in this conspiracy.

We brought Suzanne Savoie up from Dublin to testify at this trial, and we are attempting to get her back here. It is my understanding, if this defendant goes to Dublin, she will be prevented, and I believe that the Bureau of Prisons should hold out Ms. Savoie's initial claim to Dublin over this defendant's. So all I'm asking is for the Court to say no, make no recommendation with regard to prison placement.

Surprisingly, defendant also asks that she be released pending appeal, and in the alternative, at least be allowed to self-report. I say surprisingly because this issue has been litigated. In fact, the first time that I am aware of in this district, this issue has been litigated all the way up to the

1   Ninth Circuit.  In fact, she hired Dennis Riordan, one of the

2   best criminal appellate attorneys on the west coast, to

3   represent her at the Ninth Circuit, and this is what the Ninth

4   Circuit held in looking at her request for release.

5       "The district court properly found appellant failed to

6   establish by clear and convincing evidence that she is not a

7   flight risk."  The Ninth Circuit continued, saying, "The

8   district court also properly found that there are no

9   exceptional circumstances why appellant's detention pending

10  sentence would not be appropriate."

11      This issue has been decided.  In effect, they're almost

12  asking this Court to overrule what the Ninth Circuit ruled at

13  their request.

14      I would ask the Court continue detention of this defendant

15  and readopt it's findings set forth in its April 28th order.

16      You've heard this trial, and I want to wrap it up and not

17  take too much of the Court's time, but there are a couple of

18  final points I want to make.

19      The first is just a frank request.  Don't punish us for

20  making a ten-year recommendation.  There's been a part of me,

21  a big part of me, that was strongly tempted to recommend 20

22  years in this case.  That's where the defendant clearly

23  thought we would be, given the Eric McDavid sentence, the

24  guideline sentence.  I think that would have been a very

25  reasonable recommendation.

I've been appearing before this Court for over 25 years, and I have always provided you with nothing but my frank and honest recommendation, and I'm not going to change today. Ten years is what we strongly believe this defendant should get.

It's human nature in a bitterly contested case for a court to want to split the baby, and I would suggest that's why you have the defense recommendation of 18 months. Does the defense really think the five-year mandatory doesn't apply? Of course not. But they wanted to get under five years because they think, it's kind of like a defense, we have to be low so when they come in high we will get somewhere in the middle.

I'm not doing that. I know this Court will independently and carefully think about the appropriate sentence. Don't play the game defense is asking you to play.

Second, the defense in all of its statements really talks nothing except about specific deterrence for this crime, that this defendant will never commit another crime and you can trust that. But the Court, of course, has to not think just about specific deterrence for Briana Waters, but you must think about a general deterrence for the public at large. And in this case, not only just general deterrence for other individuals that might be considering arson, but other individuals involved in the Earth Liberation Front and in the Animal Liberation Front.

At some point in time -- maybe not next week, maybe even not next month -- but at some point in time we will make arrests in the Woodinville arson investigation, and at that point, that individual or individuals will have to make a very difficult choice: whether to cooperate with the United States or not cooperate. And it's very difficult for Animal Liberation Front or Earth Liberation Front members to cooperate. Why? Because within that group, the most hated and vilified label anyone could ever get is that of being a snitch.

And it makes sense. Why does the ALF and ELF attack cooperators so unmercifully? Because no one will join their groups if they have the fear in the back of their mind that if we're caught, my coconspirators will turn on me. That's why, you heard the description, how they all get together before any of these crimes and they join hands and they all individually pledge, if caught, we're not going to cooperate. And that is why anyone who does cooperate is absolutely crucified within the community. Go on line and look at the blogs of how Lacey Phillabaum and Jennifer Kolar are being described over the last couple of months.

If this defendant, however, is shown leniency by this Court after her failure to cooperate, after her perjurious testimony during the trial, and after her scorched earth tactics and posttrial claims of innocence, no one from the ELF

1  or ALF will ever cooperate again.  They simply won't.  The

2  price will be too high personally.

3     The Court should also not only think about general

4  deterrence, but how this sentence will be viewed by the

5  victims and the public in general.  The people, the many

6  people at the University of Washington, at Oregon State where

7  other people were involved in poplar analysis, all of the

8  various victims in this case will be watching this sentence,

9  and a strong message needs to be sent so that they have faith

10  in our system.

11     Finally, I'm asking the Court to consider a personal

12  aspect of it.  This defendant has proven time and time and

13  time again, she is totally incapable of accepting

14  responsibility for any of her actions.  Think about it.  In

15  the fall of 1998 she invites Craig Rosebraugh to come up to

16  Evergreen and give a speech, and after that speech she's

17  interviewed by Robert Sullivan, and he asked her whether she

18  supported arsons and mink farm releases.  And she's quoted as

19  saying, "As long as people don't get hurt, I totally support

20  it."  Not I support it; I totally support it.

21     And her friend, Tiffany Tudder, comes into this Court and

22  tells you, "Yeah, I was there at the conversation that

23  occurred."  She can't accept responsibility for that

24  statement.  Not only does she deny making the statement, but

25  she says that is exactly the opposite of what I thought.

Second.  In 2001, she personally provides a collection of articles to Jennifer Kolar, her then good friend.  She writes on the top of that, "Here are some articles to read.  Let's talk about it later."

Her fingerprints are on the outside; her boyfriend's fingerprints are on the inside.  The articles are all extremely radical writings, anarchist writings about how to destroy our current economic system.

When shown these articles, her response during this trial, "I don't remember having read any of those articles or those words; I disagree with them."  Yet when we search Bill Rodgers' house and Justin Solondz's house, what do we find?  These exact articles.  The two people that she was most closest to during this time frame, all are reading this.  Of course she's reading these things and thinks they are important.  But when she gets here to court, she cannot accept responsibility.

Her own cousin gets on the stand and testifies.  A friend of hers.  Can she accept responsibility for Mr. Corrina's testimony?  No.  She basically destroys her own family to try to protect herself.  Mr. Corrina's mom flew out here to provide him a little support while he testified.  She wanted to sit here and give him one friendly face in the stand while he had to get on the stand and do what must have been a nightmare, testify against his own friend and cousin.

How did defendants respond to that?  They got up and gave
Robert Corrina's mom a subpoena and told her, you might be a
witness and you've got to get out of court.  And they escorted
her out of the courtroom, to make sure Mr. Corrina didn't even
have his own mom here in court to support him.

That's the kind of scorched earth tactics that she
undertook, denying her own responsibility for her actions to
try to save herself.  Has she changed?

Now at the eleventh hour, as the Court indicated at the
beginning of this case, we have the letter from Mr. Bloom.
He's not here today.  Why?  Well, a quote from his letter.
This is what Mr. Bloom wrote to the Court:

"It is important to Ms. Waters that Judge Burgess is aware
that she was not happy with what might be seen as an overly
aggressive response by my to the manner in which Judge Burgess
conducted the trial and the proceedings that took place prior
to the trial.  My style is not her style.

"Ms. Waters suggested that it might be best if I did not
attend court on the day of sentencing and that Mr. Fox would
speak for her on that date.  She believes my absence on that
date would signal to the judge she was not happy with my
response to the various rulings by Judge Burgess.  She was,
and is, hopeful that Judge Burgess will not punish her for any
antipathy he might have for me and my approach.  She believes
that her request that I absent myself at sentencing would make

her feelings clear to Judge Burgess."

I don't know which is more insulting about this letter, the fact that they think you might somehow be affected by personal feelings toward an attorney, or if they think they can fool us by this last minute letter; that we didn't sit here for a month and watch how closely she and Mr. Bloom were. Were there bad feelings in this case at times between the attorneys? Yeah, there appeared to be. They appeared to be directed all toward Mr. Fox who was not being rabid enough for Ms. Waters' and Mr. Bloom's tastes.

She chose Bob Bloom. She had two excellent attorneys in the Federal Public Defenders office, but she took extraordinary steps to make sure Bob Bloom represented her. She went into court and basically lied to the Court saying, I have the money to pay for Mr. Bloom to represent me throughout this case, when in fact she clearly didn't, and then got Mr. Bloom appointed to the CJA panel so he could be paid, at government expense, for a panel that he wasn't even a part of. And now she comes at this eleventh hour fearful that it might hurt her and says, oh, gee, I didn't like Mr. Bloom's actions. I'm so angry at the way he treated the Court. It's insulting.

This defendant comes before the Court today and asks for mercy. She could have cooperated, she could have proven that she was worthy of being shown mercy by this Court, but she chose a different path.

The United States comes before this Court and we also ask
for mercy.  That's why we're not asking for 30 years as
required by the Sentencing Guidelines; we're not even asking
for 20 years, as Eric McDavid received in the Eastern District
of California.  But we are strongly asking for a ten-year
sentence of imprisonment because that not only shows mercy for
this defendant, but it also shows justice to the public at
large.

We are asking the Court to remember that the American
people will view this sentence, her codefendants will view
this sentence, and all the victims are watching this sentence.
It should be no less than ten years.

And I will remind the Court what you are already keenly
aware of.  Even after this sentence, this defendant still
holds the key.  She has not chosen to cooperate up to this
point in time, but after sentencing, for a year she could
change her mind and come in and cooperate with the United
States and put herself in a position of perhaps reducing her
sentence.

She doesn't want to ever make a difficult decision.  She
wants the Court to do her work for her.  She's 32 years old.
It's time for her to be held accountable for her own actions.
It's time for her to make the difficult decisions that so far
she has avoided.

THE COURT:  All right.  Mr. Fox.

1          MR. FOX:  Did the Court want to hear from --

2          THE COURT:  No, I will hear from you.

3          MR. FOX:  Thank you.

4     May it please the Court, counsel.

5          One of the reasons I think that we put sentencing off for

6     a number of months after a trial is to give everyone a chance

7     to sit back, take account of what took place, let emotions

8     calm down, and have a more reasoned approach to sentencing

9     issues.  This was a contentious trial, there's no question,

10    and I can't stand here and point my finger and say that all

11    the issue comments came from the other side because they

12    certainly came from our side of the courtroom.  I'm not going

13    to dispute that.

14         I told you once, Your Honor, that I can't apologize for

15    what other people do.  I think I told you that one day when

16    Mr. Bloom had forgotten his notebook at his hotel room, and I

17    said I don't usually apologize for what other people do, and I

18    guess in this instance I can't apologize for Mr. Bloom's

19    behavior.

20         But I think the reason, as I said, we delay sentencing

21    months after a trial is to let the tempers tone down so we can

22    sort out what the jury found and what the jury didn't find.

23    And I could stand up here and reargue our case, as the

24    government just did.  I have a lot of things to say about what

25    Mr. Bartlett said about the evidence.  We had a different view

of the evidence.  This folder that Mr. Bartlett just spent so
much time talking about, it turns outs Ms. Kolar lied.  She
deceived the Court and the government about the chain of
custody of that folder.  This was revealed by the government,
and I respected the fact that the government came forward and
told us this.

But, I guess, let's put that aside because this isn't the
time to reargue the facts of the case.  We had a trial, the
government made a series of allegations against Ms. Waters,
the jury rejected some of those allegations, found Ms. Waters
guilty of others, and now it's the time to look at Ms. Waters
as a person and determine what a fair and just and
compassionate sentence should be.

I think that when you look at the 250 letters that have
been generated and you see that they are from people from all
walks of life, from Ms. Waters' past and her present, many of
these people may think that based upon their knowledge of Ms.
Waters, she was innocent.  They didn't sit through the trial,
but that's their opinion.  And the fact that they come to that
conclusion is based upon their observations of how Ms. Waters
acts on a daily basis, how she's acted, how she's conducted
her life.

These letters -- well, let me go back.

At trial, the Court heard about the Watch campaign, and
that was one slice of Ms. Waters' life back in the late '90s

and early 2000s.  But since Ms. Waters went to California,
since she moved down there, the Court can see what type of
person she is, how she conducts her life on a daily basis.

This is a person who lives a modest life.  She's not
living a life of excess.  She's in the community of parents,
of musicians in the Bay Area.  She's someone that helps out
the community.  She plays at benefits, she plays as senior
citizen homes.  This is a person who's dedicated her life to
improving the community around her.  These letters of support
are not from this mythical ecoterrorist network; they're not
from the Earth Liberation Front.  These are from regular
people that see Ms. Waters, that know her, and see the types
of good things she does in the community.

This is someone, whatever the jury's verdict about what
happened seven years ago, this is someone who has given a lot
to her community, and who can continue to give a lot to her
community.  She's someone that has played a positive role.
The type of things that she's done are the types of things
that we want people who come to the criminal justice system to
do when they get out of prison.  Ms. Waters has already done
that.

So I guess what the Court has to figure out is, is Ms.
Waters the type of person who needs to be locked up behind
concertina wire with armed guards and dogs and chains and
locks?  Does she need to be put into a prison for the length

1    of time that the government is asking for?  And she's not.

2    She's not the type of person that needs incarceration for an

3    extended period of time.

4        Now, the government has said that this was a horrible

5    crime, and we have no dispute with that.  The people who did

6    this were completely misguided.  And our heart goes out to the

7    people who suffered from this.

8        I would note that some of the people who are victims of

9    this crime have filed letters with this Court saying that they

10   use the Center for Urban Horticulture, they were master

11   gardeners, and they still believe that Ms. Waters deserves

12   leniency from this Court.  So not everyone who was affected by

13   this believes that Ms. Waters should be locked up for ten

14   years or more.

15       And I think what the Court has to do is to weigh this

16   arson in 2001 committed by a group of people who were

17   completely misguided and to see whether or not that in and of

18   itself is a reason to lock up Ms. Waters now in 2008.  I would

19   suggest that after reviewing everything that's been submitted,

20   there is no valid penological reason to lock Ms. Waters up, to

21   take her away from her family and from the community for such

22   an extended period of time.

23       Now, we don't agree with the verdict of the jury, and it's

24   hard sometimes when you come to court.  I mean, there really

25   is -- we are really in a no win situation.  We can't come to

court and say, oh, well, we've insisted on our innocence. Ms.
Waters insists on her innocence, but now that she's been
convicted, she takes responsibility for her actions. That
can't logically take place.

So we're really in the position of coming to court
insisting on what she's always insisted on, that Ms. Waters
has insisted on her innocence and coming in with dignity and
asking the Court to impose a fair sentence.

So the Court's not going to be able to hear and will never
hear any type of acceptance of responsibility of the type that
the government is holding out is what needs to happen. Ms.
Waters is innocent. She disagrees with the jury's verdict,
but she has to accept it. That's the rule of law. We have to
accept what the jury said. We're going to appeal it, but we
have to accept it.

But I would ask that the Court trust the jury's verdict as
well and that the government give due respect to the jury's
verdict.

The jury trial is not just some cog in the transmission
belt that goes from indictment to prison. The jury trial is
not just some formality where the government brings in
hundreds of pieces of evidence and the jurors agree with the
government and sends them off to prison. It's not that type
of a thing. And a jury trial right is not just the
government's tool, but rather the jury trial right is the

shield of defendants, particularly in cases where the emotions
run high, particularly in cases where the government is
alleging terrorism.  The jury verdict has to be respected by
all parties to this decision, and it's a shield for Ms.
Waters.  And she asks the Court, and pleads with the Court, to
give effect to the jury's verdict.

What that means is the jury didn't convict Ms. Waters of
bombing anything.  It's a term that Mr. Bartlett used.  It was
what was alleged at trial.  The jury didn't convict her of
bombing anything.  The jury didn't convict Ms. Waters of
conspiracy.  They didn't convict her of conspiracy, and I'm
going to address the significance of that in a few seconds.

But what we are asking the Court to do is to honor and to
trust that the jurors that came into court and sat in that box
over there, that they reached the right decision.  We are
going to appeal, there's no question about that.  But for
sentencing purposes, we have to trust what the jury did.  And
we can't second-guess what they did.

Trust in the jury system and the rule of law is really,
really important in today's climate.  Mr. Bartlett talked
about terrorism, and I note that the government is engaged in
a war on terrorism.  A lot of people's rights have been
trampled by this war on terrorism.  The Supreme Court's
decision last week should give pause to everyone about what
can be done in fighting the war on terrorism and whether or

not we can just ignore due process of law.

I cited in my materials to experiences in other countries and other times. Other countries, liberal democracies like England that dealt with terrorism issues. Maybe it seems remote to talk about what happened in the 1970s in England. Maybe I'm getting old and it doesn't seem that long ago. I actually lived in Ireland in the '70s, so I lived through some of these events.

But everything that we're going through now has gone on in other countries. The IRA bombing campaigns in England in the '70s and '80s were horrible because lots of people died. The English government's judicial response was hideous. They tried to do away with jury trials in terrorism cases. People were convicted who insisted on their innocence and spent years in prison until they finally were vindicated. And I talked about the guilt before in the Maguire Seven.

Again, 30 years ago may seen like a long time ago, but we can learn from the experiences of other countries. We can learn by seeing how they responded to terrorism and how they messed up, and how they ran roughshod over the rights of people.

I attached to my sentencing memo some articles, or at least one article, contemporaneous with the convictions of the Guildford Four bombing case, where the moral outrage was the same as, I'm sure, coming from the government's table today,

1  and yet those people turned out to be innocent and they spent
2  16 years in prison for something they didn't do.
3      Again, I bring that up only to tell the Court, this has
4  happened before.  Someone has gone through a terrorism trial,
5  insisted on their innocence, and turned out to be innocent.
6  And that's why we have to learn from that experience and have
7  respect for the jury's verdict.
8      We have to have respect for the fact that the jurors
9  didn't find Ms. Waters guilty of conspiracy.  We have to have
10 respect for the fact that the jury didn't convict Ms. Waters
11 of the arson at Susanville.  The government didn't even file
12 charges on that basis.  There was no indictment ever returned
13 against Ms. Waters down in the Eastern District of California
14 for that arson.  Yet the government spends a lot of its
15 sentencing memo talking about Ms. Waters being involved in the
16 second arson.
17     I've got to respond to that, and that's why I spent -- I
18 felt strange including in my sentencing memo, which really
19 ought to be about Ms. Waters and her character, talking about
20 Stan Meyerhoff and his character.  But it's important because
21 it goes to the issue of proportionality.
22     The government says, well, Ms. Waters is most similar to
23 Joyanna Zacher and Nathan Block and they got 94 months, or 92
24 months.  Well, Joanna Zacher and Nathan Block pled guilty to
25 conspiracy, and they also pled guilty to being involved in two

separate arsons, the Romania II arson and the Jefferson Poplar Farm arson.

So if we're looking at proportionality, if those people got 92 months because they admitted being in the conspiracy and they admitted involvement in two arsons, then you have to look at one arson versus two arsons. Well, the government says, well, Ms. Waters was involved in two arsons. We're not going to try to prove it. We're not going to bring any witnesses in to say that. We're going to attach Stan Meyerhoff's 302 report to our sentencing memo, but we're not going to bring him to court.

I object to the Court considering the 302 reports that's attached to this government's sentencing memo. Under Ninth Circuit cases, the ones I've cited in my brief, the Court can't consider that type of unreliable hearsay of an alleged coconspirator in a proffer session as a basis for sentencing.

The government will never bring Stan Meyerhoff to court because he's unreliable. Everything that I filed with the Court -- his involvement in subsequent surveillance of Naval installations for which he's never been charged, for what I can only imagine would be sabotage against a Naval installation; his attempted murder; his consistent lies, even to the U.S. Probation Service officer in the presentence report about his drug use -- all of these things show that he's unreliable.

But also it's contradicted by what the other people who were at Susanville said.  Darren Thurston, who also was a cooperating witness for the government, said very clearly that Briana, he had never met Briana Waters.  He doesn't know that person.

Jennifer Kolar, who the government trots out as being a credible witness, she testified in this court about Susanville and never once said that Briana Waters was there.

So what Stan Meyerhoff now says after he wants the government to be his advocate -- and those are his own words, caught on tape with his fiancee, Lacey Phillabaum -- he's just simply saying what the government wants him to say because he thinks it's going to get him a better sentence.  But that's why the government won't bring him in.  That's why they never brought him in.

And I only, again, I'm only taking precious time because it's important to show that Briana Waters has not been convicted, has not even been charged, and had no involvement in the Susanville arson.  And then we're only dealing with one arson, we're not dealing with two.  And the proportionality analysis is then driven by that.  We are talking about one arson, not two.

The jury also, as I said, did not convict Ms. Waters of conspiracy.  They didn't convict her of conspiracy.  And so I'm offended when the government -- I guess maybe I offend

easily -- but I'm offended by the government's continued
reference to Waters and her coconspirators.  There are no
coconspirators.  The jury didn't find her guilty of
conspiracy.  And it's basically an insult to the jury to say,
well, we believe that she's a coconspirator there, but we know
you didn't find her guilty of that, but we're still going to
paint her in that terminology.

That's significant.  The conspiracy counts are significant
because it ties into the terrorism aspect.

I made a number of legal arguments in my brief as to why
the terrorism enhancement doesn't apply in this case.  I'm not
going to spend any time on that unless the Court has
questions, but to me the key issue, apart from the other legal
arguments I made, is whether the government can show the
motivational element.  Whether they can show that Ms. Waters
intended to take an action to intimidate government.

Not whether coconspirators of a conspiracy count for which
the jury didn't find her guilty had that intent, not other
people accomplices.  But what was Ms. Waters intent?  Has the
government come in with clear and convincing evidence that Ms.
Waters had the motivational element of the terrorism
enhancement?  Because that's what the Ninth Circuit says they
need, clear and convincing evidence, because of the completely
disproportionate impact in sentencing that the terrorism
enhancement has.

The only evidence that the government cites to as evidence of Ms. Waters' motivation is, in their sentencing memorandum they cite to Jennifer Kolar's testimony that "we as a group," meaning the Book Clubs, the various training groups that Ms. Kolar participated in, "We as a group decided to move into dealing with genetic engineering issues and we decided to target Toby Bradshaw's research." That's the first bit of evidence that they point to.

Well, "we as a group" means the training sessions, the Book Club meetings, that the testimony was very clear that Ms. Waters never attended, she wasn't a part of. And the jury's verdict refusing to find her guilty of the conspiracy count shows that you can't charge Ms. Waters with what the Book Club wanted to do.

The second piece of evidence are the communiqués that were issued. The communiqués that Lacey Phillabaum wrote after the arsons where Lacey Phillabaum for the first time found out what was going on down at the Jefferson Poplar Farm, the other action, and she sat down with some of the other people and wrote these communiqués. She testified that Briana Waters wasn't there. There was no evidence that Briana Waters knew anything about these communiqués, what was going to be in them, what the focus was. And again, the fact that she wasn't convicted of conspiracy means that you can't charge her with knowledge of what the coconspirators were doing or the

1  coconspirators' motivations.

2      Now, Judge Aiken, down in Oregon, dealt with the terrorism
3  issue.  Actually, she had a full day hearing on the legal
4  arguments.  But the big difference between the Oregon cases
5  and Ms. Waters' case is that the defendants in that case pled
6  guilty and admitted facts sufficient to find a terrorism
7  enhancement.

8      Yesterday I filed under seal, because it was a sealed plea
9  agreement, Suzanne Savoie's guilty plea statement.  That
10  guilty plea statement, Ms. Savoie admitted factually the
11  elements for the terrorism enhancement.  She admitted that the
12  goals of the conspiracy were to intimidate the government and
13  to retaliate against the government.

14      All the other people down in Oregon -- I filed one, or
15  attached to my memo Daniel McGowan's guilty plea statement,
16  but I believe that Zacher's and Block's had identical
17  language.  They admitted also the elements of the terrorism
18  enhancement.

19      So those cases are completely different than this case
20  because those people admitted that what they did was intended
21  to influence the course of government.

22      Here we had a trial, and the jury didn't convict Ms.
23  Waters of conspiracy.  I guess, given their failure to convict
24  on conspiracy, I'm asking the Court to have respect for that
25  jury verdict, to trust that those 12 people knew what they

1    were doing, and they rejected the government's arguments.

2        So at this point, the only thing that Ms. Waters is being

3    sentenced for is being an accomplice to one arson, on one day

4    in 2001.  There are two jurisdictional basis for that one

5    count, for that one act, but it's only one act.  We don't know

6    what the jury found Ms. Waters' motivation to be.  We don't

7    know that.  That wasn't something that they were asked to

8    determine.  And because they didn't find her guilty of

9    conspiracy, you can't give her the terrorism enhancement

10   because there's no evidence as to what Ms. Waters' intent was.

11       Now, the terrorism enhancement is important not just

12   because it completely skews the sentencing structure, but it

13   also has significance for the Bureau of Prisons and has

14   significance as to how Ms. Waters is going to be treated by

15   the Bureau of Prisons, what her custody status will be, and

16   what will happen maybe next year in a different political

17   climate or a year after that.  We don't know.  But if the

18   Court finds a terrorism enhancement, I can assure the Court

19   that the conditions of confinement are probably going to be

20   more severe for Ms. Waters than if the Court doesn't find it.

21       So it's significant, not just in terms of skewing the

22   sentencing scoring, but in terms of the conditions of

23   confinement.

24       We're dealing with one person today, Ms. Waters; we're not

25   dealing with the ELF.  You know, Mr. Bartlett talks about the

Street of Dreams arsons.  There could have been nothing worse
for Ms. Waters than for that to have taken place.  That is not
something that Ms. Waters ever wanted to happen.  She had
obviously no part of it, and it is really insulting to say
that her going to trial encourages that type of behavior.

That's not who Ms. Waters is.  She will tell you in a few
minutes that she does not want to be a martyr for anyone's
cause.  The fact that there are people out there -- and we
don't know that it was the ELF that set that fire.  I mean, we
simply don't know anything about it.  I'm not privy to any of
the investigation.  But that fire was a disaster for Ms.
Waters, and it contributes to the climate of fear.  And, yes,
there is a climate of fear in this country about terrorism
cases.  And did that have an effect on the trial?  Yeah.  That
climate of fear clearly had an effect on the trial.

You know, true, the jury didn't return verdicts on
everything the government was asking for, but in other
circumstances, maybe the jury would have found Ms. Waters not
guilty, but there was this climate of fear in this country
about terrorism, and those fires out in Woodinville
contributed to that.  That's not something that we in any way
condone, and we believe that it was very, very damaging to Ms.
Waters.

So you have to look at Ms. Waters not as a representative
of the Earth Liberation Front, but as a person, as a full

person.  A person who's being sentenced for something that happened seven years ago.  Someone who's very functional in the community, who has many ties to the community.  And the Court does have the power to impose probation.  The Court has that power.

The government has poo-pooed that.  They haven't given any legal analysis to the fact that the statute, as written, does not preclude the Court from suspending the mandatory five years in prison.  Other statutes, even in Section 844, talk about how the Court can suspend mandatory minimums.  The mandatory minimum drug sentences have a provision about how the Court can suspend it.

844(f) and (i), mandatory minimums don't have that language in it.  The Court has the power to impose probation. I suppose, in this environment, the Court can even impose the ten years that the government is seeking and suspend a portion of that.  The Court could suspend three years, the Court could suspend five years.  The Court has incredible discretion as to the type of sentence that they can impose, and can tailor that sentence to the individualized issues that pertain to a particular defendant.

Now, in terms of calculating the guideline range, the first step in the sentencing process.  I have made objections in our materials to the government's and the U.S. Probation Service's calculations.  We dispute some issues about the

value of the building.  Do we use the value that the
University of Washington itself gave, the 1984 value adjusted
for inflation?  That changes the sentence by one point or so,
or the calculations by one point.  I'm not going to spend much
more time on that.  We believe that the sentence can be
adjusted -- the guideline calculations can be adjusted
downwards based on other factors.

Family circumstances, you know, is correct.  Mr. Bartlett
says there's no evidence that Ms. Waters loves her daughter
more than he loves his daughters or I love my daughters.  And
I think sometimes in our judicial system, we get anesthetized
to the human costs of mandatory incarceration.  There are a
lot of people that come through the court with small children
who go away for long periods of time.  There's no question
about that.  And sometimes as lawyers or judges, we become
anesthetized to that.  We forget what the true human impact is
of those sentencing decisions because we're so used to,
particularly in the federal system, to pass out sentences in
five-year increments.  There's a whole series of mandatory
minimums, five years for this, five years for that, and we
forget what the impact of that is on people with young
children.

I have to look back at myself, when I represented Ms.
Waters, I had to look back at myself as a lawyer where I've
talked to clients about plea bargains in the past and they

say, well, I have a young son, and I say, well, you know, you

really need to take this deal and go away for four years to

avoid being sent off for a much longer period of time.  And I

wonder if I've been hardened myself where I've not thought

about the effect that that has on young children.  And I have

to think, you know, have I been insensitive, possibly, because

of race and gender issues, or class issues, that I have not

paid attention to that?

But the effects are there.  And in the past, those

effects, we brush those aside because of the mandatory nature

of sentencing.

We're in a new era.  Things have changed since the Supreme

Court issued it's decision a few years ago.  We no longer have

to callously disregard people's children in the mix when we

are sentencing people.  We don't have to do that anymore, the

Court doesn't have to do that anymore.

And should we think about the effect of prolonged

incarceration on a three-year-old child?  Yes, we have to

consider that.

Is it extraordinary?  Well, I agree, it's probably no more

extraordinary than in other cases where people have young

children, where they are mother's of young children.

Is it humane to consider that?  Yes.

Is it compassionate to consider that?  Yes.

Is it just to consider that?  Yes.

1    And so I think that the family circumstances need to be
2    considered by this Court, and adjust the sentence guideline's
3    range downwards.

4    Other things, such as good works.  The Watch Mountain
5    campaign, it wasn't just a college project.  It contained Ms.
6    Waters' life for a significant period of time.  She helped
7    other people.  It wasn't just she helped the town prevent the
8    town from being obliterated by having the old growth forest
9    cut down.  It was a peaceful campaign.  It was a campaign that
10   brought together people from diverse backgrounds who
11   ordinarily wouldn't be getting along, and it worked.  It was
12   successful.  And the film documented this peaceful, nonviolent
13   campaign to promote that model of social change around the
14   country.

15   So it wasn't just a college project, it was something of
16   significance.  And when we're dealing with sentencing, this is
17   like "This is Your Life" where everything comes in.  This is a
18   piece of Ms. Waters' life that was important.  She wasn't just
19   a college student.  She was doing something for society.

20   Everything that she's done down in the Bay Area, the
21   probation department said, well, a few benefit concerts.
22   Well, these letters show more than a few benefit concerts.  It
23   shows a consistent concern for the affairs of others.  A
24   concern for senior citizens, a concern for refugees in
25   different parts of the world.  Ms. Waters didn't have to do

any of those things. She didn't have to spend her days going
to senior citizen centers and playing the violin for them.
She didn't have to play the benefit concerts for refugees.
She didn't have to do that. That's not just what ordinary
people do. It's what she did. It shows her commitment to her
community.

Is she entitled to get consideration for that at
sentencing? Yes. That's what we are here for. We're here to
figure out what sentence she should get based upon who she is
and what she's done. Does that reduce her sentence under the
guidelines? Yes.

Post offense rehabilitation. Well, it's hard to talk
about rehabilitation when the position is I didn't do
anything. But even assuming the government's correct, giving
credence to the jury's verdict, you have to look at what Ms.
Waters has done in seven years. Has she been out with other
ELF people? Lacey Phillabaum and Stan Meyerhoff spent the
last seven years together. Ms. Waters didn't have any
partners that were part of the Earth Liberation Front. Does
she have a secret hidden arms cache, as Mr. Thurston and Ms.
Gerlach and Mr. Meyerhoff had? No. Was she in the country
illegally with fake passports or identification as Mr.
Thurston was? No. Was she involved in drugs for the last
seven years as Chelsea Gerlach was? No.

So you have to look at what she's done and say, well,

given -- let's assume, assume the government is correct for
2001, where is she today? Has there been post-offense
rehabilitation? Is she entitled to ask the Court to adjust
downward the guidelines? Yes. Clearly under the case law
she's entitled to do that. So we ask that the Court can and
should adjust the guidelines downward.

And I think that when you look at all these things, you
are trying to calculate the Sentencing Guidelines, you put
aside things that she wasn't convicted of and you put aside
the conspiracy charge, I calculated the range of six to twelve
months with a level of ten.

So then you look at the 3553 factors, and you look at
comparability and proportionality. And then you really do
have to look at all the other sentences for related cases, or
what the government claims are related cases, and that
includes the Oregon cases.

If you look at all of the sentences that have been
imposed, the average sentence is one to two years per arson.
If you look at what people in Oregon got and you look at
people up here, the average, they tend to be in the one to two
year range per arson. Jennifer Kolar was involved in four,
maybe five arsons. She trained the Book Club in secret
communications, she built devices and placed them herself. A
core member. Her plea was to a seven year range.

Stan Meyerhoff, you know, dozens of arsons. Attempted

assassinations, continuing criminal activity, spying on Naval
installations and the like.

Again, basically one to two years per arson. That's the
pattern. True, a lot of those people cooperated. But then if
you weigh their cooperation against other factors unique to
them, which don't exist in this case, such as integral roles
in the Earth Liberation Front, writing the arson manual and
publicizing it on the Internet, arms caches and the drug use,
all those things that a lot of those people in Oregon had,
that balances out against that cooperation.

And so even though, even assuming the government's
calculations on obstruction, which we disagree with, but even
assuming that's correct, the guidelines range is still not
that much different than what we're asking for.

If you say one to two years for arson for someone that is,
you know, integrally involved in the Earth Liberation Front
and has done all the things Stan Meyerhoff has done, well, you
balance that against his cooperation and you end up, for
someone like Ms. Waters, with the one to two years. And
that's why we asked the Court to impose five years and to
suspend three-and-a-half years of that.

That's proportionate, it's fair, it takes into account her
family circumstances, it takes into account everything that
she's done in the last seven years that we ask the Court to
give her credit for.

I just have a few other minor points I would like to deal with at the conclusion.

I notice that the presentence report from the probation department asks for a computer ban in the conditions of supervision for post-release supervision.

There's nothing about this case that would justify that. I have cited cases in my memo that under the Ninth Circuit case law you can't impose those restrictions, and I would ask the Court not to impose those in terms of conditions of supervision.

In terms of the Bureau of Prisons and placement. It's very important to Ms. Waters that she be placed in Dublin, in California. Her family is down there. Even if she is serving prison time, she can still see her daughter during visits.

Recently her husband has been up -- or Mr. Landgraf has been up here with Kalliope and they've had some visits at the FDC, but he has to go back to California, and it would be very, very bad for Kalliope if she couldn't see Ms. Waters at all.

Ms. Waters' release community is down in the Bay Area. Her support community is there. Her father, who is aging and has some illnesses, is down there. There's no reason not to recommend placement at Dublin.

Suzanne Savoie apparently is in the camp unit, and it is probably doubtful that Ms. Waters would end up in camp, and so

1   they can still be separated.  I would ask the Court recommend

2   placement at Dublin, and if the Bureau of Prisons doesn't do

3   it, well, then I guess they won't do it.  But I would ask the

4   Court to not treat Ms. Waters any differently than anyone else

5   who comes to court and asks for a placement at a specific

6   institution.

7        I have also asked the Court to sign an order of correcting

8   the presentence report.  The presentence report will follow

9   Ms. Waters to prison.  If there are factual allegations in the

10  presentence report that are not necessary for the Court to

11  resolve when imposing sentence, such as the allegations about

12  Susanville, I would ask, as the rule requires, that either a

13  new presentence report be issued that deletes those references

14  or that the Court enter an order that is attached to the

15  presentence report saying the Court is not finding those

16  factors.

17       In terms of an appeal bond, I don't know if the Court

18  wants to hear my presentation now or after sentencing on that?

19            THE COURT:  We will hear it at that time.

20            MR. FOX:  After sentencing?

21            THE COURT:  Yes.

22            MR. FOX:  Okay.  So basically, Your Honor, we're

23  asking the Court to sit back after three months, after a

24  contentious trial, to look at what the jury convicted Ms.

25  Waters of, and to sentence her in accordance, not what the

government hoped the jury would convict her of, but what she was actually convicted of. That's what I would ask the Court to do, and I appreciate it.

Thank you.

THE COURT: Thank you.

Let's take our morning recess, and then we will continue. All right.

THE CLERK: All rise. Court is at recess.

(Recessed at 10:30 a.m.)

THE COURT: I have heard from Mr. Fox now.

Ms. Waters, as a defendant, you have a right to speak to your situation here as to what's taken place as to sentencing, so anything you want to say, now would be the time to do that.

THE DEFENDANT: Is it okay if I use my notes?

THE COURT: That's all right.

THE DEFENDANT: Judge Burgess, I'm very grateful to be able to have this opportunity to talk to the Court. There have been so many things that so many people have said about me and written about me, and a lot of these people don't actually know me, so I'm really happy to be able to speak the truth. And it's tempting to -- I want to respond to a lot of things that the prosecution said, but I know the goal is not to reargue the case, and I just want to talk about who I am.

I don't want to go into too much about Mr. Bloom because we've already talked about him today. But basically I feel

that he is not me, and just because he's my lawyer doesn't
mean that we are one person.  And just because I hired him
does not mean that I knew everything that he was going to do
in the trial, and I did, I did disagree with his approach in a
number of ways, and that's why I asked him not to be here
today because I just thought it would be better.  But he is
not who I am, and that's why I am addressing the Court, to
tell you who I am.

I'm a mother, as you know.  I'm a daughter and a partner
and I'm a friend and I'm a teacher, and I'm not a terrorist.

I ask you to bear with me.

I am a person who lives in peace.  I do believe in
spreading compassion in the world, not hatred.  I do believe
that our society and our planet is in need of healing, but not
through violence or force of any kind.

The one thing that I do agree with the prosecution about
is the seriousness of this crime.  I don't agree with it in
any way.  I don't endorse it.  I think that it was really
wrong, and I do pray for the victims that were affected.  I
hope that they are healing from the trauma and the stress that
it caused them.

I also pray for the people who did lie on the stand to
save themselves.  It's amazing to me what people can do when
they are scared.

Your Honor, I am disappointed about the jury's decision,

but I know that you are bound by it today and I respect that.
I wish to make it clear that I am not the person that the
prosecution has painted this evil, negative picture of.  And
I'm also not the martyr that other people might praise or
support.  They all seem to think that I'm someone that I'm
actually not.

I believe that I am a valuable, contributing member of my
community and society, and I don't agree with property
destruction or violence of any kind to further a cause, and I
don't want to be a martyr for any cause.  My cause is to take
care of my family.

And I know that this is not about how much I love my
daughter because everyone loves their kids.  But I am her
mother and she does need me, and every day that I am away from
her is more pain than I can describe.

I know that you have read a lot of letters about my life
and about who I am, and so I'm not going to go into a lot of
detail about what I have done because there's already been so
much written about that.

But I just wanted to say that before I was incarcerated,
what seems like a very long time ago, I spent almost all my
time with my daughter caring for her and never spent one night
away from her.

I also spend my time teaching music to children and to
adults and participating in a lot of activities with my

neighborhood parents group.  You know, I am not Mother Teresa, but I think we do do a lot of things to help people: helping to cook meals for families in need and education, you know, educational events for our children, as well as advocating a cleaner and safer neighborhood to live in.  I've obviously not been able to do any of these things from prison and will not be able to.

I am not begging for your mercy, but I am asking you to consider the facts of my life in your sentence.  I'm asking you to consider everything that you have read when deciding how long I need to be separated from my family and my community.  Hundreds of people will be affected by your decision, and the most important one is, obviously, my daughter.

My greatest desire is to care for her and nurture her throughout her childhood.  And I know that my life is more valuable in society rather than in prison.

Your Honor, I do ask that you consider everything that I have said in your sentencing decision, as well as in your decision whether or not to release me pending self-surrender to whatever prison I am assigned to.  It would make such a tremendous difference.  I can't even describe what kind of a difference it would make to be able to prepare my daughter before serving my sentence.

I have no desire to flee, which would obviously create a

1　lot more pain for everyone involved.  I just want to put this

2　experience behind me and move on with my life.  Therefore I

3　will show up as I am required to by the Court, as I have

4　always done in the past throughout the course of this case.

5　　　I appreciate your time for listening to me, my words.

6　　　Thank you.

7　　　　THE COURT:  Now, Mr. Thomas, you prepared the

8　presentence report.  Anything to add to that report in any

9　way?

10　　　　THE PROBATION OFFICER:  No, Your Honor.

11　　　　THE COURT:  Now, it was mentioned, Mr. Bartlett,

12　about someone from the University of Washington.

13　　　　MR. BARTLETT:  Your Honor, one of the victims in the

14　case, Linda Chalker-Scott, is here and has asked for just a

15　few moments of the Court's time.

16　　　　THE COURT:  All right, have her come forward.

17　　　I will have you identify yourself for the record, please.

18　　　　MS. CHALKER-SCOTT:  Thank you, I will.  My name is

19　Linda Chalker-Scott.

20　　　　THE COURT:  Okay.

21　　　　MS. CHALKER-SCOTT:  Thank you, Your Honor, for

22　letting me speak.  I also submitted a written statement to

23　you, but today I want to talk about something personal rather

24　than professional and how this has changed my life.

25　　　From 1997 to 2004 I was an associate professor at the

Center for Urban Horticulture.  I'm one of those whose losses were minimized and dehumanized by the arsonists and their apologists who called them "collateral damage."

Just after 5 in the morning of May 21, 2001, the radio reported a three-alarm fire at the Center for Urban Horticulture.  My first reaction was that I had left something turned on in my lab and this was my fault.  I turned to my husband, Jim, and said "I've got to go in; tell the kids what happened when they wake up."

I was the first person to arrive at the Center among those of us who worked there.  Firefighters and police were already there, and I stood alone and helpless watching the smoke and flames billow from the roof.  Seeing the blackened hole that was once Toby Bradshaw's office window, I was actually relieved that the fire obviously hadn't started in my lab. It was also obvious that I wouldn't be teaching class that day, so I began making phone calls.

My mother, Charlotte Chalker, drove up from Tacoma to keep me company (she's here with me today ).  As other faculty, staff, and students arrived, we huddled together watching the destruction.  Once the fire was out, my mother and I approached one of the firemen and begged him to see if my childrens' framed artwork in my office was salvageable.  Since mine was only two doors away from Toby's office, I didn't hold out much hope.  So when the fireman emerged with all the

artwork, sooty but otherwise undamaged, I burst into tears.

In the four years prior to the firebombing, my son and daughter would be dropped off at the Center after school while I finished my work. When the weather was good they enjoyed exploring the gardens, wetlands and woods around the Center. Other times they would visit faculty, staff and students or do their homework. They felt safe and secure at the Center, and regarded the people there as part of their extended family.

This routine, and their sense of security, changed permanently on May 21, 2001. They couldn't come to the Center any longer, because there was no place to go and I was busy with salvage and cleanup. Jim and I had to rely on after-school programs and the hospitality of classmates' families to take care of our 7-year-old son Jack and our 11-year-old daughter Charlotte. They were no longer able to visit their friends at the Center, and they saw much less of me during the many months of extra work that the firebombing created.

On Briana Waters' web page is this statement regarding her trial and conviction: "The stress of this situation has been enormous on both Briana and her family, especially her daughter." I have related my story to the Court to point out that I, and my family, and especially my children, suffered distress as a direct result of the senseless firebombing planned and carried out by Briana and her accomplices. They

destroyed my workplace, they forcibly stole from me and my
family our time together, and they shattered my children's
faith in the inherent goodness of people.

This is only one story of 50 or more out there of how very
real impacts had an effect on very real people. And I would
plead the Court, please don't allow these impacts to be
further minimized and dehumanized by the contentiousness of
only one act.

Thank you.

THE COURT: Mr. Fox, I believe you had mentioned
that -- let me get the name?

MR. FOX: Marilyn Waters.

THE COURT: Marilyn Waters.

MR. FOX: And John Landgraf.

THE COURT: Right. Let me have you just state your
name for the record.

MRS. WATERS: Marilyn Waters.

THE COURT: All right.

MRS. WATERS: Your Honor, thank you for hearing me
speak today.

I'm here, too, on behalf of my daughter, Briana Waters.

With all my heart I plead her goodness. She's really a
good person. And the way that the government has categorized
her is not who she is. It is not who she is.

She is a gentle woman, and I join the 250 individuals who

have written to you, Your Honor, to tell you about who they

know.   They know her as a kind and dear friend, a talented

musician, a skilled violin teacher, a good neighbor, and a

contributing member of her community.

They took the time to write those letters.   A lot of

people wouldn't do that if that person really didn't mean a

lot to them.

Most importantly, Your Honor, I come before you on behalf

of someone who cannot be here to speak to you for herself.

Because she is only three years old, and she cannot speak with

you, Your Honor, herself, and I come before you to speak for

her.

I hope you can see this.   I thought I was going to be

closer.   This is my granddaughter, Kalliope.

This is Briana with her at Christmas.   You can see

Briana's face.

Of course, all mothers love their children.   There is no

question about that.

What I have observed, what I find extraordinary about

Briana's mothering is her patience.   I have never seen a

mother more patient with her child than Briana, and it truly,

truly is extraordinary.

When she first found out that she was pregnant, she

completely embraced the prospecting role of motherhood by

reading all kinds of books about taking good care of yourself

1  when you are expecting, and then also reading about parenting.

2  She really embraced it fully and took the role of motherhood

3  very seriously, unlike many women who take it for granted, and

4  who even think of parenting, the role of parenting, as it is,

5  very difficult and burdensome. But she never regarded

6  parenting that way at all. She considered it a privilege and

7  something that she needed to do the best possible job that she

8  could do.

9     Ever since Kalliope was born she dedicated herself to the

10  care and nurturing of her child. She chose to be the primary

11  caregiver of her child, not to go out and work and put her in

12  daycare. And she had to make sacrifices to do that.

13     She was a violin teacher in the evening when her partner,

14  John, could care for Kalliope. But she spent all of her time,

15  because that's how important she regarded her role as

16  Kalliope's mother.

17     I feel grateful and blessed to live in a country where we

18  have a judicial system within which you have the latitude and

19  the power to decide Briana's faith here in your sentence. You

20  have the latitude to sentence her to the minimum of five years

21  and then suspend that to whatever period of time you consider

22  appropriate. And I am very grateful that you have that

23  ability to do that, Your Honor, and I humbly beseech you to

24  consider that sentence for her.

25     I also humbly beseech you, Your Honor, to release Briana

1  until the appointed report date so that she can prepare

2  Kalliope properly for their separation from each other.

3     Thank you, Your Honor.

4        THE COURT:  All right.

5     Then I will hear from John Landgraf.

6     I will have you state your name.

7        MR. LANDGRAF:  My name is John Landgraf.  Can you

8  hear me?

9        THE COURT:  Yes.  Go ahead.

10       MR. LANDGRAF:  Good morning, Your Honor, Judge

11 Burgess.  I address you in this way because I'm speaking

12 directly to your highest self, that part of you which guides

13 your decision making and fills you with enough righteousness

14 to become a judge and decide what is right and what is wrong.

15 Your sense of compassion in the bounds of your heart is what

16 I'm speaking to.

17    I ask that you look beyond the negative ideas that have

18 been projected onto Briana and try to get a deeper

19 understanding of who she is.  I ask for myself and on behalf

20 of our daughter that you act out of compassion as you

21 determine the sentence today.  Consider her potential as a

22 mother, as a wife, as a teacher, as a helper of others, what

23 she can bring to this world given the opportunity.  She's a

24 truly loving human being.  I have come to know her very well,

25 and I can vouch for anyone, as much as Kalliope, that she is

truly loving.

I'm not asking for special treatment, only a just reading of the circumstances.

In addition to the hundreds of pages of legal documents that you have had to read in this case, I trust that you have also personally read each of the letters received on behalf of Briana and have gained further insight into her character by reading them. Understand, I am talking to you because you are in power to make a decision for the life Briana Waters, the woman who I love, who has blessed me with her spirit and love and miracle of our daughter.

Furthermore, I humbly ask that you give her the opportunity to prove her honesty and self-surrender. I promise you in this court, and the prosecutors, that I will enable her transportation to that facility, whatever date is called for.

While detractors might argue my creditworthiness, I've had difficulty paying some bills, I say to look at my track record in this whole case as evidence of my consequence and support of Briana's desire to resolve this matter responsibly. From the very first day when Special Agent Ted Halla approached me on a first name basis in front of our home looking for Briana, I steadfastly support her in dealing with this challenge of maturity. I've been with her and helped her make every flight to Seattle to meet with prosecutors, attend arraignments,

hearings, and finally, every single day of the trial in this court, and the support will continue beyond the day when she is finally released to rejoin her family after serving the sentence you give her today.

It would be an immense help to our family, myself and Kalliope, if she were granted the opportunity to self-surrender, for time to explain personally to her daughter where she is going and for how long and that that day will eventually come for us to be reunited as a family.

Additionally, to bring some order to worldly affairs and to prepare to serve our sentence.  We are inextricably linked and our affairs are in a state of disarray.  Frankly, I need her help in dealing with things and stabilizing our family infrastructure and getting things in order for Kalliope for the long run that we are facing.  Our family has been torn apart and I'm left out here in the world trying to put the pieces together while being a father, focussed on our daughter, and being present there every day, being strong and loving and not falling apart by the weight on my shoulders. If I look tired, it's because I am.  There have been many sleepless nights since I was last in this court, and there will be, undoubtedly, many more.

Her sudden departure has left me sitting with immense emotional pain.  While there may seem to be nothing you can do to alleviate the deep sadness of myself and daughter, any hope

1   you can give me that we will be together again as a family in
2   a more reasonable number of years than what the prosecutors
3   call for gives me hope.  It helps me to be a better father to
4   be filled with hope and to share that with my daughter.  I
5   would have never guessed that she would learn to count the
6   days of the year by counting down the months until her mother
7   is released from prison, which is unfortunately where we seem
8   to be now.

9       I am resolved to be a great father and strive through
10  every minute of every day to make the best of a situation for
11  our daughter, for Briana, and for myself.

12      While in the eyes of this Court Briana and I are domestic
13  partners, I would say in the eyes of God we are so much more
14  than that term implies.  We are bonded at the highest level,
15  and we've made a spiritual commitment to be a family together.
16  That spiritual time transcends the physical separation that we
17  now live with and is a reminder that this, too, shall pass.
18  The day will come when this is all behind us, time served, and
19  we are actually able to move forward together.  I pray that
20  will happen before Kalliope is a teenager, and sooner.  I do
21  not wish for her to grow up feeling like an enemy of the
22  state, but rather filled with hope for a better future.

23      I ask that you consider the circumstances of our lives and
24  exercise grace in sentencing Briana Waters.  Without hope and
25  faith the system crumbles from eternal decay.  I wish to

1   impart to my daughter a true sense of hope and faith in this
2   world for the future.  I do not wish her to grow up
3   disillusioned and hopeless but rather optimistic and
4   visionary.  That is what we need for our civilization to
5   survive and evolve in a healthy way for future generations to
6   walk this earth.
7       I ask you to help me give her faith and to give her
8   personal order to the world she is born into and hope for the
9   system that governs it that they may develop compassion and
10  better serve their fellow man, woman, and child.
11      To this end, I ask finally that you exercise your strength
12  of discernment and right to pass judgment in this courtroom
13  with benevolence.  I ask that you give a sentence today that
14  is as lenient as you are able, the mandatory minimum in this
15  case.
16      Thank you for the opportunity to address this Court.
17          THE COURT:   Okay.
18  So I have given everybody a chance to talk.   Anything else
19  that needs to be added here?
20          MR. FOX:   No, Your Honor.
21          THE COURT:   All right.   Then the Court has the
22  unfortunate position, I guess, to sit in the way that we are
23  called to sit in judgment after some other judgment has been
24  passed -- of course, that's the verdict of the jury, in terms
25  of what this defendant has done.   That's what the Court is

here to look at, what that is, and to determine what price, I guess, is to be paid for that conviction, but also involved in conviction, of course, is the conduct surrounding the conviction.

It's hard to talk about this like it's, when you say arson and leave it there. It doesn't really define what's happened here. We're talking about the whole matter, all the facts, all the evidence that the Court heard during the course of trial to try to fashion, if you will, a sentence based on that conduct. And the Court's called on its knowledge of what took place here, as well as what's contained in the presentence report, and to make that kind of a determination.

The first thing the Court is called on to do is to determine what guideline range is to be applied to this case, which doesn't necessarily determine the sentence, but since the law has changed as to the status of the guidelines, as to the mandatory and discretionary, as outlined, the Booker and Fanfan cases and that sort of thing.

In looking at the guidelines dealing with those, the level of the offense dealing with the conviction, and as well as an adjustment based on the area of the law that's dealt with terrorism, and that's where the matter goes from a level 24 to a 36. Mr. Fox has raised questions as to that because Ms. Waters does not stand convicted of conspiracy, that that enhancement should not apply.

I don't think that you have to have a number of folks to come to the conclusion as to whether the act would fit within the description of conduct.  So the Court is not of the opinion that that enhancement shouldn't be.  I heard the evidence, and the facts, as I heard them, convinced me that when I take the conduct into consideration, that the conclusion I come to is that that enhancement would apply, and that's the enhancement that the Court will accept and utilize.

There's another enhancement called adjustment for obstruction of justice.  This one is problematic in some ways because it talks about that being false testimony in the course of trial, and the false testimony seemed to come by way of bringing you to some kind of conclusion that if a person testifies and a jury rules or decides otherwise, then that obviously has got to translate to being a lie, I guess, and if you don't get up and agree with what's being presented, then you get the enhancement.

That seems to be, as to the right to defend yourself and a lot of other issues that it goes to, would tend to be something that would be taken to a level that I don't know how legally it necessarily can bring it to that conclusion by saying -- I guess, if you take it, whether or not I don't believe you are telling the truth, it's automatic it has to be something else, and when there's no way to really decide that, other than through some, perhaps, quantum leap of some kind.

So the Court is not going to grant that enhancement.  I
don't think that this is a proper place for it in this
particular situation.  And I'm not so sure it makes any
difference, really, because the issue as to the guidelines
being -- I guess would be moot in looking at what the levels
would pencil out to because of the enhancement for the
terrorism, an enhancement that I have granted, that would be a
level of 36, which carries an imprisonment range from 324
months to 405 months.

Well, obviously, the statute has trumped that, and so what
we are talking about now, it doesn't matter, but I guess
record of this thing, and looking at the guidelines, it's
always a matter of mathematics, and the Court is not called on
here to do that.  The Court is called on here to look at the
crime that this defendant has been convicted of and determine
what is a fair and appropriate sentence.  And that's the
bottom line, I guess the things that we do, to give it that
kind of understanding.

So, for the record, the Court is settling on the guideline
range as being a level 36, criminal history category of VI,
and a range of 324 to 405 months.

Now we get to the issue as to what should be the fair and
just sentence under the situation of this case.  Looking at
all of what the Court has heard, all of the relevant conduct,
and that the Susanville matter is another, the due process

1   issue for the Court to take that and to make it, and in light

2   of the fact that nobody testified as to anything along that

3   line, for the Court to conclude that there was involvement in

4   that, and for the due process issue, the Court is not

5   considering that.  The Court has before it this particular act

6   involving the University of Washington that it should

7   consider, in how it involved and how we talked about disparity

8   and a lot of sentences involving folks down in Oregon.  But

9   there's also codefendants involved in this case that testified

10  in this case where there were plea agreements structured under

11  11(c)(1)(C) that would tell the Court a range, and this range,

12  what is based on substantial assistance and all of that, but

13  that is an element of this case for the Court to determine in

14  terms of punishment being meted out in those cases.  If you

15  talk about it in terms of acts, I suppose under this case, one

16  act by -- and by that I mean the University of Washington, and

17  we have Ms. Kolar that pled to three counts of arson and one

18  attempt.  And Ms. Phillabaum, in her plea of guilty, to one

19  count of arson and a count of destruction of property over

20  there in Eastern Washington.

21      So that would mean, seem to be the scenario of the ones

22  that are coming before this court.

23      The others, there's been testimony about what happened to

24  Mr. Rodgers and Mr. Solondz and others that no longer are

25  available for various reasons.  And the Court has all of this

backdrop to determine the sentence. And I've read all of the letters, and they are all over the place, like I mentioned. They talk about some things that I wonder how they could have knowledge of, but they do speak to what they have known from Ms. Waters subsequent to the offense date on the charges brought against her.

The jury heard all of that, and the jury made a decision as to what to believe, what not to believe based on the instructions given by the Court, and they found her guilty of the two counts involving the bombing of the University of Washington in terms of financial assistance and in terms of interstate commerce.

And that's what the Court is here to try to determine, and I've heard the recommendations from Mr. Bartlett saying that it should be ten, and Mr. Fox saying it should be something, I guess around a year, based on the Court's ability, in his opinion, to suspend the mandatory minimum sentence.

Well, I think it's fair to say the Court is bound by, because I don't find any support that would convince the Court that it should suspend the mandatory minimum.

So what the sentence is looking at here is whether this sentence should be ten or whether this sentence should be a five-year sentence. I think that's the conclusion that we can draw at this point.

The language, I've gone through these things, and

everybody, I guess, has been heard by in this matter.  Ms.
Waters talks about "missing my daughter" and things that will
go undone because of what she's facing here.  The University
of Washington is talking about what they have lost there, and
by account, if you look at all the replacement costs and all
of this, it's still around an amount that probation has been
recommending, it's right around six million dollars.  That's
the loss of damage done by what this defendant has been
convicted of.  And the Court can't lose sight of that.

So, the Court has considered this and wrestled with this
case for a long time and in a lot of respects in terms of
trying to fashion what I would consider a fair sentence based
on what's been submitted, and trying to do what Mr. Fox has
said, to make a fair and just sentence based on all of the
participation.  Believe me, that is not the easiest job in the
world to go through and give credit for what they do.
Sometimes you wonder whether there is an answer in terms of
how you meet this definition of fair and just.  How do you
really meet it without going through a lot of your own
experiences, trying to make sense out of no sense, and how you
do what you do because you hope to change something that you
probably won't change.

I don't know where all the insight will come from, but you
have to call on what you know in terms of making evaluation of
people, of the world, and all of that.

1    Sometimes it brings about understanding, but it doesn't
2  make an excuse for anything.  So after you get through all of
3  that, you have to then say, your involvement, you stand
4  convicted, and any time you take any kind of action, there are
5  always consequences for it.  So when you step out in that
6  direction, that's what you face.
7    I think that's what happened here, and I guess the rest of
8  it is up to the Ninth Circuit to determine whether or not the
9  ultimate issue was answered.  As Mr. Fox said, they intend to
10  appeal, and maybe those are the folks that can sit there and
11  make a decision different than what was made here.
12    I know what I heard, and I know how the evidence went, and
13  to that extent this Court thinks a fair sentence in this
14  matter would be a period of six years.  And that's what the
15  Court is going to set in terms of this defendant.  This is the
16  sentence that you will have to serve.  And the Court orders
17  restitution in the amount set forth in the presentence report,
18  and I see that this would be a figure that is justified under
19  the facts, as I understand about this case.
20    There will be a supervised release period of three years
21  following that sentence; that you will pay the special
22  assessment in the amount of $200.  No fine will be imposed
23  under the circumstances of this case.
24    Once you are released, you will be supervised by
25  probation, which means you are to not violate any of their

1  rules and regulations, nor any federal, state, or local laws.

2     You will cooperate in collection of DNA as directed by

3  probation.

4     You are not to have a firearm or any other destructive

5  device.

6     That you will submit to search of your person, your

7  vehicle, your residence, and that sort of thing, to make sure

8  you are in compliance.

9     I mentioned the restitution.

10     You are to provide probation with access to your financial

11  situation, which will show your assets and your federal income

12  tax return and give them the ability to make credit checks and

13  that sort of thing.

14     You are to maintain a single checking account in your own

15  name or with your husband, and work with them so they can

16  understand where your assets may be and where they may lie,

17  and have an account that would give them the right to do that

18  so they can make these kind of checks and make those kind of

19  determinations.

20     If you were to maintain any business enterprise of any

21  kind, you are to make available to probation the nature of

22  that, any documents that may go to that enterprise.

23     You are to expose all of your assets and liabilities to

24  probation and not transfer or waste, give away any property,

25  as there is an issue of restitution here that you are to

1    attempt to address.

2        If you have a personal computer of any kind -- I know

3    Mr. Fox has raised this question -- you are to open that for

4    inspection to make sure that it does not violate any

5    conditions as set down by the Court in terms of probation, and

6    to let them know what's going on there and software that may

7    be utilized in this matter, as you know this case involved the

8    use of computers and communiqués and that sort of thing, if it

9    involves the conduct here that we are talking about.  You are

10   going to have to consent to them monitoring that.  Upon

11   request, they can request, and you are to let them see that,

12   and they can retrieve what data may be there and that sort of

13   thing.

14       You are prohibited from incurring any major debt

15   obligation without approval of probation.  And by that I don't

16   mean the necessaries like food and shelter.  But if you start

17   buying things out of the ordinary that are big ticket items,

18   so to speak, you are to notify them of your intent to do that,

19   and do that, of course, prior to any purchase of that kind.

20       You are to cooperate and furnish financial information, a

21   statement that may be required by the Internal Revenue

22   Service, taxes owing and due, if that become an issue in this

23   case.

24       You are to have no contact with the coconspirators of this

25   in Washington or in Oregon, members of this organization and

1  group that have been testified to, and you heard all the names

2  and places and things that came up during the course of trial.

3      As I indicated, you have no ability to pay a fine, and no

4  fine will be imposed.

5      A special assessment amount of $200 will be imposed as to

6  count 5 and 7.

7      It's been mentioned about recommending where you will be

8  housed. I have no problem with the recommendation being made.

9  If Dublin is the place, that's fine. I expect that the Bureau

10  will take care of everything as to not have this in a way that

11  would be a conflict of some kind. I don't know the size of

12  this institution, whether two could coexist down there or

13  whatever the case may be. I don't know about that, until

14  there's a problem. But the recommendation will be made that

15  at least you should be housed at a place close to home where

16  you can have family and visit your daughter and that sort of

17  thing. So that's the intent of the recommendation, so you

18  have that right and you get the opportunity to do that.

19      Were there any other requests that I need to address at

20  this time?

21      MR. FOX: Your Honor, I had asked the Court to, since

22  the Court's not finding the Susanville incident, I would ask

23  that the Court, that those references to that incident be

24  deleted from the presentence report, or that --

25      THE COURT: I think it should be, because the Court

1   is not making a finding one way or another. So it won't be

2   confusing in any kind of way in the matter, I will ask

3   probation to take any reference to that out.

4           MR. FOX: The other proposal that I had was to remove

5   references to joining the family, the conspiracy, because

6   that's not what she was convicted of.

7           THE COURT: That's part of the relevant conduct that

8   we talked about. The Susanville bombing, I'm going to, from a

9   due process standpoint; not that.

10           MR. FOX: Okay. So Mr. Thomas will -- thank you.

11       The other issue, Your Honor, with regards to Dublin. I

12   had proposed an order that I filed the other day that sets out

13   the reasons, and under the statute, asking the BOP to explain

14   to the Court why they wouldn't honor that. I think statute

15   says if the BOP doesn't honor it, they should say --

16           THE COURT: I think they will tell me if they somehow

17   can't accommodate me on my recommendation, so I don't think I

18   need an order to that.

19           MR. FOX: Then we will just attach it to the

20   judgment, the -- the designation is going to be handwritten

21   in?

22           THE COURT: It will be in the judgment itself;

23   recommending that, if at all possible, that that's where she

24   will be housed.

25           MR. FOX: Okay.

1    THE COURT:  Or at least in an alternative way, that

2  any facility close to her home would be considered, you know.

3  I don't know if Dublin or some other place may serve the

4  purpose, but I don't want to start running the Bureau of

5  Prisons.  So they understand what I'm saying, and so I will

6  let them do their job.

7    MR. FOX:  The final issue -- I don't know if the

8  Court wants to deal with this now, or deal with it in context

9  with our motion for an appeal bond, that Ms. Waters be allowed

10  to self-surrender.

11    THE COURT:  I don't think that's an issue before the

12  Court today.  I say it for this reason.  Nothing has been done

13  that would change what came down from the Ninth Circuit.

14  Until something that would give some reason to change that, I

15  would say that it will stand as entered.

16    So unless something's come before the Court that would

17  cause this Court to revisit something in terms of new

18  evidence -- the only thing that has been raised by way of

19  letter or otherwise is that you mentioned about Ms. Kolar and

20  this file ending.  Well, the Court hasn't disposed of any

21  issue there, so nothing has changed.  Nothing that the Court

22  knows of has changed.

23    MR. FOX:  May I address that and address the appeal

24  bond issue at the same time?

25    Your Honor, there's two issues.  One is self-surrender and

1   the other is our motion that I filed for an appeal bond.  I

2   understand what the Court just said, nothing's changed.  I

3   believe, Your Honor, that there are a few circumstances which

4   have changed.

5       Under the government's calculations, Ms. Waters was

6   looking at --

7           THE COURT:  What you are asking me now is probably to

8   do a detention hearing, and the Court's not -- there was no

9   detention hearing set for today.

10          MR. FOX:  I filed a motion, a separate motion for

11  appeal bond.

12          THE COURT:  I understand, but what would that be

13  based on if I have gone through a detention motion saying

14  that --

15          MR. FOX:  Can I explain to the Court what I believe

16  the changes are?

17          THE COURT:  All right.

18          MR. FOX:  The Court has now imposed a sentence of six

19  years.

20          THE COURT:  Right.

21          MR. FOX:  The government before was saying the

22  maximum sentence was 40 years.  That's what their memo said.

23  There's been a change of circumstances in that any motivation

24  to flee is a lot less given the Court's actual sentence as

25  opposed to what the government was saying Ms. Waters was

1 facing. So we believe there has been a change in

2 circumstances. Ms. Waters is now facing six years in prison,

3 not the 40 that the government -- I believe it was 20, but

4 they were saying it was 40.

5     Secondly, the 250 letters were not part of the record when

6 the case went up to the Ninth Circuit, and those do show

7 extensive community ties that speak to the fact that Ms.

8 Waters is not a flight risk. Those hadn't been submitted

9 before, and we are offering those in support of our motion

10 both for release pending self-surrender so she gets the

11 additional credits with the Bureau of Prisons for

12 self-surrender, and for release pending appeal.

13     Then with regards to the information about Ms. Kolar, it

14 is powerful evidence that will be the basis of a Rule 33, or

15 2255 petition. It changes substantially her position with

16 regards to the likelihood of success on appeal. I know the

17 Court hasn't ruled on it yet, but I'm sure the Court is

18 probably going to get briefing on it. But the fact is, is

19 that this is a material witness who admittedly was deceptive

20 in her testimony by a key piece of evidence. That evidence

21 was a key issue at trial, and we think that ultimately Ms.

22 Waters' chances for reversal on appeal are greater now.

23     So there are those three categories of changed

24 circumstances. So I'm asking that the Court release her

25 pending self-surrender, or to release her pending appeal for

1  those three reasons, in addition to everything else we argued

2  before.

3  　　　　THE COURT:  I understand.  All right.

4  　　Anything from the government on this matter?

5  　　　　MR. FRIEDMAN:  If you would like me to, Your Honor.

6  　　Your Honor, as the Court knows, we have addressed the

7  issue of Ms. Waters' detention or release on bond at

8  tremendous length since her conviction.  It was litigated

9  fully in front of Judge Arnold, it was litigated fully in

10 front of this court, and then briefed and litigated in front

11 of the Ninth Circuit.

12 　　The Ninth Circuit -- at each level Ms. Waters was ordered

13 detained, and the Ninth Circuit affirmed the findings below.

14 　　First off, there's two statutes that apply -- and the

15 Court's familiar with this, I know -- but 18 U.S.C. 3143, to

16 be eligible for detention.  Now that Ms. Waters has been --

17 and released, to be eligible for release.  Now that Ms. Waters

18 has been convicted of a crime of violence, she is not eligible

19 for release.  The statute provides that she shall be detained.

20 　　So it's an even higher standard than applied before.  It's

21 mandatory, and the Court is required to detain her under that

22 statute.

23 　　That takes us to 18 U.S.C. 3145(b), which allows for

24 release if she shows extraordinary circumstances.

25 　　When this started, the extraordinary circumstance was that

1    she's a mother of a young child and she was going to be

2    separated suddenly from the child.  That argument was rejected

3    by both this Court and the Ninth Circuit, and by today we

4    actually heard Mr. Fox say that there is nothing extraordinary

5    about that, that's ordinary.

6        Now we have a different extraordinary circumstance, the

7    likelihood of success on appeal.  This Court found that that

8    wasn't the basis, that there was no likelihood of success on

9    appeal.  The Ninth Circuit affirmed that finding.  The new

10    piece of information to which Mr. Fox refers is a minor point.

11    There's no evidence that Ms. Kolar was deceptive to this

12    Court.  There's been no showing of a likelihood of success on

13    appeal on that, and so Ms. Waters should remain detained.

14        If it were truly important, I expect -- when it first came

15    up, the Court will remember that the defense said dramatic new

16    development; we need to continue sentencing.  After about a

17    week to think about it, they said, no, let's go ahead with

18    sentencing; we will deal with that somewhere down the line.  I

19    think that tells you how important it is and how likely there

20    is to be a reversal on appeal based on that.

21        THE COURT:  Well, I think the issue here is not for

22    the Court to take up today.  Now, you have the right to file

23    your motion.

24        MR. FOX:  I do, Your Honor.

25        THE COURT:  I understand, but the motion is not set

1   for the Court today because obviously we talked about

2   something that I was going to take up.  You are telling me the

3   way, what that means.

4        At this point in time, just from what you say, it's a

5   critical piece, and it may tend to tell the Ninth Circuit that

6   they are going to reverse on it.  I don't necessarily come to

7   that conclusion, but I haven't heard from everybody on that

8   and how to look at that.  She wasn't the only person that

9   testified.  So it was only a piece of evidence utilized in the

10  case.  So the Court has to considered all of that.

11       So what I'm saying, the Court is not going to get into

12  that today because that wasn't set on the docket to be visited

13  because I want -- it's not briefed.  I may even want

14  testimony; I don't know.  I don't know exactly what you have

15  to present other than the way that it was written to me in

16  letter form.  I know it's been filed, but it wasn't filed and

17  set on the docket to be heard today.

18       MR. FOX:  I guess I'm asking the Court, rather than

19  having a separate hearing, I'm asking the Court to make a

20  ruling today.

21       THE COURT:  I will stand by the ruling I already

22  made, and what the Ninth Circuit already made.  It's denied.

23  And then it could be reopened, but you need to get me

24  something to show me, for the Court to decide whether

25  something like that will change my view in terms of an entry

they got as to whether or not something new has come into the case. The letters don't really add that element that you're talking about from what the statute has required. The letters don't do that. They help me to determine what the appropriate sentence should be, but not the issue that you're raising. That's totally a legal issue.

All right. So if there's a judgment to that extent, I will sign it.

MR. FOX: Let me just review it, Your Honor.

MR. BARTLETT: I have provided it to Mr. Fox to review, Your Honor.

MR. FOX: Your Honor, I will pass forward the judgment.

THE COURT: Mr. Fox, are you satisfied now that the judgment being presented comports with the Court's order?

MR. FOX: It does, Your Honor.

THE COURT: With that understanding, this is the judgment that I'm signing.

Ms. Waters, this means this is the sentence that you will be under. But if you feel for any reason I have imposed an illegal or unconstitutional sentence upon you, you have a right to appeal this judgment. And since I am signing it here today, if you intend to do that, you need to do it within ten days of today's date. And that's --

THE CLERK: June 19th.

1          THE COURT:  Okay, within ten days of today's date,

2     June 19.

3          Anything else?

4          MR. BARTLETT:  No, Your Honor.

5          THE COURT:  This will be the judgment.

6     Court is at recess.

7     (Recessed at 11:45 a.m.)

8

9

10                    C E R T I F I C A T E

11     I certify that the foregoing is a correct transcript from

12     the record of proceedings in the above-entitled matter.

13

14

15     /s/  Julaine V. Ryen          June 25, 2008
         JULAINE V. RYEN                  Date

16

17

18

19

20

21

22

23

24

25